# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and | ) | |
| THE STATES OF CALIFORNIA, | ) | |
| FLORIDA, ILLINOIS, INDIANA, | ) | |
| MASSACHUSETTS, MINNESOTA, | ) | CIVIL ACTION NO. 07-461 |
| MONTANA, NEW JERSEY, NEW | ) | |
| MEXICO, NEW YORK, AND | ) | |
| TENNESSEE, and THE DISTRICT OF | ) | JUDGE McVERRY |
| COLUMBIA, each ex rel. LYNNTOYA | ) | |
| WASHINGTON and MICHAEL T. | ) | |
| MAHONEY, | ) | *(Electronic Filing)* |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EDUCATION MANAGEMENT | ) | |
| CORPORATION; EDUCATION | ) | |
| MANAGEMENT HOLDINGS LLC; | ) | |
| EDUCATION MANAGEMENT LLC; THE | ) | |
| ART INSTITUTE OF CALIFORNIA - | ) | |
| HOLLYWOOD; THE ART INSTITUTE OF | ) | |
| CALIFORNIA - INLAND EMPIRE; THE | ) | |
| ART INSTITUTE OF CALIFORNIA - LOS | ) | |
| ANGELES; THE ART INSTITUTE OF | ) | |
| CALIFORNIA - ORANGE COUNTY; THE | ) | |
| ART INSTITUTE OF CALIFORNIA - | ) | |
| SACRAMENTO; THE ART INSTITUTE | ) | |
| OF CALIFORNIA - SAN DIEGO; THE | ) | |
| ART INSTITUTE OF CALIFORNIA - SAN | ) | |
| FRANCISCO; THE ART INSTITUTE OF | ) | |
| CALIFORNIA - SUNNYVALE; ARGOSY | ) | |
| UNIVERSITY, INLAND EMPIRE; | ) | |
| ARGOSY UNIVERSITY, ONLINE DIVISION; | ) | |
| ARGOSY UNIVERSITY, ORANGE | ) | |
| COUNTY; ARGOSY UNIVERSITY, SAN | ) | |
| DIEGO; ARGOSY UNIVERSITY, SAN | ) | |
| FRANCISCO; ARGOSY UNIVERSITY, | ) | |
| SANTA MONICA; WESTERN STATE | ) | |
| UNIVERSITY COLLEGE OF LAW; THE | ) | **JURY TRIAL DEMANDED** |
| ART INSTITUTE OF FORT | ) | |
| LAUDERDALE; THE ART INSTITUTE OF | ) | |
| JACKSONVILLE; THE ART INSTITUTE | ) | |

OF TAMPA; MIAMI INTERNATIONAL )
UNIVERSITY OF ART & DESIGN; )
ARGOSY UNIVERSITY, SARASOTA; )
ARGOSY UNIVERSITY, TAMPA; SOUTH )
UNIVERSITY/WEST PALM BEACH; )
SOUTH UNIVERSITY/TAMPA; SOUTH )
UNIVERSITY ONLINE DIVISION; )          CIVIL ACTION NO. 07-461
BROWN MACKIE COLLEGE - MIAMI; THE )
ILLINOIS INSTITUTE OF ART - )
CHICAGO; THE ILLINOIS INSTITUTE )
OF ART - SCHAUMBERG; ARGOSY )
UNIVERSITY, CHICAGO; ARGOSY )
UNIVERSITY, SCHAUMBURG; BROWN )
MACKIE COLLEGE - MOLINE; THE ART )
INSTITUTE OF INDIANAPOLIS; BROWN )
MACKIE COLLEGE - MERRILLVILLE; )
BROWN MACKIE COLLEGE - MICHIGAN )
CITY; BROWN MACKIE COLLEGE - )
FORT WAYNE; BROWN MACKIE )
COLLEGE - SOUTH BEND; BROWN )
MACKIE COLLEGE - INDIANAPOLIS; )
THE ART INSTITUTE INTERNATIONAL )
MINNESOTA; ARGOSY UNIVERSITY, )
TWIN CITIES; BROWN MACKIE )
COLLEGE - ALBUQUERQUE; THE ART )
INSTITUTE OF NEW YORK CITY; THE )
ART INSTITUTE OF TENNESSEE - )
NASHVILLE; ARGOSY UNIVERSITY, )
NASHVILLE; THE ART INSTITUTE OF )
ATLANTA; THE ART INSTITUTE OF )
ATLANTA - DECATUR; THE ART )
INSTITUTE OF AUSTIN; THE ART )
INSTITUTE OF CHARLESTON; THE ART )
INSTITUTE OF CHARLOTTE; THE ART )
INSTITUTE OF COLORADO; THE ART )
INSTITUTE OF DALLAS; THE ART )
INSTITUTE OF FORT WORTH; THE ART )
INSTITUTE OF HOUSTON; THE ART )
INSTITUTE OF HOUSTON - NORTH; )
THE ART INSTITUTE OF LAS VEGAS; )
THE ART INSTITUTE OF MICHIGAN; )
THE ART INSTITUTE OF OHIO - )
CINCINNATI; THE ART INSTITUTE OF )

2

PHILADELPHIA; THE ART INSTITUTE )
OF PHOENIX; THE ART INSTITUTE OF )
PITTSBURGH; THE ART INSTITUTE OF )
PITTSBURGH ONLINE DIVISION; )
THE ART INSTITUTE OF PORTLAND; )
THE ART INSTITUTE OF )
RALEIGH - DURHAM; THE ART )   CIVIL ACTION NO. 07-461
INSTITUTE OF SAN ANTONIO; THE ART )
INSTITUTE OF SALT LAKE CITY; THE )
ART INSTITUTE OF SEATTLE; THE ART )
INSTITUTE OF TUCSON; THE ART )
INSTITUTE OF VANCOUVER; THE ART )
INSTITUTE OF VIRGINIA BEACH; THE )
ART INSTITUTE OF WASHINGTON; THE )
ART INSTITUTE OF WASHINGTON - )
NORTHERN VIRGINIA; THE ART )
INSTITUTE OF WISCONSIN; THE ART )
INSTITUTE OF YORK - PENNSYLVANIA; )
THE ART INSTITUTE INTERNATIONAL )
- KANSAS CITY; THE NEW ENGLAND )
INSTITUTE OF ART; ARGOSY )
UNIVERSITY, ATLANTA; ARGOSY )
UNIVERSITY, DALLAS; ARGOSY )
UNIVERSITY, DENVER; ARGOSY )
UNIVERSITY, HONOLULU; ARGOSY )
UNIVERSITY, PHOENIX; ARGOSY )
UNIVERSITY, SALT LAKE CITY; )
ARGOSY UNIVERSITY, WASHINGTON )
D.C.; SOUTH UNIVERSITY/SAVANNAH; )
SOUTH UNIVERSITY/MONTGOMERY; )
SOUTH UNIVERSITY/COLUMBIA; )
SOUTH UNIVERSITY/RICHMOND; )
SOUTH UNIVERSITY/NOVI; SOUTH )
UNIVERSITY/VIRGINIA BEACH; BROWN )
MACKIE COLLEGE - AKRON; BROWN )
MACKIE COLLEGE - CINCINNATI; )
BROWN MACKIE COLLEGE - FINDLAY; )
BROWN MACKIE COLLEGE - )
NORTHERN KENTUCKY; BROWN )
MACKIE COLLEGE - NORTH CANTON; )
BROWN MACKIE COLLEGE - ATLANTA; )
BROWN MACKIE COLLEGE - KANSAS; )
CITY; BROWN MACKIE COLLEGE - )

3

SALINA; BROWN MACKIE COLLEGE -            )
LOUISVILLE; BROWN MACKIE                   )
COLLEGE - HOPKINSVILLE; BROWN             )
MACKIE COLLEGE - TUCSON; BROWN            )
MACKIE COLLEGE - BOISE; BROWN             )
MACKIE COLLEGE - TULSA; BROWN             )
MACKIE COLLEGE - PHOENIX; BROWN           )          CIVIL ACTION NO. 07-461
MACKIE COLLEGE - GREENVILLE;              )
BROWN MACKIE COLLEGE - ST. LOUIS;         )
BROWN MACKIE COLLEGE - SAN                )
ANTONIO; THE ILLINOIS INSTITUTE OF        )
ART - TINLEY PARK; ARGOSY                 )
UNIVERSITY - LOS ANGELES; SOUTH           )
UNIVERSITY - AUSTIN; BROWN                )
MACKIE COLLEGE - BIRMINGHAM;              )
BROWN MACKIE COLLEGE - QUAD               )
CITIES,                                    )
                                           )
                Defendants.                )

## JOINT COMPLAINT IN INTERVENTION BY THE UNITED STATES OF AMERICA, AND THE STATES OF CALIFORNIA, FLORIDA, ILLINOIS, AND INDIANA

Plaintiffs, the United States of America, the State of California, the State of Florida, the

State of Illinois, and the State of Indiana, by their undersigned counsel, represent as follows:

## I. INTRODUCTION

1.      Plaintiff, the United States of America ("United States") brings this action to

recover treble damages, civil penalties and costs under the False Claims Act, 31 U.S.C. §§ 3729-

33 ("FCA"), and to recover damages and other monetary relief under the common law and

equitable theories of unjust enrichment and payment by mistake.

2.      Plaintiff, People of the State of California ("California") brings this action to

recover treble damages, civil penalties and costs under the California False Claims Act, Cal.

Gov't Code § 12650 et seq., and to recover damages and other monetary relief under the theory

of unjust enrichment.

3.      Plaintiff, the State of Florida ("Florida") brings this action to recover treble

damages, civil penalties and costs under the Florida False Claims Act, Fla. Stat. § 68.082(2).

4.      Plaintiff, the State of Illinois ("Illinois"), brings this action to recover treble

damages, civil penalties and costs under the Illinois False Claims Act, 740 ILCS 175/1 et seq.,

and to recover damages and other monetary relief under the common law and equitable theories

of payment by mistake of fact and unjust enrichment.

5.      Plaintiff, the State of Indiana ("Indiana"), brings this action to recover all

damages, treble damages, civil penalties, costs and remedies under the Indiana False Claims and

Whistleblower Protection Act, Ind. Code § 5-11-5.5-1 et seq., and to recover damages and

monetary and other relief under the common law and equitable theories of unjust enrichment and

common law fraud.

6.      This action arises from false statements and claims that Defendants Education

Management Corporation and its subsidiary corporations listed in the caption (collectively

"EDMC" or "Defendants") knowingly presented to, or caused to be presented to, the United

States and the United States Department of Education, and the States of California, Florida,

Illinois and Indiana (collectively "the States"), in violation of the FCA, the States' false claims

acts, and common law.

7.      EDMC knowingly presented and/or made, or caused to be presented or made, the

false claims and statements at issue, in order to participate in the federal student aid programs

authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §

1070 et seq.  ("Title IV, HEA programs").   Title IV, HEA programs, which are administered by

the United States Department of Education ("Department of Education"), provide students with financial aid in the form of, among other things, federal Pell Grants and loans guaranteed by the federal government. EDMC presented and/or made numerous false claims and statements in order to obtain eligibility to participate in Title IV, HEA programs.

8.      Pursuant to the FCA and common law theories of payment by mistake and unjust enrichment, the United States seeks to recover damages and civil penalties arising from EDMC's knowingly false, misrepresented, and/or improper certifications of eligibility to the Department of Education for participation in its Title IV, HEA programs. From July 1, 2003 to the present, EDMC knowingly submitted, or caused to be submitted, numerous claims for payment to the Department of Education based upon these false certifications.

9.      From July 1, 2003, to the present, EDMC and/or students enrolled in its institutions received over eleven billion dollars ($11,000,000,000.00) in federal funds through Title IV, HEA programs.

10.     Because EDMC's compensation system bases changes in admissions personnel compensation upon the number of students recruited by each admissions employee, EDMC's compensation system, as designed, violates Title IV of the HEA's incentive compensation ban. In addition, EDMC's compensation system is not eligible for Title IV of the HEA's regulatory safe harbor, because the compensation awarded under EDMC's system does not constitute "fixed compensation" within the meaning of the regulatory safe harbor. Instead, the compensation EDMC awards constitutes a form of incentive payments. Because EDMC's compensation system as designed violates Title IV of the HEA's incentive compensation ban and is not eligible for the regulatory safe harbor, and because EDMC misrepresents to the federal government its

6

compliance with Title IV's incentive compensation ban, EDMC is liable to the United States

under the common law theories of unjust enrichment and payment by mistake of fact.

11.     Even if EDMC's compensation system, as designed, was eligible for the

regulatory safe harbor, which it is not, EDMC's compensation system, as implemented, does not

comply with the incentive compensation ban or regulatory safe harbor.  In practice, the sole

factor that determines changes to the compensation of admissions personnel is the number of

students the admissions employee recruited during the previous twelve months.  Furthermore, in

practice, the compensation awarded under EDMC's system does not constitute fixed

compensation within the meaning of the regulatory safe harbor.  Despite knowing that its

compensation system, as implemented, does not comply with Title IV of the HEA and its

regulatory safe harbor, EDMC falsely represents and certifies to the federal government its

compliance with Title IV of the HEA and submits, or causes EDMC students to submit, claims

for payment pursuant to Title IV programs.  Accordingly, EDMC's conduct violates the FCA.

## II.  JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C.

§§ 3730 and 3732.

13.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §

3732(a) because Defendants transact business and are found in this District, and acts proscribed

by 31 U.S.C. § 3729 occurred in this District.

14.      This Court has false claims jurisdiction over the States' state law claims pursuant

to 31 U.S.C. § 3732(b).

15.      This Court also has supplemental jurisdiction over the States' state law claims

pursuant to 28 U.S.C. § 1367.

16.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and under 28

U.S.C. §§ 1391(b) and 1395(a), because Education Management Corporation is a Pennsylvania

Corporation with its principal office located in Pittsburgh, Pennsylvania.  In addition, EDMC

maintains and operates a traditional primary campus and online program within this District.

Furthermore, certain of the acts that form the basis of this Complaint occurred in this District.

### III. **PARTIES**

17.     Plaintiffs in this action are the United States, California, Florida, Illinois, and Indiana.

18.     Plaintiff the United States files this Complaint in Intervention pursuant to 31 U.S.C. § 3730(b)(4)(A), intervening on some but not all of the causes of action originally brought by Relators Lynntoya Washington and Michael T. Mahoney ("Relators").  The United States timely asserts the causes of action alleged herein based on the filing of Relator Lynntoya Washington's Complaint in this matter, which was filed under seal on or about April 5, 2007, insofar as the causes of action herein arise out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in Ms. Washington's Complaint.

19.     Plaintiffs California, Florida, Illinois and Indiana file this Complaint in Intervention pursuant to their respective false claims acts.  See Cal Gov't Code § 12652(c)(6)(A); 740 ILCS 175/4(b)(4)(A);  Ind. Cod § 5-11-5.5-4; Ind. Code § 5-11-5.5-5.  The States timely assert the causes of action alleged herein based on the filing of Relator Lynntoya Washington's Complaint in this matter, which was filed under seal on or about April 5, 2007, insofar as the causes of action herein arise out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in Ms. Washington's Complaint.

20.     Relator, Lynntoya Washington ("Ms. Washington"), originally filed this action on behalf of the United States, the States, and for herself, pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3730 (b)(1).  Ms. Washington filed her original Complaint in this Court under seal on April 5, 2007.  She subsequently filed under seal a First Amended Complaint on October 29, 2007, and a Second Amended Complaint on May 2, 2011.  Ms. Washington was

an employee of EDMC from June 1, 2004 through May 25, 2007.  For most of her employment
at EDMC, Ms. Washington served as an Assistant Director of Admissions ("ADA") at EDMC's
Art Institute of Pittsburgh Online Division.  Ms. Washington's primary job duties as an ADA
consisted of recruiting applicants for admission to the Art Institute Online, including managing
and securing new student inquiries, scheduling and conducting interviews of potential students,
determining the appropriateness of potential students for admission, and achieving enrollment
and start rate goals.  After serving as an ADA, Ms. Washington was assigned temporarily to the
position of Student Advising Specialist.  In that role, Ms. Washington was responsible primarily
for working with students who were considering withdrawal from the Art Institute Online.
Through her employment with EDMC, Ms. Washington has personal knowledge of the false
records, statements, certifications, and claims that EDMC presented to the United States and/or
Department of Education.

21.     Relator, Michael T. Mahoney ("Mr. Mahoney") also filed suit on behalf of the
United States and the States, pursuant to the qui tam provisions of the False Claims Act, 31
U.S.C. § 3730 (b)(1), and joined in Ms. Washington's Second Amended Complaint.  Mr.
Mahoney was employed by EDMC as its Director of Training for EDMC's Online Higher
Education Division from October 2, 2006 through June 22, 2007.  As Director of Training, Mr.
Mahoney oversaw the training of all of EDMC's Online Higher Education admissions trainers,
ADAs, and their admissions management personnel and trainers.   Through his employment with
EDMC, Mr. Mahoney obtained information and evidence, and has personal knowledge of, the
false records, statements, certifications, and claims that EDMC presented to the United States
and/or Department of Education.

10

22.     Defendant Education Management Corporation is a Pennsylvania corporation with its principal offices located at 210 Sixth Avenue, Pittsburgh, Pennsylvania.

23.     Defendant Education Management Holdings LLC is a Delaware corporation which is wholly owned by Defendant Education Management Corporation.

24.     Defendant Education Management LLC is also a Delaware corporation and is wholly owned by Defendant Education Management Holdings LLC.

25.     Defendants the Art Institutes ("the Art Institute"), each of which is listed individually in the caption, and which include but are not limited to, the Art Institute of Pittsburgh, the Art Institute of Pittsburgh Online Division, the Illinois Institute of Art – Chicago, the Illinois Institute of Art – Schaumburg, and the Indiana-based Art Institute of Indianapolis, are wholly owned, either directly or indirectly, by Defendant Education Management Corporation.

26.     Defendants the Argosy University schools ("Argosy University"), each of which is listed individually in the caption, and which include but are not limited to the Pittsburgh-based Argosy University Online Division, are wholly owned, either directly or indirectly, by Defendant Education Management Corporation.

27.     Defendants the Brown Mackie College schools ("Brown Mackie College"), each of which is listed individually in the caption, and which include, but are not limited to the Indiana-based Brown Mackie College– Fort Wayne, Brown Mackie College – Indianapolis, Brown Mackie College– Merrillville, Brown Mackie College– Michigan City, and Brown Mackie College – South Bend, are wholly owned, either directly or indirectly, by Defendant Education Management Corporation.

28.     Defendants the South University schools ("South University"), each of which is

listed individually in the caption, and which include but are not limited to the Pittsburgh-based

South University Online Division, are wholly owned, either directly or indirectly, by Defendant

Education Management Corporation.

29.     Education Management Corporation, including Education Management Holdings

LLC, Education Management LLC, The Art Institute, Argosy University, Brown Mackie College,

and South University (collectively "EDMC") is one of the largest for-profit providers of post-

secondary, higher education in the United States.  EDMC maintains one physical campus in

Pittsburgh, Pennsylvania, The Art Institute of Pittsburgh, along with three online programs,

Argosy University Online, South University Online, and The Art Institute of Pittsburgh Online

Division.  EDMC has approximately 101 traditional primary campuses in 31 states and Canada,

and nationwide online programs, which are operated through the wholly-owned subsidiary

Defendants.

30.     According to EDMC's Fiscal 2011 Third Quarter Report, at the start of the April

2011 quarter, EDMC's schools enrolled a total of 148,800 students.

## IV.   FEDERAL STATUTORY BACKGROUND

### A.   The Federal False Claims Act

31.     For violations occurring prior to May 20, 2009, the false claims provision of the

FCA, at 31 U.S.C. § 3729(a)(1)(1986), provides in pertinent part that a person is liable to the

United States government for each instance in which the person "knowingly presents, or causes

to be presented, to an officer or employee of the United States Government . . . [a] false or

fraudulent claim for payment or approval."

32.     For violations occurring on or after May 20, 2009, the false claims provision of

the FCA, at 31 U.S.C. § 3729(a)(1)(A) (2009), as amended by the Fraud Enforcement and

Recovery Act of 2009 ("FERA"), provides in pertinent part that any person who "knowingly

presents, or causes to be presented, a false or fraudulent claim for payment or approval" shall be

liable to the United States Government.

