# EXHIBIT 1

# EDUCATION MANAGEMENT CORPORATION

REPORT OF THE LITIGATION COMMITTEE

DATED MAY 4, 2011

Leo F. Mullin
Paul J. Salem

R. Todd Cronan
Stuart M. Glass
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109

### TABLE OF CONTENTS

Page

I. Executive Summary ............................................................................................. 1
   A. Background ................................................................................................. 2
   B. The Investigation ....................................................................................... 3
   C. Summary of the Reasons for the Litigation Committee's Decision ......... 4
      1. EDMC Maintains an Extensive and Robust Internal Control
         Structure .......................................................................................... 5
      2. EDMC Maintains an Effective System of Corporate Governance
         Practices and Procedures ................................................................. 8
      3. The Evidence Does Not Support the Specific Allegations Identified
         in the GAO Report or Demand Letters ........................................... 10
   D. Litigation Committee Conclusion .............................................................. 13

II. Background of the Investigation ........................................................................ 13
   A. EDMC ........................................................................................................ 13
   B. GAO Report and Subsequent Revisions .................................................... 14
      1. Initial GAO Report ........................................................................... 14
      2. Revised GAO Report ......................................................................... 16
   C. Critiques of GAO Investigation and Reports ............................................ 17
   D. Demand Letters .......................................................................................... 19
      1. Summary of the Demands Made by the Shareholders ...................... 19
      2. Shareholders Fail to Provide Any Support for the Allegations in
         the Demand Letters ........................................................................... 21

III. The Litigation Committee Process ..................................................................... 22
   A. Establishment of Litigation Committee ..................................................... 23
      1. Composition of Litigation Committee .............................................. 24
      2. Disinterestedness of the Litigation Committee ................................ 25
      3. Retention of Counsel ........................................................................ 30
   B. Scope of the Investigation .......................................................................... 30

IV. Governing Legal Principles ................................................................................ 31
   A. Pennsylvania Law Relating to Fiduciary Duties ....................................... 32
      1. Duty of Care ...................................................................................... 32
      2. Duty of Loyalty ................................................................................. 34

V. Findings Regarding Internal Controls ................................................................ 35
   A. Company-Wide Standards .......................................................................... 36
      1. The Code of Conduct ........................................................................ 36
      2. The Integrity Brochure ..................................................................... 39
   B. The Hotline Committee .............................................................................. 40
      1. Overview of the Hotline Process ...................................................... 40
      2. Review of Hotline Submissions ....................................................... 42
   C. Internal Audit Department .......................................................................... 44
      1. School Audits .................................................................................... 45
      2. Review of a School Audit ................................................................. 47
      3. Review of a Corporate Process Audit .............................................. 49

i

## TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| D. | | Online Higher Education Department | 50 |
| | 1. | Internal Audit and Compliance Department | 51 |
| | | a. Call Monitoring | 51 |
| | | b. Auditing | 54 |
| | | c. Reporting | 55 |
| | 2. | OHE Marketing and Admissions | 56 |
| E. | | Corporate Services Marketing and Admissions Department | 59 |
| | 1. | Training and Messaging to Admissions Staff | 60 |
| | | a. On-boarding | 60 |
| | | b. Polishing-Off | 64 |
| | | c. Ongoing Training | 64 |
| | 2. | Compliance and Remediation | 64 |
| | | a. Observations | 65 |
| | | b. Mystery Shopping | 66 |
| F. | | Financial Aid | 67 |
| | 1. | Intake | 67 |
| | 2. | Processing | 68 |
| | 3. | Regulatory Policy and Compliance | 69 |
| G. | | Regulatory Affairs | 69 |
| H. | | The Business Practices Committee | 71 |
| I. | | Sarbanes-Oxley Controls | 72 |
| J. | | Compliance | 72 |

| VI. | | Findings Regarding Corporate Governance | 73 |
|---|---|---|---|
| A. | | Corporate Governance | 73 |
| | 1. | Background on EDMC Corporate Governance Structure | 74 |
| | | a. The Board of Directors | 74 |
| | |    i. Board Composition | 74 |
| | |    ii. Independence of Board | 76 |
| | | b. Board Committees | 76 |
| | |    i. The Audit Committee | 76 |
| | |    ii. Compensation Committee | 77 |
| | |    iii. Nominating and Corporate Governance Committee | 78 |
| | | c. Officers of EDMC | 78 |
| | | d. Senior Management Committees | 81 |
| | |    i. Financial Disclosure Committee | 81 |
| | |    ii. Management Committee | 81 |
| | |    iii. Executive Committee | 81 |
| B. | | Corporate Governance Findings Related to Allegations of Breaches of the Duty of Care | 82 |
| | 1. | Role of the Board | 82 |
| | | a. Time Commitment and Regular Attendance | 82 |
| | | b. Need to be Informed and Prepared and Reliance on Others | 82 |
| | 2. | Role of the Audit Committee | 85 |
| | | a. Time Commitment and Regular Attendance | 85 |
| | | b. Need to be Informed and Prepared and Reliance on Others | 85 |

| | | | | Page |
|---|---|---|---|---|
| | | 3. | Role of Senior Management | 86 |
| | C. | Corporate Governance Findings Related to Allegations of Breaches of the Duty of Loyalty | | 87 |
| | | | | |
| VII. | | Findings Regarding the Specific GAO-Related Allegations | | 87 |
| | A. | GAO Reports Allegations Are Unsubstantiated | | 88 |
| | | 1. | Analysis of Program Cost Allegation | 88 |
| | | 2. | Analysis of Graduation Rate Allegation | 90 |
| | | 3. | No Evidence of Alleged Conduct Occurring Elsewhere | 91 |
| | B. | Investigation of Other Allegations | | 92 |
| | | 1. | Demand Letter and GAO-Derived Allegations | 93 |
| | | | a. Providing False Accreditation Information | 93 |
| | | | b. Misrepresentation/Refusal to Provide Graduation Rates | 94 |
| | | | c. Deceptive Financial Aid Practices | 95 |
| | | | d. Employing Questionable Sales and Marketing Tactics | 95 |
| | | | e. Basing Admission Personnel Compensation on Number of Enrolled Students | 97 |
| | | | f. Creating False Reasons to Terminate Admissions Representatives | 98 |
| | | | g. Manipulation of Employment Statistics | 98 |
| | | | h. "Vocational Training" and "Cost Structures" | 99 |
| | | 2. | Additional *Gaer* Allegations | 99 |
| | | | a. Admission Personnel Interference with Financial Aid | 100 |
| | | | b. Evasive Answers Regarding Transfer Credits | 101 |
| | | | c. Academic Quality Issues/Misrepresentation about Academic Obligations | 101 |
| | | | d. Enrollment Data Inflation | 102 |
| | | | e. Basing ADA Compensation "Solely" on Students Enrolled | 102 |
| | | 3. | References to Other Litigations | 104 |
| | | | | |
| VIII. | | Conclusions | | 105 |
| | | | | |
| | | | | |
| Appendix A – Bushansky Correspondence | | | | |
| | A. | August 23, 2010 Demand Letter from Bushansky's Counsel | | A-1 |
| | B. | November 19, 2010 Letter from Goodwin Procter LLP to Bushansky's Counsel | | A-6 |
| | C. | February 22, 2011 Letter from Goodwin Procter LLP to Bushansky's Counsel | | A-7 |
| | D. | March 10, 2011 Letter from Bushansky's Counsel to Goodwin Procter LLP | | A-8 |
| | E. | March 16, 2011 Letter from Goodwin Procter LLP to Bushanksky's Counsel | | A-11 |
| | F. | April 6, 2011 Letter from Goodwin Procter LLP to Bushansky's Counsel | | A-13 |
| | G. | April 20, 2011 Email from Goowin Procter LLP to Bushansky's Counsel | | A-14 |
| | H. | May 4, 2011 Letter from Goodwin Procter LLP to Bushansky's Counsel | | A-15 |

## TABLE OF CONTENTS

Appendix B – Ganley Correspondence
    A.     October 7, 2010 Demand Letter from Ganley's Counsel ...................................B-1
    B.     January 19, 2011 Letter from Goodwin Procter LLP to Ganley's Counsel.........B-4
    C.     January 20, 2011 Letter from Ganley's Counsel to Goodwin Procter LLP.........B-5
    D.     February 22, 2011 Letter from Goodwin Procter LLP to Ganley's Counsel.......B-6
    E.     May 4, 2011 Letter from Goodwin Procter LLP to Ganley's Counsel................B-7

## I.    EXECUTIVE SUMMARY

A committee of the Board of Directors of Education Management Corporation (the "Litigation Committee") has conducted an investigation in response to two shareholder demand letters received by the Company.  The Litigation Committee consists of Leo Mullin and Paul Salem.  Messrs. Mullin and Salem are disinterested directors within the meaning of the ALI Principles of Corporate Governance.  This report summarizes the investigation and conclusions reached by the Litigation Committee.

The first demand letter, dated August 23, 2010, was sent by Joseph H. Weiss, Esq., as counsel for Stephen Bushansky (the "Bushansky Demand Letter").  The second demand letter, dated October 27, 2010, was sent by Eric L. Zagar, Esq., as counsel for Karen Ganley (the "Ganley Demand Letter," and together with the Bushansky Demand Letter, the "Demand Letters").  EDMC received the Demand Letters in the wake of the release of a report prepared by the United States Government Accountability Office ("GAO"), dated August 4, 2010, which asserted that certain for-profit educational institutions had engaged in allegedly deceptive and questionable practices.  Both Demand Letters, which make substantially the same allegations, request that the Board of Directors of EDMC (the "Board") investigate and take necessary actions in response to the GAO report.

The Bushansky Demand Letter requests the Company to investigate all of the allegations found in the GAO report, install an adequate system of internal controls to identify and prevent unlawful activity, and make changes to the Company's corporate governance system.  The Ganley Demand letter alleges the officers and directors of EDMC breached their fiduciary duties by knowingly approving "illegal business practices" and/or "abdicating their responsibility to make a good faith effort to oversee the Company's operations and business practices."

The Litigation Committee conducted an extensive investigation into the matters raised in the Demand Letters. The Committee concludes that the Company has a robust set of internal controls that are properly designed to identify, deter and remediate the types of allegedly deceptive and questionable practices referred to in the Demand Letters and the GAO report. These internal controls are supported by a properly designed and staffed corporate governance structure. The Litigation Committee also concludes that there has been no breach of the fiduciary duty owed by the officers or directors of EDMC in connection with their oversight of the internal control and corporate governance systems in place at EDMC. Further, the Litigation Committee's investigation did not uncover evidence showing that the types of conduct identified in the Demand Letters and GAO report are in fact occurring at EDMC. Accordingly, the Litigation Committee has determined that it would not be in the best interests of the Company or its shareholders to take the actions demanded in the Demand Letters.

## A.    BACKGROUND

EDMC, one of the largest providers of private post-secondary education in North America, was part of a broad GAO investigation in which the GAO sent undercover representatives to meet with admissions and financial aid representatives at fifteen for-profit colleges. Only one of EDMC's 104 schools – Argosy University in Chicago, Illinois ("Argosy University – Chicago") – was part of this investigation. With respect to Argosy University – Chicago, the investigation involved two interactions between undercover GAO representatives and one of EDMC's approximately 3,500 assistant directors of admission ("ADA"). Based upon these interactions, the GAO initially reported that, while there was no evidence of fraudulent activity, the employee at Argosy University – Chicago had engaged in three types of improper activity: allegedly deceptive and/or otherwise questionable practices (*i.e.*, provided misleading information on program duration cost ("Program Cost Allegation"), refusing to provide

graduation rates ("Graduation Rate Allegation"), and providing misleading information about the professional experience of professors ("Professor Experience Allegation")) and a good practice (*i.e.*, provided reasonable information about prospective salaries and potential employment). The GAO initially reported several fraudulent, deceptive and/or questionable practices at the fourteen other schools subject to its investigation, such as providing false accreditation information, misrepresenting employment opportunities, and providing questionable financial aid advice.

On November 30, 2010, the GAO released a revised report that made substantial revisions to its initial findings. With respect to Argosy University – Chicago, the new report completely removed the Professor Experience Allegation, diluted the GAO's findings related to the Program Cost Allegation, but left the good practice attributed to EDMC unchanged. As to the remaining fourteen for-profit colleges, the revised GAO report similarly recanted many of the allegedly deceptive and/or questionable practices discussed in the initial report. On December 1, 2010, amidst political and public criticism about the lack of rigor and independence of its initial fact finding process, the GAO released audio recordings made during its interactions with the ADA at Argosy University – Chicago. As discussed below, the audio recordings provided limited and unpersuasive evidence in support of the allegations of deceptive and/or questionable practices at Argosy University – Chicago.

**B.    THE INVESTIGATION**

Shortly after the release of the original GAO report EDMC received the Demand Letters. No effort has been made by counsel for the shareholders to update the Demand Letters following the release of the revised GAO report or the audio recordings. Both Demand Letters, without providing specific factual support or examples of misconduct, attribute all of the alleged deceptive and/or wrongdoing found in the GAO's initial report to EDMC, and summarily

3

conclude that the Company's officers and directors must have breached their fiduciary duties by failing to properly oversee EDMC's operations and business practices.

In response to the Demand Letters, the Board adopted a resolution creating the Litigation Committee pursuant to Section 1731 of the Pennsylvania Associations Code, Title 15 Pa. C.S., including Subpart B known as the Business Corporation Law of 1988 and Section 3.1 of the Company's Amended and Restated Bylaws. The Board delegated to the Litigation Committee the power and authority to: (1) review, analyze, and investigate the allegations in the Demand Letters; (2) engage legal counsel and other experts to conduct the investigation, and draft a report setting forth conclusions and recommendations resulting from the investigation, on behalf of the Committee; and (3) determine the appropriate actions, if any, the Company should pursue in response to the Demand Letters. Messrs. Mullin and Salem were appointed by the Board to serve on the Litigation Committee.

The Litigation Committee oversaw a thorough review and analysis of the factual and legal issues identified in the Demand Letters. During this process, members of the Litigation Committee were advised by independent legal counsel, Goodwin Procter LLP, who conducted approximately forty (40) witness interviews and reviewed more than 163,000 pages of documents pertaining to the allegations raised by the Demand Letters. The Litigation Committee and its counsel met on numerous occasions to discuss and analyze the information collected through this investigative process. During its investigation, the Litigation Committee also requested that counsel for Mr. Bushansky and Ms. Ganley provide factual support for their allegations; however, no such support was ever provided.

## C. SUMMARY OF THE REASONS FOR THE LITIGATION COMMITTEE'S DECISION

The principal reasons for the Litigation Committee's decision to reject the demands set for in the Demand Letters are that: (1) an extensive and robust internal control structure exists at

EDMC; (2) an effective system of corporate governance and procedures is present at the Company; and (3) the evidence does not support the allegations of wrongdoing at EDMC made in the Demand Letters.

### 1. EDMC Maintains an Extensive and Robust Internal Control Structure

The Litigation Committee determined that EDMC has an extensive and properly designed system of internal controls. These internal controls operate to educate and train the Company's employees on significant policies of practices, to monitor the performance of departments and individuals, and to take remedial efforts as appropriate. In sum, the Litigation Committee found a robust internal control structure that safeguards the Company against the types of wrongdoing identified by the Demand Letters and GAO reports.

*Education & Training*: EDMC sets high standards of conduct for all directors and employees and trains each employee on those standards. These standards are imposed under the Company's Code of Conduct ("Code"), which requires nothing less than full compliance with the highest moral, legal, ethical, and financial reporting standards. All employees, regardless of position, must certify that they understand the Code. The Code, moreover, provides mechanisms for employees to report suspected misconduct and makes clear that retaliation for reports made will not be tolerated.

In accordance with the high ethical standards set by the Code and other Company policies, EDMC employees receive extensive training. Employees involved in the admissions process – *i.e.*, assistant directors of admissions ("ADAs") – receive three weeks of "on-boarding" training, five days of "polishing-off" training, as well as continuing guidance throughout their employment on best practices. During the initial phase of training, ADAs, among other things, learn how to provide accurate messages to prospective students and practice appropriate

recruiting strategies. ADAs then must pass multiple tests before interacting with prospective

students. Even after passing these tests, ADAs are monitored during the "polishing-off" process

to ensure compliance with Company standards. Additional training is provided by specialists on

topics such as common compliance violations throughout an employee's tenure at the Company.

   *Monitoring & Remediation*: The Litigation Committee also found a series of internal

controls at EDMC that are designed to detect and remediate the types of behavior identified in

the Demand Letters and GAO report. These internal controls include:

- The Internal Audit Department ("IAD"), which identifies and remediates risks facing EDMC by auditing corporate processes, ground schools, and the Online Higher Education Division ("OHE"). These audits allow the Company to, among other things, verify compliance with internal policies and regulatory requirements, deter fraud by encouraging appropriate controls, and identify best practices. All business activities of EDMC are subject to auditing, and IAD identifies the frequency of such audits using a risk-based approach. At the conclusion of its audits, IAD issues a comprehensive and objective assessment of its findings and recommendations.

- OHE Internal Audit and Compliance Department, which performs a similar function as IAD within OHE, is designed to prevent, mitigate and remediate, among other things, student-facing risks by monitoring interactions between students and ADAs or Student Financial Services ("SFS") representatives in OHE. This department monitors conversations with students to assess compliance with internal policies and applicable regulations. Poor performing ADAs and SFSs receive remediation – ranging from verbal coaching, re-training or termination depending upon the severity of the grade and number of previous infractions – when appropriate.

- Corporate Services ("CS") Marketing and Admissions Department ensures that ADAs conduct themselves according to the Company's standards of ethical conduct by using, among other things, frequent observations and "mystery shopping." Observations track compliance with internal policies by allowing directors to listen to phone conversations between ADAs and prospective students, while "mystery shopping" employs a third-party vendor posing as a prospective student to ask ADAs difficult questions and assess their responses. Both observation and "mystery shopping results" are graded and remediated on a scale similar to that of OHE.

- The CS and OHE Marketing and Admissions Departments have policies and procedures related to admissions personnel at ground schools and the online brands to ensure compliance with federal regulations and Company policy

regarding interactions with prospective students. The Compliance FAQ Guide and associated multi-week training embodies this commitment by ensuring that each ADA understands how to deliver legally and factually correct information while interacting with prospective students. ADAs must take an exam annually on this information; initial failure suspends any student interaction, and successive failures lead to termination. ADAs also learn and are tested on the techniques of proper salesmanship, which require ADAs to build a relationship with the prospective student based on trust and honesty as they select the features and benefits of the school to match the student's needs and values. ADAs also attend ongoing training activities related to ethical compliance.

- A Corporate Compliance Hotline is accessible twenty-four hours a day, seven days a week, as a way to anonymously report suspected misconduct. Reports submitted through this hotline are sent to, and investigated by, a committee comprised of senior management from the Human Resources, Legal, and the Internal Audit Departments. This committee assesses the merits of allegations, oversees investigations where appropriate, determines whether corrective action is necessary, and follows up on recommendations for remediation. The Audit Committee of the Board of Directors, moreover, is updated quarterly about these reports. The Litigation Committee's review of Hotline submissions and Hotline Committee activity in 2009 and 2010 only yielded nine submissions, broadly construed, as relating to the types of potential ethical violations raised in the Demand Letters. Each incident was properly investigated by the Hotline Committee.

- EDMC has additional internal control processes designed to ensure compliance with regulatory requirements regarding financial aid. Ground school campus directors are responsible for training SFS representatives in connection with the intake of financial aid applications. In addition, SFS representatives undergo "Back to Basics" training, whereby they learn rules, regulations, and best practices related to financial aid. The Student Finance and Compliance Department addresses regulatory policy and compliance.

- EDMC also has a senior-level position dedicated to the compliance function that reports directly to the Company's General Counsel. The Vice President of Compliance implements EDMC's compliance program designed to emphasize EDMC's values and promote a culture of integrity. Among other responsibilities, the Vice President of Compliance develops policies and programs that encourage employees to report alleged misconduct without fear of retaliation and works with Internal Audit to conduct risk assessments and Human Resources on training programs for all employees.

- The Audit Committee of the Board is extremely active and engaged – meeting on twelve occasions between September 2009 and November 2010. This committee, in accordance with governing law and regulations, consists of three independent directors with one member who is a certified financial

expert. It was created to assist the Board with oversight on a number of topics, including compliance with legal and regulatory authority and review of the internal audit functions at the Company. In performing its duties, among other things, the Audit Committee regularly reviews and discusses with the Company's senior management: (i) quarterly and annual audits completed by internal and external auditors, (ii) reports received by the Company's hotline, available to employees to submit information regarding unethical conduct, (iii) significant lawsuits and investigations, (iv) personnel training and quality assurance, (v) school accreditation, (vi) risks associated with proposed or newly enacted post-secondary education regulations, and (vii) the integrity of the Company's financial statements.

## 2.    EDMC Maintains an Effective System of Corporate Governance Practices and Procedures

The Litigation Committee also found that the Company maintains a strong corporate governance structure and there is no evidence that any director or officer breached his or her fiduciary duties to EDMC.

Under Pennsylvania law, each director and officer of EDMC owes a duty of care and loyalty to the Company. The duty of care, which primarily relates to being properly informed and overseeing the management of the corporation, mandates that directors and officers act in good faith by acting with the care that a person in a like position would reasonably believe appropriate under similar circumstances. When due care is taken, the business judgment rule imposes a presumption that decisions made are in the best interests of the company to prevent second-guessing of business decisions by courts. The duty of loyalty, moreover, requires that directors and officers act only in the interests of the corporation, rather than acting intentionally with a purpose other than that of advancing the best interests of the corporation. The Litigation Committee investigation revealed that the directors and officers of EDMC have satisfied these fiduciary duties to the Company by establishing, and maintaining, appropriate governance structures and the Demand Letters contain no facts to the contrary.

The Board – which consists of ten directors who are entrepreneurs, attorneys, senior business executives, former government officials, and investment bankers – is empowered, not to mention well-equipped, to make decisions related to, and provide oversight of, EDMC's business and affairs. It conforms with the requirements imposed under federal law, as well as those imposed by NASDAQ, by maintaining the requisite number of independent directors and delegating the appropriate decision-making authority to the Board's committees which include an Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. Notably, in accordance with governing laws and regulations, the Audit Committee is comprised solely of independent directors, with one certified financial expert, and, among other things, oversees compliance with legal and regulatory requirements, ensures the integrity of the Company's financial statements, and supervises the external and internal auditors at EDMC.

The Board regularly meets and proactively addresses the types of concerns identified in the Demand Letters and GAO report. The Board has near perfect attendance – maintaining a 95% attendance rate between its initial public offering in October 2009 and November 2010 – and has held eleven (11) meetings since September 2009. During its meetings the Board regularly considers a wide-range of topics related to the Company's business and affairs, including but not limited to accreditation, regulatory and compliance issues, significant litigations, and employee quality. Senior management also reports to the Board regarding issues related to prospective students (*e.g.*, enrollment trends and financial aid issues), enrolled students (*e.g.*, academic quality), and graduates (*e.g.*, graduation rates and employment statistics). The Committees of the Board also routinely provide updates to the full Board, including the Audit Committee, which has presented on the structure and qualifications of EDMC's internal audit process. The Board considers special topics when necessary, such as when it devoted significant

9

time to considering newly proposed gainful employment regulations as well as the allegations in the Demand Letters and GAO Report. In sum, the directors are informed and prepared to respond regarding EDMC's business affairs.

Members of the senior management team – who have diverse backgrounds including extensive experience in post-secondary education (at for-profit as well as not-for profit institutions), law and government – are diligent in overseeing the day-to-day affairs of the Company. Senior management have created several committees – including the Financial Disclosure Committee (which designs and implements controls to ensure that relevant information is timely disclosed to management and the SEC), Management Committee (which meets monthly to discuss the short-term results of the Company and to facilitate strategy discussions), the Executive Committee (which meets monthly to provide a forum for a broad audience to update senior management on business performance, dissemination policies and procedures and provide feedback), and the Compliance Committee (which meets monthly and oversees EDMC's activities, policies, programs, and procedures to ensure compliance with relevant laws and regulations, and identifies legal and regulatory risks associated with the Company's business and reviews and the design of procedures and training programs to address such risks), which collectively allow the Company to address in a comprehensive and practical way the types of issues raised by the Demand Letters.

### 3. The Evidence Does Not Support the Specific Allegations Identified in the GAO Report or Demand Letters

The GAO investigation – which forms the basis for the Demand Letters – has been the subject of widespread criticism for its biased investigation of for-profit schools. The release of a revised GAO report, which post-dated the Demand Letters, served to further undercut the reliability of the GAO's investigation. Nevertheless, the two (2) remaining allegations directed

at Argosy University – Chicago were carefully investigated. After reviewing the transcripts of the GAO's undercover interactions with the one (1) employee at Argosy University – Chicago, in the GAO report and based on our independent investigation, the Litigation Committee did not find credible evidence to support these allegations. Moreover, the Litigation Committee finds no support that any director or officer of EDMC approved of, or acquiesced in, the activities identified in the GAO Reports or the Demand Letters.

The Revised GAO Report contains two allegations directed at Argosy University – Chicago: the Program Cost Allegation and the Graduation Rate Allegation. After reviewing the 138-page transcript of the ADA's interaction with undercover GAO investigators, the Litigation Committee found no evidence to support a conclusion that any "deceptive or questionable" practice occurred at EDMC related to either allegation. With respect to the Program Cost Allegation, which alleges that ADA provided an annual cost estimate for only one-fifth (1/5) of the total program, it is clear from the transcript that the undercover GAO representative never asked the ADA for the total cost of the program. The ADA, moreover, provided accurate price quotes per credit hour for the program in question, tallied the total cost – including tuition and fees – per semester, and noted that the duration of the program would depend upon the specific student's circumstances. As for the Graduation Rate Allegation, which alleges that the Argosy University – Chicago ADA failed to provide the graduation rate when asked, it is clear from the transcript that the ADA was asked whether everyone graduates, not for a specific rate, and responded that "not everyone graduates." Moreover, the Litigation Committee did not find evidence stating or suggesting that this alleged conduct occurs elsewhere at EDMC.

The Demand Letters, in addition to relying upon the unfounded allegations made by the GAO against one (1) ADA at Argosy University – Chicago, attempt to attribute all the alleged

11

misconduct that purportedly occurred at the other fourteen schools mentioned in the GAO Report to EDMC. The Demand Letters do not provide, and the Litigation Committee has not found, any support that employees of EDMC: provided false accreditation information, misrepresented or refused to provide graduation rates, engaged in deceptive financial aid practices, employed questionable sales or marketing tactics, based compensation on the number of students enrolled, created false reasons to terminate admissions representatives, or manipulated employment statistics. In contrast, during its investigation the Litigation Committee has found that the Company maintains internal controls and corporate governance practices designed to prevent the occurrence of such activity through proper training, monitoring, and remedial efforts.

In response to a request for additional information, counsel for Ganley also asked that the Litigation Committee should investigate "the related facts and allegations in *Gaer v. Education Management Corp.*, Case No. 2:10-cv-0161 ["*Gaer* Litigation"]." Most of the allegations contained in the *Gaer* Litigation also appear in the GAO Reports and Demand Letters. The Litigation Committee investigated those allegations that were non-duplicative, including allegations concerning interference with the financial aid process, evasive answers about the transferability of credits, misrepresentations about academic quality, inflation of enrollment data, and compensation of ADAs being based "solely" on the enrollment of students. As with the previous allegations, Ganley did not provide, nor did the Litigation Committee discover, any evidence that would support that any of these alleged actions occurred at EDMC. The Litigation Committee, moreover, determined that the Company has an extensive internal control system and corporate governance structure that is designed to prevent the occurrence of such alleged activities.

### D.   LITIGATION COMMITTEE CONCLUSION

After reasonable and diligent inquiry, the Litigation Committee determined in good faith and in the exercise of its business judgment that it would not be in the best interest of the Company or its shareholders to take the actions requested in the Demand Letters and, as such, has voted to reject the demands.

## II.   BACKGROUND OF THE INVESTIGATION

### A.   EDMC

EDMC is among the largest providers of private post-secondary education in North America with 104 locations in the United States and Canada.  Headquartered in Pittsburgh, Pennsylvania, and founded there in 1962, EDMC employs approximately 19,000 full-time, part-time and adjunct faculty and staff.  As of October 2010, EDMC had over 158,300 students enrolled in its four educational systems (and a total of 104 schools):  The Art Institutes, Argosy University, Brown Mackie Colleges, and South University.

The Company offers a broad range of undergraduate and graduate academic programs, ranging from doctoral degrees to specialized non-degree diplomas.  These programs include design, media arts, health sciences, psychology and behavioral sciences, culinary, fashion, business, legal, education and information technology.  Students attending EDMC schools in the United States are eligible to participate in federal student loans, grants and other forms of public and private financial aid programs, since each school is licensed or permitted to offer post-secondary programs by the state in which it is located, accredited by a national or regional accreditation agency and certified by the United States Department of Education ("DOE").

## B.   GAO REPORT AND SUBSEQUENT REVISIONS

### 1.   Initial GAO Report

On August 4, 2010, the GAO released a report entitled "For-Profit Colleges:  Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices," which describes the results of a GAO investigation that was designed to examine whether for-profit colleges engage in any fraudulent, deceptive, or otherwise questionable marketing practices (the "Initial GAO Report").  The Initial GAO Report was prepared at the request of the United States Senate Committee on Health, Education, Labor and Pensions (the "Senate HELP Committee").  The GAO selected fifteen for-profit colleges to be the subject of its investigation, Argosy University in Chicago, Illinois ("Argosy University – Chicago") was the only EDMC-owned school to be part of the GAO investigation.

During this investigation, undercover GAO representatives posed as potential students with fictitious identities and materials to meet with admissions and financial aid representatives at the colleges.  The undercover GAO investigators tested each college twice – once as a student eligible for federal grants or subsidized student loans and once as a student that would only qualify for certain unsubsidized loans.  Specifically, the Initial GAO Report identified the following deceptive and/or questionable practices at some of the fifteen colleges as:  providing false accreditation information; refusing to provide graduation rates; misrepresenting employment opportunities; exaggerating salary possibilities; providing misleading information on program duration and cost; providing questionable financial aid advice; and employing other questionable tactics.

The Initial GAO Report found that certain colleges "provided accurate or helpful information" to the undercover applicants.  According to the GAO, these colleges acted "[i]n line with federal regulations" by providing accurate information about:

- *Transferability of Credits.* "[U]ndercover applicants at several colleges were provided accurate information about the transferability of credits to other postsecondary institutions."

