# EXHIBIT 2

Exhibit 6-N

# EDUCATION MANAGEMENT CORPORATION

REPORT OF THE LITIGATION COMMITTEE

DATED MAY 31, 2012

Leo F. Mullin
Paul J. Salem

R. Todd Cronan
Brian LaMacchia
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109

# TABLE OF CONTENTS

**Page**

I.    Executive Summary ..............................................................................................1

     A.    Summary of Demand Letters and Findings of the Litigation Committee ..............2

II.    Background of The Litigation Committee's Investigation..............................................4

III.    The Litigation Committee Process ..........................................................................5

     A.    EDMC's Establishment Of A Litigation Committee................................................5

         1.    Composition Of The Litigation Committee ................................................. 6

         2.    Disinterestedness Of The Litigation Committee........................................ 7

         3.    Retention Of Counsel ............................................................................ 13

     B.    Actions Taken By The Litigation Committee.........................................................13

IV.    Governing Legal Principles...................................................................................14

     A.    Pennsylvania Law Relating to Fiduciary Duties...................................................14

         1.    Duty Of Care.......................................................................................... 14

         2.    Duty Of Loyalty ..................................................................................... 15

     B.    Pennsylvania Law Relating to Special Committees .............................................16

V.    Summary Of The Litigation Committee's Findings .................................................17

     A.    Findings Regarding Internal Controls...................................................................17

         1.    Company-Wide Standards ...................................................................... 17

             a.    The Code Of Conduct ................................................................ 17

             b.    The Integrity Brochure ............................................................... 20

         2.    The Hotline Committee........................................................................... 21

         3.    Internal Audit Department ...................................................................... 22

         4.    Online Higher Education Division ("OHE") ............................................. 24

             a.    OHE's Internal Audit And Compliance Department.................... 24

                 i.    Call Monitoring............................................................. 25

                 ii.    Auditing ...................................................................... 26

                 iii.    Reporting..................................................................... 26

<u>**TABLE OF CONTENTS**</u>
**(continued)**

**Page**

     b.    OHE's Marketing And Admissions ................................. 27

5.    Corporate Services Marketing And Admissions Department .................. 30

     a.    Training And Messaging To Admissions Staff ........................... 31

        i.    On-boarding ............................................................ 31

        ii.    Polishing-Off ............................................................ 34

        iii.    Ongoing Training ...................................................... 34

     b.    Compliance And Remediation ......................................... 34

        i.    Observations ............................................................ 34

        ii.    Mystery Shopping .................................................... 35

6.    Financial Aid .............................................................................. 37

     a.    Intake ........................................................................ 37

     b.    Processing .................................................................. 38

     c.    Regulatory Policy and Compliance ............................... 38

7.    Regulatory Affairs ...................................................................... 39

8.    The Business Practices Committee .............................................. 40

9.    Sarbanes-Oxley Controls ............................................................ 41

10.    The Audit Committee ................................................................. 41

B.    Findings On The Title IV Claim .............................................................. 42

1.    As Designed, EDMC's Compensation Plan Complied With The Act ........................................................................................ 44

2.    As Implemented, EDMC's Compensation Plan Complied With The Act ........................................................................................ 51

     a.    Evidence From Interviews Of Upper Management Employees .................................................................. 52

     b.    Evidence From Interviews Of ADA Managers ........................... 54

     c.    EDMC Had Appropriate Internal Controls In Place To Ensure The Plan Was Implemented As Designed ........................ 55

3.    Miscellaneous Title IV Allegations In The Demand Letters .................. 58

# TABLE OF CONTENTS
**(continued)**

Page

     a.     Commissions, Bonuses And Awards Based Solely On Obtaining New Student Enrollments ............................................. 59

     b.     ADAs' Enrolling Unqualified Students ........................................ 60

     c.     ADAs' Encouraging Prospective Students To Accept Unwanted Financial Aid Packages ................................................ 61

C.     Findings On The Letter Of Credit Claim.............................................................61

D.     Findings On The Fraudulent Job Placement Claim ................................................62

VI.     **Conclusion** ...............................................................................................................65

**Appendix**.................................................................................................................................66

A.     August 19, 2011 Demand Letter from OLERS's Counsel ................................ A-1

B.     December 8, 2011 Letter From Goodwin Procter LLP To OLERS's Counsel ......................................................................................................... A-6

C.     December 15, 2011 Letter From OLERS's Counsel To Goodwin Procter LLP ............................................................................................................. A-7

D.     January 19, 2012 Demand Letter From OLERS's Counsel................................ A-9

E.     February 17, 2012 Letter From Goodwin Procter LLP To OLERS's Counsel ......................................................................................................... A-12

F.     March 6, 2012 Letter From Goodwin Procter LLP To OLERS's Counsel ...... A-13

G.     May 16, 2012 Letter From Goodwin Procter LLP To OLERS's Counsel ....... A-34

H.     May 21, 2012 Letter From Goodwin Procter LLP To OLERS's Counsel ....... A-36

I.     May 24, 2012 Letter From Goodwin Procter LLP To OLERS's Counsel ....... A-37

J.     May 24, 2012 Letter From OLERS's Counsel To Goodwin Procter LLP ....... A-49

I.    **EXECUTIVE SUMMARY**

A committee of the Board of Directors of Education Management Corporation (the "Litigation Committee" or the "Committee") has conducted an investigation in response to two shareholder demand letters received by the Company. The Litigation Committee consists of Leo Mullin and Paul Salem, both of whom are "disinterested" directors of the Company under the standards set forth in the American Law Institute's Principles of Corporate Governance ("ALI Principles") and adopted by Pennsylvania courts. This report summarizes the investigation and conclusions reached by the Litigation Committee.

Education Management Corporation ("EDMC") is among the largest providers of private post-secondary education in North America with 104 locations in the United States and Canada. Headquartered in Pittsburgh, Pennsylvania, and founded there in 1962, EDMC employs approximately 19,000 full-time, part-time and adjunct faculty and staff. As of May 9, 2011, EDMC had approximately 151,200 students enrolled in its four educational systems: The Art Institutes, Argosy University, Brown Mackie Colleges, and South University.

EDMC offers a broad range of undergraduate and graduate academic programs, ranging from doctoral degrees to specialized non-degree diplomas. These programs include design, media arts, health sciences, psychology and behavioral sciences, culinary, fashion, business, legal, education and information technology. Students attending EDMC schools in the United States are eligible to participate in federal student loans, grants and other forms of public and private financial aid programs, since each school is licensed or permitted to offer post-secondary programs by the state in which it is located, accredited by a national or regional accreditation agency and certified by the United States Department of Education ("DOE").

Against this background, EDMC received certain demand letters sent on behalf of the Oklahoma Law Enforcement Retirement System ("OLERS"), a shareholder in EDMC, dated

1

August 19, 2011 and January 19, 2012 (collectively, the "Demand Letters"). On March 6, 2012, the Litigation Committee informed counsel for OLERS of its findings with respect to certain of the claims in the Demand Letters. In particular, the Litigation Committee informed OLERS of its conclusion that EDMC has in place an appropriate system of internal controls to identify, deter and remediate the types of claims identified in the Demand Letters. The Litigation Committee also invited OLERS and its counsel to provide additional facts in support of its assertions. No additional information has been provided.

Thereafter, on May 16, 2012, the Litigation Committee advised counsel for OLERS that it was in the process of finalizing its investigation into the remaining aspects of the claims raised by the Demand Letters. The Litigation Committee again invited OLERS's counsel to provide further evidence in support of its assertions. Counsel for OLERS did not respond to the May 16, 2012 letter. Instead, on May 21, 2012, OLERS filed a Complaint against all of the directors of EDMC alleging a breach of fiduciary duty arising from the conduct identified in the Demand Letters. Shortly thereafter, on May 24, 2012, the Litigation Committee provided OLERS with a letter setting forth its remaining findings.[1] The Committee then finalized this Report, memorializing its findings and conclusions in a comprehensive written report for submission to the Court, as necessary.

### A. SUMMARY OF DEMAND LETTERS AND FINDINGS OF THE LITIGATION COMMITTEE

The Demand Letters assert three principle claims against EDMC's directors and officers, as follows:

---

[1] A copy of the Demand Letters and related correspondence, through the date of this Report, is contained in the Appendix herein.

*First*, the Demand Letters assert that the plan utilized by EDMC to compensate its admissions personnel violated Title IV of the Higher Education Act of 1965's (the "Act") ban on incentive compensation (the "Title IV Claim"). The factual basis for the Title IV Claim rests on allegations made against EDMC, in its corporate capacity, in a pending federal court action brought against the Company for alleged violations of the False Claims Act. *See United States, et al., v. Education Management Corp., et al.*, 2:07-cv-0461-TFM (W.D. Pa.) (the "False Claims Act Litigation"). The individual members of EDMC's Board of Directors are not named as defendants in the False Claims Act litigation.

*Second*, the Demand Letters allege that EDMC's supposed failing financial health caused an increase in the letters of credit that it posted, as required by the DOE (the "Letter of Credit Claim"). The factual basis for the Letter of Credit Claim appears to be a routine disclosure made by EDMC in the annual report (or Form 10-K filing) for the fiscal year ending December 31, 2011.

*Third*, the Demand Letters assert that EDMC "systematically falsified job placement data for its graduates in order to maintain accreditation for its institutions" (the "Fraudulent Job Placement Claim"). The factual basis offered for this claim is certain testimony provided by an ex-EDMC employee before a U.S. Senate Committee in 2011.

Counsel for OLERS apparently recognizes that the individual directors of EDMC cannot be held liable for the day-to-day acts or omissions of EDMC's employees. Accordingly, the Demand Letters assert that the individual members of EDMC's Board of Directors breached their fiduciary duties to the Company by not implementing an adequate system of internal controls to detect and prevent the alleged underlying misconduct. In this regard, the Demand Letters state "[t]he conduct described above pervaded the entire EDMC system and was known

to members of higher management" and "the Board [should] . . . immediately establish internal controls sufficient to ensure that if such compensation and recruiting practices occur at the company in the future, those practices will be brought promptly to the attention of the Board of Directors so that they can be eliminated before they cause the Company any legal liabilities."

The Litigation Committee has conducted a thorough and careful investigation into the matters raised in the Demand Letters. As set forth below, the evidence does not support a finding that the conduct at issue pervaded the entire EDMC system or was known to senior management, as claimed in the Demand Letters. Further, the Litigation Committee determined that the Company has a robust set of internal controls that are properly designed to identify, deter and remediate the types of allegedly deceptive and questionable practices referred to in the Demand Letters and the GAO report. These internal controls are supported by a properly designed and staffed corporate governance structure. The Committee also concluded that there has been no breach of fiduciary duty by the directors of EDMC in connection with their oversight of the internal control and corporate governance systems in place at EDMC. Accordingly, the Litigation Committee has determined that it would not be in the best interests of the Company or its shareholders to take the actions demanded in the Demand Letters.

## II.     BACKGROUND OF THE LITIGATION COMMITTEE'S INVESTIGATION

EDMC, one of the largest providers of private post-secondary education in North America, was part of a broad investigation conducted by the United States Government Accountability Office ("GAO") (report dated August 4, 2010, ("GAO Report")) in which the GAO sent undercover representatives to meet with admissions and financial aid representatives at fifteen for-profit colleges. According to published reports, only one of EDMC's 104 schools—Argosy University in Chicago, Illinois ("Argosy University – Chicago")—was part of

the GAO investigation. Significantly, no claim was made by the GAO that any of EDMC's 104

schools engaged in the type of improper conduct identified in the Demand Letters.

On November 30, 2010, the GAO released a revised report that made substantial changes

to its initial findings. With respect to Argosy University – Chicago, the revised GAO report

removed one negative allegation regarding EDMC and left intact its finding with respect to the

good practices attributed to EDMC. Once again, no allegations or findings are contained in the

revised GAO Report with respect to the issues raised in these Demand Letters.

On August 11, 2010, a securities class action complaint was filed against EDMC in *Gaer*

*v. Education Management Corp.*, Case No. 2:10-cv-0161, W.D. Pa. ("*Gaer* Litigation"), which

was largely premised upon the same allegations underlying the GAO Reports. On March 28,

2011, EDMC filed a motion to dismiss the *Gaer* Litigation. On September 29, 2011, United

States District Judge Nora Fischer adopted the report and recommendations of the Magistrate

Judge and dismissed all claims with prejudice. Plaintiffs initially appealed this decision;

however, on April 18, 2012, Plaintiffs voluntarily abandoned their appeal.

## III. THE LITIGATION COMMITTEE PROCESS

### A. EDMC'S ESTABLISHMENT OF A LITIGATION COMMITTEE

The Board of Directors of EDMC formed the Litigation Committee in November 2010 in

response to the issues raised by the GAO Report.[2] The Litigation Committee was established

pursuant to Section 1731 of the Pennsylvania Associations Code, Title 15 Pa. C.S., including

Subpart B known as the Business Corporation Law of 1988 and Section 3.1 of the Company's

Amended and Restated Bylaws.

---

[2] The Litigation Committee previously undertook an extensive review of EDMC's internal controls, in response to allegations made in certain demand letters received by the Company in 2010. Where appropriate, the Litigation Committee utilized the knowledge developed during that prior review, including the investigative findings made therein, in preparing this Report and reaching the conclusions set forth herein.

The Board delegated to the Litigation Committee the power and authority to: review, analyze, and investigate any allegations of misconduct or breach of fiduciary duty at EDMC; engage legal counsel and other experts to conduct the investigation; and determine the appropriate actions, if any, the Company should pursue in response to related inquiries or demands from shareholders. Consistent with this delegation of authority, the Board requested that the Litigation Committee also investigate the allegations made in the two Demand Letters sent on behalf of OLERS.

EDMC directors Leo Mullin and Paul Salem have at all times served as the members of the Litigation Committee. As set forth below, Messrs. Mullin and Salem are "disinterested" directors under the standards set forth in the ALI Principles. As such, their decisions are subject to the protections offered to directors of Pennsylvania corporations under the business judgment rule. *See* Pa. C.S. § 1715(d).

### 1.    Composition Of The Litigation Committee

Leo F. Mullin serves as a director on the Board and is the acting chairman of the Audit Committee of the Company, where he has been certified as an independent director pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and the NASDAQ Rules. He retired as the Chief Executive Officer of Delta Air Lines, Inc. in December 2003 and Chairman in April 2004, after having served as Chief Executive Officer since 1997 and Chairman since 1999. Mr. Mullin currently serves in a consultative capacity as a Senior Advisor, on a part-time basis, to Goldman Sachs Capital Partners. He also was Vice Chairman of Unicom Corporation and its principal subsidiary, Commonwealth Edison Company, from 1995 to 1997. He was an executive of First Chicago Corporation from 1981 to 1995, serving as that company's President and Chief Operating Officer from 1993 to 1995, and as Chairman and Chief Executive Officer of American National Bank, a subsidiary of First Chicago Corporation, from 1991 to 1993. Mr. Mullin serves

6

as a director of Johnson & Johnson, a publicly traded manufacturer of pharmaceutical and healthcare products and ACE Limited, a publicly traded provider of insurance and reinsurance services as well as several private companies in his role as a senior advisor. Mr. Mullin previously served as a director of Bell South Corporation. His experience from having served as Chairman and CEO of one of the nation's largest airlines and his long and distinguished career in the banking industry make him a skilled advisor on operational and financial matters.

Paul J. Salem serves as a director of the Board and is the acting chairman of the Nominating and Corporate Governance Committee of the Company. He is a Senior Managing Director and a co-founder of Providence Equity Partners. Prior to joining Providence Equity Partners in 1992, Mr. Salem worked for Morgan Stanley & Co. in corporate finance and mergers and acquisitions. He also spent four years with Prudential Investment Corporation, an affiliate of Prudential Insurance, where his responsibilities included leveraged buyout transactions and helping to establish Prudential's European investment office. Mr. Salem is also a director of N.E.W. Asurion Corp., a provider of technology protection services, and NexTag, Inc., a provider of online comparison shopping, and he previously served as a director of PanAmSat Holding Corporation. Mr. Salem, who is a director designee of Providence Equity Partners, provides the Board with a broad-based background in analyzing business operations, models, strategic plans and financial statements.

### 2.    Disinterestedness Of The Litigation Committee

The ALI Principles define "disinterested" in terms of what it means to be "interested." Section 1.23(a) of the ALI Principles provides that a director is interested if any of the following four tests are met:

> (1)    The director or officer, or an associate . . . of the director or officer, is a party to the transaction or conduct;

(2)     The director or officer has a business, financial, or familial relationship with a party to the transaction or conduct, and that relationship would reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation;

(3)     The director or officer, an associate of the director or officer, or a person with whom the director or officer has a business, financial, or familial relationship, has a material pecuniary interest in the transaction or conduct (other than usual and customary directors' fees and benefits) and that interest and (if present) that relationship would reasonably be expected to affect the director's or officer's judgment in a manner adverse to the corporation; or

(4)     The director or officer is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation.[3]

The Litigation Committee requested that counsel analyze the basis, if any, on which OLERS may claim that members of the Committee are not "disinterested." The Demand Letters do not assert, and the investigation by counsel for the Litigation Committee did not find, a basis to conclude that Messrs. Mullin or Salem were involved in, associated with, have a pecuniary interest in, have a business or financial relationship with, or are a party to any transaction or conduct alleged in the Demand Letters.

Counsel also did not find that Messrs. Mullin or Salem are "interested" in the transactions or conduct alleged in the Demand Letters. Counsel considered a number of facts and circumstances bearing on the disinterestedness analysis, including:

*First,* Messrs. Mullin and Salem are affiliated with certain institutional investors (Goldman Sachs and Providence Equity Partners), which have substantial stock and debt interests in EDMC. That fact, however, does not make these individual directors "interested" in

---

[3]     ALI Principles § 1.23(a); *see also* § 1.23(c).

the transaction or conduct at issue in the Demand Letters.[4]  Numerous cases have held that having a financial stake in a company is not a financial interest making a director "interested."[5] In order for a director to be "interested":

> [T]he financial interest at issue must be directly related to the transaction at issue . . . [S]imply because a director has some financial relationship with the primary corporation, that director should not be deemed "interested" if he or she does not otherwise have a financial interest in the transaction at issue.  Moreover, this interest must be somehow different from the director's interest as a stockholder.[6]

"There are many cases in which greater credence has been given to the judgment of directors because their equity interests aligned them with the interests of the other stockholders."[7] Accordingly, one Delaware court has stated: "Only in the mind of the most aggressive legal advocate could the claim be made, with a straight face and absent any serious factual support, that a board of directors, consisting, in part, of three of the largest individual shareholders in the corporation and the largest single institutional investor, would completely ignore the best economic interests of the shareholders in order to avoid . . . duties found in . . . common law."[8]

There is no evidence that the interests of Messrs. Mullin or Salem (or Goldman Sachs and Providence Equity Partners) are not aligned with the interests of the common stockholders of

---

[4]   *See, generally,* 15 C.S. Pa. 1715(e)(2)(i) ("A person shall not be deemed to be other than a disinterested director solely by reason of [the] ownership by the director of shares of the corporation." )

[5]   *See, e.g., In re IXC Commc'ns, Inc. v. Cincinnati Bell, Inc.,* Nos. C.A. 17324, C.A. 17334, 1999 WL 1009174, at *6 (Del. Ch. Oct. 27, 1999) ("Plaintiff has not demonstrated how the rational economic self-interest of these large [director] shareholders differs from all IXC shareholders, nor that they would receive anything more for their shares than even the numerically smallest IXC shareholder.").

Similarly, Pennsylvania law makes clear that in situations where there are challenges to corporate control, "[a] person shall not be deemed to be other than a disinterested director solely by reason of [the] ownership of shares of the corporation."  *See* 15 C.S. Pa. 1715(e)(2)(i).

[6]   Eric G. Orlinsky, *Corporate Opportunity Doctrine and Interested Director Transactions: A Framework for Analysis in an Attempt to Restore Predictability,* 24 DEL. J. CORP. L. 451, 511-12 (1999).

[7]   *In re Oracle Corp.,* 867 A.2d 904, 930 (Del.Ch. 2004).

[8]   *Cincinnati Bell, Inc.,* 1999 WL 1009174, at *7.

EDMC with respect to investigating and remediating the conduct alleged in the Demand Letters. Nothing in the Demand Letters demonstrates how "the rational economic self-interest of these large shareholders differs from all [EDMC] shareholders . . . ."[9] Neither Mr. Mullin nor Mr. Salem stands to receive any personal financial benefit or detriment from any conduct alleged in the Demand Letters that is not equally shared by other stockholders. [10] The same applies to Goldman Sachs and Providence Equity Partners.

In particular, as directors of EDMC, Messrs. Mullin and Salem have a responsibility to ensure that the Company has an appropriate system of internal controls to minimize the risk of improper or unlawful conduct occurring. This interest is shared equally by Goldman Sachs and Providence Equity Partners, as institutional investors of EDMC. There is abundant evidence in the record concerning the adequacy and vigor of EDMC's internal control structure.[11] This evidence speaks to the good faith and due care exercised by all of EDMC's directors in discharging their duties, including Messrs. Mullin and Salem.

This conclusion applies with equal force to each of the allegations in the Demand Letters, which focus on the due care exercised by EDMC's board of directors in overseeing the Company's activities. For example, one of the principal allegations made in the Demand Letters is that the incentive compensation plan in place at EDMC was a "sham" and that the individual directors or officers of EDMC failed to take appropriate actions to remedy this situation. The incentive compensation plan at issue was adopted by EDMC in 2003 and remained largely the

---

[9]   *Id.*

[10]   *See, e.g., Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), *rev'd on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)) (a director is "interested" if he "has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders"); *Cincinnati Bell, Inc.*, 1999 WL 1009174, at *6-7 (finding that directors with large stock holdings would likely have interests aligned with shareholders); *see also Marx. v. Akers*, 666 N.E.2d 1034, 1042 (N.Y. 1996) ("Directors are self-interested in a challenged transaction where they will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally") (citing Delaware law and ALI Principles § 1.23).

[11]   *See* discussion at Section V(A), at pp. 17-42, of this Report.

same until it was phased out in 2011.  Messrs. Mullin and Salem did not become directors of

EDMC until 2006.[12]  Neither individual played any role in the design or implementation of that

plan.[13]  Further, the investigation revealed that EDMC regularly obtained advice from outside

counsel, with expertise in the design and implementation of similar types of compensation plans,

to the effect that EDMC's compensation plan complied in all respects with requirements of

Title IV of the Higher Education Act of 1965.

