# EXHIBIT 3

"

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

OKLAHOMA LAW ENFORCEMENT
RETIREMENT SYSTEM,

*Plaintiff,*

v.

TODD S. NELSON, JOHN R. McKERNAN,
MICK J. BEEKHUIZEN, SAMUEL C.
COWLEY, ADRIAN M. JONES, JEFFREY T.
LEEDS, LEO F. MULLIN, PAUL J. SALEM,
PETER O. WILDE, and JOSEPH R. WRIGHT

*Defendants,*

and

EDUCATION MANAGEMENT CORP.,

*Nominal Defendant.*

CIVIL DIVISION

No.: GD-12-008785

Code: 020 Equity

**AMENDED COMPLAINT IN
CIVIL ACTION**

Filed on behalf of Plaintiff:
Oklahoma Law Enforcement
Retirement System

Counsel of Record for this Party:

William R. Caroselli, Esquire
PA I.D. #00452
Email: wcaroselli@cbmclaw.com

CAROSELLI BEACHLER McTIERNAN
& CONBOY, LLC
Firm ID: 589

20 Stanwix Street, 7th Floor
Pittsburgh, PA 15222

Telephone: (412) 391-9860

**JURY TRIAL DEMANDED**

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, <br> *Plaintiff,* <br> v. <br> TODD S. NELSON, JOHN R. McKERNAN, MICK J. BEEKHUIZEN, SAMUEL C. COWLEY, ADRIAN M. JONES, JEFFREY T. LEEDS, LEO F. MULLIN, PAUL J. SALEM, PETER O. WILDE, and JOSEPH R. WRIGHT <br> *Defendants,* <br> and <br> EDUCATION MANAGEMENT CORP., <br> *Nominal Defendant.* | CIVIL DIVISION <br><br> No.: GD-12-008785 <br><br> Code: 020 Equity |

## AMENDED COMPLAINT IN CIVIL ACTION

Plaintiff Oklahoma Law Enforcement Retirement System ("OLERS" or "Plaintiff"), by and through its undersigned counsel, asserts this action on behalf of Education Management Corp. ("EDMC" or the "Company") against the EDMC Board of Directors. OLERS makes the following allegations upon knowledge as to itself and upon information and belief (including the investigation of counsel and review of publicly available information) as to all other matters, and alleges as follows.

## SUMMARY OF THE ACTION

1.     This is a shareholder derivative action that seeks to recover damages incurred by the Company caused by breaches of fiduciary duty by its Board of Directors ("Board").

2.     EDMC was taken private in 2006 in a leveraged buy-out ("LBO") led by Goldman Sachs, and then taken public again with an initial public offering in 2009. Since the LBO, there has been a radical shift in the Company's priorities. The $2 billion debt Goldman Sachs and its fellow investors took on in the LBO has driven the Company to value short-term

return over long-term, sustainable growth. This focus has led to aggressive and illegal recruiting techniques to drive up student enrollment, as well as improper incentive-based compensation for recruiters, in violation of various regulations governing disbursement of federal funds for education. As a result, EDMC has become one of the largest for-profit educational providers in the country, but the Company faces a myriad of legal challenges to its practices.

3.      EDMC's primary revenue stream comes from the tuition that students pay to enroll in the Company's various academic programs. The majority of tuition paid to EDMC is funded by federal student financial aid programs authorized by Title IV ("Title IV") of the Higher Education Act of 1965, as amended (the "HEA").

4.      In order to continue receiving Title IV funds, EDMC must be compliant with the regulations of both the federal and state governments. Specifically, EDMC must comply with the rules and regulations established by the Department of Education ("DOE"), as well as those established by state agencies and accrediting agencies. These regulations prohibit, *inter alia*, compensating employees based solely on the number of new students they recruit (the "Incentive Compensation Ban") and recruiting new students with various aggressive recruitment tactics designed to enroll new students at all costs regardless of the students' eligibility.

5.      Educational institutions receiving Title IV funding must maintain state authorization and accreditation by a recognized accrediting agency. Agencies require EDMC schools to demonstrate their graduates are "gainfully employed" in a profession that utilizes the degrees earned. Some accrediting agencies have minimum gainful employment thresholds that require placement of approximately 65% to 70% of each graduating class in jobs in their chosen field of study to receive accreditation.

6.    EDMC maintains that it is fully compliant with all governing rules and regulations, but the reality is that the advent of the LBO and the extraordinary focus on servicing the debt-load has led it to violate several key requirements. EDMC's practices that are in violation of these rules and regulations include: improperly compensating its employees based solely on the number of new student enrollments in violation of the Incentive Compensation Ban; aggressively and misleadingly coercing potential new students to enroll in violation of recruitment policies; and misrepresenting EDMC graduates' job placement data in order to retain or obtain accreditation, a practice which misleads both investors and potential new students.

7.    As a result of EDMC's misconduct and violations of Title IV and state regulations, EDMC risks losing its eligibility to accept Title IV funding, which would threaten to extinguish nearly 90% of its revenue stream and thus its very existence.

8.    EDMC is already facing some of the consequences of its violations. Two *qui tam* actions were filed by relators under federal and state false claims acts, alleging that EDMC has violated governmental regulations while receiving Title IV funding. The federal government and various state governments intervened in the action, which is pending against EDMC in the United States District Court for the Western District of Pennsylvania ("District Court") under the caption *United States of America v. Education Management Corp.*, 2:07-cv-461 (W.D. Pa., filed August 8, 2011) ("Government Action"). EDMC faces substantial liability in the Government Action, including the possibility of treble damages that could total more than $33 billion. By opinion and order dated May 11, 2012, the District Court upheld the majority of the claims brought both by the federal and the state governments in the Government Action.

9.    Plaintiff learned of the misconduct at EDMC on or about August 8, 2011, when the federal government intervened in the Government Action and the protective seals on the *qui*

*tam* actions were lifted.  Since learning of the Government Action, Plaintiff has also discovered that other government entities are investigating wrongdoing at EDMC.  Both the Government Accountability Office ("GAO") and the Senate Health, Employment, Labor and Pension ("HELP") Committee have investigated EDMC as part of their investigations into abuses committed by for-profit education companies.  In December 2011, the GAO issued a report titled: "Student Outcomes Vary at For-Profit, Nonprofit, and Public Schools" ("GAO Report") and on July 29, 2012, the Senate HELP Committee issued a report titled "For Profit Higher Education:  The Failure to Safeguard the Federal Investment and Ensure Student Success" ("HELP Report").  The GAO Report found that graduates of for-profit schools had higher rates of unemployment and default rates on their loans, as compared to graduates of public or nonprofit schools, suggesting that across the industry, for-profit schools regularly admit unqualified students.  The HELP Committee reported specific examples of wrongdoing by EDMC employees, particularly with regard to aggressive recruiting tactics, which were supported with citations to internal EDMC documents.

10.    Upon learning of the abuses at EDMC, by letter dated August 19, 2011, Plaintiff made a demand on the EDMC Board to bring suit asserting the claims set forth herein ("Demand Letter").  On December 8, 2011, counsel for Plaintiff received a reply letter from R. Todd Cronan, Esquire ("Cronan") at Goodwin Procter LLP ("Goodwin"), which referred to a committee of unidentified "disinterested directors" (the "Committee"), purportedly convened by EDMC's Board to investigate the conduct described in the Demand Letter, and which invited Plaintiff to participate in the investigation by providing information.

11.    Counsel for Plaintiff responded to Goodwin's letter by letter dated December 15, 2011, expressing a strong interest in providing the Committee with information and otherwise

participating in the Committee's investigation.  Plaintiff's counsel also requested that Goodwin identify the Committee members and provide a copy of the Board's resolution that created the Committee and defined the scope of its authority.

12.     Notwithstanding Plaintiff's acceptance of Goodwin's invitation for Plaintiff to participate in the investigation, Plaintiff did not receive a response from Goodwin or any representative of the Board, the Committee or the Company concerning the Committee's investigation.  On January 19, 2012, Plaintiff wrote to Cronan again, reiterating Plaintiff's willingness to work with the Committee on the investigation, and supplementing the initial Demand Letter with additional allegations of wrongdoing, including allegations that EDMC's financial health was questionable in light of certain actions of the DOE and that EDMC falsified its job placement data provided to accreditation agencies and disclosed to investors.  Given that Plaintiff had received no substantive response from the Committee during lengthy amount of time since Plaintiff's demand was first made, Plaintiff requested a response from the Committee on or before February 20, 2012.

13.     On February 17, 2012, Stuart M. Glass ("Glass") of Goodwin wrote to Plaintiff's counsel stating that the Committee expected to have a "response" to "some of the issues addressed in your letters" by the end of the week of February 20, 2012.  That response finally materialized on March 6, 2012 ("March 6 Response").  In the March 6 Response, the Committee refused Plaintiff's demand with regard to the issue of why EDMC was required to post a greater letter of credit and with regard to the issue of false job placement data.  The Committee's investigation of improper recruitment and other practices that threatened EDMC's receipt of Title IV funds, including the violation of the Incentive Compensation Bans, was purportedly ongoing.

14.    On May 16, 2012, Plaintiff's counsel received another letter from Cronan which stated that the Committee was in the process of finalizing its report, and that a substantive report would be forthcoming.  However, by this time, Plaintiff's counsel had waited nearly nine months since sending its initial Demand Letter on August 19, 2011, with no substantive response from EDMC regarding allegations of improper recruitment and the violation of the Incentive Compensation Ban, and the Committee had not accepted Plaintiff's offer to participate in the investigation.  Therefore, Plaintiff's counsel determined it was left with no choice but to file a complaint against the wrongdoers at the Company.

15.    On May 24, 2012, Plaintiff's counsel finally received a letter from Cronan, on behalf of the Committee ("May 24 Response"), which supplemented the March 6 Response and denied Plaintiff's demand with regard to the Company's violation of the Incentive Compensation Ban and the improper recruitment of new students.

16.    On May 31, 2012, the Company produced its "Report of the Litigation Committee" ("Report"), summarizing the contents of the March 6 and May 24 Responses.

17.    The Committee has not acted reasonably or in good faith in addressing Plaintiff's demands.  First, the Committee members – whose identities were finally revealed in the March 6 Response – are conflicted because they are closely connected with two of the investors in the LBO.  It is the heavy debt load incurred in the LBO that caused the focus at EDMC to lean so strongly toward the wrongful recruitment and compensation practices.  The Committee members were also conflicted during their investigation that led both to the March 6 and May 24 Responses because they were defendants in a securities action ("Securities Action"),[1] and

---

[1] The Securities Action, *Gaer v. Education Management Corp., et. al.*, 2:10-cv-1061RCM (W.D. Pa.) was initially filed on August 11, 2010.  The case was dismissed for failure to meet the scienter requirement of securities fraud, but was on appeal to the United States Court of Appeals for the Third Circuit at the time the March 6 and May 24

ultimately could have faced significant personal liability in that case. In other words, they had a vested interest in ensuring that the issues underlying the Securities Action and common to Plaintiff's Demand were swept under the rug through a demand refusal.

18.     Second, the Committee, despite paying lip service to a desire to meet with the Plaintiff, never responded to Plaintiff's multiple offers to meet and work with the Committee.

19.     Third, the refusal of the Demand on the issue of EDMC's failing financial reliability in the eyes of the DOE and the need to post increasingly higher letters of credit with the DOE was wrongful. The Committee's "explanation" for the fact that the EDMC has failed to meet the DOE's financial health ratios is facially nonsensical. The Committee purports that the higher level of credit was required because the DOE expects the dollar amount of EDMC's Title IV funds to increase. However, an increase in the amount of Title IV funds alone does not explain why the DOE would require a higher *percentage* of those funds to be posted. Moreover, the DOE was concerned enough about the financial situation at EDMC to give its schools only provisional certification – a determination that is based upon the Secretary of the DOE's belief that the institutions are not sufficiently financially stable. Thus, because the Committee's reasoning was inherently flawed, it was unreasonable for the Committee to refuse demand on these issues.

20.     Fourth, the refusal of Plaintiff's demand regarding false job placement data reporting was also wrongful. The Committee admits that it did not even conduct its own investigation of the issue. Rather they chose to rely entirely upon a prior on an internal investigation conducted by the Company when a whistleblower first made allegations concerning falsification of job placement data. This is an utterly improper abdication of responsibility.

---

Responses were being prepared. On April 18, 2012, EDMC announced that the plaintiffs in the securities case had withdrawn their appeal.

Moreover, the internal investigation was limited to one division of EDMC, whereas Plaintiff's demand was not so limited. Failure to conduct its own investigation and to rely upon a limited investigation alone is unreasonable and demonstrates the Committee's bad faith.

21.     Fifth, the refusal of the demand regarding the Company's violation of the HEA's Incentive Compensation Ban and improper recruiting practices was also wrongful for several reasons. First, the Committee's conclusions were based primarily on purported internal controls at the Company, yet the Report does not adequately address whether those controls were actually followed. For example, although EDMC may have procedures in place for reporting ethical violations, neither the May 26 Response nor the Report demonstrate any effort to determine whether employees did, in fact, make such reports. This myriad of problems associated with relying on the mere existence of internal controls makes it unreasonable for the Committee to have rejected Plaintiff's demands regarding the Incentive Compensation Ban and improper recruiting practices. To say the least, it strains credulity to conclude that these internal controls were effective in light of the host of allegations against the Company coming from all directions, including the federal and several state governments, whistleblowers, and investigative reports.

22.     Sixth, with regard to its conclusion that EDMC did not violate the Incentive Compensation Ban, the Committee examined primarily only whether EDMC's compensation plan was properly designed, and provides insufficient evidence that the Committee investigated whether that plan was properly implemented. The absence of any legitimate effort to determine whether EDMC's written compensation plan was actually followed in practice renders the Committee's conclusions unreasonable.

23.     Finally, the Committee's investigation does not identify the employees it purportedly interviewed, and furthermore, to the extent the employees provided support for the

Committee's conclusions, neither the May 26 Response nor the Report provide any basis to conclude those employees were forthcoming with relevant information.  For example, the Report does not state whether the employees would have felt free to speak openly to the Committee members without concern for retribution from the Company.  Such facts are critical to a determination of whether the Committee's investigation was made in good faith and whether its conclusions were reasonable.  Their omission gives rise to an inference that those questions should be answered in the negative.

24.     Indeed, as described below, Plaintiff conducted its own investigation, which occurred during a three-month period following the Board's improper demand refusal on May 24, 2012.  Despite significant constraints, including no access to non-public Company documents and ethical constraints prohibiting Plaintiff from contacting any current EDMC employees, Plaintiff's investigation confirmed the allegations of wrongdoing at EDMC in the Government Action and in other public reports.  In particular, Plaintiff's investigation included interviews with seven confidential witnesses, all of whom confirmed that aggressive recruiting practices pervaded EDMC's culture and that EDMC violated the Incentive Compensation Ban.  That Plaintiff was able to uncover corroborative evidence of the public reports of wrongdoing, despite the fact that its investigation faced significant restrictions not constraining the Committee, confirms that the Committee's investigation was not conducted in good faith and that its results were unreasonable.

25.     For these reasons, Plaintiff asserts that its demands have been wrongfully refused by the Committee, which has not acted reasonably or in good faith.  Plaintiff therefore brings this derivative action to address the wrongdoing at the Company that the Board and its Committee have refused to address.

## JURISDICTION

26.     This Court has jurisdiction over this action because the Company is headquartered in Pittsburgh, Pennsylvania.

27.     As directors of a Pennsylvania Corporation, the Individual Defendants have consented to the jurisdiction of this Court pursuant to Section 5322(a)(7)(iv) of the Judicial Code, 42 Pa.C.S.A. §5322(a)(7)(iv).

## THE PARTIES

28.     Plaintiff Oklahoma Law Enforcement Retirement System is a public pension retirement fund.  Plaintiff has owned EDMC common stock continuously during the time of the wrongful course of conduct by the Defendants alleged herein and continues to hold EDMC stock.

29.     Nominal Defendant EDMC is a Pennsylvania corporation with its principal place of business located in Pittsburgh, Pennsylvania.  It is one of the largest for-profit education providers in the United States, offering campus-based and online instruction to students through its Art Institute, Argosy University, Brown Mackie College and South University schools.  In total, EDMC operates schools in 108 locations across the United States and Canada, and through those schools awards undergraduate and graduate degrees and certain specialized non-degree diplomas in a broad range of disciplines.  On October 1, 2009, EDMC offered 20 million shares of its common stock pursuant to a Registration Statement on Form S-1/A ("Registration Statement") and an Initial Public Offering ("IPO") for proceeds of $330 million.

30.     Defendant Todd S. Nelson served as the Company's Chief Executive Officer ("CEO") and a Director from February 2007 until August 15, 2012.  On August 15, 2012, Defendant Nelson was named Chairman of the Board.  He was formerly the CEO of Apollo Group, Inc., which was the parent company of the University of Phoenix, the nation's largest for-

profit post-secondary school educational provider. During Nelson's tenure there, the DOE accused the University of Phoenix of misconduct that is very similar to that described herein; those accusations were settled by a record payment by the University of Phoenix.

31.    Defendant John R. McKernan, Jr. ("McKernan") has served as a director of the Company since June 1999, and until August 15, 2012 was the Chairman of the Board. McKernan also served as EDMC's CEO from September 2003 until February 2007.

32.    Mick J. Beekhuizen ("Beekhuizen") has served as a director of the Company since October 2009. Beekhuizen has been a Managing Director in the Merchant Banking Division of Goldman Sachs & Co. since 2010. Beekhuizen is a designee on the EDMC Board by Goldman Sachs Capital Partners, one of the entities that participated in the 2006 LBO.

33.    Samuel C. Cowley ("Cowley") has served as a director of the Company since October 2009.

34.    Defendant Adrian M. Jones ("Jones") has served as a director of the Company since June 2006. Jones also serves as a managing director of Goldman, Sachs & Co.'s Principal Investment Area of its Merchant Banking Division. Jones was appointed to the EDMC Board by Goldman Sachs Capital Partners.

