# EXHIBIT 4

"

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

OKLAHOMA LAW ENFORCEMENT
RETIREMENT SYSTEM,

*Plaintiff,*

v.

TODD S. NELSON, JOHN R. McKERNAN,
MICK J. BEEKHUIZEN, SAMUEL C.
COWLEY, ADRIAN M. JONES, JEFFREY T.
LEEDS, LEO F. MULLIN, PAUL J. SALEM,
PETER O. WILDE, and JOSEPH R. WRIGHT

*Defendants,*

and

EDUCATION MANAGEMENT CORP.,

*Nominal Defendant.*

**CIVIL DIVISION**

**COMMERCE AND COMPLEX
LITIGATION CENTER**

No. GD-12-008785

Code: 020 Equity

**MOTION TO DISMISS THE
AMENDED COMPLAINT
PURSUANT TO SECTION 7.08 OF
THE AMERICAN LAW INSTITUTE
PRINCIPLES OF CORPORATE
GOVERNANCE AND FOR LACK
OF STANDING**

Filed on behalf of Nominal Defendant
Education Management Corporation

Counsel of Record for this Party:

Thomas S. Jones, Esq. (Pa. 71636)
Laura E. Ellsworth, Esq. (Pa. 39555)
Anderson T. Bailey, Esq. (Pa. 206483)

JONES DAY
Firm ID: 865
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Ph: (412) 391-3939
Fx: (412) 394-7959

tsjones@jonesday.com
leellsworth@jonesday.com
atbailey@jonesday.com

2012 OCT 17 PM 4: 09

OKLAHOMA LAW ENFORCEMENT
RETIREMENT SYSTEM,

       *Plaintiff,*

       v.

TODD S. NELSON, JOHN R. McKERNAN,
MICK J. BEEKHUIZEN, SAMUEL C.
COWLEY, ADRIAN M. JONES, JEFFREY T.
LEEDS, LEO F. MULLIN, PAUL J. SALEM,
PETER O. WILDE, and JOSEPH R. WRIGHT

       *Defendants,*

       and

EDUCATION MANAGEMENT CORP.,

       *Nominal Defendant.*

**CIVIL DIVISION**

**COMMERCE AND COMPLEX
LITIGATION CENTER**

No.  GD-12-008785

Code:  020 Equity

## NOTICE

    Notice is hereby given that Nominal Defendant Education Management Corporation's

Motion to Dismiss Pursuant To Section 7.08 Of The American Law Institute Principles Of

Corporate Governance And For Lack Of Standing, together with the supporting Memorandum of

Law and Appendix, was filed with the Clerk of Court of the Court of Common Pleas of

Allegheny County on October 17, 2012, and any opposition must be filed on or before

November 6, 2012.

October 17, 2012

          Respectfully submitted,

          Anderson T. Bailey, Esq. (Pa. 206485)
          *Counsel for Nominal Defendant*
          *Education Management Corporation*

OKLAHOMA LAW ENFORCEMENT
RETIREMENT SYSTEM,

    *Plaintiff,*

        v.

TODD S. NELSON, JOHN R. McKERNAN,
MICK J. BEEKHUIZEN, SAMUEL C.
COWLEY, ADRIAN M. JONES, JEFFREY T.
LEEDS, LEO F. MULLIN, PAUL J. SALEM,
PETER O. WILDE, and JOSEPH R. WRIGHT

    *Defendants,*

    and

EDUCATION MANAGEMENT CORP.,

    *Nominal Defendant.*

**CIVIL DIVISION**

**COMMERCE AND COMPLEX
LITIGATION CENTER**

No. GD-12-008785

Code: 020 Equity

## ORDER

    AND NOW, this _____ day of _____, 2012, upon consideration of Nominal

Defendant Education Management Corporation's Motion to Dismiss Pursuant To Section 7.08

Of The American Law Institute Principles Of Corporate Governance And For Lack Of Standing,

it is hereby ORDERED that the Motion is GRANTED and this case is DISMISSED with

PREJUDICE.

                      BY THE COURT

                      _____

OKLAHOMA LAW ENFORCEMENT
RETIREMENT SYSTEM,

      *Plaintiff,*

          v.

TODD S. NELSON, JOHN R. McKERNAN,
MICK J. BEEKHUIZEN, SAMUEL C.
COWLEY, ADRIAN M. JONES, JEFFREY T.
LEEDS, LEO F. MULLIN, PAUL J. SALEM,
PETER O. WILDE, and JOSEPH R. WRIGHT

      *Defendants,*

         and

EDUCATION MANAGEMENT CORP.,

      *Nominal Defendant.*

**CIVIL DIVISION**

**COMMERCE AND COMPLEX
LITIGATION CENTER**

No. GD-12-008785

Code: 020 Equity

## MOTION TO DISMISS PURSUANT TO SECTION 7.08 OF THE AMERICAN LAW INSTITUTE PRINCIPLES OF CORPORATE GOVERNANCE AND FOR LACK OF STANDING

Nominal Defendant Education Management Corporation ("EDMC" or "the Company"), by and through its counsel Jones Day, submits the following Motion to Dismiss Pursuant To Section 7.08 Of The American Law Institute Principles Of Corporate Governance And For Lack Of Standing the Amended Complaint filed by Plaintiff Oklahoma Law Enforcement Retirement System ("OLERS").

1.     EDMC is a Pittsburgh-based Pennsylvania corporation that operates four different education systems, The Art Institutes, Argosy University, Brown Mackie Colleges, and South University. Collectively, these systems have more than 100 schools across North America and offer online educational programs as well. Shares of EDMC are publicly traded on the NASDAQ exchange.

2.      OLERS alleges that it is a public pension retirement fund located in Oklahoma and that it has owned EDMC common stock continuously during the relevant time period. *See* Am. Compl. ¶ 28.

3.      On September 27, 2012, OLERS filed a single-count Amended Complaint naming as Defendants each member of EDMC's Board of Directors (the "Board") and naming EDMC as a nominal Defendant. *See id.* ¶¶ 29-39.  In its sole cause of action, OLERS derivatively alleges a claim for breach of fiduciary duty against each member of the Board. *See id.* ¶¶ 272-76.

4.      The Amended Complaint should be dismissed in its entirety, with prejudice, for the following reasons.

## I.      OLERS Lacks Standing Because It Did Not Make Proper Demand On EDMC.

5.      OLERS failed to satisfy Pennsylvania's demand requirement for each of its allegations.  Prior to filing suit, a derivative plaintiff must exhaust intra-corporate remedies by making a written demand upon the Company's board. *Cuker v. Mikalauskas*, 692 A.2d 1042, 1050 (Pa. 1997) (citing ALI Principles § 7.03).  Demand is only excused upon "'a specific showing that irreparable injury to the corporation would otherwise result....'" *Id.* (quoting ALI Principles § 7.03(b)).

6.      Many of the allegations in the Amended Complaint are not to be found in the two demand letters that OLERS sent to the EDMC Board.  In failing to make demand, OLERS deprived the Board of an opportunity to investigate these claims, and it is therefore precluded from pursuing those allegations through litigation that is purportedly on the Company's behalf.

## II.      OLERS Lacks Standing Because It Could Not Have Owned Shares In EDMC Throughout The Relevant Time Period.

7.      OLERS' Amended Complaint suffers from other defects as well.  "To have standing to bring a derivative action, one must be a shareholder, both at the time of the alleged

wrongdoing and continuing to judgment." *Warden v. McLelland*, 288 F.3d 105, 111 (3d Cir.

2002) (citing *Cuker*). *See also* Pa. R. Civ. P. 1506(a)(3)(i) (requiring that a plaintiff must be "a

stockholder or owner of an interest in the corporation or other entity at the time of the transaction

of which the plaintiff complains" in order to bring a derivative lawsuit).

8.     EDMC went private in a leveraged buy-out in 2006.  It did not issue public shares

again until October 1, 2009.

9.     The Amended Complaint is replete with allegations of misconduct that allegedly

occurred prior to October 1, 2009.  Under Pennsylvania law, OLERS lacks standing to bring any

derivative claims based on such conduct, and those claims must therefore be dismissed.

**III.    The Complaint Should Be Dismissed Pursuant To The Business Judgment Rule.**

10.     The Pennsylvania Supreme Court has established procedures for companies, such

as EDMC, to receive, investigate and act on claims by shareholders that fiduciaries of the

company have violated their duties and acted contrary to the interests of stockholders. *See*

*Cuker*, 692 A.2d at 1049-1055.

11.     In *Cuker*, the Court adopted the procedures set forth in Sections 7.02 to 7.10 and

Section 7.13 of the ALI Principles of Corporate Governance ("ALI Principles") and held that

where a company adheres to those procedures when considering a shareholder's demands, the

decision to adopt or decline those demands is entitled to deference.

12.     This is the business judgment rule.  Under *Cuker*, the court must "presum[e] that

[directors] pursue the best interests of their corporations," *Cuker*, 692 A.2d at 1046, and, in order

to minimize "judicial or shareholder second-guessing" in corporate management, *id*., should

conduct only a "limited and precise" inquiry to determine whether derivative claims like

OLERS' may proceed, *id*. at 1048.

13.    Thus, where a special litigation committee ("SLC") of a corporate board concludes that a shareholder's derivative lawsuit is not in the company's best interests, and that determination is rational and made in good faith, the court must dismiss the lawsuit. *Id.* at 1046, 1048.

14.    After investigating the various allegations levied by OLERS and other purported EDMC shareholders against the Company and the members of the Board for more than a year, an SLC composed of two non-employee directors of the EDMC Board produced a 65-page report analyzing OLERS' demands and concluded "that it would not be in the best interest of the Company or its shareholders to take the actions requested with respect to the allegations in the Demand Letters." SLC Report at 65.

15.    The SLC's conclusion was made in good faith following "an extensive and diligent inquiry." *Id.* The two directors that composed the SLC were independent and disinterested. Both individuals have extensive experience and expertise in matters of corporate management, operations, and finance. Neither is alleged to have any personal involvement in the alleged wrongdoing, any direct personal financial interest in the conduct or transactions in question, or any family or social connections to a person with a direct personal financial interest. And, as alleged shareholders or representatives of shareholders in EDMC, the interests of the two SLC members is presumptively the same as those of all other EDMC shareholders.

16.    The SLC retained counsel to help conduct its investigation. That investigation entailed interviewing nearly forty witnesses at both the executive and lower-level managerial levels, reviewing over 165,000 pages of documents, and inviting OLERS to share any additional information it had regarding the allegations in its demand letters. The investigation culminated

GD-12-008785

in a sixty-five page written report that analyzes OLERS' allegations in depth and reviews the nature and extent of EDMC's internal controls and oversight procedures.

17.    The SLC's conclusion that OLERS' claims are not in the best interests of EDMC is also rational.  The allegations in OLERS' demand letters mimic those in prior federal lawsuits against EDMC that have largely been dismissed on their pleadings for failure to state a claim.  In addition, the SLC found no evidence to substantiate OLERS' claims of internal wrongdoing. Rather, its investigation established that EDMC "has a robust set of internal controls that are properly designed to identify, deter and remediate the types of allegedly deceptive and questionable practices referred to in the Demand Letters...."  SLC Report at 4.

18.    Accordingly, the SLC's decision is within the business judgment rule and the Court should dismiss OLERS' claims. *See Cuker*, 692 A.2d at 1048.

WHEREFORE, this litigation is not in the best interests of the Company and its shareholders, and Nominal Defendant Education Management Corporation respectfully requests that the Court enter the attached Proposed Order.

October 17, 2012

Respectfully submitted,

Thomas S. Jones, Esq. (Pa. 71636)
Laura E. Ellsworth, Esq. (Pa. 39555)
Anderson T. Bailey, Esq. (Pa. 206483)
JONES DAY
Firm ID:  865
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Ph:  (412) 391-3939
Fx:  (412) 394-7959
tsjones@jonesday.com
leellsworth@jonesday.com
atbailey@jonesday.com
*Counsel for Nominal Defendant*
*Education Management Corporation*

5

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of October, 2012, true and correct copies of

Nominal Defendant Education Management Corporation's Motion To Dismiss Pursuant To

Section 7.08 Of The American Law Institute Principles Of Corporate Governance And For Lack

Of Standing and the Memorandum of Law in support thereof were served via electronic mail and

first class U.S. mail, postage prepaid, on the following:

| | | |
|---|---|---|
| William R. Caroselli, Esq. | R. Todd Cronan, Esq. | Michael L. Kichline, Esq. |
| CAROSELLI, BEACHLER, | GOODWIN PROCTER LLP | DECHERT LLP |
| MCTIERNAN & CONBOY, LLC | Exchange Place | Cira Centre |
| 20 Stanwix Street, 7th Floor | 53 State Street | 2929 Arch Street |
| Pittsburgh, PA 15222 | Boston, MA 02109 | Philadelphia, PA 19104 |
| Ph: (412) 391-9860 | Ph: (617) 570-1000 | Ph: (215) 994-4000 |
| *Counsel for Plaintiff Oklahoma* | *Counsel for Defendants Leo F.* | *Counsel for Defendant-* |
| *Law Enforcement Retirement* | *Mullin and Paul J. Salem, as* | *Directors* |
| *System* | *members of a duly formed* | |
| | *Litigation Committee of the* | |
| | *board of directors of* | |
| | *Education Management* | |
| | *Corporation* | |

*Counsel for Nominal Defendant*
*Education Management Corporation*

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

OKLAHOMA LAW ENFORCEMENT
RETIREMENT SYSTEM,

*Plaintiff,*

v.

