# EXHIBIT 5

"

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

OKLAHOMA LAW ENFORCEMENT
RETIREMENT SYSTEM,

           Plaintiff

      vs.

TODD S. NELSON, JOHN R.
McKERNAN, MICK J. BEEKHUIZEN,
SAMUEL C. COWLEY, ADRIAN M.
JONES, JEFFREY T. LEEDS, LEO
F. MULLIN, PAUL J. SALEM, PETER
O. WILDE, and JOSPEH R. WRIGHT,

              Defendants

    and

EDUCATION MANAGEMENT CORP.,

          Nominal Defendant

CIVIL DIVISION

NO. GD-12-008785

CODE:  020 EQUITY

MEMORANDUM AND ORDER OF COURT

HONORABLE R. STANTON WETTICK, JR.

FILED

13 JUL 17  PM 12: 43

DEPT. OF RECORDS
CIVIL/FAMILY DIVISION
ALLEGHENY COUNTY PA

COPIES MAILED TO:

Counsel for Plaintiff:

William R. Caroselli, Esquire
Seventh Floor
20 Stanwix Street
Pittsburgh, PA 15222-4802

Counsel for Defendants:

Michael L. Kichline, Esquire
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

Counsel for Leo F. Mullin and Paul J. Salem, as
members of a duly formed Litigation Committee
of the Board of Directors of Education
Management Corporation:

Steven M. Reinsel, Esquire
Ryan O. Hemminger, Esquire
30th Floor
525 William Penn Place
Pittsburgh, PA 15219

Counsel for Nominal Defendant:

Thomas S. Jones, Esquire
Laura E. Ellsworth, Esquire
Anderson T. Bailey, Esquire
Suite 4500
500 Grant Street
Pittsburgh, PA 15219

MEMORANDUM AND ORDER OF COURT

WETTICK, J.

This is a shareholder derivative action. The Motion of the nominal defendant Education Management Corporation ("EDMC") to Dismiss Plaintiff's Amended Complaint pursuant to § 7.08 of the American Law Institute Principles of Corporate Governance and for lack of standing is the subject of this Memorandum and Order of Court.

Plaintiff alleges that it is a public pension retirement fund located in Oklahoma and that it owned EDMC common stock continuously during the relevant period. Defendants are the Board of Directors of EDMC, a Pennsylvania corporation.[1]

EDMC, a for-profit institution, is one of the largest providers of post-high-school education ("higher education") in the United States. According to plaintiff's Amended Complaint, EDMC operates schools in 108 locations across the United States and Canada. Its enrollment exceeded 158,000 students as of 2010.[2] Its annual revenue as of 2010 was $2.9 billion.

EDMC has received billions of dollars in federal funding through tuition payments funded through federal loans made to EDMC students. While the students are expected to repay these federal loans, failure to do so shifts their tuition costs onto the federal government. In other words, if EDMC admits a student who does not complete the semester, EDMC keeps the tuition, and the federal government will eat the loan if the student never has the means to make his or her payments. Thus, EDMC and other for-profit schools have no financial incentive to restrict

---

[1] The parties agree that this litigation is governed by Pennsylvania law.

[2] According to a May 31, 2012 Report describing other information provided by EDMC, as of May 9, 2011, EDMC had approximately 151,200 students enrolled in its education system.

admissions to those applicants who are likely to complete the program of study and to repay the loan.

Because the for-profit school keeps the tuition payment regardless of the performance of the student, the for-profit school's revenues and profits increase as enrollment increases. Thus, for-profit schools devote extensive resources to recruitment.[3] The recruiters have backgrounds in sales rather than academics; their training focuses on sales techniques.

Federal funding for higher education is provided for under Title IV of the Higher Education Act ("HEA"). In 1992 Congress adopted amendments to Title IV imposing restrictions designed to discourage recruitment of unqualified students who will derive little benefit from the program and may be unable to repay the federally-guaranteed loans. In addition, through Regulations, the Secretary of Education imposed additional requirements. See the following discussion under *General Background* in the Opinion in *United States v. Corinthian Colleges*, 655 F.3d 984, 989 (9th Cir. 2011):

> **A. General Background**
> The federal government distributes funds under Title IV of the HEA, 20 U.S.C. § 1094, in order to assist with the costs of secondary education. In order to receive federal funds under the HEA, schools must enter with the DOE into a Program Participation Agreement, in which they agree to abide by a host of statutory, regulatory, and contractual requirements. *U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1168 (9th Cir.2006) (" *Hendow* "); *see also* 34 C.F.R. § 668.14(a) (2010). Among these requirements is a recruiter-incentive compensation ban, which prohibits institutions from paying recruiters "incentive payments" based on the number of students they enroll. More specifically, this ban prohibits schools from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20). "This requirement is meant to curb the risk that recruiters will 'sign up

---

[3] As of 2010, EDMC had an admission staff of 2,600 persons.

poorly qualified students who will derive little be-
nefit from the subsidy and may be unable or unwill-
ing to repay federally guaranteed loans.' " *Hendow,*
461 F.3d at 1168–69 (citation omitted).

In 2002, the DOE amended its previous regula-
tions and created a "safe harbor" provision inter-
preting and clarifying this ban on recruiter-incent-
ive compensation. The regulation provides that an
educational institution may, without violating the
ban on incentive compensation, provide "payment
of fixed compensation, such as a fixed annual
salary or a fixed hourly wage, as long as that com-
pensation is not adjusted up or down more than
twice during any twelve month period, and any ad-
justment is not based solely on the number of stu-
dents recruited, admitted, enrolled, or awarded fin-
ancial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (2010)
("Safe Harbor Provision"). Both the ban on incent-
ive compensation and the Safe Harbor Provision
were in effect when this suit was filed.[FN1]

> FN1. Since this suit was filed, the DOE has
> engaged in negotiated rulemaking to reex-
> amine this and other HEA safe harbor pro-
> visions. In the final regulations resulting
> from this process, which took effect in July
> 2011, the DOE eliminated the Safe Harbor
> Provision for salary-based compensation.
> *See* 75 Fed.Reg. 66832 (Oct. 29, 2010). In
> commenting on the elimination of the Safe
> Harbor Provision, the DOE notes that "the
> Department's experience has demonstrated
> that unscrupulous actors routinely rely
> upon these safe harbors to circumvent the
> intent of [the incentive compensation ban]
> of the HEA." *Id.* at 66872. According to
> the DOE, "the safe harbors have served to
> obstruct [the objectives of the incentive
> compensation ban] and have hampered the
> Department's ability to efficiently and ef-
> fectively administer the title IV, HEA pro-
> grams." *Id.* Thus, going forward, educa-
> tional institutions must comply with the
> ban on incentive compensation in order to
> be eligible for federal grant money, but
> will no longer be able to rely on the Safe
> Harbor Provision to shield compensation
> programs based directly or indirectly upon
> recruitment numbers.

Also see the discussion of Title IV of the HEA in *Association of Private Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 435-36 (D.C. Cir. 2012):

### A. The Higher Education Act

Congress created the Title IV programs to foster access to higher education. "Every year [these] programs provide more than $150 billion in new federal aid to approximately fourteen million post-secondary students and their families." *Career Coll. Ass'n*, 796 F.Supp.2d at 113–14. Students receiving this aid attend private for-profit institutions, public institutions, and private nonprofit institutions. *See id.* at 114. These students are expected to repay their federal loans; their failure to do so shifts their tuition costs onto taxpayers. But schools receive the benefit of accepting tuition payments from students receiving federal financial aid, regardless of whether those students are ultimately able to repay their loans. Therefore, Congress codified statutory requirements in the HEA to ensure against abuse by schools. Three are at issue in this dispute.

First, the HEA stipulates that "[i]n order to be an eligible institution for the purposes of any [Title IV] program[,] ... an institution must be an institution of higher education." 20 U.S.C. § 1094(a). Federal law defines an "institution of higher education" as an institution in any state that *inter alia* "is legally authorized within such State to provide a program of education beyond secondary education." *Id.* § 1001(a)(2); *see also id.* § 1002(a)(1), (b)–(c). The HEA does not define "legally authorized." This lack of a statutory definition has meant that, for virtually all of the HEA's history, each state has determined for itself the method of authorizing schools within its borders.

