# EXHIBIT 6

"

# EDUCATION MANAGEMENT CORPORATION

## SUPPLEMENTAL REPORT OF THE LITIGATION COMMITTEE OF EDUCATION MANAGEMENT CORPORATION

### Dated October 15, 2013

Leo F. Mullin
Paul J. Salem

R. Todd Cronan
Paul E. Nemser
Brian M. LaMacchia
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109

LIBA/2440150.1

# TABLE OF CONTENTS

**Page**

I.   **Executive Summary** ..........................................................................................1

    A.   Summary of the Supplemental Investigation Requested by the Court ....................1

    B.   Summary of the Litigation Committee's Response and Supplemental Findings..........................................................................................................2

II.   **Background of the Litigation Committee's Supplemental Investigation** ....................4

III.  **The Litigation Committee's Process in Response to the Court's Order in the OLERS Action** ..............................................................................................7

    A.   Retention of an Outside Expert.............................................................................7

    B.   Actions Taken by the Litigation Committee in Response to the Court's Order in the *OLERS* Action ................................................................................9

IV.  **Summary of the Litigation Committee's Findings** .......................................................10

    A.   Findings on the Incentive Compensation Claim ...................................................10

        1.   Was ADA Compensation Based "Solely" on Enrollments under the Plan?...................................................................................................... 13

        2.   To What Extent Is Each of the Five Quality Factor Categories Used?...................................................................................................... 16

        3.   Does the Number of Quality Points Awarded to ADAs Operate Independently of the ADAs' New Student Point Range?........................ 17

        4.   Is the Number of New Students a Significant Factor in Determining the Compensation for Six Month-Eighteen Month ADAs?................................................................................................... 19

    B.   Findings on the Job Placement Claim..................................................................21

        1.   External and Internal Audits of Placement Records ................................. 24

            a.   Historical External Audits Have Repeatedly Confirmed that EDMC's Procedures Surrounding Placement Data Are Effective...................................................................................... 24

## TABLE OF CONTENTS
### (continued . . .)

| | Page |
|---|---|

        b.    School Audits by the Internal Audit Department Have Confirmed that Documentation Supporting Placement Statistics Is Consistently Maintained ........................................... 28

    2.    Dr. Topel's Audit and Statistical Analysis of Job Placement Determinations Found No Evidence or Indication that EDMC Systematically Falsified Job Placement Statistics .................................... 31

**V.**    **The Litigation Committee's Decision Not to Take Action in Response to OLERS's Demand Letters or Amended Complaint** ......................................................34

**APPENDIX 1:**    **Detailed Description of EDMC's Policies Regarding Job Placement Statistics**

I.     **EXECUTIVE SUMMARY**

This is the Supplemental Report of a committee (the "Litigation Committee" or the "Committee") of the Board of Directors of Education Management Corporation ("EDMC" or the "Company") and is submitted in the shareholder derivative action captioned *Oklahoma Law Enforcement Retirement System v. Todd S. Nelson, et al.*, which is pending in the Court of Common Pleas for Allegheny County, Pennsylvania. In a July 16, 2013 Order (the "Order"), the Court granted in part and denied in part motions to dismiss filed by the Company and its directors. With respect to the two claims in the amended complaint that were not dismissed, the Court ruled that the Committee "may within ninety (90) days conduct a more complete investigation as described in the Memorandum accompanying this Order of Court and may file a Supplemental Report describing the investigation (including results). . . ." Order ¶ 3. In response to the Court's invitation, the Committee has conducted additional investigation and submits this Supplemental Report.

A.     SUMMARY OF THE SUPPLEMENTAL INVESTIGATION REQUESTED BY THE COURT

In its Order, the Court found that the Litigation Committee's members, EDMC directors Leo F. Mullin and Paul J. Salem, are "disinterested" and "independent" under the standards set forth in the American Law Institute's Principles of Corporate Governance (the "ALI Principles") and adopted by Pennsylvania courts. The Court also found that they were assisted by counsel, that they issued a written report, and that they rationally believed that their decision was in the best interests of the Company. Although the Court dismissed two of the four claims brought by plaintiff Oklahoma Law Enforcement Retirement System ("OLERS"), the Court also requested further investigation into OLERS's remaining claims: (i) the Incentive Compensation Claim, and (ii) the Job Placement Claim.

The Incentive Compensation Claim[1] alleges that EDMC's compensation plan used to determine compensation for Assistant Directors of Admissions ("ADAs") between 2003 and 2011 (the "Plan") violated the Higher Education Act's ban on compensating recruiters based on success in obtaining student enrollments, known as the incentive compensation ban. In its Order, the Court did not conclude that the Plan, *as designed*, violated the incentive compensation ban, but it nevertheless requested a statistical analysis as to whether the Plan, *as implemented*, violated the ban.

The Job Placement Claim alleges that EDMC inflated graduate job placement statistics to increase student enrollments and meet reporting requirements of accrediting agencies.[2] The Court acknowledged the Committee's description of internal controls at EDMC to prevent reporting of manipulated job placement statistics, but requested that the Committee randomly sample job placement records to confirm that those internal controls were effective.

### B.    SUMMARY OF THE LITIGATION COMMITTEE'S RESPONSE AND SUPPLEMENTAL FINDINGS

The Litigation Committee has conducted a thorough and careful supplemental investigation into the Incentive Compensation Claim and the Job Placement Claim as requested by the Court. During this process, members of the Litigation Committee were advised by independent legal counsel at Goodwin Procter LLP, as well as outside economics and statistics expert, Dr. Robert J. Topel of the University of Chicago. Dr. Topel's analyses are set forth in a

---

[1] Allegations relating to the Incentive Compensation Claim were addressed under the Title IV Claim in the Litigation Committee's May 31, 2012 report, filed with Defendants' Preliminary Objections in the form of a Motion to Dismiss the Derivative Amended Complaint, Pursuant to Section 7.08 of the American Law Institute's Principles of Corporate Governance (October 17, 2012) (hereafter "May 31, 2012 SLC report").

[2] "Accrediting agencies, which are private educational associations of regional or national scope, develop evaluation criteria and conduct peer evaluations to assess whether or not those criteria are met." U.S. Dep't of Ed., "The Database of Accredited Postsecondary Institutions and Programs," available at http://ope.ed.gov/accreditation (last visited September 25, 2013). According to the DOE, "the goal of accreditation is to ensure that education provided by institutions of higher education meets acceptable levels of quality."

separate report entitled, "Audit of Education Management Corporation Assistant Director of Admissions' Compensation and Career Service Job Placement Information," (hereafter "Topel Report"), attached as Exhibit 2 to Defendants' Notice of the Special Litigation Committee's Supplemental Investigation in Response to the Court's Memorandum and Order on Preliminary Objections in the Form of Motions to Dismiss the Derivative Amended Complaint.

As is explained in the body of this Supplemental Report and in the Topel Report, neither Dr. Topel nor the Committee found any evidence supporting OLERS's contentions regarding incentive compensation or job placement. Further, no evidence corroborated OLERS's claims in the Demand Letters and the amended complaint that pervasive misconduct infected the EDMC system or was sanctioned by senior management. As to the Incentive Compensation Claim, Dr. Topel performed statistical analyses on compensation data for ADAs evaluated under EDMC's compensation Plan between 2003 and 2011, the period the Plan was in effect. Those analyses confirm that the Plan, *as implemented*, complied with the Safe Harbor and did not violate the incentive compensation ban. On the Job Placement Claim, Dr. Topel's and the Committee's investigation confirmed that EDMC's internal controls surrounding gathering, analyzing, and reporting job placement data are not only strong, but work as designed. Neither Dr. Topel's analyses of randomly selected job placement records nor the Committee's parallel investigation found any evidence or indication that EDMC systematically falsified job placement statistics, as OLERS alleges.

Thus, the further investigation detailed in this Supplemental Report and Dr. Topel's separate report, filed herewith, confirm the Litigation Committee's previous conclusions in its May 31, 2012 report, namely, that (i) the Company has a robust and effective set of internal controls that are properly designed and implemented to identify, deter and remediate the types of

allegedly deceptive and questionable practices referred to in OLERS' Demand Letters and the amended complaint; (ii) these internal controls are supported by a properly designed and staffed corporate governance structure; and (iii) there has been no breach of fiduciary duty by the directors of EDMC in connection with their oversight of the internal control and corporate governance systems in place at EDMC.  Accordingly, the Litigation Committee has determined, after both the initial investigation and this supplemental investigation, that it would not be in the best interests of the Company or its shareholders to take the actions demanded in the Demand Letters or the amended complaint.  The Committee, therefore, believes that what remains of OLERS's amended complaint should be dismissed under the business judgment rule.

## II.    BACKGROUND OF THE LITIGATION COMMITTEE'S SUPPLEMENTAL INVESTIGATION

Education Management Corporation ("EDMC" or the "Company") is among the largest providers of private post-secondary education in North America with 110 locations in the United States and Canada, as of December 31, 2012.  Headquartered in Pittsburgh, Pennsylvania, and founded there in 1962, EDMC employs approximately 24,000 full-time, part-time, and adjunct faculty and staff, and has approximately 132,000 students enrolled in its four educational systems:  The Art Institutes, Argosy University, Brown Mackie Colleges, and South University.[3] EDMC offers a broad range of undergraduate and graduate academic programs, ranging from doctoral degrees to specialized non-degree diplomas.  These programs include design, media arts, health sciences, psychology and behavioral sciences, culinary, fashion, business, legal, education, and information technology.

---

[3] Employment and enrollment data as of October 2012.  *See* http://www.edmc.edu/About/(last visited October 11, 2013).

As is described in the Committee's May 31, 2012 report, the Board of Directors of

EDMC formed the Litigation Committee in November 2010 pursuant to Section 1731 of the

Pennsylvania Associations Code, Title 15 Pa. C.S., including Subpart B known as the Business

Corporation Law of 1988 and Section 3.1 of the Company's Amended and Restated Bylaws.

The Board delegated to the Litigation Committee the power and authority to: review, analyze,

and investigate any allegations of misconduct or breach of fiduciary duty at EDMC; engage legal

counsel and other experts to conduct the investigation; and determine the appropriate actions, if

any, the Company should pursue in response to related inquiries or demands from shareholders.[4]

Consistent with this delegation of authority, the Litigation Committee has investigated the

questions raised by OLERS's allegations, as well as the questions posed by the Court.

Thus, when EDMC received certain demand letters sent on behalf of OLERS, a purported

shareholder in EDMC, dated August 19, 2011 and January 19, 2012 (collectively, the "Demand

Letters"), the Litigation Committee on March 6, 2012 and May 24, 2012, provided OLERS with

the findings of its investigation to the allegations in the Demand Letters.[5]

Before the Litigation Committee informed OLERS of its completed findings, however,

OLERS sued EDMC's Board, claiming that its directors breached their fiduciary duties and that

the Litigation Committee was not disinterested or independent and failed to adequately

investigate OLERS's allegations. On September 27, 2012, OLERS filed an amended complaint,

with new allegations related to two claims pertinent to this Supplemental Report:

---

[4] The Litigation Committee was formed in response to a report by the United States Government Accountability Office ("GAO"). The Committee also previously undertook an extensive review of EDMC's internal controls, in response to allegations made in certain demand letters received by the Company in 2010 from shareholders other than OLERS. This Supplemental Report assumes familiarity with OLERS's Demand Letters and the report of the GAO investigation related to for-profit colleges, and other litigation pending or dismissed against EDMC related to the allegations in the GAO report, as described in the May 31, 2012 SLC report.

[5] A copy of the Demand Letters and related correspondence is contained in the Appendix to the May 31, 2012 SLC report.

*First*, the amended complaint claims that the Plan utilized by EDMC to compensate ADAs violated Title IV of the Higher Education Act of 1965's ban on incentive compensation (the "Incentive Compensation Claim"). The factual basis for the Incentive Compensation Claim rests on allegations made against EDMC, in its corporate capacity, in two pending federal court actions brought against the Company for alleged violations of the False Claims Act. *See United States, et al., v. Education Management Corp., et al.*, 2:07-cv-0461-TFM (W.D. Pa.); *Sobek v. Education Management Corp., et al.*, 2:10-cv-0131-TFM (W.D. Pa.).[6]

*Second*, the amended complaint asserts that EDMC "systematically falsified job placement data for its graduates in order to maintain accreditation for its institutions" (the "Job Placement Claim"). The factual basis offered for this claim is certain testimony provided by an ex-EDMC employee, Kathleen Bittel, before a U.S. Senate Committee, as well as allegations made in the *Sobek* litigation.

On July 16, 2013, the Court issued its Order on EDMC's motion to dismiss the amended complaint, rejecting most of the arguments made by OLERS, granting the Committee an opportunity to investigate more detailed allegations made for the first time in OLERS's amended complaint, and requesting that the Committee address specific questions posed by the Court. In particular, the Court found "no merit to plaintiff's contention that the Litigation Committee was not disinterested and not independent." Order at 13.[7] The Court also found that the Litigation Committee was assisted by counsel, prepared a written report, and "rationally believed that its decision was in the best interests of the corporation (i.e., acted in good faith)." *Id.* at 14.

---

[6] The individual members of EDMC's Board of Directors are not named as defendants in either litigation.

[7] As "disinterested" and "independent" directors under the standards set forth in the ALI Principles, the Committee members' decisions are subject to the protections offered to directors of Pennsylvania corporations under the business judgment rule. *See* Pa. C.S. § 1715(d).

Although the Court dismissed two of OLERS's claims, the Court also postponed a ruling on EDMC's Motion to Dismiss OLERS's Incentive Compensation Claim and Job Placement Claim and posed additional questions to the Committee related to those Claims.  In particular, as to the Incentive Compensation Claim, the Court requested a statistical analysis of compensation to determine whether EDMC's Plan was implemented correctly.  As to the Job Placement Claim, the Court requested a review of sampled placement records to determine whether the internal controls described by the Litigation Committee were effective.  Because the Demand Letters "contained mostly general descriptions of alleged improper practices" and "the allegations set forth in [OLERS]'s 276-paragraph Amended Complaint" were "not available to the SLC," the Court "g[a]ve the SLC the opportunity to supplement its Report prepared before the Amended Complaint was filed" within 90 days.  *Id.* at 14.

III.    **THE LITIGATION COMMITTEE'S PROCESS IN RESPONSE TO THE COURT'S ORDER IN THE _OLERS_ ACTION**

A.    RETENTION OF AN OUTSIDE EXPERT

On July 25, 2013, the Committee filed with the Court a notice of its intention to file a supplemental report within 90 days of the Court's Order.  Thereafter the Committee conducted a supplemental investigation to answer the Court's questions and to investigate OLERS's allegations in the amended complaint.  The Committee continued to engage independent legal counsel at Goodwin Procter LLP to assist in the supplemental investigation.  In addition, the Committee sought the assistance of an expert who has substantial expertise and experience in statistical evaluation techniques, particularly in the labor and employment context.  After careful consideration of candidates, the Committee retained outside expert Dr. Robert H. Topel of the University of Chicago to analyze data regarding the Incentive Compensation Claim and the Job Placement Claim.

Dr. Topel is extremely well-qualified to address the statistical and employment-related questions posed by the Court in its Order. Dr. Topel is a distinguished economist specializing in a number of areas related to economics and statistics, including microeconomics, which is the study of markets, pricing, and firm and industry behavior. He is presently the Isidore Brown and Gladys J. Brown Distinguished Service Professor of Economics at the Booth School of Business, at the University of Chicago. He is also the Director of the George J. Stigler Center for the Study of the Economy and the State, and the Co-Director of the Energy Policy Institute at Chicago, both of which are at the University of Chicago. He is a Research Associate at the National Bureau of Economic Research, and a Fellow of the Stanford University Center for the Study of Poverty and Inequality. In addition to the University of Chicago, Dr. Topel has taught at the Department of Economics at the University of California, Los Angeles. His courses have included Markets and Prices, Economic Theory, Labor Markets, Empirical Methods in Economics, Compensation and Personnel Policies, Industrial Organization and Antitrust, Business Strategy, and Law and Economics. He received his B.A. with High Honors from the University of California, Santa Barbara, and his Ph.D. from the University of California, Los Angeles. He has testified as an expert in numerous litigations calling for expertise in economics and statistical analysis.

Dr. Topel also has achieved great success in his field. He has held various visiting and research positions with the Board of Governors of the Federal Reserve, the World Bank, the Economics Research Center of the National Opinion Research Center, the Brookings Panel on Economic Activity, the Rand Corporation, and the Center for the Study of the Economy and the State. In 2004, he was elected a Fellow of the Society of Labor Economists. In 2005, he received the Eugene Garfield Award for contributions to the economics of medical research, and

8

in 2007, he received the Kenneth Arrow Award from the International Health Economics Association. He also has authored or co-authored more than 60 books and articles on economic and statistical analysis, has authored six reports for the Department of Labor, and has testified twice before U.S. Senate Committees.

Dr. Topel's experience is described in more detail in his report, which is filed along with this Supplemental Report. *See* Topel Report at 1-2, App'x A.

**B.**   **ACTIONS TAKEN BY THE LITIGATION COMMITTEE IN RESPONSE TO THE COURT'S ORDER IN THE *OLERS* ACTION**

The Litigation Committee conducted a thorough and careful review of the issues identified by the Court's Order and OLERS's amended complaint. Dr. Topel conducted statistical analyses of nearly seven years' worth of admissions personnel compensation data and analyzed records from 1,250 randomly selected graduate job placement records spanning the last four years at EDMC. In addition, independent legal counsel at Goodwin Procter LLP conducted additional witness interviews and reviewed hundreds of pages of documents pertaining to the issues in the supplemental investigation. The Litigation Committee and its counsel met periodically to discuss and analyze the information collected through the investigative process. The Litigation Committee also provided guidance and input to counsel on the matters under review, including the conclusions reached in this Supplemental Report.

It should be noted that since the Court's Order was issued, counsel for OLERS has not provided any additional information for the Litigation Committee to consider. Accordingly, the Litigation Committee's supplemental investigation is based on the information that OLERS has previously sent and on the Court's Order.

9

## IV.  SUMMARY OF THE LITIGATION COMMITTEE'S FINDINGS

### A.  FINDINGS ON THE INCENTIVE COMPENSATION CLAIM

In 1992,[8] Congress amended the Higher Education Act ("the Act") to preclude schools whose students receive federal student financial aid from paying employees incentive compensation based on student enrollment, known as the incentive compensation ban.[9] In 2002, the Department of Education ("DOE") promulgated twelve "safe harbors" to the Act, which the DOE described as "compensation arrangements that do not run afoul of the incentive compensation prohibition" of the Act. 67 Fed. Reg. 67054. One of the safe harbors permitted colleges and universities to provide recruiters with salary or hourly wage adjustments based on the number of students enrolled, so long as student placement was not the sole compensation factor:

> Activities and arrangements that an institution[10] may carry out without violating the [Act] include, but are not limited to:

---

[8]  The Committee's May 31, 2012 report set forth in detail the legal background on the incentive compensation ban, the safe harbors to the ban, and the development and design of the Plan. This report, therefore, assumes the reader's familiarity with the Committee's prior reports and only highlights the background necessary to address the questions raised by the Court.

[9]  The Act specifically precludes:

> Provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities.

20 U.S.C. § 1094(a)(20).

[10]  An "institution" under Title IV "has a written agreement with the Secretary of Education that allows the institution to participate in any of the Title IV federal student financial assistance programs (other than the State Student Incentive Grant (SSIG) and the National Early Intervention Scholarship and Partnership (NEISP) programs)." Glossary, Integrated Postsecondary Education Data System, Nat'l Center for Ed. Statistics, available at http://nces.ed.gov/ipeds/glossary/index.asp?id=847 (last visited September 26, 2013). EDMC includes multiple institutions. Each institution may include more than one education system. For example, certain locations of The Art Institutes and certain locations of Brown Mackie Colleges may be part of the same institution for Title IV purposes. "School," however, is not so defined, but in this Supplemental Report it is used to refer to particular locations of EDMC's institutions, such as, The New England Institute of Art or Brown Mackie College—Lenexa. "Program" as used in this report refers to a particular program of study at a school.

10

(A)    The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based **solely** on the number of students recruited, admitted, enrolled, or awarded financial aid. . . .

34 C.F.R. § 668.14(b)(22)(ii)(A) (eff. July 1, 2003 to June 30, 2011) (the "Safe Harbor") (emphasis added). Thus, this particular Safe Harbor permitted recruiters' salaries to be adjusted based on student enrollments provided that enrollments are not the "sole" factor considered.[11]

After the Safe Harbor was promulgated in 2002, EDMC drafted and adopted the Plan, versions of which were in effect from 2003 until 2011. The Plan's design is described in detail in the Committee's May 31, 2012 report and in Dr. Topel's report. *See* May 31, 2012 SLC Report at 46-50; Topel Report at 6-10. In sum, the Plan based compensation of ADAs on a number of non-enrollment factors, including "quality" factors (such as "Job Knowledge," "Business Practices and Ethics," "Professionalism," "Customer Service," and "Initiative"), as well as other factors, including longevity, location of employment, and management responsibilities. May 31, 2012 SLC Report at 46-50; Topel Report at 6-10.

In its May 31, 2012 report, the Committee previously set forth its conclusion that the Plan complied with the Safe Harbor to the incentive compensation ban—both as designed and as implemented. In particular, the Committee concluded that the Plan, as designed, did not base ADA compensation "solely" on student enrollments. May 31, 2012 SLC Report at 44-51. As to

---

[11] OLERS, in its amended complaint, attempts to infer wrongdoing from the fact that EDMC phased out the Plan in 2011. *E.g.,* Am. Compl. ¶ 269 ("EDMC abandoned the Matrix in the middle of 2011, a tacit admission that EDMC's management recognized the Matrix as unlawful on its face, and knew it was not properly followed in practice."). However, as described in the Committee's prior report, on October 28, 2010, the DOE amended its regulations to repeal the safe harbors, including the Safe Harbor upon which EDMC's Plan was based, Section 668.14(b)(22)(ii)(A). Those amendments went into effect in July 2011. Prior to the Safe Harbor's repeal, EDMC implemented a new admissions compensation plan that adhered to the requirements of the Act following the repeal of the Safe Harbors. Thus, EDMC's decision to phase out the Plan was plainly motivated by its desire to comply with a change in regulation. Nothing found during the Committee's investigation suggests otherwise.

11

OLERS's allegation that the Plan, as implemented, ran afoul of the incentive compensation ban,

the Committee concluded otherwise, summarizing its investigation as follows:

> The Committee also conducted an in-depth review of whether the Plan, "as implemented," violated the Act. This phase of the investigation included interviews of over 30 individuals who had hands-on experience implementing the Plan over many years. The investigation focused on the assertion that the Plan was a "sham" as implemented and that salaries for admissions personnel were based "solely" on new student enrollments, without reference to other "soft" factors. The Committee did not find factual support for this assertion. Indeed, the evidence developed throughout the investigation presents a compelling case to the contrary. The Committee's investigation also identified a series of internal controls, including standardized training materials and policy statements, that support the conclusion that EDMC's senior management and directors had a good faith basis to believe that the Plan, as implemented, complied with the Act.

*Id.* at 43; *see also id.* at 51-58.

In response to the Committee's investigation, the Court asked the Committee to conduct a

statistical analysis of the Plan *as implemented. Id.* at 27-28. In addition to analyzing whether

ADA compensation was based "solely" on new student enrollments, the Court requested analysis

of the following questions: "(1) to what extent is each of the five [quality factor] categories used;

(2) does the number of quality points awarded to ADAs operate independently of the ADAs'

new student point range, or are ADAs who score higher on the new student point range far more

likely to achieve higher quality-point scores; (3) is the number of new students a significant

factor in determining the compensation for six month-eighteen month ADAs?" Order at 29.

At the Committee's request, Dr. Topel analyzed the compensation data available for

ADAs reviewed under the Plan from 2003 through 2011, a total of over 12,000 ADA

evaluations. As described further below and in Dr. Topel's report, Dr. Topel's analyses

demonstrate that there is no support for OLERS's allegations. Rather, the Plan was implemented

as designed, and it complied with the Safe Harbor.

12

### 1.    Was ADA Compensation Based "Solely" on Enrollments under the Plan?

The fundamental statistical analyses performed by Dr. Topel determined whether compensation of ADAs under the Plan was based "solely" on the number of students enrolled. Topel Report at 3, 10-29, 35-36, App'x D.  This question is the most fundamental to OLERS's allegations because if compensation of ADAs was not based "solely" on student enrollments under the Plan, then EDMC implemented the Plan in compliance with the Safe Harbor.  Further, if EDMC implemented the Plan in compliance with the Safe Harbor, the Committee has no basis for recommending that action be taken in response to OLERS's Incentive Compensation Claim, and the Court should dismiss that claim based on the business judgment rule.

As Dr. Topel's report explains in further detail, the Plan, as implemented, complied with the Safe Harbor because, during the Plan's tenure, "the total number of new students recruited did not solely determine compensation of ADAs at EDMC.  This was true both at EDMC as a whole and within each individual compensation matrix."  Topel Report at 3.  To reach this conclusion, Dr. Topel performed regression analyses of the qualitative and quantitative factors that can result in changed compensation under the Plan.  *Id.* at 11-24.  The crux of the regression analyses for purposes of the Safe Harbor was to look at which, if any, of the independent variables were statistically significant.  *Id.* at 16-21.  Those independent variables included a number of specific, non-enrollment-related factors—quality points, managing associate adjustments, years-of-service adjustments, location cost-of-living adjustments, and project associate adjustments—along with student enrollments or new student points.[12]  *Id.* at 19.  If even one of the independent variables other than student enrollments or new student points were

---

[12]  As discussed in the Litigation Committee's May 31, 2012 report, under the Plan, ADAs are awarded "new student points" for each student enrolled.  *See* May 31, 2012 SLC Report at 48.  Typically, ADAs were awarded three points per student enrolled, but the points might be greater or lesser depending on certain characteristics of the student enrolled (e.g., ADAs may have received greater new student points for international students).  *Id.*

13

statistically significant, then the Committee could be confident that a variable other than student

enrollments or new student points contributed to changes in ADAs' salaries under the Plan. *Id.*

at 19-21.

Dr. Topel's analyses found that, across EDMC, *every* variable contributing to

compensation under the Plan, including all non-enrollment-related variables (such as quality

points) was strongly statistically significant. *E.g., id.* at 17-21, Exs. 9-10. The probability that

non-enrollment factors under the Plan, taken together, had *no* impact on ADA compensation is

*less than 0.001%*. *Id.* at 20, *see id.* at 18-20, Exs. 9-10. In other words, it is all but certain—

based on EDMC's overall implementation of the Plan from 2003 to 2011—that non-enrollment

factors significantly influenced compensation and that student enrollments were not the "sole"

factor affecting compensation. *E.g., id.* at 19-22, Exs. 9-10, App'x D.[13]

Dr. Topel's regression analyses also estimated the impact of the independent variables on

change of ADAs' salaries. *Id.* at 18-21. Dr. Topel limited one of his regression models to only

one independent variable: number of students recruited. *Id.* at 18-21; Ex. 9. For all ADAs

reviewed under the Plan, Dr. Topel found that only about 45% of variation in the change in

ADAs' salaries could be explained by the number of students recruited. *Id.* Ex. 9. A second

regression model used all of the independent variables under the Plan—quality points, managing

associate adjustments, years-of-service adjustments, location cost-of-living adjustments, and

project associate adjustments, along with student enrollments and new student points. *Id.* Ex. 10.

That second model explained roughly 85% of the variation in the change in ADAs' salaries. *Id.*

at 18, Ex. 10. This means that the second regression model fitted the data very well, and that

---

[13] As noted in his report, Dr. Topel did not include in the above analyses reviews for those ADAs who were not reviewed under the Plan. *Id.* at 12. ADAs employed less one year and some ADAs employed less than eighteen months were not "on the Plan." *See id.* 9-10. Instead, these ADAs were not compensated based on student enrollments or new student points and instead were evaluated on quality factor points, as well as other non-enrollment factors. *Id.*

only a little variation (approximately 15%) could not be explained by the independent variables. *Id.* at 20-21. Thus, the two models together show that much of the variation in ADAs' change in salary can be attributed to variables other than student enrollments, such as quality points. *Id.* The results of these regression analyses held true, not only when looking at EDMC overall, but also when Dr. Topel analyzed the versions of the Plan used by specific schools, such as the Online Higher Education Division or The Art Institutes. *E.g., id.* at 20-22, Exs. 11.1, 11.2, App'x D.

