# EXHIBIT 7

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, | CIVIL DIVISION |
| | GD No. 12-008785 |
| *Plaintiff,* | |
| | **DEFENDANTS' NOTICE OF ADDITIONAL FILINGS BY THE SPECIAL LITIGATION COMMMITEE OF EDMC IN RESPONSE TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS THE DERIVATIVE AMENDED COMPLAINT** |
| v. | |
| TODD S. NELSON, JOHN R. McKERNAN, MICK J. BEEKHUIZEN, SAMUEL C. COWLEY, ADRIAN M. JONES, JEFFREY T. LEEDS, LEO F. MULLIN, PAUL J. SALEM, PETER O. WILDE, and JOSEPH R. WRIGHT, | |

*Defendants,*

and

EDUCATION MANAGEMENT CORP.,

*Nominal Defendant.*

Code:    020

*Filed on behalf of Leo F. Mullin and Paul J. Salem, in their capacity as members of a duly formed Special Litigation Committee of the Board of Directors of Education Management Corporation*

Counsel of Record for this Party:

Steven M. Reinsel
Pa. I.D. No. 66808
Ryan O. Hemminger
Pa. I.D. No. 200809
Leech Tishman Fuscaldo
& Lampl, LLC
525 William Penn Place
Pittsburgh, PA 15219
Tel.:  (412) 261-1600

R. Todd Cronan
*Pro Hac Vice*
GOODWIN PROCTER LLP
Exchange Place, 53 State Street
Boston, MA 02109
Tel.:  (617) 570-1000

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, ) ) ) | CIVIL DIVISION |

OKLAHOMA LAW ENFORCEMENT )    CIVIL DIVISION
RETIREMENT SYSTEM, )
 )    No. GD-12-008785
        Plaintiff, )
 )    Code: 020 Equity
    v. )
 )
TODD S. NELSON, JOHN R. )
McKERNAN, MICK J. BEEKHUIZEN, )
SAMUEL C. COWLEY, ADRIAN M. )
JONES, JEFFREY T. LEEDS, LEO F. )
MULLIN, PAUL J. SALEM, PETER O. )
WILDE, and JOSEPH R. WRIGHT, )
 )
        Defendants, )
 )
    and )
 )
EDUCATION MANAGEMENT CORP., )
 )
        Nominal Defendant. )

**DEFENDANTS' NOTICE OF ADDITIONAL FILINGS BY THE SPECIAL
LITIGATION COMMMITTEE OF EDMC IN RESPONSE TO
PLAINTIFF'S OPPOSITION TO DEFENDANT'S
RENEWED MOTION TO DISMISS THE DERIVATIVE AMENDED COMPLAINT**

      The individual defendants, Leo F. Mullin and Paul J. Salem, in their capacity as members

of a duly formed Special Litigation Committee of the Board of Directors of Education

Management Corporation ("Litigation Committee" or "Committee"), file this further Notice of

their response to the opposition of Plaintiff Oklahoma Law Enforcement Retirement System

("Plaintiff") to the renewed motion to dismiss by Education Management Corporation ("EDMC"

or the "Company"), as well as the opinion of Dr. David B. Madigan, submitted with Plaintiff's

opposition. Plaintiff's opposition and Dr. Madigan's opinion purport to criticize the Litigation

Committee's supplemental investigation, in particular the statistical analyses by Dr. Robert

Topel, on whom the Committee relied.

Dr. Topel has considered Dr. Madigan's criticism and has prepared a response, entitled "Reply Report – Audit of Education Management Corporation Assistant Director of Admissions' Compensation and Career Service Job Placement Information," dated January 8, 2014.  A copy of the Reply Report is attached hereto as Exhibit 1.  The Reply Report addresses each of Dr. Madigan's points and explains why they fail to undermine Dr. Topel's prior analyses or conclusions.

In addition, the Litigation Committee has considered Plaintiff's opposition and Dr. Madigan's opinion, as well as Dr. Topel's Reply Report, and has set forth its response in a further report, entitled "Additional Report of the Litigation Committee of Education Management Corporation," dated January 8, 2014.   A copy of the Additional Report is attached hereto as Exhibit 2.

For the reasons set forth in these two reports, as well as its prior reports, the Litigation Committee believes that what remains of Plaintiff's derivative claim should be dismissed and that its conclusions should be respected and affirmed.

Dated: January 9, 2014

Respectfully submitted,

Steven M. Reinsel
Pa. I.D. No. 66808
Ryan O. Hemminger
Pa. I.D. No. 200809
Leech Tishman Fuscaldo & Lampl, LLC
525 William Penn Place
Pittsburgh, PA 15219
Tel.:  (412) 261-1600

R. Todd Cronan
*Pro Hac Vice*
GOODWIN PROCTER LLP
Exchange Place, 53 State Street
Boston, MA 02109
Tel.:  (617) 570-1000

*Filed on behalf of Leo F. Mullin and Paul J.
Salem, in their capacity as members of a duly
formed Special Litigation Committee of the
Board of Directors of Education Management
Corporation*



**Prepared for:**

Special Litigation Committee of
Education Management Corporation

# Reply Report – Education Management Corporation Assistant Director of Admissions' Compensation and Career Service Job Placement Information

**Prepared by:**

Robert Topel, Ph.D.

Charles River Associates

1 South Wacker Drive, 34th Floor

Chicago, IL 60606

Date: January 8, 2014

# Disclaimer

The conclusions set forth herein are based on independent research and publicly available material. The views expressed herein are the views and opinions of the authors and do not reflect or represent the views of Charles River Associates or any of the organizations with which the authors are affiliated. Any opinion expressed herein shall not amount to any form of guarantee that the authors or Charles River Associates has determined or predicted future events or circumstances and no such reliance may be inferred or implied. The authors and Charles River Associates accept no duty of care or liability of any kind whatsoever to any party, and no responsibility for damages, if any, suffered by any party as a result of decisions made, or not made, or actions taken, or not taken, based on this paper. Detailed information about Charles River Associates, a registered trade name of CRA International, Inc., is available at www.crai.com.

Copyright 2013 Charles River Associates

# Table of contents

1.    Introduction ................................................................................................................ 1

2.    Placement Analysis .................................................................................................... 4

3.    Compensation Analysis ............................................................................................. 6

       3.1.    Madigan Paragraphs 5 and 6 ........................................................................ 6

       3.2.    Madigan Paragraphs 7 - 9 ............................................................................. 8

       3.3.    Madigan Paragraphs 10 and 11 .................................................................... 9

       3.4.    Madigan Paragraph 12 ................................................................................ 10

       3.5.    Madigan Paragraphs 13 - 16 ....................................................................... 10

       3.6.    Madigan Paragraph 17 ................................................................................ 12

4.    Distributions of TQF and NSP ................................................................................. 13

5.    Conclusions ............................................................................................................. 14

## 1.    Introduction

At the request of counsel for the Special Litigation Committee (SLC) for Education Management Corporation (EDMC) I was asked to review the November 17, 2013 report submitted by Professor David Madigan, Ph.D. on behalf of Plaintiffs in the matter of *Oklahoma Law Enforcement Retirement System v. Todd S. Nelson, et al. and Education Management Corporation.*[1] Based on my understanding of the questions raised in the July 16, 2013 Memorandum and Order of Court issued by the Honorable R. Stanton Wettick, Jr., Professor Madigan's criticisms of my October 14, 2013 report are unfounded and, in many cases are simply incorrect. Professor Madigan has not attempted to provide any alternative analyses that would support Plaintiff's allegations that placement rates are grossly overstated or that ADA compensation is "solely" dependent on the number of students that an ADA recruits.[2] Instead, Professor Madigan incorrectly characterizes my analyses and offers hypothetical examples that are either inconsistent with the EDMC data or actually support the conclusions reached in my analyses.

For example, with respect to the placement analysis, Professor Madigan apparently does not understand the process I used to assess whether graduates were placed in-field or in a related field, and his subsequent criticisms are based on his inaccurate interpretation of my methodology.  He also asserts that I should have developed a survey that would have been sent to graduates to verify the underlying documentation maintained by EDMC.  However, this is not what I understand to be asked

---

[1] I understand that questions have been raised by Plaintiff's counsel regarding my qualifications to address the subjects raised in my report.  My qualifications and CV were provided in my October report, but to summarize, I have been an applied econometrician in the field of labor economics for over 30 years, and of my roughly 80 peer reviewed publications over 50 have dealt with issues related to compensation and applied econometrics.  I routinely use the statistical techniques found in my October 14, 2013 report.  As an empirical economist I have substantial knowledge and experience in the use of statistics *and* economics in evaluating employment outcomes including placement and compensation.  I have been recognized as a statistical expert in employment matters for more than 20 years, and since 2008 I have provided expert testimony on economic and statistical matters in more than 20 litigation matters, including employment issues using methods similar to those in my October report, and have never been excluded as an expert witness.

[2] In my October report, as well as this reply, ADA compensation refers to total fixed compensation (such as total fixed annual salary) that an ADA receives.

by the Court. It is my understanding that the Court requested that the Special Litigation Committee engage a statistical expert with experience in analyzing compensation data and employment outcomes, who would analyze the determinants of compensation for EDMC ADAs and placement outcomes for a sample of graduates and review whether the employment listed for the graduate was related to the graduate's field of study. That is precisely what I have done.

Similarly, Professor Madigan's critique of my compensation analyses mischaracterizes what I have done and the questions being raised by the Court. In particular, Professor Madigan focuses his criticisms in three areas. His first criticism focuses on the Department of Education's (DOE) safe harbor provision, which I understand allows companies to compensate recruiters based on the number of students recruited, so long as number of students is not the "sole" basis for an individual's compensation. Professor Madigan argues that the interpretation of "number of students" should be interpreted to mean "new student points"—an EDMC compensation metric that is affected by the number of students but also by other characteristics of recruiting performance and student attributes. Consistent with my understanding of the DOE guidelines, the number of new students and other determinants of compensation should be distinguished. Thus, to evaluate whether EDMC's ADA compensation practices are compliant it is necessary to examine all aspects and determinants of ADA compensation. The analyses presented in my October 14, 2013 report specifically address this question, as well as the individual questions posed by the Court.

