# EXHIBIT 8

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, | CIVIL DIVISION |
| Plaintiff | |
| | NO. GD-12-008785 |
| vs. | |
| TODD S. NELSON, JOHN R. McKERNAN, MICK J. BEEKHUIZEN, SAMUEL C. COWLEY, ADRIAN M. JONES, JEFFREY T. LEEDS, LEO F. MULLIN, PAUL J. SALEM, PETER O. WILDE, and JOSEPH R. WRIGHT, | CODE:  020 EQUITY |
| Defendants | MEMORANDUM AND ORDER OF COURT DATED AUGUST 25, 2015 |
| and | |
| EDUCATION MANAGEMENT CORP., | |
| Nominal Defendant | HONORABLE R. STANTON WETTICK, JR. |

COPIES MAILED TO:

Counsel for Plaintiff:

William R. Caroselli, Esquire
Seventh Floor
20 Stanwix Street
Pittsburgh, PA  15222-4802

Counsel for Defendant-Directors:

Michael L. Kichline, Esquire
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104

Counsel for Leo F. Mullin and Paul J. Salem, as
members of a duly formed Litigation Committee
of the Board of Directors of Education
Management Corporation:

Ryan O. Hemminger, Esquire
28th Floor
525 William Penn Place
Pittsburgh, PA  15219

R. Todd Cronan, Esquire
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA  02109

Counsel for Nominal Defendant:

Thomas S. Jones, Esquire
Laura E. Ellsworth, Esquire
Anderson T. Bailey, Esquire
Suite 4500
500 Grant Street
Pittsburgh, PA  15219

## MEMORANDUM AND ORDER OF COURT
### DATED AUGUST 25, 2015

WETTICK, J.

This is a shareholder derivative action.  Through a July 16, 2013 Memorandum and Order of Court, I ruled on a motion of the nominal defendant, Education Management Corporation ("EDMC"), to dismiss plaintiff's Amended Complaint pursuant to Section 7.08 of the American Law Institute Principles of Corporate Governance and for lack of standing.[1]

I granted EDMC's Motion to Dismiss with respect to each claim raised by plaintiff other than the fraudulent job placement claim and the incentive-based compensation claim.

I discussed the fraudulent job placement claim at pages 24-25 of the Memorandum:

> I find that the investigation is inadequate because of its failure to independently assess whether the checks and balances described in the Report actually worked.

> At a minimum, the SLC [Special Litigation Committee] should have randomly selected an appropriate number and cross-section of graduates and obtained the placement documentation for these graduates, including writings relating to (1) the department supervisor's checking the accuracy of the information entered by Career Services Advisors, (2) the confirmation of the Career Services Advisors that verifications are documented, and (3) the separate review of EDMC's corporate staff, including a review of whether the employment listed for the graduate is related to the graduate's field of study. (See SLC Report at 63-64, quoted at pages 16-17 of this Memorandum.)  A full description of the investigation and individual findings should be included in a supplemental report.

> I recognize that the Report states that EDMC retained outside counsel to conduct a second investigation which included document review and interviews of more than twenty employees, that "compliance procedures also verify accuracy of statistics" and that during a standard school audit, "auditors randomly select services files and verify employment and salary data."

---

[1] The factual background of this litigation is described in my July 16, 2013 Memorandum.

These statements fall far short of a detailed description of an independent analysis that SLC could easily have conducted.

I also find that the investigation is inadequate because the facts, as described in the Report, are that at a time when student enrollment exceeded 150,000, EDMC employed only 300 or so people to help EDMC's graduates find jobs and to ensure that EDMC accurately and fairly reported its job placement statistics. An adequate investigation would have sought additional information as to whether the checks and balances upon which the Report relied were actually effective where only 300 or so employees were responsible for the accuracy of the statistics.

I discussed the incentive-based compensation claim at pages 28-29 of the Memorandum:

I find the SLC's investigation as to how the grid actually operates was inadequate because its findings were based almost entirely on interviews, descriptions of EDMC's training and EDMC's manuals. What was missing was any measurable objective findings.

