GZJ KDKV';"

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEPHEN BUSHANSKY, derivatively on behalf of Education Management Corp., | ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) ) |
| TODD S. NELSON, JOHN R. MCKERNAN, JR., PAUL J. SALEM, SAMUEL C. COWLEY, ADRIAN M. JONES, PETER O. WILDE, and LEO F. MULLIN, | ) ) ) ) ) |
| *Defendants,* | ) ) |
| and | ) ) |
| EDUCATION MANAGEMENT CORP., | ) ) |
| *Nominal Defendant.* | ) ) |

**VERIFIED DERIVATIVE COMPLAINT**

**CIVIL ACTION NO.**

**JURY TRIAL DEMANDED**

Plaintiff, Stephen Bushansky ("Plaintiff"), by his undersigned attorneys, brings this complaint derivatively on behalf of Education Management Corporation ("EDMC" or the "Company") against certain members of the EDMC Board of Directors (the "Board"), based upon, *inter alia*, knowledge as to himself and the investigation made by and through his attorneys, and alleges as follows:

## NATURE OF THE ACTION

1.      Having made demand on August 23, 2010 upon the Board to bring this action, and the Board having refused to take any of the actions set forth in the demand, Plaintiff brings this derivative action seeking, *inter alia*, to recover damages incurred by the Company, from, among others, current and/or former top executives and directors of EDMC, for, among other things, knowingly causing the Company to operate with serious board, management and corporate governance weaknesses and failing to maintain adequate controls and expertise to master its compliance with Title IV ("Title IV") of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 et seq. (the "HEA"), thereby placing all of the Company's Title IV receipts over an eight (8) year period at risk, and failing to pursue recovery for EDMC from those who have caused great financial and other damage to it.

2.      An underlying cause for this dispute occurred when the United States in 2006 deregulated online education removing the "50 Percent Rule" which had previously limited federal student loan access to universities providing more than 50% of their courses online.  This change led to explosive growth at for-profit educational institutions now that federal funding was available to institutions providing primarily online course offerings.  Wall Street investment bankers quickly seized upon the lucrative opportunity posed by the deregulation by investing in for-profit educational institutions and implementing enrollment strategies to achieve

hypergrowth and capture federal student aid funds. EDMC fell into the cross-hairs of private equity investors intent upon achieving hypergrowth in enrollment and the receipt of federal student aid funds when it was acquired in 2006 through a leveraged buy-out.

3.      An August 5, 2010 *Business Week* article, "Goldman Schools Students on Debt," revealed that EDMC had incurred substantial debt, in the amount of $2 billion, to affiliates of its private equity shareholders in connection with the acquisition of EDMC in a $3.4 billion leveraged buyout by a consortium of private equity investors, including Goldman Sachs Capital Partners ("Goldman"), Providence Equity Partners ("Providence"), and Leeds Equity Partners ("Leeds Equity") (collectively the "Sponsors" and the "2006 LBO"). EDMC's former CEO stated that EDMC's massive debt to the Company's private equity shareholders "changed the culture of EDMC." EDMC's debt to its private equity shareholders caused the Company to pursue aggressive growth strategies that undermined EDMC's academic quality for its students and led to EDMC's use of improper and unlawful recruiting and enrollment practices in order to satiate the need for immediate returns for its private equity shareholders. This quest to achieve hypergrowth, at the expense of its students, led to a ten-fold increase in the number of students enrolled in its online programs exclusively in the five years after the 2006 LBO. This huge increase in enrollment was accomplished through EDMC's targeted focus on employing a large team of recruiters resulting in EDMC employing one recruiter for every 28 students, while each EDMC career counselor was responsible for 493 students and each student services staffer was responsible for 133 students by 2010.

4.      As described in further detail below, the culture shift at EDMC was further cemented when the Sponsor-led Board of EDMC hired former executives of the Apollo Group,

2

Inc. ("Apollo"), which had run afoul of federal regulations over enrollment, tactics to lead the Company's pursuit of hypergrowth.

5.     EDMC's misconduct was first reported on or about August 3, 2010 in connection with the impending release of a United States Government Accountability Office ("GAO") report entitled "For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Questionable Marketing Practices" (the "GAO Report").

6.     The following day, on August 4, 2010, the United States Senate Committee on Health, Education, Labor and Pensions ("HELP Committee") held a hearing related to its investigation of for-profit education providers.  It was revealed at the hearing that EDMC systemically employed improper practices related to student recruiting, enrollment, admissions, and financial aid.

7.     On July 30, 2012, Senator Tom Harkin (D-IA), Chairman of the HELP Committee, unveiled a report on the findings of the Committee's two year investigation of the for-profit higher education industry entitled, For-Profit Higher Education: the Failure to Safeguard the Federal Investment and Ensure Student Success (the "HELP Report").  The HELP Report outlines widespread problems throughout the for-profit educational sector, and pinpointed institutional problems at EDMC in its quest to capture federal revenues and profit through hypergrowth in enrollment.

8.     As detailed in the GAO Report, HELP Committee hearing testimony and in the 2012 HELP Report, for-profit colleges, including EDMC, systematically used improper and unlawful practices in an effort to consistently increase revenues through tuition and fees paid for by federal student aid.  The practices revealed included: misleading prospective students about tuition costs, academic program quality, accreditation, graduate rates, and graduate employment

3

prospects and expected salaries; aggressively targeting low-income and vulnerable populations; using aggressive telephone marketing practices; engaging in improper practices in connection with students' and prospective students' financial aid forms; and improperly compensating admissions staff based on student enrollments.

***Plaintiff's Demand on the Board Falls on Deaf Ears***

9.      In light of the troubling and damaging news to EDMC, by letter dated August 23, 2010, Plaintiff made a demand on the EDMC Board (the "Demand Letter") to take action to determine the extent of the improper and illegal practices, the amount of damage caused to EDMC and take steps to recover those damages.  The Demand Letter further insisted that EDMC substantially revise its corporate governance practices and procedures, and require its directors have both the time and inclination to properly oversee EDMC on behalf of its shareholders in light of the fact that the members of EDMC's Board have multiple board memberships, in addition to time-consuming positions at other firms, leaving little, if any, time to meaningfully oversee the Company.

10.      On November 19, 2010, counsel for Plaintiff received a reply letter from counsel representing a purported committee of "disinterested directors" of EDMC (the "Litigation Committee") which was purportedly investigating the matters identified in the Demand Letter, and which invited Plaintiff to provide further information for the Litigation Committee to consider as part of its investigation (the "November Letter").

11.      Counsel for Plaintiff responded to the November Letter by letter dated November 22, 2010, expressing an interest in meeting with the Litigation Committee and its counsel in order to discuss the facts and information underlying the Demand Letter, and in order to facilitate

such a dialogue, having the Company identify the members of EDMC's Board who comprised the Litigation Committee.

12.    On February 22, 2011, the Litigation Committee's counsel wrote to Plaintiff's counsel stating that the Litigation Committee's work was proceeding and that counsel for Plaintiff should expect to hear back by the end of March 2011 (the "February Letter").

13.    In response to the February Letter, Plaintiff's counsel sent a letter on March 10, 2011 to the Litigation Committee's counsel expressing concern that six months had passed since the Demand Letter had been sent and that the EDMC Board was not fairly and in a disinterested fashion addressing Plaintiff's demand.  Plaintiff's counsel further expressed its interest in meeting with the Litigation Committee, who were at that time unidentified, and its counsel to discuss the concerns enumerated above and the work of the Litigation Committee after being provided with: 1) the identity of the Litigation Committee members; 2) any Board resolutions by which the Litigation Committee was established and that defined its powers and responsibilities; 3) copies of all other demands made upon the EDMC Board; and 4) an identification of all outstanding litigation against EDMC, its Board, or EDMC management concerning the facts discussed in Plaintiff's Demand Letter.

14.    Notwithstanding the request by Plaintiff's counsel to address the serious issues raised by Plaintiff by meeting with the Litigation Committee, the Litigation Committee's counsel responded by a letter dated March 16, 2011 trying to frame Plaintiff's valid requests as counterproductive conditional offers and continued to assert that the Litigation Committee anticipated the completion of its investigation by the end of March.  None of the information requested by Plaintiff's Counsel in its March 10, 2011 letter was provided.

