**<u>EXHIBIT A</u>**

Exhibit 11

# EXHIBIT 11

"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA et al.,** ) | *__Jury Trial Demanded__* |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action No. 2:07-cv-00461-TFM** |
| **v.** ) | |
| ) | **Hon. Terrence F. McVerry** |
| **EDUCATION MANAGEMENT** ) | |
| **CORPORATION., et al.,** ) | **Electronically Filed** |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Laura E. Ellsworth (Pa. 39555)
James M. Jones (Pa. 81295)
Thomas S. Jones (Pa. 71636)
Matthew R. Divelbiss (Pa. 200510)
Katelyn M. Matscherz (Pa. 308922)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

I.     Salary Adjustments Not Based Solely On Enrollments Were Lawful. ........................... 2

     A.    The Incentive Compensation Ban And The Safe Harbor Allowed Changes In Salary Not Based Solely On Number Of Students Enrolled ............................ 2

     B.    DOE Implements The Incentive Compensation Ban ............................................. 3

     C.    The Regulatory History Surrounding Rescission of the Safe Harbor Confirms Its Broad Scope And Effect. ................................................................... 4

II.    EDMC's Compensation Plan ........................................................................................ 6

     A.    The Plan Terms ....................................................................................................... 6

     B.    The Plan as Applied in Practice ............................................................................. 7

     C.    Getting Behind The Numbers ................................................................................ 8

           1.    Salaries Were Not Based Solely On Enrollments ...................................... 9

           2.    Quality Points Were Not Based Solely On Enrollments ......................... 12

           3.    Regression Analysis Further Confirms That The Number Of Enrollments Does Not By Itself Explain Salary, Salary Differentials, Or Quality Points ............................................................ 13

ARGUMENT .................................................................................................................... 15

I.     THE RULE 56 STANDARDS ................................................................................... 15

II.    EDMC'S COMPLIANCE WITH THE SAFE HARBOR WARRANTS SUMMARY JUDGMENT IN ITS FAVOR .................................................................. 16

CONCLUSION .................................................................................................................. 19

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................................................15, 16

*Boon v. Prof'l Collection Consultants*,
    No. 12-03081, 2014 U.S. Dist. LEXIS 16654 (S.D. Cal. Jan. 30, 2014) .................................8

*Bushansky v. Nelson*,
    No. 2:12-cv-01101-TFM (W.D. Pa.) .....................................................................................17

*Campbell v. Shinseki*,
    No. 13-11974, 2013 U.S. App. LEXIS 23611 (11th Cir. Nov. 25, 2013) .................................8

*Career College Assoc. v. Duncan*,
    No. 1:11-cv-00138-RMC (D.D.C.)......................................................................................5, 6

*Celotex v. Catrett*,
    477 U.S. 317 (1986)...............................................................................................................15

*Davidson v. Allsteel, Inc.*,
    No. 09-11308, 2011 U.S. Dist. LEXIS 17190 (E.D. Mich. Feb. 22, 2011)............................18

*EEOC v. Bloomberg*,
    778 F. Supp. 2d 458 (S.D.N.Y. 2011)..............................................................................17, 18

*EEOC v. McDonnell Douglas Corp.*,
    191 F.3d 948 (8th Cir. 1999) .................................................................................................17

*Hartle v. Firstenergy Generation Corp.*,
    No. 08-1019, 08-1025, 08-1030, 2014 U.S. Dist. LEXIS 43033 (W.D. Pa. March 31,
    2014) ......................................................................................................................................18

*Hite v. Peters*,
    No. 07-4492, 2010 U.S. Dist. LEXIS 65121 (D.N.J. June 30, 2010)......................................8

*In re Chocolate Confectionary Antitrust Litig.*,
    289 F.R.D. 200 (M.D. Pa. 2012)............................................................................................18

*In re Western Dist. Xerox Litig.*,
    850 F. Supp. 1079 (W.D.N.Y. 1994) .....................................................................................18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................................................5

Page

*Nat'l Assn. for the Advancement of Colored People v. North Hudson Regional Fire &
Rescue,*
  665 F.3d 464 (3d Cir. 2011) ................................................................. 15

*Okla. Law Enforcement Ret. Sys. v. Educ. Mgmt. Corp. et al.,*
  GD-12-008785 (Ct. Com. Pl. Allegheny Cty) ............................... 17, 18

*Peloro v. United States,*
  488 F.3d 163 (3d Cir. 2007) ................................................................. 15

*Rodriguez v. Our Lady of Lourdes Med. Ctr.,*
  552 F.3d 297 (3d Cir. 2008) ................................................................. 16

*United States ex rel. Eisenstein v. City of New York,*
  556 U.S. 928 (2009) ............................................................................. 16

*United States ex rel. Munoz v. Computer Systems Institute, Inc.,*
  No. 11-7899, 2013 WL 5781810 (N.D. Ill. Oct. 25, 2013) .................. 4

*United States ex rel. Pilecki-Simko v. Chubb Inst.,*
  No. 06-3562, 2010 WL 1076228 (D.N.J. Mar. 22, 2010), *aff'd*, No. 10-3907, 2011
  WL 3890975 (3d Cir. Sept. 6, 2011) ..................................................... 3

*United States ex rel. Quinn v. Omnicare Inc.,*
  382 F.3d 432 (3d Cir. 2004) ................................................................. 16

