# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| THE ART INSTITUTE OF PHILADELPHIA LLC, *et al.*,[1] | Case No. 18-11535 (LSS) |
| *Debtors.* | Jointly Administered |
| GEORGE L. MILLER, Chapter 7 Trustee, | |
| *Plaintiff,* <br> v. | Adv. Pro. No. 20-50627 (LSS) |
| TODD S. NELSON, *et al.*, | |
| *Defendants.* | **Re: Adv. Docket Nos. 40, 42, 45, & 48** |

## PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): American Education Centers, Inc. (6160); Argosy Education Group, Inc. (5674); Argosy University of California LLC (1273); Brown Mackie College - Tucson, Inc. (4601); Education Finance III LLC (2533); Education Management LLC (6022); Education Management II LLC (2661); Education Management Corporation (9571); Education Management Holdings II LLC (2529); Higher Education Services II LLC (3436); Miami International University of Art & Design, Inc. (1065); South Education – Texas LLC (2573); South University of Florida, Inc. (9226); South University of Michigan, LLC (6655); South University of North Carolina LLC (9113); South University of Ohio LLC (9944); South University of Virginia, Inc. (9263); South University, LLC (7090); Stautzenberger College Education Corporation (4675); TAIC-San Diego, Inc. (1894); TAIC-San Francisco, Inc. (9487); The Art Institutes International Minnesota, Inc. (6999); The Art Institute of Atlanta, LLC (1597); The Art Institute of Austin, Inc. (3626); The Art Institute of California-Hollywood, Inc. (3289); The Art Institute of California-Inland Empire, Inc. (6775); The Art Institute of California - Los Angeles, Inc. (4215); The Art Institute of California-Orange County, Inc. (6608); The Art Institute of California-Sacramento, Inc. (6212); The Art Institute of Charleston, Inc. (6048); The Art Institute of Charlotte, LLC (4912); The Art Institute of Colorado, Inc. (3062); The Art Institute of Dallas, Inc. (9012); The Art Institute of Fort Lauderdale, Inc. (0255); The Art Institute of Houston, Inc. (9015); The Art Institute of Indianapolis, LLC (6913); The Art Institute of Las Vegas, Inc. (6362); The Art Institute of Michigan, Inc. (8614); The Art Institute of Philadelphia LLC (7396); The Art Institute of Pittsburgh LLC (7441); The Art Institute of Portland, Inc. (2215); The Art Institute of Raleigh-Durham, Inc. (8031); The Art Institute of St. Louis, Inc. (9555); The Art Institute of San Antonio, Inc. (4394); The Art Institute of Seattle, Inc. (9614); The Art Institute of Tampa, Inc. (6822); The Art Institute of Tennessee-Nashville, Inc. (5359); The Art Institute of Virginia Beach, Inc. (2784); The Art Institute of Washington, Inc. (7043); The Art Institutes International II LLC (9270); The Illinois Institute of Art at Schaumburg, Inc. (3502); The Illinois Institute of Art, Inc. (3500); The Institute of Post-Secondary Education, Inc. (0283); The New England Institute of Art, LLC (7798); The University of Sarasota, Inc. (5558);Western State University of Southern California (3875).

KAUFMAN, COREN & RESS, P.C.
Steven M. Coren, Esq.
Benjamin M. Mather, Esq.
Francis X. Lane, Esq.
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700

Dated:  November 13, 2020

PACHULSKI STANG ZIEHL & JONES
LLP
Bradford J. Sandler (DE Bar No. 4142)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Tel: (302) 652-4100

*Attorneys for Plaintiff George L. Miller,
Chapter 7 Trustee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iv

I. NATURE AND STAGE OF THE PROCEEDING ................................................... 1

II. INTRODUCTION ................................................................................................. 1

III. BACKGROUND ................................................................................................. 4

IV. MOTION TO DISMISS STANDARD ................................................................. 9

V. ARGUMENT ..................................................................................................... 11

   A. The Complaint States Claims for Breach of Fiduciary Duty, Fraud, and Civil
   Conspiracy (Counts I Through III) Against the Defendants ................................. 11

      1. The Complaint States a Claim for Breach of Fiduciary Duty ....................... 12

      2. The Complaint States a Claim for Fraud ...................................................... 19

      3. The Complaint States a Claim for Civil Conspiracy .................................... 21

      4. The Allegations are Sufficiently Specific as to Each Defendant .................. 23

   B. Counts I Through III Are Not Barred By The Statute of Limitations ................ 24

      1. Delaware's Three-Year Statute of Limitations Applies to the Trustee's Claims .......... 24

         a. The Statute of Limitations of Delaware, the Forum State, Should Apply ..... 24

         b. The Causes of Action Arose in Delaware ...................................................... 26

      2. The Statute of Limitations Does Not Bar the Trustee's Claims .................... 28

         a. Under the Doctrine of Continuing Violations, the Statute of Limitations
         Does Not Bar the Trustee's Claims Because Defendants Continued
         Their Unlawful Course of Conduct Into the Limitations Period ................... 30

         b. Even Absent the Continuing Violations Doctrine, The Claims Did Not
         Accrue Until November 2015 At the Earliest .................................................. 34

         c. The Statute of Limitations is Tolled by the Discovery Rule and Other
         Tolling Principles ............................................................................................ 39

   C. Counts I Through III of the Trustee's Complaint are Not Precluded or Barred
   As a Result of the Prior *OLERS* or *Bushansky* Derivative Actions or the
   Government Qui Tam Action ............................................................................... 43

i

1. *OLERS* Does Not Have Preclusive Effect Under Principles of Res Judicata or Collateral Estoppel ..........................................................................44

2. The Trustee's Claims Are Not Barred By Judicial Estoppel .........................................53

3. The Trustee's Claims Are Not Barred By the Doctrine of Waiver and Abandonment ..............................................................................57

D. The Complaint Sufficiently Pleads Claims to Avoid and Recover the Excessive Payments Made to the Transferee Defendants ....................................................................60

1. The Excessive Payments Constituted Transfers of the Debtors' Property ...................61

2. Counts VI and IX State Claims for Avoidance of the Excessive Payments as Actually Fraudulent Pursuant to 11 U.S.C. §§ 544 & 548(a)(1)(A) and 6 Del. C. § 1304(a)(1) ............................................................................63

3. Count VII States a Claim for Avoidance of the Excessive Payments as Constructively Fraudulent Pursuant to 11 U.S.C. § 548(a)(1)(b) ...............................66

a. The Complaint Plausibly Alleges Lack of Reasonably Equivalent Value Received in Exchange for the Transfers ........................................................67

b. The Complaint Contains Sufficient Allegations Concerning the Debtors' Poor Financial Condition and the Extraordinary Nature of the Transfers ......71

c. The Complaint's Factual Allegations Also State Claims for Constructive Fraudulent Transfer Under DUFTA ...............................................................75

4. The Complaint States a Claim to Avoid and Recover Excessive Payments Made Within One Year of the Petition Date as Preferential Transfers........................77

a. The "Reasonable Due Diligence" Language Contained In Section 547(b) Does Not Modify or Create Additional Pleading Requirements, and Defendants' Factual Disputes Are Meritless and, In Any Event, Not Bases for Dismissal Under Rule 12(b)(6) ................................................77

b. The Trustee Sufficiently Identifies the Preferential Transfers and Pleads All Required Elements Under Section 547(b) ................................................81

5. Because the Complaint Adequately States Avoidance Claims Under 11 U.S.C. §§ 544, 547, & 548, Plaintiff's Claim for Recovery of the Avoided Transfers Under § 550 Also States a Claim for Relief ...................................86

E. The Complaint States a Claim for Corporate Waste Based on the Excessive Payments Made to Transferee Defendants ..........................................................................87

F. Count V States a Claim for Unjust Enrichment ................................................................91

ii

G. In the Alternative, If the Court Determines that Dismissal of Any Claims Is
   Warranted, Leave to Amend Should Be Granted.................................................................92

VI. CONCLUSION.........................................................................................................................95

# TABLE OF AUTHORITIES

**Cases**

*Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032 (Del. Ch. 2006) ....................... 19

*Adv. Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*,
182 F. App'x 994 (Fed. Cir. 2006) ................................................................... 29

*Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085 (Del. Ch. Ct. 2005) .......... 32, 38, 40

*Albert v. Carovano*, 851 F.2d 561 (2d Cir. 1988) ........................................................... 75

*Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020 (Del. Ch. 2006) ................. 21, 22

*Arnault v. Diamondhead Casino Corp.*, 277 F. Supp. 3d 671 (D. Del. 2017) ............................. 92

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................... 9

*Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062 (Del. Ch. 1989) .......................................... 29

*Basho Techs. Holdco B, LLC v. Georgetown Basho Investors, LLC*, 2018 WL 3326693
(Del. Ch. July 6, 2018) ..................................................................................... 36

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................. 9, 10, 72

*Brown v. Tucci*, 960 F. Supp. 2d 544 (W.D. Pa. 2013) ............................................... 51

*Buckley v. O'Hanlon*, 2007 WL 956947 (D. Del. Mar. 28, 2007) .................................. 13, 16, 23

*Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*,
229 F.3d 245 (3d Cir. 2000) .............................................................................. 63

*Cannon-Stokes v. Potter*, 453 F.3d 446 (7th Cir. 2006) .......................................... 54, 55

*Cap v. K-Mart Discount Store, Inc.*, 515 A.2d 52 (Pa. Super. Ct. 1986) ..................................... 36

*Carr v. New Enterprise Assocs., Inc.*, 2018 WL 1472336 (Del. Ch. 2018) ............................. 40

*Catroppa v. Carlton*, 998 A.2d 643 (Pa. Super. 2010) .................................................... 52

*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993) ......................................... 12

*Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032 (Del. Ch. 2005) ............................. 35, 40

*CHC Invs., LLC v. FirstSun Capital Bancorp.*, 2020 WL 1480857 (Del. Ch. Mar. 23, 2020) .... 25

*Citigroup Inc. v. AHW Inv. P'ship.*, 140 A.3d 1125 (Del. 2016) ................................... 26

*Colaizzi v. Beck*, 895 A.2d 36 (Pa. Super. 2006) .......................................................... 19

*Coleman v. Taub*, 638 F.2d 628 (3d Cir. 1981) ............................................................ 27

*Comba Telecom, Inc. v. Andrew, L.L.C.*, 2013 WL 12409853 (D. Del. Mar. 8, 2013) ............... 94

*Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb*, 385 F. Supp. 2d 449
(D. Del. 2004) ................................................................................................ 90

*Cowell v. Palmer Twp.*, 263 F.3d 286 (3d Cir. 2001) ................................................. 33, 34

*Crystallex Int'l Corp. v. Petroleos De Venezuela, S.A.*, 879 F.3d 79 (3d Cir. 2018) .................. 63

iv

*Cuker v. Mikalauskas*, 692 A.2d 1042 (Pa. 1997) ........................................................ 47

*Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267 (3d Cir. 2001) .................... 93

*Day v. Volkswagenwerk Aktiengesellschaft*, 464 A.2d 1313 (Pa. Super. 1983) .................... 51, 52

*Del. Display Group LLC v. Lenovo Group Ltd.*, 2016 WL 720977 (D. Del. Feb. 23, 2016) ....... 93

*Dole v. Arco Chem. Co.*, 921 F.2d 484 (3d Cir. 1990) ........................................... 92, 94

*Eureka Res., LLC v. Range Res.-Appalachia, LLC*, 62 A.3d 1233 (Del. Super. 2012) ............... 28

*Levin, et al. v. Kursman*, 175 B.R. 560 (Bankr. E.D.Pa. 1994) .................................... 42

*Feeley v. NHAOCG, LLC*, 62 A.3d 649 (Del. Ch. 2012) .............................................. 37

*Fine v. Checcio*, 870 A.2d 850 (Pa. 2005) ....................................................... 40

*Foman v. Davis*, 371 U.S. 178 (1962) ............................................................ 93

*Furnari v. Wallpang, Inc.*, 2014 WL 1678419 (Del. Super. Apr. 16, 2014) .......................... 25

*Gaer v. Educ. Mgmt. Corp.*, 2011 WL 7277447 (W.D. Pa. Aug. 30, 2011),
   *recommendation adopted*, 2011 WL 7277578 (W.D. Pa. Sept. 29, 2011) ........................... 45

*Gantler v. Stephens*, 965 A.2d 695 (Del. 2009) .................................................. 90

*Garman v. Angino*, 230 A.3d 1246 (Pa. Super. 2020) ..................................... 46, 50, 51

*Green Field Energy Servs.*, 2015 WL 514616 ...................................................... 92

*Gregory v. Chehi*, 843 F.2d 111 (3d Cir. 1988) .................................................. 45

*Halpern v. Barran*, 313 A.2d 139 (Del. Ch. 1973) ................................................ 40

*Harris v. Pernsley*, 755 F.2d 338 (3d Cir. 1985). ............................................... 50

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989) ....... 26

*Henik ex rel. LaBranche & Co., Inc. v. LaBranche*, 433 F. Supp. 2d 372 (S.D.N.Y. 2006) ........ 49

*Hopewell Estates, Inc. v. Kent*, 646 A.2d 1192 (Pa. Super. 1994) ...................... 46, 47, 50

*Household Int'l, Inc. v. Westchester Fire Ins. Co.*, 286 F. Supp. 2d 369 (D. Del. 2003) ............. 10

*In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004) ................................. 11

*In re Adelphia Commc'ns Corp.*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007) ......................... 41, 64

*In re AgFeed USA, LLC*, 558 B.R. 116 (Bankr. D. Del. 2016) ...................................... 70

*In re All Phase Roofing & Constr., LLC*, 2020 WL 374357 (Bankr. W.D. Okla. Jan. 17, 2020),
   *aff'd*, 2020 WL 5512500 (10th Cir. B.A.P. Sept. 14, 2020) .................................... 87

*In re Am. Bus. Fin. Servs., Inc.*, 361 B.R. 747 (Bankr. D. Del. 2007) ............................ 67

*In re Am. Bus. Fin. Servs., Inc.*, 384 B.R. 80 (Bankr. D. Del. 2008) ....................... 10, 19

*In re Am. Int'l Group*, 965 A.2d 763 (Del. Ch. 2009) ............................................ 29

*In re Am. Int'l Refinery*, 402 B.R. 728 (Bankr. W.D. La. 2008) .................................. 56

*In re AMC Investors, LLC.*, 524 B.R. 62 (Bankr. D. Del. 2015) ............................... 40, 43

v

*In re Amcad Holdings, LLC*, 579 B.R. 33 (Bankr. D. Del. 2017)............................................ 70, 71

*In re An-Tze Cheng*, 308 B.R. 448 (9th Cir. B.A.P. 2004) ............................................................ 54

*In re Bayonne Med. Ctr.*, 429 B.R. 152 (Bankr. D.N.J. 2010) ..................................................... 85

*In re Bean*, 252 F.3d 113 (2d Cir. 2001)...................................................................................... 87

*In re Bed Bath & Beyond Inc. Deriv. Litig.*, 2007 WL 4165389 (D.N.J. Nov. 19, 2007) ........... 49

*In re Bernard L. Madoff Inv. Secs. LLC*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011).......................... 60

*In re Biggers*, 249 B.R. 873 (Bankr. M.D. Tenn. 2000) ............................................................... 80

*In re BMT-NW Acquisition, LLC*, 582 B.R. 846 (Bankr. D. Del. 2018)....................................... 74

*In re Bracket Holding Corp. Litig.*, 2017 WL 3283169 (Del. Super. July 31, 2017).................. 28

*In re Bridgeport Holdings, Inc.*, 388 B.R. 548 (Bankr. D. Del. 2008) ........................................ 16

*In re Brooke Corp.*, 506 B.R. 560 (Bankr. D. Kan. 2014)............................................................ 84

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ................................... 11

*In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996) ....................................... 13

*In re Charys Holding Co.*, 2010 WL 2774852 (Bankr. D. Del. July 14, 2010).................... 10, 63

*In re Charys Holding Co., Inc.*, 443 B.R. 628 (Bankr. D. Del. 2010) .................................. 68, 69

*In re Cheng*, 160 F. App'x 644 (9th Cir. 2005) .......................................................................... 54

*In re Circle Y of Yoakum, Texas*, 354 B.R. 349 (Bankr. D. Del. 2006)....................................... 27

*In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106 (Del. Ch. 2009)................................. 89

*In re Crucible Materials Corp.*, 2011 WL 2669113 (Bankr. D. Del. July 6, 2011) ..................... 81

*In re DBSI, Inc.*, 445 B.R. 344 (Bankr. D. Del. 2011).................................................................. 85

*In re Dean Witter*, 1998 WL 442456 (Del. Ch. July 17, 1998) ................................................... 37

*In re Dewey & LeBoeuf LLP*, 2014 WL 4746209 (Bankr. S.D.N.Y. Sept. 23, 2014)................. 69

*In re Dex Media, Inc.*, 595 B.R. 19 (D. Del. 2018) ...................................................................... 56

*In re DSI Renal Holdings, LLC*, 574 B.R. 446 (Bankr. D. Del. 2017) ............................ 13, 15, 89

*In re DVI, Inc.*, 2008 WL 4239120 (Bankr. D. Del. Sept. 16, 2008)........................................... 11

*In re Eagle Enters., Inc.*, 223 B.R. 290 (E.D. Pa. 1998)............................................................. 24

*In re Elrod Holdings Corp.*, 421 B.R. 700 (Bankr. D. Del. 2010) ............................................... 70

*In re Enron Corp.*, 357 B.R. 32 (Bankr. S.D.N.Y. 2006) ............................................................ 82

*In re EXDS, Inc.*, 316 B.R. 817 (Bankr. D. Del. 2004).................................................................. 54

*In re FAH Liquidating Corp.*, 572 B.R. 117 (Bankr. D. Del. 2017)....................................... 72, 91

*In re Fedders N. Am., Inc.*, 405 B.R. 527 (Bankr. D. Del. 2009) .................................... 10, 28, 64

*In re First Jersey Sec., Inc.*, 180 F.3d 504 (3d Cir. 1999) .......................................................... 82

*In re Fruehauf Trailer Corp.*, 444 F.3d 203 (3d Cir. 2006) ....................................................... 67

vi

*In re F-Squared Inv. Mgmt., LLC*, 600 B.R. 294 (Bankr. D. Del. 2019) ...................................... 84

*In re Genesis Health Ventures, Inc.*, 355 B.R. 438 (Bankr. D. Del. Dec. 13, 2006) ................... 23

*In re Green Field Energy Servs., Inc.*, 2015 WL 5146161 (Bankr. D. Del. Aug. 31, 2015) ........ 82

*In re Health Diagnostic Lab., Inc.*, 2018 WL 4676339 (Bankr. E.D. Va. Sept. 26, 2018) .......... 17

*In re Hecker*, 496 B.R. 541 (8th Cir. B.A.P. 2013) ....................................................................... 87

*In re Hill*, 342 B.R. 183 (Bankr. D.N.J. 2006) ...................................................................... 64, 66

*In re Ho*, 564 B.R. 49 (Bankr. D. Haw. 2017) ............................................................................. 57

*In re Integrated Health Servs., Inc.*, 304 B.R. 101 (Bankr. D. Del. 2004),
    *subsequently aff'd*, 233 F. App'x 115 (3d Cir. 2007) ......................................................... 24, 57

*In re Iulo*, 766 A.2d 335 (Pa. 2001) ........................................................................................... 46

*In re Kendall*, 491 B.R. 191 (Table) (10th Cir. B.A.P. 2013),
    *aff'd*, 565 F. App'x 714 (10th Cir. 2014) ................................................................................ 72

*In re KNH Aviation*, 549 B.R. 356 (Bankr. D.S.C. 2016) ...................................................... 32, 34

*In re Lexington Healthcare Group, Inc.*, 339 B.R. 570 (Bankr. D. Del. 2006) ........................... 95

*In re Litas Int'l, Inc.*, 1996 WL 617776 (Bankr. S.D.N.Y. Sept. 6, 1996) ................................. 52

*In re Liquid Holdings Group, Inc.*, 2018 WL 6841351 (Bankr. D. Del. Nov. 14, 2018) ............. 71

*In re Lloyd Sec., Inc.*, 153 B.R. 677 (E.D. Pa. 1993) ................................................................. 42

*In re Longview Aluminum, LLC*, 657 F.3d 507 (7th Cir. 2011) ................................................... 84

*In re Massey Energy Co.*, 2011 WL 2176479 (Del. Ch. May 26, 2011) .......................... 12, 13, 17

*In re Mervyn's Holdings, LLC*, 426 B.R. 488 (Bankr. D. Del. 2010) .................................... 25, 27

*In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) ..... 66

*In re Miller*, 347 B.R. 48 (Bankr. S.D. Tex. 2006) ..................................................................... 56

*In re Montgomery Ward, LLC*, 634 F.3d 732 (3d Cir. 2011) ................................................. 52, 53

*In re New Century TRS Holdings, Inc.*, 502 B.R. 416 (Bankr. D. Del. 2013) ............................. 44

*In re NJ Affordable Homes Corp.*, 2013 WL 6048836 (Bankr. D.N.J. Nov. 8, 2013) ................ 82

*In re Oakwood Homes Corp.*, 340 B.R. 510 (Bankr. D. Del. 2006) ............................................ 77

*In re OODC, LLC*, 321 B.R. 128 (Bankr. D. Del. 2005) ........................................................ 59, 64

*In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1 (Del. Ch. 2014) .......................... 12, 15

*In re Our Alchemy, LLC*, 2019 WL 4447202 (Bankr. D. Del. Sept. 16, 2019) ........................... 85

*In re Our Alchemy, LLC*, 2019 WL 4447545 (Bankr. D. Del. Sept. 16, 2019) ........................... 92

*In re Payroll Express Corp.*, 921 F. Supp. 1121 (S.D.N.Y. 1996) .............................................. 56

*In re Pearson*, 2010 WL 3956762 (Bankr. M.D. Pa. Oct. 7, 2010) ............................................ 84

*In re PennySaver USA Publ'g, LLC*, 587 B.R. 445 (Bankr. D. Del. 2018) ...................... 27, 65, 82

*In re Pitt Penn Holding Co.*, 484 B.R. 25 (Bankr. D. Del. 2012)............................................ 13, 67

*In re Plassein Int'l Corp.*, 2008 WL 1990315 (Bankr. D. Del. May 5, 2008) ............................ 67

*In re PMTS Liquidating Corp.*, 490 B.R. 174 (D. Del. 2013) ...................................................... 94

*In re Polichuk*, 506 B.R. 405 (Bankr. E.D. Pa. 2014)............................................................ 63, 64

*In re PostRock Energy Corp.*, 2019 WL 137115 (Bankr. W.D. Okla. Jan. 8, 2019).................... 82

*In re PostRock Energy Corp.*, 2019 WL 137116 (Bankr. W.D. Okla. Jan. 8, 2019)........ 68, 82, 86

*In re R.M.L., Inc.*, 92 F.3d 139 (3d Cir. 1996).......................................................................... 67

*In re Ramba, Inc.*, 437 F.3d 457 (5th Cir. 2006) ...................................................................... 80

*In re Ritz Camera & Image, LLC*, 2014 WL 432192 (Bankr. D. Del. Feb. 4, 2014) .................. 86

*In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198 (3d Cir. 2002) .............................. 21

*In re Scott Acquisition Corp.*, 344 B.R. 283 (Bankr. D. Del. 2006) ............................................ 59

*In re Simplexity, LLC*, 2017 WL 65069 (Bankr. D. Del. Jan. 5, 2017) ........................................ 15

*In re SLM Int'l, Inc.*, 248 B.R. 240 (D. Del. 2000).................................................................... 58

*In re Student Fin. Corp.*, 335 B.R. 539 (D. Del. 2005) .............................................................. 11

*In re Sverica Acquisition Corp., Inc.*,179 B.R. 457 (Bankr. E.D. Pa. 1995) ................................ 41

*In re TEU Holdings, Inc.*, 287 B.R. 26 (Bankr. D. Del. 2002) .................................................... 90

*In re The Brown Schools*, 368 B.R. 394 (Bankr. D. Del. 2007) .................................................. 87

*In re THQ Inc.*, 2016 WL 1599798 (Bankr. D. Del. Apr. 18, 2016) .......................................... 81

*In re Total Containment, Inc.*, 335 B.R. 589 (Bankr. E.D. Pa. 2005)........................ 15, 16, 18, 93

*In re Trans World Airlines, Inc.*, 261 B.R. 103 (Bankr. D. Del. 2001) ........................................ 56

*In re Tribune Co.*, 464 B.R. 126 (Bank. D. Del. 2011) ........................................................ 64, 66

*In re Troll Commc'ns, LLC*, 385 B.R. 110 (Bankr. D. Del. 2008) ........................................ 15, 73

*In re TSIC, Inc.*, 428 B.R. 103 (Bankr. D. Del. 2010) ...................................................... 68, 69, 85

*In re Tweeter Opco*, 452 B.R. 150 (Bankr. D. Del. 2011)............................................................ 93

*In re Tzanides*, 574 B.R. 489 (Bankr. D.N.J. 2017).................................................................... 52

*In re Uni-Marts, LLC*, 404 B.R. 767 (Bankr. D. Del. 2009) ...................................................... 27

*In re United Tax Group, LLC*, 2016 WL 7235622 (Bankr. D. Del. Dec. 13, 2016).................... 70

*In re U.S. Mortg. Corp.*, 492 B.R. 784 (Bankr. D.N.J. 2013)...................................................... 94

*In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003).......................... 44

*In re W.J. Bradley Mortg. Capital, LLC*, 598 B.R. 150 (Bankr. D. Del. 2019)............................ 88

*In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275 (Del. Ch. 2003)............................................ 12

*In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693 (Del. Ch. 2005),
    *aff'd*, 906 A.2d 27 (Del. 2006) ........................................................................................ 13, 16

viii

*In re Walt Disney Co.*, 2004 WL 2050138 (Del. Ch. Sept. 10, 2004) .......................................... 90

*In re Wash. Mut., Inc.*, 2013 WL 3757330 (Bankr. D. Del. July 16, 2013) ................................. 87

*In re Wind Power Sys., Inc.*, 841 F.2d 288 (9th Cir. 1988) ......................................................... 80

*In re World Health Alternatives, Inc.*, 385 B.R. 576 (Bankr. D. Del. 2008) ......................... 88, 90

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ...................................................................................... 58

*Kahn v. Seaboard Corp.*, 625 A.2d 269 (Del. Ch. 1993) .............................................................. 32

*Kane v. Chester County Dep't of Children, Youth and Families*,
   10 F. Supp. 3d 671 (E.D. Pa. 2014) ......................................................................................... 10