33.     The FCA defines the term "claim" to mean "any request or demand, whether

under a contract or otherwise, for money or property and whether or not the United States has

title to the money or property, that (I) is presented to an officer, employee, or agent of the United

States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be

spent or used on the Government's behalf or to advance a Government program or interest, and if

the United States Government (I) provides or has provided any portion of the money or property

requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any

portion of the money or property which is requested or demanded. . . ."  31 U.S.C. §

3729(b)(2)(A) (2009).

34.     The false statements provision of the FCA, prior to the FERA amendments,

provides that a person is liable to the United States Government for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2) (1986). As amended by FERA, the false statements provision of the FCA makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B) (2009).

35.     The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(A) (2009). The FCA further provides that "no proof of specific intent to defraud" is required.  31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(B) (2009).

## V.  UNITED STATES' FACTUAL ALLEGATIONS

### A.  Eligibility for Programs under Title IV of The Higher Education Act of 1965

36.     Under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070

et seq., Congress established various student loan and grant programs, including but not limited

to the Federal Pell Grant Program ("Pell"), the Federal Family Education Loan Program

("FFELP"), and the Federal Direct Loan Program ("FDLP") (collectively "Title IV funding") in

order to financially assist eligible students in obtaining a post-secondary education.

37.     Although the mechanism by which Title IV funding is disbursed to eligible

students under the Title IV, HEA programs varies, each Title IV, HEA program requires

compliance with specific conditions as a prerequisite to obtaining federal funds.

38.     In order to become eligible to receive Title IV funding under programs such as

Pell, FFELP, or FDLP, or to have its students receive Title IV funding, a post-secondary

educational institution must first enter into a program participation agreement ("PPA") with the

Department of Education.  20 U.S.C. § 1094(a); 34 C.F.R. §668.14.

39.     Each PPA expressly conditions a school's initial and continuing eligibility to

receive funds under Title IV, HEA programs on compliance with specific statutory requirements,

including 20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

40.     Section 487(a)(20) of  Title IV of the HEA, 20 U.S.C. § 1094(a)(20) explicitly

requires that schools: "Will not provide any commission, bonus, or other incentive payment

based directly or indirectly on success in securing enrollments or financial aid to any persons or

entities engaged in any student recruiting or admission activities or in making decisions

regarding the award of student financial assistance. . . ."  20 U.S.C. § 1094(a)(20) ("Incentive

15

Compensation Ban").  Title IV of the HEA expressly conditions the initial and continuing

eligibility of schools to obtain Title IV funding on the requirement that the schools comply with

the Incentive Compensation Ban.

41.     The HEA's Incentive Compensation Ban is also reiterated in the federal

regulations which specify the requirements to which schools must expressly agree in PPAs.  34

C.F.R. § 668.14(b)(22) ("Incentive Compensation Regulations").

42.     In 2002, the Incentive Compensation Regulations accompanying the Incentive

Compensation Ban were amended to clarify, among other things, that schools may pay "fixed

compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation

is not adjusted up or down more than twice during any twelve month period, and any adjustment

is not based solely on the number of students recruited, admitted, enrolled, or awarded financial

aid."  34 C.F.R. §668.14(b)(22)(ii)(A) ("Regulatory Safe Harbor").

43.     In each PPA, an educational institution certifies that "[t]he execution of this

Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or

continued participation in any Title IV, HEA Program."  (Ex. 1, PPA effective Dec. 19, 2006

between South University and U.S. Dept of Education, at LW 1110; Ex. 2, PPA effective

October 20, 2010 between South University and U.S. Dept of Education, at p. 1; Ex. 3, PPA

effective January 28, 2009 between Art Institute of Pittsburgh and U.S. Dept. of Education, at p.

1.)  The PPA then states, inter alia, that "[b]y entering into this Program Participation

Agreement, the Institution agrees that . . . (22) It will not provide, nor contract with any entity

that provides, any commission, bonus, or other incentive payment based directly or indirectly on

success in securing enrollments or financial aid to any persons or entities engaged in any student

recruiting or admission activities or in making decisions regarding the awarding of student financial assistance. . . ."  (Ex. 1, at pp. LW 1114-1117; Ex. 2, at pp. 4-7; Ex. 3, at pp. 4-7.)

44.     In order to maintain its eligibility to receive Title IV funding, each year an educational institution that participates in any Title IV, HEA program also must provide the Department of Education with an annual compliance audit of its administration of Title IV, HEA programs, and an audit of the institution's general purpose financial statements, prepared by independent auditors.  20 U.S.C. § 1094(c)(1)(A); 34 C.F.R. §§ 668.23 (a)(2) & (a)(4).  For-profit educational institutions, such as EDMC, must conduct their annual financial statements and compliance audits in accordance with the Department of Education Office of Inspector General's Audit Guide.  The Department of Education uses the results of the compliance and financial audits to determine whether schools are adhering to applicable requirements for Title IV funding, including the Incentive Compensation Ban.  As part of the annual audits, EDMC is required to certify, in the form of written "Required Management Assertions,"  that, among other things,  it complies with the requirements for eligibility to participate in Title IV programs, including the Incentive Compensation Ban. (Ex. 4, Dep't of Education Audit Guide, at p. II-3.) Specifically, EDMC must certify in its "Required Management Assertions" regarding "Institutional Eligibility and Participation" that it has "[n]ot paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments, financial aid to students, or student retention [34 C.F.R. § 668.14(b)(22)]."  (Ex. 4, at p. II-4.)

45.     Congress enacted the prohibition against paying commissions, bonuses, or other incentive payments based on success in recruiting students because such payments were

associated with high loan default rates, which in turn resulted in a significant drain on program

funds where the government acts as a loan guarantor.  When Congress amended the HEA in 1992

to prohibit schools from paying these incentives, it did so based on evidence of serious program

abuses, including incentive compensation.  S. Rep. No. 58, 102d Cong., 1st Sess., at 8

(1991)("Abuses in Federal Student Aid Programs")(noting testimony "that contests were held

whereby sales representatives earned incentive awards for enrolling the highest number of

students for a given period"); H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, reprinted in 1992

U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned

sales persons and recruiters").

46.     With respect to the Regulatory Safe Harbor, in the Preamble to the Notice of

Proposed Rulemaking for the Regulatory Safe Harbor, the Secretary of the Department of

Education reminded post-secondary educational institutions that salary adjustments based solely

on the number of students recruited, admitted, enrolled, or awarded financial aid do not fall

within the Regulatory Safe Harbor, that the Regulatory Safe Harbor was not intended to protect

salary adjustments that are formulated to circumvent the statutory prohibition against incentive

compensation, and that salary adjustments based on success in securing enrollments remain

prohibited.  67 C.F.R. 51723 (Aug. 8, 2002).

**B.      Claims for Payment under Title IV Programs**

47.     After a school becomes eligible to receive Title IV funding by entering into a

PPA, claims for payment of those funds can be made in various ways.  Under Pell and FDLP, for

example, students submit requests for funding directly to the Department of Education, or to the

Department of Education with the assistance of schools.  Under the FFELP, students and schools

18

jointly submit requests to private lenders for loans that are then guaranteed by state agencies and are, in turn, insured by the Department of Education and paid in the event of a default.

48.     With respect to all Title IV, HEA programs, the disbursement of federal funds rests on required statements of eligibility made by schools that are necessary for requests for payment to be considered.

49.     For all Title IV, HEA programs, students who are interested in receiving federal student aid must complete a "Free Application for Federal Student Aid," known as a "FAFSA." (Ex. 5, 2010-2011 FAFSA.)

### 1.     Title IV Grant Programs

50.     Under the Pell Grant program, which provides federal funds to assist post-secondary school students in financial need,  20 U.S.C. § 1070a; 34 C.F.R. § 690.1, the student initiates the process by submitting a FAFSA to the Department of Education to have her expected family contribution ("EFC") calculated in order to receive an accurate amount of Pell funds.  34 C.F.R. § 690.12(a).  The student either sends the FAFSA directly to the Department of Education or provides it to a school for the school to transmit it to the Department of Education on the student's behalf.  34 C.F.R. § 690.12(b).

51.     The Department of Education sends the student's application information and EFC to the student on a Student Aid Report ("SAR") and sends each school the student has designated an Institutional Student Information Record ("ISIR") for that student.  34 C.F.R. § 690.13.

52.     The school uses the above-described information, including the EFC, to calculate the student's eligibility for all aid and to assemble a "financial aid award package" for the student

borrower.  The financial aid package may include Pell Grants, FDLP Direct Loans, or Campus-Based Aid (which in turn includes Federal Supplemental Educational Opportunity Grants, Federal Work-Study, and Federal Perkins Loans), as well as other scholarships or aid for which the student may be eligible.

53.     The student can accept all or part of the financial aid award package.

54.     If the student accepts a Pell Grant, an FDLP Direct Loan (for which the Department of Education is both lender and guarantor), or both a Pell Grant and a Direct Loan, the school creates an electronic "origination" record that the school submits to a Department of Education computerized database called COD.  The origination record includes student demographic data, the award or payment period, the award amount, and disbursement dates and amounts. The COD data base, in turn, links the information in the origination record to another Department of Education database, called CPS, which compares the information in the origination record to the information on the student's SAR and ISIR.

55.     Provided that the information submitted by the school is consistent with the information possessed by the Department of Education, the Department of Education makes funds available for the school to electronically draw down from a computerized system known as "G5."

56.     Schools must electronically certify in G5 prior to drawing down the funds that "by processing this payment request . . .  the funds are being expended within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement."  (Ex. 6, G5 Certification.)

57.     In addition to the Pell Grants themselves, the Department of Education also pays

20

to the school an annual administrative cost allowance of $5.00 for each student who receives a

Pell Grant, to be used to pay the costs of administering the Pell Grant and other Title IV, HEA

federal student aid programs.  20 U.S.C. § 1096; 34 C.F.R. § 690.10.

2.     **Title IV Loan Programs**

58.     Under the FFELP, which includes subsidized and un-subsidized Stafford Loans, a

guaranty agency makes the eventual claim for payment by the United States.  No new loans were

made under FFELP after July 1, 2010.  Prior to that date, the school and student submitted an

application to a private lender for a loan on behalf of the student.  If a student defaults in

repaying a loan under the FFELP program, a state or private guaranty agency reimburses the

lender or the subsequent holder of the loan for the outstanding balance and takes assignment of

the loan for collection action.  34 C.F.R.§ 682.401(b)(14).  If the guaranty agency is unable to

collect from the borrower, the Department of Education reimburses the guaranty agency for the

loss it incurred in honoring the defaulted claims, 20 U.S.C. § 1078(c)(1)(A), and the Department

of Education may, in its discretion, take assignment of the loan.  20 U.S.C. § 1078(c)(8).  In this

way, the government is ultimately called upon to satisfy claims for payment.

59.     In order to participate in the FFELP or any other Title IV loan, as opposed to

grant, program, a student completes a Master Promissory Note ("MPN") and submits the MPN to

the educational institution.  The institution, in turn, completes a "School Certification," in which

it certifies the accuracy of the information it provided to the Department of Education and the

student's eligibility for the loan.  34 C.F.R. § 682.102.  (Ex. 7, Federal Stafford Loan Master

Promissory Note; Ex. 8, Federal Stafford Loan School Certification.) While the MPN itself is

valid for ten years, the educational institution determines the student's ongoing eligibility for aid

21

and completes the School Certification annually.

60.    Under FFELP, the educational institution then submits the MPN to the lender. Upon approval by the lender, the lender obtains a loan guarantee from a guarantee agency. 34 C.F.R. § 682.102. The loan is made in reliance upon the accuracy of the information provided by the educational institution.

61.    The lender transfers the FFELP funds directly into the educational institution's account. Upon receiving the FFELP funds, the educational institution credits a student's account for education-related expenses, such as tuition, fees, books, and supplies.

62.    For subsidized Stafford loans, the government pays the interest on the student's behalf during the time the student is enrolled in school on at least a half-time basis, and during the student's grace period before repayment commences. 34 C.F.R. § 682.102(d)(2).

63.    In the event of default on the loan, the Department pays to the guarantee agency all or part of the unpaid principal and accrued interest, as well as a variety of administrative costs. 34 C.F.R. § 682.404.

**C.    EDMC's Participation in Title IV, HEA Programs**

64.    EDMC knowingly made false statements, certifications, and claims regarding compliance with the Incentive Compensation Ban in order to become and remain eligible to receive Title IV funding. EDMC's statements were false when made, and caused the Department of Education to pay various claims under Title IV, HEA programs.

**1.    EDMC's Submission of Program Participation Agreements to Department of Education**

65.    EDMC signs and submits PPAs to the Department of Education on behalf of all of

22

EDMC's educational institutions throughout the United States.  All of EDMC's institutions are currently operating under approved PPAs.  In December 2006, EDMC Chairman and CEO, John R. McKernan, Jr., signed all PPAs for EDMC institutions certifying that EDMC is complying with Title IV of the HEA's Incentive Compensation Ban. The chart attached as Exhibit 9 indicates the date on which certain PPAs were signed, and those PPAs' expiration date for each EDMC educational institution, along with the individual institution's initial PPA approval date. (Ex. 9, PPA chart).

66.     More recently, between approximately January of 2009 and January of 2011, the President for each EDMC institution signed that institution's current PPA agreement.  The chart attached as Exhibit 10 indicates the date on which current PPAs for EDMC institutions were signed, the name of the signator for each PPA, and each PPA's expiration date, along with the institution's initial PPA approval date.  (Ex. 10, Current PPA chart.)

67.     In each PPA, EDMC certifies that "[i]t will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA. . ."  (Ex. 1, at LW 1114; Ex. 2, at pp. 4-5; Ex. 3, at p. 4.)

68.     EDMC further certifies in each PPA that "[i]t will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance . . ."  (Ex. 1, at LW 1117; Ex. 2, at p. 7; Ex. 3, at pp. 6-7.)

23

69.     All of EDMC's PPAs with the Department of Education are "Provisional Certification" PPAs rather than "Full Certification" PPAs, because, among other reasons, EDMC's educational institutions failed the financial responsibility standards set forth in 34 C.F.R. § 668.171.

70.     In addition to the certifications it makes in its PPAs, EDMC also makes, or causes to be made, additional certifications as part of its annual compliance audits and as part of the student financial aid process, including but not limited to Required Management Assertions, G5 Certifications, Master Promissory Notes, and their accompanying School Certifications.

71.     EDMC submits a variety of claims to the government for Title IV funding that it knows to be false based upon its non-compliance with the Incentive Compensation Ban.

### 2.     Title IV Funding Received by EDMC

72.     United States Department of Education calculations reflect that from July 1, 2003 through June 30, 2011, EDMC received over $11.1 billion ($11,100,000,000.00) in Title IV funding for students enrolled in EDMC institutions.  A copy of a chart depicting Title IV funding received by EDMC for each year from July 1, 2003 through June 30, 2011 is attached hereto as Exhibit 11. (Ex. 11, EDMC – Funding by Year and Program chart prepared by Department of Education.)

73.     For the 2003-2004 Title IV "Award Year," which runs from July 1, 2003 to June 30, 2004, Department of Education calculations reflect that EDMC received, at a minimum, $656,268,775.00 in Title IV funding for students enrolled in EDMC institutions. (Ex. 11.)

74.     From July 1, 2004 to June 30, 2005, Department of Education calculations reflect that EDMC received, at a minimum, $768,476,757.00 in Title IV funding for students enrolled in

24

EDMC institutions. (Ex. 11.)

75.     From July 1, 2005 to June 30, 2006, Department of Education calculations reflect that EDMC received at least $893,170,978.00 in Title IV funding for students enrolled in EDMC institutions. (Ex. 11.)

76.     From July 1, 2006 to June 30, 2007, Department of Education calculations reflect that EDMC received at least $919,187,428.00 in Title IV funding for students enrolled in EDMC institutions. (Ex. 11.)

77.     From July 1, 2007 to June 30, 2008, Department of Education calculations reflect that EDMC received at least $1,205,247,718.00 in Title IV funding for students enrolled in EDMC institutions. (Ex. 11.)

78.     From July 1, 2008 to June 30, 2009, Department of Education calculations reflect that EDMC received at least $1,732,083,724.00 in Title IV funding for students enrolled in EDMC institutions. (Ex. 11.)

79.     From July 1, 2009 to June 30, 2010, Department of Education calculations reflect that EDMC received at least $2,410,125,719.00 in Title IV funding for students enrolled in EDMC institutions. (Ex. 11.)

80.     From July 1, 2010 to June 30, 2011, Department of Education calculations reflect that EDMC received at least $2,578,159,501.00 in Title IV funding for students enrolled in EDMC institutions. (Ex. 11.)

81.     EDMC's records reflect that during the 2002-2003 academic year, EDMC received at least $428,166,072.00 in Title IV funding for students enrolled in its Art Institute and Argosy University divisions of educational institutions. (Ex. 12, EDMC Financial Aid

Utilization Charts, at LW 1571.)

82.     EDMC's records reflect that during the 2003-2004 academic year, EDMC

received at least $625,872,781.00 in Title IV funding for students enrolled in its Art Institute and

South University educational institutions.  (Ex. 12, at LW 1583.)

83.     EDMC's records reflect that during the 2004-2005 academic year, EDMC

received at least $719,206,175.00 in Title IV funding for students enrolled in its Art Institute and

South University educational institutions.  (Ex. 12, at LW 1594.)

84.     EDMC's records reflect that during the 2005-2006 academic year, EDMC

received at least $800,977,892.00 in Title IV funding for students enrolled in its Art Institute and

South University educational institutions.  (Ex. 12, at LW 1599.)

85.     EDMC's 2010 Form 10-K reflects that, for the fiscal year ending June 30, 2010,

EDMC received $2,239,400,00.00 in Title IV funding for students enrolled in all EDMC

institutions.  Title IV funding for fiscal year 2010 constituted 89.3% of EDMC's net revenue.

86.     As a required part of its annual compliance audits, EDMC certifies that it

complies with the requirements for eligibility to participate in Title IV programs, including the

Incentive Compensation Ban.

87.     As a required part of the student financial aid process, and in order to receive Title

IV, HEA funds for students enrolled at its institutions, EDMC certifies that it complies with the

requirements for eligibility in Title IV, HEA programs, including the Incentive Compensation

Ban.

D.    **EDMC's Violations of the Incentive Compensation Ban**

88.    From July 1, 2003 to the present, EDMC has compensated Assistant Directors of

Admission ("ADAs"), including Relator Lynntoya Washington, and their supervisors, the

Associate Directors of Admission, based upon the number of new students who enroll in EDMC

institutions.  Indeed, ADAs' compensation and advancement in the company are a result of

EDMC's relentless and exclusive focus on the number of new students an ADA is able to recruit.

89.    EDMC has created a "boiler room" style sales culture and has made recruiting and

enrolling new students the sole focus of its compensation system.  Moreover, EDMC's

compensation system and compensation practices result in the payment of  "commission[s],

bonus[es], or other incentive payment [s]" and thus violate the Incentive Compensation Ban set

forth in Title IV of the HEA.  Through its compensation system and compensation practices, the

representations and certifications it makes to the federal government in its PPAs, in connection

with annual compliance audits, and in other documents, EDMC knowingly violates Title IV of

the HEA's Incentive Compensation Ban and Regulatory Safe Harbor, and its accompanying and

implementing regulations.

1.    **EDMC's Compensation System for Admissions Personnel**

90.    EDMC's ADAs serve as EDMC's "in-school recruiters."  (Ex. 13, EDMC's

"Your Guide to the Admissions Performance Plan" for ADAs, at p. 3, LW1212.)  ADAs,

including Ms. Washington, are responsible for recruiting applicants for admission to EDMC

schools, including securing and managing new student inquiries, achieving enrollment and start

rate goals, and participating in recruitment and enrollment activities.  An ADA is in frequent

contact with potential students during the entire recruitment and enrollment process.  The ADA's

name is on all of the student's application and financial aid documents to ensure that the ADA

receives credit for enrolling the student.