- *Financial Aid.* "Some financial aid counselors cautioned undercover applicants not to take out more loans than necessary or provided accurate information about what the applicant was required to report on his FAFSA"

- *Salaries and Potential for Employment.* "[S]ome admissions or career placement staff gave undercover applicants reasonable information about prospective salaries and potential for employment."

Only **one** of EDMC's 104 schools, Argosy University – Chicago, was included in the GAO investigation. This investigation into Argosy University – Chicago involved **only two** interactions between undercover GAO representatives and one of EDMC's approximately 3,500 assistant directors of admissions ("ADA"), this particular one at Argosy University – Chicago. The GAO found no fraudulent activity at Argosy University – Chicago.

The Initial GAO Report identified the following three instances of allegedly deceptive and/or otherwise questionable practices by the ADA when the undercover prospective student applied for a bachelor's degree program in psychology at Argosy University – Chicago:

(i) *Providing Misleading Information on Program Duration and Cost.* "Admissions representative said the bachelor's degree would take 3.5-4 years to complete, but only provided an annual cost estimate for 1/5 of the program."

(ii) *Refusing to Provide Graduation Rates.* The "[a]dmissions representative did not provide the graduation rate when directly asked. Instead she said 'not everyone graduates.'"

(iii) *Professional Experience of Professors.* "When the undercover applicant asked about the qualification of the professors, the only information provided about the qualifications of the professors is that they have professional experience."

As discussed below, the revised GAO report eliminated the third characterization because it was not supported by the evidence. Further the Initial GAO Report recognized that Argosy University – Chicago was one of only three colleges investigated where an employee displayed "good practices." Specifically, the GAO found that the ADA at Argosy University – Chicago

gave undercover applicants reasonable information about prospective salaries and potential for employment, including refusing to make any guarantees about job placement to prospective applicants

## 2. Revised GAO Report

On November 30, 2010, the GAO reissued their report to "clarify and add more precise wording to the report" (the "Revised GAO Report," and together with the Initial GAO Report, the "GAO Reports"). A spokesperson for the GAO asserted that "ultimately nothing has changed with the overall message of the report, and nothing has changed with any of our findings."[1] A review of the actual changes to the GAO report, however, reveals a significant number of substantive revisions to the GAO's initial findings. It also reveals that **_all_** the revisions made to the Initial GAO Report cut in one direction: in favor of the for-profit schools; which suggests a lack of rigor and perhaps a lack of independence in the initial fact finding process.

With respect to Argosy University – Chicago, the Revised GAO Report attributed the following misleading and/or deceptive practices to the targeted ADA:

(i) *Providing Misleading Information on Program Duration and Cost.* "Admissions representatives said the bachelor's degree would take 3.5-4 years to complete, but only provided an annual cost estimate for 1/5 of the program" (the, "Program Cost Allegation").

(ii) *Refusing to Provide Graduation Rates.* "Admissions representative did not provide the graduation rate when directly asked. Instead she indicated that not everyone graduates" (the, "Graduation Rate Allegation").

The Revised GAO Report did not remove or alter the good practice – regarding providing accurate information about job placement opportunities to the undercover investigators – attributed to the ADA at Argosy University – Chicago.

---

[1]    Tamar Lewin, *U.S. Revises Report on Commercial Colleges*, N.Y. TIMES, Dec. 9, 2010, at A35.

Notably, the Revised GAO Report substantially diluted the GAO's finding of deceptive and/or misleading practices by the ADA at Argosy University – Chicago. *First*, the Revised GAO Report removes any allegation that the ADA made deceptive or questionable statements about the professional experience of professors. *Second*, the Revised GAO Report modifies its findings related to the ADA's representations about graduation rates. The Initial GAO Report attributed a direct quote to the ADA (*i.e.*, "*said* 'not everyone graduates'") while the Revised GAO Report no longer contained any direct quote attributable to the ADA and rather simply stated that the ADA "*indicated* that not everyone graduates."

On December 1, 2010, the day after the GAO released its revised GAO report - the GAO also released audio recordings made during its undercover interactions with the ADA at Argosy University – Chicago. The audio recordings show the following with respect to the two remaining alleged instances of misconduct at Argosy University – Chicago:

- *Program Cost Allegation*: Admissions representative explained how students attend class and provided a per-credit hour cost for the first academic year.

- *Graduation Rate Allegation*: The undercover applicant does not ask for a graduation rate at any time, but instead asks "Does everyone graduate that starts?" To which the admissions representative responds, "Nah (inaudible) I don't know what our completion rate is, but I do know that it's not 100%."

As discussed below, it is a stretch to make any finding of misconduct at Argosy University-Chicago on the basis of these two audio recordings. It is an even greater stretch to attribute misconduct to EDMC *as a whole* on the very slim factual record contained in the GAO Report.

### C. CRITIQUES OF GAO INVESTIGATION AND REPORTS

The extensive changes made in the Revised GAO Report subjected the GAO and its investigation of for-profit college to widespread criticism by the media, industry activists and, notably, members of Congress. For example, Senator Michael Enzi, ranking member of the

17

Senate HELP Committee, wrote a letter to Gene Dodaro, then-Acting Comptroller General of the GAO, on December 7, 2010, observing that the revisions in the report raise "a number of troubling questions." Senator Enzi charged that while the GAO claimed to have only made moderate changes, "the revisions appear much more substantial" and observed that these changes "appear to undermine many of the allegations made in [the GAO] testimony, and suggest that information was either intentionally or reckless omitted and/or misrepresented." He concluded that the revisions "raise serious questions about the quality and rigor of this particular investigation" and requested that the GAO "withdraw [its] previous testimony and submit for the record [its] revised testimony."

Echoing the concerns of Senator Enzi, on December 21, 2010, a bipartisan group of House of Representative members sent a letter to Mr. Dodaro suggesting that the GAO failed to hold itself "to the highest standards of 'accountability, integrity, and reliability'" when investigating for-profit colleges. By way of this letter, the Representatives requested that the GAO explain, *inter alia*, whether the GAO's Office of General Counsel ("OGC") examined or investigated the facts surrounding the need to revise the report, whether the OGC examined the GAO Report's conclusions to ensure that they accurately reflect the analysis in the report, whether the OGC examined the methodology that the GAO used in the report, and why there was no announcement of the release of the Revised GAO Report on the GAO's website.

In January 2011 two House of Representative committees – the House Oversight and Government Reform Committee (the, "Oversight Committee") and House Education and Workforce Committee the "Education Committee," and collectively with the Oversight Committee, "the House Committees") – also launched a joint inquiry of the GAO as a result of its investigation of for-profit colleges. The House Committees, *inter alia*, have: (1) demanded

18

that the Director of the Forensic Audit and Special Investigations Unit at the GAO, the unit

responsible for the GAO Reports, be removed from further investigations pending the results of

an internal GAO review, (2) ordered the production of documents and testimony from the GAO

related to its investigation of the for-profit schools, and (3) noted that "we are alarmed about

reports that work papers including video recordings related to the proprietary schools

investigation and report may have been destroyed, effectively obscuring what actually took

place."

### D. DEMAND LETTERS

#### 1. Summary of the Demands Made by the Shareholders

Shortly after the Initial GAO Report was issued, and *prior to* the Revised GAO Report

and release of the GAO audio recordings, the Company received the Bushansky demand in a

letter dated August 23, 2010. The Bushansky Demand Letter directs the Board to investigate all

of the allegations found in the original GAO Report as they related to the fifteen schools, rather

than just the two particular allegations attributed to an ADA at Argosy University – Chicago.

The Bushansky Demand Letter also asks that the Board take any necessary corrective actions,

install a functioning and adequate system of internal controls to identify illegal activity, and

revise the Company's corporate governance system which has allegedly allowed the Board to

breach its fiduciary duties.

In most respects, the allegations made in the Ganley Demand Letter, which also *pre-dates*

the Revised GAO Report and release of GAO audio recordings, mirror those made in the

Bushansky Demand Letter. The Ganley Demand Letter, dated October 27, 2010, alleges that the

officers and directors of EDMC breached their fiduciary duties by knowingly approving "illegal

business practices" and/or "abdicating their responsibility to make a good faith effort to oversee

the Company's operations and business practices." The Ganley Demand Letter maintains that in

addition to the directors, certain officers, of the Company also breached their fiduciary duties by approving or acquiescing in the following practices:

- *Misrepresenting Accreditation Status*: "[M]aking false or misleading statements to prospective and/or enrolled students concerning the type, nature and extent of a school's accreditation and misidentifying the accrediting organization(s)." The letter goes on to assert that prospective and enrolled students were told that "an academic program was going to obtain accreditation from a national accrediting organization by a certain date," when in fact the accreditation was never obtain or applied for. As a result, graduates were unable to obtain employment and were ineligible for certain loan forgiveness or repayment plans.

- *Misrepresenting Graduation Rates*: "[M]isrepresenting or failing to provide graduation and completion rates to prospective and/or enrolled students."

- *Manipulating Job Placement Rates*: "[M]anipulating or falsifying job placement rates and exaggerating potential salaries to prospective and/or enrolled students."

- *Misrepresenting Program Costs*: "[M]isrepresenting the total cost of a program by giving prospective and/or enrolled students tuition figures based on nine months of classes per year and program duration based on twelve months of classes per year."

- *Manipulating Admissions Tests*: "[M]anipulating the results of admissions tests to ensure enrollment by allowing prospective students to take admissions tests multiple times until a passing grade is achieved, openly coaching prospective students during admissions tests and/or completing the test for them and/or submitting fraudulent protect forms."

- *Manipulating Grades*: "[M]anipulating prospective students' transcripts to achieve a grade point average that meets admissions requirements."

- *Utilizing Aggressive Recruiting Tactics*. "[U]sing overly aggressive recruiting tactics such as 'bring the pain,' *i.e.*, exploiting prospective students' sensitivities in order to presume them into enrollment."

- *Improper Compensation Practices*. "[B]asing compensation, including bonuses, paid to admissions representatives on the number of students enrolled; requiring admissions representative to meet enrollment quotas and instructing admissions representatives to conceal evidence thereof, such as salary matrixes and sales goals, from accreditation agencies during site visits."

- *Improper Terminations*. "[F]alsely creating reasons to terminate admissions representatives who do not achieve sales goals."

- *Manipulating Employment Statistics*: "[M]anipulating former students' employment status to claim a higher percentage of graduations gainfully employed in their field of

study . . . ." The letter goes on to assert that this manipulation included "overstating salaries, counting students who were employed for only a short amount of time in their field, eliminating from employment statistics graduates who would face salary cuts if they accepted positions in their field of study; and/or pressuring graduates who were working in unrelated fields to sign employment forms falsely stating that they were using certain skills obtained as a result of their degree or certificate in their current, often unskilled, positions."

## 2. Shareholders Fail to Provide Any Support for the Allegations in the Demand Letters

Neither of the Demand Letters provides any factual support or specific examples of alleged misconduct. That is, neither of them contain "the who, what, when, where, and how: the first paragraph of any newspaper story."[2]

On November 19, 2010 and on January 19, 2011, the Litigation Committee sent letters to counsel for Bushansky and Ganley, respectively, requesting additional factual support for their allegations, as well as for "any other facts or information that [the shareholder] would like the Litigation Committee to consider as part of its investigation." In response, neither shareholder provided any facts or information to support their allegations.

Counsel for Ganley responded by way of a letter, dated January 20, 2011, requesting that "[i]n addition to the facts and allegations in [the Ganley Demand Letter], the Litigation Committee should investigate the related facts and allegations in the Amended Class Action Complaint filed on January 10, 2011 in *Gaer v. Education Management Corp.*, Case No. 2:10-cv-1061 RCM" ("*Gaer* Litigation"). As discussed below, the Litigation Committee reviewed the allegations in the *Gaer* Litigation – a securities class action brought against EDMC that is premised upon the same allegations underlying the GAO Reports – and found them to be without merit. No other facts or information were provided by Ganley or her counsel in support of the Ganley Demand Letter.

---

[2]    *In re Advanta Corp. Sec. Litig.*, 180 F.3d, 525, 534 (3d Cir. 1999).

Counsel for Bushansky, never responded to the request for additional information. On February 16, 2011, he called Goodwin Procter to inquire about the timing of the investigation of the Litigation Committee. On February 22, 2011, the Litigation Committee sent a second request for any further information or support for the allegations made in the Bushansky Demand Letter. In response, on March 10, 2011, counsel for Bushansky wrote to make a series of broad information requests of the Litigation Committee but failed to provide any facts in support of his demand. On March 16, 2011, the Litigation Committee made a third request for information in support of the Bushansky Demand. Bushansky and his counsel did not respond to this final letter, nor did they provide any other facts or information to support the allegations in the Bushansky Demand Letter.

## III. THE LITIGATION COMMITTEE PROCESS

The Pennsylvania Supreme Court has adopted the American Law Institute Principles of Corporate Governance ("ALI Principles") with respect to derivative actions and, in doing so, has made the ALI Principles an authoritative statement on Pennsylvania law.[3] The ALI Principles state that a board of directors must be given a reasonable opportunity to respond to a demand.[4] Under the ALI Principles, one method for responding to demand letters is for the board of directors to create an independent litigation committee to conduct an in-depth review of the allegations in the demand.[5]

---

[3] *See Cuker v. Mikalauskas*, 692 A.2d 1042, 1049 (Pa. 1997) (specifically adopting §§ 7.02-7.10 and § 7.13 of the ALI Principles). While not specifically adopting all ALI Principles, the Pennsylvania Supreme Court noted that its "adoption of [a certain] section is not a rejection of other sections not cited." *Cuker*, 692 A.2d at 1042, 1049 n.5. Accordingly, Pennsylvania courts routinely look to the ALI Principles for guidance on corporate governance issues. *See, e.g.*, *Lemenestrel v. Warden*, 964 A.2d 902, 904 (Pa. Supr. 2008).

[4] ALI Principles § 7.03 cmt. f.

[5] *Id.* §§ 7.05(b)(1), 7.08.

When evaluating the appropriateness of a litigation committee, Pennsylvania courts consider whether the committee: (a) is composed of two or more disinterested directors who are, as a group, capable of objective judgment under the circumstances; (b) is assisted by counsel of its choice; (c) conducts an adequate investigation; (d) prepares a written report; and (e) details why it rationally believed its decision was in the best interests of the corporation.[6]  Decisions of a litigation committee, formed in accordance with these standards, are protected by the business judgment rule.[7]  "[T]the business judgment rule reflects a policy of judicial noninterference with business decisions of corporate managers, presuming that they pursue the best interests of their corporations, insulating such managers from second-guessing or liability for their business decisions in the absence of fraud or self-dealing or other misconduct or malfeasance."  Under the business judgment rule, courts shall not examine the merits of the litigation committee's decision.[8]  "Without considering the merits of the action, a court should determine the validity of the board's decision to terminate the litigation; if that decision was made in accordance with the appropriate standards, then the court should dismiss the derivative action prior to litigation on the merits."[9]

### A.  ESTABLISHMENT OF LITIGATION COMMITTEE

On November 5, 2010, the Board unanimously adopted a resolution creating the Litigation Committee pursuant to Section 1731 of the Pennsylvania Associations Code, Title 15 Pa. C.S., including Subpart B known as the Business Corporation Law of 1988 ("BCL") and Section 3.1 of the Company's Amended and Restated Bylaws.  The EDMC Board delegated to

---

[6]   *See Cuker*, 692 A.2d at 1048; *see also Lemenestrel*, 964 A.2d at 912, (quoting *Cuker*, 692 A.2d at 1048).

[7]   *See Cuker*, 692 A.2d at 1046-48.

[8]   *See id.* at 1047-48.

[9]   *Id.*

the Litigation Committee the power and authority to:  (1) review, analyze, and investigate the

allegations in the Demand Letters; (2) engage independent legal counsel and other experts to

conduct the investigation, and draft a report setting forth conclusions and recommendations

resulting from the investigation, on behalf of the Committee; and (3) determine the appropriate

actions, if any, the Company should pursue in response to the Demand Letters.

### 1. Composition of Litigation Committee

The Board appointed Messrs. Leo F. Mullin and Paul J. Salem to serve on the Litigation

Committee.

Leo F. Mullin serves as a director on the Board and is the acting chairman of the Audit

Committee of the Company, where he has been certified as an independent director pursuant to

the Sarbanes-Oxley Act of 2002 ("SOX") and the NASDAQ Rules.  He retired as the Chief

Executive Officer of Delta Air Lines, Inc. in December 2003 and Chairman in April 2004, after

having served as Chief Executive Officer since 1997 and Chairman since 1999.  Mr. Mullin

currently serves in a consultative capacity as a Senior Advisor, on a part-time basis, to Goldman

Sachs Capital Partners.  He also was Vice Chairman of Unicom Corporation and its principal

subsidiary, Commonwealth Edison Company, from 1995 to 1997.  He was an executive of First

Chicago Corporation from 1981 to 1995, serving as that company's President and Chief

Operating Officer from 1993 to 1995, and as Chairman and Chief Executive Officer of American

National Bank, a subsidiary of First Chicago Corporation, from 1991 to 1993.  Mr. Mullin serves

as a director of Johnson & Johnson, a publicly traded manufacturer of pharmaceutical and

healthcare products, ACE Limited, a publicly traded provider of insurance and reinsurance

services, Michael Foods, Inc., Kenan Advantage Group, Inc. and Hawker Beechcraft

Corporation.  He also serves on the non-profit board of the Juvenile Diabetes Research

Foundation.  Mr. Mullin previously served as a director of Bell South Corporation.  His

experience from having served as Chairman and CEO of one of the nation's largest airlines and his long and distinguished career in the banking industry make him a skilled advisor on operational and financial matters.

Paul J. Salem serves as a director of the Board and is the acting chairman of the Nominating and Corporate Governance Committee of the Company. He is a Senior Managing Director and a co-founder of Providence Equity Partners. Prior to joining Providence Equity Partners in 1992, Mr. Salem worked for Morgan Stanley & Co. in corporate finance and mergers and acquisitions. He also spent four years with Prudential Investment Corporation, an affiliate of Prudential Insurance, where his responsibilities included leveraged buyout transactions and helping to establish Prudential's European investment office. Mr. Salem is also a director of N.E.W. Asurion Corp., a provider of technology protection services, and NexTag, Inc., a provider of online comparison shopping, and previously served as a director of PanAmSat Holding Corporation. Mr. Salem, who is a director designee of Providence Equity Partners, provides the Board with a broad-based background in analyzing business operations, models, strategic plans and financial statements.

### 2. Disinterestedness of the Litigation Committee

The ALI Principles define "disinterested" in terms of what it means to be "interested." Section 1.23(c) of the ALI Principles provides that a director is interested if any of the following four tests are met:[10]

(1) The director or officer, or an associate of the director or officer, is a party to the transaction or conduct;

---

[10] Section 1.23 was not specifically adopted by the Pennsylvania Supreme Court, however, the *Cuker* Court found that its "adoption of [certain] sections is not a rejection of other sections not cited." *Cuker*, 692 A.2d at 1049 n.5. Moreover, Section 1.23 is cross-referenced in other sections of the ALI Principles that were specifically adopted by the *Cuker* Court. *See, e.g.*, ALI § 7.04.

(2)     The director or officer has a business, financial, or familial relationship with a party to the transaction or conduct, and that relationship would reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation;

(3)     The director or officer, an associate of the director or officer, or a person with whom the director or officer has a business, financial, or familial relationship, has a material pecuniary interest in the transaction or conduct (other than usual and customary directors' fees and benefits) and that interest and (if present) that relationship would reasonably be expected to affect the director's or officer's judgment in a manner adverse to the corporation; or

(4)     The director or office is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation.  Counsel, public accountants or other persons as to matters which the director reasonably believes to be within the professional or expert competence of such person.[11]

The Litigation Committee requested that counsel analyze the basis, if any, on which the Shareholders may claim that members of the Committee are not "disinterested."  The Demand Letters do not assert, and the investigation by counsel for the Litigation Committee did not find, a basis to conclude that Messrs. Mullin or Salem were involved in, associated with, have a pecuniary interest in, have a business or financial relationship with, or are a party to any transaction or conduct alleged in the Demand Letters.

Counsel also did not find that Messrs. Mullin or Salem are "interested" in the transactions or conduct alleged in the Demand Letters.  Counsel considered a number of facts and circumstances bearing on the disinterestedness analysis, including:

*First,* Messrs. Mullin and Salem are affiliated with certain institutional investors (Goldman Sachs and Providence Equity Partners), which have substantial stock and debt interests in EDMC.  That fact, however, does not make these individual directors "interested" in

---

[11]     *Id.* § 1.23(a).

the transaction or conduct at issue in the Demand Letters.[12] Numerous cases have held that

having a financial stake in a company is not a financial interest making a director "interested."[13]

In order for a director to be "interested":

> [T]he financial interest at issue must be directly related to the
> transaction at issue . . . . [S]imply because a director has some
> financial relationship with the primary corporation, that director
> should not be deemed "interested" if he or she does not otherwise
> have a financial interest in the transaction at issue. Moreover, this
> interest must be somehow different from the director's interest as a
> stockholder.[14]

"There are many cases in which greater credence has been given to the judgment of directors

because their equity interests aligned them with the interests of the other stockholders."[15]

Accordingly, one Delaware court has stated: "Only in the mind of the most aggressive legal

advocate could the claim be made, with a straight face and absent any serious factual support,

that a board of directors, consisting, in part, of three of the largest individual shareholders in the

corporation and the largest single institutional investor, would completely ignore the best

economic interests of the shareholders in order to avoid . . . duties found in . . . common law."[16]

There is no evidence that the interests of Messrs. Mullin or Salem (or Goldman Sachs and

Providence Equity Partners) are not aligned with the interests of the common stockholders of

EDMC with respect to investigating and remediating the conduct alleged in the Demand Letters.

---

[12]   *See, generally,* 15 C.S. Pa. 1715(e)(2)(i) ("A person shall not be deemed to be other than a disinterested
director solely by reason of [the] ownership by the director of shares of the corporation." )

[13]   *See, e.g., In re IXC Commc'ns, Inc. v. Cincinnati Bell, Inc.*, Nos. C.A. 17324, C.A. 17334, 1999 WL 1009174,
at *6 (Del. Ch. Oct. 27, 1999) ("Plaintiff has not demonstrated how the rational economic self-interest of these
large [director] shareholders differs from all IXC shareholders, nor that they would receive anything more for
their shares than even the numerically smallest IXC shareholder."). Similarly, Pennsylvania law makes clear
that in situations where there are challenges to corporate control, "[a] person shall not be deemed to be other
than a disinterested director solely by reason of [the] ownership by the director of shares of the corporation."
*See* 15 C.S. Pa. 1715(e)(2)(i).

[14]   Eric G. Orlinsky, *Corporate Opportunity Doctrine and Interested Director Transactions: A Framework for
Analysis in an Attempt to Restore Predictability*, 24 DEL. J. CORP. L. 451, 511-12 (1999).

[15]   *In re Oracle Corp.*, 867 A.2d 904, 930 (Del.Ch. 2004).

Nothing in the Demand Letters demonstrates how "the rational economic self-interest of these large shareholders differs from all [EDMC] shareholders . . . ."[17]  Neither Mr. Mullin nor Mr. Salem stands to receive any personal financial benefit or detriment from any conduct alleged in the Demand Letters that is not equally shared by other stockholders.[18]  The same applies to Goldman Sachs and Providence Equity Partners.

In particular, as directors of EDMC, Messrs. Mullin and Salem have a responsibility to ensure that the Company has an appropriate system of internal controls to minimize the risk of improper or unlawful conduct occurring.  This interest is shared equally by Goldman Sachs and Providence Equity Partners, as institutional investors of EDMC.  As described herein, there is abundant evidence in the record concerning the adequacy and vigor of EDMC's internal control structure.  This evidence speaks to the good faith and due care exercised by all of EDMC's directors in discharging their duties, including Messrs. Mullin and Salem.

This conclusion applies with equal force to each of the allegations in the Demand Letters, which focus on the due care exercised by EDMC's board of directors in overseeing the Company's activities.  For example, one of the allegations made in the Ganley Demand Letter is that the incentive compensation plan in place at EDMC was improper and that the individual directors or officers of EDMC failed to take appropriate actions to remedy this situation.  The incentive compensation plan at issue was adopted by EDMC in 2003 and remained largely the same until it was phased out in 2011.  Messrs. Mullin and Salem did not become directors of

---

[16]  *Cincinnati Bell, Inc.*, 1999 WL 1009174, at *7.

[17]  *Id.*

[18]  *See, e.g., Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), *rev'd on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)) (a director is "interested" if he "has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders"); *Cincinnati Bell, Inc.*, 1999 WL 1009174, at *6-7 (finding that directors with large stock holdings would likely have interests aligned with shareholders; *see also Marx. v. Akers*, 666 N.E.2d 1034, 1042 (N.Y. 1996) ("Directors are self-interested

EDMC until 2006.[19] Neither individual played any role in the design or implementation of that plan.[20] Further, the investigation revealed that EDMC regularly obtained advice from outside counsel, with expertise in the design and implementation of similar types of compensation plans, to the effect that EDMC's compensation plan complied in all respects with requirements of Title IV of the Higher Education Act of 1965.

*Second*, the investigation confirmed that certain affiliates of Providence Equity Partners do business with EDMC. As described in the Company's public filings, for example, EDMC did approximately $9.8 million in business with four Providence Equity Partners affiliates in 2010. A director's association with entities that conduct business with EDMC does not render a director interested.[21] For example, in *Kaplan v. Wyatt*, the Delaware Supreme Court held that a director appointed to a special litigation committee was not interested despite the fact that director also owned businesses that transacted over $200 million in business with the company.[22] Here, there is no evidence that the business relationship between EDMC and affiliates of Providence Equity Partners affected in any way Mr. Salem's actions as a member of the board of directors of EDMC, or as a participant in the Litigation Committee.

---

in a challenged transaction where they will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally") (citing Delaware law and ALI Principles § 1.23).

[19] *See* ALI Principles § 1.23, cmt.; *accord Harhen v. Brown*, 730 N.E.2d 859, 864 (Mass. 2000) (holding, under ALI Principles § 1.23, that two directors appointed to special committee were not "interested" where one committee member was not on the board at the time of the crimes perpetrated by employee and the other committee member, while on the board during the relevant time, was not alleged to have played any role in the crimes).

[20] *See* ALI Principles § 1.23(c) (stating that a director is not interested, for purposes of a derivative action, if the director, among other things, merely "approved of or acquiesced in the transaction or conduct that is the subject of the action").

[21] *See, e.g., In re J.P. Morgan Chase & Co. Shareholder Litig.*, 906 A.2d 808, 821-22 (Del. Ch. 2005) (in analyzing the independence of certain directors, court observed that three directors had substantial personal wealth invested in their related companies, each of which conducts business with J.P. Morgan, but held that alleging that bank provided financing to these companies standing alone is insufficient to put their disinterestedness into question).

[22] 499 A.2d 1184, 1189 (Del. 1985).

*Third*, the fact that Messrs. Mullin and Salem were named as individual defendants in the *Gaer* Litigation, in their capacity as members of the Board of Directors of EDMC, does not change this conclusion.  It is well-settled that the fact that a director "is named as a defendant [in a lawsuit involving the Company] does not make the director interested under [the ALI Principles] if the complaint against the director:  (A) is based only on the fact that the director approved of or acquiesced in the transaction or conduct that is the subject of the action, and (B) does not otherwise allege with particularity facts that, if true, raise a significant prospect that the director would be adjudged liable to the corporation or its shareholders."[23]  The *Gaer* Litigation does not raise the prospect of liability, much less "a significant prospect that the director would be adjudged liable to the corporation or its shareholders."[24]

### 3.    Retention of Counsel

The Litigation Committee retained outside legal counsel at Goodwin Procter to assist in responding the Demand Letters.  The Litigation Committee considered Goodwin Procter, among other major law firms to assist it with its investigation.  The Litigation Committee considered the extensive experience of Goodwin Procter as a firm, and in particular that of partner R. Todd Cronan, the chair of Goodwin Procter's Securities Litigation and White Collar practice groups, in conducting investigations on behalf of directors and special committees into a wide-range of topics.  The Litigation Committee determined that Goodwin Procter was qualified to assist the Litigation Committee in an unbiased manner.

### B.    SCOPE OF THE INVESTIGATION

The Litigation Committee, with the assistance of legal counsel, first defined the scope of its investigation by identifying those portions of the Demand Letters that describe, albeit with

---

[23]    *Lemenestrel v. Warden*, 964 A.2d 902, 919 (Pa. Super. 2008) (quoting ALI Principles § 1.23(c)).

[24]    *Id.*

varying degrees of clarity, possible breaches of fiduciary duties owed to the Company. The Demand Letters – while failing to provide details regarding specific conduct at EDMC – primarily reiterate the allegations of deceptive or questionable practices found in the GAO Reports, and then summarily conclude that the internal control structure and corporate governance practices at the Company are somehow deficient. While most of the above-discussed allegations lack the requisite clarity and specificity, and, as such, could properly be rejected, the Litigation Committee nevertheless decided to conduct an investigation into: (1) the internal control structures at EDMC, (2) the corporate governance practices and procedures at EDMC, and (3) allegations of wrongdoing contained in the Demand Letters and GAO Reports (and also the *Gaer* litigation).

## IV. GOVERNING LEGAL PRINCIPLES

As a Pennsylvania corporation, the Company, as well as its directors and officers, are governed by and subject to the applicable provisions of the BCL. While Pennsylvania case law offers guidance in interpreting the BCL, it is relatively sparse in regards to the fiduciary obligations of directors and officers with much of the case law either predating the BCL or arising in situations involving egregious misconduct. Accordingly, Pennsylvania courts routinely look to other respected sources – such as the ALI Principles and the case law of other jurisdictions – when interpreting Pennsylvania corporate law.[25]

Section 7.03 of the ALI Principles requires that "[t]he demand should give notice to the board, with reasonable specificity, of the essential facts relied upon to support each of the claims made therein." As clarified by the Reporter's Notes to the ALI Principles, "[w]ith respect to the

---

[25]  *See, e.g., Treasurer, State of Connecticut ex rel. Keystone Venture V, L.P. v. Ballard*, No. 01796 Dec. Term 2003, 2004 WL 717236, at *2 n.6 (Pa. Com. Pl. Mar. 2, 2004), *rev'd on other grounds by Treasurer of State v. Ballard Spahr Andrews & Ingersoll LLP*, 866 A.2d 479, 480 (Pa. Cmwlth. 2005) (holding that Pennsylvania

substance of the demand itself, it is desirable that the demand identify the participants in the alleged wrong, describe the factual basis of the wrongful acts and the harm caused to the corporation, and specify the relief requested."[26] "[M]ere conclusory allegations are insufficient . . . ."[27]

While the Demand Letters here lack specificity (and at times clarity), the Litigation Committee presumes for purposes of this investigation that the broadly-worded claims refer to alleged violations of the duty of care (including the duty to act in good faith and in a manner which the director believes to be in the best interest of the Company) or the duty of loyalty.