The investigation also did not identify any involvement by Messrs. Mullin or Salem in

the ongoing administration of the compensation plan.[14]  Rather, the administration of the

compensation plan was the responsibility of management-level employees of EDMC, located at

the Company's various campuses or at its on-line division.  Further, the investigation did not

uncover any instances in which the Demand Letters' concerns relating to the administration of

the compensation plan were elevated to EDMC's board of directors or were otherwise known to

Messrs. Mullin or Salem.  Moreover, the investigation identified a series of internal controls that

were designed to ensure that the particular components of EDMC's compensation plan

(including the qualitative factors of the plan) were applied in practice.  The investigation

confirmed that these internal controls were effective.[15]

*Second*, the investigation confirmed that certain affiliates of Providence Equity Partners

do business with EDMC.  As described in the Company's public filings, for example, EDMC did

---

[12]  *See* ALI Principles § 1.23, cmt. ; *accord Harhen v. Brown*, 730 N.E.2d 859, 864 (Mass. 2000) (holding, under ALI Principles § 1.23, that two directors appointed to special committee were not "interested" where one committee member was not on the board at the time of the crimes perpetrated by employee and the other committee member, while on the board during the relevant time, was not alleged to have played any role in the crimes).

[13]  *See* ALI Principles § 1.23(c) (stating that a director is not interested, for purposes of a derivative action, if the director, among other things, merely "approved of or acquiesced in the transaction or conduct that is the subject of the action").

[14]  *See* discussion at Section V(B), at pp. 42-61, of this Report.

[15]  *Id.*

approximately $3.8 million in business with four Providence Equity Partners affiliates in 2011.

A director's association with entities that conduct business with EDMC does not render a

director interested.[16]  For example, in *Kaplan v. Wyatt*, the Delaware Supreme Court held that a

director appointed to a special litigation committee was not interested despite the fact that

director also owned businesses that transacted over $200 million in business with the company.[17]

Along similar lines, a recent Pennsylvania case rejected a claim that a business relationship with

the company made a special committee member "interested."  Specifically, the court held that

"[a]s a long-time customer of [the company], as well as a director of it, [the committee member]

is presumed to wish [the company] well, rather than ill" and "[h]is judgment cannot be assumed

to have been clouded by the possibility that [he] may do business with [the company] in the

future."[18]  Here, there is no evidence that the business relationship between EDMC and affiliates

of Providence Equity Partners affected in any way Mr. Salem's actions as a member of the board

of directors of EDMC, or as a participant in the Litigation Committee.

   *Third*, the fact that Messrs. Mullin and Salem were named as individual defendants in the

*Gaer* Litigation, in their capacity as members of the Board of Directors of EDMC, does not

change this conclusion.  The claims against EDMC, and each of the individual defendants in the

*Gaer* case, were dismissed with prejudice.  Moreover, it is well settled that the fact that a director

"is named as a defendant [in a lawsuit involving the Company] does not make the director

---

[16]   *See, e.g., Wyilie ex rel. W Holding Co., Inc. v. Stipes*, 797 F.Supp.2d 193, 199 (D. Puerto Rico 2011) (finding, under Delaware law, member of corporation's special litigation committee (SLC) did not have such significant commercial ties to corporation's officers and directors to render him impartial in his duties, as would cast doubt on SLC's ability to independently assess shareholder's claims against officers and directors, despite that 16 percent of SLC member's accounting firm revenue came from corporation's officers and directors); *In re J.P. Morgan Chase & Co. Shareholder Litig.*, 906 A.2d 808, 821-22 (Del. Ch. 2005) (in analyzing the independence of certain directors, court observed that three directors had substantial personal wealth invested in their related companies, each of which conducts business with J.P. Morgan, but held that alleging that bank provided financing to these companies standing alone is insufficient to put their disinterestedness into question).

[17]   499 A.2d 1184, 1189 (Del. 1985).

[18]   *Fundamental Partners v. Gaudet*, No. 003519, slip op. at 4-5 (Phila. Ct. Com. Pl., Nov. 23, 2011)

interested under [the ALI Principles] if the complaint against the director:  (A) is based only on the fact that the director approved of or acquiesced in the transaction or conduct that is the subject of the action, and (B) does not otherwise allege with particularity facts that, if true, raise a significant prospect that the director would be adjudged liable to the corporation or its shareholders."[19]  The *Gaer* Litigation did not raise the prospect of liability, much less "a significant prospect that the director would be adjudged liable to the corporation or its shareholders."[20]

### 3.    Retention Of Counsel

The Litigation Committee retained outside legal counsel at Goodwin Procter to assist in responding to the Demand Letters.  The Litigation Committee considered Goodwin Procter LLP, among other major law firms, to assist it with its investigation.  The Litigation Committee considered the extensive experience of Goodwin Procter as a firm in conducting investigations on behalf of directors and special committees into a wide range of topics.  The Litigation Committee determined that Goodwin Procter was qualified to assist the Litigation Committee in an unbiased manner.

### B.    ACTIONS TAKEN BY THE LITIGATION COMMITTEE

The Litigation Committee conducted a thorough and careful review of the issues identified in the Demand Letters.  During this process, members of the Litigation Committee were advised by independent legal counsel at Goodwin Procter LLP, who conducted in excess of 30 witness interviews and reviewed numerous documents pertaining to the allegations raised by the Demand Letters.  The Litigation Committee and its counsel met periodically to discuss and analyze the information collected through the investigative process.  The Litigation Committee

---

[19]    *Lemenestrel v. Warden*, 964 A.2d 902, 919 (Pa. Super. 2008) (quoting ALI Principles § 1.23(c)).

[20]    *Id.*

also provided guidance and input to counsel on the matters under review, including the

conclusions reached in this Report.  During the investigation, the Litigation Committee requested

on several occasions that OLERS and its counsel provide additional factual support for their

allegations.  However, no additional facts were ever provided, beyond the letters themselves.

## IV.   GOVERNING LEGAL PRINCIPLES

### A.   PENNSYLVANIA LAW RELATING TO FIDUCIARY DUTIES

Each director and officer of a Pennsylvania corporation, such as EDMC, stands in a

fiduciary relationship to his or her corporation and owes duties of care and loyalty to the

company.[21]

#### 1.   Duty Of Care

The duty of care requires that directors and officers must act "in good faith, in a manner

he reasonably believes to be in the best interests of the corporation and with such care, including

reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar

circumstances."[22]  This duty primarily relates to the responsibilities of being properly informed

when making decisions and overseeing the management of the corporation.[23]

In performing these duties, a director is allowed "to rely in good faith on information,

opinions, reports or statements, including financial statements other financial data, in each case

prepared or presented by any of the following":

> (1)   One or more officers or employees of the corporation whom the
> director reasonably believes to be reliable and competent in the
> matters presented.

---

[21]   See *Anchel v. Shea*, 762 A.2d 346, 357 (Pa. Super. 2000) ("Our law prescribes that a fiduciary obligation includes both a duty of care and a duty of loyalty.") (citation omitted).

[22]   See also 15 Pa. C.S. §§ 512(a) & 1712(a); *Anchel*, 762 A.2d at 357.

[23]   See The Committee on Corporate Laws of the American Bar Association's Section of Business Law, Corporate Director's Guidebook 18 (5th ed. 2007).

14

(2)    Counsel, public accountants or other persons as to matters which the director reasonably believes to be within the professional or expert competence of such person.

(3)    A committee of the board upon which he does not serve, duly designated in accordance with law, as to matters within its designated authority, which the committee the director reasonably believes to merit confidence.[24]

A director is not considered to be acting in good faith, however, if he or she "has knowledge concerning the matter in question that would cause his reliance to be unwarranted."[25]

When due care is taken, Pennsylvania law provides substantial barriers to challenges of decisions made by officers and directors. Specifically, Pennsylvania has codified the business judgment rule: "absent a breach of fiduciary duty, lack of good faith or self-dealing, any act as the Board of Directors, a committee of the board or an individual director shall be presumed to be in the best interests of the corporation."[26] The Pennsylvania Supreme Court has explained that "the business judgment rule reflects a policy of judicial noninterference with business decisions of corporate managers, presuming that they pursue the best interests of their corporations, insulating such managers from second-guessing or liability for their business decisions in the absence of fraud or self-dealing or other misconduct or malfeasance."[27]

## 2.    Duty Of Loyalty

The duty of loyalty requires that directors and officers act only in the interests of the corporation, devoting themselves to corporate affairs with a view to promoting the common interests rather than their own.[28] The Pennsylvania Supreme Court has held that central to this duty is the principle that "the fiduciary best fulfills its duties if it approaches them with the

---

[24]    15 Pa. C.S. § 1712(a).

[25]    *Id.* § 1712(b).

[26]    *Id.* § 1715(d).

[27]    *Cuker*, 692 A.2d at 1046.

[28]    *See Anchel*, 762 A.2d at 357 (citation omitted).

attitude seeking the beneficiary's interests rather than the personal interests of the fiduciary . . . ."[29] The duty of loyalty has developed to require that self-interested transactions entered into by directors or officers be subjected to a fairness analysis, including whether conflicts of interest are disclosed to the board or shareholders as well as whether the transactions are fair to the corporation.[30]

### B. PENNSYLVANIA LAW RELATING TO SPECIAL COMMITTEES

The Pennsylvania Supreme Court has adopted the ALI Principles with respect to derivative actions and, in doing so, has made the ALI Principles an authoritative statement on Pennsylvania law.[31] The ALI Principles state that a board of directors must be given a reasonable opportunity to respond to a demand.[32] Under the ALI Principles, one method for responding to demand letters is for the board of directors to create an independent litigation committee to conduct an in-depth review of the allegations in the demand.[33]

When evaluating the appropriateness of a litigation committee, Pennsylvania courts consider whether the committee: (a) is composed of two or more disinterested directors who are, as a group, capable of objective judgment under the circumstances; (b) is assisted by counsel of its choice; (c) conducts an adequate investigation; (d) prepares a written report; and (e) details why it rationally believed its decision was in the best interests of the corporation.[34] Decisions of

---

[29] *Warehime v. Warehime*, 761 A.2d 1138, 1143 (Pa. 2000).

[30] *See* ALI Principles § 5.02 Reporter's Note.

[31] *See Cuker*, 692 A.2d at 1049 (specifically adopting §§ 7.02-7.10 and § 7.13 of the ALI Principles). While not specifically adopting all ALI Principles, the Pennsylvania Supreme Court noted that its "adoption of [a certain] section is not a rejection of other sections not cited." *Cuker*, 692 A.2d at 1042, 1049 n.5. Accordingly, Pennsylvania courts routinely look to the ALI Principles for guidance on corporate governance issues. *See, e.g.*, *Lemenestrel v. Warden*, 964 A.2d 902, 904 (Pa. Super. 2008).

[32] ALI Principles § 7.03 cmt. f.

[33] *Id.* §§ 7.05(b)(1), 7.08.

[34] *See Cuker*, 692 A.2d at 1048; *see also Lemenestrel*, 964 A.2d at 912 (quoting *Cuker*, 692 A.2d at 1048).

a litigation committee, formed in accordance with these standards, are protected by the business judgment rule.[35]

Under the business judgment rule, courts shall not examine the merits of the litigation committee's decision.[36] "Without considering the merits of the action, a court should determine the validity of the board's decision to terminate the litigation; if that decision was made in accordance with the appropriate standards, then the court should dismiss the derivative action prior to litigation on the merits."[37]

## V.   SUMMARY OF THE LITIGATION COMMITTEE'S FINDINGS

### A.   FINDINGS REGARDING INTERNAL CONTROLS

#### 1.   Company-Wide Standards

EDMC sets and maintains high ethical standards of conduct for all of its approximately 19,000 employees by way of two Company-wide policies: the Business Ethics Policy and Code of Conduct ("Code of Conduct" or "Code") and the "Help Us Preserve Our Integrity" Brochure ("Integrity Brochure").

##### a.   The Code Of Conduct

The Code of Conduct,[38] which applies to directors and employees at all levels, guides the business practices of the Company in regards to compliance with laws and maintenance of the highest moral, legal, ethical and financial reporting standards. An updated version of the Code (which was in the works since well before the GAO Reports and the Demand Letters) was implemented in the second quarter of fiscal year 2011 ("Revised Code"). The prior Code of

---

[35]   *See Cuker*, 692 A.2d at 1046-48.

[36]   *See id.* at 1047-48.

[37]   *Id.*

[38]   As discussed herein, the Company revised its Code of Conduct in 2011. The formal title of the prior Code of Conduct is the "Code of Business Ethics and Conduct." The revised Code of Conduct is titled the "Business Ethics Policy and Code of Conduct." Both are referred to generally as the "Code" or the "Code of Conduct."

Conduct ("Prior Code") covered various compliance-related topics such as employee responsibilities regarding conduct, methods for reporting violations, conflicts of interest, compliance with laws and regulations, fair dealing, treatment of students, sexual harassment, and diversity. The Revised Code provides detailed instructions on reporting potential compliance violations and reflects recent legislative changes affecting EDMC and the for-profit college industry as a whole.

The Code generally sets forth EDMC's values, including that the Company is committed to having its employees conduct themselves in an ethical manner. More specifically, the Code makes clear that EDMC will comply with all laws and regulations applicable to its business and requires employees to be familiar with the laws applicable to their specific job function and level. The Code emphasizes that employees are never expected to violate any law and should never feel pressured to do so.

The Revised Code provides specific examples of ethical conduct for particular job functions. For instance, the Revised Code details policies that admissions employees must comply with when interacting with potential and current students. The policies include accurate and transparent dissemination of information related to accreditation, graduation requirements, cost of attendance, transfer of credits, faculty qualifications, graduation and default rates, employment rates, potential salary upon graduation, and eligibility for licensing exams. In another section, the Revised Code states that financial aid professionals shall seek to minimize economic disadvantages as a barrier to higher education; advise the student of his or her right to reject aid; provide timely, complete, and accurate financial aid information to students to enhance student financial literacy and empower all participants to act and borrow responsibly; not knowingly permit or encourage an applicant to falsify or provide misleading information

when applying for aid; recommend that students exhaust federal and state provided methods of financing their education before applying for private loans in those situations where private loans are needed to supplement the cost of education; and give all prospective students the opportunity to meet with an EDMC financial aid professional.

The Code stresses the potential consequences of noncompliance for an offending employee (*e.g.,* termination or criminal or civil prosecution), for EDMC (*e.g.,* fines, loss of business, reputational damage), and for EDMC's students (*e.g.,* reduced access to higher education and higher costs).

Mechanisms for reporting unethical conduct are also outlined in the Code. These mechanisms include speaking with local and corporate Human Resources personnel, contacting the Company's General Counsel, or contacting EDMC's Corporate Compliance Hotline. The Code of Conduct also fosters an environment in which reporting of unethical conduct is encouraged by making evident that EDMC is committed to keeping complaints confidential and stressing that the Company will not tolerate any form of retaliation. Indeed, retaliation is a violation of the Code.

All employees receive training on the topics covered by the Code through the Company's "on-boarding" process for new employees. Under the Prior Code, on-boarding required employees to complete courses covering employee rights and responsibilities as well as legal considerations in the workplace, all of which incorporated the Code. Under the Revised Code, new employees also complete an additional training module specifically on the Code. This module requires employees to identify ethical dilemmas through real-life scenarios, outline steps for de-escalation, and develop strategies for mitigation. Some scenarios, for example, focus on unethical recruiting practices.

Under the Prior Code, employees were required to sign a Code of Business Ethics and Conduct Acknowledgment, thereby certifying that they received the Code, read it, and understood it. A similar certification process has been implemented for the Revised Code. Initially, certification requires new and current employees to complete the training module on the Code and certify that they have completed the module, have reviewed the Revised Code, and clearly understand it. In addition, employees are required to certify that they are aware of no ethical violations in their particular workplace. The recertification requires employees to review the Code, complete a refresher course on the Code, report any suspected Code violations, and sign an "e-authorization" acknowledging that the employee read and understood the Code and that the employee completed the course.

### b.  The Integrity Brochure

In addition to the Code, the Company also provides employees with the "Integrity Brochure, which has been distributed to all new employees since 2004 and explains the negative impact that unethical behavior can have on the Company's reputation and financial well-being. The Integrity Brochure also provides a non-exhaustive list of examples of unethical behavior, including failing to comply with state and federal laws and regulations, accrediting and licensing agencies, and professional organizations; falsifying statements to government officials or in reports; and unfairly treating students.

The brochure outlines a suggested structure for reporting unethical behavior, including speaking with a supervisor, local and corporate Human Resources, or the Campus President, or by contacting the Company's General Counsel, the Internal Audit Department, or the Corporate Compliance Hotline. The brochure emphasizes in large type that an employee will not face retaliation for making a report and provides three ways for an employee to report unethical conduct through the Corporate Compliance Hotline.

### 2.    The Hotline Committee

In January 2003, in compliance with SOX standards, EDMC launched its Corporate Compliance Hotline (the "Hotline").[39]  While originally intended to detect financial irregularities, EDMC broadened the purpose of the Hotline to include detection of other unethical activities, thereby aligning the Hotline with EDMC's philosophy of integrity. Employees may submit tips or complaints to the Hotline 24 hours per day, seven days per week, by e-mail, a secure web-form, or voicemail in a manner that electronically disguises the identity of the employee to EDMC personnel.  Employees will not face retaliation for making a report.

The Hotline Committee is charged with oversight and administration of the Hotline.  The Hotline is more than a functioning and adequate internal control, as the Demand Letters ask the Company to put in place.  The Litigation Committee's review found that most of the more than 300 Hotline submissions between fiscal years 2009 and 2010, for example, related to human resources and managerial issues, such as an allegation that a manager was "rude" to an employee.  Only a handful of submissions, broadly construed, related to the types of potential ethical violations raised in the GAO Report and mentioned in the Demand Letters.  Investigation by the Hotline Committee oftentimes could not substantiate allegations.  When allegations were substantiated, appropriate corrective action was taken.  Thus, the Hotline is (and has been) a robust, thorough and effective mechanism for detecting and remediating the types of alleged misconduct referenced in the Demand Letters and described in the GAO Report.  It further demonstrates, contrary to the Demand Letters, that EDMC directors and officers have acted in good faith by overseeing the Company's operations and business practices.

---

[39]    *See* 18 U.S.C. § 78j-1(m)(4)(SOX requires audit committees of publicly traded companies to establish procedures whereby employees can anonymously submit concerns regarding questionable accounting or auditing matters).

### 3.    Internal Audit Department

EDMC's Internal Audit Department ("IAD") conducts internal audits of corporate processes, information technology, ground schools, and the Online Higher Education Division. As discussed in further detail below, IAD, through its far-reaching audit process, provides stakeholders in EDMC, including directors and officers, a thorough and objective assessment of the Company's system of controls; verifies compliance with policies and procedures and regulatory requirements; deters fraud by encouraging appropriate controls; identifies best practices; and facilitates the transfer of knowledge.  Thus, contrary to the allegations in the Demand Letters, IAD has been functioning as an internal control for regulatory compliance (not to mention financial accuracy) and has been assisting directors and officers in overseeing the Company's operations and business practices.

To do so, IAD continuously assesses business risk and develops audit objectives, priorities, and procedures that evaluate and ensure effective internal controls.  While EDMC management is responsible for providing internal controls, IAD evaluates the adequacy and effectiveness of those internal controls and recommends improvements.  When performing these audits, IAD complies with the Standards for the Professional Practice of Internal Auditing of The Institute of Internal Auditors.

IAD's audit process is based upon periodic assessments of operating locations or processes within the Company.  A risk-based approach is used by IAD to determine frequency, location, and depth of audits of a given location or process.  Each fiscal year, IAD develops an audit plan based on a risk analysis that includes a variety of factors, such as location size, location control, prior audit results, employee turnover, compliance requirements, and revenue.

All business activities of EDMC are subject to auditing.  IAD aims to audit each school once every five years and every corporate process once every three years.  Each school or

corporate process may be audited more frequently, however, based on audit results and other risk factors.  In reviewing a particular location or process, IAD conducts field testing of various areas, grading each on a scale of 1 (deficient) to 5 (excellent).  IAD then provides an overall score to a particular location (*e.g.,* The Art Institute in Pittsburgh) or process (*e.g.,* Information Technology), along with specific recommendations for improvement.

Following field testing, IAD issues a draft report to the personnel in charge of the location or process audited and requests responses and action plans for each audit finding. Thereafter, IAD issues a final report, which can include a "Major Report," detailing findings requiring remediation, and a "Minor Report," discussing recommendations that do not require formal remediation.  A Major Report typically includes background about the site or process, a summary of the findings, a chart of grades for each auditable area, a rubric for each grade, current financial data related to the site, and recommendations for improvement.  IAD also generates an executive summary of the report.  Reports are distributed to the Audit Committee, senior management, and in some instances the Company's external auditor.  At fiscal year end, IAD prepares a report summarizing all site and process audits during the year for the Audit Committee.  This report also indicates the audit plan for the following fiscal year.

The Litigation Committee reviewed IAD's reports from school audits and found a thorough, effective control.  IAD audits approximately 20 percent of EDMC's ground schools each fiscal year.  For each ground school, IAD sends two to three auditors to "field test" each campus.  Those auditors assess an array of areas, including admissions, accounting, administration, balance sheet analysis, education, human resources, information technology, and student services.  For example, for admissions, IAD documents and tests the process for admissions personnel training and certification to assure compliance with guidelines; and

document and tests pay rate change policy to assure that admissions personnel are properly compensated. As another example, for Student Services, IAD determines if graduates' salaries are properly documented and verified in the student accounting system; and assures that the New Student Handbook has required sections as per the EDMC Systems Standard. The auditors conduct these tests through a combination of pre-audit questionnaires; random sampling and testing of files and data to verify compliance and reporting accuracy; and interviews of key personnel in particular departments to identify problem areas and ensure compliance with policies and processes.

### 4. Online Higher Education Division

Online Higher Education ("OHE") is the division at EDMC responsible for the Company's online education programs, including Argosy University Online, South University Online, and The Art Institute of Pittsburgh Online (the "Online Brands"). Two departments within OHE, the Internal Audit and Compliance Department as well as the Marketing and Admissions Department, contain control functions relevant to the Demand Letters. As the Litigation Committee's review made evident, these two departments already employ an interwoven system of controls that deter the types of unethical conduct alleged in the GAO Report. Moreover, these controls allow directors, officers, and management to oversee OHE's operations and business practices.