35.    Defendant Jeffrey T. Leeds ("Leeds") has served as a director of the Company since March 2007. Leeds is also the President and a co-founder of Leeds Capital Partners, one of the entities that participated in the LBO, and was appointed to the EDMC Board by Leeds Capital Partners.

36.    Defendant Leo F. Mullin ("Mullin") has served as a director of the Company since June 2006. Mullin also serves as a consultant to Goldman Sachs Capital Partners. Mullin was one of the members of the Committee.

37.    Defendant Paul J. Salem ("Salem") has served as a director of the Company since June 2006.  Salem is also a Senior Managing Director and Co-Founder of Providence Equity Partners, one of the participants in the 2006 LBO, and was appointed to the EDMC Board by Providence Equity Partners.  Salem was one of the members of the Committee.

38.    Defendant Peter O. Wilde ("Wilde") has served as a director of the Company since June 2006.  Wilde also serves as a Managing Director of Providence Equity Partners and was appointed to the EDMC Board by Providence Equity Partners.

39.    Defendant Joseph R. Wright ("Wright") has served as a director of the Company since August 2011.

40.    Defendants Nelson, McKernan, Beekhuizen, Cowley, Jones, Leeds, Mullin, Salem, Wilde and Wright are referred to herein collectively as the "Individual Defendants."

41.    By virtue of their positions as directors of EDMC and/or their exercise of control and ownership over the business and corporate affairs of the Company, the Individual Defendants at all relevant times had the power to control and influence the Company, and did control and influence and cause the Company to engage in the practices complained of herein. Each Individual Defendant owed the Company's shareholders fiduciary obligations of candor, due care, good faith, and loyalty and were required to: (1) use their ability to control and manage EDMC in a fair, just, and equitable manner; (2) act in furtherance of the best interests of EDMC's shareholders; (3) govern EDMC in such a manner as to heed the expressed views of its public shareholders; (4) refrain from abusing their positions of control; and (5) not favor their own interests at the expense of the Company and its public shareholders.

## BASES FOR ALLEGATIONS

42.    Plaintiff's allegations are based on an extensive investigation conducted over the past year which includes review of the Government Action's complaint and related court filings and orders; review of the GAO's Report; review of the HELP Report; review of public investigative reports; review of the Company's public SEC filings and press releases; and interviews of the seven confidential witnesses ("CWs") described below.  It also bears noting that none of the seven CWs interviewed as part of Plaintiff's investigation were contacted during the course of the Committee's investigation, nor did they know any person who had been contacted by the Committee, a fact which underscores that the Committee's investigation was not conducted in good faith.  Furthermore, Plaintiff, through its counsel and investigators, was contacted by current EDMC employees seeking to provide additional information in support of Plaintiff's allegations; however, ethical constraints precluded Plaintiff's counsel from following up with those EDMC employees.

43.    CW1 was a Director of Admissions II at South University for nearly five years, until February 2012.  He explained that he noticed a distinct difference in corporate culture following the LBO.  In particular, he believed the Company was under greater pressure to boost profits following the LBO, and in an attempt to bolster new enrollment figures, the Company shortened its recruiting cycle for signing up new enrollees from five and a half weeks to two weeks.  The effect of the shortened recruiting cycle was that Assistant Directors of Admission ("ADAs"), who were chiefly responsible for recruiting and enrolling new students, were expected to be responsible for at least two new student enrollments every two weeks.

44.    CW2 was employed at EDMC from January 19, 2006 to August 4, 2011.  He joined EDMC as an ADA for the Art Institutes ("AI") in Pittsburgh, PA and was responsible for

13

recruiting students to AI's online programs.    After approximately three years, CW2 was promoted to the position of Second Director of Admissions.    CW2 described the reporting structure within EDMC's recruiting department:    First Directors of Admissions oversaw approximately six Second Directors of Admissions, who in turn oversaw teams of approximately fifteen ADAs.    The First Directors reported to vice presidents, who reported to the EDMC President of Online Higher Education, John Kline.    Kline, in turn, reported to Defendant Nelson. (In fact, Kline and Defendant Nelson worked together at the University of Phoenix, as described below, and Defendant Nelson was responsible for bringing Kline to EDMC.)    CW2 attended several meetings run by Kline during his tenure.    According to CW2, Kline held regular meetings approximately once every two months during which he discussed topics such as EDMC's financial performance, enrollment numbers and graduation rates.    CW2 further reported that Kline earned $400,000 a year and was eligible for an annual bonus of $400,000 that was dependent on enrollment growth.    In addition to the reporting structure and the meetings held by Kline, CW2 described the "Matrix compensation plan," EDMC's written plan that purported to determine an ADA's compensation.    The Matrix was a grid which listed the number of new student enrollees attributable to an ADA on the left hand side, and various "quality factors" across the top.    Salaries were determined by matching enrollment numbers with the quality scores given to ADAs.    Salaries increased with higher enrollment numbers and quality factor scores, but according to CW2, the quality factor scores an ADA would receive would typically increase with the number of new enrollees as well.    Thus, CW2 concluded that "quality factors mattered not one bit" in determining compensation.    CW2 also provided some evidence that the Matrix compensation plan was not compliant with federal regulation even as written because

EDMC terminated it in or about April 2011, when EDMC schools were coming under heightened scrutiny from federal regulators.

45.    CW3 began at EDMC as an ADA, and was promoted to project assistant ("PA") and later Director of Admissions.  CW3 served from August 2008 to June 2010 at EDMC's Argosy University in Pittsburgh, PA.  CW3 reported directly to Director Lindsey McWilliams, who in turn reported to Senior Director Traci Roble.  CW3 stated that s/he believed that Roble oversaw all of Argosy University's admissions directors based in Pittsburgh.  In turn, CW3's supervisor reported to the Senior Director of Corporate Business Development.  CW3 confirmed that the Matrix was used to determine ADAs' and PAs' salaries and that quality factors were of limited or no importance in determining compensation.  For example, even though potential scores of 1 through 5 could be awarded for quality factors, in practice, scores of only 2 through 4 were awarded.  CW3 also stated that the individuals with higher enrollment quotas would nearly always receive higher quality scores.  In fact, CW3 stated that no ADA meeting target enrollments would receive a quality factor score below "3."  The consistent correlation between higher enrollment quotas and higher quality scores suggests that, in practice, the quality scores were, at best, window dressing.  Furthermore, CW3 explained that ADAs who did not meet various quotas in the Matrix saw their salaries decline by as much as 10%, regardless of the fact that their quality factor scores remained constant.  Directors were also subject to quotas based on their teams' enrollments.  In order to receive credit for a new enrollment, an ADA's new student only had to attend classes for the first week the course was in session.  CW3 also described the hands-on approach used and pressure tactics applied by his/her supervisors, Roble and McWilliams.  They constantly visited CW3's desk to inquire about particular recruitment calls or

discuss his/her enrollment numbers, and met daily for 15-20 minutes to receive updates on quotas and enrollment statuses.

46.    CW4 was an ADA from March 2009 to August 2009 at South University and worked at EDMC's Phoenix "call center," where ADAs for AI and Argosy University also worked. During his tenure, he reported to a Senior Director of Admissions, Joshen Franken and later Dale Clark, for EDMC Online Higher Education. These directors reported to a Senior Director of Admissions for EDCM, Sam Yaghoubi. Although CW4 confirmed that the Matrix system purportedly determined compensation, he had never even heard the term "quality factors," and his/her understanding was that ADAs' salaries and employment statuses were determined solely by the number of new enrollments. CW4 also gave some insight into the training of new ADAs at EDMC. S/he stated that his/her training was conducted by Leo Reynolds, who was a corporate trainer based in Phoenix. CW4 learned during his/her training sessions that an ADA's salary could be cut by as much as 10% if quotas were not met. It was made clear that ADAs were expected to enroll as many new students as possible, by employing such tactics as finding "points of pain" to exploit.

47.    CW5 was an ADA at EDMC for over 4 years, from January 2008 to February 2012, recruiting students for South University's online programs. S/he worked at EDMC's headquarters in Pittsburgh, and estimated that up to 1,500 employees worked there, including ADAs for Argosy University and the Art Institutes. CW5 reported to various managers during his/her tenure, who reported to the Vice President of South University Online, Walid Kaakoush. Kaakoush, in turn, reported to the Regional Vice President of South University Online, Steve Read, who reported to Kline. Like CWs 1-4, CW5 also confirmed that salaries were based on the number of students each ADA was responsible for enrolling. Although CW5 stated that

EDMC purported to use "quality points" in determining compensation, they made it clear that "if you didn't produce, you were fired," and he saw hundreds of ADAs fired over his four-year term. S/he stated that s/he heard that the quality points were only included so that EDMC could meet federal regulations. CW5 also described Kline's regular company meetings, which s/he described as "state of the union" types of meetings.

48.    CW6 was an ADA at EDMC for approximately 8 months, from November 2009 through July 2010, and s/he also recruited students for South University's online programs from the Pittsburgh headquarters. Like the other CWs, CW6 described the Matrix and stated during his/her training session, s/he was told that people could make "like $100,000 [a year] if we could recruit lots of students." CW6 also stated that ADAs who met certain thresholds of new enrollments were then given higher thresholds, and sometimes fired if they did not meet those higher enrollments. Alternatively, ADAs' salaries could be downgraded for not meeting quotas. CW6 stated that since EDMC's compensation scheme was discussed at all ADA training sessions and included a hard copy handout of the Matrix, s/he believed that all high-level EDMC executives would have been aware of its structure and application. CW6 also explained that an ADA's periodic evaluations consisted primarily of being given printouts of detailed statistics concerning how many new students an ADA had signed up. Failure to meet quotas resulted in verbal and then written warnings, and potentially even termination, which is what happened to CW6. CW6 recalled that he attended a company-wide meeting in 2010 that was also attended by Defendant Nelson and other high level executives. During this meeting, topics relating to ADA compensation issues were widely discussed, and he strongly believed executives would have been aware of the compensation system that was practiced at EDCM.

49.     CW 7 was an Admissions Representative ("AR") at EDMC from March 2011 to March 2012. S/he recruited students for The Art Institutes' online programs and was based in Phoenix, AZ, which also recruited students for South University and Argosy University. CW7 also stated that ADAs were required to meet enrollment and retention quotas, and were disciplined or fired if they failed to do so. CW7 reported to an Admissions Manager Scott Thorp, who managed a team of 12 to 14 ARs for AI's interior design programs. Thorp reported to Admissions Director Brandon Corely, who reported to a Vice President of Admissions Julie Johnson. Johnson, in turn, reported to Kline. CW7 stated that Kline traveled frequently between the Phoenix and Pittsburgh locations, and CW7 attended several meetings held by Kline. At one such meeting in February 2012 in Phoenix, Kline told the ARs that EDMC was not enrolling enough students and had to increase its numbers or they would lose their jobs. A similar message was delivered by Kline at a meeting a month later in March 2012, and shortly thereafter, CW7 was laid off. Regarding compensation, CW7 stated that "at the end of the day, it's all about [enrollment] numbers." To achieve those high numbers, ARs were expected to make approximately 300 phone calls per day to prospective students.

## SUBSTANTIVE ALLEGATIONS

### I.    THE GROWTH AND PROBLEMS OF THE FOR-PROFIT EDUCATION SECTOR

#### A.    The Relationship of For-Profit Institutions, Title IV Funding and the Incentive Compensation Ban

50.     For-profit universities and colleges are known primarily for training students for "passion" fields, such as art, cooking, fashion design and the like. EDMC is of that mold, having acquired the Art Institute of Pittsburgh in 1970 and having grown to more than 70 campuses nationwide by 2006 under its four brand names of the Art Institutes, Brown Mackie College,

Argosy University and South University.  Today, EDMC operates 107 campuses in 32 states, as well as an online division which is attended by approximately 25% of its students.

51.    EDMC has seen rapid growth, becoming in the past few years one of the largest for-profit education companies today.  It has grown more than four-fold since 2001, from 38,047 students in 2001 to 158,300 students in 2010, and 64% of this growth has occurred since EDMC's LBO in 2006.  Online enrollment has also mushroomed, from 6,400 students in 2006 to 42,300 students in 2010.  This rapid growth has allowed revenue to double in just three years, from $1.3 billion in 2007 to $2.9 billion in 2010.

52.    For-profit universities rely heavily on funding from the federal government in the form of financial aid for their students.  Title IV of the HEA, 20 U.S.C. §§ 1070, *et seq.*, governs the provision of various student loan and grant programs, including, *inter alia*, the Federal Pell Grant Program ("Pell"), the Federal Family Education Loan Program ("FFELP") and the Federal Direct Loan Program ("FDLP") (collectively, "Title IV Funding").  The purpose of Title IV Funding is to assist students in paying for a post-secondary school education who would otherwise not be able to afford the tuition and other associated costs.

53.    As the for-profit education industry has expanded, so too have for-profit schools' shares of Title IV Funding.  Between 2001 and 2010, the share of Title IV Funding flowing to for-profit schools increased from 12.2 to 24.8 percent ($5.4 billion to $32.2 billion).

54.    EDMC has contributed heavily to the increase in Title IV Funding going to for-profit schools.  For example, from July 1, 2003 through June 30, 2011, EDMC received over $11.1 billion in Title IV Funding for students enrolled in EDMC institutions.  On a yearly basis, those amounts ranged from $656 million in "Award Year" 2003-2004 (an Award Year runs from

July 1 through June 30 of the following calendar year) to over \$2.5 billion in Award Year 2010-2011.

55.     The regulations surrounding the grant of Title IV Funding are meant to protect these resources from abuse.  For example, if a student defaults in repaying a loan under FFELP, a state or private guaranty agency reimburses the lender or the subsequent holder of the loan for the outstanding balance and takes assignment of the loan.  34 C.F.R. § 682.401(b)(14).  If the guaranty agency is unable to collect from the borrower, the DOE reimburses the guaranty agency for any loss, 20 U.S.C. § 1078(c)(1)(A), and the DOE may, in its discretion, take assignment of the loan.  20 U.S.C. § 1078(c)(8).  In this way, the government – not the for-profit institution – ultimately bears the losses for any unpaid loans.

56.     Each of the programs under Title IV requires that certain conditions be met before students, and ultimately the institutions they attend, are eligible to receive federal funds.  Specifically, in order to receive Title IV Funding, a student must attend a school that had first entered into a program participation agreement ("PPA") with the DOE.  20 U.S.C. § 1094(a); 34 C.F.R. §668.14.  Pursuant to the PPA, the university must certify that its educational institutions are compliant with various regulations.

57.     Any act which violates the HEA, including falsely certifying that an institution's schools are entirely compliant with HEA regulations or submitting false PPAs, threatens an institution's ability to receive Title IV funding.  In addition, violations of the HEA can subject the institution to substantial fines, including in some cases, treble damages.

58.     One key provision that educational institutions must comply with in order to receive Title IV funding is the "Incentive Compensation Ban."  Section 487(a)(20) of Title IV of the HEA, 20 U.S.C. § 1094(a)(20) requires that schools "will not provide any commission,

bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance. . . ."

59.    This means that in order to receive Title IV Funding, an institution may not pay its employees based on the number of new students those employees recruit.    The Incentive Compensation Ban was enacted because there was a correlation between high loan default rates and the payment of commissions, bonuses, or other incentive payments based upon the success in recruiting new students to an institution.    Not surprisingly, where an employee's compensation is based upon the number of students he or she is responsible for enrolling – and in turn the tuition and fees that student pays to the institution – there is an incentive for that employee to relax the admissions standards and/or to aggressively target students who are not actually qualified to either attend the institution or to repay the loans.    The high loan default rates occurring before the Incentive Compensation Ban was enacted were causing a significant drain on funds where the government was acting as loan guarantor.    Congressional findings of abuses in federal student aid programs uncovered such abuses as "contests . . .  whereby sales representatives earned incentive awards for enrolling the highest number of students for a given period." S. Rep. No. 58, 102nd Cong., 1st Sess., at 8 (1991).    These findings helped provide the impetus for the enactment of the Incentive Compensation Ban.

> The Incentive Compensation Ban was amended in 2002 to clarify that schools may pay "fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid."    34 C.F.R. §668.14(b)(22)(ii)(A) ("Regulatory Safe Harbor").

**B.    Apollo Group, Under Defendant Nelson's Leadership, Tests the Bounds of the Incentive Compensation Ban and Pays a Record Settlement**

60.    The leader of the for-profit educational sector is the Apollo Group ("Apollo"), which runs the University of Phoenix.  About a decade ago, Apollo's enrollment and revenues exploded – with Defendant Nelson at the helm, first as President, then as CEO and Chairman. Under Nelson's guidance, Apollo tripled its revenues between 2001 and 2006.  Enrollment increased from 124,800 students to 282,300 students during his tenure.  Apollo and its University of Phoenix schools were the posterchild for success in the for-profit education industry.

61.    However, an unseemly secret to Apollo's success was revealed in early 2004 when the DOE issued a report that alleged Apollo's remarkable success resulted from predatory admissions practices at the University of Phoenix – practices which violated the Incentive Compensation Ban and other government regulations concerning new student recruitment practices.

62.    The DOE report stated that admissions officers at the University of Phoenix were little more than salespeople who were constantly pressured to increase the number of students they admitted.

63.    Successful admissions officers, *i.e.*, those who met their student enrollment quotas, were rewarded with lavish trips and other perquisites.  Admissions officers who did not meet their quotas were subjected to ridicule and humiliation, and received threats that they would be fired.  Underperformers were forced to do their jobs from the "red room," which was constantly monitored by supervisors, and were denied vacation time and breaks.  Admissions officers' "performances" – the number of students they recruited – were tracked daily on dry erase boards for the entire department to see.

64.    Admissions officers' compensation was determined according to a system called the "matrix." Under the matrix at the University of Phoenix, there was a direct correlation between an admission officer's compensation and the number of students he recruited. Other "quality of performance" factors were also supposedly considered in determining compensation, but in reality what really drove compensation was the number of students an officer enrolled.