TODD S. NELSON, JOHN R. McKERNAN,
MICK J. BEEKHUIZEN, SAMUEL C.
COWLEY, ADRIAN M. JONES, JEFFREY T.
LEEDS, LEO F. MULLIN, PAUL J. SALEM,
PETER O. WILDE, and JOSEPH R. WRIGHT

*Defendants,*

and

EDUCATION MANAGEMENT CORP.,

*Nominal Defendant.*

**CIVIL DIVISION**

**COMMERCE AND COMPLEX
LITIGATION CENTER**

No.  GD-12-008785

Code:  020 Equity

**MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO
DISMISS THE AMENDED
COMPLAINT PURSUANT TO
SECTION 7.08 OF THE AMERICAN
LAW INSTITUTE PRINCIPLES OF
CORPORATE GOVERNANCE AND
FOR LACK OF STANDING**

Filed on behalf of Nominal Defendant
Education Management Corporation

Counsel of Record for this Party:

Thomas S. Jones, Esq. (Pa. 71636)
Laura E. Ellsworth, Esq. (Pa. 39555)
Anderson T. Bailey, Esq. (Pa. 206483)

JONES DAY
Firm ID:  865
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Ph:  (412) 391-3939
Fx:  (412) 394-7959

tsjones@jonesday.com
leellsworth@jonesday.com
atbailey@jonesday.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................... ii

INTRODUCTION ................................................................. 1

BACKGROUND ................................................................. 3

   I.  Education Management Corporation ........................................ 3

   II.  The Formation Of EDMC's Special Litigation Committee.................... 5

      A. Initial Demand Letters ............................................... 5

      B. OLERS' Demands ................................................... 7

ARGUMENT ................................................................... 9

   I.  OLERS Lacks Standing To Pursue Certain Claims......................... 9

      A. OLERS Alleges Misconduct Not Included In The Demand Letters.......... 10

      B. OLERS Alleges Misconduct Related To A Time Period When It Was Not A Shareholder ..................................................... 13

   II.  The Business Judgment Rule Protects The Discretion Of Corporate Management And Requires Deference To Good Faith Demand Rejection........................... 15

      A.    EDMC's Special Litigation Committee Was Properly Constituted And Disinterested ..................................................... 18

            1.    Any Interest Of Messrs. Mullin And Salem Is Aligned With Those Of EDMC And Its Other Shareholders..................... 19

            2.    That The SLC Members—Along With Every Other Board Member—Were Defendants In *Gaer* Does Not Create Any Conflict ................................................... 23

            3.    OLERS Does Not Allege Any Wrongdoing By Mr. Mullin Or Mr. Salem........................................................ 25

      B.    The SLC Followed Proper Procedures, And Its Conclusions Are Rational By A Considerable Margin ........................................ 28

            1.    The SLC's Investigation Was More Than Adequate............... 29

            2.    Plaintiffs Cannot Shift The Presumption Under The Business Judgment Rule, And Disagreement With The SLC Does Not Constitute Inadequacy........................................ 34

            3.    Plaintiffs Cannot Shift The Presumption Under The Business Judgment Rule That The SLC's Conclusions Are Rational ........ 38

CONCLUSION.................................................................. 41

# TABLE OF AUTHORITIES

**Page**

CASES

*Allen v. Ferrera,*
    540 S.E.2d 761 (N.C. Ct. App. 2000) ....................................................................................10

*Auerbach v. Bennett,*
    393 N.E.2d 994 (N.Y. 1979) ...............................................................................................15

*Bender v. Schwartz,*
    917 A.2d 142 (Md. Ct. Spec. App. 2007) ...........................................................................10

*Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.,*
    No. 10-7031, 2012 U.S. Dist. LEXIS 41305 (N.D. Ill. Mar. 27, 2012) ....................................6

*Bushansky v. Nelson et al.,*
    Case No. 12-1101 (W.D. Pa.) ...............................................................................................7

*Cuker v. Mikalauskas,*
    35 Pa. D. & C.4th 87 (Ct. Com. Pl. 1998) ............................................................17, 19, 33, 38

*Cuker v. Mikalauskas,*
    692 A.2d 1042 (Pa. 1997) ..........................................................................................*passim*

*Daily Income Fund, Inc. v. Fox,*
    464 U.S. 523 (1984) ...........................................................................................................15

*Drilling v. Berman,*
    589 N.W.2d 503 (Minn. Ct. App. 1999) ...........................................................................37, 38

*Evans ex rel. Navarre Corp. v. Paulson,*
    No. 05-1818, 2007 WL 1549242 (D. Minn. May 24, 2007) ....................................................33

*Fernandes v. Bianco,*
    No. 05-964, 2006 WL 6862716 (W.D. Wash. June 22, 2006) ...........................................24, 25

*Gaer v. Am. Public Educ.,*
    No. 10-81, 2011 U.S. Dist. LEXIS 155243 (N.D. W.Va. Dec. 8, 2011) ......................................6

*Gaer v. Educ. Mgmt. Corp.,*
    No. 10-1061, 2011 WL 7277447 (W.D. Pa. Aug. 30, 2011) .........................................*passim*

*Grafman v. Century Broad. Corp.,*
    762 F. Supp. 215 (N.D. Ill. 1991) .......................................................................................33

# TABLE OF AUTHORITIES
## (cont.)

Page

*Grimes v. Donald,*
    673 A.2d 1207 (Del. 1996) ...................................................................................27

*In re Alloy, Inc. Shareholder Litig.,*
    No. 5626, 2011 WL 4863716 (Del. Ch. Oct. 13, 2011).......................................20

*In re Apollo Group, Inc., Sec. Litig.,*
    No. 10-1735, 2011 WL 5101787 (D. Ariz. Oct. 27, 2011)....................................6

*In re Consumers Power Co. Derivative Litig.,*
    132 F.R.D. 455 (E.D. Mich. 1990) .....................................................................29

*In re Discovery Labs. Derivative Litig.,*
    242 F.R.D. 333 (E.D. Pa. 2007)...........................................................................26

*In re Friedman's, Inc. Derivative Litig.,*
    386 F. Supp. 2d 1355 (N.D. Ga. 2005) ................................................................23

*In re IXC Commc'ns, Inc. v. Cincinnati Bell, Inc.,*
    No. C.A. 17324, 1999 WL 1009174 (Del. Ch. Oct. 27, 1999)............................20

*In re J.P. Morgan Chase & Co. Shareholder Litig.,*
    No. 531-N, 2005 WL 5783536 (Del. Ch. Apr. 29, 2005) ....................................21

*In re Lincoln Educ. Svcs. Corp. Sec. Litig.,*
    No. 10-460, 2011 WL 3912832 (D.N.J. Sept. 6, 2011)..........................................6

*In re Nutrisystem Inc. Derivative Litig.,*
    666 F. Supp. 2d 501 (E.D. Pa. 2009)....................................................................28

*In re Pozen Shareholders Litig.,*
    No. 04-1540, 2005 WL 3035783 (N.C. Sup. Ct. Nov. 10, 2005).....................21, 23

*In re UnitedHealth Group Inc. Shareholder Derivative Litig.,*
    591 F. Supp. 2d 1023 (D. Minn. 2008).............................................................15, 30

*Johnson ex rel. Bradley Pharms., Inc. v. Glassman,*
    950 A.2d 215 (N.J. Super. Ct. App. Div. 2008)...................................................21

*Kaplan v. Wyatt,*
    499 A.2d 1184 (Del. 1985) ..............................................................................21, 23

*King ex rel. Cephalon Inc. v. Baldino,*
    409 F. App'x 535 (3d Cir. 2010) ..........................................................................26

## TABLE OF AUTHORITIES
### (cont.)

Page

*Kinnett v. Strayer Educ., Inc.*,
  No. 10- 2317, 2012 U.S. Dist. LEXIS 37737 (M.D. Fla. Jan. 3, 2012)....................................6

*Lemenestrel v. Warden*,
  964 A.2d 902 (Pa. Super. Ct. 2008) ..................................................................*passim*

*Mount Moriah Cemetery ex rel. Dun & Bradstreet Corp. v. Moritz*,
  No. 11431, 1991 WL 50149 (Del. Ch. Apr. 4, 1991) .............................................................30

*Partners v. Gaudet*,
  No. 003519, 2011 WL 7141418 (Ct. Com. Pl. Phila. Cty. Nov. 23, 2011) .................20, 21, 22

*Plumbers Local #200 Pension Fund v. Wash. Post Co.*,
  831 F. Supp. 2d 291 (D.D.C. 2011) ........................................................................................6

*Powell v. First Republic Bank*,
  274 F. Supp. 2d 660 (E.D. Pa. 2003) .....................................................................................32

*Seminaris v. Landa*,
  662 A.2d 1350 (Del. Ch. 1995)...............................................................................................23

*United States ex rel. Diaz v. Kaplan Univ.*,
  No. 09-20756, 2011 WL 3627285 (S.D. Fla. Aug. 17, 2011) .................................................37

*United States ex rel. Sobek v. Educ. Mgmt. Corp.*,
  Case No. 10-131 (W.D. Pa.) .................................................................................................14

*United States ex rel. Washington v. Educ. Mgmt. Corp.*,
  No. 07-461, 2012 WL 1658482 (W.D. Pa. May 11, 2012) ...........................................*passim*

*Warden v. McLelland*,
  288 F.3d 105 (3d Cir. 2002)....................................................................................................13

*Wyilie ex rel. W Holding Co., Inc. v. Stipes*,
  797 F. Supp. 2d 193 (D.P.R. 2011).........................................................................................21

**STATUTES**

15 Pa. C.S. § 1715............................................................................................................16, 20

15 Pa. C.S. § 1731......................................................................................................................18

20 U.S.C. §§ 1070 *et seq*............................................................................................................3

20 U.S.C. § 1094.........................................................................................................................3

# TABLE OF AUTHORITIES
## (cont.)

                                                                          **Page**

26 U.S.C. § 3401................................................................................................37

26 U.S.C. § 3402................................................................................................37

**OTHER AUTHORITIES**

Pa. R. Civ. P. 1506.......................................................................................13, 14

34 C.F.R. § 668.14...............................................................................................4

Minor Myers, *The Decisions of the Corporate Special Litigation Committees: An
    Empirical Investigation*, 84 IND. L.J. 1309 (2009).................................................23

## INTRODUCTION

The Pennsylvania Supreme Court has established procedures for companies, such as

nominal Defendant Education Management Corporation ("EDMC" or "the Company"), to

receive, investigate and act on claims by shareholders that fiduciaries of the company have

violated their duties and acted contrary to the interests of stockholders.  In *Cuker v. Mikalauskas*,

692 A.2d 1042 (Pa. 1997), the Court adopted the procedures set forth in the ALI Principles of

Corporate Governance ("ALI Principles") and held that where a company adheres to those

procedures when considering allegations like those made by purported EDMC shareholder the

Oklahoma Law Enforcement Retirement System ("OLERS"), the company's decision to pursue

or forego litigation must be accorded the most deferential standard of review, the business

judgment rule.  If, after conducting a proper process, the company finds that litigation is not in its

best interests, then derivative claims like this one are properly dismissed at the pleading stage.

*Cuker*, 692 A.2d at 1048.[1]

This is just such a case.  On two separate occasions, OLERS made demands to EDMC

that mimic other lawsuits or public allegations about how EDMC supposedly administers more

than a hundred post-secondary schools across North America.  These cribbed letters sought relief

based on the possibility of a future adverse judgment and demanded drastic and unspecified

changes to EDMC's corporate governance.  Notwithstanding the copycat nature of these claims,

EDMC acted exactly as instructed by the Court in *Cuker*.  The Company employed a Special

---

[1] Under the ALI Principles, a motion seeking termination of derivative litigation "under §
7.07 or § 7.08 [of the Principles] is uniquely the corporation's motion and may only be made by
it...."  ALI Principles § 7.07 cmt. e.  Notwithstanding this comment, it appears that the practice
in Pennsylvania is for both the company and the individual defendants to seek dismissal jointly.
*See, e.g.*, *Lemenestrel v. Warden*, 964 A.2d 902, 904 (Pa. Super. Ct. 2008) (considering motion
to dismiss filed jointly).  In the current action, both the Company and the individual defendants
seek dismissal.