Second, as noted above, each school must enter into a program participation agreement with the Secretary. Pursuant to this statutory requirement, a school must agree not to "provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." **\*105  \*436** *Id.* § 1094(a)(20). Congress adopted this provision in 1992 based on its concern that schools were creating incentives for recruiters to enroll students who could not graduate or could not find employment after graduating. *See* H.R.REP. NO. 102–447, at 10 (1992), *reprinted in* 1992 U.S.C.C.A.N. 334 at 343; *see also United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 989 (9th Cir.2011) ("This requirement is meant to curb the risk that recruiters

will sign up poorly qualified students who will derive little benefit from the subsidy and may be unable or unwilling to repay federally guaranteed loans." (citations omitted) (internal quotation marks omitted)). The Department may initiate an enforcement action against a school that violates this prohibition to seek the imposition of a civil fine or the limitation, suspension, or termination of the institution's eligibility to participate in Title IV programs. *See* 20 U.S.C. § 1094(c)(1)(F), (c)(3)(B)(i)(I).

Third, the HEA prohibits schools from engaging in "substantial misrepresentation" regarding "the nature of its educational program, its financial charges, or the employability of its graduates." *Id.* § 1094(c)(3)(A). Congress adopted this provision to protect students from "false advertising" and other forms of manipulative "sharp practice." H.R.REP. NO. 94–1086, at 13 (1976). If the agency determines "after reasonable notice and opportunity for a hearing" that an institution has engaged in proscribed substantial misrepresentation, it may "suspend or terminate" the institution's eligibility to participate in Title IV programs. 20 U.S.C. § 1094(c)(3)(A). The agency may alternatively seek the imposition of a civil fine. *See id.* § 1094(c)(3)(B)(i) (II).

## PLAINTIFF'S AMENDED COMPLAINT

Prior to 2006, EDMC was a publicly-traded company. In 2006, it became a private company as the result of a leveraged buyout by a consortium of investors led by Goldman Sachs. The price was approximately $3.4 billion of which roughly $2 billion was debt that EDMC assumed.

Plaintiff alleges that beginning at the time EDMC was purchased by a consortium of investors in 2006, EDMC has focused on enrolling as many students as possible—qualified or not—by any means necessary—lawful or not—in order to increase short-term revenues at the expense of long-term success so that EDMC could service the debt assumed in the buyout.

In the Preliminary Statement of the Amended Complaint, plaintiff alleges that most students who enroll at EDMC schools pay their tuition with federal funds or federally-guaranteed

loans ("Title IV funding").   Thus, most of EDMC's revenues are generated through federal financing.

The Amended Complaint refers to provisions of federal law designed to prevent for-profit educational institutions from abusing the federal programs that provide funding for higher education.   These provisions prohibit institutions that accept Title IV funding from providing financial incentives to recruiters to boost enrollment numbers, and require those institutions to accurately report job placement data to accreditation agencies.  Plaintiff alleges in the Amended Complaint that EDMC blatantly violates these federal regulations by aggressively recruiting students who are unqualified to participate in EDMC's programs, illegally paying its recruiters based on the number of new students they recruit, and reporting false job placement data to the accrediting agencies.   The alleged misconduct has been widespread, systemic, and disseminated from the highest executive levels at EDMC.

According to plaintiff's Amended Complaint, plaintiff learned of EDMC's widespread and systemic misconduct on or about August 8, 2011, when the federal government intervened in pending whistleblower litigation against EDMC and the protective seals on these *qui tam* actions were lifted.  Plaintiff alleges that after learning of the government action, it also discovered that other government entities were investigating wrongdoing at EDMC.   Both the Government Accountability Office ("GAO") and the Senate Health, Employment, Labor and Pension ("HELP") Committee have investigated EDMC as part of larger investigations into widespread abuses committed in the for-profit education industry.

In December 2011, the GAO issued a report titled: *Student Outcomes Vary at For-Profit, Nonprofit, and Public Schools* ("GAO Report"), and on July 29, 2012, the Senate HELP Committee issued a report titled:  *For Profit Higher Education:   The Failure to Safeguard the Federal Investment and Ensure Student Success* ("HELP Report").  The GAO Report found that graduates of for-profit schools had higher rates of unemployment and default on their loans, as compared to graduates of public or nonprofit schools, suggesting that across the industry, for-

profit schools regularly admit unqualified students. The HELP Committee reported specific examples of wrongdoing by EDMC employees, particularly with regard to aggressive recruiting tactics, which were supported with citations to internal EDMC documents.

Within eleven days of learning of the misconduct, plaintiff served a five-page Demand Letter on EDMC (Attachment 1). The Demand Letter is based on practices skirting requirements of the Department of Education that, if accurately described, would jeopardize EDMC's future participation in the Title IV Program.

The Demand Letter describes the following practices that run afoul of federal requirements:

First, compensation of Assistant Directors of Admissions ("ADAs") is essentially based on the number of new enrollees. This is the only factor that makes a significant difference in the amount of compensation an ADA receives. This violates the federal regulations prohibiting institutions from providing incentive pay to recruiters based solely on the number of students they enroll.

Second, managers of EDMC encourage ADAs to enroll students without reviewing their academic transcripts or admission materials to determine that they are qualified to attend a particular institution or online program. This results in students being enrolled in EDMC programs who are academically unqualified, including some who cannot write coherently. Although applicants must submit a high school transcript and complete a 150-word essay, all student applications are approved regardless of high school grade point average or the quality of the written essay.

Through a January 19, 2012 letter, plaintiff supplemented its August 19, 2011 Demand Letter (Attachment 2).

The January 19, 2012 Demand Letter states that EDMC systematically falsifies job placement data for its graduates in order to maintain accreditation for its institutions.

The Demand Letter also states that for EDMC's fiscal year 2011, EDMC failed to achieve the minimum level composite score based on three ratios the U.S. Department of Education uses to measure the financial health of institutions that receive Title IV Funds.  As a result, the Department of Education required EDMC to raise the amount of the letter of credit that it posted in order to receive Title IV Funds from $259.8 million (or 10% of funds received) to $361.5 million (or 15% of funds received).  While management was able to safeguard EDMC's position with a new credit facility, EDMC's overall financial wellbeing continues to be endangered by the illegal practices detailed in the initial Demand Letter and by the exorbitant debt that remains outstanding as a result of the $3.4 billion leveraged buyout of the company in 2006.  There is a substantial risk that the Department of Education will require EDMC to post letters of credit in even higher amounts if action is not taken swiftly to correct the conduct described in the initial and supplemental Demand Letters.

In November 2010, the Board of Directors of EDMC formed a Special Litigation Committee ("SLC" or "Committee") consisting of EDMC Directors Leo F. Mullin and Paul J. Salem.  Initially, the Committee was formed to review, analyze, and investigate any allegations of misconduct or breach of fiduciary duty at EDMC arising out of a broad investigation of fifteen for-profit colleges conducted by the GAO and described in a Report dated August 4, 2010.  The Committee was thereafter directed to investigate the alleged misconduct described in plaintiff's Demand Letter.

The SLC completed its investigation and prepared a final Report of the Litigation Committee dated May 31, 2012.  The Committee concluded that it would not be in the best interest of the company or its shareholders to take any actions requested in the Demand Letters.  The SLC reached this conclusion based on its findings that EDMC has appropriate internal controls, policies, and procedures to address the specific risks identified in the Demand Letters.

On September 27, 2012, plaintiff filed its Amended Complaint.  On October 17, 2012,

EDMC filed its Motion to Dismiss the Amended Complaint pursuant to Section 7.08 of the

American Law Institute Principles of Corporate Governance and for lack of standing.  As I stated

at the outset, this Motion is the subject of this Memorandum and Order of Court.

EDMC's Motion to Dismiss is based on the business judgment rule.  In an April 29, 2013

Memorandum and Order of Court issued in *In re H.J. Heinz Co. Derivative and Class Action

Litigation*, No. GD13-003108, Judge Christine Ward of this Court granted the company's motion

to dismiss based on the finding of its SLC that the litigation was not in the best interests of the

company.  At pages 4-6 of her Memorandum, Judge Ward described the pertinent legislation

and case law governing the decision of a company to seek the dismissal of a shareholder

derivative action based on the report and recommendation of an SLC:

> There is no dispute that this Court's ruling on the Defendants' Motion
> to Dismiss[FN3] is governed by the Pennsylvania Supreme Court case *Cuker v.
> Mikalauskas*, in which Pennsylvania adopted Section 7.08 of the American
> Law Institute Principles of Corporate Governance.  692 A.2d 1042 (1997)
> (hereinafter the "ALI Principles").  Pursuant to *Cuker*, at this stage in the
> litigation with regard to Defendants' Motion to Dismiss, this Court is only
> permitted to examine the Heinz Board's decision to terminate the action in
> light of the findings of the SLC, and to determine whether the decision was
> proper.  "If a court makes a preliminary determination that a business
> decision was made under proper circumstances,...then the business
> judgment rule prohibits the court from going further and examining the merits
> of the underlying business decision." *Id.* at 1047.  In analyzing the propriety of
> the Board's decision in light of the report of the SLC, the Court must ask: (1)
> whether the SLC was independent, (2) whether it was disinterested, (3)
> whether it was assisted by counsel, (4) whether it conducted an adequate
> investigation, (5) whether it prepared a written report, and (6) whether it
> rationally believed its decision was in the best interests of the corporation. *Id.*
> at 612.  "If all of these criteria are satisfied, the business judgment rule
> applies and the court should dismiss the action." *Id.* See also *Fundamental
> Partners v. Gaudet*, No. 003519, 2001 Phila. Ct. Com. Pl. LEXIS 373, at *3
> (Pa. C.P. Phila. Nov. 23, 2011).
>
> > [FN3] As a preliminary matter in their Opposition to Heinz Defendants'
> > Motion to Dismiss, Plaintiffs argue that the Heinz Defendants, in filing
> > their Motion to Dismiss, did not follow the Pennsylvania Rules of Civil
> > Procedure.   Plaintiffs argue that the only appropriate method for

Defendants to challenge the sufficiency of the Complaint is through Preliminary Objections, pursuant to Pennsylvania Rule of Civil Procedure 1028. This Court finds this argument unpersuasive in light of the *Cuker* decision and the adoption of the ALI Principles, which both provide that after SLC review and recommendations, the Board of a corporation may seek "dismissal" of a shareholder derivative action. Further, Pennsylvania case law demonstrates that the proper procedural mechanism for seeking dismissal of a shareholder derivative action is a Motion to Dismiss. See *Fundamental Partners v. Gaudet*, No. 003519, 2001 Phila. Ct. Com. Pl. LEXIS 373 (Pa. C.P. Phila. Nov. 23, 2011).

## A. The Board's Decision to Terminate is Protected by the Business Judgment Rule

It is well-settled under Pennsylvania corporate law that the board of directors of a company is empowered to make decisions regarding litigation undertaken on behalf of the corporation. Under Pennsylvania's "universal demand rule," prior to filing a shareholder derivative action, a shareholder of a Pennsylvania corporation must make a written demand on its board of directors, requesting the board investigate, prosecute, and/or take other remedial measures. *Cuker*, 682 A.2d at 1049-50 (adopting ALI Principles § 7.03).[FN4] "Decisions regarding litigation by or on behalf of a corporation, including shareholder derivative actions, are...within the province of the board of directors." *Id.* at 1048; See also *Drain v. Covenant Life Ins. Co.*, 712 A.2d 273, 279 (Pa. 1998). Once a demand is made on the board of directors, the board has "an opportunity to reject the proposed action or, if it is filed, to seek its early dismissal." *LeMenestrel v. Warden*, 964 A.2d 902, 907 n.3 (quoting comment c of ALI Principles § 7.03).

> [FN4] This is unlike the "demand excused" law in Delaware, which permits a court to apply its own business judgment as to whether to terminate or pursue derivative litigation.

Inherent within the power of the board of directors to make decisions regarding litigation undertaken on behalf of the corporation, is the presumption that the board of directors will make decisions in the best interests of their corporations. *Cuker*, 682 A.2d at 1048. As such, the decision made by a board of directors is protected by the business judgment rule and must be given deference by the courts "in the absence of fraud or self-dealing or other misconduct or malfeasance." *Id.* at 1046. The business judgment rule only fails to protect such board decisions where the court determines that the answer to one or more of the *Cuker* questions discussed above is "No."

(Typographically altered for consistency.)

The Pennsylvania appellate courts continue to look to *Cuker v. Mikalauskas*, 692 A.2d 1042, in considering the applicability and impact of the business judgment rule. See *LeMenestrel v. Warden*, 964 A.2d 902, 911 (Pa. Super. 2008), where the Court reiterated that decisions regarding litigation by or on behalf of a corporation, including shareholder derivative actions, are business decisions and, thus, within the province of the board of directors. If the court makes a preliminary determination that a business decision was made under proper circumstances, the business judgment rule prohibits the court from going further and examining the merits of the underlying business decision. In other words, without considering the merits of the action, a court should determine only the validity of the board's decision to terminate the litigation; if that decision was made in accordance with appropriate standards, a court should dismiss the derivative action prior to litigation on the merits. It is presumed that in making a business decision, the directors acted on an informed basis in good faith and with an honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, the business judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumptions. *Id.* at 911-12.

As Judge Ward noted in *H.J. Heinz Co.*, *supra*, the *Cuker* and *LeMenestrel* Courts instruct that in deciding whether to apply the business judgment rule I am to answer the following questions: (1) was the SLC independent, (2) was the SLC disinterested, (3) was the SLC assisted by counsel, (4) did the SLC conduct an adequate investigation, (5) did the SLC prepare a written report, and (6) did the SLC rationally believe its decision was in the best interests of the corporation (i.e., did the SLC act in good faith)?

I am to dismiss plaintiff's cause of action against defendants only if I answer "yes" to each of these six questions.

I initially consider questions one and two: Are the committee members disinterested and independent?

The May 31, 2012 Report of the Litigation Committee ("Report"), at pages 6-7, discusses the composition of the Litigation Committee. The Board of Directors of EDMC created the Litigation Committee in 2010 and appointed Leo F. Mullin and Paul J. Salem to serve on the Committee.

Mr. Mullin is on the EDMC Board of Directors and is the acting chairperson of the Audit Committee. He currently serves in a consultative capacity as a Senior Advisor, on a part-time basis, to Goldman Sachs Capital Partners.

Mr. Salem is a Director of the EDMC Board and is the acting chairman of its Nominating and Corporate Governance Committee. He is a Senior Managing Director and a co-founder of Providence Equity Partners. He is a director designee of Providence.

Messrs. Mullin and Salem became Directors of EDMC in 2006 at the time of the leveraged buyout and continued to serve on the Board when EDMC became publicly traded.

The Prospectus filed with the SEC governing the 2009 public offering informed investors that upon completion of the public offering, private equity funds affiliated with Providence, Goldman Sachs, and Leeds Equity Partners (the "sponsors") held 29.2%, 34.4%, and 7.1%, respectively, of EDMC's outstanding common stock and five of the ten directors immediately following this offering will be representatives of the private equity funds affiliated with the sponsors. See Prospectus dated October 1, 2009 at 30-31.

According to the most recent filings with the SEC, collectively the sponsors own 84% of EDMC's shares. See FY 2012 10-K of Education Management LLC at 50, available at http://investors.edmc.edu/phoenix.zhtml?c=87813&p=irol-irhome (last visited July 9, 2013).

Approximately $2 billion of the funds for the 2006 buyout were underwritten by the sponsors. EDMC, as a publicly-traded company, assumed responsibility for that debt as discussed in the Prospectus. Consequently, the sponsors are both the controlling shareholders and the principal creditors of EDMC.

-12-

Plaintiff correctly states that its interests, as a shareholder, are not identical to the interests of the sponsors as both shareholders and creditors. I also agree with plaintiff that Messrs. Mullin and Salem are not independent and disinterested if the sponsors' interests are adverse to the interests of shareholders who are not also creditors. But if the interests of the sponsors align with the interests of the other shareholders with respect to the claims raised in the Demand Letters, there is no merit to plaintiff's contention that the Litigation Committee was not disinterested and not independent.

The interests align. Both plaintiff and the sponsors want EDMC to succeed. Both want the company's debts to be paid because of the impact of a default on the shareholders.

Plaintiff contends that the interests are adverse because without an "artificial boost to enrollment and Title IV Funds that results from the incentive compensation program and the other deceptive practices detailed herein, EDMC would have difficulty servicing the debt that was incurred in the [leveraged buyout]." Amended Complaint ¶205. The difficulty with this argument is that plaintiff purchased stock in a corporation that needed to service a debt of approximately $2 billion, and the stock which plaintiff purchased would become worthless if the debt was not serviced.

Plaintiff contends that the Committee members would never find fault with EDMC's operations because EDMC cannot service the debt held by their sponsors without continuing to operate the business in an unlawful manner. This would require a finding that the Committee members believed a report favorable to EDMC would relieve EDMC of any further scrutiny.

However, I find that EDMC's operations will continue to be scrutinized even if this lawsuit is dismissed. Thus, if further scrutiny is likely to reveal significant misconduct, I would expect the Committee members to take a proactive stance in which they would take credit for identifying the problems and describing remedial steps EDMC should voluntarily pursue.

I now consider questions three through six (page 11 of this Memorandum) that must be answered in order for me to decide whether to dismiss plaintiff's cause of action.

-13-

The record establishes that the SLC was assisted by counsel and that the SLC prepared a written report, so I answer "yes" to questions three and five.