Beyond the regression analyses, in his report, Dr. Topel demonstrates the significant impact of non-student enrollment factors through a scatter plot diagram, in which each dot represents the combination of compensation and students recruited for an ADA under a version of the Plan used by The Art Institutes. *Id.* at 10, Ex. 3. The variation in compensation for ADAs recruiting the same total number of students illustrates the effect of non-enrollment factors, such as quality points. *Id.* In other words, the width of the scatter plot diagram makes plain that substantive variation existed among ADA compensation, even for ADAs recruiting the same number of students. *Id.*

Specific data points in the scatter plot further emphasize Dr. Topel's point. For example, as Dr. Topel notes, among "nine ADAs who recruited 56 new students during the previous twelve months . . ., total compensation ranged from $45,835 to $93,543—a ratio of more than 2-to-1." *Id.* at 10. From this basic analysis, Dr. Topel concludes, "The clear message is that ADA compensation was not 'solely' determined by the number of students recruited—other factors were very important, as demonstrated by the substantial variation in compensation at every level of student recruitment." *Id.*

Based on Dr. Topel's analyses, the Litigation Committee concludes that EDMC implemented the Plan in accordance with the Safe Harbor and that the Plan as implemented did not violate the incentive compensation ban. In fact, the Plan, as implemented, went well beyond what the Safe Harbor required. Compensation under the Plan was not based "solely" on student enrollments. As Dr. Topel's work demonstrates, a host of non-enrollment factors independently influenced ADA compensation under the Plan.

In addition to this fundamental statistical question, the Court asked other targeted questions, which Dr. Topel also analyzed. His results for each question are addressed in turn below.

### 2.    To What Extent Is Each of the Five Quality Factor Categories Used?

The Court asked: "[T]o what extent is each of the five [quality point] categories used"? Order at 28. To answer this question, Dr. Topel graphed the distribution of quality points across all ADA performance reviews under the Plan. Topel Report at 14-15. That distribution shows that, across EDMC, ADAs received quality points in each of the categories, with most ADAs (44.2%) receiving 13 to 17 quality points out of a possible 25 (the middle category). *Id.* at 15, Ex. 7. Dr. Topel concludes that the distribution showed sufficient variation among the quality point categories, particularly for approximately 95% of the reviews, which fell in the lower new student point categories. *Id.* As Dr. Topel notes, the distribution demonstrates "there were a considerable number of employees who, despite achieving low to moderate student point categories, achieved high or very high quality factor points categories." *Id.* at 16.

OLERS nevertheless suggests that ADAs' quality point reviews should fall evenly into each of the five total quality point categories (i.e., 20% of reviews in each category). *See* Order at 28 (describing OLERS's allegations). As Dr. Topel's analysis suggests, however, such a result would not be reasonable because it is expected that the lowest of the five categories would

16

be underrepresented, as the lowest performing ADAs leave employ or are let go. Topel Report at 15-16.

Thus, based on Dr. Topel's findings, the Litigation Committee concludes that each of the total quality points categories was appropriately used.

### 3.    Does the Number of Quality Points Awarded to ADAs Operate Independently of the ADAs' New Student Point Range?

The Court also asked: "[D]oes the number of quality points awarded to ADAs operate independently of the ADAs' new student point range, or are ADAs who score higher on the new student point range far more likely to achieve higher quality-point scores"? Order at 28. Dr. Topel concluded that the answer is the former—that number of quality points awarded to ADAs operates independently of the ADAs' new student point range. Topel Report at 28-30. To a large degree, the regression analyses described above demonstrate quite strongly that quality points operate independently of student enrollments and the related variable, new student points. *See id.* at 16-22. This is evident from Dr. Topel's conclusion, "I find a statistically significant effect which demonstrates that [total quality factor points] affected salary independent of the effect of student points." *Id.* at 29. Dr. Topel also performed other analyses to answer this specific question.

For example, Dr. Topel analyzed whether quality points were not strongly correlated with student enrollments. *Id.* at 28-30. If the two variables were strongly correlated under the Plan, then that might support the claim that quality points were a surrogate for student enrollments (i.e., quality points were a "sham," as OLERS has alleged). *Id.* As Dr. Topel concluded, however, "The number of quality factor points . . . awarded to ADAs was not merely a proxy for the total number of students recruited." *Id.* at 3, 28-30.

17

Dr. Topel notes that some correlation between quality points and student enrollment is expected under the Plan: "It is highly likely that many of the same employee characteristics that lead to success in these five areas also lead to success in student recruitment, and therefore . . . some positive correlation between [quality points] and the number of students an ADA recruits [can be expected]." *Id.* at 29. Thus, Dr. Topel analyzed the data for not just any correlation, but an *unreasonably strong correlation.  Id.*

The results of Dr. Topel's analyses showed no such degree of correlation. For each version of the Plan, the correlation coefficients ranged from 0.4032 to 0.6219 for the different versions of the Plan. *Id.* at 30.[14] These coefficients demonstrate, as Dr. Topel concludes, that when comparing the number of students enrolled to quality points, the correlation coefficient was, as expected, positive, but not unreasonably strong. *Id.* at 29-30. Thus, Dr. Topel's analyses did not establish that quality points were a surrogate for student enrollments under the Plan. *Id.* Rather, the analyses show that quality points are independently significant in determining compensation. *Id.*

In addition to determining the correlation coefficients, the distribution of total quality factor points and student point categories charted by Dr. Topel also demonstrates, quite starkly, that quality factors were awarded independently of new student points categories. *Id.* at 15. For example, between 2003 and 2011, the majority of ADAs reviewed (35.6%) received the lowest new student point category, but nevertheless those same ADAs' reviews fell into each of the quality factor point categories, including the highest category (23 to 25). *Id.* at 15, Ex. 7. Such results fundamentally contradict OLERS's allegations, based on purported confidential witness

---

[14] As Dr. Topel writes, "A correlation coefficient that is equal to one indicates a perfect correlation between two variables, and a correlation coefficient of 0 indicates no relationship at all between two variables." Topel Report at 29.

statements, that quality factors "were, at best, window dressing," and that "quality factors matter not one bit." *See, e.g.*, Am. Compl. ¶¶ 44-45.

The Litigation Committee agrees with Dr. Topel that the data demonstrate that quality points operated independently of new student points, and that ADAs with higher new student points were not far more likely to receive higher quality points. Accordingly, the Committee concludes that the quality points under the Plan were a significant independent influence on ADA salaries.

> **4.    Is the Number of New Students a Significant Factor in Determining the Compensation for Six Month-Eighteen Month ADAs?**

Finally, the Court asked: "[I]s the number of new students a significant factor in determining the compensation for six month-eighteen month ADAs?" Order at 28. The Court's question is based on OLERS's allegation in the amended complaint that "the compensation for ADAs employed between six and eighteen months is based almost entirely on new student points" and that "[t]he amount of new student points depends on whether the ADA goes on the Matrix, resulting in higher compensation." *Id.* As described in the Litigation Committee's May 31, 2012 report, only quality points and other non-enrollment compensation factors are used to determine ADAs' compensation at six months on the job, and the Plan, including relevant non-enrollment factors, are used to determine ADAs' compensation at eighteen months on the job. May 31, 2012 SLC Report at 46. Thus, only during ADAs' twelve-month reviews are ADAs' salaries determined *either* (i) by quality points (and to the extent applicable, other non-enrollment compensation factors) without consideration of the number of new students enrolled *or* (ii) by the Plan (including relevant non-enrollment factors, such as quality points), whichever yields the greater salary. *Id.*; *accord* Topel Report at 12.

19

To answer the question posed by the Court, Dr. Topel performed additional regression analyses on compensation of ADAs who, based on their twelve-month reviews, were on the Plan. The results of these regressions were starker than regressions performed on all ADAs' compensation under the Plan. For these reviews, student enrollments only explain less than 10% of the variation in ADA salaries. Topel Report at 24-28, Ex. 12. In other words, 90% of the change in salary for ADAs on the Plan at their twelve-month review is explained by something other than the number of new students recruited. *Id.* at 24-28, Exs. 12-13. The results of Dr. Topel's analyses are similar for twelve-month reviews under the different versions of the Plan. *Id.* at 24-28, Ex. 14.1, App'x D.

Based on these analyses, the Litigation Committee concludes that the number of new students was not a significant factor in determining the compensation for six month-eighteen month ADAs; in addition, ADAs' twelve-month reviews under the Plan did not violate the Safe Harbor.

*    *    *

Based on Dr. Topel's findings, as well as the Litigation Committee's prior investigation, including interviews of 30 admissions personnel who implemented the Plan, the Litigation Committee reaffirms its prior findings: EDMC did not violate the incentive compensation ban, and there is no evidentiary support for OLERS's Incentive Compensation Claim. To the contrary, the Committee's extensive investigation has demonstrated that the Plan was implemented as designed—in full compliance with the Safe Harbor—and was not a sham. Therefore, the Committee can only conclude that EDMC's directors had a good faith basis for their actions and exercised their duty of care.

**B.    FINDINGS ON THE JOB PLACEMENT CLAIM**

The Litigation Committee previously found no support for OLERS's claims that EDMC

falsified job placement statistics in order to boost student enrollment and meet graduate

placement reporting requirements of the federal government and accreditors (the "Job Placement

Claim").[15]  The Committee based its conclusion on (i) its independent review of EDMC's

internal controls surrounding reporting placement statistics, and (ii) its review of two prior

internal investigations regarding the allegations into Ms. Bittel's allegations.

With respect to the Company's internal controls, the Committee, in its May 1, 2011 and

May 31, 2012 reports, described the array of internal controls in place at EDMC surrounding the

collection, calculation, and reporting of job placement statistics.[16]  These controls included, for

example, procedures to ensure the accuracy of collected placement data; procedures for verifying

waivers and employment; procedures to ensure the integrity of graduate placement data entered

into EDMC's student information systems; self-audit processes by which career services

employees verify and "lock down" data in the student information systems; and separate internal

audits for verifying placement records, including random sampling of supporting records.  Those

reports also described the Committee's in-depth review of those controls, including interviews of

policy stakeholders and reviews of historical audits and underlying work papers.  Based on this

investigation, the Committee concluded that the controls were sufficient to identify and

remediate the type of fraudulent job placement statistics that OLERS alleges.

Moreover, with respect to the investigations into Ms. Bittel's specific allegations that

EDMC manipulated job placement statistics, the Committee analyzed the two prior

---

[15]  Despite requests from the Committee for further support on this Claim, OLERS never provided any information beyond allegations made by Kathleen Bittel, a former EDMC employee.

[16]  A more detailed description of EDMC's graduate job placement reporting policy and the procedures in place to ensure accurate reporting is included in Appendix 1 to this Supplemental Report.

investigations into Ms. Bittel's allegations, one by EDMC human resources personnel and one

by separate outside counsel.[17] After its independent review of those two prior investigations,

including, for example, reviewing work papers from EDMC's own investigation and

interviewing the Human Resources manager who investigated Ms. Bittel's allegations, the

Committee did not find that the allegations made by Ms. Bittel were supported by reliable

collaborative evidence; nor did the Committee find any flaws in the investigations already

conducted.

The Committee also found no evidence of other verifiable complaints about job

placement statistics like Ms. Bittel's. The Committee reviewed reports submitted to EDMC's

Corporate Compliance Hotline (the "Hotline"), through which employees may submit tips or

complaints 24 hours per day, seven days per week, by e-mail, a secure web-form, or voicemail in

a manner that electronically disguises the identity of the employee to EDMC personnel.[18] The

Litigation Committee's review found that, of the more than 300 Hotline submissions between

fiscal years 2009 and 2010, only two complaints besides Ms. Bittel's, broadly speaking, touched

on placement statistics. One complaint, however, was too generalized (it did not identify any

---

[17] The Committee's May 31, 2012 report describes the two other investigations into Ms. Bittel's claims by the Company:

> Upon learning of the allegations regarding job placement statistics made by Ms. Bittel, EDMC conducted an internal investigation and sought the cooperation of Ms. Bittel (we understand that she refused to provide specific information about her allegations). The investigation found no support for her claims of undue pressure placed upon Career Services Advisors at OHE [Online Higher Education] to meet placement goals or falsely verify graduates' employment was related to their field of study. Thereafter, EDMC retained outside counsel to conduct a second investigation, which included document review and interviews of more than 20 employees, including all of Ms. Bittel's fellow Career Services Advisors and supervisors at OHE. That investigation similarly found no support for the claims that EDMC had pressured employees to violate placement policies and procedures and found no confirmed instances in which the examples the Demand Letters cite from Ms. Bittel actually ended up in EDMC's publicly reported job placement data.

May 31, 2012 SLC Report at 64-65.

[18] While originally intended to detect financial irregularities, EDMC broadened the purpose of the Hotline to include detection of other unethical activities, thereby aligning the Hotline with EDMC's philosophy of integrity.

school or employee) to investigate, and despite two attempts by the Hotline Committee to collect additional information anonymously, the caller never provided additional information. For the second complaint, the Hotline Committee investigated the allegation, including conducting a file audit and interviews, and found no support for the claim.

Nevertheless, the Court concluded that the investigation of the Job Placement Claim by the Committee was "inadequate because of its failure to independently assess whether the checks and balances described in the Report actually worked." Order at 24. In particular, the Court detailed that the Committee should have "randomly selected an appropriate number and cross-section of graduates and obtained the placement documentation for these graduates, including writings relating to (1) the department supervisor's checking the accuracy of the information entered by Career Services Advisors, (2) the confirmation of the Career Services Advisors that verifications are documented, and (3) the separate review of EDMC's corporate staff, including a review of whether the employment listed for the graduate is related to the graduate's field of study." *Id.*

The Committee has now completed its supplemental investigation, including the independent assessment and random sampling requested by the Court. As part of the Committee's supplemental investigation, Dr. Topel sampled and analyzed 1,250 graduate placement records going as far back as 2008 to determine whether EDMC school's accurately classified graduates as placed in a job related to their field of study. Separately, the Committee analyzed the legal and regulatory framework governing the reporting of job placement statistics, reviewed and familiarized itself with the placement reporting policies of EDMC's accreditors, reexamined EDMC's placement policies and procedures, conducted four additional interviews of

EDMC employees, analyzed the results of internal audits regarding placement statistics, and reviewed the results of placement audits done by outside auditors.

As discussed in detail below, this supplemental investigation reaffirms the Committee's prior conclusion: EDMC has in place adequate internal controls to ensure that job placement statistics are reported accurately, and those controls are effective at preventing, identifying, and remediating the type of fraudulent practices alleged by OLERS. Moreover, the Committee found no evidence substantiating OLERS's allegations that "[m]anagement [c]ause[d] EDMC to [f]alsify [j]ob [p]lacement [d]ata," that "EDMC had to resort to manipulation of job placement statistics in order to meet accrediting agencies' requirements," that "EDMC schools routinely manipulated the data to be able to report high job placement rates," or that "EDMC schools . . . stretched graduates' job descriptions to have them included within the definition of 'field related employment . . . .'" Am. Compl. ¶¶ 154, 156, 160. To the contrary, Dr. Topel found that the results of his investigation were "inconsistent with systemic fraudulent reporting of placement statistics by EDMC." Topel Report at 36.

### 1. External and Internal Audits of Placement Records

EDMC's procedures related to job placement data have been subject to both external and internal audits. The Litigation Committee's review of such audits supports the conclusion that EDMC's internal controls work.

#### a. *Historical External Audits Have Repeatedly Confirmed that EDMC's Procedures Surrounding Placement Data Are Effective*

On the external side, for example, the type of sampling and review of graduate placement files requested by the Court's Order has already been occurring for many years for those EDMC schools accredited by the Accrediting Council for Independent Colleges and School ("ACICS"). Founded in 1912, ACICS is "one of two national accreditors recognized by both the U.S.

24

Department of Education and the Council for Higher Education Accreditation."[19]  In 2012,

ACICS required each accredited school and program to achieve a 47% placement rate, and set a

benchmark standard for each school at 64% (58% at a program level).[20]  In order to ensure that

these standards are met, ACICS analyzes data reported by schools and audits reported statistics

during accreditation site visits.  Such site visits occur every few years, depending on whether a

school is renewing accreditation or applying for it, and on how long accreditation is granted by

ACICS.

ACICS audits of placement statistics are the type of independent review the Court

describes in its Order.  ACICS's auditors randomly select graduates' career services files,

determine whether waivers are supported by accurate backup documentation, verify employment

information by calling employers and graduates, assess whether waiver and placement

determinations comply with ACICS's standards, and compare information in files to reported

statistics.

---

[19]  Available at http://www.acics.org/ (last visited October 11, 2013).

[20]  *See* Guidelines and Instructions for Completing the 2012 Campus Accountability Report ("CAR") at 25, available at http://www.acics.org/accreditation/content.aspx?id=1616&terms=2012%20car%20guidelines (last visited October 11, 2013).

In general, ACICS's graduate placement reporting requirements are similar to EDMC's own policies, which are described in Appendix 1 to this Supplemental Report.  Prior to a recent amendment to its policies, ACICS defined "in field" employment as a position that "requires a direct use of the skills taught in the program" and "related field" employment as a position which "requires an indirect use of the skills taught in the program." *Id.* at 10-11.  ACICS also excludes from reported placement statistics a number of graduates fitting a variety of "waiver" categories, such as those unavailable for placement due to pregnancy or other health-related situations, continuing education, military service, or international students with visa restrictions. *Id.* at 11.

Beginning in 2013, ACICS eliminated the distinction between "in field" and "related field" placement.  To be considered "employ[ed] in the field of study or in a related field[, t]he position is either

    a)  Included on the list of job titles published by the institution for which the program prepares students,
    b)  It requires the use of the skills learned in the student's program as a predominant component of the job, or
    c)  The student attests to the benefit of the training received as a catalyst in obtaining or maintaining the position."

Guidelines and Instructions for Completing the 2013 CAR at 10, available at http://www.acics.org/accreditation/content.aspx?id=5712#downloads (last visited October 11, 2013).

The Committee reviewed the 25 ACICS audits since 2005 in which ACICS audited EDMC schools' graduate placement statistics.[21] In none of the audits did ACICS cite EDMC schools for manipulating placement statistics or stretching graduates' job descriptions. In only three of those audits were ACICS auditors unable to verify a handful of placements reported to ACICS from records available at the school during the site visit. None of these results, however, corroborated OLERS's allegations of fraudulent job placement statistics, of management encouraging falsification of statistics, or of EDMC schools manipulating graduates' job placements. For example, in one school's audit, ACICS verified that all graduates in seven of the school's programs were placed as reported. However, for two other programs, auditors were able to verify all but three (out of twelve) graduates reported as placed, based on the documentation in the school's records. During another school's audit, ACICS found that the files for four (out of seventeen) students classified as "not available for placement" lacked documentation, but ACICS nevertheless verified placement rates through review of back-up documentation and calls to fifteen employers and/or graduates confirming the employment as reported to ACICS. For the third school, a handful of placements could not be substantiated by records on file, but ACICS noted that the placement statistics for this school were not used for recruiting students. Notably, for each of these three schools, ACICS granted or renewed accreditation after the schools supplemented their reports to ACICS and/or provided back-up documentation for placements.

This table provides examples of the extensive sampling done by ACICS:

---

[21] Not all EDMC institutions and schools are accredited by ACICS. *See* App'x 1 of this Supplemental Report.

| School Audited | Audit Year | Employees/Graduates Successfully Contacted to Confirm Placement as Reported | Successfully Contacted Employees/Graduates Confirming Placement as Reported |
|---|---|---|---|
| *BMC – North Canton* | 2005 | 51 | 51 |
| *Ai – Los Angeles* | 2007 | 37 | 37 |
| *BMC – Merrillville* | 2007 | 52 | 52 |
| *Ai – New York City* | 2008 | 40 | 40 |
| *BMC – Northern Kentucky* | 2008 | 42 | 42 |
| *BMC – Akron* | 2008 | 64 | 64 |
| *BMC – Cincinnati* | 2008 | 94 | 94 |
| *Ai – Phoenix* | 2009 | 89 | 89 |
| *Ai – Fort Lauderdale* | 2010 | 60 | 60 |
| *Ai – Vancouver* | 2012 | 80 | 80 |
| | **Total** | **609** | **609** |

Based on the above review and the Committee's further investigation, the Committee concluded that OLERS's allegation that EDMC is "already suffering some consequences" related to manipulating job placement statistics (Am. Compl. ¶ 163) was not substantiated. For example, OLERS suggests that Argosy University's San Francisco campus was placed on probation by the American Psychological Association in August 2010 due to problems with placement rates, but the American Psychological Association does not require schools to report job placement rates. Similarly, OLERS suggests that Brown Mackie College in Ft. Wayne, Indiana was placed on probation by the Commission on Accreditation in Physical Therapy in April 2011 based on placement rates, but the Commission also does not require placement rates

27

to be reported. Finally, OLERS alleges that, as a result of manipulated job placement statistics, "[a]s of June 30, 2011, seven EDMC schools had to make supplemental submissions to accrediting agencies due to those agencies' concerns over 'either student retention or placement issues,' as reported by EDMC in its Form 10-K." *Id.* However, of the seven supplemental submissions, four were not based on incorrectly reported placement statistics. In fact, ACICS required supplemental submissions for two of the four schools because they did not meet the minimum job placement percentages required by ACICS—the opposite of the job placement inflation alleged by OLERS. The remaining three of seven supplemental submissions highlighted by OLERS were related to the schools described above, where in each case ACICS granted or renewed these schools' accreditation after supplemental submissions.

> **b.** ***School Audits by the Internal Audit Department Have Confirmed that Documentation Supporting Placement Statistics Is Consistently Maintained***

In addition to the outside audits just described, all EDMC schools' graduate placement records are subject to an internal audit process similar to ACICS's audit process. These internal audits have repeatedly found that EDMC schools systematically maintain documentation supporting placements.

Both the Committee's May 1, 2011 and May 31, 2012 reports describe how EDMC's Internal Audit Department ("IAD"), as part of its standard school audit program, samples graduates' career services files to ensure that back-up documentation is maintained and that placement data has been reported accurately to EDMC's central database of placement statistics. First, IAD selects a random sample of recent graduates and tests whether the income for those graduates was properly verified and documented in databases. In addition, IAD obtains a job placement report for the most recently "closed" term and tests whether graduates' placement rates were properly verified in the school's records. IAD also follows up with the Director of

Career Services on unusually high placement rates and high levels of "waived" graduates. IAD auditors also interview the Director of Career Services about the process for verifying employment (including the type of documentation received to verify employment and the handling of such documentation) and student job placement.

As described in its May 1, 2011 report, which was submitted to this Court by the Committee in response to OLERS's amended complaint, the Litigation Committee reviewed IAD's reports from school audits conducted between fiscal year 2009 and the beginning of fiscal year 2011.[22] Of the 33 IAD audit reports the Litigation Committee reviewed, none of the ground school audits included findings of fraudulent, or even inaccurate, job placement statistics, and 29 of the 33 contained no findings at all regarding inadequate retention of placement documentation. Four of the 33 audits noted some lack of complete documentation, but for three of the four, the number of files was small—not enough to warrant a failing audit. IAD, nevertheless, recommended methods for strengthening documentation procedures.

One of the four schools did fail its audit due to the number of job placement verifications missing. The Litigation Committee reviewed the follow-up documentation from IAD concerning this school. As part of the follow-up process, IAD tracked the school's progress remediating its procedures to strengthen graduates' file completeness. Since the school's failing audit, IAD audited this school twice, and in both cases, IAD made no findings of inadequacy with respect to this school's graduate placement files, and the career services area received good audit scores.

EDMC's internal auditors have also undertaken more in-depth audits of specific Career Services departments. For example, in 2011, Online Higher Education's Internal Audit Department audited Online Higher Education ("OHE") Career Services' files related to OHE

---

[22] Historically, IAD has conducted approximately 20 school audits per fiscal year. In fiscal year 2010, for example, 21 school audits were conducted.

graduates to ensure that all graduate files were properly maintained and contain all applicable documents such as resumes, service agreements, verification forms, and waiver forms. The audit entailed verifying that written policies were followed; verifying that the graduate was properly categorized for statistical reporting; verifying that proper salary information was reported for graduates employed in related positions; and ensuring that information was entered properly into databases by authorized personnel. In order to assess whether proper records were maintained supporting statistical reporting of OHE graduates, auditors randomly selected 206 files of graduates between October 1, 2009 and March 31, 2010. The audit found that some controls could be strengthened around ensuring that back-up files contained all documentation supporting placements. Accordingly, auditors recommended that a reconciliation process be developed and implemented in which graduate files are reviewed after each reporting period, and that authorizing personnel sign-off that all applicable documents have been obtained and properly filed. Auditors also recommended a general training session on the policies for obtaining and maintaining documentation. During the review, auditors did not note any discrepancies between statistics reported with respect to salary and placement statistics and the hard copy files. An audit of OHE's graduate placement files a year later, in 2012, showed improvement in maintenance of placement documentation.

More recently, IAD completed field testing as part of EDMC's Career Services Corporate Compliance Division, the central EDMC department in charge of processing and reporting job placement statistics. Although those results have not yet been finalized and are therefore not yet reported, preliminary findings have not located any evidence corroborating OLERS's allegations that EDMC's job placement statistics were fraudulent or systematically manipulated.

30

2.    **Dr. Topel's Audit and Statistical Analysis of Job Placement
        Determinations Found No Evidence or Indication that EDMC
        Systematically Falsified Job Placement Statistics**

As requested by the Court, the Committee asked Dr. Topel to audit, separately and

independently, a statistically significant random sample of EDMC's placement documentation

for a cross-section of graduates. The schools sampled included graduates from three schools

between 2008 and 2012—Brown Mackie Colleges, The Art Institutes, and South University.

These schools were selected because only their placement statistics were reported during the

period covered by the Demand Letters' and amended complaint's allegations.[23] Topel Report at

31. Records from 2008 to 2012 were selected because that period of time relates to the

allegations in OLERS's amended complaint. *Id.* From this group of graduates, Dr. Topel

randomly sampled a statistically significant cross-section of 1,250 graduate placement records

(400 from The Art Institutes, 400 from Brown Mackie Colleges, and 450 from South University)

and analyzed them to determine, as the Court requested, "whether the employment listed for the

graduate is related to the graduate's field of study." Order at 24; Topel Report at 32-33.[24]

Based on his review and analysis of the historical placement documentation, Dr. Topel

found "no evidence or indication of a systematic falsification of job placement statistics." Topel

Report at 36. Among the 1,250 records sampled and "without potentially helpful additional

follow-up to either graduates or employers," Dr. Topel has thus far verified that 93% of

placements were accurately classified based on EDMC's policy. *Id.* at 4, 36. As examples, Dr.

---

[23] Until recently, Argosy University's placement data was not tracked and included in EDMC's reported statistics.

[24] The data and back-up files that the Committee provided to Dr. Topel came from multiple sources. The Committee provided Dr. Topel with a database of job placement data used for reporting purposes, which data previously had been audited by the Career Services Corporate Compliance Department and "locked down" to preserve it. This "locked down" database consisted of a snapshot of a relevant subset of EDMC schools' various student databases. The Committee also provided Dr. Topel with (i) backup hardcopy documentation from placement files from each of the three schools audited, and (ii) additional relevant data from another student database.

Topel found that a graduate employed as an office manager clearly was employed in a job related to his degree in Business Administration, and a graduate working as a print production coordinator for a commercial printing company clearly was employed in a job related to her degree in Graphic Design. *Id.* at 34.