Second, Professor Madigan suggests that an appropriate analysis of ADA compensation should only include those factors that are included in the EDMC matrices (i.e., number of new student points and total quality factors). Again, such an analysis would be inconsistent with my understanding of the DOE's safe harbor provision that references recruiter compensation as a whole, rather than a particular component of compensation that can be read off of a matrix. That is, even the matrix itself is not the "sole" determinant of ADA compensation. In my expert opinion, by excluding known and measurable factors that affect compensation Professor Madigan's hypothetical approach would ignore the exact question indicated by the DOE safe harbor and posed by the Court. However, as described below, even if one were only to look at the components of the matrix, my analyses show

that Total Quality Factor points have a statistically significant impact on ADA compensation even after accounting for the total new students recruited (and new student points). Thus, even an examination of the matrix alone shows that total new students recruited is not the "sole" determinant of ADA compensation.

Third, Professor Madigan seems to ignore the language of the safe harbor provision stating that compensation may not be based "solely" on the number of students enrolled. Instead, he seems to believe that it is not enough for a factor other than number of students recruited to be a significant determinant of compensation to meet the DOE's safe harbor provision. Rather he argues that there is some unspecified threshold of magnitude that the factor must meet. He suggests that I should have assessed the impact of individual factors, but as explained below this is improper and would lead to inappropriate conclusions. As shown in Exhibits 9 and 10 of my prior report (p. 18 and 20, respectively), when factors other than total new students are included in the analysis the percent of ADA compensation that can be explained by the factors included in the model nearly doubles, from 44.8% to 85.5%. As reported in Exhibit 10, each of the other factors included in the model are statistically significant by conventional standards applied in social science and legal cases. Thus, after accounting for the number of new students recruited, each factor shows an independent association with ADA compensation. My analysis clearly demonstrates that the total number of new students is _not_ the sole determinant of ADA compensation.

In support of his criticisms, Professor Madigan offers _no_ analysis of the EDMC compensation data, but instead offers "hypothetical" examples without showing that they are consistent with either the EDMC data or the Court's questions. Further, even Professor Madigan's hypothetical examples support my empirical work, which showed that the number of students recruited is not the sole determinant of ADA's compensation. For example, in Table 1 (paragraphs 5 and 6) of Professor Madigan's report he clearly demonstrates in his hypothetical example that it is the number _and type_ of students being recruited that determines an ADA's compensation. Thus, as shown in his example, recruiting the same number of students results in different compensation because those students differed in other relevant dimensions (e.g., citizenship or program of study). Professor's Madigan's

example in Table 1 of his report is a useful demonstration of my point, which is that the number of students is not the sole determinant of ADA compensation.

As detailed below, Professor Madigan's criticisms of my report are without merit and lack foundation, as they are not consistent with the analyses that I conducted, and in fact mischaracterize my analyses. Professor Madigan's criticisms also cannot be supported with the EDMC data that are at issue in this matter. He provides no statistical analysis of EDMC compensation practices to support his criticisms, relying only on hypothetical examples that either: (a) demonstrate how ADA compensation is not determined solely on the number of students an ADA recruits; (b) completely mischaracterize the procedures I followed, with no more foundation than his own assumptions; or (c) are inconsistent with the actual EDMC compensation data. The remainder of this reply addresses each of the criticisms raised by Professor Madigan. For ease of reference, I have addressed these criticisms in the order they appeared in Professor Madigan's report.

## 2.    Placement Analysis

Professor Madigan offers two main criticisms of my approach in assessing EDMC's job placement data. First, in paragraph 2, he states that I "simply examined the name of the educational program and compared that to [the] EDMC-generated "Standard Industrial Classification" code for the job". Professor Madigan is mistaken—that is not what I did. As detailed in my previous report on pages 32 – 35, the data that I relied upon did not contain any codes for jobs, but rather contained descriptions of job titles, job duties, employer names, salary, and other job-related information. The data also contained information regarding the program of study that the graduate completed. The process by which I determined whether a job was either "in field" or "in a related field" was described in detail in my prior report (p.32-35). In summary, I and my staff used descriptions contained in EDMC's electronic database to determine which job descriptions were correctly classified as "in field"

or "in a related field".[3]  I then checked these matching cases using a database created by the Department of Education (DOE) that shows which job categories (Standard Occupational Codes (SOC)) are related to a given educational field of study (Classification of Instructional Programs (CIP)).  The purpose of this procedure was to verify that the job titles, job descriptions, and fields of study that we had determined to be "related" in the first stage were also considered related by the DOE. (The data file that links the SOC codes to CIP codes is commonly referred to as the CIP-to-SOC crosswalk).  This methodology was applied to all 1,250 of the initial sample. For 1,003 of these I was able to conclude that the placements were in fact in-field or in a related field based solely on the information available in the initial data file and the DOE crosswalk.  For example, as reported in Exhibit 16 on page 33 of my October report, a graduate in Architectural Design & Drafting Tech, hired by a Materials Handling Company as an AutoCAD Technician would be identified as placed "in field".

This left 247 cases for which information in EDMC's electronic data were insufficient to determine that employment was in a related field.  For these, I requested additional documentation from EDMC in order to clarify the description of jobs. The examples that Professor Madigan describes in his declaration are similar to those for which I would have requested additional information (e.g. an interior design graduate working at Target).  Based on the additional documentation provided, which included another data file as well as other documents described in my initial report, we could confirm an additional 154 placements as being in field or in a related field.  A detailed description of my review of the additional documentation is provided on pages 34 and 35 of my October report, and specific examples of the additional documentation that I reviewed were provided in Appendix E.

Professor Madigan's second criticism of my methodology suggests that I should have attempted to contact graduates directly to assess whether the job they were placed into was in-field or

---

[3] The job review was completed by two individuals trained in labor economics who independently reviewed the job placement information to determine whether the document supported a placement that was designated as either in field or in a related field.  Prior to starting the review both individuals received training on the criteria used to determine whether a position is either in field or in a related field.   The results of the independent review were compared and any discrepancies were reviewed by a senior Ph.D. credentialed labor economist.

in a related field.  This is not what I was asked to do nor is it my understanding of what the Court requested.

Nowhere in its description of tasks to be performed does the Court suggest that the SLC (or I on their behalf) verify the accuracy of the data or documentation maintained by EDMC by contacting EDMC's graduates.  Instead, the Court requires that that documentation be used to verify whether the jobs obtained by graduates were appropriately designated as in-field or in a related field.  That is precisely what I did.  The review I conducted goes directly to the plaintiff's allegation that EDMC "stretched graduates' job descriptions to have them included within the definition of 'field related employment' (July 16, 2013 Memorandum and Order of Court, p. 20)."  In addition, my review of the additional documentation showed evidence (manager, student and career services advisor sign-off) that is consistent with an oversight process and inconsistent with falsification of the placements.  Again, examples of the types of placement documentation were provided in Appendix E of my October report.  Furthermore, for all of his criticism of my approach, Professor Madigan offers no analysis that would indicate that EDMC has systematically misrepresented the placement reporting.

## 3.    Compensation Analysis

The next section of Professor Madigan's report offers several criticisms of my analysis of compensation.  These criticisms either misinterpret my methodology and results, or make it clear that he incorrectly understands the question raised by the Court.  I will address each of these criticisms in turn.

### 3.1.    Madigan Paragraphs 5 and 6

First, in paragraphs 5 and 6 of his declaration, Professor Madigan claims that I should have analyzed the number of student points (NSP) rather than the total new students recruited (TNS).  As noted in my previous report (section 5, pages 6 – 10), each student recruited by an ADA has an assigned point value that is based on the individual characteristics of the student.  Because these characteristics differ among students, students have different point values in determining compensa-

tion of the ADAs that recruited them.  The total of these points (referred to as NSP) in a 12-month

period is *one* of the factors used to identify where the ADA would fall on the compensation matrix.

That is, EDMC's compensation matrices not only provided incentives to recruit larger numbers of

students, but also provided incentives to recruit students with more desirable characteristics—as any

sensible compensation system would.

According to the Federal regulations governing such pay systems, "activities and arrange-

ments that an institution may carry out without violating the [Act] include, but are not limited to:

> (A)    The payment of fixed compensation, such as a fixed annual salary or a fixed hourly
> wage, as long as that compensation is not adjusted up or down more than twice during
> any twelve month period, and any adjustment *is not based solely on the number of stu-
> dents recruited, admitted, enrolled, or awarded financial aid. . . .*" 34 C.F.R. §
> 668.14(b)(22)(ii)(A) (eff. July 1, 2003 to June 30, 2011). (Emphasis added)

As the safe harbor provision referenced above relates to the *number* of students recruited (and not

the number of student points), in Exhibit 9 on page 18 of my October report I reported an analysis of

the impact on compensation of the total number of students recruited, and whether the number of

new students was the sole determinant of compensation.  I showed that the number of new students

is not the sole determinant of compensation—it accounts for less than half (44.8 percent) of the

overall variation in ADA compensation.[4]  Even so, Professor Madigan's criticism is entirely

unfounded, as Exhibit 10 on page 20 of my prior report shows results in which the matrix categories

of NSP and other measurable determinants of compensation were included in addition to the number

of students recruited by each ADA.  These additional measurable determinants of compensation

accounted for an additional 41.7 percent of the variation in ADA compensation. The analyses from

Exhibits 9 and 10 are also reported in Exhibit 11.1 for the Art Institutes and in the tables in Appendix

D for each of the other business units and relevant compensation matrices.  In all of these analyses it

is the case that, holding constant the *number* of students recruited, the differing characteristics of

---

[4] Note that I have also run a similar analysis using NSP categories and found that NSP categories explain approximately 66%
of the variation in ADA compensation.  This means that about one third of the variation in ADA compensation is
explained by factors other than NSP categories.

those students significantly contribute to differences in ADA pay.[5] That is, recruiting particular types of students raises an ADA's pay, independent of the *number* of students recruited—which is surely a characteristic of an optimal compensation strategy. Further, all of these analyses show that other factors beyond the number of students and student points were statistically significant determinants of ADA earnings, including total quality factor points, location, years of service, and the scope of managerial duties. In other words, the evidence is overwhelming that the number of students is *not* the sole determinant of ADA compensation.

Professor Madigan's hypothetical examples in Table 1 (paragraphs 5 and 6) of his report underscore the point that TNS is not the sole determinant of compensation, as he clearly shows that two individuals with the same number of students recruited could have very different compensation depending on the type of students each ADA recruited (e.g. foreign versus domestic students, recent high school graduates versus students who delay enrollment). If TNS was the sole determinant of compensation, then two individuals with the same number of students recruited would earn the same amount (even if we ignore differences in other dimensions of the quality of ADA performance). But even in Professor Madigan's examples, they do not. Professor Madigan chooses to ignore a key aspect of EDMC's compensation policy—the weight given to different types of students—and then (wrongly) claims that the remainder of compensation is solely determined by the number of students recruited. This does not address whether EDMC's compensation policies satisfy the law's safe harbor provisions, nor does it address the questions raised by the Court.