Any competent statistician could, through a sampling of records, answer the relevant questions, including (1) to what extent is each of the five categories used; (2) does the number of quality points awarded to ADAs operate independently of the ADAs' new student point range, or are ADAs who score higher on the new student point range far more likely to achieve higher quality-point scores; (3) is the number of new students a significant factor in determining the compensation for six month-eighteen month ADAs?

In summary, there was no reason for the SLC to rely exclusively on subjective evidence when far more reliable evidence is readily available.

My Order of Court provided that I was postponing a ruling on the nominal defendant's Motion to Dismiss with respect to plaintiff's Fraudulent Job Placement Claims and plaintiff's Incentive-Based Compensation Claims. The Order further provided that the SLC was permitted within ninety days to conduct more complete investigations as described in the Memorandum and was permitted to file a Supplemental Report describing the investigations (including results). If the SLC continued to recommend that it was not in the best interests of the company or its stockholders to take any action described in plaintiff's Demand Letters, nominal defendant was permitted within this ninety-day period to file a Supplemental Motion to Dismiss with a brief.

Pursuant to my July 16, 2013 Order of Court, the SLC conducted more complete investigations and filed a supplemental report describing the investigations and continuing to recommend that it would not be within the best interests of the company or its shareholders to take any action with respect to the fraudulent job placement claim and incentive-based compensation claim.

## I. FRAUDULENT PLACEMENT CLAIM

The investigation now includes the contents of the Topel October 14, 2013 Supplemental Report (Ex. 2 to Docket Entry 41).

Dr. Topel's Supplemental Report shows he performed the additional investigation which I described in my July 16, 2013 Memorandum. Thus, with respect to this claim, I find that the scope of the investigation and the procedures and methodologies employed were adequate.

Plaintiff contends that I should find the investigation to be inadequate because a reasonable number of graduates should have been interviewed to confirm that they were employed in a field for which they were trained. However, this was not a requirement that I included in my July 16, 2013 Memorandum, because the failure to interview graduates does not render the investigation inadequate.[2]

For these reasons, the decision of the Board of Directors not to proceed with the fraudulent job placement claim is protected by the business judgment rule and shall be given deference by the courts in the absence of fraud or self-dealing or other misconduct or malfeasance. See page 10, 7/16/13 Memorandum. In this case, none of the exceptions to the business judgment rule apply.

---

[2]Under the business judgment rule, the defendant may establish the scope of the investigation, and a court may intervene only where the scope of the investigation, as determined by the court, is clearly inadequate.

## II. INCENTIVE-BASED COMPENSATION CLAIM

This claim cannot be pursued if EDMC is able to enter a Safe Harbor. A Safe Harbor is available to EDMC because the regulatory Safe Harbor allows any annual salary that is "not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (eff. July 1, 2003 to June 30, 2011) (emphasis added). It is my reading of the regulatory Safe Harbor that it applies as long as salary structures are based, at least partially, on factors other than student enrollment. Thus, by including the word "solely," the regulatory Safe Harbor renders almost meaningless the legislation which prohibits for-profit schools from providing incentive pay "based directly or indirectly on success in securing enrollments or financial aid . . . ." 20 U.S.C. § 1094(a)(20).

## REPORTS OF DR. ROBERT TOPEL AND PROFESSOR DAVID MADIGAN

As I previously stated, in my July 16, 2013 Memorandum, I ruled that there was no reason for the SLC to rely exclusively on subjective evidence when far more reliable evidence was readily available through statistical analyses conducted by a competent statistician. My July 16, 2013 court order governing plaintiff's Incentive-Based Compensation Claims provided that the SLC was permitted within ninety days to conduct a more complete investigation as described in the July 16, 2013 Memorandum and was permitted to file a Supplemental Motion to Dismiss based on a supplemental expert report describing the investigation (including results). The court order also provided that if the SLC continued to recommend that it would not be in the best interests of the company or its stockholders to take any action described in plaintiff's Demand Letters, plaintiff was given thirty days to file a response to the Supplemental Motion to Dismiss.