5

15.     On May 4, 2011, well after the Litigation Committee's anticipated March 2011 completion of its investigation, Plaintiff's counsel received a letter (the "May 4 Letter") rejecting Plaintiff's demand and stated that "there has been no breach of the fiduciary duty owed by the officers or directors of EDMC in connection with their oversight of the internal control and corporate governance systems in place at EDMC" and the Litigation Committee "did not uncover evidence showing that the types of conduct identified in the Demand Letter[] and GAO report are in fact occurring at EDMC."  The May 4 Letter further set out that Defendants Leo F. Mullin ("Mullin") and Paul J. Salem ("Salem") had been appointed by the Board to serve on the Litigation Committee and that Defendants Mullin and Salem are purportedly disinterested directors under Pennsylvania law and able to discharge the duties delegated to the Litigation Committee by the Board.

16.     The May 4 Letter further states that the Board delegated to the Litigation Committee the power and authority to: (1) review, analyze, and investigate the allegations in the Demand Letter; (2) engage legal counsel and other experts to conduct the investigation, and draft a report setting forth conclusions and recommendations resulting from the investigation, on behalf of the Litigation Committee; and 3) determine the appropriate actions, if any, the Company should pursue in response to the Demand Letter.  Pursuant to this directive, the May Letter states that the Litigation Committee's counsel conducted approximately forty (40) witness interviews and reviewed more than 165,000 pages of documents pertaining to the allegations raised by the Demand Letter and that the Litigation Committee and its counsel met on numerous occasions to discuss and analyze the information collected through the investigative process. Glaringly absent from this purported "thorough review and analysis of the factual and legal issues identified in the Demand Letter[]" is any description and job titles of the witnesses

6

interviewed, descriptions of the different categories of documents analyzed, and, most troubling, no mention of a report setting forth conclusions and recommendations resulting from the investigation.

17.     The May 4 Letter states that the Litigation Committee determined that EDMC has an extensive and robust system of internal controls and that EDMC sets high standards of conduct for all directors and employees and trains each employee on those standards, imposed under the Company's Code of Conduct (the "Code"). The Litigation Committee's determination of a robust system of internal controls present at EDMC based on the Code is fatally flawed, as glaringly absent from the Code is any information pertaining to the HEA, and the U.S Department of Education's regulations prohibiting an institution participating in Title IV Programs from providing any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments to any person or entity engaged in any student recruitment or admissions activity.

18.     The May 4 Letter further stated that the Litigation Committee did not find any support that employees of EDMC, among other things, "engage[] in deceptive financial aid practices, employ[] questionable sales or marketing tactics, [or] **base[] compensation on the number of students enrolled**" (emphasis added). These findings by the Litigation Committee are belied by documents unsealed pursuant to *qui tam* actions, discussed below, instituted against EDMC, information compiled through investigative reporting and statements of former EDMC and present EDMC employees, described herein.

19.     The May 4 Letter concluded with an invitation to Plaintiff's counsel and Plaintiff to meet with counsel or the Litigation Committee to discuss any additional questions that Plaintiff's counsel or Plaintiff may have regarding the matter.

20. Following the rejection of Plaintiff's Demand Letter, Plaintiff's counsel sent a letter on June 27, 2011 (the "June Letter") conveying its conviction that EDMC is poorly served by the rejection and taking up the Litigation Committee's counsel's invitation to meet to discuss any additional questions regarding the matter. Plaintiff's counsel further conveyed the importance for a productive meeting if counsel would furnish the materials considered by the Litigation Committee, as well as any report provided by it to the EDMC Board, and all Board resolutions concerning the Litigation Committee and its work. Plaintiff's counsel further articulated the importance that EDMC's Board take a stand against those who imperiled the Company's financial condition and business prospects in light of the United States' government's intervention in the *qui tam* action pending against EDMC in the United States District Court for the Western District of Pennsylvania under the caption, *United States of America v. Education Management Corp.,* 2:07-cv-461 (W.D. Pa., filed August 8, 2011) (the Government *qui tam* Action").

21. After getting no response to the June letter, Plaintiff's counsel sent out another invitation to meet with the Litigation Committee in a letter dated July 27, 2011 (the "July Letter"). Nevertheless, the Litigation Committee continued to rebuff invitations from Plaintiff's counsel to meet and address the critical issues facing and damaging the Company.

22. Since then, as more fully discussed herein:

a. In March 2012, a *qui tam* action captioned *United States of America, ex rel. Jason Sobek v. Education Management Corporation, et al.* (the "Sobek *qui tam* Action") filed under the federal False Claims Act in the Western District of Pennsylvania in January 2010 was unsealed. The case alleges that EDMC violated the U.S. Department of Education's regulation prohibiting institutions from making substantial misrepresentations to prospective

8

students, did not adequately track student academic progress and violated the U.S Department of Education's prohibition on the payment of incentive compensation to admissions representatives and seeks to recover treble damages sustained by the federal government as a result of the activity, plus civil monetary penalties;

        b.     In August 2011, EDMC received a subpoena from the Attorney general of the State of New York requesting documents and detailed information relating to the Company's compensation of admissions representatives and recruiting activities;

        c.     In December 2011, the Company received a letter from the City Attorney of the City of San Francisco, California requesting information related to student recruitment and indebtedness, including recruiting practices and job placement reporting, among other issues, by The Art Institute of San Francisco and the seven other Art Institutes located in California; and

        d.     Most recently, on July 30, 2012 the HELP Report was unveiled highlighting institutional problems at EDMC with respect to, among other things, recruiting practices that focus on enrollment growth over ensuring that the Company enrolled students who could benefit from its programs.

23.     It is now obvious that the Litigation Committee has not reasonably and in good faith investigated and cured the issues raised by the Demand Letter which continue to harm the Company.

24.     Moreover, EDMC has suffered further damage to its reputation as a result of the findings in the HELP Report documenting the Company's focus on demonstrating enrollment growth (and the corresponding growth in profit) rather than on ensuring that the Company was enrolling students who would benefit from its programs.

25. The Litigation Committee and its counsel have failed to meet with Plaintiff's counsel and Plaintiff pursuant to the repeated good faith attempts by Plaintiff's counsel to conduct such a meeting, necessitating the present action in light of the continuing harm faced by the Company as a result of the breaches of fiduciary duties of the EDMC Board.

## JURISDICTION AND VENUE

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States. This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, many of the acts alleged and complained of herein occurred in this District where the Company maintains its headquarters.

## THE PARTIES

27. Plaintiff Stephen Bushansky owns and has owned securities of EDMC continuously at all times relevant hereto. Plaintiff is a citizen of the State of New York, residing in the Bronx, NY 10463. Plaintiff brings this action derivatively on behalf of nominal defendant EDMC after having made demand upon the Board on August 23, 2010. This action is not brought collusively to confer jurisdiction upon the Court which it would not ordinarily have.

28. Nominal Defendant EDMC is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania and maintains its corporate headquarters in Allegheny County, at 210 Sixth Avenue, Pittsburgh, Pennsylvania 15222. EDMC is one of the largest providers of post-secondary education in North America, with approximately 151,200 enrolled students as of October 2011. The Company offers education through four different

10

education systems (The Art Institutes, Argosy University, Brown Mackie Colleges and South University), through online platforms at three of the four education systems, and an ABA-accredited law school, Western State University College of Law. The Company offers academic programs to its students through campus-based and online instruction, or through a combination of both.

29.     Defendant Todd S. Nelson ("Nelson") is the Chief Executive Officer ("CEO") of EDMC and has served in that capacity and as a director since February 2007.  Nelson also served as EDMC's President from February 2007 to December 2008.  Prior to Nelson's employment with EDMC, he worked as an independent consultant from January 2006 through January 2007 and for Apollo, the parent company of the University of Phoenix, from 1987 through January 2006, where he served in various roles, including being appointed President of Apollo in February 1998, Chief Executive Officer in August 2001 and Chairman of the Board in June 2004.  Based on his lengthy experience in the for-profit post-secondary education industry and as CEO of the Company, Nelson provides the Board with an understanding of the operations of the Company and was responsible for overseeing all aspects of EDMC's operations.  Nelson is a citizen of the State of Arizona, residing in Phoenix, AZ 85044.

30.     Defendant John R. McKernan, Jr. ("McKernan") is Chairman of the Company's Board and has served as a director of EDMC since June 1999.  McKernan served in various roles with EDMC since joining the Company as its Vice Chairman in June 1999, including: EDMC's Executive Chairman from February 2007 to December 2008; Chief Executive Officer from September 2003 until February 2007; and EDMC's President from March 2003 until September 2003.  McKernan is a citizen of the State of Maine, residing in Falmouth, ME 04105.