*Wilkins v. United States,*
  No. 99-1579, 2005 U.S. Dist. LEXIS 41268 (S.D. Cal. June 29, 2005) ............... 17

STATUTES

20 U.S.C. § 1094(a)(20) ............................................................................ 2

20 U.S.C. § 1070 *et seq* ........................................................................... 2

OTHER AUTHORITIES

34 C.F.R. § 668.14(b) (2011) .................................................................... 6

34 C.F.R. § 668.14(b)(22)(ii)(A) ............................................................. 3

111th Cong. (2010) Testimony of David Hawkins, Director of Public Policy and
Research, National Association for College Admission Counseling ......................... 4

111th Cong. (2010) *Emerging Risk? An Overview of the Federal Investment In For-
Profit Education: Hearing of the Senate Committee on Health, Education, Labor and
Pensions* ................................................................................................... 5

## TABLE OF AUTHORITIES
(cont.)

                                                                                    **Page**

112th Cong. (2011) *Bridgepoint Education, Inc.:  A Case Study In For-Profit Education
    and Oversight:  Hearing of the Senate Committee on Health, Education, Labor, and
    Pensions* ...................................................................................................................5

67 Fed. Reg. 67053 ...........................................................................................................3

67 Fed. Reg. 67054 ...........................................................................................................3

67 Fed. Reg. 67055… .......................................................................................................3

67 Fed. Reg. 67056 ...........................................................................................................3

Federal Rule of Civil Procedure 56 ................................................................................15

H.R. Rep. No. 102-630, pt. G (1992) (Conf. Rep.)...........................................................2

*Higher Education: Stronger Federal Oversight Needed to Enforce Ban on Incentive
    Payments to School Recruiters*, GAO-11-10 (Oct. 7, 2010)........................................5

Webster's Third New Int'l Dictionary 2168 (1993) .........................................................3

## <u>INTRODUCTION</u>

From 2002 until 2011, federal law prohibited schools that participated in government-funded student aid programs from adjusting recruiters' compensation based "solely" on the number of students they enrolled.  Schools that adjusted recruiter compensation using enrollment numbers *in addition to* other factors, however, did not violate the law.  Undisputed evidence conclusively demonstrates that Defendants fell within the latter group.

This Court has held that Defendants' Admissions Performance Plan ("Plan") at issue in this case was lawful, as drafted, because the Plan included multiple, non-enrollment based factors.  May 11, 2012 Memorandum Opinion ("MTD Op."; Dkt. No. 183) at 10, 17-21 (attached as Exhibit 3 to the Appendix).  This Court specifically recognized that "the Department of Education has clearly determined that some incentive payments, *i.e.*, *those not based solely on enrollment numbers*, are consistent with the statutory language of the [Higher Education Act]" and that Plaintiffs must demonstrate that in practice Defendants disregarded the Plan.  *Id*. at 19 (emphasis added); *see also id.* at 20 ("[T]he use of the [compensation] matrix, by definition, could not have adjusted compensation solely on recruitment numbers.").  In other words, the Plaintiffs' burden is to "prove a negative"—that factors other than enrollments "were *not* used" to set salaries.  *Id*. at 27 (emphasis in original).

The dispositive issue is straight-forward:  Were enrollments the sole, or exclusive, factor on which Defendants actually based recruiter compensation, or did other elements have an effect on salary, even in small measure?  The number of enrollments and compensation figures are known for the salary changes that occurred under the Plan.  Moreover, one can "get behind the numbers," as Plaintiffs suggest, to assess whether the other factors identified in the Plan such as Quality Factor scores were, themselves, solely dependent on the number of enrollments such that they were merely a "proxy" or "smoke screen" for enrollments.  Analysis of the data

demonstrates that Plaintiffs cannot meet their burden to show that Defendants ignored their

lawful Plan and, instead, adjusted recruiter compensation "based *solely* on the number of

students recruited."  *See* Joint Complaint in Intervention ("JCII"; Dkt. No. 128), ¶¶ 90-139, 154

(emphasis added).  The data show:  (1) recruiter salary and salary changes at EDMC were not

based solely on enrollments; and (2) the Quality Factor scores were not based solely on

enrollments, *i.e.*, Quality Factors were not "proxies" or a "smoke screen" for enrollments.

Therefore, EDMC complied with its regulatory obligations and is entitled to summary judgment.

## BACKGROUND

**I.     SALARY ADJUSTMENTS NOT BASED SOLELY ON ENROLLMENTS WERE
LAWFUL.**

**A.     The Incentive Compensation Ban And The Safe Harbor Allowed Changes
In Salary Not Based Solely On Number Of Students Enrolled.**

EDMC[1] and its students are governed by Title IV of the Higher Education Act, 20 U.S.C.

§ 1070 *et seq.* ("HEA").  Since 1992, the HEA has included a so-called "Incentive Compensation

Ban" ("ICB") which provides that participating schools may not pay their recruiters "any

commission, bonus, or other incentive payment based directly or indirectly on success in

securing enrollments . . . ."  20 U.S.C. § 1094(a)(20).  Legislative history reflects that the

proscription was not meant to be an absolute prohibition against the consideration of recruiting

success in setting compensation; it meant only that "compensation cannot *solely* be" based on

enrollments.  *See* H.R. Rep. No. 102-630, pt. G, at 499 (1992) (Conf. Rep.), as reprinted in 1992

U.S.C.C.A.N. 334 (emphasis added).  As this Court has recognized, Congress enacted the ICB

"to combat perceived abuses of federal student aid funding, [but] it did not completely outlaw the

---

[1] For ease of reference, Defendants use "EDMC" to signify all defendants in this matter.
However, although not relevant to this Motion, Education Management Corporation is only an
indirect owner of the educational institutions named as defendants in this matter.

recruiting of students. Indeed, schools have a legitimate need to employ persons to recruit students." MTD Op. at 8 (citing 67 Fed. Reg. 67053). The United States Department of Education ("DOE") recognized the common-sense proposition that "a recruiter's job is to recruit." 67 Fed. Reg. 67056.