*Kapil v. Assoc. of Pa. State College and Univ. Faculties*, 470 A.2d 482 (Pa. 1983) ................... 36

*Kaufman v. C.L. McCabe & Sons, Inc.*, 603 A.2d 831 (Del. 1992) ............................................... 36

*Kelly v. H.C. Kerstetter Co.*, 2016 WL 1728686 (Pa. Super. Apr. 27, 2016) .............................. 36

*Killmeyer v. Oglebay Norton Co.*, 817 F. Supp. 2d 681 (W.D. Pa. 2011) .................................... 55

*Lake v. Arnold*, 232 F.3d 360 (3d Cir. 2000) ............................................................................... 93

*Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179
   (Del. Ch. Oct. 20, 2014) ........................................................................................................... 12

*Langman v. Keystone Nat'l Bank & Trust Co.*, 672 F. Supp. 2d 691 (E.D. Pa. 2009) ................. 34

*Laventhol, Krekstein, Horwath and Horwath v. Tuckman*, 372 A.2d 168 (Del. 1976) ............... 22

*LeBoyer v. Greenspan*, 2007 WL 4287646 (C.D. Cal. June 13, 2007) ........................................ 49

*Levitt v. Patrick*, 976 A.2d 581 (Pa. Super. 2009) ................................................................. 46, 48

*Liberty Mut. Fire Ins. Co. v. Corry Indus., Inc.*, 2000 WL 34546492
   (W.D. Pa. Mar. 30, 2000) ......................................................................................................... 34

*Machala v. Boehringer Ingelheim Pharms, Inc.*, 2017 WL 2814728
   (Del. Super. Jun. 29, 2017) ....................................................................................................... 25

*Marchand v. Barnhill*, 212 A.3d 805 (Del. 2019) ....................................................................... 18

*Mariner Chestnut Partners, L.P. v. Lenfest*, 152 A.3d 265 (Pa. Super. 2016) ........................... 42

*Maxus Energy Corp.*, 2019 WL 647027 (Bankr. D. Del. Feb. 15, 2019) .............................. 52, 53

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs.*, 854 A.2d 121 (Del. Ch. 2004) ... 16

*Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773 (3d Cir. 2001) ....... 54, 57

*Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992) ........................................... 74

*Nemec v. Schrader*, 991 A.2d 1120 (Del. 2010) .......................................................................... 91

*New Hampshire v. Maine*, 532 U.S. 742 (2001) .......................................................................... 54

*Nicolet, Inc. v. Nutt*, 525 A.2d 146 (Del. 1987) .......................................................................... 22

*OC Tint Shop, Inc. v. CPFilms, Inc.*, 2018 WL 4658211 (D. Del. Sept. 27, 2018) ..................... 75

*Pack v. Beech Aircraft Corp.*, 132 A.2d 54 (Del. 1957) .............................................................. 25

ix

*Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268 (11th Cir. 2004)....................................................55

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)........................................................9

*Phillips v. Selig*, 959 A.2d 420 (Pa. Super. 2008) .......................................................................21

*Resolution Trust Corp. v. Farmer*, 865 F. Supp. 1143 (E.D. Pa. 1994) ................................41, 42

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (3d Cir. 1996) ................57

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*,
    181 F.3d 410 (3d Cir. 1999).......................................................................................................11

*Sample v. Morgan*, 914 A.2d 647 (Del. Ch. 2007) ..........................................................88, 89, 90

*Sands v. McCormick*, 502 F.3d 263 (3d Cir. 2007) .......................................................................11

*Saylor v. Lindsley*, 302 F. Supp. 1174 (S.D.N.Y. 1969).............................................................42

*Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) ...................................................................11, 79

*Schock v. Nash*, 732 A.2d 217 (Del. 1999)...................................................................................91

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786 (3d Cir. 1984).................10

*Shuker v. Smith & Nephew, PLC*, 885 F.3d 760 (3d Cir. 2018) ...................................................21

*Slobodian v. U.S. ex rel. I.R.S.*, 2014 WL 2041815 (M.D. Pa. May 12, 2014) ..........................80

*Stewart v. Wilmington Trust SP Servs., Inc.*, 112 A.3d 271 (Del. Ch. 2015) ..............................28

*Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362 (Del. 2006) .........................................12

*Stone v. Ritter*, 911 A.2d 362 (Del. 2006) ...................................................................................12

*Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246 (E.D. Pa. 2020)..........................................44

*Sunrise Ventures, LLC v Rehoboth Canal Ventures, LLC*, 2010 WL 363845 (Del. Ch. 2009)....35

*Sweda v. Univ. of Penn.*, 923 F.3d 320 (3d Cir. 2019) ................................................................81

*Taylor v. Comcast Cablevision of Arkansas, Inc.*, 252 F. Supp. 2d 793 (E.D. Ark. 2003) ..........55

*Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065
    (Del. Ch. Aug. 24, 2020)............................................................................................................17

*Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 2020 WL 2063474
    (E.D. Pa. Apr. 29, 2020) ............................................................................................................94

*Trowbridge v. Scranton Artificial Limb Co.*, 747 A.2d 862 (Pa. 2000)........................................54

*TrustCo Bank v. Mathews*, 2015 WL 295373 (Del. Ch. Jan. 22, 2015) ......................................26

*U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*,
    839 F.3d 242 (3d Cir. 2016).......................................................................................................93

*U.S. ex. rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125 (E.D. Pa. 2012) ......................11

*U.S. Nat'l Bank in Johnstown v. Chase Nat'l Bank of New York City*, 331 U.S. 28 (1947).........58

*VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108 (Del. 2005)....................26

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312 (Del. 2004) ........................................35

x

*Warehime v. Warehime*, 777 A.2d 469 (Pa. Super. 2001),
   *rev'd on other grounds*, 860 A.2d 41 (Pa. 2004) ........................................................ 12

*WaveDivision Holdings, LLC v. Highland Capital Mgmt. L.P.*, 2011 WL 13175837
   (Del. Super. Aug. 7, 2012) ........................................................................................... 26

*Weiss v. Swanson*, 948 A.2d 433 (Del. Ch. 2008) ........................................................ 89

*White v. George*, 66 Pa. D. & C.4th 129 (Ct. Com. Pl., Mercer Cty., 2004) ................ 88

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), *as revised* (June 27, 2016) ....... 51

*Wilkes ex rel. Mason v. Phoenix Home Life Mut. Ins. Co.*, 902 A.2d 366 (Pa. 2006) ................. 46

*Wilmington Trust, Nat'l Ass'n v. Unknown Heirs*, 219 A.3d 1173 (Pa. Super. 2019) ................ 45

*Wilson v. El-Daief*, 964 A.2d 354 (Pa. 2009) ............................................................... 40

*Wilson v. Parker*, 227 A.3d 343 (Pa. Super. 2020) ...................................................... 91

*ZRii, LLC v. Wellness Acquisition Group, Inc.*, 2009 WL 2998169 (Del Ch. Ct. 2009) ........ 22, 39

## Statutes & Rules

6 Del. C. § 1301 .............................................................................................. *passim*

6 Del. C. § 1302 .................................................................................................. 72

6 Del. C. § 1304 .............................................................................................. *passim*

6 Del. C. § 1305 .................................................................................................. 76

6 Del. C. § 1309 .................................................................................................. 63

10 Del. C. § 8106 ................................................................................................. 29

10 Del. C. § 8121 ............................................................................................. 25, 26

11 U.S.C. § 101 .................................................................................... 61, 65, 72, 82

11 U.S.C. § 108 ................................................................................................... 29

11 U.S.C. § 541 ................................................................................................... 59

11 U.S.C. § 544 ................................................................................................... 63

11 U.S.C. § 547 ......................................................................................... 77, 78, 79

11 U.S.C. § 548 .............................................................................................. *passim*

11 U.S.C. § 704 ................................................................................................... 79

20 U.S.C. § 1094 ................................................................................................... 5

28 U.S.C. § 1409 ................................................................................................. 25

28 U.S.C. § 1738 ................................................................................................. 45

42 Pa. C.S.A. § 5524 ........................................................................................ 29, 90

Federal Rule of Bankruptcy Procedure 7009 ......................................................... 9

DOCS_DE:231708.1 57092/001

Federal Rule of Bankruptcy Procedure 7012 .................................................................. 1

Federal Rule of Bankruptcy Procedure 7015 ................................................................ 92

Federal Rule of Bankruptcy Procedure 9011 ................................................................ 79

Federal Rule of Civil Procedure 8 ................................................................................ 67

Federal Rule of Civil Procedure 9 .................................................................................. 9

Federal Rule of Civil Procedure 12 ................................................................................ 1

Federal Rule of Civil Procedure 15 .............................................................................. 92

Small Business Reorganization Act of 2019, Pub. L. 116-54, Aug. 23, 2019, 133 Stat. 1079
(2019) (enacted) ..................................................................................................... 78, 79

**Other Authorities**

151 Cong. Rec. S1979-01, 2005 WL 497395 (Cong. Rec. Mar. 3, 2005) ............................. 69, 75

6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.) ..................................................................... 94

*American Bankruptcy Institute Commission to Study the Reform of Chapter 11: 2012~2014
Final Report and Recommendations*,
23 Am. Bankr. Inst. L. Rev. 1, 164 (Winter 2015) ...................................................... 78, 79

H.R. Rep. No. 116-671 (2019) ..................................................................................... 78

Restatement (Second) of Judgments § 24 ..................................................................... 51

DOCS_DE:231708.1 57092/001

Plaintiff George L. Miller, in his capacity as the Chapter 7 Trustee ("Plaintiff" or the "Trustee") for the jointly administered bankruptcy estates of the above-referenced debtors (collectively, the "Debtors"), submits this Omnibus Memorandum of Law in opposition to the motions to dismiss filed by Defendants J. Devitt Kramer, Mark Novad, Mark A. McEachen, Frank Jalufka, John Danielson, Todd S. Nelson, Samuel C. Cowley, John R. McKernan, Edward West, and Mick Beekhuizen (collectively, the "Defendants").

## I.      NATURE AND STAGE OF THE PROCEEDING

The Debtors filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code on June 29, 2018.  On June 17, 2020, the Trustee commenced the instant adversary proceeding by filing the Complaint.  The Trustee's Complaint asserts claims for breach of fiduciary duty, fraud, and civil conspiracy against the Debtors' former directors and officers, as well as claims for avoidance and recovery of fraudulent and preferential transfers made to certain of the Defendants and related claims for corporate waste and unjust enrichment in connection with those transfers. Defendants responded to the Complaint by filing motions to dismiss (collectively, the "Motions")[2] pursuant to Federal Rule of Civil Procedure 12(b)(6) (applicable here pursuant to Federal Rule of Bankruptcy Procedure 7012(b)), to which the Trustee objects and responds herein.

## II.      INTRODUCTION

The Complaint describes years of illegal business practices relating to the Company's recruiting and compensation schemes, which were designed to increase enrollment at all costs and tap into federal student loan funds, but which violated federal and state laws and regulations.  These

---

[2]      *See* D.I. Nos. 40 & 41 (motion to dismiss, and brief in support, of Defendants Kramer and Novad); D.I. Nos. 42 & 43 (motion to dismiss, and brief in support, of Defendants McEachen, Jalufka, and Danielson); D.I. Nos. 45 & 46 (motion to dismiss, and brief in support, of Defendants Nelson and Cowley); D.I. Nos. 48 & 49 (motion to dismiss, and brief in support, of Defendants McKernan, West, and Beekhuizen).

1

practices eventually caused hundreds of millions of dollars in damages and ultimately destroyed the Company.  Defendants' implementation and encouragement of these practices – including failing to take any action to reform the practices even after agreeing to do so in costly settlements with federal and state governments in November 2015 – form the basis for the Trustee's breach of fiduciary duty, fraud, and civil conspiracy claims.

Defendants violated the fiduciary duties they owed as directors and officers of the Company by operating the Company in an illegal manner.  Under Delaware law—which applies notwithstanding Defendants' mistaken advocation of Pennsylvania law—fiduciaries cannot cause the Company to violate the law (regardless of any potential profits that could arise from such activity) and must sufficiently oversee the Company's operations to ensure compliance with the law.  Given that the recruiting and compensation schemes described in the Complaint required false certifications and other misrepresentations to the Government, students, and creditors to perpetuate, the Trustee's allegations also support his claims for fraud.  And, by conspiring with one another to carry out the scheme, all Defendants are liable for the damages resulting to the Company – including Defendants who left the Company prior to the 2015 Settlements or the Petition Date.

The Trustee's claims are not time-barred—as the Complaint pleads a continuing course of conduct persisting through the sell-off of the Company's businesses in 2017 and 2018, well within the limitations period.  Moreover, as alleged in the Complaint, the claims did not accrue until the 2015 Settlements, when the Company suffered hundreds of millions of dollars in losses, and the injury for which the Trustee seeks redress was incurred.  And further, given that Defendants themselves were the individuals in control of the Company pre-petition, the Trustee is the first truly independent party in a position to bring the claims.

DOCS_DE:231708.1 57092/001

Nor are the Trustee's common law claims barred by doctrines of preclusion, judicial estoppel, or waiver as a result of prior derivative actions. The Trustee's claims include conduct and damages which post-date those actions, and do not implicate the issues pertaining to shareholder derivative standing that were litigated in those actions. And, while the Trustee may be in privity with the pre-petition Debtors for some purposes, he is *not* for purposes of preclusion here, as the interests of the Trustee and creditors diverge from those of the Company while under Defendants' control. Positions taken by the Company in the derivative or qui tam actions also do not give rise to judicial estoppel, given the complete absence of bad faith on the part of the Trustee. Courts have recognized that judicial estoppel has limits in the bankruptcy context, given the equitable nature of the doctrine. The Trustee has not made irreconcilable statements to the Court, and application of the doctrine here would unfairly hurt the Debtors' creditors.

The Trustee's fraudulent and preferential transfer claims are similarly well-pled. The Complaint alleges multiple badges of fraud concerning the severance and bonus payments made to certain Defendants while the Company was in a downward spiral and headed to bankruptcy – including lack of reasonably equivalent value, transfers to insiders, and insolvency – which provide conclusive evidence of actual fraudulent intent, and likewise support the Trustee's constructive fraud claims. The Complaint alleges that at the time of the payments the Company's liabilities exceeded their assets by hundreds of millions of dollars, and that the only "services" provided by Defendants in exchange for the payments were the perpetuation of illegal business practices which destroyed the Company. Furthermore, the Complaint sufficiently pleads that payments made within one year of the Petition Date were preferences, because, among other reasons, they were made in connection with Defendants' employment contracts. Defendants' factual disputes regarding the purportedly "worthless" nature of the property transferred (which is contradicted by

3

the very stipulation on which Defendants rely), the purported value of services they provided, or other matters have no bearing on whether the Trustee has stated his claims (which he has), and are not a basis for dismissal under Rule 12(b)(6).

Finally, given the circumstances surrounding the Excessive Payments, they constituted corporate waste on the part of the Company's officers and directors. When executive compensation is disproportionately large and lacking in consideration – as it is here – it can be sufficiently unconscionable so as to constitute waste.

Defendants' Motions should be denied.

## III.    BACKGROUND

Debtors Education Management Corporation ("EDMC") and subsidiaries (collectively, the "Company" or the "EDMC Companies")[3] were one of the largest for-profit providers of secondary education, but their exponential growth was fueled by illegal recruiting and compensation schemes which were implemented by and/or known to Defendants, and which resulted in fines and penalties exceeding $95 million, numerous consent decrees, the loss of more than $100 million of outstanding tuition receivables (by way of loan forgiveness), and ultimately the demise of the Company. *See* Compl., ¶¶ 2-3; *see also id.*, ¶¶ 13-22 (describing roles(s) and tenure with the Company of each of the Defendants).

EDMC was founded in 1962 and expanded over the next four decades – including by expanding the Art Institutes chain and acquiring Argosy Education Group, South University, and

---

[3]    The EDMC Companies' corporate structure includes (a) ultimate parent EDMC, a Pennsylvania corporation, (b) four intermediate holding companies (Education Management Holdings, LLC, Education Management LLC, Education Management Holdings II, LLC, and Education Management II LLC) (the "Delaware Holding Companies"), which are Delaware limited liability companies for which EDMC served as sole and managing member, and (c) numerous for-profit learning institutions that were wholly-owned subsidiaries of the Delaware Holding Companies. *See* Complaint ("Compl."), ¶ 10.

4

American Education Centers – with enrollment of approximately 50,000 at EDMC-owned schools in 2003. *Id.*, ¶¶ 23-28. In 2006, Congress deregulated online education by removing the "50/50 Rule" which had required institutes of higher education to enroll more than half of their students in campus-based programs (as opposed to online programs) to obtain full access to federal funding of student loans. *Id.*, ¶ 29.[4] This led to explosive growth at for-profit educational institutions offering primarily online course offerings, as well as an explosion in private equity investments in such institutions. *Id.*, ¶¶ 30-31. In 2006, EDMC was acquired in a $3.4 billion highly leveraged buyout by a consortium of private equity investors, who, in order to service the substantial debt incurred as part of the LBO, changed the culture of EDMC to pursue aggressive growth strategies that undermined academic quality and opportunity, and were instead driven by unlawful recruiting and enrollment practices. *Id.*, ¶¶ 32-33, 35-37. The Company's new focus on online enrollment, with its easy access to federal student loan funds, fueled explosive growth, with online student enrollment (of 4,000 in 2006) increasing tenfold in the following five years – driven by aggressive recruiting of unqualified students. *Id.*, ¶¶ 34, 38.

Defendant Nelson became EDMC's CEO in January 2007. *Id.*, ¶ 36. Nelson had previously run the for-profit University of Phoenix ("Phoenix"), leaving after a settlement with the Department of Education for Phoenix's unlawful and predatory recruiting practices. *Id.*, ¶¶ 36, 42-43. The Company nonetheless hired Nelson and at least ten other former Phoenix officials, and

---

[4]     Under Title IV of the Higher Education Act of 1965, Congress established various student loan and grant programs. Compl., ¶ 75. To become eligible to receive or to have its students receive Title IV funding, a post-secondary educational institution must enter into a program participation agreement ("PPA") with the Department of Education, which requires compliance with certain statutory requirements. *Id.*, ¶¶ 77-78. One such requirement is that schools: "Will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance ...." 20 U.S.C. § 1094(a)(20) (the "Incentive Compensation Ban"); Compl., ¶ 79.

– under Nelson's direction – implemented the same illegal playbook (including the use of a performance chart known as "the matrix") to EDMC. *Id.*, ¶¶ 41, 43-45. To carry out this plan, the Company drastically increased its number of Assistant Directors of Admissions ("ADAs"), the euphemism attributed to the boiler room of recruiters, and by 2010 employed 5,669 recruiters, for its 158,300 students (resulting in one recruiter for every 28 students). *Id.*, ¶¶ 47-48. ADAs were encouraged and incentivized by EDMC management to dramatically increase student enrollment without regard for requirements of accrediting agencies, and were illegally rewarded with direct or indirect commission payments for each student enrolled. *Id.*, ¶ 49; *see also id.*, ¶¶ 50-54 (describing ADA training materials).

These practices drew the attention of federal and state governments, which conducted investigations of the recruiting practices employed by EDMC, and were also the subject of qui tam actions filed in the Western District of Pennsylvania. *See id.*, ¶¶ 56-60, 67-68 (summarizing investigations conducted by federal and state governments); *id.*, ¶¶ 61, 65. On May 3, 2011, a qui tam action captioned *United States of America, and the States of California, Florida, Illinois, Indiana, Massachusetts, Minnesota, Montana, New Jersey, New Mexico, New York and Tennessee, and the District of Columbia, each ex rel., Lynntoya Washington and Michael T. Mahoney v. Education Management Corporation, et. al.* (the "Government qui tam Action"), filed under the federal False Claims Act in April 2007 in the United States District Court for the Western District of Pennsylvania, was unsealed as a result of the Government's intervention in the case. *Id.*, ¶ 61 and Ex. B. In March 2012, another qui tam action, captioned *United States of America, ex rel. Jason Sobek v. Education Management Corporation, et al.* (the "Sobek qui tam Action" and collectively with the Government qui tam Action, the "Qui tam Actions") and filed in January 2010, was also unsealed. *Id.*, ¶ 65 and Ex. C. The Qui tam Actions focused primarily on violations

6

in connection with EDMC's receipt of more than $11.1 billion in Title IV funding between 2003 and 2011, and alleged, *inter alia*, that, under the direction of Nelson and other Defendants, EDMC compensated ADAs and others based upon the number of new students enrolled, in violation of the Incentive Compensation Ban, and operated a "boiler room" style sales culture solely focused on increasing enrollment numbers, without regard for academic qualifications or other "quality factors." *Id.*, ¶¶ 63-64, 66, 69-72, 91-92, 95-101, 103, 110.  Despite these illegal practices (and Defendants' knowledge thereof), the Company submitted PPAs and certifications for annual compliance audits that falsely certified the Company's compliance with the Incentive Compensation Ban and other Title IV requirements. *Id.*, ¶¶ 83-90, 106-08.

In November 2015, the Company reached a settlement with the U.S. Department of Justice, 12 state attorneys general, the District of Columbia, and relators resolving the Qui tam Actions and other cases filed under federal and state False Claims Act provisions. *Id.*, ¶ 117 and Ex. D (Settlement Agreement).[5]  Concurrently, the Company settled investigations which were being conducted by a consortium of 38 states and the District of Columbia (the "Consumer Protection Consortium"). *Id.*, ¶¶ 68, 117.  In connection with the 2015 Settlements, the Company paid $95.5 million (to be distributed among the United States, the various states, and the relators). *Id.*, ¶ 118. The 2015 Settlements also resulted in Consent Judgments entered in state courts for the states involved in the Consumer Protection Consortium, which required, *inter alia*, reforms to the EDMC Companies' operations and forgiveness of $102.8 million in loans made to EDMC students. *Id.*, ¶ 119.

---

[5]    The settlements effectuated by the Settlement Agreement are referred to collectively herein as the "2015 Settlements."

7

The 2015 Settlements and the revelation of the Company's illegal practices sent the Company into a downward spiral from which it never recovered. *Id.*, ¶ 122  Yet, Defendants made no efforts to reform the Company's practices or comply with the Consent Judgments – and instead merely continued the illegal scheme and continued to put the Company at risk for further fines, penalties, and other monetary harm. *Id.*, ¶¶ 90, 131; *see also id.*, ¶ 133 (setting forth red flags that should have alerted Defendants to the EDMC Companies' illegal recruiting practices and other unlawful conduct, which include not only knowledge of Nelson's playbook, the Qui tam Actions, and board meetings, but also expressions of concern from members of Congress in 2017 and lawsuit filed by the Massachusetts attorney general in 2018 concerning the Company's continuing recruiting practices).

While the Debtors disintegrated, certain Defendants looted them of more than $20 million via unwarranted bonus and severance payments. *Id.*, ¶¶ 4, 135-41.  Though the Debtors had been insolvent since at least June 30, 2014 (when liabilities exceeded assets by almost $300 million) and continued to be so through the Petition Date (*see id.*, ¶¶ 113, 142), they made millions of dollars in payments to the Defendant insiders (collectively, the "Excessive Payments") without receiving reasonably equivalent value (especially in light of said Defendants' participation in the wrongdoing that caused the Debtors' demise). *See id.*, ¶ 136 and Ex. G ($13.7 million in payments to McEachen); *id.*, ¶ 137 and Ex. H ($2.2 million in payments to Jalufka); *id.*, ¶ 138 and Ex. I ($2.4 million in payments to Kramer); *id.*, ¶ 139 and Ex. J ($1.4 million in payments to Novad); *id.*, ¶ 140 ($965,000 payment to Danielson); *id.*, ¶ 141 ($262,000 payment to Beekhuizen); *id.*, ¶ 143.[6]

---

[6]    Defendants McEachen, Jalufka, Kramer, Novad, Danielson, and Beekhuizen are referred to herein as the "Transferee Defendants."

The Trustee commenced this adversary proceeding on June 17, 2020. The Complaint asserts claims for breach of fiduciary duty (Count I), Fraud (Count II), and Civil Conspiracy (Count III) against all Defendants for their roles in implementing and perpetrating illegal recruiting and enrollment practices and making false and fraudulent misrepresentations in connection therewith. The Complaint also asserts claims for Corporate Waste (Count IV), Unjust Enrichment (Count V), avoidance of actual and constructive fraudulent transfers under the Bankruptcy Code (Counts VI and VII) and under Delaware law (Count IX), avoidance of preferential transfers (Count VIII), and recovery of the avoided transfers (Count X) against the Transferee Defendants, relating to their receipt of bonus and severance payments.

## IV.    MOTION TO DISMISS STANDARD

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Because they sound in fraud, the Trustee's claims for common law fraud and actual fraudulent transfer are generally subject to Federal Rule of Civil Procedure 9(b), which is applicable here by Federal Rule of Bankruptcy Procedure 7009 and states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). "[T]he requirement of particularity does not require 'an exhaustive cataloging

9

of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated … the alleged fraud and reasonably believes that a wrong has occurred.'" *Household Int'l, Inc. v. Westchester Fire Ins. Co.*, 286 F. Supp. 2d 369, 373 (D. Del. 2003) (citations omitted) (alteration in original).

The purpose of requiring plaintiffs to plead the "circumstances" of the alleged fraud "with particularity" is to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984), *abrogated in part on other grounds by Twombly*, 550 U.S. at 557. "It is not a defendant's fraudulent intent that must be pled with particularity, but the circumstances constituting fraud." *In re Charys Holding Co.*, 2010 WL 2774852, at *3 (Bankr. D. Del. July 14, 2010). While "allegations of 'date, place or time' fulfill these functions, … nothing in the rule requires them," and thus "Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Indus.*, 742 F.2d at 791. Moreover, it is well-settled that "[a] bankruptcy trustee, as a third party outsider to the debtor's transactions, is generally afforded greater liberality in pleading fraud." [7] *In re Am. Bus. Fin. Servs., Inc.*, 384 B.R. 80, 85 (Bankr. D. Del. 2008); *see also In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009).

For purposes of Rule 12(b)(6), "the court relies on the complaint, exhibits attached to the complaint, and matters of public record, including other judicial proceedings." *Kane v. Chester County Dep't of Children, Youth and Families*, 10 F. Supp. 3d 671, 680 (E.D. Pa. 2014) (citing

---

[7] This point is particularly salient here because, as the Complaint alleges, "[i]n January 2017 . . . the DCF Buyers took possession and control of substantially all of the Company's books and records." Compl., ¶ 130.

*Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007)); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (court may also consider an extrinsic document if it is "integral to or explicitly relied upon" in the complaint).  While the Court may take judicial notice of public records, "[s]uch notice serves only to indicate what was in the public realm at the time, not whether the contents of those documents are true."  *U.S. ex. rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 139-40 (E.D. Pa. 2012); *see also S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) (court may judicially notice another court's opinion "not for the truth of the facts recited therein, but for the existence of the opinion").

"The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case."  *In re Student Fin. Corp.*, 335 B.R. 539, 546 (D. Del. 2005).  The plaintiff is not required to anticipate, overcome, or "plead around" affirmative defenses in the complaint.  *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014) (citing *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004)); *see also In re DVI, Inc.*, 2008 WL 4239120, at *11 (Bankr. D. Del. Sept. 16, 2008) ("An affirmative defense with disputed facts is not a proper basis to dismiss a complaint.").

## V.    ARGUMENT

### A.    The Complaint States Claims for Breach of Fiduciary Duty, Fraud, and Civil Conspiracy (Counts I Through III) Against the Defendants

The Complaint details years of corruption and illegal activity committed by Defendants, which ultimately destroyed the Company.  Defendants caused and/or allowed the Company to operate in violation of federal law, failed to investigate red flags that could have stopped those violations, and exposed the Company to enormous liability that ultimately resulted in the 2015 Settlements.  Because "Delaware law does not charter law breakers," *In re Massey Energy Co.*,

11

2011 WL 2176479, at *20 (Del. Ch. May 26, 2011), the allegations in the Complaint more than suffice to state claims for breaches of the fiduciary duties of loyalty and care, as well as for fraud and civil conspiracy.[8]

### 1.    The Complaint States a Claim for Breach of Fiduciary Duty

The Complaint sufficiently alleges Defendants' breaches of the fiduciary duties of loyalty and care under Delaware law.[9]  *See, e.g.*, *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 32-33 (Del. Ch. 2014).  The duty of loyalty (within which the duty of good faith is subsumed) requires fiduciaries to avoid financial or other cognizable fiduciary conflicts of interest.  *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *10 (Del. Ch. Oct. 20, 2014); *see also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ("[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.").  The fiduciary duty of loyalty is breached, *inter alia*, (1) when fiduciaries fail to act in the face of a known duty to act, demonstrating a conscious disregard for their responsibilities; (2) when fiduciaries "abdicate" their responsibilities; and/or (3) when fiduciaries fail to act in good faith.  *See, e.g.*, *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 278 (Del. Ch. 2003).  Fiduciaries of Delaware entities are considered to have abdicated their responsibilities and duties – and thus violated their duty of loyalty – when they knowingly

---

[8]    As discussed *infra* Section V.B.1, Delaware law applies to the Trustee's claims.  In any event, the Trustee's claims are sufficiently stated under either Delaware or Pennsylvania law.

[9]    If the Court were to apply Pennsylvania law (which it should not), Defendants owed the same duties of loyalty and care, and the Trustee's claims are sufficiently alleged under that jurisdiction's law as well.  *See, e.g.*, *Wareheim v. Wareheim*, 777 A.2d 469, 482, (Pa. Super. 2001), *rev'd on other grounds*, 860 A.2d 41 (Pa. 2004) (directors and officers owe duties of loyalty and care under Pennsylvania law).

cause the entity to seek profit by violating the law.  *See, e.g.*, *Massey Energy*, 2011 WL 2176479, at *20.

The duty of care requires fiduciaries to manage the company with the "care which ordinarily careful and prudent men would use in similar circumstances" and not act with gross negligence.  *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).  Gross negligence is defined as "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *In re DSI Renal Holdings, LLC*, 574 B.R. 446, 470 (Bankr. D. Del. 2017); *see also In re Pitt Penn Holding Co.*, 484 B.R. 25, 55 (Bankr. D. Del. 2012) (allegations that officer "knew or was reckless in not knowing" that the company's public statements were false stated claim for breach of fiduciary duty).  If a breach of fiduciary duty claim is based on a failure to sufficiently oversee the company's affairs, the plaintiff must plead that the directors or officers "knew or should have known that violations of the law were occurring, that they took no good faith steps to ameliorate the situation, and that the company suffered losses as a result."  *Buckley v. O'Hanlon*, 2007 WL 956947, at *3 (D. Del. Mar. 28, 2007) (citing *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996)).

The Complaint contains extensive allegations of Defendants' behavior that breached these fiduciary duties.  Among other things, the Complaint alleges that:

- Defendants caused the EDMC Companies to operate in violation of the federal laws and regulations applicable to the Debtors' ownership and management of post-secondary for-profit learning institutions.  Compl., ¶¶ 3, 111.

- Defendants instituted, implemented, and continued using an "illegal playbook" for increasing the Company's profits.  *Id.*, ¶ 44.

13

- Defendants encouraged the Company's boiler room of recruiters to dramatically increase student enrollment by "systemic abusive, deceptive, fraudulent and unlawful recruiting practices." *Id.*, ¶¶ 49, 101.

- EDMC, with the knowledge and acquiescence of its management and Boards, submitted false certifications to the Department of Education concerning its compliance and financial audits. *Id.*, ¶¶ 55, 83, 88.

- The unlawful practices included misleading prospective students aggressively targeting low-income and vulnerable populations, and improperly compensating staff based on student enrollments. *Id.*, ¶ 60.

- Pursuant to Defendants' plan and conduct, an employee's compensation level and bonuses were based solely on success in obtaining student enrollments, in violation of federal law. *Id.*, ¶¶ 63, 70-71.

- Defendants' illegal behavior put EDMC at risk for enormous liability for continuing violations of state and federal law and threatened its receipt of federal student aid funds. *Id.*, ¶¶ 73, 82.

- Defendants failed to adopt, implement, or monitor systems and procedures reasonably necessary to ensure the Company's compliance with the federal and state laws applicable to its online student programs. *Id.*, ¶ 132.

- Defendants failed to act upon numerous "red flags that should have alerted the Defendants as to the EDMC Companies' illegal recruiting practices and other unlawful conduct." *Id.*, ¶ 133. These red flags were recklessly and/or willfully ignored by Defendants. *Id.*

14

The business judgment rule is not a basis for the dismissal of the Trustee's claims.  The business judgment rule presumes that a fiduciary's decisions are made on an informed basis, in good faith, and with the honest belief that the action taken was in the best interests of the company. *Orchard Enters.*, 88 A.3d at 33-34.  Applicability of the business judgment rule is an affirmative defense to be developed after discovery, and typically is not appropriate for determination at the motion to dismiss stage.  *In re Total Containment, Inc.*, 335 B.R. 589, 606-07 (Bankr. E.D. Pa. 2005); *In re Simplexity, LLC*, 2017 WL 65069, at *8 (Bankr. D. Del. Jan. 5, 2017) ("The difficulty with the business judgment rule arguments by the Defendants is that the rule is also an affirmative defense and not to be considered on a Rule 12(b)(6) motion to dismiss.").

Moreover, a plaintiff may "plead around the business judgment rule" by plausibly alleging violations of "any one of [the] triad of fiduciary duties: due care, loyalty, or good faith." *DSI Renal Holdings*, 574 B.R. at 471 (citing *In re Troll Commc'ns, LLC*, 385 B.R. 110, 118 (Bankr. D. Del. 2008)).  Here, the Trustee has pled around the business judgment rule by demonstrating that Defendants were running a corrupt and illegal business, which violates all three fiduciary duties in the triad.  The allegations in the Complaint do not simply consist of "a laundry list of business decisions spanning the past ten years," as Defendants contend.  *See* KN Br., pp. 26-27.[10] Rather, they set forth a detailed exposition of a fraudulent and illegal operation that ultimately resulted in hundreds of millions of dollars in liability and the demise of the Company.  Defendants' conduct "was not a good faith exercise of prudent business judgment" because, among other things, Defendants (a) acted in bad faith, (b) had knowledge of improprieties that they encouraged

---

[10]    As used herein: "KN Br." refers to Kramer and Novad's brief (D.I. 41); "NC Br." refers to Nelson and Cowley's brief (D.I. 46); "MWB Br." refers to McKernan, West, and Beekhuizen's brief (D.I. 49); and "MJD Br." refers to McEachen, Jalufka, and Danielson's brief (D.I. 43).  Each of Defendants' respective briefs incorporates by reference the dismissal arguments made by the other Defendants.

rather than terminated, (c) engaged in violations of applicable laws and regulations, and (d) behaved in a manner that was reckless and egregious. Compl., ¶ 158. In addition, the presumptions of the business judgment rule do not apply when a fiduciary has engaged in fraud, as the Complaint alleges that Defendants did here. *See Walt Disney*, 907 A.2d at 747 (business judgment rule applies "when there is no evidence of fraud, bad faith or self-dealing . . ."); *Total Containment*, 335 B.R. at 606 (same).

Allegations that "raise a reason to doubt that [director] action was taken in good faith or on an informed basis" – such as when directors fail to actively monitor corporate performance, consciously disregard red flags, or make decisions constituting corporate waste – suffice to rebut the presumption of the business judgment rule. *Buckley*, 2007 WL 956947, at *5; *see also In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 569 (Bankr. D. Del. 2008) (where company's loss results from "director inaction," such as by "'sustained or systematic failure' of a director to exercise reasonable oversight," then "the protections of the business judgment rule do not apply"). Failure to take any action in the face of the red flags described in the Complaint constitutes a lack of good faith in ameliorating the situation. *See Walt Disney*, 907 A.2d at 755 ("Deliberate indifference and inaction in the face of a duty to act … is the epitome of faithless conduct.").

In addition, Delaware courts are clear that fiduciaries cannot cause or permit a company to act illegally, even if they believe that doing so will increase the Company's profits. In *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs.*, 854 A.2d 121 (Del. Ch. 2004), certain employees of an LLC were obtaining telecommunications permits in Brazil through bribery. When the scandal was revealed, the company tanked. *Id.* at 130. The Chancery Court upheld the breach of fiduciary duty claims against the managers to the extent that they were aware of the bribery. According to the court, "[f]or obvious reasons, the complaint also pleads a fiduciary duty

16

claim against those defendants who had knowledge of the bribery at the time of its occurrence. Under Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity." *Id.* at 131. In *In re Massey Energy Co.*, 2011 WL 2176479, at *7 (Del. Ch. May 26, 2011), a coal mining company had a massive explosion at a mine in which twenty-nine people died, and the company had been regularly accused of violating important safety regulations. Thereafter, stockholders brought a derivative action to challenge a proposed merger. *Id.* at *1-*2. Although the Chancery Court denied an injunction to stop the merger, it found that the complaint likely stated a claim for breach of fiduciary duty against the directors, writing that "Delaware law does not charter law breakers. Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.'" *Id.* at *20; *see also In re Health Diagnostic Lab., Inc.*, 2018 WL 4676339 (Bankr. E.D. Va. Sept. 26, 2018) (company reached a large settlement with the government for violations of the False Claims Act, which caused financial turmoil that sent the company into bankruptcy, and the court held that the complaint stated a claim for breach of fiduciary duty). Defendants thus breached their duty of loyalty by causing the Company to break the law. *Massey Energy*, 2011 WL 2176479, at *20 ("[A] fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law.").

Moreover, it is a breach of the fiduciary duty of care when lack of oversight on the part of a fiduciary causes the Company's failure to company with the law. In *Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065 (Del. Ch. Aug. 24, 2020), a prescription drug distributor pooled excess oncology drugs from syringes that were overfilled, and repackaged them

in violation of federal law.  The court found that the complaint stated breach of fiduciary duty claims based on the failure of board members to properly monitor the company's activities and failure to respond to red flags concerning the illegal behavior.  *Id.* at \*16-\*17.  Similarly, in a recent decision, *Marchand v. Barnhill*, 212 A.3d 805 (Del. 2019), the Delaware Supreme Court found that the plaintiffs sufficiently stated a claim against officers who did not oversee an ice cream company's compliance with FDA and state health regulations, which led the company to shutter its operations.  The Court wrote, "[w]hen a plaintiff can plead an inference that a board has undertaken no efforts to make sure it is informed of a compliance issue intrinsically critical to the company's business operation, then that supports an inference that the board has not made the good faith effort that *Caremark* requires."  *Id.* at 822.  Based on these authorities and on the allegations in the Trustee's Complaint, Defendants' lack of oversight in light of the pervasive red flags detailed in the Complaint certainly state a claim for breach of fiduciary duty.  As the Complaint makes clear, compliance with Title IV student loan regulations was as intrinsically critical to EDMC, if not more so, as the food establishment's compliance with food safety regulations in *Marchand*.

Finally, Defendants' reliance on the findings of a Special Litigation Committee in 2011 is misplaced.  First, this argument brings in facts extrinsic to the Complaint and therefore is not appropriate for consideration on a motion to dismiss.  *See Total Containment*, 335 B.R. at 606 (rejecting defendant's attempt to apply business judgment rule at pleading stage based on factual assertations outside of those raised in the complaint).  Second, the Complaint alleges that these breaches of duty continued to occur well beyond the time of the 2011 report cited by Defendants. Just because that committee failed to pursue claims for breach of fiduciary duty in 2011 does not mean that those breaches did not exist, particularly *after* 2011, during which time the Trustee

alleges the misconduct continued unabated.  A committee report from 2011 should not be used as a basis for barring claims based on conduct which continued well beyond that time.  Moreover, even the *OLERS* opinion cited in Defendants McEachen, Jalufka, and Danielson's brief acknowledges that a prior decision by the Board of Directors would have to be given deference only "in the absence of fraud or self-dealing."  *See* MJD Br., p. 14.  Of course, here the Trustee alleges fraud with regard to the entire operation of the Company's business.

The allegations in the Complaint more than suffice to state a claim for breach of fiduciary duty under Delaware law or Pennsylvania law.

### 2.    The Complaint States a Claim for Fraud

The Complaint's detailed allegations of Defendants' fraudulent and illegal enterprise sufficiently state a claim for common law fraud.  In order to set out a claim for fraud under Delaware law, the plaintiff must "plead facts supporting an inference that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance." *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).[11] Determinations of justifiable reliance present issues of fact which are "more properly addressed at trial," not on a motion to dismiss.  *In re Am. Bus. Fin. Servs., Inc.*, 384 B.R. 80, 90 (Bankr. D. Del. 2008).

---

[11]    Were the Court to apply Pennsylvania law, which it should not, the elements of common law fraud are similar.  *See, e.g.*, *Colaizzi v. Beck*, 895 A.2d 36, 39 (Pa. Super. 2006) (elements of common law fraud are "(1) misrepresentation of a material fact; (2) scienter; (3) intention by the defendant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5) damage to the party defrauded as a proximate result.").

The Complaint contains a wealth of allegations describing the illegal operation that the Company ran under the direction of Defendants.  Defendants committed fraud throughout the time they were each involved with the Company by lying to the government and students and hiding that conduct from the Company's shareholders and creditors.  *See* Compl., ¶¶ 83-90, 107 (alleging false certifications made concerning Company's compliance with regulations and other requirements, which continued to be made until the Petition Date and concealed the true nature of the Debtors' business practices), ¶¶ 100-01 (allegations concerning fraudulent recruiting practices), ¶ 165.  Defendants hid this illegal conduct as they "defended the company's conduct, disputed its liability, and consistently maintained that its business operations complied with federal and state law and regulations" right up to the time of the 2015 Settlements.  *Id.*, ¶ 120.  As the Complaint alleges, the "fraud was ongoing and continued through and beyond the Petition Date, concealing the true nature of Defendants' behavior while assuring Debtors, shareholders, creditors, the government and students that the EDMC Companies were complying with federal regulations." *Id.*, ¶ 90.  Moreover, the Complaint alleges that these misrepresentations injured the Debtors and their creditors.  *See id.*, ¶ 164 (by "engaging in the wrongdoing alleged [in the Complaint], the Defendants committed fraud and deceit against the Debtors and their creditors.").  Defendants' failure to rectify these practices even after the 2015 Settlements further defrauded the Debtors' creditors, who justifiably relied on Defendants to carry out their duties to run the company honestly and without deceit and justifiably relied on representations in the 2015 Settlements that the Debtors' recruiting practices would be reformed.  *See id.*, ¶¶ 119, 133(k)-(o).  The Debtors were injured to the tune of over $200 million and now the Trustee, standing in the shoes of the Debtors, is the only person in a position to recover for this fraud.

The heightened pleading standard which applies to fraud claims is met here.  Pleading with particularity does not mean that the plaintiff must plead "every material detail of the fraud such as date, location and time."  *In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002).  Rather, the plaintiff must "inject precision or some measure of substantiation into a fraud allegation."  *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 778 (3d Cir. 2018).  The Complaint's specific allegations as to the fraudulent nature of the entire enterprise and as to conduct and misrepresentations undertaken to cover up the illegal behavior meets this standard.  This behavior included fraudulently certifying that the Company was complying with federal law in submissions made to the Department of Education as well as in the course of annual compliance audits.  *See* Compl., ¶¶ 87-88.  Because the Trustee's allegations support the elements of fraud and are pled with sufficient particularity, Defendants' motions to dismiss Count II should be denied.

### 3.    The Complaint States a Claim for Civil Conspiracy

The Complaint's allegations of Defendants' unlawful scheme describe and set forth a conspiracy under Delaware law.  Stating a claim for conspiracy under Delaware law requires the plaintiff to plead facts supporting (1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff.  *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006).[12]  The common purpose of the conspiracy is alleged in detail throughout the Complaint.  In short, it was to increase the number of students for the EDMC

---

[12]    Under Pennsylvania law, civil conspiracy contains the same elements.  *See, e.g.*, *Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. 2008) (elements of civil conspiracy claim are "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage") (citations omitted).

21

schools as much as possible by any means necessary, including illegal means.  *See, e.g.*, Compl., ¶ 91.

The Complaint sets out the extensive conspiracy involved in running the Company illegally, and unlawful conduct done in furtherance thereof.  It explicitly alleges that Defendants conspired with each other, and with the individual EDMC schools "to perpetrate, facilitate, and perpetuate the breaches of fiduciary duty, fraud, violations of federal law and other wrongs alleged herein."  *Id.*, ¶ 168.  It alleges, for example, that Defendant Nelson was the architect of the Company's illegal recruiting and compensation scheme.  *See, e.g.*, *id.*, ¶¶ 44, 110.  Defendant McKernan signed false PPAs for the EDMC institutions, which were later signed by the individual school presidents, furthering the conspiracy among Defendants and the individual institutions.  *Id.*, ¶¶ 83-84.  As for the other Defendants, they are alleged to have been well aware of the Company's illegal business practices, but simply rubber-stamped them and eschewed any efforts to reform them.  *See, e.g.*, *id.*, ¶¶ 108, 110, 133.

Where a claim for civil conspiracy is pled, "all conspirators will be vicariously liable for the acts of co-conspirators in furtherance of the conspiracy."  *Allied Capital*, 910 A.2d at 1036 (citing *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del. 1987); *Laventhol, Krekstein, Horwath and Horwath v. Tuckman*, 372 A.2d 168, 170 (Del. 1976)).  A conspirator continues to be liable for the acts of his co-conspirators even if he leaves the company.  *See, e.g.*, *ZRii, LLC v. Wellness Acquisition Group, Inc.*, 2009 WL 2998169, at *12 (Del Ch. 2009) ("The fact that Defendants ceased to be employed by and to owe fiduciary duties to Zrii does not mean the conspiracy cannot continue after February 2, 2009, and does not absolve them from responsibility for their own acts *and those of their co-conspirators* after that date in furtherance of the conspiracy.") (emphasis added).  Thus, here, all Defendants are liable for the acts of the other Defendants in furtherance of

22

the conspiracy, *including* those Defendants which set the conspiracy in motion but later left the Company. *See* Compl., ¶¶ 36-37, 44, 46, 50, 55, 83 (allegations concerning Nelson's implementation of illegal playbook and matrix that had been used at the University of Phoenix, during which time McKernan was also on the Board), ¶¶ 106-11 (alleging all Defendants' knowledge and furtherance of the scheme), ¶ 170 (alleging that each Defendant failed to withdraw from the conspiracy because he did not blow the whistle and instead remained silent as to the wrongdoing, which was merely continued by the remaining co-conspirators).

### 4.    The Allegations are Sufficiently Specific as to Each Defendant

The allegations in the Complaint are specific enough to set forth claims against each Defendant. Defendants accuse the Trustee of simply engaging in so-called "group pleading," which, they argue, makes the Complaint insufficient. This is wrong. The Complaint details each Defendant's role at EDMC, *see id.*, ¶¶ 12-22, and includes specific claims regarding the conduct of individual Defendants throughout. To the extent that certain paragraphs are alleged in terms of conduct the Defendants as a group engaged in or allowed to happen, the Complaint is pleaded in that fashion because all of the Defendants collectively engaged in that behavior. In such instances, allegations of conduct by the group sufficiently plead a breach of fiduciary duty claim. *See Buckley*, 2007 WL 956947, at *5 (stating a claim for breach of fiduciary duty does not require a plaintiff to "associate specific parties to particularized conduct" when "much of the alleged conduct involved collective action and decision making"); *In re Genesis Health Ventures, Inc.*, 355 B.R. 438, 457 (Bankr. D. Del. Dec. 13, 2006) (collective references to certain groups of defendants did not render the pleadings defective, and made sense because the allegations arose out of group action on the part of a committee).

Even with regard to the allegations of fraud and the heightened pleading standards applied to it, 'there is no per se rule that group pleading cannot satisfy Rule 9(b).'" *Id.* at 455. Here, as in *Genesis Health*, the Trustee has "clearly provided a statement of facts upon which [his] allegations are based." *Id.* at 456. Nothing more is required at the pleading stage. Moreover, the Complaint sufficiently alleges a conspiracy in which all Defendants engaged to commit and further their breaches of fiduciary duty and fraud. Here, the Complaint plausibly alleges that Defendants acted collectively to engage in unlawful behavior that ultimately cost the company over $200 million and led to its collapse.

**B.      Counts I Through III Are Not Barred By The Statute of Limitations**

**1.      Delaware's Three-Year Statute of Limitations Applies to the Trustee's Claims**

As an initial matter, the parties dispute which statute of limitations should apply to the Trustee's tort claims. In the Trustee's view, Delaware law and its three-year statute of limitations applies. In Defendants' mistaken view, Pennsylvania's two-year statute of limitations should apply. For the reasons that follow, the Trustee's view is correct, and Delaware's three-year statute of limitations applies.

In its choice of law analysis, this Court must apply the choice of law rules of the forum state, Delaware. *See In re Integrated Health Servs., Inc.*, 304 B.R. 101, 106 (Bankr. D. Del. 2004) ("[W]e must first determine which state's law should apply using the choice of law rules of the forum state.") (citing *In re Eagle Enters., Inc.*, 223 B.R. 290, 292 (E.D. Pa. 1998)). Applying these rules, Delaware law, and its statutes of limitations, apply to the Trustee's claims.

**a.      The Statute of Limitations of Delaware, the Forum State, Should Apply**

24

Under Delaware common law, the statute of limitations of the forum state applies. *See CHC Invs., LLC v. FirstSun Capital Bancorp.*, 2020 WL 1480857, at *4-*5 (Del. Ch. Mar. 23, 2020) (citing *Pack v. Beech Aircraft Corp.*, 132 A.2d 54, 57 (Del. 1957)). However, Delaware applies a borrowing statute as an exception to the common law rule, which states that a cause of action arising outside of Delaware cannot be brought "after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose . . .." 10 Del. C. § 8121. Delaware courts have repeatedly found that the purpose of the borrowing statute is to avoid forum-shopping, in which a plaintiff would bring a claim in Delaware that would have expired under the statute of limitations in the jurisdiction where the claim arose. *See, e.g.*, *CHC Invs.*, 2020 WL 1480857, at *5 ("Because the borrowing statute was intended to eliminate forum-shopping incentives, the statute is most true to its purpose when applied to claimants who choose to litigate in Delaware.").

Delaware courts have created exceptions to the borrowing statute where no forum-shopping concerns exist. *See, e.g.*, *Machala v. Boehringer Ingelheim Pharms, Inc.*, 2017 WL 2814728, at *5 (Del. Super. Jun. 29, 2017) ("The *Furnari* court thus crafted an exception that preserved plaintiff's claim when plaintiff was forced, for jurisdictional reasons, to file in Delaware.") (citing *Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *6 (Del. Super. Apr. 16, 2014)). Here, the Trustee filed the Adversary Proceeding in this Court because it is the appropriate venue under 28 U.S.C. § 1409(a). *See* Compl., ¶ 7. This was not done for forum-shopping purposes; thus, the concerns underlying the borrowing statute do not apply and this Court should simply apply the statute of limitations of Delaware. *See In re Mervyn's Holdings, Inc.*, 426 B.R. 488, 503 (Bankr. D. Del. Mar. 17, 2010) ("There is absolutely no threat of forum shopping and the Delaware 'borrowing' statute is inapplicable.").

DOCS_DE:231708.1 57092/001

In addition, the borrowing statute does not apply to shorten statutes of limitations against Delaware residents. *See* 10 Del. C. § 8121 ("Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply."). As courts have consistently recognized, the Chapter 7 Trustee "stands in the shoes of the debtor." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir. 1989). The Delaware Holding Companies were Delaware residents for these purposes at the time the causes of action accrued, and thus the Delaware statute of limitations should apply to the Trustee, who now brings these claims standing in the shoes of the Delaware Holding Companies. *See WaveDivision Holdings, LLC v. Highland Capital Mgmt. L.P.*, 2011 WL 13175837, at *8 (Del. Super. Aug. 7, 2012) (applying Delaware's three-year statute of limitations to tortious interference claim brought by Delaware LLC rather than Texas's two-year statute).

### b. The Causes of Action Arose in Delaware

Even if the Court were to find that there is no applicable exception to the borrowing statute, the causes of action arose in Delaware. Therefore, there is no need to apply the borrowing statute at all, and Delaware's statute of limitations still applies. *See, e.g.*, *TrustCo Bank v. Mathews*, 2015 WL 295373, at *9 (Del. Ch. Jan. 22, 2015); 10 Del. C. § 8121.

Delaware follows the internal affairs doctrine, under which the law of the state of incorporation applies to matters that pertain to the relationships between the corporation and its officers, directors, or shareholders. *See, e.g.*, *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005) ("[T]he conflicts practice of both state and federal courts has consistently been to apply the law of the state of incorporation to 'the entire gamut of internal corporate affairs.'"); *Citigroup Inc. v. AHW Inv. P'ship.*, 140 A.3d 1125, 1137 (Del. 2016) (state of incorporation has the "exclusive right to govern the internal affairs of the corporation."). A

26

breach of fiduciary duty claim involves the internal affairs of the corporation, and thus the state of incorporation's law governs. *See In re Circle Y of Yoakum, Texas*, 354 B.R. 349, 359 (Bankr. D. Del. 2006) (citing *Coleman v. Taub*, 638 F.2d 628, 629 n.1 (3d Cir. 1981)). This doctrine applies equally with regard to the state in which an LLC is organized. *See, e.g.*, *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 463 (Bankr. D. Del. 2018) (applying internal affairs doctrine to LLC).