91.     EDMC's compensation system for admissions personnel is called the Admissions

Performance Plan.

92.     EDMC provides all of its ADAs, including Relator Lynntoya Washington, with a

copy of a document that explains the Admissions Performance Plan.  The December 2004

version of this document, which Ms. Washington received, is entitled "Your Guide to the

Admissions Performance Plan for Assistant Directors of Admission" ("Guide to the Admissions

Performance Plan").  (Ex. 13.)  More recent versions of this document are titled, for example,

"Admissions Performance Plan, Information for Assistant and Associate Directors of

Admission."

93.     In the Guide to the Admissions Performance Plan, EDMC explains to ADAs that

their compensation is based on "your manager's evaluation of your performance against quality

factors over the previous six months, combined with the number and types of new students you

recruited over the past 12 months." (Ex. 13, at p. 5, LW1214.)  "The number of new students you

recruited over the previous 12 months is converted into points, and the point total ["New Student

Points"] determines the salary range.  Your salary within the range is determined by your

manager's evaluation of performance against quality factors, as described above."  (Ex. 13, at p.

6, LW 1215.)

94.     EDMC indicates in the Guide to Admissions Performance Plan that ADAs will

receive performance evaluations twice per year, in May/June and November/December, and that

ADAs' salaries will be re-calculated to take effect July 1 and January 1, based on the results of

the ADA's evaluation.  (Ex. 13, at p. 5, LW 1214.)

95.     EDMC's Guide to the Admissions Performance Plan includes EDMC's

"ADA/Associate Annualized Salary Chart," which is known as "the Matrix" ("Matrix").  (Ex.

13, at p. 7, LW 1216.)

96.     The Matrix is the centerpiece of EDMC's compensation system and is featured in

each iteration of EDMC's Admissions Performance Plan.

97.     The Matrix sets forth the number of "New Student Points" that an ADA must

attain in order to achieve a particular compensation level.  New Student Points are calculated

based on the number of students the ADA recruits.  The Matrix lists compensation schedules,

with a compensation level corresponding to the "New Student Point Range" an ADA achieves,

i.e., based on the number of students recruited.  Pursuant to the Matrix as designed, "quality

factor" ratings, such as "needs improvement," "meets expectations," "highly effective," and

"outstanding," purport to adjust the employee's compensation within the level set by the number

of students recruited.

98.     Per EDMC's Guide to the Admissions Performance Plan, newly hired ADAs are

subject to a six-month introductory period, at the end of which they are ostensibly evaluated only

on quality factors, and not on the basis of number of students recruited, and their compensation is

adjusted based on their quality factors.  (Ex. 13, LW 1219.)  However, at their second review,

twelve months after hire, ADAs are ostensibly reviewed based on quality factors for the past six

months and New Student Points for their entire past twelve month employment with EDMC. At

the time of the twelve month review, the employee's compensation is set at the greater of the

"quality points only" compensation or based on New Student Points and quality factor points

29

("Matrix compensation"). To the extent that the employee has amassed sufficient New Student Points in her first twelve months at EDMC to result in higher compensation by including the New Student Points than by calculating the compensation based on quality points alone, the employee has successfully "gone on the Matrix." The new employee's third review and associated compensation change, which is scheduled to take place 18 months after hire, occurs according to the terms of the Matrix, i.e. the new student point range is necessarily taken into account in setting the employee's compensation level.

99.     In addition to appearing in the Guide to Admissions Performance Plan that EDMC distributes to ADAs, the Matrix is also presented in a PowerPoint presentation to prospective EDMC employees during their interviews, and to new EDMC employees as part of their initial training and orientation sessions. (Ex. 14, "The Art Institute Online: New Employee Introduction," at LW 1172.)  During Relator Lynntoya Washington's initial training, she was told that "the number of points based on new students recruited for the prior twelve months determines a person's salary range and 'quality factors' determine the person's position within the salary range." (Ex. 14, at LW 1162.)

100.     EDMC's Admissions Department openly admits that compensation is tied to enrollment numbers.  During Relator Lynn Washington's initial interview for her ADA position with EDMC employees Dave Bryant and Gregg Schneider, Mr. Bryant showed Ms. Washington and approximately thirty (30) other candidates the PowerPoint presentation and explained the Matrix.  When Ms. Washington then interviewed with EDMC Vice President of Admissions Ken Boutelle in May of 2004, he told her that her compensation would depend on the number of students she enrolled and promised that her compensation would increase within the first six (6)

months of employment if she met enrollment goals.

101.    Using the Matrix, an ADA is able to determine the precise effect that each new student enrollment will have on his or her compensation.

102.    From day one of their employment with EDMC, ADAs are pressured to, and desire to, "go on the Matrix" in order to receive the associated higher levels of compensation.

103.    EDMC provides all of its Directors of Admissions with a document that provides an overview of the compensation system for admissions personnel.  The July 1, 2003 and December 2004 versions of this document are entitled "Admissions Performance Plan Manager Guidelines" ("Manager Guidelines").  (Ex. 15, Admissions Performance Plan Manager Guidelines (updated December 2004); Ex. 16, Admissions Performance Plan Manager Guidelines (July 1, 2003).)  More recent versions of this document are titled, for example, "Admissions Performance Plan, Manager's Guide to Policies and Procedures."

104.    The Director of Admissions for each EDMC school serves as the primary recruiting and marketing manager for that EDMC school, and manages or oversees the managers of all recruiting functions, including Associate and Assistant Directors of Admissions. (Ex. 15, at LW 1231.)  The Manager Guidelines document that each Director of Admissions receives reinforces the instructions that ADAs receive about how the Matrix operates.  The Manager Guidelines specify that "[t]he fundamentals of the Admissions Performance Plan work the same way for all participants, to ensure that Associate and ADA compensation is standardized and rewards performance against specific qualitative and quantitative objectives."  (Ex. 15, at LW 1237.)  The Manager Guidelines further specify that the salary range for each ADA is determined as follows: "[t]he new students recruited over the previous 12 months are converted into points

31

(based on the characteristics of the new student), and the point total determines a salary range for a participant. The salary within the range is determined by the manager's evaluation of performance against quality factors." (Ex. 15, at LW 1237.)

**2. EDMC Determines Compensation Based on New Student Enrollments**

105.     EDMC's emphasis of, and reliance on, new student enrollment as the sole basis upon which it determines an ADA's compensation is demonstrated by the emphasis EDMC places on training its ADAs to "sell" enrollments.

106.     In order to boost its student enrollment numbers, EDMC urges ADAs to enroll students before thoroughly reviewing their transcripts to determine their academic qualifications to attend the institution or online program. EDMC also regularly instructs ADAs to enroll applicants regardless of their qualifications, including applicants who are unable to write coherently, applicants who appear to ADAs to be under the influence of drugs, and applicants for EDMC's online program who do not own computers. Although EDMC publishes academic requirements for incoming students, EDMC accepts potential students who complete an application and submit a 150-word essay. EDMC approves all student applications regardless of the applicant's high school grade point average or the quality of the applicant's written essay, although some deficient students are required to take extra credits.

107.     EDMC instructs ADAs that, when making a recruitment pitch to a student, the ADA should inform the potential student that EDMC schools have very high career placement percentages and that the Career Services Office will contact the student six (6) weeks prior to graduation and will set up interviews for the student with prospective employers. However, in actuality, students themselves must initiate the process to receive the benefits of the Career

32

Services Office.  In addition, students may use the Career Services Office for a limited time after graduation, despite the fact that many ADAs tell students that they will have lifetime access to the Career Services Office.

108.    EDMC instructs ADAs to secure enrollments by employing a recruitment tactic called "finding the pain."  "Finding the pain" means locating a prospective student's vulnerabilities and exploiting those vulnerabilities to persuade the student to enroll in an EDMC program, even after the student has expressed a desire not to enroll.  EDMC trains ADAs that examples of "the pain" include a hypothetical student's desire to earn enough money to move her kids out of a dangerous neighborhood, or her desire to make her father proud.

109.    An ADA will not receive credit for the student's enrollment, and corresponding "New Student Points,"  which are used to calculate the ADA's compensation on the Matrix, until a student confirms enrollment in a class, and thus becomes financially liable to EDMC.

110.    Accordingly, ADAs pressure prospective students to enroll in EDMC schools so that the ADAs can receive New Student Points on the Matrix corresponding compensation increases.

111.    EDMC institutions have four academic quarters per year.  EDMC's online programs, such as the Art Institute Online Division, and at least some of the EDMC "ground schools," i.e. non-online programs, break each quarter into two "sessions," such that there are eight student start dates per year, which correspond to the beginning of each session.  (Ex. 17, EDMC List of Quarters and Sessions from Spring 2006 through Fall 2010.)

112.    During the week before a new start date, ADAs receive Daily Confirmation Reports at least three (3) times per day.  These reports update ADAs as to whether their students

have confirmed enrollment in classes.  If an ADA's student has not confirmed enrollment in his

or her class schedule, the ADA is expected to call the student, urge him or her to confirm, and

even walk the student through the confirmation process on the webpage.  During the days leading

up to a new start period, ADAs are expected to check their email throughout weekends and

follow up with students on weekends to urge them to confirm enrollment in their classes.

113.    Because an ADA does not get credit for enrolling a student or receive New

Student Points until that student confirms his or her enrollment, ADAs remain in contact with the

student via telephone calls and emails until the student confirms enrollment.  The ADA

continually urges the student to confirm enrollment in a class, even if a student expresses doubts

about doing so and even if the student appears to be unqualified.

114.    After a student confirms enrollment, whether the student succeeds or fails in the

class is of no concern to the ADA because, upon enrollment confirmation, the ADA earns the

New Student Points towards the ADA's compensation increase.

115.    EDMC's linking of New Student Points for the ADA to a student's enrollment

confirmation leads to the enrollment of unqualified and uninformed students, many of whom fail

to complete the EDMC programs in which they enroll.  For the 2010 fiscal year, EDMC reported

a year-to-year persistence rate of 64%. EDMC defines this "persistence" rate as a measure of the

number of students who are enrolled during a fiscal year and either graduate or advance to the

next fiscal year.

116.    During the student enrollment process, ADAs are also in constant contact with

EDMC Financial Aid Officers.  ADAs are responsible for making sure that students complete all

of their loan applications and that students submit those applications to the EDMC school and to

34

the federal government.  The ADA seeks to ensure that his or her name will be on all of the

student's applications and financial aid documents in order for the ADA to receive credit for

enrolling the student.  ADAs email links to applications or fax applications and financial aid

documents to students, or instruct students to print the necessary forms from the particular

EDMC institution's website.  Once all of the student's applications are complete, the ADA

forwards them to the assigned EDMC Financial Aid Officer.

117.    After a student's financial aid forms are complete, an EDMC Financial Aid

Officer will calculate the student's financial aid plan based on a Department of Education

formula, and inform the student.  The student can accept or reject the financial aid plan.  If a

student rejects a financial aid plan, often because the student does not qualify for enough

financial aid to cover the entire amount of tuition, it is the ADA's job to convince the student to

accept the financial aid package and enroll in an EDMC school.

118.    ADAs are instructed to use a number of tactics to convince students to enroll in

an EDMC school.  For example, ADAs may convince a student to change his or her status from

full-time to part-time so that the student's financial aid package will cover the tuition.  A

majority of students will change their status to part-time, because after doing so, they usually

receive a refund from financial aid, in the form of a check from EDMC for the amount of

financial aid that the student has not used for that particular academic quarter.   However, most

ADAs do not inform the students that the refunded amount of financial aid is still part of the

student loan and that it will eventually have to be repaid.

119.    Once a student accepts his or her financial plan, the EDMC Financial Aid Officer

certifies the student's loans and grants, which are then submitted to the Department of Education

for approval and payment.

### 3. EDMC's Tracking of ADAs' Success in Securing New Enrollments and Lack of Focus on Quality Factors

120.   EDMC's emphasis of, and reliance on, new student enrollment as the sole basis on upon which it determines an ADA's compensation is also demonstrated by the way it tracks ADAs' success in obtaining student enrollments.

121.   EDMC continually measures each ADA against his or her "Student Start Plan." An ADA's Student Start Plan sets forth the number of students an ADA is expected to enroll for the upcoming quarter, in the case of some EDMC ground schools, or upcoming session, for online programs and some EDMC ground schools.  Two examples of Student Start Plans for Lynn Washington for the July 2005 and August 2005 Art Institute Online sessions are attached hereto as Exhibit 18.  (Ex. 18, May 16 and June 28, 2005 Neft emails to LynnToya Washington.) The Student Start Plan for each ADA is provided to the ADA's supervisor by higher level EDMC corporate employees.  Whether an ADA's compensation is governed by the Matrix, or in EDMC's words, whether an ADA is "on the Matrix," is a function of whether or not the ADA meets the required enrollment numbers in her Student Start Plan.

122.   Based on the ADA's Student Start Plan, the ADA's supervisor formulates a "Plan to Make Plan" that shows the ADA what he or she needs to do to achieve the number of student enrollments required by his or her Student Start Plan for the upcoming quarter or session.  An example of Lynn Washington's "Plan to Make Plan" for the July 2006 summer start date is attached hereto as Exhibit 19.  (Ex. 19, June 12, 2006 Schneider email to Lynn Washington attaching Plan to Make Plan, LW 5915-16.)

36

123.     To encourage ADAs to meet their enrollment goals, ADAs' supervisors also ask ADAs to imagine their "dream car" or other financial goal, or to name the overall compensation they hope to earn.  EDMC then uses documents such as "Financial Planning 101" worksheets, to show each ADA exactly how many New Student Points she needs to make a particular amount of compensation.  For example, the Financial Planning 101 document breaks down the specific number of applications, interviews, and appointments per week that an ADA must accomplish to reach the number of New Student Points necessary to achieve her desired compensation.  An example of Financial Planning 101 worksheet for Lynn Washington is attached as Exhibit 20. (Ex. 20, Financial Planning 101, LW 1651.)

124.     EDMC closely tracks and maintains data regarding the actual number of student enrollments that the ADA obtained for previous quarters and sessions, compared to the number of enrollments the ADA was expected to achieve according to her Student Start Plan. An example of a document tracking Lynn Washington's actual performance against her Student Start Plan is attached as Exhibit 21.  (Ex. 21.)

125.     Quality factors are not discussed or included in an ADA's Student Start Plan, Plan to Make Plan, or documents EDMC uses to track ADAs' performance against their Student Start Plans.  To the contrary, the Student Start Plan, Plan to Make Plan, and associated tracking documents focus entirely on the number of students the ADA enrolls and only measure quantitative factors.

126.     EDMC managers who supervise ADAs use Student Start Plan documents, and other similar documents, as part of each ADA's review every six months, and to provide regular informal feedback to ADAs.  Typically, ADAs are told at the end of their reviews exactly how

many student enrollments they need to procure during the next six-month review period in order to be on track to reach their identified financial goals. ADAs are not given any similar prodding or incentivizing with respect to any "quality factors." EDMC presents an ADA's ability to reach her financial goals as solely a matter of procuring an identified number of student enrollments.

127.    In late July or early August of 2006, Relator Michael Mahoney interviewed with Vice President of Admissions for EDMC's Online Higher Education division Ken Boutelle for the position of Director of Training of EDMC's online division.

128.    During Mr. Mahoney's initial interview with Mr. Boutelle, and in a subsequent interview on September 1, 2006, Mr. Boutelle told Mr. Mahoney that EDMC's goals included:

    a.    Increasing the total number of students enrolled in EDMC schools from approximately 4,500 students to 50,000 students within five years;

    b.    Increasing ADAs' average new student enrollments from 1.6 to 3.0 per week;

    c.    Increasing EDMC's then-current turnover rate for its ADAs from 17%, which Mr. Boutelle characterized as "too low," to 25%, by firing ADAs who did not meet their enrollment "sales" targets.

    d.    Increasing total student enrollments by increasing the number of ADAs, which stood at approximately 530, to 800 ADAs, within six to eight months, and then to 1000 ADAs within two years; and

    e.    Hiring someone to oversee the training of the new ADAs, EDMC's "sales force," and admissions management personnel and trainers.

129.    Mr. Mahoney understood that EDMC's goals were driven by its desire to increase

student enrollments at all costs.

130.    Mr. Boutelle knew that Mr. Mahoney had extensive experience in sales and sales training, including over fifteen years working in the automotive industry.  Mr. Boutelle was extremely interested in Mr. Mahoney's sales training background. Mr. Boutelle's final question in Mr. Mahoney's interview was whether Mr. Mahoney could write the best training ever written on how to close the sale and get an application from the student.  Mr. Mahoney said "yes."  Mr. Boutelle then hired Mr. Mahoney to fill EDMC's newly created "Director of Training" position, effective October 2, 2006, with the expectation that Mr. Mahoney would employ his car sales experience, and specifically his experience teaching techniques for closing sales, to train EDMC's recruiters.

131.    At the time Mr. Mahoney was hired, EDMC was utilizing well-known and commonly-used sales/intelligence screening tools to ascertain if an applicant would succeed as an ADA.  However, because that screening process was time-intensive and was not allowing EDMC to keep pace with its hiring goals, EDMC eliminated the sophisticated screening tools and began to hire large numbers of ADAs out of so-called "cattle-calls," with little or no screening.

132.    As EDMC's Director of Training for EDMC's online division, Mr. Mahoney was charged with revamping EDMC's sales training for ADAs.  When Mr. Mahoney started working at EDMC in October of 2006, EDMC's training materials for its ADAs did not mention Title IV of the HEA's Incentive Compensation Ban.  Mr. Mahoney was never instructed to provide training on the Incentive Compensation Ban.  Consequently, none of the sales training materials Mr. Mahoney created referred to or acknowledged the prohibition regarding incentive-based compensation.

39

133.    In approximately March of 2007, Mr. Boutelle directed Mr. Mahoney to create a compliance training program for EDMC's online division that could be presented to ADAs.  At the time of Mr. Boutelle's request, EDMC did not have compliance materials or a compliance program for its ADAs that was specific to the online division.  Working on his own, Mr. Mahoney researched what he believed were the rules and regulations applicable to EDMC's industry and created a compliance training program.

134.    While employed at EDMC, Mr. Mahoney never heard anyone focus on, or even discuss, the "quality factors" reflected on the Matrix.  To the contrary, EDMC's focus on ADAs' performance, and therefore their compensation, was limited solely to the number of new student enrollments the ADAs obtained.

135.    EDMC's so-called "quality factors" have no real impact on the manner in which EDMC's compensation system is implemented.  When Relator Lynntoya Washington received her oral reviews, quality factors were never mentioned.  In addition, Ms. Washington's written "Quality Assessment," under the category "Business Practices and Ethics," Ms. Washington's reviewer made the following comment in two separate reviews: "For business practices I would like to see Lynn increase her weekly and daily activity.  If she increases her overall activity her overall production will increase considerably."  (Ex. 22, Performance Evaluation and Planning forms for Lynntoya Washington, at LW 1655.)  The EDMC reviewer's comments regarding Ms. Washington's business practices are simply one example of how the quality factors link directly to EDMC's focus on student enrollment numbers.

136.    Mr. Mahoney was employed as EDMC's Director of Training for the online division.  His core function was to train the EDMC employees who would then train EDMC's

40

ADAs. During his employment at EDMC, Mr. Mahoney never gave any training whatsoever regarding the "quality factors." Indeed, during the eight months that Mr. Mahoney was employed at EDMC, he never heard anyone focus on, or even discuss, the "quality factors" reflected on the Matrix, in any context.

137. For EDMC, the number of students that an ADA enrolls governs whether an ADA gets a good review, gets a promotion or a compensation increase, or is terminated. For example, on October 11, 2006, Gregg Schneider, an Art Institute Online Director of Admissions, sent an email to all of the ADAs he supervised, including Ms. Washington, warning the ADAs that failure to hit their student enrollment numbers could result in their termination. (Ex. 23, Oct. 11, 2006 Schneider email.) In his email, Director of Admissions Schneider reprimanded ADAs for failing to meet their goals for the October 2006 student start date, and he reminded each ADA that "Each of you knows your plan for November. This number is not a casual level that I want you to be at but rather a number that you must hit to have a good review, get promoted or keep your position here. This number is set by the VP of Admissions and the Director of Admissions." (Ex. 23.) Similarly, by email dated October 30, 2006, Mr. Schneider reminded ADAs that there were "5 days to recruit for November" and listed each ADA's individual student enrollment numbers for November. He then stated "I want to see some urgency in hitting your plan. For the new people you must realize that these plans play a huge part in your 6, 12, and 18 month reviews. It is so very important that you hit your plan. 5 days to go. Make it happen." (Ex. 24, Oct. 30, 2006 Gregg Schneider email, LW 5924.)