## A. PENNSYLVANIA LAW RELATING TO FIDUCIARY DUTIES

Each director and officer of a Pennsylvania corporation, such as EDMC, stands in a fiduciary relationship to his or her corporation and, therefore, owes duties of care and loyalty to their company.[28]

### 1. Duty of Care

The duty of care requires that directors and officers must act "in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances."[29] This duty primarily relates the responsibilities of being properly informed when making decisions and overseeing the management of the corporation.[30]

---

courts "look for guidance to those courts [that] have the most experience," such as Delaware and New York, in the context of derivative actions).

[26] ALI § 7.03 Reporter's Note 6.

[27] *Id.*

[28] *See Anchel v. Shea*, 762 A.2d 346, 357 (Pa. Super. 2000) ("Our law prescribes that a fiduciary obligation includes both a duty of care and a duty of loyalty") (citation omitted).

[29] *See also* 15 Pa. C.S. §§ 512(a) & 1712(a); *Anchel*, 762 A.2d at 357.

[30] *See* THE COMMITTEE ON CORPORATE LAWS OF THE AMERICAN BAR ASSOCIATION'S SECTION OF BUSINESS LAW, CORPORATE DIRECTOR'S GUIDEBOOK ("CDG") 18 (5th ed. 2007).

In performing these duties, a director is allowed "to rely in good faith on information, opinions, reports or statements, including financial statements other financial data, in each case prepared or presented by any of the following":

> (1) One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented.

> (2) Counsel, public accountants or other persons as to matters which the director reasonably believes to be within the professional or expert competence of such person.

> (3) A committee of the board upon which he does not serve, duly designated in accordance with law, as to matters within its designated authority, which the committee the director reasonable believes to merit confidence.[31]

A director is not considered to be acting in good faith, however, if he or she "has knowledge concerning the matter in question that would cause his reliance to be unwarranted."[32]

When making a determination based on the best interests of a company, directors should (to the extent appropriate) consider:

(1)     The effects of any action upon any or all groups affected by such action, including shareholders, employees, suppliers, customers and creditors of the corporation, and upon communities in which offices or other establishments of the corporation are located.

(2)     The short-term and long-term interests of the corporation, including benefits that may accrue to the corporation from its long-term plans and the possibility that these interests may be best served by the continued independence of the corporation.

(3)     The resources, intent and conduct (past, stated and potential) of any person seeking to acquire control of the corporation.

(4)     All other pertinent factors.[33]

---

[31]     15 Pa. C.S. § 1712(a).

[32]     *Id.* § 1712(b).

[33]     *Id.* § 1715(a).

A director is not required "to regard any corporate interest or the interests of any particular group affected by such action as a dominant or controlling interest or factor;" nor does consideration of interests and factors in the manner described in Section 1715(a) of the BCL constitute a violation of Section 1712 of the BCL (relating to the standard of care and justifiable reliance).[34]

When due care is taken, Pennsylvania law provides substantial barriers to challenges of decisions made by officers and directors.  Specifically, Pennsylvania has codified the business judgment rule:  "absent a breach of fiduciary duty, lack of good faith or self-dealing, any act as the board of directors, a committee of the board or an individual director shall be presumed to be in the best interests of the corporation."[35]  The Pennsylvania Supreme Court has explained that "the business judgment rule reflects a policy of judicial noninterference with business decisions of corporate managers, presuming that they pursue the best interests of their corporations, insulating such managers from second-guessing or liability for their business decisions in the absence of fraud or self-dealing or other misconduct or malfeasance."[36]

### 2.    Duty of Loyalty

The duty of loyalty requires that directors and officers act only in the interests of the corporation, devoting themselves to corporate affairs with a view to promoting the common interests rather than their own.[37]  The Pennsylvania Supreme Court has held that central to this duty is the principle that "the fiduciary best fulfills its duties if it approaches them with the attitude seeking the beneficiary's interests rather than the personal interests of the fiduciary . . .

---

[34]    *Id.* § 1715(b).

[35]    *Id.* § 1715(d).

[36]    *Cuker*, 692 A.2d at 1046.

[37]    *See Anchel*, 762 A.2d at 357 (Pa. Super. 2000) (citation omitted).

.["38] The duty of loyalty has developed to require that self-interested transactions entered into by directors or officers be subjected to a fairness analysis, including whether conflicts of interest are disclosed to the board or shareholders as well as whether the transactions are fair to the corporation.[39] It also may require that directors and officers act in "good faith" by not *intentionally* disregarding applicable laws, failing to establish controls or monitoring any compliance systems.[40]

## V.    FINDINGS REGARDING INTERNAL CONTROLS

Central to both Demand Letters is the broad-brush allegation that EDMC lacks requisite internal controls. Specifically, the Bushansky Letter demands that the Board "install a functioning and adequate system of internal controls,"[41] and the Ganley Letter claims that "the Directors and Officers breached their fiduciary duties by . . . abdicating their responsibility to make a good faith effort to oversee the Company's operations and business practices."[42] As a result of these allegations, the Litigation Committee conducted a detailed investigation into EDMC's internal controls and found that the Company maintains a robust internal control structure comprised of multiple policies, departments, and committees. Together, these functional components deploy a broad array of controls designed to ensure ethical, regulatory, and financial compliance. Based upon the depth and breadth of the Company's control structures, the Litigation Committee concludes that EDMC maintains preventative, supervisory,

---

[38]   *Warehime v. Warehime*, 761 A.2d 1138, 1143 (Pa. 2000).

[39]   *See* ALI Principles § 5.02 Reporter's Note.

[40]   CDG at 22. *See, also, e.g., Miller v. U.S. Foodservice, Inc.*, 361 F.Supp.2d 470, 481 (D. Md. 2005) (finding a breach of duty of loyalty claim under Delaware law where former director alleged to have intentionally misrepresented the status of efforts to correct subsidiary's internal controls, and that director's alleged conscious disregard of known risks of internal systems and his failure to address the problem, resulted in damages).

[41]   Bushansky Demand Letter at 1.

[42]   Ganley Demand Letter at 3.

remedial policies and practices that more than adequately guard the Company against occurrences of the allegedly deceptive or questionable behaviors identified in the Demand Letters and GAO Reports.

### A.  COMPANY-WIDE STANDARDS

EDMC sets and maintains high ethical standards of conduct for all of its approximately 19,000 employees by way of two Company-wide policies:  Business Ethics Policy and Code of Conduct ("Code of Conduct" or "Code") as well as the "Help Us Preserve Our Integrity" Brochure ("Integrity Brochure").[43]

### 1.  The Code of Conduct

The Code of Conduct, which applies to directors and employees at all levels, guides the business practices of the Company in regards to compliance with laws and maintenance of the highest moral, legal, ethical and financial reporting standards.  An updated version of the Code (which has been in the works since well before the GAO Reports and the Demand Letters) is to be implemented in the second quarter of fiscal year 2011 ("Revised Code").  The prior Code of Conduct ("Prior Code") covered various compliance-related topics such as employee responsibilities regarding conduct, methods for reporting violations, conflicts of interest, compliance with laws and regulations, fair dealing, treatment of students, sexual harassment, and diversity.  The Revised Code provides detailed instructions on reporting potential compliance violations and reflects recent legislative changes affecting EDMC and the for-profit college industry as a whole.

The Code addresses the types of ethical issues at the forefront of the allegations contained in the Demand Letters.  The Code generally sets forth EDMC's values, including that the

36

Company is committed to having its employees conduct themselves in an ethical manner. More specifically, the Code makes clear that EDMC will comply with all laws and regulations applicable to its business and requires employees be familiar with the laws applicable to their specific job function and level. The Code emphasizes that employees are never expected to violate any law and should never feel pressured to do so.

The Revised Code provides specific examples of ethical conduct for particular job functions. For instance, the Revised Code details policies that admissions employees must comply with when interacting with potential and current students. The policies include accurate and transparent dissemination of information related to accreditation, graduation requirements, cost of attendance, transfer of credits, faculty qualifications, graduation and default rates, employment rates, potential salary upon graduation, and eligibility for licensing exams. In another section, the Revised Code states that financial aid professionals shall seek to minimize economic disadvantages as a barrier to higher education; advise the student of his or her right to reject aid; provide timely, complete, and accurate financial aid information to students to enhance student financial literacy and empower all participants to act and borrow responsibly; not knowingly permit or encourage an applicant to falsify or provide misleading information when applying for aid; recommend that students exhaust federal and state provided methods of financing their education before applying for private loans in those situations where private loans are needed to supplement the cost of education; and give all prospective students the opportunity to meet with an EDMC financial aid professional.

---

[43]    As discussed herein, the Company recently revised its Code of Conduct. The formal title of the prior Code of Conduct is the "Code of Business Ethics and Conduct." The revised Code of Conduct is titled the "Business Ethics Policy and Code of Conduct." Both are referred to generally as the "Code" or the "Code of Conduct."

The Code stresses the potential consequences of noncompliance for an offending employee (*e.g.,* termination or criminal or civil prosecution), for EDMC (*e.g.,* fines, loss of business, reputational damage), and for EDMC's students (*e.g.,* reduced access to higher education and higher costs).

Mechanisms for reporting unethical conduct are also outlined in the Code. These mechanisms include speaking with local and corporate human resources personnel, contacting the Company's General Counsel Office, or contacting EDMC's Corporate Compliance Hotline. The Code of Conduct also fosters an environment in which reporting of unethical conduct is encouraged by making evident that EDMC is committed to keeping complaints confidential and stressing that the Company will not tolerate any form of retaliation. Indeed, retaliation is a violation of the Code.

All employees receive training on the topics covered by the Code through the Company's "on-boarding" process for new employees. Under the Prior Code, on-boarding required employees to complete courses covering employee rights and responsibilities as well as legal considerations in the workplace, all of which incorporated the Code. After the Revised Code is released, new employees will also complete an additional training module specifically on the Code. This module will require employees to identify ethical dilemmas through real-life scenarios, outline steps for de-escalation, and develop strategies for mitigation. Some scenarios, for example, focus on unethical recruiting practices.

Under the Prior Code, employees were required to sign a Code of Business Ethics and Conduct Acknowledgment, thereby certifying that they received the Code, read it, and understood it. A similar certification process will be implemented for the Revised Code. Initially, certification will require new and current employees to complete the training module on

the Code and certify that they have completed the module, have reviewed the Revised Code, and clearly understand it. In addition, employees will be required to certify that they are aware of no ethical violations in their particular workplace. Although the recertification process for the Revised Code is under development, it will require employees to review the Code, complete a refresher course on the Code, report any suspected Code violations, and sign an "e-authorization" acknowledging that the employee read and understood the Code and that the employee completed the course.

## 2.    The Integrity Brochure

In addition to the Code, the Company also provides employees with an ethics brochure entitled, "Help Us Preserve Our Integrity" (the "Integrity Brochure"). The Integrity Brochure, which has been distributed to all new employees since 2004, explains the negative impact that unethical behavior can have on the Company's reputation and financial well-being. The Integrity Brochure also provides a non-exhaustive list of examples of unethical behavior, including failing to comply with state and federal laws and regulations, accrediting and licensing agencies, and professional organizations; falsifying statements to government officials or in reports; and unfairly treating students.

The brochure outlines a suggested structure for reporting unethical behavior, including speaking with a supervisor, local and corporate human resources, or the campus president, or by contacting the Company's General Counsel, the Internal Audit Department, or the Corporate Compliance Hotline. The brochure emphasizes in large type that an employee will not face retaliation for making a report and provides three ways for an employee to report unethical conduct through the Corporate Compliance Hotline.

## B.    THE HOTLINE COMMITTEE

In January 2003, in compliance with SOX standards, EDMC launched its Corporate Compliance Hotline (the "Hotline"). [44] While originally intended to detect financial irregularities, EDMC broadened the purpose of the Hotline to include detection of other unethical activities, thereby aligning the Hotline with EDMC's philosophy of integrity. Employees may submit tips or complaints to the Hotline twenty-four hours per day, seven days per week, by e-mail, a secure web-form, or voicemail in a manner that electronically disguises the identity of the employee to EDMC personnel.  Employees will not face retaliation for making a report.

The Hotline Committee – consisting of Devitt Kramer, SVP, General Counsel; Roberta Troike, SVP, Human Resources; Shelley Bias, VP, Internal Audit Department; and Lou Pisano, VP, Labor and Employee Relations – is charged with oversight and administration of the Hotline.  As discussed in detail below, the Hotline is more than a "functioning and adequate" internal control, as the Bushansky Demand Letter asks the Company to put in place.  Rather, it is (and has been) a robust, thorough and effective mechanism for detecting and remediating the types of alleged misconduct referenced in the Demand Letters and described in the GAO Report. It further demonstrates, contrary to the Ganley Demand Letter, that EDMC directors and officers have acted in good faith by overseeing the Company's operations and business practices.

### 1.    Overview of the Hotline Process

Mr. Pisano reviews the allegations in the submissions and confers with the other Hotline Committee members to determine the appropriate initial response which will generally include an investigation.  Depending on the nature of the submission, Mr. Pisano may involve various

regional and school personnel or Corporate Services departments as necessary to conduct an investigation.

At the conclusion of each investigation a report is drafted, which summarizes the factual findings and recommends action items to the Hotline Committee. Mr. Pisano initially reviews these reports, analyzes the investigation and the conclusions drawn, circulates the report to the Hotline Committee, and makes a recommendation whether to close the case, mitigate the problem, or to investigate the allegations further. If an allegation is found to have merit, remediating actions may include additional employee training, written warnings, and termination of employment. When a submission is closed, the person making the submission is notified if possible that an investigation was conducted and that the issue was remediated.

Throughout this process, the Hotline Committee members communicate with each other about the submissions as appropriate. The Hotline Committee holds monthly in-person meetings to review the status of the submissions, and meets more frequently as needed. A fifteen day deadline exists for all reviews involving allegations of potential DOE regulation violations, and a thirty day deadline is in place for other submissions. For any case that remains open more than sixty days, the Hotline Committee notifies senior leadership at the school system where cases originated from and requires a written explanation be sent to the Hotline Committee explaining why the investigation exceeds the standard timeframe.

The Hotline Committee also tracks information about all submissions. The information tracked includes when a submission was made, how it was made, the location of the complainant

---

44  *See* 18 U.S.C. § 78j-1(m)(4)(SOX requires audit committees of publicly traded companies to establish procedures whereby employees can anonymously submit concerns regarding questionable accounting or auditing matters).

(if known), the complainant's concern, a categorization of the submission, a description of the submission, and information on the status of the investigation.

Each quarter, Ms. Bias updates the Audit Committee of the Board regarding the nature and status of submissions reviewed by the Hotline Committee. Certain matters relating to Hotline Committee investigations are also discussed with EDMC's outside independent auditors. The Internal Audit Department, headed by Ms. Bias, incorporates the nature and frequency of Hotline submissions into its annual risk assessment, which determines the department's annual audit plan.

### 2. Review of Hotline Submissions

The Litigation Committee reviewed data from Hotline submissions for Fiscal Years 2009 and 2010. In Fiscal Year 2009, the Hotline Committee received 91 submissions, and in Fiscal Year 2010, it received 159 submissions. The majority of these submissions were related to human resources and managerial issues, such as an allegation that a manager was "rude" to an employee, or that an ADA was manipulating records regarding times they were not in the office.

During Fiscal Year 2010, only nine submissions, broadly construed, related to the types of potential ethical violations raised in the Demand Letters. Those submissions are as follows:

| Submission Date | Essence of Submission | Investigation | Status |
|---|---|---|---|
| July 15, 2009 | Director of Admissions accused of unethical behavior to enhance personal earnings. | After Human Resources Vice President investigation involving interviews of admission personnel, allegations were unsubstantiated. | Closed |
| July 21, 2009 | Faculty member claimed that they were forced to change a grade for a student. | Human Resources Vice President investigation involved explanation of situation to the caller and the matter was closed. | Closed |

| Submission Date | Essence of Submission | Investigation | Status |
|---|---|---|---|
| Aug. 28, 2009 | Allegations that Director of Admissions instructed ADAs to disregard FAQs, and ADAs were engaging in aggressive recruiting practices. | Human Resources Vice President investigation determines that misunderstanding and miscommunication at root of complaint. Allegations of unethical activity not substantiated. | Closed |
| Oct. 1, 2009 | Allegations of student classroom attendance deceptions to obtain financial aid. | Human Resources Vice President conducts investigation, and as a result, corrective action taken. | Closed |
| Oct. 26, 2009 | Allegations that students were graduating without meeting necessary requirements. | Investigation determines that complaint stems from morale issues related to leadership transition and that allegation is without merit. Training related to coping with change in campus leadership recommended. | Closed |
| Nov. 10, 2009 | Allegation that admissions person made correction to student FAFSA and that the practice was common. | Human Resources Vice President and admissions manager met with admissions personnel to reinforce correct policy. | Closed |
| Nov. 19, 2009 | Allegation that campus financial aid office is in a "tail spin." | Investigation of allegations to extent possible despite lack of specific details. Concerns forwarded to Human Resources personnel and regional SFS director. | Closed |
| Dec. 18, 2009 | Allegation that ADA improperly recruited students with certain degrees and manipulated computer system to delete notes. | Human Resources Vice President investigation determines that practices of ADA required corrective action and that additional training and guidance for admission personnel was required. | Closed |
| May 10, 2010 | Allegation that campus president pushes admissions department to act unethically. | Investigation determined that president admitted to being persistent with employees to work hard & meet deadlines. President verbally counseled by Group Vice President. | Closed |

Based on the above, it is evident that the Hotline Committee acts as an effective internal control that employees use and that allows that Company to detect and address the types of deceptive and/or questionable conduct identified in the Demand Letters and the GAO Reports.

## C.    INTERNAL AUDIT DEPARTMENT

EDMC's Internal Audit Department ("IAD"), headed by Ms. Bias, conducts internal audits of corporate processes, information technology, ground schools, and the Online Higher Education Division.  As discussed in further detail below, IAD, through its far-reaching audit process, provides stakeholders in EDMC, including directors and officers, a thorough and objective assessment of the Company's system of controls; verifies compliance with policies and procedures and regulatory requirements; deters fraud by encouraging appropriate controls; identifies best practices; and facilitates the transfer of knowledge.  Thus, contrary to the allegations in the Demand Letters, IAD has been functioning as an internal control for regulatory compliance and financial accuracy and has been assisting directors and officers in overseeing the Company's operations and business practices.

To do so, IAD continuously assesses business risk and develops audit objectives, priorities, and procedures that evaluate and ensure effective internal controls.  While EDMC management is responsible for providing internal controls, IAD evaluates the adequacy and effectiveness of those internal controls and recommends improvements.  When performing these audits, IAD complies with the Standards for the Professional Practice of Internal Auditing of The Institute of Internal Auditors.

IAD's audit process is based upon periodic assessments of operating locations or processes within the Company.  A risk-based approach is used by IAD to determine frequency, location, and depth of audits of a given location or process.  Each fiscal year, IAD develops an audit plan based on a risk analysis that includes a variety of factors, such as location size, location control, prior audit results, employee turnover, compliance requirements, and revenue.

All business activities of EDMC are subject to auditing.  IAD aims to audit each school once every five years and every corporate process once every three years.  Each school or

44

corporate process may be audited more frequently, however, based on audit results and other risk factors. In reviewing a particular location or process, IAD conducts field testing of various areas, grading each on a scale of 1 (deficient) to 5 (excellent). IAD then provides an overall score to a particular location (*e.g.,* The Art Institute in Pittsburgh) or process (*e.g.,* Information Technology), along with specific recommendations for improvement.

Following field testing, IAD issues a draft report to the personnel in charge of the location or process audited and requests responses and action plans for each audit finding. Thereafter, IAD issues a final report, which can include a "Major Report," detailing findings requiring remediation, and a "Minor Report," discussing recommendations that do not require formal remediation. A Major Report typically includes background about the site or process, a summary of the findings, a chart of grades for each auditable area, a rubric for each grade, current financial data related to the site, and recommendations for improvement. IAD also generates an executive summary of the report. Reports are distributed to the Audit Committee, senior management, and in some instances the Company's external auditor. At fiscal year-end, IAD prepares a report summarizing all site and process audits during the year for to the Audit Committee. This report also indicates the audit plan for the following fiscal year.

### 1.    School Audits

The Litigation Committee reviewed IAD's reports from school audits conducted between fiscal year 2009 and the beginning of fiscal year 2011. That review revealed that IAD conducts approximately twenty school audits per fiscal year. In fiscal year 2010, for example, 21 school audits were conducted, representing twenty-three percent of EDMC's ground schools. For fiscal year 2011, twenty school audits are scheduled, representing nineteen percent of the Company's ground schools.

IAD conducts school audits using its standard school audit program, which is typically administered by a team of two or three auditors. The audit program includes pre-audit information requests, field testing and information gathering, and follow-up requests for information and documentation. On site, an audit begins with an entrance conference with the executive committee at the school. Then auditors interview school personnel, tour the facility, analyze data and information, conduct transaction testing, review documents, make copies of findings that will be addressed in the audit report, and address any issues school personnel may have. When field testing is concluded, auditors hold an exit meeting with the school's executive committee. During this meeting, auditors provide the executive committee with preliminary results of testing. Following field testing, auditors draft a report that includes their findings and then solicit action plans from the school to address those findings. Once the action plans are finalized, IAD issues its report. The ground school auditing process, measured by the length of time between IAD's receipt of the pre-audit information requests and its issuance of the final report, generally lasts about four months. During this time, auditors spend a minimum of one week at the school location.

For each school, IAD audits an array of areas, including admissions, accounting, administration, balance sheet analysis, education, human resources, information technology, and student services. The following chart illustrates some tests performed during the standard school audit program:

| School Area | Objective |
| --- | --- |
| Admissions | Document and test the process for Associate Directors of Admissions ("ADAs") training and certification to assure compliance with guidelines. |
| | Document and test the ADA pay rate change policy to assure that ADAs are properly compensated in a timely manner. |

| School Area | Objective |
|---|---|
| Education | Document and test various areas of the Registrar's office, including satisfactory academic performance compliance. |
| | Document the school's process for assuring credentials are adequate and truthful for the instructor to be employed teaching at EDMC. |
| Human Resources | Perform testing of new hires, terminations, pay rate changes, and segregation of duties. |
| | Assure that the Employee Handbook has required sections as per the EDMC Systems Standards. |
| Student Services | Determine if graduates' salaries are properly documented and verified in the student accounting system. |
| | Assure that the New Student Handbook has required sections as per the EDMC Systems Standard. |

### 2. Review of a School Audit

The Litigation Committee conducted a review of the 2010 audit of Brown Mackie College in Lenexa, Kansas ("BMC-Lenexa"). IAD's previous audit of BMC-Lenexa took place in November 2008. This audit was selected because it was recently completed and therefore reflected IAD's most current practices. The Litigation Committee conducted interviews of IAD personnel and analyzed documents related to the audit, including draft reports, underlying work papers, and emails. As discussed below, that review revealed that the school audit program verified appropriate controls were in place in both admissions and career services.

Field testing took place at BMC-Lenexa from May 17 through 21, 2010. Before and after the testing, IAD collected information and documentation from BMC-Lenexa personnel. IAD issued its audit report and accompanying audit recommendations, along with a minor assessment report, on September 10, 2010. During this audit, IAD examined each of the areas described above, including admissions and career services practices. The auditors analyzed pre-audit data,

47

interviewed approximately a dozen school officials on a variety of topics, and conducted five days of field testing.

Testing as to admissions involved a thorough assessment of that department. Before on-site auditing began, IAD requested and reviewed a variety of admissions-related data and information. Initially, IAD directed questions through a pre-audit questionnaire to the Director of Admissions about the accuracy of promotional materials and admissions documents, and training and monitoring of ADAs. The completed questionnaire was returned to IAD before the field auditing began. Next, IAD analyzed pre-audit data regarding the observations of ADA interactions with prospective students by more senior admissions officers for each ADA hired in the current fiscal year. Thereafter, IAD examined the results of the school's FAQ examinations for admissions representatives.

Once on-site, IAD interviewed the Director of Admissions on topics such as student recruitment, mystery shopping calls, and monthly evaluations of ADAs. IAD also audited the training, certification, and evaluation of ADAs. First, IAD reviewed the employee files for ten randomly-selected ADAs to determine if the proper training and certifications were completed. IAD concluded that the ADA training and certification requirements were always being monitored and kept up to date and gave the school the highest possible score for the test. Second, IAD reviewed those same ten ADAs' files to determine if each ADA's most recent performance evaluation was completed accurately and timely per school policy. IAD concluded that ADAs were reviewed every 6 months and that the campus was in compliance with evaluations. The BMC-Lenexa's Admissions Department received the highest possible score for the test.

Field testing was similarly thorough as to career services.  On-site, IAD interviewed the Director of Career Services about the process for verifying employment (including the type of documentation received to verify employment and the handling of such documentation) and student job placement.  IAD also audited the school's processes for verifying income data and job placement rates.  First, lAD selected a random sample of five recent BMC-Lenexa graduates and tested whether the income for those graduates was properly verified and documented in BMC-Lenexa's system.  IAD found that the school had properly verified and documented the income for each graduate and gave it the highest score possible score for this test.  Second, IAD obtained a Graduate Employment Statistics report for the most recently "closed" term and tested whether graduates' placement rates were properly verified in BMC-Lenexa's controls.  IAD did this by reviewing placement rates by program and following up with the Director of Career Services on unusually high placement rates and high levels of "waived" graduates.  BMC-Lenexa received the highest possible score for this test.

### 3.    Review of a Corporate Process Audit

The Litigation Committee also reviewed corporate process audits completed by IAD between fiscal years 2009 and the beginning of 2011.  During fiscal years 2009 and 2010, IAD completed sixty-two corporate process audits.  For fiscal year 2011, IAD has scheduled thirty-two corporate process audits.

The Litigation Committee also conducted an in-depth review of the 2009 internal audit of the Corporate Services Marketing and Admissions Department ("CS Marketing and Admissions").  The CS Marketing and Admissions audit was selected for further review because of that department's relevance to the allegations in the Demand Letters and the GAO Reports.  The Litigation Committee conducted interviews and analyzed documents related to the audit, including final and draft reports, work papers, and emails.

49

This was IAD's first audit of CS Marketing and Admissions.  The audit program was designed by IAD to investigate finance, administration, information technology, and recruiting within CS Marketing and Admissions.  Field testing was conducted from September 28 to October 16, 2009, and the final report was issued on February 24, 2010.  With respect to recruitment, IAD:  (1) documented policies and procedures applicable admissions personnel, including performance expectations, evaluations, and lead generation; (2) assessed whether training levels adequately mitigated risk, especially related to safeguarding personal information of prospective students; (3) verified that training requirements were communicated and monitored for completion; and (4) ensured that performance objectives for admissions personnel were appropriate.

While most of IAD's recommendations for improvement related to finance, administration, and information technology; three findings related to recruitment.  First, IAD found that ADA training was adequate but recommended that CS Marketing and Admissions implement a procedure for tracking compliance with training requirements.  In response, CS Marketing and Admissions implemented such a procedure.  Second, IAD further recommended that CS Marketing and Admissions formalize its policy regarding monitoring of ADAs by supervisors.  In response, CS Marketing and Admissions communicated a formal policy regarding monitoring requirements and created a procedure for tracking compliance.  Finally, IAD reviewed the compensation plan for admissions personnel and found that it complied with federal regulations.

## D. ONLINE HIGHER EDUCATION DEPARTMENT

Online Higher Education ("OHE") is the department at EDMC responsible for the Company's online education programs, including Argosy University Online, South University Online, and The Art Institute of Pittsburgh Online (the "Online Brands").  OHE is headed by

John Kline, President.  Two departments within OHE, the Internal Audit and Compliance Department as well as the Marketing and Admissions Department, contain control functions relevant to the Demand Letters.  As the Litigation Committee's review made evident, these two departments already employ an interwoven system of controls that deter the types of unethical conduct alleged in the GAO Report.  Moreover, these controls allow directors, officers, and management to oversee OHE's operations and business practices.

### 1.  Internal Audit and Compliance Department

OHE Internal Audit and Compliance conducts audits and monitors OHE employee interaction with students and prospective students, including ADAs and Student Financial Services ("SFS") representatives working for the Company's Online Brands.  Specifically, this department conducts call monitoring, auditing and report functions that are adequate to address the type of wrongdoing alleged in the Demand Letters.

### a.  Call Monitoring

OHE Internal Audit and Compliance has conducted a call monitoring program at the Company since June 2007.  The Company devotes significant resources to monitoring phone calls between students and prospective students and OHE employees, including representatives from admissions, financial aid, academic counseling, and collections.  By doing so, the OHE Internal Audit and Compliance department strives to monitor ninety percent of ADAs and SFS representatives every three weeks.  As a result of this extensive program, the Company estimates that representatives may be monitored as many as 40 to 50 times over the course of two years.  While ADAs and SFS representatives know they can be monitored on any given call, they are not informed when the monitoring occurs.  For a call to qualify as "monitored," it must last more than five minutes.