### a. OHE's Internal Audit And Compliance Department

OHE Internal Audit and Compliance conducts audits and monitors OHE employee interaction with students and prospective students, including Assistant or Associate Directors of Admissions (collectively, "ADAs") and Student Financial Services ("SFS") representatives working for the Company's Online Brands. Specifically, this department conducts call

monitoring, auditing and reporting functions that are adequate to address the type of wrongdoing alleged in the Demand Letters.

i.     <em>Call Monitoring</em>

OHE Internal Audit and Compliance has conducted a call monitoring program at the Company since June 2007. The Company devotes significant resources to monitoring phone calls between students and prospective students and OHE employees, including representatives from admissions, financial aid, academic counseling, and collections. By doing so, the OHE Internal Audit and Compliance department strives to monitor 90 percent of ADAs and SFS representatives every three weeks. As a result of this extensive program, the Company estimates that representatives may be monitored as many as 40 to 50 times over the course of two years. While ADAs and SFS representatives know they can be monitored on any given call, they are not informed when the monitoring occurs. For a call to qualify as "monitored," it must last more than five minutes. Therefore, ADAs and SFS representative may be listened to more frequently than the monitoring statistics indicate.

Each incomplete or incorrect response provided by a representative on a monitored call is labeled as a "gap" and is given a grade ranging from Level 1 (being the least problematic) to Level 4 (being the most severe).[40] All representatives are provided with policies that explain how their interactions are graded, and each is required to acknowledge in writing that she has read the policy. The severity of the gap, coupled with the number of previous infractions by the representative, determines the remediation process employed by the Company upon discovering a gap. Any compliance infraction requires that the offending ADA and her supervisor sign-off on a remediation form. Level 3 gaps also require sign-off by the Vice President of the

---

[40] The types of conduct that earn a certain grade level are substantially the same as those found in Corporate Services Marketing and Admissions, as discussed below.

employee's department.  Level 4 gaps, moreover, are reported to Human Rand the Vice President of OHE.

The Litigation Committee's review of historical call monitoring data demonstrated that the compliance program and remediation policy have proven successful in detecting and remedying gaps.  As an example, between November 2008 and November 2010, OHE monitored nearly 40,000 calls involving over 3,300 ADAs and nearly 2,700 calls involving over 200 SFS representatives.  A small fraction of these calls involved any gaps.  For ADAs, for instance, less than two percent of calls involved gaps, with less than 0.5 percent involving Level 3 or Level 4 gaps.

### ii.    *Auditing*

OHE Internal Audit and Compliance audits areas of risk within OHE—including financial aid, student accounting, the registrar, academic counseling and SOX testing—by examining the same areas that IAD audits for ground schools.  Before each fiscal year, this department performs a risk assessment of auditable areas within OHE, and based on that assessment, develops an audit plan for the upcoming fiscal year.  Areas with particularly high risk areas, such as financial aid, are audited annually.  Audit findings are summarized in reports; each report contains findings and provides a recommendation for improvement, a target date for that improvement, and a responsible party.

### iii.    *Reporting*

OHE Internal Audit and Compliance presents the results of internal audits and compliance monitoring to the OHE Executive Committee on a quarterly basis.  These presentations, which usually last sixty to ninety minutes, summarize the methodologies, findings, and corrective actions taken with respect to each audit.  These presentations also describe the areas tested, the time period covered, all major findings, and any corrective actions

26

recommended. Presentations further contain the proposed audit schedule for the upcoming fiscal year and details on compliance and gaps in the Admissions and Student Financial Services departments, including trends of gaps found during mystery shopping and observations for each school. Compliance gaps are also reported weekly to OHE's Executive Committee.

Senior management in IAD and OHE also meet on a quarterly basis. During these meetings, both departments exchange the findings of their respective audits and risk assessment efforts. These quarterly meetings help identify potential areas of common risk. By way of example, IAD was able to identify a faculty credentialing risk in ground schools that OHE had originally identified during its audits.

### b. OHE's Marketing And Admissions

OHE's Marketing and Admissions Department supervises the marketing and admissions functions for the three EDMC Online Brands by, among other things, developing policies and procedures related to admissions personnel, training admissions personnel, and ensuring compliance with federal regulations and Company policy regarding interactions with prospective students.

Similar to their counterparts at the ground schools, ADAs in OHE attempt to recruit qualified students to the three Online Brands. In doing this, ADAs must determine the appropriateness of candidates for admissions based upon career goal compatibility; accurately and completely portray programs, services, and expected outcomes; conduct all activities in accordance with the highest ethical standards; and conduct all activities in accordance with state and federal rules and regulations.

All OHE ADAs receive extensive training before being allowed to interact with prospective students. This training includes a two-week program for new hires, which covers the history of EDMC, the Code of Conduct, director expectations, quality conversations with

prospective students, school curricula, financial aid, and compliance. New ADAs also sign an Ethics Acknowledgment stating that they are responsible for providing prospective students with legally and factually correct information about the qualities, attributes, and benefits of attending the school and that they may be monitored for compliance with those standards.

OHE's Marketing and Admissions also provides all ADAs with a Compliance FAQ Guide ("Compliance Guide"), which ensures that each ADA has legally and factually correct information while interacting with prospective students. While Compliance Guides are tailored to specific schools (e.g., Argosy University Online), the Compliance Guides for each school are largely similar to each other and to the Guidebooks distributed to ADAs at ground schools by Corporate Services Marketing and Admission. Topics covered by OHE's Compliance Guide include accreditation, transfer of credits, student services, career services, international students, education, faculty, and financial aid. Similar to ADAs at ground schools, ADAs in OHE must pass a "Frequently Asked Questions" exam (the "FAQ exam") based on the information in the Compliance Guide by successfully answering eighty-five percent of the questions. ADAs are given two opportunities to retake the FAQ exam and cannot speak with prospective students until passing the exam. The FAQ exam is administered annually to all ADAs.

Beyond the Compliance Guides, ADAs also complete a training module on compliance during their two-week training. The module is designed to instruct ADAs on how to identify questionable recruiting practices and the associated negative effects; understand what to do and what not to do in key compliance areas; and identify resources as a means to report possible violations. ADAs also view a "60 Minutes" segment on deceptive recruiting practices and then engage in a discussion regarding the importance of compliance. The discussion is intended to highlight the negative effects of noncompliance, including damage to EDMC's reputation and

loss of business, and emphasize that the industry is heavily regulated. ADAs are instructed on what information can and cannot be communicated to students in such areas as accreditation, transfer of credits, technology requirements, career services, financial aid, tuition, student responsibilities, and competition. The module concludes by providing strategies for reporting potential compliance violations and provides three means for contacting the EDMC Corporate Compliance Hotline.

During new hire training, ADAs also receive instruction on how to effectively conduct phone calls with prospective students and sales and marketing techniques. Some training materials teach ADAs techniques for uncovering a prospective student's goals, motivations, desires, and educational shortfalls. Other materials provide ADAs with a roadmap to use when navigating through a conversation with a potential student. Still others train ADAs on engaging prospective students and encouraging them to pursue a degree that suits their confirmed need or goal. In order to demonstrate their understanding of these concepts, ADAs must complete a final exam and a final role-play.

After completing the two-week new hire training—including passing the final exam, the FAQ exam, and the final role play—ADAs transition into a "training pod," which lasts from two to eight weeks depending on the progress of the individual ADA. The training pod provides intensive on-the-job training involving monitored conversations, coaching, and daily assessments and reviews against performance criteria. Only after satisfactorily completing the training pod can an ADA interact on an unsupervised basis with a prospective student.

OHE also requires continuing education for all ADAs after the initial new hire training and the training pod. The amount and type of training depends upon the length of employment. ADAs who have been employed less than three months are required to attend two trainings per

month and one additional training the month of their first start. ADAs who have been employed between three and six months are required to attend one training per month and complete a "Back to Basics Boot Camp." ADAs who have been employed more than six months are required to take one training class per quarter. Additional training for ADAs may also be conducted if a compliance "gap" occurs in order to "fill" the gap.

Following training, ADAs are continually monitored to ensure they comply with EDMC policies, as well as the law. ADAs must submit to monitoring by a combination of internal call monitoring administered by OHE's Internal Audit and Compliance, as described above, and the mystery shopping program administered by Corporate Services Marketing and Admissions, described further below. ADAs are provided Compliance Grade Levels, which are used to rate and track compliance "gaps." Any gaps are rated on the Compliance Grade Levels and recorded on a corrective action record. Gaps are remediated according to the grading policy, which ADAs are required to acknowledge. Possible remediation includes counseling, verbal coaching, verbal warnings, written formal warnings, and termination. Aside from these formal monitoring programs, ADAs are encouraged to self-monitor and report compliance issues to supervisors, Human Resources personnel, or anonymously through EDMC's Corporate Compliance Hotline.

### 5.    Corporate Services Marketing And Admissions Department

EDMC's Corporate Services Marketing and Admissions Department ("CS Marketing and Admissions") is responsible for, among other things, formulating and implementing policies and procedures for admissions personnel related to training, compliance, and remediation. While this department primarily supervises EDMC's ground schools (as opposed to OHE), some of its policies and procedures also apply to admissions personnel in OHE.

a. **Training And Messaging To Admissions Staff**

Upon hire, an ADA undergoes two stages of initial training, in addition to the more general training administered through Human Resources (as discussed in the prior section). The first stage of ADA training is known as "on-boarding" and consists of three weeks of on-campus training on various topics specific to the ADA job function, such as compliance and recruiting "best practices." The second stage of training, known as "polishing-off," occurs at a national five-day training program in Pittsburgh, and provides new hires with further guidance on how to comport themselves when speaking with students and prospective students.

i. *On-boarding*

Although on-boarding occurs at each ground school and OHE, the process is largely standardized across EDMC. An ADA learns to provide the correct messages to students, gains knowledge of the financial aid process, observes experienced ADAs, and practices recruiting strategies.

During the first week of training, each ADA is provided with the "FAQ and Compliance Guidebook." This guide is an important tool for communicating the Company's expectations regarding compliance. Through the Guidebook, ADAs learn how to set realistic expectations and present an accurate portrayal of a prospective student's academic experience, including information regarding program offerings, financial aid, and graduate outcomes. Each school system has a version of the Guidebook that is customized to that school, but Guidebooks are largely similar and are updated by departments, including Legal, Student Financial Services, and the Regulatory Affairs and Compliance Department.

Guidebooks, at around 30 pages in length, are divided into topics such as Accreditation, Transfer Credits, Student Affairs, Career Services, International Issues, Education, and Financial Aid. Each topic includes information that must be conveyed, supplemental information that can

be conveyed, and information that can never be conveyed, including bulleted proscriptions against using certain terms, making certain promises, implying certain outcomes, or making unwarranted comparisons.

Similar to OHE ADAs, ADAs at the ground schools must pass a "closed-book" FAQ exam testing their knowledge of the Guidebook before interacting with prospective students. The FAQ exam consists of true/false and multiple choice questions of varying difficulty. ADAs have three chances to pass the FAQ exam. If an ADA fails the exam, she must study the Guidebook for a week and receive additional instruction from a supervisor before retaking the exam. Per policy, an employee who fails the exam a third time is terminated. Further, all existing admissions personnel, including ADAs, Senior Directors of Admissions, and Directors of Admissions, must pass the FAQ exam annually. If current admissions personnel do not pass, they may not participate in recruiting. If they fail three times, their employment is terminated.

During their initial on-boarding, ADAs also learn the techniques of "partnership selling," which is a benefit-based sales methodology that requires ADAs to build a relationship with the prospective student based on trust and honesty in order to develop a shared goal of determining the best course for the prospective student. Through the use of open-ended questions and active listening techniques, ADAs help the prospective students to select the features and benefits of the school to match their needs and values.

In practice, an ADA implements these selling techniques through an "appointment set," whereby an ADA talks to a prospective student over the phone, learns more about the prospective student, and endeavors to set an appointment for an interview. If the prospective student is a dependent, the ADA will also work to include the involvement of the parent, guardian, or teacher. If a prospective student is interested in continuing on in the process, an

interview is scheduled with the ADA. During this interview stage, the ADA is counseled to avoid promising prospective students something that a program cannot offer and to always give prospective students accurate information. ADAs are further warned that anything less than the absolute truth would put the company's reputation at risk.

CS Marketing and Admissions also produces an online training course that contains information and simulations that allow the ADA to acquire the knowledge, skills, and abilities necessary to perform the job, including partnership selling, matching features and benefits to needs and values, and overcoming challenges to commitment. Compliance-related information is also explained in the program.

After completing all of the lessons in the training manual and the online training course, an ADA is required to take the Mastery Exam, which tests whether ADAs have mastered using open-ended questions, seeking buy-in from a dependent student's family, and providing the correct documents to a student during an interview. A minimum score of 85 percent is required for passing the Mastery Exam. An ADA has three attempts to pass the test before he or she is let go.

ADAs must pass both the FAQ exam and Mastery test before speaking with prospective students without being monitored. Typically, this does not occur until five weeks after ADAs are hired. ADAs and their Directors of Admissions must sign off that their multi-week training has been completed. The Department tracks by campus whether ADAs have submitted training sign offs, whether they have completed the training within five weeks, and the number and percent of ADAs, Directors of Admissions, and Senior Directors of Admissions who have passed the FAQ exam. A review of this data for the 2010 academic year indicated that most campuses achieved nearly 100 percent passage rates for the FAQ exam.

### ii.   *Polishing-Off*

After completing on-boarding, newly hired ADAs must attend a "polishing-off" training program at EDMC headquarters in Pittsburgh. This training consists of five days of training aimed at ensuring that new ADAs conduct themselves according to EDMC's standards. During training, each ADA is "observed" several times by the trainers. To pass, ADAs must successfully demonstrate compliance with the Company's standards. At the conclusion of the polishing-off, each ADA takes a certification test in order to be allowed to work with prospective students.

### iii.   *Ongoing Training*

Following on-boarding and polishing-off, ADAs receive ongoing training from Department training specialists. Training visits cover a variety of topics, including financial aid and common compliance violations. During visits, training specialists also observe ADAs interacting with prospective students. Between July 2009 and June 2010, training specialists conducted training visits at 98 percent of ground schools. Many ground schools had two or more training visits.

### b.   **Compliance And Remediation**

In addition to training and messaging, CS Marketing and Admissions has implemented other controls designed to ensure that ADAs conduct themselves according to the Company's standards. These controls include frequent observations and "mystery shopping."

### i.   *Observations*

Observations are designed to track compliance with Company policies by allowing Directors of Admissions to listen to phone conversations between ADAs and prospective students. Outlines, developed by CS Marketing and Admissions (and modified by the different education systems), are used for monitoring observations. A typical outline tracks whether the

34

ADA properly introduced himself, explained the purpose of the call, gathered important information from a prospective student, made any misrepresentations, and concluded the call in a proper manner. After the observations, Directors of Admissions review the results with ADAs.

The number of observations an ADA undergoes varies per school system. At The Art Institutes, Senior Directors of Admissions must submit at least three interview observations and three phone observations on a monthly basis. Directors of Admissions must conduct at least five interview observations and five phone observations on a monthly basis. At South University, Senior Directors of Admissions and Directors of Admissions are required to do two appointment sets and two interviews per month. At Brown Mackie, Senior Directors of Admissions are required to do three appointment sets and three interviews per month and Directors of Admissions are required to do five appointment sets and five interviews per month. Finally, Argosy Senior Directors of Admissions and Directors of Admissions are required to do three appointment sets and three interviews per month.

ii. *Mystery Shopping*

In addition to observations of ADAs conducted by EDMC employees, CS Marketing and Admissions also hires a third-party vendor to "mystery shop" ADAs. Similar to the GAO investigation, mystery shopping consists of a vendor posing as a prospective student over the telephone, asking trick questions of the ADAs, and assessing the professionalism and qualitative responses from ADAs. Mystery shopping occurs via phone and online. The vendor supplies the department with a recording of the call and provides a brief checklist of points occurring during the call. A training specialist then documents compliance infractions, if any.

Similar to the scale used by OHE Internal Audit and Compliance during its call monitoring of OHE ADAs, each infraction is graded on a scale of 1 through 4, with four being the most serious infraction. A Level 1 infraction might involve concerns such as the

misstatement of factual information or not fully responding to a compliance question. Level 2 infractions involve slightly more severe compliance infractions than Level 1 infractions. Level 3 infractions can involve an unintentional incorrect response to a compliance question or ignoring the proposed FAQ Guidebook response. Finally, Level 4 violations involve the most serious infractions, such as intentionally ignoring the FAQ Guidebook response or demonstrating a blatant disregard for the facts. The policy for remediating infractions is largely similar to the one used by OHE.

Level 3 and Level 4 infractions are reported directly to the Vice Presidents of Admissions and Human Resources for that the school. Infractions may also be communicated to the Director of Admissions and Senior Director of Admissions, Campus Presidents, Regional Vice Presidents, and sometimes the education system president himself. For all mystery shopping, regardless of the infraction, the offending ADA and his or her supervisor must sign a verification that the ADA was retrained on appropriate conduct. All disciplinary actions, including verbal warnings, are recorded in the employee's personnel file. Furthermore, Senior Directors of Admissions and Directors of Admissions who fail to follow through with ADAs or who consistently have ADAs with infractions may be held accountable through verbal warnings, written warnings, or termination.

For more serious infractions warranting termination, one education system uses a process whereby a Director of Admissions submits a termination recommendation. The recommendation thereafter is reviewed by the Regional Vice President and Human Resources, the VP of Admissions, and the school system President. If all parties agree, an ADA's employment will be terminated.

### 6.    Financial Aid

EDMC's internal controls related to financial aid exist Company-wide. Those controls fall into three broad, overlapping areas: intake, processing, regulatory compliance. As discussed in this section, contrary to the Demand Letters' allegations, these controls work to ensure that the Company remains compliant with regulations regarding financial aid and allow the Company's Board of Directors to oversee the Company's operations and business practices with respect to financial aid.

### a.    Intake

Financial aid applications are initiated through campus representatives in campus-based Student Financial Services ("SFS") departments. Those departments are responsible for training and compliance with respect to intake.

Campus directors are responsible for training SFS representatives in connection with the intake of financial aid applications. Directors educate SFS representatives on the student counseling and financial planning process by discussions on costs, financial aid options, and how the balance of tuition can be covered. Some schools provide additional training at the campus level. At Brown Mackie College, standard financial aid training sessions are held twice a month and all financial aid personnel are required to attend. At these meetings, discussions are held on new regulations or issues related to the GAO Report. Additionally, prior trainings on financial aid topics are posted on EDMC's intranet site and go back two years.

In addition, SFS representatives undergo "Back to Basics" training, whereby they learn rules, regulations, and best practices related to financial aid. The "Back to Basics" Guide is for all EDMC staff persons who assist students in the financial aid process. Each new award year, SFS staff and other campus staff (such as ADAs) who must understand the financial aid process are required to review the Guide.

37

With regard to accuracy of intake, SFS mangers conduct periodic reviews of intake files to ensure compliance. These assessments include sampling financial aid files and related computer system records for each SFS representative. The purpose of the review is to identify any training needs and to make corrections before errors are discovered by an outside audit. Per policy, errors uncovered require additional auditing and training.

### b. Processing

The Financial Aid and Compliance Department is a central location for the processing of all financial aid applications, disbursement of funds to students, and refunds to lenders or the Government. The centralization (the planning for which began before the IPO) is designed to minimize financial and regulatory risks associated with the processing of Title IV funds to the Company through standardization. To ensure standardization, extensive training and assessments program have been developed for staff members in this department. In addition, employees are required to complete training upon promotion to a new area or a move to a different area within the department.

### c. Regulatory Policy and Compliance

The Student Finance and Compliance Department addresses regulatory policy and compliance. The department oversees financial aid compliance audits of schools by an external auditor; prepares schools for compliance reviews by the DOE; ensures that institutions remain eligible for financial aid; reviews data submitted to the DOE, such as graduation rates; provides *ad hoc* advice across EDMC on compliance with DOE regulations; interfaces with the DOE and assesses new and proposed regulations regarding financial aid; and places a representative on the Business Practices Committee, which provides guidance on accuracy of statements in EDMC's advertising. This department has senior management with extensive experience in Title IV

regulations who interface with the DOE and serve as internal experts on regulation interpretation and compliance.

### 7.    Regulatory Affairs

The Regulatory Affairs and Compliance Department ("Regulatory Affairs") works to ensure, among other things, that EDMC's institutions are accredited, either nationally, regionally or programmatically, and if accredited, remain in compliance with the governing accrediting organization's standards. Thus, the Department serves as an internal control to protect the quality of academic programs offered by EDMC's schools.

As part of their work, representatives from Regulatory Affairs visit each EDMC campus approximately every two years to ensure compliance with accrediting organization requirements. In advance of a visit by an accrediting organization, representatives from Regulatory Affairs conduct "mock" visits, which mimic the review conducted during an accrediting organization's visit. In advance of a mock visit, institutions provide the types of documents reviewed by accrediting organizations to the team visiting from Regulatory Affairs. Mock visits address a wide range of institutional areas, including, for example, organization and communication, physical facilities and equipment, resources for clinical instruction, library and informational resources, admissions, faculty and staff qualifications, and curriculum.

Regulatory Affairs representatives make multiple campus visits each month. As part of each mock visit, the Regulatory Affairs team completes a report showing the accreditation-related standards audited and whether the institution has "met" or "not met" the standards. The Department tracks which campuses have been visited, which accrediting organizations have scheduled visits and the reason for the visit, whether a department representative will be on-site during the visit, and the status of an institution's accreditation application.

## 8.    The Business Practices Committee

The Company also has created an employee-level committee, called the Business Practices Committee ("BPC"), that reviews materials published by the Company in order to help ensure that the material created and circulated by EDMC is accurate and complies with relevant regulations.  This Committee is yet another example of the controls that have been in place at EDMC to promote accurate representations and deter misrepresentations in messaging to students and prospective students.

For example, the BPC requires submission of any broadcast, print, or electronic materials provided to current or potential students or the general public concerning a school, its program offerings or services provided, and requires schools to create and maintain advertising files.  The BPC conducts quarterly meetings and is comprised of members from the following departments: Regulatory Affairs, Legal, Student Financial Services and Compliance, and CS Marketing and Admissions.

The BPC also disseminates a handbook, called the Business Practices Handbook ("the Handbook"), to assist EDMC employees in ensuring that all EDMC marketing and promotional materials conform to accreditation, licensing, legal and DOE requirements.  The Handbook instructs employees on good practices regarding compliance with regulatory requirements.  For example, the Handbook explains that almost all accrediting and licensing agencies express a general prohibition of all false or misleading advertising and that a regulatory agency's silence on the use of a specific word, phrase, or concept related to advertising and marketing does not equal assent to use that word, phrase, or concept.  In addition, the Handbook warns that, because regulations are constantly evolving to address changes in the industry, a compliance review of marketing materials in one year does not necessarily mean that those materials are approved for

subsequent years. More generally, the Handbook counsels against making claims about the Company's schools or programs that cannot be supported by empirical evidence.