65.    In September 2004, the University of Phoenix settled the charges leveled by the DOE for a record amount at the time – $9.8 million. Defendant Nelson left Apollo in January 2006, having been pushed out by Apollo's founder for his ruthless pursuit of short term profits to temporarily bolster the stock price. John Sperling, the founder of the University of Phoenix schools testified in 2006 that Nelson was asked to leave Apollo by its board of directors because he was "mainly concerned with the stock price and not with the functioning of the company."

## II.    THE PERFECT STORM – DEREGULATION, MORE FEDERAL DOLLARS AND EDMC'S 2006 GOLDMAN SACHS-LED LBO

66.    2006 was an eventful year for the for-profit institutions. The federal government was making more Title IV Funding available for students who wanted to go to college, and it also lifted certain regulations that constrained for-profit institutions in their growth models. Specifically, the government lifted the requirement that at least 50% of students be enrolled in brick and mortar institutions. Following that change, online students could account for more than 50% the student bodies at for-profit institutions.

67.    This deregulation and increased financial aid created a potential for growth that the sector had not seen before. The for-profit institutions wasted no time expanding their recruiting efforts for online students.

68.    According to the Senate HELP Committee Report, in 2009, the 15 publicly traded for-profit institutions spent, on average, 23% of their revenues on marketing and recruiting (and

19.7% on profit) while 86% of their revenues came from federal taxpayers. As described by a December 14, 2011 report on huffingtonpost.com, "[T]his new market in higher education boasted seemingly unlimited growth potential at virtually zero risk. . . . The colleges essentially receive all their revenues upfront, primarily through federal government loans and grants for tuition, regardless of whether students are able to gain employment and pay back their loans."

69.    Goldman Sachs recognized the unique opportunity that the confluence of these factors created. Thus, in 2006, it and a small consortium of investors (which also included Providence Equity Partners and Leeds Capital Partners) bought EDMC in a leveraged buy-out for $3.4 billion. In total, EDMC took on $2 billion in debt to finance the purchase.

70.    Not surprisingly, once Goldman Sachs, Providence and Leeds took over, the composition of EDMC's Board changed as well. By the time of the IPO in 2009, 50% of the EDMC Board was appointed by the LBO investors. Goldman Sachs appointed Defendants Beekhuizen and Jones, both Goldman Sachs employees. Leeds appointed Defendant Leeds, who is a co-founder of Leeds. Providence appointed Defendants Salem and Wilde, both of whom are Managing Directors of Providence.

## III.    THE NEW CULTURE OF EDMC – ENROLLMENT ABOVE ALL ELSE

71.    According to EDMC's former CFO Robert T. McDowell, who retired shortly after the LBO, the debt from the LBO changed EDMC's focus. As McDowell observed, when "you take on that amount of private-equity debt, you need to earn high rates of return for these investors." Indeed, a former EDMC vice president for marketing and admissions operations noted that once the LBO investors took over in 2006, the "new group managed [EDMC] short term."

72.    In pursuit of those short-term, high rates of return, the consortium turned to Defendant Nelson.  In February 2007 – virtually as soon as his non-competition agreement with Apollo had expired – Defendant Nelson joined EDMC as its new CEO.

73.    Soon thereafter, other former Apollo executives were brought on board at EDMC – Robert Carroll (Apollo's former CIO), Craig Swenson (a former Senior Vice President of the University of Phoenix), Ken Boutelle, Sam Yaghoubi, David Preece, Phil Clark, Sean St. Clair, Jamie Wellnitz, Mary Dyer-St. Clair, Anthony F. Digiovanni (Senior Vice President of Marketing and Admissions) and John Kline (President of EDMC Online Higher Education).

74.    With the change in management came a change in culture at EDMC.  Enrolling new students, at all costs and above all other considerations, became the focus of the administration.  According to Kathleen Bittel, who started her career at EDMC as a recruiter at its Argosy University in the first year after the LBO, "it was an absolute feeding frenzy.  They were on us every minute of the day.  We had managers who were just literally circling the pods, listening to every word that was spoken.  I swear I thought they were going to wear out the carpeting."

75.    Admissions staff grew exponentially, from 950 to 2,600.  The "sales" focus of the recruitment process was bolstered by hiring career salespeople rather than people experienced in the academic arena.  According to CW7, an admissions representative for AI based in Phoenix, "Honestly, it really was a sales job.  We were selling the dream.  Our job was to sell the dream."

76.    To bolster "sales," i.e., new student enrollments, EDMC sought to train its admissions representatives in traditional sales techniques.  To that end, EDMC invited Michael Mahoney in late July or early August 2006 to interview with the Vice President of Admissions for EDMC's Online Higher Education division, Ken Boutelle (a former Apollo employee under

Nelson), for the position of Director of Training for EDMC's online division. Mr. Mahoney's background was in sales and sales training in the automotive industry. During that meeting and in a subsequent interview, Mr. Boutelle informed Mr. Mahoney of EDMC's enrollment goals, including: (a) increasing the total number of enrollees ten-fold within five years; (b) increasing the average number of new enrollees for each ADA from 1.6 to 3.0 students per week; (c) increasing the turnover rate for ADAs from 17% to 25% by firing ADAs who did not meet their enrollment quotas; (d) increasing the number of ADAs from 530 to 1,000 within two years; and (e) hiring an individual to oversee training of new ADAs, referenced sometimes as EDMC's "sales force."

77.    During the Mahoney interviews, Mr. Boutelle was extremely interested in Mr. Mahoney's sales experience and indicated that Mr. Mahoney would be hired, in part, to write a training manual on how to "close the sale" and lock in a student's enrollment. Mr. Mahoney was then hired to fill EDMC's newly-created "Director of Training" position, effective October 2, 2006, with the understanding that he would use his sales experience in the automotive industry to help achieve EDMC's new student enrollment targets through a new training program.

78.    Mr. Mahoney's core function was to train EDMC employees who would then train the ADAs. The training materials did not mention Title IV's Incentive Compensation Ban, and Mr. Mahoney was never instructed to add any such description to the materials. New marketing scripts and internal teaching brochures were handed down that listed typical reasons potential students gave for not enrolling and forbade the staff to accept those reasons, and offered prepared responses designed to alleviate a potential recruit's concerns.

79.    None of the sales training materials referred to or acknowledged the Incentive Compensation Ban. Moreover, during his employment at EDMC, Mr. Mahoney never gave any

instruction – nor was he told that he should – regarding the "quality factors" that EDMC purports to use in determining an ADA's salary, *i.e.*, those factors that supposedly keep the compensation from being based solely on new student enrollment. In fact, he never heard anyone even discuss the "quality factors."

80.     The CWs identified by Plaintiff's counsel provide further confirmation for the shift to a sales-oriented culture following the LBO. CW1, a Director of Admissions II at South University, stated that the Company reduced its recruiting cycle from 5.5 weeks to 2 weeks in an effort to generate a more steady flow of new enrollees, and repeatedly noted that the Company became very focused on the bottom line. CW2, a Director of Admissions II at AI, stated that EDMC grew exponentially after its business partnership with Goldman Sachs, and described the pressure that ADAs were under to meet their quotas. He also stated that EDMC would take "any Tom, Dick and Harry with a heart beat and a computer," and he noted that some prospective students were called "morons" because they could barely read or write. As described in more detail below, the CWs also uniformly referred to the "find the pain" mantra that resounded in the recruiting offices of EDMC. CW4, an ADA for South University based in Phoenix, stated that ADAs were "tethered to [their] desks, using EDMC's auto-dialing system to route calls to and from prospective students to each ADA's desk." CW5, an ADA at South University based in Pittsburgh, had a sales background in the mortgage industry, and believed that was one reason s/he excelled at the job. Likewise, CW3 had a background in sales and a self-described "competitive" nature. CW2 summed it up as follows, "Any time there is a number that needs to be hit to get paid or keep your job, that's sales," referring to the quotas that ADAs were expected to meet.

81.    In order to meet the aggressive quotas that were set, ADAs began enrolling "anyone and everyone," according to a former HR Manager for EDMC's Online Division, including people who "barely passed high school," and who would "never pass in this college environment." CW7 noted that recruiters were expected to make at least 300 calls per day.

82.    As described in greater detail below, the "find the pain" technique was taught to admissions personnel during their training courses that were conducted all across the various EDMC schools and geographic locations. ADAs were taught to determine what a prospective student's emotional weakness was and to press that issue as a reason to enroll at an EDMC school. For example, a current admissions officer for the online program at EDMC's South University recalled a single mother who was worried about taking out student loans because she could barely pay her utility bills. The admissions officer thought the woman was not an appropriate candidate, but his manager told him to use her dire financial condition to EDMC's advantage by implying that a college degree would change her circumstances. Brian Buchanan, an admissions representative at South University from December 2005 to May 2007, stated that his managers told him that if the candidate was a single mother, he should say to her "How are you going to explain to your children that you cannot buy them the things they need because you couldn't be bothered to finish your education?" or "Do you honestly think that your children are ever going to go to college and graduate after watching their mother never even try to finish hers?" As noted in more detail below, the CWs also testified to the "find the pain" technique sponsored by EDMC's central management.

83.    Admissions staff even lied to potential recruits. For example, people with felony criminal records were told that pursuing a criminal justice degree at EDMC could lead to

working for the FBI. That is patently untrue, as the FBI is barred from hiring anyone with a felony criminal record.

84.    Patrick Flynn, a recruiter at EDMC's South University from 2006 to 2009, stated that "it just got to the point where I felt like I was lying to these people on a regular basis. Honestly, I just felt dirty doing the things I was doing."

85.    An article dated December 14, 2011 in the huffingtonpost.com sums the change in culture as follows:

> Management handed down revamped telemarketing scripts designed to prey on poor and uneducated consumers, honing in on their past mistakes in life as a ploy to convince them that the college would solve all their problems, according to conversations with more than a dozen current and former Education Management Corp. employees over the past two months. "You'd probe to find a weakness," said Brian Klein, a former admissions employee who worked for three years at Argosy University Online, one of four major colleges operated by EDMC. "You basically take all that failure and all those bad decisions, and you spin it around and put it right back in their face as guilt, to go to this shitty university and run up all of this debt."

## IV.    THE VIOLATIONS OF FEDERAL AND STATE REGULATIONS THAT ARE DAMAGING THE COMPANY

### A.    <u>EDMC Violates the Incentive Compensation Ban</u>

86.    To facilitate EDMC's new focus on student enrollment after the LBO, recruiting and enrolling new students became the sole focus of its compensation system for its recruiting personnel. This practice violates the Incentive Compensation Ban. Because of this violation, the representations and certifications EDMC makes to the federal government in its PPAs, in connection with annual compliance audits, and in other documents, are false. By providing these false PPAs and other documents, EDMC knowingly violates Title IV of the HEA's Incentive Compensation Ban and Regulatory Safe Harbor, and its accompanying regulations, and thereby jeopardizes EDMC's continued ability to be paid with Title IV Funds.

1.    **EDMC's Purported Compensation System: The Matrix**

87.    EDMC's written compensation system for admissions personnel is called the Admissions Performance Plan. EDMC provides its ADAs with a copy of a document explaining the Admissions Performance Plan during training sessions which are uniform across all EDMC schools and geographic locations. During the relevant time period, this document has had various titles including "Your Guide to the Admissions Performance Plan for Assistant Directors of Admission" (the "Performance Guide") and "Admissions Performance Plan, Information for Assistant and Associate Directors of Admission." Despite these various titles, what was handed out and taught to ADAs was actually the Matrix: the compensation scheme used by Apollo that was found to run afoul of the DOE regulations and resulted in a record settlement.

88.    The written version of the Matrix shows ADAs that their compensation is based on an evaluation of their performance against quality factors combined with the number and types of new students recruited in the previous 12 months. The Performance Guide informs ADAs that "[t]he number of new students you recruited over the previous 12 months is converted into points, and the point total ['New Student Points'] determines the salary range. Your salary within the range is determined by your manager's evaluation of performance against quality factors."

89.    The Matrix sets forth the number of "New Student Points" that an ADA must attain in order to achieve a particular compensation level. New Student Points are calculated based on the number of students the ADA recruits. The Matrix lists compensation schedules, with a compensation level corresponding to the "New Student Point Range" an ADA achieves, i.e., based on the number of students recruited. Pursuant to the Matrix, EDMC purports to use "quality factors" to adjust the employee's compensation within the level set by the number of

new students recruited.  As described in detail below, however, in practice an ADA's qualitative attributes have no effect on his or her salary, which is determined solely by the new students an ADA is responsible for recruiting.

90.     Per EDMC's Performance Guide, newly hired ADAs are subject to a six-month introductory period, at the end of which they are supposed to be evaluated solely on qualitative factors, and not on the number of New Student Points.  After that six-month period, however, ADAs are evaluated on the number of New Student Points, again, supposedly taking into account qualitative factors as well.  The employee's compensation is then, purportedly, based upon the greater of "quality points only" or on the New Student Points and qualitative factors.  Once an employee has attained a sufficient number of New Student Points to result in a higher compensation based on the combination of New Student Points and quality factors rather than quality factors alone, the employee has "gone on the Matrix."  An employee's third review, which occurs after 18 months of employment, must take into account the New Student Points.

91.     In addition to appearing in the Performance Guide, the Matrix is presented to employees during their interviews and as part of their initial training and orientation sessions. Employees have been informed that "the number of points based on new students recruited for the prior twelve months determines a person's salary range and 'quality factors' determine the person's position within the salary range."

### 2.     EDMC's Compensation Scheme in Practice

92.     Despite the "quality factors" in the Matrix, EDMC's admissions personnel are compensated based solely on the number of new students they are responsible for enrolling. Thus, regardless of whether EDMC's written compensation plan is lawful or violates the Incentive Compensation Ban, there is no doubt that as applied, it runs afoul of the Ban.

93.    Members of EDMC's Admissions Department have openly admitted to their admissions employees that compensation is tied to enrollment numbers. Some employees have been told that their compensation would increase after six months if they achieved certain enrollment goals. For example, Jan Anton, a Vice President at the Art Institute of Chicago, advised an ADA in 2007 at her evaluation that "quality factors" were insignificant in ADA compensation. In fact, Anton openly admitted that the "quality factors" were merely a ruse, created for the purpose of getting around the Incentive Compensation Ban.

94.    A former ADA for South University's online division was told when he was hired by the Director of Online Admissions, "I can't pay you on commission but we have something called a matrix." The former ADA was then told that the Matrix is used to get around the restriction on incentive based compensation for Title IV Funding. The former ADA also noted that his enrollment quotas increased anywhere from 6 to 30 new students every three months, and said if he failed to meet those quotas, there was a risk that his salary would be reduced by 15%.

95.    An ADA at Brown Mackie College stated that he was shown "a chart, and depending on how much money you wanted to make was your quota that you had to get." Several former ADAs described how admission representatives would receive substantial increases in compensation after short periods of time due to having met or exceeded enrollment quotas. The former Director of Admissions for EDMC's online division from March 2006 through December 2009 stated outright that ADAs received points for each student they enrolled, and that "these points were tallied up and this determined your salary."

96.    Directors of Admissions are also provided with documents that provide an overview of the compensation system ("Manager Guidelines"), including the Matrix. The

Director of Admissions for each EDMC school is the primary recruiting and marketing manager for that school. He manages or oversees the managers of all recruiting functions, including ADAs and Assistant Directors of Admissions. The Manager Guidelines reinforce the Matrix system and specify that

> [t]he fundamentals of the Admissions Performance Plan work the same way for all participants, to ensure that ***Associate and ADA compensation is standardized*** and rewards performance against specific and quantitative objectives.

(Emphasis added).

97.    At the Illinois Institutes of Art, for example, there is ample evidence that ADAs are compensated solely based on new student enrollments. In the Government Action, Illinois alleged that one ADA had, during one evaluation period, recruited 65 new students, which resulted in an increase of her compensation to $46,440. At the next evaluation, she had only recruited 57 new students, and her compensation declined to $42,120. At each of those reviews, however, her "qualitative factor" evaluations were the same. Therefore, the adjustments in her salary were due solely to changes in the number of new student enrollments.

98.    Illinois alleges that another ADA at the Illinois Institutes of Art had received compensation of $37,908 in a January 2006 evaluation for enrolling 54 students. Six months later, she had recruited 62 new students and her compensation increased to $42,120. And six months after that, when her enrollment figures increased again to 71 new students, her compensation increased again, to $46,440. Throughout these three review periods, her marks on the qualitative factors remained constant.

99.    Jason Sobek, a former admissions officer for South University, alleged in a *qui tam* suit he filed against EDMC in January 2010 that compensation for admissions officers was

entirely driven by new student enrollments, and quoted part of the 2008-2009 EDMC Admission Compensation Plan as follows:

Hire date: August 1, 2008; Review date: February 1, 2009 (1st Review)

    18 new students, 8/1/2008-1/30/2009 (3 points each)----------54

    Quality Points (Meets Expectations) ----------------------------14

    Annualized baseline salary ---------------------------------$39,000

Hire date: August 1, 2008; Review date: August 1, 2009 (2nd Review)

    30 new students 2/1/2009-7/30/2009 (3 points each)-----------90

    Quality Points (Meets Expectations)-----------------------------15

    Annualized baseline salary---------------------------------$44,000

100.    The portion of the Compensation Plan that Sobek quoted demonstrates that new student enrollment is what drives an admissions officer's compensation. To achieve a $5000 annualized increase, the officer need only raise their "quality points" by 1 point, or 7%, but they must raise their new student enrollment by 12 students, or 67%.

101.    In fact, Sobek's own compensation demonstrates that salary for admissions personnel was determined solely on the number of new students they enroll. For all four of his biannual reviews, he received 20 quality points and was rated in the Highly Effective range. Yet his salary over the same time period fluctuated from roughly $15.38 per hour (annualized to roughly $33,000) to $29.56 (annualized to roughly $61,500) and was clearly tied to the number of new students he enrolled.