Litigation Committee ("SLC") of the Board of Directors comprised of two directors who were

neither the subject of the demand letters nor otherwise employed by EDMC.  The SLC then

employed its own independent counsel, reviewed OLERS' allegations, investigated EDMC's

internal procedures, interviewed dozens of witnesses, reviewed the results of prior investigations,

and examined tens of thousands of documents.  After over a year of investigation on this and

related demands, the SLC produced two lengthy analyses of the Company's procedures,

including a sixty-five page report that specifically addressed OLERS' claims and determined, in

its judgment, that pursuing its demands would not be in EDMC's best interests.  *See* Report of

the Special Litigation Committee at 65 ("SLC Report"), attached hereto as Exhibit 1.

Contrary to proper practice under *Cuker*, OLERS filed this suit even before the SLC had

fully issued the results of its investigation.  Plaintiff now wants this Court to do what the SLC

properly found was against EDMC's best interests: take control over the Company's board of

directors, order the implementation of a new—still undefined—corporate governance structure,

take responsibility for the best interests of thousands of EDMC shareholders, and dictate

managerial and personnel decisions.  But *Cuker* and its progeny not only set the parameters of

the SLC investigation, they also mandate the dismissal of this action for the following well-

supported reasons:

- Plaintiff lacks standing because this lawsuit is the first time OLERS has raised certain issues.  Large portions of the Amended Complaint make a host of allegations that OLERS did not give the Board an opportunity to investigate by making a proper demand;

- OLERS also lacks standing for many of its allegations because EDMC held its initial public offering in 2009, yet Plaintiff claims it has owned EDMC common stock "continuously during the time of the wrongful course of conduct" and alleges wrongful acts dating back to *2003*;

- OLERS' arguments concerning alleged conflicts of interest among the SLC members are routinely rejected as grounds for preempting application of *Cuker* and the business judgment rule; and

- OLERS fails to challenge the SLC investigation in any meaningful fashion let alone make a showing that the Committee's investigation was inadequate or that its conclusions were so deficient that they could fall outside the protections of the business judgment rule.

These fatal deficiencies lead to two inescapable conclusions under *Cuker*: EDMC's business judgment is entitled to deference and OLERS' derivative claim must be dismissed with prejudice as contrary to the Company's best interests.

## **BACKGROUND**

### I.    EDUCATION MANAGEMENT CORPORATION.

EDMC is a Pittsburgh-based Pennsylvania corporation that operates four different education systems: The Art Institutes, Argosy University, Brown Mackie Colleges, and South University.[2] Collectively, these systems have more than 100 schools across North America, and three of the systems offer online education in affiliation with an integrated service provider known as EDMC Online Higher Education ("OHE"). *See* Am. Compl. ¶ 29; SLC Report at 1. As is the case at most post-secondary institutions, many students at EDMC-affiliated schools obtain government-sponsored financial aid through programs administered under Title IV of the federal Higher Education Act ("HEA"), 20 U.S.C. §§ 1070 *et seq.*, such as Pell Grants and Stafford Loans. The Department of Education ("DOE") oversees these programs, including by promulgating and enforcing the HEA's implementing regulations.

The HEA, *inter alia*, prohibits schools from paying admissions personnel based solely on the number of students they recruit, *see* 20 U.S.C. § 1094(a)(20), and in 2002, DOE codified a

---

[2] EDMC securities traded publicly until 2006, when investors took the Company private in a leveraged buy-out. *See* Am. Compl. ¶ 2. EDMC returned to the public equity markets on October 1, 2009, with an Initial Public Offering ("IPO") on the NASDAQ exchange. *Id.* As a result, OLERS' alleged shareholdings could date back to, at the earliest, October 1, 2009.

regulatory "Safe Harbor" meant to clarify what constituted illicit incentive compensation. That

rule expressly *authorized*

> [t]he payment of fixed compensation, such as a fixed annual salary
> or a fixed hourly wage, as long as that compensation is not
> adjusted up or down more than twice during any twelve month
> period, and any adjustment is not based solely on the number of
> students recruited, admitted, enrolled or awarded financial aid.

34 C.F.R. § 668.14(b)(22)(ii)(A) (eff. July 1, 2003 to June 30, 2011).[3]  In enacting the Safe

Harbor, DOE "clearly determined that some incentive payments, *i.e.*, those not based solely on

enrollment numbers," were lawful. *See United States ex rel. Washington v. Educ. Mgmt. Corp.*,

No. 07-461, 2012 WL 1658482, at *9 (W.D. Pa. May 11, 2012).

After DOE codified the Safe Harbor, EDMC designed and implemented the Admissions

Performance Plan (the "Plan"), which set the method by which certain EDMC-affiliated schools

would compensate their recruiters, most of whom held the title Assistant Director of Admission

("ADA").  Under the Plan, an ADA's salary was initially based on the person's work

experience and education and was then adjusted every six months. *See id.* at *9-10.  Depending

on certain factors, an ADA's adjustment would be calculated either by assessing only a set of

non-enrollment based "Quality Factors"—such as Professionalism and Job Knowledge—or by

using a Matrix that combined consideration of those Quality Factors with "New Student

Points," which were derived in part from the number of students that the ADA enrolled.

Adjustments were thus "not made more than twice during any twelve month period," and "use

of the matrix … could not have adjusted compensation solely on recruitment numbers." *Id.* at

*10. *See also* SLC Report at 45-46.

---

[3] This provision has been superseded, but all of the allegations in OLERS' complaint relate to
a time when the Safe Harbor was in effect.

## II.    THE FORMATION OF EDMC'S SPECIAL LITIGATION COMMITTEE.

### A.    Initial Demand Letters.

The EDMC Board formed the SLC in this case in response to two demand letters that

EDMC received in Fall 2010, both of which followed on the heels of unprecedented political and

regulatory activity in the proprietary education sector.  On August 4, 2010, the Government

Accountability Office ("GAO") released a report that examined the entire proprietary education

industry; only one of the more than one hundred schools affiliated with EDMC was mentioned,

an Illinois campus of Argosy University.  *See* SLC Report at 4-5; *see also Gaer v. Educ. Mgmt.*

*Corp.*, No. 10-1061, 2011 WL 7277447, at *5 (W.D. Pa. Aug. 30, 2011) (describing the GAO

report and its references to EDMC).  Even as to that one school, however, the GAO did not find

any fraudulent actions or "abusive or deceptive" conduct, and the Argosy campus was among

those where GAO found "good practices" in place.  *Gaer*, 2011 WL 7277447, at *5.  Moreover,

in November 2010, GAO was compelled to revise its report substantially.  The second version

minimized any negative claims about the single EDMC-affiliated school involved in the

investigation, and all of the other revisions were favorable to the for-profit education industry

generally.  *Id.* at *6.  *See* Ex. M to Affidavit of R. Todd Cronan at 16-17 ("Cronan Aff."),

attached hereto as Exhibit 2.  Nevertheless, the initial report precipitated a flood of securities

fraud claims against proprietary schools, and despite the GAO's praise for EDMC, the Company

was no exception.  Douglas Gaer filed a federal lawsuit against EDMC in the Western District of

Pennsylvania a week after the GAO first issued its report.  *See Gaer*, 2011 WL 7277447, at *1.

The *Gaer* suit relied on allegations virtually identical to those in OLERS' complaint,

including that the Plan violated the Safe Harbor because it based recruiter compensation solely

on enrollments; that "EDMC employed pervasive and systemic abusive and deceptive recruiting

and enrollment practices"; and that new management headed by Todd Nelson turned EDMC into

a "high-pressure, boiler room sales environment where abusive practices were used to manipulate students." *Id.* at \*11. As with virtually all of the securities claims against for-profit education companies that followed the release of the GAO report, the *Gaer* lawsuit was dismissed on its pleadings for failure to state a claim. *See id.* at \*30, *recommendation adopted at* 2011 WL 7277578 (W.D. Pa. Sept. 29, 2011). The plaintiffs in that case ultimately abandoned their appeal voluntarily. *See* No. 11-3820 (3d Cir. Apr. 18, 2012).[4]

The dismissal of *Gaer* occurred only after EDMC's Board of Directors (the "Board") began receiving shareholder demand letters that made copycat allegations. Less than two weeks after *Gaer* was filed, the Board received a letter from attorneys for shareholder Stephen Bushansky, which demanded an "investigation of [EDMC's] recruiting, vocational training, and cost structures," as well as substantial revisions to the Company's "corporate governance practices and procedures." *See* Cronan Aff., Ex. A at 2. Soon thereafter, EDMC received a second demand letter from attorneys for shareholder Karen Ganley, which alleged that EDMC "engaged in unfair and deceptive marketing practices," including improper compensation under the Plan, and also demanded that EDMC "correct deficiencies in the Company's internal controls that allowed the misconduct to occur." *See* Cronan Aff., Ex. B at 2, 3.

---

[4] *See also Karam v. Corinthian Colls., Inc.*, No. 10-6523, Dkt. No. 109 (C.D. Cal. Aug. 20, 2012) (ordering dismissal under Rule 12); *Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*, No. 10-4474, 2012 U.S. Dist. LEXIS 76011 (D. Minn. June 1, 2012) (same), *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10-7031, 2012 U.S. Dist. LEXIS 41305 (N.D. Ill. Mar. 27, 2012) (same); *Kinnett v. Strayer Educ., Inc.*, No. 10- 2317, 2012 U.S. Dist. LEXIS 37737 (M.D. Fla. Jan. 3, 2012), *adopted*, 2012 U.S. Dist. LEXIS 37733 (M.D. Fla. Mar. 20, 2012) (same); *Plumbers Local #200 Pension Fund v. Wash. Post Co.*, 831 F. Supp. 2d 291 (D.D.C. 2011) (same); *Gaer v. Am. Public Educ.*, No. 10-81, 2011 U.S. Dist. LEXIS 155243 (N.D. W.Va. Dec. 8, 2011) (same); *In re Apollo Group, Inc., Sec. Litig.*, No. 10-1735, 2011 WL 5101787 (D. Ariz. Oct. 27, 2011) (same); *In re Lincoln Educ. Svcs. Corp. Sec. Litig.*, No. 10-460, 2011 WL 3912832 (D.N.J. Sept. 6, 2011) (same).

In response, the EDMC Board created the SLC in November 2010 and appointed directors Leo Mullin and Paul Salem as its members. *See* Cronan Aff., Ex. M at 23-24. The SLC retained the law firm of Goodwin Procter LLP as its independent counsel and "conducted a detailed investigation into EDMC's internal controls." *Id.* at 30, 35. Goodwin Procter interviewed approximately forty witnesses and reviewed more than 163,000 pages of documents pertaining to Bushansky's demand letter. *Id.* at 4.

Based on this investigation, the SLC concluded that EDMC had a robust set of internal controls designed to identify any deceptive and questionable practices; that these controls were supported by a properly designed corporate governance structure; and that EDMC's directors had not breached any fiduciary duty. *Id.* at 2. The SLC also rejected any reliance on the GAO report and *Gaer* litigation, noting that the demand letters had relied on the initial, outdated version of the GAO report and that the SLC had not uncovered any evidence of the misconduct alleged in the soon-to-be-dismissed *Gaer* suit. *Id.* at 3-4, 21. The SLC therefore concluded "in good faith and in the exercise of its business judgment that it would not be in the best interest of the Company or its shareholders to take the actions requested in the" Bushansky and Ganley demand letters.[5] *Id.* at 13; *see also* Cronan Aff., Ex. E at 19.

### B.    OLERS' Demands.

Three months after the SLC concluded its investigation of the Bushansky and Ganley demands, the EDMC Board received a demand letter from OLERS, which reiterated the prior allegations about the Plan. *See* Cronan Aff., Ex. F. As with the prior demand letters, OLERS' claims also copied heavily from recent allegations in a federal lawsuit—this time a *qui tam*

---

[5] Over a year after being advised of the SLC's conclusion, Mr. Bushansky filed his own derivative action in federal court on August 3, 2012. *See Bushansky v. Nelson et al.,* Case No. 12-1101 (W.D. Pa.).

lawsuit in which the United States had intervened just a few days before OLERS wrote its

demand letter. *See Washington*, 2012 WL 1658482, at *5. And, as with *Gaer*, the claims in

*Washington* attacking the design of the Plan were ultimately dismissed on the pleadings. As the

court in *Washington* held, the Plan was lawfully drafted and complied with the Safe Harbor. *Id.*

at *9-10.[6] Before that happened, however, OLERS demanded that EDMC: (1) commence a

lawsuit against senior EDMC executives to recover any losses the Company might possibly incur

as a result of the *Washington* case; (2) overhaul the Company's admissions and recruiting

personnel compensation structure; and (3) establish internal controls and procedures to detect

and eliminate wrongful compensation practices. *See* Cronan Aff., Ex. F at 5.

    The SLC thus continued its investigation after receiving OLERS' demands. Goodwin

Procter responded to OLERS on the Committee's behalf, asked Plaintiff to submit any

information it believed would be helpful, and requested that Plaintiff substantiate its alleged

shareholding interest in EDMC. *See* Cronan Aff., Ex. G. OLERS did not provide any of the

requested information, but instead made additional allegations of wrongdoing: (1) that EDMC's

failing financial health forced it to obtain a $150 million letter of credit from Bank of America in

order to maintain its eligibility to participate in HEA funding programs; and (2) that EDMC-

affiliated schools were falsifying statistical information about graduates' job placement rates in

order to maintain accreditation.[7] *See* Cronan Aff., Ex. H.