Furthermore, I answer "yes" to the question of whether the SLC rationally believed that its decision was in the best interests of the corporation (i.e., acted in good faith). No action or inaction on the part of the SLC supports a finding that the SLC acted in bad faith in recommending that the case should not proceed.

I now consider the remaining requirement that the SLC conduct an adequate investigation. In answering this question, I am precluded from second guessing the conclusions reached by the SLC based on the information described in the Report. However, I may ask whether the scope of the investigation and the procedures and methodologies employed, as described in the Report, were adequate. Otherwise, this requirement would be meaningless.

The Demand Letters that the May 31, 2012 Report addressed contained mostly general descriptions of alleged improper practices. However, in determining the adequacy of the investigation, I will also consider what was not available to the SLC, this being the allegations set forth in plaintiff's 276-paragraph Amended Complaint. Thus, to the extent that I find the investigation was inadequate, I will give the SLC the opportunity to supplement its Report prepared before the Amended Complaint was filed.

I now consider the adequacy of the investigation with respect to each of the practices described in the Demand Letters (see pages 7-8 of this Memorandum).

## 1. LETTER OF CREDIT

I find that the SLC Report adequately addressed this claim. Consequently, I grant EDMC's Motion to Dismiss as to this claim.

While the Demand Letter states that EDMC's overall financial wellbeing continues to be endangered by the illegal practices alleged in the Demand Letters, there appears to be no relationship between these allegations and the amount of the letter of credit.

While there appears to be a relationship between EDMC's debt and the amount of the letter of credit, the defendants, while members of the Board of Directors of EDMC, as a publicly-traded corporation, did not create the debt. It was debt that existed when EDMC went public and was disclosed in the filings with the SEC at the time the company went public.

## 2. FRAUDULENT JOB PLACEMENT CLAIM

The investigation of this claim conducted by the SLC is described at pages 62-65 of the Report (*infra*, at pages 16-18 of this Memorandum):

### D.    FINDINGS ON THE FRAUDULENT JOB PLACEMENT CLAIM

The Demand Letters' allegations concerning the Fraudulent Job Placement Claim appear

to have been taken directly from Kathleen Bittel (a former Career Services Advisor at OHE) and

her correspondence with and testimony before the U.S. Senate Committee on Health, Education,

Labor, & Pensions. Ms. Bittel alleged that EDMC manipulated job placement statistics in order

to recruit a higher number of students, that Career Services Advisors were encouraged to falsify

forms to inflate the salaries of graduates, and that graduates were encouraged to incorrectly

report that they were using skills related to their coursework. Ms. Bittel also alleged that

supervisors ignored her concerns. As described below, the Litigation Committee found effective

internal controls in place to prevent the type of conduct alleged by Ms. Bittel. The Committee

also did not find that the allegations made by Ms. Bittel were supported by reliable collaborative

evidence.

The Litigation Committee's investigation confirmed that EDMC takes seriously its

responsibility to assist its graduates in finding productive and rewarding work in their chosen

field following graduation. EDMC employs more than 300 people who help graduates find jobs

and who are responsible for ensuring that the Company accurately and fairly reports its job

placement statistics. EDMC has long utilized a process designed to ensure the accurate

collection and reporting of graduate employment statistics. This process serves as a series of

checks and balances to safeguard against an employee's ability to report inaccurate data and

includes the following steps:

    (i)    placement documentation is obtained by a Career Services Advisor
directly from an employer or a graduate whenever possible;

    (ii)    a department supervisor is responsible for checking the accuracy of
all information entered by Career Services;

    (iii)    Career Services Advisors confirm that verifications are
documented;

          (iv)     unusual salary fluctuations and certain waivers from placement are independently reviewed by EDMC's corporate staff; and

          (v)     EDMC's corporate staff performs a separate review of all data prior to records being finalized, including a review of whether the employment listed for each graduate is related to his or her field of study.

EDMC has multiple layers of controls designed to prevent inaccurate reporting of employment statistics. EDMC's standard training curriculum ensures that Career Services Advisors accurately report employment data. That training specifically warns about potential risk exposures, such as counting one job as two when the latter is just an update; accepting employment with no documentation that it was verified; and overestimating salaries in the cases where graduates or employers will not release exact information. Career Services Advisors are taught to note suspicious reporting data and contact managers for guidance. EDMC has written policies that require all errors or suspicious data be emailed to the Career Services Advisor and Director of Career Services at the affected school and that further investigation be conducted until the anomaly is corrected or explained. Moreover, students themselves are also encouraged to provide accurate information to Career Services for its records. Compliance procedures also verify accuracy of statistics. Career Services Advisors must obtain placement documentation to verify the statistics they use, and department supervisors check the accuracy of all information submitted by advisors and confirm that verifications are documented. Data are further audited by EDMC's Internal Audit Department. During a standard school audit, auditors randomly select career services files and verify employment and salary data.

Upon learning of the allegations regarding job placement statistics made by Ms. Bittel, EDMC conducted an internal investigation and sought the cooperation of Ms. Bittel (we

understand that she refused to provide specific information about her allegations). The investigation found no support for her claims of undue pressure placed upon Career Services Advisors at OHE to meet placement goals or falsely verify graduates' employment was related to their field of study. Thereafter, EDMC retained outside counsel to conduct a second investigation, which included document review and interviews of more than 20 employees, including all of Ms. Bittel's fellow Career Services Advisors and supervisors at OHE. That investigation similarly found no support for the claims that EDMC had pressured employees to violate placement policies and procedures and found no confirmed instances in which the examples the Demand Letters cite from Ms. Bittel actually ended up in EDMC's publicly reported job placement data.

Paragraphs 152-166 of plaintiff's Amended Complaint set forth its allegations regarding EDMC's falsifying job placement data:[4]

152.    The HEA requires that programs at for-profit institutions, other than those that are clearly designated as "liberal arts" and other vocational programs, must prepare students for "gainful employment in a recognized occupation" to be eligible for Title IV Funding.    A graduate is considered to be gainfully employed only if he is engaged in work for which the degree he earned is designed.    Accrediting agencies also require institutions to achieve certain levels of placement of graduates in their chosen fields in order to maintain accreditation.    The agencies that accredit EDMC institutions – to the extent that they have specific numeric requirements for job placement – require on average that 65% to 70% of graduates be employed in their chosen fields to maintain accreditation.    For example, the Accrediting Council for Independent Colleges, which accredits 19 of EDMC's schools, requires that at least 65% of graduates must have jobs in their chosen field of study in order to receive accreditation.    The Accrediting Commission of Career Schools and Colleges, which accredits 2 of EDMC's schools, requires 70% placement for accreditation.

153.    Despite these regulations, EDMC's schools misrepresented EDMC's employment placement rates both to prospective students and to the accrediting agencies.

154.    Ms. Bittel testified extensively to the Senate HELP Committee regarding falsification of EDMC's graduate career placement statistics.    It was made clear to her that career placement was far less of a concern than student recruitment, considering there were "only nine

---

[4]These allegations are supported by the January 19, 2012 Demand Letter.

career service advisors to accommodate the graduates of all their online programs" compared to 1,600 admissions personnel at the time of her employment.  Career placement advisors were stretched so thin, they were each responsible for assisting the placement of 150 to 180 students at any given time, and generally only had six months to help get this large number of students placed in their fields.  With that level of discrepancy in resources, EDMC had to resort to manipulation of job placement statistics in order to meet accrediting agencies' requirements.

155.    The examples Ms. Bittel provided regarding these tactics used to meet "gainfully employed" statistics are shocking.  EDMC schools routinely used estimated, rather than actual, reported salaries.  For example, a graduate earning $8,000 a year was documented as earning $25,000 per year because $25,000 was the average salary in the geographic area the type of position in which the graduate was employed.

156.    EDMC schools also stretched graduates' job descriptions to have them included within the definition of "field related employment," and counted students as "employed" even if they worked at a relevant job for only one day.  According to the Sobek *qui tam* complaint, internal reporting procedures explained that to be counted as gainfully employed, "[t]he graduate must work at least one day.  No additional days on the job are required as long as the grad went to a job that fit their skill level."

157.    Ms. Bittel was repeatedly pressured to call graduates and ask them about the courses they had taken to see if there was not some "skill" from those courses that could be used to shoehorn their current employment into field-related employment.  A graphic design graduate working at a Starbucks was deemed to be gainfully employed in graphic design because she was "using her skills" by making signs for the daily specials.  A graduate of the residential planning program was deemed to have been placed in her chosen field because her arrangement of candy

bars for sale supposedly utilized her program skills. Ms. Bittel was pressured to count a graduate of the game arts program as working in his field even though he worked at Toys R Us selling video games and earned $8.30 an hour.