Moreover, Dr. Topel found that the historical placement documentation going back as far as 2008 reflects an effective company-wide process for verifying placements that is "inconsistent with systemic fraudulent reporting of placement statistics by EDMC." *Id.* at 36. Among EDMC's randomly sampled records, Dr. Topel repeatedly found "historical documentation . . . verifying that the graduates were in fact working in-field or in a related field"—e.g., verification forms signed by employers and graduates, email communications with employers and graduates, and summaries of conversations with employers and graduates entered into EDMC's databases. *Id.* at 34, 36, App'x E. The "many instances" of such records demonstrates that EDMC has company-wide controls in place to prevent the type of placement statistic manipulation alleged by OLERS, and further confirms that placements were not systematically falsified or manipulated. *See id.* at 34, 36.

To assess EDMC's historical job classification process, Dr. Topel limited his review to historical placement documents in EDMC's records. *Id.* at 35. He did note, however, that a number of additional verifications might be made with further information that was not available to him, such as conversations with graduates and employers. *See id.* at 35-36. Such information was likely available to Career Services Advisors making the placement determinations at the time they were made, and is made available to ACICS auditors, who speak with graduates and employers, and invite schools to respond to audit findings with explanations or further documentation. *Id.*

32

Recognizing that interviews with employers, graduates, or Career Services Advisors might have resulted in further verifications beyond the 93% already made by Dr. Topel (*see id.* at 36), the Litigation Committee has nonetheless concluded that further inquiry is simply not necessary.  The present verification rate and extent of verification records maintained are more than sufficient to exclude any possibility of the systematic placement-reporting fraud alleged by OLERS.  Moreover, the results of Dr. Topel's review also reflect the effective operation of a company-wide procedure for supporting and verifying placements.

*        *        *

Based on its independent assessment of EDMC's internal controls, including its policies and procedures, its independent review of outside audits by ACICS, its independent review of IAD's audits of career services files, and Dr. Topel's further audit of graduate's placement files, the Litigation Committee cannot corroborate OLERS's allegations regarding systematic falsification or manipulation of placement statistics.  To the contrary, the Committee's investigation corroborates a different conclusion:  EDMC's internal controls surrounding the collection, verification, and reporting of job placement statistics are effective at identifying and preventing the type of conduct alleged by OLERS.  Moreover, based on the Committee's investigation and Dr. Topel's findings, the evidence shows that this internal control structure is adequately staffed to ensure its effectiveness.[25]  Accordingly, the Committee concludes, in its business judgment, that EDMC's directors had a good faith basis for their actions and exercised their duty of care with respect to EDMC's reporting of graduate job placement statistics.

---

[25] The Committee is not aware of any specific career placement staffing requirements or recommendations by the U.S. Department of Education or accrediting bodies.  The Committee, therefore, bases its conclusion that the internal control structure is adequately staffed on its own investigation and on the results of Dr. Topel's independent audit.

33

## V.   THE LITIGATION COMMITTEE'S DECISION NOT TO TAKE ACTION IN RESPONSE TO OLERS'S DEMAND LETTERS OR AMENDED COMPLAINT

As the Court noted in its Order, when evaluating the appropriateness of a Board's decision in light of a report by the Litigation Committee,[26] the Court must ask whether the Committee was: (1) independent, (2) disinterested, (3) assisted by counsel, and (4) conducted an adequate investigation, (5) prepared a written report, and (6) rationally believed its decision was in the best interests of the corporation. *See In re H.J. Heinz Co. Derivative and Class Action Litig.*, No. G.D. 13-003108, at 5 (Ct. Com. Pl. Apr. 29, 2013) (citing *Cuker v. Mikalauskas*, 692 A.2d 1042, 1048 (Pa. 1997)); *see also Lemenstrel v. Warden*, 694 A.2d 902, 904 (Pa. Super. 2008). "If all of these criteria are satisfied, the business judgment rule applies and the court should dismiss the action." *Cuker*, 692 A.2d at 1048.

The business judgment rule represents "a policy of judicial noninterference with business decisions of corporate managers." *Cuker*, 692 A.2d at 1046. When considering a shareholder's demands, corporate managers are entitled to a presumption "that they pursue the best interests of their corporations, insulating such managers from second-guessing or liability for their business decisions in the absence of fraud or self-dealing or other misconduct or malfeasance." *Id.* Pursuant to the standards adopted by the Supreme Court of Pennsylvania, the Court should conduct only a "limited and precise" inquiry to determine whether derivative claims such as those brought by OLERS may proceed. *Id.* at 1048. The Court must dismiss the lawsuit when a

---

[26] Under the standards set forth in the American Law Institute's Principles of Corporate Governance ("ALI Principles"), which have been adopted by Pennsylvania courts, a board of directors must be given a reasonable opportunity to respond to a demand. ALI Principles § 7.03 cmt. F; *see In re H.J. Heinz Co. Derivative and Class Action Litig.*, No. G.D. 13-003108 (Ct. Com. Pl. Apr. 29, 2013) ("It is well-settled under Pennsylvania corporate law that the board of directors of a company is empowered to make decisions regarding litigation undertaken on behalf of the corporation."). One method for responding to demand letters is for the board of directors to create an independent litigation committee to conduct an in-depth review of the allegations of the demand. ALI Principles §§ 7.05(b)(1), 7.08.

disinterested SLC of a corporate board concludes rationally and in good faith that a shareholder's

derivative lawsuit is not in the company's best interests. *Id.* at 1046, 1048.

The Court, in its Order, already determined that the Litigation Committee was

independent, disinterested, and assisted by counsel, and that it had prepared a written report, and

it rationally believed its decision was in the best interest of the corporation. However, the Court

questioned the adequacy of the Litigation Committee's investigation because the Committee did

not conduct specific independent quantitative analyses.

Under Pennsylvania law, challenges to the adequacy of an SLC's investigation are

subject to the deferential requirements of the business judgment rule. *See LeMenestrel*, 964 A.2d

at 918. A plaintiff must show that the investigation was "so restricted in scope, so shallow in

execution, or otherwise so Pro forma or halfhearted as to constitute a pretext or sham . . . ." *Id.*

at 914 (marks and citations omitted). Moreover, "for the business judgment rule to apply, a

corporation is not required to undertake the ideal or perfect investigation—one that can

anticipate all suggestions and withstand any criticism of derivative plaintiffs or of further court

review. What is required is that the corporation makes a *reasonable* effort to reach an informed

business decision." *In re Consumers Power Co. Derivative Litig.*, 132 F.R.D. 455, 483 (E.D.

Mich. 1990) (dismissing shareholder derivative action) (emphasis in original).

By now, the Litigation Committee has prepared three reports, each reflecting a searching

and evolving investigation: the May 1, 2011 report, the May 31, 2012 report,[27] and this

Supplemental Report. The Litigation Committee's investigation, as described in these three

reports, is entitled to the benefit of the business judgment rule under Pennsylvania law. From its

---

[27] Both the Committee's May 1, 2011 and May 31, 2012 reports were Exhibits to Defendants' Preliminary Objection in the Form of a Motion to dismiss the Derivative Amended Complaint, Pursuant to Section 7.08 of the American Law Institute's Principles of Corporate Governance, filed on behalf of Leo F. Mullin and Paul J. Salem, in their capacity as members of a duly formed Special Litigation Committee of the Board of Directors of Education Management Corporation (Oct. 17, 2012).

creation, the Litigation Committee conducted a related investigation based on demand letters from other shareholders, for which the Committee (i) engaged competent and experienced counsel to assist with the investigation, (ii) assessed the effectiveness of the EDMC's internal control structure, including analyzing EDMC's Hotline Committee complaints and processes and IAD audits, (iii) reviewed corporate policies regarding ethics and conduct, as well as enforcement of those policies, (iv) considered EDMC's staffing levels and use of outside experts to enhance its internal controls, (v) reviewed thousands of pages of documents (vi) met periodically to discuss and direct the investigative process, (vii) sought input from those shareholders who made the demands, (viii) interviewed 30 witnesses, including witnesses who were involved in designing and implementing the Plan, and upper level management, and (ix) issued a 105-page report of May 1, 2011 summarizing its findings.

Then, in response to OLERS's Demand Letters, the Litigation Committee conducted an additional investigation, for which the Committee (i) continued to engage competent counsel who had conducted the prior investigation, (ii) met periodically to discuss and direct the investigation, (iii) sought input from OLERS, (iv) reviewed additional documents, (v) conducted interviews of another 30 witnesses, all of whom were directly involved in implementation of the Plan, and (vi) and detailed its findings in two letters to OLERS, and summarized those findings in a separate 65-page report of May 31, 2012.

Now, in response to OLERS's allegations raised for the first time in its amended complaint, and in response to questions posed by the Court, the Committee has conducted further investigation, for which the Committee (i) engaged a distinguished expert, Dr. Topel, to conduct statistical analyses requested by the Court and to prepare a report, (ii) continued to engage competent counsel who had conducted the prior investigations, (iii) met periodically to

discuss and direct the investigation, (iv) reviewed hundreds of pages of additional documents, (v) conducted interviews of still more witnesses, and (vi) summarized its findings in this Supplemental Report, as well as the report by Dr. Topel.

The sum of these thousands of hours of investigation, not to mention considerable cost and disruption to the Company, is this:  The Litigation Committee has found no support for OLERS's allegations regarding either the Incentive Compensation Claim or the Job Placement Claim.  It has, however, found that EDMC's internal controls, and supporting policies and procedures, are effective in addressing the specific risks identified in OLERS's Demand Letters and amended complaint.  Moreover, it has also found that EDMC's directors properly exercised their fiduciary duties in implementing and overseeing that internal control structure. Accordingly, the Litigation Committee, after an extensive and diligent inquiry, has determined in good faith and based on rational belief, and in the exercise of its business judgment, that it would not be in the best interest of the Company or its shareholders to take the actions requested with respect to the allegations in the Demand Letters or OLERS's amended complaint.

[SIGNATURE PAGES FOLLOW]

By the Litigation Committee of the Board of
Directors of Education Management Corporation,

_____

Paul J. Salem

_____

Leo F. Mullin

38

By the Litigation Committee of the Board of
Directors of Education Management Corporation,

_____

Paul J. Salem

Leo F. Mullin

38

# **APPENDIX 1**

## **Detailed Description of EDMC's Policies Regarding Job Placement Statistics**

This Appendix 1 describes EDMC's policies regarding job placement statistics as they relate to OLERS's claims.

## 1.    EDMC's Policy Related to Job Placement Statistics

No federal methodology exists for calculating graduate job placement rates[28] and many of the approximately 90 accrediting bodies[29] to which EDMC's schools must report[30] have varying requirements for calculating and reporting graduate job placement statistics.[31] Therefore, EDMC has developed its own methodology that complies with standards drawn from these accrediting bodies. EDMC's methodology can be summarized as follows:

---

[28] While the DOE has contemplated imposing a single methodology for calculating employment statistics, that idea was recently abandoned. In October 2010, the DOE amended regulations on disclosure of information to prospective students, including job placement rates. The regulation required "develop[ment of] a placement rate methodology and the processes necessary for determining and documenting student employment and reporting placement data to the Department using the Integrated Postsecondary Education Data System (IPEDS)." *Federal Register*, Oct. 29, 2010. Vol. 75 at 66837. Subsequently, the DOE convened a panel to develop a peer-reviewed method for calculating consistent and comparable job placement rates. However, after collaborating with educators and the public, the panel concluded that "a single job placement rate methodology could not be developed." Report and Suggestions from IPEDS Technical Review Panel #34, Calculating Job Placement Rates. Available at https://edsurveys.rti.org/IPEDS_TRP/documents/TRP34_SummaryPackage_suggestions_final.pdf (last visited September 24, 2013).

[29] This Appendix uses the term "accrediting bodies" to refer collectively to institutional and programmatic accreditation agencies, state licensing agencies, and state educational oversight committees and workforce commissions.

[30] Given EDMC's size, national footprint, and the variety of schools and educational programs it offers, EDMC's institutions and schools, as well as various programs at those schools, are subject to the requirements of approximately 90 different institutional and programmatic accreditation agencies, state licensing agencies, and state educational oversight committees and workforce commissions. For example, Argosy University is accredited by the Senior College and University Commission of the Western Association of Schools and Colleges (the same organization that accredits Stanford University and the University of California system). South University is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools (the same organization that accredits Emory University and Georgia Tech). The Art Institutes and Brown Mackie Colleges are accredited by a variety of national and regional accreditors, including The Higher Learning Commission (the same organization that accredits Northwestern University and Case Western Reserve University) and the Commission on Accreditation of Allied Health Education Programs (the same organization that accredits programs at Temple University and the University of Pittsburgh). Certain programs at each of these institutions must also receive programmatic accreditation. In addition, EDMC institutions are located in approximately 40 states, and therefore, on top of the regional, national, and programmatic accreditors, EDMC schools must also seek approval, and answer to regulations, from at least 40 state departments.

[31] For example, the Texas Higher Education Coordinating Board does not permit international students who are ineligible for employment to be excluded from those graduates it considers available for employment, while the Ohio State Board of Career Colleges and Schools, as well as ACICS and ACCSC, do. Some agencies require an institution to include incarcerated graduates in its total number of eligible graduates, while others do not. Further, the agencies may have different definitions of incarceration. Moreover, agencies have different definitions for what type of employment is considered within any given graduate's field of study.

APPENDIX 1 – 1



- A school's job placement rate is (i) the number of students employed after graduation (ii) divided by the number of students eligible for employment:

$$\textbf{Job Placement Rate} \ = \ \frac{\textit{\# of Graduates Employed}}{\textit{\# of Graduates Available to be Employed}}$$

- Some graduates are excluded, or receive a "waiver," from the denominator in the above formula because they are not available to be employed.

- For the numerator, a graduate is considered "employed" if (i) she started a job within six months of graduation, and (ii) that job is in a "related field" to the graduate's program of study.

Each of these aspects of EDMC's policy is described further below.[32]

*Waivers.*  For purposes of calculating job placement statistics, EDMC does not include certain unemployed graduates when determining the relevant number of graduates available to be employed (the denominator).  EDMC, like most accrediting bodies, refers to these students as "waivers."[33]

Acceptable reasons for waivers include graduates who have not obtained work within six months of graduation due to: (1) medical conditions, including pregnancy or a graduate who is the primary caregiver of an immediate family member; (2) active military duty, including graduates with a spouse on active duty; (3) international students who are not eligible for employment in the country of an EDMC school; (4) those graduates who have enrolled in continuing education at a regionally or nationally accredited school; (5) those graduate who are deceased; (6) those graduates who are incarcerated; (7) and those graduates who have chosen to continue employment in an unrelated field upon graduation, provided the graduate can show that

---

[32] EDMC schools' adapt this policy, as necessary, to comply with nuances in accrediting bodies' various reporting requirements.

[33] Removing waivers from job placement rates is widely accepted by accrediting bodies and may be required under their methodologies. *See, e.g.,* ACICS's Guidelines and Instructions for Completing the 2013 Campus Accountability Report, available at http://www.acics.org/accreditation/content.aspx?id=5712#downloads (last visited October 3, 2013).

APPENDIX 1 – 2

taking a new position in a related field would impose an economic hardship.[34] A waiver is not granted unless the graduate is unable to work for at least three months due to the waiver condition.[35]

On its website and in brochures, EDMC publishes that it excludes waivers from its calculated statistics. For example, when listing the graduate employment statistics on the website for The Art Institutes, EDMC states: "Graduates available for employment excludes graduates who have waived employment assistance due to extenuating circumstances which prevent them from working," and goes on to list the type of waivers that apply.[36]

*Valid Employment*. EDMC only counts "employed" graduates in its job placement rate calculation. Under EDMC's policy, a graduate is considered "employed" if (i) she started a job within six months of graduation, and (ii) that job is in a "related field" to the graduate's program of study.

For (i)—whether a graduate is employed within six months of graduation—EDMC does not require any minimum duration of employment before a graduate is considered employed, so

---

[34] The definition of "economic hardship" has varied slightly over time, but the fundamental idea is that the graduate's salary in his or her current employment is higher by some degree than the salary he or she would earn by taking a new job in a related field upon graduation.

[35] Each of the above bases for waiver is accepted among one or more of the accrediting bodies to which EDMC reports, including for example, ACICS, ACCSC, the Texas HECB, and/or the Ohio SBCCS. *See, e.g.,* ACICS's Guidelines and Instructions for Completing the 2013 Campus Accountability Report, available at http://www.acics.org/accreditation/content.aspx?id=5712#downloads (last visited October 11, 2013); Instructions for Completing the ACCSC 2013 Annual Report, available at http://www.accsc.org/UploadedDocuments/2013% 20Annual%20Report%20Instructions.pdf (last visited October 11, 2013).

[36] *See* http://www.artinstitutes.edu/CareerServices/Employers/career-stats.aspx (last visited October 11, 2013); *see also* "Gainful Employment Information for our Programs," *available at* http://www.argosy.edu/programs-info/default.aspx?acronym= (last visited October 11, 2013) (specifying that "Certain graduates are excluded from cohort such as those who are continuing their education and those that have waived employment assistance . . . .").

long as that graduate is employed within six months after graduation.[37] This policy is consistent
with those of EDMC's accrediting agencies.[38]

For (ii)—whether a graduate is "related" to the graduate's program of study—EDMC
determines relatedness by comparison to skills that a graduate is expected to have by graduation
from a particular program.[39] For example, in EDMC's Career Services Policy Handbook
Revised on June 27, 2012, EDMC defined a graduate as in "related employment" if that graduate
uses 25% of their skills developed in their program of study at least 50% of the time.

For purposes of reporting to some accrediting bodies, EDMC separately tracks graduates
as being employed "in field," which is defined as when the graduate uses "at least 50% of their
learning outcomes, concentration courses or core skills at least 50% of the time." "In field"
placements are not (and are not required to be) reported separately to potential students; instead,
EDMC reports to students the percentage of available graduates employed in a related field.[40]

EDMC's definitions of "in field" and "related field" have differed slightly over time and
by school. For example, in 2008, regardless of how often the skills were used, EDMC
considered a job as "in field" if the graduate used 50% of skills developed from the program of
study and a job "in a related field" if the graduate used 25% of skills developed from the
program of study. At times, EDMC had varying requirements for students of specific schools.
EDMC also allows schools to identify jobs that will/will not be considered as "related." For

---

[37] In special cases, EDMC has also permitted a graduate who was hired within six months of graduation, but who
did not actually start working until after six months, to be counted as employed. In such cases, EDMC subjected the
offer to additional verification by both the student and employer.

[38] For example, like EDMC, some accrediting bodies, such as ACICS, the Texas HECB, and the Ohio SBCCS, have
no minimum employment duration requirement.

[39] EDMC's programs publish lists of skills or competencies that graduates are expected to develop by completion of
the program.

[40] See, e.g., http://www.artinstitutes.edu/CareerServices/Employers/career_stats/CS_location0028.pdf (last visited
October 11, 2013) (The Art Institute of California—Hollywood reporting placement statistics for particular
programs).

APPENDIX 1 – 4

example, in 2012, The Art Institutes' graduates working at video stores were never counted as employed; graduates working at craft stores were only counted if they were teaching art classes; and graduates working at department stores were only counted if working in corporate level positions.

**2.    Policies and Procedures Surrounding the Collection, Calculation, and Reporting of Job Placement Data**

Although the Committee's May 31, 2012 report summarized the internal controls EDMC has in place surrounding the collection, calculation, and reporting of job placement data, the Committee describes them here in more detail.

**a.    *EDMC's Procedures Ensuring the Collection of Accurate Job Placement Data***

EDMC has redundant, tiered processes to ensure the accuracy of collected placement data. Career Services Advisors at school-level Career Services Departments work with students to locate employment through job leads. In working with students, Career Services Advisors collect, verify, and enter data related to the student's job search and any placement into central computerized databases. Throughout this process, placement data collection is supervised by each Career Services Advisor's Director of Career Services.

Data entry is governed by specific policies and procedures intended to ensure consistency and accuracy. For example, before a graduate's job status in central databases can be selected as "waived" or "employed," all verifications, verification attempts, and contact with the student and his or her employer must be validated and signed off on by the school's Director of Career Services. Additionally, Career Services is required to keep hard copies of the records used to determine job placement statistics.

b.    *EDMC's Procedures Ensuring Accurate Verification of Waivers and Employment*

EDMC also has procedures in place to ensure accurate verification and documentation of waivers and employment. An advisor may not determine that a student should be classified in one of the "waiver" categories unless the graduate's eligibility for that waiver is documented and verified by the Director of Career Services. EDMC only excludes a graduate from the calculation of placement statistics if the graduate has signed a waiver form or verbally verified his or her waiver status for three months. There may also be additional requirements specific to each waiver. For example, EDMC policy does not permit a graduate to be placed on an Active Duty Military Waiver without a copy of the graduate's or the graduate's spouse's enlistment agreement, current orders indicating active duty, a copy of deployment orders, online verification from the Defense Manpower Data Center, or properly documented verbal verification from a military recruiter.

Corporate Specialists, who work in EDMC's Career Services Corporate Compliance Division and assist EDMC's schools, provide guidance if the Director of Career Services is unsure whether a graduate is eligible for a waiver. Additionally, a graduate's status may not be changed in a central database from "waived" to "employed" or vice versa without approval from a Corporate Specialist.

As with waivers, employment determinations are documented. EDMC strives to have a student's employment verified in writing by the employer, and its goal is to obtain written verification of student employment at least 50% of the time. Career Services Advisors are instructed to make several attempts to receive written verification of employment, including by electronic means. Corporate Specialists also track the percentage of written verifications; if less than 75% are obtained, Corporate Specialists notify Directors of Career Services.

APPENDIX 1 – 6

EDMC has additional guidelines as to what constitutes verification of employment. For example, email verification is acceptable provided it meets certain specifications, but social networking blogs are not. If Career Services Advisors cannot obtain written verification from the employer, EDMC will accept a verbal verification from either the employer or the graduate. EDMC may accept employment verification from The Work Number, a third-party employment verification service, only as a last resort and only after all other verification resources have been exhausted. Additional verification procedures apply for students who are self-employed, who are employed part time, who freelance, who remain in the job they had prior to graduation, or who claim multiple jobs.

The Career Services Advisor also determines a graduate's employment as well as the job duties and description from either the written verification filled out by the graduate and/or employer, or through conversations with the graduate and employer. Once the employment status for the graduate has been validated, the Career Services Advisor selects from an appropriate menu the position most closely aligned with the graduate's job. The Career Services Advisor also typically enters additional information describing the position and its requirements. The Advisor must then select an employed graduate as "in field" or "in a related field" after consulting the standardized list of core skills associated with the graduate's field of study. The Director of Career Services then ensures that the selected job classification matches the graduate's core skill set. Directors must sign off on the field of study determinations before those determinations are reported to central administration. Corporate Specialists are available to provide guidance if the Director is unsure of any part of the process.

The Career Services Corporate Compliance Division also provides guidance to Career Services Advisors on maintaining data integrity in EDMC's databases related to job placement

statistics. For example, procedures require that the verification field in databases only be used when employment is verified in writing, that an accurate description of all job duties must be entered, employed status can only be entered when verification documents are complete, official descriptions of atypical job titles must be entered, and back-up documentation should be maintained in a dedicated secured file system.

In addition, Career Service departments must conduct self-audits on a quarterly basis to identify noncompliance with accreditor and/or internal guidelines. Audits consist of a review of all employment data, including employer information, salary information, and waiver details. Career Service departments must verify that job placement and waiver information in graduate's files matches corresponding entries in EDMC's databases.

     **c.**     ***EDMC's Procedures Ensuring Accurate Reporting of Job Placement Data***

Every six months after students graduate and before data is included in reported statistics, the Career Services Corporate Compliance Division also performs a final "lock down" of the databases containing job placement statistics to ensure the data is accurate and documented correctly before any placement statistics are calculated. Corporate Specialists in the Compliance Division audit reported data in the central databases for completeness, accuracy, and compliance with EDMC policy. A Corporate Specialist also may attempt to obtain written verifications or additional verbal verifications for placements where Career Services Advisors were only able to obtain verbal verifications. Errors or suspicious data are emailed to Career Services Advisors and Directors of Career Services at schools and followed up by Corporate Specialists in the Career Services Corporate Compliance Division until corrected or explained.



**Prepared for:**

Special Litigation Committee of
Education Management Corporation

# Audit of Education Management Corporation Assistant Director of Admissions' Compensation and Career Service Job Placement Information

**Prepared by:**

Robert Topel, Ph.D.

Charles River Associates

1 South Wacker Drive, 34th Floor

Chicago, IL 60606

Date: October 14, 2013



October 14, 2013                                                          Charles River Associates

# Disclaimer

The conclusions set forth herein are based on independent research and publicly available material. The views expressed herein are the views and opinions of the authors and do not reflect or represent the views of Charles River Associates or any of the organizations with which the authors are affiliated. Any opinion expressed herein shall not amount to any form of guarantee that the authors or Charles River Associates has determined or predicted future events or circumstances and no such reliance may be inferred or implied. The authors and Charles River Associates accept no duty of care or liability of any kind whatsoever to any party, and no responsibility for damages, if any, suffered by any party as a result of decisions made, or not made, or actions taken, or not taken, based on this paper. Detailed information about Charles River Associates, a registered trade name of CRA International, Inc., is available at www.crai.com.

Copyright 2013 Charles River Associates

# Table of contents

1. Introduction ................................................................................................................... 1

2. Qualifications ............................................................................................................... 1

3. Summary of Findings ................................................................................................... 3

4. Questions Raised in the Court Order ........................................................................... 4

5. Description of EDMC Pay Practices ............................................................................. 6

6. Statistical Analysis of the Factors Affecting ADA Compensation ....................................... 11
   6.1. Description of the Data Collected ...................................................................... 11
   6.2. Summary of Methods and Results ...................................................................... 12
   6.3. Twelve Month ADA Compensation ..................................................................... 24

7. The Correlation Between TQF and TNS ..................................................................... 28

8. Career Services Placement Review .............................................................................. 30
   8.1. Data ................................................................................................................. 31
   8.2. Initial Round of Analysis .................................................................................... 32
   8.3. Second Round of Analysis ................................................................................. 34

9. Concluding Remarks ................................................................................................... 35



# 1.    Introduction

At the request of counsel for the Special Litigation Committee for Education Management Corporation (EDMC) I was asked to review the July 16, 2013 Memorandum and Order of Court issued by the Honorable R. Stanton Wettick, Jr. in the matter of *Oklahoma Law Enforcement Retirement System v. Todd S. Nelson, et al. and Education Management Corporation.* In the order the Court requests EDMC to investigate several questions regarding (1) incentive compensation in the recruiting of students and (2) job placement of graduates. The Judge's request bears on the issue of whether EDMC's policies and procedures were compliant with regulations established by the U.S. Department of Education (DOE) making EDMC institutions eligible to receive Title IV funding from students enrolled in their programs.  In the report that follows, I examine each of the questions raised by the Court with regard to incentive compensation and job placement.

# 2.    Qualifications

I am Robert H. Topel, the Isidore Brown and Gladys J. Brown Distinguished Service Professor of Economics at The University of Chicago Booth School of Business. I am also the Director of the George J. Stigler Center for the Study of the Economy and the State and the Co-Director of the Energy Policy Institute at Chicago (EPIC), both at The University of Chicago. I am also a Senior Consultant at Charles River Associates (CRA), an economics consulting firm specializing in the application of economic theory and statistics to legal and regulatory issues.

I am an economist, and I specialize in (among other things) microeconomics, which is the study of markets, pricing, and firm and industry behavior. I received a B.A. in economics from the University of California, Santa Barbara in 1974, and a Ph.D. in economics from the University of California, Los Angeles in 1981. In addition to my position at the Booth School of Business at the University of Chicago, I have been a member of the faculties in the

Department of Economics at the University of Chicago and the Department of Economics at the University of California, Los Angeles. At these institutions, I have taught courses on Markets and Prices, Economic Theory, Labor Markets, Empirical Methods in Economics, Compensation and Personnel Policies, Industrial Organization and Antitrust, Business Strategy, and Law and Economics.