## 3.2.    Madigan Paragraphs 7 - 9

The next several paragraphs of Professor Madigan's report suggest that I did not allow for a non-linear relationship between NSP (and other factors) and compensation, and that this results in a misstatement of R-squared. Professor Madigan's claim is wrong. As explained in my prior report, the R-squared in my estimations is a measure of the fraction of variation in ADA compensation that was accounted for by the factors included in the model. In all the models that control for the number of

---

[5] As noted in my prior report, these characteristics include particular program of study, citizenship, year of high school graduation, and start date (p. 7).

student points, these points are entered as categorical variables representing each of the NSP intervals defined by EDMC's compensation matrices. Thus the effects of NSP are non-linear by construction, as the procedure allows the data to determine the relationship between compensation and each category separately. It most emphatically does not assume a linear relationship, or any particular relationship. In other words, the model does not assume that each additional student point is worth the same amount of additional compensation. For example, the model allows for the possibility that "going from points level 2 to points level 3 results in an increase in compensation of $7,750, whereas going from points level 8 to points level 9 results in an increase in compensation of $4,500", as Professor Madigan thinks it should. The estimated model is specified in exactly the way suggested by Professor Madigan—he simply assumed that I did something different. In addition, location, year, and total quality factor points (TQFs) are also specified as categorical variables, so allowing a non-linear relationship to be determined by the data.

### 3.3.    Madigan Paragraphs 10 and 11

Paragraphs 10 and 11 of Professor Madigan's report suggest that because the data do not contain information on the salary floors that applied to individuals EDMC ADAs this causes my estimates to "mask the deterministic association between points and salary". These salary floors are meant to protect ADA's from the risk of reduced compensation when current performance falls substantially below past performance. This is an odd and misguided claim. The very existence of salary floors is another example of why TNS would not be the sole determinant of compensation—a decline in an ADA's recruiting numbers or other elements of performance would not cause a corresponding decline in compensation. He continues by claiming that I "used all the data in these analyses including the new hires that EDMC treats under a different regimen". Once again, Professor Madigan is mistaken. As clearly stated at the top of page 12 of my October report, "Since the 6-month evaluations were only based on TQF, these evaluation forms do not include information about the number of students recruited and are therefore not included in any analyses below that investigate the total number of new students recruited." Therefore, all 6-month ADAs (i.e. "new hires") were excluded from my analyses as they could not have been compensated on the basis of new students or points. In addition, my report includes a separate analysis of 12-month ADA's on

pages 25 – 28 and in Appendix D as requested by the Court.  These analyses also show that ADA

compensation is not solely determined by the number of students recruited.

### 3.4.    Madigan Paragraph 12

In paragraph 12, Professor Madigan claims that figures in my report suggest the existence of

"outliers" in the data that would impact measures like R-squared.  He offers no examples of which

figures suggest the existence of "outliers" or any explanation of which part of those figures support

this claim.  In addition, the hypothetical calculations he presents in his declaration are misleading and

substantially different than the actual R-squared values I report.  He uses hypothetical data in which

between 1 and 9 percent of the variation is explained by the model, even though all of the results I

present in my report for all ADAs with total new students recorded show R-squared values above 44

percent with many much higher.  For example, among these estimates the lowest reported R-squared

is 44.8% for all ADAs across all business units only controlling for TNS and year (Exhibit 9, p. 18),

and the highest reported R-squared is over 99% for South University ADAs from 2008 – 2011 after

accounting for all factors in the full model (Appendix D).  Given the number of observations in the

data I relied upon, the influence of a single "outlier" or even a few "outliers" would not materially affect

my conclusions.  As importantly, the very fact that "outliers" might exist is further evidence that total

new students recruited are not the sole determinant of compensation.  By definition, "outliers" are

observations on compensation that are not explained by the measurable variables in the model,

including the number of student recruited, so they are inconsistent with Plaintiff's claim of a

deterministic relationship between new students recruited and total compensation.

### 3.5.    Madigan Paragraphs 13 - 16

In paragraph 13, Professor Madigan claims that factors outside of total number of students

that I included in the models are statistically significant because of large sample size.  However, he

ignores the results in Appendix D which run the same models separately for each of the individual

matrices and show the same pattern: factors including TQF categories, location, NSP categories,

years of service, and adjustments for managerial duties are significant and material determinants of

differences in ADA compensation, even after accounting for the number of students recruited.  Each

of these analyses demonstrates my conclusion that total number of students recruited is not the sole determinant of ADA compensation. Many of the specific matrices do not contain large numbers of observations and would not be subject to this critique by Professor Madigan. In each case the results are consistent with those presented in the body of the report for the larger population. Further, though he only offers speculation that these other factors may be "weakly explanatory"—a term that has no technical definition—the formal result is that these factors are statistically significant determinants of compensation, over and above any effect of the number of students, which demonstrates that the total number of students recruited is not the sole factor in determining compensation of ADAs.

Both in paragraph 13 and again in paragraphs 14 through 16, Professor Madigan seems to suggest that it is not enough to show that there are other factors that significantly impact compensation, but that those other factors must pass some arbitrary and unspecified threshold of explanatory power. It is my understanding that the safe harbor does not establish a threshold for the magnitude of the impact a given factor must have on compensation, but rather simply states that total number of students recruited cannot be the sole factor in determining compensation. Even so, my analyses offer statistical proof that these other measurable (and non-measurable) factors account for a material portion of the variation in ADA compensation, as discussed above and in my report (p. 18 – 23 and Appendix D).

Professor Madigan further confuses the point by stating that factors that are not part of the initial matrix that sets the unadjusted salary for ADAs should be ignored in an analysis of ADA compensation. This makes no sense as either a statistical or economic matter. Each of these factors directly impacts the compensation that an ADA eventually receives—therefore affecting the ability to recruit and retain productive ADAs—and therefore should not be ignored in an accurate assessment of ADA compensation. Professor Madigan seems to suggest that the question being asked by the Court and the safe harbor is "after ignoring all other factors that affect compensation, does total number of students recruited explain all of ADA compensation?" By omitting these statistically significant determinants of compensation, Professor Madigan's approach would bias an econometric

estimate of the effect of new students on compensation because productivity in recruiting is correlated with other determinants of performance.  For example, if productive recruiters are also better managers of others, and are compensated for it, then omission of managerial responsibilities from the model will attribute part of the returns to managerial responsibilities to new student recruiting.  More generally, by ignoring other factors that actually affect ADA compensation Professor Madigan's approach would avoid the very question being asked by the Court with regard to the law's safe harbor.

Paragraph 16 of Professor Madigan's report suggests that "the R-squared values" for each measured factor affecting ADA compensation should be reported separately.  The meaning of this critique is not obvious, as the individual factors do not have unique "R-squared values" beyond their incremental ability to add explanatory power, conditional on the other variables included in the model—the "partial R-squared".  Each of these variables has incremental, statistically significant explanatory power, as my tables show, and jointly they account for a substantial portion of ADA compensation. These points aside, this critique misses the larger point of my analysis. As Professor Madigan acknowledges, differences in number of students recruited account for only 44.8 percent of the variation in ADA compensation which means that *other factors* unrelated to the number of new students, including the measurable factors that are recorded in EDMC's data, account for more than half (55.2 percent) of the variation in ADA compensation. And even the 44.8 percent "attributable" to the number of students is an overstatement, because that model does not control for other performance-related determinants of compensation, with which the number of students is correlated. Based on this evidence, by any reasonable definition the compensation of ADAs "*is not based solely on the number of students recruited*".

### 3.6.    Madigan Paragraph 17

In paragraph 17 Professor Madigan presents two statistical criticisms of the regression analyses.  The first states that I did not appropriately account for the fact that the data include repeated observations for some individuals, "potentially resulting in an important violation of the independence assumption."  It is true that non-independence can affect hypothesis tests, but it is not true that I did

not account for such non-independence—Professor Madigan merely assumes that I did not.   In fact, I dealt with this exact issue using standard econometric techniques.   All of the hypothesis tests in my report account for possible non-independence of multiple observations on individual ADAs, exactly as suggested by Professor Madigan.

The second criticism in paragraph 17 is that factors in the regression are "presumably corre-lated", which "complicates the interpretation of the regression". While I agree that some degree of collinearity exists in the data (as it does in almost all such analyses), Professor Madigan's interpretation of the issue is mistaken.  He states that "because TQF is correlated with other variables, such as number of students, it is not possible to hold number of students constant while considering the effect of TQF, and thus the TQF effect is, at the very least, difficult to interpret".  In point of fact it is "possible to hold number of students constant while considering the effect of TQF", precisely because ADAs with identical numbers of students recruited have different levels of TQF—TQF is determined by other dimensions of performance.  In a regression, the separate (and statistically significant) estimated effect of TQF derives from precisely that variation in TQF that is *uncorrelated* with (orthogonal to) other explanatory variables in the model, including the number of students—there would be no such measured association if Professor Madigan's concern were important.

In summary, Professor Madigan offers a variety of criticisms and hypothetical examples that purport to show that my regression analyses are not valid or "difficult to interpret".  His criticisms are misguided and unreliable, based on a misinterpretation of my methods, flawed analysis, and, in my view, a mischaracterization of the questions raised by the Court.  Further, for all of his criticism of my approach, Professor Madigan offers no analysis that would indicate that EDMC ADA compensation is solely based on the number of students recruited.

## 4.    Distributions of TQF and NSP

Paragraph 19 of Professor Madigan's report purports to demonstrate a "substantial correla-tion between TQF and student points."  His analysis is misguided for two reasons.  First, and less

importantly, he appears to misunderstand the compensation matrices of EDMC. The left-hand column of Exhibit 7 in my report does not represent the actual number of student points, as Professor Madigan assumes. Instead they are simply the rows of EDMCs compensation matrices, which are categories containing different levels of points for different matrices. Second, and more importantly, the fact that quality points and student points are positively correlated is neither surprising nor concerning. ADAs that perform well in attracting students with preferred characteristics are also likely to perform well in other employment dimensions, just as students who do well in mathematics are likely to do well in other subjects. And I return to the point made above: Holding constant the categorical controls for student points (and other variables as well) total quality points (TQF) have a highly statistically significant impact in explaining variation in ADA compensation. This impact is estimated from precisely the component of TQF that is *not* correlated with student points or other measured factors.