In response to this court order, defendants retained Dr. Topel to conduct statistical analyses and make findings based on his statistical analyses as to whether or not compensation

was based solely on new student points.    On October 15, 2013, defendants filed a

Supplemental Motion to Dismiss supported by an October 14, 2013 Supplemental Report in

which Dr. Topel described in detail the statistical analyses he performed to answer the question

of whether ADA compensation was based solely on the number of students enrolled.    See

Exhibit 2 to Defendants' Notice of the Special Litigation Committee's Supplemental Investigation

in Response to the Court's Memorandum and Order on Preliminary Objections in the Form of

Motions to Dismiss the Derivative Amended Complaint (Docket Entry 41).   Dr. Topel's Summary

of Findings is set forth at pages 3-4 of his October 14, 2013 Report:

## 3.    Summary of Findings

In the analyses below I assess each of the questions raised by the Court regarding the incentive compensation claim of ADAs at EDMC and the job placement claim regarding the categorization of placements by Career Services. I find that:

Incentive Compensation Claim

- Based on my statistical analysis of the compensation of ADAs at EDMC, I find that the total number of new students recruited did not solely determine compensation of ADAs at EDMC. This was true both at EDMC as a whole and within each individual compensation matrix.

- After accounting for the number of new students recruited, several additional factors were both numerically and statistically significant in explaining ADA compensation differences at the 12-month evaluation and after. Some of these factors include total quality factor points, location, and adjustments due to managerial responsibilities, all of which were statistically significant factors in explaining compensation. The contributions of these factors imply that the total number of new students recruited did not solely determine compensation of ADAs at either EDMC as a whole or within each individual compensation matrix.

- The total number of quality factor points—a summary measure of evaluated performance—awarded to ADAs was not merely a proxy for the total number of new students recruited. While the total number of quality factor points was positively correlated with the number of new students recruited, the correlation does not establish that ADAs who scored higher on the new student point range were far more likely to achieve higher total quality point scores. Moreover, the regression results show that total quality factor points

-6-

were independently statistically significant (after controlling for the number of students recruited) in determining compensation of ADAs.

- Each of the five categories of total quality factor points in the matrices used to determine compensation (5 – 8 total points, 9 – 12, 13 – 18, 19 – 22, and 23 – 25) were used in assessing the performance of ADAs. Individuals appeared in each of the categories in each matrix, and within different categories of student points.

On November 25, 2013, plaintiff filed a Declaration of Michael T. Berry in Support of Plaintiff's Memorandum of Law in Opposition to Nominal Defendant Educational Management Corporation's Supplemental Motion to Dismiss which included Exhibit A—David Madigan's Comments on Dr. Robert Topel's Report (Docket Entry 47).

Dr. Madigan, whom plaintiff retained, has an impressive background in the field of statistics.

Dr. Madigan describes what he characterizes as flaws in Dr. Topel's analyses and findings that make the regression analyses Dr. Topel utilized to examine "incentive compensation" unreliable. He opines that the "key flaw in Dr. Topel's analysis is that the number of student *points* was actually used to determine salary, not overall student *numbers*. Points *are* directly related to student numbers insofar as they derive from the number of students in each of a set of pre-defined categories. However, any analysis that focuses on the relationship between compensation and *overall* numbers misses this subtlety and can lead to inappropriate conclusions." (p. 2) Dr. Madigan also describes other problems which undermine Dr. Topel's analyses and render his conclusions unreliable including the use of R-Square values for non-linear relationships.

On January 9, 2014, defendants filed a Notice of Additional Filings by the Special Litigation Committee of EDMC in Response to Plaintiff's Opposition to Defendant's Renewed Motion to Dismiss the Derivative Amended Complaint. This Notice includes a Report of Dr. Topel as Exhibit 1.