11

31.     Defendant Paul J. Salem ("Salem") is a member of the Company's Board.  Salem is a Senior Managing Director and Co-Founder of Providence, one of the Sponsors of EDMC's 2006 LBO, and was appointed to the Board by Providence in June 2006.  Salem and Defendant Peter O. Wilde ("Wilde") also serve on the Boards of Directors of Asurion Corp. and N.E.W. Asurion Corp.  Salem is Chairperson of the Board's Nominating and Governance Committee. Salem is a citizen of the State of Rhode Island, residing in Barrington, RI 02806.

32.     Defendant Samuel C. Cowley ("Cowley") has served on the Company's Board since October 2009 and is a member of the Audit Committee.  Cowley is a citizen of the State of Arizona, residing in Phoenix, AZ 11013.

33.     Defendant Adrian M. Jones ("Jones") is a member of the Company's Board. Jones also serves as a Managing Director of Goldman, Sachs & Co., and was appointed to the Board by Goldman, Sachs in June 2006.  Jones serves on the Board of Directors of Michael Foods Inc. with Defendant Mullin.  Jones is a member of the Board's Nominating and Governance Committee.  Jones is a citizen of the State of New Jersey, residing in Ridgewood, NJ 07450.

34.     Defendant Peter O. Wilde ("Wilde") is a member of the Company's Board. Wilde is a Managing Director of Providence, one of the Sponsors of EDMC's 2006 LBO, and was appointed to the Board by Providence in June 2006.  Wilde serves on the Boards of Directors of Asurion Corp. and N.E.W. Asurion Corp. with Defendant Salem.  Wilde is a citizen of the State of Massachusetts, residing in Brookline, MA 02445.

35.     Defendant Leo M. Mullin ("Mullin") is a member of the Company's Board. Mullin serves in a consultative capacity to Goldman, Sachs as a Goldman Senior Advisor, and was appointed to the Board by Goldman, Sachs, one of the Sponsors of EDMC's 2006 LBO, in

June 2006. Mullin serves on the Board of Directors of Michael Foods Inc. with Defendant

Jones. Mullin is Chairperson of the Board's Audit Committee and a member of the Nominating

and Corporate Governance Committee. Mullin is a citizen of the State of Georgia, residing in

Atlanta, GA 30327.

36.     Defendants Nelson, McKernan, Salem, Cowley, Jones, Wilde and Mullin are

collectively referred to herein as the "EDMC Director Defendants."

37.     By reason of their positions as officers, directors and/or fiduciaries of EDMC and

because of their ability to control the business and corporate affairs of EDMC, the EDMC

Director Defendants owed the Company and its shareholders fiduciary obligations of trust,

loyalty, good faith, and due care, and were and are required to use their utmost ability to control

and manage EDMC in a fair, just, honest, and equitable manner. The EDMC Director

Defendants were and are required to act in furtherance of the best interests of EDMC and its

shareholders so as to benefit all shareholders equally, to refrain from abusing their positions of

control and not act in furtherance of their personal interest or benefit at the expense of the

Company and its public shareholders.

38.     The EMDC Director Defendants, because of their positions of control and

authority as directors and/or officers of EDMC, were able to and did, directly and/or indirectly,

exercise control over and cause the Company to engage in the wrongful acts complained of

herein.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

***EDMC's 2006 LBO***

39.     In March of 2006, EDMC announced that it had agreed to be sold to Providence

and Goldman for $3.4 billion in cash, at the time the largest buyout in the for-profit education

13

sector. The deal came at a time when Congress had repealed a law that forced all accredited schools to deliver at least half their courses on a campus, instead of online, to qualify for federal student aid. The change in law was expected to be a boon for companies like EDMC, who could aggressively expand and market its online learning programs. Despite the growth potential, the for-profit education industry had been tarnished with allegations of fraud, with the then inspector general of the Department of Education, John P. Higgins, testifying that 74 percent of his fraud cases involved for-profit schools.

40. On June 1, 2006, EDMC's acquisition by a consortium of private equity investment funds led by the Sponsors was completed. The acquisition was accomplished through the merger of EM Acquisition Corporation into EDMC, with EDMC surviving the merger (the "Transaction"). The Sponsors, together with certain other investors, became the owners of EDMC.

41. The acquisition of EDMC was financed by equity invested in EM Acquisition Corporation by the Sponsors and other investors, cash on hand, borrowings by Education Management LLC ("EM LLC") under a new senior secured credit facility and the issuance by EM LLC and Education Management Finance Corp. (a wholly-owned subsidiary of EM LLC) of senior notes due 2014 (the "Senior Notes") and senior subordinated notes due 2016 (the "Senior Subordinated Notes").

***The Initial Public Offering***

42. In October 2009, EDMC completed an initial public offering of 23 million shares of its common stock at $18.00 per share (the "IPO"). Net proceeds to EDMC, after transaction costs, totaled approximately $387.3 million. The Sponsors did not sell any of their shares in connection with the initial public offering.

43.     In connection with EDMC's IPO, certain of EDMC's shareholders, including investment funds associated with Providence, Goldman and Leeds Equity who led the acquisition of the Company in June 2006, entered into a shareholders agreement (the "Shareholders Agreement").  As of September 8, 2011, the parties to the Shareholders Agreement, collectively, beneficially owned 90.8% of EDMC outstanding common stock.

***Eligibility for Programs under Title IV of the Higher Education Act of 1965***

44.     For-profit universities rely on federal funding in the form of financial aid for their students.

45.     Under Title IV of the HEA, Congress established various student loan and grant programs, including but not limited to, the Federal Pell Grant Program ("Pell"), the Federal Family Education Loan Program ("FFELP"), and the Federal Direct Loan Program ("FDLP") (collectively "Title IV Funding") in order to financially assist eligible students in obtaining a post-secondary education.

46.     Although the mechanism by which Title IV funding is disbursed to eligible students under the Title IV, HEA programs varies, each Title IV, HEA program requires compliance with specific conditions as a prerequisite to obtaining federal funds.

47.     In order to become eligible to receive Title IV Funding under programs such as Pell, FFELP, or FDLP, or to have its students receive Title IV funding, a post-secondary educational institution must first enter into a Program Participation Agreement ("PPA") with the Department of Education.  20 U.S.C. § 1094(a); 34 C.F.R. § 668.14.

48.     Each PPA expressly conditions a school's initial and continuing eligibility to receive funds under Title IV, HEA programs on compliance with specific statutory requirements, including 20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

15

49.     Section 487 (a)(20) of Title IV of the HEA, 20 U.S.C. § 1094(a)(20) explicitly requires that schools: "Will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance…." 20 U.S.C. § 1094(a)(20) ("Incentive Compensation Ban").  Title IV of the HEA expressly conditions the initial and continuing eligibility of schools to obtain Title IV funding on the requirement that the schools comply with the Incentive Compensation Ban.

50.     Congress enacted the prohibition against paying commissions, bonuses, or other incentive payments based on success in recruiting students because such payments were associated with high loan default rates, which in turn resulted in a significant drain on program funds where the government acts as a loan guarantor.  When Congress amended the HEA in 1992 to prohibit schools from paying these incentives, it did so based on evidence of serious program abuses, including incentive compensation.

51.     The HEA's Incentive Compensation Ban is also reiterated in the federal regulations which specify the requirements to which schools must expressly agree in PPAs.  34 C.F.R. § 668.14(b)(22) ("Incentive Compensation Regulations").

52.     In each PPA, educational institutions such as EDMC certify that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program."  Pursuant to the PPA, EDMC agreed it "will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid

16

to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance...."

53.     In 2002, the Incentive Compensation Regulations accompanying the Incentive Compensation Ban were amended to clarify, among other things, that schools may pay "fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) ("Regulatory Safe Harbor").

54.     In order to maintain its eligibility to receive Title IV funding, each year an educational institution that participates in any Title IV, HEA program also must provide the Department of Education with an annual compliance audit of its administration of Title IV, HEA programs, and an audit of the institution's general purpose financial statements, prepared by independent auditors. 20 U.S.C. § 1094(c)(1)(A); 34 C.F.R. §§ 668.23(a)(2) & (a)(4). For-profit educational institutions, such as EDMC, must conduct their annual financial statements and compliance audits in accordance with the Department of Education Office of Inspector General's Audit Guide. The Department of Education uses the results of the compliance and financial audits to determine whether schools are adhering to applicable requirements for Title IV funding, including the Incentive Compensation Ban. As part of the annual audits, EDMC is required to certify, in the form of written "Required Management Assertions," that, among other things, it complies with the requirements for eligibility to participate in Title IV programs, including the Incentive Compensation Ban. Specifically, EDMC must certify in its "Required Management Assertions" regarding "Institutional Eligibility and Participation" that it has "[n]ot paid to any persons or entities any commission, bonus, or other incentive payment based directly or

indirectly on success in securing enrollments, financial aid to students, or student retention.  34 C.F.R. § 668.14(b)(22)."