### B. DOE Implements The Incentive Compensation Ban.

By regulation, DOE provided that, for the time period relevant to this case, certain forms of compensation were expressly permissible notwithstanding the language of the ICB, including:

> The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is **not based solely on the number** of students recruited, admitted, enrolled, or awarded financial aid.

34 C.F.R. § 668.14(b)(22)(ii)(A) (eff. July 1, 2003 to June 30, 2011) (emphasis added). This regulation was known as the "Safe Harbor."

The term "solely" means just what it says. To clarify the "conditions under which an institution may make an incentive payment" to a recruiter, the Safe Harbor used "the word 'solely' . . . in its dictionary definition," 67 Fed. Reg. 67054, 67055—in other words, "solely," "singly," "alone," or "to the exclusion of alternate or competing things." WEBSTER'S THIRD NEW INT'L DICTIONARY 2168 (1993). *See also* Arne Duncan, Sec'y of Educ., August 13, 2010 Letter to Tom Harkin and Michael Enzi (observing that the Safe Harbor gave "license . . . to pay [] recruiters based on success in securing enrollments").

This Court and other courts considering like claims have held that the Safe Harbor authorized schools to "consider a recruiter's success at recruiting students and adjust his/her

salary based in part on that success." *See* MTD Op. at 8.[2] Indeed, this Court dismissed the Government's claim that the Plan's design caused salary adjustments to be "driven nearly entirely by" enrollments. Pls.' Opp. to Dismissal at 49 (Dkt. No. 158); *see also* MTD Op. at 17-21. "Nearly entirely" is not "solely," and to violate the Incentive Compensation Ban, salary adjustments must be "*based solely*" on a recruiter's success in enrolling students.

### C. The Regulatory History Surrounding Rescission of the Safe Harbor Confirms Its Broad Scope And Effect.

Fewer than three years after the Safe Harbor went into effect, members of Congress complained that the Safe Harbor had legalized incentive compensation systems that "violate[] the spirit and intent" of the Incentive Compensation Ban. *See* Testimony of Congresswoman Maxine Waters Hearing Before the Committee on Education and the Workforce, U.S. House of Representatives, Serial No. 109-2 at 19 (Mar. 1, 2005). By its plain terms, the Safe Harbor:

> poked a little hole in the [ICB] by saying you couldn't base the salary solely on the number of students enrolled. So if you put some minimal evaluatory criteria out for 10 percent of the—or whatever percent you want to call it—of the admission officer's salary, you could base the other 90 percent on whether they enrolled the student or not.

*For-Profit Schools: The Student Recruitment Experience: Hearing of the Senate Committee on Health, Education, Labor, and Pensions*, 111th Cong. (2010) (testimony of David Hawkins,

---

[2] *See United States ex rel. Pilecki-Simko v. Chubb Inst.*, No. 06-3562, 2010 WL 1076228, at *10 (D.N.J. Mar. 22, 2010) (dismissing the complaint and stating, "Relators do not allege that TCI based its compensation practices solely on means prohibited by the Title IV ban, and the examples provided with the [second amended complaint] demonstrate that TCI's compensation scale complied with the regulatory safeharbor."), *aff'd*, No. 10-3907, 2011 WL 3890975, at *1 (3d Cir. Sept. 6, 2011); *see also United States ex rel. Munoz v. Computer Systems Institute, Inc.*, No. 11-7899, 2013 WL 5781810, at *4 (N.D. Ill. Oct. 25, 2013) (requiring relator to plead that compensation was based "exclusively on success in recruiting").

Director of Public Policy and Research, National Association for College Admission

Counseling).

Kathleen Tighe, DOE's Inspector General, testified before Congress that:

> [C]ompensation plans that are clearly providing direct financial
> incentives for recruiters to increase enrollment . . . , due to the safe
> harbors included in the [DOE's] current regulations, in many cases,
> schools are shielded from administrative, civil, and criminal
> liability.  Proprietary institutions are making full use of the safe
> harbors in the Department's regulations to provide financial
> incentives to drive enrollment.
>
> *       *       *
>
> It is very easy under the safe harbors in order to show that there is
> some factor other than enrollment that allows the recruiters to get
> paid and get salary increases. . . .  A lot of qui tam cases have been
> filed under the False Claims Act.  They have never been really
> successfully pursued.

*Emerging Risk?  An Overview of the Federal Investment In For-Profit Education: Hearing of the*

*Senate Committee on Health, Education, Labor, and Pensions*, 111th Cong. (2010).  In 2011

Congressional testimony, Ms. Tighe reiterated these themes: "[A]ll [a school] had to do was

show that the enrollment advisers' [*sic*] compensation was based on something other than

enrollments.  It really isn't a very hard criteria to meet.  Most schools have met it very readily."