As the Complaint alleges, the Delaware Holding Companies were all Delaware LLCs. Compl., ¶ 10. The Delaware Holding Companies were the direct owners of the individual operating entities (*i.e.*, the individual EDMC schools, which are also Debtors here) at which the alleged unlawful activity was being carried out. *Id.* Thus the entities which actually owned the operating subsidiaries were Delaware LLCs, even though their sole member, EDMC, is a Pennsylvania corporation. The Complaint also alleges that each Defendant was a director and/or officer of the Delaware Holding Companies and that he breached his fiduciary duties to those companies under Delaware law. *Id.*, ¶¶ 12 -22, 146-62. Under Delaware's choice of law rules, the Delaware statute of limitations therefore applies to the Trustee's claims. *See, e.g.*, *In re Mervyn's Holdings, LLC*, 426 B.R. 488, 502 (Bankr. D. Del. 2010) (applying California statute of limitations to breach of fiduciary duty claims against California corporation).

In Nelson and Cowley's brief, which contains Defendants' main arguments on choice of law, they ignore the internal affairs doctrine and instead analyze the issue in terms of the "most significant relationship" test. *See* NC Br., pp. 13-14. That is the wrong test. None of the cases Defendants cite for the application of such a test are breach of fiduciary duty cases. The only Chancery Court case they cite involves a fraudulent transfer claim, not a breach of fiduciary duty claim. *See id.*, p. 13 (citing *In re Uni-Marts, LLC*, 404 B.R. 767, 779 n.4 (Bankr. D. Del. 2009)). The only other Delaware cases they cite are Superior Court cases where the court conducted choice

27

of law analyses on tortious interference claims.  *See id.*, p. 14 (citing *In re Bracket Holding Corp. Litig.*, 2017 WL 3283169, at \*17-\*18 (Del. Super. July 31, 2017); *Eureka Res., LLC v. Range Res.-Appalachia, LLC*, 62 A.3d 1233, 1238 (Del. Super. 2012)).  This case law is inapposite.  The internal affairs doctrine is the applicable test under Delaware law.  It is of no moment whether certain Defendants were located in Pennsylvania at certain points in time, or whether Pennsylvania was the principal place of business for certain Debtors.

The fraud and conspiracy claims arise out of the same conduct and also implicate "matters peculiar to the relationships" between the Delaware Holding Companies and their officers and directors, and thus the internal affairs test applies to those as well.  *See Fedders*, 405 B.R. at 538; *see also Stewart v. Wilmington Trust SP Servs., Inc.*, 112 A.3d 271, 291 n.76 (Del. Ch. 2015) (internal affairs doctrine would likely apply to related claim of aiding and abetting breach of fiduciary duty).  But even if the Court were to apply a "most significant relationship" test to those claims, Defendants' argument that Pennsylvania law applies is not consistent with the allegations in the Complaint.  The Complaint alleges that the unlawful activity was carried out throughout the country through the individual schools.  *See* Compl., ¶¶ 3, 10, Ex. A.  The Complaint does not allege that the conduct at issue occurred specifically in Pennsylvania.   What is plainly alleged, however, is that the operating entities were wholly-owned by Delaware holding companies of which Defendants were officers and directors.  *Id.*, ¶¶ 10, 12-22.  Thus, the only clear issue on the most significant relationships test is the place of incorporation of the Delaware Holding Companies.  For these reasons, Delaware law applies.[13]

### 2.    The Statute of Limitations Does Not Bar the Trustee's Claims

---

[13]    At the very least, the most significant relationship test should not and cannot be used to dismiss these claims at the pleading stage under the Pennsylvania statute of limitations without any discovery on the issue of most significant relationship.

The Trustee's breach of fiduciary duty, fraud, and civil conspiracy claims are not barred by any applicable statutes of limitations.  Because Delaware law applies, the statute of limitations for breach of fiduciary duty, fraud and conspiracy is three years pursuant to the "catch all" three-year limitations period set forth in 10 Del. C. § 8106(a).  *See, e.g.*, *In re Am. Int'l Group*, 965 A.2d 763, 812 (Del. Ch. 2009) ("For a breach of fiduciary duty or fraud claim, the statute of limitation is three years."); *Adv. Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 182 F. App'x 994 (Fed. Cir. 2006) (three-year statute for fraud claim under Delaware law); *Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1064 (Del. Ch. 1989) (applying three-year statute to civil conspiracy claim).[14]   In addition, the Bankruptcy Code automatically extends by two years the time in which to initiate claims that had not expired as of the bankruptcy filing date.  11 U.S.C. § 108(a) ("If applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before . . . two years after the order for relief.").  The Petition Date was June 29, 2018, so the Trustee had until June 29, 2020 to bring any claims that had not expired by the Petition Date. The Trustee filed the Complaint before June 29, 2020, so any claims that had not expired before June 29, 2018 are timely.  Therefore, any claims that did not accrue before June 29, 2015 are timely under Delaware law.  *See also* NC Br., p. 15.

Defendants' arguments that the Trustee's claims are barred by the statute of limitations are meritless for several reasons.  First, the Complaint alleges that the unlawful conduct that injured the Company continued to occur well past the November 2015 settlements, and in fact, through the Company's sell-off of its businesses in 2017 and 2018.  *See., e.g.*, Compl., ¶ 31.  Therefore,

---

[14]     In Pennsylvania, a two-year limitations period applies to causes of action based upon fraud or breach of fiduciary duty. 42 Pa. Cons. Stat. § 5524.  As set forth more fully below, even if the Court were to apply Pennsylvania law, the Trustee's clams are timely.

DOCS_DE:231708.1 57092/001

those Defendants who were continuing to engage in unlawful conduct through and beyond the

2015 Settlements, as set forth in the Complaint, are liable under the doctrine of continuing

violations.[15]  Second, the Trustee's claims did not first accrue against any of the Defendants until,

at the earliest, the November 2015 Settlements of both the qui tam litigations and state court

investigations.  The injuries which resulted from Defendants' wrongdoing and for which the

Trustee seeks recompense did not occur until then.  Those settlements cost Debtors over $200

million and sent them into a death spiral, causing the claims to accrue.  Because Delaware law

applies here, and the November 2015 settlements were within three years of the Petition Date, the

claims are timely on this ground as well.  Third, any statute of limitations should be tolled under

the discovery rule, fraudulent concealment, equitable tolling and/or adverse domination, as

Defendants dominated the actions of the Company and no non-culpable party was in a position to

recover on behalf of creditors until the Settlements occurred, the Company tanked, bankruptcy was

declared and the Trustee was appointed.

> a.  **Under the Doctrine of Continuing Violations, the Statute of Limitations Does Not Bar the Trustee's Claims Because Defendants Continued Their Unlawful Course of Conduct Into the Limitations Period**

The Complaint contains extensive allegations that Defendants' conduct in illegally

operating EDMC continued through the sell-off of the Company's businesses in 2017 and 2018.

Because certain Defendants continued to commit fraud and affirmatively violate their fiduciary

duties in furtherance of their conspiracy up until the Company collapsed and Defendants cashed

---

[15]  Because the continuing violations doctrine applies under Pennsylvania law as well as Delaware law, the Trustee's claims against those Defendants who were involved with the Company as it continued to engage in illegal behavior up through the sell-off of the businesses are not time-barred under either jurisdiction's law on this ground alone.

out, the statute of limitations did not begin to run until the final sale to Dream Centers Foundation closed in January 2018.  *See* Compl., ¶ 129.

As alleged in the Complaint, the unlawful activity that Defendants directed at EDMC was ushered in under Defendant Nelson and continued until 2018.  *Id.*, ¶¶ 35-40, 129.  EDMC ostensibly agreed to end "abusive recruitment practices" in November 2015, in connection with the 2015 Settlements, but did not do so.  *Id.*, ¶ 133(l).  In fact, in 2017, members of Congress, including Senators Dick Durbin, Elizabeth Warren, Sherrod Brown, and Kamala Harris, called for close scrutiny of the sale of EDMC to Dream Centers Foundation for this very reason.  These legislators sent letters to university accrediting commissions noting that earlier in 2017, "a staggering number of EDMC programs were revealed to be saddling their students with stunning levels of student debt and producing graduates at poverty-level wages.''  *Id.*, ¶ 133(m).  The letters stated that EDMC had the highest number of programs that failed the guidelines of the federal gainful employment regulations.  *Id.*  In fact, more than 70% of EDMC schools were failing or in the "warning" zone on these regulations.  *Id.*  Thus, these members of Congress expressed "deep concern" that EDMC was ***still, in 2017***, maintaining a "***predatory operating and recruitment model in violation of federal law***."  *Id.* (emphasis added).  These members of Congress were also concerned that EDMC was ***still, in 2017***, ***engaging in*** "a pattern of spending more on marketing and recruitment than on instruction, and a ***financial arrangement that allows institution leaders to personally profit from the institution's operations***."  *Id*., ¶ 133 (emphasis added).

This and the other red flags, like the 2018 lawsuit brought by the attorney general of Massachusetts, support the Trustee's allegations that Defendants' unlawful behavior "was part of a course of conduct that continued unabated through and beyond the time of the 2015 Settlements" and that it, in fact, "continued through the sale of the Debtors' businesses."  *Id.*, ¶¶ 131, 133(o).

31

Based on the allegations in the Complaint, which must be accepted as true at the motion to dismiss stage, Defendants' behavior was still occurring and injuring the company by furthering its downward spiral right up until the time the Company sold off its assets, declared bankruptcy, and numerous Defendants cashed out. *Id.*, ¶¶ 127-31.

In the face of these allegations, the Court should not dismiss the Trustee's claims on statute of limitations grounds. Delaware has recognized the continuing violations doctrine. Under that doctrine, "where the defendant continues, without right, an action injurious to plaintiff," the statute of limitations does not run until the last continuing act. *See, e.g.*, *Kahn v. Seaboard Corp.*, 625 A.2d 269, 271 (Del. Ch. 1993). Delaware courts have applied the doctrine in breach of fiduciary duty cases where there is an ongoing, continuing duty that is being consistently violated as a course of conduct past the time that the statute of limitations would have expired. For example, in *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *16, (Del. Ch. Ct. 2005), the Delaware Court of Chancery held that the plaintiffs' allegations of failure to manage certain funds consistent with their fiduciary duties did not constitute a discrete wrong, which occurred at a specific time. Rather, because the plaintiffs alleged that the defendants "owed (and owe) a continuing duty to actively manage and supervise the Funds," the wrongful act is the failure to meet that ongoing duty. *Id.* The court concluded that it could not "say that this wrongful act occurred before" the running of the statute. As a result, the court found that "plaintiffs' claims based on the failure of Alex. Brown and DCIP to provide active management are *not* barred by the statute of limitations." *Id.*

Likewise, in *In re KNH Aviation*, 549 B.R. 356, 360 (Bankr. D.S.C. 2016) (applying Delaware law), the court noted the continuing violations doctrine, which "is well-established in the Third Circuit," applied to breach of fiduciary duty claims relating to an ongoing course of

conduct with regard to sale and lease agreements.  Because the court was examining the case at the motion to dismiss stage, it found that it could not dismiss the claims.  *See, e.g.*, *id.* at 362 ("Without making any determinations as to whether the continuing violation doctrine should actually apply in this case, the Court finds that Plaintiffs' amended complaint contains allegations that the conduct complained of was a pattern of ongoing continuous conduct and therefore the first cause of action should not be dismissed at this stage of the proceeding.").  As the court in *KNH Aviation* pointed out, where courts have declined to apply the continuing violations doctrine, it has been because the allegations related to "individual, discrete acts or that the acts did not continue into the statute of limitations period."  *Id.* at 361 (collecting cases).  Neither is true here.  The Complaint clearly alleges an ongoing course of conduct that continued well into the period required to make the claims timely; allegations that, in fact, are bolstered by findings of certain members of Congress.

As in *Albert*, the Defendants here had a duty to act faithfully to the Company that continued through and beyond the time of the 2015 Settlements.  *See, e.g.*, Compl., ¶ 147.  As the Complaint alleges, these Defendants continued to commit affirmative acts in furtherance of their breaches of fiduciary duty, fraud, and conspiracy well past June 29, 2015.  *See, e.g.*, *Cowell v. Palmer Twp.*, 263 F.3d 286, 293 (3d Cir. 2001) ("The focus of the continuing violations doctrine is on the affirmative acts of the defendants.").  Because these breaches continued past that period, the statute of limitations does not bar the claims against them.

Even if Pennsylvania law were to apply, which it does not, the Trustee's claims would still remain timely because Pennsylvania likewise recognizes the continuing violations doctrine.  Under Pennsylvania's equitable doctrine of "continuing violations," when a defendant's conduct "is part of a continuing practice, an action is timely so long as the last act evidencing the continuing

practice falls within the limitations period." *Langman v. Keystone Nat'l Bank & Trust Co.*, 672 F. Supp. 2d 691, 697 (E.D. Pa. 2009), *aff'd sub nom.*, *Langman v. Keystone Nazareth Bank & Trust Co.*, 502 F. App'x 220 (3d Cir. 2012) (quoting *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001)).  Courts applying Pennsylvania law have found it applies in breach of fiduciary duty cases. *See Liberty Mut. Fire Ins. Co. v. Corry Indus., Inc.*, 2000 WL 34546492, at *3 (W.D. Pa. Mar. 30, 2000) (applying continuing violations doctrine to breach of fiduciary duty claim where breach began before the limitations period ran and continued after that period).

Under the doctrine of continuing violations, the duty-based claims against all Defendants who remained with the Company in June 2015 and beyond are not barred by the statute of limitations because the Complaint, on its face, alleges that these Defendants continued to violate their duties through affirmative acts well past that date, and in fact, up to the Petition Date.  At the very least, the issue of whether Defendants continued to commit additional affirmative breaches of their duties up through and past 2017 as part of a continuing course of conduct, as alleged in the Complaint, is an issue that should be subject to fact discovery, not decided at the motion to dismiss stage.  *See, e.g.*, *KNH Aviation*, 549 B.R. at 362 ("Discovery may clarify the nature of the acts as ongoing or discrete.").

### b.    Even Absent the Continuing Violations Doctrine, The Claims Did Not Accrue Until November 2015 At the Earliest

Even if the Court fails to apply the continuing violations doctrine, the Trustee's claims are timely because they did not accrue until, at the earliest, the occurrence of the Settlements in November 2015.  In connection with the Settlements, the Company paid $95.5 million to state and federal governments, and forgave over $102 million in loans to students.  *See* Compl., ¶¶ 118-19. After years of profiting, at least on paper, from Defendants' actions, those settlements represented a reckoning for the Company, as "the 2015 Settlements and the revelation of the Company's illegal

34

practices sent the Company into a downward spiral from which it never recovered." *Id.*, ¶ 121. The Complaint goes on to detail the series of sell-offs and other events that constituted the demise of the Company, which started to occur immediately following, and as a result of, the 2015 Settlements. *Id.*, ¶¶ 123-29.

Delaware cases have held that a tort, which requires an injury, does not accrue until the time of the injury. *See, e.g.*, *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *7 (Del. Ch. 2005) ("First, the court must ascertain the date of accrual of the cause of action. *Wal-Mart* holds that a cause of action accrues 'at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action.' The 'wrongful act' is a general concept that varies depending on the nature of the claim at issue. . . . For tort claims, the wrongful act is a tortious act causing injury, and the cause of action accrues at the time of injury. . . .") (citing *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312 (Del. 2004)). Here, the Trustee alleges that the injury to the estate caused by Defendants' unlawful conduct occurred when the Company incurred the liabilities in connection with the 2015 Settlements. In fact, the Complaint contains extensive allegations that the Company, and in turn the Defendants, prospered as a result of the illegal conduct until the Settlements occurred. *See, e.g.*, Compl., ¶¶ 92-93 (alleging that Title IV funding to the Company increased by the billions from 2003 to 2011).

As both the fraud and conspiracy claims inarguably require an injury as an element of the claims, *see supra* Sections V.A.2 and V.A.3, those claims could not have accrued until the injury to the Company occurred. On the face of the Complaint, this was not until November 2015 at the earliest, meaning that the Petition Date was well within the three-year statute of limitations applicable under Delaware law. Defendants cite *Sunrise Ventures, LLC v Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *6 (Del. Ch. 2009), for the proposition that fraud claims

35

accrue at the time of the act and not the injury. But *Sunrise* does not explicitly analyze that issue, instead mentioning it only in passing, and Defendants cite no other Delaware case that supports such a proposition. To the extent *Sunrise* is inconsistent with the clear holdings in *Wal-Mart* and other Delaware Supreme Court cases that "a cause of action in tort accrues at the time of injury," *see, e.g.*, *Kaufman v. C.L. McCabe & Sons, Inc.*, 603 A.2d 831, 834 (Del. 1992), it is not binding law. Thus, given the case law that a tort accrues at the time of injury, and the fact that injury is a necessary element for fraud and conspiracy, the statute of limitations on these claims did not begin to run until November 2015, at the earliest. As Delaware's three-year statute of limitations applies, the claim had not expired as of the June 29, 2018 Petition Date.[16]

Delaware case law is less clear on the accrual of a breach of fiduciary duty claim, but, based on the facts alleged, the breach of fiduciary duty claims did not accrue until the 2015 Settlements. Delaware views a breach of fiduciary duty as an "equitable tort," for which damages is not technically an element. *See Basho Techs. Holdco B, LLC v. Georgetown Basho Investors, LLC*, 2018 WL 3326693, at * 22-24 (Del. Ch. July 6, 2018) (explaining "equitable tort" concept and elements). However, even still, "a plaintiff will not be awarded a meaningful remedy without additional showings that parallel the other elements of a traditional common law tort claim. One is a showing of harm to the beneficiary or, alternatively, the wrongful taking of a benefit by the fiduciary." *Id.* at 23. Therefore, a breach of fiduciary duty claim still requires a showing of harm.

---

[16]    As in Delaware, under Pennsylvania law, a claim does not accrue until "the plaintiff could have first maintained the action to a successful conclusion." *Cap v. K-Mart Discount Store, Inc.*, 515 A.2d 52, 53 (Pa. Super. 1986) (quoting *Kapil v. Assoc. of Pa. State College and Univ. Faculties*, 470 A.2d 482, 485 (Pa. 1983)). Therefore, the statute of limitations does not begin to run until all essential elements and necessary prerequisites to bringing a particular claim have been met. Pennsylvania appellate courts repeatedly have made clear that "for purposes of the statute of limitations, a claim accrues when the plaintiff is harmed," not before any harm occurs. *See, e.g.*, *Kelly v. H.C. Kerstetter Co.*, 2016 WL 1728686, at *4 (Pa. Super. Apr. 27, 2016).

36

Defendants argue that the breach of fiduciary duty claims accrued at the time of the initial breach, and not at the time that those breaches caused an injury to the Company. They cite cases to support the argument that "the fact that damages are not fully known or quantifiable will not delay accrual of a claim." *See* NC Br., pp. 18-19. But here the issue is not that the damages were not ***fully*** known until the time of the Settlement. The issue is that the Settlements brought about by Defendants' conduct, and Defendants' continued unlawful conduct after those Settlements, ***are what injured the company in the first place***. Up until that time, the Company benefitted from the unlawful conduct in the form of additional students and revenue. If Defendants are correct, then neither the Company nor the Trustee would ever be able to sue to recover the damages caused by Defendants' years of conspiring to breach their fiduciary duties to the Company, and defrauding the Company, students and the government, which ultimately killed the Company and left its creditors high and dry. Prior to November 2015, the damages for which the Trustee now sues had not yet occurred, and therefore neither the Trustee nor the pre-petition Debtors could have recovered for those damages. According to Defendants, by the time of the Settlements, it was already too late for anyone to sue for those damages. This is not the law. Breach of fiduciary duty in an equitable claim. *See, e.g.*, *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 668 (Del. Ch. 2012). It is not equitable to leave the Trustee, standing in the shoes of the Company, with no means for recovery on behalf of creditors, for damages which were incurred within the limitations period.

Defendants rely heavily on *In re Dean Witter*, 1998 WL 442456 (Del. Ch. July 17, 1998), but in that case, the value of the partnerships at issue was destroyed by the breaches of fiduciary duty as they occurred. *See id.* at *8 (the reports made available to plaintiffs at the time showed the "partners' capital" steadily declining ***during the period of the alleged breaches***) (emphasis added). This is distinguishable from the situation here, where the Company's student body numbers, and

37

in turn, its revenue (though ill-gotten), were actually *increasing* during the time that the breaches of fiduciary duty took place, up until the 2015 Settlements.  As Defendants themselves point out, "if *injurious* wrongdoing has occurred, the claim accrues . . . ."  NC Br., pp. 18-19 (emphasis added).  In the unique circumstances here, the injury for which the Trustee seeks redress, which began the Company's downward spiral, did not occur until the wrongdoing had already been ongoing for many years.  At the very least, this issue of when the injury occurred and when the claims accrued requires discovery and is not susceptible to determination on a motion to dismiss.

Defendants also cite *Albert* for the proposition that the claim accrued "as soon as the wrongful act occurred."  NC Br., p. 17.  *Albert* held that a breach of fiduciary duty claim would accrue even if merely injunctive relief were potentially available to the plaintiff at the time of the breach.  *Albert*, 2005 WL 1594085, at *18.  The court pointed out that initially the funds at issue there rose to "dizzying heights" and plaintiffs only sued after they came crashing down.  *Id.*  This is distinguishable from the present situation because Defendants dominated the actions of the Company and avoided any and all attempts to reform those all the way up until the Settlements.  *See* Compl., ¶ 120 ("Prior to entering into the 2015 Settlements and Consent Judgments, the Company and the Defendants defended the Company's conduct, disputed its liability, and consistently maintained that its business operations complied with federal and state law and regulations.").  Here, as Defendants admit in their Responses, the Board of Directors refused to bring suit when it was demanded prior to the Settlements.  Thus, unlike *Albert*, prior attempts to bring the claims were stymied, and now Defendants argue that the claims were brought too late. They cannot have it both ways—torpedo requests to bring suit and then argue suit was commenced too late—especially in a court of equity like the bankruptcy court.

Defendants also argue that the Trustee seeks to hold Nelson and Cowley liable for actions taken by others after they left.  This is not true.  The Trustee seeks to hold them liable for unlawful actions taken by them and at their direction while they were associated with the Company, that in turn caused harm to the Company at a later time, before the limitations period ran.  Additionally, because the conspiracy Nelson and Cowley set in place continued after they left, they remain liable for the damages caused by that conspiracy even after they were no longer with the Company.  *See ZRii, LLC v. Wellness Acquisition Group, Inc.*, 2009 WL 2998169, at *12 (Del Ch. Ct. 2009) ("The fact that Defendants ceased to be employed by and to owe fiduciary duties to Zrii does not mean the conspiracy cannot continue after February 2, 2009, and does not absolve them from responsibility for their own acts ***and those of their co-conspirators*** after that date in furtherance of the conspiracy.") (emphasis added); *see also supra* Section V.A.3.

Because the claims did not accrue until 2015 at the earliest, even absent the application of the continuing violations doctrine, the Trustee's claims are not barred as to any of the Defendants, whose years of misbehavior ultimately injured the company.

> c.    **The Statute of Limitations is Tolled by the Discovery Rule and Other Tolling Principles**

The Trustee alleges that Defendants consistently denied their liability and wrongdoing, while simultaneously engaging in a massive illegal operation that put the Company at risk of eventual collapse under the weight of civil and criminal liability.  Any applicable statutes of limitations should therefore be tolled by the discovery rule, fraudulent concealment, equitable tolling, and/or the adverse domination doctrine.

Under Delaware law, there are three bases for tolling the statute of limitations: (1) inherently unknowable injuries, (2) fraudulent concealment, and (3) equitable tolling following a breach of fiduciary duties.  *Carr v. New Enterprise Assocs., Inc.,* 2018 WL 1472336, at *8 (Del.

Ch. 2018). The inherently unknowable injuries doctrine is Delaware's discovery rule, under which "the statute begins to run 'upon the discovery of facts constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts.'" *In re AMC Investors, LLC*., 524 B.R. 62, 80-81 (Bankr. D. Del. 2015). Fraudulent concealment means that the defendant took affirmative steps to prevent a plaintiff from learning facts or made misrepresentations to "'put the plaintiff off the trail of inquiry.'" *Certainteed v. Celotex Corp.*, 2005 WL 217032, at *8 (Del. Ch. Jan. 24, 2005) (quoting *Halpern v. Barran*, 313 A.2d 139, 143 (Del. Ch. 1973)). Under the doctrine of equitable tolling, the statute is tolled "where a plaintiff reasonably relies on the competence and good faith of a fiduciary." *Albert*, 2005 WL 1594085, at *19. Pennsylvania likewise recognizes the discovery rule, in which the statute of limitations is tolled "until plaintiff discovers, or reasonably should discover, that she has been injured and that her injury has been caused by another party's conduct." *Wilson v. El-Daief*, 964 A.2d 354, 361-62 (Pa. 2009). Fraudulent concealment also tolls statutes of limitations under Pennsylvania law, providing that "the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005). To the extent there is a dispute about when the injury occurred, or when the injury could have been discovered, that is a factual dispute that cannot be resolved on a motion to dismiss. *See Wilson*, 964 A.2d at 358 (noting that the discovery rule is a "fact intensive" inquiry and is "ordinarily a question for a jury to decide") (citing, *inter alia*, *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005)).

Regardless of how characterized, one or more of these tolling doctrines apply here, whether Delaware or Pennsylvania law is applied. The Complaint alleges that Defendants, through the

Company, "knowingly made false statements" to the government regarding the Company's compliance. Compl., ¶ 91. Moreover, prior to entering into the 2015 Settlements, Defendants "defended the Company's conduct, disputed its liability, and consistently maintained that its business operations complied with federal and state law and regulations." *Id.*, ¶ 120. Not only that, as Defendants go outside of the scope of the pleadings to argue in their briefs, the Company, under the direction of Defendants, refused to authorize the shareholders' suit, as discussed in more detail in Section V.C.1, *infra*. Because of all of this, as alleged in the Complaint, "[i]t was not until the announcement of the 2015 Settlements in November 2015 that the Defendants' wrongdoing became apparent and that the injury to Debtors became knowable." Compl., ¶ 121. Thus, whether described as the discovery rule, equitable tolling, or fraudulent concealment, the statute of limitations should be tolled here because Defendants covered up their fraud, misled shareholders and creditors, and fought attempts to bring suit to recover for the violations. It was not until the Trustee was appointed and was able to bring these claims in Bankruptcy Court that true redress could be sought.