138. On August 24, 2005, while meeting with EDMC's then-President of Online Higher Education Stephen Weiss, Ms. Washington expressed concerns about a recent dip in her

"quality factor" rating.  Mr. Weiss responded by explaining to Ms. Washington that because she

had met her student enrollment numbers, her "quality factor" rating would have no effect

whatsoever on her compensation.

139.    EDMC meticulously tracks each ADA's student enrollment activities on a daily,

weekly, monthly, quarterly, and annual basis.  Each ADA's enrollment activity is then included

in the following reports, which are widely disseminated within EDMC:

> Report

a.    Operations Dashboard  (Ex. 25, MM5247-5255.)

b.    Plan Status Report  (Ex. 26, MM6557-6560 (excerpts).)

c.    Call Summary Inquiry Report (Ex. 27, MM 6255-6259 (excerpts).)

d.    Underachiever Report  (Ex. 28, Thurs. Mar. 8, 2007 report, MM 1241-43.)

e.    Stacked Rankings-Applications (Ex. 29, Mar. 19, 2007 rankings, MM 1986-88.)

f.    Aging Report  (Ex. 30, MM 5022-5025.)

g.    ADA Trend Analysis  (Ex. 31, LW 2401; Ex. 32, MM 5290.)

h.    O/OE Movement Report  (Ex. 33, Mar. 13, 2007 report, MM 1-2.)

I.    Stacked Rankings-Starts  (Ex. 34, Nov. 17, 2006 Report, LW 4210-13.)

j.    Conversion Reports  (Ex. 35, Feb. 22, 2007 Report, MM 1852-54.)

The above-listed reports contain only quantitative information, and focus on the student

applications and enrollments that ADAs procure.  These reports, which EDMC uses to manage,

evaluate, and compensate its ADAs, do not contain any information regarding qualitative factors.

**4.        EDMC's Awards Based Solely on Success in Obtaining Enrollments**

140.      In addition to compensation, EDMC provides commissions, bonuses, and other

incentive payments in the form of awards based solely on success in obtaining student enrollments.

141.    EDMC rewards the top 10% of EDMC admissions personnel, based on number of new student enrollments achieved during a given year, with an all-expenses paid "President's Club" trip to a desirable location such as Puerto Vallarta or Cancun, Mexico, or Las Vegas, Nevada.  EDMC employees who become members of the President's Club may bring a family member or significant other on the trip at no cost to the EDMC employee.

142.    The only criterion that EDMC considers for membership in the President's Club is the number of new student enrollments an ADA achieves.  During the course of the year, EDMC managers send mass emails to the ADAs on a weekly basis detailing the top performers for the previous week.  The weekly results and rankings of top performers include only the numbers of appointments, interviews, and student applications an ADA was able to secure during that week. For example, on March 15, 2007, Vice President of Admissions Training and Development Lee Colker sent an email to all EDMC admissions personnel titled "AI Mega Grand Slam and Top Achievers!!!  Week ending 3/9/07."  (Ex. 36, Mar. 15, 2007 Colker email.)  In the body of the email, Mr. Colker lists the top performers for the week, including each person's number of appointments, interviews, and student applications.  Mr. Colker also encourages recipients of the email to "[p]our it on everyone and become a member of this year's event in Puerto Rico!"  (Ex. 36.)

143.    EDMC's repeated promotion of the President's Club reward trips incentivizes ADAs to increase the number of students that they enroll.  Indeed, the President's Club trips themselves constitute incentive payments that EDMC uses to encourage ADAs to compete

43

against one another to obtain the most student enrollments.  These trips are not designed for the

purpose of educating and improving the skills of the institutions' admissions personnel in a way

that complies with the Incentive Compensation Ban.

144.     In addition to the President's Club reward trips, EDMC provides other awards to

ADAs who excel in obtaining student enrollments.  For example, on March 16, 2007, Ken

Boutelle, Vice President of Admissions for EDMC's Online Higher Education division, sent an

email to all ADAs for EDMC's online programs, listing EDMC's "Circle of Achievement

Winners" for the prior quarter, whom Mr. Boutelle described as "the best of the best."  The only

criterion on which the award winning ADAs were evaluated was their total student starts for the

prior quarter. (Ex. 37, Mar. 16, 2007 Boutelle email.)

145.     In addition to the President's Club trip and awards such as the Circle of

Achievement, which focus on ADAs' success in enrolling new students over a quarter or a whole

year, EDMC also precisely monitors ADAs' recruitment numbers on a shorter term basis (e.g.

daily and weekly), and regularly provides financial incentives for ADAs to enroll more students.

The top-recruiting ADAs for brief time periods or in particular offices win bonuses including

Godiva Chocolate gift baskets, movie tickets, Pittsburgh Pirates baseball tickets, amusement park

tickets, various restaurant and Starbucks gift cards and free lunches with EDMC management.  In

addition, ADAs who recruit a large number of new students are given permission to leave work

early, yet are still paid for an entire work day.  For example, by email dated April 5, 2005 then-

Director of Admissions for the Art Institute Online, Christina Neft, offered a $20.00 Starbucks

gift card to the first ADA to get a student application before 8 pm that day.  (Ex. 38, April 5,

2005 Neft email re: Crunch Time, LW 1706.)  That same day, Ms. Neft sent an email

summarizing various individual ADAs performance for that day and promising free lunch to the first ADA to obtain 15 referrals or 30 student applications.  (Ex. 39, April 5, 2005 Neft email re: Team Totals.)  On May 23, 2005, Ms. Neft recognized 7 ADAs for meeting their goals with respect to the number of student interviews and applications they achieved, and rewarded them with lunch with her that Thursday and a 3:00 pm departure from work that Friday.  (Ex. 40, May 23, 2005 Neft email, LW 1711-13.)  Ms. Neft also offered ADAs under her supervision paid time off from work, during which she promised to call prospective students from the winning ADAs' phones so that the winning ADAs would receive credit for more students (and thereby obtain more remuneration) even during their paid time off.  (Ex. 41, April 19, 2005 Neft email, LW 1708.)  In June and July of 2006, Gregg Schneider, another then-Director of Admissions for the Art Institute Online, continued to provide paid time-off incentives to ADAs who obtained the highest numbers of student applications.

146.    EDMC directly and expressly connects ADAs' ability to obtain student applications and enrollment with increased compensation.  For example, on October 26, 2006, Brian Summy, then-Director of Admissions for EDMC's South University Online, sent an email to South University Online ADAs which directly equated an ADA's procurement of two student applications with cash.  (Ex. 42, Oct. 26, 2006 Summy email, MM 000010.)

147.    The walls and cubicle partitions of EDMC's offices display posters and charts graphing each ADA's progress toward his or her sales goals and noting whatever prize the ADA is then competing for.  However, when an audit of EDMC or an accreditation is scheduled to take place, EDMC's management ensures that these materials are taken down and removed from view.  Once the auditors or accreditors depart, the posters and charts are put back up.

148.    In addition to rewarding admissions personnel who meet their student enrollment targets, EDMC closely monitors "underachievers," admissions personnel who fail to meet their enrollment numbers.  EDMC routinely terminates admissions personnel for failing to obtain an acceptable number of student enrollments, without regard to the employee's performance in the "quality factors" area.  Indeed, the written warnings that EDMC routinely sends to underachieving admissions personnel focus entirely on the number of applications and enrollments the employee has procured over a specific period of time.

149.    If an ADA fails to meet his or her individual student enrollment goal, EDMC will administer a written warning, known as a Performance Improvement Plan ("PIP"), advising the ADA that he or she must, for example, conduct a minimum of ten interviews with potential students and submit a minimum of three admissions applications per week for the next thirty days.  However, the number of interviews an ADA conducts is not as important as the number of completed admissions applications the ADA procures.  Furthermore, the requirement of three completed admissions applications per week is a flexible requirement, in that as long as the ADA can submit twelve admissions applications within the thirty day period, he or she will not be terminated.

150.    PIPs are based exclusively on an ADAs failure to meet student enrollment goals. Stated differently, the "unacceptable performance or conduct" giving rise to the PIP is the employee's failure to achieve the number of student starts required by the employee's quarterly Student Start Plan.  An ADA who is meeting student enrollment projections is rarely, if ever, the subject of a PIP.

E.    **EDMC's Conduct Does Not Qualify For the Regulatory Safe Harbor**

151.    As previously set forth in this Complaint, in 2002, Incentive Compensation Regulations accompanying the Incentive Compensation Ban were amended to clarify that, under the Regulatory Safe Harbor, schools may pay "fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A).

152.    EDMC's conduct, however, does not fall within the purview of, or satisfy, the above Regulatory Safe Harbor for several reasons.

153.    First, EDMC's compensation system, as designed and as implemented, is not eligible for Title IV of the HEA's Regulatory Safe Harbor, because the compensation awarded under EDMC's system is not "fixed compensation" within the meaning of the Regulatory Safe Harbor. Instead of a permissible "fixed annual salary" or "fixed hourly wage," the compensation EDMC awards under the Matrix constitutes a form of incentive payment. Under EDMC's compensation system, EDMC pre-establishes student enrollment goals and the incentive payments that it will make for admissions personnel who achieve those goals. EDMC constantly communicates those enrollment goals and resulting incentive payments to the ADAs to incentivize them to recruit more students. Using the Matrix, EDMC frequently adjusts each admissions employee's compensation, in a clear and pre-defined manner, based directly on that employee's success in obtaining student enrollments, and the employee is acutely aware of those adjustments. The fact that adjustments to an admissions employee's compensation are

47

accumulated and then paid to the employee in bi-weekly installments during the subsequent six month period does not convert the improper compensation into permissible fixed compensation.

154. Second, EDMC's compensation system, as designed and as implemented by EDMC, adjusts compensation based solely on the number of students recruited by EDMC admissions employees, in direct violation of the Incentive Compensation Ban and accompanying Regulatory Safe Harbor. Under EDMC's compensation system as designed and as implemented, an admissions employee's initial eligibility to "go on the Matrix" is strictly based on the number of students the admissions employee can recruit. Once admissions employees are "on the Matrix," EDMC's compensation system, as designed, dictates many adjustments based solely on the number of students, in violation of the Regulatory Safe Harbor. For example, under the Matrix, if an ADA's "quality" rating stays the same for two review periods, but her compensation changes, that compensation adjustment is based solely on the number of new students recruited. Similarly, EDMC's compensation system, as implemented by EDMC, adjusts the compensation of admissions employees who are "on the Matrix" based solely on the number of students enrolled, in violation of the Regulatory Safe Harbor. In practice, EDMC's so-called "quality factors" are nothing more than window-dressing, used to camouflage a compensation system that, in reality, is driven entirely by student enrollment numbers and adjusts compensation based solely on the number of students recruited. In implementing its compensation system, EDMC creates an environment in which admissions employees understand that their compensation is determined solely by the number of students they enroll. Once an admissions employee succeeds in "going on the Matrix" by recruiting a sufficient number of students, each subsequent compensation adjustment is, in practice, made solely on the basis of the number of

students that admissions employee recruits.  Only after the enrollment numbers set a

compensation range are quality factors even ostensibly taken into account.  As a matter of course,

the quality ratings were assigned to admissions employees by supervisors who were not trained

on how to rate the "quality" attributes of an ADA, who paid no attention to the "quality"

attributes of an ADA, and instead were trained to focus on, and did focus, solely on the ADA's

success in obtaining student enrollments.

155.    Finally, the President's Club trips and other rewards, such as free meals and paid

time off, that EDMC provides, constitute incentive compensation that is awarded based solely on

the number of students admissions employees recruit. Accordingly, the President's Club trips and

other rewards violate the Incentive Compensation Ban and the Regulatory Safe Harbor.

156.    Consequently, EDMC's compensation system, as it is designed and implemented,

violates the Incentive Compensation Ban and does not qualify for protection under the

Regulatory Safe Harbor.

### F.    EDMC Knows that its Conduct in Implementing its Compensation System Violates the Incentive Compensation Ban and Does Not Qualify for the <u>Regulatory Safe Harbor</u>

157.    EDMC knows that its conduct in implementing its compensation system violates

the Incentive Compensation Ban and does not qualify for the Regulatory Safe Harbor.

Consequently, when EDMC made statements in its PPAs and other documents such as

compliance audit Management Assertions, G5 Certifications, School Certifications, and MPNs

regarding its compliance with the Incentive Compensation Ban and eligibility for Title IV

funding, those statements were knowingly false.  EDMC's compensation system, as implemented

by EDMC, is inconsistent with EDMC's statements of compliance in its PPAs, compliance audit

Management Assertions, and other documents.

158.    At the time that EDMC stated in its PPAs and other documents that it would not make incentive payments to admissions personnel based on their success in securing enrollments, EDMC knew that it was paying and planned to continue to pay admissions personnel incentive payments based directly on their success in securing enrollments.

159.    In August of 2003, the Department of Education conducted a Program Review of the University of Phoenix, which is the largest for-profit provider of post-secondary higher education in the United States.  The University of Phoenix had employed a compensation system similar to the one used by EDMC.  In its February 5, 2004 Program Review Report regarding the University of Phoenix, the Department of Education found that the University of Phoenix compensation system was an illegal attempt to circumvent Title IV of the HEA's prohibition on incentive compensation, and did not qualify for safe harbor protection.  (Ex. 43, Program Review Report for University of Phoenix, at p. 29.)

160.    The Department of Education's Program Review of the University of Phoenix was made public and circulated throughout the for-profit higher education industry.

161.    EDMC's compensation system is not materially different from the University of Phoenix's system with respect to violation of Title IV of the HEA's prohibition on incentive compensation.  Indeed, the link between student enrollments and compensation is more clearly detailed in EDMC's compensation system as compared to the compensation system described in the University of Phoenix Program Review Report.  Consequently, EDMC could not reasonably believe that the Department of Education would conclude that EDMC's conduct comported with the Incentive Compensation Ban and Regulatory Safe Harbor but that the University of Phoenix's

50

conduct did not.  EDMC knew that its Matrix-based compensation system and the sales culture it was implementing did not satisfy the Incentive Compensation Ban and Regulatory Safe Harbor.

162.    On September 3, 2004, the Department of Education and the University of Phoenix entered into a settlement agreement to resolve the Department of Education's Program Review.  While the University of Phoenix disputed the Program Review Report's methodology and conclusions, the University of Phoenix paid the Department of Education $9.8 million as part of the settlement.  (Ex. 44, University of Phoenix Settlement Agreement.)  Todd S. Nelson, then-Chairman and Chief Executive Officer of the Apollo Group, Inc., the University of Phoenix's parent corporation, signed the settlement on behalf of the University of Phoenix.  Mr. Nelson was employed by Apollo from approximately 1987 through January 2006.

163.    In February 2007, Mr. Nelson was hired as the Chief Executive officer of EDMC, and he continues to hold that title currently.  In addition to serving as CEO, Mr. Nelson served as the President of EDMC from February 2007 to December 2008.  In addition to Mr. Nelson, the following individuals left their employment with the University of Phoenix following its settlement with the Department of Education and were subsequently employed by EDMC in management-level positions:  Ken Boutelle, Sam Yaghoubi, David Preece, Phil Clark, Sean St. Clair, Jamie Wellnitz, and Mary Dyer-St. Clair.  Current EDMC executives Robert Carroll (Executive Vice President and Chief Information Officer), Anthony F. Digiovanni (Senior Vice President – Marketing and Admissions), and John Kline (President, EDMC Online Higher Education), among others, also are former employees of the University of Phoenix.

164.    Therefore, EDMC's senior management knows that the compensation system EDMC implements violates the Incentive Compensation Ban and fails to qualify for the

Regulatory Safe Harbor.

165.     EDMC knew that its misrepresentations regarding compliance with the Incentive

Compensation Ban would result in the payment of federal funds and that a reasonable and

foreseeable consequence of such misrepresentations was that such funds would be paid out.

     **G.**     **The Submission of False Claims**

166.     Every request for a federal grant, every request for a loan under FDLP, every

request for a federally guaranteed loan under FFELP, every interest payment on a subsidized

Stafford Loan, and every government payment on a loan made on behalf of a student attending an

EDMC institution constitutes a separate false claim.

167.     The following examples of student financial aid packages illustrate EDMC's false

claims:

     a.     Art Institute Online student A received a financial aid package of $534.00

in Pell Grant funds, $100.00 in SEOG Grant funds, $875.00 in Stafford subsidized loan funds,

and $1,334.00 in Stafford unsubsidized loan funds for the 2006 summer and fall quarters and the

2007 winter quarter.  The student accepted her financial aid package and received her summer

2006 Art Institute Online class schedule on July 6, 2006.

     b.     Art Institute Online student B received a financial aid package of

$1,350.00 in Pell Grant funds, $300.00 in SEOG Grant funds, $875.00 in Stafford subsidized

loan funds, and $1,334.00 in Stafford unsubsidized loan funds for the 2006 summer and fall

quarters and the 2007 winter quarters.  The student accepted her financial aid package and

received her summer 2006 Art Institute Online class schedule on June 15, 2006.

     c.     Art Institute Online student C received a financial aid package including a

$150.00 AIIN Merit Award, $875.00 in Stafford subsidized loan funds, and $1,334.00 in Stafford unsubsidized loan funds for the 2006 fall quarter and the 2007 winter and spring quarters. The student accepted her financial aid package and received her fall 2006 Art Institute Online class schedule on August 16, 2006.

      d.     Art Institute Online student D received a financial aid package of $667.00 in Creative Education Loan Program funds, $763.00 in Stafford subsidized loan funds, and $1,446.00 in Stafford unsubsidized loan funds for the 2006 summer and fall quarters and the 2007 winter quarter.

      e.     Art Institute Online student E received a financial aid package including a $300.00 AIIN Merit Award, $1,167.00 in Stafford subsidized loan funds, and $1,334.00 in Stafford unsubsidized loan funds for the 2006 fall quarter and the 2007 winter and spring quarters. The student accepted her financial aid package and received her fall 2006 Art Institute Online schedule on September 7, 2006.

      168.     Each of the grant awards listed and described above and each government repayment of loan interest or defaulted loan principal was caused by Defendants' false certifications and statements in the PPAs, compliance audit Management Assertions, G5 Certifications, MPNs, School Certifications, and other documents, that EDMC was in compliance with the Incentive Compensation Ban and was therefore eligible to receive Title IV funding. Defendants made these false certifications and statements despite the fact that they had actual knowledge of their falsity. Each request for payment constitutes a false claim under the FCA.

## VI.  STATE OF CALIFORNIA'S STATUTORY AND FACTUAL ALLEGATIONS

### A.  The California False Claims Act

169.    For violations occurring prior to January 1, 2010, the California False Claims Act ("CFCA"), at California Government Code Section 12651, subdivision (a)(1), provides in pertinent part that a person is liable to the State of California for each claim when the person "knowingly presents or causes to be presented to an officer or employee of the state … a false claim for payment or approval."  Cal. Gov't Code § 12651(a)(1) (2009).

170.    For violations occurring prior to January 1, 2010, the CFCA, at California Government Code Section 12651, subdivision (a)(2), provides in pertinent part that a person is liable to the State of California for each claim when the person "knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state …."  Cal. Gov't Code § 12651(a)(2) (2009).

171.    The CFCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (A) "has actual knowledge of the information"; (B) "acts in deliberate ignorance of the truth or falsity of the information"; or (C) "acts in reckless disregard of the truth or falsity of the information."  Cal. Gov't Code § 12650(b)(2) (2010).  The CFCA further provides that "[p]roof of specific intent to defraud is not required."  Cal. Gov't Code § 12650(b)(2)(2010).