Each incomplete or incorrect response provided by a representative on a monitored call is labeled as "gap," and is given a grade ranging from Level 1 (being the least problematic) to Level 4 (being the most severe).[45] All representatives are provided with policies that explain how their interactions are graded, and each is required to acknowledge in writing that she has read the policy. The severity of the gap, coupled with the number of previous infractions by the representative, determines the remediation process employed by the Company upon discovering a gap:

| Grade Level | First Infraction | Second Infraction | Additional Infractions |
|---|---|---|---|
| 1 | Verbal Coaching from the Director of Admissions | Verbal Coaching from the Director of Admissions | 1) Verbal or Written Warning<br><br>2) Potentially "more significant disciplinary actions" |
| 2 | 1) Verbal Coaching<br><br>2) Study the FAQ Handbook | 1) Verbal Coaching<br><br>2) Study the FAQ Handbook | 1) Verbal or Written Warning<br><br>2) Potentially "more significant disciplinary actions" |
| 3 | 1) Written Warning<br><br>2) ADA stops public interaction<br><br>3) Study FAQ Handbook<br><br>4) Re-take and Pass FAQ Exam<br><br>5) Director of Admissions may observe ADA interactions within 30 days of report receipt | 1) Final Warning<br><br>2) ADA stops public interaction<br><br>3) Study FAQ Handbook<br><br>4) Re-take and Pass FAQ Exam<br><br>5) Director of Admissions may observe ADA interactions within 30 days of report receipt<br><br>6) Ineligibility for promotion or sales recognition program for one year | Termination without Notice |

---

[45]  The types of conduct that earn a certain grade level are substantially the same as those found in Corporate Services Marketing and Admissions, as discussed in more detail in Section V.E., *infra*.

| Grade Level | First Infraction | Second Infraction | Additional Infractions |
|---|---|---|---|
| 4 | Final Warning or Termination<br><br>If Final Warning,<br><br>1) ADA stops public interaction<br><br>2) Study FAQ Handbook<br><br>2) Senior Director of Admissions oversees re-training<br><br>4) Re-take and Pass FAQ Exam<br><br>5) Director of Admissions may observe ADA interactions within 30 days of report receipt<br><br>6) Ineligibility for promotion or sales recognition program for one year | Termination | Not applicable |

Any compliance infraction requires that the offending ADA and her supervisor sign-off on a remediation form. Level 3 gaps also require sign-off by the Vice President of the employee's department. Level 4 gaps, moreover, are reported to Human Resources and the Vice President of OHE Finance.

The compliance program and remediation policy have proven successful in detecting and remedying gaps. The Litigation Committee reviewed OHE's compliance data from November 2008 to November 2010 and found that OHE has monitored nearly 40,000 calls involving over 3,300 ADAs. Approximately five percent of those calls involved gaps, with less than 0.7 percent of all calls involving a Level 4 violation and less than 1.2 percent of all calls involving a Level 3 violation. The Litigation Committee also found that OHE has monitored nearly 2,728 calls involving 226 SFS representatives during the same time period. Approximately 1.7 percent of those calls involved gaps, with less than 0.037 percent of all calls involving a Level 4 violation and less than .063 percent of all calls involving a Level 3 violation.

The Litigation Committee also reviewed detailed descriptions of the gaps found from September 13, 2010 to November 10, 2010, which include brief explanations explaining the violation. Of the 130 gaps attributed to ADAs during this period, only fifteen Level 4 gaps could be broadly construed as relating to the types of conduct described in the Demand Letters and GAO Reports. During the same time period, no gaps committed by SFSs earned a Level 4 rating.

b.     Auditing

OHE Internal Audit and Compliance audits areas of risk within OHE – including financial aid, student accounting, the registrar, academic counseling and SOX testing – by examining the same areas that IAD audits for ground schools. Before each fiscal year, this department performs a risk assessment of auditable areas within OHE, and based on that assessment, develops an audit plan for the upcoming fiscal year. Areas with particularly high risk areas, such as financial aid, are audited annually. Audit findings are summarized in reports; each report contains findings and provides a recommendation for improvement, a target date for that improvement, and a responsible party.

As part of its investigation, the Litigation Committee conducted a review of an audit by OHE Internal Audit and Compliance. The Litigation Committee selected a financial aid audit because of financial aid's relevance to the allegations in the Demand Letters and the GAO Reports. The audit began in approximately January 2010 and concluded in the summer of 2010, after action plans were provided responding to the recommendations arising out of the audit. The audit conducted over forty tests of OHE's financial aid processes and procedures to ensure compliance with DOE regulations and EDMC policies.

As part of the audit, student files were reviewed for multiple reasons. First, student files were randomly selected to determine whether OHE's policies and procedures regarding

calculations and disbursements of stipends, refunds, and loans were being followed.  Second, student files were also audited to determine whether students met enrollment requirements, such as standardized test requirements, which are necessary to be eligible for financial aid.  Lastly, OHE Internal Audit and Compliance tested to ensure that OHE confirmed that the information on the Free Application for Student Aid ("FAFSA") forms corresponded with verification documents (such as tax forms).

Upon completion of this audit, OHE Internal Audit and Compliance made a series of recommendations – such as periodic self-assessments of staff, enhancement of procedures to ensure compliance with policies, and thorough training for employees – to ensure compliance with Company policies and standards related to the above activities.

c.    <u>Reporting</u>

OHE Internal Audit and Compliance presents the results of internal audits and compliance monitoring to the OHE Executive Committee on a quarterly basis.  These presentations, which usually last sixty to ninety minutes, summarize the methodologies, findings, and corrective actions taken with respect to each audit.  These presentations also describe the areas tested, the time period covered, all major findings, and any corrective actions recommended.  Presentations further contain the proposed audit schedule for the upcoming fiscal year and details on compliance and gaps in the Admissions and Student Financial Services departments, including trends of gaps found during mystery shopping and observations for each school.  Compliance gaps are also reported weekly to OHE's Executive Committee.

Senior management in IAD and OHE also meet on a quarterly basis.  During these meetings, both departments exchange the findings of their respective audits and risk assessment efforts.  These quarterly meetings help identify potential areas of common risk.  By way of

example, IAD was able to identify a faculty credentialing risk in ground schools that OHE had originally identified during its audits.

### 2.    OHE Marketing and Admissions

OHE's Marketing and Admissions Department supervises the marketing and admissions functions for the three EDMC Online Brands by, among other things, developing policies and procedures related to admissions personnel, training admissions personnel, and ensuring compliance with federal regulations and Company policy regarding interactions with prospective students.

OHE employs approximately 1,700 ADAs.  Similar to their counterparts at the ground schools, ADAs in OHE attempt to recruit qualified applicants to the three Online Brands.  In doing this, ADAs must determine the appropriateness of candidates for admissions based upon career goal compatibility; accurately and completely portray programs, services, and expected outcomes; conduct all activities in accordance with the highest ethical standards; and conduct all activities in accordance with state and federal rules and regulations.

All OHE ADAs receive extensive training before being allowed to interact with prospective students.  This training includes a two-week program for new hires, which covers the history of EDMC, the Code of Conduct, director expectations, quality conversations with prospective students, school curricula, financial aid, and compliance.  New ADAs also sign an Ethics Acknowledgment stating that they are responsible for providing prospective students with legally and factually correct information about the qualities, attributes, and benefits of attending the school and that they may be monitored for compliance with those standards.

OHE's Marketing and Admissions also provides all ADAs with a Compliance FAQ Guide ("Compliance Guide"), which ensures that each ADA has legally and factually correct information while interacting with prospective students.  While Compliance Guides are tailored

to specific schools (*e.g.*, Argosy University Online), the Compliance Guides for each school are largely similar to each other and to the Guidebooks distributed to ADAs at ground schools by Corporate Services Marketing and Admission.[46] Topics covered by OHE's Compliance Guide include accreditation, transfer of credits, student services, career services, international students, education, faculty, and financial aid. Similar to ADAs at ground schools, ADAs in OHE must pass a FAQ exam based on the information in the Compliance Guide by successfully answering eighty-five percent of the questions. ADAs are given two opportunities to retake the FAQ exam and cannot speak with prospective students until passing the exam. The FAQ exam is administered annually to all ADAs.

Beyond the Compliance Guides, ADAs also complete a training module on compliance during their two-week training. The module is designed to instruct ADAs on how to identify questionable recruiting practices and the associated negative effects; understand what to do and what not to do in key compliance areas; and identify resources as a means to report possible violations. ADAs also view a "60 Minutes" segment on deceptive recruiting practices and then engage in a discussion regarding the importance of compliance. The discussion is intended to highlight the negative effects of noncompliance, including damage to EDMC's reputation and loss of business, and emphasize that the industry is heavily regulated. ADAs are instructed on what information can and cannot be communicated to students in such areas as accreditation, transfer of credits, technology requirements, career services, financial aid, tuition, student responsibilities, and competition. The module concludes by providing strategies for reporting potential compliance violations and provides three means for contacting the EDMC Corporate Compliance Hotline.

---

[46]     The Compliance Guides used by Corporate Services Marketing and Admissions are discussed in detail in Section V.E., *infra*.

During new hire training, ADAs also receive instruction on how to effectively conduct phone calls with prospective students and sales and marketing techniques. Some training materials teach ADAs techniques for uncovering a prospective student's goals, motivations, desires, and educational shortfalls. Other materials provide ADAs with a roadmap to use when navigating through a conversation with a potential student. Still others train ADAs on engaging prospective students and encouraging them to pursue a degree that suits their confirmed need or goal. In order to demonstrate their understanding of these concepts, ADAs must complete a final exam and a final role-play.

After completing the two-week new hire training – including passing the final exam, the FAQ exam, and the final role play – ADAs transition into a "training pod," which lasts from two to eight weeks depending on the progress of the individual ADA. The training pod provides intensive on-the-job training involving monitored conversations, coaching, and daily assessments and reviews against performance criteria. Only after satisfactorily completing the training pod can an ADA can interact on an unsupervised basis with a prospective student.

OHE also requires continuing education for all ADAs after the initial new hire training and the training pod. The amount and type of training depends upon the length of employment. ADAs who have been employed less than three months are required to attend two trainings per month and one additional training the month of their first start. ADAs who have been employed between three and six months are required to attend one training per month and complete a "Back to Basics Boot Camp." ADAs who have been employed more than six months are required to take one training class per quarter. Additional training for ADAs may also be conducted if a compliance "gap" occurs in order to "fill" the gap.

58

Following training, ADAs are continually monitored to ensure they comply with EDMC policies, as well as the law. ADAs must submit to monitoring by a combination of internal call monitoring administered by OHE's Internal Audit and Compliance[47] and the mystery shopping program administered by Corporate Services Marketing and Admissions.[48] ADAs are provided Compliance Grade Levels, which are used to rate and track compliance "gaps." Any gaps are rated on the Compliance Grade Levels and recorded on a corrective action record. Gaps are remediated according to the grading policy, which ADAs are required to acknowledge. Possible remediation includes counseling, verbal coaching, verbal warnings, written formal warnings, and termination. Aside from these formal monitoring programs, ADAs are encouraged to self-monitor and report compliance issues to supervisors, human resources personnel, or anonymously through EDMC's Corporate Compliance Hotline.

### E. CORPORATE SERVICES MARKETING AND ADMISSIONS DEPARTMENT

EDMC's Corporate Services Marketing and Admissions Department ("CS Marketing and Admissions") is responsible for, among other things, formulating and implementing policies and procedures for admissions personnel related to training, compliance, and remediation. While this department primarily supervises EDMC's ground schools, some of its policies and procedures also apply to admissions personnel in OHE. The Litigation Committee's review of CS Marketing and Admissions found that this department has already had in place an internal controls structure to prevent and, if necessary, remediate the types of misconduct by admissions staff that are alleged in the Demand Letters.

---

[47] For a discussion of the call monitoring program administered by OHE Internal Audit and Compliance, see Section V.D.3.(a), *supra*.

[48] For a discussion of the mystery shopping program, see Section V.E.2, *infra*.

### 1. Training and Messaging to Admissions Staff

Upon hire,[49] an ADA undergoes two stages of initial training, in addition to the more general training administered through Human Resources (as discussed in the prior section). The first stage of ADA training is known as "on-boarding" and consists of three weeks of on-campus training on various topics specific to the ADA job function, such as compliance and recruiting "best practices." The second stage of training, known as "polishing-off," occurs at a national five-day training program in Pittsburgh, and provides new hires with further guidance on how to comport themselves.

### a.    On-boarding

Although on-boarding occurs at each ground school and OHE, the process is largely standardized across EDMC. An ADA learns to provide the correct messages to students, gains knowledge of the financial aid process, observes experienced ADAs, and practices recruiting strategies.

During the first week of training, each ADA is provided with the "FAQ and Compliance Guidebook." This guide is an important tool for communicating the Company's expectations regarding compliance. Through the Guidebook, ADAs learn how to set realistic expectations and present an accurate portrayal of a prospective student's academic experience, including information regarding program offerings, financial aid, and graduate outcomes. Each school system has a version of the Guidebook that is customized to that school, but Guidebooks are largely similar and are updated by departments, including Legal, Student Financial Services, and Regulatory Affairs.

---

[49]    Ethical and compliance-related expectations are conveyed to applicants for admissions positions prior to hiring. Job descriptions for Assistant Director of Admission ("ADA") positions require that recruitment activities be conducted with the highest ethical and applicable regulatory standards.

Guidebooks, at around 30 pages in length, are divided into topics such as Accreditation, Transfer Credits, Student Affairs, Career Services, International Issues, Education, and Financial Aid. Each topic includes information that must be conveyed, supplemental information that can be conveyed, and information that can never be conveyed, including bulleted proscriptions against using certain terms, making certain promises, implying certain outcomes, or making unwarranted comparisons. The following chart summarizes some of the relevant topics addressed by the Guidebook:

| FAQ and Compliance Guidebook Topic | Example of Compliance Message |
|---|---|
| Accreditation | • Provides accurate representations about whether an institution is accredited and by which organization.<br>• Forbids ADAs from comparative or qualitative statements about accreditation or using the term "fully accredited." |
| Transfer of Credits | • Requires accurate responses to questions about whether an EDMC school will accept transfer credits, whether a non-EDMC institution will accept credits earned from an EDMC schools, and how credit from a non-EDMC institution affects a student's GPA.<br>• Forbids ADAs from promising, implying or guaranteeing any results regarding transfer of credits, either to or from an EDMC school. |
| Student Services | • Requires accurate representations about disability services provided by the school.<br>• Forbids ADAs from asking a prospective student if they have a disability or guaranteeing a specific accommodation request by a student. |
| Career Services | • Requires accurate responses to questions about potential salaries and employment opportunities upon graduation. Schools that have placement statistics are provided those figures.<br>• Forbids ADAs from using ranges of potential salaries for graduates, speculating as to what market conditions will be upon graduation, or using the term "dream job." |
| International Students | • Requires an accurate explanation of who is considered an international student.<br>• Forbids ADAs from promising that an international student will be accepted or offering to assist a student with changing their nonimmigrant status. |

| FAQ and Compliance Guidebook Topic | Example of Compliance Message |
|---|---|
| Education | • Requires accurate information regarding the degree a prospective student can earn and an accurate response when questioned about the cost of books and supplies.<br><br>• Forbids ADAs from comparing the value of a degree to degrees from other colleges and universities. |
| Faculty | • Requires accurate responses to questions about faculty qualifications and experience.<br><br>• Forbids ADAs from saying that "all faculty" are practicing professionals or have certain specific credentials. |
| Financial Aid | • Requires accurate representations about the availability of financial aid and the process to apply for financial aid.<br><br>• Forbids ADAs from promising financial aid, filling out a financial aid application for a student, or encouraging or assisting a prospective student to falsify financial aid forms. |

ADAs must pass a "closed-book" exam testing their knowledge of the Guidebook before interacting with prospective students. The exam, known as the "FAQ exam," consists of true/false and multiple choice questions of varying difficulty. ADAs have three chances to pass the FAQ exam. If an ADA fails the exam, she must study the Guidebook for a week and receive additional instruction from a supervisor before retaking the exam. Per policy, an employee who fails the exam a third time is terminated. Further, all existing admissions personnel, including ADAs, Senior Directors of Admissions, and Directors of Admissions, must pass the FAQ exam annually. If current admissions personnel do not pass, they may not participate in recruiting. If they fail three times, they are terminated.

During their initial on-boarding, ADAs also learn the techniques of "partnership selling," which is a benefit-based sales methodology that requires ADAs to build a relationship with the prospective student based on trust and honesty in order to develop a shared goal of determining the best course for the prospective student. Through the use of open-ended questions and active listening techniques, ADAs help the prospective students to select the features and benefits of the school to match their needs and values.

In practice, an ADA implements these selling techniques through an "appointment set," whereby an ADA talks to a prospective student over the phone, learns more about the prospective student, and endeavors to set an appointment for an interview. If the prospective student is a dependent, the ADA will also work to include the involvement of the parent, guardian, or teacher. If a prospective student is interested in continuing on in the process, an interview is scheduled with the ADA. During this interview stage, the ADA is counseled to avoid promising prospective students something that a program cannot offer and to always give prospective students accurate information. ADAs are further warned that anything less than the absolute truth put the company's reputation at risk.

CS Marketing and Admissions also produces an online training course contains information and simulations that allow the ADA to acquire the knowledge, skills, and abilities necessary to perform the job, including partnership selling, matching features and benefits to needs and values, and overcoming challenges to commitment. Compliance related information is also explained in the program.

After completing all of the lessons in the training manual and the online training course, an ADA is required to take the Mastery Exam, which tests whether ADAs have mastered using open-ended questions, seeking buy-in from a dependent student's family, and providing the correct documents to a student during an interview. A minimum of eighty-five percent is required for passing the Mastery Exam. An ADA has three attempts to pass the test before he or she is let go.

ADAs must pass both the FAQ exam and Mastery test before speaking with prospective students without being monitored. Typically, this does not occur until five weeks after ADAs are hired. ADAs and their Directors of Admissions must sign off that their multi-week training

has been completed. The Department tracks by campus whether ADAs have submitted training

sign offs, whether they have completed the training within five weeks, and the number and

percent of ADAs, Directors of Admissions, and Senior Directors of Admissions who have passed

the FAQ exam. A review of this data for the 2010 academic year indicated that most campuses

achieved nearly 100 percent passage rates for the FAQ exam.

    b.  Polishing-Off

    After completing on-boarding, newly hired ADAs must attend a "polishing-off" training

program at EDMC headquarters in Pittsburgh. This training consists of five days of training

aimed at ensuring that new ADAs conduct themselves according to EDMC's standards. During

training, each ADA is "observed" several times by the trainers. To pass, ADAs must

successfully demonstrate compliance with the Company's standards. At the conclusion of the

polishing-off, each ADA takes a certification test in order to be allowed to work with prospective

students.

    c.  Ongoing Training

    Following on-boarding and polishing-off, ADAs receive ongoing training from

Department training specialists. Training visits cover a variety of topics, including financial aid

and common compliance violations. During visits, training specialists also observe ADAs

interacting with prospective students. Between July 2009 and June 2010, training specialists

conducted training visits at 98 percent of ground schools. Many ground schools had two or more

training visits.

    **2.**  **Compliance and Remediation**

    In addition to training and messaging, CS Marketing and Admissions has implemented

other controls designed to ensure that ADAs conduct themselves according to the Company's

standards. These controls include frequent observations and "mystery shopping."

a.    <u>Observations</u>

Observations are designed to track compliance with Company policies by allowing Directors of Admission to listen to phone conversations between ADAs and prospective students.  Outlines, developed by CS Marketing and Admissions (and modified by the different education systems), are used for monitoring observations.  A typical outline tracks whether the ADA properly introduced himself, explained the purpose of the call, gathered important information from a prospective student, made any misrepresentations, and concluded the call in a proper manner.  After the observations, Directors of Admissions review the results with ADAs.

The number of observations an ADA undergoes varies per school system.  At The Art Institutes, Senior Directors of Admissions must submit at least three interview observations and three phone observations on a monthly basis.  Directors of Admissions must conduct at least five interview observations and five phone observations on a monthly basis.  At South University, Senior Directors of Admissions and Directors of Admissions are required to do two appointment sets and two interviews per month.  At Brown Mackie, Senior Directors of Admissions are required to do three appointment sets and three interviews per month and Directors of Admissions are required to do five appointment sets and five interviews per month.  Finally, Argosy Senior Directors of Admissions and Directors of Admissions are required to do three appointment sets and three interviews per month.

The Department monitors monthly whether these requirements are met.  The Litigation Committee reviewed compliance with observations requirements and found that ADAs are often observed more frequently than the policy requires.  For example, Argosy University exceeded its observation plan by almost twenty-two percent and South University by nearly nine percent at the close of Fiscal Year 2010.

b.    Mystery Shopping

In addition to observations of ADAs conducted by EDMC employees, CS Marketing and Admissions also hires a third-party vendor to "mystery shop" ADAs.[50]  Similar to the GAO investigation, mystery shopping consists of a vendor posing as a prospective student over the telephone, asking trick questions of the ADAs, and assessing the professionalism and qualitative responses from ADAs.  Mystery shopping occurs via phone and online.  The vendor supplies the department with a recording of the call and provides a brief checklist of points occurring during the call.  A training specialist then documents compliance infractions, if any.

Similar to the scale used by OHE Internal Audit and Compliance during its call monitoring of OHE ADAs, each infraction is graded on a scale of one through four, with four being the most serious.  A Level 1 infraction might involve concerns such as the misstatement of factual information or not fully responding to a compliance question.  Level 2 infractions involve slightly more severe compliance infractions than Level 1 infractions.  Level 3 infractions can involve an unintentional incorrect response to a compliance question or ignoring the proposed FAQ Guidebook response.  Finally, Level 4 violations, involve the most serious infractions, such as intentionally ignoring the FAQ Guidebook response or demonstrating a blatant disregard for the facts.  The policy for remediating infractions is largely similar to the one used by OHE.[51]

Level 3 and Level 4 infractions are reported directly to the Vice Presidents of Admissions and Human Resources for that the school.  Infractions may also be communicated to the Director of Admissions and Senior Director of Admissions, Campus Presidents, Regional Vice Presidents, and sometimes the education system president himself.  For all mystery shopping, regardless of

---

[50]    "Mystery shopping" is also known within EDMC as "secret shopping."  Both terms refer to the mystery shopping program managed by CS Marketing and Admissions.

[51]    For a more detail description of the remediation procedures used by OHE, see Section V.D.2., *supra.*

the infraction, the offending ADA and his or her supervisor must sign a verification that the ADA was retrained on appropriate conduct. All disciplinary actions, including verbal warnings are recorded in the employee's personnel file. Furthermore, Senior Directors of Admissions and Directors of Admissions who fail to follow through with ADAs or who consistently have ADAs with infractions may be held accountable through verbal warnings, written warnings, or termination.

For more serious infractions warranting termination, one education system uses a process whereby a Director of Admission submits a termination recommendation. The recommendation thereafter is reviewed by the Regional Vice President and the Human Resources Department, the VP of Admissions, and school system president. If all parties agree, an ADA will be terminated.

## F.     FINANCIAL AID

EDMC's internal controls related to financial aid exist Company-wide. Those controls fall into three broad, overlapping areas: intake, processing, regulatory compliance. As discussed in this section, contrary to the Demand Letters' allegations, these controls work to ensure that the Company remains compliant with regulations regarding financial aid and allow the Company's Board and Directors to oversee the Company's operations and business practices with respect to financial aid.

### 1.     Intake

Financial aid applications are initiated through campus representatives in campus-based Student Financial Services ("SFS") departments. Those departments are responsible for training and compliance with respect to intake.

Campus directors are responsible for training SFS representatives in connection with the intake of financial aid applications. Directors educate SFS representatives on the student counseling and financial planning process by discussions on costs, financial aid options, and how

67

the balance of tuition can be covered. Some schools provide additional training at the campus level. At Brown Mackie College, standard financial aid training sessions are held twice a month and all financial aid personnel are required to attend. At these meetings, discussions are held on new regulations or issues related to the GAO Report. Additionally, prior trainings on financial aid topics are posted on EDMC's intranet site, and go back two years.

In addition, SFS representatives undergo "Back to Basics" training, whereby they learn rules, regulations, and best practices related to financial aid. The "Back to Basics" Guide is for all EDMC staff persons who assist students in the financial aid process. Each new award year, SFS staff and other campus staff (such as ADAs) who must understand the financial aid process, including FAFSA are required to review the Guide.

With regard to accuracy of intake, SFS mangers conduct periodic reviews of intake files to ensure compliance. These assessments include sampling financial aid files and related computer system records for each SFS representative. The purpose of the review is to identify any training needs and to make corrections before errors are discovered by an outside audit. Per policy, errors uncovered require additional auditing and training.

### 2. Processing

The Financial Aid and Compliance Department is a central location for the processing of all financial aid applications, disbursement of funds to students, and refunds to lenders or the Government. Within twelve to eighteen months, all of financial aid processing at EDMC's ground schools and OHE will be conducted by this department. The centralization (the planning for which began before the IPO) is designed to minimize financial and regulatory risks associated with the processing of Title IV funds to the Company through standardization. To ensure standardization, extensive training and assessments program have been developed for

staff members in this department.  In addition, employees are required to complete training upon promotion to a new area or a move to a different area within the department.

### 3. Regulatory Policy and Compliance

The Student Finance and Compliance Department addresses regulatory policy and compliance.  The department oversees financial aid compliance audits of schools by an external auditor; prepares schools for compliance reviews by the DOE; ensures that institutions remain eligible for financial aid; reviews data submitted to the DOE, such as graduation rates; provides *ad hoc* advice across EDMC on compliance with DOE regulations; interfaces with the DOE and assesses new and proposed regulations regarding financial aid; and places a representative on the Business Practices Committee, which provides guidance on accuracy of statements in EDMC's advertising.  This department has senior management with extensive experience in Title IV regulations who interface with the DOE and serve as an internal expert on regulation interpretation and compliance.

### G. REGULATORY AFFAIRS

The Regulatory Affairs and Compliance Department ("Regulatory Affairs") works to ensure, among other things, that EDMC's institutions are accredited, either nationally, regionally or programmatically, and if accredited, remain in compliance with the governing accrediting organization's standards.  Thus, the Department serves as an internal control to protect the quality of academic programs offered by EDMC's schools.

As part of their work, representatives from Regulatory Affairs visit each EDMC campus approximately every two years to ensure compliance with accrediting organization requirements.  In advance of a visit by an accrediting organization, representatives from Regulatory Affairs conduct "mock" visits, which mimic the review conducted during an accrediting organization's visit.  In advance of a mock visit, institutions provide the types of documents reviewed by

accrediting organizations to the team visiting from Regulatory Affairs. Mock visits address a wide range of institutional areas, including, for example, organization and communication, physical facilities and equipment, resources for clinical instruction, library and informational resources, admissions, faculty and staff qualifications, and curriculum.

Regulatory Affairs representatives make multiple campus visits each month. As part of each mock visit, the Regulatory Affairs team completes a report showing the accreditation-related standards audited and whether the institution has "met" or "not met" the standards. The Department tracks which campuses have been visited, which accrediting organizations have scheduled visits and the reason for the visit, whether a department representative will be on-site during the visit, and the status of an institution's accreditation application.

Mock visits address areas of concern raised by the Demand Letters and the GAO Reports. For example, during a mock visit, a campus is required to produce documentation supporting enrollment, graduate, and withdrawal numbers, as well as graduate placement data, such as alumni graduation dates and job titles. A mock visit also reviews current advertising and promotional literature, including scripts and tapes of radio and television ads for misleading or inaccurate representations. In addition, mock visits focus on admissions. For example, the Regulatory Affairs team assesses whether institution and program admission policies are well defined and documented, whether the admission of students is made in accordance with clearly published criteria, and whether criteria for successful completion are given in advance to each student. Records of student or faculty complaints are also reviewed. Finally, mock visits inspect staff and faculty employment files to make certain those files include resumes, transcripts, job descriptions, annual performance reviews, and applicable licenses.

## H.     THE BUSINESS PRACTICES COMMITTEE

The Company also has created an employee-level committee, called the Business Practices Committee ("BPC"), that reviews materials published by the Company in order to help ensure that the material created and circulated by EDMC is accurate and complies with relevant regulations.  This Committee is yet another example of the controls that have been in place at EDMC to promote accurate representations and deter misrepresentations in messaging to students and prospective students.

For example, the BPC requires submission of any broadcast, print, or electronic materials provided to current or potential students or the general public concerning a school, its program offerings or services provided, and requires schools to create and maintain advertising files.  The BPC conducts quarterly meetings and is comprised of members from the following departments: Regulatory Affairs, Legal, Student Financial Services and Compliance, and CS Marketing and Admissions.

The BPC also disseminates a handbook, called the Business Practices Handbook ("the Handbook"), to assist EDMC employees in ensuring that all EDMC marketing and promotional materials conform to accreditation, licensing, legal and DOE requirements.  The Handbook instructs employees on good practices regarding compliance with regulatory requirements.  For example, the Handbook explains that almost all accrediting and licensing agencies express a general prohibition of all false or misleading advertising and that a regulatory agency's silence on the use of a specific word, phrase, or concept related to advertising and marketing does not equal assent to use that word, phrase, or concept.  In addition, the Handbook warns that, because regulations are constantly evolving to address changes in the industry, a compliance review of marketing materials in one year does not necessarily mean that those materials are approved for

71

subsequent years. More generally, the Handbook counsels against making claims about the Company's schools or programs that cannot be supported by empirical evidence.

### I.    SARBANES-OXLEY CONTROLS

Section 404 of SOX requires management and external auditors to report on the adequacy of the Company's financial reporting controls. To comply with SOX, the Company has already established and maintained an internal control framework for accurate financial reporting. This framework allows the Company's directors and officers to oversee the accuracy of the Company's financial reporting.

The Controller and Chief Accounting Officer oversees the internal control framework related to financial controls. The Company assesses financial risk areas, including financial aid, valuing student accounts, setting bad debt reserves, and valuing goodwill, and provides auditors in IAD with a testing program in addition to their regular audit program. Data collected during audits – of both individual school campuses and corporate processes – is provided to the office of the Controller and Chief Accounting Officer department for compilation and assessment. Last fiscal year, for example, this department and auditors from IAD conducted approximately 400 tests across various areas of the Company. Those tests addressed the accuracy of financial statement reporting, including tax, revenue, general accounting, student accounting, and procurement.

Following testing, deficient processes are identified and remediated. Aggregate financial controls data is also provided to the Company's outside auditor, for validation, further testing, and inclusion in financial reporting as part of the annual audit process.

### J.    COMPLIANCE

As demonstrated above, compliance permeates the departments at EDMC and begins with the positive "tone at the top" set by senior management. In addition to having all

department leaders taken responsibility for compliance within their groups, EDMC has a senior-level position dedicated to the compliance function that reports directly to the Company's General Counsel.  The Vice President of Compliance implements EDMC's compliance program designed to emphasize EDMC's values and promote a culture of integrity.  Among other responsibilities, the Vice President of Compliance:  (i) develops policies and programs that encourage employees to report alleged misconduct without fear of retaliation; (ii) works with Internal Audit to conduct risk assessments and Human Resources on training programs for all employees; (iii) develops, implements and oversees a training program for the Company's Business Ethics Policy and Code of Conduct; (iv) coordinates reviews of reports from the Company's "mystery shopping program," and (v) coordinates investigations of alleged compliance issues and any resulting corrective actions.