### 9. Sarbanes-Oxley Controls

Section 404 of SOX requires management and external auditors to report on the adequacy of the Company's financial reporting controls. To comply with SOX, the Company has already established and maintained an internal control framework for accurate financial reporting. This framework allows the Company's directors and officers to oversee the accuracy of the Company's financial reporting.

The Controller and Chief Accounting Officer oversees the internal control framework related to financial controls. The Company assesses financial risk areas, including financial aid, valuing student accounts, setting bad debt reserves, and valuing goodwill, and provides auditors in IAD with a testing program in addition to their regular audit program. Data collected during audits—of both individual school campuses and corporate processes—is provided to the office of the Controller and Chief Accounting Officer department for compilation and assessment. Last fiscal year, for example, this department and auditors from IAD conducted approximately 400 tests across various areas of the Company. Those tests addressed the accuracy of financial statement reporting, including tax, revenue, general accounting, student accounting, and procurement. Following testing, deficient processes are identified and remediated. Aggregate financial controls data is also provided to the Company's outside auditor, for validation, further testing, and inclusion in financial reporting as part of the annual audit process.

### 10. The Audit Committee

As a publically-traded company, EDMC complies with the requirements imposed under SOX and the NASDAQ Rules on the committee structures. These rules mandate the delegation of many significant matters to committees whose membership is limited to independent

41

directors. Under SOX, each public company must have an independent audit committee, with one member who is a financial expert.[41] The Company also complies with NASDAQ rules regarding audit committees.

The EDMC Audit Committee was created to assist the Board in its oversight of: (i) the integrity of the financial statements; (ii) compliance with legal and regulatory requirements; (iii) ensuring the qualifications and impendence of the Company's independent auditors; (iv) the performance of the independent auditors; and (v) the internal audit function at the Company. To perform these duties, the Board has delegated to the Audit Committee, among others, the following powers and responsibilities: (i) reviewing the scope and plans for both internal and independent auditors; (ii) establishing "whistleblowing" procedures; (iii) reviewing the Company's legal and regulatory compliance; and (viii) ensuring compliance with the Company's Business Conduct Guidelines and reviewing conflicts of interest. In performing these duties, the Audit Committee tracks management's corrective action plans, reviews the Company's financial risk and control procedures, and ensures its compliance with tax, legal and regulatory matters.

## B.    FINDINGS ON THE TITLE IV CLAIM

As a threshold matter, the Litigation Committee investigated whether EDMC's admissions compensation plan (the "Plan") "as designed" was flawed and in violation of the Act. This same issue was recently considered by the federal court in the False Claims Act Litigation brought against EDMC. The court dismissed the plaintiffs' challenges to the Plan, "as designed," holding:

> ADA salaries were "fixed" under the Plan, as defined in 34 C.F.R.
> § 668.14(b)(22)(ii)(A), as each bi-weekly payment to be received
> by an ADA during the six-month period until the next adjustment

---

[41]    SOX § 407(A) (requiring each company "to disclose whether or not, and if not, the reasons therefore, the audit committee of that issuer is comprised of at least 1 member who is a financial expert, as such term is defined by the Commission.").

was for the same amount. The Court cannot accept Plaintiffs'
effort to interpret the term "fixed" to mean only an "hourly" wage
based upon "actual time worked." To the contrary, the regulation
distinguishes a "fixed annual salary" from a "fixed hourly wage"
and deems both to be permissible. A salary decoupled from hours
worked – even if calculated partially on past Student Start points –
is "fixed" compensation. *See, e.g.*, Merriam-Webster.com
(defining "salary" as "fixed compensation paid regularly for
services"). . . . Under the Plan as written, ADAs are paid a "fixed
salary," not a "commission."

>               *       *       *

It is undisputed that "adjustments" were not made more than twice
during any twelve month period. Moreover, by its very nature, the
matrix used to determine and adjust compensation cannot be based
"solely" on quantity. Instead, the compensation generated by the
matrix can only be derived by combining the quantitative factor on
one axis with the "quality factors" on the other axis. In other
words, the use of the matrix, by definition, could not have adjusted
compensation solely on recruitment numbers.

Mem. Op. and Order of Court in False Claims Act Litigation [dkt. no. 183] at 18-20.

The federal court's holding in the False Claims Act Litigation is consistent with the

investigation and findings made by the Committee. The investigation revealed that EDMC

sought advice from outside experts at the time the Plan was designed and appropriately relied on

these outside experts in implementing the Plan. The investigation also revealed that individuals

at EDMC who were directly involved in the implementation of the Plan believed in good faith

that the Plan, as designed, complied with the Act and its Safe Harbor provisions. Given these

facts, the Committee determined that there is no basis to pursue a claim of breach of fiduciary

duty against any individual director of EDMC based on the design of the Plan.

The Committee also conducted an in-depth review of whether the Plan, "as

implemented," violated the Act. This phase of the investigation included interviews of over 30

individuals who had hands-on experience implementing the Plan over many years. The

investigation focused on the assertion that the Plan was a "sham" as implemented and that

salaries for admissions personnel were based "solely" on new student enrollments, without reference to other "soft" factors. The Committee did not find factual support for this assertion. Indeed, the evidence developed throughout the investigation presents a compelling case to the contrary. The Committee's investigation also identified a series of internal controls, including standardized training materials and policy statements, that support the conclusion that EDMC's senior management and directors had a good faith basis to believe that the Plan, as implemented, complied with the Act.

### 1.    As Designed, EDMC's Compensation Plan Complied With The Act

In 1992 Congress amended the Act to preclude schools whose students receive federal student financial aid from paying employees incentive compensation based on student enrollment. Known as the "incentive compensation ban," the Act specifically precluded:

> Provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities.

20 U.S.C. § 1094(a)(20). The ban, however, did not include "salary" as one of the prohibited types of compensation.

In 2002, the Department of Education ("DOE") promulgated twelve "safe harbors" to the Act, which the DOE described as "compensation arrangements that do not run afoul of the incentive compensation prohibition" of the Act. 67 Fed. Reg. 67054. One of the safe harbors permitted colleges and universities to provide recruiters with salary or hourly wage adjustments based on the number of students enrolled, so long as student placement was not the sole compensation factor:

> Activities and arrangements that an institution may carry out without violating the [Act] include, but are not limited to:

> (A)     The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid. . . .

34 C.F.R. § 668.14(b)(22)(ii)(A) (eff. July 1, 2003 to June 30, 2011) (the "Safe Harbor").

Thus, the Safe Harbor permitted the recruiters' salaries to be adjusted based on student enrollments, provided that (1) recruiters' salaries were "fixed" and not adjusted more than twice during any twelve month period; and (2) such adjustments were not the "sole" factor considered. On October 28, 2010, the DOE amended its regulations to repeal the safe harbors, including Section 668.14(b)(22)(ii)(A). Those amendments went into effect in July, 2011. Prior to the Safe Harbor's repeal, EDMC implemented a new admissions compensation plan that adhered to the requirements of the Act following the repeal of the Safe Harbors.

After the Safe Harbor was promulgated in 2002, EDMC drafted and adopted a Plan in accordance with that regulation. In developing the Plan, EDMC consulted two outside law firms nationally recognized in education law. These firms were retained by EDMC to assist in drafting the Plan in accordance with the Act, including the Safe Harbors. Neither firm was apprised that another law firm was retained. Both firms independently confirmed that the Plan, as designed, was in compliance with the Act and the Safe Harbors.

As part of its investigation, the Committee interviewed the principal outside attorney who had been retained to advise on the design of the Plan. This attorney is an expert in Title IV issues and had advised numerous clients on the design and implementation of compensation plans. The attorney reiterated his opinion that EDMC's Plan, as designed, complied fully with the requirements of the Act.

The Plan was effective from July 1, 2003 until Spring 2011.  Throughout its time, the Plan maintained the same basic framework.[42]  Under the Plan, all ADAs were provided a fixed salary that was adjusted only twice per year and was not based (or not based "solely") on the number of students enrolled (*i.e.*, on quantitative factors).  Newly hired ADAs were not on the Plan.  Their salaries were based exclusively on their prior experience and education and were subject to a six-month introductory period.  As discussed in more detail below, most ADAs employed between six months and 18 months were also not on the Plan.  Their salaries were determined on the basis of qualitative factors alone, without regard to any quantitative factors.  Only more senior ADAs (some of those employed 18 months and all of those employed longer than 18 months) were on the Plan.  Those ADAs' salaries were determined on both qualitative and quantitative factors and were adjusted to reflect the overall performance evaluation.  Specifically, the Plan contained the following relevant features:

*First*, ADAs were reviewed on, and awarded points for, "Quality Factors."  Under the Plan, ADAs were evaluated on five "Quality Factors," namely Job Knowledge, Business Practices and Ethics, Professionalism, Customer Service, and Initiative.  ADAs were assigned a rating for each factor, ranging from five (outstanding) to one (unsatisfactory).  The following chart provides an overview of the Quality Factors, as taken from one of EDMC's Plan guidebooks distributed to ADAs and managers:

---

[42]   The Plan was revised slightly from time to time, but none of these changes altered the Plan's basic structure implemented in 2003.  One of the outside counsel who approved the Plan also reviewed and approved all revisions to the Plan.  No changes were ever made to the Plan without that counsel's review and approval.

In addition, not all of EDMC's education systems were on the Plan.  Argosy University ground schools were never on the Plan, and Brown Mackie Colleges only adopted the Plan close to when it was phased out.

| Overview of Quality Factors | |
|---|---|
| Job Knowledge | Adheres to approved recruitment methods and practices. Knows the products. Understands fellow enrollment and education department functions and objectives. Uses the enrollment systems and technology correctly. |
| Business Practices and Ethics | Demonstrates sound business ethics and business principles in serving prospective students and applicants, including achievement on the Compliance/FAQ test. |
| Professionalism | Assists prospective students and applicants in a cooperative manner. Willing to assist students assigned to others. Displays a positive attitude in the work environment. |
| Customer Service | Serves prospective students, applicants and fellow employees in a timely and accurate manner. Works to resolve issues and acts in a consultative sales role in achieving positive customer satisfaction. |
| Initiative | Evaluates, selects and appropriately acts on various methods and strategies for effectively and appropriately solving problems and meeting objectives before being asked or required to do so. Self-starting rather than passively complying with instructions or assignments. |

The guidebook on the Plan provided a rubric describing the behaviors ADAs were required to demonstrate for each Quality Factor. For example, ADAs "met expectations" for the Quality Factor of Business Practices and Ethics if they:

- "Conduct[ed] all activities in accordance with the highest ethical standards"

- "[Did] their best to accurately and completely portray the school's educational programs, expected outcomes, student services and financial considerations to students, parents and educators"

- "Usually determine[d] the appropriateness of candidates for admission"

- "Adhere[d] to all state, federal accreditation and Institute rules and regulations regarding student recruitment"

- "Usually treat[ed] people equitably and with respect"

- "Buil[t] trust through fulfilling commitments made to students, prospective students, co-workers, and supervisors"

- "Maintain[ed] confidentiality of sensitive information"

- "Recognize[d] when situations or directives [were] directly or indirectly in conflict with professional ethics or with the organization's stated values, and [took] the appropriate action"

47

*Second*, ADAs were awarded "New Student" Points.  After Quality Factor points were determined, ADAs were awarded "New Student Points" for students recruited over the previous period.  Typically, ADAs received three New Student Points for each student recruited.  Characteristics of the student recruited, however, such as whether the student was from outside the United States, could affect the number of New Student Points awarded.  EDMC Corporate Services would then centrally calculate the New Student Points for all ADAs.

*Third*, using the "Matrix," a baseline salary was determined using New Student Points and Quality Factors points awarded to ADAs.  For ADAs who were on the Plan, their baseline salaries were determined by finding the total New Student Points and total Quality Factors point on a chart known as the "Matrix."  The New Student Points were tracked on the Matrix's Y-axis, and the Quality Factors points were tracked on the X-axis.  The intersecting point between the two totals determined an ADA's baseline salary.

One guidebook distributed to all ADAs and their managers described the Matrix as follows:

## ADA/Associate Annualized Salary Chart

The combination of the total number of new student points and quality factor points determines the participant's annualized salary. (Adjustments may apply to this annualized salary—as applicable—for labor market, years of service and Associate management responsibilities.)

The following chart provides annualized salaries based on new student points and quality factor points.

| Level | New Student Point Range | Annualized Salary, Based on Quality Points | | | | |
|---|---|---|---|---|---|---|
| | | Unsatisfactory | Needs Improvement | Meets Expectations | Highly Effective | Outstanding |
| | | 5-8 points | 9-12 points | 13-17 points | 18-22 points | 23-25 points |
| 1 | 0 - 99 | $26,000 | $27,000 | $29,000 | $31,000 | $33,000 |
| 2 | 100 - 125 | $28,500 | $29,500 | $32,000 | $34,000 | $36,000 |
| 3 | 126 - 150 | $31,250 | $32,500 | $35,000 | $37,000 | $39,000 |
| 4 | 151- 175 | $34,750 | $36,000 | $39,000 | $41,000 | $43,500 |
| 5 | 176 - 200 | $38,500 | $40,000 | $43,000 | $45,500 | $48,000 |
| 6 | 201 - 225 | $42,500 | $44,000 | $47,000 | $49,750 | $52,000 |
| 7 | 226 - 250 | $47,000 | $49,000 | $52,000 | $55,000 | $57,500 |
| 8 | 251 - 275 | $51,500 | $53,500 | $57,000 | $60,000 | $63,000 |
| 9 | 276 - 300 | $56,000 | $58,000 | $62,000 | $65,000 | $68,000 |
| 10 | 301 - 325 | $61,000 | $63,500 | $68,000 | $71,000 | $74,000 |
| 11 | 326 - 350 | $67,000 | $70,000 | $74,000 | $77,000 | $80,500 |
| 12 | 351 - 375 | $73,000 | $76,000 | $80,000 | $84,000 | $87,500 |
| 13 | 376 - 400 | $79,000 | $82,000 | $87,000 | $91,000 | $95,000 |
| 14 | 401 - 425 | $86,000 | $89,000 | $94,000 | $99,000 | $103,000 |
| Add'l levels | 25-point increments | Add $7,000 | Add $7,000 | Add $7,000 | Add $8,000 | Add $8,000 |

As the above Matrix makes clear, baseline salaries for ADAs could not have been calculated without considering *both* the total Quality Factors points and the total New Student Points. Each time salaries were calculated, moreover, the Matrix required new Quality Factors points and New Student Points to be generated. Thus, by design, ADA salaries were never based "solely" on New Student Points, student starts, students enrolled, students recruited, or the like.

The Matrix also makes clear that Quality Factor points significantly affected ADA compensation. For example, as the chart above demonstrates, the salary for an ADA earning no New Student Points could increase as much as 20 percent based on Quality Factor points alone (*i.e.*, from $26,000 to as much as $33,000). Even for ADAs with high numbers of students recruited, Quality Factor points could have varied compensation by as much as 15 to 20 percent.

For instance, an ADA earning between 401 and 425 New Student Points could earn between $86,000 and $103,000 based solely on Quality Factors points, a salary swing of almost 20 percent.

*Finally*, the baseline salary could have been further adjusted.  Once ADAs' baseline salaries were determined, they could have been adjusted upwards by three to 15 percent for ADAs with at least two years of service; by $1,000 to $5,000 for ADAs who managed other ADAs or particular projects; and/or by five to 20 percent based on the cost of labor in a particular geographical area, as determined by the Economic Research Institute data on wage and salary differentials.

*     *     *

The fact that ADA compensation was determined, in part, based on the number of students recruited does not itself violate the Act.  The Safe Harbor specifically allowed for incentive-based compensation if two criteria were met:  (i) the compensation was "fixed;" and (ii) the compensation was "not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid."  34 C.F.R. § 668.14(b)(22)(ii)(A) (emphasis added).  The Plan met both of these requirements, as outside experts confirmed before the Plan was implemented.

*First*, ADAs' compensation under the plan was "fixed compensation" within the meaning of the Act and the Safe Harbor.  The term "fixed compensation" includes "a fixed annual salary" that is not adjusted "up or down more than twice during a twelve month period." *Id.*  Here, the Plan provided for a fixed salary that was only adjusted every six months and paid on an annualized basis.  Nothing about this payment scheme ran afoul of the Act, which defined "fixed compensation to include up to two pay adjustments during a 12-month period," 67 Fed. Reg.

50

67054. Indeed, the DOE has admitted that the Safe Harbor "immunized incentive payments built into semi-annual compensation plans." Def.'s Mot. To Dismiss For Lack Of Jurisdiction, Or In The Alternative, For Summary Judgment, *Career College Ass'n. v. Duncan*, No. 11-038, at 5 (D.D.C. Mar. 18, 2011).

*Second*, the Plan did not determine compensation based "solely" on "number of students recruited, admitted, enrolled, or awarded financial aid." According to the DOE, "[i]n this safe harbor, the word 'solely' is being used in its dictionary definition." 67 Fed. Reg. 67055 (Nov. 1, 2002); *see also* Webster's Third Int'l Dictionary 2168 (1993) (defining "solely" as "singly," "alone," and "to the exclusion of alternate or competing things"). Aside from the New Student Points, ADAs' compensation was based on the Quality Factors and also may have been based on length of service and additional responsibilities.

Based on the foregoing, the Committee determined that EDMC, and its Board of Directors and senior management, had a good faith basis to believe the Plan's design complied with the Act.

### 2.      As Implemented, EDMC's Compensation Plan Complied With The Act

The Demand Letters assert the Plan as implemented violated the Act. Specifically, the claim is made that the Plan was a "sham" because ADAs were compensated "solely" on the number of new students enrolled in their programs.

To assess how the Plan had been implemented historically, and to determine whether it was a "sham," the Litigation Committee conducted an extensive review of past practices at EDMC with regards to the implementation of the Plan. First, the Litigation Committee interviewed upper-level managers involved in designing, implementing, and administering the Plan. Second, the Litigation Committee interviewed current and former ADA managers who

completed ADA reviews under the Plan. These interviews did not corroborate the "as implemented" allegations. Third, the Litigation Committee reviewed the internal controls that EDMC had in place to ensure that the Plan was implemented correctly. The review determined that appropriate internal controls were in place throughout the relevant period and that these controls were properly applied to ensure compliance with the Act.

### a. Evidence From Interviews Of Upper Management Employees

The more than 30 EDMC employees interviewed included upper-level management personnel involved in designing and implementing the Plan. These interviews did not support the claims made in the Demand Letters. The interviews did not adduce facts indicating (or even suggesting) that members of senior management of EDMC knew or were on notice that the Plan was a "sham" as implemented. In fact, the evidence developed through the investigation indicates the contrary.

The Quality Factors were designed with the help of an outside human resources consultant to represent EDMC's values and to provide checks and balances on the quantitative assessment. When the Plan was rolled out, all Directors of Admissions and Senior Directors of Admissions were trained on how to assign the Quality Factors points and provided a guidebook that included rubrics detailing the specific behaviors that had to be demonstrated for ADAs to meet or exceed expectations in each of the five Quality Factors. This is the rubric from one guidebook for the Quality Factor of Professionalism:

| | ❶ Unsatisfactory | ❷ Needs Improvement | ❸ Meets Expectations | ❹ Highly Effective | ❺ Outstanding Performance |
|---|---|---|---|---|---|
| **Professionalism** | Does not display professionalism | Needs to accept responsibility and maintain a positive attitude | Accepts responsibility for one's actions | Acts with a positive attitude toward work and change | Shows willingness to learn new procedures and suggests changes to enhance results |
| | Frequently does not maintain composure under stress and pressure of the job | Occasionally exhibits stress from the pressures of the job | Usually maintains composure under stress and pressure of the job | Almost always maintains composure under stress and pressure of the job | Always maintains composure under stress and pressure of the job |
| Assists prospective students and applicants in a cooperative manner. Willing to assist students assigned to others. Displays a positive attitude in the work environment. | Does not accept responsibility for actions; blames others | Occasionally blames others and does not take responsibility for own actions | Usually accepts responsibility and deals constructively with own mistakes, feedback and failure | Almost always accepts responsibility and deals constructively with own mistakes, feedback and failure | Always accepts responsibility and deals constructively with own mistakes, feedback and failure |
| | Does not respond constructively or tactfully to feedback; speaks negatively of customers or co-workers | Occasionally speaks negatively about customers or co-workers | Usually responds tactfully to criticism and opposing ideas, remaining objective and receptive to the views of others | Almost always responds tactfully to criticism and opposing ideas, remaining objective and receptive to the views of others | Always responds tactfully to criticism and opposing ideas, remaining objective and receptive to the views of others |
| | Rebels against new procedures or methods and incites co-workers to do the same | Ignores new procedures or methods that change | Accepts new procedures or methods that change | Seeks full understanding of new procedures or methods resulting from a change<br><br>Adapts to change quickly<br><br>Talks positively about changes with co-workers | Looks for ways to make changes work rather than only identifying why change won't work<br><br>Makes suggestions for increasing the effectiveness of changes<br><br>Shows willingness to learn new methods, procedures, techniques, or systems resulting from departmental or organization-wide change |

In addition, upper-level management had conference calls with Campus Presidents and Admissions Specialists[43] on how to implement the Plan correctly. Following the initial roll out, proper implementation of the Plan was covered at a formal, central Director of Admissions training program or by individual, department-level training.

ADAs were also provided guidebooks describing the Plan. These guidebooks included the Quality Factor rubrics. ADAs were required to sign off that they had received the guidebook, that they had been explained the key terms of the Plan (and any changes to the Plan), that they had been given an opportunity to ask questions about how the Plan worked, and that their questions had been answered. When slight variations were made to the Plan and a new version was reissued, managers and ADAs were retrained on the Plan and how to properly implement it.

---

[43] At the Company, an Admission Specialist is an EDMC Corporate Services Marketing and Admissions employee responsible for supervising multiple ground school locations in a geographic region.

According to upper-level managers, the message during trainings about the relationship between the New Student Points and Quality Factor points was that the two were to be treated separately. None of the upper-level managers, based on their longstanding experience with EDMC and the Plan, considered the Plan a "sham" or believed that student recruitment was the "sole" compensation factor under the Plan.