102.    An ADA is given a "Student Start Plan," which lists quotas of students that the ADAs are expected to enroll. If an ADA achieves the number of enrollments set forth in the Student Start Plan, he goes "on the Matrix," meaning that his compensation is governed by new

student enrollments (and is typically higher than if qualitative factors are taken into account). Based on the Student Start Plan, an ADA's supervisor formulates a "Plan to Make Plan," which is essentially a roadmap for what the ADA must do in order to achieve the new student enrollment quotas for the upcoming quarter.

103.    ADAs do not receive credit for a new student enrollment until the new student confirms enrollment in a class so that the student becomes liable to EDMC.  Therefore, during the week before the start of "start date," i.e., when classes begin (which occurs, in most EDMC schools, twice per quarter, or eight times a year), ADAs are expected to call any student who has not confirmed enrollment in a class to ensure that the student enrolls).  However, a new student need only attend classes for one week in order for an ADA to receive credit for the enrollment.

104.    To motivate ADAs to meet their enrollment quotas, supervisors often ask them to think of a financial goal, such as a "dream car" or vacation that they can attain by reaching the enrollment quotas.  EDMC uses financial planning documents to show the ADAs exactly how many New Student Points are required to make a particular amount of compensation, and that is broken down by number of applications, interviews, and appointments per week.

105.    EDMC closely tracks and maintains data regarding the actual number of student enrollments that the ADA obtained versus the number of enrollments the ADA was expected to obtain according to the Student Start Plan.  For example, EDMC circulates reports that track each ADA's enrollment activities on a daily, weekly, monthly, quarterly and annual basis.  Some of these reports include, "Operations Dashboard," "Plan Status Report," "Call Summary Report," "Underachiever Report," "Stacked Rankings-Applications," "ADA Trend Analysis," "Stacked Rankings-Starts," and "Conversion Report."   These reports are widely disseminated within EDMC, and are used to manage, evaluate and compensate EDMC ADAs.  At the office level, the

dry erase boards that were used to track each ADAs' admissions at Apollo under Nelson's leadership were implemented at EDMC as a daily reminder that the number of students enrolled was the paramount concern of the admissions department.

106.    Notably, quality factors are not discussed in an ADA's Student Start Plan, Plan to Make Plan or any other documents that EDMC uses to track the ADAs' performance. To the contrary, these documents focus solely on the number of new student enrollments each ADA is responsible for, and only measure quantitative factors.

107.    Furthermore, as noted above, Mr. Mahoney, hired to train new ADAs, never gave any instruction – nor was he told that he should – regarding the "quality factors" that EDMC purports to use in determining an ADA's salary, *i.e.*, those factors that supposedly keep the compensation from being based solely on new student enrollment. In fact, he never heard anyone even discuss the "quality factors."

108.    ADAs are reviewed by their supervisors, but such reviews focus solely on the number of enrollments the ADAs are expected to obtain in order to reach their identified financial goals. ADAs are not given any similar prodding or incentivizing with regard to quality factors.

109.    The fact that the quality factors are not really used in determining an ADA's compensation was confirmed by Jan Anton, a Vice President of the Art Institute of Chicago and a member of the committee that designed the plan. According to the complaint in the Government Action (and relied upon by the District Court in sustaining the government's claims), Anton told an ADA that "quality factors were insignificant weight relative to ADA payments and were created for the purpose of getting around the Incentive Compensation Ban." In addition, Stephen Weiss, a former President of Online Higher Education, told relator

Washington that "because she had met her student enrollment numbers, her 'quality factor' rating would have no effect whatsoever on her compensation." The District Court held that this supported an inference that quality factors were not independent, but were used merely as a proxy for recruiting success.

110.    Thus it is solely the number of students that an ADA enrolls that governs whether the ADA is promoted, gets an increase in salary, or is fired. Relator Washington, an EDMC ADA from June 1, 2004 through May 25, 2007, was warned on October 11, 2006 that failure to hit her enrollment numbers could result in her termination by Gregg Schneider, an Art Institute Online Director of Admissions. He reprimanded ADAs, including Ms. Washington, for failing to meet goals for the October 2006 start date. In an email, he wrote, "Each of you knows your plan for November. This number is not a casual level that I want you to be at but rather a number that you must hit to have a good review, get promoted or keep your position here. This number is set by the VP of Admissions and the Director of Admissions."

111.    The fact that EDMC applies enrollment quotas appears to be so ingrained in the Company culture that EDMC employees openly described those quotas. According to his profile on Linkedin.com, Clinton Knittle is a Director of Admissions II at EDMC, and held various other positions at ADA since August 2009. He advertises that as an ADA and a Project Associate Director of Admissions, he "was responsible for meeting corporate sales quotas," and "exceeded personal enrollment quotas by 149%." As a Director of Admissions II, he stated he was responsible for "applying motivational techniques to ensure customer enrollment and success quotas are met by all."

112.    One ADA stated that she received a $15,000 raise after just six months on the job due simply to exceeding enrollment quotas. She also stated that ADA salaries would be cut if

they did not meet their quotas, a practice which also directly ties compensation to new student enrollments and violates the Incentive Compensation Ban.

113.    The former Manager for Human Resources for EDMC's Online Division stated that there was one ADA who started with an annual salary of $30,000-$40,000, and whose salary was increased to $90,000 after just six months based on new student enrollments.

114.    Further evidence that EDMC used only enrollment numbers to compensate its employees occurred during a meeting between Ms. Washington and EDMC's then-president of Online Higher Education, Stephen Weiss, on August 24, 2005.    During that meeting, Ms. Washington expressed concern about a dip in her "quality" ratings, and Mr. Weiss assured her that the quality factor rating would have no effect on her compensation.

115.    Finally, the CWs provide ample backup for the fact that EDMC compensated its ADAs based solely on new student enrollments, and the "quality factors" were effectively meaningless. CW2 stated that "quality factors mattered not one bit," and that compensation was "how many students you put in school." S/he noted that the ADAs who enrolled more students would receive higher "quality factor" scores in any event, rendering them meaningless. CW3 reported that ADAs who failed to meet quotas saw salaries decline by as much as 10%, and that quality factors were arbitrary and generally tied to the number of new student enrollments. CW3 further reported that there were quotas set, in his/her belief, by the corporate office, and noted that the quality factors were incidental in determining compensation. Furthermore, although an employee could theoretically score from 1 to 5 in the various quality factors, CW3 was told that, as a rule, the range was from 2 to 4. And an ADA meeting quotas would never receive below a "3" for any quality factor.

116.    CW4 was not even familiar with the term "quality factors," and stated that it was his/her understanding that ADAs' salaries and employment status were dependent solely on enrollment numbers.  CW5 stated that "if you didn't produce, you were fired," and noted that it was his/her impression that the quality factors were included only so it appeared that EDMC was complying with the Incentive Compensation Ban.  "The long and the short of it is if you are not bringing in students, you're not making money," CW5 stated.  CW6 noted that if an ADA did not meet his enrollment quotas, he would receive verbal and written warnings, and could be put on a 30-day probation period.  Salaries were downgraded if quotas were not fulfilled.  Therefore, the "quality factor" scores were not indicative of an ADA's true qualities, and were meaningless window dressing designed to circumvent the Incentive Compensation Ban.

117.    EDMC also provides incentive-based awards to its ADAs in the form of commissions, bonuses and other incentive awards.  These are based solely on success in obtaining new student enrollments.  For example, the top 10% of EDMC admissions personnel, as measured by new student enrollments, are given an all-expenses paid "President's Club" trip to a location such as Cancun, Mexico, or Las Vegas.  In addition, the top ADAs, as measured by new student enrollments during brief periods of time, are awarded gifts such as Godiva chocolates, movie tickets, baseball tickets, and various restaurant and Starbucks gift cards, as well as free lunches with EDMC management.  Other ADAs have been rewarded with early departures/time off from work.

118.    In addition, the walls of EDMC's offices display posters and charts graphing each ADA's progress toward his sales goals and noting prizes for which the ADAs may be competing.  However, if an auditor or accreditor is expected to conduct an on-site visit, these graphs and posters are taken down until such auditor or accreditor leaves.

119.    The Senate HELP Committee report also documented the boiler-room sales atmosphere at EDMC.  For example, an EDMC manager emailed her group on February 13, 2008, stating "The goal is 100 March starts [new enrollments] and we only have 47 on the books. . . . WE ARE FAR BEHIND WHERE WE NEED TO BE!!!"  Other EDMC managers used incentives such as "GET OUT OF WORK AT 3 p.m." cards to push their ADAs to enroll more students, or even offered trips to Hawaii.  (Emphases in the originals.)

120.    "Underachieving" ADAs are also closely monitored and are routinely fired for failing to meet an acceptable number of student enrollments, without regard to the ADA's ratings in the "quality factors" area.  Written warnings sent to underachieving ADAs focus entirely on the number of new student enrollments.  If an ADA fails to meet a new student enrollment goal, EDMC administers a Performance Improvement Plan ("PIP") which advises the ADA of a minimum amount of activity, such as meetings with potential students, that the ADA must perform in a given time frame.  PIPs are based entirely on student enrollment figures.

121.    The intense sales environment designed to enroll as many new students as possible was further corroborated by Kathleen Bittel, who started her EDMC career as an admissions officer and ended it as a career service advisor in the online division of EDMC's Art Institute of Pittsburgh.  Ms. Bittel gave testimony before a Senate Committee in September 2010.  She described a "high pressure" environment where ADAs were constantly pressured "to deliver a minimum of two applications per week" and were instructed to pressure prospective students to enroll.  She stated that "new leads" could be called three times a day for at least a week, and noted that "high-pressure sales tactics are being used to recruit individuals from the lower-income sector of our population as they are eligible for the most amount of [federal student] aid."

**B.    EDMC's Improper Recruitment Tactics Violate Title IV and <u>Accrediting Agencies' Guidelines</u>**

122.    State authorization and accreditation by a DOE-approved accrediting agency are also required for an institution to become and remain eligible to receive Title IV Funding.  As such, EDMC is subject to extensive state regulations and accrediting agency requirements including those of the Accrediting Council for Independent Colleges and Schools, Accrediting Commission of Career Schools and Colleges, Commission on Colleges of the Southern Association of Colleges and Schools, Higher Learning Commission of the North Central Association, Middle States Association of Colleges & Schools of the Commission on Higher Education, Northwest Commission on Colleges and Universities, and the Commission on Colleges of the Western Association of Schools and Colleges.

123.    The accrediting agencies monitor the performance of each individual educational institution that falls under the EDMC umbrella according to a variety of criteria.  Monitoring occurs through self-reporting and through periodic site visits by employees of the accrediting agency.

124.    The accrediting agencies require periodic reporting and conduct regular site visits to ensure that recruiters are accurately and ethically describing the pros and cons of attending the school so as to increase the chances that a school will only enroll students qualified to complete the programs, and in turn, repay their loans.  Such requirements include, *inter alia*:

- Advertising, recruiting and admissions information must adequately and accurately represent the programs, requirements and services available to students;

- An institution may not delegate unsupervised recruiting activities to anyone whose economic incentives are to recruit prospects through means that are unethical or subject to public criticism or to admit ill-prepared students;

- Institutions' recruitment methods must be ethical and compatible with the educational objectives of the institution, including ensuring that any person engaged in admissions or

recruitment activities is communicating current and accurate information regarding courses and programs, services, tuition, terms and operating policies;

- Institutions must describe themselves to prospective students fully and accurately and follow practices that permit prospective students to make informed and considered enrollment decisions without undue pressure.

- Institutions must make efforts to attract only those students who are qualified and likely to complete and benefit from the training provided by the school and not simply obtain enrollments; and

- Institutions may not make misrepresentations to prospective students, including   . . . misrepresenting job placement and employment opportunities for graduates; misrepresenting program costs; misrepresenting abilities required to complete intended program.

125.    Likewise, Title IV requires that institutions make no "false, erroneous or misleading statement," "regarding the nature of its educational program, its financial charges, or the employability of its graduates" to "a student enrolled at the institution, to any prospective student, to the family of an enrolled or prospective student, or to the Secretary" of the DOE.  34 C.F.R. § 668.71.

126.    However, there are rampant and sanctioned violations of the aforementioned policies governing recruiting techniques.   To achieve EDMC's aggressive recruiting goals, management actively encourages its ADAs to utilize several improper recruiting tactics in violation of the accrediting agencies' guidelines and Title IV's prohibition on false statements to prospective students.   Indeed, similar to Apollo before it, EDMC's unrealistically high enrollment goals could not be achieved unless such improper and aggressive recruiting methods were used.

127.    EDMC's ADAs used a wide variety of tactics to pressure students to enroll in EDMC institutions.  For example, management urges EDMC's ADAs to enroll students before thoroughly examining their academic qualifications, such as transcripts or essays written.  For

example, a governmental audit in the 2008-2009 academic year of EDMC's Brown Mackie-South Bend campus found that of 5 student files tested, 3 were found to not be eligible at the time federal funds were disbursed due to inability to meet the high school requirements for the program or not being enrolled full-time.  Although EDMC schools require a 150-word essay with the student's application, the quality of the essay is not evaluated, and all EDMC applicants are admitted.

128.    CW2 confirmed that the quality of the student being admitted was not a factor whatsoever.  In fact, s/he said that potential students were commonly referred to as "morons" who "couldn't spell or write essays."  In some instances, ADAs suggested the students should cut and paste essays into a word document, and the ADA would spell check the essay before it was submitted.  CW5 explained that students with poor grades were required to take an entrance exam.  If the student failed three times, s/he had to wait a year to take the test again.  The tests were supposed to be administered by a neutral "proctor," such as a librarian, and EDMC would send the test to the proctor.  However, if the student had failed the test twice, some ADAs would tell the student to set up an imaginary proctor so that the student could take the test with the benefit of the internet, calculators, and other resources that were not permitted.  CW6 described rumors that ADAs took exams for students and falsified signatures to achieve quotas.  In particular, CW6 stated that s/he personally witnessed two ADAs print out prospective students' entrance exam results, alter the scores, and scan the altered documents and save them in the prospective students' files.

129.    ADAs are also pressured to use tactics that overestimate an EDMC student's likelihood of attaining employment upon graduation.  ADAs often tell potential EDMC students that EDMC schools have a very high career placement rate and that the Career Services Office

will contact students prior to graduation to set up interviews with prospective employers. However, the Career Services Office has minimal involvement and students must find employment on their own, something which is frequently not possible. One former employee recalled that prospective students were told that, upon graduation, the career service department would offer them "umpteen amount of places they can refer you to," when in actuality, "career services was [for] people who basically go on monster.com and indeed.com, they have no connections." Another former employee said that in response to questions about potential salaries post-graduation, ADAs were instructed to tell students, "go onto the web and punch it in, and see what numbers you come up with," rather than tell them the reality, which often meant spending $40,000 on tuition and ending up with an $8 per hour medical assistant position.

130.    CW3 confirmed that ADAs made frequent empty promises of lucrative jobs and financial aid, and stated that ADAs were only reprimanded for making these false promises if the ADA was not successful in convincing the prospective student to submit an application. CW4 stated that ADAs were instructed to inform students about financial aid opportunities, and some referred to student loans as "free money."

131.    CW6 stated that if potential students expressed concern about finances, ADAs were instructed to "walk around" those issues. CW7 stated that when such concerns arose, ADAs were instructed to divert the conversation and inform potential students that they could get high paying jobs once they earned their EDMC degree.

132.    A former student confirmed that admissions personnel frequently promised that the career placement division would essentially find a job for graduating students. This student was told by an admissions officer that career placement would arrange interviews with top companies, and all the student would have to do was show up for the interview. Approaching

graduation, the student looked to career placement for assistance, only to be given a list of websites where the student could post a resume. When the student complained about difficulty in finding a job, the student was encouraged to take yet more courses at EDMC schools.

133.    At a recent seminar regarding for-profit universities, Kathleen Bittel recounted that a graduating student came to her during her tenure as a career placement counselor and said, "I'm ready for my job now." She stated that the student told her he had been told by admissions personnel that when he was nearing graduation, the career placement office would find him a job.

134.    Carrianne Howard, who graduated from EDMC's game art and design program, stated in an interview that she was led to believe by EDMC personnel that such a degree would lead to a very lucrative job. What she found, however, was that the best she could do was a $12 an hour job recruiting for a gaming company. When she lost that job due to the closing of her division, she applied for any position, including minimum wage positions such as a retail clerk position. The only way she could make a living and begin to pay her parents back the $70,000 they gave her for tuition was to turn to dancing in a strip club.

135.    Furthermore, ADAs are instructed to use various pressure tactics to encourage prospective students to enroll, including "finding the pain," which means determining and exploiting a prospective student's particular vulnerability. For example, a student may be motivated to attend school so that she may eventually move out of a dangerous neighborhood, and the ADAs are instructed to assure the prospective student that such goal will be attainable if she attends an EDMC school.

136.    The majority of the CWs also confirmed the "find the pain" methods of signing up new students. CW2 stated that ADAs are taught "pain selling" during training, designed to

"embarrass" the prospective student with suggestions such as "Do you want to work at Wal-Mart for the rest of your life for $7 an hour or do you want to do something with your life?" Alternatively, ADAs might ask the student how he expected his own children to work if he was not willing to make the effort himself. CW3 stated that EDMC taught its ADAs during training to listen to a prospective student's goals and address concerns by using "pain as a hot button." CW4, an ADA for South University's online division working out of Phoenix, recalled that if a prospective student balked at the cost of tuition, ADAs would tell him, "What, you don't love your kids" enough to go to school for them? S/he stated that ADAs were taught by their superiors to "basically find [the prospective student's] weakness and when they push back, throw that weakness in their face." Likewise, CW6, an ADA in Pittsburgh, recounted that s/he was instructed to "find their pain" when talking to students, and stated that "finding their pain" was a mantra used repeatedly during his training, which occurred in a classroom setting. In addition, CW6 stated that if a prospective student raised doubts about the financial obligations, ADAs were "told to walk around it." CW5, an ADA for 4 years based in Pittsburgh, stated s/he was taught to listen to a prospective student's "confirmed need," and suggest a program for a pronounced goal to be achieved. CW7, an ADA based in Phoenix, also spoke of exploiting a prospective student's "confirmed need," and described the job as "selling the dream."