---

    [6] The court in *Washington* distinguished between claims against the Plan as designed and as
implemented, and held that the plaintiffs could proceed to discovery on the "as-implemented"
claims. These claims were "inherently difficult to resolve at the motion to dismiss stage" after
recognizing that plaintiffs had the daunting task of "prov[ing] a negative." *Washington*, 2012
WL 1658482, at *14, 20. Those claims remain pending at this time.

    [7] The purported miscalculation of job placement statistics was also alleged (and dismissed) in
the *Gaer* litigation. *See Gaer*, 2011 WL 7277447, at *14.

The SLC released its initial findings to OLERS' demands in letters dated March 6, 2012,

and May 24, 2012, and issued a Final Report dated May 31, 2012. Those responses explained

the circumstances of EDMC's credit obligations, extensively reviewed the internal controls in

place to prevent inaccurate reports of placement statistics, analyzed the claims in *Washington*

and the opinion blessing the Plan's design, and reported that the SLC had found no evidence to

substantiate the accusations in OLERS' demands regarding job placement data and the letter of

credit requirement. *See* Cronan Aff., Exs. I, J; SLC Report.

The SLC also found no evidence in support of OLERS' compensation claims and

concluded that both in its design and in its implementation, the Plan complied with the Safe

Harbor. *See* Cronan Aff., Ex. J. As the court in *Washington* had done, the SLC reviewed how

the Plan was intended to operate in concept, concluded that compensation under the Matrix was

not based solely on enrollment numbers, and therefore reaffirmed what *Washington* had already

held: that the Plan itself complied with the Safe Harbor. *See id.* at 2-6. With respect to the

Plan's implementation, the SLC had interviewed over 30 employees, reviewed EDMC's methods

for implementation, and examined the procedures in place for ensuring faithful application of the

Plan's design. *Id.* at 6-10. The SLC ultimately concluded that there was no evidence to support

the allegations in the demand letter, and that taking the actions that OLERS demanded would not

be in the Company's best interests. *Id.* at 1-2, 11.

## ARGUMENT

### I.    OLERS LACKS STANDING TO PURSUE CERTAIN CLAIMS.

The prolix Amended Complaint must first be dismissed to the extent that Plaintiff fails to

meet the basic prerequisites for any derivative claim. The Amended Complaint relies

extensively on allegations for which OLERS never made any demand on EDMC's Board, and

which predate by a substantial margin any shareholding interest in the Company that OLERS

could have.  For both reasons, the Court can dispense with many of the allegations in the

Amended Complaint at the outset.

### A.    OLERS Alleges Misconduct Not Included In The Demand Letters.

A threshold requirement of any shareholder derivative claim in this Commonwealth is

that the Plaintiff must exhaust intra-corporate remedies by making a written demand prior to

filing suit.  *Cuker*, 692 A.2d at 1049-50 (adopting ALI Principles § 7.03).  At its heart, the

demand requirement recognizes that allegations of corporate misconduct are core issues of

corporate governance and should be considered, in the first instance, by the board of directors.

*See* ALI Principles § 7.03 cmt. c.  The universal demand rule simplifies the collateral questions

that accompany derivative claims, minimizes unnecessary litigation, and sets a clear standard for

easy adjudication of threshold requirements.  *See generally* ALI Principles § 7.03 cmt. e; *see also*

*Allen v. Ferrera*, 540 S.E.2d 761, 765 (N.C. Ct. App. 2000) (holding that the principal purpose

of universal demand requirements is to avoid "excessive and unnecessary litigation on a

preliminary point" regarding the need for demand).[8]  The demand should thus "give notice to the

board, with reasonable specificity, of the essential facts relied upon...." ALI Principles §

7.03(a).  *See also Bender v. Schwartz*, 917 A.2d 142, 154 (Md. Ct. Spec. App. 2007) (affirming

that matters could not be the subject of a derivative claim for wrongful demand refusal where the

plaintiffs "did not provide sufficient allegations in their demand letter").  Ambiguous or indirect

allegations satisfy neither the letter or spirit of the demand rule.

The Amended Complaint purports to advance entire theories of liability and factual

allegations that are nowhere to be found in Plaintiffs' demand letters.  OLERS' initial letter

---

[8] In Pennsylvania, this demand requirement is only excused if the plaintiff "makes a specific
showing that irreparable injury to the corporation would otherwise result...." *Cuker*, 692 A.2d at
1050 (quoting ALI Principles § 7.03(b)).

exclusively asserted that EDMC management was in breach of its fiduciary obligations for a single reason: an alleged violation of the incentive compensation ban. *See* Cronan Aff., Ex. F. In its second demand, OLERS made claims about EDMC's letter of credit and purported falsification of job placement data. *See* Cronan Aff., Ex. H. And yet, the Amended Complaint now seeks judicial intervention in EDMC's corporate management based on a claim that the Company was "aggressively and misleadingly coercing potential new students to enroll in violation of recruitment policies." Am. Compl. ¶ 6. Entire sections of OLERS' allegations focus solely on "improper recruitment tactics." *Id.* ¶¶ 122-51; 228-32. None of this was the subject of any demand, and none of it can now support OLERS' derivative claim.

For a bevy of OLERS' other allegations, Plaintiff similarly failed to provide the EDMC Board with the required notice. For instance, OLERS now claims—without having done so previously—that:

- The Plan was identical to a compensation scheme used by one of EDMC's competitors, which ultimately led DOE to levy significant administrative penalties against that company, *id.* ¶ 87;
- Accrediting agencies placed certain campuses on probation due to concerns over "either student retention or placement issues," *id.* ¶¶ 151, 163;
- That, due to misconduct, some schools affiliated with EDMC are only "provisionally certified" as eligible to participate in DOE funding programs, *id.* ¶ 214;
- ADAs, in speaking with prospective students, overestimated that student's likelihood of finding suitable employment after graduation, *id.* ¶¶ 129-34;
- ADAs were taught to "find the pain," to exploit prospective students' weaknesses, and lie in order to encourage enrollment, and recruited individuals from homeless shelters and battered women shelters, *id.* ¶¶ 80, 82, 135, 136, 244, 245, 255;
- EDMC employed a disproportionate number of career counselors to recruiters, and included within its job placement statistics graduates who worked in their chosen profession for only a single day, *id.* ¶¶ 154, 217-18;
- EDMC failed to investigate the qualifications of its applicants, *id.* ¶ 228;
- ADAs draft admissions essays for unqualified applicants, doctor exam results, and falsify application information, *id.* ¶ 229; and

GD-12-008785

- Supervisors of ADAs motivated their employees by asking them to think of financial goals they wish to obtain by reaching a quota of new student enrollments, *id.* ¶ 104.[9]

OLERS also broadly relies on information that it refused to share with EDMC, notwithstanding the SLC's requests for Plaintiff's evidence. Throughout the Amended Complaint, OLERS cites a report from the Senate Health, Employment, Labor and Pension ("HELP") Committee and a different *qui tam* lawsuit filed by Jason Sobek, neither of which was publicly released until well after January 2012, and thus could never have been included with the demand letters in this case. *See* Am. Compl. ¶¶ 9, 42, 68, 99-101, 119, 149, 156, 160, 217-18, 239, 249-50. OLERS also cites news articles, government proceedings, profiles on the website linkedin.com, and internet posts from unidentified authors, none of which was ever referenced in any demand to the Board. *Id.* ¶¶ 68, 85, 111, 121, 154-55, 159, 190-91, 267, 270. And none of the purported confidential witnesses—or any other aspect of Plaintiff's supposed three-month investigation into EDMC—was ever shared with the SLC prior to this litigation. *Id.* ¶¶ 24, 42-49. By OLERS' own admission, its "allegations are based" on claims, reports, and events that were never part of any demand. *Id.* ¶ 42.

A lawsuit brought by an independent shareholder against EDMC's directors is not the proper vehicle to request corporate action for the first time. The Company's Board cannot be expected to investigate—or consider taking action on—claims of wrongdoing that OLERS never included in any demand. Plaintiffs' omissions thus infringe both the letter and the spirit of Pennsylvania's demand requirement. Having never notified the Board that it found these

---

[9] Even if OLERS did have standing to pursue these claims, such allegations would be foreclosed by the SLC's exhaustive investigation of the various layers of oversight and evaluation of ADA practices at EDMC. *See, e.g.*, SLC Report at 34-35, 40. EDMC has implemented several "controls designed to ensure that ADAs conduct themselves according to the Company's standards." *Id.* at 34. The determination that OLERS' claims are not in the best interests of EDMC would thus still require disregarding these new allegations. *See infra*.

practices problematic, OLERS is precluded from raising them for the first time in a derivative suit that would up-end EDMC's entire governance structure. *Cuker*, 692 A.2d at 1050.

**B.     OLERS Alleges Misconduct Related To A Time Period When It Was Not A Shareholder.**

Plaintiff also lacks standing for any claim that predates its interest in EDMC.  Absent certain exceptions—which OLERS has not invoked—a derivative plaintiff purporting to represent the interests of a company's shareholders must have itself been "a stockholder or owner of an interest in the corporation or other entity at the time of the transaction of which the plaintiff complains" before it can bring a derivative lawsuit.  Pa. R. Civ. P. 1506(a)(3)(i).  "To have standing to bring a derivative action, one must be a shareholder, both at the time of the alleged wrongdoing and continuing to judgment." *Warden v. McLelland*, 288 F.3d 105, 111 (3d Cir. 2002) (citing *Cuker*).

In a nearly identical case applying the federal analog to Pa. R. Civ. P. 1506, another proprietary school system received a shareholder demand in the wake of the GAO report, and later faced a lawsuit alleging—just as OLERS does here—that members of the board "breached their duty to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls over the company." *Smith v. Sperling*, No. 11-722, 2012 U.S. Dist. LEXIS 104695, at *10 (D. Ariz. July 26, 2012). *See also* Am. Compl. ¶ 274.  Although the plaintiff had not purchased any shares in the corporation until August 2009, "the events and transactions alleged in her complaint allegedly occurred throughout 2007, 2008, 2009, and 2010." *Id.* at *17.  Accordingly, plaintiff's allegation that she "continuously held the stock" at the relevant times was "patently false," *id.*, and she lacked standing for failure to "satisfy the contemporaneous/continuous ownership requirement" of Fed. R. Civ. P. 23.1. *Id.* at *21.

GD-12-008785

Here, Plaintiff never responded to the SLC's request for proof that OLERS owns any shares of the Company. *See Cronan Aff., Ex. G.* But even assuming the truth of its allegations, OLERS could not have owned shares of "EDMC common stock continuously during the time of the wrongful course of conduct," as it alleges. Am. Compl. ¶ 28. Plaintiff relies on purported misconduct that dates back to well before October 1, 2009, and even before EDMC went private in 2006.[10] Many of the "confidential witnesses" on which OLERS relies started working for EDMC years before the IPO, and some left the Company altogether prior to October 1, 2009. *Id.* ¶¶ 43-47. In addition, by the time of the IPO, EDMC-affiliated schools had been implementing the Plan for six years, *see* SLC Report at 10-11; EDMC had been posting letters of credit with DOE for three years, *id.* at 61; and the alleged transition to EDMC's "new culture" was two years old, *see* Am. Compl. ¶¶ 71-85. OLERS also relies on funding that EDMC received as far back as 2003, *id.* ¶ 54, and borrows allegations from the *Sobek* complaint, which itself cites alleged improprieties that pre-date the IPO. *See id.* ¶¶ 156, 160.[11] Many of the various allegations of regulatory impropriety occurred well before OLERS would have owned any EDMC shares. *See id.* ¶¶ 76-77, 82, 84, 93, 95, 98-99, 110-11, 114, 119, 142-43.

OLERS cannot have it both ways. It could not have owned any EDMC shares when the Company was a private entity, and it cannot represent the Company's interests or those of other shareholders for anything that occurred prior to the IPO. *See* Pa. R. Civ. P. 1506(a)(3)(i).[12]

---

[10] While it is theoretically possible that OLERS owned shares of the Company prior to the leveraged buy-out, sold them in 2006, and then re-purchased shares in 2009, Plaintiff has not made that allegation and refused to disclose that information when the SLC requested it. Regardless, OLERS could not have continuously owned EDMC shares since 2003.

[11] *See also United States ex rel. Sobek v. Educ. Mgmt. Corp.*, Case No. 10-131 (W.D. Pa.), Sec. Am. Compl. ¶ 49 (Docket No. 27).

[12] If EDMC learns that OLERS did not own shares until sometime after October 1, 2009, the Company will renew its motion to dismiss for lack of standing as appropriate.

14

## II.    THE BUSINESS JUDGMENT RULE PROTECTS THE DISCRETION OF CORPORATE MANAGEMENT AND REQUIRES DEFERENCE TO GOOD FAITH DEMAND REJECTION.