158. Another way EDMC inflated its job placement numbers was to get as many non-complying students as possible out of the pool that counted toward the statistics. Career advisors were routinely pressured to obtain waivers from graduates on the grounds that they had a medical condition or cared for someone with such a condition, were stay at home parents, or were continuing their education.

159. These abuses are clearly systemic at EDMC institutions. Ms. Bittel testified that management at EDMC had weekly brainstorming meetings for its career services personnel where they could come up with "angles" to address how to deal with graduates who were not gainfully employed in order to maximize the institutions' gainful employment statistics. Job placement counselors are clearly told that they have placement quotas to meet, but are encouraged to meet those quotas through the types of manipulation detailed above.

160. In his *qui tam* complaint, Sobek confirmed that EDMC schools routinely manipulated the data to be able to report high job placement rates. The complaint alleges such examples as the following that were counted as working in their field of study; (i) a bank teller with a business degree earning roughly $23,000 a year; (ii) a fashion marketing program graduate working in a sneaker outlet for approximately $14,000 a year; (iii) an interior design graduate working at Target for $19,273 a year; (iv) an accounting graduate working as a cashier at a McDonald's for $15,700 a year; and (v) a business management graduate working as a customer service representative at Walmart for $16,549 a year.

161.    The percentage of graduates employed in their field as reported by EDMC defies

credulity in the current job market.  For example, South University Online reported that of "all

2009 South University Online graduates available for employment, 92.1% were working in a ·

field related to their program of study within six months of graduation and earning an average

salary of $51,005."  According to a national survey of 50,000 new college graduates across

disciplines conducted by the National Association of Colleges and Employers, only 24% of

graduates had a job offer at the time of graduation in 2010.  Even well-recognized universities

reported much lower employment rates than EDMC.  For example, Fordham University reported

that only 68% of its 2009 graduates were employed.

162.    South University Online also reported that of 234 graduates of the nursing

bachelor's degree program, 98.3% of them were employed with six months of graduation at an

average salary of $61,467.  In contrast, the American Association of Colleges of Nursing

released the results of a survey that only ·88% of nursing school graduates with bachelor's

degrees were employed in their field four to six months after graduation.

163.    EDMC's most recent Form 10-K – for fiscal 2011 – reveals that EDMC is already

suffering some consequences of these wrongful acts.  As of June 30, 2011, seven EDMC schools

had to make supplemental submissions to accrediting agencies due to those agencies' concerns

over "either student retention or placement issues," as reported by EDMC in its Form 10-K.

Argosy University's San Francisco campus was placed on probation by the American

Psychological Association in August 2010.  That probationary status gives the program two

years to improve before accreditation is revoked.  Brown Mackie College in Ft. Wayne, Indiana

had its physical therapy program's accreditation placed on probation by the Commission on

Accreditation in Physical Therapy in April 2011, and can have that accreditation revoked at any time during the following two year period if the program does not improve.

164.    In December 2011, the Company received a letter from the City Attorney of the City of San Francisco, California requesting information about, among other things, job placement reporting by The Art Institute of San Francisco and seven other Art Institutes located in California.

165.    There will undoubtedly be further consequences for EDMC schools in light of new federal regulations. The federal government recently passed new regulations regarding the definition of "gainful employment." The new measure of gainful employment is that: (i) 35% or more of former students are repaying their loans; (ii) annual loan payments do not exceed 30% of a typical graduate's discretionary income; or (iii) annual loan payments do not exceed 12% of a typical graduate's total income. Data collection on these statistics starts in July 2012, and enforcement begins in 2015.

166.    Based upon the deceptive practices regarding placement described above, EDMC is going to have difficulty withstanding the federal government's scrutiny under the new regulations. Moreover, EDMC has had growing loan default rates among its students, *i.e.*, the number of students who default on loans within two years of leaving school. For example, loan default rates at the Art Institute of Pittsburgh more than doubled between 2008 (7.9%) and 2009 (15.4%), and grew substantially at South University from 2008 (7.9%) to 2009 (13.5%).

I now consider whether the investigation described in the Report was adequate with respect to the fraudulent job placement claim.[5]

The Litigation Committee "found effective internal controls in place to prevent the type of conduct alleged by Ms. Bittel" (a witness before a U.S. Senate Committee whose testimony is discussed in the foregoing excerpts, *supra*). The SLC Report described a process which it characterized as serving "as a series of checks and balances to safeguard against an employee's ability to report inaccurate data . . . ." The Report refers to EDMC's standard training curriculum that ensures Career Services Advisors accurately report employment data.

The Report supports its conclusion that "EDMC takes seriously its responsibility to assist its graduates in finding productive and rewarding work in their chosen field following graduation" from the fact that "EDMC employs more than 300 people who help graduates find jobs and also are responsible for ensuring that the company accurately and fairly report its job placement statistics."

I find that the investigation is inadequate because of its failure to independently assess whether the checks and balances described in the Report actually worked.

At a minimum, the SLC should have randomly selected an appropriate number and cross-section of graduates and obtained the placement documentation for these graduates, including writings relating to (1) the department supervisor's checking the accuracy of the information entered by Career Services Advisors, (2) the confirmation of the Career Services Advisors that verifications are documented, and (3) the separate review of EDMC's corporate staff, including a review of whether the employment listed for the graduate is related to the graduate's field of study. (See SLC Report at 63-64, quoted at pages 16-17 of this

---

[5]The Prospectus filed with the SEC for the initial public offering stated that approximately 87% of the undergraduate students who graduated from EDMC institutions obtained a position in his or her field of study within six months of graduation. See Prospectus dated October 1, 2009 at 3.

Memorandum.)  A full description of the investigation and individual findings should be included in a supplemental report.

I recognize that the Report states that EDMC retained outside counsel to conduct a second investigation which included document review and interviews of more than twenty employees, that "compliance procedures also verify accuracy of statistics" and that during a standard school audit, "auditors randomly select services files and verify employment and salary data."

These statements fall far short of a detailed description of an independent analysis that SLC could easily have conducted.

I also find that the investigation is inadequate because the facts, as described in the Report, are that at a time when student enrollment exceeded 150,000, EDMC employed only 300 or so people to help EDMC's graduates find jobs and to ensure that EDMC accurately and fairly reported its job placement statistics.   An adequate investigation would have sought additional information as to whether the checks and balances upon which the Report relied were actually effective where only 300 or so employees were responsible for the accuracy of the statistics.

### 3. ENROLLING ACADEMICALLY UNQUALIFIED STUDENTS

I now consider whether the investigation described in the Report was adequate with respect to the enrollment claims.

The August 19, 2011 Demand Letter states that EDMC enrolls students who are academically unqualified, including some who cannot write coherently, and that all student applications are approved regardless of high school grade point average or the quality of the written essay.[6]

---

[6]The Demand Letters do not include claims based on any other improper recruitment tactics. (See Attachments 1 and 2.)

The SLC Report addressed this claim at page 60:

**b.    ADAs' Enrolling Unqualified Students**

The Demand Letters also allege that ADAs enroll unqualified students in order to meet

student enrollment quotas. The investigation revealed that this allegation is without merit.

While ADAs recruit students, they have no role in setting admissions requirements or

determining whether a student meets those requirements or should be enrolled. All admissions

decisions are made by a separate department or committee, such as a school's Registrar. This is

why interviewees described this allegation as "weird," "impossible," "absurd," the "furthest

thing from the truth," and "nonsense." As one interviewee explained, EDMC does not just

accept everybody and instead looks for indicators that students will be successful.

I am dismissing this claim. The investigation was adequate in light of the demand, which

is too general to elicit a more detailed response.

**4.    INCENTIVE-BASED COMPENSATION CLAIM**

I now consider whether the investigation described in the Report was adequate

regarding the compensation of ADAs.

As I discussed at pages 2-3 of this Memorandum, Title IV does not permit schools to

provide compensation based on enrollment. However, during the relevant times, a Department

of Education regulation permitted payment of fixed compensation (such as a fixed annual salary

or a fixed hourly wage) as long as that compensation is not adjusted up or down more than

twice during any twelve-month period and as long as any adjustment "is not based solely on the

number of students recruited, admitted, enrolled, or awarded financial aid."

In its August 19, 2011 Demand Letter, Oklahoma claims that salaries of ADAs and their

supervisors are based on the number of new students enrolled.

The SLC rejected this claim. It found that for the first six months, ADAs are paid a fixed salary based on prior experience and education. For the next twelve months, the salaries of most ADAs are based on qualitative factors and not quantitative factors.[7]

The salaries of all ADAs employed longer than eighteen months, as well as some employed six months or more, are based on a plan that takes into account both qualitative and quantitative factors (i.e., salary is not based solely on the number of new students).