From 1993 to 2003, I served as the Editor of the Journal of Political Economy, and from 1991 to 1993, I was a member of the Editorial Board of the American Economic Review, two of the leading professional publications in economics and economic theory. I am also a past founding editor of the Journal of Labor Economics (1982-92), and I currently am a member of the Editorial Advisory Board of the International Journal of the Economics of Business and the Advisory Board of the Economics Research Network. I am a Research Associate of the National Bureau of Economic Research, an elected member of the Council on Income and Wealth, an elected Founding Member of the National Academy of Social Insurance, and a Fellow of the Stanford University Center for the Study of Poverty and Inequality. In 2004, I was elected a Fellow of the Society of Labor Economists. In 2005, I received the Eugene Garfield Award for contributions to the economics of medical research, and, in 2007, I received the Kenneth Arrow Award from the International Health Economics Association.

I have held various visiting and research positions with the Board of Governors of the Federal Reserve, the World Bank, the Economics Research Center of the National Opinion Research Center, the Brookings Panel on Economic Activity, the Rand Corporation, and the Center for the Study of the Economy and the State. I have published numerous articles in academic literature. My curriculum vitae appears in Appendix A.



October 14, 2013                                                                    Charles River Associates

## 3.    Summary of Findings

In the analyses below I assess each of the questions raised by the Court regarding the incentive compensation claim of ADAs at EDMC and the job placement claim regarding the categorization of placements by Career Services.  I find that:

Incentive Compensation Claim

- Based on my statistical analysis of the compensation of ADAs at EDMC, I find that the total number of new students recruited did not solely determine compensation of ADAs at EDMC.  This was true both at EDMC as a whole and within each individual compensation matrix.

- After accounting for the number of new students recruited, several additional factors were both numerically and statistically significant in explaining ADA compensation differences at the 12-month evaluation and after.  Some of these factors include total quality factor points, location, and adjustments due to managerial responsibilities, all of which were statistically significant factors in explaining compensation.  The contributions of these factors imply that the total number of new students recruited did not solely determine compensation of ADAs at either EDMC as a whole or within each individual compensation matrix.

- The total number of quality factor points—a summary measure of evaluated performance—awarded to ADAs was not merely a proxy for the total number of new students recruited.  While the total number of quality factor points was positively correlated with the number of new students recruited, the correlation does not establish that ADAs who scored higher on the new student point range were far more likely to achieve higher total quality point scores.  Moreover, the regression results show that total quality factor points



were independently statistically significant (after controlling for the number of students recruited) in determining compensation of ADAs.

- Each of the five categories of total quality factor points in the matrices used to determine compensation (5 – 8 total points, 9 – 12, 13 – 18, 19 – 22, and 23 – 25) were used in assessing the performance of ADAs. Individuals appeared in each of the categories in each matrix, and within different categories of student points.

<u>Job Placement Claim</u>

- Based on a review and analysis of a random sample of a cross section of job placements of EDMC graduates, I find no evidence or indication of a systemic falsification of job placement statistics.

- Based on the information presently available, my review verified approximately 93% of placements of EDMC graduates based on the policies in use by EDMC.

- While my review was limited to the historical documentation that is available, further investigation may help to explain the 7% of placements that I was unable to definitively verify as placed in field or a related field.

The following sections describe in detail what was asked by the Court and my methodology and findings for each question raised by the Court.

## 4.   Questions Raised in the Court Order

Plaintiff alleges that EDMC did not meet the requirements of the Department of Education (DOE) safe harbor with regard to recruiter compensation and that EDMC artificially inflates graduate placement rates by recording graduates as being placed in a field related to their degree when they are not. With regard to compensation, plaintiff claims that EDMC's compensation practices did not meet the requirements of the DOE's safe harbor provision



that allows companies to compensate recruiters based on the number of students recruited as long as number of students is not the "sole" basis for an individual's compensation.[1] Plaintiff argues that although EDMC paid recruiters based on a matrix that sets compensation based on the number of student points and the number of "quality" points, the number of quality points simply depended on the number of students recruited—those who recruited many students received higher quality points, and those who recruited fewer students received lower quality points. (Amended Complaint paragraph 92 -121). With regard to placement, plaintiff claims that EDMC has systematically inflated the reported rates at which EDMC graduates find employment either "in field" or "in a related field", resulting in continued accreditation and higher levels of student enrollment than would be obtained with correctly reported placement rates (Amended Complaint, paragraph 152-166).

The July 16, 2013 order issued by the Court indicated that both of these issues could be addressed through a review of EDMC's compensation policies and record keeping practices by a competent statistician. Specifically, the Court requested a review of the compensation of Assistant Directors of Admission (ADAs) – whose responsibility is the recruitment of new students – to demonstrate that compensation was not solely based on the number of new students an ADA recruits. The order requests answers to the following questions (p. 28 – 29):

1.  To what extent was each of the five (quality factor) categories used;

2.  Did the number of quality points awarded to an ADA operate independently of the ADA's new student point range, or were ADAs who scored higher on the new student point range far more likely to achieve higher quality-point scores;

---

[1] According to the Federal regulations, "activities and arrangements that an institution may carry out without violating the [Act] include, but are not limited to:

(A)    The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid. . . ." 34 C.F.R. § 668.14(b)(22)(ii)(A) (eff. July 1, 2003 to June 30, 2011) .



3.  Was the number of new students recruited a significant factor in determining the compensation for 6 month-18 month ADAs?

The Court also found that the SLC did not sufficiently review the process by which graduates are identified as being employed in field.  The Court indicated (p.24) that:

> At a minimum, the SLC should have randomly selected an appropriate number and cross-section of graduates and obtained the placement documentation for these graduates, including writings relating to (1) the department supervisor's checking the accuracy of the information entered by Career Services Advisors, (2) the confirmation of the Career Services Advisors that verifications are documented, and (3) the separate review of EDMC's corporate staff, including a review of whether the employment listed for the graduate is related to the graduate's field of study.

In the following sections I describe the pay practices of EDMC and then present the results of statistical analyses that address each of the questions the Court identifies concerning whether ADA compensation is based solely on student recruitment. Following my review of EDMC's compensation practices, I will outline the procedure I undertook to sample and review the placement information that is recorded for graduates from 2008 to 2012.  Finally, I will summarize my opinions concerning the issues raised in the July 16, 2013 Court Order.

## 5.    Description of EDMC Pay Practices

During the period at issue, compensation of ADAs at EDMC consisted of a base salary that was obtained from a performance evaluation matrix (described below) along with several potential adjustments to an ADA's base salary. ADAs were evaluated every 6 months to determine their compensation for the next 6 month period, and both quantitative and qualitative factors determined the exact level of compensation during that period.  Note that this evaluation did not determine an increase or decrease to current compensation, but rather determined an entirely new base salary for the next 6 month period which may have been higher or lower than the ADA's current salary.

In order to determine the base salary, managers evaluated each ADA's performance in five areas (Job Knowledge, Business Practices and Ethics, Professionalism, Customer

Service, Initiative) and assigned a score between 1 and 5 for each factor, with 5 being the highest score.  These scores were summed to obtain a Total Quality Factor score (TQF). TQFs were then categorized into five categories of 5 to 8, 9 to 12, 13 to 18, 19 to 22, and 23 to 25, which were inputs to the performance evaluation matrix.

ADAs were also measured based on the "New Student Points" (NSP) accumulated in the prior evaluation period (in most instances the prior 12 months). NSPs were earned by recruiting students, with each student recruited being assigned a certain point value based on various factors.  These factors included the particular program of study, citizenship, year of high school graduation, and start date.  The total number of NSPs earned by the ADA in the prior evaluation period was categorized according to the then-current matrix used by the EDMC entity for which the ADA worked.  Exhibit 1 lists the EDMC entities relevant to this case and the time periods during which separate compensation matrices were used for each.



Exhibit 1 – Relevant Matrix Date Ranges by Institution

| Institution | Matrix | Data Range |
|---|---|---|
| The Art Institutes | Matrix 1 (AIG1) | 2003 - 2009 |
| | Matrix 2 (AIG2) | 2010 - 2011 |
| Online | Matrix 1 (OHE1) | 2003 - 2008 |
| | Matrix 2 (OHE21) | 2009 - 2011 |
| | Matrix 3 – First Reviews (OHE22) | 2009 - 2011 |
| Brown Mackie College | Matrix 1 (BMC2) | 2009 - 2011 |
| South University | Matrix 1 (SUG1) | 2008 - 2011 |

Exhibit 2 below shows the base compensation matrix that applied to The Art Institutes in January 2010. (The Art Institutes are the largest EDMC units, accounting for just over half of all ADA evaluations in the data. Other matrices were very similar to this one.) The exhibit shows that an individual ADA's base compensation was determined by her combination of NSP and TQF, which placed her performance in a particular cell. For example, if an ADA accumulated 360 NSPs (Level 12) and the quality of her performance earned 20 TQFs (Highly Effective) then her base annual salary would have been $84,750. Note that NSP is different than a simple count of students, because points are awarded based on the particular attributes of the students recruited. In addition, since each cell of the matrix represents a range of student points, the act of recruiting an additional student could only lead to a higher salary determination if it caused the ADA to move to the next highest cell in the matrix.

 

October 14, 2013                                                                Charles River Associates

| Exhibit 2 - AI On-Ground Salary Chart for January, 2010, Salary Calculations | | | | | |
|---|---|---|---|---|---|
| | | Annualized Salary, Based on Quality Points | | | | |
| | New Student | Unsatisfactory | Needs Improvement | Meets Expectations | Highly Effective | Outstanding |
| Level | Point Range | 5-8 pts | 9-12 pts | 13-17 pts | 18-22 pts | 23-25 pts |
| 1 | 0-99 | $26,000 | $27,000 | $29,000 | $31,000 | $33,000 |
| 2 | 100- 125 | $31,500 | $32,500 | $35,000 | $37,000 | $38,000 |
| 3 | 126- 150 | $37,750 | $39,000 | $42,000 | $44,500 | $45,750 |
| 4 | 151-175 | $40,500 | $41,750 | $45,000 | $47,750 | $49,000 |
| 5 | 176- 200 | $43,000 | $44,500 | $48,000 | $51,000 | $52,250 |
| 6 | 201-225 | $46,000 | $47,500 | $51,000 | $54,000 | $55,500 |
| 7 | 226-250 | $49,500 | $51,000 | $55,000 | $58,250 | $60,000 |
| 8 | 251 -275 | $53,000 | $54,750 | $59,000 | $62,500 | $64,250 |
| 9 | 276-300 | $56,500 | $58,500 | $63,000 | $66,750 | $68,750 |
| 10 | 301 - 325 | $61,000 | $63,000 | $68,000 | $72,000 | $74,250 |
| 11 | 326-350 | $66,500 | $68,750 | $74,000 | $78,500 | $80,750 |
| 12 | 351 - 375 | $72,000 | $74,500 | $80,000 | $84,750 | $87,500 |
| Add'l Levels | 25-point increments | add $5,000 | add $6,000 | add $7,000 | add $8,000 | add $8,000 |

After determining the base salary, there were several possible adjustments that could increase the ADA's compensation. First, several locations received adjustments for local labor market conditions ranging from 5% to 20% of the base salary amount calculated in the matrix. Second, an ADA may have received an increment of up to 15% of the base salary amount for years of EDMC seniority. Third, prior to 2010 the analyzed ADAs received adjustments for managing other employees. The management adjustments consisted of a $1,000 increase in base compensation for each employee managed (up to $5,000) and an additional amount equal to a percentage of the five highest paid managed employees' salaries.

Given that ADAs were assessed every 6 months, and the base compensation was determined on recent performance, it was possible for an ADA to have large increases or decreases in salary from one period to the next. To mitigate this compensation risk, EDMC provided ADAs with salary protection limits that prevented their salary from falling below some percent (usually 90% or 95%) of their current salary. Additionally, an ADA's first 6-month evaluation and subsequent compensation amount was based on only their TQF (i.e. there were no student points or any other adjustments), and the 12-month evaluation and

October 14, 2013                                                    Charles River Associates

compensation amount was the higher of either the compensation based on TQF alone, or the process based on the matrix with the adjustments described above. All subsequent compensation amounts (i.e. 18-month and beyond) were based on the relevant matrix, combined with any additional adjustments.

The central question in this dispute is whether compensation of ADAs was solely determined by the number of students they recruited. To illustrate my main conclusion, developed formally below, Exhibit 3 again uses the example of The Art Institutes in January 2010. The exhibit is a simple scatter diagram showing the relationship between total compensation (measured on the vertical axis) and the total number of students recruited (measured on the horizontal). Each dot in the figure represents the combination of compensation and students recruited for one of the 429 ADAs evaluated in January 2010. While it is true that ADAs who recruited more students typically earned more, the range of compensation for ADAs with identical numbers of recruited students is quite large.  For example, of the nine ADAs who recruited 56 new students during the previous twelve months (the sample median is 56), total compensation ranged from $45,835 to $93,543—a ratio of more than 2-to-1.[2] Inspection of Exhibit 3 below clearly shows that this range was not atypical. The clear message is that ADA compensation was not "solely" determined by the number of students recruited—other factors were very important, as demonstrated by the substantial variation in compensation at every level of student recruitment. I detail what these factors were in the next section.

---

[2] A review of the underlying review documents shows that the individual receiving the highest compensation with 56 new students recruited was subject to EDMC's salary protection policy. However, even those who were not subject to this policy earned as much as 40 percent more than the lowest ADA with 56 new students recruited.



Exhibit 3 – Comparison of New Salary and Total New Students (The Art Institutes – January 2010)



## 6. Statistical Analysis of the Factors Affecting ADA Compensation

### 6.1. Description of the Data Collected

     I received an electronic database that was constructed from hard-copy records of individual ADA salary and performance evaluations.  The electronic database included records of each evaluation for all ADAs employed by EDMC from July 2003 through May 2011.[3]  The data include information collected on the actual ADA compensation evaluation forms such as current salary, new salary (for the next 6-month period), number of new students recruited during the evaluation period, number of new student points, quality factor

---

[3] Argosy University employees are not included in the compensation data as they were not paid according to the compensation plan used by all other education systems of EDMC.



points (both the individual scores as well as TQF), any adjustment amounts made to the new

salary based on management responsibilities, location and the relevant compensation matrix

that applied to the ADA.  The data contain nearly 16,000 evaluation records for over 6,000

ADAs employed in four EDMC units.  Since the 6-month evaluations were only based on

TQF, these evaluation forms do not include information about the number of students

recruited and are therefore not included in any analyses below that investigate the total

number of new students recruited.

These data were collected from hard copy evaluation forms from which specific

information was extracted to produce an electronic database.  Exhibit 4 (in Appendix B) is an

example of an individual ADA's evaluation form, and Exhibit 5 (in Appendix C) lists the

variables contained in the created compensation data set that were used in the analysis.  The

creation of this data set was audited for accuracy in two ways.  First, five of the fields

(employee ID, evaluation date, total number of new students, current salary, and new salary)

were verified on all records by reviewing the evaluation forms.  In addition, I directed a

random sampling of 500 evaluation forms that were verified across all fields that I used in my

analyses against the data contained in the electronic file.  In this sample, I found no data

entry errors in the fields that I relied upon.

## 6.2.    Summary of Methods and Results

In order to ascertain whether compensation of EDMC ADAs was solely determined

by the number of students recruited, I performed a statistical analysis of ADA compensation

using the data described above.

As shown in Exhibit 1 above, from 2003 to 2011 EDMC used a total of seven

different compensation matrices in four business units. For this review I estimated a multiple

regression model of the determinants of ADA compensation for EDMC as a whole, as well as

for each of these seven matrices.  In the body of my report I discuss the results based on the

analyses including all of relevant EDMC's business units as well as the results for The Art

Institutes alone. With regard to the individual business unit review I have focused on The Art Institutes because (1) they comprise the largest single business unit in EDMC and (2) the results for The Art Institutes are representative of those for other relevant business units. Complete results for other relevant EDMC units appear in Appendix D.

The general approach of my statistical analysis is quite simple. If it were true that the number of new students solely determined compensation of ADAs, I would find that after accounting for the number of new students recruited there were no other factors that significantly (in the statistical sense) influenced compensation—all or virtually all differences in compensation among ADAs would be accounted for by differences in the number of students recruited. In contrast, if after accounting for the number of new students recruited there were other factors that significantly influenced compensation then I would conclude that the number of new students recruited did not solely determine compensation of ADAs at EDMC. If one finds that there were factors other than the total number of students recruited that significantly influenced compensation, then EDMC's compensation of ADAs would be consistent with the Federal regulations' safe harbor since ADAs received a fixed salary that was not adjusted more than twice a year and compensation was not based solely on the number of new students recruited, admitted, enrolled or awarded financial aid.

Before presenting formal regression results, it is worthwhile to demonstrate the substantial independent variation among total new students recruited (TNS), the number of student points (NSP) awarded for those recruits, and the total number of quality points awarded to the ADAs based on other dimensions of performance (TQF). Since the number of student points awarded for recruits differed by business unit, for this example I have focused on The Art Institutes ADAs so that I make an "apples to apples" comparison. However, for any of the business units where student points may have differed from one recruit to another a similar comparison could be made.

Exhibit 6 shows the relationship between the number of new students and new student points for ADAs employed in The Art Institutes in 2010. While it is obvious that

recruiting more students of the same type increased NSP, at any level of TNS there was substantial variation in NSP—the relationship was not one-to-one. For example, among 63 ADAs who recruited between 80 and 90 total new students, the number of student points ranged from 168 to 288. According to the matrix shown in Exhibit 2, this range would have raised the base salary of an ADA whose other dimensions of performance "meets expectations" from $45,000 to $63,000.

Exhibit 6 – Comparison of New Student Points and Total New Students (The Art Institutes – January 2010)



Similarly, Exhibit 7 shows the relationship between new student points (NSP) and total quality factor points (TQF), which were direct inputs to the salary matrix, for all of EDMC's ADAs. Since the number of student point ranges vary from one matrix to another, I have standardized the NSP categories into an ordinal ranking (e.g., for The Art Institutes in January 2010 category 1 corresponds to an NSP range of 0 – 99, whereas for the Online Higher Education ongoing reviews category 1 corresponds to an NSP range of 0 – 45). It is

 

October 14, 2013                                                                    Charles River Associates

evident that evaluations of performance *quality* were not simply another reflection of new

student recruiting—there was a wide range of TQF at nearly all levels of student recruiting.

### Exhibit 7 - Distribution of NSP and TQF (All ADAs)

| Number of Student Points Categories | Total Quality Factor Points Categories | | | | | Percent of Total |
|---|---|---|---|---|---|---|
| | 5 to 8 | 9 to 12 | 13 to 17 | 18 to 22 | 23 to 25 | |
| 1 | 13 | 583 | 2,885 | 805 | 39 | 35.6% |
| 2 | 0 | 82 | 825 | 659 | 60 | 13.4% |
| 3 | 1 | 36 | 559 | 663 | 84 | 11.1% |
| 4 | 1 | 30 | 378 | 619 | 116 | 9.4% |
| 5 | 0 | 13 | 275 | 572 | 108 | 8.0% |
| 6 | 0 | 14 | 183 | 482 | 107 | 6.5% |
| 7 | 1 | 6 | 114 | 396 | 104 | 5.1% |
| 8 | 0 | 1 | 72 | 285 | 81 | 3.6% |
| 9 | 0 | 4 | 39 | 181 | 71 | 2.4% |
| 10 | 0 | 1 | 25 | 144 | 72 | 2.0% |
| 11 | 0 | 1 | 6 | 70 | 53 | 1.1% |
| 12 | 0 | 0 | 5 | 55 | 40 | 0.8% |
| 13 | 0 | 0 | 1 | 31 | 26 | 0.5% |
| 14 | 0 | 0 | 4 | 13 | 14 | 0.3% |
| 15 | 0 | 0 | 1 | 1 | 6 | 0.1% |
| 16 | 0 | 0 | 1 | 2 | 5 | 0.1% |
| 17 | 0 | 0 | 0 | 0 | 4 | 0.0% |
| 18 | 0 | 0 | 0 | 1 | 2 | 0.0% |
| 19 | 0 | 0 | 0 | 0 | 3 | 0.0% |
| 20 | 0 | 0 | 0 | 0 | 2 | 0.0% |
| 21 | 0 | 0 | 0 | 1 | 2 | 0.0% |
| 22 | 0 | 0 | 0 | 0 | 1 | 0.0% |
| 23 | 0 | 0 | 0 | 0 | 1 | 0.0% |
| 24 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 25 | 0 | 0 | 0 | 0 | 2 | 0.0% |
| Percent of Total | 0.1% | 6.3% | 44.2% | 41.0% | 8.3% | |

As shown in Exhibit 7, the distribution of employees across quality point category

appears reasonable. There were few employees who fell into the first quality factor point

category. In general, *poor performing employees are usually not hired initially, quickly leave,*

*or are let go.* In the overall distribution the bulk of employees fell into the third and fourth

categories (44% and 41% respectively) with a few falling into the second and fifth categories

(6% and 8% respectively). When I also considered the distribution across quality factor point

categories but within a specific student point category I found substantial variation,



particularly in student point categories 1 – 9. This finding shows that there were a
considerable number of employees who, despite achieving low to moderate student point
categories, achieved high or very high quality factor point categories. The findings are
consistent when each of the compensation matrix groups is considered separately.  The
distribution of The Art Institutes ADAs for 2010 – 2011 is provided in Exhibit 8 below, and
similar charts for each of the other compensation matrices are provided in Appendix D.

Exhibit 8 - Distribution of NSP and TQF (The Art Institutes ADAs – 2010 - 2011)

| Number of Student Points Categories | Total Quality Factor Points Categories | | | | | Percent of Total |
|---|---|---|---|---|---|---|
| | 5 to 8 | 9 to 12 | 13 to 17 | 18 to 22 | 23 to 25 | |
| 1 | 2 | 59 | 424 | 135 | 13 | 34.1% |
| 2 | 0 | 12 | 118 | 89 | 10 | 12.3% |
| 3 | 0 | 3 | 98 | 120 | 19 | 12.9% |
| 4 | 0 | 2 | 75 | 109 | 28 | 11.5% |
| 5 | 0 | 0 | 35 | 116 | 35 | 10.0% |
| 6 | 0 | 0 | 36 | 94 | 21 | 8.1% |
| 7 | 0 | 0 | 4 | 72 | 13 | 4.8% |
| 8 | 0 | 0 | 8 | 34 | 10 | 2.8% |
| 9 | 0 | 0 | 3 | 18 | 10 | 1.7% |
| 10 | 0 | 0 | 0 | 7 | 7 | 0.8% |
| 11 | 0 | 0 | 0 | 4 | 6 | 0.5% |
| 12 | 0 | 0 | 0 | 1 | 2 | 0.2% |
| 13 | 0 | 0 | 0 | 1 | 1 | 0.1% |
| 14 | 0 | 0 | 0 | 0 | 1 | 0.1% |
| 15 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 16 | 0 | 0 | 0 | 0 | 2 | 0.1% |
| 17 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 18 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 19 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 20 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 21 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 22 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 23 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 24 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 25 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| Percent of Total | 0.1% | 4.1% | 43.1% | 43.1% | 9.6% | |

Exhibit 9 summarizes my regression analyses of the determinants of compensation
for EDMC ADAs across business units from 2003 through 2011.  In these analyses I have
included all ADAs for which the number of total new students (TNS) is recorded in the data.
In this analysis I estimate ADA compensation controlling only for the total number of new

students recruited and the year of the ADA review.[4]  The second column in Exhibit 9 reports the probability associated with the formal test of whether the total number of new students was a statistically significant determinant of ADA compensation, while the last column indicates how much of the variance in ADA compensation could be explained by the total number of new students alone.  While the first measure will indicate whether the total number of new students was a significant contributor to ADA compensation, the second measure will indicate if it was the "sole" contributor.

Generally, courts have operated under the assumption that observed differences that have a probability of occurring by chance of 0.05 (five percent, or one-in-twenty) or less are "statistically significant"—they are unlikely to have occurred by chance, which casts doubt on the hypothesis that the true difference is zero.  In the context of the regression analysis, factors with probability less than 0.05 are considered to have been statistically significant contributors to ADA compensation.  As shown in Exhibit 9, I find, not surprisingly, that the total number of new students was a statistically significant factor in ADA compensation at EDMC.  However, this does not indicate whether the number of total new students was the "sole" contributor to ADA compensation.

---

[4] In order to account for the fact that the impact of total new students may not be linear, I include both the total new students squared and total new students cubed in the regression analysis.  The reported probability is based on the joint test of significance across the three total new student variables.

Exhibit 9 – Analysis of New Salary Differences for EDMC ADAs
Controlling for TNS and Year (2003-2011)

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 1 |  |  |  |  |
| Total New Students (TNS)* | 0.0000 | Yes | 12,143 | 44.80% |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

The last column of Exhibit 9 shows the proportion of variance in ADA compensation in 2003-2011 that was accounted for by total new students (TNS) alone, without controlling for other determinants of compensation. This proportion, referred to as the "R-squared" of the regression, ranges between zero (none of the variance in compensation is explained) and one (all of the variance in compensation is explained). R-squared values that are very close to one would be consistent with a finding that a factor was a "sole" determinant of compensation, while those less than one suggest that the factor was not the "sole" determinant. As shown in Exhibit 9, the R-squared is 45 percent, which means that more than half of the variance in compensation was determined by factors other than TNS. These findings alone are sufficient to conclude that ADA compensation was not solely determined by the number of new students recruited—other factors accounted for nearly one-half of the variation in compensation across ADAs.

The results presented in Exhibit 9 show that the number of total new students was not the "sole" factor determining ADA compensation. As detailed above ADA compensation was determined based on several factors, including years of service and total quality factor points. However, plaintiff contends that these factors were simply other measures of the total number of new students. The analysis reported in Exhibit 10 examines the validity of this argument by estimating a model that adds other determinants of compensation to the



statistical model presented in Exhibit 9—that is, these factors were included in the model along with the effects of TNS.  As outlined above in my review of EDMC compensation procedures, the additional factors considered were:

- New Student Points categories
- TQF categories
- location
- managing associate adjustments
- years of service adjustments
- project associate adjustments

For each potential compensation factor listed in the left side of the Exhibit 10, I again report the probability associated with a formal statistical test that measures whether the factor in question was a statistically significant determinant of compensation, holding constant the effects of other factors, including the number of total new students.  I also report a broader statistical test for whether these factors were *jointly* statistically significant determinants of compensation, over and above the effect of total new students on compensation.  If these factors were, in fact, jointly statistically significant in determining compensation, then a statistician would conclude that total new students (TNS) recruited was not the sole measurable determinant of ADA compensation.



Exhibit 10 – Analysis of New Salary Differences for EDMC ADAs

Controlling for TNS and Other Compensation Related Factors (2003-2011)

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 2 | | | 12,143 | 85.49% |
| MA Adjustment | 0.0114 | Yes | | |
| ADA Salary Percent Increase | 0.0000 | Yes | | |
| Years of Service Adjustment | 0.0000 | Yes | | |
| PA Adjustment | 0.0000 | Yes | | |
| Total New Students (TNS) | 0.0002 | Yes | | |
| Student Point Categories | 0.0000 | Yes | | |
| Total Quality Factor Categories | 0.0000 | Yes | | |
| Evaluation Year | 0.0000 | Yes | | |
| Location | 0.0000 | Yes | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

Exhibit 10 shows the results for seven factors, in addition to the total new students (TNS), which the record indicates may have significantly contributed to an individual ADA's compensation.  Overall, this set of factors raised the proportion of variance explained by the statistical model from 45 percent to 85 percent.  Using the joint statistical test for the contribution of these factors taken together the result is a vanishingly small probability (probability < 0.0001) that the factors did not contribute to the determination of ADA compensation, even after accounting for the number of total new students.  Formally, this means that the measured contribution of the factors other than the total new students (TNS) in Exhibit 10 is extremely unlikely to have occurred by chance—the probability is very small, so the data are telling us that these particular factors were important determinants of compensation, over and above the effect of new students.   The exhibit also reports statistical probability for the incremental contribution of each factor *individually*.



For example, it is at least conceivable that total quality factor points (TQF) would make little incremental contribution to compensation after controlling for total new students, in spite of the formal structure of the matrix, either because everyone was given a similar evaluation or because TQF was simply another reflection of the number of students recruited. But the data indicate that this was not the case. Holding constant all other measureable determinants of compensation, including the number of students, TQF categories had a highly statistically significant incremental contribution in explaining compensation (probability < .0001). In fact, each of the other factors listed in the table was also statistically significant in its own right, which means that each of them individually had significant power in explaining compensation differences, after controlling for all other determinants of compensation including new students.