Professor Madigan's final criticism seeks to extend the same point, showing different hypo-thetical relationships that might exist between TQF and NSP. He claims that my analysis does not distinguish among the simulated possibilities that he shows in his Figure 4. (As an aside, the values and variation he chooses for TQF and NSP have no correspondence to the values of these variables in EDMC's data or compensation matrices—he seems to have simply simulated some data without considering the actual problem being addressed.) But he does not explain why his possibilities are even relevant—the point is that there is substantial variation in TQF that is independent of NSP. Simple inspection of the frequencies in EDMC's compensation matrices establishes this, and the independent contributions of NSP and TQF are established by my regression analyses.

## 5.    Conclusions

In summary, Professor Madigan's criticisms of my report lack foundation, as they are not consistent with the actual analyses I conducted, and cannot be supported with the EDMC data that are at issue in this matter. In multiple instances he has simply misinterpreted or misread my analyses. In others cases, my procedures were exactly consistent with what he claims should have

been done.  He also assumes that I should be answering a question outside of that asked by the

Court.  For example, Professor Madigan argues that an analysis of compensation should only focus

on the matrix itself.  However, by ignoring other factors that actually affect ADA compensation

Professor Madigan avoids the very question being asked by the Court with regard to the law's safe

harbor.  Similarly, he suggests that I should have solicited information from a sample of graduates

rather than assessing the assignment of graduates as requested by the Court.  Finally, he assumes—

without foundation in the economics of compensation—that compensation based on the characteris-

tics of students should be treated as compensation based on the *number* of students recruited. In all

cases, Professor Madigan offers shallow or wholly incorrect criticisms of my analysis, and he fails to

provide any alternative analyses that would support Plaintiff's allegations.

# EDUCATION MANAGEMENT CORPORATION

## ADDITIONAL REPORT OF THE LITIGATION COMMITTEE OF EDUCATION MANAGEMENT CORPORATION

### Dated January 9, 2014

Leo F. Mullin
Paul J. Salem

R. Todd Cronan
Paul E. Nemser
Brian M. LaMacchia
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109

## TABLE OF CONTENTS

Page

I.  Executive Summary ........................................................................................1

    A.  The Circumstances Necessitating the Litigation Committee's Reply. ....................1

    B.  Overview of the Committee's Supplemental Response to the Incentive Compensation Claim................................................................................4

    C.  Overview of the Committee's Supplemental Response to the Job Placement Claim ................................................................................5

II. Neither Dr. Madigan's Report Nor OLERS's Opposition Undermines the Litigation Committee's Conclusion on the Incentive Compensation Claim. ...............9

    A.  The Initial Topel Report Confirmed Compliance with the Safe Harbor. ..............10

    B.  The Topel Reply Report Answers the Criticism of Dr. Madigan. .........................12

        1.  Dr. Topel Properly Considered the Impact on Compensation of Variables Beyond Those Used in the Matrix. ...........................................12

        2.  Dr. Topel Correctly Addressed Whether Student Enrollments Were the "Sole Factor" in Determining ADA Salary.........................................14

        3.  The Magnitude of the Effect of Quality Factors Is Not Relevant to Whether EDMC Violated the Safe Harbor. .............................................16

        4.  The Other Minor Critiques Raised by Dr. Madigan and OLERS Are Either Wrong or Have No Impact on Dr. Topel's Conclusions.........17

III. Neither Dr. Madigan's Report Nor OLERS's Opposition Undermines the Litigation Committee's Conclusion on the Job Placement Claim...............................18

    A.  The Litigation Committee Justifiably Relied on Dr. Topel's Random Sampling and Review of EDMC's Graduate Placement Records.........................19

    B.  The Litigation Committee Justifiably Relied on the ACICS and Internal Audits as Additional Reasons for Its Conclusion. .................................................24

    C.  The Litigation Committee's Determination that Career Services Staffing Is Adequate Is Entitled to the Protection of the Business Judgment Rule................25

IV. CONCLUSION ...........................................................................................26

i

I.    **EXECUTIVE SUMMARY**

    A.    **The Circumstances Necessitating the Litigation Committee's Reply.**

        The Litigation Committee (or the "Committee") of the Board of Directors of Education

Management Corporation ("EDMC" or the "Company") submits this Additional Report, as well

as a Reply Report of Dr. Robert Topel of the University of Chicago (the "Topel Reply Report"),

in the shareholder derivative action captioned *Oklahoma Law Enforcement Retirement System v.*

*Todd S. Nelson, et al.*, which is pending in the Court of Common Pleas for Allegheny County,

Pennsylvania.

        In a July 16, 2013 Memorandum and Order of the Court (the "Order"), the Court

determined that the Litigation Committee was "independent," "disinterested," and assisted by

competent counsel, that it had prepared a written report, and that it rationally believed its

decision was in the best interests of the Company.  The Court also dismissed two of the four

claims in the amended complaint of plaintiff Oklahoma Law Enforcement Retirement System

("OLERS" or "Plaintiff").

        In accordance with requests in the Court's Order, the Litigation Committee conducted a

supplemental investigation into OLERS's two remaining claims:  the Incentive Compensation

Claim and the Job Placement Claim.  To address the Court's concerns, the Committee filed a

detailed expert report from Dr. Topel entitled, "Audit of Education Management Corporation

Assistant Director of Admissions' Compensation and Career Service Job Placement

Information" (the "Topel Report"), along with a Supplemental Report of the Litigation

Committee (the "Supplemental Report"), on October 15, 2013.  Neither Dr. Topel nor the

Committee found evidence supporting Plaintiff's claim that EDMC's application of its matrix-

based compensation plan for admissions personnel (the "Plan") violated the Safe Harbor

provisions of Title IV of the Higher Education Act.  Nor did they find evidence of manipulation

of job placement data. To the contrary, the statistical analysis conducted by Dr. Topel has served to affirm the conclusions reached by the Litigation Committee; that it is not in the best interests of EDMC to pursue a derivative lawsuit on the facts of this case.

Recently, Plaintiff filed papers criticizing these findings: a Memorandum of Law in Opposition to Nominal Defendant Education Management Corporation's Supplemental Motion to Dismiss (the "Opposition"), and an opinion by Dr. David B. Madigan, entitled "Comments on Dr. Robert Topel's Report" (the "Madigan Report"). In its Opposition, Plaintiff calls the Litigation Committee's Supplemental Report and the detailed statistical analyses done by Dr. Topel a "charade," "meaningless," and "deliberately manipulated," among other names. Opp'n at 13, 17. At other points, Plaintiff indulges in baseless exaggeration: the Committee "did not even attempt to do any actual supplemental investigation," or the Committee "ignored the factual record from" "the parallel whistleblower actions." *Id.* at 5.

There is no basis whatsoever for the hyperbole and mud-slinging that Plaintiff has directed at the Litigation Committee and Dr. Topel. This Court has already found the Litigation Committee members to be "independent" and "disinterested." The commitment of the individual members of the Committee to conducting a thorough and objective investigation is well-documented. Dr. Topel is a distinguished economist who holds an endowed chair at the University of Chicago in labor economics—the very field at issue in this inquiry—and has had an exemplary career, including among many other accomplishments, serving as a consultant to the Department of Labor and testifying or presenting to Congress three times. Analyses of workplace compensation and of job outcomes are part and parcel of labor economics. *See* Topel Rpt. at 1-2, App'x A; Topel Reply Rpt. at 1 n.1. Moreover, Dr. Topel is an empirical economist who teaches statistical analysis and publishes statistical analyses in peer-reviewed journals. *See*

2

Topel Rpt. at 1-2, App'x A; Topel Reply Rpt. at 1 n.1. Without question, he is eminently qualified to conduct the analyses at issue.

At bottom, Plaintiff would have the Court substitute the (clearly biased) critique of Dr. Madigan for the careful statistical analysis of Dr. Topel and the reasoned deliberation of the Litigation Committee. Significantly, however, Dr. Madigan did not conduct *any* independent statistical analysis. The Madigan Report consists of an arm-chair criticism of the well-documented analyses performed by Dr. Topel. Moreover, if Dr. Madigan's criticisms had any force, Dr. Topel has answered every one in his Reply Report, thereby underscoring the diligence of Dr. Topel's work on behalf of the Committee.

Plaintiff also would have this Court ignore the legal framework utilized by Pennsylvania courts to review shareholder derivative claims. The key Pennsylvania case in this area is *LeMenestrel v. Warden*, 964 A.2d 902 (Pa. Super. 2008). In *LeMenestrel*, the Court reaffirmed the holding in *Cuker v. Mikalauskas,* 692 A.2d 1042 (Pa. 1997), that the decisions made by a committee of independent and disinterested directors are to be reviewed under the business judgment rule. Under this standard, as applied in *LeMenestrel*, a plaintiff seeking to bring a shareholder derivative claim challenging the adequacy of the committee's investigation must demonstrate that the investigation was "*so restricted in scope, so shallow in execution, or otherwise so Pro forma or halfhearted as to constitute a pretext or sham . . . .*" *LeMenestrel*, 692 A.2d at 914 (emphasis added) (quotation omitted); *see generally id.* at 914-918 (finding no evidence that the investigation was conducted in bad faith).

Nothing Plaintiff has submitted can refute the thoroughness of the Committee's investigation or the reasonableness of its reliance on the expert analysis of Dr. Topel. No "sham" investigation was conducted here.

**B.**    **Overview of the Committee's Supplemental Response to the Incentive Compensation Claim.**

Turning first to the Incentive Compensation Claim, the Court requested that the

Committee, "through a sampling of records," determine whether "measurable objective findings"

showed that the variation in recruiters' "fixed compensation" "is not adjusted up or down more

than twice during any twelve-month period [and that] any adjustment 'is not based solely on the

number of students recruited, admitted, enrolled, or awarded financial aid.'" *See* Order at 26, 28.

The Court also requested that the Committee:

> answer the relevant questions, including (1) to what extent is each of the five
> categories used; (2) does the number of quality points awarded to ADAs operate
> independently of the ADAs' new student point range, or are ADAs who score
> higher on the new student point range far more likely to achieve higher quality-
> point scores; (3) is the number of new students a significant factor in determining
> the compensation for six month-eighteen month ADAs?

Order at 28.

The Committee engaged Dr. Robert Topel of the University of Chicago—a highly

respected expert, with no ties whatsoever to EDMC—to perform this statistical analysis. As Dr.

Topel's reports show, he performed precisely the kind of analysis requested, answered each of

the questions, and found no basis for the contention that adjustments to fixed compensation were

based solely on number of students recruited. Topel Rpt. at 2-30, App'x D; Topel Reply Rpt. at

1-3, 6-14. The Committee appropriately relied on Dr. Topel's analysis. The Committee also

independently reviewed Dr. Topel's work product to assess its thoroughness and to confirm its

responsiveness to the issues raised by the Court.