In this Report, Dr. Topel separately addressed each of the comments of Dr. Madigan criticizing Dr. Topel's October 15, 2013 Report governing incentive compensation. For each comment, Dr. Topel explains why Dr. Madigan's criticism is unfounded and offers explanations supporting his analysis and findings. See, for example, Dr. Topel's responses to paragraphs 12-17 of Dr. Madigan's comments:

### 3.4.    Madigan Paragraph 12

In paragraph 12, Professor Madigan claims that figures in my report suggest the existence of "outliers" in the data that would impact measures like R-squared. He offers no examples of which figures suggest the existence of "outliers" or any explanation of which part of those figures support this claim. In addition, the hypothetical calculations he presents in his declaration are misleading and substantially different than the actual R-squared values I report. He uses hypothetical data in which between 1 and 9 percent of the variation is explained by the model, even though all of the results I present in my report for all ADAs with total new students recorded show R-squared values above 44 percent with many much higher. For example, among these estimates the lowest reported R-squared is 44.8% for all ADAs across all business units only controlling for TNS and year (Exhibit 9, p. 18), and the highest reported R-squared is over 99% for South University ADAs from 2008 – 2011 after accounting for all factors in the full model (Appendix D). Given the number of observations in the data I relied upon, the influence of a single "outlier" or even a few "outliers" would not materially affect my conclusions. As importantly, the very fact that "outliers" might exist is further evidence that total new students recruited are not the sole determinant of compensation. By definition, "outliers" are observations on compensation that are not explained by the measurable variables in the model, including the number of student recruited, so they are inconsistent with Plaintiff's claim of a deterministic relationship between new students recruited and total compensation.

### 3.5.    Madigan Paragraphs 13 - 16

In paragraph 13, Professor Madigan claims that factors outside of total number of students that I included in the models are statistically significant because of large sample size. However, he ignores the results in Appendix D which run the same models separately for each of the individual matrices and show the same pattern: factors including TQF categories, location, NSP categories, years of service, and adjustments for managerial duties are significant and material determinants of differences in ADA compensation, even after accounting for the number of students recruited. Each

of these analyses demonstrates my conclusion that total number of students recruited is not the sole determinant of ADA compensation. Many of the specific matrices do not contain large numbers of observations and would not be subject to this critique by Professor Madigan. In each case the results are consistent with those presented in the body of the report for the larger population. Further, though he only offers speculation that these other factors may be "weakly explanatory"—a term that has no technical definition—the formal result is that these factors are statistically significant determinants of compensation, over and above any effect of the number of students, which demonstrates that the total number of students recruited is not the sole factor in determining compensation of ADAs.

Both in paragraph 13 and again in paragraphs 14 through 16, Professor Madigan seems to suggest that it is not enough to show that there are other factors that significantly impact compensation, but that those other factors must pass some arbitrary and unspecified threshold of explanatory power. It is my understanding that the safe harbor does not establish a threshold for the magnitude of the impact a given factor must have on compensation, but rather simply states that total number of students recruited cannot be the sole factor in determining compensation. Even so, my analyses offer statistical proof that these other measurable (and non-measurable) factors account for a material portion of the variation in ADA compensation, as discussed above and in my report (p. 18 – 23 and Appendix D).

Professor Madigan further confuses the point by stating that factors that are not part of the initial matrix that sets the unadjusted salary for ADAs should be ignored in an analysis of ADA compensation. This makes no sense as either a statistical or economic matter. Each of these factors directly impacts the compensation that an ADA eventually receives—therefore affecting the ability to recruit and retain productive ADAs—and therefore should not be ignored in an accurate assessment of ADA compensation. Professor Madigan seems to suggest that the question being asked by the Court and the safe harbor is "after ignoring all other factors that affect compensation, does total number of students recruited explain all of ADA compensation?" By omitting these statistically significant determinants of compensation, Professor Madigan's approach would bias an econometric

estimate of the effect of new students on compensation because productivity in recruiting is correlated with other determinants of performance. For example, if productive recruiters are also better managers of others, and are compensated for it, then omission of managerial responsibilities from the model will attribute part of the returns to managerial responsibilities to new student recruiting. More generally, by ignoring other factors that actually affect ADA compensation Professor Madigan's approach would avoid the very question being asked by the Court with regard to the law's safe harbor.