55.     The Secretary of the Department of Education has informed post-secondary educational institutions that salary adjustments based solely on the number of students recruited, admitted, enrolled, or awarded financial aid do not fall within the Regulatory Safe Harbor.  The Regulatory Safe Harbor was not intended to protect salary adjustments that are formulated to circumvent the statutory prohibition against incentive compensation, and that salary adjustments based on success in securing enrollments remain prohibited.  67 C.F.R. 51723 (Aug. 8, 2002).

56.     In addition, state authorization and accreditation by an accrediting commission recognized by the Department of Education are also required for an institution to become and remain eligible to participate in Title IV programs.  As such, EDMC is also subject to extensive state regulations and requirements of accrediting agencies, including the Accrediting Council for Independent Colleges and Schools ("ACICS"), Accrediting Commission of Career Schools and Colleges ("ACCSC"), Commission on Colleges of the Southern Association of Colleges and Schools, Higher Learning Commission of the North Central Association, Middle States Association of Colleges & Schools of the Commission on Higher Education, Northwest Commission on Colleges and Universities, and the Commission on Colleges of the Western Association of Schools and Colleges.  The requirements of each of the accrediting agencies include, among other requirements, that:

> Advertising, recruiting, and admissions information adequately and accurately represent the programs, requirements, and services available to students.

> An institution may not delegate without supervision these [recruiting] activities to anyone whose economic incentives are to recruit prospects through means that are unethical or subject to public criticism or to admit ill-prepared applicants.

[r]ecruiting shall be ethical and compatible with the educational objectives of the institution ... The following minimums apply: (a) An institution shall ensure that any person or entity engaged in admissions or recruitment activities on its behalf is communicating current and accurate information regarding courses and accurate information regarding courses and programs, services, tuition, terms, and operating policies.

Schools are required "to describe themselves to prospective students fully and accurately and to follow practices that permit prospective students to make informed and considered enrollment decisions without undue pressure. The school's recruitment efforts must attract students who are qualified and likely to complete and benefit from the training provided by the school and not simply obtain enrollments ... Each school observes ethical practices and procedures in the recruitment of its students.

No misrepresentations should be made in student recruitment, including ... b. misrepresenting job placement and employment opportunities for graduates; c. misrepresenting program costs; d. misrepresenting abilities required to complete intended program.

57.     If the Department of Education or another regulatory agency determines that an institution improperly disbursed Title IV program funds or violated a provision of the HEA or the implementing regulations, that institution could be required to repay such funds to the Department of Education or the appropriate state agency or lender and could be assessed a substantial fine.  Violations of Title IV program requirements could also subject EDMC to other civil and criminal penalties, including the limitation, suspension or termination of the participation of affected institutions in Title IV programs, and, thus, threatening its receipt of federal student aid funds.

***Claims for Payment Under Title IV Programs***

58.     After a school becomes eligible to receive Title IV funding by entering into a PPA, claims for payment of those funds can be made in various ways.  Under Pell and FDLP, for example, students submit requests for funding directly to the Department of Education, or to the Department of Education with the assistance of schools.  Under the FFELP, students and schools

jointly submit requests to private lenders for loans that are then guaranteed by state agencies and are, in turn, insured by the Department of Education and paid in the event of a default.

59.    With respect to all Tile IV, HEA programs, the disbursement of federal funds rests on required statements of eligibility made by schools that are necessary for requests for payment to be considered.

### EDMC's Participation in Title IV, HEA Programs

60.    EDMC signs and submits PPAs to the Department of Education on behalf of all of EDMC's educational institutions throughout the United States.  All of EDMC's institutions are currently operating under approved PPAs.  In December 2006, EDMC's then Chairman and CEO, McKernan, signed all PPAs for EDMC institutions certifying that EDMC is complying with Title IV of the HEA's Incentive Compensation Ban.

61.    More recently, between approximately January of 2009 and January of 2011, the President for each EDMC institution signed that institution's current PPA agreement.

62.    In each PPA, EDMC certifies that "[i]t will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA…."

63.    EDMC further certifies in each PPA that "[i]t will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance…."

64.     All of EDMC's PPAs with the Department of Education are "Provisional Certification" PPAs rather than "Full Certification" PPAs, because, among other reasons, EDMC's educational institutions failed the financial responsibility standards set forth in 34 C.F.R. § 668.171.

65.     In addition to the certifications it makes in its PPAs, EDMC also makes, or causes to be made, additional certifications as part of its annual compliance audits and as part of the student financial aid process, including but not limited to, Required Management Assertions, G5 Certifications, Master Promissory Notes, and their accompanying School Certifications.

66.     From July 1, 2003 through June 30, 2011, EDMC received over $11.1 billion in Title IV funding for students enrolled in EDMC institutions.

67.     The Title IV Funding received by EDMC increased rapidly, from $656 million in 2003-2004 to $2.578 billion in 2010-2011.

**The Transformation of EDMC**

68.     Nelson joined EDMC as its CEO in January 2007.  At that time, EDMC had an enrollment of 82,000 students.  In the five years after the LBO, EDMC experienced phenomenal growth, particularly in the exclusively online programs it offers, with enrollment doubling from 2007 to 2011 to about 160,000 students, making it the second largest for-profit higher education company in the country.  At the same time, its annual revenue nearly tripled to $2.8 billion (nearly 90 percent of which came from the federal student aid programs).  Moreover, when the Sponsors purchased EDMC in 2006, only about 4,000 of the Company's students were enrolled in its online programs exclusively, a number that increased more than tenfold in the following five years based on EDMC's aggressive recruiting of unqualified students.

69.     Once the Sponsors took control of EDMC, the composition of EDMC's Board changed.  By the time of the initial public offering, 50% of the EDMC Board was appointed by the Sponsors.

70.     The new board then hired former Apollo chief executive officer Nelson to lead the Company in its mission to become "the preeminent global higher education company", through a concerted goal of boosting EDMC's enrollment at all costs.  In addition to the fallout from the then record settlement with the Department of Education during Nelson's tenure with Apollo, set forth in more detail *infra*, Nelson had been forced out of his job at Apollo for having been, according to University of Phoenix founder John Sperling, too "preoccupied" with the stock price of the company.  Nelson was one of at least ten former University of Phoenix officials to land top management positions at EDMC after the 2006 LBO.

71.     The largest company in the for-profit educational sector is Apollo, the parent company of the University of Phoenix.  Apollo's growth and success in the sector has come under intense scrutiny including its admissions and compensation practices which violated the Incentive Compensation Ban.

72.     In September 2004, the University of Phoenix had agreed to a then record $9.8 million settlement with the government pertaining to improper enrollment tactics used to achieve the University of Phoenix's massive expansion.

73.     Further, in a Program Review Report made public in 2004, the Department of Education described the University of Phoenix as a predatory machine, with a sales force that was singularly focused on maximizing enrollment numbers.  Among the most important findings in the University of Phoenix report were the consistent accounts from both recruiters and enrollment managers about how employees received raises.  Central to the salary calculations

22

was a performance chart known as "the matrix," which clearly laid out how many students were needed to attain certain salary brackets.

74.     Nelson remained with Apollo until January 2006, when he abruptly resigned.  As a condition of his departure, Nelson could not work for a competing education company for a year, but reemerged to take the reins at EDMC a year later, bringing the same playbook to EDMC that earlier damaged Apollo.

75.     In addition to Defendant Nelson, other individuals who left their employment with the University of Phoenix following its settlement with the Department of Education and were subsequently employed by EDMC in management-level positions include: EDMC's Senior Vice President and Chief Financial Officer, Robert A. Carroll, the former Chief Financial Officer at Apollo;  EDMC's Senior Vice President John Kline, the former Senior Vice President of Operations and Finance for the University of Phoenix Online from August 2002 – February 2006 and its Chief Administration Officer from February 2006 – October 2007; EDMC's Chief Accounting Officer, Craig Swenson, the former Provost and Senior Vice President for Academic Affairs for University of Phoenix and Senior Regional Vice President and Campus Director for University of Phoenix; Ken Boutelle ("Boutelle") EDMC's former Vice President of Admissions for EDMC's Online Higher Education Division and former Director of Enrollment at the University of Phoenix; Anthony F. Digiovanni, EDMC's Senior Vice President – Marketing and Admissions; Sam Yaghoubi, David Preece, Phil Clark, Sean St. Clair, Jamie Wellnitz and Mary Dyer-St. Clair.