*Bridgepoint Education, Inc.:  A Case Study In For-Profit Education and Oversight: Hearing of*

*the Senate Committee on Health, Education, Labor, and Pensions*, 112th Cong. (2011).

The government has noted that the term "solely" enabled the argument that "any

enforcement action [DOE] takes . . . for payments to a recruiter of students that are based in

part—*even 99%*—on the number of students a recruiter enrolls is contrary to the" Safe Harbor.

*See Higher Education: Stronger Federal Oversight Needed to Enforce Ban on Incentive*

*Payments to School Recruiters*, GAO-11-10 at 54 (Oct. 7, 2010) (emphasis added).[3] 

.[4]

## II.   EDMC'S COMPENSATION PLAN.

### A.   The Plan Terms.

This Court has held that the Plan was lawful as written and dismissed Plaintiffs' claims to the contrary. *See* MTD Op. at 17-21, 49. Under the Plan, EDMC paid newly-hired recruiters a salary based upon relevant experience and education. *Id.* at 20. Thereafter, EDMC evaluated the performance of recruiters at approximately six-month intervals and made corresponding salary adjustments based on those evaluations.[5] JCII ¶ 94. This Court described those subsequent evaluations as follows:

---

[3] In litigation over the repeal of the Safe Harbor in 2011, DOE represented to the United States District Court for the District of Columbia that the Safe Harbor actually "*immunized* incentive payments built into semi-annual compensation plans." *See* Defendants' Motion to Dismiss for Lack of Jurisdiction, or in the Alternative For Summary Judgment, in *Career College Assoc. v. Duncan*, Case No. 1:11-cv-00138-RMC (D.D.C.) (Dkt. No. 17) at p. 5 (emphasis added).

[4] After the change in administrations, DOE rescinded the Safe Harbor. *See* 34 C.F.R. § 668.14(b) (2011) (amended regulation). The Safe Harbor, however, remained in force during the life of the Plan challenged in this case.

[5] *See also* MTD Op. at 20 ("It is undisputed that 'adjustments' were not made more than twice during any twelve month period.").

> The First Evaluation, after six months, is based on quality factors. The Second Evaluation awards ADAs the higher salary as determined under the matrix or under quality factors alone. At the Third Evaluation, all ADAs are reviewed under the Matrix.

MTD Op. at 20. *See also* JCII ¶ 98. The "Matrix" was an Annualized Salary Chart used to calculate salary adjustments. JCII ¶ 95. It was the "centerpiece of EDMC's compensation system and is featured in each iteration of EDMC's Admissions Performance Plan." JCII ¶ 96. This Court explained:

> According to its terms, the Plan calculates ADA salaries based on a number of quantitative and qualitative factors, including the manager's evaluation of defined "quality factors" such as job knowledge, business practices and ethics, professionalism, customer service and initiative; the types and quantity of new students recruited over the previous year ("new student points"); an adjustment to reflect differences in labor costs in various markets; an increase for supervising people or projects; and years of service. The "quality points" and "new student points" are placed into a chart, known as the "matrix," that sets annualized baseline salary ranges for ADAs.

MTD Op. at 10. "[T]he compensation generated by the matrix can only be derived by combining the quantitative factor on one axis with the 'quality factors' on the other axis." *Id.* at 20. Thus, "the use of the matrix, by definition, could not have adjusted compensation solely on recruitment numbers." *Id.*

### B.     The Plan as Applied in Practice.

EDMC has produced the Salary and Performance Worksheets ("Salary Worksheet") for over 15,000 separate ADA reviews covering 6,187 recruiters over an eight-year period.[6] Every

---

[6] Lynn Kossick, the Manager of Admissions Performance Compensation at EDMC, or someone under her supervision, created each of the Salary Worksheets. Declaration of Lynn Walwender Kossick ¶ 7 ("Kossick Decl.") (attached as Exhibit 6 to the Appendix).

one of these Salary Worksheets, like those that Plaintiffs attached to the JCII,[7] were

contemporaneously-created business records that reveal the values used to calculate the actual

salary adjustments (including enrollments and Quality Points).  Kossick Decl. ¶¶ 7-9.[8]  Armed

with the facts of enrollment totals, salaries paid and Quality Points awarded, it is possible to

assess definitively the key questions in the case.

### C.      Getting Behind The Numbers.

Plaintiffs allege that salaries were adjusted "solely on the number of students recruited by

EDMC admissions employees," JCII ¶ 154, and that the Quality Factor ratings that appear on

those documents are a "smoke screen" because they are mere proxies for enrollments.  *See* JCII

¶¶ 154, 388.  Plaintiffs contend that: "[I]n practice, those so-called 'quality factors' had *no

impact* on the manner in which Defendants implemented their compensation system."  Plaintiff

United States' Supplemental Responses and Objections to Interrogatories at 68 (emphasis added).

These allegations are belied by the undisputed evidence.

Stanford University Labor Economist and former Chairman of the President's Council of

Economic Advisers, Edward Lazear, Ph.D., analyzed 15,375 separate salary adjustments—every

accessible performance review for full time ADAs over the entire time that the Plan was in force.

*See* Declaration of Edward Lazear, Ph.D at ¶ 28 ("Lazear Decl.") (attached as Exhibit 7 to the

---

[7] *See* JCII, Ex. 22 (Dkt. No. 128-24) at LW001656, LW001661, LW0016667, LW001672 (attaching Salary Worksheets for four Lynn Washington reviews).