Under Pennsylvania law, the "adverse domination" tolling doctrine—"a corollary of Pennsylvania's discovery rule, applied in a corporate context"—holds that when a corporation is dominated by wrongdoers, the statute is tolled until the wrongdoers are replaced. *Resolution Trust Corp. v. Farmer*, 865 F. Supp. 1143, 1151 (E.D. Pa. 1994). Although the Pennsylvania state courts have not had occasion to adopt this doctrine, federal courts have predicted that the Pennsylvania Supreme Court would apply it. *See id.*; *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 59 (Bankr. S.D.N.Y. 2007) (". . . the court regards it as highly likely that the Pennsylvania Supreme Court would apply the doctrine of adverse domination . . ."); *In re Sverica Acquisition Corp., Inc.,* 179 B.R. 457, 470 (Bankr. E.D. Pa. 1995). The Superior Court of Pennsylvania recently examined the

41

issue again and noted that federal cases that have applied the adverse domination doctrine "have relied on the fact that no non-culpable party could have brought suit before the receiver or trustee was appointed because of the control the defendants exerted over the organization…." *Mariner Chestnut Partners, L.P. v. Lenfest*, 152 A.3d 265, 281 (Pa. Super. 2016). The Superior Court rejected the application of the doctrine in that particular case, and declined to state a view as to whether the doctrine should be adopted as the law in Pennsylvania, though the court did not state any disagreement with the federal courts' predictions that it would be applied. The situation cited by the *Mariner* court is precisely what exists here. There is no one who could have brought these claims before the Trustee was appointed. Prior shareholders who tried to bring similar claims were stymied.

The doctrine is applied where the corrupt nature of the entity's management creates what is essentially a self-concealing fraud: the statute of limitations is tolled for as long as the corporation is controlled by the alleged wrongdoers. The doctrine is based on the theory that the corporation, which can only act through the controlling wrongdoers, cannot reasonably be expected to pursue a claim which it has against them until they are no longer in control. *Resolution Trust Corp.*, 865 F. Supp. at 1151; *see also, Levin, et al. v. Kursman*, 175 B.R. 560, 572 (Bankr. E.D.Pa. 1994) (same); *In re Lloyd Sec., Inc.*, 153 B.R. 677, 684-85 (E.D. Pa. 1993); *Saylor v. Lindsley*, 302 F. Supp. 1174, 1184 (S.D.N.Y. 1969). Here, Defendants ran the Company illegally and resisted all attempts to reform that behavior and hold themselves and the Company accountable. The fact-based nature of adverse domination and similar doctrines precludes a decision on the pleadings, before the Trustee has even had an opportunity to take discovery and uncover the true extent of the fraud. *See Resolution Trust Corp.*, 865 F. Supp. at 1158.

42

The adverse domination doctrine does not appear to have been explicitly adopted by Delaware courts. *See AMC Investors*, 524 B.R. at 81. However, it relies on similar equitable principles as Delaware's equitable tolling doctrine, and therefore, the statute should be tolled under either jurisdiction's applicable law.

Simply stated, Defendants participated in a massive fraud and conspiracy to illegally operate the Company. Because demand was denied in the shareholder litigation, the Trustee is ***the only person*** who possibly could recover for this behavior on behalf of the Company's creditors, and it would not be equitable for him to be shut out from doing so by a holding that the statute of limitations ran before he was ever appointed. Defendants ran an illegal operation, covered it up, and fought any attempts to reform it. Only now, after the appointment of the Trustee, can this behavior be rectified for the benefit of the estates and their creditors. Under the principles discussed above, it is clear that until the Company collapsed, Defendants cashed out, and a truly independent party (the Trustee) began his own investigation, there was no opportunity for redress of Defendants' unlawful behavior.

**C.      Counts I Through III of the Trustee's Complaint are Not Precluded or Barred As a Result of the Prior *OLERS* or *Bushansky* Derivative Actions or the Government Qui Tam Action**

Defendants argue that prior judicial rulings and positions taken by EDMC in two derivative actions filed by EDMC shareholders in 2012[17] and the Government qui tam Action preclude the Trustee's breach of fiduciary duty, fraud, and civil conspiracy claims in this proceeding under principles of res judicata, collateral estoppel, judicial estoppel, and/or waiver and abandonment.

---

[17] These derivative actions are captioned as follows: (i) *Oklahoma Law Enforcement Retirement System v. Nelson, et al.*, Court of Common Pleas of Allegheny County, Pennsylvania, Case No. GD-12-008785 ("*OLERS*"); and (ii) *Bushansky v. Nelson, et al.*, U.S. District Court for the Western District of Pennsylvania, Case No. 12-CV-01101 ("*Bushansky*").

43

For the reasons discussed herein, these arguments are without merit.  The Trustee's claims are distinct from the claims brought in prior actions (and were not actually litigated therein), are asserted in good faith, and are not barred by Defendants' own refusal to pursue the claims pre-petition.

As an initial matter, Defendants submit numerous filings from *OLERS*, *Bushansky*, and the Government qui tam Action in support of their preclusion arguments.  *See* D.I. 50 (Declaration in Support of McKernan, West, and Beekhuizen's Motion to Dismiss) ("Kichline Decl."); D.I. 44 (Declaration in Support of McEachen, Jalufka, and Danielson's Motion to Dismiss); D.I. 47 (Declaration in Support of Nelson and Cowley's Motion to Dismiss).  Because filings from prior litigation are public records, they may be subject to judicial notice – but only for their existence, not for the truth or accuracy of any findings or other assertions contained in them.  *See In re New Century TRS Holdings, Inc.*, 502 B.R. 416, 423-24 (Bankr. D. Del. 2013); *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 257-58 (E.D. Pa. 2020).  However, with respect to filings other than judicial opinions and orders – such as expert reports or motions filed in the prior actions – there is no reason or basis for the Court to take judicial notice of those items in order to resolve Defendants' motions.  In particular, insofar as Defendants ask the Court to afford evidentiary weight to the contents of SLC reports or other materials, that is well beyond the scope of appropriate or necessary judicial notice.  *See In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *1 (E.D. Pa. Apr. 7, 2003) ("If a court adopted the approach of considering such documents for the truth of the matter asserted therein, it would be authorizing a trial by public documents, and thus imprudently expanding the scope of 12(b)(6) motions.").

    1.    ***OLERS* Does Not Have Preclusive Effect Under Principles of Res Judicata or Collateral Estoppel**

Defendants argue that the Allegheny County Court of Common Pleas' dismissal of the breach of fiduciary duty claims in *OLERS*[18] has preclusive effect, under principles of both res judicata and collateral estoppel, on the Trustee's breach of fiduciary duty, fraud, and civil conspiracy claims.[19]  These arguments should be rejected because the required elements for the application of either doctrine are not met – specifically, identity of issue, identity of causes of action, and identity of parties are lacking, rendering res judicata inapplicable, and because the issues raised by the Trustee's claims were not actually litigated and there is not complete privity between the Trustee and the pre-petition Debtors, collateral estoppel does not apply.

"A federal court applying preclusion principles is bound by the Full Faith and Credit statute and must give a prior state judgment the same effect as would the adjudicating state" – here, Pennsylvania.  *Gregory v. Chehi*, 843 F.2d 111, 116 (3d Cir. 1988) (citing 28 U.S.C. § 1738).  Determining the preclusive effect of a prior judgment implicates the related, though distinct, doctrines of res judicata and collateral estoppel.  *See Wilmington Trust, Nat'l Ass'n v. Unknown Heirs*, 219 A.3d 1173, 1179 (Pa. Super. 2019).

---

[18]    *See* Kichline Decl., Ex. 8, Memorandum and Order of Court dated August 25, 2015, entered by Court of Common Pleas of Allegheny County, Pennsylvania (Wettick, J.) (the "*OLERS* 8/25/15 Op.") (dismissing shareholder-plaintiff's incentive-based compensation and fraudulent job placement claims).  The Court of Common Pleas had also issued an earlier opinion, dated July 16, 2013, which postponed ruling on the above-referenced claims pending further investigation by the Board's Special Litigation Committee ("SLC").  *See id.*, Ex. 5 (the "*OLERS* 7/16/13 Op.").

[19]    *See* MWB Br., pp. 12-19 (preclusion arguments citing *OLERS* Complaint and *OLERS* 8/25/15 Op.), which the other Defendants incorporate by reference.  Defendants Kramer and Novad also suggest, without any argument, that the dismissal of securities fraud claims in *Gaer v. Educ. Mgmt. Corp.*, 2011 WL 7277447 (W.D. Pa. Aug. 30, 2011), *recommendation adopted*, 2011 WL 7277578 (W.D. Pa. Sept. 29, 2011), may give rise to preclusive effect (*see* KN Br., pp. 29-30), but such an argument should be rejected because the claims in *Gaer* were dismissed for failure to meet certain pleading requirements that are specific to claims brought under the federal securities laws.  There is no identity of issue or cause of action between the *Gaer* litigation and this adversary proceeding.

Under Pennsylvania law, "*[r]es judicata*, or claim preclusion, prohibits parties involved in prior, concluded litigation from subsequently asserting claims in a later action that were raised, or could have been raised, in the previous adjudication." *Levitt v. Patrick*, 976 A.2d 581, 589 (Pa. Super. 2009) (quoting *Wilkes ex rel. Mason v. Phoenix Home Life Mut. Ins. Co.*, 902 A.2d 366, 376 (Pa. 2006)). In order for the doctrine of res judicata to apply, there must be a concurrence of four elements: (1) identity of issues; (2) identity of causes of action; (3) identity of persons and parties to the action; and (4) identity of the quality or capacity of the parties suing or being sued. *Id.* (citing *In re Iulo*, 766 A.2d 335, 337 (Pa. 2001)). In making this determination, the Court may consider "whether the factual allegations of both actions are the same, whether the same evidence is necessary to prove each action and whether both actions seek compensation for the same damages." *Garman v. Angino*, 230 A.3d 1246, 1252 (Pa. Super. 2020).

Collateral estoppel, also known as issue preclusion, is intended to "prevent[] an issue of law or fact from being relitigated after it has been once litigated and finally adjudicated in a court of competent jurisdiction." *Hopewell Estates, Inc. v. Kent*, 646 A.2d 1192, 1195 (Pa. Super. 1994). Collateral estoppel applies if: (1) the issue decided in the prior case was identical to the one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party against whom it is asserted had a full and fair opportunity to litigate the issue in question in the prior case; and (5) the determination in the prior proceeding was essential to the judgment. *Garman*, 230 A.3d at 1255. "As distinguished from *res judicata*, which bars subsequent claims that could have been litigated in the prior proceeding, but which were not, collateral estoppel only bars litigation of issues that were actually litigated in the prior action." *Wilmington Trust*, 219 A.3d at 1179; *see*

46

*also Hopewell Estates*, 646 A.2d at 1195 ("Collateral estoppel applies only to issues which have been actually litigated in a prior action.").

In *OLERS*, an EDMC shareholder asserted breach of fiduciary duty claims against members of EDMC's Board of Directors relating to, *inter alia*, the Company's incentive-based compensation program and improper recruitment tactics.[20]  Because *OLERS* was a shareholder derivative action, it implicated issues concerning demand and the Board's ability to terminate shareholder litigation – which, notably, had to be determined "prior to litigation on the merits." *OLERS* 7/16/13 Op., p. 11; *OLERS* 8/25/15 Op., p. 17.  The Pennsylvania state court's August 25, 2015 decision (on which Defendants base their preclusion arguments) accordingly examined whether the investigation performed by the Board's SLC into the shareholder-plaintiff's claims was sufficiently adequate to be given deference under *Cuker v. Mikalauskas*, 692 A.2d 1042 (Pa. 1997), in which the Pennsylvania Supreme Court adopted certain American Law Institute principles concerning the commencement, maintenance, and dismissal of derivative actions.  *See OLERS* 8/25/15 Op., pp. 16-17; *Cuker*, 692 A.2d at 1049.[21]  Significantly, the *Cuker* opinion expressly states that it is "limited to the issue of whether the business judgment rule permits the

---

[20]    *See* Kichline Decl., Ex. 3, *OLERS* Amended Complaint, dated September 27, 2012. Defendants Nelson, McKernan, Beekhuizen, and Cowley were among the individuals named as defendants in *OLERS*.  With respect to the other Defendants, while West, Kramer, and Novad were with the Company at the time the *OLERS* amended complaint was filed (*see* Compl., ¶¶ 16, 19-20), McEachen, Jalufka, and Danielson were not.  *See id.*, ¶¶ 17, 18, 21.  Privity for res judicata purposes should not apply to those who were not even with the Company at the time, given that the Trustee's claims against those individuals pertain to actions they took (or failed to take) which damaged the Debtors and furthered the conspiracy to illegally increase recruitment numbers after the *OLERS* litigation had already concluded.

[21]    In addition to the factual and procedural reasons discussed above, the *Cuker* analysis is also inapplicable here because Delaware law applies to the Trustee's claims.  *See supra* Section V.B.1.  The framework applied in Pennsylvania pursuant to *Cuker* differs from Delaware law.  *See, e.g.*, *Cuker*, 692 A.2d at 1049 (explaining that in "demand excused" cases Delaware law permits the court to apply its own business judgment when examining a board's decision to terminate derivative litigation); *see also OLERS* 7/16/13 Op., p. 10 n. 4 (referencing same).

47

board of directors of a Pennsylvania corporation to terminate derivative lawsuits brought by minority shareholders." *Id.* at 1043 (internal quotation marks omitted). This was the issue addressed by the court in *OLERS*. *See OLERS* 8/25/15 Op., p. 17 (finding SLC's investigation comported with requirements under *Cuker* for dismissal of derivative claims prior to litigation on the merits); *see also OLERS* 7/16/13 Op., p. 11.

"Neither res judicata nor collateral estoppel will apply in the absence of an identity of issues." *Levitt*, 976 A.2d at 589 (quoting *Iulo*, 766 A.2d at 337). Identity of issue is lacking here because questions concerning a board of directors' ability to terminate derivative lawsuits brought by minority shareholders (the focus of *Cuker* and *OLERS*) are not relevant to the instant adversary proceeding, which the Trustee brings in his capacity as representative of the Debtors' bankruptcy estates. While the business judgment rule, in general, has relevance as an affirmative defense the Defendants may raise to the Trustee's breach of fiduciary duty claim (though the Trustee disputes the sufficiency of such a defense, which in any event cannot be determined at the pleading stage), issues concerning the Board's ability to terminate shareholder litigation are not implicated here.

The *OLERS* opinions make clear that the court was engaging in a "preliminary determination" concerning the Board's decision to seek dismissal of the action, which due to the nature of shareholder derivative suits was a threshold question pertaining "only [to] the validity of the board's decision to terminate the litigation," separate from and in advance of litigation on the merits. *See OLERS* 7/16/13 Op., pp. 9-11; *OLERS* 8/25/15 Op., pp. 2-3, 17. Further, in *OLERS* the court acknowledged that the Board's decision would have to be given deference "only in the absence of fraud or self-dealing or other misconduct or malfeasance," *id.*, p. 17, and here the Trustee alleges fraud by Defendants, with respect to the Company's entire business operations.

The cases cited by Defendants in support of the assertion that *OLERS* was dismissed "'on the merits' for purposes of res judicata" are unavailing, given that they all involve application of res judicata to the issue of demand requirements between two related derivative actions. *See* MWB Br., p. 17 and n. 8 (citing: *In re Bed Bath & Beyond Inc. Deriv. Litig.*, 2007 WL 4165389, at *6 (D.N.J. Nov. 19, 2007) (dismissal of first derivative suit for failure to make demand had res judicata effect in second derivative suit filed by another shareholder); *Henik ex rel. LaBranche & Co., Inc. v. LaBranche*, 433 F. Supp. 2d 372, 379 (S.D.N.Y. 2006) (demand futility determination in prior derivative action had res judicata effect in second nearly-identical derivative action); *LeBoyer v. Greenspan*, 2007 WL 4287646, *3 (C.D. Cal. June 13, 2007) (same)). These cases are distinguishable because they involve situations where derivative standing was a threshold requirement for the maintenance of both suits. Here, the Trustee's claims do not implicate issues of derivative standing.

Moreover, the Trustee's claims pertain in large part to conduct and damages post-dating the *OLERS* litigation, and therefore implicate issues and causes of action which by definition could not have been brought and were not actually litigated as part of *OLERS*. *See, e.g.*, Compl., ¶¶ 3, 117-19, 144 and Section VI(a) (seeking damages arising out of 2015 Settlements and related Consent Judgments, which occurred in November 2015, and the subsequent destruction of the Company); ¶ 121 (alleging that injury for which the Trustee seeks damages was not knowable until 2015 Settlements); ¶¶ 90, 131 (alleging fraud and other unlawful behavior ongoing and continuing through and beyond the time of the 2015 Settlements and the Petition Date); ¶ 170 (alleging ongoing conspiracy which continued until the Petition Date); ¶ 131 (alleging failure by Board to comply with Consent Judgments); ¶ 133(m)-(o) (allegations concerning continued predatory recruiting practices in 2017 and 2018); ¶ 161 (alleging breach of fiduciary duty in connection with

49

authorizing and accepting Excessive Payments, which were made between 2016 and 2018).[22]  "A Pennsylvania judgment is not conclusive on matters which by reason of the nature of the case could not have been adjudicated."  *Harris v. Pernsley*, 755 F.2d 338, 342 (3d Cir. 1985).

Courts consider "whether the factual allegations of both actions are the same, whether the same evidence is necessary to prove each action and whether both actions seek compensation for the same damages" in deciding whether res judicata should apply.  *Garman*, 230 A.3d at 1252.  Examination of these factors demonstrates an absence of identity between the causes of action in *OLERS* and in this adversary proceeding.  While there is overlap in the Trustee's factual allegations concerning the commencement and operation of the Company's unlawful recruitment program (given the continuing course of conduct alleged in the Complaint), the Trustee's claims also implicate factual allegations post-dating the *OLERS* litigation and thus will require different evidence – such as, for example, evidence regarding Board meetings and other actions (or inaction) by the Board following the 2015 Settlements and Consent Judgments.  *See, e.g.*, Compl., ¶ 131 (referencing Board meeting minutes "show[ing] no concerted effort by Defendants to reform their behavior or to comply with the Consent Judgments"); *see also id.*, ¶ 133(m)-(o) (referencing continued unlawful recruitment practices that drew concerns from members of Congress in 2017 and were the subject of a suit filed by the Massachusetts attorney general in 2018).  Furthermore, even when claims are based on common or overlapping facts, res judicata will not bar a subsequent action that seeks relief which is distinct from or could not have been sought in the prior action.  *See Hopewell Estates*, 646 A.2d at 1195; *Brown v. Tucci*, 960 F. Supp. 2d 544, 570 (W.D. Pa.

---

[22]    The aspect of the Trustee's breach of fiduciary duty claim relating to the Excessive Payments plainly is not precluded by the *OLERS* litigation, as the payments occurred years later and there is no overlap in facts, evidence, or damages between the Excessive Payment-related claims and the *OLERS* litigation.

50

2013). Such is the case here, given that the Complaint seeks compensation for damages incurred after the *OLERS* litigation had already ended. *See* Compl., ¶ 144 and Section VI(a) (seeking compensatory damages related to the 2015 Settlements, Consent Judgments, Excessive Payments, and demise of the Company, all of which occurred after the *OLERS* litigation had concluded).[23]

"[D]evelopment of new material facts can mean that a new case and an otherwise similar previous case do not present the same claim." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016), *as revised* (June 27, 2016) (citing Restatement (Second) of Judgments § 24, Comment f ("Material operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first.")). Such is the case here. Defendants' course of conduct continued unabated beyond the time of the *OLERS* litigation, giving rise to material operative facts and damages which post-date and were not the subject of claims in *OLERS*. Thus neither res judicata nor collateral estoppel bars Counts I through III of the Trustee's Complaint, due to lack of identity between the issues and causes of action asserted and litigated.

Additionally, identity of parties is also lacking,[24] because the Trustee cannot, for preclusion purposes, properly be considered "in privity" with the pre-petition Debtors. "[P]rivity requires

---

[23]  Although the *OLERS* complaint did refer to "harm that EDMC will suffer as a result of the Government [qui tam] Action" in its request for damages (*see* Kichline Decl., Ex. 3, p. 92), that issue was not litigated or addressed in *OLERS* and, as discussed above, any such damages were not incurred until after *OLERS* had concluded. Moreover, the 2015 Settlements (and the damages suffered by the Debtors as a result thereof) pertained not only to the Government qui tam Action, but also to the Consumer Protection Consortium investigations.

[24]  *See Day v. Volkswagenwerk Aktiengesellschaft*, 464 A.2d 1313, 1317 (Pa. Super. 1983) (identity of parties for res judicata refers to actual parties in the prior litigation as well as their privies); *Garman*, 230 A.3d at 1255 (collateral estoppel can apply to party in prior case or its privy).

51

such an identification of interest of one person with another as to represent the same legal right." *Catroppa v. Carlton*, 998 A.2d 643, 647 (Pa. Super. 2010) (citation omitted).  This requires more than simply demonstrating that the parties are interested in prevailing on similar legal or factual questions.  *Day*, 464 A.2d at 1317 ("Privity for purposes of res judicata is not established by the mere fact that persons may be interested in the same question or in proving the same facts.").  "Substance rather than form governs the parties' identities in a particular case."  *In re Tzanides*, 574 B.R. 489, 520 (Bankr. D.N.J. 2017).  As the successor to a debtor's property interest, a Chapter 7 trustee may, under certain circumstances, be considered a privy of the pre-petition debtor for purposes of preclusion, but the Third Circuit has explained:

> [E]ven though a trustee in bankruptcy has a substantive legal relationship with the pre-bankruptcy debtor, the trustee is not simply the successor in interest to the Debtor: he represents the interests of all creditors of the Debtor's bankruptcy estate. Because the trustee also represents the general creditors' interests, the legal relationship between the trustee and the pre-bankruptcy debtor is incomplete, particularly when the interests of the creditors diverge from those of the debtor.

*In re Montgomery Ward, LLC*, 634 F.3d 732, 738 (3d Cir. 2011) (internal quotation marks and citations omitted).  While most commonly applied to avoidance claims brought by a trustee, this reasoning can apply in the context of state law claims as well.  *See Maxus Energy Corp.*, 2019 WL 647027, at *5-6 (Bankr. D. Del. Feb. 15, 2019) (liquidating trust not precluded from bringing avoidance claims *or* state law alter ego claims, which were property of the estate, because, among other reasons, there was no privity between the trust and the prepetition entity).

Here, the Trustee's interests in asserting state law claims against Company insiders for the benefit of the estates and their creditors are directly opposite to the Company and Defendants' defense of the alleged misconduct and dispute of liability in the prior action.  *See In re Litas Int'l, Inc.*, 1996 WL 617776, at *4-5 (Bankr. S.D.N.Y. Sept. 6, 1996) (trustee would not be precluded from asserting state law causes of action because the interests of the trustee and the debtor's

creditors were not aligned with the entity which controlled the debtor during the prior litigation); *see also* Compl., ¶ 120 ("Prior to entering into the 2015 Settlements and the Consent Judgments, the Company and the Defendants defended the Company's conduct, disputed its liability, and consistently maintained that its business operations complied with federal and state laws and regulations."). Defendants argue that privity exists because in a derivative action the "'true' plaintiff" is the corporation,[25] but "substance rather than form" governs determinations of privity for preclusion purposes[26] and here the Company was, at the time of *OLERS*, controlled by the very individuals who participated in and conspired to perpetrate the wrongdoing alleged in the Complaint (and continued to do so long after the *OLERS* litigation concluded). *See Maxus Energy Corp.*, 2019 WL 647027, at *5 n. 5 ("[I]t would be inequitable to preclude the [liquidating trust] from pursuing these claims against [controlling entities] YPF and Repsol based on decisions that were adverse to the interest of [the debtor]'s creditors when [the debtor] was dominated and controlled by YPF and Repsol."). These "misaligned incentives" defeat Defendants' arguments that the Trustee and the Debtors are in privity for purposes of res judicata or collateral estoppel. *Montgomery Ward, LLC*, 634 F.3d at 738.

Simply stated, the Trustee's claims are not precluded by the *OLERS* litigation.

## 2. The Trustee's Claims Are Not Barred By Judicial Estoppel

Judicial estoppel is an equitable doctrine that "seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding," in order to "prevent litigants from playing fast and loose with the courts." *In re*

---

[25]    *See* MWB Br., p. 15.
[26]    *See Tzanides*, 574 B.R. at 520.

*EXDS, Inc.*, 316 B.R. 817, 824 (Bankr. D. Del. 2004) (citation omitted).[27]  Defendants argue that,

under the doctrine of judicial estoppel, positions taken by EDMC in *OLERS*, *Bushansky*, and the

Government qui tam Action prevent the Trustee from asserting his breach of fiduciary duty, fraud,

and civil conspiracy claims.  These arguments should be rejected because the Trustee has not made

any inconsistent statements to the courts or acted in bad faith, and because applying the doctrine

in these circumstances would be inequitable to the Debtors' creditors.

Three requirements must be met before judicial estoppel is applied: 1) the party took "two

positions that are irreconcilably inconsistent"; 2) the party "changed his or her position in bad faith

– i.e. with intent to play fast and loose with the court"; and 3) application of the doctrine is "tailored

to address the harm identified and no lesser sanction would adequately remedy the damage done

by the litigant's misconduct."  *Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d

773, 779-80 (3d Cir. 2001) (internal quotation marks omitted).  "[J]udicial estoppel is an equitable

doctrine invoked by a court at its discretion."  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).

In the bankruptcy context, courts have recognized that the bankruptcy estate, as represented

by the Trustee, is an entity distinct from the debtor, and that attributing debtor conduct to the

trustee for purposes of judicial estoppel may give rise to inequitable results for the bankruptcy

estate and its creditors.  "[A]s a technical matter the estate in bankruptcy, not the debtor, owns all

pre-bankruptcy claims, and unless the estate itself engages in contradictory litigation tactics the

elements of judicial estoppel are not satisfied."  *Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th

Cir. 2006); *see also In re An-Tze Cheng*, 308 B.R. 448, 459 (9th Cir. B.A.P. 2004), *aff'd sub nom.*,

*In re Cheng*, 160 F. App'x 644 (9th Cir. 2005) ("Commentators are beginning to perceive problems

---

[27]     The doctrine of judicial estoppel is also recognized under Pennsylvania law.  *See Trowbridge v. Scranton Artificial Limb Co.*, 747 A.2d 862, 864-65 (Pa. 2000).