### B.  Eligibility for Cal Grants Program

172.    The State of California is authorized pursuant to Title 5 of the California Code of Regulations, Division 4 and California Education Code §§ 69400-69460 to provide students with financial aid in the form of grants ("the Cal Grants program"), which are administered by the

California Student Aid Commission ("CSAC") and disbursed directly to educational institutions.

173.    In order to participate and receive disbursed funds from the Cal Grants Program, educational institutions such as Defendants must sign an Institutional Participation Agreement ("IPA") as a counterpart to, and functional equivalent of, the federal PPA (program participation agreement) that is submitted to the United States Department of Education.

174.    The IPA also contains a certification that the educational institution agreed to be subject to and comply with "all current and applicable federal and state law and regulations in its implementation of the terms of" the IPA.

### C.    Defendants' False Certifications to the California Student Aid Commission

175.    California hereby realleges and incorporates by reference the allegations made in section V., United States Factual Allegations, subsections A. through F., above, paragraphs 36 through 165, above.

176.    Since at least 2003, Defendants have falsely certified every few years in the IPA that they are in compliance with all federal regulations such as the incentive compensation ban, even while knowingly violating such regulations, in order to continue receiving funds from the Cal Grants Program.

177.    Since at least 2003, Defendants have knowingly made, used, or caused to be made or used false reports, certifications, and other documents, to conceal their ineligibility for federal financial aid, as a result of their violation of the incentive compensation ban.  As result of this concealment, Defendants were able to continue receiving funds from the Cal Grants Program.

178.    Once eligibility for the Cal Grants Program funds is established, the CSAC disburses the Cal Grants Program fund to Defendants as an advance, and the Defendants bill

against the advance.  If the advance is insufficient, Defendants requests and receives additional

Cal Grants Program funds from the CSAC throughout the year.

179.    From 1999 to 2010, the Defendants and/or students enrolled in Defendants'

institutions have received approximately $93,000,000.00 of Cal Grants Program funds from the

CSAC.

## VII.   STATE OF INDIANA'S STATUTORY AND FACTUAL ALLEGATIONS

### A.   Introduction

180.    Indiana seeks relief to redress the harm done to the public welfare and the property of the State of Indiana that has resulted from Defendants' false claims and misrepresentations and unlawful retention of the State's money.

181.    This action arises from false or fraudulent statements, records, and claims that Defendants Education Management Corporation and its subsidiary corporations currently and formerly doing business as Brown Mackie College - Fort Wayne, Brown Mackie College - Indianapolis, Brown Mackie College – Merrillville, Brown Mackie College – Michigan City, Brown Mackie College – South Bend, and the Art Institute of Indianapolis (collectively "EDMC" or "Defendants"), including their predecessors and successors, knowingly or intentionally presented to, or caused to be presented to, the State of Indiana, and the State Student Assistance Commission of Indiana, in violation of the Indiana False Claims and Whistleblower Protection Act and the common law.

182.    The false claims, records, and statements at issue were knowingly or intentionally presented and/or were caused to be presented by EDMC in order to participate and as a participant in the State of Indiana's student financial assistance programs authorized under Indiana Code Title 21, Articles 11 and 12.  ("Indiana financial aid programs").

183.    The State Student Assistance Commission of Indiana ("SSACI") was established in order to, among other actions, administer the Indiana financial aid programs, determine the respective amounts of, and award, the appropriate higher education awards, determine the amounts of grants and scholarships, determine eligibility for grants and scholarships, and act as

the designated state agency for participation in any federal program for reinsurance of student loans.  Ind. Code § 21-11-3-1; 21-11-3-2.

184.    Pursuant to the Indiana False Claims and Whistleblower Protection Act and common law theories of unjust enrichment and common law fraud, the State of Indiana seeks to recover damages and civil penalties arising from EDMC's knowingly false, misrepresented, and/or improper certifications of EDMC's Title IV Higher Education Act compliance and eligibility to SSACI to become and remain an eligible and approved institution for participation in the Indiana financial aid programs.  From at least January 1, 2003, to the present, EDMC and/or students enrolled in its institutions received over twelve million dollars ($12,000,000.00) in State of Indiana funding.

**B.    Parties**

185.    Defendant EDMC, doing business as Brown Mackie College – Fort Wayne, is a company doing business at 3000 East Coliseum Boulevard, Fort Wayne, Allen County, Indiana, 46805.

186.    Defendant EDMC, doing business as Brown Mackie College – Indianapolis, is a company doing business at 1200 N. Meridian Street, Suite 100, Indianapolis, Marion County, Indiana, 46204.

187.    Defendant EDMC, doing business as Brown Mackie College – Merrillville, is a company doing business at 1000 East 80th Place, Suite 205M, Merrillville, Lake County, Indiana, 46410.

188.    Defendant EDMC, doing business as Brown Mackie College – Michigan City, is a company doing business at 325 East U.S. Highway 20, Michigan City, LaPorte County, Indiana,

46360.

189.    Defendant EDMC, doing business as Brown Mackie College – South Bend, is a

company doing business at 3454 Douglas Road, South Bend, St. Joseph County, Indiana, 46635.

190.    Defendant EDMC, doing business as The Art Institute of Indianapolis, is a

company doing business at 3500 DePauw Boulevard, Suite 1010, Indianapolis, Marion County,

Indiana, 46268.

### C.    The Indiana False Claims and Whistleblower Protection Act

191.    Under Indiana Code § 5-11-5.5-3, the Attorney General may bring a civil action

against any person who may be liable for violations of Indiana Code § 5-11-5.5-2. A "person" for

purposes of Indiana's statute, "includes a natural person, a corporation, a firm, an association, an

organization, a partnership, a limited liability company, a business, or a trust."  Ind. Code § 5-11-

5.5-1(5).

192.    The Indiana False Claims and Whistleblower Protection Act  ("Indiana FCA"),

Ind. Code § 5-11-5.5-1 et. seq. provides, in pertinent part, that a person is liable to the State of

Indiana for each instance in which the person "knowingly or intentionally: (1) presents a false

claim to the state for payment or approval; (2) makes or uses a false record or statement to obtain

payment or approval of a false claim from the state; … or (8) causes or induces another person to

perform an act described in subdivisions (1) [or (2)]."  Ind. Code § 5-11-5.5-2.

193.    For each violation, the Indiana FCA provides that the person is "liable to the state

for a civil penalty of at least five thousand dollars ($5,000.00) and for up to three (3) times the

amount of damages sustained by the state. In addition, a person who violates this section is liable

to the state for the costs of a civil action brought to recover a penalty or damages." Id.

59

194.     The Indiana FCA defines the terms "knowing" and "knowingly" to mean that a

person, with respect to information, (1) "has actual knowledge of the information"; (2) "acts in

deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard

of the truth or falsity of the information."  Ind. Code § 5-11-5.5-1(4).

195.     Under Indiana Code § 5-11-5.5-1(1), " "Claim" means a request or demand for

money or property that is made to a contractor, grantee, or other recipient if the state: (A)

provides any part of the money or property that is requested or demanded; or (B) will reimburse

the contractor, grantee or other recipient for any part of the money or property that is requested or

demanded."

### D.     Eligibility for Indiana Financial Aid Programs

196.     State grant awards in Indiana are governed by Title 21, Articles 11 and 12 of the

Indiana Code, the Indiana Administrative Code at Title 585.  These programs include the Frank

O'Bannon Higher Education Grants, and the Twenty-First Century Scholar Awards, which are

state funded financial aid programs designed to financially assist eligible students in obtaining a

post-secondary education.

197.     Each institution that wishes to participate in the Indiana financial aid programs

must sign an agreement with the State Student Assistance Commission of Indiana ("SSACI").

SSACI requires that the institutions comply with a number of conditions as a prerequisite to

receiving State of Indiana funds.

198.     Each school's "Institutional Agreement to Participate in the State of Indiana

Funded Student Financial Aid Programs" ("Indiana Agreement") requires that the school provide

SSACI with documentation of their Program Participation Agreement with the United States to

comply with the Title IV regulations, and the Indiana Agreement expressly conditions a school's

initial and continuing eligibility to receive funds from the Indiana financial aid awards on

compliance with specific Indiana and federal statutes and regulations. (Ex. 45, Indiana

Agreement for Brown Mackie – Fort Wayne).

199.    The Agreement requires that the institution notify SSACI if its eligibility changes,

and expressly affirms that if any assurances or representations made in connection with the

agreement are incomplete or incorrect, or that there has been failure to comply with any of the

provisions of the Agreement, the Agreement may be terminated.  (Exs. 45-50, Section V.,

Indiana Agreements).

200.    In order to receive funding, a student must be enrolled or accepted for enrollment

"at an approved institution of higher education."  585 IND. ADMIN. CODE § 1-9-1(21).

201.    Additionally, the regulations provide that "[a]ll approved institutions must have

active Title IV participation agreements with the United States Department of Education and

active program participation agreements with the commission."  585 IND. ADMIN. CODE § 1-9-

1(7).  The Indiana Agreements specifically state that the Agreement automatically terminates on

the date the institution no longer qualifies as an eligible institution.

**E.    Claims for Payment from the Indiana Financial Aid Programs**

202.    After a school becomes eligible to receive Indiana financial aid awards by

entering into the Indiana Agreement and certifying compliance with Title IV, applications for

payment of those funds are made by students to SSACI, and the funds themselves are claimed

directly by EDMC.

203.    SSACI gathers the data from the Free Application for Federal Student Aid

("FAFSA") on each student applying for the Indiana financial aid programs.  SSACI uses the FAFSA form from students in order to consider whether a particular student, attending an approved institution, is eligible for an award.

204.    Each student must indicate that their application for aid is intended for use at an approved institution of higher education.  The disbursement of funds from Indiana financial aid programs by SSACI rests on required statements of eligibility made by schools that are necessary for requests for payment to be considered.

205.    Then, for those students who have listed an EDMC institution in Indiana on their FAFSA, SSACI sends Notification lists to the institutions identifying potential student awards for each student that has listed the EDMC institution on their FAFSA.  This notification is accomplished through SSACI's electronic system.

206.    In addition to the certifications in the Indiana Agreements that are required for qualification for the awards, each institution must submit a reconciliation form to the SSACI, which indicates the number of students for whom the school is claiming funds.  The reconciliation form identifies the amount of money being claimed by the institution for each student.

207.    The awards are claimed by designated signers for each institution through the electronic system, and through that process EDMC and its institutions knowingly or intentionally presented false claims for payment by the State of Indiana by submitting reconciliation forms claiming funds for which they did not qualify.

208.    For each institution, the Financial Aid Administrator or Director was responsible for monitoring and supervising the submission of the reconciliation forms and use of SSACI's

62

electronic systems with respect to claiming and administering Indiana financial aid funds. During the relevant time period, the Financial Aid Directors included Robin (Leonhard) Gigliotti, Alison Edgerton, Sandra McIntosh, Holly Dennett, Sarah Wajnarowski, Susan Goldern, and Nichole Lincoln, and their predecessors and successors.

### F.    **EDMC's Participation in Indiana Financial Aid Programs**

209.    EDMC intentionally or knowingly made false or fraudulent statements, records, certifications, and claims regarding compliance with the Incentive Compensation Ban in order to become and remain eligible for Title IV funding, and in turn, in order to become and remain eligible for the Indiana financial aid programs.  EDMC's statements were false when made, and caused the State of Indiana to pay various claims under the Indiana financial aid programs.

210.    EDMC signs and submits the Indiana Agreements and PPAs to SSACI in order to receive funds.  All of EDMC's institutions in Indiana have an Indiana Agreement in place, and have submitted their PPAs with the federal government to the State of Indiana.

211.    Each EDMC institution in Indiana intentionally or knowingly submitted a false certification to the SSACI for payment of Indiana funds when it certified that it was a "college or university in the state of Indiana with a unique Title IV federal school code that meets accreditation and eligibility requirements as stipulated in pertinent statute(s) of the Indiana Code, Administrative Code, and other Commission rules." (Ex. 45 - 50, Indiana Agreements[1]).

212.    Additionally, each EDMC institution in Indiana intentionally or knowingly submitted a false certification to the SSACI for payment of Indiana funds when it certified that it

---

[1] ˚For each Indiana Agreement attached as an exhibit to this Complaint in Intervention, all appendices to the Agreement are not attached and the exhibits are not intended to represent the full and complete agreement between the State of Indiana and the Defendants.

would "comply with all program rules, regulations and guidelines for the student financial aid

programs…[in Indiana]." (Ex. 45 - 50, Indiana Agreements).

213.    Regional trainings were regularly held for ADAs who worked at Indiana-based

EDMC institutions.  The ADA compensation plan and sales techniques were consistent across

each institution owned by EDMC.

214.    ADA supervisors maintained white boards with each ADAs recruitment numbers

and student goals, indicating not only where the individual ADA stood against their personal goal

for salary, but also against other employees.

215.    EDMC managers consistently meet with the ADAs to check on the number of

students attained, and to encourage them to work to get their numbers up.

216.    On or about November 6, 2008, Richard Them, Senior Vice President for Student

Financial Services of EDMC, as authorized representative and signatory for Defendants,

intentionally or knowingly presented or caused to be presented a false claim to the State of

Indiana when he signed and certified the Indiana Agreement on behalf of Brown Mackie College

– Fort Wayne, for a term beginning in the 2008-2009 Academic Year. (Ex. 45, Indiana

Agreement of Brown Mackie College – Fort Wayne).

217.    On or about November 6, 2008, Richard Them, Senior Vice President for Student

Financial Services of EDMC, as authorized representative and signatory for Defendants,

intentionally or knowingly presented or caused to be presented a false claim to the State of

Indiana when he signed and certified the Indiana Agreement on behalf of Brown Mackie College

– Merrillville, for a term beginning in the 2008-2009 Academic Year. (Ex. 46, Indiana

Agreement of Brown Mackie College - Merrillville).

218. On or about November 6, 2008, Richard Them, Senior Vice President for Student Financial Services of EDMC, as authorized representative and signatory for Defendants, intentionally or knowingly presented or caused to be presented a false claim to the State of Indiana when he signed and certified the Indiana Agreement on behalf of Brown Mackie College – Michigan City, beginning in the 2008-2009 Academic Year. (Ex. 47, Indiana Agreement of Brown Mackie College – Michigan City).

219. On or about November 6, 2008, Richard Them, Senior Vice President for Student Financial Services of EDMC, as authorized representative and signatory for Defendants, intentionally or knowingly presented or caused to be presented a false claim to the State of Indiana when he signed and certified the Indiana Agreement on behalf of Brown Mackie College – South Bend, beginning in the 2008-2009 Academic Year. (Ex. 48, Indiana Agreement of Brown Mackie College – South Bend).

220. On or about May 14, 2009, Todd A. Matthews, Sr., President of Brown Mackie College – Indianapolis, as authorized representative and signatory for Defendants, intentionally or knowingly presented or caused to be presented a false claim to the State of Indiana when he signed and certified the Indiana Agreement on behalf of Brown Mackie College – Indianapolis. (Ex. 49, Indiana Agreement for Brown Mackie College – Indianapolis).

221. On or about February 17, 2006, Tony Mediate, as authorized representative and signatory for Defendants, intentionally or knowingly presented or caused to be presented a false claim to the State of Indiana when he signed and certified the Indiana Agreement on behalf of the Art Institute of Indianapolis. (Ex. 50, Indiana Agreement for the Art Institute of Indianapolis).

222. Each EDMC institution in Indiana had, at all times relevant to this Complaint, an

65

Indiana Agreement in place substantially similar to Exhibits 45 - 50 certifying their eligibility and compliance with Title IV regulations.

223.    EDMC submits a variety of claims to the government for Indiana financial aid funding that it knows to be false based upon its non-compliance with the Incentive Compensation Ban.

224.    SSACI calculations for the period from January 1, 2003 through June 30, 2010, reflect that EDMC received, at a minimum, over $12.3 million ($12,313,428.00) in Indiana financial aid funding for students enrolled in EDMC institutions as a direct and proximate cause of Defendants' false claims and misrepresentations and unlawful retention of money.

225.    In 2003, SSACI calculations reflect that EDMC received $784,647.00 in Indiana financial aid funding for students enrolled in EDMC institutions in Indiana.

226.    In 2003, regarding Brown Mackie College – Merrillville, EDMC submitted 515 false claims for payment of student financial aid awards.

227.    In 2003, regarding Brown Mackie College – South Bend, EDMC submitted 1162 false claims for payment of student financial aid awards.

228.    In 2004, SSACI calculations reflect that EDMC received $795,115.00 in Indiana financial aid funding for students enrolled in EDMC institutions in Indiana.

229.    In 2004, regarding Brown Mackie College – Merrillville, EDMC submitted 471 false claims for payment of student financial aid awards.

230.    In 2004, regarding Brown Mackie College – South Bend, EDMC submitted 843 false claims for payment of student financial aid awards.

231.    In 2005, SSACI calculations reflect that EDMC received $667,992.00 in Indiana

financial aid funding for students enrolled in EDMC institutions in Indiana.

232.    In 2005, regarding Brown Mackie College – Merrillville, EDMC submitted 410 false claims for payment of student financial aid awards.

233.    In 2005, regarding Brown Mackie College – South Bend, EDMC submitted 670 false claims for payment of student financial aid awards.

234.    In 2006, SSACI calculations reflect that EDMC received $786,227.00 in Indiana financial aid funding for students enrolled in EDMC institutions in Indiana.

235.    In 2006, regarding Brown Mackie College – Merrillville, EDMC submitted 445 false claims for payment of student financial aid awards.

236.    In 2006, regarding Brown Mackie College – South Bend, EDMC submitted 740 false claims for payment of student financial aid awards.

237.    In 2006, regarding the Art Institute of Indianapolis, EDMC submitted 31 false claims for payment of student financial aid awards.

238.    In 2007, SSACI calculations reflect that EDMC received $1,098,632.00 in Indiana financial aid funding for students enrolled in EDMC institutions in Indiana.

239.    In 2007, regarding Brown Mackie College – Merrillville, EDMC submitted 616 false claims for payment of student financial aid awards.

240.    In 2007, regarding Brown Mackie College – South Bend, EDMC submitted 811 false claims for payment of student financial aid awards.

241.    In 2007, regarding the Art Institute of Indianapolis, EDMC submitted 212 false claims for payment of student financial aid awards.

242.    In 2008, SSACI calculations reflect that EDMC received $1,317,050.00 in Indiana

financial aid funding for students enrolled in EDMC institutions in Indiana.

243.    In 2008, regarding Brown Mackie College - Fort Wayne, EDMC submitted 311 false claims for payment of student financial aid awards.

244.    In 2008, regarding Brown Mackie College – Merrillville, EDMC submitted 170 false claims for payment of student financial aid awards.

245.    In 2008, regarding Brown Mackie College – Michigan City, EDMC submitted 80 false claims for payment of student financial aid awards.

246.    In 2008, regarding Brown Mackie College – South Bend, EDMC submitted 731 false claims for payment of student financial aid awards.

247.    In 2008, regarding the Art Institute of Indianapolis, EDMC submitted 278 false claims for payment of student financial aid awards.

248.    In 2009, SSACI calculations reflect that EDMC received $2,960,970.00 in Indiana financial aid funding for students enrolled in EDMC institutions in Indiana.

249.    In 2009, regarding Brown Mackie College - Fort Wayne, EDMC submitted 729 false claims for payment of student financial aid awards.

250.    In 2009, regarding Brown Mackie College – Indianapolis, EDMC submitted 381 false claims for payment of student financial aid awards.

251.    In 2009, regarding Brown Mackie College – Merrillville, EDMC submitted 312 false claims for payment of student financial aid awards.

252.    In 2009, regarding Brown Mackie College – Michigan City, EDMC submitted 263 false claims for payment of student financial aid awards.

253.    In 2009, regarding Brown Mackie College – South Bend, EDMC submitted 1221

false claims for payment of student financial aid awards.

254.    In 2009, regarding the Art Institute of Indianapolis, EDMC submitted 306 false claims for payment of student financial aid awards.

255.    In 2010, SSACI calculations reflect that EDMC received $3,902,795.00 in Indiana financial aid funding for students enrolled in EDMC institutions in Indiana.

256.    In 2010, regarding Brown Mackie College - Fort Wayne, EDMC submitted 1191 false claims for payment of student financial aid awards.