## VI.   FINDINGS REGARDING CORPORATE GOVERNANCE

The Litigation Committee has found no merit to the corporate governance allegations in the Demand Letters.  The Demand Letters assert that the directors and officers failed to properly oversee the Company's affairs and, as a result, breached their fiduciary duties to EDMC and that the Company needs "an effective system of corporate governance practices and procedures." The investigation of the Litigation Committee, however, revealed that the Company has a substantial corporate governance structure in place and that there was no evidence that any director and officer breached his or her fiduciary duties to the Company.

### A.   CORPORATE GOVERNANCE

To determine whether any merit exists to such allegations the Litigation Committee investigated EDMC's corporate governance structure and reviewed how corporate governance practices were implemented by the directors and officers.

1.      **Background on EDMC Corporate Governance Structure**

The Litigation Committee has determined that the structure of governance established at EDMC – which consists of the Board and its committees as well as senior management and their committees – is more than adequate to do so.

a.      The Board of Directors

Under Pennsylvania law, "[u]nless otherwise provided by statute or in a bylaw adopted by the shareholders, all powers . . . vested by law in a business corporation [are] exercised by or under the authority of, and the business and affairs or every business corporation [are] managed under the direction of, a board of directors."[52] EDMC's bylaws similarly provide: "<u>Section 2.8 Powers of Directors</u>: 'Except as otherwise provided by statute or the Amended and Restated Articles of Incorporation, all powers vested by law in the Corporation shall be exercised by or under the authority of, and the business and affairs of the Corporation shall be managed under the direction of, the Board of Directors.'" The language of Section 2.8, which is nearly verbatim to that of 15 Pa. C.S. Section 1721, makes clear that the powers and duties of the Company's Board are no less extensive than those conferred by Pennsylvania law. As such, throughout the relevant period, the Board was empowered to make decisions concerning the issues raised in the Demand Letters.

i.      *Board Composition*

The Board has consisted of the following ten directors since the Company's IPO in October 2009:

- Mick J. Beekhuizen a Vice President in the Merchant Banking Division at Goldman, Sachs & Co. where he has been employed since 2000.

- Samuel C. Cowley is an Executive Vice President, Business Development, General Counsel and Secretary of Matrixx Initiatives, Inc. and has served as a director of

---

[52]    15 Pa. C.S. § 1721.

Matrixx Initiatives. Mr. Cowley previously was a partner with the law firm of Snell & Wilmer L.L.P.

- Adrian M. Jones is a Managing Director of the Principal Investment Area within the Merchant Banking Division of Goldman, Sachs & Co., where he has worked since 1996. He also serves on Corporate Investment Committee in the Merchant Banking Division.

- Jeffrey T. Leeds is President and Co-Founder of Leeds Equity Partners. Mr. Leeds previously served as a law clerk to the Hon. William J. Brennan, Jr. of the Supreme Court, and worked in the corporate department of the law firm of Cravath, Swaine & Moore in New York.

- John R. McKernan, Jr. is Chairman of the Board, and served as the Company's Executive Chairman from February 2007 to December 2008 and as Chief Executive Officer from September 2003 until February 2007.

- Leo F. Mullin is the former Chief Executive Officer and Chairman of Delta Air Lines, Inc. Mr. Mullin currently serves in a consultative capacity as a Senior Advisor, on a part-time basis, to Goldman Sachs Capital Partners.

- Todd S. Nelson is the Company's Chief Executive Officer and its former President. Mr. Nelson also worked as an independent consultant for the Company from January 2006 through January 2007. He also held several positions with the Apollo Group, Inc., including President, Chief Executive Officer and Chairman of the board of directors.

- Michael K. Powell is Chairman of the MK Powell Group, a consulting firm, and serves in a consultative capacity as a Senior Advisor, on a part-time basis, to Providence Equity Partners. Mr. Powell previously was Chairman of the Federal Communications Commission from January 2001 to March 2005, having served as a Commissioner since November 1997.

- Paul J. Salem is a Senior Managing Director and a co-founder of Providence Equity Partners. Prior to joining Providence Equity Partners in 1992, Mr. Salem worked for Morgan Stanley & Co. in corporate finance and mergers and acquisitions.

- Peter O. Wilde is a Managing Director of Providence Equity Partners. Prior to joining Providence Equity Partners in 2002, Mr. Wilde was a General Partner at BCI Partners, where he began his career in private equity investing in 1992.

These biographies demonstrate that the Board has broad diversity of experience and

skills. Consisting of entrepreneurs, lawyers, former chief executives, former government

regulators, and investment bankers, the Board is equipped to monitor all facets of EDMC's business.

ii.    *Independence of Board*

EDMC maintains a Board that consists of a majority of interested directors in compliance with NASDAQ Rules.  The Company also maintains the requisite number of formally designated directors who have been formally designated as independent – *i.e.*, three – as required by SOX and NASDAQ Rules.[53]  As publically disclosed it its SEC filings, directors who have been so designated for NASDAQ Rules are Messrs. Cowley, Mullin, and Powell.[54]

b.    Board Committees

The Board has created three committees to address the following subject areas:  audit, compensation, and nominating and corporate governance.

i.    *The Audit Committee*

As a publically-traded company, EDMC complies with the requirements imposed under SOX and the NASDAQ Rules on the committee structures.  These rules mandate the delegation of many significant matters to committees whose membership is limited to independent directors.  Under SOX, each public company must have an independent audit committee, with one member who is a financial expert.[55]  The Company also complies with NASDAQ rules regarding audit committees.

The EDMC Audit Committee was created to assist the Board in its oversight of:  (i) the integrity of the financial statements; (ii) compliance with legal and regulatory requirements; (iii)

---

[53]    SOX § 301(m)(3)(A) ("Each member of the audit committee of the issuer shall be a member of the board of directors of the issuer, and shall otherwise be independent.")

[54]    *See* EDMC Schedule 14A (10/6/10) at 10.

[55]    SOX § 407(A) (requiring each company "to disclose whether or not, and if not, the reasons therefore, the audit committee of that issuer is comprised of at least 1 member who is a financial expert, as such term is defined by the Commission.").

ensuring the qualifications and impendence of the Company's independent auditors; (iv) the performance of the independent auditors; and (v) the internal audit function at the Company. To perform these duties, the Board has delegated to the Audit Committee, among others, the following powers and responsibilities: (i) reviewing the scope and plans for both internal and independent auditors; (ii) establishing "whistleblowing" procedures; (iii) reviewing the Company's legal and regulatory compliance; and (viii) ensuring compliance with the Company's Business Conduct Guidelines and reviewing conflicts of interest. In performing these duties, the Audit Committee tracks management's corrective action plans, reviews the Company's financial risk and control procedures, and ensures its compliance with tax, legal and regulatory matters.

The Audit Committee consists of Messrs. Cowley, Mullin and Powell, with Mr. Mullin serving as the chairman and financial expert.

ii. *Compensation Committee*

The Compensation Committee was created to assist the Board with overseeing and setting the Company's compensation and benefits policies and producing an annual report on executive compensation. To perform these duties, the Board has delegated to the Compensation Committee, among others, the following powers and responsibilities: (i) establishing, reviewing, approving and administering the Company's compensation and benefits policies; (ii) approving and overseeing the compensations package for executive officers, including the CEO, and makes recommendations regarding compensation for directors; (iii) evaluating the performance of the CEO; and (iv) recommending management succession and long-term incentive compensation plans.

The Compensation Committee is comprised of Messrs. Jones, Leeds, and Wilde, with Jones serving as the chairman.

iii.     *Nominating and Corporate Governance Committee*

The Nominating and Corporate Governance ("NCG") Committee was created to assist

the Board in: (i) ensuring that qualified candidates are presented to the Board for election as

directors and the chairpersons of the Board committees; (ii) ensuring that the Board and its

committees are structured to best serve the Company's objectives; (iii) overseeing the evaluation

of the performance of the Board and its committees; and (iv) developing and reviewing, and

assessing compliance with, the Company's corporate governance principles and guidelines.  To

perform these duties, the Board has delegated to the NCG Committee, among others, the

following powers and responsibilities: (i) establishing criteria, and identifying individuals, for

nomination to the Board and its committees; (ii) evaluating, and recommending, director policies

and compensation; (iii) recommending actions related to corporate governance and principles;

and (iv) monitoring compliance with the Company's Code of Business Ethics and Conduct.

The NCG is comprised of Messrs. Jones, Leeds, Mullin, and Salem, with Mr. Salem

serving as chairman.[56]

c.     Officers of EDMC

While the Board is responsible for establishing risk management processes at the

Company, senior management is responsible for the day-to-day implementation of these

processes.[57] This division of responsibility is a highly effective approach for addressing the risks

facing the Company.  Todd Nelson, who serves both as a director and as Chief Executive

---

[56]     *See* Pros. at 109.

[57]     *See* EDMC Schedule 14A (10/14/10) at 13.

Officer, ensures there is a continuity of relationship between the Board and senior management.[58]

Additional relevant members of the Company's senior management team include:

- Edward H. West was appointed President and Chief Financial Officer in December 2008. He previously served as the Executive Vice President and Chief Financial Officer from June 2006 until December 2008. Mr. West also has held senior executive positions at ICG Commerce, Internet Capital Group, Inc., and Delta Air Lines, Inc.

- J. Devitt Kramer was appointed Senior Vice President, General Counsel and Secretary in July 2006 after serving as Vice President, Senior Counsel and Assistant Secretary from May 2004 through June 2005 and Vice President, Corporate Compliance from July 2005 to June 2006. Prior to joining EDMC, Mr. Kramer worked at as general counsel of Printcafe Software, Inc.; an attorney at Benesch, Friedlander, Coplan & Aronoff; and an accountant with Ernst & Young LLP.

- Anthony F. Digiovanni was appointed Senior Vice President – Marketing and Admissions in October 2008 after joining the Company in October 2007 as Vice President of Marketing for The Art Institutes. Prior to joining EDMC, Mr. Digiovanni was a senior executive at ClassesUSA, Corinthian Colleges, Inc., and Apollo Group, Inc.

- Dr. Stacey R. Sauchuk has been Senior Vice President of Academic Programs and Student Affairs since July 2003. She was Group Vice President from August 2001 through July 2003 and President of The Art Institute of Philadelphia from January 1997 through July 2000. .

- Roberta L. Troike has been Senior Vice President of Human Resources since April 2007. Prior to joining EDMC, she held senior management positions in human resources with Glimcher Realty Trust and Bath and Body Works.

- Anthony J. Guida Jr. has served as Senior Vice President of Regulatory Affairs and Strategic Development since March 2005. He was appointed Senior Vice President, Strategic Development in March 2003 after joining EDMC in January 2002 as Vice President of Strategic Development. He previously served as general counsel at the Pennsylvania Culinary Institute and an attorney with Buchanan Ingersoll. Mr. Guida was appointed to the Advisory Committee on Student Financial Assistance by the Speaker of the United States House of Representatives in 2009 to serve a term that expires in September 2011. He also serves on the Board of Directors of the Career Colleges Association where he chairs the Federal Legislative Committee.

---

[58] John McKernan, who serves as chairman of the Board, serves a similar role by virtue of having previously been a member of senior management.

- Robert A. Carroll has served as Senior Vice President and Chief Information Officer since June 2007. He has also held senior management positions Western Governors University and Apollo Group, Inc.

- John R. Kline was appointed as President of EDMC Online Higher Education in July 2009 after joining EDMC in April 2009 as Senior Vice President of Student Acquisition and Retention. Mr. Kline previously served in senior management at Nelnet Enrollment Solutions and Apollo Group, Inc.

- Danny Finuf has served as President of Brown Mackie Colleges since July 2006. From July 2004 to July 2006, he served as Group Vice President for the Company. From September 2003 to July 2004, he served as Regional Vice President of the Central Region. From November 1995 to September 2003, Mr. Finuf held the position of Campus President and Regional President for seven Brown Mackie College campuses. Prior to joining American Education Centers, which was acquired by Education Management Corporation in September 2003, Mr. Finuf was the Vice President of Administrative Services for Spartan College of Aeronautics.

- John M. Mazzoni has been the President of The Art Institutes since October 2005. At EDMC, he also served as a Senior Vice President of Group Operations from March 2005 to October 2005 and as Group Vice President for EDMC. From July 2001 through August 2004, he served as Group Vice President for The Art Institutes. Mr. Mazzoni also held several senior management level positions in the areas of Operations, Finance and Information Systems.

- John T. South, III, joined EDMC in July 2003 when EDMC acquired South University, which was owned by Mr. South. Mr. South has served as Chancellor of South University since October 2001 and has served on the Board of Trustees of Argosy University since February 2006, serving as Chairman from February 2006 until April 2010. Prior to the acquisition of South University, Mr. South was shareholder and CEO of various affiliated private colleges and had been CEO of South University since 1975. Mr. South also served as President of South University prior to being appointed Chancellor in October 2001.

- Dr. Craig D. Swenson was named President of Argosy University in September 2007. Prior to joining Argosy University, Mr. Swenson served as Provost at Western Governors University and the University of Phoenix system. Mr. Swenson was elected to the board of the Council of Higher Education Accreditation in July 2009. Mr. Swenson is a member of the U.S. Army Education Committee and recently completed service as a member of the U.S. Secretary of Education's National Advisory Council on Institutional Quality and Integrity.

d.      Senior Management Committees

i.      *Financial Disclosure Committee*

The Financial Disclosure Committee assists the senior management of EDMC in fulfilling their responsibility to oversee the accuracy and timeliness of the disclosures made by the Company.  To this end, this committee is charged with designing controls to ensure that relevant information is timely disclosed to the SEC, that information is communicated to management in order to let them make timely decisions, to monitor the integrity and effectiveness of EDMC's disclosure controls and procedures, and to evaluate the effectiveness of its disclosure controls and procedures.

The Financial Disclosure Committee is comprised of Edward West, President and Chief Financial Officer, Shelley Bias, Vice President of ice resident of Internal Audit, Randall Killeen, Vice President and Controller, J. Devitt Kramer, Senior Vice President and General Counsel, Dorinda Pannozzo, Vice President, Treasurer, James Sober, Vice President, Finance, and Richard C. Them, Senior Vice President, Student Finance and Compliance.

ii.      *Management Committee*

The Management Committee convenes at least once per month to, among other things, discuss short-term results for the different education systems, provide feedback and direction to proposed policies as they relate to EDMC, participate in strategy sessions, and conduct management evaluations.  This Committee is comprised of Messrs. Nelson, West, South, Swenson, Mazzoni, Finuf, Kline, Guida, Digiovanni, Carroll, and Kramer, and Mmes. Troike and Sauchuk.

iii.      *Executive Committee*

The Executive Committee meets once a month and involves broad audience, including managers of Internal Audit, Human Resources, Public Relations, Corporate Real Estate, Investor

Relations, and Regulatory Affairs.  This committee also includes vice presidents at each of the four Education systems.  These meetings are informational in nature, and are designed to update Company management on business performance, dissemination of policies and procedures, and for the provision of feedback.

**B.  CORPORATE GOVERNANCE FINDINGS RELATED TO ALLEGATIONS OF BREACHES OF THE DUTY OF CARE**

The Litigation Committee also investigated whether the implementation of EDMC corporate governance policies was deficient.  From the above discussion, it is evident that the Company maintains more than adequate corporate governance structures.  While it is possible to have adequate corporate governance policies but implement them in a manner that is deficient, such is not the case at EDMC.

**1.  Role of the Board**

a.  Time Commitment and Regular Attendance

The Board has near perfect attendance:  maintaining a 95% attendance rate since immediately before the Company's initial public offering in October 2009 until November 2010. The Board has held eleven meetings since September 2009:  September 16, 2009, November 6, 2009, February 11, 2010, February 12, 2010, May 7, 2010, July 9, 2010, August 13, 2010, August 19, 2010, September 3, 2010, September 8, 2010, and November 5, 2010.  .

b.  Need to be Informed and Prepared and Reliance on Others

The Litigation Committee also conducted an investigation into the quality of information being provided to the Board to assess whether the information being provided to the directors is relevant, concise and timely, well-organized, supported by background or historical data to place in context, designed to inform directors of material aspects of the corporation's business, performance and prospects.

A review of the materials and Board minutes demonstrates that the Board was adequately informed and prepared to investigate and respond to all of the Company's business affairs. Specifically, the minutes demonstrate that the Board regularly considers important issues related to EDMC's business and affairs including the type of issues raised by the Demand Letters and GAO Reports. For example, directors have heard presentations on and discussed compliance related issues regarding accreditation, the quality of ADAs, financial aid issues, graduation rate statistics, employment outcomes, and academic quality. And in general, the Board minutes and materials demonstrate that the Board has been actively engaged in issues regarding the general risk oversight responsibilities of the board, education regulations, significant litigations, and the general scrutiny that for-profit schools have endured in recent months.

Quarterly meetings often involve a report by the CEO regarding new students, enrollment trends, graduate employment outcomes, starting salaries, student persistence rates, and the conversion rate between the number of prospective students making inquiries into an EDMC school to the number of students that eventually enroll. Board members are also provided with a summary of financial results of the company for that quarter. Additionally, Board members are also recurrently updated on regulatory affairs and compliance issues. Non-management members of the Board meet in executive sessions on a regular basis, and neither the Chairman of the Board of Directors, nor the Chief Executive Officer or any other member of management attends such meetings of non-management directors. Finally, the entire Board of Directors approves the EDMC strategic plan and the annual operating plan.

Different Board-level committees also update the full Board periodically on important developments. For example, the Audit Committee has updated the Board on the structure and qualifications of the Company's internal audit department, material litigation directed at the

Company, and regulatory issues. Additionally, the Compensation Committee has reported to the Board about long-term incentive compensation awards and the Nominating and Corporate Governance Committee has also submitted policies on director diversity and director nominees.

Special topics are also addressed in Board meetings. One entire meeting has been devoted to the response of the Company to proposed gainful employment regulations. Meetings have also devoted a significant amount of time to understanding the allegations in and responding to the Demand Letters. Mr. Kramer, the General Counsel, also regularly sends relevant news articles and other informational items to the Board on an ongoing basis.

Further as indicated above, Pennsylvania law allows a director to rely in good faith on information provided by officers or employees of the corporation, counsel, public accountants, other experts, and reports from other committees of the Board.[59] Review of the materials and minutes shows that the Board reasonably relied on the presentations and expertise of EDMC representatives such as Messrs. West, Kramer, and Guida, and Ms. Sauchuk. Representatives from all three Board-level Committees also present on items of importance to the Board, disseminating information upon which the Board could rely.

This review of the process of the Board reveals that they are well-informed and prepared to carry out their duties, and that they reasonably rely on the expertise of EDMC personnel and Board-level Committees. In sum, the Litigation Committee finds no evidence to support a claim for breach of the duty of care against either the officers or directors of the Company.

---

[59]   15 Pa. C.S. § 1712(a).

## 2.    Role of the Audit Committee

The EDMC Audit Committee meets all applicable corporate governance standards, including those imposed by SOX and the NASDAQ Rules, because the committee consists of the requisite three independent directors and has one member that is a financial expert.

### a.    Time Commitment and Regular Attendance

As noted above, reliability of EDMC's financial reporting and the Company's compliance with applicable laws and regulations are primarily overseen by the Audit Committee. In carrying out their duties, Audit Committee members have had near perfect attendance.  The Audit Committee met on twelve occasions since September 2009:  November 2, 2009, November 6, 2009, February 5, 2010, February 12, 2010, May 3, 2010, May 7, 2010, August 9, 2010, August 13, 2010, August 30, 2010, November 1, 2010 and November 5, 2010  The Audit Committee has met over twice as many times as required by its charter.

### b.    Need to be Informed and Prepared and Reliance on Others

A review of the Audit Committee minutes demonstrates that its members were adequately informed and prepared to investigation and react to all of the committee's affairs, and that the committee reasonably relied on company officials and subject matter experts.

On a quarterly and annual basis, summarizes of audits completed by IAD are provided to the Audit Committee.  These summaries typically include summaries of audits by school and audit category, an audit score and an explanation of results.  The Audit Committee is also given a list of activities, such as visits to proposed third-party vendors to assess their controls, as well as a preview of IAD's audit plan for the upcoming fiscal year.  The Committee periodically reviews the qualifications of IAD staff.

The Audit Committee also receives updates during its meetings of Compliance Hotline activity.  This summary includes the number of complaints received categorized by education

85

system and the nature of those complaints, including whether the submission alleged financial irregularities or fraud. The Audit Committee regularly discusses the Compliance Hotline activity with relevant senior management.

EDMC's external auditor, Ernst & Young, also reports on a quarterly and annual basis to the Audit Committee. These reports include overviews of risks facing the Company and provide an assessment of, among other things, revenue recognition, compensation plans, income taxes, accounts receivable, and leases. Ernst & Young also reports on the adequacy of IAD's procedures, including the strength of internal controls, the risk assessment process, and management communications on business practices and ethical behavior.

Mr. Kramer routinely updates the Audit Committee on significant lawsuits and investigations into EDMC on a quarterly basis. In addition to providing an oral report, Mr. Kramer circulates summaries of cases, providing the case background, causes of action, and current posture.

During fiscal years 2010 and 2011, the Audit Committee considered other matters of significant importance to the EDMC's business. By way of example, the Audit Committee reviewed: the annual compliance audits by the DOE, SOX-related reports involving internal controls over financial reporting, marketing practices, admissions personnel compensation, financial aid processes, personnel training and quality assurance, school accreditation requirements, and risks associated with proposed or newly enacted post-secondary education regulations.

### 3. Role of Senior Management

Members of the senior management team – who have diverse backgrounds including extensive experience in post-secondary education (at for-profit as well as not-for profit institutions), law and government – are highly effective in implementing the day-to-day affairs

and oversight at the Company. Senior management have created several committees – including the Financial Disclosure Committee (which designs and implements controls to ensure that relevant information is timely disclosed to management and the SEC), Management Committee (which meets monthly to discuss the short-term results of the Company and to facilitate strategy discussions), and the Executive Committee (which meets monthly to provide a forum for a broad audience to update senior management on business performance, dissemination policies and procedures and provide feedback) – which allow the Company to address and remediate the kinds of issues raised by the Demand Letters.

### C.  CORPORATE GOVERNANCE FINDINGS RELATED TO ALLEGATIONS OF BREACHES OF THE DUTY OF LOYALTY

To the extent that either Demand Letter suggests that the directors or officers have breached their duty of loyalty to the Company, the Litigation Committee also finds no support for this allegation. The Demand Letters fail to offer, and the Litigation Committee does not find, anything to suggest that the directors or officers of the Company engaged in self-interested transactions. As demonstrated exhaustively above, moreover, the Litigation Committee did not uncover any evidence of (let alone intentional conduct related to) the failure to: (1) comply with laws, (2) establish controls or monitoring and compliance systems, or (3) knowingly approve alleged illegal business practices or respond to red flags.

## VII.  FINDINGS REGARDING THE SPECIFIC GAO-RELATED ALLEGATIONS

The Litigation Committee also analyzed the specific allegations of deceptive or questionable behavior at EDMC found within the Demand Letters and GAO Reports. Based upon the extensive internal control structure and strong corporate governance system, the Litigation Committee determined these allegations to be entirely without merit.

## A. GAO REPORTS ALLEGATIONS ARE UNSUBSTANTIATED

Only one ADA at one EDMC school, Argosy University – Chicago, was subject to GAO investigation. Argosy University – Chicago has not been accused of any fraudulent actions, however, the Revised GAO Report attributes two "deceptive or questionable" practices – as discussed above, the Program Cost Allegation and Graduation Rate Allegation – to one ADA. After reviewing both the Revised GAO Report and the 138-page transcript of the ADA's interaction with undercover GAO investigators, the Litigation Committee found no evidence to support a conclusion that any "deceptive or questionable" practices occurred at EDMC. Even assuming *arguendo* that the ADA's conduct was "deceptive and/or questionable" (which it was not), the Litigation Committee finds no support that the directors or officers at the Company approved of, or acquiesced in, a pattern or practice of illegal conduct or failed to adequately oversee EDMC's business.

### 1. Analysis of Program Cost Allegation

The Revised GAO Report first alleges that the "[a]dmissions representative said the bachelor's degree would take 3.5-4 years to complete, but only provided an annual cost estimate for 1/5 of the program." The transcript of the interaction between the ADA and the undercover GAO representatives fails to support this finding.

Most important, the GAO representatives *never* asked the ADA to calculate or even estimate the total cost of the program. Nevertheless, the ADA provided clear price quotes to the two GAO representatives inquiring about the degree program. Initially, the ADA made clear that that program required 120 credit hours, at a cost of $510 per credit hour. In particular, the ADA opened the discussion on credit hours by observing that "I want to talk about, just the program, the classes that you'll be taking. It is 120 credit hours." Later on, she again stated that the program required 120 credit hours. The ADA also provided the cost of tuition per credit hour:

"so in terms of tuition, it is $510 a credit hour for our undergrad program." She later repeats that the tuition is "$510 a credit hour." The ADA also ran through fees that would be charged, including the application fee, the technology fee, the textbook resource fee, the student activity fee, and a fee for paying tuition in installments. Provided with this information, no reasonable person could have been misled regarding the cost of the program.

In addition to the cost per credit hour and specific fees, the ADA tallied the total cost, including tuition and fees, per semester: "As a full-time student you do 12 credit hours, plus 120-worth of technology fees for the semester, you're looking at $6,240 a semester or $12,000 – [break in audio] – for two semesters in an academic year." The ADA also referred the GAO representatives to an "undergraduate tuition and fees worksheet" on a website that calculates the tuition for the student.

The GAO, however, takes issue with the two-semester price quote because it only accounts for one fifth of the program (i.e., two semesters, totaling twenty-four credits at a cost of $12,000, equals only one fifth of the required 120 credits). This finding, however, ignores the multiple per-credit price quotes provided by the ADA and the discussion in which the price quote occurred.

Prior to the two-semester price quote, the ADA and the GAO representatives engaged in discussion about the length of the program. Initially, one of the GAO representatives inquired whether "it usually take[s] about four years to get the 120." In response, the ADA stated that "[w]ith our program, you can complete it if it's full-time the whole time you're with us, between three and three and a half years. The ADA emphasized completion during that time would require "continuous enrollment" and "attend[ing] classes summer, spring, fall – all year round" in order to complete the degree "a little bit faster."

Further, in response to an inquiry by the GAO representatives, the ADA explained the duration of the program might vary based on a specific student's enrollment. The ADA made clear that 120 credit hours are required to complete the program but that the time to complete those credit hours depends on a student's circumstances.

It was only after this discussion – in which the ADA correctly explained that completion depended on the enrollment of a particular student and that the degree could be complete in 3 to 3.5 years, if a student attended full time, including summers – that the ADA and the GAO representatives discussed the cost of the program. During the discussion that followed the ADA provide clear and accurate information about the total number of credits required to complete the program (120), the cost per credit hour ($510), the cost of one 12-credit semester, including fees ($6,240), and the cost of two 12-credit-hour semesters ($12,000). Thus, the ADA accurately explained how long the program took to complete, made clear that completion in less than four years required summer enrollment, and provided multiple iterations of correct cost of the program.

## 2. Analysis of Graduation Rate Allegation

There is also no support for the Revised GAO Report's finding that the ADA "did not provide the graduation rate when directly asked." As discussed above, the Original GAO Report said that the ADA stated "'not everyone graduates.'" The Revised GAO Report, however, backed off that quote and now claims that the ADA "indicated that not everyone graduates." Even with this revision, there is no support for the finding.

The primary problem with the Revised GAO Report's finding is that the ADA was never "directly" asked to provide graduation rates, as the report claims. Instead, one GAO representative merely asked whether everyone graduates. The ADA then explained her experiences about why some students she knows did not graduate (finances, family, or jobs), and

90

the GAO representative asked no further questions about graduation rates and instead asks about costs. Thus, the Revised GAO Report again gets it wrong. The ADA was never asked for the information she allegedly misrepresented. To the questions actually asked, she provided an accurate response. There was nothing "deceptive" or "questionable" about this exchange.

For these reasons, there is no basis for the Revised GAO Report's cost-related finding regarding Argosy University – Chicago or any other EDMC school. No reasonable person could have been misled by the discussion regarding program costs, and it was plainly wrong for the GAO to characterize this exchange as "deceptive" or "questionable."

### 3. No Evidence of Alleged Conduct Occurring Elsewhere

Ignoring the fact that the conduct alleged by the GAO Reports is not substantiated as to the ADA at Argosy University – Chicago, the Litigation Committee also found no evidence that the alleged conduct occurs elsewhere in the Company.

As to costs of attendance, EDMC trains ADAs to provide correct information about total costs to prospective students during the initial interview prior to their meeting with the financial aid department. As the Argosy ADA appeared to be doing in the transcript, ADAs are instructed to use a "cost sheet" to run through tuition per credit per quarter for the duration of the program. The cost sheet provides an accurate, universal way for ADAs to convey cost information. In addition, EDMC trains its ADAs to provide prospective students avenues to learn more about costs through websites and catalogues.

EDMC also provides cost information to prospective students by other means. Cost information is reviewed with students and prospective students when they meet with representatives from the financial aid department. In addition, before matriculation, the total program cost is set forth, in detail, to each prospective student in an enrollment agreement. The

GAO representatives, however, did not proceed far enough along in the enrollment process to receive this information.

As to graduation rates, ADAs are trained to provide students correct graduation rates as part of their interview of the prospective student. If ADAs do not immediately remember this statistic, they are trained to know where to find the answer. Beyond interaction with ADAs, EDMC makes statistics regarding graduation rates easily available to students and prospective students in other places. As required by the DOE, graduation rates are available on all EDMC school websites. In addition, graduation rates are provided in course catalogs, which are also available online. In Argosy's case, graduation rates are also on enrollment agreements that students are required to sign before matriculating.

As to both cost of attendance and graduation rates, EDMC has controls in place to detect and remediate any such misrepresentations. As discussed above in Sections V.D. and V.E., EDMC's ADAs, in both ground schools and OHE, are monitored through programs to ensure accurate messages are being provided to prospective students. Indeed, before the GAO even conducted its undercover investigation, EDMC has been using similar methods to detect noncompliance with policy, including misrepresentations of the sort alleged by the GAO.

Thus, even if the GAO Report's allegations could be substantiated (which they cannot for the reasons discussed above), there is no basis for the allegations in the Demand Letters that the Board of Directors is not overseeing the Company and has not installed adequate controls to prevent and remediate the type of conduct alleged against Argosy University – Chicago.