The upper-level managers interviewed also had no knowledge of reports that the Quality Factors were not being assigned as the Plan required. ADAs could report any improper implementation to local Human Resources representatives, Campus Presidents, or through EDMC's compliance Hotline, which was available 24 hours a day, seven days a week. Improper implementation of the Plan could also have been identified during the multi-level review process, discussed further below. No upper-level manager interviewed was aware of any such reports or complaints.

### b.    Evidence From Interviews Of ADA Managers

The Litigation Committee also interviewed employees who had administered reviews under the Plan as managers in the Admissions Department. These managers were chosen because of their longevity with EDMC and their experience with administering the Plan. Although the allegations in the False Claims Act Litigation dealt only with two former employees who worked at OHE in Pittsburgh between 2004 and 2007,[44] the managers interviewed by the Litigation Committee collectively work or have worked for each of the four EDMC colleges, in both online and ground divisions. These employees included current and

---

[44]    The two relators in the False Claims Act Litigation are Lynntoya Washington and Michael Mahoney. Ms. Washington, according to the Complaint, worked as an ADA for The Art Institutes Online Division located in Pittsburgh from 2004 through 2007. False Claims Act Litig. Compl. ¶ 20. Thus, Ms. Washington worked in an entry level job in one division of EDMC. Mr. Mahoney worked as Director of Training for OHE for less than a year, from October 2, 2006 through June 22, 2007. *Id.* ¶ 21. His job was to teach salesmanship, not to implement any compensation practices or train anyone on compensation practices or make any compensation decisions. *Id.* ¶ 130.

former Senior Directors of Admissions, Directors of Admissions, and Admissions Managers, all of whom managed ADAs and completed hundreds of ADA reviews under the Plan between 2003 and 2011. Some of these Senior Directors of Admissions, Directors of Admissions, and Admissions Managers were themselves ADAs reviewed under the Plan. These interviews were designed to elicit first-hand experiences from employees across EDMC, to cover a wide range of time, and to elicit information from individuals with hands-on experience in applying the Plan to determine ADA compensation.

Despite direct questioning about the allegations, not a single one of these ADA managers considered the Plan a "sham" or believed that student recruitment was the "sole" compensation factor under the Plan. Indeed, many of the managers expressed anger, dismay, or frustration in response to these allegations. Based on the foregoing, the Committee concluded that allegations that the Plan was a "sham" or based "solely" on student recruitment were not corroborated.

### c. EDMC Had Appropriate Internal Controls In Place To Ensure The Plan Was Implemented As Designed

The Litigation Committee also reviewed the specific internal controls in place at EDMC relevant to the implementation and administration of the Plan. These controls included training and guidebooks on proper implementation of the Plan, a standardizing review process with forms, vetting of each ADA's Quality Factor review through a multi-level management review process, a policy requiring that Quality Factors points be calculated *prior* to calculating New Student Points, and a policy providing ADAs and managers with the opportunity to anonymously report violations. Each of these controls is described below.

ADAs and managers were provided guidebooks. EDMC issued guidebooks that described the Plan in detail and, notably, provided detailed instruction on how it should be implemented. As discussed above, the guidebooks clearly defined the Quality Factor rating

criteria, as well as all other aspects of the Plan. The Committee found that the guidebooks were ubiquitous across EDMC schools. In fact, all of the managers interviewed specifically mentioned using the guidebooks' Quality Factor rubrics to rate ADAs on Quality Factors. The guidebook's clear criteria and its widespread use further demonstrate that the Plan was being implemented as designed.

Training emphasized that New Student Points and Quality Factors were separate. Interviewees almost uniformly described extensive training on the Plan, including emails, presentations, WebExs, in-person national trainings, and in-person local trainings. That training emphasized proper implementation of the Plan. Some interviewees, moreover, explained that the training stressed that Quality Factors should be treated separately and distinctly from New Student Points and not as surrogates for New Student Points. Thus, the training stressed exactly the opposite of what the Demand Letters' allegations suggest.

Use of templates encouraged consistent implementation. Managers at EDMC used a form that listed all of the Quality Factors and required that numerical ratings be justified by written narratives. The use of these standardized review templates forced managers to consistently implement the Plan's Quality Factor review component and to justify their Quality Factor points with narratives based on non-student recruitment criteria.

Managers' reviews were vetted through a multi-level approval process. Quality Factor reviews were completed in the first instance by ADAs' immediate supervisors. In ground schools, ADAs were directly supervised by a Director of Admissions or in some cases a Senior Director of Admissions. In OHE, Admissions Managers usually completed the Quality Factors reviews.

Once completed, managers submitted Quality Factors reviews to more senior

management for approval.  At ground schools, each ADA's Quality Factor review had to be

approved by:  (1) the Director or Senior Director of Admissions, (2) the President (or Human

Resources Director, at the President's discretion), (3) an Admissions Specialist, and (4) EDMC's

central Corporate Services.  In OHE, each ADA's Quality Factor review had to be approved by:

(1) a Director of Admissions, (2) a Senior Director of Admissions, (3) the Vice President of

Admissions for OHE, (4) Human Resources, and (5) Corporate Services.

The review process was not a rubber stamp.  Employees interviewed described how

upper management would critique their reviews if ratings were not supported by specific

instances of conduct.

Managers completed Quality Factor reviews before even knowing ADAs' New Student

Points.  Quality Factor reviews were completed, approved, and submitted to EDMC Corporate

Services before New Student Points were calculated and distributed to managers.  After an

ADA's Quality Factors review was submitted and an ADA's New Student Points calculation

done, a salary was then determined using the Matrix, along with any further adjustments made

based on location, tenure, or management responsibilities.  This salary, together with an

explanation for the basis of the salary, was returned by Corporate Services to managers in a

salary and performance worksheet.  Managers then reviewed the worksheet with the ADA, who

signed off that it had been discussed with the manager.  This divided process—whereby Quality

Factor reviews were completed first and without knowledge of the New Student Points—ensured

that New Student Points could not provide the basis for Quality Factors points.[45]

---

[45]  One upper-level manager explained that it was not possible to accurately guess New Student Points in advance
of receiving the calculation from Corporate Services because ADAs did not have any knowledge of which
students were backed out of the calculation due to lack of attendance.  He estimated that, historically, some
schools have had back out rates as high as 15 to 20 percent.

<u>Internal Audit Departments audited the performance review process.</u> Both of EDMC's internal audit divisions, the ground school and corporate-focused Internal Audit Department and OHE's Internal Controls and Compliance Department, reviewed ADA performance reviews to make sure they were fully and timely completed, including making sure that Quality Factors points had been assigned and narratives were completed, that the ADA, the manager, and upper-level management had signed off on every review, and that ADAs were not reviewed more than two times per year.

<u>ADAs or managers could report violations through the Corporate Compliance Hotline.</u> As discussed above, since 2003, EDMC has operated its Hotline through which employees could anonymously report compliance violations. Accordingly, if ADAs or managers believed that the Plan was not being implemented correctly, they could have reported those violations through the Hotline. A review of nearly three years' worth of Hotline data, however, did not reveal any complaints that the Plan or the Quality Factors were a "sham" or based "solely" on New Student Points. The lack of real-time complaints further underscores the absence of evidence that the Plan was not implemented as it was designed.

Further, beginning in 2009, ADAs were required to sign a certificate that their performance evaluations were completed in accordance with the Plan. The certification included a specific contact for reporting improper implementation of the Plan. The EDMC personnel who reviewed those complaints recalled no complaints that the Plan was a "sham" or based "solely" on students recruited.

### 3. Miscellaneous Title IV Allegations In The Demand Letters

The Demand Letters make other allegations regarding admissions practices at EDMC. Specifically, the Demand Letters allege that (i) ADAs are given commissions, bonuses and awards based solely on obtaining new student enrollments; (ii) ADAs enroll students without

thoroughly reviewing their academic transcripts and admissions materials in order to determine whether they are qualified to attend the particular EDMC institution or online program; and (iii) ADAs pressure prospective students into accepting or changing financial aid packages or into expanding those financial aid packages to cover full-time tuition. As set forth below, the Litigation Committee found no basis to support these allegations.

### a. Commissions, Bonuses And Awards Based Solely On Obtaining New Student Enrollments

The Demand Letters allege that EDMC provided admissions personnel with all-expense-paid vacations and gifts based on student recruitment. Historically, EDMC's employees have been recognized for performance through company-wide programs, such as the President's Club and Top Achievers' Club. These programs included an annual all-expense-paid trip to an off-site location for a training program. Neither of these programs nor any similar program is currently in effect, and they have not been since around 2008 or 2009.

More fundamentally, these programs did not violate the Act. In 1995, EDMC and other educational institutions sought guidance from the DOE on whether the Act would "prohibit an institution from paying the travel and related business expenses incurred by its employees for attendance at annual business meetings, when only the institution's top recruiters are invited to such meetings." *See* Letter from DOE Deputy Director, dated Feb. 6, 1995. In a February 6, 1995 letter, the Department advised that "paying for the travel and related expenses incurred for attendance at such business meetings would not be in violation of" the incentive compensation provision of the Act. *Id.*

Moreover, during the Department of Justice's review of EDMC's compensation practices in 2000 and 2001, EDMC described the President's Club program, provided numerous documents regarding the program, and expressed its opinion that the program was proper

pursuant to the Department's February 6, 1995 letter. The Government never refuted EDMC's position regarding the President's Club or took regulatory action over the President's Club. Indeed, following EDMC's explanation, the Government dropped its review without requesting any change in compensation practices. Thus, there is no merit to the claim that the President's Club or similar programs violated the Act.

Beyond the President's Club and similar programs, EDMC prohibits monetary awards for performance and has done so for many years. EDMC distributes a detailed written policy precluding employees from receiving any incentives of monetary value. Any free lunches or events are part of all-inclusive "team builders" or trainings where participation is not based on performance.

Moreover, a review of the Hotline process demonstrated that EDMC's policy was followed. Only one submission out of the hundreds reviewed involved a substantiated instance of a manager giving ADAs commissions, bonuses, and other types of gratuities in exchange for obtaining student enrollments. In that case, the Hotline Committee recommended termination.

### b.    ADAs' Enrolling Unqualified Students

The Demand Letters also allege that ADAs enroll unqualified students in order to meet student enrollment quotas. The investigation revealed that this allegation is without merit. While ADAs recruit students, they have no role in setting admissions requirements or determining whether a student meets those requirements or should be enrolled. All admissions decisions are made by a separate department or committee, such as a school's Registrar. This is why interviewees described this allegation as "weird," "impossible," "absurd," the "furthest thing from the truth," and "nonsense." As one interviewee explained, EDMC does not just accept everybody and instead looks for indicators that students will be successful.

### c. ADAs' Encouraging Prospective Students To Accept Unwanted Financial Aid Packages

The Demand Letters also allege that ADAs encouraged prospective students to accept unwanted financial aid packages or switch from full time to part time in order to have tuition covered by financial aid. The investigation found no support for this allegation. Financial aid determinations are not made by ADAs; rather, a financial aid counselor works with prospective students to determine the amount of financial aid for which a prospective student will qualify. EDMC considers it a compliance violation for ADAs to be involved in financial aid determinations or talk with students about financial aid possibilities.[46]

### C. FINDINGS ON THE LETTER OF CREDIT CLAIM

As noted above, the Litigation Committee found no support for the allegations that: (i) EDMC's "failing financial health cause[d] an increase in letters of credit that must be posted," or (ii) EDMC's failure to meet the composite score of financial health was the reason that EDMC entered into a new letter of credit facility with Bank of America.

The letter of credit requirement was instituted in 2006 as part of EDMC's going private transaction. As a matter of Generally Accepted Accounting Principles, the EDMC going-private transaction resulted in subsequent goodwill being recorded on the Company's financial statements. EDMC and the DOE understood that, given the recording of such a substantial amount of goodwill on its balance sheet, EDMC would not achieve the composite score on the financial responsibility test. EDMC consistently disclosed this fact in its public filings with the SEC. As a result, the DOE required a letter of credit from EDMC in the amount of 10 percent of the prior fiscal year's Title IV revenue (subsequently raised to 15 percent). The DOE may set

---

[46] The Demand Letter also alleges that ADAs encourage prospective students to cover their full tuition with financial aid by switching from full time to part time enrollment. The Litigation Committee found no basis for wrongdoing based on interviews with managers.

the level of the required letter of credit anywhere between 10 percent and 100 percent at their discretion. EDMC believes that the DOE set the amount of the letter of credit at 15 percent to account for annual increases in total Title IV funds received by students attending EDMC's institutions. In other words, the increase in the size of the letter of credit assumes that Title IV funds received by students attending EDMC's institutions would increase by 5 percent per fiscal year because the percentage is applied to Title IV funds received in the prior fiscal year. Accordingly, the amount of the letter of credit has increased each year primarily because of the increase in Title IV revenues. Thus, it is the growth in EDMC's net revenues that caused the letter of credit amount to be increased. Since the letter of credit amount required to be posted is based upon the prior fiscal year's Title IV revenue, the $361.5 million letter of credit that is currently in place with the DOE was calculated using fiscal year 2010's Title IV revenues. The letter of credit amount was set before the fiscal year 2011 financial results were known.

EDMC's decision to enter into a new letter of credit facility with Bank of America was not the result of a failure of EDMC to meet the composite score of financial health. EDMC issues the letter of credit to the DOE from its revolving credit facility. This facility had a maturity date of June 1, 2012. As a proactive measure to ensure letter of credit capacity beyond this date, EDMC amended the facility in December 2010 to extend the maturity to June 1, 2015. Approximately 74 percent of the holders elected to extend the maturity, totaling $328.3 million. Since $114.2 million will expire on June 1, 2012, EDMC put in place the $150 million cash-secured letter of credit line as a replacement. This facility was put in place because of the maturity of the existing facility, not because of increases in the required letter of credit.

### D.   FINDINGS ON THE FRAUDULENT JOB PLACEMENT CLAIM

The Demand Letters' allegations concerning the Fraudulent Job Placement Claim appear to have been taken directly from Kathleen Bittel (a former Career Services Advisor at OHE) and

her correspondence with and testimony before the U.S. Senate Committee on Health, Education, Labor, & Pensions.  Ms. Bittel alleged that EDMC manipulated job placement statistics in order to recruit a higher number of students, that Career Services Advisors were encouraged to falsify forms to inflate the salaries of graduates, and that graduates were encouraged to incorrectly report that they were using skills related to their coursework.  Ms. Bittel also alleged that supervisors ignored her concerns.  As described below, the Litigation Committee found effective internal controls in place to prevent the type of conduct alleged by Ms. Bittel.  The Committee also did not find that the allegations made by Ms. Bittel were supported by reliable collaborative evidence.

The Litigation Committee's investigation confirmed that EDMC takes seriously its responsibility to assist its graduates in finding productive and rewarding work in their chosen field following graduation.  EDMC employs more than 300 people who help graduates find jobs and who are responsible for ensuring that the Company accurately and fairly reports its job placement statistics.  EDMC has long utilized a process designed to ensure the accurate collection and reporting of graduate employment statistics.  This process serves as a series of checks and balances to safeguard against an employee's ability to report inaccurate data and includes the following steps:

      (i)      placement documentation is obtained by a Career Services Advisor directly from an employer or a graduate whenever possible;

      (ii)      a department supervisor is responsible for checking the accuracy of all information entered by Career Services;

      (iii)      Career Services Advisors confirm that verifications are documented;

       (iv)     unusual salary fluctuations and certain waivers from placement are independently reviewed by EDMC's corporate staff; and

       (v)     EDMC's corporate staff performs a separate review of all data prior to records being finalized, including a review of whether the employment listed for each graduate is related to his or her field of study.

EDMC has multiple layers of controls designed to prevent inaccurate reporting of employment statistics. EDMC's standard training curriculum ensures that Career Services Advisors accurately report employment data. That training specifically warns about potential risk exposures, such as counting one job as two when the latter is just an update; accepting employment with no documentation that it was verified; and overestimating salaries in the cases where graduates or employers will not release exact information. Career Services Advisors are taught to note suspicious reporting data and contact managers for guidance. EDMC has written policies that require all errors or suspicious data be emailed to the Career Services Advisor and Director of Career Services at the affected school and that further investigation be conducted until the anomaly is corrected or explained. Moreover, students themselves are also encouraged to provide accurate information to Career Services for its records. Compliance procedures also verify accuracy of statistics. Career Services Advisors must obtain placement documentation to verify the statistics they use, and department supervisors check the accuracy of all information submitted by advisors and confirm that verifications are documented. Data are further audited by EDMC's Internal Audit Department. During a standard school audit, auditors randomly select career services files and verify employment and salary data.

Upon learning of the allegations regarding job placement statistics made by Ms. Bittel, EDMC conducted an internal investigation and sought the cooperation of Ms. Bittel (we

understand that she refused to provide specific information about her allegations). The investigation found no support for her claims of undue pressure placed upon Career Services Advisors at OHE to meet placement goals or falsely verify graduates' employment was related to their field of study. Thereafter, EDMC retained outside counsel to conduct a second investigation, which included document review and interviews of more than 20 employees, including all of Ms. Bittel's fellow Career Services Advisors and supervisors at OHE. That investigation similarly found no support for the claims that EDMC had pressured employees to violate placement policies and procedures and found no confirmed instances in which the examples the Demand Letters cite from Ms. Bittel actually ended up in EDMC's publicly reported job placement data.

## VI.    CONCLUSION

For the reasons summarized above, the Litigation Committee, after an extensive and diligent inquiry, has determined in good faith and in the exercise of its business judgment that it would not be in the best interest of the Company or its shareholders to take the actions requested with respect to the allegations in the Demand Letters. Further, the Litigation Committee has concluded that EDMC has appropriate internal controls, and supporting policies and procedures, to address the specific risks identified in the Demand Letters.

BY THE LITIGATION COMMITTEE OF THE
BOARD OF DIRECTORS OF EDUCATION
MANAGEMENT CORPORATION

Paul J. Salem

Leo F. Mullin

65

# **APPENDIX**



Grant & Eisenhofer P.A.

1201 North Market Street
Wilmington, DE 19801
Tel: 302-622-7000 • Fax: 302-622-7100

485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8500 • Fax: 646-722-8501

1920 L Street, N.W., Suite 400
Washington, DC 20036
Tel: 202-386-9500 • Fax: 202-386-9505

www.gelaw.com

Direct Dial: 646-722-8505
Email: jeisenhofer@gelaw.com

August 19, 2011

**VIA UPS OVERNIGHT MAIL**

Board of Directors
c/o J. Devitt Kramer, Senior Vice President, General Counsel and Secretary
Education Management Corporation
210 Sixth Avenue
33rd Floor
Pittsburgh, PA  15222

Re:    **Shareholder Demand For Board Action**

Dear Members of the Board:

This firm represents the Oklahoma Law Enforcement Retirement System (the "Stockholder"), holder of 25,800 shares of common stock of Education Management Corporation ("EDMC" or the "Company"). I write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take action to remedy the harm to EDMC as a result of the wrongful conduct described below.

On August 8, 2011, The U.S. Department of Justice ("DOJ") brought a complaint against EDMC for violations of the False Claims Act, 31 U.S.C. § 3729-33. *See United States of America v. Education Management Corp.*, 2:07-cv-461-FRM (W.D. Pa.). The DOJ Complaint, which was filed in intervention in a qui tam action brought by LynnToya Washington, a former employee of EDMC, and Michael T. Mahoney, another former EDMC employee, alleges, *inter alia*, that EDMC's compensation practices violate Title IV of the Higher Education Act of 1965's ("HEA") ban on incentive-based compensation.[1] The DOJ seeks to recover treble damages, civil penalties and costs pursuant to the False Claims Act, 31 U.S.C. §§ 3729-33. In

---

[1] The qui tam litigation was originally brought by the relators in 2007. Under the provisions of the False Claims Act, that action was sealed until such time as the government determined whether or not to intervene in the action. The government's decision was publicly disclosed on August 8, 2011 with the filing of its complaint in intervention.

Board of Directors
c/o J. Devitt Kramer, Senior Vice President, General Counsel and Secretary
Education Management Corporation
August 19, 2011
Page 2

addition, the DOJ is joined by the Attorneys General of California, Florida, Indiana and Illinois, who each seek to recover treble damages, fines, costs and other monetary relief under their respective states' false claims laws. These complaints are collectively referred to herein as the Government/Qui Tam Actions.

The HEA prohibits post-secondary educational institutions who receive funding or whose enrolled students receive funding under the HEA from paying compensation to their employees tied in any way to procuring new student enrollments. Specifically, Section 1094 of the HEA prohibits schools receiving federal grants or federally guaranteed loans from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of financial assistance. . . ." 20 U.S.C. § 1094(a)(20). Institutions receiving funds under the HEA must sign a program participation agreement ("PPA") stating that they will comply with all applicable statutes and regulations promulgated thereunder. The institutions must also conduct an independent audit each year and submit the results to the Department of Education ("DOE") confirming compliance with such statutes and regulations each year. Since 2002, EDMC has signed PPAs and provided documentation to the DOE indicating that it has complied with all applicable HEA rules and regulations. During that same time frame, EDMC or its enrolled students have received over $11 billion in grants and federally-backed loans from the federal government.

EDMC's PPA statements falsely certified EDMC's compliance with the HEA. Since at least July 1, 2003 to the present, EDMC has violated Section 1094 of the HEA by compensating its Assistant Directors of Admissions ("ADA") and their supervisors based upon the number of new students they are responsible for enrolling in EDMC institutions. At EDMC institutions, the ADAs are responsible for recruiting applicants for admission, achieving enrollment and start rate goals and securing and managing new student enrollment activities. The ADAs' compensation system is set forth in the Admissions Performance Plan, which states that compensation for ADAs will be based upon a manager's evaluation of an ADA's performance "combined with the number and types of new students you recruited over the past 12 months. . . . . The number of new students you recruited over the previous 12 months is converted into points, and the point total determines the salary range." The Admission Performance Plan also includes a salary chart which sets forth the number of "new student points" required to achieve a particular salary level. Once an ADA has been employed for a year, his or her compensation is based solely on the salary chart, *i.e.*, on new student enrollments.

In addition, ADAs are given commissions, bonuses and awards based solely on obtaining new student enrollments. For example, the top 10% of ADAs, based upon new student enrollments, are given all-expenses-paid vacations to places such as Cancun, Mexico or Las

Board of Directors
c/o J. Devitt Kramer, Senior Vice President, General Counsel and Secretary
Education Management Corporation
August 19, 2011
Page 3

Vegas. Other high-performing ADAs, as measured solely by new student enrollment, are given gifts, such as tickets to Major League Baseball games and amusement parks, gift certificates and free lunches.