137.    Several former employees provided statements that ADAs were instructed to misrepresent such matters as post-graduation employment prospects, the full cost of EDMC's programs, and a student's financial aid repayment obligations. For example, a former ADA recalled that EDMC trained the ADAs not to tell prospective students that the majority of tuition costs would need to be paid using loans, which would need to be repaid, as opposed to outright grants of funds, and that federal student loans were not dischargeable in bankruptcy, or that

defaulting on a student loan could prevent an individual from obtaining a mortgage. A former ADA at EDMC for three years stated that it was the job of an ADA to talk a student into enrolling, even people who "would never be able to pay for their education."

138.    Another former employee recalled that a prospective student, who had a child and was herself suffering from AIDS, was encouraged to enroll by being told, "now more than ever you need an education, for what time you have left here, get a job where they might have life insurance, get a job where you can get health insurance."

139.    A former Senior Admissions Representative for South University's online division recalled a company-wide meeting held sometime before Thanksgiving 2009. The Online Higher Education CEO Stephen J. Weiss and President John R. Kline attended the meeting. The purpose of the meeting was to inform ADAs of changes in EDMC's recruitment practices, which would increase the amount of time ADAs spent interacting with prospective students, forcing them to make up to 200 calls per day and spend at least 4 hours per day talking to prospective students. In addition, ADAs were told that they would have to become more closely involved with helping new students obtain financial aid.

140.    An ADA at Brown Mackie College in Arizona stated that ADAs were encouraged to speak to people working at fast-food restaurants and other "dead end jobs," and to tell them that they could "get into a career" if they enrolled in an EDMC institution.

141.    Furthermore, ADAs were instructed to give evasive answers if the truth would discourage a prospective student from enrolling. For example, a former employee stated that if a student asked whether credits from Brown Mackie would be transferrable to another school, rather than tell the truth – that no school would accept EDMC credits – ADAs were instructed to tell the prospective student to call the school to which he or she was considering transferring.

142.    EDMC was sued in Texas state court by 18 of its students who alleged that they were misled about the accreditation status of their program.  They alleged that Argosy University falsely told applicants to the clinical psychology doctoral program that the institution would be accredited by the American Psychological Association.  They claimed that their degrees were far less valuable than they would have been had the program been accredited, and that the high tuition left them with debts that they could not pay.  One of the plaintiffs, Stephanie Capalbo, got her doctorate from that program in 2008.  Capalbo was turned down by many employers because she lacks a degree from an institution accredited by the American Psychological Association. She was able to find a job in New York paying $60,000 a year, but she graduated with student loans totaling $280,000.  She stated in an interview that "I'll be working the rest of my life to pay off these student loans.  It's an unbearable debt."

143.    The Director of Staffing at EDMC's online division from December 2007 through May 2008 stated that a lot of people "were asked to do things [that were] unethical," describing that ADAs were asked to provide incorrect information to students regarding financial aid so they could meet their quotas.  Some ADAs complained to the former Director of Staffing, stating, "I can't do this to people.  [Students] don't know what they're getting into.  It's too expensive."  The former Director of Staffing described EDMC as a "diploma mill," stating that it issued "valueless degree[s]."

144.    In connection with the GAO investigation, Ms. Bittel stated that certain of her ADA co-workers attempted to enroll gentlemen in homeless shelters and programs for the underprivileged in EDMC programs, and she stated that she was encouraged to enroll a woman hiding out in a battered women's shelter.

145.    Individuals with no access to a computer or the internet were told by admissions staff that they could use local public library computers, but this was not true as the online program requires files to be saved and software to be downloaded – something that cannot be done on public access computers.

146.    Pressure tactics are also employed by ADAs in encouraging prospective students to accept financial aid packages.    ADAs are in constant contact with EDMC Financial Aid Officers.    ADAs are responsible for ensuring that students complete all of their loan applications and submit those applications to EDMC schools and the federal government.    The ADA ensures that his name is on the financial aid forms so that he receives credit for that student.    Once all the student's applications are complete, the ADA forwards them to an assigned EDMC Financial Aid Officer, who calculates the student's financial aid plan and informs the student.    The student may accept or reject the financial aid plan.    But if a student rejects the plan, usually because he does not qualify for enough financial aid to cover the entire tuition due, the ADA then seeks to convince the student to accept the financial aid package anyway.

147.    ADAs use a number of tactics to encourage the students to enroll despite a deficient financial aid package.    For example, a student may change his status from full-time to part-time, so that the financial aid package will cover the tuition.    Students are refunded the difference in the amount of financial aid they received and the amount they paid in tuition, but are typically not informed that they must re-pay the full amount to the lender.

148.    In addition, former employees reported that they were instructed to tell students what to do when filling out their financial aid forms, including falsify information, such as changing the ages of their dependents, the amounts of money earned by students or dependents, and/or whether the student was living with the parent so that he could be considered a dependent.

A former employee recounted an instance where a student was instructed that she could claim three undocumented, non-citizen children as dependents on a financial aid form in order to qualify for more federal student aid, even though that student had not claimed those children as dependents on her tax return.

149.    There can be no doubt that these heavy-handed recruitment tactics were approved by central management at EDMC.  One document relied upon in the Senate HELP Committee report titled "Common Objections and Answers" provides a script to ADAs to respond to common concerns raised by prospective students.  For example, if a student states "I'm worried about the money," the ADA was taught to respond that education is "an investment that pays off in the future.  Most students ultimately decide this is the best possible investment one can make." Further, if a student stated, "I think I'll just go to Community College first," an ADA was instructed to say, "It sounds like you might be settling for second best.  Community colleges are excellent for students who don't know what they want to do."  CW2 stated that it was inconceivable that executives were unaware of predatory tactics used to enroll students.

150.    Evidence that EDMC's institutions violated the accrediting agencies' guidelines is even found in its public filings.  In its Form 10-K for the fiscal year ended June 30, 2011, EDMC reported that seven of its schools were required to provide supplemental reports to their accrediting agencies due either to student retention or employment placement issues.  EDMC further reported that it expected twelve additional schools to be required to provide supplemental reports during fiscal 2011 due to student retention issues.

151.    If an institution is found to be noncompliant with the accrediting agency's standards, it can be ordered to show cause as to why its accreditation should not be revoked or withdrawn, or it may be placed on probation for stricter scrutiny.  Thus, EDMC's predatory

recruitment practices, like its violation of the Incentive Compensation Ban, threaten its ability to continue receiving Title IV Funding.  In its Form 10-K for the fiscal year ended June 30, 2011, EDMC reported that two of its programs were placed on probation:  The Doctor of Psychology program at Argosy University's San Francisco campus and the physical therapy assistant program at Brown Mackie College in Fort Wayne, Indiana.

### C.    **Management Causes EDMC to Falsify Job Placement Data**

152.    The HEA requires that programs at for-profit institutions, other than those that are clearly designated as "liberal arts" and other vocational programs, must prepare students for "gainful employment in a recognized occupation" to be eligible for Title IV Funding.  A graduate is considered to be gainfully employed only if he is engaged in work for which the degree he earned is designed.  Accrediting agencies also require institutions to achieve certain levels of placement of graduates in their chosen fields in order to maintain accreditation.  The agencies that accredit EDMC institutions – to the extent that they have specific numeric requirements for job placement – require on average that 65% to 70% of graduates be employed in their chosen fields to maintain accreditation.  For example, the Accrediting Council for Independent Colleges, which accredits 19 of EDMC's schools, requires that at least 65% of graduates must have jobs in their chosen field of study in order to receive accreditation.  The Accrediting Commission of Career Schools and Colleges, which accredits 2 of EDMC's schools, requires 70% placement for accreditation.

153.    Despite these regulations, EDMC's schools misrepresented EDMC's employment placement rates both to prospective students and to the accrediting agencies.

154.    Ms. Bittel testified extensively to the Senate HELP Committee regarding falsification of EDMC's graduate career placement statistics.  It was made clear to her that career placement was far less of a concern than student recruitment, considering there were "only nine

career service advisors to accommodate the graduates of all their online programs" compared to 1,600 admissions personnel at the time of her employment. Career placement advisors were stretched so thin, they were each responsible for assisting the placement of 150 to 180 students at any given time, and generally only had six months to help get this large number of students placed in their fields. With that level of discrepancy in resources, EDMC had to resort to manipulation of job placement statistics in order to meet accrediting agencies' requirements.

155.   The examples Ms. Bittel provided regarding these tactics used to meet "gainfully employed" statistics are shocking. EDMC schools routinely used estimated, rather than actual, reported salaries. For example, a graduate earning $8,000 a year was documented as earning $25,000 per year because $25,000 was the average salary in the geographic area the type of position in which the graduate was employed.

156.   EDMC schools also stretched graduates' job descriptions to have them included within the definition of "field related employment," and counted students as "employed" even if they worked at a relevant job for only one day. According to the Sobek *qui tam* complaint, internal reporting procedures explained that to be counted as gainfully employed, "[t]he graduate must work at least one day. No additional days on the job are required as long as the grad went to a job that fit their skill level."

157.   Ms. Bittel was repeatedly pressured to call graduates and ask them about the courses they had taken to see if there was not some "skill" from those courses that could be used to shoehorn their current employment into field-related employment. A graphic design graduate working at a Starbucks was deemed to be gainfully employed in graphic design because she was "using her skills" by making signs for the daily specials. A graduate of the residential planning program was deemed to have been placed in her chosen field because her arrangement of candy

bars for sale supposedly utilized her program skills. Ms. Bittel was pressured to count a graduate of the game arts program as working in his field even though he worked at Toys R Us selling video games and earned $8.30 an hour.

158.    Another way EDMC inflated its job placement numbers was to get as many non-complying students as possible out of the pool that counted toward the statistics. Career advisors were routinely pressured to obtain waivers from graduates on the grounds that they had a medical condition or cared for someone with such a condition, were stay at home parents, or were continuing their education.

159.    These abuses are clearly systemic at EDMC institutions. Ms. Bittel testified that management at EDMC had weekly brainstorming meetings for its career services personnel where they could come up with "angles" to address how to deal with graduates who were not gainfully employed in order to maximize the institutions' gainful employment statistics. Job placement counselors are clearly told that they have placement quotas to meet, but are encouraged to meet those quotas through the types of manipulation detailed above.

160.    In his *qui tam* complaint, Sobek confirmed that EDMC schools routinely manipulated the data to be able to report high job placement rates. The complaint alleges such examples as the following that were counted as working in their field of study; (i) a bank teller with a business degree earning roughly $23,000 a year; (ii) a fashion marketing program graduate working in a sneaker outlet for approximately $14,000 a year; (iii) an interior design graduate working at Target for $19,273 a year; (iv) an accounting graduate working as a cashier at a McDonald's for $15,700 a year; and (v) a business management graduate working as a customer service representative at Walmart for $16,549 a year.

161.    The percentage of graduates employed in their field as reported by EDMC defies credulity in the current job market.  For example, South University Online reported that of "all 2009 South University Online graduates available for employment, 92.1% were working in a field related to their program of study within six months of graduation and earning an average salary of $51,005."  According to a national survey of 50,000 new college graduates across disciplines conducted by the National Association of Colleges and Employers, only 24% of graduates had a job offer at the time of graduation in 2010.  Even well-recognized universities reported much lower employment rates than EDMC.  For example, Fordham University reported that only 68% of its 2009 graduates were employed.

162.    South University Online also reported that of 234 graduates of the nursing bachelor's degree program, 98.3% of them were employed with six months of graduation at an average salary of $61,467.  In contrast, the American Association of Colleges of Nursing released the results of a survey that only 88% of nursing school graduates with bachelor's degrees were employed in their field four to six months after graduation.

163.    EDMC's most recent Form 10-K – for fiscal 2011 – reveals that EDMC is already suffering some consequences of these wrongful acts.  As of June 30, 2011, seven EDMC schools had to make supplemental submissions to accrediting agencies due to those agencies' concerns over "either student retention or placement issues," as reported by EDMC in its Form 10-K.  Argosy University's San Francisco campus was placed on probation by the American Psychological Association in August 2010.  That probationary status gives the program two years to improve before accreditation is revoked.  Brown Mackie College in Ft. Wayne, Indiana had its physical therapy program's accreditation placed on probation by the Commission on

Accreditation in Physical Therapy in April 2011, and can have that accreditation revoked at any time during the following two year period if the program does not improve.

164.    In December 2011, the Company received a letter from the City Attorney of the City of San Francisco, California requesting information about, among other things, job placement reporting by The Art Institute of San Francisco and seven other Art Institutes located in California.

165.    There will undoubtedly be further consequences for EDMC schools in light of new federal regulations.  The federal government recently passed new regulations regarding the definition of "gainful employment."  The new measure of gainful employment is that: (i) 35% or more of former students are repaying their loans; (ii) annual loan payments do not exceed 30% of a typical graduate's discretionary income; or (iii) annual loan payments do not exceed 12% of a typical graduate's total income.  Data collection on these statistics starts in July 2012, and enforcement begins in 2015.

166.    Based upon the deceptive practices regarding placement described above, EDMC is going to have difficulty withstanding the federal government's scrutiny under the new regulations.  Moreover, EDMC has had growing loan default rates among its students, *i.e.*, the number of students who default on loans within two years of leaving school.  For example, loan default rates at the Art Institute of Pittsburgh more than doubled between 2008 (7.9%) and 2009 (15.4%), and grew substantially at South University from 2008 (7.9%) to 2009 (13.5%).

**D.    EDMC Fails to Meet Financial Responsibility Guidelines**

167.    The DOE also requires educational institutions to meet certain "financial responsibility" standards.  The financial responsibility standards measure: (1) an institution's capital resources and ability to borrow and finance its operations; (2) an institution's ability to support current operations from expendable resources; and (3) an institution's profitability.

168.    Following the LBO, the DOE adjudged EDMC's financial responsibility at the consolidated level.  In fiscal years 2009 and 2010, respectively, the DOE required EDMC to post a letter of credit in an amount equal to 10% of Title IV funds received in fiscal 2008 and fiscal 2009.

169.    As of June 30, 2011, EDMC once again did not meet the required quantitative measures of financial responsibility.  Unlike previous years, however, the DOE raised the letter of credit requirement for EDMC from 10% to 15% of the Title IV program funds received by students at its schools during fiscal year 2010, which amounted to $361.5 million.  In order to cover this new requirement, EDMC had to enter into a new $150 million Letter of Credit Facility with Bank of America.

170.    The letter of credit requirement could further increase in the future.  The DOE is entitled to assess a letter of credit up to 100% of the Title IV funds that EDMC receives.  Based upon the amount of Title IV funds EDMC received in 2011, that requirement could go as high as $2.4 billion.

171.    As a further result of its failure to demonstrate financial responsibility, all of EDMC's schools have been provisionally certified.   The letter of credit and provisional certification result in heightened financial and cash monitoring by the DOE, which is costly to the Company and could require the Company to assume additional letters of credit.

## V.    DAMAGES TO EDMC FROM THE MISCONDUCT

### A.    EDMC Is at Significant Risk of Losing Its Eligibility for Title IV Funds and Its Accreditations

172.    EDMC's violations of HEA regulations, including its improper recruiting practices, its incentive-based compensation plan and its misrepresentation of job placement data, threaten its ability to continue to receive Title IV Funding.  If EDMC's institutions cannot accept

Title IV Funding, there is little doubt that EDMC would fail as an enterprise because nearly 90% of its revenues come from Title IV Funding.

173.    EDMC faces potential damages if its financial health does not improve and the DOE raises its required letter of credit.  The DOE can force EDMC to post a letter of credit equal to 100% of the Title IV Funding it receives – or in excess of $2.5 billion.

**B.    Pending Litigation Threatens EDMC with**
**Billions of Dollars in Potential Liability**

174.    The pervasiveness of the misconduct at EDMC described above has led to a number of actions that threaten EDMC with substantial liability and the loss of its ability to receive Title IV funds.

175.    There are two *qui tam* actions pending against EDMC in which the federal government and several states intervened.  The first of these actions was filed on April 5, 2007 by relator Lynntoya Washington, who was employed by EDMC from June 1, 2004 through May 25, 2007 and served as an Assistant Director of Admissions at EDMC's Art Institute of Pittsburgh Online Division.

176.    The second of the two *qui tam* cases was filed by relator Michael T. Mahoney on behalf of the United States and the States, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)(1).  Mr. Mahoney was employed by EDMC as its Director of Training for EDMC's Online Higher Education Division from October 2, 2006 through June 22, 2007. The relators described improper recruiting and compensation practices in violation of Title IV occurring at EDMC schools, as detailed above.

177.    Upon intervening in these actions, the United States brought claims against EDMC under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1) (1986), 31 U.S.C. § 3729(a)(1)(A) (2009), 31 U.S.C. § 3729(a)(1)(B)(2009) and for unjust enrichment.  The United

States seeks treble damages plus interest and civil penalties and fines. Because EDMC received over $11 billion in federally funded tuition during the time period addressed by the suit, it has potential liability for over $33 billion.

178.    The states of California, Florida, Illinois and Indiana have joined the Government Action and seek fines and penalties for fraudulent claims by EDMC to obtain state funded tuition.

179.    In the Government Action, California brings claims under the California False Claims Act, Government Code Section 12650, *et. seq.* California does not specify how much in damages and penalties it seeks from EDMC, but does specify that it is seeking treble damages and penalties.

180.    Florida brings claims in the Government Action against EDMC under the Florida False Claims Act, §68.082(2)(a), Fla. Stat. Florida, which alleges that EDMC schools received approximately $5.2 million in Florida state funds for student grants and scholarships, seeks treble damages, as well as civil penalties, attorneys' fees, expenses and costs.