What remains of this case—that post-October 2009 conduct that OLERS actually raised in its demand letters—cannot survive the deference to the business judgment rule that *Cuker* requires in shareholder derivative cases. Pennsylvania courts do not second guess the judgment of corporate boards when it comes to deciding whether to initiate suit for perceived wrongdoing to the corporation. *See Cuker*, 692 A.2d at 1046. Such matters are presumptively entrusted to the board of directors, and the barriers are high when a shareholder seeks to deprive the board of that discretion. *See also Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 532 (1984). "The SLC's substantive decision to pursue the claims implicates a 'careful balancing' of 'legal, ethical, commercial, promotional, public relations, fiscal and other factors familiar to the resolution of many if not most corporate problems,'" and that balancing should be left to "'the board of directors, which is familiar with the appropriate weight to attribute to each factor given the company's product and history.'" *In re UnitedHealth Group Inc. Shareholder Derivative Litig.*, 591 F. Supp. 2d 1023, 1028 (D. Minn. 2008) (internal citation omitted). "This is the essence of the responsibility and role of the board of directors, and courts may not intrude to interfere." *Auerbach v. Bennett*, 393 N.E.2d 994, 1001 (N.Y. 1979).

Pennsylvania has decisively sided with those jurisdictions that defer to the judgment of litigation committees and narrowly constrain the judicial inquiry when a shareholder tries to preempt the discretion of the corporate board and its designees. According to the Supreme Court of Pennsylvania, courts must "provide[] directors broad discretion in setting policies," and apply procedures that avoid the kind of "judicial or shareholder second-guessing" that OLERS now seeks in this case. *Cuker*, 692 A.2d at 1046. The Court thus adopted Sections 7.02 to 7.10 and Section 7.13 of the ALI Principles, under which a company may request and a court shall dismiss

derivative claims if a special litigation committee appointed by the board follows appropriate

procedures and determines that the suit is not in the company's best interests. *See Cuker*, 692

A.2d at 1046; ALI Principles §§ 7.07(a), 7.08(a).[13]  Those procedures include "whether the board

or its special litigation committee was disinterested, whether it was assisted by counsel, whether

it prepared a written report, whether it was independent, whether it conducted an adequate

investigation, and whether it rationally believed its decision was in" EDMC's best interests.

*Cuker*, 692 A.2d at 1048. *See also* ALI Principles §§ 7.08(b), 7.09(a).

Accordingly, the threshold question in derivative cases like this one is not whether the

shareholder-plaintiff has stated a claim, whether there is underlying merit to its allegations, or

whether a Board was right or wrong in rejecting shareholder demands.  Courts conduct only a

"limited and precise" inquiry that prohibits any review of the merits, focuses only on the

procedures that a company followed to ensure that a demand was not indiscriminately rejected,

and thus "minimize[s] judicial involvement" in corporate management. *Cuker*, 692 A.2d at

1048.

To give the business judgment rule meaning, *Cuker* also requires "presuming that

[directors] pursue the best interests of their corporations." *Cuker*, 692 A.2d at 1046. *See also* 15

Pa. C.S. § 1715(d) ("Absent breach of fiduciary duty, lack of good faith or self-dealing, any act

of the board of directors, a committee of the board or an individual director shall be presumed to

---

[13] According to the ALI Principles, "[t]he court having jurisdiction over a derivative action
should dismiss the action as against one or more of the defendants based on a motion by the
board or a properly delegated committee requesting dismissal of the action as in the best interests
of the corporation, if .... the conditions specified in § 7.08 ... are satisfied...." ALI Principles §
7.07(a)(2). Section 7.08 provides that "[t]he court should ... dismiss a derivative action ... [if] a
properly delegated committee ... has determined that the action is contrary to the best interests of
the corporation and has requested dismissal of the action," and, among other things,
"substantially complied with" certain procedures in reaching that conclusion. *Id*. § 7.08(a)-(b).

be in the best interests of the corporation."). Shareholder-plaintiffs therefore have the burden of establishing facts that rebut the presumption. *Id.* at 1045-46; *see also Cuker v. Mikalauskas*, 35 Pa. D. & C.4th 87, 89 (Ct. Com. Pl. 1998) (*Cuker II*) ("The *Cuker* court placed the burden of proof on plaintiffs to show impropriety on the part of the board."). And, shareholders who take issue with the adequacy of an SLC's investigation must allege how the procedures were "so restricted in scope, so shallow in execution, or otherwise so Pro forma or halfhearted as to constitute a *pretext or sham*...." *Lemenestrel*, 964 A.2d at 914 (marks and citation omitted; emphasis added).

In attempting to meet this burden, derivative plaintiffs must also allege these purported deficiencies with particularity. The ALI Principles require shareholders to "'plead with particularity facts that, if true, raise a significant prospect that the transaction or conduct complained'" of amounts to a breach of duty "'in light of the . . . conduct communicated to the plaintiff by the corporation.'" *Cuker*, 692 A.2d at 1050 (quoting ALI Principles § 7.04(a)(1)). Absent such allegations, courts must defer to the rational recommendation of the SLC and dismiss shareholder-derivative cases. *Cuker*, 692 A.2d at 1048.

These principles are dispositive of this case. OLERS dedicates only a fraction of its pleading to rebutting the *Cuker* presumption, and its allegations in this regard are woefully deficient. Of the 276 paragraphs in the Amended Complaint, there are *four* that relate to the alleged disinterestedness of the SLC, and each advances a claim that courts routinely reject as a matter of law. Additionally, OLERS does not—because it cannot—make *any* allegation that the SLC in this case was not assisted by counsel or that it failed to prepare a written report. *See* Cronan Aff. ¶ 2. Plaintiff only attempts to quibble with the adequacy of the investigation by alleging what the SLC might have done differently, by speculating about hypothetical evidence

that the SLC might have uncovered, and by surmising that the absence of evidence of
wrongdoing somehow proves that the SLC's conclusions are irrational.

This is exactly the kind of second-guessing that the business judgment rule prevents. As
set forth below, the EDMC Board properly constituted the independent and disinterested SLC;
the SLC conducted its investigation according to proper procedures; and the rationality of the
SLC's ultimate determination is well within the deference accorded corporate officers and
directors. OLERS fails to plead any allegations that rebut the *Cuker* presumption, the procedures
that the SLC followed and the conclusions that it reached warrant this Court's deference, and the
Amended Complaint should be dismissed with prejudice.

### A.    EDMC's Special Litigation Committee Was Properly Constituted And Disinterested.

The EDMC Board created the SLC in November 2010. Acting pursuant to 15 Pa. C.S. §
1731, ALI Principles § 7.08, and the Company's bylaws, the Board authorized two non-
employee directors, Leo Mullin and Paul Salem, to "review, analyze, and investigate any
allegations of misconduct or breach of fiduciary duty at EDMC; engage legal counsel and other
experts to conduct the investigation; and determine the appropriate actions, if any, the Company
should pursue in response to related inquiries or demands from shareholders." SLC Report at 6.
*See also* ALI Principles § 7.09(a)(1) (indicating that litigation committees should have at least
two board members). Messrs. Mullin and Salem brought significant experience and expertise to
the SLC. Each had substantial corporate experience, including as an executive officer of Delta
Airlines and American National Bank, and as directors of Johnson & Johnson, Bell South,
NexTag, Inc., and several other companies. *Id.* at 6-7. Both also specialized in matters of
corporate operations and finance. *Id.* The SLC was thus well-equipped with both the
background and the means to review shareholders' demands, and OLERS does not allege to the

contrary. *See Cuker II*, 35 Pa. D. & C.4th at 90 (noting with approval that the members of the SLC "were experienced, sophisticated business executives with impeccable backgrounds").

Under Pennsylvania law, a director is only "interested" if he "has a material pecuniary interest in the transaction or conduct (other than usual and customary directors' fees and benefits) and that interest ... would reasonably be expected to affect the director's or officer's judgment in a manner *adverse to the corporation*." *Lemenestrel*, 964 A.2d at 919 (citing ALI Principles § 1.23(a)(3) (emphasis added)). While OLERS tries to fit Messrs. Mullin and Salem within this standard, it does not allege any of the typical indicia of conflicting interests, such as intertwined familial or social relationships or direct personal financial interests. *See Cuker II*, 35 Pa. D. & C.4th at 90-91. Moreover, by the time Messrs. Mullin and Salem joined the Board in 2006, the Plan had been in place for three years, and OLERS does not claim that either director was ever responsible for its implementation or personally participated in any compensation decision for an individual recruiter. *See* SLC Report at 11. While OLERS does claim that the SLC members were interested by virtue of their involvement in other companies and in litigation against the Board, its arguments are contrary to established law.

### 1.   Any Interest Of Messrs. Mullin And Salem Is Aligned With Those Of EDMC And Its Other Shareholders.

In support of the allegation that the SLC members suffered from a disabling conflict of interest, OLERS relies primarily on allegations about the relationships that Mullin and Salem purportedly have with other companies that invest in or do business with EDMC. According to the Amended Complaint, Mr. Mullin is a "consultant" to Goldman Sachs,[14] an institutional investor in EDMC that helped underwrite the leveraged buy-out in 2006, and Mr. Salem is a

---

[14] OLERS does not explain what "consultant" actually means.

director at Providence Equity Partners ("PEP"), another institutional investor. *See* Am. Compl. ¶ 205. Plaintiff claims that these accomplished businessmen "owe their livelihood to entities that have" invested in EDMC and thus allegedly could not reasonably evaluate whether the Company engaged in a scheme to defraud the United States. *See* Am. Compl. ¶ 205. Plaintiff also assails Mr. Salem because EDMC has done $3.8 million worth of business with PEP "affiliates." *Id.* ¶ 208. Both as a matter of law and as a matter of common sense, the allegations do not suggest any conflict of interest.

The critical element in finding that a director is impermissibly biased is adversity with other shareholders. *See Lemenestrel*, 964 A.2d at 919; ALI Principles § 1.23(a)(3). Thus, there is no improper conflict where the "directors' interests [are] the same as those of the other shareholders." *Partners v. Gaudet*, No. 003519, 2011 WL 7141418 (Ct. Com. Pl. Phila. Cty. Nov. 23, 2011). *See also* 15 Pa. C.S. § 1715(e)(2) ("A person shall not be deemed to be other than a disinterested director solely by reason of … [t]he ownership by the director of shares of the corporation."); *In re Alloy, Inc. Shareholder Litig.*, No. 5626, 2011 WL 4863716, at *7 (Del. Ch. Oct. 13, 2011) ("A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.").

In fact, when members of a special committee have financial interests aligned with shareholders, that *supports*, rather than undermines, a finding of independence. *See Partners*, 2011 WL 7141418 (rejecting claim that SLC members were interested because they had share holdings that would benefit from proposed transaction and noting that "[i]t makes the directors' interests the same as those of the other shareholders"); *see also In re IXC Commc'ns, Inc. v. Cincinnati Bell, Inc.*, No. C.A. 17324, 1999 WL 1009174, at *6 (Del. Ch. Oct. 27, 1999) (noting that the "rational economic self-interest of" directors affiliated with large shareholders is

presumably the same as that of "even the numerically smallest" shareholder); *Johnson ex rel. Bradley Pharms., Inc. v. Glassman*, 950 A.2d 215, 226 (N.J. Super. Ct. App. Div. 2008) (holding that ownership of less than a majority of a company's stock is not sufficient proof to show that a director is interested). For instance, a defendant who serves as the "managing partner of a venture capital fund which is one of [the Company's] investors" was not interested for purposes of the business judgment rule and service on the SLC, because that kind of investment interest mirrored that of other shareholders and was therefore "far more compatible with independence than a lack thereof." *In re Pozen Shareholders Litig.*, No. 04-1540, 2005 WL 3035783, at *14 (N.C. Sup. Ct. Nov. 10, 2005).

For the same reason, a member of a litigation committee is not interested where he is affiliated with third-parties that do business with the company against which demand was made. *See* Am. Compl. ¶ 208. In *Partners*, the plaintiffs challenged an SLC member who also was a customer of the company. But, as "a long-term customer of Penn Millers, as well as a director of it, [the SLC member was] presumed to wish it well rather than ill." *Partners*, 2011 Wl 7141418. *See also Kaplan v. Wyatt*, 499 A.2d 1184, 1189 (Del. 1985) (holding that the director on a litigation committee was not interested despite owning another business that transacted over $200 million in business with the company); *Wyilie ex rel. W Holding Co., Inc. v. Stipes*, 797 F. Supp. 2d 193, 199 (D.P.R. 2011) (applying Delaware law and finding that a committee member was not interested despite having an accounting firm that generated 16 percent of its revenue from the corporation); *In re J.P. Morgan Chase & Co. Shareholder Litig.*, No. 531-N, 2005 WL 5783536, at *1 (Del. Ch. Apr. 29, 2005). Doing business with a company hardly suggests that

the director's interests are necessarily adverse to the company's. Nor does it disqualify a director from serving on an SLC.[15]

OLERS' spurious claim of bias shows only that the members of the SLC had interests aligned with those of the Company and other shareholders. All EDMC shareholders—including OLERS, PEP, and Goldman Sachs—have the same interest in EDMC's profitability and sustainability. Whether a stakeholder has an equity share, a debt interest, or a business relationship with a company, the conclusory allegation that it has an interest in seeing the continuation of purportedly unlawful practices that risk the viability of the company is both unsubstantiated and illogical. No investor has an interest in seeing its investment fail or risk failure with illegal behavior; the only logical inference runs directly contrary to Plaintiff's arguments. *See Partners*, 2011 WL 7141418.