The plan uses the following Matrix that includes both new student points and quality factor points.

The following chart provides annualized salaries based on new student points and quality factor points.

| Level | New Student Point Range | Annualized Salary Based on Quality Points | | | | |
|---|---|---|---|---|---|---|
| | | Unsatisfactory 0-8 points | Needs Improvement 9-12 points | Meets Expectations 13-17 points | Highly Effective 18-22 points | Outstanding 23-25 points |
| 1 | 0 - 99 | $26,000 | $27,000 | $29,000 | $31,000 | $33,000 |
| 2 | 100 - 125 | $28,500 | $29,500 | $32,000 | $34,000 | $36,000 |
| 3 | 126 - 150 | $31,250 | $32,500 | $35,000 | $37,000 | $39,000 |
| 4 | 151 - 175 | $34,750 | $36,000 | $39,000 | $41,000 | $43,500 |
| 5 | 176 - 200 | $38,500 | $40,000 | $43,000 | $45,500 | $48,000 |
| 6 | 201 - 225 | $42,500 | $44,000 | $47,000 | $49,750 | $52,000 |
| 7 | 226 - 250 | $47,000 | $49,000 | $52,000 | $55,000 | $57,500 |
| 8 | 251 - 275 | $51,500 | $53,500 | $57,000 | $60,000 | $63,000 |
| 9 | 276 - 300 | $56,000 | $58,000 | $62,000 | $65,000 | $68,000 |
| 10 | 301 - 325 | $61,000 | $63,500 | $68,000 | $71,000 | $74,000 |
| 11 | 326 - 350 | $67,000 | $70,000 | $74,000 | $77,000 | $80,500 |
| 12 | 351 - 375 | $73,000 | $76,000 | $80,000 | $84,000 | $87,500 |
| 13 | 376 - 400 | $79,000 | $82,000 | $87,000 | $91,000 | $95,000 |
| 14 | 401 - 425 | $86,000 | $89,000 | $94,000 | $99,000 | $103,000 |
| Add'l levels | 25-point increments | Add $7,000 | Add $7,000 | Add $7,000 | Add $8,000 | Add $8,000 |

The Report references Level 14 where the salary will range between $86,000 and $103,000, depending solely on quality factor points.

The Report concludes that the Plan is implemented correctly as a result of controls which the Report describes. In addition, thirty EDMC employees, including upper-level management personnel, were interviewed. These persons described how the Plan is to be

---

[7]A quantitative factor would be the number of new students enrolled.

implemented and the training and supervision which ensures its proper implementation. The Committee also interviewed ADA managers who stated that the Plan was properly implemented.

Plaintiff's Amended Complaint alleges that the compensation for ADAs employed between six and eighteen months is based almost entirely on new student points. The amount of new student points depends on whether the ADA goes on the Matrix, resulting in higher compensation.[8]

Plaintiff's Amended Complaint alleges that the Matrix, as implemented, results in compensation being based almost entirely on new student numbers. While the use of five categories for quality ratings (with approximately 20% of the ADAs falling within each category) may meet the "not solely based" requirement, the five categories are not actually used. Instead, most ADAs are in the third or fourth category. Furthermore, ADAs who meet their new student enrollment quotas are almost always in at least the third category.

Plaintiff also alleges that quality factors are not considered in EDMC's decisions to terminate an ADA for lack of productivity.

I find the SLC's investigation as to how the grid actually operates was inadequate because its findings were based almost entirely on interviews, descriptions of EDMC's training and EDMC's manuals. What was missing was any measurable objective findings.

Any competent statistician could, through a sampling of records, answer the relevant questions, including (1) to what extent is each of the five categories used; (2) does the number of quality points awarded to ADAs operate independently of the ADAs' new student point range, or are ADAs who score higher on the new student point range far more likely to achieve higher quality-point scores; (3) is the number of new students a significant factor in determining the compensation for six month-eighteen month ADAs?

---

[8]The August 19, 2011 Demand Letter supports these allegations in the Amended Complaint.

In summary, there was no reason for the SLC to rely exclusively on subjective evidence when far more reliable evidence is readily available.

## DEFENDANTS' PRELIMINARY OBJECTIONS

Defendants' preliminary objections include a request for dismissal on the ground that, even if the business judgment rule does not apply, plaintiff has failed to set forth a cause of action against any members of the Board of Directors. This is so, according to defendants, because the practices described in the Demand Letters would have been implemented by management, and, as a general rule, members of a board of directors are not responsible for the conduct of the corporate managers.

Ordinarily, I would not be considering the Directors' Preliminary Objections before I had decided EDMC's Motion to Dismiss. However, there is no need to continue with the Motion to Dismiss if there is merit to what appears to be defendants' strongest preliminary objection.

However, I find that plaintiff's Amended Complaint may state a cause of action against Todd S. Nelson who is both a Board member and an officer.[9]

Defendants, citing *Guttman v. Huang*, 823 A.2d 492, 507 (Del. Ch. 2003), note there is an exception to the rule that directors are not liable for the manner in which a corporation is managed if

(1) the director knowingly authorized the illegal conduct or

(2) the director either learned of the wrongdoing and did nothing to stop it or ignored

"red flags" that clearly suggested wrongdoing.

This exception may apply to plaintiff's claims against Mr. Nelson.

Plaintiff alleges that after Goldman Sachs and other investors bought EDMC in a leveraged buyout in 2006, the investors hired Todd S. Nelson as its CEO. According to the

---

[9]At this stage of the proceedings, I do not consider whether the Amended Complaint states a cause of action against the other defendants or the merits of other preliminary objections.

Amended Complaint, Mr. Nelson had been the CEO of the Apollo Group which operates the University of Phoenix. Its enrollment and revenues exploded under the leadership of Mr. Nelson. However, Mr. Nelson was asked to leave Apollo by its board of directors when it was discovered that Apollo's success resulted from predatory admission practices at the University of Phoenix and Apollo's use of a so-called *matrix compensation system* which, as applied, based compensation on new student enrollment in violation of federal incentive compensation ban.[10]

Mr. Nelson brought with him to EDMC numerous former Apollo executives. With the change of leadership, the culture of EDMC changed. Plaintiff alleges that aggressive quotas were set, and ADAs were trained to apply a "find the pain" technique with applicants in order to close the sale.

This resulted in rapid growth. From 2006 to 2010, EDMC's enrollment increased from approximately 83,000 to 158,300 students. Revenue more than doubled in three years from $1.3 billion in 2007 to $2.9 billion in 2010.

Because of the change in the culture of EDMC and its rapid growth once Mr. Nelson became the CEO of EDMC, a fact-finder may conclude that Mr. Nelson, rather than those below Mr. Nelson in the corporate structure, was controlling the day-to-day operations of EDMC both before and after EDMC went public.

For these reasons, I enter the following Order of Court:

---

[10]In *Association of Private Sector Colleges & Universities v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012), the Court considered challenges to new regulations, promulgated by the Department of Education on October 29, 2010, that, *inter alia*, eliminated the safe harbors governing compensation because the "agency had determined that the existing regulations were too lax, allowing schools to circumvent the proscriptions of the HEA and threaten the integrity of Title IV programs." *Id.* at 436. The Court used as its example of a school circumventing the proscriptions of HEA the finding of agency officials that the University of Phoenix had "systemically engage[d] in actions designed to mislead the [Department] and to evade detection of its improper incentive compensation system for those involved in recruiting activities." *Id.* (quoting a Feb. 5, 2004 letter to Todd S. Nelson, president of Apollo Group, Inc.)

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CIVIL DIVISION

OKLAHOMA LAW ENFORCEMENT
RETIREMENT SYSTEM,

                Plaintiff

    vs.