While the analysis reported in Exhibit 10 accounts for many of the compensation related factors identified by EDMC, it may not capture business unit specific matrix characteristics that affect ADA compensation. Thus, I re-ran the previous two analyses separately for each of the seven compensation matrices that were applicable during this period and again found no statistical support for the allegation that ADA compensation was based solely on the number of total new students.

Exhibit 11.1 and 11.2 summarize my regression analyses of the determinants of compensation for The Art Institutes ADAs under the relevant matrix in 2003-2009 and separately under the relevant matrix in 2010-2011. Model 1 in each of the exhibits shows the results of a regression analysis that only controls for the number of total new students and year, whereas Model 2 adds in the additional compensation related factors identified by EDMC.

As shown in Model 1 of Exhibit 11.1 approximately 70 percent of the variance in ADA compensation in 2003-2009 was accounted for by total new students (TNS) alone, without controlling for other determinants of compensation, which means that 30 percent of the variance was determined by factors other than TNS. Model 2 includes the seven additional

factors that the record indicates may have significantly contributed to an individual ADA's compensation at The Art Institutes.  Overall, this set of factors raised the proportion of variance explained by the statistical model from 67 percent to 89 percent.  Again I find the joint statistical test for the contribution of these factors taken together has a vanishingly small probability (probability < .0001).  Formally, this means that the measured contribution of the factors in Model 2 is extremely unlikely to have occurred by chance—the probability is very small, so the data are telling us that these particular factors were important determinants of compensation, over and above the effect of new students.   In addition, each of the additional compensation related variables were statistically significant factors in determining ADA compensation.

Exhibit 11.1 – Analysis of New Salary Differences for ADAs in The Art Institutes
(2003-2009)

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 1 | | | | |
| Total New Students (TNS)* | 0.0000 | Yes | 3,888 | 66.76% |
| | | | | |
| Model 2 | | | 3,888 | 88.94% |
| MA Adjustment | 0.0007 | Yes | | |
| ADA Salary Percent Increase | 0.0000 | Yes | | |
| Years of Service Adjustment | 0.0000 | Yes | | |
| PA Adjustment | 0.0000 | Yes | | |
| Total New Students (TNS) | 0.0440 | Yes | | |
| Student Point Categories | 0.0000 | Yes | | |
| Total Quality Factor Categories | 0.0000 | Yes | | |
| Evaluation Year | 0.0000 | Yes | | |
| Location | 0.0000 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.



October 14, 2013                                                                Charles River Associates

Model 1 in Exhibit 11.2 shows that the corresponding proportion in 2010-2011 under

The Art Institutes compensation matrix was 67 percent. These findings alone are sufficient to

conclude that ADA compensation was not solely determined by the number of new students

recruited—other factors accounted for nearly one-third of the variation in compensation

across ADAs.

Exhibit 11.2 – Analysis of New Salary Differences for ADAs in The Art Institutes (2010-2011)

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| **Model 1** | | | | |
| Total New Students (TNS)* | 0.0000 | Yes | 1,857 | 66.63% |
| | | | | |
| **Model 2** | | | 1,857 | 86.33% |
| MA Adjustment | --- | --- | | |
| ADA Salary Percent Increase | --- | --- | | |
| Years of Service Adjustment | 0.0000 | Yes | | |
| PA Adjustment | 0.0000 | Yes | | |
| Total New Students (TNS) | 0.0000 | Yes | | |
| Student Point Categories | 0.0000 | Yes | | |
| Total Quality Factor Categories | 0.0000 | Yes | | |
| Evaluation Year | 0.0000 | Yes | | |
| Location | 0.0000 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

Model 2 in Exhibit 11.2 shows the results after accounting for the other compensation

related factors in addition to the number of total new students. The results are qualitatively

the same as those reported above. Taken together, the results in Exhibits 11.1 and 11.2 offer

formal and statistically powerful evidence that the number of new students recruited was not

the sole determinant of compensation for The Art Institutes ADAs. Other measurable factors

were statistically significant determinants of ADA compensation.



Appendix D reports the results of similar regression analyses for each of the other EDMC business units and relevant compensation matrices, which report qualitatively identical conclusions. Overall, the data provide powerful confirmation that new student recruiting was not the sole determinant of compensation among EMDC ADAs.

## 6.3.    Twelve Month ADA Compensation

The Court also asked whether the number of new students was a significant factor in determining the compensation for 6 month – 18 month ADAs (i.e. based on the twelve-month reviews).  Similar to the analyses for the full population of ADAs (both twelve and eighteen plus month reviews), I conducted regression analyses of compensation for the 12-month reviews controlling for not only the number of students, but also several other factors.  As with the previous analyses, I report those for all EDMC ADAs in Exhibit 12 and Exhibit 13, and then for The Art Institutes ADAs in Exhibits 14.1 and 14.2 below and provide the other business units in Appendix D

Following the analytical approach used to examine the compensation for all EDMC ADA outlined above, Exhibit 12 shows the results of a regression analysis that only accounts for the number of total new students and the year of the review based only on the ADA 12-month reviews.  While the number of total new students was again a statistically significant determinant of ADA salary, even for those receiving their 12-month review, it explained less than 10 percent of the variation in the ADA salaries for those subject to their 12-month review.  Thus, across all EDMC ADAs subject to the 12-month review more than 90 percent of the variation in compensation was explained by something other than the number of total new students.  This result does not support an allegation that the 12-month ADA salaries were solely determined by the number of students recruited.

 

October 14, 2013                                                      Charles River Associates

Exhibit 12 – Analysis of New Salary for EDMC ADAs based on 12-month Reviews
Controlling for Total New Students

(2003-2011)

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 1 | | | | |
| Total New Students (TNS)* | 0.0000 | Yes | 3,454 | 9.40% |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

Exhibit 13 reports the results of a regression analysis that includes the other compensation related factors identified by EDMC. For each factor I report the probability that it was a statistically significant determinant of 12-month ADA compensation, after accounting for the number of total new students for an ADA. Again, I find that factors other than the total new students (TNS), including total quality factors, had a statistically significantly impact on ADA 12-month compensation. With these additional factors the model was able to explain more than 70 percent of the variation in ADA 12-month compensation compared to less than 10 percent with the number of total new students alone. Again, the joint test on the contribution of the additional factors taken together had a vanishingly small probability (probability < .0001), telling us that these particular factors were important determinants of compensation, over and above the effect of new students.



Exhibit 13 – Analysis of New Salary for EDMC ADAs based on 12-month Reviews
Controlling for Total New Students and other Compensation Related Factors

(2003-2011)

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 2 | | | 3,454 | 70.69% |
| MA Adjustment | 0.0171 | Yes | | |
| ADA Salary Percent Increase | 0.0016 | Yes | | |
| Years of Service Adjustment | 0.0000 | Yes | | |
| PA Adjustment | 0.0000 | Yes | | |
| Total New Students (TNS) | 0.0000 | Yes | | |
| Student Point Categories | 0.0000 | Yes | | |
| Total Quality Factor Categories | 0.0000 | Yes | | |
| Evaluation Year | 0.0000 | Yes | | |
| Location | 0.0000 | Yes | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

The next two exhibits report similar analyses for The Art Institutes alone. Model 1 reports the results of the analyses based only on the number of total new students and year, and Model 2 adds the additional compensation related factors. Exhibit 14.1 shows the proportion of variance in 12-month ADA compensation in 2003-2009 that was accounted for by total new students (TNS) alone, without controlling for other determinants of compensation. Consistent with the results for all 12-month ADAs, the proportion of 12-month compensation that was explained by total new students is substantially less than that of all The Art Institutes ADAs reported in Exhibit 11.1. For 12-month ADAs during this period approximately 12 percent of variation in compensation was explained by total new students, which means that more than 88 percent of the variance was determined by factors other than total new students.



October 14, 2013                                                                        Charles River Associates

Exhibit 14.1 – Analysis of New Salary Differences for 12-month ADAs in The Art Institutes
(2003-2009)

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| **Model 1** | | | | |
| Total New Students (TNS)* | 0.0033 | Yes | 1,014 | 11.58% |
| | | | | |
| **Model 2** | | | 1,014 | 45.52% |
| MA Adjustment | 0.0060 | Yes | | |
| ADA Salary Percent Increase | 0.0013 | Yes | | |
| Years of Service Adjustment | 0.0044 | Yes | | |
| PA Adjustment | 0.1259 | No | | |
| Total New Students (TNS) | 0.0988 | No | | |
| Student Point Categories | 0.0025 | Yes | | |
| Total Quality Factor Categories | 0.1080 | No | | |
| Evaluation Year | 0.0000 | Yes | | |
| Location | 0.0000 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

        As shown in Model 2 of Exhibit 14.1, once other compensation related factors were

added to the model I was able to explain less than half of the variation in 12-month ADA

compensation.  Thus, most of the variation in 12-month ADA compensation at The Art

Institutes was not explained by the factors included in the model, including TNS.




Exhibit 14.2 – Analysis of New Salary Differences for 12-month ADAs in The Art Institutes
(2010-2011)

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| **Model 1** | | | | |
| Total New Students (TNS)* | 0.8020 | No | 463 | 10.41% |
| | | | | |
| **Model 2** | | | 463 | 56.19% |
| MA Adjustment | — | — | | |
| ADA Salary Percent Increase | — | — | | |
| Years of Service Adjustment | 0.0000 | Yes | | |
| PA Adjustment | 0.0144 | Yes | | |
| Total New Students (TNS) | 0.1686 | No | | |
| Student Point Categories | 0.4130 | No | | |
| Total Quality Factor Categories | 0.0071 | Yes | | |
| Evaluation Year | 0.2594 | No | | |
| Location | 0.0000 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

\* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the
evaluation year.

As shown in Model 1 of Exhibit 14.2, for the 2010 – 2011 period the TNS was not a statistically significant determinant of 12-month ADA compensation for those in The Art Institutes. As with the earlier period for The Art Institutes 12-month ADAs, I again find that the other compensation related factors only explained approximately half of the variation in compensation for this group. However, these results indicate that for this subset of reviews the number of students did not "solely" determine compensation of 12-month ADAs.

# 7.    The Correlation Between TQF and TNS

The findings from the regression analyses demonstrate that ADA compensation was not based solely on total new students. However, the Court also asks whether ADAs who scored higher on the new student point range were more likely to achieve higher TQFs. To



some extent the regression analyses address this question. If TQFs were a function of

student points – meaning managers assigned high TQFs to those who recruited the most

students - then once student points were included in the model, the effect of TQFs would not

be statistically significant. I find a statistically significant effect which demonstrates that TQFs

affected salary independent of the effect of student points.

As an additional check I tested the correlation between student points and TQFs.

EDMC compensation documents specify five factors which determined an ADA's TQF:

1.  Job Knowledge
2.  Business Practices and Ethics
3.  Professionalism
4.  Customer Service
5.  Initiative

It is highly likely that many of the same employee characteristics that lead to success in these

five areas also lead to success in student recruitment, and therefore I expect some positive

correlation between TQF and the number of students an ADA recruits.  However, if managers

assigned TQFs based on student points then the correlation would be unreasonably strong.

Exhibit 15 shows the correlation coefficients between TNS and TQF for all ADAs for each

compensation matrix.  A correlation coefficient that is equal to one indicates a perfect

correlation between two variables, and a correlation coefficient of 0 indicates no relationship

at all between two variables.  As expected, all coefficients were positive, but none of them

were unreasonably strong. The correlation coefficients are between 0.4032 and 0.6219.



October 14, 2013                                                                                    Charles River Associates

Exhibit 15 – Correlation between TQF and TNS by Matrix – All ADAs

| Matrix | Correlation Coefficient |
|--------|------------------------|
| AIG1 | 0.5712 |
| AIG2 | 0.5438 |
| BMC2 | 0.4074 |
| OHE1 | 0.6052 |
| OHE21 | 0.5889 |
| OHE22 | 0.6219 |
| SUG1 | 0.4032 |

When considering the distribution of TQF points both within a NSP category and across NSP categories as shown in Exhibit 7, along with the correlation coefficients in Exhibit 15 it is evident that TQF points were not entirely determined by TNS.

## 8.    Career Services Placement Review

Plaintiff in this matter alleges that EDMC systematically falsified job placement data both to accreditors and prospective students by stretching graduates' job descriptions to have them included within the definition of field-related employment. In order to investigate this claim further, in the Memorandum and Order of the Court, the Court stated that "the SLC should have randomly selected an appropriate number and cross-section of graduates and obtained the placement documentation for these graduates … including a review of whether the employment listed for the graduate is related the graduate's field of study."

I was provided with a list of all graduates from 2008 to present including information related to the graduates' post-graduation employment and EDMC's Career Services Advisors' assessment of whether that employment was related to the graduate's field of study. I selected a random sample of 1,250 placements (400 from The Art Institutes, 400 from Brown Mackie College, and 450 from South University) and can verify that 1,157 (or 92.6%) of these graduates were working "in-field" or "in a related field" based on the information that I have received to date. For the remaining 7.4%, based on the information I have received to date I



cannot decisively determine whether the individual was placed in field or in a related field. Based on my investigation of these sample records, I do not find evidence or indication of systemic falsification of job placement information. The following sections describe in more detail the data and other materials I received, the process I used to investigate the placement information, and the results of my investigation.

## 8.1. Data

I received a database titled "GksGradsPlacementsFull.xls" from EDMC that contained information on 136,730 graduates from the four EDMC education systems of higher education (Argosy University, The Art Institutes, Brown Mackie College, and South University), along with data on the schools they attended, dates associated with their graduation, student ID numbers, the level and type of degrees they completed, the businesses and positions in which they were known to be employed, employment status, and their EDMC advisors' names.

I also received copies of the policies that EDMC used to determine whether a graduate would be considered placed "in field" or "in a related field". It is my understanding that EDMC determined a graduate's placement "in field" or "in a related field" based upon the amount of time a student spent using skills gained in their academic program at the job. EDMC determined a graduate to be "in-field" if the graduate was employed in a position for at least one day that required 50% of the skills that were learned in the graduate's field of study. If the position required 25% of the skills that were learned in the graduate's field of study then the graduate was determined to be placed in a "related field".[5]

It is my understanding that graduates of Argosy University have historically not been included in the published placement rates for EDMC and, therefore, I did not consider any Argosy University graduates in my analysis. I also eliminated any graduates from "Calendar

---

[5] The specific policies that were in place varied slightly both over time and by educational system. In my review, I considered the timing and educational system of a graduate when determining whether their placement was "in field" or "in a related field".

Year" 2013 or later, as these graduates have not been used in the calculation of published placement rates.

After removing 2013 graduates and graduates from Argosy University, the file contained 98,592 EDMC graduates, of these 62,914 were considered both employed (according to "Employment Status") and "in field" or "in a related field" (according to "fldrelat_emp") according to EDMC. It is from this group of graduates that I randomly sampled 400 observations from each of the remaining education systems (The Art Institutes, Brown Mackie, and South University) for a total sample of 1,200 in order to estimate the percentage of placements that I verify as "in field" or "in a related field" given the data that I was provided. Based on the number of records in the data, a sample of 400 in each stratum (education system) is sufficient to calculate a 95% confidence interval of the placement rate with an error rate of 5%. Based on my initial analysis, I randomly sampled an additional 50 observations from South University online (see below). In full, my sample consisted of 1,250 observations which, according to their own criteria, EDMC considered to be graduates placed "in field" or "in a related field."

## 8.2.    Initial Round of Analysis

I performed the initial round of analysis on the original stratified random sample of 1,200 observations described above; using the following information from the data I was provided:

- Program: Includes detailed field of study as well as level (master, bachelor, associate, diploma) of degree earned
- BusinessState, BusinessCity, BusinessName: Location and name of the business employing the graduate. If I could not tell the industry of employment from the business name, I performed internet searches of the businesses using their cities and states to distinguish them.
- DOTDescOrig: "Dictionary of Occupational Titles" Description; brief description of graduate's job title.
- SICDesc: "Standard Industrial Classification" Description; brief description of the graduate's employer's industry.

Using the information included on the database, I determined whether the individual placements were "in-field" or "in a related field" or whether I needed additional information to

be able to make a determination.  In this sample, I noticed that I needed additional

information more often for placements from the South University online programs than in

other education systems so I decided to over-sample this group by an additional 50 (bringing

the total sample to 1,250).[6]  Based on the full sample of 1,250 I verified over 80 percent of

the "in-field" or "in related field" placements.  Exhibit 16 below shows a few examples of

placements that I determined to be in field or in a related field based on field of study,

employer name, and job title.

**Exhibit 16: "In-Field" or "In a Related Field" Based on Job, Employer, and Program**

| Program | Employer[7] | Job Title |
|---|---|---|
| Medical Coding and Billing – Diploma | Health Center | Nurse's Aide |
| Criminal Justice - Associate | Big Box Retail Store | Security Officer |
| Architectural Design & Drafting Tech - Associate | Materials Handling Company | AutoCAD Technician |
| Business Administration – Bachelor | Electrical Services Company | Office Manager |
| Fashion Marketing – Associate | Retail Clothing Store | Sales Associate |
| Graphic Design - Associate | Commercial Printing Company | Print Production Co-ordinator |

As part of this initial analysis, I relied upon the CIP to SOC "crosswalk" published by

the Department of Education, which maps CIP Codes (a 6-digit code indicating an

instructional program) to Standard Occupation Codes (SOC) used by the Census to indicate

the occupation in which a person works.  For over 70% of the placements that I examined in

the initial round of analysis, the occupation of the placed individual matched exactly to the

CIP code of their program based on the full 6-digit CIP Code.  An additional nearly 20%

matched based on the broader 4-digit CIP code (for a total of approximately 90%).  The

others that I determined to be in-field placements in the initial analysis were cases in which

the job title was not detailed enough to match perfectly to the CIP to SOC crosswalk, but was

---

[6] When sampling, it is common to oversample strata that show different patterns than other strata.

[7] The specific employer names have been redacted to ensure student privacy.

a very close match in general.[8]  For example, graduates of a Registered Nursing program whose job title was "Nurse" I considered to be verified as an in-field placement even though the job titles based on the crosswalk required that the job be as a "Registered Nurse" to match perfectly.

The initial round of analysis resulted in 247 cases (or 19.76 percent of the original sample of 1,250) in which I needed additional information (outside of just employer name, job title, and field of study) to determine whether the individual should have been labeled as "in-field" or "in related field".

## 8.3.    Second Round of Analysis

I requested additional documentation for the 247 cases from EDMC and EDMC sent additional information regarding these graduates in two forms.  One was an Excel database titled "EDMCGradsPlacements_Questions_WithDetail from RPark (9.23.13) – Copy Sent to CRA."  It is my understanding that this file contains information stored in EDMC's CampusVue system, including additional information on graduates' jobs linked with their student ID numbers.  The data contained in this file were consistent with that in the original placement data, but in many instances offered more detail regarding the employer, job title, or job duties of the graduate.  The other information I received was a set of PDF documents, each pertaining to a particular student and identified with his or her student ID.  The PDF documents contained either screen shots of a database system detailing conversations with the student about his or her job, email conversations between the graduate and the Career Services Advisor, or scanned forms about the job filled out by the student.  Exhibit 17 below shows some examples of placements that I determined to be in field or in a related field based on the additional documentation I received.  The additional documentation for each example is in Appendix F, and is indicated by the Student number used in the Exhibit.

---

[8] The CIP to SOC crosswalk contains only one description of a job title belonging to a given SOC code.  However, most SOC codes contain numerous descriptions of corresponding job titles according to the Bureau of Labor Statistics.



**Exhibit 17: "In-Field" or "In a Related Field" Based on Additional Information**

| Student | Program | Employer[9] | Job Title |
|---------|---------|-------------|-----------|
| Student 1 | Biomedical Equipment Technology - Associate | Pharmaceutical Company | Technician |
| Student 2 | Health Care Administration - Associate | Healthcare Business Resources | Technician |
| Student 3 | Graphic Design - Associate | Commercial and Residential Building | Event Coordinator |
| Student 4 | Web Site Development - Diploma | Media Technology Company | Advertising Executive |
| Student 5 | Fashion Design - Bachelor | Formal Wear Designer | Unknown |
| Student 6 | Business Administration - Master | Energy Company | Consultant |
| Student 7 | Computer Software Applications - Diploma | Staffing Company | Product Fabricator |

Using both the additional data and the supplemental documents, I performed a second round of analysis on these 247 observations. After reviewing these additional materials, there were 154 of the 247 which I could determine were placed in field or in a related field, leaving 93 for which I cannot confirm using the information currently available. Note that Career Service Advisors and accrediting agencies such as ACICS (who accredits many of EDMC's programs) also rely on phone conversations with graduates and employers to verify in-field job placements. To assess EDMC's historical job classification process, I have relied strictly on documents contained in the historical record of EDMC and therefore have a more limited set of information in which to confirm in-field placements than what would be available either to accreditors or to EDMC Career Services Advisors.

## 9.    Concluding Remarks

The statistical analysis reveals that contrary to the plaintiff's claim, ADA compensation is not solely determined by student recruitment. Other factors including total

---

[9] The specific employer names have been redacted to ensure student privacy.



quality factor points, location, and adjustments due to managerial responsibilities also significantly affect ADA compensation both at the 12-month evaluation and after. In addition, I find no evidence that would suggest that the quality factor point category is determined based solely on student recruiting. Total quality factor points independently impact compensation even after accounting for the total number of new student recruited.

        With respect to job placement classifications, based on the sample of records that I reviewed I find no evidence or indication of a systematic falsification of job placement statistics. Simply based on the historical information that was available to me (without potentially helpful additional follow-up to either graduates or employers) I was able to verify approximately 93% of the placements in my sample as in-field or in a related field, and would expect that further information may help to explain much of the remaining placements that I was not able to verify. In addition, the historical documentation reflects a verification process being used at EDMC's schools. In many instances the documentation includes conversations between Career Services Advisors and graduates as well as employers verifying that the graduates were in fact working in-field or in a related field. These results are inconsistent with systemic fraudulent reporting of placement statistics by EDMC.



# Appendix A

# Robert H. Topel

## CURRICULUM VITAE
### July, 2012

## CURRENT POSITIONS

*Isidore Brown and Gladys J. Brown Distinguished Service Professor of Economics,*
Booth School of Business, University of Chicago
*Director,* George J. Stigler Center for the Study of the Economy and the State
*Director,* University of Chicago Energy Initiative
*Research Associate,* National Bureau of Economic Research

## EDUCATION

B.A. (with High Honors), University of California, Santa Barbara, 1974
Ph.D., University of California, Los Angeles, 1980

## FIELDS OF SPECIALIZATION

Microeconomics, Labor Economics, Industrial Organization, Health Economics,
Economic Policy, Energy Economics, National Security Economics

## PREVIOUS POSITIONS

*Professor of Economics,* Graduate School of Business, University of Chicago, 1986-
1993
*Professor of Economics,* Department of Economics, University of California, Los
Angeles, 1986
*Associate Professor of Economics,* Department of Economics, University of California,
Los Angeles, 1985-86
*Associate Professor of Economics,* Graduate School of Business, University of Chicago,
1983-85
*Assistant Professor of Economics,* Department of Economics, University of Chicago,
1980-83

## OTHER AFFILIATIONS

*Research Associate,* National Bureau of Economic Research, 1984—present
*Senior Fellow,* the Milken Institute, 1999—present
*Fellow,* Center for the Study of Poverty and Inequality, Stanford University, 2006-present
*Member,* Brookings Panel on Economic Activity, various years.
*Visiting Scholar,* Board of Governors of the Federal Reserve, 1990
*Research Associate,* Economics Research Center, NORC, 1980—1990

*Consulting Economist*, The Rand Corporation, 1982—1989
*Research Associate*, Center for the Study of the Economy and the State, 1980—present
*Faculty Research Fellow*, National Bureau of Economic Research, 1981-83
*Research Economist*, Unicon Corporation, 1981-88
*Consultant*, U.S. Department of Labor, 1985-90
*Partner*, Chicago Partners LLC 1994-present

## EDITORIAL POSITIONS

Editor, *Journal of Political Economy*, 1993-2003
Board of Editors, *American Economic Review*, 1992-94
Associate Editor, *Journal of Labor Economics*, 1982-92
Editorial Board, *International Journal of the Economics of Business*, 1993-
Member of the Advisory Board, ERN Labor Journals

## HONORS & AWARDS

*Kenneth J. Arrow Award*, International Health Economics Association, 2007
*Kirby Distinguished Visiting Professor*, Texas A&M University, 2006
*Elected Fellow*, Society of Labor Economists, 2004
*Research America Eugene Garfield Prize for Medical and Health Research*, 2005
*Elected Member*, Conference on Research in Income and Wealth
*Elected Founding Member*, National Academy of Social Insurance
*William Ladany Research Scholar*, University of Chicago, 1989-91
*William Fishman Research Scholar*, University of Chicago, 1986-87
*Smith Richardson Dissertation Fellowship in Political Economy*, 1978-79
*Foundation for Research in Economics and Education Fellowships*, 1975-79
*Chancellor's Intern Fellow*, University of California, Los Angeles, 1975-79
*University Fellow*, Northwestern University, 1975
*General Electric Dissertation Fellowship*, 1978

## TEACHING EXPERIENCE

Graduate Economic Theory I, II, III
Law, Economics and Business
Competitive Strategy
Advanced Topics in Labor Economics
Advanced Topics in Microeconomics
Managing the Workplace
Industrial Organization/Antitrust
Price Theory

## OTHER PROFESSIONAL ACTIVITIES

*Thompson Lecture* (Keynote Address), Midwest Economic Association, 2000
*Nominating Committee,* American Economic Association, 1996, 1997
*Program Committee,* American Economic Association, 2006-2007.
*Organizer,* Universities-NBER Research Conference: "Labor Markets in the 1990s,"
Cambridge, December 1989.
*Program Chair,* Labor Economics, Econometric Society Meetings, December 1989.
National Science Foundation Review Panel in Economics, 1998, 1999
*Pihl Lecturer,* Wayne State University, November, 2004
*Keynote Address,* Federal Reserve Bank of Cleveland Conference on Education and
Economic Development, November, 2004
*Kirby Lecturer,* Texas A&M University, 2006
*Huggins Lecturer* (Keynote Address), Department of Surgery Huggins Conference,
University of Chicago, May, 2007
*Keynote Address,* Conference Board of Canada Meetings on Medical Research, Montreal,
January 2009
*Keynote Address,* Council on Competitiveness Conference on Energy Policy, Argonne
National Laboratory, May 2009
*Keynote Address,* University of Chicago/RFF/University of Illinois Conference on
*Energy Policy and the Economy,* Washington, D.C., January 2010

## UNIVERSITY SERVICE

Director, Undergraduate Program in Economics, 1980-83
Chairman, Graduate School of Business Curriculum Review, 1990-91
Committee on Graduate Education, 1992-94
Committee on Undergraduate Education, 1993-94
Council of the University Senate, 1992-94, 1995-97, 1999-2002, 2004-2007
Committee of the Council of the University Senate, 2000-2002, 2006-2007
Graduate School of Business Policy Committee, 1995-97, 1999-2001
Member, Presidential Search Committee, 1999-2000
Board of Directors, University of Chicago Laboratory Schools, 1986-92, 1998-2007
Chairman, Director Search Committee, U of C Laboratory Schools, 2002-2003
Area Coordinator, PhD Program in Economics, 2002-2008
Director, George J. Stigler Center, 2007-present
Director, University of Chicago Energy Initiative, 2008-present

## BIBLIOGRAPHY

*Books*:

*The Welfare State in Transition*, with Richard Freeman and Birgitta Swedenborg.
Chicago: University of Chicago Press for NBER, 1997.

*Labor Market Data and Measurement*, with John Haltiwanger and Marilyn Manser.
Chicago: University of Chicago Press for NBER, 1998.

*Välfärdsstat i omvandling: Amerikanskt Perspectiv på den Svenska Modelten*, with Richard Freeman and Birgitta Swedenborg. Författarna och SNS Förlag, 1995.

*Measuring the Gains from Medical Research: An Economic Approach*, with Kevin M. Murphy. Chicago: University of Chicago Press (2003).