By contrast, Dr. Madigan does not offer any independent statistical analysis for the

Committee to consider. Dr. Madigan instead offers hypotheticals, speculation, and critiques that,

as Dr. Topel's Reply Report explains, have minimal relevance to the issues at hand or are simply

wrong. OLERS and Dr. Madigan, for example, dispute Dr. Topel's conclusion that the Plan was

4

Case 20-50627-LSS    Doc 50-7    Filed 09/14/20    Page 30 of 54

not based "solely" on the number of students "enrolled", as provided for in one of the Safe

Harbors to the incentive compensation ban in the Higher Education Act. But OLERS and Dr.

Madigan misread the plain language of that Safe Harbor and ignore how ADA compensation

actually was determined under the Plan. Dr. Topel deals with each of these issues in his Reply

Report, submitted herewith.

In addition, OLERS and Dr. Madigan lodge a number of minor technical complaints that

Dr. Topel more than adequately addresses in his Reply Report. None of those critiques caused

Dr. Topel to change his views, and none has given the Litigation Committee a reason to change

its well-considered conclusions.

Rather than undercutting Dr. Topel's analyses, Dr. Madigan's arguments ultimately

support Dr. Topel's conclusion that ADA compensation under the Plan was not based "solely"

on the number of students "enrolled," as required under the Safe Harbor. For example, Dr.

Madigan suggests that even "weakly explanatory factors are statistically significant," conceding

that non-enrollment factors have a real influence on ADA compensation under the Plan.

Madigan Rpt. ¶ 13.[1] This, of course, is Dr. Topel's point and one of the reasons the Litigation

Committee found no support for OLERS's allegations on the Incentive Compensation Claim.

C.    **Overview of the Committee's Supplemental Response to the Job Placement
Claim.**

As to the Job Placement Claim, the Court's Order at 24 requested that the Committee

independently assess whether the checks and balances "actually worked" in EDMC's system for

determining whether a graduate's job placement was related to the graduate's field of study:

---

[1] Dr. Madigan does not explain what he means by "weakly explanatory," and it is a term without technical definition, see Topel Reply Rpt. at 11, but regardless what he means, the Safe Harbor does not use any such term, and Dr. Madigan is conceding that factors other than number of students enrolled have a real effect on ADA compensation.

At a minimum, the SLC should have randomly selected an appropriate number and cross-section of graduates and obtained the placement documentation for these graduates, including writings relating to (1) the department supervisor's checking the accuracy of the information entered by Career Services Advisors, (2) the confirmation of the Career Services Advisors that verifications are documented, and (3) the separate review of EDMC's corporate staff, including a review of whether the employment listed for the graduate is related to the graduate's field of study.

The Committee also requested that Dr. Topel to respond to this aspect of the Court's Order. Dr. Topel responded to this request by drawing a random sample of 1,250 graduates and examining the existing documentation for these graduates to determine whether they were properly classified to have a job related to their field of study. Topel Rpt. at 30-35; Topel Reply Rpt. at 1-2, 4-6 He also observed evidence of "the department supervisor's checking the accuracy of the information entered by Career Services Advisors" and "the confirmation of the Career Services Advisors that verifications are documented." Topel Rpt. at 34, 36; Topel Reply Rpt. at 6.

In response, Plaintiff and Dr. Madigan either misunderstand Dr. Topel's analysis or raise new allegations never made before. For example, OLERS claims that Dr. Topel's work was meaningless because it could have been based on a data set manipulated by EDMC. Putting aside that Plaintiff does not even allege in its Amended Complaint such a "fake data set" allegation, Plaintiff's new allegations are totally unfounded. The allegations also are contradicted by the hundreds of placement records that Dr. Topel reviewed, which included verifications signed by graduates, emails between graduates and career services advisors, and placement worksheets signed by career services supervisors.

As discussed in greater detail below, Dr. Topel, without EDMC's involvement, randomly selected 1,250 records to review from 62,914 records of graduates who EDMC considered placed "in field" or "in a related field," and then independently selected 247 records for follow

6

up review from the initial sample.  Topel Rpt. at 32-34; Topel Reply Rpt. at 4-5  EDMC

personnel had no way of knowing which records would be selected for the sample or for follow-

up review.  EDMC information technology personnel promptly provided the database, and a

member of the Career Services Corporate Compliance Division coordinated provision of backup

records, which personnel at specific schools provided as fast as they could locate, scan, and send

them.  In many cases, backup documentation was pulled from boxes retrieved from offsite

storage facilities.  *Id*.

Given these facts, Plaintiff's new allegations could not be true without a grand

conspiracy—rigged computer systems, manipulated database entries, thousands of fabricated

hard copy documents spread across the United States, with hundreds of present and former

employees in career services and information technology all conspiring to this day.  The

Litigation Committee finds no merit whatsoever for Plaintiff's new and wholly fabricated

allegations.

Plaintiff's other critiques as to how the Committee conducted the supplemental

investigation are similarly without merit.  For example, Plaintiff claims that the Committee's

reliance on Dr. Topel's statistical analyses is "highly suspect" because discovery in two qui tam

actions (the *Washington* and *Sobek* cases) may at some future date reveal "what those underlying

facts actually *are*."  Opp'n at 12-13 (emphasis in original).  Plaintiff's speculative musings are

not a substitute for the diligent efforts of the Litigation Committee.  In this regard, the Court has

already affirmed what is black-letter law in Pennsylvania:  it is this Committee of disinterested

directors that is properly vested with the authority to determine whether to pursue a derivative

action or not.  The Committee has fully discharged its responsibilities in this regard.

7

The Committee and its counsel have diligently investigated "what the underlying facts actually are" by reviewing thousands of pages of internal documents and interviewing more than 60 witnesses on the allegations underlying the qui tam actions, as described in its May 1, 2011 report, its May 31, 2012 report, and its October 15, 2013 Supplemental Report. Moreover, in sending an email to the Committee's counsel stating that Plaintiff "stand[s] ready to assist the SLC in connection with its investigation" and leaving a "voicemail asking to discuss the case," Opp'n 8; Barry Decl. Ex. C at 1, Plaintiff neither provided nor offered to provide any factual information that would be useful to the Committee. Plaintiff also never even hinted, as it now suggests, that it would have proposed that Dr. Madigan somehow assist the Litigation Committee with the statistical analysis.

It is now apparent that Plaintiff's arguments are intended to circumvent the special committee process and obtain a result which Plaintiff would not otherwise be entitled to under Pennsylvania law. Under *Cuker* and *LeMenestrel*, the investigative process is in the control of those who are authorized to determine whether pursuing claims made by shareholders is in the best interest of the Company—that is, the independent and disinterested directors of the Board of Directors. Here, the Litigation Committee consists of outside directors Paul J. Salem and Leo F. Mullin, both of whom the Court has already determined are "disinterested" and "independent." This Committee has conducted an extensive and painstaking investigation. Four Committee reports (including this one) and two expert reports by Dr. Topel describe in detail why there is no merit to either the Incentive Compensation Claim or the Job Placement Claim. The Committee reaffirms its prior conclusions that the Court should dismiss what remains of Plaintiff's amended complaint under *Cuker, LeMenestrel*, and the business judgment rule.

8

II.    **NEITHER DR. MADIGAN'S REPORT NOR OLERS'S OPPOSITION UNDERMINES THE LITIGATION COMMITTEE'S CONCLUSION ON THE INCENTIVE COMPENSATION CLAIM.**

The Incentive Compensation Claim alleges that EDMC's compensation plan used to determine compensation for Assistant Directors of Admissions ("ADAs") between 2003 and 2011 (the "Plan") violated the Higher Education Act's ban on compensating recruiters based on success in obtaining student enrollments, known as the incentive compensation ban.

As the Court knows, EDMC's Plan determined ADA compensation based on both enrollment and non-enrollment factors. The Plan determined base compensation by locating two variables on a matrix—(i) the "total quality factors," representing the sum of points assigned to each ADA for performance in five different competencies (e.g., professionalism, job knowledge), and (ii) the "new student points," which for each new student the ADA enrolled in the last six month period assigned points based on characteristics related to that particular student, such as whether the new student came from outside the United States. The base salary from the matrix was then adjusted for non-enrollment factors, including management responsibilities, locality adjustments, and longevity bonuses. In addition, salary protections prevented salaries from dropping more than a certain percentage compared to the prior period. The Committee concluded that the Plan, as designed, did not violate the Higher Education Act's incentive compensation ban because one of the safe harbors to the incentive compensation ban permitted colleges and universities to provide recruiters with salary or hourly wage adjustments based on the number of students enrolled, so long as student placement was not the *sole* compensation factor. 34 C.F.R. § 668.14(b)(22)(ii)(A) (eff. July 1, 2003 to June 30, 2011) (the "Safe Harbor").

A.    **The Initial Topel Report Confirmed Compliance with the Safe Harbor.**

In its Order, the Court did not disagree with the Committee's conclusion that the Plan, as designed, complied with the Safe Harbor.  Nevertheless the Court requested that the Committee conduct a statistical analysis of ADAs' compensation under the Plan to determine whether the Plan was implemented in compliance with the Safe Harbor.

To answer that question, Dr. Topel, at the Committee's request, analyzed the compensation data available for all ADAs reviewed under the Plan from 2003 through 2011, a total of over 12,000 ADA evaluations.  Dr. Topel performed regression analyses of the enrollment and non-enrollment variables (e.g., quality points, managing associate adjustments, years-of-service adjustments, location cost-of-living adjustments, and project associate adjustments) that can result in changed total ADA compensation under the Plan to determine which, if any, of the independent variables contributing to total compensation were statistically significant. Topel Rpt. at 16-21.  Dr. Topel's analyses found that, across EDMC, *every* variable contributing to compensation under the Plan, including all non-enrollment-related variables (such as quality points) was strongly statistically significant. *E.g., id.* at 17-21, Exs. 9-10.  In other words, Dr. Topel found that, based on EDMC's overall implementation of the Plan from 2003 to 2011, non-enrollment factors significantly influenced compensation and that student enrollments were not the "sole" factor affecting compensation. *E.g., id.* at 19-22, Exs. 9-10, App'x D.

In addition to analyzing whether ADA compensation was based "solely" on new student enrollments, the Court requested analysis of the following questions:

> (1) to what extent is each of the five [quality factor] categories used; (2) does the number of quality points awarded to ADAs operate independently of the ADAs' new student point range, or are ADAs who score higher on the new student point range far more likely to achieve higher quality-point scores; (3) is the number of new students a significant factor in determining the compensation for six month-eighteen month ADAs?