Paragraph 16 of Professor Madigan's report suggests that "the R-squared values" for each measured factor affecting ADA compensation should be reported separately. The meaning of this critique is not obvious, as the individual factors do not have unique "R-squared values" beyond their incremental ability to add explanatory power, conditional on the other variables included in the model—the "partial R-squared". Each of these variables has incremental, statistically significant explanatory power, as my tables show, and jointly they account for a substantial portion of ADA compensation. These points aside, this critique misses the larger point of my analysis. As Professor Madigan acknowledges, differences in number of students recruited account for only 44.8 percent of the variation in ADA compensation which means that *other factors* unrelated to the number of new students, including the measurable factors that are recorded in EDMC's data, account for more than half (55.2 percent) of the variation in ADA compensation. And even the 44.8 percent "attributable" to the number of students is an overstatement, because that model does not control for other performance-related determinants of compensation, with which the number of students is correlated. Based on this evidence, by any reasonable definition the compensation of ADAs "*is not based solely on the number of students recruited*".

### 3.6.    Madigan Paragraph 17

In paragraph 17 Professor Madigan presents two statistical criticisms of the regression analyses. The first states that I did not appropriately account for the fact that the data include repeated observations for some individuals, "potentially resulting in an important violation of the independence assumption." It is true that non-independence can affect hypothesis tests, but it is not true that I did

not account for such non-independence—Professor Madigan merely assumes that I did not.   In fact, I dealt with this exact issue using standard econometric techniques.   All of the hypothesis tests in my report account for possible non-independence of multiple observations on individual ADAs, exactly as suggested by Professor Madigan.

The second criticism in paragraph 17 is that factors in the regression are "presumably correlated", which "complicates the interpretation of the regression". While I agree that some degree of collinearity exists in the data (as it does in almost all such analyses), Professor Madigan's interpretation of the issue is mistaken. He states that "because TQF is correlated with other variables, such as number of students, it is not possible to hold number of students constant while considering the effect of TQF, and thus the TQF effect is, at the very least, difficult to interpret".   In point of fact it is "possible to hold number of students constant while considering the effect of TQF", precisely because ADAs with identical numbers of students recruited have different levels of TQF— TQF is determined by other dimensions of performance.  In a regression, the separate (and statistically significant) estimated effect of TQF derives from precisely that variation in TQF that is *uncorrelated* with (orthogonal to) other explanatory variables in the model, including the number of students—there would be no such measured association if Professor Madigan's concern were important.

In summary, Professor Madigan offers a variety of criticisms and hypothetical examples that purport to show that my regression analyses are not valid or "difficult to interpret".  His criticisms are misguided and unreliable, based on a misinterpretation of my methods, flawed analysis, and, in my view, a mischaracterization of the questions raised by the Court.  Further, for all of his criticism of my approach, Professor Madigan offers no analysis that would indicate that EDMC ADA compensation is solely based on the number of students recruited.

Page 13

On November 19, 2014, plaintiff filed a Notice of Filing of Supplemental Report of Dr. David Madigan, Ph.D., which includes as Exhibit 1 a Supplemental Report of David Madigan, Ph.D. (Docket Entry 86). The Report takes into account data and documents which plaintiff recently obtained.

In the Introduction to his Supplemental Report at page 1, Dr. Madigan opines:

> In summary, I conclude that Dr. Topel's Reports were unreliable and flawed, and could not have formed an adequate and reliable basis for the Special Litigation Committee's ("SLC") decision to seek dismissal of the claims in this action.

Dr. Madigan addresses the question of whether new student point categories and total quality factor points explain variances in ADA salaries (page 2). He does not include other factors, including years of service, the number of supervisees, and labor market adjustment. He concludes that new student categories explain 98-99% of the salary variation.