76.     To carry out their ambitious plans for growth, Nelson and his colleagues set their sights on the Company's fledgling online-only offerings, which enrolled about 4,000 at the time of the 2006 LBO.  EDMC's push to achieve hyper-growth in enrollment was accomplished

through its focus on employing a large number of recruiters. EDMC employed about 550 recruiters at the time of the 2006 LBO. Under Nelson's leadership, the number of Assistant Directors of Admissions (ADAs), as they came to be called, skyrocketed to about 2,600.

77. In 2010, with 158,300 students, EDMC employed 5,669 recruiters, 321 career service employees, and 1,187 student service employees meaning each career counselor was responsible for 493 students and each student services staffer was responsible for 133 students, but the Company employed one recruiter for every 28 students.

78. The ADAs, under Nelson's leadership, were encouraged and incented by EDMC management to dramatically increase student enrollment in violation of the requirements of accrediting agencies, as set forth in ¶ 56 herein, by systemic abusive, deceptive, fraudulent and unlawful recruiting practices, for which the ADAs were unlawfully rewarded with direct or indirect commission payments for each student signed up.

79. Moreover, EDMC, with knowledge of its management and Board, falsely certified to the Department of Education the results of its compliance and financial audits.

*The GAO Report and HELP Committee Testimony*

80. On August 4, 2010, the GAO Report was released and the HELP Committee held a hearing on for-profit education providers at which extensive testimony was provided regarding the abusive and deceptive recruiting and enrollment practices at for-profit schools. The GAO Report details over 70 instances of abusive and deceptive recruiting and enrollment practices encountered by the GAO during its investigation, including encouraging prospective students to falsify their financial aid forms; misleading prospective students about tuition costs, program quality, accreditation, graduation rates, employment prospects and expected salaries; and using abusive telemarketing practices whereby fictitious prospective students who registered on

websites that match prospective students with for-profit colleges, received numerous, repetitive

calls from for-profit colleges attempting to recruit the students. The report points out that

institutions engaged in such practices could face substantial fines and possible suspension or

termination of their eligibility to receive funds under Title IV. The report also found that for-

profit schools substantially inflated their tuition costs.

81.     During the August 4, 2010 hearing, Gregory D. Kutz ("Kutz"), Managing

Director of Forensic Audits and Special Investigation at the GAO, who authored the GAO

Report, testified as to the abusive and deceptive recruiting and enrollment practices uncovered by

the GAO investigation as described in the GAO Report. Mr. Kurtz identified Argosy University

in Illinois, an EDMC school, as one of the 15 schools visited by the GAO that were the subject

of the Report and at which abusive and deceptive recruiting and enrollment practices were found.

The abusive and deceptive practices identified at Argosy included that an admissions

representative provided misleading information about the cost of tuition and incomplete

information regarding qualifications of professors and graduation rates to a prospective student.

**EDMC Quits Lobbying Coalition It Started After the Coalition for Educational Success
Unveils a Voluntary Code of Conduct for Its Members to Follow**

82.     On September 12, 2011, the for-profit college industry group, the Coalition for

Educational Success (the "Coalition") unveiled a voluntary code of conduct for its members (the

"Standards of Conduct"). The Coalition stated the Standards of Conduct "will provide strong

new student protections; guidelines for training, enrollment and financial aid; and include an

enforcement mechanism to ensure that participating schools adhere to the principles of the new

standards." The Standards of Conduct were developed to embrace the following principles:

⊙     **Enrollment** – compliance training for admissions and financial employees.

- **Disclosure** – standardized disclosure of tuition cost and fees, graduation and job placement rates and student debt obligations.

- **Market demand for programs** – assessments of job market demand for graduates.

- **Financial Aid** – guidelines to ensure clarity and veracity in the application for financial aid.

- **Student Readiness** – guidelines to protect students who withdraw early in an education program from incurring or retaining Title IV debt.

- **Career Placement** – employment and/or placement assistance for new graduates.

- **Enforcement** – developing and ensuring a thorough system to monitor and enforce compliance.

83.    Not surprisingly, given the corporate-wide policies that flaunted the principles embraced in the Standards of Conduct, EDMC did not sign on to the code.

### *EDMC's Violations of the Incentive Compensation Ban*

84.    From July 1, 2003 to the present, EDMC has compensated Assistant Directors of Admission ("ADAs"), and their supervisors, the Associate Directors of Admission, based upon the number of new students who enroll in EDMC institutions.  Indeed, ADAs' compensation and career advancement within the Company is known as the Admission Performance Plan, explicitly stating that an employee's compensation level is determined by the number of new students an ADA is able to recruit.

### *Awards Based Solely on Success in Obtaining Enrollments*

85.    In addition to compensation, EDMC provides commissions, bonuses, and other incentive payments in the form of awards based solely on success in obtaining student enrollments.

86.    EDMC rewarded the top 10% of EDMC admissions personnel, based on number of new student enrollments achieved during a given year, with an all-expenses paid "President's

26

Club" trip to a desirable location such as Puerto Vallarta or Cancun, Mexico, or Las Vegas, Nevada. EDMC employees who become members of the President's Club were allowed to bring a family member or significant other on the trip at no cost to the EDMC employee.

87.    The only criterion that EDMC considered for membership in the President's Club is the number of new student enrollments an ADA achieves.  During the course of the year, EDMC managers send mass emails to the ADAs on a weekly basis detailing the top performers for the previous week.  The weekly results and rankings of top performers include only the numbers of appointments, interviews, and student applications an ADA was able to secure during that week.

88.    EDMC's repeated promotion of the President's Club reward trips incentivizes ADAs to increase the number of students that they enroll.  Indeed, the President's Club trips themselves constitute incentive payments that EDMC uses to encourage ADAs to compete against one another to obtain the most student enrollments.  These trips are not designed for the purpose of educating and improving the skills of the institutions' admissions personnel in a way that complies with the Incentive Compensation Ban.

### EDMC's Conduct Does Not Qualify for the Regulatory Safe Harbor

89.    As previously set forth, in 2002, Incentive Compensation Regulations accompanying the Incentive Compensation Ban were amended to clarify that, under the Regulatory Safe Harbor, schools may pay "fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A).

27

90.     EDMC's conduct, however, does not fall within the purview of, or satisfy, the above Regulatory Safe Harbor for several reasons.

91.     First, EDMC's compensation system, as implemented, is not eligible for Title IV of the HEA's Regulatory Safe Harbor, because the compensation awarded under EDMC's system is not "fixed compensation" within the meaning of the Regulatory Safe Harbor. Under EDMC's compensation system, EDMC pre-establishes student enrollment goals and the incentive payments that it will make for admissions personnel who achieve those goals. EDMC constantly communicates those enrollment goals and resulting incentive payments to the ADAs to incentivize them to recruit more students. The centerpiece of EDMC's compensation system is the "ADA/Associate Annualized Salary Chart," known within EDMC as the "Matrix." Using the Matrix , EDMC frequently adjusts each admissions employee's compensation, in a clear and pre-defined manner, based directly on that employee's success in obtaining student enrollments, and the employee is acutely aware of those adjustments. The fact that adjustments to an admissions employee's compensation are accumulated and then paid to the employee in bi-weekly installments during the subsequent six month period does not convert the improper compensation into permissible fixed compensation.

92.     Second, EDMC's compensation system, as implemented by EDMC, adjusts compensation based solely on the number of students recruited by EDMC admissions employees, in direct violation of the Incentive Compensation Ban and accompanying Regulatory Safe Harbor. Under EDMC's compensation system as implemented, an admissions employee's initial eligibility to "go on the Matrix" is strictly based on the number of students the admissions employee can recruit. EDMC's compensation system, as implemented by EDMC, adjusts the compensation of admissions employees who are "on the Matrix" based solely on the number of

students enrolled, in violation of the Regulatory Safe Harbor. In practice, EDMC's so-called "quality factors" are nothing more than window-dressing, used to camouflage a compensation system that, in reality, is driven entirely by student enrollment numbers and adjusts compensation based solely on the number of students recruited. In implementing its compensation system, EDMC creates an environment in which admissions employees understand that their compensation is determined solely by the number of students they enroll. Once an admissions employee succeeds in "going on the Matrix" by recruiting a sufficient number of students, each subsequent compensation adjustment is, in practice, made solely on the basis of the number of students that admissions employee recruits. Only after the enrollment numbers set a compensation range are quality factors even ostensibly taken into account. As a matter of course, the quality ratings were assigned to admissions employees by supervisors who were not trained on how to rate the "quality" attributes of an ADA, who paid no attention to the "quality" attributes of an ADA, and instead were trained to focus on, and did focus, solely on the ADA's success in obtaining student enrollments.