[8] The contemporaneously created business records reflect the key metrics of enrollments secured and salaries paid.  Kossick Decl. ¶¶ 5-7.  *See Boon v. Prof'l Collection Consultants*, No. 12-03081, 2014 U.S. Dist. LEXIS 16654, at *7 n.2 (S.D. Cal. Jan. 30, 2014) (granting summary judgment based, in part, on account summary notes prepared at or around the time of the transaction); *Campbell v. Shinseki*, No. 13-11974, 2013 U.S. App. LEXIS 23611, at *15 (11th Cir. Nov. 25, 2013) (affirming the district court's reliance on business records at summary judgment which were properly authenticated by a declaration); *Hite v. Peters*, No. 07-4492, 2010 U.S. Dist. LEXIS 65121, at 35 (D.N.J. June 30, 2010) (granting summary judgment based, in part, on evidence that included time and attendance records and emails).

Appendix) (emphasis added). That analysis demonstrates two facts. *First*, whether a recruiter's salary "adjustment" is measured by the amount of a new salary or the difference between a recruiter's old salary and new salary (*i.e.*, "salary differential"), enrollments were not the sole determinative factor.[9] *Second*, contrary to Plaintiffs' allegations, Dr. Lazear's analysis confirms that Quality Points were not, in fact, a proxy or "smoke screen" for enrollments.

### 1.    *Salaries Were Not Based Solely On Enrollments.*

Dr. Lazear first used descriptive analysis techniques assessing the relationship between two variables—here, new salary and enrollments. Lazear Decl. ¶¶ 36-57. Under the government's theory, if an EDMC recruiter's new salary were based solely on enrollments during the review period, then new salary and enrollments would co-vary in lockstep. *Id.* ¶ 36. No matter how Dr. Lazear examined the data, however, new salary and enrollments do not co-vary in that manner.

First, Dr. Lazear identified the most common number of new students that recruiters across all schools enrolled in a given year. *Id.* ¶ 38. On 152 occasions,[10] a recruiter enrolled 24 students during the review period. *Id.* ¶ 39. If salary depended solely on the number of students enrolled, then the new salary awarded would be identical for each of these 152 observations. *Id.*

---

[9] The Safe Harbor uses the term salary "adjustment" without specifying whether that means the adjusted salary itself or the amount of difference between the existing salary and the new salary. The Court need not determine the meaning of the term since, under either definition, the enrollments were not the sole determining factor. The Safe Harbor speaks in terms of "students . . . enrolled," and Dr. Lazear assessed the impact that enrollments had on compensation decisions. Lazear Decl. ¶¶ 34-35. He also confirmed this analysis for the metric used in the Plan—New Student Points. *See id.* at ¶ 38.

[10] The year 2010 is selected for discussion here because the amount of student aid funding that the government disbursed to EDMC schools generally increased over time. *See* JCII ¶¶ 79-80, 255, 351-62. In theory, EDMC's allegedly corporate-wide, top-down fraudulent scheme, therefore, would have been at its peak in 2010, the year before ED removed the Safe Harbor. As discussed more fully, *infra*, this analysis holds regardless of what year is analyzed.

In fact, however, the new salary ranged from $29,994 to $96,470. *Id.* The ten most frequently occurring enrollment numbers—as well as the median enrollment number—reveal a similarly broad range of new salaries associated with each enrollment count:



*Id*. Ex. 1A. For example, recruiters credited with 28 enrollments made between $26,000 and $70,000. If two ADAs each recruit 28 students but one is paid two-and-one-half times more than the other, some other factor or factors independent of enrollments necessarily must be at work. *Id.* ¶ 43 ("Not only do these results contradict the notion that recruiter salaries were solely based on the number of enrollments, they are fundamentally inconsistent with a compensation plan in which recruiter salaries were solely determined by student enrollment."). To test these conclusions, Dr. Lazear looked at the five next most frequently observed enrollment numbers, as well as the fifteen most frequently observed enrollment numbers for every other year during which the Plan was in effect. *See id.* Lazear Appendix ("Lazear Appx.") C-1A.01 to C-1A.09. Each time, a range of salaries was associated with each distinct number of enrollments. *See id.* ¶ 44; *see also id.*, Lazear Appx. C-1C.01 – C-1C.07.

-10-

Dr. Lazear then "flipped" the analysis and examined the most frequently observed new salaries. If new salaries were based solely on enrollments, then there should be the same number of enrollments associated with each common new salary. *See* Lazear Decl. ¶ 40. But that was not true for any school for any year or for any version of the matrix. *Id.* ¶¶ 40-45; *see also id.*, Lazear Appx. C-1B.01 to C-1B.09 and Lazear Appx. C-1D.01 to C-1D.07. For example, a new salary of $35,006 was awarded on 192 occasions across all schools in 2010. *Id.* ¶ 42. The recruiters who earned this new salary, however, enrolled from as few as 4 students to as many as 97:



*Id.* Ex. 1B. Whether looking at new salaries across all schools by year or looking at just those new salaries associated with specific versions of the compensation matrix, a range of enrollment numbers was associated with each frequently observed new salary.[11] This range could not occur if salaries were based solely on enrollment numbers. *Id.* ¶¶ 37-45.