DOCS_DE:231708.1 57092/001

inherent in the nature of bankruptcy as a collective proceeding that may operate to make the [judicial estoppel] remedy worse than the disease."). This principle most frequently arises in the context of a trustee being permitted to pursue causes of action the debtor failed to disclose,[28] but the equitable considerations it raises apply here as well.

In particular, "[t]he fashioning of a judicial estoppel remedy in bankruptcy requires vigilance to the possibility that what looks like a two-party dispute may be complicated by the effect that the result will have on others." *Id.* at 460. In this regard, courts have cautioned that "[a]n overly strict application of judicial estoppel has been criticized as providing a windfall to the alleged wrongdoer and possibly depriving creditors, who are not parties to the nonbankruptcy action, of a potential bankruptcy asset." *Taylor v. Comcast Cablevision of Arkansas, Inc.*, 252 F. Supp. 2d 793, 798 (E.D. Ark. 2003). Such is the case here. Applying the doctrine to prevent the Trustee from asserting claims against Defendants for their misconduct relating to the Debtors' recruiting practices based on prior positions taken by the Debtors – while under Defendants' control – to evade liability for and conceal those practices (which the Defendants made no effort to reform even after the 2015 Settlements) would inequitably deny the estates and their creditors the ability to recover for the hundreds of millions of dollars in damages suffered as a result of Defendants' conduct. *See Cannon-Stokes*, 453 F.3d at 448 ("Judicial estoppel is an equitable

---

[28]    *See, e.g.*, *Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1271-72 (11th Cir. 2004) (judicial estoppel did not apply because party pursuing case against employer was not employee/debtor but bankruptcy trustee, who did not make any inconsistent statements to the courts); *Killmeyer v. Oglebay Norton Co.*, 817 F. Supp. 2d 681, 691-92 (W.D. Pa. 2011) (collecting cases). Some courts have stated that, even if judicial estoppel cannot be applied to a trustee based on a debtor's failure to disclose causes of action in bankruptcy filings, it may still apply based on earlier pre-petition conduct by the debtor. *See, e.g.*, *Parker*, 365 F.3d at 1272 n. 3. As discussed herein, however, the reasoning employed by these courts – particularly that concerning potential harm to creditors – applies equally to the situation here, where application of the doctrine would benefit Defendants while depriving creditors of potential bankruptcy assets (*i.e.*, the causes of action).

doctrine, and it is not equitable to employ it to injure creditors who are themselves victims of the debtor's deceit.").

Defendants assert that positions taken by EDMC in prior litigation should be attributed to the Trustee, but "the [T]rustee and the [D]ebtor[s] are separate entities with separate interests with respect to whom application of judicial estoppel has limits." *In re Miller*, 347 B.R. 48, 57 (Bankr. S.D. Tex. 2006).  As the Southern District of New York has explained:

> Assuming that [the debtor] would be judicially estopped if it were the plaintiff in this action, it does not follow that judicial estoppel should apply to [the debtor's] trustee.  The [] Defendants contend that because a bankruptcy trustee is subject to all claims and defenses that might have been asserted against the debtor, Plaintiff must be judicially estopped.  The fact that a trustee is subject to the claims and defenses that might have been asserted against the debtor, does not mean that those claims and defenses necessarily have the same effect as if they were asserted against the debtor.  As the trustee in bankruptcy is distinct from the pre-petition debtor, the trustee should not be foreclosed from asserting his position.

*In re Payroll Express Corp.*, 921 F. Supp. 1121, 1124 (S.D.N.Y. 1996) (citations omitted); *see also In re Am. Int'l Refinery*, 402 B.R. 728, 750 (Bankr. W.D. La. 2008) ("Nor would the court be inclined to apply [judicial estoppel] in such a way that the pre-appointment conduct of the debtor could be used to unduly limit the ability of an appointed bankruptcy trustee to administer the estate.").  Defendants argue that EDMC's prior conduct should give rise to "an inference of deliberate manipulation" on the part of the Trustee, but the case they cite for this proposition does not involve a trustee and is readily distinguishable because, instead, it involved a creditor being estopped by its *own* prior statements.  *See* MWB Br., p. 22 (citing *In re Dex Media, Inc.*, 595 B.R. 19, 39 (D. Del. 2018)).

"Application of judicial estoppel in the Third Circuit requires a showing of intentional wrongdoing," with inconsistent positions "be[ing] used as a means of obtaining an unfair advantage." *In re Trans World Airlines, Inc.,* 261 B.R. 103, 111 (Bankr. D. Del. 2001) (citing

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996)); *see also*

*In re Integrated Health Servs., Inc.*, 304 B.R. 101, 109 (Bankr. D. Del. 2004), *subsequently aff'd*,

233 F. App'x 115 (3d Cir. 2007) ("[B]ad faith is a prerequisite of judicial estoppel.").  There is no

basis for a bad faith finding here, as the Trustee has not engaged in any contradictory litigation

tactics and certainly has not sought to "play fast and loose with the court" – the harm the doctrine

is intended to prevent.  *Ryan Operations*, 81 F.3d at 361.

Judicial estoppel is an "extraordinary remedy" that "constitutes an exercise of a court's

inherent power to sanction misconduct" and therefore "must be exercised with restraint and

discretion."  *Montrose Med. Group*, 243 F.3d at 784.  Given that the Trustee and the pre-petition

Debtors are distinct entities, that the Trustee has exhibited no bad faith, and that the Debtors'

creditors are the parties who would be inequitably harmed by application of the doctrine, there is

no basis for judicially estopping the Trustee from bringing his breach of fiduciary duty, fraud, and

civil conspiracy claims.  *See id.* at 780, 786 (finding district court erred in applying judicial

estoppel to claims brought by retirement plan fiduciaries because the only parties harmed by

application of the doctrine were the innocent plan participants, which "create[d] rather than

defeat[ed] a miscarriage of justice"); *In re Ho*, 564 B.R. 49, 56 (Bankr. D. Haw. 2017) (judicial

estoppel did not apply where debtors' conduct was not attributable to the trustee, application of

doctrine would harm creditors, and "[n]othing about [] case cast[ed] doubt on the integrity of the

judicial process").

### 3.    The Trustee's Claims Are Not Barred By the Doctrine of Waiver and Abandonment

Defendants argue that the doctrine of waiver and abandonment bars Counts I through III

of the Complaint because of (i) the SLC's decision not to pursue derivative claims, (ii) EDMC's

position in *OLERS*, and (iii) EDMC's agreement to the plaintiff's voluntary dismissal in *Bushansky*.[29]  *See* MWB Br., p. 23.  These arguments are without merit.

The "most widely employed definition of waiver" is that enunciated in *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), wherein the U.S. Supreme Court explained that "a waiver is ordinarily an intentional relinquishment of a known right or privilege."  *In re SLM Int'l, Inc.*, 248 B.R. 240, 247 (D. Del. 2000).  To assess whether waiver should apply, "a court must examine 'the particular facts and circumstances surrounding th[e] case, including the background, experience, and conduct of the accused.'"  *Id.* (quoting *Johnson*, 304 U.S. at 464).  This "totality of the circumstances" analysis is equitable in nature – particularly in the bankruptcy context.  *Id.* at 247-48.  "It has long been established that courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity."  *U.S. Nat'l Bank in Johnstown v. Chase Nat'l Bank of New York City*, 331 U.S. 28, 36 (1947) (internal quotation marks omitted).  As such, the Court's analysis must include consideration of "the equities involved," such as creditors' interests.  *SLM Int'l*, 248 B.R. at 247-48 (citing *Johnstown*, 331 U.S. at 36).

As discussed at length above, the Trustee's claims pertain in large part to misconduct which occurred after the *OLERS* and *Bushansky* litigations were concluded – in particular, insofar as Defendants failed to remedy the Company's illegal business practices even after the Settlements which occurred in November 2015.  These practices were still ongoing, and being investigated by federal and state governments, in 2017 and 2018.  The damages the Trustee seeks – relating to the 2015 Settlements, Consent Judgments, and demise of the Company (as well as relating to the Excessive Payments, which are completely unrelated to *OLERS* or *Bushansky*) – were incurred

---

[29]     *See* Kichline Decl., Ex. 10, Stipulation and Order of Voluntary Dismissal, dated September 22, 2015.

DOCS_DE:231708.1 57092/001

after *OLERS* and *Bushansky* had concluded.  Given that the Trustee's claims include conduct and damages post-dating the prior actions, they cannot have been waived by any position taken in *OLERS* or the dismissal in *Bushansky*.  Furthermore, the stipulated dismissal in *Bushansky* was without prejudice for parties other than Bushansky himself.  *See* Kichline Decl., Ex. 10, p. 4.

Moreover, the Pennsylvania state court's decision in *OLERS* (which was the basis for the *Bushansky* plaintiff's decision to voluntary dismiss his claims, *see id.*, p. 2) was based specifically on issues of derivative standing, which do not apply here.  Here, Counts I through III are property of the Debtors' estates pursuant to 11 U.S.C. § 541, and the Trustee is bringing the claims in his capacity as the representative of those estates.  Prior positions taken by EDMC in litigation concerning shareholders' derivative rights do not operate to bar the Trustee from now bringing claims which belong to the estates.

To the extent Defendants argue that conclusions reached by the SLC are, by themselves, binding on the Trustee and prevent him from bringing claims against the Debtors' directors and officers, this argument is baseless.  It is well established that a trustee has standing to pursue breach of fiduciary duty and related claims against a debtor's former fiduciaries.  *See In re Scott Acquisition Corp.*, 344 B.R. 283, 290-91 (Bankr. D. Del. 2006); *In re OODC, LLC*, 321 B.R. 128, 143 (Bankr. D. Del. 2005).  This authority would be meaningless if, as Defendants argue, the doctrine of waiver operated to prevent the Trustee from challenging a board of directors' prior decisions, even when those decisions violated fiduciary duties and harmed the Debtors.  The Trustee can properly allege that the Debtors' directors and officers breached fiduciary duties with respect to the Company's illegal recruiting practices, notwithstanding any prior contrary (and self-serving) decision made by the SLC otherwise.  And at the pleading stage the Trustee overcomes

59

the business judgment rule as long as he pleads a violation of fiduciary duties, which he has done in his Complaint.

Applying waiver here would inequitably harm the Debtors' creditors.  Courts have rejected attempts by fiduciaries to invoke equitable defenses that would have the effect of letting them "escape liability to the corporation on whose behalf he or she acted."  *See, e.g.*, *In re Bernard L. Madoff Inv. Secs. LLC*, 458 B.R. 87, 123-24 and n. 26 (Bankr. S.D.N.Y. 2011) (explaining why *in pari delicto* defense does not apply to insiders).  Here, denying the Trustee any ability to recover for the fiduciary violations described in the Complaint based on self-serving decisions made by those same fiduciaries when they controlled the Company pre-petition, would only operate to reward Defendants while leaving the Debtors' creditors high and dry.  For similar reasons as discussed above concerning judicial estoppel, this outcome would create rather than prevent an injustice.

### D.    The Complaint Sufficiently Pleads Claims to Avoid and Recover the Excessive Payments Made to the Transferee Defendants

The Trustee alleges that, while the Debtors were in the midst of selling off parts of the business and spiraling out of existence, the Transferee Defendants lined their pockets with more than $20 million in bonuses and severance payments.  *See* Compl., ¶¶ 4, 135-42.  The Trustee seeks to avoid and recover the Excessive Payments as actual and constructive fraudulent transfers under the Bankruptcy Code and the Delaware Uniform Fraudulent Transfer Act ("DUFTA") and as preferential transfers under the Bankruptcy Code.  *See id.*, Count  VI (avoidance of actual fraudulent transfers, pursuant to Section 548(a)(1)(A) of the Bankruptcy Code); Count VII (avoidance of constructive fraudulent transfers, pursuant to Section 548(a)(1)(B) of the Bankruptcy Code); Count VIII (avoidance of preferential transfers made within one year of Petition Date, pursuant to Section 547(b) of the Bankruptcy Code); Count IX (avoidance of

DOCS_DE:231708.1 57092/001

transfers pursuant to Section 544 of the Bankruptcy Code and DUFTA); Count X (recovery of transfers pursuant to Section 550 of the Bankruptcy Code).

### 1. The Excessive Payments Constituted Transfers of the Debtors' Property

As an initial matter, the Complaint sufficiently pleads that the Excessive Payments constituted transfers of property, or of an interest in property, of the Debtors to or for the benefit of the Transferee Defendants. *See* Compl., ¶¶ 180-81, 185, 192. The Bankruptcy Code defines the term "transfer" to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D); *see also* 6 Del. C. § 1301(12) (defining "transfer" in substantively similar terms, for purposes of DUFTA). As payments of money belonging to the Debtors, the Excessive Payments plainly constituted "transfers" within the meaning of the Bankruptcy Code and DUFTA.

The Transferee Defendants argue, based on a Stipulation the Trustee entered into with U.S. Bank in the main bankruptcy case,[30] that the Trustee's avoidance claims should all be dismissed because the Debtors' interest in the transferred funds was encumbered and "likely . . . valueless." *See* KN Br., p. 9.[31] These arguments are baseless and contradicted by the language of the U.S. Bank Stipulation itself.

Paragraph 3 of the U.S. Bank Stipulation states as follows:

U.S. Bank holds a valid and enforceable first priority security interest in and continuing lien on all of the Credit Party Debtors' right, title, and interest to and under all of the Credit Party Debtors' assets ***other than*** (i) estate causes of action, if any, to the extent such causes of action are "Commercial Tort Claims" (as defined in the New York Uniform Commercial Code § 9-102(a)(13)), and (ii) ***causes of***

---

[30]    *See* Case No. 18-11500, *Stipulation Resolving Objection of George L. Miller, Chapter 7 Trustee, to Proofs of Claim Filed By U.S. Bank, National Association as Administrative Agent on Behalf of Itself and Each Secured Claimant*, D.I. 64-1 (the "U.S. Bank Stipulation").
[31]    *See also, e.g.*, KN Br., pp. 11, 15, 19-20 and MJD Br., pp. 27, 30 (arguments concerning purported effect of U.S. Bank's security interest).

61

> ***action, if any, under chapter 5 of the Bankruptcy Code*** (together, (i) and (ii), the
> "***Unliened Assets***").

U.S. Bank Stipulation, ¶ 3 (emphasis added).  Causes of action under chapter 5 of the Bankruptcy

Code include, *inter alia*, causes of action asserted under Sections 544, 547, 548, and 550.  The

Transferee Defendants assert that the exceptions identified in paragraph 3 of the U.S. Bank

Stipulation are "inapplicable" (*see* KN Br., p. 9 n.11), but there can be no dispute that the Trustee's

avoidance and recovery claims are being asserted under chapter 5 of the Bankruptcy Code – and

as such are included within the expressly-defined category of "Unliened Assets" under the U.S.

Bank Stipulation.

The basis for the Transferee Defendants' assertion that the above-referenced language is

"inapplicable" is unclear, but to the extent Defendants are suggesting that even if the Debtors have

an interest in the avoidance and recovery causes of action, they still did not have an interest in the

underlying funds that were transferred, such an argument does not make logical or legal sense

because those causes of action would not even exist unless the Debtors held an interest in the

property for which avoidance and recovery were sought.  The U.S. Bank Stipulation clearly

contemplated that the estates held and intended to pursue causes of action under chapter 5 of the

Bankruptcy Code, such as those asserted by the Trustee here.  *See, e.g.*, U.S. Bank Stipulation, ¶

13(iii).  Moreover, the potential effect of U.S. Bank's security interest on how recovered funds

will ultimately be distributed to creditors has no relevance to this adversary proceeding or the

question of whether the Trustee has adequately stated claims to avoid and recover the transfers

described in the Complaint.

Because the Trustee's causes of action plainly are not subject to the security interest

invoked by the Transferee Defendants, their arguments concerning the purportedly "worthless"

nature of the claims should be rejected.

2.    **Counts VI and IX State Claims for Avoidance of the Excessive Payments as Actually Fraudulent Pursuant to 11 U.S.C. §§ 544 & 548(a)(1)(A) and 6 Del. C. § 1304(a)(1)**

Fraudulent conveyance law exists "to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away." *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000). Under the Bankruptcy Code and Delaware law, actual fraudulent transfers are avoidable if they were made "with actual intent to hinder, delay, or defraud" any of the debtor's creditors. 11 U.S.C. § 548(a)(1)(A); 6 Del. C. § 1304(a)(1).[32]

Because parties to an actual fraudulent transfer rarely acknowledge their fraudulent intent, courts rely on "badges of fraud" as circumstantial proof of actual fraudulent intent. *Charys Holding*, 2010 WL 2774852, at *3, *5; *In re Polichuk*, 506 B.R. 405, 417 (Bankr. E.D. Pa. 2014). The badges of fraud courts often consider include, but are not limited to: "(1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or

---

[32]    Section 544 of the Bankruptcy Code authorizes the avoidance of transfers of the debtor's property that are avoidable by unsecured creditors under applicable state law (here, the Delaware Uniform Fraudulent Transfer Act). *See* 11 U.S.C. § 544. The requirements to state claims for avoidance of actual and constructive fraudulent transfers under the Delaware UFTA are substantially the same as those under Section 548 of the Bankruptcy Code. *See Crystallex Int'l Corp. v. Petroleos De Venezuela, S.A.*, 879 F.3d 79, 86 (3d Cir. 2018). Thus, when evaluating whether elements of such claims have been sufficiently pled, "the result under Delaware law should be the same as the outcome under the Bankruptcy Code." *Id.* However, there is one significant difference between the statutes – DUFTA provides for recovery of fraudulent transfers made up to four years prior to the Petition Date, whereas the Bankruptcy Code provides only a two-year lookback period. *Compare* 6 Del. C. § 1309(1) & (2), *with* 11 U.S.C. § 548(a)(1). For this reason, the Trustee acknowledges that the Excessive Payments made to McEachen, Kramer, and Beekhuizen during 2016 (*see* Compl., ¶¶ 136, 138, and 141), more than 2 years before the Petition Date, are avoidable only under DUFTA. To the extent the Complaint pleads that the 2016 transfers are also avoidable under § 548 of the Bankruptcy Code, that was in error.

63

concealment of the transaction." *Fedders*, 405 B.R. at 545; *see also OODC*, 321 B.R. at 140

(badges of fraud include transferor's knowledge of creditors' claims and its inability to pay them);

6 Del. C. § 1304(b) (setting forth non-exhaustive list of badges for consideration under Delaware

UFTA).

While the presence or absence of any single badge of fraud is "not conclusive," "[t]he

presence of a single … badge of fraud may cast suspicion on the transferor's intent," and "the

confluence of several in one transaction generally provides conclusive evidence of an actual intent

to defraud." *In re Hill*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006). "A court may, of course, consider

factors other than the traditional badges of fraud in an analysis of fraudulent intent," such as, for

example, if the "natural consequence" of the transfer is that the debtor's creditors were hindered,

delayed, or defrauded. *In re Tribune Co.*, 464 B.R. 126, 162 (Bank. D. Del. 2011). Ultimately,

the determination of whether a transfer was made with fraudulent intent is a question of fact "rarely

susceptible to resolution at the summary judgment stage," let alone on a motion to dismiss.

*Polichuk*, 506 B.R. at 418; *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 35 (Bankr. S.D.N.Y.

2007).

The Excessive Payments were made to insiders, without any benefit to the Debtors, at a

time when the Debtors' business was collapsing as a result of illegal business practices

implemented by those same insiders. These allegations implicate multiple badges of fraud,

including the Debtors' insolvency, transfers to insiders, and the lack of reasonably equivalent value

received by the Debtors in exchange for the transfers. With respect to insolvency, the Complaint

describes how the Debtors' liabilities exceeded their assets by hundreds of millions of dollars for

each year from 2014 through the Petition Date. *See* Compl., ¶¶ 113, 142; *see also infra* Section

V.D.3.b (further discussion concerning the Trustee's insolvency allegations). As alleged in the

64

Complaint, the Transferee Defendants were aware of the Debtors' insolvent financial state and impending bankruptcy when they received the Excessive Payments, and knew that their receipt of the payments would "leav[e] the Debtors' creditors high and dry." *Id.*, ¶¶ 182, 204. Given that the Debtors' lacked sufficient assets to pay its other obligations at the time, these allegations also support the badge of fraud concerning the amount of the estate transferred. *See PennySaver USA Publ'g*, 587 B.R. at 461 (allegations that debtor paid bonuses and salaries to affiliates' employees even though it could not afford to pay its other obligations supported claim for actual fraudulent transfer).

The Transferee Defendants received the Excessive Payments due to their roles as officers and directors of the EDMC Companies. *See* Compl., ¶¶ 17-22 (alleging officer and/or director status of each Transferee Defendant). These roles render them "insiders" of the Debtors (which include EDMC, the Delaware Holding Companies, and the wholly owned subsidiaries).[33] *See* 11 U.S.C. § 101(31)(B) (insiders of a corporation include directors, officers, and persons in control of the debtor); 6 Del. C. § 1301(7)b (same); *see also* 11 U.S.C. § 101(31)(E) ("The term 'insider' includes … affiliate, or insider of an affiliate as if such affiliate were the debtor."); 6 Del. C. § 1301(7)d (same)[34]; *see also infra* Section V.D.4.b (further discussion concerning the Transferee Defendants' insider status). However, the Excessive Payments were not justified by any services performed by the Transferee Defendants, because those activities consisted of running the Company in an illegal fashion that caused the Company's collapse. *See* Compl., ¶¶ 143, 189; *infra* Section V.D.3.a (discussing lack of reasonably equivalent value in connection with the Excessive Payments).

---

[33]    *See* Compl., ¶ 10 (allegations regarding Debtors' corporate structure).

[34]    *See also* 11 U.S.C. §§ 101(2)(A)-(B) (corporation that owns 20 percent or more of debtor, or that is owned 20 percent or more by the debtor, is an "affiliate"); 6 Del. C. §§ 1301(1)a-b (same).

65

The confluence of these badges of fraud "provides conclusive evidence of an actual intent to defraud." *Hill*, 342 B.R. at 198.  Moreover, the "natural consequence" of transferring away over $20 million to insiders while the Debtors were collapsing as a result of the illegal business practices detailed in the Complaint was to hinder, delay, or defraud creditors. *Tribune*, 464 B.R. at 162.  In *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3-4 (Bankr. D. Del. Feb. 28, 2019), the court found that the plaintiff stated a claim for actual fraudulent transfer despite not pleading the traditional badges of fraud, because the allegations of the complaint, considered as a whole, demonstrated actual intent to defraud.  The allegations highlighted by the court in this regard included, *inter alia*, that "[the debtor's] entire business model was based on practices that violated the Stark Law and the Anti-Kickback Statute" and that "[t]he legality of [the debtor's] business was being challenged on several fronts and in multiple courts, including by the United States Department of Justice, various qui tam relators, and a competitor…." *Id.* at *4.  Similar allegations exist here.  As discussed herein, the Trustee alleges that the Debtors' entire business model was based on recruiting practices that violated Title IV and other governing federal and state laws and regulations, and that these practices had been the subject of multiple *qui tam* actions, investigations by state and federal governments, and other legal challenges.  Notwithstanding the substantial damages to (and ultimate demise of) the Debtors as a result of these illegal practices – which were implemented and carried out on Defendants' watch – the Excessive Payments enriched the Transferee Defendants at the expense of the Debtors and their creditors.

Accordingly, the Complaint adequately sets forth circumstances of the alleged fraudulent transfers, including sufficient indicia of actual fraudulent intent.  Defendants' motions to dismiss Counts VI and IX should be denied.

> **3.**    **Count VII States a Claim for Avoidance of the Excessive Payments as Constructively Fraudulent Pursuant to 11 U.S.C. § 548(a)(1)(b)**

A plaintiff states a claim for constructive fraudulent transfer by alleging facts demonstrating that: (i) the debtor received less than reasonably equivalent value in exchange for the transfer, and (ii) was insolvent at the time of the transfer or rendered insolvent as a result, or was engaged (or about to be engaged) in business or a transaction for which it had unreasonably small capital. *See* 11 U.S.C. § 548(a)(1)(B); 6 Del. C. §§ 1304(a)(2) & 1305(a). Transfers are also constructively fraudulent under the Bankruptcy Code when made for less than reasonably equivalent value and "to or for the benefit of an insider . . . under an employment contract and not in the ordinary course of business." *See* 11 U.S.C. § 548(a)(1)(B)(ii)(IV). Constructive fraud claims "are subject to the lower standard of Federal Rule of Civil Procedure 8." *Pitt Penn Holding*, 484 B.R. at 36.

### a.    The Complaint Plausibly Alleges Lack of Reasonably Equivalent Value Received in Exchange for the Transfers

To determine whether a debtor received reasonably equivalent value, courts look to the totality of the circumstances, including: "(1) the 'fair market value' of the benefit received as a result of the transfer, (2) 'the existence of an arm's-length relationship between the debtor and the transferee,' and (3) the transferee's good faith." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006) (quoting *In re R.M.L., Inc.*, 92 F.3d 139, 148-49 (3d Cir. 1996)). Courts generally find that a party receives reasonably equivalent value when it "got roughly the value it gave." *Id.* at 212-13; *see also In re Plassein Int'l Corp.*, 2008 WL 1990315, at *6 (Bankr. D. Del. May 5, 2008). Whether a debtor received reasonably equivalent value for an allegedly fraudulent transfer is a factual inquiry ordinarily "not suitable for determination on a motion to dismiss." *In re Am. Bus. Fin. Servs., Inc.*, 361 B.R. 747, 760 (Bankr. D. Del. 2007); *see also In re Charys Holding Co.,*

67

*Inc.*, 443 B.R. 628, 637-38 (Bankr. D. Del. 2010) (value determinations are "inherently fact driven" and "typically require[] testing through the discovery process").

The Complaint pleads that the Debtors did not receive reasonably equivalent value in exchange for making the Excessive Payments because the directors and officers who received those payments were responsible for the unlawful activity that caused the Debtors' demise. *See* Compl., ¶¶ 143, 189. Given that the Transferee Defendants participated in the wrongdoing that caused the Debtors to suffer hundreds of millions in damages (*see* Compl., ¶ 144), the Debtors did not receive value – and certainly not $21 million dollars' worth of value (over $13 million of which represents payments made to McEachen alone) – for making bonus and severance payments to those Defendants while the Company was going under.