257.    In 2010, regarding Brown Mackie College – Indianapolis, EDMC submitted 1253 false claims for payment of student financial aid awards.

258.    In 2010, regarding Brown Mackie College – Merrillville, EDMC submitted 335 false claims for payment of student financial aid awards.

259.    In 2010, regarding Brown Mackie College – Michigan City, EDMC submitted 497 false claims for payment of student financial aid awards.

260.    In 2010, regarding Brown Mackie College – South Bend, EDMC submitted 1064 false claims for payment of student financial aid awards.

261.    In 2010, regarding the Art Institute of Indianapolis, EDMC submitted 766 false claims for payment of student financial aid awards.

### G.    The Submission of False Claims

262.    Every request for a Frank O'Bannon Higher Education Award, and every request for a Twenty–First Century Scholar Award made on behalf of a student attending an EDMC institution constitutes a separate false claim by EDMC to the State of Indiana.

263.    Each of the Indiana financial aid program awards listed and described above was

caused by Defendants' false certifications and statements in the PPAs and Indiana Agreements, and false representations in each grant and loan application, that EDMC was in compliance with the Incentive Compensation Ban and eligible for Title IV funding, and was therefore eligible to receive Indiana funding.  Defendants made these false certifications and statements despite the fact that they had actual knowledge of their falsity.  Each request for payment constitutes a false claim under the Indiana False Claims and Whistleblower Protection Act.

264.    The total number of student applications for Indiana financial aid funding for EDMC institutions that falsely represented their compliance with Title IV and eligibility for Indiana funds is 16,814.

# VIII.  COUNTS

## COUNT I – UNITED STATES

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT,

### 31 U.S.C. § 3729(a)(1) (1986)

### (False claims regarding compliance with Title IV of the HEA)

265.    The United States re-alleges and incorporates herein paragraphs 1 through 168, above.

266.    From July 1, 2003 to May 20, 2009, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment, in violation of the FCA, 31 U.S.C. § 3729(a)(1).  Specifically, EDMC knowingly submitted or caused to be submitted, false certifications regarding compliance with the requirements of Title IV of the HEA, in, inter alia,  its PPAs and annual financial and compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV, HEA programs and receive Title IV funding, when in fact, EDMC's compensation system, as implemented by EDMC, was not compliant with the Title IV of the HEA and its associated safe harbor regulations.  In practice, the sole factor that determined changes to the compensation of EDMC's admissions personnel was the number of students recruited by the admissions employee during the previous twelve months.  In submitting or causing to be submitted such certifications and applications, EDMC acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

267.    EDMC made express representations in writing to the Department of Education that it would not make incentive payments to its admissions personnel based directly or indirectly

on their success in securing enrollments.  These representations induced the Department of

Education to make students at EDMC eligible for many forms of financial aid.  These

representations were material to the Department of Education's decision to make EDMC eligible

for these financial aid programs.  At the time EDMC made these representations, it knew that

these representations were false, and would continue to be false, because EDMC was paying its

admissions personnel incentive payments based on their success in securing enrollments.

Therefore, EDMC fraudulently induced the Department of Education to make EDMC eligible to

participate in the Title IV, HEA programs, and each and every one of the claims it submitted or

caused a student to submit violated the FCA.

268.    Even if EDMC had not affirmed to the government that it would comply with the

Incentive Compensation Ban, the mere fact that such compliance was material to the

government's decision to make EDMC eligible for Title IV, HEA programs, combined with the

fact that EDMC, knowing that it was in violation of the Incentive Compensation Ban and

therefore ineligible to receive such student financial aid, submitted claims for student financial

aid, caused students to submit claims for student financial, and/or received such aid, makes

EDMC liable under the FCA.

269.    By virtue of these false or fraudulent claims, the United States suffered damages

in an amount to be determined at trial.

## COUNT II – UNITED STATES

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT,

### 31 U.S.C. § 3729(a)(1) (A)(2009)

(False claims regarding compliance with Title IV of the HEA)

270.    The United States re-alleges and incorporates herein by reference paragraphs 1 through 168, above.

271.    From May 20, 2009 to the present, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to the United States, in violation of the FCA, 31 U.S.C. § 3729(a)(1).  Specifically, EDMC knowingly submitted or caused to be submitted, false certifications regarding compliance with the requirements of Title IV of the HEA, in, inter alia, its PPAs and annual financial and compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV, HEA programs and to receive Title IV funding, when in fact, EDMC's compensation system, as implemented by EDMC, was not compliant with Title IV of the HEA and its associated  safe harbor regulations.  In practice, the sole factor that determined changes to the compensation of EDMC's admissions personnel was the number of students recruited by the admissions employee during the previous twelve months.  In submitting or causing to be submitted such certifications and applications, EDMC acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

272.    EDMC made express representations in writing to the Department of Education that it would not make incentive payments to its admissions personnel based directly or indirectly on their success in securing enrollments.  These representations induced the Department of

Education to make students at EDMC eligible for many forms of financial aid.  These

representations were material to the Department of Education's decision to make EDMC eligible

for these financial aid programs.  At the time EDMC made these representations, it knew that

these representations were false, and would continue to be false, because EDMC was paying its

admissions personnel incentive payments based on their success in securing enrollments.

Therefore, EDMC fraudulently induced the Department of Education to make EDMC eligible to

participate in the Title IV, HEA programs, and each and every one of the claims it submitted or

caused a student to submit violated the FCA.

273.    Even if EDMC had not affirmed to the government that it would comply with the

Incentive Compensation Ban, the mere fact that such compliance was material to the

government's decision to make EDMC eligible for Title IV, HEA programs, combined with the

fact that EDMC, knowing that it was in violation of the Incentive Compensation Ban and

therefore ineligible to receive such student financial aid, submitted claims for student financial

aid, caused students to submit claims for student financial, and/or received such aid, makes

EDMC liable under the FCA.

274.    By virtue of these false or fraudulent claims, the United States suffered damages

in an amount to be determined at trial.

## COUNT III – UNITED STATES

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT,

### 31 U.S.C. § 3729(a)(1)(B) (2009)

(False statements and records regarding compliance with Title IV of the HEA)

275.    The United States re-alleges and incorporates herein by reference paragraphs 1 through 1-168.

276.    From July 1, 2003 to the present, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B) (2009).  Specifically, EDMC knowingly made, used, and caused to be made or used, false certifications regarding compliance with the requirements of Title IV of the HEA, in, inter alia, its PPAs and annual financial and compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV, HEA programs and to receive Title IV funding, when in fact, EDMC's compensation system, as implemented by EDMC, was not compliant with Title IV of the HEA and its associated  safe harbor regulations. In practice, the sole factor that determined changes to the compensation of EDMC's admissions personnel was the number of students recruited by the admissions employee during the previous twelve months.  In making, using, or causing to be made or used such certifications and applications, EDMC acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

277.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT IV – UNITED STATES

## PAYMENT BY MISTAKE OF FACT

278.     This is a claim for recovery of monies paid by the United States to Defendants by mistake.

279.     The United States realleges and incorporates by reference paragraphs 1 through 168 as if fully set forth herein.

280.     Because EDMC's compensation system based changes in admissions personnel compensation upon the number of students recruited by the admissions personnel during the previous twelve months, EDMC's compensation system as designed violated the Title IV of the HEA.

281.     EDMC's compensation system was not eligible for Title IV of the HEA's Regulatory Safe Harbor, because the compensation awarded under that system did not constitute "fixed compensation" within the meaning of the Regulatory Safe Harbor.  Instead, the compensation awarded thereunder constituted a form of prohibited incentive payments, spread out over the subsequent compensation period.

282.     Even if EDMC's compensation system as designed was eligible for the Regulatory Safe Harbor, it was not compliant with the Regulatory Safe Harbor as implemented. In practice, the sole factor that determined changes to the compensation of admissions personnel was the number of students recruited by the admissions employee during the previous twelve months.

283.     The United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the claims, paid to the Defendants certain sums of money to

which they were not entitled, and Defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

## COUNT V – UNITED STATES

## UNJUST ENRICHMENT

284.     This is a claim for the recovery of monies by which Defendants have been unjustly enriched.

285.     The United States realleges and incorporates by reference paragraph1 through 168 as if set forth fully therein.

286.     As described above, the Defendants received, and/or have continued to maintain control over, federal monies to which they were not entitled.

287.     By directly or indirectly obtaining federal funds to which they were not entitled, Defendants were unjustly enriched and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## COUNT VI – CALIFORNIA

**VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT,**

**CAL. GOV'T CODE § 12651(a)(1)(2009)**

288.    California incorporates herein by reference the allegations in paragraphs 1 through 165 (Sections I through V, sub sections A. through F.) and 169 through 179, (Section VI. State of California's Statutory and Factual Allegations) of this Complaint.

289.    This is a claim for treble damages and penalties brought by California under the California False Claims Act, Government Code Section 12650 et seq.

290.    Defendants knowingly presented or caused to be presented to the California Student Aid Commission false claims for payment of money.

291.    As a proximate result of Defendants' actions, California suffered damages in a specific amount to be determined at trial.

## COUNT VII– CALIFORNIA

### VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT,

### CAL. GOV'T CODE § 12651(a)(2)(2009)

292.     California incorporates herein by reference the allegations in paragraphs 1 through 165 (Sections I through V, sub sections A. through F.) and 169 through 179, (Section VI. State of California's Statutory and Factual Allegations) of this Complaint.

293.     This is a claim for treble damages and penalties brought by California under the California False Claims Act, Government Code Section 12650 et seq.

294.     Defendants knowingly made, used, or caused to be made or used false records and statements to get false claims for funds from the California Student Aid Commission paid and approved by the California Student Aid Commission.

295.     As a proximate result of Defendants' actions, California suffered damages in a specific amount to be determined at trial.

## COUNT VIII – CALIFORNIA

## UNJUST ENRICHMENT

296.     California incorporates herein by reference the allegations in paragraphs 1 through 165 (Sections I through V, sub sections A. through F.) and 169 through 179, (Section VI. State of California's Statutory and Factual Allegations) of this Complaint.

297.     This is a claim for the recovery of monies by which Defendants have been unjustly enriched.

298.     As described above, the Defendants received, and/or have continued to maintain control over, California state monies to which they were not entitled.

299.     By directly or indirectly obtaining California state funds to which they were not entitled, Defendants were unjustly enriched and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to California.

## COUNT IX – FLORIDA

## VIOLATION OF FLORIDA FALSE CLAIMS ACT, FALSE CLAIMS FOR PAYMENT
## § 68.082(2)(a), FLA. STAT.

300.    The State of Florida realleges and incorporates by reference the allegations made in paragraphs 1 through 168 of this Complaint.

301.    Defendants knowingly presented or caused to be presented to an officer or employee of an agency of the State of Florida, false or fraudulent claims for payment or approval in violation of § 68.082(2)(a), Fla. Stat.

302.    During the academic years 2006/2007 through 2009/2010, Defendants received approximately $5,205,337.52 in state funds as a result of Defendants' presentation to an officer or employee of an agency of the State of Florida a claim for payment or approval in connection with student grants and scholarships.

303.    The institutional eligibility requirements for participation in Florida scholarship and grant programs include that the institutions are Title IV eligible and therefore in compliance with the applicable Title IV regulations.  Defendants represented their institutions as Title IV eligible in connection with Defendants' presentation of said claims for payment or approval. Such representations were false, for the reasons set forth in the foregoing paragraphs.

304.    As a result of the Defendants' conduct as set forth in these causes of action, the State of Florida has suffered actual damages in excess of $15,000.00.

305.    Pursuant to §§ 68.082(2) and 68.086, Fla. Stat., the State of Florida is entitled to treble the amount of actual damages sustained, and no less than $5,500 and not more than $11,000 in civil penalties per claim, attorneys' fees, expenses, and costs.

## COUNT X – FLORIDA

### VIOLATION OF FLORIDA FALSE CLAIMS ACT,

### FALSE OR FRAUDULENT CLAIMS PAID OR APPROVED, § 68.082(2)(b), FLA. STAT.

306.    The State of Florida realleges and incorporates by reference the allegations made in paragraphs 1 through 168 of this Complaint.

307.    Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State of Florida, in violation of §68.082(2)(b), Fla. Stat.

308.    During the academic years 2006/2007 through 2009/2010, Defendants received approximately $5,205,337.52 in state funds as a result of Defendants' records and/or statements for payment or approval of claims in connection with student grants and scholarships.

309.    The institutional eligibility requirements for participation in Florida scholarship and grant programs include that the institutions are Title IV eligible and therefore in compliance with the applicable Title IV regulations.  Defendants presented records and/or statements of their institutions as Title IV eligible in connection with Defendants' presentation of said claims for payment or approval.  Such statements were false, for the reasons set for the in the foregoing paragraphs.

310.    As a result of the Defendants' conduct as set forth in these causes of action, the State of Florida has suffered actual damages in excess of $15,000.00.

311.    Pursuant to §§ 68.082(2) and 68.086, Fla. Stat., the State of Florida is entitled to treble the amount of actual damages sustained, and no less than $5,500 and not more than

$11,000 in civil penalties per claim, attorneys' fees, expenses, and costs.

## COUNT XI– ILLINOIS

## ILLINOIS FALSE CLAIMS ACT

## 740 ILCS 175/1 et seq.

312.     Plaintiff, the State of Illinois, realleges and incorporates by reference the allegations made in paragraphs 1 through 168, and 265 to 277 of this Complaint as though fully set forth herein.

313.     This is a claim for treble damages and penalties under the Illinois False Claims Act, 740 ILCS 175/1 et seq., (effective July 27, 2010) and its predecessor the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1 et seq. (1992)(the "WRPA") against Defendants Education Management Corp. ("EDMC"), The Illinois Institute of Art-Chicago ("Ai Chicago") and The Illinois Institute of Art-Schaumburg ("Ai Schaumburg") (collectively "The Illinois Institutes of Art").

314.     Since 2004 and continuing through the present, The Illinois Institutes of Art have fraudulently obtained millions of dollars in grant funds annually from the State of Illinois through its Monetary Award Program ("MAP") in violation of the Illinois False Claims Act.

315.     As the State of Illinois' largest student assistance program with an annual appropriation of approximately $400,000,000, MAP provides access to higher education for students who have demonstrable financial need.

316.     Due to the high numbers of MAP-eligible students and a limited state appropriation, every year tens of thousands of prospective Illinois students demonstrating financial need receive no MAP funding.

317.     Although MAP grants are awarded to eligible students, the students themselves do

85

not receive the MAP grant funds. Rather, the MAP funds are a revenue stream for educational institutions. Institutions directly receive and retain all MAP funds and give students a credit towards their tuition. Institutions retain the revenue from MAP funds even in situations where students do not complete classes paid for with MAP funds so long as students drop out after expiration of the institution's course withdrawal/refund period.

318. Educational institutions must comply with requirements provided in agreements between the institutions and the State and pursuant to Illinois and federal law to receive MAP grant funds.

319. One requirement for an institution's receipt of MAP grant funds is that it be in compliance with the Incentive Compensation Ban.

320. Educational institutions that pay recruiters based on the number of enrollments, thereby violating the Incentive Compensation Ban, incentivize their recruiters to pressure applicants to enroll and, in doing so, to mislead applicants about the degree programs' cost, effectiveness and job placement rates.

321. As a result, students awarded MAP grant funds at these institutions ultimately may not realize their goals for higher education or its benefits, and eligible students at other institutions do not receive MAP grant funds at all, contravening the important public purpose of the MAP program to provide access to higher education for the benefit of students and the State. Violations of the ban also result in a diminution of scarce state resources only to bolster the profits of educational institutions at the expense of the State and its taxpayers.

322. While there is a Regulatory Safe Harbor to the Incentive Compensation Ban, institutions cannot seek refuge in its protections simply to disguise incentive compensation

schemes.  In the Preamble to the Notice of Proposed Rulemaking, the Secretary of Education

stressed that the Regulatory Safe Harbor was not intended to include salary adjustments that are

formulated in a way that circumvents the statutory prohibition against incentive payments,

commissions and bonuses.

323.    The Illinois Institutes of Art fraudulently induced the State of Illinois to enter into

program participation agreements with them by promising to comply with the Incentive

Compensation Ban, although The Illinois Institutes of Art had no intention to do so.

324.    The Illinois Institutes of Art did not comply with the Incentive Compensation Ban

and knowingly, or acting in deliberate ignorance or reckless disregard of the falsity, submitted

false claims for payment and made false statements material to these false claims to the State of

Illinois.  The State of Illinois would not have paid MAP funds to The Illinois Institutes of Art if it

had known about the fraud.

## I.    The MAP Program and Its Requirements

325.    MAP is authorized pursuant to the Illinois Higher Education Student Assistance

Act, 110 ILCS 947/1 et seq., and its regulations, Ill. Admin. Code tit. 23, § 2700.10 et seq., and is

administered by the Illinois Student Assistance Commission ("ISAC").   ISAC is charged with

coordinating Illinois student assistance programs with those of the United States Department of

Education.  Ill. Admin. Code tit. 23, § 2700.10(a).

326.    The requirements for institutions to receive MAP grant funds are set forth in

ISAC's administrative rules, which are enacted pursuant to the Illinois Higher Education Student

Assistance Act and codified in the Illinois Administrative Code.  110 ILCS 947/20(f); Ill. Admin.

Code tit. 23, § 2700.10(b); Ill. Admin. Code tit. 23, § 2700.30.

327.    To receive MAP funds under Illinois law, an institution must have a valid federal Program Participation Agreement with the Department of Education.  Ill. Admin. Code tit. 23, § 2700.30(j).

328.    Illinois law also requires educational institutions to report to ISAC their Office of Postsecondary Education Identification ("OPE-ID") number.  Ill. Admin. Code tit. 23, § 2700.30(j).  The OPE-ID number is given by the Department of Education to institutions that are approved to receive Title IV funds.

329.    Before an institution will be approved for the receipt of MAP funds, ISAC must verify that the OPE-ID number is active and that the federal Program Participation Agreement is valid by reviewing the Department of Education's Eligibility and Certification Approval Report available on the department's electronic database.

330.    Once approved, an educational institution may receive MAP grant funds only after executing an ISAC Program Participation Agreement. Ill. Admin. Code tit. 23, § 2700.30(a)(1). Illinois law requires that the ISAC Program Participation Agreement contain provisions requiring the institutions to comply with federal and state law and rules.  Ill. Admin. Code tit. 23, § 2700.30(a)(3).

331.    Specifically, in accordance with Illinois law, ISAC Program Participation Agreements contain a provision in which the institutions certify that they will comply with the Higher Education Act of 1965 (the "HEA") and the corresponding Department of Education regulations, which include the Incentive Compensation Ban and Regulatory Safe Harbor, and that they will comply with ISAC's administrative rules that are codified in the Illinois Administrative Code, one of which is to have a valid federal Program Participation Agreement.  The federal

Program Participation Agreement, in turn, contains a certification of an institution's compliance with the same educational laws, namely Title IV of the HEA and its Incentive Compensation Ban.

332.     ISAC Program Participation Agreements also contain a provision that requires institutions to promptly notify ISAC of any changes in their status that could affect their eligibility for participation in ISAC student assistance programs, such as MAP, or Title IV federal student financial aid programs.

333.     ISAC-approved educational institutions submit claims directly to ISAC to receive MAP grant funds for each enrolled student who has met MAP's student eligibility requirements.

334.     Under Illinois law, each time an institution submits a payment request to ISAC, it is certifying to ISAC that the student meets the student eligibility requirements, one of which is that the student is enrolled at an ISAC-approved institution.  Ill. Admin. Code tit. 23, § 2735.40(g),(l); Ill. Admin. Code tit. 23, § 2735.20(a)(5).

## II.     The Illinois Institutes of Art's Representations, Certifications, and Claims to Receive MAP Funds

### A.     Ai Chicago and Ai Schaumburg's Applications and Agreements

335.     Ai Chicago applied with ISAC to become an approved educational institution eligible to receive MAP funds.

336.     As part of its application, Ai Chicago submitted its federal Program Participation Agreement as well as the Department of Education's approval notice and Eligibility and Certification Approval Report.