### B. INVESTIGATION OF OTHER ALLEGATIONS

In addition to relying on the unsubstantiated allegations made by the GAO against one ADA at Argosy University – Chicago, the Demand Letters simply cut and paste the alleged misconduct contained in the GAO Report for the fourteen other schools and assume that such

conduct may occur at EDMC.  Nothing in the GAO Reports however ties any such allegations in any way to EDMC.  Nevertheless, in an abundance of caution, the Litigation Committee reviewed these GAO findings as they related to non-EDMC schools that were copied into the Demand Letters.  Each allegation is discussed in further detail below.

### 1.  Demand Letter and GAO-Derived Allegations

#### a.  Providing False Accreditation Information

The Demand Letters allege – without reference to any particular fact or evidence – that EDMC provides false information on accreditation.  The Demand Letters do not provide, and the Litigation Committee has not found, any support for this allegation.

The FAQ training and testing, which as discussed above in Section V.E.1. is administered to all ADAs through on-boarding, provides guidance on the correct messaging regarding accreditation.  In particular, it counsels that ADAs must provide accurate representations about whether an institution is accredited and by which organization.[60]  After training, ADAs are monitored to make sure they provide accreditation information accurately.

Moreover, information regarding EDMC accreditation is widely available through a variety of public channels.  Every prospective applicant and enrolled student receives catalogs stating accreditation information, and anyone can view that information on EDMC websites.  In addition, marketing materials must also conform to these strict accreditation requirements. Finally, most enrollment agreements, which matriculating students must review and sign, specifically state schools' accreditation.

---

[60]    For example, in the transcript of the Argosy ADA and GAO representatives, the ADA accurately represented that the campus of Argosy University-Chicago is accredited by the Higher Learning Commission and the North Central Association.

b.    Misrepresentation/Refusal to Provide Graduation Rates

The Demand Letters also allege – without reference to any particular fact or evidence – that EDMC personnel misrepresent potential salaries and employment opportunities to students. The Demand Letters do not provide, and the Litigation Committee has not found, any support for this allegation.

EDMC has internal controls in place to prevent ADAs from misrepresenting salaries or employment opportunities. During the initial training and examination, ADAs learn to provide accurate responses to questions about potential salaries and employment opportunities upon graduation. They are specifically instructed not to speculate as to either the market conditions or salaries upon graduation. During interviews, ADAs also use an "interview packet" that includes accurate employment information.

Providing accurate disclosures regarding employment outcomes, however, goes beyond admissions. The Career Services Department provides students with literature that reminds them about job placement statistics by degree program and other disclosures. As their degree program draws to a close, students who choose to use Career Services assistance sign agreements stating clearly that they understand that finding employment is the students' responsibility and that the Career Services Department can only offer advice and meaningful assistance. Moreover, Career Services Advisors are trained that they cannot guarantee career outcomes, employment, employment opportunities, and salaries; estimate salaries that students could receive upon graduation; promise that students will get a job; or tell them that EDMC provides "placement services."

c.      Deceptive Financial Aid Practices

The Demand Letters allege – without reference to any particular fact or evidence – that EDMC personnel engage in deceptive financial aid practices.  The Demand Letters do not provide, and the Litigation Committee has not found, any support for this allegation.

Providing accurate information with respect to financial aid is communicated to ADAs throughout the on-boarding process.  During the FAQ training and examination process, ADAs learn not to misrepresent the availability of financial aid, promise financial aid, fill out a financial aid applications for prospective students, or assist prospective students in falsifying financial aid forms.  Prospective students are also provided with a financial aid booklet that discusses the financial aid process and eligibility.

Likewise, SFS representatives undergo a "Back to Basics" training, whereby they learn the rules, regulations, and best practices related to financial aid.  The "Back to Basics" guide specifically warns against providing or assisting in providing any incorrect or false information related to financial aid.  The guide further urges SFS representatives to report any suspected improprieties regarding financial aid.  In addition, SFS Directors walk through the student counseling and financial planning process with SFS representatives before student interfacing begins.  Ongoing training on compliance also occurs, and all trainings, going back two years, are posted on EDMC's intranet site.

More generally, as discussed in Section V.F., EDMC has robust internal controls around financial aid that ensure EDMC complies with federal regulations.  These controls literally span the Company, involving multiple departments, Internal Audit, and outside auditors.

d.      Employing Questionable Sales and Marketing Tactics

The Demand Letters allege – without reference to any particular fact or evidence – that EDMC employees engage in overly aggressive recruiting and unfair marketing practices –

95

notably without any specific allegations of unlawful conduct. The Demand Letters do not provide, and the Litigation Committee has not found, any support for this allegation.

Contrary to the allegations in the Demand Letters, the Litigation Committee's investigation revealed that EDMC teaches ADAs a "partnership selling" philosophy, which requires a commitment to building a relationship with the student based on trust and honesty. ADAs are instructed to ask open-ended questions regarding their fields of interest, their preferred learning style and environment, and whether they have any concerns regarding their pursuits. With these questions, the ADA and the prospective student can determine which values are most important to them, such as self-esteem, confidence, stability, and accomplishment. If at any time during the ADA's interaction with the student, the ADA unintentionally promises the student something that the program cannot offer, ADAs are directed to rectify the mistake immediately and document exactly what was said and how it was rectified. As an added check on what is promised to ADAs, schools may also provide a student disclosure form to each student which requires them to initial and sign that they understand a school's policies on topics such as employment assistance, financial aid, accreditation, academic requirements, and transferability of credits. ADAs are also tested on their knowledge and commitment to integrity as part of this partnership selling process. Senior leadership at the different education systems confirmed that it is not an accepted practice for ADAs to "negative" sell, and that ADA-student interaction is heavily monitored and remediated when any violation occurs. Indeed, the transcripts of the GAO representatives' interactions with the Argosy ADA is devoid of any the "hard sell" tactics alleged by the Demand Letters.

e.   Basing Admission Personnel Compensation on Number of
     Enrolled Students

The Ganley Demand Letter alleges – without reference to any particular fact or evidence – that EDMC bases compensation on the number of enrolled students.  The letter, however, does not provide any support for this allegation.  The Litigation Committee's investigation found that the law permits EDMC (and other for-profit colleges) to consider, among other factors, the number of students enrolled when determining an ADAs' compensation.

DOE regulations currently in effect permit all colleges to base recruiter compensation, in part, on the number of students enrolled.  While a ban on so-called "incentive compensation" had been added to Title IV of the Higher Education Act (the "Act") in 1992, the Act was amended again in 2002 to add twelve "safe harbors" to the incentive compensation ban.  One of those safe harbors permitted colleges to provide recruiters with incentive compensation based on the number of students enrolled, so long as student placement was not the *sole* compensation factor. 34 C.F.R. § 668.14(b)(22)(ii)(A) (Nov. 1, 2002).[61]

EDMC's compensation plan for ADAs complied with that "safe harbor."  In particular, ADA salaries were based, on a combination of qualitative factors, such as professionalism and ethical compliance, as well as quantitative factors, such as the number of students enrolled. Thus, there is no basis for the Ganley Demand Letter's claim that ADA compensation based on student enrollment was somehow illegal.

On October 28, 2010, however, the DOE amendments repealed the safe harbors.  Those amendments, however, do not go into effect until July 2011.  Thus, after July 2011, colleges,

---

[61]   In particular, that section permits: "[t]he payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based <u>solely</u> on the number of students recruited, admitted, enrolled, or awarded financial aid. . . .  Title 34 C.F.R. § 668.14(b) (emphasis added).

including EDMC, will no longer be able to base incentive compensation on the number of students enrolled. EDMC has already taken steps to comply with these changes. EDMC has recently changed its performance plans to track the requirements of the Department of Education's new regulations. New ADAs are being compensated under this plan; all current ADAs will transition to the plan prior to June 30, 2011.

            f.        Creating False Reasons to Terminate Admissions Representatives

The Ganley Demand Letters also alleges – without reference to any particular fact or evidence – that EDMC falsely created reasons for terminating admissions representatives who do not achieve sales goals. The Ganley Demand Letter does not provide, and the Litigation Committee has not found, any support for this allegation.

            g.        Manipulation of Employment Statistics

The Ganley Demand Letter alleges – without reference to any particular fact or evidence – that EDMC manipulates former students' employment status to meet federal education requirements. The Ganley Demand Letter does not provide, and the Litigation Committee has not found, any support for this allegation.

Rather, the Litigation Committee has found multiple layers of controls designed to prevent inaccurate reporting of employment statistics. The foremost controls are policies and training. EDMC's standard training curriculum ensures that Career Services Advisors accurately report employment data. That training, for example, warns about potential risk exposures, such as counting one job as two when the latter is just an update; accepting employments with no documentation that it was verified; and overestimating salaries in the cases where graduates or employers will not release exact information. Career Services Advisors are taught to note suspicious reporting data and contact managers for guidance. Policies require that all errors or suspicious data be emailed to the Career Services Advisor and Director of Career Services at the

affected school and that further investigation be conducted until the anomaly is corrected or explained. Moreover, students themselves are also encouraged to provide accurate information to Career Services for its records.

Compliance procedures also verify accuracy of statistics. Career Services Advisors must obtain placement documentation to verify the statistics they use, and department supervisors check the accuracy of all information submitted by advisors and confirm that verifications are documented. Unusual salary fluctuations, certain waivers from placement, and other data are also periodically reviewed by Corporate Services. These data are further audited by the Internal Audit Department. During a standard school audit, auditors randomly select career services files and verify employment and salary data.

### h. "Vocational Training" and "Cost Structures"

The Bushansky Demand Letter vaguely requests that an investigation be conducted into EDMC's "vocational training" and "cost structures." The Bushansky Demand Letter does not provide, and the Litigation Committee has not found, any support for this allegation.

The Litigation Committee requested that counsel for Mr. Bushansky provide further information or support for the allegations in her demand. None was forthcoming. To the extent the allegation questions the integrity of degree programs offered by EDMC schools, the Litigation Committee finds that this allegation is not supported in light of the fact that those programs are nationally, regionally, and/or programmatically accredited by respected accrediting organizations.

### 2. Additional *Gaer* Allegations

On January 19, 2011, the Litigation Committee sent a letter to counsel for Ganley requesting additional factual support for its allegations, as well as for "any other facts or information that [the shareholder] would like the Litigation Committee to consider as part of its

99

investigation." In response, counsel for Ganley requested that the Litigation Committee investigate "the related facts and allegations in [the *Gaer* Litigation]."[62] The Litigation Committee reviewed the Complaint and investigated the substantive allegations that were not duplicative of the Demand Letters or the GAO Reports. The Committee's findings are discussed in further detail below.

a.      Admission Personnel Interference with Financial Aid

The *Gaer* Complaint alleges that ADAs were instructed to help students obtain financial aid and that ADAs would intervene when financial aid not was not secured. The Litigation Committee found no evidence to support this allegation. As discussed in Sections V.E.1., *supra*, EDMC ensures through the training, examination, and reexamination that ADAs remain clear of any involvement with the financial aid application and awarding process. Compliance with this policy is tracked and any noncompliance corrected.

Indeed, the transcript from the GAO investigation refutes this allegation and demonstrates an example of an ADA complying with EDMC policy. During the two separate interactions between the Argosy University – Chicago ADA and the GAO representatives, the ADA stated several times that she would seek the assistance of a financial aid representative for a more "in-depth" discussion as they are "absolutely the experts." She stressed that if the GAO investigators decided to "apply" for financial aid, the admissions department would "keep [its] nose out of [their] business until [they] decide[d] [they] want[ed] to . . . come join us."

---

[62]   *See* Barroway Letter to Goodwin Procter (Jan. 20, 2011). On January 10, 2011, a 168-page Amended Complaint was filed in the *Gaer* Litigation, which largely resembles the allegations made in the Demand Letters that have been refuted above.

b.      Evasive Answers Regarding Transfer Credits

The *Gaer* Complaint alleges that personnel offered evasive answers regarding transfer of credits. The Litigation Committee's investigation, however, found the opposite. The FAQ Handbook instructs ADAs to provide accurate responses to questions about whether an EDMC school will accept transfer credits, whether a non-EDMC institution will accept credits earned from an EDMC school, and how credit from a non-EDMC institution affects a student's GPA. Moreover, ADAs are instructed to never imply or guarantee any results regarding transfer of credits, either to or from an EDMC school. One interviewee even described how compliance data regarding specific transfer of credits issues was used to develop additional training for ADAs.

Aside from the policies and procedures in place to prevent less-than-forthcoming responses to transfer of credit questions, the results of the GAO investigation again contradict this allegation. The transcript reveals that the Argosy University – Chicago ADA followed EDMC policy where she accurately disclosed that "[t]ransferability of credits always depends on the receiving institution."

c.      Academic Quality Issues/Misrepresentation about Academic
Obligations

The *Gaer* Complaint alleges that personnel made misrepresentations about academic obligations, and that the degree itself is of lesser value. The FAQ training and examination regimen insists that accurate information be provided regarding the degree a prospective student can earn and the requirements of that degree. ADA interviews are also geared toward disclosing program requirements. For example, the Argosy University – Chicago employee explained to GAO representatives that although she may be working towards an undergraduate degree in psychology, she would need to fulfill other general education requirements, because of the

EDMC philosophy that it was "important for a student to get a base of knowledge." Further in the interview, she explained the importance of timeliness for class attendance, and that there are some instructors who may not have a Ph.D. or a Masters, "but have a lot of experience in the field they're teaching in."

Finally, to the extent that an investigation regarding the quality of education that EDMC provides is warranted, the Litigation Committee finds no merit to that allegation. Appropriate state, regional, national, and programmatic accreditation organizations have reviewed EDMC's institutions and programs and accredited them. Accreditation renewal requirements, along with efforts of the Regulatory Affairs to ensure compliance with accreditation requirements, as discussed in Section V.G., *supra*, provide a thorough and continuous assessment of the strength of EDMC's offerings.

#### d.     Enrollment Data Inflation

An allegation exists that EDMC's "system for reporting enrollment data was not subject to internal controls that were 'true and accurate.'" Information about student "starts" is inputted at the ground school level, and Corporate Services extracts this information and combines it with qualitative ratings to generate a full employee assessment.

#### e.     Basing ADA Compensation "Solely" on Students Enrolled

The *Gaer* Complaint alleges that, while EDMC's compensation plans for ADAs used a matrix that based salaries on a number of factors, such as ethics, professionalism, and the number of students enrolled, EDMC in practice only based compensation on the number of students enrolled. The Litigation Committee found this allegation to be false.

As discussed above (at Section VII.B.1.e.) in response to the Ganley Demand Letter allegations, each ADA at EDMC has been compensated based on a matrix of qualitative factors, such as professionalism and ethical compliance, and a quantitative calculation of the number

students that ADA was responsible for enrolling. For each of the qualitative factors, ADAs are graded by their direct supervisor on a scale of 1 through 5, with 5 being the highest. The total points from the each qualitative rating and the total points from the quantitative rating, along with years of service and geographic location, determine an ADA's salary.

The qualitative factors vary compensation significantly. For example, at the lowest compensation range of the compensation matrix, qualitative factors could vary an ADA's salary by as much as $10,000. At the top of the matrix, qualitative factors could vary an ADA's salary by more than $40,000. The fact that the qualitative factors mattered is further evidenced by the fact that Directors of Admissions historically have lobbied for Human Resources to change ADAs' qualitative performance ratings when mistakes were made in calculations. ADAs may have separate boosts in compensation based upon the initiative they take in managing special projects or for the expertise that they have for the length of their years in service. Additionally, EDMC provides a ramp-up period at its Education Systems of up to eighteen months before quantitative factors are fully integrated into their performance review. Thus, for almost a year and a half, ADAs are compensated on nothing but qualitative factors.

Qualitative factors also play a part in the compensation of Directors of Admissions. Business Practices and Ethics, Job Knowledge and Development, and ADA Training and Development constitute a significant percentage of their employee assessment which factors into their compensation. In fact, any Director of Admissions who receives the lowest score in any of the three qualitative categories automatically is prevented from earning a salary increase, regardless of all other scores, including quantitative results, and their salary is subject to decrease.

### 3. References to Other Litigations

The Bushansky Demand Letter also alleges that the Board "fail[ed] to heed warning signs of illegal activity occurring at the Company" by referencing three suits against the Company and one civil investigative demand letter issued by the Massachusetts State Attorney General. The Litigation Committee investigation revealed, however, that these matters have been addressed appropriately by the Company and did not present "warning signs," as suggested by the Bushansky Demand Letter, that went unheeded.

As an initial matter, the claims and postures of all three litigations and the civil investigative demand letter were publicly disclosed in EDMC's quarterly report to its shareholders in May 2010 – several months before the Demand Letter was sent. Further developments in these matters were subsequently disclosed in EDMC's first annual report to its shareholders. Moreover, the Board and the Audit Committee were made aware of and discussed these litigation matters in their meetings. The Audit Committee routinely discusses and addresses significant litigations as a matter of practice. With respect to the civil investigative demand and three litigations raised in the Bushansky Demand Letter, moreover, the Audit Committee discussed and evaluated the merits of each claim and to the extent still active continues to do so.

## VIII.   CONCLUSIONS

After reasonable inquiry, for the reasons discussed above, as well as other considerations (including the cost and uncertainties of litigation), the Litigation Committee determined in good faith and in the exercise of its reasonable business judgment that the that there is no evidence that the allegedly deceptive and questionable practices referred to in the Demand Letters occur at the Company and, in any event, there has been no breach of any fiduciary duties owed by the officers or directors of EDMC.  The Litigation Committee, therefore, concludes that it would not be in the best interest of the Company or its shareholders to take the actions requested in the Demand Letters and, as such, has voted to reject the demands.

BY THE LITIGATION COMMITTEE OF THE
BOARD OF DIRECTORS OF EDUCATION
MANAGEMENT CORPORATION

_____

Paul J. Salem

_____

Leo F. Mullin

BY THE LITIGATION COMMITTEE OF THE
BOARD OF DIRECTORS OF EDUCATION
MANAGEMENT CORPORATION

_____

Paul J. Salem

_____

Leo F. Mullin

# APPENDIX A

# WEISS & LURIE

The Fred French Building
551 Fifth Avenue
New York, New York 10176
TEL (212) 682-3025
FAX (212) 682-3010

New York  Los Angeles

August 23, 2010

Board of Directors
EDUCATION MANAGEMENT CORP.
210 Sixth Avenue. 33rd Floor
Pittsburgh. Pennsylvania 15222

Re: Shareholder Demand of Stephen Bushansky

To the Board of Directors of Education Management Corp.:

We represent Stephen Bushansky, a shareholder of Education Management Corp. ("EMC" or the "Company") at all times relevant herein, and are writing to demand that you take action to repair the Company's reputation and recover the Company's damages caused by the misconduct described herein. Likewise, we demand, on behalf of Mr. Bushansky, that you take all necessary steps to install a functioning and adequate system of internal controls and an effective system of corporate governance practices and procedures, the absence of which further damages the Company and its shareholders.

The United States government has been investigating "for-profit" schools, such as EMC, including the recruiting practices, financial aid and loans secured by students, loan delinquency rates, and job placement for students at such schools. The results of the Government Accountability Office ("GAO") investigation have been released and the facts therein are devastating to EMC and its shareholders.

Specifically, the GAO found:

* School personnel encouraged prospective students to falsify financial aid forms;

* School personnel misled prospective students about costs; and

* School personnel gave prospective students false information about accreditation.

WEISS & LURIE

Board of Directors
EDUCATION MANAGEMENT CORP.
August 23, 2010
Page 2

In the wake of these findings, not only has EMC's business prospects plummeted, along with its stock price, but calls for stricter regulation of "for-profit" schools, such as those run by the Company, have been heightened. Indeed, in July, the United States Department of Education proposed new "gainful employment" rules that would curtail EMC's access to student financial aid and loans unless certain thresholds were met demonstrating that a sufficient number of students' loans were being repaid and that those students who were repaying their loans had found jobs adequate to realistically make such repayments. The GAO's findings will surely add to the momentum behind the implementation of such new regulations and diminish the enrollment and profitability of EMC's institutions.

In order to repair the damage done to the Company reputationally, a thorough far-reaching investigation of EMC's recruiting, vocational training, and cost structures must be performed by a strictly independent party. Failure to do so would only further undercut the position of trust so essential to be maintained by an educational institution. Steps also must be taken to repair the financial harm caused to EMC. Those responsible for performing the fraudulent, and deceptive practices highlighted by the GAO must be terminated. In the event that those employees were acting in accord with Company policies, those policies must be identified and cease immediately. Those who devised such policies must also be terminated and, where possible, action must be taken to recover the Company's financial losses from such persons. Moreover, a thorough investigation must be launched to determine to what extent these practices were known by the Board of Directors.

We further demand that the Company take all appropriate steps to build an internal control structure that would identify illegal activity of EMC's employees so that such activities could be stopped before material damage is caused to the Company, and its shareholders, as well as prospective students.

Finally, we demand that EMC substantially revise its corporate governance practices and procedures. It is readily apparent that the Board of Directors failed in its fiduciary duties to its shareholders to adequately oversee the Company. Such failings must be investigated. Indeed, it appears that the Company must change its corporate governance practices to require that its directors have both the time and inclination to properly oversee EMC on behalf of its shareholders. Rather than do so, it appears that the members of EMC's Board have multiple board memberships, in addition to time-consuming positions at other firms, leaving little, if any, time to meaningfully oversee the Company:

*     Michael K. Powell besides from serving as Chairman of MK Powell Group LLC, Senior Advisor to Providence Equity Partners Inc., and a Rector of Williams & Mary College, sits on eight boards;

A-2

WEISS & LURIE

Board of Directors
EDUCATION MANAGEMENT CORP.
August 23, 2010
Page 3

* Paul J. Salem besides from serving as Senior Managing Director of Providence
  Equity LLP and Providence Equity Partners Inc., sits on four boards;

* Jeffrey T. Leeds besides from serving as Preisdent of Leeds Group Inc., Principal
  of Advance Capital Management, Principal of Leeds Weld & Co., and President
  of Leeds Equity Partners, sits on seven boards;

* Adrian Jones, besides from serving as Vice-President and General Manager of
  Stella-Jones Inc., a Managing Director and Partner of Goldman Sachs & Co., and
  Manager of Buck Holdings LLC, sits on six boards;

* Leo F. Mullin besides from serving as Senior Advisor to GS Capital Partners LP,
  sits on four boards;

* Peter O. Wilde besides from serving as a Managing Director of Providence Equity
  Partners, sits on six boards, including serving as Chairman of one such board.

* John R. McKernan, Jr. is the Chairman and CEO of McKernan Enterprises Inc.
  and Nottingham Equity, Inc., sits on another board, yet also serves as EMC's
  Chairman;

* Mick J. Beekhuizen is a Vice-President for Merchant Banking at Goldman Sachs
  & Co.; and

* Samuel C. Cowley is the Executive Vice-President - Business Development and
  Secretary for Matrixx Intitiatives Inc.

As the above further demonstrates, a number of EMC's purportedly independent
directors work for the same company or related entity. Given the constraints of their duties, their
common allegiance thereto and apparent familiary with each other, these directors do not appear
to be disinterested or independent at all.

The Board's lack of disinterest, and failure to exercise fiduciary duties is further
demonstrated by the failure to heed warning signs of illegal activity occurring at the Company.
For example:

* In June 2007, The New England Institute of Art received a civil investigative
  demand letter from the Massachusetts State Attorney General requesting
  information in connection with the Attorney General's review of alleged

WEISS & LURIE

Board of Directors
EDUCATION MANAGEMENT CORP.
August 23, 2010
Page 4

submissions of false claims by the school to the Commonwealth of Massachusetts
and alleged unfair and deceptive student lending and marketing practices engaged
in by the school;

\* In July 2007, Buchanan v. South University Online and Education Management
Corporation, a qui tam action, was filed in the United States District Court for the
Western District of Pennsylvania relating to whether the defendants'
compensation plans for admissions representatives violated the Higher Education
Act and U.S. Department of Education regulations prohibiting an institution
participating in Title IV Programs from providing any commission, bonus or
other incentive payment based directly or indirectly on success in securing
enrollments to any person or entity engaged in any student recruitment or
admissions activity;

\* In August 2009, Capalbo et al. v. Argosy University, Education Management
Corporation and Marilyn Powell-Kissinger was filed in District Court for Dallas
County, Texas. The plaintiffs in the Capalbo action are all former students
enrolled in the Clinical Psychology doctoral program at the Argosy University
Dallas campus. The Capalbo plaintiffs allege that, prior to enrolling and/or while
enrolled in the program, the defendants violated the Texas Deceptive Trade
Practices and Consumer Protection Act and made material misrepresentations
regarding the importance of accreditation of the program by the Commission on
Accreditation, American Psychological Association, the status of the application
of the Dallas campus for such accreditation, the availability of loan repayment
options for the plaintiffs, and the quantity and quality of the plaintiffs' career
options; and

\* In March 2010, Adibian et al. v. Argosy University, Education Management LLC
and Education Management Corporation was filed in the District Court for Dallas
County, Texas by three more former students enrolled in the Clinical Psychology
doctoral program at Argosy University Dallas campus filed a complaint making
similar allegations as to those made by the plaintiffs in Capalbo.

As stated above, this is a demand letter, the intention of which is to give you the first
opportunity at taking the actions described herein. If you fail to take the requested actions within
ninety (90) days of the date of this letter, we will assume that you have decided not to pursue
them and we will then institute an action to obtain the remedies we are asking you to obtain.

By making this demand, we in no way concede the independence or disinterestedness of
EMC's Board of Directors and entirely reserve our client's rights to challenge EMC's Board's
disinterestedness. In fact, we submit that, based on their numerous conflicts of interest, and

WEISS & LURIE

Board of Directors
EDUCATION MANAGEMENT CORP.
August 23, 2010
Page 5

entanglements, and their corporate governance failings, the Board must allow these claims to be pursued on behalf of the Company in a meaningful fashion by our client. This demand is being made, despite the futility thereof, solely pursuant to the requirements of the law of the Commonwealth of Pennsylvania, which requires such action.

If you would like to discuss any of the matters contained in this letter, please contact us.

Very truly yours,

Joseph H. Weiss

cc:     Mr. Stephen Bushansky



GOODWIN | PROCTER

R. Todd Cronan          Goodwin Procter LLP
617.570.1389           Counselors at Law
rcronan@               Exchange Place
goodwinprocter.com     Boston, MA 02109
                       T: 617.570.1000
                       F: 617.523.1231

November 19, 2010

**VIA E-MAIL & VIA FIRST CLASS MAIL**

Joseph H. Weiss, Esq.
Weiss & Lurie
The Fred French Building
551 Fifth Avenue
New York, NY 10176

**Re:   Shareholder Demand of Stephen Bushanksy to Education Management Corporation**

Dear Mr. Weiss:

I write in response to your letter to the Board of Directors of Education Management Corporation ("EDMC"), dated August 23, 2010. Goodwin Procter LLP represents a committee of disinterested directors of EDMC (the "Litigation Committee") and is assisting the Litigation Committee with its investigation of the matters identified in your letter.

The investigation is ongoing and the Litigation Committee will report its results when the investigation is concluded. In the meantime, we ask that you provide us with any further information or support that you have for the allegations set forth in your August 23, 2010 letter or any other facts or information that you would like the Litigation Committee to consider as part of its investigation.

In addition, we ask that you provide written confirmation that your client, Stephen Bushansky, has owned shares of EDMC continuously from October 7, 2009 to the present.

Please contact me if you have any questions.

Sincerely,

Todd Cronan

R. Todd Cronan

A-6

GOODWIN | PROCTER

Stuart M. Glass
617.570.1920
sglass@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

February 22, 2011

**VIA E-MAIL & MAIL**

Joseph H. Weiss, Esq.
Weiss & Lurie
The Fred French Building
551 Fifth Avenue
New York, NY 10176

Re:    **Shareholder Demand of Stephen Bushansky to Education Management
       Corporation**

Dear Mr. Weiss:

I write in furtherance of our telephone conversation last week.

As you will recall, in response to your letter to the Board of Directors of Education Management Corporation ("EDMC"), dated August 23, 2010, we informed you that Goodwin Procter LLP represents a committee of disinterested directors of EDMC (the "Litigation Committee") and is assisting the Litigation Committee with its investigation of the matters identified in your letter. We told you that the investigation is ongoing and the Litigation Committee will report its results when the investigation is concluded. We asked you to provide us with any further information or support that you have for the allegations set forth in your August 23, 2010 letter or any other facts or information that you would like the Litigation Committee to consider as part of its investigation and to provide written confirmation that your client, Stephen Bushansky, has owned shares of EDMC continuously from October 7, 2009 to the present. We did not receive a response to any of these requests. As I indicated during our recent conversation, the Litigation Committee's work is proceeding and you should expect to hear back from it by the end of March. In the meantime, if you have specific factual information that you would like the Litigation Committee to consider, please let us know as soon as possible.

Sincerely,

Stuart Glass/JDO

Stuart M. Glass

cc:    R. Todd Cronan, Esq.

# WEISS & LURIE

Suite 1600
1500 Broadway
New York, New York 10036
TEL (212) 682-3025
FAX (212) 682-3010

New York   Los Angeles

March 10, 2011

By Email and First Class Mail

Stuart Glass, Esq.
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109

> Re:   Shareholder Demand of Stephen Bushansky to
> Education Management Corporation's Board of Directors

Dear Stuart:

I write in response to your letter of February 22, 2011. As you requested, I enclose herewith a document reflecting Stephen Bushansky's continuous ownership of Education Management Corporation ("EDMC" or the "Company") stock.

On August 23, 2010, on behalf of Mr. Bushansky, we made a written demand on EDMC's Board of Directors to investigate illegal activity, and risky practices engaged in by the Company, as well as serious corporate governance failings, that put EDMC's future viability, and its shareholders' financial interests, in dire jeopardy. That demand was made over six months ago and demanded that action be taken within ninety (90) days of that date. Rather than taking any action, all that appears to have been done is that you have requested information from Mr. Bushansky. In fact, the correspondence requesting such information was sent some eighty-eight (88) days after demand was made. Given this history and the fact that EDMC's directors are named defendants in class action securities litigation styled Gaer v. Education Management Corp., et al., Case No. 2:10-cv-06061-RCM (W.D. Pa.), it appears that EDMC's so-called "Litigation Committee," the members of which are not identified in EDMC's public filings or your letters, and the EDMC Board are not fairly and in a disinterested fashion addressing Mr. Bushansky's demand. In fact, it appears that, in accord with the facts set forth in Mr. Bushansky's demand letter, there are no independent and disinterested directors of EDMC.