EDMC's compensation system for ADAs is not a harmless violation of the HEA. ADAs are encouraged to enroll students without thoroughly reviewing their academic transcripts and admissions materials in order to determine whether they are qualified to attend the particular institution or online program. As a result, students have enrolled in EDMC programs who are academically unqualified, including some who cannot write coherently, or who appear to be under the influence of drugs, or who enroll in online programs without owning a computer. Although applicants must submit a high school transcript and complete a 150-word essay, all student applications are approved regardless of high school grade point average or the quality of the written essay.

The end goal of this system is to qualify the recruited students for financial aid packages from the federal government and state governments. ADAs work with the recruited students during the financial aid application process to help them complete their forms. At that point, EDMC Financial Aid Officers ("FAO") calculate a financial aid package based on a DOE formula and inform the student of the award, which the student can accept or reject. If a student initially wishes to reject the package, it is the ADA's job to convince the student to accept the package. The ADAs are also instructed to make sure the package will cover the student's entire tuition, even if that means the student will have to change his or her status from full-time to part-time. Once a student accepts a package, the FAO certifies the student's loans and grants which are then submitted to the DOE.

EDMC continually measures the ADA's performance against new student enrollment quotas established for each ADA ("Student Start Plan"). The Student Start Plans are provided to the ADA's supervisor by higher level corporate employees. The ADAs are also given a "plan to make plan," which sets forth recruitment strategies to gain the desired number of new student enrollees. EDMC closely tracks and maintains the data regarding the actual number of student enrollments each ADA obtains and measures that against the quotas established in the Student Start Plans. So called "underachievers" are admonished to meet their quotas, and ADAs are regularly terminated for failure to meet their quotas.

The pervasiveness of tying of ADA compensation to student enrollment is demonstrated by the allegations of Mr. Mahoney, one of the relators in the Government/Qui Tam Actions. Mr. Mahoney was the Director of Training for EDMC's online division. When he initially interviewed for the position with the Vice President of Admissions for EDMC's Online Higher Education division, he was told that EDMC's enrollment goals were to increase the number of

Board of Directors
c/o J. Devitt Kramer, Senior Vice President, General Counsel and Secretary
Education Management Corporation
August 19, 2011
Page 4


students more than ten-fold in five years; to nearly double the average number of new students each ADA enrolled per week and to double the amount of ADAs within two years. Furthermore, he was informed that EDMC would fire ADAs who did not meet their new student enrollment quotas. Mr. Mahoney was then charged with designing a training program to recruit new students based upon his extensive sales experience in the automotive industry, employing techniques to "close the sale." Mr. Mahoney was never made aware of Section 1094's ban on incentive-based compensation, and thus none of the training materials he designed made reference to it.

The conduct described above pervaded the entire EDMC system and was known to members of higher management. Particular members of higher management were well aware of the HEA's ban on tying compensation to student recruitment, as they had previously been employed in the University of Phoenix system when it was forced to pay $9.8 million to the DOE for its improper recruiting and compensation practice. Todd S. Nelson, Chief Executive Officer of EDMC since February 2007, was formerly the CEO and Chairman of the Board of Directors of Apollo Group, Inc., which owned the University of Phoenix. In addition to Mr. Nelson, several former University of Phoenix employees were subsequently employed by EDMC, including current executives Robert Carroll (Executive Vice President and Chief Information Officer), Anthony F. Digiovanni (Senior Vice President – Marketing and Admission) and John Kline (President, EDMC Online Higher Education).

As a result of this wrongful conduct, EDMC is subject to enormous fines and other penalties for its false statements to the federal government which allowed it to obtain $11 billion in Title IV funding. EDMC also faces substantial liability for making similar false statements to the governments of California, Florida, Indiana and Illinois. The Attorney General of California alleges that EDMC received over $93 million in funding from 1999-2010 and seeks an unspecified amount in damages, including treble damages. The Attorney General of Florida alleges that EDMC received over $5 million in 2006, 2007, 2009 and 2010, and seeks treble damages and up to $11,000 in civil penalties per false claim submitted. The Attorney General of Indiana alleges that EDMC received over $12 million in funding from 2003 to the present and seeks treble damages and at least $5,000 in fines and penalties for each false claim submitted. Finally, the Attorney General of Illinois alleges that EDMC received over $27 million in funding from 2004-2011 and seeks treble damages and a fine of $11,000 per false claim submitted.

The Company has valuable claims against its officers and directors who committed or negligently disregarded the conduct described herein. Your fiduciary duties as directors of EDMC require you to investigate and prosecute potential claims for recoupment of any damages suffered by the Company as a result of these violations. Failing or refusing to cause the Company to exercise its rights to seek recoupment of any fines or penalties that may be paid to

Board of Directors
c/o J. Devitt Kramer, Senior Vice President, General Counsel and Secretary
Education Management Corporation
August 19, 2011
Page 5

the federal or state governments would be flatly inconsistent with your fiduciary duties and may expose you to liability. Accordingly, the Stockholder demands that the Board:

(i)     commence a civil action against senior executives to recover for the benefit of the Company all damages that flow to the Company as a result of the Government/Qui Tam Actions, including any fines or penalties that it may be required to pay, all costs of defending the Company, and all costs of remediating the wrongful behavior;

(ii)    immediately overhaul the Company's admissions and recruiting personnel compensation structure such that no portion of compensation earned by ADAs – including any bonuses or other awards – is based on the number of new student enrollments that ADA achieves;

(iii)   immediately adopt and establish policies and procedures that eliminate improper new student recruitment tactics, including, but not limited to, aggressive techniques designed to encourage unqualified students to enroll in EDMC programs and to seek and obtain government funding to pay for such education; and

(iv)   immediately establish internal controls sufficient to ensure that if such wrongful compensation and recruiting practices occur at the Company in the future, those practices will be brought promptly to the attention of the Board of Directors so that they can be eliminated before they cause the Company any legal liabilities.

The Stockholder reserves its right to commence a derivative action on behalf of the Company seeking appropriate relief if the Board has not commenced an action and taken the other measures as demanded herein within 120 days of receipt of this letter.

Very truly yours,

Jay W. Eisenhofer

JWE/rm

A-5

GOODWIN | PROCTER

R. Todd Cronan
617.570.1389
rcronan@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

December 8, 2011

**VIA E-MAIL & VIA FIRST CLASS MAIL**

Jay W. Eisenhofer, Esq.
Grant & Eisenhofer P.A.
485 Lexington Avenue
New York, NY 10017

Re:    **Shareholder Demand of the Oklahoma Law Enforcement
       Retirement System to Education Management Corporation**

Dear Mr. Eisenhofer:

I write in response to your letter to the Board of Directors of Education Management
Corporation ("EDMC"), dated August 19, 2011. Goodwin Procter LLP represents a committee
of disinterested directors of EDMC (the "Litigation Committee") and is assisting the Litigation
Committee with its investigation of the matters identified in your letter.

The investigation is ongoing and the Litigation Committee will report its results when the
investigation is concluded. In the meantime, we ask that you provide us with any further
information or support that you have for the allegations set forth in your August 19, 2011 letter
or any other facts or information that you would like the Litigation Committee to consider as part
of its investigation.

In addition, we ask that you provide proof that your client, the Oklahoma Law Enforcement
Retirement System, has owned shares of EDMC continuously from July 1, 2003 to the present.

Please contact me if you have any questions.

Sincerely,

R. Todd Cronan

cc:     Devitt Kramer, Esq.

LIBA/2228778.1

A-6



**Grant & Eisenhofer P.A.**

123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000 • Fax: 302-622-7100

485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8500 • Fax: 646-722-8501

www.gelaw.com

Writer's Direct Dial: (646) 722-8505

1920 L Street, N.W., Suite 400
Washington, DC 20036
Tel: 202-386-9500 • Fax: 202-386-9505

December 15, 2011

**VIA EMAIL AND FIRST CLASS MAIL**

R. Todd Cronan, Esquire
Goodwin Proctor LLP
Exchange Place
Boston, MA 02109

Re:     **Shareholder Demand For Board Action**

Dear Mr. Cronan:

I write to respond to your December 8, 2011 letter regarding the shareholder demand of the Oklahoma Law Enforcement Retirement System ("OLERS"), a holder of common stock of Education Management Corporation ("EDMC" or the "Company"), on the EDMC Board of Directors ("Board"). While I was a bit surprised by the length of time it has taken you to communicate with us about a demand made more than three months ago, I am pleased that you have invited us to participate in the investigation of the issues raised in OLERS' demand letter.

You have stated that the Board formed a Litigation Committee "of disinterested directors" of the Company to investigate the issues raised in OLERS' demand. As a preliminary matter, we would appreciate learning from you who the Committee members are and receiving a copy of the resolution creating the Committee and defining its authority. You also invited OLERS to provide you with information relating to the issues raised in the demand letter. We are happy to do so, and suggest that our participation not be a one way street. We have studied these issues for several months, and have a wealth of experience in dealing with such governance issues. We can be an invaluable resource to your investigation and urge you to consider sharing information with us so that we can better assist your investigative efforts.

R. Todd Cronan
December 15, 2011
Page 2


      You have also requested that we provide documentation of OLERS' ownership of EDMC stock since 2003. As derivative standing is not a requirement for making a demand, how long OLERS has held its EDMC shares is irrelevant to the investigation of OLERS' demand. If you were requesting that information for a reason other than testing OLERS' derivative standing, please provide an explanation of your reason(s) and we will be happy to reconsider the request.


                       Very truly yours,

                       Jay W. Eisenhofer

JWE/dm



123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000 • Fax: 302-622-7100

Grant & Eisenhofer P.A.

485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8500 • Fax: 646-722-8501

www.gelaw.com

1920 L Street, N.W., Suite 400
Washington, DC 20036
Tel: 202-386-9500 • Fax: 202-386-9505

Jay W. Eisenhofer
Managing Director
Tel: 646-722-8505
jeisenhofer@gelaw.com

January 19, 2012

**VIA EMAIL AND OVERNIGHT MAIL**

R. Todd Cronan, Esquire
Goodwin Proctor LLP
Exchange Place
Boston, MA  02109

      **Re:**    **Shareholder Demand For Board Action**

Dear Mr. Cronan:

This firm represents the Oklahoma Law Enforcement Retirement System ("OLERS"), a holder of common stock of Education Management Corporation ("EDMC" or the "Company"), in connection with the demand  ("Demand") OLERS made on the EDMC Board of Directors ("Board"), dated August 19, 2011.  In your December 8, 2011 letter – the first communication we received that even acknowledged the Demand – you stated that the Board had formed a Litigation Committee "of disinterested directors" of the Company to investigate the issues raised in OLERS' demand.  You also stated that the Litigation Committee was inviting OLERS to participate in the Committee's investigation by providing the Committee with information.  On December 15, 2011, I wrote to you to accept your invitation to work with the Committee and to offer our assistance in the investigation.  More than a month later (and five months after the Demand was made), I have not heard anything further from you.

I write today to both reiterate our willingness to work with the Committee, and to supplement the original Demand with additional allegations of wrongdoing that have recently come to our attention.  The supplemental Demand issues are:

(1)    Failing Financial Health Causes An Increase In Letters Of Credit That Must Be Posted

In EDMC's fiscal year 2011, EDMC failed to achieve the minimum level of composite score based on three ratios the U.S. Department of Education uses to measure the financial health of institutions that receive Title IV funds.  As a result, the Department of Education required EDMC to raise the amount of its letter of credit that it posted in order to receive Title IV funds from $259.8 million (or 10% of funds received) to $361.5 million (or 15% of funds received).

R. Todd Cronan
January 19, 2012
Page 2

This failure to meet the composite score of financial health, and the resulting increase in required letters of credit, forced the Company to enter into a new $150 million Letter of Credit Facility with Bank of America.

While management was able to cover this situation this year with a new credit facility, the shareholders may not be so lucky in future years. EDMC's overall financial well-being continues to be endangered by the illegal practices detailed in the original Demand letter and the exorbitant debt that remains outstanding after the $3.4 billion leveraged buy-out of the Company in 2006. EDMC runs a substantial risk that the Department of Education will require it to post letters of credit in even higher amounts. The Department has the authority to raise the requirement to 100% of Title IV funds the Company receives. If action is not taken swiftly to correct the problems we have detailed in the Demand and this supplemental demand, the regulatory requirements the problems engender will soon overwhelm the Company and will result in even greater losses.

(2)    Fraudulent Practices Endangering Accreditation Of Company Institutions

Through a U.S. Senate investigation of for-profit universities, it was revealed that EDMC systematically falsifies job placement data for its graduates in order to maintain accreditation for its institutions. Accreditation agencies require certain levels of placement of graduates in their chosen fields in order to receive or maintain accreditation. Apparently unable to meet those levels honestly, EDMC has taken to falsifying its job placement data. Graduates are routinely cajoled into signing employment verification forms stating that they are working in their chosen fields or are otherwise using the skills they learned at Company institutions when, in reality, they are not. An example given by a career placement counselor employed at EDMC's Argosy University is that a graduate of the residential planning program was deemed to have been placed in a job in her field while she was working as a cashier at a gas station, because arrangement of candy bars for sale supposedly utilized her program skills. A graduate of the art program was deemed to be working in the art field as a counter-person at Starbucks because the graduate helped write daily specials signs. A graduate earning $8000 per year was documented as earning $25,000 per year because $25,000 was the average salary in the area for that type of position.

The abuses in job placement statistics at EDMC are not the work of rogue counselors. These employees are repeatedly told by supervisors that they have quotas of job placement to meet or they will be fired. The manipulations of data, such as those noted above, are clearly tolerated and even encouraged at EDMC. A counselor reported these abuses to her superiors, only to find nothing was done about them. It is time for the Committee to investigate these practices and bring them to an end before they cause further harm to the Company.

R. Todd Cronan
January 19, 2012
Page 3


As I stated above and in my December 15, 2011 letter, we stand ready to assist the Committee in its investigation of the matters raised in the original Demand and those issues highlighted in this supplemental demand. If the Committee continues to move at a glacial pace with its investigation and continues to ignore OLERS' commitment to assist it, OLERS will address the wrongdoing it has brought to the Committee's attention in this demand and the original Demand in another manner. We hope that you and the Committee will see fit to involve us in the investigation immediately. If we have not heard from you by February 20, 2012 that the Committee would like to work with us, OLERS will pursue the matter outside of the Company.

Very truly yours,

Jay W. Eisenhofer

JWE/dm

GOODWIN | PROCTER

Stuart M. Glass
617.570.1920
sglass@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

February 17, 2012

**VIA E-MAIL**

Jay W. Eisenhofer, Esq.
Grant & Eisenhofer, P.A.
485 Lexington Avenue
New York, NY 10017

Re:     **Shareholder Demand of Oklahoma Law Enforcement Retirement
         System to Education Management Corporation**

Dear Mr. Eisenhofer:

        I write on behalf of the committee of disinterested directors of Education Management
Corporation in response to your letters. We are in the process of preparing a response that will
cover some of the issues addressed in your letters. We expect to get that to you by the end of
next week. Should that timetable change, we will let you know.

Sincerely,

Stuart M. Glass

cc:  R. Todd Cronan

A-12

GOODWIN | PROCTER

R. Todd Cronan
617.570.1389
rcronan@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

March 6, 2012

**VIA E-MAIL & FIRST CLASS MAIL**

Jay W. Eisenhofer, Esq.
Grant & Eisenhofer, P.A.
485 Lexington Avenue
New York, NY

Re:    **Shareholder Demand of Oklahoma Law Enforcement Retirement System**

Dear Mr. Eisenhofer:

I am writing on behalf of a committee of disinterested directors of the Board of Directors

of Education Management Corporation (the "Litigation Committee"). The Litigation

Committee is conducting an investigation in response to certain demand letters sent by

you, as counsel to the Oklahoma Enforcement Retirement System, a shareholder in

Education Management Corporation ("EDMC" or the "Company"), dated August 19,

2011 and January 19, 2012 (collectively, the "Demand Letters"). This letter summarizes

the investigation and conclusions reached to date by the Litigation Committee with

respect to certain of the claims asserted in the Demand Letters.

### OVERVIEW AND SUMMARY OF FINDINGS

Your August 19, 2011 Letter generally tracks the allegations contained in the complaint

filed in *United States of America, et al., v. Education Management Corporation., et al.*,

2:07-cv-0461-TFM (W.D. Pa.). You principally allege that EDMC's compensation

LIBA/2264369.4

A-13

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 2

practices violate Title IV of the Higher Education Act of 1965's ban on incentive

compensation (the "Title IV Claims") with respect to the compensation of Assistant

Directors of Admissions (the "ADAs").  You allege, for example, that ADAs engaged in

unethical practices, such as enrolling unqualified students or pressuring prospective

students to accept unwanted financial aid packages, in pursuit of compensation based

solely on student enrollments.  You demand that, among other things, the Company

establish sufficient internal controls surrounding compensation practices to identify and

prevent such allegedly unlawful activity.

Your January 19, 2012 Letter raises two issues not addressed in your prior letter.  First,

you allege that EDMC's supposed failing financial health caused an increase in letters of

credit that it posted as required by the Department of Education ("Letter of Credit

Claim").  Second, you allege that a U.S. Senate investigation ("Senate Inquiry") of for-

profit universities revealed that EDMC "systematically falsified job placement data for its

graduates in order to maintain accreditation for its institutions" ("Fraudulent Job

Placement Claim").  Your allegations regarding the Fraudulent Job Placement Claim

appear to be taken directly from statements made by Kathleen Bittel, a former Career

Services Advisor at EDMC, during hearings held in the fall of 2011 before the Senate

Committee on Health, Education, Labor and Pensions (the "HELP Committee").

The Title IV Claims are the subject of ongoing review by the Litigation Committee.  To

date, we have conducted an extensive review of the internal controls environment at

A-14

# GOODWIN PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 3

EDMC, including the internal controls that apply to activities by ADAs and other employees in the Admissions, Career Services, and Financial Aid areas, and we are in a position to provide you with a summary of the Committee's findings thus far. We also are able to provide you with the findings of the Litigation Committee with respect to the Letter of Credit Claim and the Fraudulent Job Placement Claim.

As discussed below, the Litigation Committee has determined that the Company has a robust set of internal controls that are properly designed to identify, deter and remediate the types of allegedly deceptive and questionable practices referred to in the Demand Letters. These internal controls are supported by a properly designed and staffed corporate governance structure. The Litigation Committee has concluded that there has been no breach of the fiduciary duty owed by the officers or directors of EDMC in connection with their oversight of the internal control and corporate governance systems in place at EDMC.

With respect to the Letter of Credit Claim, the Litigation Committee found no support for the allegations that: (i) EDMC's "failing financial health cause[d] an increase in letters of credit that must be posted," or (ii) EDMC's failure to meet the composite score of financial health was the reason that EDMC entered into a new letter of credit facility with Bank of America. The Committee also found no evidence that the Company's board of directors or senior management failed to properly discharge their fiduciary duties in connection with the approval or oversight of the Letter of Credit.

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 4

As discussed below, the amount of EDMC's letter of credit has increased each year

primarily because of the increase in Title IV revenues; thus, it is the growth in EDMC's

net revenues that have caused the letter of credit amount to be increased. EDMC issued

the letter of credit to the U.S. Department of Education (the "DOE") from the Company's

revolving credit facility. This facility had a maturity date of June 1, 2012. As a proactive

measure, and to ensure credit capacity beyond this original maturity date, EDMC

amended the facility in December 2010 to extend the maturity to June 1, 2015.

Approximately 74% of the holders elected to extend the maturity, totaling $328.3 million.

Since $114.2 million will expire on June 1, 2012, EDMC put in place the $150 million

cash secured letter of credit as a replacement. This facility was put in place because of

the maturity of the existing facility, not because of increases in the required letter of

credit. Thus, sound business reasons exist for the actions taken by EDMC with respect to

the Letter of Credit.

With respect to the Fraudulent Job Placement Claim, EDMC has multiple layers of

controls designed to prevent inaccurate reporting of employment statistics. Our

investigation found that these internal controls were properly designed and applied to

address the risk that false or inaccurate job placement data was provided to students. We

also found no confirmed instances in which the examples you cited actually ended up in

EDMC's publicly reported job placement data. Thus, we find no support for your claim

that EDMC "systematically falsified job placement data." That is simply not true.

GOODWIN │ PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 5

## BACKGROUND

EDMC, one of the largest providers of private post-secondary education in North

America, was part of a broad investigation by the United States Government

Accountability Office ("GAO") (report dated August 4, 2010, ("GAO Report")) in which

the GAO sent undercover representatives to meet with admissions and financial aid

representatives at fifteen for-profit colleges. We understand that only one of EDMC's

104 schools – Argosy University in Chicago, Illinois ("Argosy University – Chicago") –

was part of the GAO investigation. Significantly, no allegation or claim was made that

any of EDMC's 104 schools engaged in the type of improper conduct identified by you in

the Demand Letters. In particular, no allegation is made in the GAO Report that any of

the EDMC schools engaged in misconduct with respect to letters of credit or job

placement practices.

On November 30, 2010, the GAO released a revised report that made substantial

revisions to its initial findings. With respect to Argosy University – Chicago, the revised

GAO report removed an allegation regarding the reporting of professors' experience, in

its entirety, diluted the GAO's findings related to an allegation regarding program costs,

and left the good practice attributed to EDMC unchanged. Once again, no allegations or

findings are contained in the revised GAO Report with respect to the issues raised in your

Demand Letters – including no allegations or findings regarding the Letter of Credit

Claim or the Fraudulent Job Placement Claim.

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 6

### THE LITIGATION COMMITTEE

In response to the issues raised by the Senate Inquiry and GAO Report, the Board of

Directors of EDMC established the Litigation Committee pursuant to Section 1731 of the

Pennsylvania Associations Code, Title 15 Pa. C.S., including Subpart B known as the

Business Corporation Law of 1988 and Section 3.1 of the Company's Amended and

Restated Bylaws. The Board delegated to the Litigation Committee the power and

authority to: review, analyze, and investigate any allegations of misconduct or breach of

fiduciary duty at EDMC; engage legal counsel and other experts to conduct the

investigation; and determine the appropriate actions, if any, the Company should pursue

in response to related inquiries or demands from shareholders.