181.    Illinois brings claims against EDMC in the Government Action under the Illinois False Claims Act, 740 ILCS 175/1 *et. seq.* Illinois alleges that EDMC schools received "millions of dollars in grant funds annually from the State of Illinois" through its Monetary Award Program ("MAP") in violation of the Illinois False Claims Act, ranging from $1,476,677 in MAP grant funds to $3,139,511 in MAP grant funds, totaling $27,471,111 for the academic years 2004-2005 to 2010-2011. Illinois seeks treble damages, fines and penalties.

182.    Indiana brings claims in the Government Action against EDMC under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-2(b)(1), (2) and (8).

Indiana does not specify how much in damages and penalties it seeks from EDMC, but does specify that it is seeking treble damages and penalties.

183.    The possibility that EDMC will face significant punitive damages stemming from the Government Action has increased by virtue of the fact that on May 11, 2012, the Honorable Terrence F. McVerry of the United States District Court in the Western District of Pennsylvania sustained the government's claims that EDMC's compensation plan violated the HEA "as implemented."    Thus, the District Court held that "Plaintiffs allege a knowing decision by EDMC executives to perpetuate a company-wide 'sham' Plan to cover up for prohibited compensation practices.    To put it starkly, Plaintiffs allege a coordinated, multi-billion dollar corporate-wide fraud."    In fact, the District Court held that the allegations in the Government Action meet the heightened pleading requirements associated with pleading fraud under the Federal Rules of Civil Procedure.

184.    The parties in the Federal Action recently submitted competing reports under Federal Rule of Civil Procedure 26(f), setting forth their respective positions regarding deadlines such as amendment of the pleadings and close of discovery.    The District Court is scheduled to meet with the parties to discuss those issues on October 2, 2012.    One issue to be decided is a deadline for adding new parties and amending the pleadings, which leaves open the possibility that additional allegations will be brought against EDMC and its schools.

185.    In sustaining the claims in the Government Action, the District Court first held that the government alleged that the certifications provided to the Department of Education necessary for EDMC to receive Title IV Funding were falsified because, in fact, the quality factors EDMC purportedly used to determine compensation were mere "window dressing," and that the "quality factors" were ignored in practice.    This conclusion was supported by allegations

that "EDMC did not measure, encourage or incentivize ADAs with respect to quality factors. . . . This is in stark contrast to EDMC's detailed tracking of ADA student enrollment numbers."

186.    The District Court also relied on allegations that Jan Anton, a Vice President of the AI of Chicago and a member of the committee that designed the compensation plan, told an ADA that "quality factors were insignificant relative to ADA payments and were created for the purpose of getting around the Incentive Compensation Ban." Also found relevant by the District Court were allegations that Stephen Weiss, former President of Online Higher Education, told relator Washington that "because she had met her student enrollment numbers, her 'quality factor' rating would have no effect whatsoever on her compensation." According to the District Court, this allegation supports the inference that quality factors were not independent from enrollment numbers, but were used "merely as a proxy for recruiting success," and that EDMC thereby violated the Incentive Compensation Ban.

187.    Furthermore, the District Court held that the government alleged that Mahoney, who was responsible for training ADAs, never gave any training regarding quality factors or even heard anyone discuss them, facts which strongly suggested that in practice, EDMC did not take the quality factors into account in determining ADA compensation. The District Court also found that the government alleged scienter, in large part because of various executives' prior positions at the University of Phoenix, including Defendant Nelson and Kline. In particular, the District Court sustained allegations that:

> The Department of Education's enforcement actions against the University of Phoenix were well-known in 2004 throughout the for-profit education industry. . . . [T]he allegations support the inference that EDMC knew that its Plan was similar to that used by University of Phoenix, and therefore was improper. Accordingly, one may infer that EDMC's alleged implementation of a similar compensation was done knowingly.

188.    The presidents of Brown Mackie, Argosy University, South University, and the regional clusters of the Art Institutes signed the PPAs, which the District Court found created an inference of scienter.  Furthermore, the compensation plan was devised by an EDMC-wide task force, and because government funding represented such a significant source of EDMC's revenues, the District Court held that it was plausible to conclude that the alleged violations of the Incentive Compensation Ban would have been approved by the highest levels of EDMC management.  The District Court further held that the government alleged that EDMC's violations of HEA regulations caused an economic injury to the government because the fraud on the government enabled it to receive billions of dollars in revenue.  In sum, the District Court upheld the government's theory that "there is one, EDMC-wide scheme controlled by top-level executives."

189.    The District Court also sustained the states' claims against EDMC under their respective false claims acts and the various federal and state common law claims brought against EDMC and its schools.  Because the District Court sustained these claims, there is a high probability that EDMC will be forced to pay actual and punitive damages to the federal and state governments, potentially in the billions of dollars range.

C.    **Other Government Investigations Threaten EDMC's Ability to Receive Title IV Funds**

190.    The Government Accountability Office ("GAO"), in connection with the Senate Health Education Labor & Pension Committee ("HELP Committee"), has been conducting an investigation into improper recruitment and compensation practices at for-profit institutions.  On August 4, 2010, the GAO released a report entitled, "For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Questionable Marketing Practices" (the "GAO Report").  On that same day, the *New York Times* reported that undercover investigations in

connection with the GAO inquiry at 15 for-profit institutions discovered that recruiters were encouraging students to falsify their financial aid applications and were misleading prospective students about the duration and quality of the programs offered. The GAO Report concluded that the abusive and deceptive recruiting practices did exist at, among other places, Argosy University, an EDMC school.

191.    At an August 4, 2010 hearing in connection with the HELP investigation, it was revealed that EDMC regularly and systemically engaged in improper practices related to student enrollment, admissions and financial aid. As part of the Senate investigation, EDMC employee Kathleen Bittel, who worked at EDMC for more than three years in career services and admissions, including as an ADA at Argosy University and as a career services advisor at the Art Institute of Pittsburgh, wrote a letter dated September 15, 2010 to the HELP Committee and provided testimony before the HELP Committee on September 30, 2010, describing the improper practices in recruitment and compensation at EDMC, as well as EDMC's falsification of graduates' job placement data.

192.    On August 13, 2010, the DOE published loan repayment rates for for-profit educational providers, including EDMC. The data showed an overall repayment rate of 38%. EDMC's low repayment rates confirmed that it was systematically employing improper recruiting and enrollment practices.

193.    Finally, in addition to the investigations conducted by the federal government and its agencies, several state attorney generals are also conducting investigations into wrongful recruitment and compensation practices at EDMC. For example, the Attorney General of Florida is investigating one of EDMC's brands, Argosy University, for "alleged misrepresentations regarding financial aid; alleged unfair/deceptive practices regarding recruitment, enrollment,

accreditation, placement, graduation rates, etc." EDMC and its schools also face active investigations concerning similar abuses from the New York Attorney General, the Kentucky Attorney General and the City Attorney of San Francisco.

## DERIVATIVE ACTION ALLEGATIONS

194.   Plaintiff brings this action derivatively to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duties by the Individual Defendants.

195.   Plaintiff has owned EDMC stock continuously during the time of the wrongful course of conduct by the Individual Defendants alleged herein and continues to hold EDMC stock.

196.   Plaintiff will adequately and fairly represent the interests of EDMC and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in shareholder derivative litigation.

## DEMAND REFUSAL WAS IMPROPER

197.   On August 19, 2011, Plaintiff sent its Demand Letter to the Board, requiring that the Board bring suit against the wrongdoers to redress the wrongful recruiting, incentive, and other practices that jeopardized EDMC's receipt of Title IV funding (the "Title IV Funding Issues"). In the Demand Letter, Plaintiff informed the Board that if it had not instituted an action addressing the wrongdoing set forth in the Demand Letter within 120 days of receipt of the Demand Letter, Plaintiff would exercise its right to bring a shareholder derivative suit against the Board of Directors. The Demand Letter was delivered to EDMC on August 22, 2011.

198.   On December 8, 2011, just a few weeks before the 120 day investigation period was set to expire, counsel for Plaintiff received a letter from R. Todd Cronan, Esquire ("Cronan") at Goodwin Procter LLP. The letter stated that Goodwin represented the committee

formed to investigate the matters set forth in the Demand Letter. The letter purported to invite Plaintiff to participate in the investigation.

199.    Counsel for Plaintiff responded to Cronan's December 8, 2011 letter by letter dated December 15, 2011. Plaintiff's counsel expressed a strong interest in participating in the Committee's investigation, and requested certain information, including identity of the Committee members and a copy of the Board resolution creating and defining the scope of the Committee's duties.

200.    Notwithstanding the invitation for Plaintiff to participate in the investigation, and Plaintiff's acceptance of such invitation, the Committee did not respond. On January 19, 2012, Plaintiff wrote to Cronan again, reiterating Plaintiff's willingness to work with the Committee on the investigation and supplementing the initial Demand Letter (the "Supplemental Demand") with additional allegations of wrongdoing, including allegations that EDMC's financial health was failing (the "Letter of Credit Issues") and that EDMC falsified its job placement data (the "Placement Falsification Issues"). Plaintiff further stated that if it did not hear back from the Company by February 20, 2012, Plaintiff would pursue its claims outside of the Company.

201.    After promising Plaintiff a response to its Demand Letter and its Supplemental Demand by communications on February 17 and 24, 2012, the Committee finally gave a partial response by letter dated March 6, 2012 (the "March 6 Response").

202.    The March 6 Response purported to give the Committee's findings on the Letter of Credit and the Placement Falsification Issues. The Committee concluded that it would not be in the Company's best interests to pursue claims relating to the Letter of Credit and the Placement Falsification Issues. The Committee purported to be still investigating the Title IV Funding Issues.

64

203.    By letter dated May 16, 2012, Cronan advised Plaintiff's counsel that the Committee was finalizing its investigation of the Title IV Funding Claims, and on May 24, 2012, Cronan provided a 12 page summary of the Committee's findings, which resulted in its decision to refuse Plaintiff's demands regarding the violation of the Incentive Compensation Ban and improper recruiting practices.    On May 31, 2012, EDMC produced its Report of the Litigation Committee ("Report") which essentially summarized the findings in the March 6 and May 24 Responses.

### A.    The Committee Members Are Conflicted

204.    In the March 6 Response, the identity of the Committee members was revealed for the first time.  Defendants Mullin and Salem were appointed to the Committee by the Board. Plaintiff does not know what their precise charge and authority were, as the Committee never did give Plaintiff the requested copy of the resolution creating and charging the Committee.  In the March 6 Response, the Committee's counsel professed Mullin's and Salem's disinterestedness with a cursory and conclusory statement that they meet the ALI Principles' definition of disinterestedness.  These statements were supplemented by a more robust legal discussion in the Report, but the Report again only offered conclusory statements and no actual evidence of disinterestedness.

205.    In fact, Mullins and Salem are anything but disinterested.  Salem is a designee to the Board of a member of the consortium of investors that led the LBO and to whom EDMC's exorbitant debt is owed.  Specifically, Salem is a Senior Managing Director and Co-Founder of Providence Equity Partners.    Mullins is similarly beholden to the consortium of investors, employed as a consultant to Goldman Sachs.  Thus, they each owe their livelihoods to entities that have a vested interest in the continuation of the practices complained of herein.  Without the

artificial boost to enrollment and Title IV funds that results from the incentive compensation program and the other deceptive practices detailed herein, EDMC would have difficulty servicing the debt that was incurred in the LBO. Thus, contrary to the Report's assertion that the affiliations with these institutional investors do not make Mullins and Salem interested because their interests are purportedly aligned with the interests of the common shareholders, Mullins and Salem in fact have interests not shared by the common shareholders. The common shareholders are not employed or otherwise compensated by Providence Equity Partners or Goldman Sachs.

206.    Similarly, the Report's conclusion that Mullins and Salem were not disinterested because they were not Board members at the time EDMC's compensation plan was adopted in 2003 misses a key component of Plaintiff's allegations – which is that the compensation plan was ignored in practice. And while the Report recites that Mullins and Salem were not involved with the administration of EDMC's compensation plan, this conclusion ignores allegations concerning the widespread abuses in the for-profit education industry, which undoubtedly had the entire EDMC Board on notice of the wrongdoing.

207.    Mullins and Salem are also interested because they signed the Registration Statement that was at issue in the Securities Action, and were defendants in that action. At the time of the March 6 Response and during the course of the bulk of their investigation on the Title IV Claims, they each stood to face substantial liability for the conduct alleged in the Securities Action because plaintiffs were appealing the dismissal of their complaint, and they did not withdraw such appeal until April 18, 2012, just 5 weeks before the Committee issued final demand refusal.

208.    Salem is not independent for the additional reason that EDMC does business with Providence Partners affiliates.  In 2011 alone, EDMC paid $3.8 million to Providence Partners affiliates.

**B.    The Committee Did Not Conduct a Good Faith and
Reasonable Investigation of the Letter Of Credit Issues
and the Placement Falsification Issues**

209.    The Committee, purportedly vested with the Board's authority to investigate Plaintiff's demands and to determine the Company's response thereto, did not conduct a good faith and reasonable investigation of the issues raised in the Demand Letter and the Supplemental Demand.  It has therefore wrongfully refused Plaintiff's demands.  Both the March 6 Response and the Report offer the same – invalid – reasons for refusing Plaintiff's demands regarding the Letter of Credit Issues.

210.    The Committee claimed that Plaintiff's Letter of Credit claim was meritless because EDMC's additional $150 million letter of credit from Bank of America was necessary simply because a portion of EDMC's existing line of credit was going to mature in June 2012. The Committee further contended that the increase the DOE required in the letter of credit was attributable in some inexplicable way to the expectation that EDMC's receipt of Title IV funds would increase by 5% each year.

211.    The Committee's "explanation" of its findings with regard to the Letter of Credit Issues makes no logical sense.  It admits that EDMC has failed to meet the required DOE ratios demonstrating financial health, and that the DOE increased the requirement for EDMC's letter of credit from 10% to 15% of Title IV funds received.  It tries to explain this increase away by contending that an increase in Title IV funds by an approximate 5% each year is the reason for

the increased letter of credit requirement. It states that "[a]ccordingly, the amount of the letter of credit has increased each year primarily because of the increase in Title IV revenues."

212. This explanation does not hold water. First, the required letter of credit did not change in fiscal years 2009 and 2010, even though EDMC's Title IV revenues also increased during those years. Second, as EDMC's Title IV revenues increased, the dollar amount of its letter of credit would also increase, even absent any increase in the DOE's *percentage* requirement of the letter of credit. In other words, if EDMC received $1 billion in Title IV funds, its 10% letter of credit would be $100 million. If EDMC's Title IV funds increased by 5% to $1.05 billion, then the necessary 10% letter of credit would increase to $105 million.

213. More likely, there are untold circumstances at EDMC that caused the DOE to raise the letter of credit requirement, circumstances that have nothing to do with any potential increase in EDMC's Title IV funds. Regardless, the Committee abdicated its responsibility to determine precisely why the DOE changed the letter of credit requirement, and its failure to do so shows the unreasonableness of its conclusions and the absence of good faith in conducting its investigation.

214. Finally, in neither the March 6 Response nor the Report did the Committee address the issue of the provisional certification of EDMC's schools as a result of the need for a higher line of credit. Under 20 U.S.C. §1099c(h), an institution can be provisionally certified if the Secretary of the DOE finds it to be "in an administrative or financial condition that may jeopardize its ability to perform its financial responsibilities under a program participant agreement." Far from being a routine matter as portrayed by the Committee, the requirement that EDMC post a larger letter of credit – and its resulting provisional certification – demonstrate that the DOE found EDMC to be in a financial condition that might "jeopardize its ability to

perform its financial responsibilities" under its PPA. It appears that the Committee never even explored the provisional certification as a potential reason for the DOE's higher Letter of Credit demands, and the absence of such investigation alone demonstrates the unreasonableness of the Committee's investigation of this issue.

### C.    The Committee Did Not Conduct a Good Faith and Reasonable <u>Investigation of the Job Placement Falsification Issues</u>

215.    The Committee also concluded in its March 6 Response and Report that Plaintiff's claim that EDMC "systematically falsified job placement data" was "simply not true." The Committee contends that Plaintiff's allegations regarding the False Placement Issues were taken "directly from Kathleen Bittel" and her testimony before the Senate HELP Committee. Therefore, the Committee apparently felt justified in shirking its duties to conduct an investigation into those allegations, and in relying instead solely on a prior internal investigation conducted by EDMC employees that purportedly found "no support for [Ms. Bittel's] claims of undue pressure placed on Career Services Advisors at EDMC Online Higher Education to meet placement goals or falsely verify graduates' employment was related to their field of study," as well as a subsequent investigation conducted by EDMC's outside counsel of employees in the Online Higher Education division that similarly, purportedly, found no support for Ms. Bittel's allegations. Finally, the Committee claimed that EDMC has "robust" internal controls in place to train its employees not to falsify job placement data.

216.    The Committee's reliance on the internal investigation and the investigation by EDMC's outside counsel was not reasonable. First, the Committee, had it been acting in good faith, would have conducted its own investigation rather than rely on prior investigations that may have been tainted by internal participation. Moreover, those investigations appear to have been conducted for the express purpose of negating Ms. Bittel's testimony, which represents just

a portion of Plaintiff's allegations. It was also unreasonable for the Committee to rely on those investigations because they related only to the Online Higher Education department. The Committee should have conducted its own investigation of career placement services throughout EDMC rather than focus on negating Ms. Bittel's testimony. Plaintiff's Supplemental Demand was not limited to the Online Higher Education department or Ms. Bittel's assertions, but rather was directed to the entire Company. In addition, the Committee has provided no details concerning those prior investigations, such as the names and positions of the employees interviewed by EDMC's outside counsel. The Committee, due to its bad faith approach to investigating Plaintiff's demands, simply presumed that the Supplemental Demand was limited to Ms. Bittel's allegations and conveniently used the internal investigations as a reason to reject the demand.