Indeed, to suggest that Goldman Sachs and PEP would appoint directors who would condone illegal conduct that allegedly threatens the very existence of EDMC would force the Court to conclude that, for some undisclosed reason, these investors wanted to lose money. This strains credulity. Whether or not Messrs. Salem and Mullin "owe their livelihoods" to PEP and Goldman Sachs—itself an implausible proposition, given the long and successful careers each has enjoyed—courts do not abide the counter-intuitive argument that such entities "have a vested

---

[15] OLERS does not allege what relationship any member of the SLC has with the unnamed PEP "affiliates" or that any SLC member benefitted from that business. Am. Compl. ¶ 208. Nor does OLERS allege what the nature of EDMC's business is with these affiliates or whether the purported payments took the form of fees, dividends, or something else. Regardless, the $3.8 million in alleged payments is a miniscule amount in comparison to both EDMC's net revenue of $2.76 billion for fiscal year 2012 and the approximately $27 billion in assets that PEP reportedly manages. *See* Aug. 8, 2012 Form 8-K of Education Management Corporation at 2, *available at* http://investors.edmc.edu/phoenix.zhtml?c=87813&p=irol-sec (last visited October 17, 2012); http://www.provequity.com/ (last visited October 17, 2012). Such an insignificant fraction cannot disqualify Mr. Salem as a member of the SLC.

interest in" seeing their investments fail. Am. Compl. ¶ 205. The SLC members' alleged

affiliation with companies that, like OLERS, have invested in EDMC or do business with EDMC

does not create any conflict of interest. *Kaplan*, 499 A.2d at 1189; *Pozen Shareholders*, 2005

WL 3035783, at *14.[16]

### 2.    That The SLC Members—Along With Every Other Board Member— Were Defendants In *Gaer* Does Not Create Any Conflict.

OLERS' next claim—that Messrs. Mullin and Salem were interested because they were

defendants in a dismissed securities case—is equally insubstantial. *See* Am. Compl. ¶ 207.

Plaintiff alleges that because they "signed [EDMC's] Registration Statement" and were therefore

defendants in the *Gaer* case, and because the appeal in that case was not voluntarily withdrawn

until "5 weeks before the Committee issued final demand refusal," the SLC members could not

properly serve on that committee. *Id.*

The claim that Messrs. Mullin and Salem are interested based on the one-time possibility

that they could have been liable is "merely ... a slightly altered version of the discredited

refrain—'you can't expect directors to sue themselves.'" *Seminaris v. Landa*, 662 A.2d 1350,

1355 (Del. Ch. 1995) (citation omitted); *see also In re Friedman's, Inc. Derivative Litig.*, 386 F.

Supp. 2d 1355, 1363-64 (N.D. Ga. 2005) (signing S.E.C. filings that contained allegedly

misleading statements did not make directors interested for purposes of companion shareholder

---

[16] Implicit in OLERS' attack on the SLC is the unstated premise that because its members serve on the same board and have other, pre-existing relationships with the defendants, SLC members cannot be trusted to act in a truly independent fashion—friends take care of friends. This presumption that directors elevate social mores over legal duties not only runs counter to *Cuker*, it is not empirically supported. A recent study of SLC activities concluded: "Contrary to the predominant view in legal scholarship, SLCs do not invariably move to dismiss litigation. Instead, approximately forty percent of the time SLCs either settled claims or pursued them against one or more defendants." Minor Myers, *The Decisions of the Corporate Special Litigation Committees: An Empirical Investigation*, 84 IND. L.J. 1309, 1332 (2009).

derivative claims); *Fernandes v. Bianco*, No. 05-964, 2006 WL 6862716, at *4 (W.D. Wash. June 22, 2006) (holding directors were not interested based on being named as defendants in companion securities litigation). If accepted, OLERS' claim would paralyze companies from ever investigating shareholder demands and nullify the entire *Cuker* standard. To disqualify a director simply because he or she is mentioned in passing as one of several defendants in a meritless securities lawsuit would only encourage endless "tag along" derivative suits that proceed not out of merit but only to trigger an artificial limit on the *Cuker*-mandated process.

In addition, Plaintiff's own admissions preclude any suggestion that being defendants in *Gaer* created an impermissible conflict of interest for the SLC members. To the extent any ever existed, the risk of substantial personal liability arising from *Gaer* for Messrs. Mullin and Salem was exceedingly remote. The SLC members, along with every other member of the EDMC Board, were parties to that lawsuit principally because they happened to have signed the Company's Registration Statement filed with the U.S. Securities and Exchange Commission. *See* Am. Compl. ¶ 207; *see also Gaer*, Am. Compl. ¶¶ 164-65, Docket No. 56, Case No. 10-1061 (W.D. Pa.). Like the Amended Complaint in this case, the pleadings in *Gaer* did not attribute any specific misconduct to either individual, and imposed no appreciable risk that they would incur personal liability.

Moreover, at the time the SLC in this case voted to reject OLERS' final demand, any theoretical risk had evaporated completely. The magistrate judge in *Gaer* recommended dismissing the matter on its pleadings in August 2011—just eleven days after EDMC received OLERS' first demand letter. *See Gaer*, 2011 WL 7277447. The district court adopted that recommendation and dismissed the case with prejudice in September 2011—approximately one month after the first demand, and *before* OLERS served its second demand letter in January

2012. *See Gaer*, 2011 WL 7277578.  And, the SLC had not formally rejected all of Plaintiffs'

demands until after the plaintiffs in *Gaer* voluntarily dismissed their appeal. *See* Am. Compl. ¶

207.

When assessing disinterestedness for purposes of the business judgment rule, courts do

not blind themselves to "'material developments'" that occur after the SLC has voted. *See*

*Cuker*, 692 A.2d at 1054 (quoting ALI Principles § 7.10(c)).  Rather, "subsequent

developments," even those that are "subsequent to the time … of the motion by the board or

committee requesting dismissal," should inform the analysis.  ALI Principles § 7.10(c).  While as

a general matter, being named as a defendant in related securities litigation does not disqualify a

director from serving on an SLC, *Fernandes*, 2006 WL 6862716, at \*4, the procedural history of

*Gaer* irrefutably ends any suggestion that the case could have created any conflict germane to the

*Cuker* analysis in this lawsuit.

> ### 3.    OLERS Does Not Allege Any Wrongdoing By Mr. Mullin Or Mr. Salem.

Plaintiff makes no meaningful attempt to even support the final grounds on which it

would disqualify the SLC members.  According to the Amended Complaint, Messrs. Mullin and

Salem were not disinterested because of "allegations concerning the widespread abuses in the

for-profit education industry, which undoubtedly had the entire EDMC Board on notice of

wrongdoing." Am. Compl. ¶ 206.  But, the mere allegation of wrongdoing is insufficient to

create a disqualifying conflict.  Were the law susceptible to such easy manipulation, shareholders

could manufacture conflicts at will simply by suing each individual on the Company's board—as

OLERS has done in this case.

The ALI Principles thus provide that a claim against a director does not make him or her

interested if the claim

> (A) is based only on the fact that the director approved of or acquiesced in the transaction or conduct ... and (B) does not otherwise allege with particularity facts that, if true, raise a significant prospect that the director would be adjudge liable to the corporation or its shareholders.

ALI Principles § 1.23(c)(2). OLERS must therefore identify "detailed allegations of oversight that should have been undertaken and was not, or a policy that would have improved compliance but that [the corporation] failed to institute." *In re Discovery Labs. Derivative Litig.*, 242 F.R.D. 333, 337 (E.D. Pa. 2007) (applying materially identical Delaware law). The "fact of violations of law" alone is insufficient to establish director interest. *King ex rel. Cephalon Inc. v. Baldino*, 409 F. App'x 535, 538 (3d Cir. 2010) (Delaware law).

Tellingly, the only allegations in OLERS' Amended Complaint that reference either Mr. Mullin or Mr. Salem pertain to their roles on the SLC. Plaintiff does not dispute that the SLC members "were not Board members at the time EDMC's compensation plan was adopted in 2003," or that the SLC members "were not involved with the administration of EDMC's compensation plan." Am. Compl. ¶ 206. Where OLERS does attempt to specify what acts allegedly injured EDMC shareholders, it makes no mention of either the SLC, Mr. Mullin, or Mr. Salem. There is no claim that either director—or any other member of the EDMC Board—ever calculated recruiter salary, falsified job placement data, or misled a prospective student. Nor is there any allegation that some other director on the EDMC Board interfered with the SLC's investigation.

OLERS also fails to allege the "particularized facts" necessary to adequately show a lack of oversight on the part of the EDMC Board (including Messrs. Mullin and Salem).[17] Initially,

---

[17] The requirement of pleading detailed and particularized allegations is particularly critical in a case like this one, where a shareholder names each director as a defendant in its derivative case. Were doing so sufficient to disqualify the entire board from serving on an SLC, it would

GD-12-008785

OLERS has not identified any improper conduct.  The design of the Plan has been held lawful.

*Washington*, 2012 WL 1658482, at *10.  And, while the Complaint is rife with accusations of

recruiting practices that OLERS characterizes as unseemly, identical allegations have already

been dismissed as describing legal activity; "aggressively seeking students, monitoring financial

performance, computing enrollment numbers or various alleged acts regarding recruiting,

financial reporting and placement practices … are not in fact fraudulent or misleading." *Gaer*,

2011 WL 7277447, at *25.

OLERS makes no attempt to identify what policies the EDMC Board (including Messrs.

Mullin and Salem) declined to adopt that would have prevented the alleged injuries.

Generalized—and frequently debunked—reports of "widespread abuses in the for-profit

education industry," Am. Compl. ¶ 206, do not "raise a significant prospect that" the two SLC

members could "be adjudged liable to the corporation or its shareholders." ALI Principles §

1.23(c)(2).  Even assuming those reports could be construed to suggest wrongdoing at EDMC,[18]

---

(continued…)

effectively give a dissident shareholder an easy manner to trump the business judgment rule and
preclude the use of SLCs. *See, e.g.*, *Grimes v. Donald*, 673 A.2d 1207, 1216 n.8 (Del. 1996),
*overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) (holding that
plaintiffs cannot "subvert the particularity requirements" governing derivative actions "simply by
designating all the directors as targets").

[18] An assumption that would be mistaken.  Many of the legal claims against EDMC have
been dismissed on their pleadings. *See Gaer*, 2011 WL 7277578; *Washington*, 2012 WL
1658482, at *12.  The GAO was also forced to retract its initial allegations about EDMC—as
well as the for-profit industry more generally. *See supra* page 5.  And, while OLERS makes
repeated reference to the Senate's HELP Committee report, Plaintiff omits any reference to the
dissenting opinion in that report, which debunks the majority's analysis on multiple grounds,
including partisanship, improper reliance on financially interested Wall Street traders,
mischaracterization of facts, interference with witness testimony, and bias. *See* Minority
Committee Staff Views, *For Profit Higher Education: The Failure to Safeguard the Federal
Investment and Ensure Student Success*, *available at* http://www.help.senate.gov/imo/media/
for_profit_report/PartI-PartIII-SelectedAppendixes.pdf (last visited October 17, 2012).

there is nothing to suggest that the SLC members did anything but, at most, "approve of or acquiesce to" such conduct. As a matter of law, that does not rebut their presumptive disinterestedness. *See* ALI Principles § 1.23(c)(2); *In re Nutrisystem, Inc. Deriv. Litig.*, 666 F. Supp. 2d 501, 524 (E.D. Pa. 2009) (dismissing derivative claims in part because plaintiff "alleged no particularized facts to show a systemic failure of oversight … and the outside directors therefore do not face a substantial risk of liability").

**B.    The SLC Followed Proper Procedures, And Its Conclusions Are Rational By A Considerable Margin.**

Once duly constituted, SLCs have great latitude in the manner with which they conduct the investigation, and the procedures that the SLC followed in this case were fully consistent with *Cuker*. For instance, two hallmarks of a proper investigation is the retention of qualified, disinterested counsel and the preparation of a written report analyzing the issues. *See Cuker*, 692 A.2d at 1048. OLERS properly raises no objection to either point in this case. The SLC retained expert outside counsel to facilitate its investigation. *See* SLC Report at 13. R. Todd Cronan, Esq., a partner at Goodwin Procter with "extensive experience conducting internal investigations for public companies, audit committees and other special board committees," acted as lead outside counsel. *See* Cronan Aff. ¶ 2. As a general matter, "the use of capable counsel is desirable and is another indicator of good faith on the part of a special litigation committee." *Lemenestrel*, 964 A.2d at 914 (citing cases). *See also* ALI Principles § 7.09(a)(2) (a litigation committee "should be assisted by counsel of its choice and such other agents as it reasonably considers necessary").