TODD S. NELSON, JOHN R.
McKERNAN, MICK J. BEEKHUIZEN,
SAMUEL C. COWLEY, ADRIAN M.
JONES, JEFFREY T. LEEDS, LEO
F. MULLIN, PAUL J. SALEM, PETER
O. WILDE, and JOSPEH R. WRIGHT,

            Defendants

    and

EDUCATION MANAGEMENT CORP.,

    Nominal Defendant

NO. GD-12-008785

## ORDER OF COURT

    Upon consideration of the nominal defendant's Motion to Dismiss, it is hereby ORDERED that:

    (1) I am postponing a ruling on the nominal defendant's Motion to Dismiss with respect to plaintiff's Fraudulent Job Placement Claims and plaintiff's Incentive-Based Compensation Claims;

    (2) The nominal defendant's Motion to Dismiss is granted as to all other claims raised in plaintiff's Amended Complaint;

(3) For plaintiff's Fraudulent Job Placement Claim and plaintiff's Incentive-Based Compensation Claim, the SLC may within ninety (90) days conduct a more complete investigation as described in the Memorandum accompanying this Order of Court and may file a Supplemental Report describing the investigation (including results), and if the SLC continues to recommend that it will not be in the best interests of the company or its stockholders to take any action described in plaintiff's Demand Letters, nominal defendant may within this ninety (90)-day period file a Supplemental Motion to Dismiss with a brief;

(4) If the steps described in paragraph (3) are not taken, the nominal defendant's Motion to Dismiss, as to plaintiff's Fraudulent Job Placement Claim and plaintiff's Incentive-Based Corporation Claim, is denied;

(5) If the nominal defendant files a Supplemental Motion to Dismiss pursuant to paragraph (3) of this Order of Court, within thirty (30) days plaintiff shall file a response, with a brief, to the Supplemental Motion to Dismiss; and

(6) An argument on the nominal defendant's Supplemental Motion to Dismiss will be held on December 3, 2013 at 1:30 P.M. o'clock.

BY THE COURT:

DATED:  July 16, 2013

_____
WETTICK, J.

*Copies mailed. (cc) 7/16/13*

# G&E

**Grant & Eisenhofer P.A.**

1201 North Market Street
Wilmington, DE 19801
Tel: 302-622-7000 • Fax: 302-622-7100

485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8500 • Fax: 646-722-8501
www.gelaw.com

1920 L Street, N.W., Suite 400
Washington, DC 20036
Tel: 202-386-9500 • Fax: 202-386-9505

Direct Dial: 646-722-8505
Email: jeisenhofer@gelaw.com

August 19, 2011

**VIA UPS OVERNIGHT MAIL**

Board of Directors
c/o J. Devitt Kramer, Senior Vice President, General Counsel and Secretary
Education Management Corporation
210 Sixth Avenue
33rd Floor
Pittsburgh, PA 15222

Re:    **Shareholder Demand For Board Action**

Dear Members of the Board:

This firm represents the Oklahoma Law Enforcement Retirement System (the "Stockholder"), holder of 25,800 shares of common stock of Education Management Corporation ("EDMC" or the "Company"). I write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take action to remedy the harm to EDMC as a result of the wrongful conduct described below.

On August 8, 2011, The U.S. Department of Justice ("DOJ") brought a complaint against EDMC for violations of the False Claims Act, 31 U.S.C. § 3729-33. *See United States of America v. Education Management Corp.*, 2:07-cv-461-FRM (W.D. Pa.). The DOJ Complaint, which was filed in intervention in a qui tam action brought by LynnToya Washington, a former employee of EDMC, and Michael T. Mahoney, another former EDMC employee, alleges, *inter alia*, that EDMC's compensation practices violate Title IV of the Higher Education Act of 1965's ("HEA") ban on incentive-based compensation.[1] The DOJ seeks to recover treble damages, civil penalties and costs pursuant to the False Claims Act, 31 U.S.C. §§ 3729-33. In

---

[1] The qui tam litigation was originally brought by the relators in 2007. Under the provisions of the False Claims Act, that action was sealed until such time as the government determined whether or not to intervene in the action. The government's decision was publicly disclosed on August 8, 2011 with the filing of its complaint in intervention.

**ATTACHMENT 1**

Board of Directors
c/o J. Devitt Kramer, Senior Vice President, General Counsel and Secretary
Education Management Corporation
August 19, 2011
Page 2

addition, the DOJ is joined by the Attorneys General of California, Florida, Indiana and Illinois, who each seek to recover treble damages, fines, costs and other monetary relief under their respective states' false claims laws. These complaints are collectively referred to herein as the Government/Qui Tam Actions.

The HEA prohibits post-secondary educational institutions who receive funding or whose enrolled students receive funding under the HEA from paying compensation to their employees tied in any way to procuring new student enrollments. Specifically, Section 1094 of the HEA prohibits schools receiving federal grants or federally guaranteed loans from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of financial assistance . . ." 20 U.S.C. § 1094(a)(20). Institutions receiving funds under the HEA must sign a program participation agreement ("PPA") stating that they will comply with all applicable statutes and regulations promulgated thereunder. The institutions must also conduct an independent audit each year and submit the results to the Department of Education ("DOE") confirming compliance with such statutes and regulations each year. Since 2002, EDMC has signed PPAs and provided documentation to the DOE indicating that it has complied with all applicable HEA rules and regulations. During that same time frame, EDMC or its enrolled students have received over $11 billion in grants and federally-backed loans from the federal government.

EDMC's PPA statements falsely certified EDMC's compliance with the HEA. Since at least July 1, 2003 to the present, EDMC has violated Section 1094 of the HEA by compensating its Assistant Directors of Admissions ("ADA") and their supervisors based upon the number of new students they are responsible for enrolling in EDMC institutions. At EDMC institutions, the ADAs are responsible for recruiting applicants for admission, achieving enrollment and start rate goals and securing and managing new student enrollment activities. The ADAs' compensation system is set forth in the Admissions Performance Plan, which states that compensation for ADAs will be based upon a manager's evaluation of an ADA's performance "combined with the number and types of new students you recruited over the past 12 months. . . . The number of new students you recruited over the previous 12 months is converted into points, and the point total determines the salary range." The Admission Performance Plan also includes a salary chart which sets forth the number of "new student points" required to achieve a particular salary level. Once an ADA has been employed for a year, his or her compensation is based solely on the salary chart, i.e., on new student enrollments.

In addition, ADAs are given commissions, bonuses and awards based solely on obtaining new student enrollments. For example, the top 10% of ADAs, based upon new student enrollments, are given all-expenses-paid vacations to places such as Cancun, Mexico or Las

Board of Directors
c/o J. Devitt Kramer, Senior Vice President, General Counsel and Secretary
Education Management Corporation
August 19, 2011
Page 3

Vegas. Other high-performing ADAs, as measured solely by new student enrollment, are given gifts, such as tickets to Major League Baseball games and amusement parks, gift certificates and free lunches.

EDMC's compensation system for ADAs is not a harmless violation of the HEA. ADAs are encouraged to enroll students without thoroughly reviewing their academic transcripts and admissions materials in order to determine whether they are qualified to attend the particular institution or online program. As a result, students have enrolled in EDMC programs who are academically unqualified, including some who cannot write coherently, or who appear to be under the influence of drugs, or who enroll in online programs without owning a computer. Although applicants must submit a high school transcript and complete a 150-word essay, all student applications are approved regardless of high school grade point average or the quality of the written essay.

The end goal of this system is to qualify the recruited students for financial aid packages from the federal government and state governments. ADAs work with the recruited students during the financial aid application process to help them complete their forms. At that point, EDMC Financial Aid Officers ("FAO") calculate a financial aid package based on a DOE formula and inform the student of the award, which the student can accept or reject. If a student initially wishes to reject the package, it is the ADA's job to convince the student to accept the package. The ADAs are also instructed to make sure the package will cover the student's entire tuition, even if that means the student will have to change his or her status from full-time to part-time. Once a student accepts a package, the FAO certifies the student's loans and grants which are then submitted to the DOE.

EDMC continually measures the ADA's performance against new student enrollment quotas established for each ADA ("Student Start Plan"). The Student Start Plans are provided to the ADA's supervisor by higher level corporate employees. The ADAs are also given a "plan to make plan," which sets forth recruitment strategies to gain the desired number of new student enrollees. EDMC closely tracks and maintains the data regarding the actual number of student enrollments each ADA obtains and measures that against the quotas established in the Student Start Plans. So called "underachievers" are admonished to meet their quotas, and ADAs are regularly terminated for failure to meet their quotas.

The pervasiveness of tying of ADA compensation to student enrollment is demonstrated by the allegations of Mr. Mahoney, one of the relators in the Government/Qui Tam Actions. Mr. Mahoney was the Director of Training for EDMC's online division. When he initially interviewed for the position with the Vice President of Admissions for EDMC's Online Higher Education division, he was told that EDMC's enrollment goals were to increase the number of

Board of Directors
c/o J. Devitt Kramer, Senior Vice President, General Counsel and Secretary
Education Management Corporation
August 19, 2011
Page 4

students more than ten-fold in five years; to nearly double the average number of new students each ADA enrolled per week and to double the amount of ADAs within two years. Furthermore, he was informed that EDMC would fire ADAs who did not meet their new student enrollment quotas. Mr. Mahoney was then charged with designing a training program to recruit new students based upon his extensive sales experience in the automotive industry, employing techniques to "close the sale." Mr. Mahoney was never made aware of Section 1094's ban on incentive-based compensation, and thus none of the training materials he designed made reference to it.