*Reforming the Welfare State: Recovery and Beyond in Sweden*, with Richard Freeman and Birgitta Swedenborg, Chicago, University of Chicago Press for NBER, 2009

*Att Reformera Välfärdsstaten*, with Richard Freeman and Birgitta Swedenborg, SNS Förlag, Stockholm, 2006

*Energy Policy and the Economy*, with Mark Cohen and Don Fullerton, Special Issue of the BE Journal of Economic Analysis and Policy, Spring 2010

### Articles and Monographs:

"Layoffs, Inventories, and the Demand for Labor," Ph.D. Dissertation, University of California, Los Angeles, December 1980.

"Unemployment Insurance: Survey and Extensions," *Economica* **47** (August 1980): 351-79 (with F. Welch)

"Inventory Adjustments, Industry Behavior, and the Business Cycle," presented at the NBER Conference on Inventories and Business Cycles, March 1980 (with A. Stockman)

"Inventories, Layoffs, and the Short-Run Demand for Labor," *American Economic Review* (September 1982): 769-87.

"Experience Rating of Unemployment Insurance and the Incidence of Unemployment," *Journal of Law and Economics* (April 1984): 61-90.

"On Layoffs and Unemployment Insurance," *American Economic Review* (September 1983): 541-59.

"Equilibrium Earnings, Turnover, and Unemployment: New Evidence," *Journal of Labor Economics* (October 1984): 500-22.

"Local Labor Markets," Presented at Hoover Institution Conference on Labor Markets, January 1983. *Journal of Political Economy* **94** (June 1986, part 2): 111-43.

"Estimation and Inference in 'Two-Step' Econometric Models," (with K. M. Murphy) *Journal of Business and Economic Statistics* **3** (October 1985): 370-80.

"Employment Risk, Sectoral Shifts, and Unemployment," (with G. Neumann), in *Studies in Search*, ed. N. M. Kiefer and G. R. Neumann. Oxford: Oxford University Press, 1989.

"Unemployment and Unemployment Insurance," *Research in Labor Economics* **7** (1985): 91-135.

"Efficient Labor Contracts with Employment Risk," (with F. Welch), *Rand Journal of Economics* **17** (Winter 1986): 490-507.

"Financing Unemployment Insurance: History, Incentives, and Reform," in *Unemployment Insurance: The Second Half Century*, ed. W. Lee Hansen and J. Byers. University of Wisconsin Press, 1990.

"Sectoral Uncertainty and Unemployment," UCLA Department of Economics Working Paper No. 384, September 1985 (with L. Weiss), in *Employment, Unemployment, and Labor Utilization*, ed. R. A. Hart. Boston: Allen & Unwin, 1988.

"The Housing Market in the United States" (with S. Rosen), *Journal of Political Economy* (August 1988): 718-40.

"What They Say or What They Do? The Use of Survey Data in Predicting Behavior" (with K. M. Murphy), Graduate School of Business, University of Chicago, March 1985.

"Unemployment, Risk and Earnings: Theory and Evidence from a Model of Equalizing Wage Differentials" (with K. M. Murphy), in *Unemployment and the Structure of Labor Markets*, ed. J. Leonard and K. Lang. London: Basil Blackwell, 1986, pp. 103-140.

"Job Mobility, Search, and Earnings Growth: A Reinterpretation of Human Capital Earnings Functions," *Research in Labor Economics* **8** (1986): 199-233.

"The Evolution of Unemployment in the United States: 1968-1985" (with K. M. Murphy), *The NBER Macroeconomics Annual*, vol. 2, 1987, pp. 7-58.

"The Impact of Immigration on the Labor Market," in *Immigration, Trade, and the Labor Market*, ed. R. Freeman. University of Chicago Press for NBER, 1988.

"Efficiency Wages Reconsidered: Theory and Evidence" (with K. M. Murphy), in *Advances in the Theory and Measurement of Unemployment*, pp. 204-40. Edited by Yoram Weiss and Gideon Fishelson. London: Macmillan, 1990.

"Labor Market Adjustments to Increased Immigration," (with R. LaLonde), in *Immigration, Trade, and the Labor Market*, ed. R. Freeman. University of Chicago Press for NBER, 1989.

"Job Mobility and the Careers of Young Men" (with M. P. Ward), *Quarterly Journal of Economics* 107 (May 1992): 441-79.

"Employment Risk, Diversification, and Unemployment," (with George Neumann) *Quarterly Journal of Economics* (November 1991): 1341-1365.



"Specific Capital, Mobility, and Wages: Wages Rise with Job Seniority," *Journal of Political Economy* 99 (February 1991): 145-76.   Reprinted in *Outstanding Contributions in Labor Economics,* ed. Orley Ashenfelter, Worth Publishers, 1999: 162-192.

"Specific Capital and Unemployment: Measuring the Costs and Consequences of Worker Displacement." *Carnegie-Rochester Series on Public Policy* 33 (1990): 181-214.

"The Assimilation of Immigrants in the United States: Immigrant Quality and the Changing Price of Skills," In *Immigration and the Work Force: Economic Consequences for the United States and Source Areas,* ed. G. Borjas and R. Freeman. Chicago: University of Chicago Press for NBER, 1992.

"Trends in the American Labor Market," *GSB Chicago,* vol. 12, no. 2, Winter 1990, pp. 11-16.

"Why Has the Natural Rate of Unemployment Increased over Time?" (with K. Murphy and C. Juhn), *Brookings Papers on Economic Activity* 2 (1991), pp. 75-142.

"Immigrant Quality and Assimilation in the American Labor Market" (with R. LaLonde), *American Economic Review,* 81 ( May 1991): 297-302.

"Unemployment and Insurance," in *Proceedings of National Academy of Social Insurance,* 1992.

"Labor Markets and Economic Growth: Lessons from Korea's Industrialization, 1970-1990" (with D. Kim), *Differences and Changes in Wage Structures,* ed. Richard Freeman and Larry Katz (Chicago: University of Chicago Press for NBER, 1995.

"Wage Inequality and Regional Labor Market Performance in the United States," *Labour Market and Economic Performance: Europe, Japan, and the USA,* ed. Toshiaki Tachibanaki (New York: St. Martin's Press, 1994).

"Discretion and Bias in Performance Evaluation" (with C. Prendergast), *European Economic Review* 36 (June 1993): 355-65.

"What Have We Learned from Empirical Studies of Unemployment and Turnover?" *American Economic Review,* 83 (May 1993): 110-115.

"Regional Labor Markets and the Determinants of Wage Inequality," *American Economic Review,* 84 (May 1994): 17-22.

"Ekonomiska problem i Sveriges välfärdsstat -- inledning, sammanfattning och slutsatser," with Richard B. Freeman and Birgitta Swedenborg. In *Välfärdsstat i omvandling: Amerikanskt Perspectiv pä den Svenska Modelten,* with Richard Freeman and Birgitta Swedenborg. Författarna och SNS Förlag, 1995.



"Lönepolitik och strukturomvandling," with Per-Anders Edin. In *Välfärdsstat i omvandling: Amerikanskt Perspectiv pä den Svenska Modelten*, with Richard Freeman and Birgitta Swedenborg. Författarna och SNS Förlag, 1995.

"Favoritism in Organizations" (with C. Prendergast), *Journal of Political Economy* **104** (October 1996): 958-78.

"Another Look at Look Labor Market Adjustments to Increased Immigration" (with J. Hojvat-Gallin and R. LaLonde), 1996.

"Economic Impact of International Migration and the Economic Performance of Migrants," (with R. LaLonde), in *Handbook of Population and Family Economics*, ed. Mark R. Rosenzweig and Oded Stark (Amsterdam: North-Holland, 1997), pp. 799-850.

"Economic Troubles in Sweden's Welfare State," in *The Welfare State in Transition*, ed. Richard Freeman, Robert Topel, and Birgitta Swedenborg. Chicago: University of Chicago Press for NBER, 1997.

"Wage Policy and Restructuring: The Swedish Labor Market Since 1960" (with Per-Anders Edin), in *The Welfare State in Transition*, ed. Richard Freeman, Robert Topel, and Birgitta Swedenborg. Chicago: University of Chicago Press for NBER, 1997.

"Unemployment and Nonemployment" (with Kevin M. Murphy), *American Economic Review* 87 (May 1997): 295-300.

"Factor Proportions and Relative Wages: The Supply Side Determinants of Wage Inequality," *Journal of Economic Perspectives* 11 (Spring 1997): 55-74.

"Empirical Knowledge in Labor Economics," in *Labor Market Data and Measurement*, ed. John Haltiwanger, Marilyn Manser, and Robert Topel. Chicago: University of Chicago Press for NBER, 1998.

"Labor Markets and Economic Growth," in *Handbook of Labor Economics*, ed. Orley Ashenfelter and David Card.  Amsterdam: Elsevier Science B.V., 1999, pp. 2943-2984.

"Medical Research: What's It Worth?" (with K. M. Murphy), *Milken Institute Review: A Journal of Economic Policy* (First Quarter 2000): 23-30.

"Entry, Product Design, and Pricing in an Initially Monopolized Market" (with S. Davis and K. M. Murphy), University of Chicago GSB, September 2001, revised January, 2003. *Journal of Political Economy*, vol. 112 no. 1, pt. 2, February, 2004, pp188-225.

"Adverse Price Effects of Entry in Markets with Few Firms" (with Steven J. Davis and Kevin M. Murphy), Working Paper, University of Chicago, April 2001.

"The Economic Value of Medical Research" (with Kevin M. Murphy), in *Measuring the Gains from Medical Research: An Economic Approach*, edited by Kevin M. Murphy and Robert H. Topel. Chicago: University of Chicago Press, 2003, pp 41-73.

"Current Unemployment, Historically Contemplated" (with Kevin M. Murphy and Chinhui Juhn), *Brookings Papers on Economic Activity* 1. Washington, D.C.: The Brookings Institution, 2002.

"Estimation and Inference in Two-Step Econometric Models" (with K.M. Murphy), *Journal of Business and Economic Statistics*, 20, issue 1, 2002: 88-97 (reprint: 20th Anniversary issue of the most important contributions published in *JBES*).

"Labor Markets in the United States and Korea: Factor Proportions, Inequality, and Unemployment" in *Macroeconomic Implications of Post-Crisis Structural Change*, L.J. Cho, D. Cho and Y.H. Kim, KDI press, 2005, pp 131-60.

"Diminishing Returns? Evidence on the Costs and Benefits of Improving Health" (with K.M. Murphy) November, 2002, *Perspectives in Biology and Medicine*, volume 46, no. 3, (Summer, 2003): pp108-128.

"War vs. Containment" (with S.J. Davis and K.M. Murphy), March 2003; presented at *NBER* Conference on National Security Economics, November 2003.

"Black-White Differences in the Economic Value of Improving Health", Working Paper, University of Chicago, December, 2001 revised August 2004 (with K. M. Murphy). Presented at the National Institutes of Health Conference on Racial Disparities in Health Outcomes, December, 2001. *Perspectives in Biology and Medicine*, Summer, 2004.

"The Value of Health and Longevity" (with K.M. Murphy), Revised March, 2005, *NBER Working Paper #11405,* June, 2005. *Journal of Political Economy,* October, 2006, pp 871-904. Winner of the 2005 *Eugene Garfield Economic Impact of Medical Research Award,* given by Research America. Winner of the 2007 *Kenneth J. Arrow Award,* given by the International Health Economics Association for the best paper in health economics published in 2006.

"The Private and Social Benefits of Education", (with Fabian Lange), *Handbook of the Economics of Education*, North-Holland, 2006

"The Social Value of Education", *Keynote Address, Federal Reserve Bank of Cleveland Conference on Education and Economic Development, November 2004,* in *Education and Economic Development*, Federal Reserve Bank of Cleveland Economic Review, 2004, pp 47-58.

"On Human Capital and Economic Growth" (with Fabian Lange), Working Paper, University of Chicago, September, 2005.


"Återhämtning och terstaende problem I den svenska valfardsstaten—inlendning, sammanfattning och slutsatser" in *Att Reformera Välfärdsstaten,* with Richard Freeman and Birgitta Swedenborg, SNS Förlag, Stockholm, 2006, 9-34.

"Forandrade forutsattningar for svensk lonebildning" (with Peter Fredriksson), in *Att Reformera Välfärdsstaten,* with Richard Freeman and Birgitta Swedenborg, SNS Förlag, Stockholm, 2006, 65-82.

"War in Iraq versus Containment" (with Steven J. Davis and Kevin M. Murphy), for CESifo Conference *"Guns and Butter: The Economic Causes and Consequences of Conflict",* Munich, December 2005, February, 2006.

"Social Value and the Speed of Innovation" (with Kevin M. Murphy), *American Economic Review,* May, 2007.

"Unemployment", *The New Palgrave of Economics,* 2008

"Wage Determination and Employment in Sweden Since 1990", (with Peter Fredricksson), Working Paper, University of Chicago and Uppsala University, August, 2006, revised December, 2008, in *Recovery and Beyond: Reforming the Welfare State in Sweden,* Richard Freeman, Birgitta Swedenborg and Robert Topel, eds., University of Chicago Press for NBER, 2009

"Reforming the Welfare State: Recovery and Beyond in Sweden" (with Richard Freeman and Birgitta Swedenborg), in *Recovery and Beyond: Reforming the Welfare State in Sweden,* Richard Freeman, Birgitta Swedenborg and Robert Topel, eds., University of Chicago Press for NBER, 2009

"Critical Loss Analysis in the Whole Foods Case", *Global Competition Policy,* March, 2008, @ http://www.globalcompetitionpolicy.org/index.php?&id=949&action=907.

"On the Economics of Climate Policy", (with Gary S. Becker and Kevin M. Murphy), *BE Journal of Economic Analysis and Policy,* 2010.

**Congressional Testimony and Presentations:**

"Unemployment and Insurance," Testimony before the U.S. Senate Committee on Finance, April 23, 1991.

"The Economic Value of Medical Research," Testimony before the U.S. Senate Committee on Health, Education, Labor, and Pensions, May 10, 2001.

"The Value of Improvements in Health and Longevity", Presentation for Congressional Staff and the American Cancer Society, Washington, July, 2005.

**Selected Reports:**

"Unemployment Insurance Financing and Unemployment: Empirical Investigation of Adverse Incentives," Final Report, U.S. Department of Labor Contract No. B9M22046, November 1982.

"Unemployment and Unemployment Insurance," Final Report, U.S. Department of Labor, ETA, May 1984.

"Local Labor Markets," Final Report, U.S. Department of Labor, Office of the Assistant Secretary for Policy, March 1984.

"The Use of Survey Data in Predicting Behavior: The Case of Enlistment Intentions," Final Report, U.S. Department of Defense, May 1985.

"Equalizing Wage Differences," Final Report, U.S. Department of Labor, Office of the Assistant Secretary for Policy, August 1985.

"Sectoral Change and Worker Displacement," Final Report, U.S. Department of Labor, Office of the Assistant Secretary for Policy, March 1990.

**Book Reviews:**

*Employment Hazards* by W. Kip Viscusi. In *Journal of Economic Literature*, March 1982.

*Handbook of Labor Economics*, ed. O. Ashenfelter and R. Layard. In *Journal of Economic Literature*, 1988.

**Selected Comments:**

"Comment on 'Some Recent Developments in Labor Economics and Their Implications for Macroeconomics'," *Journal of Money, Credit and Banking* **20** (August 1988, part 2).

"Comment on 'Industry Rents: Evidence and Implications'," (by Lawrence Summers and Lawrence Katz) *Brookings Papers on Economic Activity*, Brookings Institution, Washington, D.C., 1989.

"Comment on 'Wage Dispersion between and within U.S. Manufacturing Plants', *Brookings Papers on Economic Activity*, 1991.

"Comment on 'Why Is the U.S. Unemployment Rate So Much Lower?'" *NBER Macroeconomics Annual*, 1998, pp. 67-72.

"Comment on 'Does Immigration Grease the Wheels of the Labor Market?'" by George J. Borjas. *Brookings Papers on Economic Activity*. edited by William C. Brainard and George L. Perry. Washington, D.C. Brookings Institution, 2001.

"Comment on 'Where did the Productivity Growth Go? Inflation Dynamics and the Distribution of Income'" by Ian Dew-Becker and Robert J. Gordon. *Brookings Papers on Economic Activity.* edited by William C. Brainard and George L. Perry. Washington, D.C. Brookings Institution, 2005, 135-44.

**Testimonial Experience: (Last 4 Years)**

**Daryal T. Nelson, et al. v. Wal-Mart Stores, Inc. and Wal-Mart Transportation LLC., Eastern District of Arkansas Helena Division, NO. 2:05 CV-00134-WRW.** Expert on behalf of Wal-Mart in racial discrimination hiring case. Expert Report, April 12, 2006. Deposition, May 2, 2006. Expert Report, July 28, 2008. Rebuttal Expert Report, September 12, 2008. Deposition, September 23, 2008. Declaration, October 2, 2008.

**Pinkowski et al,. v. 3M Company, United States District Court, District of New Jersey, No. 205CV05668.** Affidavit on behalf of 3M in labor discrimination case, January 29, 2007. Trial Testimony, May 8, 2010.

**Sun Microsystems, Inc., et al. v. Hynix Semiconductor, Inc., et al. (Consolidated), Unisys Corporation v. Hynix Semiconductor, Inc., et al., Jaco Electronics, Inc. v. Hynix Semiconductor, Inc., et al., Edge Electronics, Inc. v. Hynix Semiconductor, Inc., et al., All American Semiconductor, Inc., et al., v. Hynix Semiconductor, Inc. et al., DRAM Claims Liquidation Trust, by its Trustee Wells Fargo Bank, NA v. Hynix Semiconductor, et al., United States District Court for the Northern District of California San Francisco Division.** Expert on behalf of Hynix Semiconductor, Inc. and Hynix Semiconductor America, Inc. Expert Report, March 7, 2008. Deposition, April 25, 2008. Declaration, April 16, 2009.

**Katherine Puffer, on behalf of herself and all others similarly situated, v. Allstate Insurance Company in the U.S. District Court for the Northern District of Illinois Eastern Division.** Expert on behalf of Allstate Insurance Company in labor case. Expert Report, April 1, 2008. Declaration, October 20, 2008.

**William Syverson, Patrick Boone, Lee Deshler, Robert Flowers, Barry Gerard, Tina Gleisner, Thomas Gomez, Edwin "Dana" Goodloe, Rolf Marsh, Daniel Moczan, James Payne, and Antonio Rivera, individually and on behalf of others similarly situated, v. International Business Machines Corporation in the U.S. District Court for the Northern District of California San Jose Division.** Expert on behalf of IBM in labor discrimination case. Expert Report, August 19, 2008. Deposition, September 9, 2008. Declaration in support of IBM, December 19, 2008.

**The United States of America v. Canada, in support of the United States' request for arbitration regarding Canadian softwood lumber subsidies.** Expert Report, November 21, 2008. Expert Response Report, March 23, 2009. Expert Rejoinder Report, June 19, 2009. Trial Testimony, July 20, 2009. Report to the Tribunal, June 15, 2010.

**Valassis Communications, Inc. v. News America Incorporated, a/k/a News America Marketing Group, News America FSI, Inc. a/k/a News America Marketing FSI, LLC and News America Marketing In-Store Services, Inc. a/a/a News American Marketing In-Store Services, LLC in the United States District Court for the Eastern District of Michigan Southern Division, No. 06-10240.** Expert Report, November 21, 2008. Rebuttal Expert Report, December 26, 2008. Deposition, January 22, 2009. Supplemental Expert Report, December 21, 2009. Supplemental Rebuttal Expert Report, January 14, 2010. Deposition, January 25, 2010.

**Valassis Communications, Inc., v. News America Incorporated, No. 07-706645-CZ.** Expert Report, November 21, 2008. Rebuttal Expert Report, December 26, 2008. Deposition, January 22, 2009. Trial Testimony, July 15-16, 2009.

**EBay Seller Antitrust Litigation in the U.S. District Court for the Northern District of California San Jose Division. Expert in support of Ebay Inc.'s opposition to plaintiff's motion for class certification.** Declaration, August 14, 2009. Deposition, August 28, 2009 and September 18, 2009.

**Payment Card Interchange Fee and Merchant Discount Antitrust Litigation in the U.S. District Court for the Eastern District of New York.** Expert Report, December 14, 2009. Deposition, April 20, 2010.

**Applied Medical Resources Corp., and Applied Medical Distribution Corp. v. Ethicon Endo-Surgery, Inc. in the United States District Court for the Central Division of California Southern Division, No. CV09-3605-RSWL (VBKx).** Expert Report, March 19, 2010. Deposition, April 15, 2010.

**Wallace Bolden, et al. vs. Walsh Group, et.al in the U.S. District Court Northern District of Illinois, Eastern Division, No. 06cv104.** Expert Report, December 22, 2010. Deposition, February 18, 2011.

**Jones, et al. vs. Wells Fargo Bank N.A., Wells Fargo Home Mortgage, Inc. in the Superior Court of California, County of Los Angeles, BC337821.** Expert Testimony, December 21, 2010.

**Peterson v. Seagate U.S. LLC, 534 F.Supp.2d 996, 2008 WL398968.** Expert Report, October 25, 2010. Deposition, February 15, 2011.

**NRLC and Railroad Employees, National Mediation Board Case Nos. A-13569; A-13570; A-13572; A-13573; A-13574; A-13575; A-13592.** Expert Report, October 10, 2011.

**Toyota Motor Corporation Hybrid Brake Marketing Sales Practices and Products Liability Litigation in the United States District Court Central District of California Southern Division, No. 8:10-ML-02172-CJC-RNB.** Expert Report, May 28, 2012. Deposition, July 19, 2012.



Charles River Associates

# Appendix B



**EDMC**
Education Management Corporation

*Education that Builds Careers*

**The Art Institutes·**
America's Leader in Creative Education

## Salary and Performance Worksheet:  JULY 1, 2006 EVALUATION

**ADA Name:** ▮▮▮▮▮        **Employee ID#:** ▮▮▮▮        **Location:** AiNYC

**Job Classification:** MA        **Hire Date:** 2/10/2003        **Evaluation:** 7/1/2006

**New Student Summary:**

**Points:** 178        **Total New Students:** 79

**Total New Students by Monthly Session:**

| May 05 | Jul 05 | Aug 05 | Oct 05 | Nov 05 | Jan 06 | Feb 06 | Apr 06 |
|---|---|---|---|---|---|---|---|
| 0 | 24 | 0 | 28 | 0 | 12 | 0 | 15 |

| | New Students | | Points | | | New Students | | Points |
|---|---|---|---|---|---|---|---|---|
| CPD | 0 | X | 1 = | 0 | Zone C General | 0 | X | 3 = 0 |
| Zone A General | 60 | X | 2 = | 120 | Zone C Senior | 0 | X | 4 = 0 |
| Zone A Senior | 11 | X | 3 = | 33 | Zone C International | 0 | X | 4 = 0 |
| Zone A International | 0 | X | 3 = | 0 | Inter-School Referrals (non-CPD) | 0 | X | 1 = 0 |
| Zone B General | 7 | X | 3 = | 21 | | | | |
| Zone B Senior | 1 | X | 4 = | 4 | | | | |
| Zone B International | 0 | X | 4 = | 0 | | | | |

### Quality Factor Points:

| | |
|---|---|
| *Job Knowledge* | 5 |
| *Business Practices and Ethics* | 4 |
| *Professionalism* | 5 |
| *Customer Service* | 4 |
| *Initiative* | 5 |
| **Total** | **23** |

**Managed ADAs 11/1/05-4/30/06:**

1.
2.
3.
4.
5.

### *New Student/Quality Factor Point Salary*

| | | |
|---|---|---|
| New Student/Quality Point Salary: | | $ 48,000 |
| Years of Service Adjustment: | 3 | $ 1,440 |
| Labor Market Adjustment: | 15% | $ 7,200 |
| ***Managing Associate Adjustments*** | | |
| 4ADAs to be Managed: | | $ 4,000 |
| 4% of  4 ADAs' salaries: | | $ 8,092 |
| **NS/QP Calculated Salary** | | **$ 68,732** |

### Salary Protection Data:

**Ranking Index:** 4,094

**Protection Level:** 95 %

**Current Salary** (As of 1/1/2006): **$ 63,639**

**Protected Salary Calculation (if applicable):** $

**\*Your New Salary Effective July 1, 2006\*:** **$68,732**

**I have discussed this worksheet with my supervisor.**

Employee Signature        Date

Supervisor Signature        Date

President/Human Resources Director Signature        Date

EDMC        7/1/2006 Salary Review



Charles River Associates

# Appendix C



**Exhibit 5 – List of variables from the compensation database used in the analysis**

employee_id – Unique employee identifier

Last_Name – Employee last name

First_Name – Employee first name

Hire_Date – Employee hire date

eval_date – Evaluation date

Matrix – field indicating the relevant matrix effective for the employee

curr_sal – salary before the current evaluation

new_salary – salary after the current evaluation

tns – total number of students recruited during the relevant evaluation period

YS_Adj – Years of service adjustment amount

ma_adj – Per person (up to 5) adjustment amount for Managing Associate responsibilities

ADA_1 – first ADA managed by the employee

ADA_2 – second ADA managed by the employee

ADA_3 – third ADA managed by the employee

ADA_4 – fourth ADA managed by the employee

ADA_5 – fifth ADA managed by the employee

ada_sal_perc – Dollar amount of adjustment for the percent of base salary of ADAs managed

Filename – File name of the pdf document containing the hard copy of the evaluation

Location – Location where the employee worked

NSP – Number of Student Points

QF1_Job_Know – Quality factor score for Job Knowledge

QF2_Bus_Eth – Quality factor score for Business Ethics

QF3_Prof – Quality factor score for Professionalism

QF4_Cust_Ser – Quality factor score for Customer Service

QF5_Init – Quality factor score for Initiative

TQF_Points – Sum of Quality factor scores (Total Quality Factor Points)

PA_Adj – Dollar adjustment for Project Associate responsibilities



# Appendix D

## Distribution of Number of Student Points and
## Total Quality Factor Points
## AIG1

## EDMC

| Number of Student Points Categories | Total Quality Factor Points Categories | | | | | Percent of Total |
|---|---|---|---|---|---|---|
| | 5 to 8 | 9 to 12 | 13 to 17 | 18 to 22 | 23 to 25 | |
| 1 | 1 | 117 | 700 | 153 | 4 | 25.1% |
| 2 | 0 | 11 | 168 | 88 | 7 | 7.0% |
| 3 | 0 | 10 | 154 | 120 | 4 | 7.4% |
| 4 | 0 | 20 | 168 | 151 | 2 | 8.8% |
| 5 | 0 | 10 | 179 | 223 | 11 | 10.9% |
| 6 | 0 | 12 | 116 | 235 | 24 | 10.0% |
| 7 | 0 | 3 | 93 | 234 | 32 | 9.3% |
| 8 | 0 | 1 | 53 | 193 | 14 | 6.7% |
| 9 | 0 | 4 | 31 | 133 | 28 | 5.0% |
| 10 | 0 | 1 | 17 | 113 | 37 | 4.3% |
| 11 | 0 | 1 | 3 | 47 | 27 | 2.0% |
| 12 | 0 | 0 | 4 | 43 | 24 | 1.8% |
| 13 | 0 | 0 | 0 | 18 | 20 | 1.0% |
| 14 | 0 | 0 | 0 | 6 | 8 | 0.4% |
| 15 | 0 | 0 | 0 | 1 | 4 | 0.1% |
| 16 | 0 | 0 | 0 | 0 | 1 | 0.0% |
| 17 | 0 | 0 | 0 | 0 | 1 | 0.0% |
| 18 | 0 | 0 | 0 | 0 | 2 | 0.1% |
| 19 | 0 | 0 | 0 | 0 | 2 | 0.1% |
| 20 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 21 | 0 | 0 | 0 | 1 | 0 | 0.0% |
| 22 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 23 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 24 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 25 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| Percent of Total | 0.0% | 4.9% | 43.4% | 45.2% | 6.5% | |

Source: Based on data provided by EDMC.