Order at 29.

Dr. Topel addressed each question. As to the distribution of ADA scores on the five quality factor categories, he concluded that the distribution showed sufficient variation among the quality point categories, particularly for approximately 95% of the reviews, which fell in the lower new student point categories. Topel Rpt. at 16. The distribution also demonstrated "there were a considerable number of employees who, despite achieving low to moderate student point categories, achieved high or very high quality factor points categories." *Id.* at 16.

As to the second question, Dr. Topel found that number of quality points awarded to ADAs operated independently of the ADAs' new student point range and student enrollments. *Id.* at 28-30. The correlation coefficients that Dr. Topel calculated for each version of the plan demonstrate that quality points were not a surrogate for number of student enrollments. *Id.* In addition, the distribution of total quality factor points and student point categories charted by Dr. Topel also demonstrates, quite starkly, that quality factors were awarded independently of new student points categories. *Id.* at 15. For example, between 2003 and 2011, the majority of ADAs reviewed (35.6%) received the lowest new student point category, but nevertheless those same ADAs' reviews fell into each of the quality factor point categories, including the highest category (23 to 25). *Id.* at 15, Ex. 7.

As to the Court's final question, Dr. Topel performed additional regression analyses on compensation of ADAs who, based on their twelve-month reviews, were on the Plan. The results of these regressions showed that student enrollments only explain less than 10% of the

11

variation in ADA salaries.  Topel Rpt. at 24-28, Ex. 12.  In other words, 90% of the change in

salary for ADAs on the Plan at their twelve-month review is explained by something other than

the number of new students recruited.  *Id.* at 24-28, Exs. 12-13.

Based on Dr. Topel's analyses, the Litigation Committee concluded that there was no

evidence to support OLERS's Incentive Compensation Claim.  Neither OLERS nor Dr. Madigan

has offered a critique that undermines the Litigation Committee's conclusion or shakes its

reliance on Dr. Topel's analyses of the Incentive Compensation Claim.

**B.**     **The Topel Reply Report Answers the Criticism of Dr. Madigan.**

**1.**     **Dr. Topel Properly Considered the Impact on Compensation of Variables Beyond Those Used in the Matrix.**

OLERS and Dr. Madigan principally argue that Dr. Topel improperly analyzed the

impact of the non-enrollment-related factors on ADAs' total compensation under the Plan.  *E.g.,*

Opp'n at 26-27.  They claim that Dr. Topel should have only analyzed the effect of the two

variables used in calculating an ADA's base salary on the matrix (i.e., total quality factors and

total new student points).  *Id.*  They claim that these two matrix-based variables are the only

relevant ones because they are "incentive" payments, which is what the incentive compensation

ban precludes.  *Id.*  They further claim that Dr. Topel should have ignored any impact of other

non-enrollment variables affecting ADA salary under the Plan.

The critique, however, is inconsistent with the Safe Harbor.  Rather than referencing

"incentive" payments or "base salary," the Safe Harbor prohibits recruiters' "fixed annual

salary" being "solely" determined by "the number of students recruited, admitted, [or] enrolled:"

> Activities and arrangements that an institution may carry out without violating the [Act] include, but are not limited to:

12

> (A)    The payment of *fixed compensation*, such as a *fixed annual salary* or a
> fixed hourly wage, as long as that compensation is not adjusted up or down more
> than twice during any twelve month period, and any adjustment is not based
> *solely* on the *number of students recruited, admitted, enrolled*, or awarded
> financial aid. . . .

34 C.F.R. § 668.14(b)(22)(ii)(A) (emphasis added) (eff. July 1, 2003 to June 30, 2011).   In

EDMC's Plan, the matrix alone does not determine adjustments to "fixed compensation such as a

fixed annual salary" of an ADA, so the argument that the Safe Harbor analysis should look at the

matrix alone is misplaced.  Dr. Topel puts it in lay terms: "[E]ven the matrix itself is not the

'sole' determinant of ADA compensation."  Topel Reply Rpt. at 2.

    Moreover, OLERS and Dr. Madigan are wrong as a factual matter that the only

"incentive" factors in the Plan are in the matrix.  Longevity bonuses of up to 15% of base salary

were offered under the Plan and incentivized ADAs to maintain their positions, and incremental

bonuses for managing employees (up to $5,000) incentivized ADAs to manage others. *See*

Topel Rpt. at 9.  OLERS and Dr. Madigan, however, prefer to ignore these "incentive"

payments, which plainly demonstrate that EDMC's Plan was not based "solely" on student

enrollments.  As Dr. Topel notes, "Each of these factors directly impacts the compensation that

an ADA eventually receives—therefore affecting the ability to recruit and retain ADAs—and

therefore should not be ignored in an accurate assessment of ADA compensation."  Topel Reply

Rpt. at 11.

    Finally, even assuming that Dr. Topel cabined his analysis to only those variables in the

matrix rather than all variables in the Plan itself affecting ADA compensation, as Dr. Madigan

suggests he should have, Dr. Topel's analyses demonstrated that the Plan did not violate the Safe

Harbor because he found "that Total Quality Factor points have a statistically significant impact

on ADA compensation even after accounting for total new students recruited (and new student

points)."  Topel Reply Rpt. at 3.  Dr. Topel's regression model estimated that the "separate (and

13

statistically significant) estimated effect of [total quality factors points] derives from precisely that variation in [total quality factor points] that is *uncorrelated* with (orthogonal to) other explanatory variables in the model, including the number of students . . . ." *Id.* at 13 (emphasis in original). Thus, as Dr. Topel concludes, "even an examination of the matrix alone shows that total new students recruited is not the 'sole' determinant of ADA compensation." *Id.* at 3.

In sum, to assess the factors under the Plan that contributed to ADA compensation, Dr. Topel correctly analyzed all the relevant variables, not an artificially limited subset. But even examining that artificially limited subset shows that the Plan fell within the Safe Harbor.

### 2.    Dr. Topel Correctly Addressed Whether Student Enrollments Were the "Sole Factor" in Determining ADA Salary.

OLERS and Dr. Madigan argue that Dr. Topel's conclusions cannot be trusted because variances among ADAs' salaries could be due to "new student points," a variable in the matrix, and Dr. Topel only analyzed the effect of student enrollments. Opp'n at 26-29. This critique is wrong in principle. Under the Safe Harbor, the correct variable is not "new student points," but "number of students recruited, admitted, enrolled, or awarded financial aid." The critique is also wrong in fact because Dr. Topel's analysis did take new student points fully into account.

As the Court may recall, "new student points" are determined by multiplying each new student enrolled by a multiplier related to that student's characteristics, such as "program of study, citizenship, year of high school graduation, and start date." Topel Rpt. at 7. The total number of new student points was used, along with the total quality factor points, to calculate an ADA's base salary in the matrix. *Id.* at 7-9. Thus, if the effect upon compensation of the number of students recruited differs from the effect of new student points, as Dr. Madigan suggests, then the number of students recruited is no longer the "sole" factor affecting ADA compensation. *See* Topel Reply Rpt. at 6-7. Because student points are a salary enhancement

tied to the characteristics of students, they are not based on the number of enrollments, and therefore, demonstrate EDMC's compliance with the Safe Harbor. *Id.*

As Dr. Topel notes, *id.* at 8, this point is demonstrated by Dr. Madigan's hypothetical in which two ADAs with the same number of students recruited do not earn the same amount. Madigan Rpt. ¶ 5, Table 1. As Dr. Topel explains, "If [total new students] was the sole determinant of compensation, then two individuals with the same number of students recruited would earn the same amount . . . ., [b]ut even in Professor Madigan's examples, they do not." Topel Reply Rpt. at 8. This shows that a variable other than the actual number of students enrolled is affecting ADA salary. *Id.* Where that variable was student points and those points related to student characteristics and were unrelated to "the number of students recruited, admitted, [or] enrolled," EDMC satisfied the Safe Harbor. *See* Topel Reply Rpt. at 6-8.

In any event, these critiques are off base because Dr. Topel *did* take into account new student points in his analyses. A set of regressions that Dr. Topel reported based on total enrollments did control for new student points along with other variables, and the results showed that factors other than total enrollments still had a statistically significant effect on compensation. *See* Topel Rpt. at 20, Exs. 9-11, App'x D; Topel Reply Rpt. at 6-7.[2] Beyond the regression analyses, Dr. Topel graphed scatter plots and compiled distributions showing that quality points were not a proxy for student points. For example, as Dr. Topel noted in his original report, among "nine ADAs who recruited 56 new students during the previous twelve months . . ., total compensation ranged from $45,835 to $93,543—a ratio of more than 2-to-1." Topel Rpt. at 10.

---

[2] The simplest way to see this is that the regression tables contain a line near the bottom: "*All Variables Outside of Total New Students and Student Point Categories.*" *See* Topel Rpt. at 20, 22, Exs. 10, 11.2, App'x D. This measures the joint effect of all factors other than total new students and new student points (the "Other factors"). In each instance, the measured effect of the Other factors was statistically significant; there was a "vanishingly small probability" that the measured effect of the Other factors was caused by chance, and therefore, "the data are telling us that these particular [Other] factors were important determinants of compensation. . . ." *See, e.g.,* Topel Rpt. at 20, 22.

This again demonstrated that ADA compensation was not 'solely' determined by the number of students recruited—other factors were very important, as demonstrated by the substantial variation in compensation at every level of student recruitment." *Id.* Similarly, the distributions demonstrated that new student points could not account for all variation in ADA compensation. As Dr. Topel noted in his original report, the distribution showed that, across EDMC, "there were a considerable number of employees who, despite achieving low to moderate student point categories, achieved high or very high quality factor points categories." *Id.* at 16. Accordingly Dr. Topel concludes that "all of these analyses show that other factors beyond the number of students and student points were statistically significant determinants of ADA earnings, including total quality factor points, location, years of service, and the scope of managerial duties. In other words, the evidence is overwhelming that the number of students is *not* the sole determinant of ADA compensation." Topel Reply Rpt. at 8 (emphasis in original). The Committee agrees.

### 3. The Magnitude of the Effect of Quality Factors Is Not Relevant to Whether EDMC Violated the Safe Harbor.

OLERS and Dr. Madigan argue that, although quality points are statistically significant, Dr. Topel does not eliminate the possibility that they have a "weakly explanatory" impact on salaries. They suggest that Dr. Topel should have presented a separate analysis of the explanatory power of each variable affecting ADA compensation. This argument is misguided twice over. First, the *degree* of impact of non-enrollment elements of the Plan is not at issue under the Safe Harbor. The issue is whether student enrollments "solely" determine compensation. *See* Safe Harbor, 34 C.F.R. § 668.14(b)(22)(ii)(A).