He also describes continuing concern about Dr. Topel's analysis of the compensation data:

### 2.2 Continuing Concerns About Dr. Topel's Analysis of the Compensation Data

In the First Madigan Report, before having had a chance to analyze the data that underlie the Topel Report, I raised some potential concerns about Dr. Topel's analysis. My new analysis has allayed the concerns I raised in paragraph 12 about so-called "outliers." However, in paragraph 17 I had raised a concern about distributional assumptions underlying Dr. Topel's analysis. I noted the correctness of the statistical significance calculations requires that the so-called residuals be normally distributed. The "residuals" are the differences between the actual salary values and the salary values predicted by the regression model. I have now checked this assumption for several of Dr. Topel's models. Figure 1 below, for example, shows a "normal quantile plot" for the model described in Dr. Topel's Exhibit 9. The basic idea is to plot the residuals against the quantiles of a theoretically perfect normal distribution (also known as a "bell curve"). A normal quantile plot is a standard diagnostic used in regression modeling; if the assumptions underlying the regression model are correct, the points in the normal quantile plot should lie in a straight line. Figure 1 shows some severe departures from linearity demonstrating that the residuals are not normally distributed. As a consequence, the "probability the variable does not independently impact salary" that features prominently in Dr. Topol's analysis is invalid (see, for example, Exhibits 9, 10, 11.1 and11.2 in Dr. Topol's opening report). There is also evidence that residuals increase in magnitude as the fitted values increase, another violation of the underlying technical assumptions.



Figure 1. Normal quantile plot for the residuals in Dr. Topel's Exhibit 9 model. If the underlying statistical assumption is correct, the points should fall in a straight line.

Furthermore, Dr. Topel's models that adjust for "Other Compensation Related Factors" adjust for a variable called "Location" in an attempt to account for a labor market adjustment that is applied for some employees. While I have demonstrated that variances for labor market adjustments should not be considered in assessing factors that affect incentive-based compensation, Dr. Topel did not even use the correct labor market variable. For example, employee 10594's location was "AICAOC" across seven separate salary adjustments, but the dollar amount of the labor market adjustment was different on all seven occasions. Even the percent value of the labor market adjustment varied, being 15% for five of the evaluations and 20% for the remaining two. Instead, Dr. Topel should have analyzed data from the columns "lma_salary" and "lma_percent."

On or about December 18, 2014, defendants filed a Notice of Filing Dr. Robert Topel's Reply Report to Supplemental Report of Dr. David Madigan, Dated November 19, 2014 that includes as Exhibit A a Reply Report to Supplemental Report of Dr. David Madigan, dated November 19, 2014 (Docket Entry 91).

In the Report's Introduction at page 2, Dr. Topel states:

> I conducted several analyses addressing the questions raised by the Court and found that the total number of new students recruited was not the sole determinant of ADA compensation and that several other factors (total quality factor points, management responsibilities and activities, seniority, and others) significantly impact the fixed compensation of ADAs. I found no evidence that the number of quality factor points was merely a proxy for total new students recruited. Instead I found that the total number of quality factor points independently impacts ADA compensation. Also, based on a review

-14-

and analysis of a random sample of a cross section of job placements of
EDMC graduates, I found no evidence or indication of a systemic falsification
of job placement statistics.

In his Report, Dr. Topel describes what he characterizes as three major errors of

Professor Madigan, each of which favors plaintiff's claims. The first is that Professor Madigan

concludes only that more than 98% of "incentive compensation" is explained by new student

points. "Incentive compensation" is a term used by plaintiff's expert that includes only new

student points and quality factor points. However, the regulations provide a Safe Harbor if total

compensation is not based <u>solely</u> on the number of students enrolled. Total compensation

includes consideration of other factors used in calculating compensation, including seniority and

supervision of other employees. Dr. Topel concludes that when these additional factors are

considered, he finds that compensation is not based solely on the number of students admitted.

Dr. Topel also criticizes plaintiff's conclusion that when considering only new student

points and quality points, student points account for 98-99% of salary variance. This means that

total quality factor points account for less than 2% of the variation. Dr. Topel opines that Dr.

Madigan offers no statistical analysis that would support assigning less than 2% to total quality

factor points. He refers to the average of all matrixes showing that the number of new students

recruited accounts for only 80.4 percent of the variation in the matrix component of

compensation.

COURT'S RULING

I now consider whether to grant or deny defendants' Motion Seeking Dismissal of

Plaintiff's Incentive-Based Compensation Claim.

The SLC, in the exercise of its business judgment, chose to rely on the analyses and

findings of Dr. Topel.