93.     Finally, the President's Club trips and other rewards, such as free meals and paid time off, that EDMC provides, constitute incentive compensation that is awarded based solely on the number of students admissions employees recruit. Accordingly, the President's Club trips and other rewards violate the Incentive Compensation Ban and the Regulatory Safe Harbor.

94.     Consequently, EDMC's compensation system, as it is implemented, violates the Incentive Compensation Ban and does not qualify for protection under the Regulatory Safe Harbor.

***EDMC and the Board Know that Its Conduct in Implementing Its Compensation System Violates the Incentive Compensation Ban and Does Not Qualify for the Regulatory Safe Harbor***

95.     EDMC and the Board know that the Company's conduct in implementing its compensation system violates the Incentive Compensation Ban and does not qualify for the Regulatory Safe Harbor. Consequently, when EDMC certified in its PPAs and other documents such as compliance audit Management Assertions, G5 Certifications, School Certifications, and MPNs regarding its compliance with the Incentive Compensation Ban and eligibility for Title IV funding, those certifications were knowingly false. EDMC's compensation system is inconsistent with EDMC's certifications of compliance in its PPAs, compliance audit Management Assertions, and other documents.

96.     At the time that EDMC certified in its PPAs and other documents that it does not make incentive payments to admissions personnel based on their success in securing enrollments, EDMC and its Board knew that it was paying and planned to continue to pay admissions personnel incentive payments based directly on their success in securing enrollments.

**EDMC Is Faced with Billions of Dollars in Potential Damages Stemming from Pending Litigation**

97.     EDMC's misconduct described herein, has led to increased scrutiny for the Company and a plethora of actions that threaten EDMC with serious financial liability and the potential loss of its ability to receive Title IV funds.

***Qui Tam Matters***

98.     On May 3, 2011, the Government *qui tam* Action captioned *United States of America, and the States of California, Florida, Illinois, Indiana, Massachusetts, Minnesota, Montana, New Jersey, New Mexico, New York and Tennessee, and the District of Columbia, each ex rel., Lynntoya Washington and Michael T. Mahoney v. Education Management*

*Corporation, et. al* filed under the federal False Claims Act in April 2007 was unsealed due to the U.S. Department of Justice's decision to intervene in the case. Five of the states listed on the case caption and the District of Columbia have joined the case based on *qui tam* actions filed under their respective False Claims Acts. The case, which is pending in the Western District of Pennsylvania, relates to whether the defendants' compensation plans for admission representatives violated the HEA, and U.S. Department of Education regulations prohibiting an institution participating in Title IV programs from providing any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments to any person or entity engaged in any student recruitment or admissions activity during the period of July 1, 2003 through June 30, 2011. The complaint was initially filed by a former admissions representative at The Art Institute of Pittsburgh Online Division and a former director of training at EDMC Online Higher Education and asserts a claim for treble the amount of actual damages allegedly sustained by the federal government as a result of the alleged activity, plus civil monetary penalties. The complaint claims that the Company and/or students attending the Company's schools received over $11 billion in funds from participation in Title IV programs and state financial aid programs during the period of alleged wrongdoing.

99. In March 2012, the Sobek *qui tam* Action filed under the federal False Claims Act in January 2010 was unsealed. The case, which is pending in the Western District of Pennsylvania, alleges that the defendants violated the U.S. Department of Education's regulation prohibiting institutions from making substantial misrepresentations to prospective students, did not adequately track student academic progress and violated the U.S. Department of Education's prohibition on the payment of incentive compensation to admissions representatives. The complaint was filed by a former project associate director of admissions at EDMC Online Higher

31

Education who worked for South University and asserts a claim for treble the amount of actual damages allegedly sustained by the federal government as a result of the alleged activity, plus civil monetary penalties. The complaint claims that the Company's institutions were ineligible to participate in Title IV programs during the period of alleged wrongdoing.

### OIG Subpoena

100. On March 22, 2011, the Company received a subpoena from the Office of Inspector General of the U.S. Department of Education ("OIG") requesting documents related to satisfactory academic progress standards and state licensing of online programs offered by South University and The Art Institute of Pittsburgh for the time period beginning January 1, 2006 through the date of the subpoena.

### Buirkle APA Program Accreditation Lawsuit

101. In August 2009, a petition was filed in the District Court for Dallas County, Texas in the case of *Capalbo et al. v. Argosy Education Group, Inc. University, Education Management LLC, Education Management Corporation and Marilyn Powell-Kissinger* by 15 former students in the Clinical Psychology program offered by the Dallas campus of Argosy University. In September 2009, the defendants removed the case to the United States District Court for the Northern District of Texas, Dallas division. The case was remanded back to state court in November 2009 by agreement after the plaintiffs amended their pleadings to specify their allegations and agreed to dismiss Ms. Powell-Kissinger as a defendant. The plaintiffs filed an amended petition in state court in January 2010 under the name of *Buirkle et al. v. Argosy Education Group, Inc., Education Management LLC and Education Management Corporation* and included three new plaintiffs. The petition alleges that, prior to the plaintiffs' enrollment and/or while the plaintiffs were enrolled in the program, the defendants violated the Texas

Deceptive Trade Practices and Consumer Protection Act and made material misrepresentations regarding the importance of accreditation of the program by the Commission on Accreditation of the American Psychological Association, the status of the application of the Dallas campus for such accreditation, the availability of loan repayment options for the plaintiffs, and the quantity and quality of the plaintiffs' career options. Plaintiffs seek unspecified monetary compensatory and punitive damages. In March 2010, claims filed by three of the plaintiffs who signed arbitration agreements with Argosy University were compelled to binding arbitration. The remaining lawsuits in the case were stayed pending the resolution of the three arbitrations. In September 2010, the plaintiffs filed two amendments to the petition filed in the previously-stayed *Buirkle* lawsuit, adding four new plaintiffs to the lawsuit.

### State Attorney General Investigations

102.     In August 2011, the Company received a subpoena from the Attorney General of the State of New York requesting documents and detailed information for the time period of January 1, 2000 through the present. While the Art Institute of New York City is the Company's only school located in New York, the subpoena also addresses fully online students who reside in the State. The subpoena is primarily related to the Company's compensation of admissions representatives and recruiting activities. The relators in the Government *qui tam* Action filed the complaint under the State of New York's False Claims Act though the state has not announced an intention to intervene in the matter.

103.     In December 2010, the Company received a subpoena from the Office of Consumer Protection of the Attorney General of the Commonwealth of Kentucky requesting documents and detailed information for the time period of January 1, 2008 through December 31, 2010. The Company has three Brown Mackie College locations in Kentucky. The Kentucky

33

Attorney General announced an investigation of the business practices of for-profit post-secondary schools and that subpoenas were issued to six proprietary colleges that do business in Kentucky in connection with the investigation.

104.     In October 2010, Argosy University received a subpoena from the Florida Attorney General's office seeking a wide range of documents related to the Company's institutions, including the nine institutions located in Florida, from January 2, 2006 to the present.  The Florida Attorney General has announced that it is investigating potential misrepresentations in recruitment, financial aid and other areas.

105.     In June 2007, The New England Institute of Art ("NEIA") received a civil investigative demand letter from the Massachusetts State Attorney General requesting information in connection with the Attorney General's review of alleged submissions of false claims by NEIA to the Commonwealth of Massachusetts and alleged unfair and deceptive student lending and marketing practices engaged in by the school.   In February 2008, the Attorney General informed NEIA that it does not plan to further pursue its investigation of deceptive marketing practices. In June and August of 2011, the Company provided the Attorney General with additional information related to the false claims investigation.

***City of San Francisco***

106.     In December 2011, the Company received a letter from the City Attorney of the City of San Francisco, California requesting information related to student recruitment and indebtedness, including recruiting practices and job placement reporting, among other issues, by The Art Institute of San Francisco and the seven other Art Institutes located in California.

## DERIVATIVE ALLEGATIONS

107.    Plaintiff brings this action derivatively in the right and for the benefit of EDMC to redress injuries suffered, and to be suffered, by EDMC as a direct result of the EDMC Director Defendants' breaches of fiduciary duty.