_____

[11] *See* Lazear Appx. C-1B.01 to Appx. C-1B.09 (evaluating all data broken down by fifteen most frequently occurring new salaries across all schools for each year under the Plan);

-11-

Dr. Lazear next examined where each recruiter ranked among his or her peers with respect to both enrollments and salary. *See id.* ¶¶ 46-53. "If Plaintiffs' theory were true, a recruiter's ranking on the number of enrollments would perfectly predict that recruiter's ranking on salary, and vice versa." *Id.* ¶ 46. Put differently, the most successful recruiters should make more than their less successful colleagues if nothing else matters. *Id.*

But, again, what must be true for Plaintiffs to prevail was not in fact true: Salary rank and enrollment rank did not vary together.[12] Indeed, in one instance and at complete odds with the theory of this case, the recruiter with the fewest enrollments had the highest salary. *Id.* ¶ 52.[13]

## 2. *Quality Points Were Not Based Solely On Enrollments.*

To analyze whether Quality Points were a "proxy" for enrollments, Dr. Lazear assessed the connection between these values. The extent to which two variables are correlated can be measured and, if one is a "proxy" for another, the variables would be highly or perfectly correlated and the number of enrollments would predict the number of Quality Points. *Id.* ¶¶ 62-65. To the contrary, Dr. Lazear found that any correlation between Quality Points and enrollment success or change in those metrics was quite weak. The number of enrollments only explained 19.7% of the difference in Quality Points observed and the change in enrollments

---

(continued…)

Lazear Appx. C-1D.01 to Appx. C-1D.07 (evaluating all data broken down by fifteen most frequently occurring new salaries for each iteration of the Plan).

[12] The results of these ordinal placing analyses are presented at Lazear Appx. C-1A-C-1D.

[13] Although the Safe Harbor speaks in terms of salaries and not the difference between salaries, Dr. Lazear also conducted the same analysis for salary differential and reached the same conclusion that enrollments were not the sole factor dictating salary differentials. Lazear Decl. ¶¶ 54-56.

explained only 9.79% of the difference in Quality Points. *Id.* ¶ 64, Ex. 4.[14]  "Statistical analysis also shows that quality points and student enrollments are not perfectly correlated, which means that quality points are not themselves a perfect proxy, or 'smoke screen,' for student enrollments." *Id.* ¶ 17.

### 3. *Regression Analysis Further Confirms That The Number Of Enrollments Does Not By Itself Explain Salary, Salary Differentials, Or Quality Points.*

Dr. Lazear continued his analysis to assess whether factors other than enrollments *actually influenced* salaries under the Plan using the universally accepted statistical tool of multi-variate regression. *Id.* ¶¶ 66-72.  Regression analysis evaluates whether multiple factors have real, tangible effects on a given outcome—here salary adjustment (whether measured as new salary or salary differential). *Id.* ¶ 67.  When possible influences are known, regression modeling allows evaluation of whether one is solely responsible for the outcome of interest.  To illustrate, if an allegation is made that billable hours are the sole factor affecting a lawyer's salary at a firm, regression analysis can compare billed hours to compensation and also consider whether other factors (such as pro bono work, client development, overall firm performance etc.) also have impact.  If hours alone cannot explain the salary changes observed, then it is not the only factor at play.  It may be one, but it cannot be the only one.  Regression analysis identifies what else matters.  Similarly, Dr. Lazear utilized regression analysis not only to assess Plaintiffs'

---

[14]  A correlation coefficient describes how closely one variable is related to another.  If that value is squared, the result describes the percentage of total variance in one that is predicted by the variance in the other variable.  So, if the correlation coefficient between two variables is .5 and the square of the correlation coefficient is .25, that means that one value explains 25% of the variance in the other and other factors account for the remaining 75%. *See generally* FED. JUDICIAL CTR., Ref. Man. on Sci. Evid., 345 (3d ed. 2011).

core proposition—enrollments achieved were the sole factor driving salary, salary differential, or Quality Points—but also whether other factors were in play.

Dr. Lazear performed regression analyses to determine whether the non-enrollment components of the Plan (Quality Points and other adjustments) had real impact *in practice*— directly evaluating Plaintiffs' assertion that Plan components were a "smoke screen" with "no impact" in application. *See id.* ¶¶ 70, 72. Because regression analysis "account[s] for all factors that might affect salary adjustment," whether they are enrollments or something else, *id.* ¶ 59, this method is well-suited to assess Plaintiffs' core theory of liability. "[U]nder the Plaintiffs' hypothesis, non-enrollment factors should have no effect at all on salary adjustments." *Id.* ¶ 72. Regression analysis can confirm or refute whether enrollments were the sole factor dictating salary.

Dr. Lazear found that each non-enrollment factor independently and significantly affected salary adjustment and had *real* and *significant* impact on the actual salaries and salary changes, causing salaries to change by thousands of dollars.[15] *Id.* ¶¶ 80-86. The number of enrollments "does not come close to solely determining salary differential." *Id.* ¶ 86. Dr. Lazear performed more than a dozen different checks to ensure the reliability of his results. None changed the outcome. *Id.* ¶¶ 92-96.[16] Similarly, the fact that Quality Points and enrollments are

---

[15] Dr. Lazear found that not only did the non-enrollment factors have demonstrable impact on salaries paid, these impacts were "economically significant." *See* Lazear Decl. ¶ 83. For example, Dr. Lazear found that ADAs who received adjustments tied to supervisory authority were paid, on average, $3,249 more than those ADAs who did not receive those adjustments, holding all other factors, including enrollment success, equal. *Id.*

[16] Dr. Lazear checked these results by attempting to predict salary adjustments for a hundred reviews, first solely using enrollment numbers (Plaintiffs' theory), and second using both enrollment numbers and non-enrollment factors. Using both enrollments and non-enrollment factors resulted in predictions that were, by a considerable margin, more accurate than using enrollments alone. Lazear Decl. ¶¶ 92-96, Ex. 7A, 7B.

both significant in the model indicates that enrollments also do not solely determine Quality Points. *See id.* ¶ 103.