In *In re TSIC, Inc.*, 428 B.R. 103, 116-17 (Bankr. D. Del. 2010), the court granted summary judgment for the debtor on its constructive fraudulent transfer claim concerning a severance payment made to its CEO shortly before the company collapsed. The court held that the debtor had received less than reasonably equivalent value in exchange for the severance payment because "[a]t the time [the CEO] signed the Employment Agreement, [his] base salary served as consideration for his services as CEO. . . . [He] had a preexisting duty to provide services as CEO to the Debtor." *Id.* at 114; *see also In re PostRock Energy Corp.*, 2019 WL 137116, at *9 (Bankr. W.D. Okla. Jan. 8, 2019) ("*PostRock I*") (finding lack of reasonably equivalent value sufficiently pled because bonuses were paid in addition to regular wages). The same is true here – the Excessive Payments were made to the Transferee Defendants on top of the regular compensation they received as officers and directors, in which roles they had preexisting duties to provide services to the Debtors. In *TSIC*, the Court explained that a case like this, where large bonuses or severance are paid to executives as the Company collapses, is "the very situation" that Congress

68

intended to remedy when amending the Bankruptcy Code in 2005.  *See TSIC*, 428 B.R. at 110 ("…Congress intended to eliminate excessive insider payments under employment contracts that prejudice general unsecured creditors in light of the Enron and WorldCom bankruptcy cases.  As Senator Richard J. Durbin stated: '[M]y amendment would address fraudulent transfers made by corporate insiders, all those huge payouts and loans and bonuses and transactions that went to these corporate executives as the company was headed to bankruptcy.'") (citing 151 Cong. Rec. S1979-01, 2005 WL 497395, at *21-26 (Cong. Rec. Mar. 3, 2005)).

In response to the Trustee's allegations, the Transferee Defendants argue that they engaged in valuable "employment activities" during the time the Excessive Payments were made,[35] but these are factual disputes which cannot be resolved at the pleading stage.  *See In re Dewey & LeBoeuf LLP*, 2014 WL 4746209, at *11 (Bankr. S.D.N.Y. Sept. 23, 2014) (allegations that payments were so exorbitant that they could not be justified by the services performed sufficiently pled lack of reasonably equivalent value and raised questions of fact inappropriate for resolution on motion to dismiss).  Given that the Trustee sufficiently pleads lack of reasonably equivalent value in connection with the Excessive Payments, further determinations concerning the value of services purportedly provided by the Transferee Defendants require "testing through the discovery process" – particularly given the wide variation in amounts received by each respective Transferee Defendant.  *See Charys Holding*, 443 B.R. at 637-38; Compl., ¶¶ 136-41 and Exs. G-J (identifying transfers, which total approximately: $13.7 million to McEachen; $2.4 million to Kramer; $2.2 million to Jalufka; $1.4 million to Novad; $965,000 to Danielson; and $262,000 to Beekhuizen).

---

[35]     *See* KN Br., p. 19 (contending that they engaged in efforts to "sell the company's assets, recover monies securing regulatory obligations, and transfer the Debtors' students to other institutions").

69

The cases cited by the Transferee Defendants are distinguishable.  In *In re United Tax Group, LLC*, the plaintiff pled *no* information about value received.  2016 WL 7235622, at *4 (Bankr. D. Del. Dec. 13, 2016) (explaining that plaintiff was required to present "some information" of the value received but had failed to do so because the complaint only recited statutory elements).  In *In re AgFeed USA, LLC*, the court recognized that allegations regarding "excessive or extraordinary" payments may be sufficient to overcome a motion to dismiss, but the complaint in that case alleged nothing more than that the new CEO's salary was more than the old CEO's.  558 B.R. 116, 130 (Bankr. D. Del. 2016).  Here, the Trustee pleads that the Debtors did not receive reasonably equivalent value because the "services" provided by the Transferee Defendants consisted of running the Company in an illegal fashion (and thereby causing substantial damages to the Company).

Defendants' argument that that the Trustee "effectively conced[es]" reasonably equivalent value is baseless.  *See* KN Br., p. 19.  The Transferee Defendants rely on *In re Amcad Holdings, LLC*, 579 B.R. 33, 42 (Bankr. D. Del. 2017), but *Amcad* does not pronounce any *per se* rule as to the existence of reasonably equivalent value when a contract exists between the parties.  *Amcad* states that "[a] transfer made by a Debtor to reimburse a party for a pre-existing obligation, *without further explanation*, does not show a lack of reasonably equivalent value."  *Id.* (emphasis added). Importantly, *Amcad* states that this principle applies "*unless the trustee can show the value was not sufficient*."  *Id.* (citing *In re Elrod Holdings Corp.*, 421 B.R. 700, 714 (Bankr. D. Del. 2010)) (emphasis added).  As Judge Kevin Gross has explained, "[t]he court did not find [in *Amcad* and *Elrod*] that a payment on a preexisting debt always constitutes an exchange for reasonably equivalent value; rather, it found that the *Trustees failed to provide sufficient facts or arguments*

70

*that show* that the transfers otherwise lacked reasonably equivalent value." *In re Liquid Holdings Group, Inc.*, 2018 WL 6841351, at *5 (Bankr. D. Del. Nov. 14, 2018) (emphasis in original).[36]

Here, the Trustee's allegations that the "services" provided by the Transferee Defendants consisted of unlawful behavior causing the Debtors' demise supports his position that the Debtors received insufficient value in exchange for the Excessive Payments. *Amcad* did not involve severance or discretionary bonuses paid on top of ordinary compensation; rather, it involved amounts paid to reimburse a party for a loan, an advance, and expenses the party had paid. The court found these reimbursements appeared to reduce amounts owed on pre-existing obligations, and the plaintiff had not pled facts showing otherwise. *Amcad*, 579 B.R. at 42. This is distinguishable from the Excessive Payments, which were bonuses and severance paid to the Transferee Defendants in addition to their regular compensation, and for which the Trustee pleads facts showing lack of reasonably equivalent value.

b.    **The Complaint Contains Sufficient Allegations Concerning the Debtors' Poor Financial Condition and the Extraordinary Nature of the Transfers**

Pursuant to Section 548(a)(1)(B)(ii), a transfer is avoidable as a constructive fraudulent transfer if, in addition to being made for less than reasonably equivalent value, the transfer was made when the debtor:

(I)    was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II)    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

[…] *or*

---

[36]    In *Liquid Holdings*, the court rejected the proposition that pleading the existence of an antecedent debt in connection with a preference claim operates to prevent the plaintiff from also alleging lack of reasonably equivalent value for purposes of a fraudulent transfer claim concerning the same payment. *See* 2018 WL 6841351, at *5.

71

(IV)    made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B)(ii) (emphasis added).[37]  The Complaint states a claim under each of these three subsections.

Insolvency is defined generally as an entity's debts being greater than the sum of such entity's property, at a fair valuation.  *See* 11 U.S.C. § 101(32)(A); *see also* 6 Del. C. § 1302. Insolvency is recognized as "a factual inquiry that often evades determination at the motion to dismiss stage." *In re FAH Liquidating Corp.*, 572 B.R. 117, 128 (Bankr. D. Del. 2017).  Moreover, the Trustee's burden to plead insolvency is not onerous.  *See id.* (as long as complaint provides enough information "to raise a reasonable expectation that discovery will reveal evidence of" insolvency, that is sufficient at the pleading stage) (quoting *Twombly*, 550 U.S. at 556).

The Complaint alleges that EDMC was insolvent "[n]o later than June 30, 2014," with "liabilities exceed[ing] assets by almost $300 million," and "*remained insolvent through the Petition Date*."  Compl., ¶ 113 (emphasis added).  In this regard, the Complaint alleges that the Debtors "were insolvent when the Excessive Payments to Defendants were made," and provides the following particulars concerning the Debtors' deteriorating financial condition in the years leading up to the Petition Date:

On June 30, 2016, Debtors had $1,012,222,843 in total assets and $1,292,738,942 in total liabilities, for an excess of liabilities over assets of $280,388,243. On June 30, 2017, Debtors had $717,217,387 in total assets and $1,184,301,067 in total liabilities, for an excess of liabilities over assets of $467,083,680. And at the time of the Petition Date, the Company had only $394,635 in assets (excluding net operating loss) and liabilities of $628,885,442.

---

[37]    Because Section 548(a)(1)(B)(ii) is written in the disjunctive, the Trustee states a claim for constructive fraudulent transfer by sufficiently pleading the requirements of any one of the conditions identified therein. *See In re Kendall*, 491 B.R. 191 (Table), at *6 (10th Cir. B.A.P. 2013), *aff'd*, 565 F. App'x 714 (10th Cir. 2014).

*Id.*, ¶ 142[38]; *see also id.*, ¶ 187.[39]  These allegations are more than sufficient to establish the Debtors' continual state of insolvency – with excess liabilities amounting to hundreds of millions of dollars and increasing each year – during the time period when the Excessive Payments were made between January 2016 and February 2018.  The Transferee Defendants' argument that these figures do not plead insolvency because they do not pertain to the exact dates on which the Excessive Payments were made (*see* MJD Br., pp. 25-26) is frivolous.  The figures cited by the Trustee demonstrate insolvency for each of the relevant fiscal years, and the Court can plausibly infer that the Debtors continued to be insolvent throughout the course of each year, particularly given that the Debtors' business was in a death spiral at the time.[40]  *See In re Troll Commc'ns, LLC*, 385 B.R. 110, 123 (Bankr. D. Del. 2008) (insolvency adequately pleaded where plaintiff alleged facts showing that debtors' liabilities exceeded their assets beginning one year before, and continuing until, the petition date, during which time the transfers were made).

The Complaint also pleads a constructive fraudulent transfer claim based on unreasonably small capital.  *See* 11 U.S.C. 548(a)(1)(B)(ii)(II) (providing for constructive fraudulent transfer claim when debtor was engaged in business or a transaction for which property remaining with debtor was an unreasonably small capital); *see also* 6 Del. C. § 1304(a)(2)a (same).

---

[38]    The data points cited in paragraphs 113 and 142 of the Complaint are measured as of June 30 of those respective years because the Debtors' fiscal year ended on June 30.

[39]    The Complaint also alleges that in January 2017, when the Debtors sold assets associated with Brown Mackie College campuses, "[t]he Debtors' business and assets were in such poor financial shape at the time that Debtors actually had to ***pay*** [the buyer] $2.1 million in connection with the sale." Compl., ¶ 128.

[40]    The alternate explanation suggested by Defendants – that between June of each year the Debtors somehow overcame their financial struggles to return to a state of solvency (for long enough to make substantial bonus payments), only to return to an even worse state of insolvency by the following June – is completely implausible and, in any event, not supported by the Trustee's allegations, which must be accepted as true at the pleading stage.  Moreover, payments which cause a debtor to become insolvent are also avoidable as constructive fraudulent transfers.  *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I).

73

"[U]nreasonably small capital denotes a financial condition short of equitable insolvency," and "refer[s] to the inability to generate sufficient profits to sustain operations." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992).[41]  The Complaint alleges that as a result of the Excessive Payments the Debtors were left with unreasonably small capital with which to conduct their business.  *See* Compl., ¶ 186.  The Debtors were already in the process of selling off assets for pennies on the dollar and winding down operations, giving rise to the plausible inference that they lacked sufficient capital to sustain their operations – a condition only worsened by making more than $20 million in unwarranted bonus payments to the Transferee Defendants.  *See id.*, ¶¶ 4, 122-29, 135, 186.

Finally, the Complaint also pleads a constructive fraudulent transfer claim under Section 548(a)(1)(B)(ii)(IV) of the Bankruptcy Code, which provides for avoidance of transfers made "to or for the benefit of an insider . . . under an employment contract and not in the ordinary course of business."  11 U.S.C. § 548(a)(1)(B)(ii)(IV); *see also* Compl., ¶ 188 ("The Excessive Payments to Defendants were made to the benefit of insiders, under an employment contract, and were not made in the ordinary course of business, as they consisted largely of unwarranted bonus payments for engaging in unlawful activity."); *see also infra* Section V.D.4.b (discussing Defendants' insider status, due to their roles as officers and directors).  The Transferee Defendants challenge whether the transfers were made outside the ordinary course of business (*see* MJD Br., p. 29 and n. 27), but "[c]ourts hold that when a debtor transfers funds for the sole benefit of an insider, the transfer is not considered in the ordinary course of business."  *TSIC*, 428 B.R. at 116.  The allegations of the Complaint – taken as true as they must be at this stage – describe "transfer[s] made to [] insider[s]

---

[41]     "Much like the insolvency inquiry, unreasonably small capital often turns on questions of fact, thus being inappropriate to decide on a motion to dismiss." *In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 859 (Bankr. D. Del. 2018).

at a time when the Debtor[s] suffered from severe financial distress, therefore making the payment[s] extraordinary and avoidable." *Id.* Indeed, Section 548(a)(1)(B)(ii)(IV) was enacted specifically to address the problem of huge payouts and bonuses – such as the Excessive Payments here – made to corporate executives as the Company was headed to bankruptcy. *See id.* at 110 (citing 151 Cong. Rec. S1979-01, 2005 WL 497395, at *21-26 (Cong. Rec. Mar. 3, 2005)); *see also* Compl., ¶¶ 123-29 (Debtors' "teach-out" of certain locations began in January 2016, and closure of campuses and selling off assets commenced in June 2016).

For the foregoing reasons, Defendants' motions to dismiss VII should be denied.

### c. The Complaint's Factual Allegations Also State Claims for Constructive Fraudulent Transfer Under DUFTA

Count IX, which asserts a claim under DUFTA, refers in its heading only to 6 Del. C. § 1304(a)(1), which concerns actual fraudulent transfer. Count IX, however, also encompasses constructive fraud claims under DUFTA, under 6 Del. C. §§ 1304(a)(2) and 1305, as demonstrated by the substantive allegations of Count IX, which address the required elements for constructive fraud as well as actual fraud. *See* Compl., ¶¶ 203-04, 206-08; *see also id.*, ¶ 210 ("the Excessive Payments to Defendants constitute avoidable fraudulent transfers pursuant to 6 Del. C. §§ 1304 and 1305").

"The pleading requirements as set out in the Federal Rules ask whether the factual allegations of the Complaint – not the precise pleading of a specific statute or law – provide [Defendant] with fair notice of the claims asserted against it." *OC Tint Shop, Inc. v. CPFilms, Inc.*, 2018 WL 4658211, at *8 (D. Del. Sept. 27, 2018) (internal quotation marks omitted); *see also Albert v. Carovano*, 851 F.2d 561, 571 n. 3 (2d Cir. 1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.").

75

Sections 1304(a)(2) and 1305(a) of DUFTA are substantially similar to Sections 548(a)(1)(B)(ii)(I)-(III) of the Bankruptcy Code, though they provide for avoidance of fraudulent transfers made up to four years before the Petition Date (and thus encompass all of the Excessive Payments, including those made in 2016). *See* 6 Del. C. §§ 1304(a)(2), 1305(a), & 1309(2). The Complaint states claims against the Transferee Defendants under §§ 1304(a)(2) and 1305(a) for the same reasons as discussed above concerning the constructive fraudulent transfer claims under the Bankruptcy Code – particularly, that the Complaint pleads lack of reasonably equivalent value, the Debtors' insolvency, and unreasonably small capital.[42]

Additionally, Section 1305(b) of DUFTA provides for avoidance of transfers made within one year of the Petition Date if made "to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent." 6 Del. C. §§ 1305(b) & 1309(3). With respect to the transfers made to McEachen, Jalufka, Danielson, Kramer, and Novad during 2017 and 2018 (all of which were made within one year of the Petition Date), the Complaint states claims under 6 Del. C. § 1305(b) because the Transferee Defendants are insiders, the transfers were made on account of antecedent debt, and the Transferee Defendants, by virtue of their role as officers and directors, knew that the Debtors were insolvent at the time. *See infra* Section V.D.4.b; Compl., ¶ 203 ("Defendants took the Excessive Payments to Defendants knowing that the Debtors were insolvent and heading into bankruptcy.").

For these reasons, the substantive allegations of the Complaint state claims for avoidance of fraudulent transfers under §§ 1304(a)(2) and 1305 of DUFTA and provide fair notice to the

---

[42] The Complaint also pleads the existence of triggering creditors under Section 544. *See* Compl., ¶¶ 200, 204-05 and Ex. K. Defendants do not challenge this aspect of the Trustee's pleading.

76

Transferee Defendants of the Trustee's assertion of those claims (*see, e.g.*, Compl., ¶ 210).[43]  *See In re Oakwood Homes Corp.*, 340 B.R. 510, 525-26 (Bankr. D. Del. 2006) (liquidating trust stated strong-arm claim under Section 544 despite not identifying particular state law under which it was proceeding).

### 4.    The Complaint States a Claim to Avoid and Recover Excessive Payments Made Within One Year of the Petition Date as Preferential Transfers

Section 547(b) of the Bankruptcy Code provides that a transfer is avoidable as a preference when the transfer was (i) to or for the benefit of a creditor, (ii) for or on account of an antecedent debt, (iii) made when the Debtor was insolvent, (iv) made within 90 days before the petition or within one year if the creditor was an insider, and (v) enabled the creditor to receive more than he would have in a Chapter 7 liquidation had the payment not been made.  11 U.S.C. § 547(b).  To the extent that certain of the Excessive Payments (more than $20.3 million dollars' worth) were made within one year of the Petition Date, the Trustee seeks to avoid those transfers as preferences under Section 547(b).  *See* Compl., Count VIII.[44]

### a.    The "Reasonable Due Diligence" Language Contained In Section 547(b) Does Not Modify or Create Additional Pleading Requirements, and Defendants' Factual Disputes Are Meritless and, In Any Event, Not Bases for Dismissal Under Rule 12(b)(6)

---

[43]    Alternatively, the Trustee seeks leave to amend his Complaint to, *inter alia*, clarify the scope of Count IX.  *See infra* Section V.G.

[44]    In total, the Trustee seeks avoidance of $20,392,173.27 in preferential payments (*i.e.*, Excessive Payments made after June 29, 2017), broken down as follows: (i) $13,459,814.27 to McEachen; (ii) $2,202,295 to Jalufka; (iii) $965,000 to Danielson; (iv) $2,321,402 to Kramer; and (v) $1,443,662 to Novad.  *See id.*, ¶¶ 136-40 and Exs. G-J (identifying transfers).  The January 15, 2016 transfers to McEachen and Kramer are not among those the Trustee seeks to avoid as preferential transfers.  *See id.*, ¶ 198 (seeking avoidance of "the Excessive Payments to Defendants made within one year of the Petition Date" as preferential transfers).

With respect to Defendant Beekhuizen, who received one Excessive Payment on March 18, 2016, the Complaint incorrectly states that the preference claim (Count VIII) is also brought against him.  This was a drafting error.  To clarify, Count VIII was intended to be limited to those Defendants which received Excessive Payments within one year of the Petition Date – *i.e.*, Defendants McEachen, Jalufka, Danielson, Kramer, and Novad.  *See id.*, ¶¶ 194, 198.

77

In connection with the Small Business Reorganization Act of 2019 ("SBRA"), Section 547(b) was amended to add language emphasizing that a preference claim brought thereunder should be "based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection [547](c)." 11 U.S.C. § 547(b); *see also* Small Business Reorganization Act of 2019, Pub. L. 116-54, Aug. 23, 2019, 133 Stat. 1079, § 3(a) (2019) (enacted) (effective Feb. 19, 2020).   The Transferee Defendants invoke this language to argue that the preference claim must be dismissed for failing to rebut their purported defense concerning U.S. Bank's security interest.  *See* KN Br., pp. 10-12. This argument must be rejected because, as discussed above, the Trustee's avoidance claims are not subject to the lien held by U.S. Bank.  *See supra* Section V.D.1.  Furthermore, the Transferee Defendants' argument is contrary to well-established principles concerning pleading standards and burdens of proof.   The Trustee is not required under Section 547 to plead the details of his investigation concerning the Debtors' affairs, and the argument raised by the Transferee Defendants neither has merit nor serves as a basis for dismissal under Rule 12(b)(6).

Congress's addition of language concerning "reasonable due diligence" and consideration of potential affirmative defenses to Section 547(b) was intended to "specif[y] an additional criterion that a trustee must *consider* before commencing an action to recover a preferential transfer."  *See* H.R. Rep. No. 116-671, at 4 (2019) (House of Representatives' Committee on the Judiciary Report discussing purpose of SBRA's revisions to Section 547) (emphasis added); *see also American Bankruptcy Institute Commission to Study the Reform of Chapter 11: 2012~2014 Final Report and Recommendations* (the "ABI Report"), 23 AM. BANKR. INST. L. REV. 1, 164 (Winter 2015) (explaining that goal of change was to "codify[] a standard" requiring the Trustee "to perform reasonable due diligence and to make good faith efforts to evaluate the merits of the

preference claim.").[45]   The Trustee's detailed Complaint evidences his investigation into the

Debtors' affairs.  *See* 11 U.S.C. § 704(a)(4) (duties of Trustee include "investigat[ing] the financial

affairs of the debtor"); FED. R. BANKR. P. 9011(b) (submission of pleading to the Court constitutes

a certification that the party has engaged in "inquiry reasonable under the circumstances").  There

is no basis for the Transferee Defendants' contention that the Trustee is required to describe such

efforts in the Complaint.

The SBRA's revision to Section 547(b) did not create additional pleading requirements or

shift any burden of proof concerning potential defenses to the claim.   Indeed, in its report

recommending addition of the "reasonable due diligence" language, the ABI explained that it had

purposefully rejected proposed revisions that would have added requirements for a trustee to make

"affirmative statements" regarding his investigation or rebut affirmative defenses as part of his

prima facie case.  *Id.*  This accords with the well-established principle that a plaintiff is not required

to overcome or disprove possible affirmative defenses in his pleading.  *See Schmidt*, 770 F.3d at

248.  Section 547(g) codifies this principle with respect to preferential transfers, providing that

"the creditor or party in interest against whom recovery or avoidance is sought has the burden of

proving the nonavoidability of a transfer under subsection (c) of this section."  11 U.S.C. § 547(g).

Thus, even though Section 547(b) provides for consideration of affirmative defenses as part of the

Trustee's pre-suit investigation, that language does not have the effect of shifting any burden onto

the Trustee to refute possible defenses in his pleading.

---

[45]      The provisions of the SBRA were derived primarily from recommendations developed by
the ABI and the National Bankruptcy Conference.  *See* H.R. Rep. No. 116-671, at 4.  The ABI
recommended adding language to Section 547(b) concerning "reasonable due diligence" and
consideration of potential affirmative defenses by the trustee.  *See* ABI Report, 23 AM. BANKR.
INST. L. REV. at 161-65.  That recommendation was incorporated into the SBRA.  *See* Pub. L. 116-
54, § 3(a).

Though the Transferee Defendants have couched their argument as criticism of the Trustee's investigation efforts, it is clear that their argument is actually based on nothing more than a dispute concerning the avoidability of the preferential transfers alleged by the Trustee. The Trustee asserts that the Excessive Payments to the Transferee Defendants were transfers of property, or of an interest in property, of the Debtors. *See* Compl., ¶ 192. The Transferee Defendants disagree. *See* KN Br., pp. 11-12 (arguing transfers not within reach of Section 547 because funds at issue were encumbered). For the reasons discussed above, their argument is wrong. In any event though, it constitutes a defense which must be resolved at summary judgment or trial.[46] *See Slobodian v. U.S. ex rel. I.R.S.*, 2014 WL 2041815, at *4 (M.D. Pa. May 12, 2014) (declining to dismiss preference claim based on challenges concerning the creditor/debtor relationship and whether transferred funds were the debtor's interest in property, because the trustee was not required to prove his case at the pleading stage).

Finally, Defendants' attempt to add additional facts and documents into the record as a supposed basis for dismissal should be rejected. *See* KN Br., pp. 7-8 (assertions concerning the background of EDMC's asset sales); *id.*, p. 9 and n. 11 (assertions concerning lien held by U.S. Bank). Defendants' belief that additional facts not contained in the Complaint mitigate their liability for the preference claims asserted against them is not appropriate for consideration at this

---

[46]     The language used by Defendants themselves in their briefing underscores this point. *See, e.g.*, KN Br., p. 11 (arguing that the Trustee's preference allegations "*likely* lack merit," that the transfers are "*likely* not subject to avoidance because they were *almost certainly* fully encumbered," and that the Trustee's claim will stand "*only if*" U.S. Bank was not undersecured) (emphasis added). These arguments merely demonstrate the existence of factual disputes, which – in addition to being meritless – cannot properly be resolved at the pleading stage. Indeed, the three cases cited by Defendants as support for their argument were all decided on summary judgment, not a motion to dismiss. *See id.*, pp. 11-12 (citing *In re Ramba, Inc.*, 437 F.3d 457, 460 (5th Cir. 2006) (addressing motion for summary judgment); *In re Biggers*, 249 B.R. 873, 878 (Bankr. M.D. Tenn. 2000) (same); *In re Wind Power Sys., Inc.*, 841 F.2d 288, 292 (9th Cir. 1988) (same)).

DOCS_DE:231708.1 57092/001

stage and is not a basis for dismissal.  *See Sweda v. Univ. of Penn.*, 923 F.3d 320, 332 (3d Cir. 2019) (reasonable inferences must be drawn in plaintiff's favor on a motion to dismiss, and district court erred by instead drawing inferences in defendant's favor and faulting plaintiff for not pleading facts contradicting those inferences).

**b.    The Trustee Sufficiently Identifies the Preferential Transfers and Pleads All Required Elements Under Section 547(b)**

The Transferee Defendants further challenge the Trustee's preference claim by arguing that the Complaint fails to sufficiently identify the transfers at issue and fails to plead the existence of antecedent debt, the Defendants' insider status, or the Debtors' insolvency.   None of these arguments has merit.

*First*, the Complaint contains sufficient information identifying the Excessive Payments that the Trustee seeks to avoid and recover.  The Complaint identifies the amount, date, and recipient of the transfers and the nature of the antecedent debt (*i.e.*, one arising out of the Transferee Defendants' employment contracts).  The Transferee Defendants argue that the preference claim must be dismissed because it does not identify which of the Debtors made the transfer.  Some cases have dismissed preference claims that did not identify which of multiple debtors made the transfer. *See, e.g.*, *In re THQ Inc.*, 2016 WL 1599798, at *3 (Bankr. D. Del. Apr. 18, 2016); *In re Crucible Materials Corp.*, 2011 WL 2669113, at *4 (Bankr. D. Del. July 6, 2011).  Often in those cases the preference claim suffered from other infirmities as well.  *See, e.g.*, *id.* (complaint also lacked any information about nature of relationship between parties or antecedent debt).  That is not the case here, where the Trustee sufficiently alleges each element of his preference claim and information concerning the Transferee Defendants' relationship with the Debtors.  These allegations are sufficient to provide the "fair notice due and owing to the Defendants" and states a plausible entitlement to relief.  *In re NJ Affordable Homes Corp.*, 2013 WL 6048836, at *34 (Bankr. D.N.J.