337.     After ISAC approved Ai Chicago's application, and in accordance with Illinois

89

law, ISAC advised Ai Chicago that it would not authorize MAP payments until Ai Chicago

executed an ISAC Program Participation Agreement.

338.    In June 2004, Ai Chicago executed the ISAC Program Participation Agreement,

which is attached hereto as Exhibit 51.  (Ex. 51, June 2004 ISAC Agreement for Ai Chicago.)

339.    In that agreement, Ai Chicago certified that it would comply with the HEA and

corresponding regulations, including the Incentive Compensation Ban.  ISAC entered into the

Program Participation Agreement with Ai Chicago based on its certification.

340.    In the 2004 ISAC Program Participation Agreement, Ai Chicago also represented

that it would promptly notify ISAC of any change in its status that could impact its eligibility for

participation in ISAC student assistance programs, such as MAP, or Title IV federal student

financial aid programs.

341.    After the 2004 agreement was executed, EDMC underwent corporate

reorganization, which required Ai Chicago to re-apply for approval and to execute a new ISAC

Program Participation Agreement.  In July 2006, Ai Chicago was re-approved and executed the

ISAC Program Participation Agreement attached as Exhibit 52.  (Ex. 52, July 2006 ISAC

Agreement for Ai Chicago.)

342.    In 2006, Ai Schaumburg also applied with ISAC to become an approved

educational institution eligible to receive MAP funds.

343.    As part of its application, Ai Schaumburg submitted the applicable federal

Program Participation Agreement, as well as the Department of Education's approval notice and

Eligibility and Certification Approval Report.

344.    After ISAC approved Ai Schaumburg's application, and in accordance with

Illinois law, ISAC advised Ai Schaumburg that it would not authorize MAP payments until Ai
Schaumburg executed an ISAC Program Participation Agreement.

345.    In July 2006, Ai Schaumburg executed its ISAC Program Participation
Agreement, which is attached hereto as Exhibit 53.  (Ex. 53, ISAC Agreement for Ai
Schaumburg.)

346.    In the 2006 ISAC Program Participation Agreements, both Ai Chicago and Ai
Schaumburg certified that they would comply with the HEA and corresponding regulations,
which include the Incentive Compensation Ban, and ISAC entered into the agreements based on
these certifications.

347.    In the 2006 ISAC Program Participation Agreements, The Illinois Institutes of Art
also represented that they would promptly notify ISAC of any change in their status that could
impact their eligibility for participation in ISAC student assistance programs, such as MAP, or
Title IV federal student financial aid programs.

**B.      The Illinois Institute of Art's Submission of Claims**

348.    Since executing the 2004 and 2006 ISAC Program Participation Agreements, The
Illinois Institutes of Art have submitted, and continue to submit, payment requests to ISAC.

349.    ISAC processed each such request and authorized the Illinois Comptroller to
release MAP grant funds to The Illinois Institutes of Art.

350.    Upon receiving the MAP grant funds, The Illinois Institutes of Art credited
students for tuition paid.  The Illinois Institutes of Art directly received and retained all MAP
funds for students who remained enrolled past The Illinois Institutes of Art's withdrawal/refund
period.

C.    **Ai Chicago's MAP Funding**

351.    In the 2004-2005 academic year, Ai Chicago received $2,354,590 in MAP grant funds.

352.    In the 2005-2006 academic year, Ai Chicago received $2,519,453 in MAP grant funds.

353.    In the 2006-2007 academic year, Ai Chicago received $2,689,656 in MAP grant funds.

354.    In the 2007-2008 academic year, Ai Chicago received $2,625,719 in MAP grant funds.

355.    In 2008-2009 academic year, Ai Chicago received $2,790,344 in MAP grant funds.

356.    In 2009-2010 academic year, Ai Chicago received $3,139,511 in MAP grant funds.

357.    In the 2010-2011 academic year, Ai Chicago received approximately $3,173,903 in MAP grant funds.

D.    **Ai Schaumburg's MAP Funding**

358.    In the 2006-2007 academic year, Ai Schaumburg received $1,476,677 in MAP grant funds.

359.    In the 2007-2008 academic year, Ai Schaumburg received $1,643,339 in MAP grant funds.

360.    In 2008-2009 academic year, Ai Schaumburg received $1,555,105 in MAP grant funds.

92

361.    In 2009-2010 academic year, Ai Schaumburg received $1,679,388 in MAP grant funds.

362.    In the 2010-2011 academic year, Ai Schaumburg received approximately $1,904,426 in MAP grant funds.

### III.    The Illinois Institutes of Art Violate the Incentive Compensation Ban

363.    The Illinois Institutes of Art's compensation system violates the Incentive Compensation Ban and does not qualify for the Regulatory Safe Harbor.

364.    The Illinois Institutes of Art knowingly and intentionally created a compensation system that not only pays incentive compensation, but aggressively promotes the recruitment of students.

365.    The Illinois Institutes of Art's compensation system provides fluctuating incentive payments to Assistant and Associate Directors of Admissions ("ADAs") based on the number of enrolled students deemed to be "Starts."  The Illinois Institutes of Art classify "Starts" as students who remain enrolled through The Illinois Institutes of Art's two-week withdrawal/refund period.

366.    By incentivizing ADAs to pressure students to enroll and stay in class through the withdrawal/refund period, The Illinois Institutes of Art ensure that they keep their revenue from MAP funds.

367.    The Illinois Institutes of Art's payment scheme that compensates ADAs based on the numbers of Starts is not fixed compensation, and thus does not fall within the Regulatory Safe Harbor.

368.    In addition, in violation of the Regulatory Safe Harbor, The Illinois Institutes of Art adjust ADA compensation solely based on the number of students enrolled and use purported

93

quality factors to attempt to disguise the fact that compensation adjustments solely are based on enrollment.

### A.      Creation of the Incentive-Based Compensation System

369.      After passage of the Regulatory Safe Harbor in November 2002, EDMC re-designed its compensation plan to pay ADAs prohibited incentive payments.

370.      To achieve that goal, EDMC formed a task force of its management and executives, which included Jan Anton, an executive at Ai Chicago.

371.      The task force worked to design a compensation plan that would boost EDMC's enrollment numbers and, in turn, its revenue and profits to shareholders.

372.      EDMC approved the new compensation plan and implemented it at The Illinois Institutes of Art beginning in July 2003.

373.      The compensation plan is based on what The Illinois Institutes of Art refer to as a "Matrix," in which ADA compensation is not "fixed" but rather consists of incentive payments that are based on the numbers of students recruited.

### B.      Payments and Adjustments under the Matrix Are Not Fixed Compensation

374.      The Matrix contains over a dozen different levels of incentive payments, which are set forth on the Y axis of the Matrix. (*See* Ex. 13, at p. 7, LW 1216).  Each payment level on the Matrix is achieved by accumulating new student points, which an ADA earns based on the number of enrolled students deemed to be "Starts."

375.      Every 25 additional new student points moves the ADA into a new incentive payment level, and guarantees an ADA thousands of dollars more in payments, creating a strong incentive for ADAs to increase "Starts."

376.     Further, although the Matrix refers to its figures as "annualized salaries," the payments ADAs receive, in actuality, completely change every six months.  As a result, each "Annualized Salary" figure contained in the Matrix has a value of half the amount stated.

377.     Beginning 18 months after an ADA is hired, The Illinois Institutes of Art tally each ADA's new student points to reset each ADA's incentive payment level on the Y axis of the Matrix every six months.

378.     There is no limit on the number of levels of upward adjustment from one six-month period to the next, which means that successful ADAs receive incentive payments that increase by thousands of dollars.  Conversely, when an ADA enrolls fewer students, their compensation often decreases by thousands of dollars.  As such, ADAs face both high upside and downside risk.

379.     Under the Matrix, The Illinois Institutes of Art do not pay ADAs fixed compensation and therefore ADA compensation does not qualify for the Regulatory Safe Harbor.  ADAs are not paid for performance of regular job duties.  Rather, in violation of the Incentive Compensation Ban, ADAs receive incentive payments that are based on and fluctuate with enrollment numbers and are decoupled from actual time worked.

**C.     Enrollment Numbers as the Sole Factor in "Salary" Adjustments in Violation of the Safe Harbor**

380.     The Illinois Institutes of Art created an X axis on the Matrix that purports to increase the incentive payments based on an ADA's quality rating.  The Illinois Institutes of Art created "quality factors" of "Job Knowledge," "Business Practices and Ethics," "Professionalism," "Customer Service," and  "Initiative," based upon which ADAs purportedly

receive an overall "quality rating" of "Unsatisfactory," "Needs Improvement," "Meets Expectations," "Highly Effective" or "Outstanding."

381.    As The Illinois Institutes of Art designed the Matrix and as they intended, the purported "quality factors" and correlated "quality ratings" often have no effect on adjustments to ADA compensation, leaving student recruitment numbers as the sole factor influencing or in any way affecting adjustments to compensation.

382.    In many instances, ADAs receive the exact same quality rating, such as "Meets Expectations" or "Highly Effective," from one review to the next, which under the Matrix, result in salary adjustments based solely on success in securing enrollments.

383.    For example, at a January 2005 evaluation, an Illinois Institutes of Art ADA enrolled 51 students, which equated to incentive payment level 4 on the Matrix and compensation of $42,120 (actually $21,060 because ADA compensation is reset every six months).  At the July 2005 evaluation, the ADA had recruited 65 new students, resulting in incentive payment level 5 on the Matrix, and an increase in compensation to $46,440.  At the July 2006 evaluation, the ADA's student enrollments decreased to 57 new students and incentive payment level 4 on the Matrix, which resulted in a decrease in compensation to $42,120.  At each of these reviews the quality rating of "Meets Expectations" remained the same.  The adjustments to compensation were solely due to changes in the number of enrollments and, thus, violate the safe harbor.

384.    Similarly, at a January 2006 evaluation, an Illinois Institutes of Art ADA enrolled 54 students, which equated to incentive payment level 3 on the Matrix and compensation of $37,908.  At the July 2006 evaluation, the ADA had recruited 62 new students, corresponding to

incentive level payment 4 on the Matrix and increasing compensation to $42,120. At the January 2007 evaluation, the ADA's student enrollments increased again to 71 new students, resulting in incentive payment level 5 on the Matrix and compensation of $46,440. At each of these reviews the quality rating of "Meets Expectations" remained the same. The adjustments to compensation were solely due to changes in the number of enrollments and, thus, violate the safe harbor.

385.    At a July 2005 evaluation, an Illinois Institutes of Art ADA enrolled 56 students, which equated to incentive payment level 4 on the Matrix and compensation of $42,120. At the January 2006 evaluation, the ADA had recruited 70 new students, resulting in incentive payment level 6 on the Matrix and an increase to compensation of $50,760. At the July 2006 evaluation, the ADA's student enrollments decreased to 69 new students thereby dropping the ADA to incentive payment level 5 on the Matrix, and compensation of $46,440. At each of these reviews the quality rating of "Meets Expectations" remained the same. The adjustments to compensation were solely due to changes in the number of enrollments and, thus, violate the safe harbor. This ADA's latter adjustment shows that the difference of recruitment of just one student could result in a significant decrease in salary. Moving from 70 to 69 students resulted in a drop from incentive payment level 6 to 5 on the Y axis of the Matrix, causing a drop in "salary" of $4,320.

386.    ADAs in Illinois often received adjustments to compensation that were solely based on the number of students enrolled. As illustrated in the above, non-exhaustive examples, the quality ratings of many ADAs stayed the same from one review to the next, and no factor other than enrollment of students resulted in an upward or downward "salary" adjustment, thereby violating the Incentive Compensation Ban and the Regulatory Safe Harbor.

### D.      **Quality Factors and Ratings are a Mirage**

387.      The Illinois Institutes of Art intentionally and knowingly designed and implemented the quality factors and ratings to attempt to conceal their violations of the Incentive Compensation Ban and Regulatory Safe Harbor.

388.      The quality factors and ratings are a smoke screen to disguise the fact that ADAs are compensated solely based on recruitment, admission, and enrollment numbers.

389.      In 2007, Jan Anton, a Vice President at Ai Chicago and a member of the committee that designed the compensation plan, advised an ADA at her evaluation that quality factors were insignificant relative to ADA payments and were created for the purpose of getting around the Incentive Compensation Ban.

390.      Despite their creation of five quality ratings, The Illinois Institutes of Art never used certain quality ratings, such as "Unsatisfactory," and other quality ratings, such as "Outstanding," measured ADAs' success in securing enrollments.  Only ADAs with high numbers of students recruited, admitted or enrolled received the "Outstanding" rating.

391.      The "Meets Expectations" quality rating was not based on quality, but was the default rating that ADAs received.  In 2004, the first year the Matrix was implemented, the "salary" worksheets directed ADAs how to maintain their "salary" at the next review.  The "salary" worksheet specified the exact number of new student points that would provide the ADA with the same salary for the default quality rating of "Meets Expectations."  Significantly, the "salary" worksheet did not advise ADAs of any way they could maintain their "salary" through increasing their quality ratings, again underscoring that only new student points mattered.

392.     Quality Factors purportedly were evaluated based on a Quality Factor Rubric that described numerous criteria for each quality factor and the corresponding quality ratings.  For example, to receive the Highly Effective quality rating for "job knowledge," the rubric provided that ADAs were to make themselves available to others to help solve problems, and that ADAs were to apply professional, technical, and procedural knowledge to correctly address a situation.  ADAs at The Illinois Institutes of Art were unaware of actions they could take to increase their quality rating because the Quality Factor Rubric was not explained to them or reinforced.

393.     In addition to not explaining or reinforcing the Quality Factor Rubric, The Illinois Institutes of Art did not follow it.  For example, The Illinois Institutes of Art often evaluated the quality factor of "job knowledge" based on ADAs' success in achieving their quotas for appointments, interviews, referrals, and applications, all of which measure numbers of recruitments, admissions or enrollments, and none of which are criteria in the Quality Factor Rubric for "job knowledge."

394.     For example, in her evaluation one ADA received a quality rating of "Meets Expectations" for the quality factor of "job knowledge."  For "Areas for Improvement," the ADA was instructed to increase her referrals to two per week and to increase her scheduled interviews to 10 per week.  The same ADA again received a Meets Expectations quality rating for "job knowledge" in a later evaluation.  Listed as "Areas for Improvement" was that the ADA should increase her referrals to two per week and increase her scheduled interviews to twelve per week.

395.     Another ADA received a quality rating of "Meets Expectations" for "job knowledge."  Listed as "Areas for Improvement" was that the ADA needed to increase to twelve scheduled interviews and five completed interviews per week.

396.    A third ADA received a quality rating of "Needs Improvement" for "job knowledge."  Listed as "Areas for Improvement" was that the ADA had averaged only two scheduled interviews per week and needed to immediately improve to a minimum of twelve scheduled weekly interviews.  The "Areas for Improvement" further stated that the low number of scheduled interviews resulted in the ADA only completing forty-four interviews for the six-month period.  The reviewer also noted in "job knowledge" that 56% of the candidates interviewed by the ADA had submitted applications, so if the ADA's "other metrics improve," the ADA "would realize a much greater number of applicants."

397.    A fourth ADA received a quality rating of "Highly Effective" for "customer service."  Listed as a strength was that the ADA's "start rate was 100% for the summer start and 76% for the fall.  Excellent!"  The Quality Factor Rubric made no mention of number of Starts as a criterion for "customer service."

398.    The Illinois Institutes of Art had enrollments down to a science.  The schools annually gave ADAs their Student Start Plans and required ADAs to have the plans posted on their desks.  The Student Start Plans were unique to each ADA and required each ADA to enroll a specific number of students for each of the eight quarters and mid-quarters per academic year.

399.    The Illinois Institutes of Art also gave ADAs quotas for cold calls, scheduled interviews, completed interviews, applications and referrals in order to yield the desired number of Starts so that The Illinois Institutes of Art could reach their revenue goals. The schools determined that if an ADA scheduled the recommended number of interviews, a certain percentage would show for the interview, and a smaller percentage would apply, ultimately leading to a targeted number of Starts.

100

400.    The Illinois Institutes of Art provided ADAs with reports detailing their activity on a weekly and monthly basis, such as the numbers of outgoing "cold calls" an ADA made to potential prospective students, scheduled interviews from those calls, completed interviews, and applications and personal referrals secured from the interviews. ADAs also were frequently advised about whether they had made their goal for the number of Starts for each of the eight quarters and mid-quarters per academic year.

401.    The Illinois Institutes of Art required ADAs to attend weekly team meetings that focused on Starts.  At these meetings, managers discussed strategies for ADAs to increase their enrollments and make their Student Start Plans, and emphasized that ADAs could make more money and earn a higher salary if they enrolled more students.

402.    Supervisors also frequently met individually with ADAs to discuss their enrollment numbers.  At these meetings, ADAs were required to report the numbers of cold calls, scheduled and completed interviews, applications, and enrollments that they achieved that day. The Illinois Institutes of Art required reporting of these numbers to pressure ADAs to meet their Student Start Plans' enrollment requirements.

403.    The Illinois Institutes of Art did not emphasize or even refer to quality factors and ratings at these individual meetings between ADAs and their supervisors or at weekly team meetings.

404.    While The Illinois Institutes of Art provided ADAs with extensive training on how to make their Student Start Plans and thereby increase their new student points, they provided no training to ADAs on how to increase their quality ratings.

405.    The quality factors and ratings often did not factor into adjustments to ADA

101

compensation, and to the extent they purportedly did, the quality factors and ratings measured

recruitment, admission, and enrollment numbers, thereby violating the Incentive Compensation

Ban and the Regulatory Safe Harbor.

## IV.   Violations of the Illinois False Claims Act, 740 ILCS 175/3 (a)(1)(A), (B)

406.   The false claims provision of the Illinois False Claims Act, at 740 ILCS

175/3(a)(1)(A), provides, and the WRPA, at 740 ILCS 175/3(a)(1), provided, that any person

who knowingly presents, or causes to be presented, "a false or fraudulent claim for payment or

approval" shall be liable to the State of Illinois.

407.   The false statements provision of the Illinois False Claims Act makes liable any

person who "knowingly makes, uses, or causes to be made or used, a false record or statement

material to a false or fraudulent claim." 740 ILCS 175/3(a)(1)(B).  The false statements provision

of the WRPA provided that a person is liable to the State of Illinois for each instance in which

the person "knowingly makes, uses, or causes to be made or used, a false record or statement to

get a false or fraudulent claim paid or approved by the State." 740 ILCS 175/3(a)(2).

408.   The Illinois Institutes of Art knowingly presented or caused to be presented false

or fraudulent claims to the State of Illinois for payment in violation of the Illinois False Claims

Act, 740 ILCS 175/3(a)(1)(A) and the WRPA, 740 ILCS 175/3(a)(1).  The Illinois Institutes of

Art also knowingly made, used, or caused to be made or used false records or statements to get

false or fraudulent claims paid or approved by the State of Illinois in violation of the Illinois

False Claims Act, 740 ILCS 175/3(a)(1)(B) and the WRPA, 740 ILCS 175/3(a)(2).

409.   Specifically, The Illinois Institutes of Art knowingly submitted or caused to be

submitted, and knowingly made, used or caused to be made or used, false certifications and

representations in their ISAC Program Participation Agreements of compliance with the HEA

and the corresponding Department of Education regulations, which include the Incentive

Compensation Ban and the Regulatory Safe Harbor, and with Illinois law's requirement of a

valid federal Program Participation Agreement when in fact, The Illinois Institutes of Art were

not in compliance with Title IV of the HEA and its associated safe harbor regulations.

410.    At the time The Illinois Institutes of Art executed the 2004 and 2006 ISAC

Program Participation Agreements, the schools knew that they were not in compliance with Title

IV of the HEA's Incentive Compensation Ban and would not comply, and that disclosure of their

violations would render them ineligible to receive both MAP and Title IV funds.

411.    Since executing the 2004 and 2006 ISAC Program Participation Agreements, The

Illinois Institutes of Art have never notified ISAC that they were and are not in compliance with

Title IV of the HEA.

412.    Since executing the ISAC Program Participation Agreements in 2004 and 2006,

The Illinois Institutes of Art have submitted payment requests to ISAC on an ongoing basis.

413.    Every request for MAP grant funding constitutes a separate false claim under the

Illinois False Claims Act and the WRPA.