Our firm has an established record of achieving substantial recoveries and corporate governance reforms for corporations damaged by such misconduct. We are committed to assisting EDMC in remedying the damage caused to it and achieving the substantial reforms

WEISS & LURIE

Stuart Glass, Esq.
March 10, 2011
Page 2

demanded. We are prepared to meet with you and the as-yet unidentified members of the
Litigation Committee to discuss the concerns enumerated herein and the work of the Litigation
Committee after being provided with: 1) the identity of the Litigation Committee members;
2) any Board resolutions by which the Litigation Committee was established and that define its
powers and responsibilities; 3) copies of all other demands made upon the EDMC Board; and
4) an identification of all outstanding litigation against EDMC, its Board, or management
concerning the facts discussed in Mr. Bushansky's demand letter. If you will not do so, we will
consider Mr. Bushansky's demand to have been rejected.

Very truly yours,

David C. Katz

DCK/pjm
Enclosure

cc: Mr. Stephen Bushansky
    Joseph H. Weiss, Esq.
    R. Todd Cronan, Esq.

2/14/2011                                        Gain/Loss

**Stifel  ccess**

Enter symbol

print    alerts (0)

| Unrealized | Realized |

Account                          Show
REDACTED - BUSHANSKY STEPHEN ▼   All Asset Classes ▼

Export to Excel

| Asset Type | Description | Symbol | Qty | Date Acquired | Unit Cost | Purchase Cost | Market Price* | Market Value* | Total Gain/Loss* | Total % Gain/Loss* |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | REDACTED | | | | | | |
| ⊟ **Stock** | EDUCATION MANAGEMENT CORP NEW | EDMC | 130 | Multiple | $18.00 | $2,340.00 | $19 53 | $2,538.38 | $198 38 | 8 48% |
| Stock | EDUCATION MANAGEMENT CORP NEW | EDMC | 100 | 10/01/2009 | $18 00 | $1,800 00 | $19 53 | $1,952 60 | $152 60 | 8 48% |
| Stock | EDUCATION MANAGEMENT CORP NEW | EDMC | 30 | 10/01/2009 | $18 00 | $540 00 | $19 53 | $585 78 | $45 78 | 8 48% |
| | | | | REDACTED | | | | | | |

Total Value of Search Results                                        REDACTED

Privacy Statement  |  User Agreement  |  Real-Time Quote Agreement  |  Contact Us  |  Investment Objectives  |  Fee Schedule

Copyright © 2001-2011 Scivantage and/or its data suppliers  All rights reserved

GOODWIN | PROCTER

Stuart M. Glass
617.570.1920
sglass@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

March 16, 2011

**VIA E-MAIL & FIRST CLASS MAIL**

David C. Katz, Esq.
Weiss & Lurie
Suite 1600
1500 Broadway
New York, NY 10036

Re:     **Shareholder Demand of Stephen Bushansky to Education Management
        Corporation**

Dear David:

On behalf of the committee of disinterested directors (the "Litigation Committee") of Education
Management Corporation ("EDMC"), I write in response to your March 10, 2011 letter.

As you are aware, and as memorialized in our November 19, 2010 and February 22, 2011 letters
and as discussed during my telephone conversation with your colleague Joseph Weiss on
February 16, 2011, the Litigation Committee is currently investigating the matters raised by your
client, Stephen Bushansky. As part of this investigation, and as also noted in our previous
correspondence, we have asked you to provide information or facts in support of the assertions of
Mr. Bushansky or regarding any other issues you would like to be considered by the Litigation
Committee. You have not provided any such information or facts.

Now, you claim that Mr. Bushansky is prepared to meet with the Litigation Committee to discuss
his concerns but only after EDMC complies with a series of broad information requests of your
own. Such conditional offers are counterproductive. Far from rejecting Mr. Bushansky's
demand, the Litigation Committee has, and continues to, diligently investigate the matters
described in his demand letter. As always, the Litigation Committee remains open to
considering any and all information or facts provided by Mr. Bushansky.

Please note, as memorialized in our February 22, 2011 letter, however, that the Litigation
Committee anticipates completing its investigation by the end of March. Accordingly, any

GOODWIN | PROCTER

David C. Katz, Esq.
March 16, 2011
Page 2

additional information or facts that Mr. Bushansky desires the Litigation Committee to consider
must be provided without conditions or further delay.

Sincerely,

*Stuart M. Glass*

Stuart M. Glass

cc: R. Todd Cronan, Esq.

GOODWIN | PROCTER

Stuart M. Glass
617.570.1920
sglass@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

April 6, 2011

**VIA E-MAIL**

David C. Katz, Esq.
Weiss & Lurie
Suite 1600
1500 Broadway
New York, NY 10036

Re:     **Shareholder Demand of Stephen Bushansky to Education Management
        Corporation**

Dear Mr. Katz:

As you know, Goodwin Procter LLP represents a committee of disinterested directors of
Education Management Corporation (the "Litigation Committee") and is assisting the Litigation
Committee with its investigation of the matters identified in your shareholder demand letter,
dated August 23, 2010. I am writing to follow-up on my prior correspondence and to let you
know that the Litigation Committee has completed its factual investigation of Mr. Bushansky's
demand and we will provide you with the conclusions from that investigation in the next two
weeks.

Sincerely,

Stuart M. Glass

cc: R. Todd Cronan, Esq.

**From:** Glass, Stuart M
**Sent:** Wednesday, April 20, 2011 3:53 PM
**To:** 'dkatz@weisslurie.com'
**Subject:** FW: Education Management Corporation

Following up on the attached letter, I wanted to let you know that the Litigation Committee is finalizing its response and you should receive it in the next two weeks.

Stu

Stuart M. Glass
**Goodwin Procter** LLP
Exchange Place
Boston, MA 02109
T: 617-570-1920
F: 617-523-1231
sglass@goodwinprocter.com
www.goodwinprocter.com

---

**From:** Glass, Stuart M
**Sent:** Wednesday, April 06, 2011 11:56 AM
**To:** 'dkatz@weisslurie.com'
**Cc:** Cronan, R Todd
**Subject:** Education Management Corporation

Please see the attached letter.



Stuart M. Glass
**Goodwin Procter LLP**
Exchange Place
Boston, MA 02109
T: 617-570-1920
F: 617-523-1231
sglass@goodwinprocter.com
www.goodwinprocter.com

GOODWIN | PROCTER

R. Todd Cronan
617.570.1389
rcronan@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T. 617.570.1000
F. 617.523.1231

May 4, 2011

## VIA E-MAIL & FIRST CLASS MAIL

Joseph E. Weiss, Esq.
Weiss & Lurie
Suite 1600
1500 Broadway
New York, NY 10036

Re:  **Shareholder Demand of Stephen Bushansky to Education Management
Corporation**

Dear Mr. Weiss:

I am writing at the direction of a committee of the Board of Directors of Education Management

Corporation (the "Litigation Committee"). The Litigation Committee has conducted an

extensive and thorough investigation in response to two shareholder demand letters received by

Education Management Corporation ("EDMC" or the "Company"). This letter summarizes the

investigation and conclusions reached by the Litigation Committee.

EDMC received two demand letters following the release of a report prepared by the United

States Government Accountability Office ("GAO"), dated August 4, 2010, which asserted that

certain for-profit educational institutions had engaged in allegedly deceptive and questionable

practices. Both letters (the "Demand Letters"), which make substantially the same allegations,

request that the Board of Directors of EDMC (the "Board") investigate and take necessary

actions in response to the GAO report.

GOODWIN │ PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 2

The demand letter you sent requests the Company to investigate the allegations in the GAO
report, take appropriate steps to ensure that an adequate system of internal controls is in place to
identify and prevent unlawful activity, and make any needed changes to the Company's
corporate governance system. The other demand letter raises similar concerns with respect to the
conduct at issue in the GAO report. It further alleges that the officers and directors of EDMC
breached their fiduciary duties by knowingly approving "illegal business practices" and/or
"abdicating their responsibility to make a good faith effort to oversee the Company's operations
and business practices."

The Litigation Committee has conducted its investigation into the matters raised in the Demand
Letters. The Committee determined that the Company has a robust set of internal controls that
are properly designed to identify, deter and remediate the types of allegedly deceptive and
questionable practices referred to in the Demand Letters and the GAO report. These internal
controls are supported by a properly designed and staffed corporate governance structure. The
Litigation Committee also concludes that there has been no breach of the fiduciary duty owed by
the officers or directors of EDMC in connection with their oversight of the internal control and
corporate governance systems in place at EDMC. Further, the Litigation Committee's
investigation did not uncover evidence showing that the types of conduct identified in the
Demand Letters and GAO report are in fact occurring at EDMC. Accordingly, the Litigation
Committee has determined that it would not be in the best interests of the Company or its
shareholders to take the actions demanded in the Demand Letters.

GOODWIN PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 3

## BACKGROUND

EDMC, one of the largest providers of private post-secondary education in North America, was part of a broad GAO investigation in which the GAO sent undercover representatives to meet with admissions and financial aid representatives at fifteen for-profit colleges. Only one (1) of EDMC's 104 schools – Argosy University in Chicago, Illinois ("Argosy University – Chicago") – was part of this investigation. With respect to Argosy University – Chicago, the investigation involved two interactions between undercover GAO representatives and one of EDMC's approximately 3,500 assistant directors of admission ("ADA"). Based upon these interactions, the GAO initially reported that, while there was no evidence of fraudulent activity, the employee at Argosy University – Chicago had engaged in three types of improper activity: providing misleading information on program duration cost ("Program Cost Allegation"), refusing to provide graduation rates ("Graduation Rate Allegation"), and providing misleading information about the professional experience of professors ("Professor Experience Allegation"). The GAO also identified one good practice at Argosy University – Chicago, the providing of reasonable information about prospective salaries and potential employment.

On November 30, 2010, the GAO released a revised report that made substantial revisions to its initial findings. With respect to Argosy University – Chicago, the new report removed the Professor Experience Allegation, in its entirety, diluted the GAO's findings related to the Program Cost Allegation, and left the good practice attributed to EDMC unchanged. As to the

GOODWIN | PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 4

remaining fourteen for-profit colleges, the revised GAO report similarly removed many of the allegedly deceptive and/or questionable practices discussed in the initial report.

## THE INVESTIGATION

Shortly after the release of the original GAO report, EDMC received the Demand Letters. No effort has been made by counsel for the shareholders to update the Demand Letters following the release of the revised GAO report or the audio recordings. Both Demand Letters, without providing specific factual support or examples of misconduct, attribute all of the alleged deceptive and/or wrongdoing found in the GAO's initial report to EDMC, and summarily conclude that the Company's officers and directors must have breached their fiduciary duties by failing to properly oversee EDMC's operations and business practices.

In response to the Demand Letters, the Board adopted a resolution creating the Litigation Committee pursuant to Section 1731 of the Pennsylvania Associations Code, Title 15 Pa. C.S., including Subpart B known as the Business Corporation Law of 1988 and Section 3.1 of the Company's Amended and Restated Bylaws. The Board delegated to the Litigation Committee the power and authority to: (1) review, analyze, and investigate the allegations in the Demand Letters; (2) engage legal counsel and other experts to conduct the investigation, and draft a report setting forth conclusions and recommendations resulting from the investigation, on behalf of the Committee; and (3) determine the appropriate actions, if any, the Company should pursue in

GOODWIN PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 5

response to the Demand Letters. Leo Mullin and Paul Salem were appointed by the Board to

serve on the Litigation Committee.

Messrs. Mullin and Salem are disinterested directors under Pennsylvania law and may therefore

discharge the duties delegated to the Litigation Committee by the Board. The ALI Principles of

Corporate Governance define "disinterested" in terms of what it means to be "interested."

Section 1.23(c) of the ALI Principles provides that a director is interested if any of the following

four tests are met:

(1)     The director or officer, or an associate of the director or officer, is a party to the
        transaction or conduct;

(2)     The director or officer has a business, financial, or familial relationship with a
        party to the transaction or conduct, and that relationship would reasonably be
        expected to affect the director's or officer's judgment with respect to the
        transaction or conduct in a manner adverse to the corporation;

(3)     The director or officer, an associate of the director or officer, or a person with
        whom the director or officer has a business, financial, or familial relationship, has
        a material pecuniary interest in the transaction or conduct (other than usual and
        customary directors' fees and benefits) and that interest and (if present) that
        relationship would reasonably be expected to affect the director's or officer's
        judgment in a manner adverse to the corporation; or

(4)     The director or office is subject to a controlling influence by a party to the
        transaction or conduct or a person who has a material pecuniary interest in the
        transaction or conduct, and that controlling influence could reasonably be
        expected to affect the director's or officer's judgment with respect to the
        transaction or conduct in a manner adverse to the corporation. Counsel, public
        accountants or other persons as to matters which the director reasonably believes
        to be within the professional or expert competence of such person.

GOODWIN PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 6

Based upon these factors, under the ALI Principles "[a] person who neither is an associate of, nor has a pecuniary interest in, or business or financial relationship to, a party to the transaction or conduct will normally not be interested within the meaning of § 1.23." The Demand Letters fail to provide, and the facts do not support, any basis to conclude that Messrs. Mullin or Salem are associated with, have a pecuniary interest in, a business or financial relationship with, or are a party to the conduct alleged in the GAO Report or the Demand Letters.

The Litigation Committee oversaw a thorough review and analysis of the factual and legal issues identified in the Demand Letters. During this process, members of the Litigation Committee were advised by independent legal counsel, Goodwin Procter LLP, who conducted approximately forty (40) witness interviews and reviewed more than 165,000 pages of documents pertaining to the allegations raised by the Demand Letters. The Litigation Committee and its counsel met on numerous occasions to discuss and analyze the information collected through this investigative process. During its investigation, the Litigation Committee also requested that counsel that sent the Demand Letters provide factual support for their allegations; however, no such support was ever provided.

## SUMMARY OF THE REASONS FOR THE LITIGATION COMMITTEE'S DECISION

The principal reasons for the Litigation Committee's decision to reject the demands set for in the Demand Letters are that: (1) an extensive and robust internal control structure exists at EDMC; (2) an effective system of corporate governance and procedures is present at the Company; and

GOODWIN PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 7

(3) the evidence does not support the specific allegations of potential misconduct at EDMC made
in the Demand Letters.

### 1. EDMC Maintains an Extensive and Robust Internal Control Structure

The Litigation Committee determined that EDMC has an extensive and robust system of internal
controls. These internal controls operate to educate and train the Company's employees on
significant policies of practices, to monitor the performance of departments and individuals, and
to take remedial efforts as appropriate. In sum, the Litigation Committee found a robust internal
control structure that safeguards the Company against the types of wrongdoing identified by the
Demand Letters and GAO report.

*Education & Training*: EDMC sets high standards of conduct for all directors and employees
and trains each employee on those standards. These standards are imposed under the Company's
Code of Conduct ("Code"), which requires full compliance with the highest moral, legal, ethical,
and financial reporting standards. All employees, regardless of position, must certify that they
understand the Code. The Code, moreover, provides mechanisms for employees to report
suspected misconduct and makes clear that retaliation for reports made will not be tolerated.

In accordance with the high ethical standards set by the Code and other Company policies,
EDMC employees receive extensive training. Employees involved in the admissions process—
*i.e.*, Assistant Directors of Admissions ("ADAs")—receive three weeks of "on-boarding"

GOODWIN PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 8

training, five days of "polishing-off" training, as well as continuing guidance throughout their

employment on best practices. During the initial phase of training, ADAs, among other things,

learn how to provide accurate messages to prospective students and practice appropriate

recruiting strategies. From the beginning, ADAs are specifically trained to avoid behaviors

critiqued in the Demand Letters and the GAO report. ADAs then must pass multiple tests before

interacting with prospective students. Even after passing these tests, ADAs are monitored during

the "polishing-off" process to ensure compliance with Company standards. Additional training

is provided by specialists on topics such as common compliance violations throughout an

employee's tenure at the Company. ADAs recertify their knowledge of legal and ethical

compliance requirements annually.

*Monitoring & Remediation*: The Litigation Committee also found a series of internal controls at

EDMC that are designed to detect and remediate the types of behavior identified in the Demand

Letters and GAO report. These internal controls include:

- The Internal Audit Department ("IAD"), which identifies and remediates risks

  facing EDMC by auditing corporate processes, ground schools, and the Online

  Higher Education Division ("OHE"). These audits allow the Company to, among

  other things, verify compliance with internal policies and regulatory requirements,

  deter fraud by encouraging appropriate controls, and identify best practices. All

  business activities of EDMC are subject to auditing, and IAD identifies the

GOODWIN PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 9

frequency of such audits using a risk-based approach. At the conclusion of its

audits, IAD issues a comprehensive and objective assessment of its findings and

recommendations.

- OHE Internal Audit and Compliance Department, which performs a similar

  function as IAD within OHE, is designed to prevent, mitigate and remediate,

  among other things, student-facing risks by monitoring interactions between

  students and ADAs or Student Financial Services ("SFS") representatives in

  OHE. This department monitors conversations with students to assess

  compliance with internal policies and applicable regulations, including the types

  of behaviors critiqued in the Demand Letters and the GAO report. Poor

  performing ADAs and SFSs receive remediation—ranging from verbal coaching,

  re-training or termination depending upon the severity of the grade and number of

  previous infractions—when appropriate.

- Corporate Services ("CS") Marketing and Admissions Department ensures that

  ADAs conduct themselves according to the Company's standards of ethical

  conduct by using, among other things, frequent observations and "mystery

  shopping," which are designed to prevent, identify and remediate the types of

  behaviors identified in the Demand Letters and the GAO report. Observations

  track compliance with internal policies by allowing directors to listen to phone

GOODWIN | PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 10

conversations between ADAs and prospective students, while "mystery shopping"
employs a third-party vendor posing as a prospective student to ask ADAs
difficult questions and assess their responses. Both observation and "mystery
shopping results" are graded and remediated on a scale similar to that of OHE.

- The CS and OHE Marketing and Admissions Departments have policies and
  procedures related to admissions personnel at ground schools and the online
  brands to ensure compliance with federal regulations and Company policy
  regarding interactions with prospective students. The Compliance FAQ Guide
  and associated multi-week training embodies this commitment by ensuring that
  each ADA understands how to deliver legally and factually correct information
  while interacting with prospective students. ADAs must take an exam annually
  on this information; initial failure suspends any student interaction, and
  successive failures lead to termination. ADAs also learn and are tested on the
  techniques of proper salesmanship, which require ADAs to build a relationship
  with the prospective student based on trust and honesty as they select the features
  and benefits of the school to match the student's needs and values. ADAs also
  attend ongoing training activities related to ethical compliance.

- A Corporate Compliance Hotline is accessible twenty-four hours a day, seven
  days a week, as a way to anonymously report suspected misconduct. Reports

GOODWIN PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 11

submitted through this hotline are sent to, and investigated by, a committee comprised of senior management from the Human Resources, Legal, and the Internal Audit Departments. This committee assesses the merits of allegations, oversees investigations where appropriate, determines whether corrective action is necessary, and follows up on recommendations for remediation. The Audit Committee of the Board of Directors, moreover, is updated quarterly about these reports. The Litigation Committee's review of Hotline submissions and Hotline Committee activity in 2009 and 2010 only yielded nine submissions, broadly construed, as relating to the types of potential ethical violations raised in the Demand Letters. Each incident was properly investigated by the Hotline Committee.

- EDMC has additional internal controls processes designed to ensure compliance with regulatory requirements regarding financial aid. Ground school campus directors are responsible for training SFS representatives in connection with the intake of financial aid applications. In addition, SFS representatives undergo "Back to Basics" training, whereby they learn rules, regulations, and best practices related to financial aid. The Student Finance and Compliance Department addresses regulatory policy and compliance.

GOODWIN | PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 12

- EDMC also has a senior-level position dedicated to the compliance function that reports directly to the Company's General Counsel. The Vice President of Compliance implements EDMC's compliance program designed to emphasize EDMC's values and promote a culture of integrity. Among other responsibilities, the Vice President of Compliance develops policies and programs that encourage employees to report alleged misconduct without fear of retaliation and works with Internal Audit to conduct risk assessments and Human Resources on training programs for all employees.

- The Audit Committee of the Board is extremely active and engaged—meeting on twelve occasions between September 2009 and November 2010. This committee, in accordance with governing law and regulations, consists of three independent directors with one member who is a certified financial expert. It was created to assist the Board with oversight on a number of topics, including compliance with legal and regulatory authority and review of the internal audit functions at the Company. In performing its duties, among other things, the Audit Committee regularly reviews and discusses with the Company's senior management: (i) quarterly and annual audits completed by internal and external auditors, (ii) reports received by the Company's hotline, available to employees to submit information regarding unethical conduct , (iii) significant lawsuits and

GOODWIN | PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 13

> investigations, (iv) personnel training and quality assurance, (v) school
>
> accreditation, (vi) risks associated with proposed or newly enacted post-secondary
>
> education regulations, and (vii) the integrity of the Company's financial
>
> statements.

### 2. EDMC Maintains an Effective System of Corporate Governance Practices and Procedures

The Litigation Committee also found that the Company maintains a strong corporate governance
structure and there is no evidence that any director or officer breached his or her fiduciary duties
to EDMC.

Under Pennsylvania law, each director and officer of EDMC owes a duty of care and loyalty to
the Company. The duty of care, which primarily relates to being properly informed and
overseeing the management of the corporation, mandates that directors and officers act in good
faith by acting with the care that a person in a like position would reasonably believe appropriate
under similar circumstances. When due care is taken, the business judgment rule imposes a
presumption that decisions made are in the best interests of the company to prevent second-
guessing of business decisions by courts. The duty of loyalty, moreover, requires that directors
and officers act only in the interests of the corporation, rather than acting intentionally with a
purpose other than that of advancing the best interests of the corporation. The Litigation
Committee investigation revealed that the directors and officers of EDMC have satisfied these

GOODWIN PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 14

fiduciary duties to the Company by establishing, and maintaining, appropriate governance structures and the Demand Letters contain no facts to the contrary.

The Board—which consists of nine directors who are entrepreneurs, attorneys, senior business executives, and investment bankers—is empowered, not to mention well-equipped, to make decisions related to, and provide oversight of, EDMC's business and affairs. It conforms with the requirements imposed under federal law, as well as those imposed by NASDAQ, by maintaining the requisite number of independent directors and delegating the appropriate decision-making authority to the Board's committees which include an Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. Notably, in accordance with governing laws and regulations, the Audit Committee is comprised solely of independent directors, with one certified financial expert, and, among other things, oversees compliance with legal and regulatory requirements, ensures the integrity of the Company's financial statements, and supervises the external and internal auditors at EDMC.

The Board regularly meets and proactively addresses the types of concerns identified in the Demand Letters and GAO report. The Board has near perfect attendance—maintaining a 95% attendance rate between its initial public offering in October 2009 and November 2010—and has held at least eleven (11) meetings since September 2009. During its meetings the Board regularly considers a wide-range of topics related to the Company's business and affairs, including but not limited to accreditation, regulatory and compliance issues, significant

GOODWIN PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 15

litigations, and employee quality. Senior management also reports to the Board regarding issues related to prospective students (*e.g.*, enrollment trends and financial aid issues), enrolled students (*e.g.*, academic quality), and graduates (*e.g.*, graduation rates and employment statistics). The Committees of the Board also routinely provide updates to the full Board, including the Audit Committee which has presented on the structure and qualifications of EDMC's internal audit process. The Board considers special topics when necessary, such as when it devoted significant time to considering newly proposed gainful employment regulations as well as the allegations in the Demand Letters and GAO Report. In sum, the directors are informed and prepared to respond to EDMC's business affairs.

Members of the senior management team—who have diverse backgrounds including extensive experience in post-secondary education (at for-profit as well as not-for profit institutions), law and government—are diligent in overseeing the day-to-day affairs of the Company. Senior management have created several committees— including the Financial Disclosure Committee (which designs and implements controls to ensure that relevant information is timely disclosed to management and the SEC), Management Committee (which meets monthly to discuss the short-term results of the Company and to facilitate strategy discussions), the Executive Committee (which meets monthly to provide a forum for a broad audience to update senior management on business performance, dissemination policies and procedures and provide feedback), and the Compliance Committee (which meets monthly and oversees EDMC's activities, policies, programs, and procedures to ensure compliance with relevant laws and regulations, and identifies

GOODWIN PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 16

legal and regulatory risks associated with the Company's business and reviews the design of

procedures and training programs to address such risks), which collectively allow the Company

to address in a comprehensive and practical way the types of issues raised by the Demand

Letters.

### 3. The Evidence Does Not Support the Specific Allegations Identified in the GAO Report or Demand Letters

The GAO investigation—which forms the basis for the Demand Letters—has been the subject of

widespread criticism for its biased investigation of for-profit schools. The release of a revised

GAO report, which post-dated the Demand Letters, served to further undercut the reliability of

the GAO's investigation. Nevertheless, the two (2) remaining allegations directed at Argosy

University – Chicago were carefully investigated. After reviewing the transcripts of the GAO's

undercover interactions with the one (1) employee at Argosy University – Chicago, in the GAO

report and based on our independent investigation, the Litigation Committee did not find credible

evidence to support these allegations. Moreover, the Litigation Committee finds no support that

any director or officer of EDMC approved of, or acquiesced in, the activities identified in the

GAO Reports or the Demand Letters.

As discussed above, the Revised GAO Report was released on November 30, 2010. It contains

only two (2) allegations directed at Argosy University – Chicago: the Program Cost Allegation

and the Graduation Rate Allegation. On December 1, 2010, amidst political and public criticism

about the lack of rigor and independence of its initial fact finding process, the GAO released

GOODWIN | PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 17

audio recordings made during its interactions with the ADA at Argosy University – Chicago.

After reviewing the 138-page transcripts of the ADA's interaction with undercover GAO

investigators, the Litigation Committee found no evidence to support a conclusion that any

"deceptive or questionable" practice occurred at EDMC related to either allegation. With respect

to the Program Cost Allegation, which alleges that the ADA provided an annual cost estimate for

only one-fifth (1/5) of the total program, it is clear from the transcript that the undercover GAO

representative never asked the ADA for the total cost of the program. The ADA, moreover,

provided accurate price quotes per credit hour for the program in question, tallied the total cost—

including tuition and fees—per semester, and noted that the duration of the program would

depend upon the specific student's circumstances. As for the Graduation Rate Allegation, which

alleges that the Argosy University – Chicago ADA failed to provide the graduation rate when

asked, it is clear from the transcript that the ADA was asked whether everyone graduates, not for

a specific rate, and responded that "not everyone graduates." Moreover, the Litigation

Committee did not find evidence stating or suggesting that this alleged conduct occurs elsewhere

at EDMC.

The Demand Letters, in addition to relying upon the unfounded allegations made by the GAO

against one (1) ADA at Argosy University – Chicago, attempt to attribute all the alleged

misconduct that purportedly occurred at the other fourteen schools mentioned in the GAO Report

to EDMC. The Demand Letters do not provide, and the Litigation Committee has not found, any

support that employees of EDMC: provided false accreditation information, misrepresented or

GOODWIN PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 18

refused to provide graduation rates, engaged in deceptive financial aid practices, employed

questionable sales or marketing tactics, based compensation on the number of students enrolled,

created false reasons to terminate admissions representatives, or manipulated employment

statistics. In contrast, during its investigation the Litigation Committee has found that the

Company maintains internal controls and corporate governance practices designed to prevent the

occurrence of such activity through proper training, monitoring, and remedial efforts.

In response to a request for additional information, the counsel that sent the other demand letter

also asked that the Litigation Committee should investigate "the related facts and allegations in

*Gaer v. Education Management Corp.*, Case No. 2:10-cv-0161 ["*Gaer* Litigation"]." Most of

the allegations contained in the *Gaer* Litigation also appear in the GAO Reports and Demand

Letters. The Litigation Committee investigated those allegations that were clear and non-

duplicative, including allegations concerning interference with the financial aid process, evasive

answers about the transferability of credits, misrepresentations about academic quality, inflation

of enrollment data, and compensation of ADAs being based "solely" on the enrollment of

students. As with the previous allegations, counsel for the shareholders did not provide, nor did

the Litigation Committee discover, any evidence that would support that any of these alleged

actions occurred at EDMC. The Litigation Committee, moreover, determined that the Company

has an extensive internal control system and corporate governance structure that is designed to

prevent the occurrence of such alleged activities.

GOODWIN | PROCTER

Joseph E. Weiss, Esq.
May 4, 2011
Page 19

**Conclusion**

After reasonable and diligent inquiry, the Litigation Committee determined in good faith and in the exercise of its business judgment that it would not be in the best interest of the Company or its shareholders to take the actions requested in the Demand Letters and, as such, has voted to reject the demands.

*     *     *

We trust that this letter is fully responsive to the demand letter you sent, however, we invite you and your client to meet with counsel for the Litigation Committee to discuss any additional questions that you or your client may have regarding this matter.

Sincerely,

Todd Cronan

R. Todd Cronan

cc:    Stuart M. Glass, Esq.

# APPENDIX B



Writer's Direct Dial:  (610) 822-2209
E-Mail: ezagar@btkmc.com

October 27, 2010

**VIA FEDEX**
John R. McKernan, Jr.
Chairman of the Board
Education Management Corporation
210 Sixth Avenue
33rd Floor
Pittsburgh, PA 15222-2603

      **Re:**   *Shareholder Demand*

Dear Mr. McKernan:

      This firm represents Karen Ganley (the "Stockholder"), a holder of shares of common stock of Education Management Corporation ("EDMC" or the "Company"). I write on behalf of the Stockholder to demand that the Board of Directors of EDMC (the "Board") take action to remedy breaches of fiduciary duties by the directors and certain officers of the Company, as described herein.

      As you are aware, by reason of their positions as officers and/or directors of EDMC and because of their ability to control the business and corporate affairs of EDMC, the officers and directors of EDMC owe the Company and its shareholders the fiduciary obligations of good faith, loyalty, and due care, and are required to use their utmost ability to control and manage EDMC in a fair, just, honest and equitable manner. In addition, the Audit Committee of the Board (the "Audit Committee") is required to periodically review with management any correspondence with, or other action by, regulators or governmental agencies and any employee complaints or published reports that raise concerns regarding the Company's financial statements, accounting or auditing matters, or compliance with the Company's Code of Business Ethics and Conduct, which prohibits, *inter alia*, directors and officers of EDMC from taking unfair advantage of any other person or entity through manipulation, concealment, abuse of privileged information, misrepresentation of material fact or any other unfair-dealing practice. The Stockholder believes that you; Chief Executive Officer Todd S. Nelson; President and Chief Financial Officer Edward H. West; Senior Vice President - Marketing and Admissions Anthony F. Digiovanni; Senior Vice President - Regulatory Affairs and Strategic Development Anthony J. Guida, Jr.; Senior Vice President - Strategic Operations Joseph A. Charlson; and directors Mick J. Beekhuizen, Samuel C. Cowley, Adrian M. Jones, Jeffrey T. Leeds, Leo F. Mullin, Michael K.