Leo Mullin and Paul Salem were appointed by the Board to serve on the Litigation

Committee. Messrs. Mullin and Salem are disinterested directors under Pennsylvania

law and may therefore discharge the duties delegated to the Litigation Committee by the

Board. The ALI Principles of Corporate Governance define "disinterested" in terms of

what it means to be "interested." Section 1.23(c) of the ALI Principles provides that a

director is interested if any of the following four tests are met:

    (1)    The director or officer, or an associate of the director or officer, is a party
to the transaction or conduct;

    (2)    The director or officer has a business, financial, or familial relationship
with a party to the transaction or conduct, and that relationship would
reasonably be expected to affect the director's or officer's judgment with

GOODWIN │ PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 7

        respect to the transaction or conduct in a manner adverse to the corporation;

(3)    The director or officer, an associate of the director or officer, or a person with whom the director or officer has a business, financial, or familial relationship, has a material pecuniary interest in the transaction or conduct (other than usual and customary directors' fees and benefits) and that interest and (if present) that relationship would reasonably be expected to affect the director's or officer's judgment in a manner adverse to the corporation; or

(4)    The director or office is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director's or officer's judgment with respect to the transaction or conduct in a manner adverse to the corporation. Counsel, public accountants or other persons as to matters which the director reasonably believes to be within the professional or expert competence of such person.

Based upon these factors, under the ALI Principles, "[a] person who neither is an associate of, nor has a pecuniary interest in, or business or financial relationship to, a party to the transaction or conduct will normally not be interested within the meaning of § 1.23." Messrs. Mullin and Salem do not have a pecuniary interest in, a business or financial relationship with, or are a party to the conduct alleged in the Demand Letters, and fully satisfy the requirements of a "disinterested" director under Pennsylvania law and the ALI Principles of Corporate Governance.

### SUMMARY OF THE REASONS FOR THE LITIGATION COMMITTEE'S FINDINGS

An issue that cuts across the claims made in your Demand Letters is whether EDMC has an internal control structure that is properly designed to indentify, deter and remediate

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 8

improper conduct. A follow-on issue, for purposes of this letter, is whether there exists

evidence to support the specific allegations made with respect to the Letter of Credit

Claim and the Fraudulent Job Placement Claim in the Demand Letters. These issues are

addressed below.

### 1. EDMC Maintains an Extensive and Robust Internal Control Structure

As a threshold matter, the Litigation Committee has determined that EDMC has an

extensive and robust system of internal controls. These internal controls operate to

educate and train the Company's employees on significant policies and practices, to

monitor the performance of departments and individuals, and to take remedial efforts as

appropriate. The Litigation Committee also found that these internal controls are applied

diligently and in good faith across the EDMC organization and that these internal

controls provide appropriate safeguards against the types of wrongdoing identified in the

Demand Letters.

*High Ethical Standards*: EDMC sets high standards of conduct for all employees and

officers and trains each employee on those standards. These standards are set forth in the

Company's Code of Conduct ("Code"), which requires full compliance with the highest

moral, legal, ethical, and financial reporting standards. All employees, regardless of

position, must certify that they understand the Code. The Code also fosters an

environment in which the reporting of unethical conduct is encouraged by making

GOODWIN PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 9

evident that EDMC is committed to keeping complaints confidential and stressing that the Company will not tolerate any form of retaliation. Indeed, retaliation is in violation of the Code.

In addition to the Code, the Company provides employees with an ethics brochure entitled, "Help Us Preserve Our Integrity" (the "Integrity Brochure"). The Integrity Brochure, which has been distributed to all new employees since 2004, explains the negative impact that unethical behavior can have on the Company's reputation and financial well being. The brochure outlines a structure for reporting unethical behavior, including speaking with a supervisor, local and corporate human resources, or the campus president, or by contacting the Company's General Counsel, the Internal Audit Department, or the Corporate Compliance Hotline. The brochure emphasizes in large type that an employee will not face retaliation for making a report and provides multiple ways for an employee to report unethical conduct through the Corporate Compliance Hotline.

*Education and Training*: In accordance with the high ethical standards set by the Code and other Company policies, EDMC employees receive extensive training, including on topics such as compliance violations that an employer may encounter during his or her tenure at the Company. Employees involved in the admissions process – including Assistant Directors of Admissions ("ADAs") – receive three weeks of "on-boarding" training, five days of "polishing-off" training, as well as continuing guidance throughout

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 10

their employment on best practices. The ADAs must pass multiple tests before
interacting with prospective students. Even after passing these tests, the ADAs are
monitored during the "polishing-off" process to ensure compliance with Company
standards. Additional training is provided by specialists on topics such as common
compliance violations throughout an employee's tenure at the Company. ADAs recertify
their knowledge of legal and ethical compliance requirements annually. These ethics
training and testing programs focus on preventing the types of unethical conduct
referenced in the Demand Letters, including conduct regarding financial aid and career
placement.

*Monitoring and Remediation*: The Litigation Committee also reviewed and assessed the
internal controls at EDMC that exist to detect and remediate the types of behavior
identified in the Demand Letters. These internal controls include:

- The Internal Audit Department ("IAD"), which identifies and remediates
  risks facing EDMC by auditing corporate processes, ground schools, and
  the Online Higher Education Division ("OHE"). These audits allow the
  Company to, among other things, verify compliance with internal policies
  and regulatory requirements, deter fraud by encouraging appropriate
  controls, and identify best practices. All business activities of EDMC are
  subject to auditing, and IAD identifies the frequency of such audits using a
  risk-based approach. At the conclusion of its audits, IAD issues a

GOODWIN PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 11

comprehensive and objective assessment of its findings and

recommendations.

- OHE Internal Audit and Compliance Department, which performs a
  similar function as IAD within OHE, is designed to prevent, mitigate and
  remediate, among other things, student-facing risks by monitoring
  interactions between students and ADAs or Student Financial Services
  representatives in OHE.  Poor performing employees receive
  remediation—ranging from verbal coaching and re-training to termination.

- Corporate Services ("CS") Marketing and Admissions Department ensures
  that ADAs conduct themselves according to the Company's standards of
  ethical conduct by using, among other things, frequent observations and
  "mystery shopping." Observations track compliance with internal policies
  by allowing directors to listen to phone conversations between ADAs and
  prospective students, while "mystery shopping" employs a third-party
  vendor posing as a prospective student to ask ADAs difficult questions
  and assess their responses.  Both observation and "mystery shopping
  results" are graded and remediated on a scale similar to that of OHE.

- The CS and OHE Marketing and Admissions Departments have policies
  and procedures related to admissions personnel at ground schools and the

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 12

online brands to ensure compliance with federal regulations and Company
policy regarding interactions with prospective students. The Compliance
FAQ Guide and associated multi-week training embodies this commitment
by ensuring that each ADA understands how to deliver legally and
factually correct information while interacting with prospective students.
ADAs must take an exam annually on this information; initial failure
suspends any student interaction, and successive failures lead to
termination. ADAs also learn and are tested on the techniques of proper
salesmanship, which require that they build a relationship with the
prospective student based on trust and honesty as they select the features
and benefits of the school to match the student's needs and values. ADAs
also attend ongoing training activities related to ethical compliance.

- A Corporate Compliance Hotline is accessible twenty-four hours a day,
seven days a week, as a way to anonymously report suspected misconduct.
Reports submitted through this hotline are sent to, and investigated by, a
committee comprised of senior management from the Human Resources,
Legal, and the Internal Audit Departments. This committee assesses the
merits of allegations, oversees investigations where appropriate,
determines whether corrective action is necessary, and follows up on

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 13

> recommendations for remediation. The Audit Committee of the Board of
> Directors is updated quarterly about these reports.

- EDMC also has a senior-level position dedicated to the compliance
  function that reports directly to the Company's General Counsel. The
  Vice President of Compliance implements EDMC's compliance program
  designed to emphasize EDMC's values and promote a culture of integrity.
  Among other responsibilities, the Vice President of Compliance develops
  policies and programs that encourage employees to report alleged
  misconduct without fear of retaliation and works with Internal Audit to
  conduct risk assessments and Human Resources on training programs for
  all employees.

- The Audit Committee of the Board is active and engaged on compliance
  issues. This committee, in accordance with governing law and
  regulations, consists of three independent directors with one member who
  is a certified financial expert. In performing its duties, among other
  things, the Audit Committee regularly reviews and discusses with the
  Company's senior management: (i) quarterly and annual audits completed
  by internal and external auditors, (ii) reports received by the Company's
  hotline, available to employees to submit information regarding unethical
  conduct, (iii) significant lawsuits and investigations, (iv) personnel

GOODWIN|PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 14

training and quality assurance, (v) school accreditation, (vi) risks

associated with proposed or newly enacted post-secondary education

regulations, and (vii) the integrity of the Company's financial statements.

### 2. EDMC Maintains an Effective System of Corporate Governance Practices and Procedures

The Litigation Committee also found that the Company maintains a strong corporate

governance structure and there is no evidence that any director or officer breached his or

her fiduciary duties to EDMC in connection with the oversight of the Company's internal

controls.

Under Pennsylvania law, each director and officer of EDMC owes a duty of care and

loyalty to the Company. The duty of care, which primarily relates to being properly

informed and overseeing the management of the corporation, mandates that directors and

officers act in good faith by acting with the care that a person in a like position would

reasonably believe appropriate under similar circumstances. When due care is taken, the

business judgment rule imposes a presumption that decisions made are in the best

interests of the company to prevent second-guessing of business decisions by courts. The

duty of loyalty, moreover, requires that directors and officers act only in the interests of

the corporation, rather than acting intentionally with a purpose other than that of

advancing the best interests of the corporation. The Litigation Committee investigation

revealed that the directors and officers of EDMC have satisfied these fiduciary duties to

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 15

the Company by establishing and maintaining, appropriate governance structures, and the
Demand Letters contain no facts to the contrary.

The Board is empowered to make decisions related to, and provide oversight of, EDMC's
business and affairs.  It conforms with the requirements imposed under federal law, as
well as those imposed by NASDAQ, by maintaining the requisite number of independent
directors and delegating the appropriate decision-making authority to the Board's
committees which include an Audit Committee, Compensation Committee, and
Nominating and Corporate Governance Committee.  Notably, in accordance with
governing laws and regulations, the Audit Committee is comprised solely of independent
directors, with one certified financial expert, and, among other things, oversees
compliance with legal and regulatory requirements, ensures the integrity of the
Company's financial statements, and supervises the external and internal auditors at
EDMC.

### 3. The Evidence Does Not Support the Specific Allegations With Respect to the Letter of Credit Claim

As noted above, the Litigation Committee found no support for the allegations that: (i)
EDMC's "failing financial health cause[d] an increase in letters of credit that must be
posted," or (ii) EDMC's failure to meet the composite score of financial health was the
reason that EDMC entered into a new letter of credit facility with Bank of America.

GOODWIN⎟PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 16

The letter of credit requirement was instituted in 2006 as part of EDMC's going private

transaction. As a matter of Generally Accepted Accounting Principles ("GAAP"), the

EDMC going-private transaction resulted in subsequent goodwill being recorded on the

Company's financial statements. EDMC and the DOE understood that, given the

recording of such a substantial amount of goodwill on its balance sheet, EDMC would

not achieve the composite score on the financial responsibility test. EDMC consistently

disclosed this fact in its public filings with the SEC. As a result, the DOE required a

letter of credit from EDMC in the amount of 10% of the prior fiscal year's Title IV

revenue (subsequently raised to 15%). The DOE may set the level of the required letter

of credit anywhere between 10% and 100% at their discretion. EDMC believes that the

DOE set the amount of the letter of credit at 15% to account for annual increases in total

Title IV funds received by students attending EDMC's institutions. In other words, the

increase in the size of the letter of credit assumes that Title IV funds received by students

attending EDMC's institutions would increase by 5% per fiscal year because the

percentage is applied to Title IV funds received in the prior fiscal year. Accordingly, the

amount of the letter of credit has increased each year primarily because of the increase in

Title IV revenues. Thus, it is the growth in EDMC's net revenues that caused the letter

of credit amount to be increased. Since the letter of credit amount required to be posted

is based upon the prior fiscal year's Title IV revenue, the $361.5 million letter of credit

that is currently in place with the DOE was calculated using fiscal year 2010's Title IV

GOODWIN PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 17

revenues. The letter of credit amount was set before the fiscal year 2011 financial results
were known.

EDMC's decision to enter into a new letter of credit facility with Bank of America was
not the result of a failure of EDMC to meet the composite score of financial health.
EDMC issues the letter of credit to the DOE from its revolving credit facility. This
facility had a maturity date of June 1, 2012. As a proactive measure to ensure letter of
credit capacity beyond this date, EDMC amended the facility in December 2010 to
extend the maturity to June 1, 2015. Approximately 74% of the holders elected to extend
the maturity, totaling $328.3 million. Since $114.2 million will expire on June 1, 2012,
EDMC put in place the $150 million cash secured letter of credit line as a replacement.
This facility was put in place because of the maturity of the existing facility, not because
of increases in the required letter of credit.

### 4. The Evidence Does Not Support the Allegations with Respect to the Fraudulent Job Placement Claim

The allegations concerning the Fraudulent Job Placement Claim appear to have been
taken directly from Kathleen Bittel (a former Career Services Advisor at EDMC Online
Higher Education) and her correspondence with and testimony before the Senate HELP
Committee.

EDMC takes seriously its responsibility to assist its graduates in finding productive and
rewarding work in their chosen field following graduation. EDMC employs more than

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 18

300 people who help graduates find jobs and who are responsible for ensuring that the

Company accurately and fairly report its job placement statistics. EDMC has long

utilized a process designed to ensure the accurate collection and reporting of graduate

employment statistics. This process serves as a series of checks and balances to

safeguard against an employee's ability to report inaccurate data and includes the

following steps: (i) placement documentation is obtained by a Career Services Advisor

directly from an employer or a graduate whenever possible; (ii) a department supervisor

is responsible for checking the accuracy of all information entered by Career Services;

(iii) Career Services Advisors confirm that verifications are documented; (iv) unusual

salary fluctuations and certain waivers from placement are independently reviewed by

EDMC's corporate staff; and (v) EDMC's corporate staff performs a separate review of

all data prior to records being finalized, including a review of whether the employment

listed for each graduate is related to his or her field of study.

EDMC has multiple layers of controls designed to prevent inaccurate reporting of

employment statistics. EDMC's standard training curriculum ensures that Career

Services Advisors accurately report employment data. That training specifically warns

about potential risk exposures, such as counting one job as two when the latter is just an

update; accepting employments with no documentation that it was verified; and

overestimating salaries in the cases where graduates or employers will not release exact

information. Career Services Advisors are taught to note suspicious reporting data and

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 19

contact managers for guidance. EDMC has written policies that require all errors or

suspicious data be emailed to the Career Services Advisor and Director of Career

Services at the affected school and that further investigation be conducted until the

anomaly is corrected or explained. Moreover, students themselves are also encouraged to

provide accurate information to Career Services for its records. Compliance procedures

also verify accuracy of statistics. Career Services Advisors must obtain placement

documentation to verify the statistics they use, and department supervisors check the

accuracy of all information submitted by advisors and confirm that verifications are

documented. Data are further audited by EDMC's Internal Audit Department. During a

standard school audit, auditors randomly select career services files and verify

employment and salary data.

EDMC's policies and procedures for verifying and approving job placement statistics,

including the multiple levels of review designed to ensure accuracy in reporting that data

are effective in practice. For example, Ms. Bittel's own career services placement

portfolio revealed instances of job placements she submitted that were identified by her

supervisors to be of a questionable nature. This data was captured through EDMC's

standard operating processes, investigated, and ultimately rejected by supervisors through

the course of routine reviews.

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 20

Upon learning of the allegations regarding job placement statistics made by Ms. Bittel, EDMC conducted an internal investigation and sought the cooperation of Ms. Bittel (she refused to provide specific information about her allegations). The investigation found no support for her claims of undue pressure placed upon Career Services Advisors at EDMC Online Higher Education to meet placement goals or falsely verify graduates' employment was related to their field of study. Outside counsel to EDMC subsequently conducted a second investigation, including document review and interviews of more than twenty employees, including all of Ms. Bittel's fellow Career Services Advisors and supervisors at EDMC Online Higher Education. That investigation similarly found no support for the claims that EDMC had pressured employees to violate placement policies and procedures and found no confirmed instances in which the examples you cited from Ms. Bittel actually ended up in EDMC's publicly reported job placement data.

**Conclusion**

After reasonable and diligent inquiry, the Litigation Committee has determined in good faith and in the exercise of its business judgment that it would not be in the best interest of the Company or its shareholders to take the actions requested with respect to the Letter of Credit Claim and Fraudulent Job Placement Claim in the Demand Letters. Further, the Litigation Committee has concluded that EDMC has appropriate internal controls, and well designed policies and procedures, to address the specific risks identified in the Demand Letters.

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
March 6, 2012
Page 21

As noted above, our investigation into certain aspects of the Title IV Claims is ongoing.

We will provide you with a written summary of the findings of the Committee's

investigation as soon as it is complete. In the interim, to the extent that you have factual

evidence that you believe will assist the Litigation Committee in its efforts, please do not

hesitate to contact me.

Sincerely,

R. Todd Cronan

# GOODWIN PROCTER

R. Todd Cronan
617.570.1389
rcronan@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

May 16, 2012

**VIA E-MAIL & FIRST CLASS MAIL**

Jay W. Eisenhofer, Esq.
Grant & Eisenhofer, P.A.
485 Lexington Avenue
New York, NY 10017

Re:     **Shareholder Demand of Oklahoma Law Enforcement Retirement System**

Dear Mr. Eisenhofer:

I write on behalf of a committee of disinterested directors of the Board of Directors of

Education Management Corporation (the "Litigation Committee" or the "Committee").

In our March 6, 2012 letter, we substantively responded to allegations in certain demand

letters sent by you, as counsel to the Oklahoma Enforcement Retirement System, a

shareholder in Education Management Corporation ("EDMC"), dated August 19, 2011

and January 19, 2012 (collectively, the "Demand Letters").  In particular, our March 6,

2012 letter described the Litigation Committee's review of EDMC's system of internal

controls and related the Committee's findings with respect to two claims in the Demand

Letters, the "Letter of Credit Claim" and the "Fraudulent Job Placement Claim."  Our

letter also explained that the Committee was still investigating the Demand Letters'

allegations that EDMC's compensation practices violated Title IV of the Higher

LIBA/2303890.1

A-34

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
May 16, 2012
Page 2

Education Act of 1965's ban on incentive compensation with respect to the compensation of admissions personnel (the "Title IV Claims").

The Litigation Committee is now in the process of finalizing its investigation into the Title IV Claims and expects to have a substantive response to you shortly. In the meantime, if you have any factual evidence that you believe will assist the Litigation Committee in its efforts, please contact me as soon as possible.

Sincerely,

*R. Todd Cronan / BML*

R. Todd Cronan



GOODWIN | PROCTER

R. Todd Cronan
617.570.1389
rcronan@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

May 21, 2012

**VIA E-MAIL & FIRST CLASS MAIL**

Jay W. Eisenhofer, Esq.
Grant & Eisenhofer, P.A.
485 Lexington Avenue
New York, NY 10017

Re:     **Shareholder Demand of Oklahoma Law Enforcement Retirement System**

Dear Mr. Eisenhofer:

As you are aware, Goodwin Procter LLP represents a committee of disinterested directors of the Board of Directors of Education Management Corporation (the "Litigation Committee" or the "Committee").

As I mentioned in my May 16, 2012 letter, the Litigation Committee is in the process of finalizing its investigation into the Title IV Claim.

In the meantime, the Litigation Committee wants to know whether your client, the Oklahoma Law Enforcement Retirement System ("OLERS"), satisfies the continuous interest requirement necessary to maintain shareholder derivative standing under Pennsylvania law. *See Cuker v. Mikalauskas*, 692 A.2d 1042 (1997). Accordingly, please confirm that OLERS has owned and continues to own shares in EDMC.

Sincerely,

R. Todd Cronan /BML

R. Todd Cronan

LIBA/2305015.1

A-36

GOODWIN | PROCTER

R. Todd Cronan
617.570.1389
rcronan@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

May 24, 2012

**VIA E-MAIL & FEDERAL EXPRESS**

Jay W. Eisenhofer, Esq.
Grant & Eisenhofer, P.A.
485 Lexington Avenue
New York, NY 10017

Re:     **Shareholder Demand of Oklahoma Law Enforcement Retirement System**

Dear Mr. Eisenhofer:

I am writing on behalf of a committee of disinterested directors of the Board of
Directors of Education Management Corporation (the "Litigation Committee" or the
"Committee"). This letter will supplement our prior response to you, dated March 6,
2012, in connection with certain Demand Letters sent to Education Management
Corporation ("EDMC" or the "Company"). The letters were sent by you on behalf of
Oklahoma Law Enforcement Retirement System ("OLERS"), a purported shareholder in
EDMC.

As set forth in my March 6 letter, the Litigation Committee conducted an
extensive review of the internal controls environment at EDMC, including the internal
controls that apply to activities by employees in the Admissions, Career Services, and
Financial Aid areas. The Litigation Committee determined that the Company has a
robust set of internal controls that are properly designed to identify, deter and remediate
the types of practices referred to in the Demand Letters sent on behalf of OLERS. The
Litigation Committee also concluded that there has been no breach of the fiduciary duty
owed by individual members of EDMC's Board of Directors in connection with their
oversight of the internal control systems in place at EDMC.

These conclusions apply with particular force to the "Title IV claims" in the
Demand Letters. The Demand Letters claim that EDMC's Admissions compensation
plan, as applied and as implemented, violated the ban on incentive compensation in
Higher Education Act of 1965.

The Committee's investigation identified a series of internal controls that support
the conclusion that EDMC's Board of Directors had a good faith basis to believe that the

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
May 24, 2012
Page 2

Company's Admissions compensation plan, as designed and implemented, complied with Title IV. In addition, the Committee conducted an in-depth review of whether the compensation plan, as implemented, violated the Act. The Committee did not find factual support for this assertion. Indeed, the evidence developed through the investigation presents a compelling case to the contrary.

### SUMMARY OF ADDITIONAL FINDINGS ON TITLE IV CLAIM

#### I.    AS DESIGNED, EDMC'S COMPENSATION PLAN COMPLIED WITH THE ACT

In 1992, Congress amended Title IV of the Higher Education Act (the "Act") to preclude schools whose students receive federal student financial aid from paying employees incentive compensation based on student enrollment.

In 2002, the Department of Education ("DOE") promulgated twelve "safe harbors" to the Act, which the DOE described as "compensation arrangements that do not run afoul of the incentive compensation prohibition" of the Act. 67 Fed. Reg. 67054. One of the safe harbors permitted colleges and universities to provide recruiters with salary or hourly wage adjustments based on the number of students enrolled, so long as student placement was not the sole compensation factor:

> Activities and arrangements that an institution may carry out without violating the [Act] include, but are not limited to:
>
> (A)    The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid. . . .