217. Moreover, in his *qui tam* action, Sobek alleged that EDMC's internal reporting procedures allowed for a student to be "placed" if that worked for at least one day. Sobek stated, "No additional days on the job are required as long as the grad went to a job that fit their skill level." However, the Committee did not undertake to investigate these allegations or their implications.

218. Furthermore, in its Report the Committee touted the "more than 300 people" employed by EDMC to help graduates find jobs. What the Committee fails to investigate is whether this is sufficient to meet the demands of students attempting to find jobs. The Senate HELP Committee concluded that it was not. The HELP Report concluded:

> While for-profit education companies employed large numbers of recruiters to enroll new students, the same companies frequently employ far less staff available to provide services including tutoring, remedial services, or career counseling and job placement. In 2010, with 158,300 students, EDMC employed 5,669 recruiters, 321 career services employees . . . . That means each career counselor

was responsible for 493 students . . . but the company employed one recruiter for every 28 students.

The Committee's failure to investigate or report these statistics – which demonstrate a patent lack of support for EDMC students to find jobs – renders its investigation inadequate and further demonstrates the Committee's bad faith.

### D.    The Committee Did Not Conduct a Good Faith and Reasonable Investigation Concerning Violations of the Incentive Compensation Ban

219.    Although in its March 6 Response the Committee claimed not to have reached a determination on the Title IV Issues, which includes allegations that EDMC violated the Incentive Compensation Ban, it was apparent from that Response that it had, in fact, baselessly, determined that the officers of the Company bear no responsibility for the Title IV Issues. This implicit refusal of Plaintiff's demand, made before the investigation was complete (as the Committee admitted), demonstrates the Committee's prejudice against the Plaintiff's claim and constitutes bad faith.

220.    Furthermore, the Committee's May 24 Response and Report support the conclusion that the Committee's investigation into violations of the Incentive Compensation Ban was inadequate and conducted in bad faith, and led to unreasonable conclusions in light of the vast amount of allegations and reports in the public domain.

221.    The Committee devoted over one-third of its 12-page May 24 Response to explaining why EDMC's compensation plan did not violate the Incentive Compensation Ban as *written*. The Committee essentially described the Matrix, which as detailed above, purports to adjust salaries based on "quality factors." However, the design of the plan, in fact, has very little to do with how ADAs were actually compensated. Similarly, in defending EDMC's

compensation system, the Report devotes substantial time to the largely irrelevant question of whether the plan was lawfully designed.

222.    In contrast to the discussion regarding the design of the compensation plan, the Committee devotes little space in its May 24 Response and its Report – and apparently little effort too – to addressing the heart of Plaintiff's allegations regarding the violation of the Incentive Compensation Ban, namely that the "Matrix" and its "quality factors" were shams designed to get around the Incentive Compensation Ban.  According to the Committee, its investigation included interviewing "upper-level managers" and current and former ADA managers who completed ADA reviews under the compensation plan.  However, the Committee fails to identify those "upper-level managers" and ADA managers either by name, job title, geographic region, tenure, or any other metric that might shed light on their reliability. Furthermore, the Committee states that it interviewed "more than 30 EDMC employees" – but in a Company of several thousands of employees, this could hardly be a representative sampling. Moreover, the Committee made no effort to gather feedback anonymously from employees by, for example, conducting written surveys.  There is no evidence that the employees interviewed were assured their jobs would be secure if they provided honest feedback that reflected negatively on the Company, and in fact even if they were, it is reasonable to infer that at least some of them would have been concerned about other forms of retribution if they provided such negative responses.  Therefore, the very design of the Committee's investigation was flawed.

223.    Furthermore, the topics that the Committee appeared to focus upon with the employees selected for interviews misses the mark of the allegations in the Demand Letter.  For example, the Committee reports that Directors and Senior Directors of Admission were trained on how to assign quality points, and references conference calls on plan administration.  It also

points to guidebooks provided to ADAs that describe the Plan. However, Plaintiff's allegations far exceed issues that could be corrected by training or guidebooks; in fact the CWs and other eyewitness accounts all support the view that ADAs were told about the Matrix. What the Committee failed to do was conduct an analysis on how, in practice, the Plan was administered. It could have examined, for example, enrollment reports and performance reviews in conjunction with salaries awarded to various ADAs. If it had found that ADAs with more student enrollments were systematically receiving higher "quality factor" points, it could have interviewed those employees' colleagues to determine if such higher quality factor points were truly earned. These are but a smattering of steps the Committee could have taken to determine if the "quality points" were objectively awarded and meaningfully factored into an ADA's salary.

224.    The Committee also failed to provide any detail concerning the conversations that were actually held with the employees. For example, the Committee does not even provide a list of the questions asked of the employees that would enable a determination that the relevant issues were being covered, and in such a manner as to facilitate truthful feedback. Thus, the Committee's cursory conclusions that "not a single one of the[] ADA managers considered the Plan a 'sham' or believed that student recruitment was the 'sole' compensation factor under the Plan" is meaningless without context.

225.    As with its response to the Letter of Credit allegations, the Committee again relied upon "internal controls" to demonstrate that EDMC's compensation plan was properly administered. However, pointing to a slew of internal controls means nothing without a demonstration that they were actually followed, or that they effectively ferreted out instances of wrongdoing, and such a showing is wholly lacking in the Report. This is akin to citing a law prohibiting jaywalking and concluding that no citizen ever crosses the street against the light or

outside a crosswalk. Such a conclusion is illogical and – as with the wrongdoing alleged against EDMC – wholly unreasonable because it is unsupported by the evidence.

226.    In fact, the lengthy description of the so-called robust internal controls includes not one incidence demonstrating that those internal controls uncovered wrongdoing, a result impossible to imagine given how large and sprawling EDMC is, and given the numerous similar allegations raised against the Company by other civil litigants and government agencies, as well as in public investigative reports. In fact, EDMC points to the fact that there were no complaints on its "compliance Hotline" concerning incentive compensation as evidence that no such abuses existed. However, this lack of complaints, given the widespread reports of abuses, actually demonstrates that EDMC's internal controls failed to uncover wrongdoing. The Committee's heavy reliance on those internal controls is therefore defective and constitutes bad faith.

227.    Alternatively, if the Committee is correct that EDMC's internal controls were effective safeguards in weeding out improper behavior, then it follows that the highest levels of senior management would have known about that wrongdoing. Therefore, if the internal controls were operating properly, Defendants cannot disclaim knowledge of the wrongdoing, and this increases the chance they will ultimately be subject to liability in this and other actions, such as the Government Action. Such threat of liability undermines any claim that the investigation was carried out in good faith.

### E.    The Committee Did Not Conduct a Good Faith and Reasonable Investigation Concerning Aggressive Recruitment Tactics

228.    The findings in the Committee's May 24 Response and its Report concerning the aggressive recruiting tactics employed by EDMC ADAs similarly misses the mark. The Committee reports that ADAs had no role in determining whether a prospective student would be admitted to EDMC. However, the allegations are not that the ADAs would determine a student's

eligibility, but rather that they would aggressively encourage students to apply, many of whom were facially unqualified either to complete the programs or to repay the debt incurred. Furthermore, without statistics concerning the percentage of applicants who are actually admitted to EDMC schools, as well as a detailed description of the qualifications of those students, the Committee's assertion that ADAs do not make admissions decisions is meaningless.

229.    In addition, there is ample evidence described herein that ADAs *did* affect an applicant's chances of admission by, *inter alia*, writing the admissions essay for the applicant, doctoring entrance exam results or falsifying application information.  The Committee did nothing to address those allegations.

230.    Similarly,    the    Committee    states    that    allegations    concerning    ADAs' representations about financial aid are not supported by the results of its investigation, but again the Committee relies on the fact that ADAs do not make financial aid determinations.  That completely misses the point of Plaintiff's allegations, which are that ADAs induced prospective students to apply through their misrepresentations concerning financial aid.

231.    Because the Committee's investigation concerning the aggressive recruiting tactics apparently ended with its determination that ADAs did not make admissions or financial aid decisions, and failed to address the crux of Plaintiff's allegations, its investigation was clearly inadequate and done in bad faith.

232.    The Committee's investigation was not and has not been reasonable or in good faith for the additional reason that it has failed to include Plaintiff in the investigation, despite having invited Plaintiff to participate and Plaintiff's having accepted that invitation.

F.   **The Committee's Conclusion that Internal Controls Protect the <u>Company's Directors Officers from Liability Defies Logic</u>**

1.   **The Committee's Explanations of the Internal Controls Do Not Justify Demand Refusal**

233.   The Committee devotes more than 8 pages of its March 6 Response to a description of the alleged internal controls that the Company has in place.   Similarly, the Committee devotes a full 25 of 65 pages in its Report to boasting about its internal controls. Thus, while it is apparent that the Committee satisfied itself that no wrongdoing was occurring at EDMC because, in theory, it has various internal controls in place, the Committee's discussions of those controls do not amount to a hill of beans.   They consist primarily of unsupported statements of corporate training policies that have nothing to do with the Board's ability to detect and correct wrongdoing.

234.   For example, the March 6 Response states that the Company's "internal controls operate to educate and train the Company's employees on significant policies and practices, to monitor the performance of departments and individuals, and to take remedial efforts as appropriate."   The March 6 Response does not describe what these internal controls are, how they operate or how they address the wrongdoing alleged in the Demands.   It also purports to describe the "high ethical standards" on which EDMC purportedly trains its ADAs.   The March 6 Response does not describe how this training takes place, who conducts it or even how frequently it supposedly occurs.   The March 6 Response also refers to "unethical behavior" but never describes what the Company considers to be unethical behavior.   With the record EDMC has, as reflected in the numerous incidents of illegal behavior detailed in this Complaint, very little, if anything, is viewed as "unethical."

235.   To the extent the March 6 Response and the Report do describe audit and monitoring functions, it does so in the most generic sense.   They do not describe how many

employees staff these functions or how they conduct their audits or monitoring functions. For example, they refer to the Internal Audit Department ("IAD"), which purportedly "identifies and remediates risks facing EDMC by auditing corporate processes, ground schools and the Online Higher Education Division ("OHE")." They further state that "[a]ll business activities of EDMC are subject to auditing, and IAD identifies the frequency of such audits using a risk-based approach. At the conclusion of its audits, IAD issues a comprehensive and objective assessment of its findings and recommendations." But they do not describe what reports have been issued or even what action has been taken as a result.

236.    The Report refers to a "Code of Conduct" which purports to "guide[] the business practices of the Company in regards to compliance with the laws and maintenance of the highest moral, legal, ethical and financial reporting standards." However, such vague and lofty statements provide no practical and useful information, such as whether employees were educated on what those standards were and whether, how often, and under what circumstances the Code of Conduct was enforced. Indeed, according to the Report, the Code of Conduct "*generally* sets forth EDMC's values, including that the Company is committed to having its employees conduct themselves in an ethical manner" (emphasis added). Such a statement is virtually meaningless in a vacuum, and on its face only provides general guidelines. Among other problems, the thousands of employees of EDMC undoubtedly have different views of what constitutes "ethical" behavior. In addition, "The Code emphasizes that employees are never expected to violate any law and should never feel pressured to do so." But the Report does not state whether the employees are educated on what laws are applicable to them, and indeed, the evidence suggests they are not. Relator Mahoney, who was hired to train ADAs, stated that he was not required to explain the Incentive Compensation Ban to employees. Similarly, reference

to an "Integrity Brochure," without more explanation than it lists as an example of unethical behavior failure to comply with federal laws, regulations, accrediting and licensing agencies, does not explain how this worked in practice or suggest that employees were educated on applicable federal laws and regulations. Furthermore, the Committee could have provided the Code of Conduct to Plaintiff but failed to do so, and such omission suggests that the Code of Conduct actually does little to alleviate concerns about the misconduct alleged.

237. The Report includes similar descriptions for each of the internal controls it describes, including the Hotline Committee, the Internal Audit Department, the Online Higher Education Division Audit and Compliance Department, the Corporate Services Marketing and Admissions Department, Financial Aid, Regulatory Affairs, the Business Practices Committee, Sarbanes-Oxley Controls, and the Audit Committee. In each instance the Report describes how, in theory, these controls are designed, but provides no practical information that would allow one to determine if they are effective. Furthermore, the Report does not include any evidence that the Committee attempted to determine if these controls could possibly have been effective in uncovering the wrongdoing that has been widely alleged in the Government Action, other government investigations and public investigative reports. Such failure even to inquire whether those allegations were made at to any of the internal controls at EDMC constitutes bad faith and renders the Committee's findings unreasonable.

238. For example, the Report states that "only a handful of submissions" referred to the Hotline Committee "broadly construed, related to the types of potential ethical violations raised in the GAO Report and mentioned in the Demand Letters." However, the Committee did not provide any further detail as to what those submissions were and how they relate to the Demand Letters. Additionally, although it states that corrective action was taken in some instances, it

does not explain what led to that corrective action or what was involved in the corrective action itself.

239.    The Committee's conclusion with regard to the Hotline Committee's effectiveness is particularly unreasonable.    From its finding that "[o]nly a handful of submissions, broadly construed, related to the types of potential ethical violations raised in the GAO Report and the Demand Letters," the Committee concludes, "[t]hus the Hotline is (and has been) a robust thorough and effective mechanism for detecting and remediating the types of alleged misconduct referenced in the Demand Letters and described in the GAO Report." However, given the prevalence and pervasiveness of wrongdoing at EDMC described in multiple sources available in the public domain, including the GAO Report, the HELP Report, the Government Investigation and news articles, it is patently *unreasonable* to conclude that a system designed to uncover such misconduct was "thorough and effective" if it turned up only a "handful" of related complaints.

240.    The absence of any description of disciplinary action taken as a result of the hotline or even other forms of reporting misconduct is not surprising, as several former and current employees have stated that they complained to their superiors about illegal and unethical practices at EDMC, and nothing whatsoever was done about it.    For example, Kathleen Bittel reported such conduct to her manager and to the Human Resources department, only to find no discipline was ever issued and the wrongful behavior persisted.    In one instance, she reported that a colleague falsified the salary a graduate was earning in order to count that graduate as gainfully employed.    Not only was that employee not disciplined, but the employee was also given EDMC's "North Star Award," which signifies exemplary performance.

241.    With regard to the Internal Audit Department ("IAD"), the Committee again provides a vague explanation stating that "IAD evaluates the adequacy and effectiveness of EDMC's internal controls and recommends improvements" but does not explain how this is accomplished, nor does it describe what improvements were recommended and why. Furthermore, while the Report provides a nice and lengthy description of the IAD's reporting process, there is scant evidence detailing the contents of those reports. Despite these shortcomings, the Committee satisfied itself that "IAD's reports from school audits" provide "a thorough, effective control." The Committee's "just trust us" approach – in which it purports to have reviewed the controls and found them to be effective without offering any firm basis for such conclusion – hardly demonstrates that the Committee conducted a good faith investigation that would allow Plaintiff to have any confidence in the reasonableness of the Committee's conclusions.

242.    Similarly unavailing, the Report explains that IAD "verifies compliance with policies and procedures and regulatory requirements," but does not explain the processes used. And although the Report explains that IAD's "audit process is based upon periodic assessments of operating locations or processes within the Company" based on a "risk-based approach . . . used to determine frequency, location and depth of audits of a given location or process," the Report does not give any clue as to what the IAD determined were the riskiest locations and processes. In particular, the Report does not state whether violations of the Incentive Compensation Ban or recruiting practices were deemed "risky" processes, or whether locations were considered more risky if they were mentioned in the Government Action or the other various public documentation of wrongdoing at EDMC.

243.    The Committee's explanation of the Online Higher Education Division ("OHE") fares no better.    The March 6 Response states that "OHE Internal Audit and Compliance Department, which performs a similar function as IAD within OHE, is designed to prevent, mitigate and remediate, among other things, student-facing risks by monitoring interactions between students and ADAs or Student Financial Services representatives in OHE.    Poor performing employees receive remediation – ranging from verbal coaching and re-training to termination."    This passage does not say that EDMC employees are disciplined for improper or illegal recruiting techniques.    Rather, it states that "poor performing employees" receive retraining – "poor performing" can just as easily mean employees who are not generating sufficient enrollment to meet the demands of management.    Moreover, there is absolutely no discussion of how often or even if there have been incidents of employee discipline and what the disciplining action was.

244.    Although the Report explains that OHE monitors ADA calls to prospective students, it reports that only a minute fraction of the calls actually involve any infractions, a finding which does not comport with the numerous allegations in the various actions and press reports that describe abusive recruiting practices designed to "find the pain" of a potential student.    Thus, as with the IAD, it was patently unreasonable for the Committee to conclude that the OHE call monitoring program has "proven successful in detecting and remedying" infractions.    Furthermore, while the Committee describes training of ADAs in their recruitment efforts, it fails to investigate whether such training included the "find the pain" mantra or other abuses described in the Demand Letters.

245.    According to the Report, the OHE also provides "extensive training" to ADAs with issues pertaining to proper recruitment practices.    It purports to provide new ADAs with

information on "quality conversations with prospective students," and an FAQ Guide, unique to each major group of schools, which ensures that each ADA has "legally and factually correct information while interacting with prospective students." In fact, ADAs must pass a test based on the FAQ Guide annually. However, the Committee did not provide any substantive information about what the ADAs were taught concerning interactions with prospective students, and notably did not provide copies of the FAQ Guide or any other training materials or tests given to ADAs. Based on the numerous statements from the CWs, as well as from several named witnesses in the public domain, EDMC's corporate culture taught ADAs to "find the pain" of a prospective student and exploit it. While EDMC may spend significant time training its ADAs, if it is encouraging them to pressure prospective enrollees improperly, it is not compliant with regulations. Thus, while ADAs might very well be trained on how "to identify questionable recruiting practices," without any information concerning what constitutes a "questionable recruiting practice" at EDMC, it was unreasonable for the Committee to conclude that such training was an effective control at stemming the alleged wrongdoing.