The SLC also released its initial findings to OLERS directly in two lengthy letters, dated March 6, 2012, and May 24, 2012. *See* Cronan Aff., Exs. I and J. The SLC then issued a sixty-five page final report that reviews the nature of OLERS' allegations, the history of similar claims

against the Company, the internal controls in place at EDMC, the disinterestedness of the SLC, and the bases for its decision that pursuing this case is not in EDMC's best interest. *See generally* SLC Report. This kind of work product is *prima facie* evidence that a litigation committee has properly performed its investigative role. *See Lemenestrel*, 964 A.2d at 915 n.7 (noting that "the Committee's final report was a thorough, 106-page-long analysis of the [shareholders'] claims").

Where Plaintiff does attempt to challenge the adequacy of the SLC's investigation, it again runs afoul of settled principles surrounding the business judgment rule. While OLERS quibbles with the SLC's roster of interviewees and the level of detail in the final report, and disagrees with the ultimate decision to reject its demand, courts have rejected each of these as legitimate bases for displacing the business judgment rule.

1.    **The SLC's Investigation Was More Than Adequate.**

While the adequacy of an investigation is one consideration under the business judgment rule, *Cuker*, 692 A.2d at 1048, courts protect against misuse of that factor by derivative plaintiffs trying to second-guess the conclusions of a properly formed SLC, and an "adequate investigation" does not mean an inquiry beyond compare. An SLC is "not required to undertake the ideal or perfect investigation—one that can anticipate all suggestions and withstand any criticism or derivative plaintiffs or of further court review. What is required is that the corporation makes a *reasonable* effort to reach an informed business decision." *In re Consumers Power Co. Derivative Litig.*, 132 F.R.D. 455, 483 (E.D. Mich. 1990) (dismissing shareholder derivative action) (emphasis in original).

Here, the SLC and its counsel, which had previously conducted a related investigation and produced a 105-page report, interviewed more than 30 witnesses, including individuals involved in both designing and implementing the Plan, as well as managers of the Admissions

Department. *See* SLC Report at 13-14, 51-55. They also reviewed tens of thousands of documents, met periodically to discuss the investigative process, and sought input from OLERS and other shareholders about the allegations. *Id. See also* Cronan Aff., Ex. D at 6. The SLC became well versed in the relevant legal principles and DOE regulations, as well as EDMC's internal controls at both the upper management and lower management levels. SLC Report at 14-51. The investigation ranged from senior executives, like the Chief Accounting Officer and Controller, as well as the Audit Committee of the Board, *id.* at 41-42, to other compliance-related senior committees, *id.* at 39-41, to lower-level managerial employees with years of experience working with EDMC's policies in practice, *id.* at 43. The SLC also reviewed such internal controls as EDMC's Hotline Committee and Internal Audit Department, as well as broader corporate policies regarding employee conduct and integrity, and considered EDMC's staff training, evaluation, and the use of outside investigators to ensure integrity. *Id.* at 17-27, 31-36.

OLERS' complaints about whom the SLC purportedly did *not* interview, Am. Compl. ¶¶ 12, 42, 200, 222-23, misapprehend the nature of the business judgment rule. "In any investigation, the choice of people to interview or documents to review is one on which reasonable minds may differ.... Inevitably, there will be potential witnesses, documents and other leads that the investigator will decide not to pursue," and that does not alter the deference that the business judgment rule requires. *Mount Moriah Cemetery ex rel. Dun & Bradstreet Corp. v. Moritz*, No. 11431, 1991 WL 50149, at *4 (Del. Ch. Apr. 4, 1991)). *See also In re UnitedHealth*, 591 F. Supp. 2d at 1030 ("An SLC is not required to interview every possible witness in order to conduct a thorough and appropriate investigation.").

While Plaintiff impugns the SLC's investigation because of seven "confidential witnesses" who were not interviewed, Am. Compl. ¶¶ 42-49, its criticism misses the point. It was not practical nor necessary to interview every one of the thousands of recruiters that have worked for an EDMC-affiliated school. In any event, the SLC did interview lower level employees with "hands-on experience implementing" EDMC's compensation plan. SLC Report at 43. While mindful of the complaints like those asserted in the *Washington* case and cognizant of the fact that employees in any job often are dissatisfied with salary determinations, the SLC reasonably focused its investigation on the actual reviewers—those individuals charged with implementing the lawful compensation plan (who are also those individuals alleged to have ignored the Plan). OLERS might prefer that the SLC have expended its resources talking to hundreds of ADAs who would have subjective opinions and recollections about the nature of their individual review. But, the claimed illegality turned on what, in fact, went into salary determinations, not what ADAs thought. In conducting its investigation, the SLC thus properly turned to those individuals who actually made the determinations. Focusing on the decision makers is far from a pretext or a sham.

Moreover, OLERS fails to allege any unique information that these shrouded seven "confidential witnesses" could have provided. None of them say anything about falsifying job data or EDMC's letter of credit obligations. *See* Am. Compl. ¶¶ 42-49. Even with respect to the incentive compensation claims, none of the witnesses are alleged to have ever calculated recruiter compensation at EDMC, much less done so based solely on enrollments. These witnesses simply regurgitate the same vague and baseless allegations of which the SLC was already aware from the *Washington* complaint. Failing to interview witnesses who cannot contribute new information does not make an investigation inadequate. *See Lemenestrel*, 964

31

A.2d at 917 n.8 (applying the business judgment rule where plaintiff "fail[ed] to indicate what

information [overlooked] witnesses would have provided that was either significant to the

Committee's investigation or unavailable from other sources"); *Cuker II*, 35 Pa. D. & C.4th 87

(same).

OLERS also complains that the SLC should have offered job security to encourage

whistleblowers to come forward and should have conducted anonymous surveys of ADAs to

gather information. *See* Am. Compl. ¶ 222. Yet, the business judgment rule precludes such

second-guessing, and surely the omission of a particular fact-gathering technique is not so

egregious as to render the entire investigation a "pretext or sham." *Lemenestrel*, 964 A.2d at 914

(marks and citation omitted).

Similarly, whether or not OLERS was included in the investigation is immaterial. *See*

Am. Compl. ¶¶ 10, 198. As a general matter, participation of the plaintiff shareholder in an

investigation is not required. *See Powell v. First Republic Bank*, 274 F. Supp. 2d 660, 671 n.15

(E.D. Pa. 2003) (holding that the SLC's "report is no less credible because plaintiffs' counsel

would not consent to the investigator's interview request"). Moreover, the SLC *did* invite

OLERS to submit any evidence of wrongdoing—twice. *See* Cronan Aff., Exs. G and I at 21.

Specifically, its counsel "ask[ed] that you provide us with any further information or support that

you have for the allegations ... or any other facts or information that you would like the

Litigation Committee to consider as part of its investigation." Cronan Aff., Ex. G. Whether or

not OLERS now claims it "accepted" this invitation, Am. Compl. ¶¶ 12, 200, it never sent any of

the information purportedly in its possession—hardly indicative of a good faith effort to advance the Company's best interests.[19]

The SLC's investigation far exceeded what the business judgment rule requires. *See Lemenestrel*, 964 A.2d at 916 (applying business judgment rule where the litigation committee and its counsel examined thousands of documents, reviewed deposition testimony from previous related litigation, and interviewed management employees and defendant directors); *Cuker II*, 35 Pa. D. & C.4th at 93 (dismissing derivative claims under the business judgment rule where the litigation committee reviewed hundreds of documents and interviewed approximately twenty-two witnesses); *Evans ex rel. Navarre Corp. v. Paulson*, No. 05-1818, 2007 WL 1549242, at *3 (D. Minn. May 24, 2007) (finding an SLC conducted its investigation in good faith by interviewing nineteen witnesses, reviewing extensive corporate records, and producing a forty-page report over the course of five months); *Grafman v. Century Broad. Corp.*, 762 F. Supp. 215, 220 (N.D. Ill. 1991) (finding a "thorough" SLC investigation to include the interviews of twenty witnesses and a review of over 20,000 documents). At the very least, the SLC's

---

[19] It is also of no moment that the SLC relied on a previous investigation pertinent to the claim about falsifying job data. *See* Am. Compl. ¶¶ 215-16. The ALI Principles encourage litigation committees to rely on earlier investigations if the "committee finds that they continue to be relevant and reliable." ALI Principles § 7.09 cmt. d. *See also Lemenestrel*, 964 A.2d at 917 (noting that the committee relied in part on deposition transcripts from prior proceedings). The fact that OLERS' allegations were cribbed from other filings and were largely duplicative of previously-investigated claims makes it all the more reasonable not to waste resources repeating recent efforts related to these prior matters. EDMC conducted an investigation after learning that a former employee in the Career Services department at OHE accused EDMC of falsifying employment statistics—the exact same allegation relating to the exact same employee that OLERS made in this case. SLC Report at 62-65. OLERS also demanded that EDMC review its internal controls and compliance procedures, just as the SLC had already done in response to prior shareholder demands. *See* Cronan Aff., Exs. D, E; *see also* Cronan Aff., Ex. M at 1-2. And, where OLERS made new claims, the SLC responded individually to those. Cronan Aff., Ex. I; *see also* SLC Report at 17-62.

investigation rises well above the kind of "pretext or sham" necessary to displace the business

judgment doctrine. *Lemenestrel*, 964 A.2d at 914 (quoting *Auerbach*, 393 N.E.2d at 1003).

> ### 2.    Plaintiffs Cannot Shift The Presumption Under The Business Judgment Rule, And Disagreement With The SLC Does Not Constitute Inadequacy.

While OLERS offers gratuitous suggestions on how they might have conducted a

different inquiry, OLERS fails to allege any other information that might have been significant to

the SLC's investigation but was omitted from the final report and therefore suggests inadequacy.

Because the business judgment rule exists to prevent second-guessing of corporate governance

and undue interference with the discretionary business decisions of upper management, it

presumes the validity of an SLC's chosen process and conclusions. The onus is therefore on the

derivative plaintiff to plead with particularity allegations rebutting that presumption. *Cuker*, 692

A.2d at 1046; ALI Principles § 7.04. But according to Plaintiff, "the widespread reports of

abuses" across the for-profit education industry "actually demonstrate[] that EDMC's internal

controls failed to uncover wrongdoing." Am. Compl. ¶ 226. *See also id.* ¶ 239 ("[G]iven the

prevalence and pervasiveness of wrongdoing at EDMC described in multiple sources ... it is

patently unreasonable to conclude that a system designed to uncover such misconduct was

'thorough and effective' if it turned up only a 'handful' of related complaints.") (emphasis

omitted); *id.* ¶ 244 (alleging that the SLC's report "does not comport with" the allegations

against EDMC). Plaintiff's allegation appears to be that because the SLC did not simply confirm

the various allegations against EDMC, the investigation must have been inadequate.

Such reasoning would supplant directors' judgment about corporate affairs, nullify the

business judgment rule, and override the Supreme Court's decision in *Cuker*. As an initial

matter, the allegations against EDMC do not compel a particular outcome to the SLC's

investigation. *Gaer* was dismissed on its pleadings. Very little in the GAO Report related to

34

EDMC, and the GAO was forced to substantially revise its initial report in a manner favorable to both the Company and all other for-profit educators in the investigation. *See supra* page 5. The HELP Committee report is undermined by its reliance on the GAO's debunked investigation and has been maligned—by members of the HELP Committee—as political grandstanding. *See supra* note 18. EDMC's compensation plan was also held to be lawful as designed, and the survival of any claims in *Washington* was due in part to the early procedural posture of that lawsuit, which still has not proceeded to discovery. *See supra* note 6; *Washington*, 2012 WL 1658482, at *9-20. Those claims are also subject to a vigorous defense from the Company itself. *See* Defs.' Answer at 3-4 (Docket No. 186), *United States ex. rel Washington v. Educ. Mgmt. Corp.*, No. 07-461 (W.D. Pa.) (describing how statistical analyses have shown that OHE salaries were *not* based solely on enrollments in practice). Regardless, *Cuker* properly focused the business judgment rule on the investigation itself, not the result. The SLC was entitled—in fact, obligated—to bring its own judgment to bear on OLERS' claims; if the conclusion that it reached could render the investigation inadequate, *Cuker* would be meaningless.