The conduct described above pervaded the entire EDMC system and was known to members of higher management. Particular members of higher management were well aware of the HEA's ban on tying compensation to student recruitment, as they had previously been employed in the University of Phoenix system when it was forced to pay $9.8 million to the DOE for its improper recruiting and compensation practice. Todd S. Nelson, Chief Executive Officer of EDMC since February 2007, was formerly the CEO and Chairman of the Board of Directors of Apollo Group, Inc., which owned the University of Phoenix. In addition to Mr. Nelson, several former University of Phoenix employees were subsequently employed by EDMC, including current executives Robert Carroll (Executive Vice President and Chief Information Officer), Anthony F. Digiovanni (Senior Vice President – Marketing and Admission) and John Kline (President, EDMC Online Higher Education).

As a result of this wrongful conduct, EDMC is subject to enormous fines and other penalties for its false statements to the federal government which allowed it to obtain $11 billion in Title IV funding. EDMC also faces substantial liability for making similar false statements to the governments of California, Florida, Indiana and Illinois. The Attorney General of California alleges that EDMC received over $93 million in funding from 1999-2010 and seeks an unspecified amount in damages, including treble damages. The Attorney General of Florida alleges that EDMC received over $5 million in 2006, 2007, 2009 and 2010, and seeks treble damages and up to $11,000 in civil penalties per false claim submitted. The Attorney General of Indiana alleges that EDMC received over $12 million in funding from 2003 to the present and seeks treble damages and at least $5,000 in fines and penalties for each false claim submitted. Finally, the Attorney General of Illinois alleges that EDMC received over $27 million in funding from 2004-2011 and seeks treble damages and a fine of $11,000 per false claim submitted.

The Company has valuable claims against its officers and directors who committed or negligently disregarded the conduct described herein. Your fiduciary duties as directors of EDMC require you to investigate and prosecute potential claims for recoupment of any damages suffered by the Company as a result of these violations. Failing or refusing to cause the Company to exercise its rights to seek recoupment of any fines or penalties that may be paid to

Board of Directors
c/o J. Devitt Kramer, Senior Vice President, General Counsel and Secretary
Education Management Corporation
August 19, 2011
Page 5

the federal or state governments would be flatly inconsistent with your fiduciary duties and may expose you to liability. Accordingly, the Stockholder demands that the Board:

(i)    commence a civil action against senior executives to recover for the benefit of the Company all damages that flow to the Company as a result of the Government/Qui Tam Actions, including any fines or penalties that it may be required to pay, all costs of defending the Company, and all costs of remediating the wrongful behavior;

(ii)   immediately overhaul the Company's admissions and recruiting personnel compensation structure such that no portion of compensation earned by ADAs – including any bonuses or other awards – is based on the number of new student enrollments that ADA achieves;

(iii)  immediately adopt and establish policies and procedures that eliminate improper new student recruitment tactics, including, but not limited to, aggressive techniques designed to encourage unqualified students to enroll in EDMC programs and to seek and obtain government funding to pay for such education; and

(iv)   immediately establish internal controls sufficient to ensure that if such wrongful compensation and recruiting practices occur at the Company in the future, those practices will be brought promptly to the attention of the Board of Directors so that they can be eliminated before they cause the Company any legal liabilities.

The Stockholder reserves its right to commence a derivative action on behalf of the Company seeking appropriate relief if the Board has not commenced an action and taken the other measures as demanded herein within 120 days of receipt of this letter.

Very truly yours,

Jay W. Eisenhofer

JWE/rm



**Grant & Eisenhofer P.A.**

123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000 • Fax: 302-622-7100

485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8500 • Fax: 646-722-8501

www.gelaw.com

1920 L Street, N.W., Suite 400
Washington, DC 20036
Tel: 202-386-9500 • Fax: 202-386-9505

Jay W. Eisenhofer
Managing Director
Tel: 646-722-8505
jeisenhofer@gelaw.com

January 19, 2012

**VIA EMAIL AND OVERNIGHT MAIL**

R. Todd Cronan, Esquire
Goodwin Proctor LLP
Exchange Place
Boston, MA  02109

Re: <u>Shareholder Demand For Board Action</u>

Dear Mr. Cronan:

This firm represents the Oklahoma Law Enforcement Retirement System ("OLERS"), a holder of common stock of Education Management Corporation ("EDMC" or the "Company"), in connection with the demand ("Demand") OLERS made on the EDMC Board of Directors ("Board"), dated August 19, 2011. In your December 8, 2011 letter – the first communication we received that even acknowledged the Demand – you stated that the Board had formed a Litigation Committee "of disinterested directors" of the Company to investigate the issues raised in OLERS' demand. You also stated that the Litigation Committee was inviting OLERS to participate in the Committee's investigation by providing the Committee with information. On December 15, 2011, I wrote to you to accept your invitation to work with the Committee and to offer our assistance in the investigation. More than a month later (and five months after the Demand was made), I have not heard anything further from you.

I write today to both reiterate our willingness to work with the Committee, and to supplement the original Demand with additional allegations of wrongdoing that have recently come to our attention. The supplemental Demand issues are:

(1)     Failing Financial Health Causes An Increase In Letters Of Credit That Must Be Posted

In EDMC's fiscal year 2011, EDMC failed to achieve the minimum level of composite score based on three ratios the U.S. Department of Education uses to measure the financial health of institutions that receive Title IV funds. As a result, the Department of Education required EDMC to raise the amount of its letter of credit that it posted in order to receive Title IV funds from $259.8 million (or 10% of funds received) to $361.5 million (or 15% of funds received).

**ATTACHMENT 2**

R. Todd Cronan
January 19, 2012
Page 2

This failure to meet the composite score of financial health, and the resulting increase in required letters of credit, forced the Company to enter into a new $150 million Letter of Credit Facility with Bank of America.

While management was able to cover this situation this year with a new credit facility, the shareholders may not be so lucky in future years. EDMC's overall financial well-being continues to be endangered by the illegal practices detailed in the original Demand letter and the exorbitant debt that remains outstanding after the $3.4 billion leveraged buy-out of the Company in 2006. EDMC runs a substantial risk that the Department of Education will require it to post letters of credit in even higher amounts. The Department has the authority to raise the requirement to 100% of Title IV funds the Company receives. If action is not taken swiftly to correct the problems we have detailed in the Demand and this supplemental demand, the regulatory requirements the problems engender will soon overwhelm the Company and will result in even greater losses.

(2)    Fraudulent Practices Endangering Accreditation Of Company Institutions

Through a U.S. Senate investigation of for-profit universities, it was revealed that EDMC systematically falsifies job placement data for its graduates in order to maintain accreditation for its institutions. Accreditation agencies require certain levels of placement of graduates in their chosen fields in order to receive or maintain accreditation. Apparently unable to meet those levels honestly, EDMC has taken to falsifying its job placement data. Graduates are routinely cajoled into signing employment verification forms stating that they are working in their chosen fields or are otherwise using the skills they learned at Company institutions when, in reality, they are not. An example given by a career placement counselor employed at EDMC's Argosy University is that a graduate of the residential planning program was deemed to have been placed in a job in her field while she was working as a cashier at a gas station, because arrangement of candy bars for sale supposedly utilized her program skills. A graduate of the art program was deemed to be working in the art field as a counter-person at Starbucks because the graduate helped write daily specials signs. A graduate earning $8000 per year was documented as earning $25,000 per year because $25,000 was the average salary in the area for that type of position.

The abuses in job placement statistics at EDMC are not the work of rogue counselors. These employees are repeatedly told by supervisors that they have quotas of job placement to meet or they will be fired. The manipulations of data, such as those noted above, are clearly tolerated and even encouraged at EDMC. A counselor reported these abuses to her superiors, only to find nothing was done about them. It is time for the Committee to investigate these practices and bring them to an end before they cause further harm to the Company.

R. Todd Cronan
January 19, 2012
Page 3


As I stated above and in my December 15, 2011 letter, we stand ready to assist the Committee in its investigation of the matters raised in the original Demand and those issues highlighted in this supplemental demand. If the Committee continues to move at a glacial pace with its investigation and continues to ignore OLERS' commitment to assist it, OLERS will address the wrongdoing it has brought to the Committee's attention in this demand and the original Demand in another manner. We hope that you and the Committee will see fit to involve us in the investigation immediately. If we have not heard from you by February 20, 2012 that the Committee would like to work with us, OLERS will pursue the matter outside of the Company.

Very truly yours,

Jay W. Eisenhofer

JWE/dm