## Distribution of Number of Student Points and
## Total Quality Factor Points
## AIG2

### EDMC

| Number of Student Points Categories | Total Quality Factor Points Categories | | | | | Percent of Total |
|---|---|---|---|---|---|---|
| | 5 to 8 | 9 to 12 | 13 to 17 | 18 to 22 | 23 to 25 | |
| 1 | 2 | 59 | 424 | 135 | 13 | 34.1% |
| 2 | 0 | 12 | 118 | 89 | 10 | 12.3% |
| 3 | 0 | 3 | 98 | 120 | 19 | 12.9% |
| 4 | 0 | 2 | 75 | 109 | 28 | 11.5% |
| 5 | 0 | 0 | 35 | 116 | 35 | 10.0% |
| 6 | 0 | 0 | 36 | 94 | 21 | 8.1% |
| 7 | 0 | 0 | 4 | 72 | 13 | 4.8% |
| 8 | 0 | 0 | 8 | 34 | 10 | 2.8% |
| 9 | 0 | 0 | 3 | 18 | 10 | 1.7% |
| 10 | 0 | 0 | 0 | 7 | 7 | 0.8% |
| 11 | 0 | 0 | 0 | 4 | 6 | 0.5% |
| 12 | 0 | 0 | 0 | 1 | 2 | 0.2% |
| 13 | 0 | 0 | 0 | 1 | 1 | 0.1% |
| 14 | 0 | 0 | 0 | 0 | 1 | 0.1% |
| 15 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 16 | 0 | 0 | 0 | 0 | 2 | 0.1% |
| 17 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 18 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 19 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 20 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 21 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 22 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 23 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 24 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 25 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| Percent of Total | 0.1% | 4.1% | 43.1% | 43.1% | 9.6% | |

Source: Based on data provided by EDMC.

## Distribution of Number of Student Points and
## Total Quality Factor Points
## BMC2

## EDMC

| Number of Student Points Categories | Total Quality Factor Points Categories | | | | | Percent of Total |
|---|---|---|---|---|---|---|
| | 5 to 8 | 9 to 12 | 13 to 17 | 18 to 22 | 23 to 25 | |
| 1 | 2 | 50 | 126 | 42 | 4 | 48.9% |
| 2 | 0 | 2 | 33 | 15 | 2 | 11.4% |
| 3 | 0 | 5 | 35 | 17 | 2 | 12.9% |
| 4 | 1 | 1 | 13 | 10 | 1 | 5.7% |
| 5 | 0 | 2 | 15 | 8 | 0 | 5.5% |
| 6 | 0 | 2 | 11 | 8 | 0 | 4.6% |
| 7 | 1 | 2 | 7 | 6 | 1 | 3.7% |
| 8 | 0 | 0 | 5 | 6 | 0 | 2.4% |
| 9 | 0 | 0 | 1 | 7 | 0 | 1.7% |
| 10 | 0 | 0 | 4 | 3 | 2 | 2.0% |
| 11 | 0 | 0 | 0 | 0 | 1 | 0.2% |
| 12 | 0 | 0 | 1 | 1 | 0 | 0.4% |
| 13 | 0 | 0 | 0 | 3 | 0 | 0.7% |
| 14 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 15 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 16 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 17 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 18 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 19 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 20 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 21 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 22 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 23 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 24 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 25 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| Percent of Total | 0.9% | 14.0% | 54.8% | 27.5% | 2.8% | |

Source: Based on data provided by EDMC.

## Distribution of Number of Student Points and
## Total Quality Factor Points
## OHE1

### EDMC

| Number of Student Points Categories | Total Quality Factor Points Categories | | | | | Percent of Total |
|---|---|---|---|---|---|---|
| | 5 to 8 | 9 to 12 | 13 to 17 | 18 to 22 | 23 to 25 | |
| 1 | 2 | 75 | 120 | 19 | 0 | 29.0% |
| 2 | 0 | 15 | 88 | 21 | 1 | 16.8% |
| 3 | 0 | 10 | 75 | 42 | 1 | 17.2% |
| 4 | 0 | 3 | 40 | 53 | 3 | 13.3% |
| 5 | 0 | 0 | 25 | 50 | 4 | 10.6% |
| 6 | 0 | 0 | 9 | 38 | 3 | 6.7% |
| 7 | 0 | 1 | 1 | 18 | 4 | 3.2% |
| 8 | 0 | 0 | 0 | 7 | 4 | 1.5% |
| 9 | 0 | 0 | 0 | 2 | 3 | 0.7% |
| 10 | 0 | 0 | 0 | 1 | 1 | 0.3% |
| 11 | 0 | 0 | 0 | 3 | 1 | 0.5% |
| 12 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 13 | 0 | 0 | 0 | 1 | 0 | 0.1% |
| 14 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 15 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 16 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 17 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 18 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 19 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 20 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 21 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 22 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 23 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 24 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 25 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| Percent of Total | 0.3% | 14.0% | 48.1% | 34.3% | 3.4% | |

Source: Based on data provided by EDMC.



## Distribution of Number of Student Points and
## Total Quality Factor Points
## OHE21

### EDMC

| Number of Student Points Categories | Total Quality Factor Points Categories | | | | | Percent of Total |
|---|---|---|---|---|---|---|
| | 5 to 8 | 9 to 12 | 13 to 17 | 18 to 22 | 23 to 25 | |
| 1 | 2 | 98 | 478 | 131 | 6 | 25.0% |
| 2 | 0 | 38 | 309 | 235 | 24 | 21.2% |
| 3 | 1 | 8 | 172 | 268 | 39 | 17.0% |
| 4 | 0 | 3 | 76 | 239 | 60 | 13.2% |
| 5 | 0 | 0 | 17 | 156 | 48 | 7.7% |
| 6 | 0 | 0 | 10 | 95 | 53 | 5.5% |
| 7 | 0 | 0 | 6 | 50 | 46 | 3.6% |
| 8 | 0 | 0 | 1 | 33 | 42 | 2.7% |
| 9 | 0 | 0 | 0 | 16 | 27 | 1.5% |
| 10 | 0 | 0 | 0 | 8 | 18 | 0.9% |
| 11 | 0 | 0 | 0 | 9 | 11 | 0.7% |
| 12 | 0 | 0 | 0 | 5 | 12 | 0.6% |
| 13 | 0 | 0 | 0 | 0 | 3 | 0.1% |
| 14 | 0 | 0 | 0 | 1 | 4 | 0.2% |
| 15 | 0 | 0 | 0 | 0 | 1 | 0.0% |
| 16 | 0 | 0 | 0 | 0 | 2 | 0.1% |
| 17 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 18 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 19 | 0 | 0 | 0 | 0 | 1 | 0.0% |
| 20 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 21 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 22 | 0 | 0 | 0 | 0 | 1 | 0.0% |
| 23 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 24 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 25 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| Percent of Total | 0.1% | 5.1% | 37.3% | 43.5% | 13.9% | |

Source: Based on data provided by EDMC.

## Distribution of Number of Student Points and
## Total Quality Factor Points
## OHE22

### EDMC

| Number of Student Points Categories | Total Quality Factor Points Categories | | | | | Percent of Total |
|---|---|---|---|---|---|---|
| | 5 to 8 | 9 to 12 | 13 to 17 | 18 to 22 | 23 to 25 | |
| 1 | 4 | 184 | 1,037 | 325 | 12 | 71.0% |
| 2 | 0 | 4 | 108 | 211 | 16 | 15.4% |
| 3 | 0 | 0 | 25 | 95 | 19 | 6.3% |
| 4 | 0 | 0 | 5 | 56 | 22 | 3.8% |
| 5 | 0 | 0 | 2 | 17 | 10 | 1.3% |
| 6 | 0 | 0 | 1 | 10 | 6 | 0.8% |
| 7 | 0 | 0 | 0 | 9 | 6 | 0.7% |
| 8 | 0 | 0 | 0 | 2 | 7 | 0.4% |
| 9 | 0 | 0 | 0 | 1 | 2 | 0.1% |
| 10 | 0 | 0 | 0 | 0 | 1 | 0.0% |
| 11 | 0 | 0 | 0 | 1 | 1 | 0.1% |
| 12 | 0 | 0 | 0 | 0 | 1 | 0.0% |
| 13 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 14 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 15 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 16 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 17 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 18 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 19 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 20 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 21 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 22 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 23 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 24 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 25 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| Percent of Total | 0.2% | 8.5% | 53.5% | 33.0% | 4.7% | |

Source: Based on data provided by EDMC.



## Distribution of Number of Student Points and
## Total Quality Factor Points
## SUG1

### EDMC

| Number of Student Points Categories | Total Quality Factor Points Categories | | | | | Percent of Total |
|---|---|---|---|---|---|---|
| | 5 to 8 | 9 to 12 | 13 to 17 | 18 to 22 | 23 to 25 | |
| 1 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 2 | 0 | 0 | 1 | 0 | 0 | 0.8% |
| 3 | 0 | 0 | 0 | 1 | 0 | 0.8% |
| 4 | 0 | 1 | 1 | 1 | 0 | 2.3% |
| 5 | 0 | 1 | 2 | 2 | 0 | 3.8% |
| 6 | 0 | 0 | 0 | 2 | 0 | 1.5% |
| 7 | 0 | 0 | 3 | 7 | 2 | 9.0% |
| 8 | 0 | 0 | 5 | 10 | 4 | 14.3% |
| 9 | 0 | 0 | 4 | 4 | 1 | 6.8% |
| 10 | 0 | 0 | 4 | 12 | 6 | 16.5% |
| 11 | 0 | 0 | 3 | 6 | 6 | 11.3% |
| 12 | 0 | 0 | 0 | 5 | 1 | 4.5% |
| 13 | 0 | 0 | 1 | 8 | 2 | 8.3% |
| 14 | 0 | 0 | 4 | 6 | 1 | 8.3% |
| 15 | 0 | 0 | 1 | 0 | 1 | 1.5% |
| 16 | 0 | 0 | 1 | 2 | 0 | 2.3% |
| 17 | 0 | 0 | 0 | 0 | 3 | 2.3% |
| 18 | 0 | 0 | 0 | 1 | 0 | 0.8% |
| 19 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 20 | 0 | 0 | 0 | 0 | 2 | 1.5% |
| 21 | 0 | 0 | 0 | 0 | 2 | 1.5% |
| 22 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 23 | 0 | 0 | 0 | 0 | 1 | 0.8% |
| 24 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 25 | 0 | 0 | 0 | 0 | 2 | 1.5% |
| Percent of Total | 0.0% | 1.5% | 22.6% | 50.4% | 25.6% | |

Source: Based on data provided by EDMC.

## Analysis of New Salary Differences
### (Student Point Categories)

### EDMC - AIG1
### Full Population
### 2003 - 2009

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| **Model 1** | | | | |
| Total New Students (TNS)* | 0.0000 | Yes | 3,888 | 66.76% |
| | | | | |
| **Model 2** | | | 3,888 | 88.94% |
| MA Adjustment | 0.0007 | Yes | | |
| ADA Salary Percent Increase | 0.0000 | Yes | | |
| Years of Service Adjustment | 0.0000 | Yes | | |
| PA Adjustment | 0.0000 | Yes | | |
| Total New Students (TNS) | 0.0440 | Yes | | |
| Student Point Categories | 0.0000 | Yes | | |
| Total Quality Factor Categories | 0.0000 | Yes | | |
| Evaluation Year | 0.0000 | Yes | | |
| Location | 0.0000 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

## Analysis of New Salary Differences
## (Student Point Categories)

### EDMC - AIG2
### Full Population
### 2010 - 2011

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 1 | | | | |
| Total New Students (TNS)* | 0.0000 | Yes | 1,857 | 66.63% |
| | | | | |
| Model 2 | | | 1,857 | 86.33% |
| MA Adjustment | --- | --- | | |
| ADA Salary Percent Increase | --- | --- | | |
| Years of Service Adjustment | 0.0000 | Yes | | |
| PA Adjustment | 0.0000 | Yes | | |
| Total New Students (TNS) | 0.0000 | Yes | | |
| Student Point Categories | 0.0000 | Yes | | |
| Total Quality Factor Categories | 0.0000 | Yes | | |
| Evaluation Year | 0.0000 | Yes | | |
| Location | 0.0000 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

## Analysis of New Salary Differences
## (Student Point Categories)

## EDMC - BMC2
## Full Population
## 2009 - 2011

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 1 | | | | |
| Total New Students (TNS)* | 0.0000 | Yes | 458 | 72.86% |
| | | | | |
| Model 2 | | | 458 | 83.53% |
| MA Adjustment | --- | --- | | |
| ADA Salary Percent Increase | --- | --- | | |
| Years of Service Adjustment | 0.0000 | Yes | | |
| PA Adjustment | 0.0002 | Yes | | |
| Total New Students (TNS) | 0.1363 | No | | |
| Student Point Categories | 0.0000 | Yes | | |
| Total Quality Factor Categories | 0.0065 | Yes | | |
| Evaluation Year | 0.0000 | Yes | | |
| Location | 0.0000 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

## Analysis of New Salary Differences
## (Student Point Categories)

### EDMC - OHE1
### Full Population
### 2003 - 2008

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 1 | | | | |
| Total New Students (TNS)* | 0.0000 | Yes | 744 | 50.99% |
| | | | | |
| Model 2 | | | 744 | 74.47% |
| MA Adjustment | 0.7355 | No | | |
| ADA Salary Percent Increase | 0.0000 | Yes | | |
| Years of Service Adjustment | 0.0589 | No | | |
| PA Adjustment | 0.0000 | Yes | | |
| Total New Students (TNS) | 0.0622 | No | | |
| Student Point Categories | 0.0000 | Yes | | |
| Total Quality Factor Categories | 0.0000 | Yes | | |
| Evaluation Year | 0.0000 | Yes | | |
| Location | 0.0000 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

## Analysis of New Salary Differences
## (Student Point Categories)

### EDMC - OHE21
### Full Population
### 2009 - 2011

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 1 | | | | |
| Total New Students (TNS)* | 0.0000 | Yes | 2,863 | 70.32% |
| | | | | |
| Model 2 | | | 2,863 | 85.13% |
| MA Adjustment | --- | --- | | |
| ADA Salary Percent Increase | --- | --- | | |
| Years of Service Adjustment | 0.0000 | Yes | | |
| PA Adjustment | 0.0000 | Yes | | |
| Total New Students (TNS) | 0.8945 | No | | |
| Student Point Categories | 0.0000 | Yes | | |
| Total Quality Factor Categories | 0.0000 | Yes | | |
| Evaluation Year | 0.0000 | Yes | | |
| Location | 0.0004 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

## Analysis of New Salary Differences
## (Student Point Categories)

### EDMC - OHE22
### Full Population
### 2009 - 2011

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 1 | | | | |
| Total New Students (TNS)* | 0.0000 | Yes | 2,200 | 72.61% |
| | | | | |
| Model 2 | | | 2,200 | 85.03% |
| MA Adjustment | --- | --- | | |
| ADA Salary Percent Increase | --- | --- | | |
| Years of Service Adjustment | 0.0000 | Yes | | |
| PA Adjustment | 0.0000 | Yes | | |
| Total New Students (TNS) | 0.0000 | Yes | | |
| Student Point Categories | 0.0000 | Yes | | |
| Total Quality Factor Categories | 0.0000 | Yes | | |
| Evaluation Year | 0.0000 | Yes | | |
| Location | 0.0000 | Yes | | . |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.



## Analysis of New Salary Differences
## (Student Point Categories)

### EDMC - SUG1
### Full Population
### 2008 - 2011

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| **Model 1** | | | | |
| Total New Students (TNS)* | 0.0000 | Yes | 133 | 91.86% |
| | | | | |
| **Model 2** | | | 133 | 99.24% |
| MA Adjustment | --- | --- | | |
| ADA Salary Percent Increase | --- | --- | | |
| Years of Service Adjustment | 0.0000 | Yes | | |
| PA Adjustment | 0.0000 | Yes | | |
| Total New Students (TNS) | 0.1940 | No | | |
| Student Point Categories | 0.0000 | Yes | | |
| Total Quality Factor Categories | 0.0000 | Yes | | |
| Evaluation Year | 0.1148 | No | | |
| Location | 0.0012 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.



## Analysis of New Salary Differences
### (Student Point Categories)

### EDMC - AIG1
### 12 Month Reviews
### 2003 - 2009

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 1 | | | | |
| Total New Students (TNS)* | 0.0033 | Yes | 1,014 | 11.58% |
| | | | | |
| Model 2 | | | 1,014. | 45.52% |
| MA Adjustment | 0.0060 | Yes | | |
| ADA Salary Percent Increase | 0.0013 | Yes | | |
| Years of Service Adjustment | 0.0044 | Yes | | |
| PA Adjustment | 0.1259 | No | | |
| Total New Students (TNS) | 0.0988 | No | | |
| Student Point Categories | 0.0025 | Yes | | |
| Total Quality Factor Categories | 0.1080 | No | | |
| Evaluation Year | 0.0000 | Yes | | |
| Location | 0.0000 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

## Analysis of New Salary Differences
## (Student Point Categories)

### EDMC - AIG2
### 12 Month Reviews
### 2010 - 2011

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| **Model 1** | | | | |
| Total New Students (TNS)* | 0.8020 | No | 463 | 10.41% |
| | | | | |
| **Model 2** | | | 463 | 56.19% |
| MA Adjustment | --- | --- | | |
| ADA Salary Percent Increase | --- | --- | | |
| Years of Service Adjustment | 0.0000 | Yes | | |
| PA Adjustment | 0.0144 | Yes | | |
| Total New Students (TNS) | 0.1686 | No | | |
| Student Point Categories | 0.4130 | No | | |
| Total Quality Factor Categories | 0.0071 | Yes | | |
| Evaluation Year | 0.2594 | No | | |
| Location | 0.0000 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.



## Analysis of New Salary Differences
## (Student Point Categories)

### EDMC - BMC2
### 12 Month Reviews
### 2009 - 2011

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 1 | | | | |
| Total New Students (TNS)* | 0.3586 | No | 190 | 66.35% |
| | | | | |
| Model 2 | | | 190 | 85.32% |
| MA Adjustment | --- | --- | | |
| ADA Salary Percent Increase | --- | --- | | |
| Years of Service Adjustment | --- | --- | | |
| PA Adjustment | 0.0020 | Yes | | |
| Total New Students (TNS) | 0.5678 | No | | |
| Student Point Categories | 0.0039 | Yes | | |
| Total Quality Factor Categories | 0.1630 | No | | |
| Evaluation Year | 0.0047 | Yes | | |
| Location | 0.0000 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.



## Analysis of New Salary Differences
## (Student Point Categories)

### EDMC - OHE1
### 12 Month Reviews
### 2003 - 2008

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 1 | | | | |
| Total New Students (TNS)* | 0.3679 | No | 451 | 29.79% |
| | | | | |
| Model 2 | | | 451 | 46.73% |
| MA Adjustment | --- | --- | | |
| ADA Salary Percent Increase | --- | --- | | |
| Years of Service Adjustment | 0.8894 | No | | |
| PA Adjustment | 0.0000 | Yes | | |
| Total New Students (TNS) | 0.2189 | No | | |
| Student Point Categories | 0.0442 | Yes | | |
| Total Quality Factor Categories | 0.0053 | Yes | | |
| Evaluation Year | 0.2577 | No | | |
| Location | 0.0000 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.



## Analysis of New Salary Differences
## (Student Point Categories)

## EDMC - OHE21
## 12 Month Reviews
## 2009 - 2011

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| **Model 1** | | | | |
| Total New Students (TNS)* | 0.0000 | Yes | 1,320 | 71.69% |
| | | | | |
| **Model 2** | | | 1,320 | 83.28% |
| MA Adjustment | --- | --- | | |
| ADA Salary Percent Increase | --- | --- | | |
| Years of Service Adjustment | 0.0000 | Yes | | |
| PA Adjustment | 0.0000 | Yes | | |
| Total New Students (TNS) | 0.0292 | Yes | | |
| Student Point Categories | 0.0000 | Yes | | |
| Total Quality Factor Categories | 0.0000 | Yes | | |
| Evaluation Year | 0.0000 | Yes | | |
| Location | 0.0103 | Yes | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | 0.0000 | Yes | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

## Analysis of New Salary Differences
## (Student Point Categories)

### EDMC - SUG1
### 12 Month Reviews
### 2008 - 2011

| Variable | Probability the Variable Does Not Independently Impact Salary | Statistically Significant Impact on Salary? | Number of Observations | Proportion of the Variation in Salary Explained |
|---|---|---|---|---|
| Model 1 | | | | |
| Total New Students (TNS)* | 0.0189 | Yes | 16 | 58.34% |
| | | | | |
| Model 2 | | | 16 | 100.00% |
| MA Adjustment | --- | --- | | |
| ADA Salary Percent Increase | --- | --- | | |
| Years of Service Adjustment | --- | --- | | |
| PA Adjustment | --- | --- | | |
| Total New Students (TNS) | --- | --- | | |
| Student Point Categories | --- | --- | | |
| Total Quality Factor Categories | --- | --- | | |
| Evaluation Year | --- | --- | | |
| Location | --- | --- | | |
| | | | | |
| *All Variables Outside of Total New Students and Student Point Categories* | --- | --- | | |

Source: Data provided by EDMC.

* Model controls for the total new students (TNS), TNS squared, TNS cubed, and the evaluation year.

# Appendix E

# Additional Documentation:  Student 1

## Brown Mackie College Cincinnati

**Employment Verification (Employer)**

**Graduate/Employee Name:** ██████████████

Thank you for taking the time to complete this form. The information gathered here assists in refining our Academic and Career Services programs to more accurately reflect the realties of the marketplace in which our graduates are entering. We truly value your input and appreciate any comments or suggestions you may have for us.

Please make any corrections or additions as needed and return this form either via email, mail or fax at your earliest convenience. If you are not able to provide all of the requested information, please complete what you can. Once again, thank you for your time and attention. Career Services tracks all employment through the first six to twelve months after graduation. We will use salary information only to confirm the amount with your employer and to calculate average student salaries for federal and internal reporting requirements.

Supervisor Name: ████████████████ Supervisor E-mail: ██████████

Employer Name: ████████████████

Employer Address ████████████ City, State, Zip ████████████

Company Telephone Number: ████████████ Company Fax Number: _____

Graduate's/Student's Position/Title: Technicist I, Manufacturing

## **Specific Job Duties performed/Job Description (may be attached if you prefer):**

_____

_____
_____

Date Hired: 10/25/10          Annual pay rate: $ 36,900

If you are paying on an hourly basis, please indicate hourly rate: 17.75 Approximate hours per week: 40-50

Other pay (may include bonuses, freelance, overtime pay, etc.) Bonus target 10%, overtime

If you indicated other pay, please provide the source of the pay_____↑_____ (Bonus, overtime, freelance, etc)

Scheduled/anticipated review date: March 2011

**Signature of supervisor/company representative** ████████████████

If completed by someone other than the supervisor named above, please complete the following:

Name: ████████████ Position Title: Director, HR

Date: 10/14/11 Telephone Number: ████████████ Email Address ████████████

**For school use only:** Please check all that apply: Field related, direct ( )  Field related, related ( )  Unrelated ( )
Part time ( )    Full time ( )    Contract work ( )  Temporary position ( )  Freelance ( )
Name of Career Services Advisor: ████████████ Date Verified: 10/17/11
Signature of Career Services Representative: ████████████

## PLEASE RETURN BY EMAIL OR FAX TO: 513-672-1535    Thank You!

**Career Services Advisor:** ████████████████████



# JOB DESCRIPTION




| JOB TITLE | | | DATE REVISED |
|---|---|---|---|
| Technician I, Manufacturing – Packaging | | | 07/07/2010 |
| POSITION TITLE | | | LAST REVISED |
| Technician I, Manufacturing – Packaging (Grubb, Henning, Herbers, Hunter, Manso, Parks, Reynolds) | | | |
| DEPARTMENT/FUNCTION | LEVEL | FLSA | GXP ROLE |
| 6730 - OH Manufacturing – Packaging | | Non-exempt | Yes |

**POSITION SUMMARY**
Performs manufacturing and assembly of commercial pharmaceutical products.

## ESSENTIAL JOB FUNCTIONS

Operate and maintain production equipment under supervision by experienced associate.

Weigh, measure or check components/materials to assure batches manufactured contain correct components/materials and quantities.

Assist in execution of validation protocols for processes and equipment.

Maintain records and a clean environment to comply with regulatory requirements.

Read, Understand, and comply with Good Manufacturing Practices and Standard Operating Procedures.

Properly completes production documentation (batch records, log books, etc.).

Reports to supervision when a process deviation occurs.

Completes required document and OJT training.

**Perform production activities including Line clearances, cleaning, and operation of the packaging equipment**

## QUALIFICATIONS

**Education, Experience and Knowledge**
HS education or equivalent. Ability to operate all types of production equipment; gown appropriately for production operations. Team player committed to quality and working effectively with others. Motivated self-starter, results oriented, dependable, organized, efficient work traits, disciplined, and able to work with minimal supervision

**Skills**
Basic math skills and mechanical aptitude.

## REQUIREMENTS

**Physical Demands**
Ability to lift 40 pounds, stand for long periods of time, work gowned up for long periods of time, maintain good personal hygiene

**Manual Dexterity**
Unimpaired Manual Dexterity

**Audible/Visual Demands**
Correctable vision equal to or better than 20/20.

**Environment**
Manufacturing - Works under conditions with minor hazards such as working with moving machinery and equipment

| *Approved - Manager Signature* | *Approved - Manager Print Name* | *Date* |
|---|---|---|
| | | |

*This document is intended to describe the general content and to identify essential functions and requirements for performing this job, and it is not an exhaustive statement of duties, responsibilities or requirements. ▊ complies with the ADAAA and considers reasonable accommodation measures that may be necessary for eligible applicants/employees to perform essential job functions. Employment with ▊ is "at-will," meaning that either ▊ or an employee may terminate the employment relationship at any time, with or without cause, notice, reason or justification.*







A fast-paced, stimulating environment and a "Best Places to Work".

## Job Opportunities

| JOB TITLE | REQ NUMBER | DEPARTMENT |
|---|---|---|
| Facilities Technician | | Ohio Manufacturing Facility |
| Location: Cincinnati, OH | | |

Apply Now  |  Add to Job Cart  |  Send To a Friend

### Position Summary:

Perform routine and preventative maintenance on all facility machinery and equipment, including HVAC, de-ionized and reverse osmosis (RO/DI) water treatment systems, emergency generators, vacuum systems, and compressed air and laboratory gas systems.

### Responsibilities:

- Perform all responsibilities in accordance with company Standard Operating Procedures, practices, and safety rules as well as appropriate industry and regulatory guidelines, rules, and regulations.
- Perform preventive maintenance in accordance with approved maintenance plans and work orders using CMMS.
- Operate facilities equipment and systems in accordance with approved operating SOP.
- Operate facility fire monitoring system.
- Read and understand equipment and system PID drawings.
- Use aseptic techniques while maintaining high purity systems.
- Operate systems and equipment via SCADA system.
- Monitor alarms on SCADA system and respond in accordance with SOP guidelines.
- Understand and follow cGMP documentation procedures.
- Take ownership of assigned equipment and systems.
- Draft operating SOP and preventive maintenance plans for assigned equipment and systems.
- Ability to work with Hazardous Materials.
- Perform all task or requirements as assigned.

### Requirements:

- High school diploma or general education degree (GED) and completion of an electrical apprenticeship or journeyman certification. 3+ years related work experience or equivalent


combination of education and experience required.
- Experience managing building fire systems, building and environmental control systems.
- Experience with facility systems such as plumbing and lighting and HVAC equipment; including boilers, chillers, cooling towers, air handlers, humidifiers and air dryers is preferred, but not required.
- Must understand low voltage electrical systems.
- General knowledge of both the maintenance and operation of facility emergency diesel generators.
- Proficient mechanical skills using appropriate hand and power tools.
- Use of computers for e-mail, Microsoft office software and CMMS system required.
- Ability to lift 40 pounds, stand for long periods of time.
- Must be able to understand the requirements of and function fully in a clean room environment.

*Relocation assistance may be available for this position.