Second, as Dr. Topel notes, discussing Exhibits 9 and 10 of his initial report, Topel Rpt. at 18-23, "when factors other than total new students are included in the analysis the percent of

ADA compensation that can be explained by the factors included in the model nearly doubles, from 44.8% to 85.5%. . . . Thus, after accounting for the number of new students recruited, each factor shows an independent association with ADA compensation." Topel Reply Rpt. at 3, 10-11. Dr. Topel, therefore, concludes that his "analyses offer statistical proof that these other measurable (and non-measurable) factors account for a material portion of the variation in ADA compensation" and "clearly demonstrate[] that the total number of new students is *not* the sole determinant of ADA compensation." *Id.* 3, 11 (emphasis added).

### 4. The Other Minor Critiques Raised by Dr. Madigan and OLERS Are Either Wrong or Have No Impact on Dr. Topel's Conclusions.

OLERS and Dr. Madigan lodge a number of other minor critiques regarding Dr. Topel's analyses. Each of these is either wrong or does not affect Dr. Topel's conclusions. For example:

- Dr. Madigan claims that Dr. Topel's regressions do not allow for a non-linear relationship between new student points and compensation, resulting in a misstatement of R-squared. As Dr. Topel notes, however, Dr. Madigan has misinterpreted the results presented because the "estimated model is specified in exactly the way suggested by Professor Madigan." Topel Reply Rpt. at 9.

- Contrary to Dr. Madigan's charge, Dr. Topel plainly noted in his report that he did *not* include in his main analyses reviews for those ADAs who were not reviewed under the Plan. Topel Rpt. at 12; Topel Reply Rpt. at 9.[3]

- Dr. Madigan claims that Dr. Topel's results could be the effect of "outliers" in the data, but as Dr. Topel explains, this critique is purely hypothetical and involves R-squared values much lower than the values Dr. Topel reported. Topel Reply Rpt. at 10. "Given the number of observations in the data [Dr. Topel] relied on," he concludes that the influence of a single outlier or even a few outliers "would not materially affect [his] conclusions." *Id.*

- Dr. Madigan claims that the magnitude of the effects of non-enrollment variables could be small, though statistically significant, with their small magnitude "masked" by the large sample size. As Dr. Topel notes, this unsupported claim is disproven by the regressions Dr. Topel ran as to each of the versions of the Plan. Many of those

---

[3] ADAs employed less one year and some ADAs employed less than eighteen months were not "on the Plan." Topel Rpt. at 9-10. Instead, these ADAs were not compensated based on student enrollments or new student points and instead were evaluated on quality factor points, as well as other non-enrollment factors. *Id.*

17

"do not contain large numbers of observations" yet "[i]n each case the results are consistent with those presented in the body of the report for the larger population." *Id.* at 11.

*       *       *

For these reasons, the Litigation Committee finds no reason to question its reliance on Dr. Topel's analyses and instead reaffirms its prior conclusion that it is not in the best interest of EDMC to pursue OLERS's allegations regarding the Incentive Compensation Claim.

## III.    NEITHER DR. MADIGAN'S REPORT NOR OLERS'S OPPOSITION UNDERMINES THE LITIGATION COMMITTEE'S CONCLUSION ON THE JOB PLACEMENT CLAIM.

The Job Placement Claim alleges that, to increase student enrollments and meet reporting requirements of accrediting agencies, EDMC inflated graduate job placement statistics by stretching whether graduates were actually placed in fields related to their area of study.  Am. Compl. ¶¶ 152-166.  In its Supplemental Report, the Litigation Committee explained that it found no evidence corroborating the Job Placement Claim, despite conducting the file review requested by the Court.  In particular, based on (i) its independent assessment of EDMC's internal controls, including its policies and procedures; (ii) its independent review of outside audits by the government-sanctioned accrediting body, the Accrediting Council for Independent Colleges and Schools ("ACICS"); (iii) its independent review of audits of career services files by EDMC's Internal Audit Department; and (iv) Dr. Topel's independent audit of graduate placement files, the Litigation Committee explained that it could not corroborate OLERS's allegations regarding systematic falsification or manipulation of placement statistics. Supplemental Rpt. at 21-34, App'x 1; Topel Rpt. at 30-35, App'x E.  Rather than supporting OLERS's allegations, the Committee's investigation determined that EDMC's internal controls surrounding the collection, verification, and reporting of job placement statistics are effective at identifying and preventing the type of conduct alleged by OLERS.  Supplemental Rpt. at 33.

18

Moreover, based on the Committee's investigation and Dr. Topel's findings, the Litigation

Committee concluded that this internal control structure is adequately staffed to ensure its

effectiveness.[4]  *Id.*  Accordingly, the Committee concluded, in its business judgment, that

EDMC's directors had a good faith basis for their actions and exercised their duty of care with

respect to EDMC's reporting of graduate job placement statistics.  *Id.*

     In its Opposition, OLERS challenges the Litigation Committee's supplemental

investigation in three ways.  First, OLERS claims that the Committee did not justifiably rely on

Dr. Topel's random sampling and independent review of job placement records, which found

that at least 93% of EDMC's job placement determinations were correct.  Second, OLERS

claims that the Committee should not have relied on years of independent audits by ACICS, one

of two national accreditors recognized by the Department of Education, and should not have

relied on multiple internal audits of career services files, even though neither the ACICS nor

internal audits found any evidence of manipulation of job placement records or data.  Finally,

OLERS claims that, despite no evidence of fraud related to job placement determinations and no

specific career placement staffing requirements or recommendations by the Department of

Education or accrediting bodies, the Committee nevertheless should have concluded that

EDMC's career services department is not adequately staffed.  Each of these critiques is

meritless.

**A.**     <u>The Litigation Committee Justifiably Relied on Dr. Topel's Random</u>
        <u>Sampling and Review of EDMC's Graduate Placement Records.</u>

     Neither OLERS nor Dr. Madigan offers any reason that the Litigation Committee should

not credit Dr. Topel's conclusion that over 93% of the placement determinations he reviewed

---

[4]  The Committee, after investigation, could not find any specific career placement staffing requirements or
recommendations by the U.S. Department of Education or accrediting bodies.  Nor has OLERS has suggested any.

were accurately classified based on a review of EDMC's records. Their critiques either misstate
Dr. Topel's actual methods or change the issue raised.

First, OLERS and Dr. Madigan claim that Dr. Topel's review was meaningless because
for 1,003 of the 1,250 samples, Dr. Topel simply compared the program name to the code for the
job. *See* Opp'n at 18; Madigan Rpt. ¶ 2. This is simply not true, as the Topel Report made plain.
Topel Rpt. at 32-34; Topel Reply Rpt. at 4-6. For these records, Dr. Topel reviewed the
program, job title, and employer to determine whether the job was properly coded "in field" or
"in a related field," or in some cases, additional information available publicly about the
employer. Topel Rpt. at 32-34; Topel Reply Rpt. at 4-6. Dr. Topel also supplemented his
analysis by reviewing whether the job titles listed on the data were consistent with the CIP to
SOC crosswalk, a job classification structure that is nationally used, including by the Department
of Education. Topel Rpt. at 33; Topel Reply Rpt. at 5.

Dr. Madigan, however, claims that the "level of detail would not allow Dr. Topel to
check whether or not a student was truly working in a related field." Madigan Rpt. ¶ 2. This
critique is surprising, considering that Dr. Madigan never requested or reviewed the underlying
data. Putting that aside, there was sufficient information in the records for Dr. Topel to
determine that the placement was correctly coded because these entries were clearly correctly
classified, as Dr. Topel's report and the examples provided made clear. Topel Rpt. at 33, Topel
Reply Rpt. at 5. For example, from this information, Dr. Topel concluded that a graduate from a
medical coding and billing program working at a health center as a nurse's aide and an
architectural design and drafting tech graduate employed as an AutoCAD technician each were
working "in field" or "in a related field." Topel Rpt. at 33. Indeed, OLERS and Dr. Madigan
offer no real critique of Dr. Topel's determinations that placements were correctly classified by

EDMC as "in field" or "in a related field" other than to say the examples in Dr. Topel's Report are "cherry picked." Opp'n at 19, n.6. An uninformed charge, made without looking at data, is insufficient to call into question Dr. Topel's investigation.

Second, OLERS and Dr. Madigan also take issue with Dr. Topel's method for choosing the 247 files that Dr. Topel reviewed further, but they mischaracterize what he did. *See* Opp'n at 19; Madigan Rpt. ¶ 2. As the Topel Report made clear, Dr. Topel randomly sampled 1,250 records and then sought additional information for 247 of those. Topel Rpt. at 30-33; Topel Reply Rpt. at 5. This process was appropriate and effective, as it covered "an appropriate number and cross section of graduates," as requested by the Court. Order at 24. Indeed, Dr. Topel's random sample of 1,250 was six times larger than the 200-graduate sample proposed by Dr. Madigan. *See* Madigan Rpt. ¶ 3. Dr. Topel never claimed that the 247 for which he sought additional information were randomly sampled—a question that is beside the point.[5]

Finally, OLERS and Dr. Madigan claim that Dr. Topel should have contacted graduates themselves because the data provided to him could have been false, presumably alleging now that EDMC engaged in some conspiracy whereby it created a completely false data set. *See* Opp'n at 18; Madigan Rpt. ¶ 3. This critique, too, is without merit.