In my July 16, 2013 Memorandum, I stated that a decision of a Board of Directors to

terminate an action is governed by the business judgment rule if a court answers "yes" to the

-15-

following questions:   (1) whether the SLC was independent, (2) whether the SLC was disinterested, (3) whether the SLC was assisted by counsel, (4) whether the SLC conducted an adequate investigation, (5) whether the SLC prepared a written report, and (6) whether the SLC rationally believed that its decision was in the best interests of the corporation.

In my July 16, 2013 Memorandum, I answered "yes" to questions 1, 2, 3, 5, and 6. As I previously stated, I postponed a ruling with respect to question 4 in order to permit the SLC to conduct a more complete investigation as described in my July 16, 2013 Memorandum and file a Supplemental Report describing the investigation.

In my July 16, 2013 Memorandum, I found that the Report upon which the SLC relied based its findings on interviews, descriptions of EDMC's training, and EDMC's manuals.  What was missing was any objective findings.  I stated that there was no reason for the SLC to rely exclusively on subjective evidence because far more reliable evidence is readily available through the retention of a statistician to analyze the relevant data and render findings based on the analyses.  In response to my ruling that the SLC must retain a statistician to answer the question of whether or not compensation was based solely on student enrollment, defendant retained a nationally-recognized statistician (Dr. Topel whom defendants had previously retained for preparation of the initial Report) to utilize appropriate statistical analyses to answer the question of whether or not compensation was based on factors in addition to the number of students enrolled.  In answering this question, Dr. Topel described in detail the analyses which he conducted.  He also explained why he found the Madigan Reports not to be reliable.

Since the SLC's investigation now includes the statistical analyses of a highly qualified expert which, according to this highly qualified expert, supports a finding that compensation is not based entirely on student enrollment, I now answer "yes" to the question of whether the SLC conducted an adequate investigation.

I recognize that plaintiff also retained a nationally-recognized statistician who disagrees with Dr. Topel's methodology and findings.  However, the issue is not whether a court should

favor the findings of Dr. Topel or Professor Madigan. The issue is, instead, whether the decision of the SLC to rely on the Topel Reports could not have been made in good faith. There is no evidence that would support such a finding.

As I stated at page 11 of the July 16, 2013 Memorandum, "a court should determine only the validity of the board's decision to terminate the litigation; if that decision was made in accordance with appropriate standards, a court should dismiss the derivative action prior to litigation on the merits. It is presumed that in making a business decision, the directors acted on an informed basis in good faith and with an honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, the business judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumptions."

In other words, under Pennsylvania law, the decision made by the Board of Directors to rely on the analyses and findings of Dr. Topel must be given deference by the court "in the absence of fraud or self-dealing or other misconduct or malfeasance." *Cuker v. Mikalauskas*, 692 A.2d 1042, 1048 (Pa. 1997).

In this case, the SLC conducted an adequate investigation and there is no basis for setting aside the decision of the SLC and the Board to rely on the explanations and findings of the highly qualified expert retained to answer the question of whether compensation is based solely on student enrollment.

For these reasons, I enter the following Order of Court:

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CIVIL DIVISION

OKLAHOMA LAW ENFORCEMENT
RETIREMENT SYSTEM,

        Plaintiff

    vs.

TODD S. NELSON, JOHN R.
McKERNAN, MICK J. BEEKHUIZEN,
SAMUEL C. COWLEY, ADRIAN M.
JONES, JEFFREY T. LEEDS, LEO
F. MULLIN, PAUL J. SALEM, PETER
O. WILDE, and JOSEPH R. WRIGHT,

        Defendants

   and

EDUCATION MANAGEMENT CORP.,

      Nominal Defendant

NO. GD-12-008785

### ORDER OF COURT

    The motion of defendants and nominal defendant seeking dismissal of plaintiff's incentive-based compensation claims and fraudulent job placement claims is granted and all counts of this action are dismissed.

BY THE COURT:

DATED:  August 25, 2015

_____
WETTICK, J.

*Copies mailed. (A) 8/25/15*