108.    Plaintiff has owned stock of EDMC continuously during the time of the wrongful conduct by the EDMC Director Defendants alleged herein and continues to hold EDMC stock.

109.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in shareholder derivative litigation.

## DEMAND REFUSAL WAS IMPROPER

### *The Litigation Committee Members are Conflicted*

110.    In the May 4 Letter refusing Plaintiff's Demand, the members of the Litigation Committee were identified as Defendants Mullin and Salem.  Defendants Mullin and Salem were appointed to serve on the Litigation Committee by the Board.  The May 4 Letter addresses the disinterestedness of Defendants Mullin and Salem in a cursory statement that "Mullin and Salem are disinterested directors under Pennsylvania law and may therefore discharge the duties delegated to the Litigation Committee by the Board."

111.    Defendants Mullin and Salem are not disinterested directors and are not able to discharge the duties delegated to the Litigation Committee by the Board.  First, Defendant Salem is a Senior Managing Director and Co-Founder of Providence and a designee of Providence on EDMC's Board under the Shareholders Agreement.  Second, Defendant Mullin is a Senior Advisor to Goldman and was appointed to the Board by Goldman under the Shareholders Agreement.  Both Defendants Salem and Mullin are employed by the entities whose financial

35

stake in EDMC is inextricably tied to EDMC's receipt of Title IV funds resulting from the enrollment practices described herein that are violative of the Incentive Compensation Ban.

112.    Defendants Mullin and Salem represent Providence and Goldman, investment banks whose financial state in EDMC poses an inherent conflict of interest for these Defendants – the interests of the investment banks conflict with those of the shareholders.  The investment banks' representatives have implemented the very scheme and conduct challenged herein.

113.    Defendants Mullin and Salem also sit on the boards of directors of other public companies with other EDMC Director Defendants making them less likely to institute proceedings and investigate the wrongdoing of their associates.  Defendant Mullin serves on the Board of Directors of Michael Foods Inc. with Defendant Jones, and Defendant Salem serves on the Boards of Directors of Asurion Corp. and N.E.W. Asurion Corp. with Defendant Wilde.

114.    Additionally, at the time of the May 4 Letter both Defendants Mullin and Salem were interested directors and were inappropriately placed on the Litigation Committee due to their being Defendants in the securities action then pending in the United States District Court Western District of Pennsylvania caption *Gaer v. Education Management Corp., et al.*, 2:10-cv-01061, by reason of their signing the EDMC registration statement at issue in that litigation.  At the time of the May 4 Letter both Defendants Mullin and Salem stood to face substantial liability for their role in the conduct described in that action.

115.    Moreover, Salem is not disinterested as EDMC does substantial business with Providence and its affiliates.  According to EDMC's Proxy filed with the Securities Exchange Commission on September 9, 2012, under the section "Other Relationships:"

> EDMC also does business with several companies affiliated with Providence, one of the Sponsors. Defendants Salem and Wilde are designees of Providence on EDMC's Board under the Shareholders Agreement. During fiscal 2011, EDMC purchased approximately $1.8 million of personal computers and related

36

equipment from CDW Corporation and its affiliates. EDMC also paid approximately $0.4 million to NexTag, Inc., which is owned by investment funds associated with Providence, for marketing lead generation services. EDMC also paid approximately $0.6 million to Assessment Technologies Institute, LLC for computer software that tests the skills in various academic fields of students attending our schools. Further, EDMC engaged Kroll Ontrack, which was purchased by investment funds associated with Providence in June 2011, for litigation management and electronic discovery document retention. Total fees paid to Kroll Ontrack during fiscal 2011 related to such services were approximately $1.0 million.

116.    Furthermore, notwithstanding the request by Plaintiff's counsel and Plaintiff in the March 10, 2011 letter to the Litigation Committee's counsel, they were never provided with any Board resolutions by which the Litigation Committee was established and that defined its powers and responsibilities.

### The Litigation Committee's Reasons for Finding an Extensive and Robust Internal Control Structure are Unavailing

117.    As described herein, and based upon the testimony of former and current EDMC employees, the Defendants have utterly failed to establish an effective system of internal controls and an adequate corporate governance framework.

118.    The May 4 Letter touts the purported high standards of conduct for all directors and employees under EDMC's Code, but fails to highlight the significant deficiencies of the Code, specifically that absent from the Code is any information pertaining to the HEA, and U.S Department of Education's regulations prohibiting an institution participating in Title IV Programs from providing any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments to any person or entity engaged in any student recruitment or admissions activity.

119.    In addition, the May 4 Letter fails to adequately describe the purported internal controls at EDMC in anything more than a cursory manner. The May 4 Letter states that the

Company has an Internal Audit Department ("IAD") which identifies and remediates risks facing EDMC, but completely fails to identify the members, if any, of the Internal Audit Department, how it operates or how the Board receives reports, if it does at all, from the IAD. The May 4 Letter also fails to document the frequency of audits, if any, performed by the IAD, and further fails to set forth any of the IAD's purportedly comprehensive and objective assessments of its findings and recommendations or who these findings and recommendations are issued to. No mention is made as to the number of employees, if any, who make up the IAD, their level of training or the funds expended by the Company to ensure the IAD fulfills its goals.

120. In a similar vein, the May 4 Letter maintains that the Company has an OHE Internal Audit and Compliance Department ("OHE Department") designed to prevent, mitigate and remediate, among other things, student-facing risks by monitoring interactions between students and ADAs, but fails to set forth the structure of this department and whether any of the findings of the Department reach the Board. No mention is made as to the number of employees, if any, who make up the OHE Department, their level of training or the funds expended by the Company to ensure the OHE Department fulfills its goals.

121. Finally, the May 4 Letter touts the Company's Corporate Services Marketing and Admissions Department ("CS Department") that purportedly ensures that ADAs conduct themselves according to EDMC's supposed standards of ethical conduct, by purportedly using, among other things, frequent observations and "mystery shopping." No mention is made as to the number of employees, if any, who make up the CS Department, their level of training or the funds expended by the Company to ensure the CS Department fulfills its goals.

122. Moreover, as described *supra,* EDMC failed to sign on to the Coalition's Standards of Conduct which embraced the principles of: compliance training for admissions and

38

financial employees; standardized disclosure of tuition cost and fees, graduation and job placement rates and student debt obligations; assessments of job market demand for graduates; guidelines to protect students who withdraw early in an education program from incurring or retaining Title IV debt; employment and/or placement assistance for new graduates; and developing and ensuring a thorough system to monitor and enforce compliance.

123.  The May 4 Letter is similarly vague when describing the Company's Corporate Compliance Hotline.  The May 4 Letter states that "[r]eports submitted through this hotline are sent to, and investigated by, a committee comprised of senior management from the Human Resources, Legal, and the Internal Audit Departments" and that "[t]he Litigation Committee's review of Hotline submissions, broadly construed, as relating to the types of potential ethical violations raised in the Demand Letter[].  Each incident was properly investigated by the Hotline Committee."  The May 4 Letter fails to set forth any details or specifics of the nine submissions in 2009 and 2010 relating to the types of ethical violations raised in Plaintiff's Demand, whether any reports stemming from these submissions were generated, or whether any corrective action was taken stemming from these submissions, and if not, why not.  The May 4 Letter also fails to set forth any submissions, not limited to 2009 and 2010 that related to the issues raised in Plaintiff's Demand.

124.  On August 23, 2010, Plaintiff made a written demand (the "Demand Letter") on the EDMC Board, asking that it, *inter alia*, conduct a thorough investigation of EDMC's recruiting practices and the Board's knowledge or reckless disregard of the wrongful practices alleged herein.  The Demand Letter further sought that the Board identify and put an end to the policies that led to EDMC's financial harm, and identify those responsible for instituting or implementing such policies.  Finally, the Demand Letter petitioned the Board to take all

appropriate steps to remediate EDMC's damage, by: (i) instituting meaningful control procedures and corporate governance practices; (ii) terminating those responsible for the fraudulent and deceptive practices; and (iii) taking action to recover the Company's financial losses.

125.    On November 19, 2010, Plaintiff's counsel received a reply letter from an attorney representing the "Litigation Committee". The letter invited Plaintiff to participate, and assist the Board, in the investigation.

126.    By letter dated November 22, 2010, Plaintiff's Counsel responded asking to meet with the Litigation Committee and its counsel in order to discuss the facts and information underlying the Demand Letter. Counsel's response specifically requested that the Company disclose the identities of the Litigation Committee's members.