Dr. Lazear's regression analysis does more than negate the proposition that enrollment success was the sole factor driving salary adjustments; it establishes that factors other than enrollments had real and significant effects on the salaries paid. Non-enrollment factors were not proxies for enrollments but rather were a necessary component to explain salaries actually paid.[17]

## ARGUMENT

### I.    RULE 56 STANDARDS.

Summary judgment is an essential mechanism "to isolate and dispose of factually unsupported claims" and to ensure the "just, speedy and inexpensive determination of every action…." *Celotex v. Catrett*, 477 U.S. 317, 323, 324, 327 (1986). It is "required where the pleadings and evidence in the record 'show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Peloro v. United States*, 488 F.3d 163, 173 (3d Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). The party moving for summary judgment bears the initial burden of showing that no genuine issue of material fact exists and that the moving party is entitled to judgment. *Nat'l Assn. for the Advancement of Colored People v. North Hudson Regional Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011). Once met, the non-moving party must identify evidence that creates a genuine dispute of material fact. *Id.* Such evidence must be more than a mere "scintilla of evidence" supporting his

---

[17] Dr. Lazear also conducted his regression analysis for the related metric of New Student Points, which is the value used by the Matrix and is calculated based upon enrollments secured in the twelve months preceding the review. Once again, even using this measurement, all factors present in the Plan retained significance, meaning that each has independent effect on the salaries actually paid to recruiters over the applicable time period. Lazear Decl. Ex. 6B.

position, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), or evidence creating "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It must have the potential to influence the outcome of the case. *See Nat'l Assn. for the Advancement of Colored People*, 665 F.3d at 475. If the non-moving party's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-52.

## II. EDMC'S COMPLIANCE WITH THE SAFE HARBOR WARRANTS SUMMARY JUDGMENT IN ITS FAVOR.

There can be no False Claims Act liability where the defendant complied with the regulation it is alleged to have violated. *See Rodriguez v. Our Lady of Lourdes Med. Ctr.*, 552 F.3d 297, 304 (3d Cir. 2008) ("[I]t is necessary to allege not only a receipt of federal funds [but also] a failure to comply with applicable regulations . . . .") *abrogated on other grounds by United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 931 n.1 (2009).[18] The same is true of common law claims such as fraud, unjust enrichment, and mistake of fact. Am. Jur. 2d Torts § 13 (2013) ("[W]hatever a person has a legal right to do, he or she may do with impunity, regardless of motive . . . ."). An essential element of each of Plaintiffs' claims is that EDMC compensated recruiters solely on enrollments.

Statistical analysis is often used to determine what factors influence (and do not influence) outcomes and thus provide the basis for dismissal of claims premised upon company-wide allegations of wrongdoing. Addressing essentially the identical issue presented here—

---

[18] *See also United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 441 (3d Cir. 2004) ("[W]e cannot impose FCA liability" where the alleged misconduct did not violate any regulation.). The state FCA laws are materially identical to those of the federal government. The state FCA claims will necessarily share the same fate as the federal FCA claims under this motion. *See* MTD Op. at 38-39.

whether EDMC compensated recruiters "solely" based on the number of students enrolled—
Judge R. Stanton Wettick of the Court of Common Pleas of Allegheny County observed that the
question involves "measurable objective findings" and that "[a]ny competent statistician could,
through a sampling of records," discern whether salary adjustments were based solely on
enrollment numbers. July 16, 2013 Memorandum and Order of Court at 28-29, *Okla. Law
Enforcement Ret. Sys. v. Educ. Mgmt. Corp. et al.*, GD-12-008785 (Ct. Com. Pl. Allegheny Cty)
("*OLERS*") (holding that a statistical analysis—which the court deemed "far more reliable" than
anecdotal evidence—would be probative of whether non-enrollment components of the Plan
operated independently of enrollment numbers).[19]

In *EEOC v. Bloomberg*, 778 F. Supp. 2d 458, 461-62 (S.D.N.Y. 2011), the government
alleged that an employer had a company-wide pattern or practice of paying pregnant women less
than other similarly situated employees. The employer moved for summary judgment and
presented statistical evidence that pregnant women, in fact, were paid at levels commensurate to
their non-pregnant peers on a company-wide basis. *Id.* Crediting the statistical evidence, the
district court granted summary judgment in the employer's favor. *Id.* at 461-62, 484. The
*Bloomberg* court did so despite anecdotal evidence of individual unlawful acts because "that
level of discrimination does not indicate [the employer's] 'standard operating procedure' or
'widespread acts of intentional discrimination against individuals.'" *Id.* at 473. Judge Wettick