81

Nov. 8, 2013); *see also In re Green Field Energy Servs., Inc.*, 2015 WL 5146161, at *13 (Bankr. D. Del. Aug. 31, 2015) (rejecting heightened pleading standard for preference claims).  Count VIII should not be dismissed on this basis.[47]

*Second*, the Complaint sufficiently pleads that the Excessive Payments were made on account of antecedent debt.  Under the Bankruptcy Code, the term "debt" is "coextensive with the definition of a claim," which includes any right to payment "whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," and is "construed broadly." *In re First Jersey Sec., Inc.*, 180 F.3d 504, 510 (3d Cir. 1999) (citing 11 U.S.C. § 101(5)).  "[T]he case law reveals an obvious trend interpreting 'antecedent debt' broadly and rejecting the proposition that debt is only incurred as it becomes due." *In re Enron Corp.*, 357 B.R. 32, 44 (Bankr. S.D.N.Y. 2006). As such, bonuses constitute payments on antecedent debt, and thus avoidable preferences, when paid pursuant to an agreement or bonus/retention plan. *See PostRock I*, 2019 WL 137116, at *9 ("This Court agrees with many courts that find that the 'debt' associated with bonus and retention plans arise when the contract, agreement or plan is formed and put in place rather than when the payment becomes due.").  The same is true for severance payments. *See In re PostRock Energy Corp.*, 2019 WL 137115, at *10 (Bankr. W.D. Okla. Jan. 8, 2019) ("*PostRock II*") (trustee

---

[47]    In the alternative, should the Court find that the Excessive Payments are not sufficiently identified, the Trustee seeks leave to amend to add further identifying information in the Complaint. *See infra* Section V.G.

Additionally, even if the Court were to find that the preference claim should be dismissed on this basis, the Trustee's allegations are still sufficiently specific for purposes of his fraudulent transfer claims. *See PennySaver USA Publ'g*, 587 B.R. at 455-62 (dismissing preference claim for failure to identify specific debtor-transferor, but denying motion to dismiss as to fraudulent transfer claims under the Bankruptcy Code, DUFTA, and California law). In *PennySaver*, the Court explained "it is not clear which of the 'Debtors' made the transfer, though it is clear that 'the Debtors' made each of the allegedly fraudulent transfers," which was sufficient to "give[] each Defendant fair notice." *Id.* at 458.

plausibly alleged severance payment was made on account of an antecedent debt because the obligation "likely arose prior to [the employee's termination] under an employment contract or severance agreement"). The Trustee's allegations that the Excessive Payments constituted bonuses and severance made on account of antecedent debts arising out of the Transferee Defendants' employment contracts (*see Compl.*, ¶¶ 136-41, 195) thus plausibly allege the existence of antecedent debt for purposes of avoiding the transfers as preferences.

*Third*, the Complaint sufficiently pleads the Transferee Defendants' insider status, given their roles as officers and/or directors of EDMC and of the Delaware Holding Companies, which wholly-owned the rest of the Debtors. The Complaint alleges that the Transferee Defendants held the following roles:

- McEachen: CEO of EDMC and the Delaware Holding Companies from September 2015 to December 2017, and Chairman of EDMC Boards[48] from April 2015 to December 2017;

- Jalufka: CFO of EDMC and the Delaware Holding Companies from January 2016 to December 2017, and CEO of EDMC and President of each Debtor from December 2017 until the Petition Date;

- Kramer: Senior VP, General Counsel, and Secretary of EDMC and the Delaware Holding Companies from July 2006 to December 2017, in addition to earlier roles;

- Novad: Office of the Chairman and Senior VP of HR of EDMC and the Delaware Holding Companies, in addition to earlier roles before August 2015; and

- Danielson: member of EDMC Boards from April 2015 to June 2018.

---

[48]     "EDMC Boards" is defined in the Complaint as including the boards of EDMC and each of the Delaware Holding Companies. *See* Compl., ¶ 13.

DOCS_DE:231708.1 57092/001

*See* Compl., ¶¶ 17-21.[49]  The Complaint further alleges that each of these Defendants played an "instrumental role in supervising, approving and directing" the Debtors' business activities described in the Complaint.  *Id.*

Based on these allegations, the Transferee Defendants qualify as statutory insiders of each of the Debtors.  The Bankruptcy Code sets forth a non-exhaustive list of the types of individuals or entities which may be considered "insiders" of a debtor, which includes, *inter alia*, directors, officers, and persons in control of the debtor.  *See* 11 U.S.C. § 101(31)(B).[50]  The Complaint plainly alleges officer and director roles – and thus insider status – held by the Transferee Defendants with respect to Debtors EDMC and the Delaware Holding Companies.  *See In re F-Squared Inv. Mgmt., LLC*, 600 B.R. 294, 311 (Bankr. D. Del. 2019) (allegations that defendants held "Senior Vice President" titles and participated in company's management sufficiently alleged insider status for purposes of Section 547).

The Transferee Defendants also qualify as insiders of the rest of the Debtor entities – which are wholly-owned subsidiaries of the Delaware Holding Companies – because under the Bankruptcy Code "insider[s] of an affiliate" are included among the types of parties considered statutory insiders.  *See* 11 U.S.C. § 101(31)(E) ("The term 'insider' includes … affiliate, or insider

---

[49]    Defendant Beekhuizen was Executive VP and CFO of EDMC and the Delaware Holding Companies from April 2013 to March 2016, as well as a member of the EDMC Boards prior to that time.  *See* Compl., ¶ 22.  Though Beekhuizen did not receive a preferential transfer, his insider status is relevant for purposes of the Trustee's actual fraudulent transfer claims against him (*see supra* Section V.D.2) and is sufficiently alleged in the Complaint for the same reasons as discussed herein with respect to the other Transferee Defendants.

[50]    The Bankruptcy Code's definition of a "corporation" includes unincorporated limited liability companies.  *See* 11 U.S.C. § 101(9)(A)(iv); *In re Longview Aluminum, LLC*, 657 F.3d 507, 509 n.1 (7th Cir. 2011); *see also In re Pearson*, 2010 WL 3956762, at *3 (Bankr. M.D. Pa. Oct. 7, 2010) (a limited liability company is the equivalent of a corporation for purposes of determining insider status); *In re Brooke Corp.*, 506 B.R. 560, 571 (Bankr. D. Kan. 2014) (a limited liability company is equivalent to a corporation for purposes of determining whether entities are affiliates).

84

of an affiliate as if such affiliate were the debtor.").  An "affiliate" includes any entity that "directly or indirectly owns, controls, or holds with power to vote" 20 percent or more of a debtor, or that is "directly or indirectly owned, controlled, or held with power to vote" 20 percent or more by the debtor.  *See* 11 U.S.C. §§ 101(2)(A)-(B).  As alleged in the Complaint, EDMC is the ultimate parent of the Debtors and the sole and managing member of the four Delaware Holding Companies, which in turn wholly-own the subsidiary for-profit learning institutions that make up the rest of the Debtors.  *See* Compl., ¶ 10 and Ex. A (allegations and chart concerning Debtors' organizational structure).  The Debtors are thus "affiliates" of one another – meaning that as "insiders" of EDMC and the Delaware Holding Companies, the Transferee Defendants are also "insiders" of the rest of the Debtors under 11 U.S.C. § 101(31)(E).  *See, e.g.*, *In re Bayonne Med. Ctr.*, 429 B.R. 152, 175 (Bankr. D.N.J. 2010) ("An affiliate can be an entity which holds as little as a twenty-percent block of a debtor's voting securities . . . and *its director* will be an insider *of the debtor*.") (emphasis in original); *PostRock II*, 2019 WL 137115, at *9 (CEO of parent company was also an insider of wholly-owned subsidiary, under 11 U.S.C. § 101(31)(E)).[51]

---

[51]     Defendant McEachen argues that the February 2018 payment he received was not an "insider" payment because he had already left the Company by that time.  *See* MJD Br., p. 25.  This argument is meritless because the payment is alleged to have been a bonus payment arising out of his employment relationship with the Company (which continued until December 2017, within the one-year insider preference period), even if the funds were not actually paid until after he left.  While cases have held that insider status for the recipient of a preference should be determined by the exact date of the transfer (*see, e.g.*, *In re Our Alchemy, LLC*, 2019 WL 4447202, at *6 (Bankr. D. Del. Sept. 16, 2019)), this Court has recognized in the fraudulent transfer context that where, as here, an insider is granted an employment-related benefit payment but does not actually receive the payment until he has already left the company, such a payment should still be considered an "insider" payment.  *See TSIC*, 428 B.R. 103, 110-11; *In re DBSI, Inc.*, 445 B.R. 344, 348 (Bankr. D. Del. 2011).  The same reasoning should apply here for the preference received by McEachen in February 2018, because otherwise "insiders could orchestrate the timing of [employment-related benefit payments] to occur after resignation when they were no longer insiders."  *TSIC*, 428 B.R. 103, 111.

DOCS_DE:231708.1 57092/001

*Fourth*, and finally, the Complaint sufficiently pleads the Debtors' insolvency at the time the Excessive Payments were made. As discussed at length above, the Trustee's allegations establish the Debtors' continual state of insolvency, with excess liabilities amounting to hundreds of millions of dollars, in the years leading up to the Debtors' bankruptcy, including during the one-year insider preference period. *See supra* Section V.D.3.b; *see also PostRock I*, 2019 WL 137116, at *8 (allegations regarding debtors' financial struggles and that their liabilities exceeded assets for one-year period preceding the petition date plausibly alleged insolvency for debtors as a whole and separately).

For these reasons, the Complaint states a claim to avoid the Excessive Payments made within the one-year period preceding the Petition Date as preferential transfers.

<blockquote>

**5.**     **Because the Complaint Adequately States Avoidance Claims Under 11 U.S.C. §§ 544, 547, & 548, Plaintiff's Claim for Recovery of the Avoided Transfers Under § 550 Also States a Claim for Relief**

</blockquote>

The Transferee Defendants also move to dismiss Count X, which seeks to recover the Excessive Payments under § 550 of the Bankruptcy Code once those transfers are avoided under §§ 544, 547, and 548. Their arguments hinge on the contention that Counts VI, VII, VIII, and IX fail to state viable claims, and therefore Count X also fails to do so. As explained above, however, Counts VI, VII, VIII, and IX properly state claims to avoid the Excessive Payments as actually and constructively fraudulent under DUFTA and the Bankruptcy Code and as preferential transfers under § 547 of the Bankruptcy Code. Accordingly, the Trustee's claim under § 550 of the Bankruptcy Code is adequately pled as well. *See In re Ritz Camera & Image, LLC*, 2014 WL 432192, at *3 (Bankr. D. Del. Feb. 4, 2014) ("Where a party's only basis for dismissing the complaint for recovery of payments under 11 U.S.C. § 550 is the dismissal of the underlying claim, it is proper to rule on the Section 550 claim in the same manner as the underlying claim."); *In re*

*Wash. Mut., Inc.*, 2013 WL 3757330, at *6 (Bankr. D. Del. July 16, 2013) (denying motion to dismiss count for recovery where the court declined to dismiss related avoidance count).

The Transferee Defendants also once again raise their argument concerning the Debtors' supposedly "worthless" interest in the Excessive Payments. This argument is baseless because the Trustee's Section 550 claim is not subject to the U.S. Bank Stipulation on which Defendants rely. Furthermore, questions concerning the scope of the Debtors' ultimate recovery on its claims cannot be resolved at the pleading stage. The cases cited by Defendants illustrate the point – as they are summary judgment or post-trial opinions, which reach their conclusions by analyzing evidence presented. *See* KN Br., pp. 20-21 (citing *In re All Phase Roofing & Constr., LLC*, 2020 WL 374357, at *16-17 (Bankr. W.D. Okla. Jan. 17, 2020), *aff'd*, 2020 WL 5512500 (10th Cir. B.A.P. Sept. 14, 2020) (post-trial findings of fact and conclusions of law); *In re Bean*, 252 F.3d 113, 117 (2d Cir. 2001) (summary judgment); *In re Hecker*, 496 B.R. 541, 552 (8th Cir. B.A.P. 2013) (post-trial)). These decisions do not support Defendants' argument that the Trustee's Section 550 claim should be dismissed at the pleading stage. Because the Complaint states claims for avoidance of the Excessive Payments, the claim for recovery is stated as well.

### E.    The Complaint States a Claim for Corporate Waste Based on the Excessive Payments Made to Transferee Defendants

A claim for corporate waste under Delaware law requires alleging facts showing an exchange of corporate assets "for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade" or for "no corporate purpose." *In re The Brown Schools*, 368 B.R. 394, 408 (Bankr. D. Del. 2007). "The doctrine of waste … allows a plaintiff to pass go at the complaint stage even when the motivations for a transaction are unclear by pointing to economic terms so one-sided as to create an inference that no person acting in good

faith pursuit of the corporation's interests could have approved the terms." *Sample v. Morgan*, 914 A.2d 647, 670 (Del. Ch. 2007).[52]

As the Trustee alleges in the Complaint, the Debtors made the Excessive Payments at a time when they were deeply insolvent, shutting down numerous campuses, and in the process of selling off part of its business for pennies on the dollar.  *See* Compl., ¶¶ 4, 113, 122-29, 135, 142. The Excessive Payments – which consisted of bonuses and severance, paid on top of regular compensation – amounted to more than $20 million, with $13.7 million paid to McEachen alone. These payments were commercially unreasonable and served no rational business purpose because they were made to individuals who, through their breaches of fiduciary duty and other wrongdoing described in the Complaint, had *caused* the Debtors' financial ruin.  Given the circumstances at the Company at the time, Defendants' role therein, and the self-dealing alleged by the Trustee in connection with the Excessive Payments (*see id.*, ¶¶ 4, 135, 161), the Complaint plausibly alleges that  no business person of ordinary sound judgment could believe that the Debtors received adequate consideration or that the payments served a corporate purpose.  *See In re World Health Alternatives, Inc.*, 385 B.R. 576, 593-94 (Bankr. D. Del. 2008) (trustee stated claim for corporate waste based on large bonuses and other expenditures for benefit of directors and officers while the company was experiencing negative net income); *In re W.J. Bradley Mortg. Capital, LLC*, 598 B.R. 150, 177 (Bankr. D. Del. 2019) (trustee stated claim for corporate waste based on disproportionately large board fees and bonuses paid to directors).

---

[52]    As discussed above, Delaware law applies to the Trustee's common law claims.  To the extent the Court determines that Pennsylvania law should apply (as Defendants argue), the Pennsylvania Supreme Court has not determined whether Pennsylvania recognizes a corporate waste claim, but lower Pennsylvania courts have treated such a claim as viable in the event of "an expenditure of corporate funds or a disposition of corporate assets for which no consideration is received and for which there is no rational business purpose."  *See White v. George*, 66 Pa. D. & C.4th 129, 149 (Ct. Com. Pl., Mercer Cty., 2004).

Defendants' arguments that compensation-related payments cannot be challenged under the theory of corporate waste should be rejected.  There is no *per se* rule that compensation-related payments cannot be the subject of a waste claim.  *See, e.g.*, *Sample*, 914 A.2d at 670 (plaintiff stated claim for waste concerning stock grants and other incentives made to executives); *Weiss v. Swanson*, 948 A.2d 433, 450 (Del. Ch. 2008) (shareholders stated claim for waste based on "excessive" option grants made to directors and officers).  "When executive compensation is disproportionately large, it can be unconscionable and constitute waste."  *W.J. Bradley*, 598 B.R. at 177 (citing *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 138 (Del. Ch. 2009)).  While a mere allegation that compensation is higher than it should be may not suffice, the Trustee alleges more here – in particular, a lack of consideration due to the fact that the recipients of the Excessive Payments were themselves responsible for the downward spiral in which the Company found itself.  Defendants' belief that they instead performed "exceptional services" and deserved the Excessive Payments they received (*see* MJD Br., p. 21; KN Br., p. 24) merely gives rise to a factual dispute that cannot be resolved until "at earliest, after discovery is complete."  *Sample*, 914 A.2d at 670.

The Trustee's allegations state a claim for corporate waste against the Debtors' officers as well as its directors.  Some cases have questioned whether a corporate waste claim can be brought against non-directors.  *See, e.g.*, *DSI Renal Holdings*, 574 B.R. at 476.  However, Delaware law is unclear on this matter.  In *DSI Renal Holdings*, the Court held that the trustee stated a corporate waste claim against the debtors' directors, but dismissed the claim against the officers and controlling shareholders.  *Id.*  The Court noted the lack of explicit authority from Delaware courts on the topic, but ultimately decided that dismissal was appropriate based on an absence of Delaware precedent for holding non-directors liable for corporate waste.  *Id.*  However, while

DOCS_DE:231708.1 57092/001

Delaware courts have not spoken one way or the other on this issue, there are examples of cases in this Court where a corporate waste claim has been brought against a non-director defendant. *See World Health Alternatives*, 385 B.R. at 593-94 (denying motion to dismiss corporate waste claim against debtor's Vice President of Operations and General Counsel); *In re TEU Holdings, Inc.*, 287 B.R. 26, 35 (Bankr. D. Del. 2002) (finding corporate waste claim sufficiently stated against directors and officers).    Additionally, in *Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 464-65 (D. Del. 2004), the District Court stated that the standard for pleading a waste claim under Delaware law, though not met in that case, "applie[d] equally to claims against officers and directors," given their identical fiduciary duties. *Id.* at 464-65 (citing *In re Walt Disney Co.*, 2004 WL 2050138, at *3 (Del. Ch. Sept. 10, 2004)); *see also Gantler v. Stephens*, 965 A.2d 695, 708 (Del. 2009) (fiduciary duties of officers are identical to those of directors).  While waste claims may be more commonly brought against directors, there is not an express prohibition under Delaware law against asserting such claims against officers as well.  Given that officers owe identical fiduciary duties and that claims of waste are "founded" on fiduciary duties, *Sample*, 914 A.2d at 669, the Trustee may properly assert his waste claims against all of the Defendants, including those who were officers.

Finally, the Trustee's corporate waste claim is timely with respect to all of the Excessive Payments, including those paid in 2016.   A three-year statute of limitations applies to waste claims under Delaware law.  *See* 10 Del. C. § 8106.  All of the Excessive Payments were made within three years of the Petition Date (*i.e.*, after June 29, 2015), and are thus timely.  Furthermore, even if the Court were to apply Pennsylvania law, which it should not, the two-year statute of limitations which applies thereunder (*see* 42 Pa. C.S.A. § 5524(7)) should be tolled for the same reasons as discussed above in connection with the Trustee's breach of fiduciary, fraud, and civil conspiracy

90

claims.  *See supra* Section V.B.1.  In particular, application of equitable tolling and of the adverse domination doctrine are appropriate because, at the time the Excessive Payments were made, the recipients themselves were in control of the Debtors, such that a corporate waste claim could not reasonably have been brought until the Trustee was appointed.

### F.    Count V States a Claim for Unjust Enrichment

Under Delaware law, unjust enrichment is defined as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999).  To state a claim, the plaintiff must allege five elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."  *FAH Liquidating*, 572 B.R. at 130 (*citing Nemec v. Schrader*, 991 A.2d 1120, 1130 (Del. 2010)).[53]

The Complaint pleads these elements.  The Trustee's unjust enrichment claim is based on the Transferee Defendants' receipt of benefits (*i.e.*, the Excessive Payments) at the expense of the Debtors and their creditors.  *See* Compl., ¶¶ 176-77.  The payments were made without justification, given the Debtors' financial condition at the time and the Transferee Defendants' participation in the wrongdoing detailed at length in the Complaint.  Given these circumstances, it would unjust for the Transferee Defendants to retain the Excessive Payments.

---

[53]    Substantively similar elements apply under Pennsylvania law.  *See Wilson v. Parker*, 227 A.3d 343, 353 (Pa. Super. 2020) ("[Unjust enrichment] is a matter of equity, and, to succeed, the plaintiff must prove: (1) benefits [were] conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.").

DOCS_DE:231708.1 57092/001

It is "entirely acceptable" to pursue alternative theories at the pleading stage, and it is also "well established" that a plaintiff may plead an alternative unjust enrichment theory even where the pleading also contains a contract-based claim.  *FAH Liquidating*, 572 B.R. at 131.  The Court may ultimately determine that unjust enrichment does not apply to some or all of the Excessive Payments, either because those transfers are covered by fraudulent transfer law, because certain writings govern the applicable relationship among the parties, or for some other reason.  But this is no cause to dismiss the unjust enrichment claims at this stage of the proceedings.  As this Court has held, a claim for unjust enrichment should survive a motion to dismiss where it is plausible that the plaintiff would otherwise be left without a remedy at law.  *See id.* (*citing Green Field Energy Servs.*, 2015 WL 5146161, at *10); *see also In re Our Alchemy, LLC*, 2019 WL 4447545, at *11 (Bankr. D. Del. Sept. 16, 2019) (denying motion to dismiss unjust enrichment claim because, *inter alia*, it was plausible the trustee would be left without an adequate remedy at law if his fraudulent transfer claims ultimately failed).  Count V should thus survive at this stage.

> **G.    In the Alternative, If the Court Determines that Dismissal of Any Claims Is Warranted, Leave to Amend Should Be Granted**

Federal Rule of Civil Procedure 15(a)(2), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7015, provides that leave to amend should be granted freely.  *See* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  The decision whether to grant or deny leave to amend rests within the court's discretion, but "[t]he Third Circuit has adopted a liberal approach to the amendment of pleadings."  *Arnault v. Diamondhead Casino Corp.*, 277 F. Supp. 3d 671, 674 (D. Del. 2017); *see also Dole v. Arco Chem. Co.*, 921 F.2d 484, 486-87 (3d Cir. 1990).  Leave to amend should be denied only when "it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the

other party." *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000) (*citing Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Otherwise, leave to amend should be granted.  *See Foman*, 371 U.S. at 182; *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 249 (3d Cir. 2016).

The Trustee alternatively seeks leave to amend, in the event that the Court determines his claims are insufficiently stated.  In such event, the Trustee anticipates amending his Complaint to, if necessary:

- Identify the specific Debtor-transferor for each of the Excessive Payments;

- Clarify the scope of Count IX, which asserts state fraudulent transfer claims under Sections 1304 and 1305 of DUFTA; and

- Remedy any other deficiency identified by the Court in its ruling on Defendants' Motions, particularly with respect to details concerning the Excessive Payments.

Granting leave to amend for these purposes is appropriate and accords with the Third Circuit's liberal approach to the amendment of pleadings.  *See Total Containment*, 335 B.R. at 601 (leave to amend, rather than dismissal, is ordinarily appropriate, unless repleading could not correct the defects in the claim); *In re Tweeter Opco*, 452 B.R. 150, 155 (Bankr. D. Del. 2011) (finding preference claim insufficiently specific, but readily granting leave to amend).

None of the grounds for denying leave to amend exist here.  There has been no undue delay. Courts typically find undue delay in situations where a party seeks leave to amend at a late stage in the case when interests in judicial economy, finality of judgments, and prejudice are implicated. *See, e.g.*, *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001) (plaintiff waited until after summary judgment had been granted to adverse party before seeking leave to amend); *Del. Display Group LLC v. Lenovo Group Ltd.*, 2016 WL 720977, at *9 (D. Del. Feb. 23, 2016) (plaintiffs "intentional[ly] . . . wait[ed] until the last moment," when discovery was closed,

93

to seek leave to add a new theory of liability).  Such is obviously not the case here, where the case

is still in the pleading stage.  *See Teamsters Local 456 Pension Fund v. Universal Health Servs.*,

2020 WL 2063474, at *10 (E.D. Pa. Apr. 29, 2020) (no undue delay, bad faith, or dilatory motive

where party promptly sought leave to amend following Court's ruling on Rule 12(b)(6) motion);

*Tweeter Opco*, 452 B.R. at 155 (alternatively seeking leave to amend in opposition to motion to

dismiss was procedurally acceptable).

Nor will the Defendants be prejudiced.  The Trustee's amendments would simply correct

any pleading deficiencies in his claims while the case is still in an early stage, before any discovery

has been conducted.  This would not create any unfair disadvantage or deprive Defendants of an

opportunity to obtain or present facts or evidence relating to Plaintiff's allegations.  *See Dole*, 921

F.2d at 488; *Comba Telecom, Inc. v. Andrew, L.L.C.*, 2013 WL 12409853, at *5 n. 5 (D. Del. Mar.

8, 2013) (finding no prejudice where case was in early procedural posture and discovery had not

begun).

Finally, amendment would not be futile because the Trustee would be amending for the

purpose of correcting any deficiencies identified by the Court in its eventual ruling on Defendants'

Motions.  The futility analysis looks at whether a proposed amendment would survive a motion to

dismiss, so the Trustee's correction of deficiencies which would enable his claims to survive such

a motion plainly would not be futile.  *See In re PMTS Liquidating Corp.*, 490 B.R. 174, 184 (D.

Del. 2013); 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.) ("If a proposed amendment is not clearly

futile, then denial of leave to amend is improper.").  The Court should therefore grant the Trustee

leave to amend as to any claim determined to have been insufficiently pled.  *See In re U.S. Mortg.*

*Corp.*, 492 B.R. 784, 823-24 (Bankr. D.N.J. 2013) (granting trustee leave to amend to add more

factual information concerning transfers); *In re Lexington Healthcare Group, Inc.*, 339 B.R. 570,

575 (Bankr. D. Del. 2006) (granting trustee leave to amend to cure deficiencies in fraudulent transfer claims).

## VI.    CONCLUSION

In light of the foregoing facts and authorities, Defendants' motions to dismiss should be denied.

Dated: November 13, 2020                  Respectfully submitted,


*/s/ Colin R. Robinson*
Bradford J. Sandler (DE Bar No. 4142)
Colin R. Robinson (DE Bar No. 5524)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-4100
Facsimile:  302-652-4400
E-mail:  bsandler@pszjlaw.com
              crobinson@pszjlaw.com

And

Steven M. Coren (admitted *pro hac vice*)
Benjamin M. Mather (admitted *pro hac vice*)
Francis X. Lane (admitted *pro hac vice*)
KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
(215) 735-8700

*Counsel for George L. Miller, Chapter 7 Trustee*