414.    Each of the MAP grants that Illinois disbursed to The Illinois Institutes of Art was

caused by The Illinois Institutes of Art's false certifications and statements in their ISAC

Program Participation Agreements and payment requests that they were in compliance with Title

IV of the HEA, and were therefore eligible to receive MAP grant funding.

415.    In submitting or causing to be submitted, and in making, using or causing to be

made or used such certifications, representations, and claims, The Illinois Institutes of Art acted

with actual knowledge, reckless disregard or deliberate ignorance of the truth or falsity of the certifications, representations, and claims.

416.    The Illinois Institutes of Art's false statements and certifications of compliance with Title IV of the HEA fraudulently induced the State of Illinois to enter into the ISAC Program Participation Agreements and were material to the State of Illinois' payment of MAP funds to The Illinois Institutes of Art.  Even if the The Illinois Institutes of Art had not affirmed to the State of Illinois that they would comply with Title IV of the HEA's Incentive Compensation Ban, the mere fact that such compliance was material to the State of Illinois' decision to make them eligible for MAP grant funds, combined with the fact that The Illinois Institutes of Art, knowing that they were in violation of the Incentive Compensation Ban and therefore ineligible to receive MAP funds, submitted claims for MAP funds, makes them liable under the Illinois False Claims Act and the WRPA.

417.    The State of Illinois was unaware of the falsity of the records, certifications, statements, and claims made and submitted by The Illinois Institutes of Art, and as a result thereof, paid money that otherwise would not have been paid.

418.    By virtue of these false or fraudulent claims, the State of Illinois suffered damages in an amount to be determined at trial.

419.    The State of Illinois is entitled to the maximum penalty of $11,000 and treble damages for each and every violation alleged herein.

## COUNT XII– ILLINOIS

## PAYMENT BY MISTAKE OF FACT

420.    Plaintiff, the State of Illinois, realleges and incorporates by reference the allegations made in paragraphs 1 through 168, 265 to 277, and 312 to 419 of this Complaint as though fully set forth herein.

421.    This is a claim for recovery of monies paid by the State of Illinois to The Illinois Institutes of Art by mistake.

422.    The Illinois Institutes of Art's compensation system violated Title IV of the HEA and was not eligible for the Regulatory Safe Harbor, because the compensation awarded under that system did not constitute "fixed compensation."

423.    Even if The Illinois Institutes of Art's compensation system was deemed to be "fixed compensation," the schools still did not qualify for the Regulatory Safe Harbor because the sole factor that determined changes to the compensation of ADAs was the number of students recruited by the ADAs.

424.    The State of Illinois, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the claims, paid to The Illinois Institutes of Art sums of money to which they were not entitled, and The Illinois Institutes of Art are thus liable to account and pay such amounts, which are to be determined at trial, to the State of Illinois.

## COUNT XIII – ILLINOIS

## UNJUST ENRICHMENT

425.    Plaintiff, the State of Illinois, realleges and incorporates by reference the allegations made in paragraphs 1 through 168, 265 through 277, and 312 through 424 of this Complaint as though fully set forth herein.

426.    This is a claim for the recovery of monies by which The Illinois Institutes of Art have been unjustly enriched.

427.    As described above, The Illinois Institutes of Art received, and/or have continued to maintain control over, state monies to which they were not entitled.

428.    By directly or indirectly obtaining state funds to which they were not entitled, The Illinois Institutes of Art were unjustly enriched and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the State of Illinois.

## COUNT XIV – INDIANA

**VIOLATIONS OF INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT**

429.    The State of Indiana re-alleges and incorporates herein by reference paragraphs 1 through 168, and paragraphs 180 through 264 of the Complaint.

430.    Defendants intentionally or knowingly presented or caused to be presented false or fraudulent claims, records, and statements to the State of Indiana for payment, in violation of the Indiana False Claims Act, Ind. Code § 5-11-5.5-2(b)(1), (2), and (8).

431.    Defendants were aware of their obligation under the Indiana Code, Indiana Administrative Code, Indiana Agreements, and Title IV of the HEA, to make or use truthful records and/or statements and to comply with the Incentive Compensation Ban.

432.    Defendants also knew that their submissions to SSACI would be used by the State of Indiana to determine whether the institution would receive Indiana financial aid funding, and were required for the payment of the funds to occur.

433.    Specifically, Defendants Education Management Corporation and its subsidiary corporations Brown Mackie College - Fort Wayne, Brown Mackie College - Indianapolis, Brown Mackie College – Merrillville, Brown Mackie College – Michigan City, Brown Mackie College – South Bend, and the Art Institute of Indianapolis, knowingly submitted false certifications regarding compliance with the requirements of Title IV of the HEA, and that each institution in Indiana was an eligible institution under Title IV, in, inter alia, its PPAs and Indiana Agreements, as well as in student grant applications and EDMC's Reconciliation Forms, in order to obtain Indiana financial aid funding, when in fact, EDMC's compensation system, as designed and as

107

implemented by EDMC, was not compliant with the Title IV of the HEA and its associated safe

harbor regulations, and therefore the institutions were not eligible institutions or approved

institutions for Indiana financial aid funding.  In practice, the sole factor that determined changes

to the compensation of EDMC's admissions personnel was the number of students recruited by

the admissions employee during the previous twelve months.  In submitting or causing to be

submitted such certifications and applications, EDMC acted with actual knowledge, reckless

disregard or deliberate ignorance of the truth or falsity of the claims.

434.    As a direct and proximate cause of the Defendants' false and fraudulent claims,

records, statements and unlawful conduct, the State of Indiana has suffered, and continues to

suffer, damages in an amount to be determined at trial.

435.    The State of Indiana is entitled to a civil penalty of at least five thousand dollars

($5,000) for each false claim presented to the State of Indiana for payment or approval or false

record or statement made or used to obtain payment or approval of a false claim from the State of

Indiana; and up to three (3) times the amount of damages sustained by the State of Indiana; and

to costs of a civil action brought to recover a penalty or damages; and for all other relief the

Court deems just.

## COUNT XV – INDIANA

## COMMON LAW FRAUD

436.    The State of Indiana re-alleges and incorporates herein by reference paragraphs 1 through 168 and paragraphs 180 through 264 of the Complaint.

437.    Because EDMC's compensation system based changes in admissions-personnel compensation in part upon the number of students recruited by the admissions personnel during the previous compensation-review period, EDMC's compensation system as designed and as implemented violated Title IV of the HEA.

438.    As such, since 2003, when EDMC certified to the SSACI that it was compliant with Title IV regulations, EDMC caused false or fraudulent claims to be made to the State of Indiana and received Indiana financial aid for which it did not qualify.

439.    EDMC made and/or caused to be made these fraudulent material misrepresentations, failing to disclose material facts that it had a duty to disclose, with actual knowledge or belief of the false and fraudulent nature of those misrepresentations and/or with reckless disregard for the truth.

440.    EDMC intended that the State of Indiana act or refrain from acting in justifiable reliance on these misrepresentations. This reliance caused loss to the State of Indiana. This loss was foreseeable by EDMC.

441.    The State of Indiana did, in fact, rely upon EDMC's false and fraudulent claims. As a result, since at least January 1, 2003, the State of Indiana has paid substantially more for EDMC student financial aid than it should have and paid EDMC claims that were ineligible.

442.     EDMC's representations of their compliance with Title IV of the HEA's incentive compensation prohibitions and consequently their representations that their Indiana institutions were Title IV eligible thus constituted misrepresentations of material fact.

443.     As a direct and proximate result of EDMC's fraudulent conduct or intentionally false and misleading misrepresentations and omissions, the State of Indiana has suffered and will continue to suffer harm. The State of Indiana is entitled to recovery of all losses, damages, costs, pre- and post-judgment interest, and any other legal or equitable relief deemed proper by the Court. Defendants are thus liable to account and pay for all losses, damages and costs, interest and other relief, which amounts are to be determined at trial, to the State of Indiana.

444.     The Defendants are jointly and severally liable for the relief owed to the State of Indiana under this Claim for Relief.

## COUNT XVI – INDIANA

## UNJUST ENRICHMENT

445.     The State of Indiana re-alleges and incorporates herein by reference paragraphs 1 through 168 and paragraphs 180 through 264 of the Complaint.

446.     For their unjust enrichment claim against the Defendants, the State of Indiana alleges the Defendants, through the acts and omissions described herein, are all in possession of state money that is rightful property of the Plaintiff State of Indiana. This money is a measurable benefit to the Defendants to which they are not entitled and its retention by the Defendants is unjust.

447.     The State of Indiana paid Indiana financial aid funding to Defendants to which the Defendants were not entitled.

448.     The State of Indiana's payments to Defendants were not gratuitous.

449.     The benefits Defendants received from the State of Indiana's payments are measurable.

450.     Defendants consciously accepted the benefits of these improper payments.

451.     Defendants have been unjustly enriched by retaining the use and enjoyment of monies that should not have been paid by the State of Indiana, pursuant to the Indiana financial aid programs, absent Defendants' false and fraudulent misrepresentations regarding their compliance with the Incentive Compensation Ban and Title IV regulations.

452.     Defendants received and/or have continued to maintain control over, Indiana monies to which they are not entitled.

453.     It would be unconscionable and against fundamental principles of justice, equity

and good conscience for Defendants to retain such monies paid to Defendants, particularly in view of the fraud and misrepresentation engaged in by Defendants.

454.     As a direct and proximate cause of the Defendants' wrongful conduct, the Defendants have been unjustly enriched and the State of Indiana has suffered a detriment.

455.     The State of Indiana is entitled to restitution and disgorgement from the Defendants of amounts they have unjustly and wrongfully received.

# IX.  PRAYERS FOR RELIEF

## A.    UNITED STATES' PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendants, as follows:

1.      On Counts I through III, under the Federal False Claims Act, as amended, for triple the amount of the United States' damages plus interest and such civil penalties as are allowable by law, together with the costs of this action and such other and further relief as may be just and proper.

2.      On Count IV, for payment by mistake of fact, for the damages sustained, plus pre-judgment and post-judgment interest, costs, and all such further relief as may be just and proper.

3.      On  Count V, for unjust enrichment, for the amount of unjust enrichment, plus pre-judgment and post-judgment interest, costs, and all such further relief as may be just and proper.

4.      That judgment be entered in favor of the United States and against the Defendants for actual damages, pre-judgment and post-judgment interest, litigation costs, investigative costs, disgorgement of all profits, and an accounting, to the fullest extent as allowed by law, and for such further relief as may be just and proper.

## B.     CALIFORNIA'S PRAYER FOR RELIEF

WHEREFORE, California demands and prays that judgment be entered in its favor

against Defendants, as follows:

1.      On Counts VI and VII, under the California False Claims Act, for triple the

amount of California's damages sustained as a result of Defendants' false claims in an amount to

be determined plus interest, and civil penalties in the amount of $10,000 for each false claim

pursuant to California Government Code Section 12651, subdivision (a) (2009), together with

the costs of this action and such other and further relief as may be just and proper.

2.      On Count VIII, for unjust enrichment, for the amount of unjust enrichment, plus

pre-judgment and post-judgment interest, costs, and all such further relief as may be just and

proper.

3.      That judgment be entered in favor of California and against the Defendants for

actual damages, pre-judgment and post-judgment interest, litigation costs, investigative costs,

disgorgement of all profits, and an accounting, to the fullest extent as allowed by law, and for

such further relief as may be just and proper.

## C.   **FLORIDA'S PRAYER FOR RELIEF**

WHEREFORE, the State of Florida demands that judgment be entered in favor of the State of Florida and the Relator against Defendants as follows:

1.     On Counts IX and X, Florida demands treble the amount of the State of Florida's actual damages in excess of $15,000 against the Defendants, individually or jointly as appropriate, for the period beginning January 1, 2006 through the date of trial pursuant to § 68.082(2), Fla. Stat.  In addition, Florida demands that Defendants, individually or jointly, as appropriate, be assessed a civil penalty of $11,000, for each and every false claim identified in this action.  Florida further demands payment of interest on the judgment, attorneys' fees, expenses, investigatory costs, and for such other and further relief as the Court deems just and equitable pursuant to §68.086, Fla. Stat.

D. **ILLINOIS' PRAYER FOR RELIEF**

WHEREFORE, the State of Illinois demands and prays that judgment be entered in its

favor against The Illinois Institutes of Art, as follows:

1.      On Count XI under the Illinois False Claims Act, for triple the amount of the State

of Illinois' damages plus interest and such civil penalties as are allowable by law up to $11,000

per claim, together with attorneys' fees, costs and expenses of this action and such other and

further relief as may be just and proper.

2.      On Count XII, for payment by mistake of fact, for the damages sustained, plus

pre-judgment and post-judgment interest, costs, and all such further relief as may be just and

proper.

3.      On Count XIII, for unjust enrichment, for the amount of unjust enrichment, plus

pre-judgment and post-judgment interest, costs, and all such further relief as may be just and

proper.

4.      That judgment be entered in favor of the State of Illinois and against the Illinois

Institutes of Art for actual damages, pre-judgment and post-judgment interest, attorneys' fees,

costs and expenses, disgorgement of all profits, and an accounting, to the fullest extent as

allowed by law, and for such further relief as may be just and proper.

### E.   INDIANA'S PRAYER FOR RELIEF

WHEREFORE, Plaintiff State of Indiana respectfully requests this Court to enter judgment for the State of Indiana and against Defendants Education Management Corporation and its subsidiary corporations Brown Mackie College - Fort Wayne, Brown Mackie College - Indianapolis, Brown Mackie College – Merrillville, Brown Mackie College – Michigan City, Brown Mackie College – South Bend, and the Art Institute of Indianapolis, as follows:

1.      On Count XIV, under the Indiana False Claims Act, an amount of three times the amount of damages sustained by the State of Indiana plus interest, a civil penalty of at least $5,000 for each false claim, all costs of this civil action, including reasonable attorneys' fees and expenses, and such other and further relief as may be just and proper.

2.      On Count XV, for common law fraud, for the damages sustained, punitive damages, plus pre-judgment and post-judgment interest, costs, and all such further relief as may be just and proper.

3.      On Count XVI, for unjust enrichment, for restitution and disgorgement for the amount of unjust enrichment, plus pre-judgment and post-judgment interest, costs, and all such further relief as may be just and proper.

4.      An order freezing the assets of Defendants, until such time as the Court has resolved the claims against the Defendants.

5.      That judgment be entered in favor of the State of Indiana and against the Defendants for actual damages, pre-judgment and post-judgment interest, litigation costs including attorneys' fees, investigative and enforcement costs, disgorgement of all profits, and an accounting, to the fullest extent as allowed by law, and for such further relief as may be just and proper.

## X.  **JURY DEMAND**

The United States, California, Florida, Illinois, and Indiana demand a trial by jury with

respect to all issues so triable.

Respectfully submitted,

TONY WEST
Assistant Attorney General

DAVID J. HICKTON
United States Attorney

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
Assistant U.S. Attorney
Western District of PA
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219-2401
(412) 894-7452
Christy.wiegand@usdoj.gov

**Counsel for the United States**

KAMALA D. HARRIS
Attorney General of California

MARK J. BRECKLER
Senior Assistant Attorney General

LARRY G. RASKIN
Supervising Deputy Attorney General


/s/ Kenny V. Nguyen
KENNY V. NGUYEN
Deputy Attorney General
Office of the Attorney General
1300 I Street
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 323-6311
Kenny.Nguyen@doj.ca.gov

**Counsel for California**


PAMELA JO BONDI
Attorney General for the State of Florida


/s/ Rene D. Harrod
RENE D. HARROD
Office of the Attorney General
State of Florida
110 SE 6th Street, 10th Floor
Ft. Lauderdale, FL 33301
(954) 712-4600
Fax: 954-527-3708
rene.harrod@myfloridalegal.com

**Counsel for Florida**

LISA MADIGAN
Attorney General for the State of Illinois


/s/ Jennifer Zlotow
JENNIFER ZLOTOW
Assistant Attorney General
IL ID No. 6280106
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, IL 60601
(312) 814-3000
(312) 814-4452 (Fax)
jzlotow@atg.state.il.us

**Counsel for Illinois**


GREGORY F. ZOELLER
Indiana Attorney General


/s/Patricia Orloff Erdmann
Patricia Orloff Erdmann
Deputy Attorney General
IN 17664-49A
Office of the Indiana Attorney General
Indiana Government Center South, 5th Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-6318
(317) 232-7979 (fax)
Patricia.Erdmann@atg.in.gov

/s/ Corinne Gilchrist
Corinne Gilchrist
Deputy Attorney General
IN 27115-53
Office of the Indiana Attorney General
Indiana Government Center South, 5th Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 234-2237
(317) 232-7979 (fax)
Corinne.Gilchrist@atg.in.gov

**Counsel for Indiana**

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of August, 2011, I have served a copy of the within

**JOINT COMPLAINT IN INTERVENTION BY THE UNITED STATES OF AMERICA,**

**AND THE STATES OF CALIFORNIA, FLORIDA, ILLINOIS, AND INDIANA**, either

electronically or by first-class United States mail, upon the following:

| | |
|---|---|
| Harry P. Litman, Esquire<br>LITMAN LAW FIRM<br>One Oxford Centre<br>301 Grant Street, 34th Floor<br>Pittsburgh, PA  15219<br>***Counsel for Relators*** | Thomas J. Farrell, Esquire<br>David H. Cook, Esquire<br>FARRELL & REISINGER, LLC<br>200 Koppers Building<br>436 Grant Street<br>Pittsburgh, PA  15219<br>***Counsel for Relators*** |
| David J. Chizewer, Esquire<br>William C. Meyers, Esquire<br>Courtney R. Baron, Esquire<br>GOLDBERG KOHN LTD.<br>55 East Monroe Street, Suite 3300<br>Chicago, IL  60603-5792<br>**Counsel for Relators** | H. Yale Gutnick, Esquire<br>Trent A. Echard, Esquire<br>STRASSBURGER McKENNA GUTNICK<br>  & GEFSKY<br>Four Gateway Center, Suite 2200<br>Pittsburgh, PA  15222<br>***Counsel for Relators*** |
| Laura E. Ellsworth, Esquire<br>Charles H. Moellenberg, Jr., Esquire<br>Scott W. Brady, Esquire<br>Amy K. Pohl, Esquire<br>Thomas S. Jones, Esquire<br>JONES DAY<br>500 Grant Street, Suite 4500<br>Pittsburgh, PA  15219<br>***Counsel for Defendants*** | Daniel E. Reidy, Esquire<br>JONES DAY<br>77 West Wacker<br>Chicago, IL  60601-1692<br>***Counsel for Defendants*** |
| Timothy H. Hatch, Esquire<br>GIBSON DUNN<br>333 South Grand Avenue<br>Los Angeles, CA  90071-3197<br>***Counsel for Defendants*** | Nikesh Jindal, Esquire<br>GIBSON DUNN<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C.  20036-5306<br>***Counsel for Defendants*** |

Kenny V. Nguyen, Esquire
California Attorney General's Office
1300 I Street
Sacramento, CA  95814
***Counsel for Plaintiff California***

Rene D. Harrod, Esquire
Florida Attorney General's Office
110 SE 6th Street, 10th Floor
Ft. Lauderdale, FL  33301
***Counsel for Plaintiff Florida***

Jennifer M. Zlotow, Esquire
Illinois Attorney General's Office
James Thompson Building, 11th Floor
100 W. Randolph Street
Chicago, IL  60601
***Counsel for Plaintiff Illinois***

Charles F. Godbey, Esquire
Illinois Attorney General's Office
Special Litigation Bureau
James Thompson Building, 13th Floor
100 W. Randolph Street
Chicago, IL  60601
***Counsel for Plaintiff Illinois***

Patricia O. Erdmann, Esquire
Corinne W. Gilchrist, Esquire
Indiana Attorney General's Office
Indiana Government Center South,
5th Floor
302 W. Washington Street
Indianapolis, IN  46204
***Counsel for Plaintiff Indiana***

Glenn S. Kaplan, Esquire
Massachusetts Attorney General's Office
One Ashburn Place
Boston, MA  02108
***Counsel for Plaintiff Massachusetts***

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
Assistant U.S. Attorney