280 King of Prussia Road, Radnor, Pennsylvania 19087  T. 610-667-7706  F. 610-667-7056  info@btkmc.com
580 California Street, Suite 1750, San Francisco, California 94104  T. 415-400-3000  F. 415-400-3001  info@btkmc.com
www.btkmc.com
B-1



John R. McKernan, Jr.
October 27, 2010
Page 2



Powell, Paul J. Salem and Peter O. Wilde (collectively, the "Directors and Officers") violated these core fiduciary duty principles, causing the Company to sustain damages.

The Stockholder contends that the Company, with the knowledge, approval, and/or acquiescence of the Directors and Officers, has systematically violated federal laws and regulations governing student financial aid and prohibiting the making of false claims and engaged in unfair and deceptive marketing practices to secure student enrollment. Examples of these practices include:

- making false or misleading statements to prospective and/or enrolled students concerning the type, nature and extent of a school's accreditation and misidentifying the accrediting organization(s); for example, assuring prospective and enrolled students that: an academic program was going to obtain accreditation from a national accrediting organization by a certain date; that students who enrolled prior to such date would be "grandfathered in" to be considered as having graduated from an accredited school; that even without having graduated from an accredited school, they would not encounter difficulty obtaining employment; and that they would be able to easily repay significant student loan debt that the school pressured them into assuming, in part because they would be eligible for certain beneficial loan repayment and/or forgiveness programs – when fact such accreditation was never obtained or even applied for, resulting in the school's graduates' inability to obtain the type of employment that required a degree from an accredited school and ineligibility for such student loan repayment and/or forgiveness programs;

- misrepresenting or failing to provide graduation and completion rates to prospective and/or enrolled students;

- manipulating or falsifying job placement rates and exaggerating potential salaries to prospective and/or enrolled students;

- misrepresenting the total cost of a program by giving prospective and/or enrolled students tuition figures based on nine months of classes per year and program duration based on twelve months of classes per year;

- manipulating the results of admissions tests to ensure enrollment by allowing prospective students to take admissions tests multiple times until a passing grade is achieved, openly coaching prospective students during admissions tests and/or completing the test for them and/or submitting fraudulent proctor forms.

- manipulating prospective students' transcripts to achieve a grade point average that meets admissions requirements;

- using overly aggressive recruiting tactics such as "bring the pain," *i.e.*, exploiting prospective students' sensitivities in order to pressure them into enrollment;

B-2



John R. McKernan, Jr.
October 27, 2010
Page 3



- basing compensation, including bonuses, paid to admissions representatives on the number of students enrolled; requiring admissions representatives to meet enrollment quotas and instructing admissions representatives to conceal evidence thereof, such as salary matrixes and sales goals, from accreditation agencies during site visits;

- falsely creating reasons to terminate admissions representatives who do not achieve sales goals; and

- manipulating former students' employment status to claim a higher percentage of graduates gainfully employed in their field of study, for example, by overstating salaries, counting students who were employed for only a short amount of time in their field; eliminating from employment statistics graduates who would face salary cuts if they accepted positions in their field of study, and/or pressuring graduates who were working in unrelated fields to sign employment forms falsely stating that they were using certain skills obtained as a result of their degree or certificate in their current, often unskilled, positions.

The Stockholder maintains that each of the Directors and Officers breached their fiduciary duties by: (i) knowingly approving the Company's foregoing illegal business practices; and/or (ii) abdicating their responsibility to make a good faith effort to oversee the Company's operations and business practices. As a result of the foregoing breaches of duty, EDMC has sustained damages, including, but not limited to, costs and expenses incurred in connection with governmental investigations of and litigation arising from this conduct.

On behalf of the Stockholder, I hereby demand that the Board take action to recover from the Directors and Officers the amount of damages sustained by the Company as a result of the misconduct alleged herein and to correct deficiencies in the Company's internal controls that allowed the misconduct to occur.

If within a reasonable period of time after receipt of this letter the Board has not taken action as demanded herein, the Stockholder will commence a shareholder derivative action on behalf of EDMC seeking appropriate relief.

Very truly yours,

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP

Eric L. Zagar

ELZ/cp



GOODWIN | PROCTER

R. Todd Cronan
617.570.1389
rcronan@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

January 19, 2011

## VIA E-MAIL & VIA FIRST CLASS MAIL

Eric L. Zagar, Esq.
Barroway Topaz Kessler Meltzer Check LLP
280 King of Prussia Road
Radnor, PA 19087

## Re:   Shareholder Demand of Karen Ganley to Education Management Corporation

Dear Mr. Zagar:

I write in response to your letter to the Board of Directors of Education Management Corporation ("EDMC"), dated October 27, 2010. Goodwin Procter LLP represents a committee of disinterested directors of EDMC (the "Litigation Committee") and is assisting the Litigation Committee with its investigation of the matters identified in your letter.

The investigation is ongoing and the Litigation Committee will report its results when the investigation is concluded. In the meantime, we ask that you provide us with any further information or support that you have for the allegations set forth in your October 27, 2010 letter or any other facts or information that you would like the Litigation Committee to consider as part of its investigation.

In addition, we ask that you provide written confirmation that your client, Karen Ganley, has owned shares of EDMC continuously from October 7, 2009 to the present.

Please contact me if you have any questions.

Sincerely,

R Todd Cronan /srb

R. Todd Cronan



**BARROWAY**TOPAZ
**KESSLERMELTZERCHECK** LLP
ATTORNEYS AT LAW

Writer's Direct Dial: (610) 822-2209
E-Mail: ezagar@btkmc.com

January 20, 2011

**VIA FEDEX**
R. Todd Cronan, Esquire
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

    Re:    **EDMC Shareholder Demand**

Dear Mr. Cronan:

    I write in response to your letter of January 19, 2011. In addition to the facts and allegations in my client's October 27, 2010 demand, the Litigation Committee should investigate the related facts and allegations in the Amended Class Action Complaint filed on January 10, 2011 in *Gaer v. Education Management Corp.*, Case No. 2:10-cv-1061 RCM. I can confirm that my client Karen Ganley has held shares of EDMC continuously since April 2010.

    Kindly provide me with the names of the members of the Litigation Committee and an estimate of when the Litigation Committee intends to respond to my client's demand.

                    Very truly yours,

                    BARROWAY TOPAZ KESSLER
                    MELTZER & CHECK, LLP

                    Eric L. Zagar

ELZ/cp

280 King of Prussia Road, Radnor, Pennsylvania 19087 T. 610-667-7706 F. 610-667-7056 info@btkmc.com
580 California Street, Suite 1750, San Francisco, California 94104 T. 415-400-3000 F. 415-400-3001 info@btkmc.com
WWW.BTKMC.COM

B-5



GOODWIN | PROCTER

Stuart M. Glass
617.570.1920
sglass@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

February 22, 2011

**VIA E-MAIL & MAIL**

Eric L. Zagar, Esq.
Barroway Topaz Kessler Meltzer Check LLP
280 King of Prussia Road
Radnor, PA 19087

**Re:    Shareholder Demand of Karen Ganley to Education Management Corporation**

Dear Mr. Zagar:

I write in response to your letter to my colleague Todd Cronan dated January 20, 2011. As we
indicated to you previously, Goodwin Procter LLP represents a committee of disinterested
directors of EDMC (the "Litigation Committee") and is assisting the Litigation Committee with
its investigation of the matters identified in your letter. The Litigation Committee's work is
proceeding and you should expect to hear back from it by the end of March. In the meantime, if
you have any questions please feel free to contact me.

Sincerely,

*Stuart Glass / JDD*

Stuart M. Glass

cc:  R. Todd Cronan, Esq.

GOODWIN | PROCTER

R. Todd Cronan
617.570.1389
rcronan@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

May 4, 2011

**VIA E-MAIL & FIRST CLASS MAIL**

Eric L. Zagar, Esq.
Barroway Topaz Kessler Meltzer Check LLP
280 King of Prussia Road
Radnor, PA 19087

Re:     **Shareholder Demand of Karen Ganley to Education Management Corporation**

Dear Mr. Zagar:

I am writing at the direction of a committee of the Board of Directors of Education Management Corporation (the "Litigation Committee"). The Litigation Committee has conducted an extensive and thorough investigation in response to two shareholder demand letters received by Education Management Corporation ("EDMC" or the "Company"). This letter summarizes the investigation and conclusions reached by the Litigation Committee.

EDMC received two demand letters following the release of a report prepared by the United States Government Accountability Office ("GAO"), dated August 4, 2010, which asserted that certain for-profit educational institutions had engaged in allegedly deceptive and questionable practices. Both letters (the "Demand Letters"), which make substantially the same allegations, request that the Board of Directors of EDMC (the "Board") investigate and take necessary actions in response to the GAO report.

# GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 2

The Demand Letters request the Company to investigate the allegations in the GAO report, take appropriate steps to ensure that an adequate system of internal controls is in place to identify and prevent unlawful activity, and make any needed changes to the Company's corporate governance system. The demand letter you sent also alleges that the officers and directors of EDMC breached their fiduciary duties by knowingly approving "illegal business practices" and/or "abdicating their responsibility to make a good faith effort to oversee the Company's operations and business practices."

The Litigation Committee has conducted its investigation into the matters raised in the Demand Letters. The Committee determined that the Company has a robust set of internal controls that are properly designed to identify, deter and remediate the types of allegedly deceptive and questionable practices referred to in the Demand Letters and the GAO report. These internal controls are supported by a properly designed and staffed corporate governance structure. The Litigation Committee also concludes that there has been no breach of the fiduciary duty owed by the officers or directors of EDMC in connection with their oversight of the internal control and corporate governance systems in place at EDMC. Further, the Litigation Committee's investigation did not uncover evidence showing that the types of conduct identified in the Demand Letters and GAO report are in fact occurring at EDMC. Accordingly, the Litigation Committee has determined that it would not be in the best interests of the Company or its shareholders to take the actions demanded in the Demand Letters.

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 3

## BACKGROUND

EDMC, one of the largest providers of private post-secondary education in North America, was part of a broad GAO investigation in which the GAO sent undercover representatives to meet with admissions and financial aid representatives at fifteen for-profit colleges.  Only one (1) of EDMC's 104 schools – Argosy University in Chicago, Illinois ("Argosy University – Chicago") – was part of this investigation.  With respect to Argosy University – Chicago, the investigation involved two interactions between undercover GAO representatives and one of EDMC's approximately 3,500 assistant directors of admission ("ADA").  Based upon these interactions, the GAO initially reported that, while there was no evidence of fraudulent activity, the employee at Argosy University – Chicago had engaged in three types of improper activity: providing misleading information on program duration cost ("Program Cost Allegation"), refusing to provide graduation rates ("Graduation Rate Allegation"), and providing misleading information about the professional experience of professors ("Professor Experience Allegation").  The GAO also identified one good practice at Argosy University – Chicago, the providing of reasonable information about prospective salaries and potential employment.

On November 30, 2010, the GAO released a revised report that made substantial revisions to its initial findings.  With respect to Argosy University – Chicago, the new report removed the Professor Experience Allegation, in its entirety, diluted the GAO's findings related to the Program Cost Allegation, and left the good practice attributed to EDMC unchanged.  As to the

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 4

remaining fourteen for-profit colleges, the revised GAO report similarly removed many of the

allegedly deceptive and/or questionable practices discussed in the initial report.

## THE INVESTIGATION

Shortly after the release of the original GAO report, EDMC received the Demand Letters. No

effort has been made by counsel for the shareholders to update the Demand Letters following the

release of the revised GAO report or the audio recordings. Both Demand Letters, without

providing specific factual support or examples of misconduct, attribute all of the alleged

deceptive and/or wrongdoing found in the GAO's initial report to EDMC, and summarily

conclude that the Company's officers and directors must have breached their fiduciary duties by

failing to properly oversee EDMC's operations and business practices.

In response to the Demand Letters, the Board adopted a resolution creating the Litigation

Committee pursuant to Section 1731 of the Pennsylvania Associations Code, Title 15 Pa. C.S.,

including Subpart B known as the Business Corporation Law of 1988 and Section 3.1 of the

Company's Amended and Restated Bylaws. The Board delegated to the Litigation Committee

the power and authority to: (1) review, analyze, and investigate the allegations in the Demand

Letters; (2) engage legal counsel and other experts to conduct the investigation, and draft a report

setting forth conclusions and recommendations resulting from the investigation, on behalf of the

Committee; and (3) determine the appropriate actions, if any, the Company should pursue in

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 5

response to the Demand Letters.  Leo Mullin and Paul Salem were appointed by the Board to

serve on the Litigation Committee.

Messrs. Mullin and Salem are disinterested directors under Pennsylvania law and may therefore

discharge the duties delegated to the Litigation Committee by the Board.  The ALI Principles of

Corporate Governance define "disinterested" in terms of what it means to be "interested."

Section 1.23(c) of the ALI Principles provides that a director is interested if any of the following

four tests are met:

> (1)   The director or officer, or an associate of the director or officer, is a party to the
> transaction or conduct;
>
> (2)   The director or officer has a business, financial, or familial relationship with a
> party to the transaction or conduct, and that relationship would reasonably be
> expected to affect the director's or officer's judgment with respect to the
> transaction or conduct in a manner adverse to the corporation;
>
> (3)   The director or officer, an associate of the director or officer, or a person with
> whom the director or officer has a business, financial, or familial relationship, has
> a material pecuniary interest in the transaction or conduct (other than usual and
> customary directors' fees and benefits) and that interest and (if present) that
> relationship would reasonably be expected to affect the director's or officer's
> judgment in a manner adverse to the corporation; or
>
> (4)   The director or office is subject to a controlling influence by a party to the
> transaction or conduct or a person who has a material pecuniary interest in the
> transaction or conduct, and that controlling influence could reasonably be
> expected to affect the director's or officer's judgment with respect to the
> transaction or conduct in a manner adverse to the corporation.  Counsel, public
> accountants or other persons as to matters which the director reasonably believes
> to be within the professional or expert competence of such person.

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 6

Based upon these factors, under the ALI Principles "[a] person who neither is an associate of, nor has a pecuniary interest in, or business or financial relationship to, a party to the transaction or conduct will normally not be interested within the meaning of § 1.23." The Demand Letters fail to provide, and the facts do not support, any basis to conclude that Messrs. Mullin or Salem are associated with, have a pecuniary interest in, a business or financial relationship with, or are a party to the conduct alleged in the GAO Report or the Demand Letters.

The Litigation Committee oversaw a thorough review and analysis of the factual and legal issues identified in the Demand Letters. During this process, members of the Litigation Committee were advised by independent legal counsel, Goodwin Procter LLP, who conducted approximately forty (40) witness interviews and reviewed more than 165,000 pages of documents pertaining to the allegations raised by the Demand Letters. The Litigation Committee and its counsel met on numerous occasions to discuss and analyze the information collected through this investigative process. During its investigation, the Litigation Committee also requested that counsel that sent the Demand Letters provide factual support for their allegations; however, no such support was ever provided.

## SUMMARY OF THE REASONS FOR THE LITIGATION COMMITTEE'S DECISION

The principal reasons for the Litigation Committee's decision to reject the demands set for in the Demand Letters are that: (1) an extensive and robust internal control structure exists at EDMC; (2) an effective system of corporate governance and procedures is present at the Company; and

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 7

(3) the evidence does not support the specific allegations of potential misconduct at EDMC made in the Demand Letters.

### 1. EDMC Maintains an Extensive and Robust Internal Control Structure

The Litigation Committee determined that EDMC has an extensive and robust system of internal controls. These internal controls operate to educate and train the Company's employees on significant policies of practices, to monitor the performance of departments and individuals, and to take remedial efforts as appropriate. In sum, the Litigation Committee found a robust internal control structure that safeguards the Company against the types of wrongdoing identified by the Demand Letters and GAO report.

*Education & Training*: EDMC sets high standards of conduct for all directors and employees and trains each employee on those standards. These standards are imposed under the Company's Code of Conduct ("Code"), which requires full compliance with the highest moral, legal, ethical, and financial reporting standards. All employees, regardless of position, must certify that they understand the Code. The Code, moreover, provides mechanisms for employees to report suspected misconduct and makes clear that retaliation for reports made will not be tolerated.

In accordance with the high ethical standards set by the Code and other Company policies, EDMC employees receive extensive training. Employees involved in the admissions process— *i.e.*, Assistant Directors of Admissions ("ADAs")—receive three weeks of "on-boarding"

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 8

training, five days of "polishing-off" training, as well as continuing guidance throughout their

employment on best practices. During the initial phase of training, ADAs, among other things,

learn how to provide accurate messages to prospective students and practice appropriate

recruiting strategies. From the beginning, ADAs are specifically trained to avoid behaviors

critiqued in the Demand Letters and the GAO report. ADAs then must pass multiple tests before

interacting with prospective students. Even after passing these tests, ADAs are monitored during

the "polishing-off" process to ensure compliance with Company standards. Additional training

is provided by specialists on topics such as common compliance violations throughout an

employee's tenure at the Company. ADAs recertify their knowledge of legal and ethical

compliance requirements annually.

*Monitoring & Remediation*: The Litigation Committee also found a series of internal controls at

EDMC that are designed to detect and remediate the types of behavior identified in the Demand

Letters and GAO report. These internal controls include:

- The Internal Audit Department ("IAD"), which identifies and remediates risks
  facing EDMC by auditing corporate processes, ground schools, and the Online
  Higher Education Division ("OHE"). These audits allow the Company to, among
  other things, verify compliance with internal policies and regulatory requirements,
  deter fraud by encouraging appropriate controls, and identify best practices. All
  business activities of EDMC are subject to auditing, and IAD identifies the

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 9

frequency of such audits using a risk-based approach. At the conclusion of its
audits, IAD issues a comprehensive and objective assessment of its findings and
recommendations.

- OHE Internal Audit and Compliance Department, which performs a similar
  function as IAD within OHE, is designed to prevent, mitigate and remediate,
  among other things, student-facing risks by monitoring interactions between
  students and ADAs or Student Financial Services ("SFS") representatives in
  OHE. This department monitors conversations with students to assess
  compliance with internal policies and applicable regulations, including the types
  of behaviors critiqued in the Demand Letters and the GAO report. Poor
  performing ADAs and SFSs receive remediation—ranging from verbal coaching,
  re-training or termination depending upon the severity of the grade and number of
  previous infractions—when appropriate.

- Corporate Services ("CS") Marketing and Admissions Department ensures that
  ADAs conduct themselves according to the Company's standards of ethical
  conduct by using, among other things, frequent observations and "mystery
  shopping," which are designed to prevent, identify and remediate the types of
  behaviors identified in the Demand Letters and the GAO report. Observations
  track compliance with internal policies by allowing directors to listen to phone

GOODWIN | PROCTER

conversations between ADAs and prospective students, while "mystery shopping" employs a third-party vendor posing as a prospective student to ask ADAs difficult questions and assess their responses. Both observation and "mystery shopping results" are graded and remediated on a scale similar to that of OHE.

- The CS and OHE Marketing and Admissions Departments have policies and procedures related to admissions personnel at ground schools and the online brands to ensure compliance with federal regulations and Company policy regarding interactions with prospective students. The Compliance FAQ Guide and associated multi-week training embodies this commitment by ensuring that each ADA understands how to deliver legally and factually correct information while interacting with prospective students. ADAs must take an exam annually on this information; initial failure suspends any student interaction, and successive failures lead to termination. ADAs also learn and are tested on the techniques of proper salesmanship, which require ADAs to build a relationship with the prospective student based on trust and honesty as they select the features and benefits of the school to match the student's needs and values. ADAs also attend ongoing training activities related to ethical compliance.

- A Corporate Compliance Hotline is accessible twenty-four hours a day, seven days a week, as a way to anonymously report suspected misconduct. Reports

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 11

submitted through this hotline are sent to, and investigated by, a committee
comprised of senior management from the Human Resources, Legal, and the
Internal Audit Departments.  This committee assesses the merits of allegations,
oversees investigations where appropriate, determines whether corrective action is
necessary, and follows up on recommendations for remediation.  The Audit
Committee of the Board of Directors, moreover, is updated quarterly about these
reports.  The Litigation Committee's review of Hotline submissions and Hotline
Committee activity in 2009 and 2010 only yielded nine submissions, broadly
construed, as relating to the types of potential ethical violations raised in the
Demand Letters.  Each incident was properly investigated by the Hotline
Committee.

- EDMC has additional internal controls processes designed to ensure compliance
  with regulatory requirements regarding financial aid.  Ground school campus
  directors are responsible for training SFS representatives in connection with the
  intake of financial aid applications.  In addition, SFS representatives undergo
  "Back to Basics" training, whereby they learn rules, regulations, and best
  practices related to financial aid.  The Student Finance and Compliance
  Department addresses regulatory policy and compliance.

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 12

- EDMC also has a senior-level position dedicated to the compliance function that reports directly to the Company's General Counsel. The Vice President of Compliance implements EDMC's compliance program designed to emphasize EDMC's values and promote a culture of integrity. Among other responsibilities, the Vice President of Compliance develops policies and programs that encourage employees to report alleged misconduct without fear of retaliation and works with Internal Audit to conduct risk assessments and Human Resources on training programs for all employees.

- The Audit Committee of the Board is extremely active and engaged—meeting on twelve occasions between September 2009 and November 2010. This committee, in accordance with governing law and regulations, consists of three independent directors with one member who is a certified financial expert. It was created to assist the Board with oversight on a number of topics, including compliance with legal and regulatory authority and review of the internal audit functions at the Company. In performing its duties, among other things, the Audit Committee regularly reviews and discusses with the Company's senior management: (i) quarterly and annual audits completed by internal and external auditors, (ii) reports received by the Company's hotline, available to employees to submit information regarding unethical conduct , (iii) significant lawsuits and

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 13

investigations, (iv) personnel training and quality assurance, (v) school

accreditation, (vi) risks associated with proposed or newly enacted post-secondary

education regulations, and (vii) the integrity of the Company's financial

statements.

### 2. EDMC Maintains an Effective System of Corporate Governance Practices and Procedures

The Litigation Committee also found that the Company maintains a strong corporate governance

structure and there is no evidence that any director or officer breached his or her fiduciary duties

to EDMC.

Under Pennsylvania law, each director and officer of EDMC owes a duty of care and loyalty to

the Company. The duty of care, which primarily relates to being properly informed and

overseeing the management of the corporation, mandates that directors and officers act in good

faith by acting with the care that a person in a like position would reasonably believe appropriate

under similar circumstances. When due care is taken, the business judgment rule imposes a

presumption that decisions made are in the best interests of the company to prevent second-

guessing of business decisions by courts. The duty of loyalty, moreover, requires that directors

and officers act only in the interests of the corporation, rather than acting intentionally with a

purpose other than that of advancing the best interests of the corporation. The Litigation

Committee investigation revealed that the directors and officers of EDMC have satisfied these

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 14

fiduciary duties to the Company by establishing, and maintaining, appropriate governance structures and the Demand Letters contain no facts to the contrary.

The Board—which consists of nine directors who are entrepreneurs, attorneys, senior business executives, and investment bankers—is empowered, not to mention well-equipped, to make decisions related to, and provide oversight of, EDMC's business and affairs. It conforms with the requirements imposed under federal law, as well as those imposed by NASDAQ, by maintaining the requisite number of independent directors and delegating the appropriate decision-making authority to the Board's committees which include an Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. Notably, in accordance with governing laws and regulations, the Audit Committee is comprised solely of independent directors, with one certified financial expert, and, among other things, oversees compliance with legal and regulatory requirements, ensures the integrity of the Company's financial statements, and supervises the external and internal auditors at EDMC.

The Board regularly meets and proactively addresses the types of concerns identified in the Demand Letters and GAO report. The Board has near perfect attendance—maintaining a 95% attendance rate between its initial public offering in October 2009 and November 2010—and has held at least eleven (11) meetings since September 2009. During its meetings the Board regularly considers a wide-range of topics related to the Company's business and affairs, including but not limited to accreditation, regulatory and compliance issues, significant

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 15

litigations, and employee quality. Senior management also reports to the Board regarding issues related to prospective students (*e.g.*, enrollment trends and financial aid issues), enrolled students (*e.g.*, academic quality), and graduates (*e.g.*, graduation rates and employment statistics). The Committees of the Board also routinely provide updates to the full Board, including the Audit Committee which has presented on the structure and qualifications of EDMC's internal audit process. The Board considers special topics when necessary, such as when it devoted significant time to considering newly proposed gainful employment regulations as well as the allegations in the Demand Letters and GAO Report. In sum, the directors are informed and prepared to respond to EDMC's business affairs.

Members of the senior management team—who have diverse backgrounds including extensive experience in post-secondary education (at for-profit as well as not-for profit institutions), law and government—are diligent in overseeing the day-to-day affairs of the Company. Senior management have created several committees—including the Financial Disclosure Committee (which designs and implements controls to ensure that relevant information is timely disclosed to management and the SEC), Management Committee (which meets monthly to discuss the short-term results of the Company and to facilitate strategy discussions), the Executive Committee (which meets monthly to provide a forum for a broad audience to update senior management on business performance, dissemination policies and procedures and provide feedback), and the Compliance Committee (which meets monthly and oversees EDMC's activities, policies, programs, and procedures to ensure compliance with relevant laws and regulations, and identifies

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 16

legal and regulatory risks associated with the Company's business and reviews the design of

procedures and training programs to address such risks), which collectively allow the Company

to address in a comprehensive and practical way the types of issues raised by the Demand

Letters.

### 3. The Evidence Does Not Support the Specific Allegations Identified in the GAO Report or Demand Letters

The GAO investigation—which forms the basis for the Demand Letters—has been the subject of

widespread criticism for its biased investigation of for-profit schools.  The release of a revised

GAO report, which post-dated the Demand Letters, served to further undercut the reliability of

the GAO's investigation.  Nevertheless, the two (2) remaining allegations directed at Argosy

University – Chicago were carefully investigated.  After reviewing the transcripts of the GAO's

undercover interactions with the one (1) employee at Argosy University – Chicago, in the GAO

report and based on our independent investigation, the Litigation Committee did not find credible

evidence to support these allegations.  Moreover, the Litigation Committee finds no support that

any director or officer of EDMC approved of, or acquiesced in, the activities identified in the

GAO Reports or the Demand Letters.

As discussed above, the Revised GAO Report was released on November 30, 2010.  It contains

only two (2) allegations directed at Argosy University – Chicago:  the Program Cost Allegation

and the Graduation Rate Allegation.  On December 1, 2010, amidst political and public criticism

about the lack of rigor and independence of its initial fact finding process, the GAO released

GOODWIN │ PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 17

audio recordings made during its interactions with the ADA at Argosy University – Chicago.
After reviewing the 138-page transcripts of the ADA's interaction with undercover GAO
investigators, the Litigation Committee found no evidence to support a conclusion that any
"deceptive or questionable" practice occurred at EDMC related to either allegation. With respect
to the Program Cost Allegation, which alleges that the ADA provided an annual cost estimate for
only one-fifth (1/5) of the total program, it is clear from the transcript that the undercover GAO
representative never asked the ADA for the total cost of the program. The ADA, moreover,
provided accurate price quotes per credit hour for the program in question, tallied the total cost—
including tuition and fees—per semester, and noted that the duration of the program would
depend upon the specific student's circumstances. As for the Graduation Rate Allegation, which
alleges that the Argosy University – Chicago ADA failed to provide the graduation rate when
asked, it is clear from the transcript that the ADA was asked whether everyone graduates, not for
a specific rate, and responded that "not everyone graduates." Moreover, the Litigation
Committee did not find evidence stating or suggesting that this alleged conduct occurs elsewhere
at EDMC.

The Demand Letters, in addition to relying upon the unfounded allegations made by the GAO
against one (1) ADA at Argosy University – Chicago, attempt to attribute all the alleged
misconduct that purportedly occurred at the other fourteen schools mentioned in the GAO Report
to EDMC. The Demand Letters do not provide, and the Litigation Committee has not found, any
support that employees of EDMC: provided false accreditation information, misrepresented or

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 18

refused to provide graduation rates, engaged in deceptive financial aid practices, employed

questionable sales or marketing tactics, based compensation on the number of students enrolled,

created false reasons to terminate admissions representatives, or manipulated employment

statistics. In contrast, during its investigation the Litigation Committee has found that the

Company maintains internal controls and corporate governance practices designed to prevent the

occurrence of such activity through proper training, monitoring, and remedial efforts.

In response to a request for additional information, the counsel that sent the other demand letter

also asked that the Litigation Committee should investigate "the related facts and allegations in

*Gaer v. Education Management Corp.*, Case No. 2:10-cv-0161 ["*Gaer* Litigation"]." Most of

the allegations contained in the *Gaer* Litigation also appear in the GAO Reports and Demand

Letters. The Litigation Committee investigated those allegations that were clear and non-

duplicative, including allegations concerning interference with the financial aid process, evasive

answers about the transferability of credits, misrepresentations about academic quality, inflation

of enrollment data, and compensation of ADAs being based "solely" on the enrollment of

students. As with the previous allegations, counsel for the shareholders did not provide, nor did

the Litigation Committee discover, any evidence that would support that any of these alleged

actions occurred at EDMC. The Litigation Committee, moreover, determined that the Company

has an extensive internal control system and corporate governance structure that is designed to

prevent the occurrence of such alleged activities.

GOODWIN | PROCTER

Eric Zagar, Esq.
May 4, 2011
Page 19

**<u>Conclusion</u>**

After reasonable and diligent inquiry, the Litigation Committee determined in good faith and in the exercise of its business judgment that it would not be in the best interest of the Company or its shareholders to take the actions requested in the Demand Letters and, as such, has voted to reject the demands.

*     *     *

We trust that this letter is fully responsive to the demand letter you sent, however, we invite you and your client to meet with counsel for the Litigation Committee to discuss any additional questions that you or your client may have regarding this matter.

Sincerely,

*Todd Cronan*

R. Todd Cronan

cc:    Stuart M. Glass, Esq.