34 C.F.R. § 668.14(b)(22)(ii)(A) (eff. July 1, 2003 to June 30, 2011) (the "Safe Harbor").

Thus, the Safe Harbor permitted the recruiters' salaries to be adjusted based on student enrollments, provided that (1) recruiters' salaries were "fixed" and not adjusted

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
May 24, 2012
Page 3

more than twice during any twelve month period; and (2) such adjustments were not the "sole" factor considered.[1]

After the Safe Harbor was promulgated in 2002, EDMC drafted and adopted a compensation plan (the "Plan") in accordance with that regulation. In developing the Plan, EDMC consulted two outside law firms nationally recognized in education law. These firms were retained by EDMC to assist in drafting the Plan in accordance with the Act, including the Safe Harbors. Neither firm was apprised that another law firm was retained. Both firms independently confirmed that the Plan, as designed, was in compliance with the Act and the Safe Harbors.

As part of its investigation, the Committee interviewed the principal outside attorney who had been retained to advise on the design of the Plan. This attorney is an expert in Title IV issues and had advised numerous clients on the design and implementation of compensation plans. The attorney reiterated his opinion that EDMC's Plan, as designed, complied fully with the requirements of the Act.

The Plan remained in place from July 1, 2003 until June 30, 2011. Throughout its time, the Plan maintained the same basic framework. Under the Plan, all ADAs were provided a fixed salary that was adjusted only twice per year and was not based (or not based "solely") on the number of students enrolled (i.e., on quantitative factors). Newly hired ADAs were not on the Plan. Their salaries were based exclusively on their prior experience and education and were subject to a six-month introductory period. As discussed further below, most ADAs employed between six months and 18 months were also not on the Plan. Their salaries were determined on the basis of qualitative factors alone, without regard to any quantitative factors. Only more senior ADAs (some of those employed 18 months and all of those employed longer than 18 months) were on the Plan. Those ADAs' salaries were determined on both qualitative and quantitative factors and were adjusted to reflect the overall performance evaluation.

Specifically, the Plan contained the following relevant features:

*First*, ADAs were reviewed on, and awarded points for, "quality factors." Under the Plan, ADAs were evaluated on five "quality factors," namely job knowledge, business practices and ethics, professionalism, customer service, and initiative. ADAs were assigned a rating for each factor, ranging from "5" (outstanding) to "1"

---

[1] On October 28, 2010, the DOE amended its regulations to repeal the safe harbors, including Section 668.14(b)(22)(ii)(A). Those amendments went into effect in July, 2011. Prior to the Safe Harbor's repeal, EDMC implemented a new Admissions compensation plan that adhered to the requirements of the Act following the repeal of the Safe Harbors.

GOODWIN PROCTER

Jay W. Eisenhofer, Esq.
May 24, 2012
Page 4

(unsatisfactory). The following chart provides an overview of the quality factors, as taken from EDMC's Plan guidebook distributed to ADAs and managers:

| Overview of Quality Factors | |
|---|---|
| Job Knowledge | Adheres to approved recruitment methods and practices. Knows the products. Understands fellow enrollment and education department functions and objectives. Uses the enrollment systems and technology correctly. |
| Business Practices and Ethics | Demonstrates sound business ethics and business principles in serving prospective students and applicants, including achievement on the Compliance/FAQ test. |
| Professionalism | Assists prospective students and applicants in a cooperative manner. Willing to assist students assigned to others. Displays a positive attitude in the work environment. |
| Customer Service | Serves prospective students, applicants and fellow employees in a timely and accurate manner. Works to resolve issues and acts in a consultative sales role in achieving positive customer satisfaction. |
| Initiative | Evaluates, selects and appropriately acts on various methods and strategies for effectively and appropriately solving problems and meeting objectives before being asked or required to do so. Self-starting rather than passively complying with instructions or assignments. |

The points for each quality factor were totaled to determine ADAs' "quality points." Thus, ADAs' could receive between 5 and 25 quality points based on the quality factors review.

*Second*, ADAs were awarded "new student points." After quality points were determined, ADAs were awarded "new student points" for students recruited over the previous period. Typically, ADAs received three new student points for each student recruited. Characteristics of the student recruited, however, such as whether the student was from outside the United States, could affect the number of new student points awarded. EDMC Corporate Services would then centrally calculate the new student points for all ADAs.

*Third*, using the "Matrix," a baseline salary was determined using new student points and quality points awarded to ADAs. For ADAs who were on the Plan, their baseline salaries were determined by finding the total new student points and total quality points on a chart known as the "Matrix." The new student points were tracked on the Matrix's Y-axis, and the quality points were tracked on the X-axis. The intersecting point between the two totals determined an ADA's baseline salary.

One guidebook distributed to all ADAs and their managers described the Matrix as follows:

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
May 24, 2012
Page 5

## ADA/Associate Annualized Salary Chart

The combination of the total number of new student points and quality factor points
determines the participant's annualized salary.  (Adjustments may apply to this
annualized salary—as applicable—for labor market, years of service and Associate
management responsibilities.)

The following chart provides annualized salaries based on new student points and
quality factor points.

| Level | New Student Point Range | Annualized Salary, Based on Quality Points | | | | |
|---|---|---|---|---|---|---|
| | | Unsatisfactory | Needs Improvement | Meets Expectations | Highly Effective | Outstanding |
| | | 5-8 points | 9-12 points | 13-17 points | 18-22 points | 23-25 points |
| 1 | 0 - 99 | $26,000 | $27,000 | $29,000 | $31,000 | $33,000 |
| 2 | 100 - 125 | $28,500 | $29,500 | $32,000 | $34,000 | $36,000 |
| 3 | 126 - 150 | $31,250 | $32,500 | $35,000 | $37,000 | $39,000 |
| 4 | 151 - 175 | $34,750 | $36,000 | $39,000 | $41,000 | $43,500 |
| 5 | 176 - 200 | $38,500 | $40,000 | $43,000 | $45,500 | $48,000 |
| 6 | 201 - 225 | $42,500 | $44,000 | $47,000 | $49,750 | $52,000 |
| 7 | 226 - 250 | $47,000 | $49,000 | $52,000 | $55,000 | $57,500 |
| 8 | 251 - 275 | $51,500 | $53,500 | $57,000 | $60,000 | $63,000 |
| 9 | 276 - 300 | $56,000 | $58,000 | $62,000 | $65,000 | $68,000 |
| 10 | 301 - 325 | $61,000 | $63,500 | $68,000 | $71,000 | $74,000 |
| 11 | 326 - 350 | $67,000 | $70,000 | $74,000 | $77,000 | $80,500 |
| 12 | 351 - 375 | $73,000 | $76,000 | $80,000 | $84,000 | $87,500 |
| 13 | 376 - 400 | $79,000 | $82,000 | $87,000 | $91,000 | $95,000 |
| 14 | 401 - 425 | $86,000 | $89,000 | $94,000 | $99,000 | $103,000 |
| Add'l levels | 25-point increments | Add $7,000 | Add $7,000 | Add $7,000 | Add $8,000 | Add $8,000 |

As the above Matrix makes clear, baseline salaries for ADAs could not have been
calculated without considering *both* the total quality points and the total new student
points.  Each time salaries were calculated, moreover, the Matrix required new quality
points and new student points to be generated.  Thus, by design, ADA salaries were never
based "solely" on new student points, student starts, students enrolled, students recruited,
or the like.

The Matrix also makes clear that quality points significantly affected ADA
compensation.  For example, as the chart above demonstrates, the salary for an ADA
earning no new student points could increase as much as 20 percent based on quality
points alone (*i.e.*, from $26,000 to as much as $33,000).

*Fourth*, the baseline salary could have been further adjusted.  Once ADAs'
baseline salaries were determined, they could have been adjusted upwards by three to 15

A-41

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
May 24, 2012
Page 6

percent for ADAs with at least two years of service; by $1,000 to $5,000 for ADAs who managed other ADAs or particular projects; and/or by five to 20 percent based on the cost of labor in a geographical area, as determined by the Economic Research Institute data on wage and salary differentials.

The fact that ADA compensation was determined, in part, based on the number of students recruited does not itself violate the Act. The Safe Harbor specifically allowed for incentive based compensation if two criteria were met: (i) the compensation was "*fixed*;" and (ii) the compensation was "not based *solely* on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (emphasis added). The Plan met both of these requirements, as outside experts confirmed before the Plan was implemented.

Based on the foregoing, the Committee determined that EDMC and its Board of Directors had a good faith basis to believe the Plan's design complied with the Act.

## II.     AS IMPLEMENTED, EDMC'S COMPENSATION PLAN COMPLIED WITH THE ACT

The Demand Letters assert the Plan as implemented violated the Act. Specifically, the claim is made that the Plan was a "sham" because ADAs were compensated "solely" on the number of new students enrolled in their programs.

To assess how the Plan had been implemented historically, and to determine whether it was a "sham," the Litigation Committee conducted an extensive review of past practices at EDMC with regards to the implementation of the Plan. First, the Litigation Committee interviewed upper-level managers involved in designing, implementing, and administering the Plan. Second, the Litigation Committee interviewed current and former ADA managers who completed ADA reviews under the Plan. These interviews revealed no evidence in support of the "as implemented" allegations in the Demand Letters. Third, the Litigation Committee reviewed the internal controls that EDMC had in place to ensure that the Plan was implemented correctly. The review determined that appropriate internal controls were in place throughout the relevant period and that these controls were properly applied to ensure compliance with the Act.

### A.     Evidence From Interviews Of Upper Management Employees

The more than 30 EDMC employees interviewed included upper-level management personnel involved in designing and implementing the Plan. These interviews did not support the claims made in the Demand Letters. The interviews did not adduce facts indicating (or even suggesting) that members of senior management of

A-42

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
May 24, 2012
Page 7

EDMC knew or were on notice that the Plan was a "sham" as implemented. In fact, the evidence developed through the investigation indicates the contrary.

The quality factors used in the Plan were designed with the help of an outside human resources consultant to ensure appropriate checks and balances on the quantitative component of the Plan. When the Plan was rolled out, all Directors of Admissions and Senior Directors of Admissions were trained on how to assign the quality points and provided a guidebook that included rubrics detailing the specific behaviors that had to be demonstrated for ADAs to meet or exceed expectations in each of the five quality factors. In addition, the task force had conference calls with Campus Presidents and Admissions Specialists on how to implement the Plan correctly. Following the initial roll out, proper implementation of the Plan was covered at a formal, central Director of Admissions training program or by individual, department-level training.

ADAs also were provided guidebooks describing the Plan. These guidebooks included the quality factor rubrics. ADAs were required to sign off that they had received the guidebook, that they had been explained the key terms of the Plan (and any changes to the Plan), that they had been given an opportunity to ask questions about how the Plan worked, and that their questions had been answered. When slight variations were made to the Plan and a new version was reissued, managers and ADAs were retrained on the Plan and how to properly implement it.

According to upper-level managers, the message during trainings about the relationship between the new student points and quality points was that the two were to be treated separately. None of the upper-level managers, based on their longstanding experience with EDMC and the Plan, considered the Plan a "sham" or believed that student recruitment was the "sole" compensation factor under the Plan.

The upper-level managers interviewed also had no knowledge of reports that the quality factors were not being assigned as the Plan required. ADAs could report any improper implementation to local Human Resources representatives, Campus Presidents, or through EDMC's compliance Hotline, which was available 24 hours a day, seven days a week. Improper implementation of the Plan could also have been identified during the multi-level review process, discussed further below. No upper-level manager interviewed was aware of any such reports or complaints.

## B. Evidence From Interviews Of ADA Managers

The Litigation Committee also interviewed EDMC employees who had first-hand experience administering the Plan as managers in Admissions. These managers were chosen because of their longevity with EDMC and their experience with administering the Plan. The managers interviewed by the Litigation Committee collectively work or

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
May 24, 2012
Page 8

have worked for each of the four EDMC colleges, in both online and ground divisions. These employees included current and former Senior Directors of Admissions, Directors of Admissions, and Admissions Managers, all of whom managed ADAs and reviewed ADAs under the Plan. Some of these Senior Directors of Admissions, Directors of Admissions, and Admissions Managers were themselves ADAs reviewed under the Plan. These interviews were designed to elicit first-hand experiences from employees across EDMC, to cover a wide range of time, and to elicit information from individuals with hands-on experience in applying the Plan to determine ADA compensation.

Despite direct questioning about the allegations, not a single one of these ADA managers considered the Plan a "sham" or believed that student recruitment was the "sole" compensation factor under the Plan. Indeed, many of the managers expressed anger, dismay, or frustration in response to these allegations. Based on the foregoing, the Committee concluded that allegations that the Plan was a "sham" or based "solely" on student recruitment were not corroborated.

### C. EDMC Had Appropriate Internal Controls In Place To Ensure The Plan Was Implemented As Designed

The Litigation Committee also reviewed the specific internal controls in place at EDMC relevant to the implementation and administration of the Plan. These controls included training and guidebooks on proper implementation of the Plan, a standardizing review process with forms, vetting of each ADA's quality factors review through a multi-level management review process, a policy requiring that quality points be calculated *prior* to calculating new student points, and a policy providing ADAs and managers with the opportunity to anonymously report violations. Each of these controls is described below.

ADAs and managers were provided guidebooks. EDMC issued guidebooks that described the Plan in detail and, notably, provided detailed instruction on how it should be implemented. As discussed above, the guidebooks clearly defined the quality factor rating criteria, as well as all other aspects of the Plan. The Committee found that the guidebooks were ubiquitous across EDMC schools. In fact, all of the managers interviewed specifically mentioned using the guidebooks' quality factor rubrics to rate ADAs on quality factors. The guidebook's clear criteria and its widespread use further demonstrate that the Plan was being implemented as designed.

Training emphasized that new student points and quality factors were separate. Interviewees almost uniformly described extensive training on the Plan, including emails, presentations, WebExs, in-person national trainings, and in-person local trainings. That training emphasized proper implementation of the Plan. Some interviewees, moreover, explained that the training stressed that quality factors should be treated separately and

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
May 24, 2012
Page 9

distinctly from new student points and not as surrogates for new student points. Thus, the training stressed exactly the opposite of what the Demand Letters' allegations suggest.

Use of templates encouraged consistent implementation. Managers at EDMC used a form that listed all of the quality factors and required that numerical ratings be justified by written narratives. The use of these standardized review templates forced managers to consistently implement the Plan's quality factors review component and to justify their quality points with narratives based on non-student recruitment criteria.

Managers' reviews were vetted through a multi-level approval process. Quality factors reviews were completed in the first instance by ADAs' immediate supervisors. In EDMC's ground schools, ADAs were directly supervised by a Director of Admissions or in some cases a Senior Director of Admissions. In EDMC's Online Higher Education Division ("OHE"), Admissions Managers usually completed the quality factors reviews.

Once completed, managers submitted quality factors reviews to more senior management for approval. At ground schools, each ADA's quality factors review had to be approved by: (1) the Director or Senior Director of Admissions, (2) the Campus President (or Human Resources Director, at the Campus President's discretion), (3) an Admissions Specialist, and (4) EDMC's central Corporate Services. At OHE, each ADA's quality factors review had to be approved by: (1) a Director of Admissions, (2) a Senior Director of Admissions, (3) the Vice President of Admissions for OHE, (4) Human Resources, and (5) Corporate Services.

The review process was not a rubber stamp. Employees interviewed described how upper management would critique their reviews if ratings were not supported by specific instances of conduct.

Managers completed quality factors reviews before even knowing ADAs' new student points. Quality factors reviews were completed, approved, and submitted to EDMC Corporate Services before new student points were calculated and distributed to managers. After the quality factors reviews were submitted, each ADA's quality points were combined with that ADA's new student points calculation. Then a salary was determined using the Matrix with any further adjustments made based on location, tenure, or management responsibilities. This salary, together with an explanation for the basis of the salary, was returned by Corporate Services to managers in a salary and performance worksheet. Managers then reviewed the worksheet with the ADA, who signed off that it had been discussed with the manager. This divided process—whereby quality factors

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
May 24, 2012
Page 10

reviews were completed first and without knowledge of the new student points—ensured that new student points could not provide the basis for quality points.[2]

Internal Audit Departments Audited the Performance Review Process. Both of EDMC's internal audit divisions, the ground school and corporate-focused Internal Audit Department and OHE's Internal Controls and Compliance Department, reviewed ADA performance reviews to make sure they were fully and timely completed, including making sure that quality points had been assigned and narratives were completed, that the ADA, the manager, and upper-level management had signed off on every review, and that ADAs were not reviewed more than two times per year.

ADAs or managers could report violations through a compliance Hotline. EDMC has operated a compliance hotline through which employees could anonymously report compliance violations since 2003. Accordingly, if ADAs or managers believed that the Plan was not being implemented correctly, they could have reported those violations through the hotline. A review of nearly three years' worth of Hotline data, however, did not reveal any complaints that the Plan or the quality factors were a "sham" or based "solely" on new student points. The lack of real-time complaints further underscores the absence of evidence that the Plan was not implemented as it was designed.

## III.   MISCELLANEOUS TITLE IV ALLEGATIONS

The Demand Letters make other allegations regarding admissions practices at EDMC. Specifically, the Demand Letters allege that (i) ADAs are given commissions, bonuses and awards based solely on obtaining new student enrollments; (ii) ADAs enroll students without thoroughly reviewing their academic transcripts and admissions materials in order to determine whether they are qualified to attend the particular EDMC institution or online program; and (iii) ADAs pressure prospective students into accepting or changing financial aid packages or into expanding those financial aid packages to cover full-time tuition. The Litigation Committee found no basis to support these allegations.

For example, the Demand Letters allege that EDMC provided admissions personnel with all-expense-paid vacations and gifts based on student recruitment. Historically, EDMC's employees have been recognized for performance through company-wide programs, such as the President's Club and Top Achievers' Club. These programs included an annual all-expense-paid trip to an off-site location for a training

---

[2]     One upper-level manager explained that it was not possible to accurately guess new student points in advance of receiving the calculation from Corporate Services because ADAs did not have any knowledge of which students were backed out of the calculation due to lack of attendance. He estimated that, historically, some schools have had back out rates as high as 15 to 20 percent.

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
May 24, 2012
Page 11

program. Neither of these programs nor any similar program is currently in effect, and they have not been since around 2008 or 2009. More fundamentally, these programs did not violate the Act. In 1995, EDMC and other educational institutions sought guidance from the DOE on whether the Act would "prohibit an institution from paying the travel and related business expenses incurred by its employees for attendance at annual business meetings, when only the institution's top recruiters are invited to such meetings." *See* Letter from Dept. of Educ. Deputy Director, dated Feb. 6, 1995. In a February 6, 1995 letter, the Department advised that "paying for the travel and related expenses incurred for attendance at such business meetings would not be in violation of" the incentive compensation provision of the Act. *Id.*

Moreover, during the Department of Justice's review of EDMC's compensation practices in 2000 and 2001, EDMC described the President's Club program, provided numerous documents regarding the program, and expressed its opinion that the program was proper pursuant to the Department's February 6, 1995 letter. The Government never refuted EDMC's position regarding the President's Club or took regulatory action over the President's Club. Indeed, following EDMC's explanation, the Government dropped its review without requesting any change in compensation practices. Thus, there is no merit to the claim that the President's Club and similar programs violated the Act.

The Demand Letters allege that ADAs enroll unqualified students in order meet student enrollment quotas. The investigation revealed that this allegation is without merit. While ADAs recruit students, they have no role in setting admissions requirements or determining whether a student meets those requirements or should be enrolled. All admissions decisions are made by a separate department or committee, such as a school's Registrar. This is why interviewees described this allegation as "weird," "impossible," "absurd," the "furthest thing from the truth," and "nonsense."

The Demand Letters also allege that ADAs encouraged prospective students to accept unwanted financial aid packages or switch from full time to part time in order to have tuition covered by financial aid. The investigation found no support for this allegation. Financial aid determinations are not made by ADAs; rather a financial aid counselor works with prospective students to determine the amount of financial aid for which a prospective student will qualify. EDMC considers it a compliance violation for ADAs to be involved in financial aid determinations or talk with students about financial aid possibilities.

CONCLUSION

This letter confirms that the Litigation Committee has determined, in good faith and in the exercise of its business judgment, that it would not be in the best interests of EDMC or its shareholders to take the actions requested in the Demand Letters. Further,

GOODWIN | PROCTER

Jay W. Eisenhofer, Esq.
May 24, 2012
Page 12

the Committee has concluded that EDMC has appropriate internal controls, and
supporting policies and procedures, to address the specific risks identified in the Demand
Letters.

Sincerely,

*R. Todd Cronan /BMM*

R. Todd Cronan



Grant & Eisenhofer P.A.

123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000 • Fax: 302-622-7100

485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8500 • Fax: 646-722-8501

www.gelaw.com

1920 L Street, N.W., Suite 400
Washington, DC 20036
Tel: 202-386-9500 • Fax: 202-386-9505

Jay W. Eisenhofer
Managing Director
Tel: 646-722-8505
jeisenhofer@gelaw.com

May 24, 2012

**VIA EMAIL AND OVERNIGHT MAIL**

R. Todd Cronan, Esquire
Goodwin Procter LLP
Exchange Place
Boston, MA  02109

    Re:    **Shareholder Demand For Board Action**

Dear Mr. Cronan:

    This firm represents the Oklahoma Law Enforcement Retirement System ("OLERS"), a holder of common stock of Education Management Corporation ("EDMC" or the "Company"), in connection with the demands OLERS made on the EDMC Board of Directors ("Board"), dated August 19, 2011 and January 19, 2012 (collectively, the "Demands"). I write to respond to your May 17, 2012 letter, wherein you invited me to contact you if I was interested in providing the Board's Litigation Committee with information relating to the Title IV aspect of the Demands.

    I am a bit surprised by your invitation given that I have previously told you – most recently in my January 19, 2012 letter – that OLERS was willing to participate in the Committee's investigation. While you have extended the invitation more than once to provide the Committee with information, you have never actually followed up on my past acceptances of the invitation.

    As I have said before, OLERS is willing to participate in the Committee's investigation. What it is not willing to do is to refrain from pursuing redress on its own given the glacial pace at which the Committee has moved. On May 21, 2012, we filed a derivative case to address the claims for which the Committee has either explicitly or tacitly rejected OLERS' demand. I enclose a copy of the complaint for your review.

R. Todd Cronan
May 24, 2012
Page 2


       If you are still interested in meeting with us, please contact me with the details of your availability.


                    Very truly yours,

                    Jay W. Eisenhofer

JWE/pmk
Enclosure