246.    The Report's description of the Corporate Services Marketing and Admissions Department also omits critical information that would enable one to determine whether its procedures are actually followed. According to the Report, the Corporate Services Marketing and Admissions Department conducts training on so-called "ground schools" (i.e., bricks and mortar schools) similar to the OHE's training of recruiters of online students, including dissemination of the an FAQ and Compliance Guidebook and administration of tests to ADAs. Following the initial training, ADAs must complete a five-day training course held at EDMC headquarters in Pittsburgh. However, the same problems associated with the Committee's reliance on the OHE apply to its reliance on the Corporate Service Marketing and Admissions

Department training procedures. With no information concerning what was in the training materials, it is unreasonable to conclude such training effectively stemmed the wrongdoing alleged.

247.    The Report also describes various methods of determining noncompliance conducted by the Corporate Services Marketing and Admissions Department, but as with other internal controls, it does not provide details as to what types of infractions are reported or how they are corrected. Thus, while ADAs are required to be "observed" by their supervisors during calls to prospective students, there is no explanation of what those observations yield. Furthermore, there is an inherent conflict of interest in putting the onus on the ADAs' supervisors to report an ADA's aggressive recruiting tactics because ADA supervisors are subject to enrollment quotas themselves and thus they have an interest in promoting aggressive and improper recruiting techniques, not reporting them. However, the Report does not identify or acknowledge this conflict of interest, much less provide any explanation for why it does not undermine the effectiveness of the internal control. Similarly, the Report describes "mystery shopping," where ADAs are subject to inquiries from vendors posing as prospective students, and infractions are purportedly reported, but again, there is no detail as to the results of those procedures.

248.    Many of the other internal controls described in the Report are facially irrelevant to the allegations in the Demand Letters. For example, the Report describes the controls relating to financial aid personnel (which do not include recruiters), to regulatory affairs, to the Business Practices Committee (which reviews Company publications), to its Sarbanes-Oxley Controls (which are designed to address accounting violations in the Company's SEC filings), and to the

Audit Committee (which also addresses compliance with various issues associated with SEC filings).

249.    The Committee's omission of any details concerning its internal compliance programs may well stem from the fact that the actual application of discipline in the Company is toothless. As Jason Sobek, a former admissions officer, stated in his *qui tam* complaint against EDMC, admissions officers are encouraged to take risks and to not worry about compliance issues because they have "three 'Get Out of Jail Free Cards,'" meaning nothing would happen to them if they were caught violating the rules and regulations. Employees who are disciplined, according to Sobek, are told of the infraction but then sent directly back to work without consequence. According to Sobek, employees regard these notices of violations as "a joke," as there are no counseling programs to rely upon in these circumstances. Sobek also claimed that compliance auditing was spotty at best, given that the use of personal and Company cellphones for calls with prospective students is not monitored. Yet the Committee failed to investigate these allegations in concluding that EDMC's internal controls were adequate.

250.    In practice, it appears the only "discipline" to be meted out at EDMC is for an admissions officer's failure to make his or her quota of production of new students. Sobek describes in his *qui tam* complaint that admissions personnel not meeting their quotas first received a "discussion memo" for "deficient performance." The discussion memorandum would set forth the recruiter's tenure (upon which the recruiter's quota was based), four week application/enrollment averages and start rates. Discipline and subsequent training for these individuals consists of listening in on calls more successful recruiters make. According to Sobek, the next step in the disciplinary process for an underperforming recruiter is the issuance of a Performance Management Plan ("PMP"). The PMP would set forth in chart form the

recruiter's quota and the recruiter's actual, deficient numbers. The PMP would often also state that if performance, *i.e.* new enrollments, did not improve, the recruiter was at risk of termination.

251. According to the March 6 Response, EDMC's compliance "policies and programs" are designed by its Vice President of Compliance "to emphasize EDMC's values and promote a culture of integrity." Once again, the Letter fails to describe what these "policies and programs" are, and the generic language about promoting values and integrity is mere lip service in the absence of any detail.

## 2. The Internal Controls Demonstrate that the Board and Senior Management Knew About the Alleged Wrongdoing

252. Far from demonstrating that demand refusal was proper, the Committee's description of the Company's internal controls actually supports the claim that the wrongdoing alleged was known throughout the Company and at the highest levels of management.

253. For example, the Report notes that the Code of Conduct and the Integrity Brochure informed employees they should report unethical conduct to, among others, corporate Human Resources personnel or the Company's General Counsel. The Report also states that the existence of the Hotline Committee "demonstrates . . . that EDMC directors and officers have acted in good faith by overseeing the Company's operations and business practices." Similarly, the IAD "has been functioning as an internal control for regulatory compliance . . . and has been assisting directors and officers in overseeing the Company's operations and business practices," and the controls associated with the OHE "allow directors, officers, and management to oversee OHE's operations and business practices."

254. With regard to the monitoring of ADAs' interactions with potential students, infractions are reported up the chain to the "Director of Admissions and Senior Director of

Admissions, Campus Presidents, Regional Vice Presidents, and sometimes the education system president himself." Recommendations to terminate an employee based on a serious infraction are reviewed by the Regional Vice President and Human Resources, the VP of Admission, and the school system President. Therefore, it is unlikely that Defendants did not know of the alleged wrongdoing.

255. In addition, the ADAs' training is uniform across all geographies and schools, and includes a 5-day session at EDMC's corporate headquarters, and therefore Defendants would have known the content of that training, including the "find the pain" mantra.

256. The Report also describes controls in the Company's financial aid department, which includes a Student Finance and Compliance Department having "senior management with extensive experience in Title IV regulations who interface with the DOE and serve as internal experts on regulation interpretation and compliance." Such experts would surely have advised senior management and the Board of any problems they discovered.

257. The Report also relies on Sarbanes-Oxley ("SOX") Controls and the Audit Committee of the Board of Directors as internal controls that support the conclusion that demand should be refused. As with the other internal controls, however, these actually demonstrate that Defendants would have been aware of any wrongdoing alleged by Plaintiff and by the multiple sources in the public making allegations. According to the Report, the Company's SOX controls "allow[] the Company's directors and officers to oversee the accuracy of the Company's financial reporting."

258. Finally, the Audit Committee has a role in assisting the Board in its oversight of the following: "(i) the integrity of the financial statements; (ii) compliance with legal and regulatory requirements; (iii) ensuring the qualifications and impendence [sic] of the Company's

independent auditors; (iv) the performance of the independent auditors; and (v) the internal audit function at the Company." To accomplish those duties, the Audit Committee is empowered to "(i) review[] the scope and plans for both internal and independent auditors; (ii) establish[] 'whistleblowing' procedures; (iii) review[] the Company's legal and regulatory compliance; and (iv) ensur[e] compliance with the Company's Business Conduct Guidelines and review[] conflicts of interest." Therefore, because the Audit Committee has oversight functions of virtually all the internal controls relied upon by the Committee in rejecting demand, it stands to reason that the highest levels of management and the Board of Directors would have had knowledge of the wrongdoing those internal controls are designed to uncover.

### 3.    It Is Unreasonable to Conclude that the Internal Controls Adequately Addressed Plaintiff's Concerns

259.    The Committee's conclusions that Plaintiff's various demands should be rejected are unreasonable because, in addition to the internal controls, there is other evidence that the highest levels of management and Defendants knew of the alleged wrongdoing. To begin, driving up student enrollment no matter the means has been ingrained in EDMC's culture since the LBO. This initiative has been led by Defendant Nelson, the current CEO of EDMC and a member of the Board. Nelson's history of creating the same culture and the same illegal compensation system at Apollo is well-known in the for-profit industry. The consequences to Apollo are also well-known, as the District Court in the Government Action noted, and this conduct resulted in a record settlement.

260.    That Nelson is trying to do at EDMC what he was caught doing at Apollo cannot be doubted. First, he has brought over many of the high ranking management personnel from his Apollo/University of Phoenix days and ensconced them at EDMC, including the following: Ken Boutelle, Sam Yaghoubi, David Preece, Phil Clark, Sean St. Clair, Jamie Wellnitz, Mary Dyer-

St. Clair, Robert Carroll (Executive Vice President and Chief Information Officer), Anthony F. Digiovanni (Senior Vice President of Marketing and Admissions) and John Kline (President of EDMC Online Higher Education).

261.    Kline and Nelson, in particular, certainly knew of the misconduct alleged herein. CW2 stated that Kline led "all-company meetings" approximately every two months during which enrollment quotas were discussed.    CW7 also recalled meetings held by Kline during which he told ARs that EDMC was not enrolling enough students.    Finally, CW6 recounted a similar company-wide meeting, which was held in 2010 by Defendant Nelson, during which issues related to ADA compensation were widely discussed.

262.    Second, Defendant Nelson has instituted a policy of oversight of the admissions functions. A former Vice President of Human Resources at EDMC's online division stated that "all pay raises for admissions reps were approved by corporate headquarters."

263.    Third, the District Court held in the Government Action that it could be inferred that given how important government funding was to EDMC's revenues, "it is plausible that any conduct which would have imperiled those revenues, such as the alleged violations of the Incentive Compensation Ban, would have required approval from the highest levels of EDMC management," and noted that the government "pled the involvement and knowledge of senior EDMC executives."

264.    A former Vice President of Human Resources stated that the compensation system for admissions staff was developed at the corporate level and approved by EDMC Corporate.  A former Vice President of Admissions reported that the compensation scheme was developed by seven to ten high level executives and was reviewed and approved by Defendant Nelson.

265.   A Vice President for Marketing and Admissions at EDMC's corporate headquarters from 1988 until April 2010 stated that Defendant Nelson criticized EDMC's historical business practices, including that EDMC had not "grown fast enough" and was "too cautious" and "not aggressive enough." This former Vice President had historically been responsible for planning and forecasting for the Company, but Nelson took over this process and made plans that "did not make sense" and were "overly aggressive."

266.   Other former employees have described the central role that senior management played in attempting to make new student enrollment quotas. One former employee described an environment whereby Defendant Nelson would meet directly with directors of admission, the ADAs' supervisors, to increase enrollments, resulting in an environment that was "very frightening, very intimidating" for ADAs, who were concerned that they would be fired for missing their quotas. Another former employee described a company-wide meeting in or about November 2009 attended by EDMC's Online Higher Education CEO, Weiss, and President Kline, where new requirements for ADAs were instituted, adding to the pre-existing enrollment quota system. The changes included increasing the number and duration of phone calls with prospective students. CW7 described meetings led by Kline which were accusatory in nature and ADAs were warned that they could be laid off if their enrollment numbers did not increase.

267.   The conduct at EDMC schools described herein was so widespread that it rose to the level in many employees' views as "company policy." For example, the Bittel Letter states that Ms. Bittel could "attest" that the improper conduct "testified to in the [HELP Committee] hearings [on August 4, 2010] was not only very true, but a companywide policy and not just" conduct that occurred at Argosy University where she was employed. She stated that the

improper recruiting "tactics were part of our daily sales meetings and were being utilized by my most 'successful' colleagues."

268.    Because the "overly aggressive" growth strategy along with the approval of the improper, incentive-laden compensation scheme came from the CEO, who is also a member of the Board of Directors, and flowed systemically throughout EDMC's many schools, it is unreasonable for the Committee to conclude that the internal controls at the Company are sufficient and that the "directors and officers of EDMC have satisfied [their] fiduciary duties to the Company by establishing and maintaining, appropriate governance structures…."

269.    In addition, EDMC abandoned the Matrix in the middle of 2011, a tacit admission that EDMC's management recognized the Matrix as unlawful on its face, and knew that it was not properly followed in practice.

270.    Other isolated incidents also demonstrate that the highest levels of EDMC management knew of the improper compensation practices and abusive recruitment practices. For example, certain readers posted in response to an article titled EDMC claims compensation plan legal in answer to lawsuit, published in the *Pittsburgh Post-Gazette* and posted on the website topix.com. One respondent named Frank Covaleski stated that at EDMC "It's all about the numbers and nothing about the student. This comes from the top of the leadership food chain . . . . I have the emails to prove it. It's not subjective or opinion. It's just plain fact." Mr. Covaleski also has a linkedin.com profile which states that he has been employed at EDMC since December 1988 and is currently a Group Vice President there.

271.    It strains credulity that the remaining members of the Board, including the members of the Committee, did not know about the improper practices. Notably, the sheer number of abusive and deceptive recruiting and enrollment practices detailed by many current

and former employees, located in various geographic locations and business units, supports the fact that the Board of Directors knew or should have known of the abuses described herein. These were not isolated instances, but rather were a widespread pattern of company-sanctioned activity.    It was this widespread pattern that led the District Court to uphold the government's allegations of an "EDMC-wide scheme controlled by top-level executives" in the Government Action.   For the foregoing reasons, the members of EDMC's Board of Directors were incapable of exercising objective judgment in determining whether to enforce the Company's claims for the misconduct described herein, and their decision to refuse demand is not entitled to the protections of the business judgment rule.

## **CAUSE OF ACTION**

### **COUNT I**
**(Breach of Fiduciary Duty)**
**(Derivatively Against the Director Defendants)**

272.    Plaintiff realleges the preceding paragraphs as set forth above and incorporates them herein by reference.

273.    The Individual Defendants, as Directors of EDMC, are fiduciaries of the Company and its shareholders.   As such, they owe the Company the highest duties of good faith, fair dealing, due care, candor and loyalty.

274.    In contemplating, planning, and/or effecting the foregoing conduct, the Individual Defendants were not acting in good faith toward the Company and breached their fiduciary duties.   The Individual Defendants further breached their fiduciary duties by failing to implement appropriate internal controls to detect and correct the harmful recruiting and other practices.

275.    As a result of these actions of the Individual Defendants, the Company has been and will be damaged.

276.    Plaintiff has no adequate remedy at law.

**WHEREFORE,** Plaintiff prays for judgment as follows:

(a)    for an order declaring that the Defendants breached their fiduciary duties to the Company;

(b)    for an order requiring Defendants to immediately overhaul the Company's admissions and recruiting personnel compensation structure such that no portion of compensation earned by ADAs – including any bonuses or other awards – is based on the number of new student enrollments that ADA achieves;

(c)    for an order requiring Defendants to immediately adopt and establish policies and procedures that eliminate improper new student recruitment tactics, including, but not limited to, aggressive techniques designed to encourage unqualified students to enroll in EDMC programs and to seek and obtain government funding to pay for such education;

(d)    for an order requiring Defendants to immediately establish internal controls sufficient to ensure that if such wrongful compensation and recruiting practices occur at the Company in the future, those practices will be brought promptly to the attention of the Board of Directors so that they can be eliminated before they cause the Company any legal liabilities;

(e)    for an order requiring the Defendants to compensate EDMC for the damage it has suffered and continues to suffer as a result of the wrongdoing set forth herein, including, but not limited to, the harm that EDMC will suffer as a result of the Government Action;

(f)    for Plaintiff's costs and expenses incurred in this action, including, but not limited to, experts' and attorneys' fees; and

(f)    for such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED.**

DATED: <u>September 27, 2012</u>                    Respectfully Submitted,

CAROSELLI BEACHLER MCTIERNAN
& CONBOY, LLC

By: _____
William R. Caroselli, Esquire
PA I.D. #00452
E-Mail: wcaroselli@cbmclaw.com

20 Stanwix Street, 7th Floor
Pittsburgh, PA 15222

Telephone: (412) 391-9860
Fax: (412) 391-7453
*Counsel for Plaintiff*

*- And -*

GRANT & EISENHOFER
Jay W. Eisenhofer, Esquire
PA I.D. #46584
Michael J. Barry, Esquire
PA I.D. #69122
Cynthia A. Calder, Esquire
PA I.D. #64711
Caitlin M. Moyna, Esquire
Shehzad Roopani, Esquire

123 Justison Street
Wilmington, DE  19801
Telephone: (302) 622-7000
*Counsel for Plaintiff*

## **V E R I F I C A T I O N**

I, Ginger Poplin, Executive Director of the Oklahoma Law Enforcement Retirement System, herein aver that the statements of fact contained in the foregoing AMENDED COMPLAINT IN CIVIL ACTION are true and correct to the best of my information, knowledge and belief and are made subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

DATE: 9|25|12                                    Ginger Poplin
                                                              [Printed Name]

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Amended Complaint in Civil Action was forwarded this 27<u>th</u> day of <u>September 2012</u> to all parties through counsel listed below:

Anderson T. Bailey, Esquire
Laura E. Ellsworth, Esquire
Thomas S. Jones, Esquire
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
E-Mail: atbailey@jonesday.com
E-Mail: leellsworth@jonesday.com
E-Mail: tsjones@jonesday.com
*Counsel for Nominal Defendant*
*Education Management Corp.*

Michael L. Kichline, Esquire
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
E-Mail: michael.kichline@dechert.com
*Counsel for Defendants Todd S. Nelson,*
*John R. McKernan, Mick J. Beekhuizen,*
*Samuel C. Cowley, Adrian M. Jones,*
*Jeffrey T. Leeds, Leo F. Mullin,*
*Paul J. Salem, Peter O. Wilde*
*and Joseph R. Wright*

Steven M. Reinsel, Esquire
Ryan O. Hemminger, Esquire
LEECH TISHMAN FUSCALDO & LAMPL, LLC
525 William Penn Place, 30th Fl
Pittsburgh, PA 15219
E-Mail: sreinsel@leechtishman.com
E-Mail: rhemminger@leechtishman.com
*Counsel for Leo F. Mullin and Paul J. Salem, as members*
*of a duly formed Litigation Committee of the board of directors*
*of Education Management Corporation*

CAROSELLI BEACHLER MCTIERNAN
& CONBOY, LLC

BY: _____
William R. Caroselli, Esquire
Pa. I.D. #00452
20 Stanwix Street, 7th Floor
Pittsburgh, Pennsylvania 15222
Telephone: (412) 391-9860
E-Mail: wcaroselli@cbmclaw.com