Plaintiff further attacks the sixty-five page report because it did not substantiate its conclusions with evidence or provide more fulsome descriptions of the investigation. The Committee "fail[ed] to identify those 'upper level managers' and ADA managers" that it interviewed, Am. Compl. ¶ 222; there was "no evidence that the employees interviewed were assured their jobs would be secure if they provided honest feedback," *id.*; there was no "detail concerning the conversations that were actually held with the employees," and the SLC did not "provide a list of the questions asked of the employees," *id.* ¶ 224, did not "describe what reports have been issued" by EDMC's internal audit department, and did not "include any evidence that the Committee attempted to determine if these controls could possibly have been effective," *id.*

¶¶ 235, 237.  Although the SLC described the complaints EDMC has received through its anonymous hotline, it "did not provide any further detail," and there was "scant evidence detailing the contents" of other internal compliance analyses.  *Id.* ¶¶ 238, 241.  *See also id.* ¶¶ 228, 234-39, 241-51.  In other words, OLERS would require the SLC to provide an affirmative "demonstration that [EDMC's internal controls] were actually followed" and "a detailed description of the qualifications of [EDMC's] students" because it is "impossible to imagine given how large and sprawling EDMC is," that the allegations against the for-profit education industry are not true.  *Id.* ¶¶ 225, 226, 228.

These minor disagreements constitute nothing more than quibbling over how the SLC exercised its considerable discretion.  In effect, OLERS wants this Court to hold that it, and not the SLC, should be the arbiter of the proper investigation.  The law is plainly to the contrary.  *Cuker* is certainly not so insubstantial that a litany of hindsight observations are sufficient to displace its considerable protection.  If allegations like OLERS' could sustain a derivative claim that a litigation committee composed of disinterested directors has determined are not in the best interests of the company, the business judgment rule would cease to exist in this context.[20]

Moreover, Plaintiff cannot even provide a basis for many of the individual issues on which it hinges its claim.  The alleged wrongdoing for which OLERS demanded corrective action from EDMC was non-compliance with DOE regulations.  *See* Cronan Aff., Ex. F at 4.  But Plaintiff now faults the SLC for failing to investigate whether having over 300 employees in

---

[20] In trying to find grounds for disagreement with the SLC, Plaintiff also contradicts its own demands.  Although OLERS now claims that the allegations in its second demand letter concerning job placement data were "not limited to the Online Higher Education department" or the Senate testimony of former Argosy University recruiter Kathleen Bittel, Am. Compl. ¶ 216, a comparison of the actual demand letter with Plaintiff's own allegations reveals that the demand claims were based solely on Ms. Bittel's testimony.  *Compare id.* ¶ 74, 121, 144, 154-55, 157, 159, 191 *with* Cronan Aff., Ex. H at 2.

its job placement office was sufficient to serve the student body, and criticizes EDMC for

including within its job placement statistics those graduates employed in their chosen field for

only one day.  *See* Am. Compl. ¶¶ 217-18.  OLERS does not—because it cannot—allege that in

either respect the Company actually violated any DOE regulation; neither practice was actually

unlawful.  Nor does Plaintiff suggest any standard by which to think either practice was

unreasonable—the United States government, for instance, also views employment to commence

from day one.  *See* 26 U.S.C. §§ 3401, 3402 (obligating "employers" to comply with withholding

requirements as soon as a "wage" is earned and defining an employer as the one who pays wages

upon performance of a service regardless of time spent in occupation).[21]

OLERS ultimately misapprehends its burden under *Cuker*.  The adequacy of a

committee's investigation depends on its "procedures and methodologies as a whole" rather than

on the individual elements of its inquiry.  *Drilling v. Berman*, 589 N.W.2d 503, 509 (Minn. Ct.

App. 1999) (citing *Auerbach*, 393 N.E.2d at 1003, and examining the committee's use of

counsel, review of documents and extent of interviews).  It is therefore incumbent upon the

shareholder to identify exactly what the SLC missed and how that would undermine the

discretion granted the SLC.  *See Lemenestrel*, 964 A.2d at 918 (noting that plaintiffs failed to

identify which documents were not fully reviewed or what "new information" further

investigation would have yielded).  OLERS might disagree with some of the SLC's methods and

it might have preferred a greater level of detail in the written report, but the purpose of the

business judgment rule is not to review each step of a litigation committee's investigation or set

---

[21] Although it lacks standing to pursue any claim regarding aggressive recruiting tactics, it is
worth noting that courts have held as a matter of law that such tactics are not illegal.  *See Gaer*,
2011 WL 7277447, at *25; *see also United States ex rel. Diaz v. Kaplan Univ.*, No. 09-20756,
2011 WL 3627285, at *7 (S.D. Fla. Aug. 17, 2011) (dismissing claims based on "enrolling
unqualified students [and] the extreme pressure of admissions representatives to perform").

specific reporting requirements, it is simply to ensure that the investigation meets a minimum

level of reasonableness. *See Cuker II*, 35 Pa. D. & C.4th at 94; *Drilling*, 589 N.W.2d at 509

(dismissing derivative claims where the "committee's final report … was two and one-half pages

long"). The record in this case leaves little doubt on this point.[22]

### 3. Plaintiffs Cannot Shift The Presumption Under The Business Judgment Rule That The SLC's Conclusions Are Rational.

Under these circumstances, the only proper judicial inquiry as to the conclusions of the

SLC is whether the Committee, having been properly formed and having conducted an adequate

investigation, "rationally believe[d] that the business judgment is in the best interests of the

corporation." *Cuker*, 692 A.2d at 1045. This "rationally believes" standard "is intended to

afford directors and officers wide latitude when making business decisions...." ALI Principles §

4.01(c) cmt. f. Notably in this case, OLERS never alleges that the SLC's conclusions were

irrational.

To the extent that corroboration of the SLC is desirable, however, the Court need look no

further than the lawsuits that have already vindicated EDMC's compensation plan and recruiting

practices, as well as the for-profit education more generally. *See Washington*, 2012 WL

1658482, at *10; *Gaer*, 2011 WL 7277447, at *25; *supra* note 4. With respect to the Plan as it

was implemented—the only claim in a lawsuit against EDMC that has to date survived

dismissal—the SLC noted that the two plaintiffs in the *Washington* case worked either in an

---

[22] Indeed, forcing fact-based litigation of the quality and conclusions of the SLC's investigation would by itself defeat the purpose of *Cuker*, which is to establish a procedure by which corporations may consider and resolve shareholder demands without costly and disruptive litigation. The ALI Principles, as adopted in *Cuker* and applied by its progeny, reject the proposition that OLERS would have this Court adopt—namely, that derivative litigation is a method to second-guess an SLC investigation, impose cost and disruption on a company, and hope for a settlement borne not of merit, but of inconvenience. As *Cuker* recognizes, such litigation is not truly in the best interests of the shareholders that OLERS purports to represent.

entry-level position or in a training capacity, that both were at EDMC for a limited time, and that neither were likely to have any knowledge about how ADA compensation was decided. *See* SLC Report at 54 n.43. Based on interviews with lower-level managers who actually applied the Plan, as well as upper management employees, the SLC found no evidence to suggest improper compensation practices that would support *qui tam* liability. *Id.* at 52-55.

Similarly, despite more than twenty interviews of knowledgeable persons and reviews of relevant documents, the SLC found no evidence to support the allegations that the Company was reporting fraudulent job placement statistics. *Id.* at 62-65. The Committee did find, however, "effective internal controls in place to prevent the type of conduct" that OLERS alleges, including dedicated personnel working in the job placement field, established procedures for gathering placement data, and "layers of controls designed to prevent inaccurate reporting," such as appropriate training, written policies, and mechanisms for reporting any potential violations. *Id.* at 63, 64. In light of the substantial evidence of compliance—and the lack of any evidence to the contrary—the SLC rationally concluded that it was in EDMC's best interest *not* to drastically rewrite the Company's internal controls, management procedures, and corporate governance, as OLERS now asks this Court to do.

Finally, with respect to the letter-of-credit claim, the Plaintiff offers nothing more to rebut the *Cuker* presumption than the self-serving allegation that the SLC's conclusion "makes no logical sense." Am. Compl. ¶ 211. Whatever OLERS might think, the SLC noted that DOE maintains sole discretion to set the percentage at any amount above 10% that the agency considers appropriate. *See* SLC Report at 61-62. The SLC thus could only speculate as to why DOE would increase the percentage from the minimum. *Id.* at 62. But the Committee noted that the letter-of-credit requirement generally had nothing to do with financial conditions at EDMC.

Rather, that requirement—as well as the provisional certification given to EDMC's affiliated schools, *see* Am. Compl. ¶ 214—resulted from the accounting of corporate goodwill that was undertaken in connection with the 2006 leveraged buy-out. SLC Report at 61. This benign explanation had long been reported to EDMC's investors—including, presumably, OLERS. *Id.* Indeed, OLERS itself has never given any reason to think that DOE's decisions have anything to do with EDMC's financial situation or alleged improprieties. *See* Cronan Aff., Ex. H. Plaintiff's speculation that "untold circumstances at EDMC" might be to blame hardly supports displacing the judgment of EDMC's board of directors. Am. Compl. ¶ 213.[23]

This case is based on nothing more than the conclusory allegation that there have been other claims made against EDMC, and so the SLC must therefore be wrong if it does not cede corporate management to Plaintiff. Given the nature of those other claims, OLERS' premise alone is misguided. *See supra pages* 34-35. More importantly, Pennsylvania law protects companies—as well as all the other shareholders that have not brought suit—from having to waste corporate resources where an investor attempts to second-guess the Board's business judgment with a follow-on derivative claim. The only pertinent question is whether the SLC was properly disinterested and informed, and whether its assessment of EDMC's best interests was rational. The decision not to pursue OLERS' demands was based on a thorough investigation and reasoned analysis of the evidence and circumstances, and is consistent with the decisions of those courts that have reviewed EDMC's practices. The good-faith belief that this lawsuit is not

---

[23] OLERS relies on misdirection about whether the letter of credit requirement increased as a matter of *dollar amount* or as a matter of *percentage*. *See* Am. Compl. ¶¶ 211-12. To suggest that DOE might raise the percentage requirement as a school's overall Title IV revenues increased is perfectly logical. Plaintiff's curiosity that DOE did not take the same approach in prior years is not grounds for overriding the business judgment of the SLC, the membership of which included the acting chairman of EDMC's Audit Committee. *See* SLC Report at 6.

GD-12-008785

in EDMC's best interests warrants deference, and the case should be dismissed. *See Cuker*, 692 A.2d at 1045.

## **CONCLUSION**

OLERS lacks standing to assert much of what is involved in the Amended Complaint. For that portion which remains, the SLC followed the process established in *Cuker* and made the considered decision that proceeding on these claims is not in EDMC's best interests. The Company therefore respectfully requests that the Court dismiss the Amended Complaint with prejudice.

October 17, 2012

Respectfully submitted,

Thomas S. Jones, Esq. (Pa. 71636)
Laura E. Ellsworth, Esq. (Pa. 39555)
Anderson T. Bailey, Esq. (Pa. 206483)
JONES DAY (Firm ID: 865)
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Ph: (412) 391-3939
Fx: (412) 394-7959
*Counsel for Nominal Defendant*
*Education Management Corporation*

OKLAHOMA LAW ENFORCEMENT
RETIREMENT SYSTEM,

        *Plaintiff,*

        v.

TODD S. NELSON, JOHN R. McKERNAN,
MICK J. BEEKHUIZEN, SAMUEL C.
COWLEY, ADRIAN M. JONES, JEFFREY T.
LEEDS, LEO F. MULLIN, PAUL J. SALEM,
PETER O. WILDE, and JOSEPH R. WRIGHT

        *Defendants,*

        and

EDUCATION MANAGEMENT CORP.,

        *Nominal Defendant.*

**CIVIL DIVISION**

**COMMERCE AND COMPLEX
LITIGATION CENTER**

No.: GD-12-008785

Code:  020 Equity

**INDEX TO EXHIBITS**

**Filed In Support Of Nominal Defendant's Motion to Dismiss
Plaintiff's Amended Complaint**

EXHIBIT 1............ May 31, 2012 Report of the Litigation Committee

EXHIBIT 2............ Affidavit of R. Todd Cronan

      Cronan Aff. Exhibit A.......... August 23, 2010 Letter from J. Weiss
      Cronan Aff. Exhibit B .......... October 27, 2010 Letter from E. Zagar
      Cronan Aff. Exhibit C .......... June 2, 2011 Letter from E. Zagar
      Cronan Aff. Exhibit D .......... May 4, 2011 Letter to J. Weiss
      Cronan Aff. Exhibit E .......... May 4, 2011 Letter to E. Zagar
      Cronan Aff. Exhibit F .......... August 19, 2011 Letter from J. Eisenhofer
      Cronan Aff. Exhibit G .......... December 8, 2011 Letter to J. Eisenhofer
      Cronan Aff. Exhibit H .......... January 19, 2012 Letter from J. Eisenhofer
      Cronan Aff. Exhibit I .......... March 6, 2012 Letter to J. Eisenhofer
      Cronan Aff. Exhibit J .......... May 24, 2012 Letter to J. Eisenhofer
      Cronan Aff. Exhibit K .......... Biographies of the Board of Directors
      Cronan Aff. Exhibit L .......... EDMC Amended and Restated Bylaws
      Cronan Aff. Exhibit M.......... May 4, 2011 Report of the Litigation Committee