# Additional Documentation:  Student 2

## Brown Mackie College-Phoenix

**EMPLOYMENT STATUS FORM/EMPLOYER**

Name: ███████
Date of Graduation: ███████

Student ID #: ███████
Program: Health Care Administration

Thank you for taking the time to complete this form.  Career Services tracks employments of graduates. We  use salary information to calculate average salaries of graduates reporting.  We value the information that accurately reflects the employment status of our graduates. Any comments or suggestions are always appreciated.

Please make any changes or additions as needed and return this form via email, scan or fax at your earliest convenience.
Any information you can provide on this form is valuable. Once again, thank you for your time and attention.

Supervisor Name: ███████

Supervisor E-mail: _____

Company/Employer Name: ███████

Company/Employer Address: ███████

City: _Scottsdale___  State: _AZ_  Zip: _85260_

Company Telephone Number ███████  Company Fax Number: _____

Graduate's/Student's Title: _Clerical___  Date Hired: _3/5/12_

Graduate's/Student's Duties: _Follow up on EOB, itemized bills, Medical records_

**EARNINGS**

Annual Salary :_____ ( this should not include: benefits, overtime, health care or bonuses)

Hourly rate: _____  Hours per week: _40_

Other pay:
- Bonus: _____
- Freelance: _____
- Overtime _____
- Commission _____

Scheduled/anticipated review date: _____

Signature _By Phone_____

Name: ███████  Position Title: _Director of Business Operations_

Date: _4/13/12_  Telephone Number: _____

For official use only: Please check all that apply: Field Related, Direct (X)  Field Related, Related ( )  Unrelated ( )

Part Time ( )  Full Time (X)  Contract Work ( )  Temporary Position ( )  Freelance ( )  Internship ( )

If verified telephonically or verbally with the Employer, please provide the following:

Date Verified: _____  Verified via: Telephone (X)  Other ( ) _____

Career Services Representative (print): _____  Date: _____

Career Services Representative (signature): _____  Date: _____

Director of Career Service (print): ███████  Date: _4/13/12_

Director of Career Service (signature): _____  Date: _4/13/12_

AI ONLY:  Re-verified Date:_____  Phone Number: _____

Comments:

_____
_____
_____

Last Revised: January 3, 2012

# Brown Mackie College-Phoenix

**EMPLOYMENT STATUS FORM/GRADUATE**

Name: ███████                                                    Student ID #: ███████

Date of Graduation ███████                          Program: Health Care Administration

*Career Services tracks employment of graduates. Please complete and return this form to the Career Services department making any necessary changes. We use salary information to confirm the amount with your employer and to calculate average salaries for external and internal reporting.*

Supervisor Name/Title: _____

Supervisor e-mail (if known): _____  Employer/Company Name ████████

Company Telephone Number ████████  Company/Employer Address: ████████  Scottsdale, AZ 85260

Graduates'/Students' Position/Title: Support    Tech

Graduates'/Students' Duties: Review and Audit Medical Records, Print & Send Medical Records from Computer System

Date Hired: 3/5/12

**EARNINGS**

Annual Salary : _____  ( this should not include: benefits, overtime, health care or bonuses)

Hourly rate: 11.95                                        Hours per week: 40

Other pay:
- Bonus: _____                    • Overtime _____
- Freelance: _____               • Commission _____

Scheduled/anticipated review date: _____

**GRADUATE/STUDENT SIGNATURE**

I, (graduate/student) ████████ verify that the information provided above is correct to the best of my knowledge and I hereby authorize the above-named employer to release information about me to the Career Services department at (school) Brown Mackie College

Signature -By Phone                          Date 4/12/12

For official use only: Please check all that apply: Field Related, Direct (X) Field Related, Related ( )  Unrelated ( )

Part Time ( ) Full Time (X) Contract Work ( )    Temporary Position ( )    Freelance ( ) Internship ( )

If verified telephonically or verbally with the Graduate/Student, please provide the following:

Career Services Representative (print): _____ Date Verified: _____

Career Services Representative (signature): _____

Director of Career Service (print): ████████

Director of Career Service (signature): ████████

Verified via: Telephone (✓C) in person ( )

AI ONLY:  Re-verified Date: _____    Phone Number: _____

Comments: 11.95 X 2080 = ²⁴²⁴,856   Docs Stu Grad by Phone to ver info. 4/12/12 Email attempts and calls were made to employer on 3/9/12, 3/12/12, 3/15/12, 3/22/12, 3/28/12, 4/12/12 with no response

EDMC CSC Form 200                                        Rev.1.3.2012



## Brown Mackie College-Phoenix

**EMPLOYMENT STATUS FORM/EMPLOYER**

Name: ▮
Date of Graduation: ▮

Student ID #: ▮
Program: Health Care Administration

Thank you for taking the time to complete this form. Career Services tracks employments of graduates. We use salary information to calculate average salaries of graduates reporting. We value the information that accurately reflects the employment status of our graduates. Any comments or suggestions are always appreciated.

Please make any changes or additions as needed and return this form via email, scan or fax at your earliest convenience.
Any information you can provide on this form is valuable. Once again, thank you for your time and attention.

Supervisor Name: _____    Supervisor E-mail: _____

Company/Employer Name: _____

Company/Employer Address: _____

City: _____    State: _____    Zip: _____

Company Telephone Number: _____    Company Fax Number: _____

Graduate's/Student's Title: _____    Date Hired: _____

Graduate's/Student's Duties: _____

**EARNINGS**

Annual Salary : _____( this should not include: benefits, overtime, health care or bonuses)

Hourly rate: _____    Hours per week: _____

Other pay:
* Bonus: _____
* Freelance: _____
* Overtime _____
* Commission _____

Scheduled/anticipated review date: _____

Signature _____

Name: _____    Position Title: _____

Date: _____    Telephone Number: _____

For official use only: Please check all that apply: Field Related, Direct ( )   Field Related, Related ( )   Unrelated ( )

Part Time ( )   Full Time ( )   Contract Work ( )   Temporary Position ( )   Freelance ( )   Internship ( )

If verified telephonically or verbally with the Employer, please provide the following:

Date Verified: _____ Verified via: Telephone ( )   Other ( ) _____

Career Services Representative (print): _____ Date: _____

Career Services Representative (signature): _____ Date: _____

Director of Career Service (print): _____ Date: _____

Director of Career Service (signature): _____ Date: _____

AI ONLY:   Re-verified Date: _____ Phone Number: _____

Comments:

Last Revised: January 3, 2012

# Additional Documentation:  Student 3

AIM
315102 ███████████
AS  GR2  SU  2009

Salary  28080.00    Bonus  0.00

Employer:  ███

Event Coordinator
Start Date      12/3/2009
Position Type    FT

Responsibility Note:

█████████ is working as an event planner/graphic designer.
Design marketing materials and event collateral. He said he spends
over 50 percent of his time doing graphic design and marketing
work. He makes $13.50 at 40 hours/week.

October 14, 2013                                                    Charles River Associates

# Additional Documentation:  Student 4

## Art Institute of Pittsburgh Online Division

Graduate
Name: █████

Student ID #: █████

Date of Graduation: █████                                          Program/Degree: ___WD-DP_____

Thank you for taking the time to complete the Graduate Employment Status Form.  Congratulations on your new job.  Career Services tracks employments of graduates and we use this data to report employment information to internal and external entities.  All employment information is protected according to FERPA* guidelines.  Please complete the following information and sign and return at your earliest convenience.  Once again, thank you for your time and assistance.

Graduate's Supervisor Name/Title: _____

Supervisor e-mail _____ Employer/Company Name: ████████████_____

Company Telephone Number: ██████ _____ Company/Employer Address: ████████████_____

Graduates'/Students' Position/Title: __Digital Advertising Sales Planner_____ Start Date: _1/9/12_____

Graduates'/Students' Job Duties: _designs, creates, researches, & develops online advertising & web design_____

This position is:  (Please check all that apply)
Part Time _____  Full Time _X____  Contract Work_____  Temporary Position _____  Freelance_____  Paid Internship_____

**Please indicate how you found out about this position:**
Career Services (Y/N) _N___
If no, what source:  Internet job site (please indicate the site) _____ Friend/Family _____ Faculty/Staff_____
Industry Event _____ (Please name) _____ Other, please specify_____

Additional Information (i.e. work schedule)
_____

Are you paid ☒ Hourly or ☒ Salary
Annual Salary : _$40,000_____ ( this should not include: benefits, overtime, health care or bonuses)
or
Hourly rate: _____                    Hours per week: _____
Other pay:
•    Bonus:      _____              •    Overtime   _____
•    Freelance: _____              •    Commission _____

Additional Information: (anticipated review date, if other pay is actual or anticipated)
_____

I, (graduate/student printed name) _____ verify that the information provided above is correct to the best of my knowledge.

Graduate Signature___verified via exit interview_____ Date___on 1/14/13_____
Graduate Email address _____
Additional Information: _____

**FOR OFFICE USE ONLY:**

___ Signed Career Services Agreement is uploaded and in file

Please check all that apply: Field Related, Direct ( )   Field Related, Related ( )   Unrelated ( )      Part Time ( )    Full Time ( )
          Contract Work ( )       Temporary Position ( )     Freelance ( )    Internship ( )

If verified telephonically or verbally with the Graduate/Student, please provide the following:
Career Services Representative (print): _____ Date Verified: _____
Career Services Representative (signature): _____

Director of Career Service (print): _____
Director of Career Service (signature): _____
Verified via: Telephone ( )    in person ( )    Written communication ( )

Corporate Verifier Signature (if applicable): _____         Date: _____
At ONLY:  Name _____ Re-verified Date: _____ Phone Number: _____
Re-Verified via Telephone ( ) in person ( )

Comments: (Please add your name and date when including any additional comments.)

The Family Education Rights and Privacy Act (FERPA) is to protect all student educational records

Manager Approval:

**Exit Interview Checklist**

| | |
|---|---|
| Advisor: ████████████ | |
| Student: ████████ | Check List: |
| Student #: ██████ | ☐ Employment Status |
| Cell Phone: ████████ | ☐ Salary |
| Home Phone: (    )    - | ☐ Job Description |
| Date: **1/14/13** | ☐ Started Job Search |
| Class: Sept '12        Program: WD-DP | ☐ Resume Received |
| | ☐ Paperwork Received |

Employment Status: ☒ Employed ☐ Self-Employed ☐ Unemployed

---

**Employment Information** – Employment was verified by: Email(EVF)☐ Phone☐ Employer☐ Other☐

Company Name: ████████████          Phone: ████████

Address: ████████████          Position: Digital Advertising Sales Planner

City, State Zip: Buffalo, NY 14202          Start Date: 1/9/12   Salary   $40,000

Do you currently have an updated resume? Yes ☒   No ☐
Are the skills you use at your current place of employment at least 25% related to your degree program? Yes ☒ No ☐
If yes, how?   designs, creates, researches, & develops online advertising & web design

Do you plan to seek entry-level employment within 6 months after graduation? Yes ☐ No ☒
If no, why will it be delayed?   employed in field
Have you started applying for jobs?   Yes ☐   No ☒
If no, why the delay?   employed in field

Would you like to receive assistance from one of our Career Services Advisors? Yes ☐   No ☒

What are the best days/times to reach you?

What experience do you have in your field?
employed in field

**Skills**
What are your two biggest strengths?          What are your two biggest weaknesses?
1.                                           1.
2.                                           2.

Do you plan to continue your education here or at another institution? Yes ☐   No ☐

If yes, where and when?   School:          Degree:          Anticipated Graduation Date:

Do you belong to LinkedIn.com?          Yes ☐   No ☐
Can we contact you via social networks?   Yes ☐   No ☐

**Notes:**

Manager Approval:

_____

Graduate Name

## Document Checklist

|  | Yes | No |
|---|---|---|
| **Employment Verification Form (EVF)** | | |
| -Is the salary documented on the form or subsequent documentation (more than $12,000 annually)? | ☑ | ☐ |
| -If the salary is estimated, is a copy of the BLS sheet appended? | ☐ | ☐ |
| -If the salary is estimated, is it indicated on the EVF? | ☐ | ☐ |
| **Education Waiver** **(minimum requirement is a completed education waiver \*verbal or written\*  PLUS additional verification)** | | |
| -Is there a signed waiver from the graduate? | ☐ | ☐ |
| -Is there a copy of the class schedule, an acceptance letter, or verbal verification from a school official? | ☐ | ☐ |
| **Incarceration Waiver** **(minimum requirement is written documentation from the graduate OR other verification)** | | |
| -Is there written documentation from the graduate, verification from a state web site or an appended newspaper article? | ☐ | ☐ |
| **International Waiver** **(minimum requirement is written documentation from graduate OR school official)** | | |
| -Is there a signed waiver from the graduate or a written note from a school official recognizing the graduate as unable to work in the United States? | ☐ | ☐ |
| **Medical Waiver** **(minimum requirement is written documentation from graduate OR physician)** | | |
| -Is there a signed waiver/other written verification from the Graduate or a physician? | ☐ | ☐ |
| **Military Waiver** **(minimum requirement is a military waiver-signed or verbal- and additional verification)** | | |
| -Is there a signed waiver from the graduate? | ☐ | ☐ |
| -Is there a copy of the grad's enlistment agreement, military orders, deployment papers or verbal verification from a recruiter appended? | ☐ | ☐ |
| **Professional Waiver** **(minimum requirement is a signed waiver form)** | | |
| -Is there a signed waiver from the graduate? | ☐ | ☐ |
| -Does the salary of the unrelated employment exceed the minimum threshold for the program? | ☐ | ☐ |

Manager Approval _____

# Additional Documentation:  Student 5

## The Illinois Institute of Art-Chicago

**EMPLOYMENT STATUS FORM/GRADUATE**

Name: _____                    Student ID #: ████████

Career Services tracks all employment of graduation. Please complete and return this form to the Career Services department making any necessary changes. We will use salary information only to confirm the amount with your employer and to calculate average salaries for external and internal reporting requirements.

Date of Graduation: 12-17-11  Program: Fashion Design

Supervisor Name/Title: ████████  owner and Boss

https://mail.google.com/mail/u/0/?ui=2&ik=6743113945&view=pt&search=inbox&th=134...   2/4/2012

Supervisor e-mail (if known): ███████████  Employer/Company Name ███████████████
█████████ .om

Company Telephone Number: ████████████  Company/Employer Address: ███████████████
███████████████

Graduates'/Students' Position/Title: **Designer -Sketcher**

Graduates'/Students' Duties: **sketch new dress ideas, email vendors** ██

Date Hired: **January 16, 2012**

| EARNINGS |
| --- |

Annual Salary : **27,000** _____ ( this should not include: benefits, overtime, health care or bonuses)

Hourly rate: **Salary**                                   Hours per week: **42 ½**

Other pay:

- Bonus: _____
- Freelance: _____
- Overtime: _____

Scheduled/anticipated review date: _____

**GRADUATE/STUDENT SIGNATURE**

'I, (graduate/student) ██████████████████ verify that the information provided above is correct to the best
of my knowledge and I hereby authorize the above-named employer to release information about me to the Career Services department
at [school] **The Illinois Institute of** to confirm the information I have provided.
**Art - Chicago**

Signature ███████████████  Date 2-9-12

**For official use only:** Please check all that apply: Field Related, Direct (X)    Field Related, Related ( )    Unrelated ( )

Part Time ( )        Full Time (X)        Contract Work ( )    Temporary Position ( )        Freelance ( )
Internship ( )

If verified telephonically or verbally with the Graduate/Student, please provide the following:

Career Services Representative (print) ███████  Date Verified: 2/9/12

Career Services Representative (signature): ██████████████

Director of Career Service (print): ███████████

Director of Career Service (signature): ████████

Verified via: Telephone ( )    In person ( )

AI ONLY:    Re-verified Date:_____

Phone Number: _____

**EDMC CSC Form 200**        **Rev.2.1.2011**

████████████████████

AI The Illinois Institute of Art-Chicago



```
                              ═CANDIDATE═
        ID   :  ████████  SS#:              Status       : PLACED
  ┌────┐ Name :  ███████████████            # Status Chg :  5
  │MOD │ Major: FD    SubProg: BS   Cur Reg: 230  Stat Chg Date: 02/02/2012
  └────┘ Advisor :  ████████  # Chg :  3    Add Date     : 02/28/2009
        AI School : ailc        H/S Grad: 2009  Ant. Start Dt:  /  /
        Start Sess: SU   Yr: 2009   Level   : 12   Last Modified: 02/02/2012
        Grad Sess : FA   Yr: 2011   Pos Pref: PT   Modified By  :  ███████
        SFS Prior :                 Location: CHIC  Last Contact : 04/19/2011
        Home Phone: ██████████████           Contact Type : visfr-can-intern
        Fax Phone :     -   -                 Contact By   :  █████████
        Exit Interview: y    Mock Interview: n    Alumni Reg   : N
        Proj/Portfolio: 12/16/2011            Multi enroll : NONE
  ━━━━━━━━━━━━ACCESS KEYS━━━━━━━━━━━━
  ┌──────────┐ ┌──────────┐ ┌──────────┐ ┌──────────┐ ┌──┐  ━EXIT KEYS━
  │PROFILE + │ │EMP HIST +│ │JOB PRF 0 │ │IND PRF 0 │ │ED│ ┌──────┐┌──────┐
  └──────────┘ └──────────┘ └──────────┘ └──────────┘ └──┘ │ SAVE ││CANCEL│
  ┌──────────┐ ┌──────────┐ ┌──────────┐ ┌──────────┐ ┌──┐ └──────┘└──────┘
  │KEYWORD 0 │ │ED HIST  +│ │GEO PRF 0 │ │ ACT    + │ │SI│
  └──────────┘ └──────────┘ └──────────┘ └──────────┘ └──┘
```

the login ID of the advisor assigned to this candidate (<F2> for selections)



┌─CANDIDATE─────────────────────────────────────────────────────┐
│  ID   :  ████████ SS#:              Status      : **PLACED**   │
│  ┌──────────CANDIDATE EMPLOYMENT HISTORY─────────────────────┐ │
│  │    Business ID: ████████          Job Title : **Designer, Assist** │
│ ┌────┐ Name : ██████████████████    Pos Type  : **FT**    PB ? **y** │
│ │MOD │ Contact: █████████████        Wage Type : **SALARY** │
│ └────┘ Addr : ███████████            Salary   $     **27,000.00** │
│        Addr : ██████████             Bonus/Com $          **0.00** │
│        City : ██████████             Qtrly Stat: **y** Curr Stat : **y** │
│        State: IL Zip : ███████       Fld Relate: **y** Acics Rel : **d** │
│        Phone: ███████████ Ext :      Begin Date: **01/16/2012** │
│        Fax  : ███████████            End date  :   /  / │
│        Off. added by: **EAO**        Res Leave : │
│        Verification : **y**          Business Stat: ACTIVE │
│                  Responsibilities │
│   **FASHION DESIGNER: Seeking designer who is creative, ambitious,** │
│   **independent and willing to explore the changing world of fashion.** │
│   ┌─────────┐  ┌─────────┐  ┌─────────┐  ┌─────────┐  ┌─────────┐ │
│   │ 1 of 2  │  │  NEXT   │  │  **PREV** │  │  SAVE   │  │ CANCEL  │ │
│   └─────────┘  └─────────┘  └─────────┘  └─────────┘  └─────────┘ │
└────────────────────────────────────────────────────────────────┘

**press <enter> to view next emp hist record, <F3> to select**

**Subject:**          Update
**Attachments:**      Update page 1.pdf; ████████Update page 2.pdf; ████████Update page 3.pdf

**From:** ████████████████████████
**Sent:** Thursday, February 09, 2012 6:42 AM
**To:** ████████████
**Subject:** Update

Good Morning ████████

I have filled out the form at the best of my knowledge and have attached it to this email.  Please feel free to contact me at anytime and I will get back to you at my earliest convenience.
Have a wonderful day!
Best Re guards,

████████████████

1

# Additional Documentation:  Student 6

**EMPLOYMENT STATUS FORM/GRADUATE**

Graduate Name: ███████████

Student ID #: ███████████

Date of Graduation: 12/14/2012

Program/Degree: MBA

Thank you for taking the time to complete the Graduate Employment Status Form. Congratulations on your new job. Career Services tracks employments of graduates and we use this data to report employment information to internal and external entities. All employment information is protected according to FERPA* guidelines. Please complete the following information and sign and return at your earliest convenience. Once again, thank you for your time and assistance.

Graduate's Supervisor Name/Title: ███████████

Supervisor e-mail ███████████    Employer/Company Name: ███████████

Company Telephone Number ███████████    Company/Employer Address: ███████████    Detroit, MI

Graduates'/Students' Position/Title: CONSULTANT    Start Date: 05/02/2010

Graduates'/Students' Job Duties: IT Team Lead Project Management, Business Intelligenc Data Architect, Business Analyst

This position is: (Please check all that apply)
Part Time _____ Full Time X Contract Work _____ Temporary Position _____ Freelance _____ Paid Internship _____

**Please indicate how you found out about this position:**
Career Services (Y/N) Y
If no, what source: Internet job site (please indicate the site) _____ Friend/Family _____ Faculty/Staff _____
Industry Event _____ (Please name) _____ Other, please specify _____

Additional Information (i.e work schedule)
_____

**EARNINGS**

Are you paid ○ Hourly or X Salary
Annual Salary : 102,000 _____ ( this should not include: benefits, overtime, health care or bonuses)
or
Hourly rate: _____    Hours per week: _____

Other pay:
• Bonus: _____    • Overtime _____
• Freelance: _____    • Commission _____

Additional Information: (anticipated review date, if other pay is actual or anticipated)
_____

I, (graduate/student printed name) ███████████ verify that the information provided above is correct to the best of my knowledge.

Graduate Signature ███████████    Date 05/02/2013

Graduate Email address ███████████

Additional Information: Looking for Management Position or Intern in Financial/ Heathcare / Education

**FOR OFFICE USE ONLY:**

___ Signed Career Services Agreement is uploaded and in file

Please check all that apply: Field Related, Direct ( ) Field Related, Related ( ) Unrelated ( )    Part Time ( )    Full Time ( )
Contract Work ( )    Temporary Position ( )    Freelance ( )    Internship ( )

If verified telephonically or verbally with the Graduate/Student, please provide the following:
Career Services Representative (print): _____    Date Verified: _____
Career Services Representative (signature): _____

Director of Career Service (print): _____
Director of Career Service (signature): _____
Verified via: Telephone ( )    in person ( )    Written communication ( )

Corporate Verifier Signature (if applicable): _____    Date: _____
AI ONLY: Name _____    Re-verified Date: _____    Phone Number: _____
Re-Verified via Telephone ( )    In person ( )

Comments: (Please add your name and date when including any additional comments.)
_____

The Family Education Rights and Privacy Act (FERPA) is to protect all student educational records



# Additional Documentation:  Student 7

Oct. 5. 2011  8:20AM                       No. 1936   P. 2

## Brown Mackie College-MI City
### 325 E. U.S. 20, Michigan City, IN 46360
### Career Services (219) 878-6411, Fax: (219) 877-3110

Graduate/Employee Name: ▮▮▮▮▮

Thank you for taking the time to complete this form. Career Services tracks all employments of graduates. We will use salary information to calculate average salaries of graduates for external and internal reporting requirements. We value the information that accurately reflects the employment status of our graduates. Any comments or suggestions are always appreciated.

Please make any changes or additions as needed and return this form via email, scan or fax at your earliest convenience. Any information you can provide on this form is valuable. Once again, thank you for your time and attention.

Supervisor Name: ▮▮▮▮▮▮ E-mail: _____

Company/Employer Name: ▮▮▮▮
Company/Employer Address:
City: Plymouth State: IN Zip: 46563
Company Telephone Number: ▮▮▮▮ Company Fax Number: ▮▮▮▮

Graduate's/Student's Title: Computer Mill Operator  Date Hired: 9/13/11

Graduate's/Student's Duties: Operate computerized CNC machine, computerized production and mix tags, computerized inventory control.

Annual Salary: $21,944 ( this should not include: benefits, overtime, health care or bonuses)

Hourly rate: _$10.56_____ Hours per week: 40

Other pay:
- Bonus: _____
- Freelance: _____
- Overtime _____
- Commission _____

Scheduled/anticipated review date: _____

Signature ▮▮▮▮▮▮▮▮
Name: _____ Position Title: _____
Date: _____ Telephone Number: _____

For official use only: Please check all that apply: Field Related, Direct ( )  Field Related, Related ( )  Unrelated ( ).

Part Time ( )    Full Time ( x )    Contract Work ( )    Temporary Position ( )    Freelance ( )  Internship ( )

If verified telephonically or verbally with the Employer, please provide the following:

Date Verified: _____ Verified via: Telephone ( )  Other ( ) _____
Career Services Representative (print): ▮▮▮▮ Date: _____
Career Services Representative (signature): _____ Date: _____
Director of Career Service (print) ▮▮▮▮▮▮
Director of Career Service (signature) ▮▮▮▮▮ Date: 9/27/11

Comments: 1 YEAR CERTIFICATE - COURSES SUPPORTING Employment INCLUDE WORD PROCESSING, MICROCOMPUTER APPLICATIONS, DATABASE Applications, SPREADSHEETS. DUTIES INCLUDE: DATA Entry into Laptop, & COMPUTERIZED ROBOTICS MACHINES Employer STATED GRAD WAS HIRED BASED ON HIS COMPUTER SKILLS WHICH GRAD STATED HE ACQUIRED THRU HIS BMC 1 YR. CERTIFICATE.

**From:**
**Sent:**  Wednesday, September 21, 2011 6:57 PM
**To:**
**Subject:**  Re: update

Hi ████
I am working through ██████████ out of Plymoth Indiana. The Company I work for is called ████ in Knox Indiana,they are a machine shop that makes transmission parts for all the Major car companies. Ford, GM, Toyoto,Crysler and so on....... I started last tuseday (9-13-2011), at a pay rate starting off at $ 9.73 an hour. I am traning on a Computerized CNC machine, that does all the milling by computer and robot that shave the part down  measurements of 3.78-3.81 and with complete millimeter inspections every 20 minutes and the parts have the 3 tabs on each part inspected right after coming out of the machine. We have desk top computers at our work station seperate from the machine that we clock in on, make tags for product, mix tags, find out were parts are located at in the plnant and what machine its at.This postition is temp to hire with a shift difference off 50 cents for seconds and 75 cents for third, which when I am done training I will go to second shift. So by the time I get hired in since the shift difference only applys to company people I will be making 10.56 with overtime avalible also.

**From:** ██████████████
**To:** ██████████████
**Sent:** Wednesday, September 21, 2011 11:10 AM
**Subject:** update

Hi ████ ...hope you are well and your new job is going well also.
I still need the following information to update my records. For accreditation purposes I must document all graduates' employment. Your help will be greatly appreciated!

Employer Name
Employer Address
Employer Phone
Supervisor Name
Start Date
Job title
FT or PT
Hrly rate of pay

Thanks ████

████
Director of Career Services
Brown Mackie College-Michigan City
325 E. U.S. Hwy. 20
Michigan City, IN  46360

*"Sometimes in the winds of change, we find our true direction."*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing

Defendants' Notice of the Special Litigation Committee's Supplemental Investigation in

Response to the Court's Memorandum and Order on the Preliminary Objections in the Form of

Motions to Dismiss the Derivative Amended Complaint has been served upon all other parties at

the address(es) below via first class mail, this 15th day of October, 2013:

William R. Caroselli, Esq.
CAROSELLI BEACHLER MCTIERNAN & CONBOY, LLC
20 Standwix Street, 7th Floor
Pittsburgh, PA 15222
Tel.: (421) 391-9860
*Counsel for Oklahoma Law Enforcement Retirement System*

Laura E. Ellsworth, Esq.
Thomas S. Jones, Esq.
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Tel.: (412) 391-3939
*Counsel for Nominal Defendant Education Management Corporation*

Michael L. Kichline, Esq.
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel.: (215) 994-4000
*Counsel for Individual Defendants*

Ryan O. Hemminger
PA I.D. No. 200809
*Filed on behalf of Leo F. Mullin and Paul J. Salem,
in their capacity as members of a duly formed
Special Litigation Committee of the Board of
Directors of Education Management Corporation*

3