As an initial matter, this critique is disingenuous. It is a fundamentally different allegation than has ever been made by either OLERS or the whistleblowers on whose assertions OLERS' allegations are based. OLERS's amended complaint simply alleges that "EDMC

---

[5] OLERS also suggests that Dr. Topel's review did not take into account its allegation that "students were counted as 'employed' even if they worked for only one day." Am. Compl. at 17. OLERS again misses the point. As the Committee made clear in its Supplemental Report, consistent with the accrediting bodies that accredit EDMC's schools (e.g., the Accrediting Council for Independent Colleges and Schools, the Texas Higher Education Coordinating Board, and the Ohio State Board of Career Colleges and Schools), EDMC "does not require any minimum duration of employment before a graduate is considered employed, so long as that graduate is employed within six months after graduation." Supplemental Rpt. App'x 1 at 3-4. Thus, rather than some fraud, OLERS simply alleges conduct consist with accrediting bodies' requirements. The Committee, therefore, finds no merit to OLERS's allegation.

schools also *stretched graduates' job descriptions* to have them included within the definition of 'field related to employment'. . . ," Am. Compl. ¶ 156 (emphasis added), not that EDMC simply fabricated job placements or underlying records. *See generally* Am. Compl. [6]  Based on these allegations, the Court ordered that the Litigation Committee's supplemental investigation should review EDMC's underlying records and said nothing about contacting graduates, employers, or even career services advisors who made the determinations.  Consistent with the Court's Order, the Committee investigated those records and found no evidence that EDMC was "stretching" its characterization of job placements.  Supplemental Rpt. at 21-34; Topel Rpt. at 30-35; Topel Reply Rpt. at 6

In any event, OLERS's new allegation is improbable and contrary to what Dr. Topel found.  The records that Dr. Topel reviewed were drawn from multiple sources across EDMC. The primary source of information the Litigation Committee obtained from EDMC for Dr. Topel to review was a database of information on all graduates who contributed to EDMC's published placement rates.  This database was drawn from three separate computer systems used by many employees in three separate education systems, The Art Institutes, South University, and Brown Mackie Colleges.  The data in those systems was entered over four years by hundreds of present or former career services advisors working in both ground and on-line schools across the

---

[6] The two whistleblowers on whom OLERS based its allegations likewise merely alleged that EDMC "stretched" its characterization of job placements, not fabricated them or falsified records. As stated in OLERS's amended complaint, Kathleen Bittel alleged that EDMC pressured career services advisors to "stretch" to make jobs fit as related to a graduate's field of study. Am. Compl. ¶ 157. She, for example, alleged that EDMC incorrectly counted a graphic design graduate as employed in a related field where she was designing signs for daily specials at Starbucks. Am. Compl. ¶ 157. She also alleged she "was pressured to count a graduate of the game arts program as working in his field even though he worked at Toys R Us selling video games . . . ." *Id.* Similarly, Jason Sobek, the other whistleblower on which OLERS's allegations are based, claimed that EDMC improperly stretched to count graduates as "working in their fields" because "EDMC's rules" permitted graduates to be considered placed "when as little as 25 percent of the job related to a graduate's education." Sobek Compl. ¶ 52. Mr. Sobek alleges, for example, that EDMC incorrectly considered graduates, such as a bank teller with a business administration degree, a McDonald's cashier with a degree in accounting, and a tester at Game Stop with a degree in game arts design, as placed "in field" or "in a related field." Sobek Compl. ¶ 52.

country. As described in the Litigation Committee's Appendix to its Supplemental Report, data entry is governed by specific procedures intended to ensure consistency and accuracy, such as limiting who can enter data into the system and requiring sign-offs by supervisors before data is entered. Supplemental Rpt., App'x 1 at 5-8. Data is also routinely audited by reference to backup records, not only by Career Services departments themselves, but by Career Services Corporate Compliance Division personnel, internal auditors, and external accreditation auditors. *Id., see also, e.g., id.* at 30 (describing how, during one internal audit, 206 graduates' files were reviewed by internal audit to "ensure that information was entered properly into databases by authorized personnel").

As noted above, Dr. Topel randomly selected 1,250 records to review from 62,914 records of graduates who EDMC considered placed "in field" or "in a related field." He then independently selected 247 records for follow-up review from the initial 1,250 sample. Topel Rpt. at 32-34; Topel Reply Rpt. at 4-5 EDMC personnel had no way of knowing which records would be selected for the sample or for follow-up review. EDMC information technology personnel promptly provided the database, and a member of the Career Services Corporate Compliance Division coordinated provision of backup records, which personnel at specific schools provided as fast as they could locate, scan, and send them. In many cases, backup documentation was pulled from boxes retrieved from offsite storage facilities. Given these facts, no basis exists to support Plaintiff's newly-minted claim of a "fake data set" being relied upon by Dr. Topel. Accordingly, the Litigation Committee rejects that claim.

These far-fetched claims also are contradicted by the placement file audit that Dr. Topel has already done. As Dr. Topel's report noted, "[t]he historical documentation reflects a verification process being used at EDMC's schools" and that "[i]n many instances the

23

documentation includes conversations between Career Services Advisors and graduates as well as employers verifying that the graduates were in fact working in-field or in a related field." Topel Rpt. at 36. For example, a graduate from The Illinois Institute of Art—Chicago working as a designer-sketcher signed the employment verification and emailed it to a career services advisor. Topel Rpt. App'x E (Student 5). A Master's in Business Administration graduate working as a consultant signed an employment status form. *Id.* (Student 6). And a Brown Mackie graduate emailed a career services advisor to explain his job duties. *Id.* (Student 7). Accordingly, Dr. Topel found the results of his audit were "inconsistent with systemic fraudulent reporting of placement statistics by EDMC." Topel Rpt. at 36; Topel Reply Rpt. at 6. Neither OLERS nor Dr. Madigan addresses these findings, much less provides a reason to discredit them.

Dr. Madigan, however, suggests, that the Committee could survey graduates to further investigate OLERS's new allegation. Madigan Rpt. ¶ 3. Given that OLERS's allegations thus far have proven unfounded, despite the Company expending substantial resources to investigate them, and that OLERS's new allegations amount to improbable and uninformed speculation unrelated to either the facts of EDMC's corporate structure and or the whistleblowers' allegations, and that Dr. Topel already found no support for these new allegations, the Litigation Committee finds no reason to expand its investigation, much less question its conclusions based on the investigation already done.

**B.** **The Litigation Committee Justifiably Relied on the ACICS and Internal Audits as Additional Reasons for Its Conclusion.**

OLERS also claims that EDMC's review of ACICS audits "does not address Plaintiff's allegation that EDMC misrepresented its job placement statistics to accrediting agencies" and that "accrediting agencies never found evidence of fraud merely suggests that Defendant's attempts to mislead them were successful." Opp'n at 16. Putting aside that OLERS never made

24

any allegation that EDMC falsified records to ACICS or any other accrediting agency (*see* Section III.A. above), this argument fails to address that ACICS auditors, during outside audits, called graduates and employers to verify placement information in EDMC's records. Supplemental Rpt. at 25.[7] Thus, the ACICS audits should have detected misrepresentation of placement statistics, if there were any.  None of those outside audits, however, noted any such misrepresentations.  *Id.* 25-28.  Instead, since at least 2005, ACICS has repeatedly verified hundreds of EDMC placement records through employer and graduate contacts.  *See id.* at 27 (chart showing 609 placements verified between 2005 and 2012 at ten different schools in as many different cities).

OLERS next claims that the Litigation Committee incorrectly relied on an audit by EMDC's Internal Audit Department that was not finalized.  Opp'n at 15-16.  OLERS, however, fails to address that the Litigation Committee reviewed and relied on other internal audits, including one involving reviews of over 200 graduates' files, and that those audits (all completed) found no support for OLERS's allegations.  Supplemental Rpt. at 28-30.  Nor does OLERS explain why the preliminary results of the audit it does mention are unreliable, particularly where the Internal Audit Department completed its field testing.

C.    **The Litigation Committee's Determination that Career Services Staffing Is Adequate Is Entitled to the Protection of the Business Judgment Rule.**

OLERS claims that the Committee "undertook no investigation whatsoever to determine if [EDMC'] career placement staff were stretched too thin." Opp'n at 20.  The Court, however, asked the Committee to consider whether the internal controls regarding reporting placement

---

[7] It is hard to understand how OLERS could fail to address that ACICS called employers and graduates, as the Litigation Committee made clear the extent of ACICS's review in its Supplemental Report, and OLERS even notes it later in its brief.  Opp'n at 18 (quoting the Litigation Committee's report stating ACICS audits include "calling employers and graduates").

25

statistics were effective considering the staffing of the Career Services department, not simply whether staff were stretched too thin. Order at 24.

The Committee addressed the Court's request, as outlined in its Supplemental Report and the Topel Report. In particular, contrary to OLERS's allegations, Opp'n at 20, the Committee investigated how "career placement staff were performing," "whether the staff was appropriately supervised," and "how career placement staff were trained to identify whether students' post-graduate employment was in a 'related field' to their course work," and "the protocols . . . adopted by the Company for recording those statistics," not only through Dr. Topel's independent review, but through its interviews of Career Services personnel, its review of EDMC's policies and procedures, and its review of outside and inside audits of placement records. Supplemental Rpt. at 21-33, App'x 1. Indeed, Appendix 1 to the Committee's Supplemental Report describes in detail EDMC's policies regarding job placement statistics, including policies regarding staff expectations, supervision, placement protocols, and training. The Committee did not conduct any supplemental investigation into the only other area mentioned by OLERS—"whether there was a backlog of requests for assistance or counseling from students"—because that area was unrelated to the Court's request or OLERS's allegations regarding placement record manipulation.

## IV.    CONCLUSION.

For the reasons set forth in its reports and in Dr. Topel's reports, the Litigation Committee has considered OLERS's Opposition and the Madigan Report and nevertheless has determined in its business judgment that it would not be in the best interest of the Company or its shareholders to take the actions requested with respect to the allegations in the Demand Letters or OLERS's amended complaint.

[SIGNATURE PAGES FOLLOW]

26

By the Litigation Committee of the Board of
Directors of Education Management Corporation,

Paul J. Salem

_____

Leo F. Mullin

By the Litigation Committee of the Board of
Directors of Education Management Corporation,

_____
Paul J. Salem

_____
Leo F. Mullin

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing

Defendants' Notice of the Special Litigation Committee's Supplemental Investigation in

Response to the Court's Memorandum and Order on the Preliminary Objections in the Form of

Motions to Dismiss the Derivative Amended Complaint has been served upon all other parties at

the address(es) below via first class mail, this 9th day of January, 2014:

William R. Caroselli, Esq.
CAROSELLI BEACHLER MCTIERNAN & CONBOY, LLC
20 Standwix Street, 7th Floor
Pittsburgh, PA 15222
Tel.: (421) 391-9860
*Counsel for Oklahoma Law Enforcement Retirement System*

Laura E. Ellsworth, Esq.
Thomas S. Jones, Esq.
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Tel.: (412) 391-3939
*Counsel for Nominal Defendant Education Management Corporation*

Michael L. Kichline, Esq.
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel.: (215) 994-4000
*Counsel for Individual Defendants*

Ryan O. Hemminger
PA I.D. No. 200809
*Filed on behalf of Leo F. Mullin and Paul J. Salem,
in their capacity as members of a duly formed
Special Litigation Committee of the Board of
Directors of Education Management Corporation*

4