127.    The Litigation Committee's counsel responded by letter, but provided none of the information requested by Plaintiff and no date was provided to meet with the Litigation Committee and its counsel.

***The Litigation Committee Failed to Reasonably and in Good Faith Investigate the Issues Raised by the Demand Letter.***

128.    The Litigation Committee, despite its authority to do so, has failed to meaningfully investigate Plaintiff's demand and so has wrongfully refused Plaintiff's demands.

129.    The Litigation Committee concluded that there was no support for the Demand Letter's charge that EDMC systematically falsified job placement data. However, instead of conducting its own investigation into the Demand Letter's allegations of false job placement statistics, the Litigation Committee relied on an internal investigation conducted by EDMC employees and a subsequent investigation conducted by EDMC's counsel.

130.    The reliance on the EDMC employees' investigation and the investigation of EDMC's counsel was not reasonable because the Litigation Committee was required to act independently, in a disinterested fashion.  Had the Litigation Committee been acting in good faith, it would have conducted its own investigation, rather than relying on prior investigations by different, interested parties.  Moreover, those investigations related only to the Online Higher Education department.  Plaintiff's Demand was not limited to the Online Higher Education department or the assertions of one particular employee, but rather was directed to a systemic Company practice.

131.    The Litigation Committee's investigation was not and has not been reasonable or in good faith for the additional reason that it has failed to consider Plaintiff's own investigation or to act transparently in dealing with Plaintiff and his counsel.  Rather, material details concerning the Litigation Committee and its work were concealed from Plaintiff and EDMC's shareholders.

### The Litigation Committee's Conclusion That Its Board Members and Officers Cannot Be Liable is Unreasonable.

132.    The Litigation Committee, in its rejection of Plaintiff's Demand, refers to the existence of purported corporate training policies; however, those training policies do not seem to relate to the detection and correction of wrongdoing by the Board.  The Litigation Committee refers to the purported "high ethical standards" by which EDMC trains its ADAs.  However, the training and who conducts it, or even how frequently it allegedly occurs is not described.  The Litigation Committee does not even define what it views as unethical behavior.

133.    The Litigation Committee describes EDMC's audit and monitoring functions in the most generic sense.  It does not describe how many employees staff these functions, how

41

frequently they conduct audits or monitor the practices complained of herein, or how they conduct their audits or monitoring functions.

134.    The Committee's lack of explanation may well stem from the fact that the actual application of discipline in the Company is toothless.  As a former admissions officer, stated in a *qui tam* complaint against EDMC, admissions officers are encouraged to take risks and to not worry about compliance issues because nothing would happen to them if they were caught violating the rules and regulations.  Employees who are "disciplined" are simply told of the infraction, then sent directly back to work without consequence.  In fact, the only "discipline" that seems to be meted out at EDMC is for an admissions officer's failure to make his or her quota of production of new students.

135.    The publicly available sources underlying the allegations contained in this Complaint demonstrate EDMC's engrained culture of driving up student enrollment, no matter what it takes to do so.  This initiative has been led by Defendant Nelson, the current CEO of EDMC and a member of the Board, who oversaw an illegal compensation system at Apollo that ultimately resulted in substantial damage to Apollo and its shareholders when discovered.

136.    According to a former Vice President of Human Resources, the compensation system for admissions staff was developed at the corporate level and approved by EDMC Corporate.  A former Vice President of Admissions reported that the compensation scheme was developed by high level executives, and was specifically reviewed and approved by Defendant Nelson.  EDMC senior management played a central role in setting overly aggressive new student enrollment quotas.

137.    Because the "overly aggressive" growth strategy along with the approval of the improper, incentive-laden compensation scheme came from the CEO, who is also a member of

the Board of Directors, and flowed systemically throughout EDMC's many schools, it is unreasonable for the Litigation Committee to conclude that the internal controls at the Company are sufficient and that the "directors and officers of EDMC have satisfied [their] fiduciary duties to the Company by establishing and maintaining, appropriate governance structures . . . ."

138.    Indeed, the numerous red flags described herein establish that the Board either knew of or recklessly turned a blind eye to EDMC's improper practices.  The sheer number of abusive and deceptive recruiting and enrollment practices detailed by many current and former employees, located in various geographic locations and business units, easily demonstrates that these were not isolated instances, but rather were a widespread pattern of Board-sanctioned activity.

139.    For the foregoing reasons, the members of EDMC's Board of Directors were incapable of exercising objective judgment in determining whether to enforce the Company's claims for the misconduct described herein, and their decision to refuse demand was entirely improper.

## COUNT I

### (Breach of Fiduciary Duties)
### (Derivatively Against the EDMC Director Defendants)

140.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.  This count is asserted against the EDMC Director Defendants.

141.    As directors and/or officers of EDMC, each of the EDMC Director Defendants owed and owe EDMC the highest obligations of loyalty, honesty, good faith, fair dealing and due care in conducting their affairs.

142.    At a minimum, to discharge these duties, each EDMC Director Defendant was required, inter alia:

a.    to exercise reasonable control and supervision over the officers, employees, agents, business, and operations of EDMC;

b.    to be and remain informed as to how EDMC was operating and, upon receiving notice or information of an imprudent, questionable, or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts, as well as satisfying all the standards of conduct set forth in applicable law, rules and regulations, including, but not limited to, those regulations promulgated by the Department of Education, as well as those established by state agencies and accrediting agencies; and

c.    to ensure that the Company was being operated in a safe and sound manner and in conformance with federal and state guidelines.

143.    The EDMC Director Defendants breached their fiduciary duties through their failure to put in place appropriate internal controls and a proper corporate governance framework to detect and cease harmful recruiting and enrollment practices violative of the Incentive Compensation and, thereby, caused the Company harm through impairing its reputation and credibility and exposing EDMC to substantial liability in connection with lawsuits and investigations caused by the EDMC Director Defendants' wrongdoing and non-compliance with applicable regulations.

144.    These actions by the EDMC Director Defendants could not have been a good faith exercise of prudent business judgment because, among other things, they were not disinterested, they were not independent, they acted in bad faith, they had knowledge of

44

improprieties and did not act upon it, they engaged in violations of applicable laws and regulations and/or their conduct was egregious on its face.

145.    As a direct and proximate result of the EDMC Director Defendants' breaches of their fiduciary duties, the Company has suffered and will continue to suffer significant damages.

146.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and seeks on behalf of EDMC an Order:

A.    Declaring that the EDMC Director Defendants have breached their fiduciary duties as alleged herein;

B.    Directing the EDMC Director Defendants to install a comprehensive corporate governance framework and adopt and establish policies, procedures and controls to eliminate improper practices including, but not limited to, EDMC's admissions and recruiting personnel's compensation structure as implemented that is violative of the Incentive Compensation Ban and improper recruitment of prospective students;

C.    Enjoining the EDMC Director Defendants, and those under their supervision and control from further violations of law, regulations, and industry standards of conduct, as are alleged herein;

D.    Ordering the EDMC Director Defendants to reimburse EDMC for all of its damages, costs, fines penalties and expenses arising out of the conduct complained of herein;

E.    Awarding plaintiff's attorneys' fees, expert fees, consultant fees, and other costs and expenses; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial.

Dated: August 3, 2012

/s/ David A. Borkovic
David A. Borkovic
PA I.D. No. 23005
Of Counsel
**JONES, GREGG, CREEHAN
& GERACE, LLP**
411 Seventh Avenue, Suite 1200
Pittsburgh, PA 15219
Tel. (412) 261-6400
dab@jgcg.com

**OF COUNSEL:**

Joseph H. Weiss
David C. Katz
Michael A. Rogovin
**WEISS & LURIE**
1500 Broadway, 16th Floor
New York, NY 10036
Tel. (212) 682-3025
jweiss@weisslurie.com

*Counsel for Plaintiff*

Richard A. Finberg
PA I.D. No. 17282
300 Mt. Lebanon Blvd, Suite 206-B
Pittsburgh, PA 15234
Tel. (412) 341-1342
richardfinberg@gmail.com

*Counsel for Plaintiff*

46

## VERIFICATION

I, Stephen Bushansky, being duly sworn, declare under penalty of perjury as follows: I have read the annexed Verified Derivative Complaint, know the contents thereof and the same are true and accurate to the best of my personal knowledge, information and belief, based upon the investigation of my counsel. I am and have been at all relevant times, a shareholder of the nominal Defendant, Education Management Corporation.

Executed on: August 3, 2012

_Stephen Bushansky_
Stephen Bushansky