---

[19] This Court awaits the result of that statistical analysis in the EDMC-related derivative
suit on its docket. *See* Aug. 5, 2013 Memorandum Order at 3 (Dkt. No. 58), *Bushansky v.
Nelson*, Civil Action No. 2:12-cv-01101-TFM (W.D. Pa.) (staying claims because "Judge
Wettick's final decision in the *OLERS* action will have significant and perhaps dispositive
impact on this litigation because the issues are virtually identical").

and the *Bloomberg* court are in ample company in crediting statistical evidence to refute

company-wide claims, despite anecdotal evidence of discrete instances of wrongdoing.[20]

Here, Plaintiffs' claims are premised on company-wide allegations of a top-down

compensation scheme involving more than one hundred EDMC affiliates setting recruiter

salaries based exclusively on enrollments.  The way to test that assertion, or, in the government's

terms, "get behind the numbers," is to subject them to accepted statistical analyses which

produce "objective measurable findings."  *OLERS*, at 28; *accord Bloomberg*, 778 F. Supp. 2d at

484 (rejecting government's "assertion that the statistical analyses are irrelevant"); *Wilkins*, 2005

U.S. Dist. LEXIS 41268, at *54.

---

[20]  *EEOC v. McDonnell Douglas Corp.*, 191 F.3d 948, 952-953 (8th Cir. 1999) (affirming summary judgment where the government's anecdotal evidence of "at most, isolated discriminatory acts on the part of certain managers" did not prove that such behavior was the defendant's "standard operating procedure"); *Wilkins v. United States*, No. 99-1579, 2005 U.S. Dist. LEXIS 41268, at *52-54 (S.D. Cal. June 29, 2005) (granting summary judgment and rejecting plaintiff's request for additional depositions and other discovery to prove claims of systemic religious discrimination because anecdotal evidence would be insufficient in light of defendants' statistical evidence); *In re Western Dist. Xerox Litig.*, 850 F. Supp. 1079, 1084-87 (W.D.N.Y. 1994) (disposing of plaintiffs' claims which "amount to nothing more than individual incidents that cannot, without more, give rise to an inference that defendant engaged in a corporate-wide pattern or practice of discrimination" and holding reliance on such anecdotal evidence to be a "glaring flaw[]" especially in light of defendant's statistical evidence); *Davidson v. Allsteel, Inc.*, No. 09-11308, 2011 U.S. Dist. LEXIS 17190, at *47 (E.D. Mich. Feb. 22, 2011) ("Even if true, [] allegations as to one rogue employee do not a pattern or corporate culture make."). *See generally* FED. JUDICIAL CTR., Ref. Man. on Sci. Evid., (3d ed. 2011) at 2-3 (Breyer, J. intro) (noting "how often our cases today involve statistics" and that judges "are expected to understand" statistical analyses); *see also id.* 303-358 (Reference Guide on Multiple Regression) (noting that "multiple regression analysis is sometimes well suited to the analysis of data about competing theories in which there are several possible explanations for the relationship among a number of explanatory variables"). Within the last month, Judge Conti upheld the admissibility of a regression-based analysis related to property values which took into account multiple variables and sought to isolate the impact of alleged contamination. *See Hartle v. Firstenergy Generation Corp.*, Nos. 08-1019, 08-1025, 08-1030, 2014 U.S. Dist. LEXIS 43033, at *10-14, 26-30 (W.D. Pa. March 31, 2014); *see also In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 211 & n.14 (M.D. Pa. 2012) (affirming the admissibility of a multiple regression analysis to assess price impact in an antitrust case).

Dr. Lazear has done precisely that here.  This is a case where the numbers are known, and they show that EDMC did not pay its recruiters based solely on enrollments.  Dr. Lazear's descriptive analysis found that the salaries actually paid and salary adjustments actually made were absolutely inconsistent with a compensation system dictated only by the number of students enrolled.  Recruiters with identical recruiting success received materially different salaries.  Lazear Decl. ¶¶ 39-45.  Recruiters with identical salaries had varying degrees of success in recruiting students.  *Id.* ¶ 45, Ex. 1D.  Better recruiters sometimes got paid less—far less—than their less productive colleagues.  *Id.*  And, the non-enrollment elements of the Plan as *drafted*, had real impact on the salaries *as applied*.  *Id.* ¶¶ 66-86.  Regardless of whether one looks at salary, salary differential, enrollments, or New Student Points, recruiter compensation was not driven solely by enrollments.

Plaintiffs' subsidiary allegation–that Quality Points were a "sham" or "proxy" for enrollments–fares no better.  These two variables moved in a material and independent fashion to such a degree that Plaintiffs' "proxy" allegation is completely inconsistent with the undisputed facts, a conclusion confirmed by the regression analysis.

## CONCLUSION

Plaintiffs have asserted that this case is "all about the numbers," and ironically, that has proven true.  The numbers put the lie to Plaintiffs' case.  The compensation of EDMC's recruiters was not based solely on enrollments and enrollments were not a proxy for Quality Points.  This lawsuit should end here.  For these reasons, EDMC requests that this Court enter summary judgment in its favor on all Plaintiffs' claims

Respectfully submitted,


 /s/ Laura E. Ellsworth
Laura E. Ellsworth (Pa. 39555)
James M. Jones (Pa. 81295)
Thomas S. Jones (Pa. 71636)
Matthew R. Divelbiss (Pa. 200510)
Katelyn M. Matscherz (Pa. 308922)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Phone: (412) 391-3939
Email: leellsworth@jonesday.com

Dated:  April 10, 2014                        *Attorneys for Defendants*