EXHIBIT 1-C

**PLEDGE AND SECURITY AGREEMENT**

**dated as of January 5, 2015**

**between**

**EACH OF THE GRANTORS PARTY HERETO**

**and**

**U.S. BANK NATIONAL ASSOCIATION,**

**as Collateral Agent**

# TABLE OF CONTENTS

PAGE

SECTION 1.    DEFINITIONS; GRANT OF SECURITY. ........................................................... 1

    1.1    General Definitions ......................................................................... 1

    1.2    Definitions; Interpretation ................................................................ 7

SECTION 2.    GRANT OF SECURITY. ............................................................................... 7

    2.1    Grant of Security ........................................................................... 7

    2.2    Certain Limited Exclusions ............................................................... 8

SECTION 3.    SECURITY FOR OBLIGATIONS; GRANTORS REMAIN LIABLE ................. 9

    3.1    Security for Obligations ................................................................... 9

    3.2    Continuing Liability Under Collateral ............................................... 10

SECTION 4.    REPRESENTATIONS AND WARRANTIES AND COVENANTS ................. 10

    4.1    Generally .................................................................................... 10

    4.2    Equipment and Inventory .............................................................. 12

    4.3    Receivables ................................................................................ 12

    4.4    Investment Related Property .......................................................... 13

    4.5    Letter of Credit Rights .................................................................. 17

    4.6    Intellectual Property ..................................................................... 18

    4.7    Commercial Tort Claims ................................................................ 21

SECTION 5.    ACCESS; RIGHT OF INSPECTION AND FURTHER ASSURANCES;
               ADDITIONAL GRANTORS. ........................................................... 21

    5.1    Further Assurances ...................................................................... 21

    5.2    Additional Grantors ...................................................................... 22

SECTION 6.    COLLATERAL AGENT APPOINTED ATTORNEY-IN-FACT ..................... 22

    6.1    Power of Attorney ........................................................................ 23

    6.2    No Duty on the Part of Collateral Agent or Secured Parties ................ 24

SECTION 7.    REMEDIES ................................................................................................ 24

    7.1    Generally .................................................................................... 24

#4847-9299-7919

7.2     Application of Proceeds ........................................................................ 26

7.3     Sales on Credit. ..................................................................................... 26

7.4     Investment Related Property ................................................................. 26

7.5     Intellectual Property .............................................................................. 27

7.6     Cash Proceeds ....................................................................................... 28

SECTION 8.   COLLATERAL AGENT ...................................................................... 29

SECTION 9.   CONTINUING SECURITY INTEREST; TRANSFER OF LOANS. ................. 30

SECTION 10. STANDARD OF CARE; COLLATERAL AGENT MAY PERFORM. ............. 30

SECTION 11. MISCELLANEOUS. ............................................................................ 31

SCHEDULE 4.1 — GENERAL INFORMATION

SCHEDULE 4.4 — INVESTMENT RELATED PROPERTY

SCHEDULE 4.5 — DESCRIPTION OF LETTERS OF CREDIT

SCHEDULE 4.6 — INTELLECTUAL PROPERTY - EXCEPTIONS

SCHEDULE 4.7 — COMMERCIAL TORT CLAIMS

EXHIBIT A — PLEDGE SUPPLEMENT

EXHIBIT B — UNCERTIFICATED SECURITIES CONTROL AGREEMENT

EXHIBIT C — PATENT SECURITY AGREEMENT

EXHIBIT D — COPYRIGHT SECURITY AGREEMENT

EXHIBIT E — TRADEMARK SECURITY AGREEMENT

#4847-9299-7919

This **PLEDGE AND SECURITY AGREEMENT,** dated as of January 5, 2015 (as it may be amended, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), between **EACH OF THE UNDERSIGNED**, whether as an original signatory hereto or as an Additional Grantor (as herein defined) (each, a "**Grantor**"), and **U.S. BANK NATIONAL ASSOCIATION** ("**US Bank**"), as collateral agent for the Secured Parties (as herein defined) (in such capacity as collateral agent, "**Collateral Agent**").

## RECITALS:

**WHEREAS**, reference is made to that certain **CREDIT AND GUARANTY AGREEMENT** dated as of the date hereof (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Education Management II LLC, a Delaware limited liability company ("**Company**"), Education Management Holdings II LLC, a Delaware limited liability company ("**Holdings**"), Education Management Corporation, a Pennsylvania corporation ("**Parent**"), certain Subsidiaries of Company, as Guarantors, the Lenders party thereto from time to time, US Bank, as Administrative Agent and as Collateral Agent;

**WHEREAS**, subject to the terms and conditions of the Credit Agreement, certain Grantors may enter into one or more Swap Agreements with one or more Lender Counterparties; and

**WHEREAS**, in consideration of the extensions of credit and other accommodations of Lenders and Lender Counterparties as set forth in the Credit Agreement and the Swap Agreements, respectively, each Grantor has agreed to secure such Grantor's obligations under the Credit Documents and the Swap Agreements as set forth herein;

**NOW**, **THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, each Grantor and Collateral Agent agree as follows:

**SECTION 1.      DEFINITIONS; GRANT OF SECURITY.**

1.1      **General Definitions**.  In this Agreement, the following terms shall have the following meanings:

"**Account Debtor**" shall mean each Person who is obligated on a Receivable or any Supporting Obligation related thereto,

"**Accounts**" shall mean all "accounts" as defined in Article 9 of the UCC.

"**Additional Grantors**" shall have the meaning assigned in Section 5.2.

"**Agreement**" shall have the meaning set forth in the preamble.

"**Cash Proceeds**" shall have the meaning assigned in Section 7.6.

"**Chattel Paper**" shall mean all "chattel paper" as defined in Article 9 of the UCC.

"**Collateral**" shall have the meaning set forth in Section 2.1.

"**Collateral Agent**" shall have the meaning set forth in the preamble.

"**Collateral Records**" shall mean books, records, ledger cards, files, correspondence, customer lists, supplier lists, blueprints, technical specifications, manuals, computer software and related documentation, computer printouts, tapes, disks and other electronic storage media and related data processing software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"**Collateral Support**" shall mean all property (real or personal) assigned, hypothecated, pledged or otherwise securing any Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

"**Commercial Tort Claims**" shall mean all "commercial tort claims" as defined in Article 9 of the UCC, including, without limitation, all commercial tort claims listed on Schedule 4.7.

"**Commodities Accounts**" shall mean all "commodity accounts" as defined in Article 9 of the UCC.

"**Company**" shall have the meaning set forth in the recitals.

"**Controlled Foreign Corporation**" shall mean "controlled foreign corporation" as defined in the Tax Code.

"**Copyright Licenses**" shall mean any and all agreements providing for the granting of any right in or to Copyrights (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement referred to in Schedule 4.6(B) .

"**Copyright Security Agreement**" shall mean a Copyright Security Agreement, substantially in the form of Exhibit D, executed and delivered by a Grantor in favor of Collateral Agent for the benefit of Secured Parties.

"**Copyrights**" shall mean all United States, and foreign copyrights, including but not limited to copyrights in software and databases, and all Mask Works (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or unregistered, and, with respect to any and all of the foregoing:  (i) all registrations and applications therefor including, without limitation, the registrations and applications referred to in Schedule 4.6(A), (ii) all extensions and renewals thereof, (iii) all rights corresponding thereto throughout the world, (iv) all rights to sue for past, present and future infringements thereof, and (v) all Proceeds of the foregoing, including, without limitation, royalties, income, payments, claims, damages and proceeds of suit.

"**Credit Agreement**" shall have the meaning set forth in the recitals.

2

"**Deposit Accounts**" shall mean all "deposit accounts" as defined in Article 9 of the UCC.

"**Documents**" shall mean all "documents" as defined in Article 9 of the UCC.

"**Equipment**" shall mean all "equipment" as defined in Article 9 of the UCC.

"**General Intangibles**" shall mean all "general intangibles" as defined in Article 9 of the UCC.

"**Goods**" shall mean all "goods" as defined in Article 9 of the UCC.

"**Grantors**" shall have the meaning set forth in the preamble.

"**Holdings**" shall have the meaning set forth in the recitals.

"**Instruments**" shall mean all "instruments" as defined in Article 9 of the UCC.

"**Intellectual Property**" shall mean, collectively, the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks, the Trademark Licenses, the Trade Secrets, and the Trade Secret Licenses.

"**Intellectual Property Security Agreement**" shall mean a Copyright Security Agreement, a Patent Security Agreement or a Trademark Security Agreement.

"**Inventory**" shall mean all "inventory" as defined in Article 9 of the UCC.

"**Investment Accounts**" shall mean the Securities Accounts, Commodities Accounts and Deposit Accounts.

"**Investment Related Property**" shall mean (a) all "investment property" (as such term is defined in Article 9 of the UCC) and (b) all of the following (regardless of whether classified as investment property under the UCC): all Pledged Equity Interests, Pledged Debt, the Investment Accounts and certificates of deposit.

"**Letter of Credit Right**" shall mean "letter-of-credit right" as defined in Article 9 of the UCC.

"**Parent**" shall have the meaning set forth in the recitals.

"**Patent Licenses**" shall mean all agreements providing for the granting of any right in or to Patents (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement referred to in Schedule 4.6(D).

"**Patent Security Agreement**" shall mean a Patent Security Agreement, substantially in the form of Exhibit C, executed and delivered by a Grantor in favor of Collateral Agent for the benefit of Secured Parties.

3

"**Patents**" shall mean all United States and foreign patents and certificates of invention, or similar industrial property rights, and applications for any of the foregoing, including, but not limited to:  (i) each patent and patent application referred to in Schedule 4.6(C) hereto, (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof, (iii) all rights corresponding thereto throughout the world, (iv) all inventions and improvements described therein, (v) all rights to sue for past, present and future infringements thereof, and (vi) all Proceeds of the foregoing, including, without limitation, royalties, income, payments, claims, damages, and proceeds of suit.

"**Permitted Liens**" shall mean Liens permitted by Section 6.1 of the Credit Agreement.

"**Pledge Supplement**" shall mean any supplement to this agreement in substantially the form of Exhibit A.

"**Pledged Debt**" shall mean all Indebtedness owed to such Grantor, including, without limitation, all Indebtedness described on Schedule 4.4 under the heading "Pledged Debt", issued by the obligors named therein, the instruments evidencing such Indebtedness, and all interest, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Indebtedness.

"**Pledged Equity Interests**" shall mean all Pledged Stock, Pledged LLC Interests, Pledged Partnership Interests and Pledged Trust Interests.

"**Pledged LLC Interests**" shall mean all interests in any limited liability company including, without limitation, all limited liability company interests listed on Schedule 4.4 under the heading "Pledged LLC Interests," and the certificates, if any, representing such limited liability company interests and any interest of such Grantor on the books and records of such limited liability company or on the books and records of any securities intermediary pertaining to such interest and, subject to Section 2.2, all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests.

"**Pledged Partnership Interests**" shall mean all interests in any general partnership, limited partnership, limited liability partnership or other partnership including, without limitation, all partnership interests listed on Schedule 4.4 under the heading "Pledged Partnership Interests," and the certificates, if any, representing such partnership interests and any interest of such Grantor on the books and records of such partnership or on the books and records of any securities intermediary pertaining to such interest and, subject to Section 2.2, all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such partnership interests.

"**Pledged Stock**" shall mean all shares of capital stock owned by such Grantor, including, without limitation, all shares of capital stock described on Schedule 4.4 under the

4

heading "Pledged Stock," and the certificates, if any, representing such shares and any interest of such Grantor in the entries on the books of the issuer of such shares or on the books of any securities intermediary pertaining to such shares, and, subject to Section 2.2, all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares.

"**Pledged Trust Interests**" shall mean all interests in a Delaware business trust or other statutory trust including, without limitation, all trust interests listed on Schedule 4.4 under the heading "Pledged Trust Interests," and the certificates, if any, representing such trust interests and any interest of such Grantor on the books and records of such trust or on the books and records of any securities intermediary pertaining to such interest and, subject to Section 2.2, all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such trust interests.

"**Proceeds**" shall mean (a) all "proceeds" as defined in Article 9 of the UCC, (b) payments or distributions made with respect to any Investment Related Property and (c) whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

"**Receivables**" shall mean all rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including, without limitation all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible or, subject to Section 2.2, Investment Related Property, together with all of Grantor's rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records.

"**Receivables Records**" shall mean (a) all original copies of all documents, instruments or other writings or electronic records or other Records evidencing the Receivables, (b) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices, and other papers relating to Receivables, including, without limitation, all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Receivables, whether in the possession or under the control of Grantor or any computer bureau or agent from time to time acting for Grantor or otherwise, (c) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements or other modifications thereto, notices to other creditors, secured parties or agents thereof, and certificates, acknowledgments, or other writings, including, without limitation, lien search reports, from filing or other registration officers, (d) all credit information, reports and memoranda relating thereto and (e) all other written or non-written forms of information related in any way to the foregoing or any Receivable.

"**Record**" shall mean a "record" as defined in Article 9 of the UCC.

"**Recordable Intellectual Property**" shall mean (i) any Patent issued by the United States Patent and Trademark Office and any exclusive Patent License with respect to a

#4847-9299-7919

Patent so issued, (ii) any Trademark registered with the United States Patent and Trademark Office or any comparable state agency and any exclusive Trademark License with respect to a Trademark so registered, (iii) any Copyright registered with the United States Copyright Office and any exclusive Copyright License with respect to a Copyright so registered, and all rights in or under any of the foregoing.

"**Secured Obligations**" shall have the meaning assigned in Section 3.1.

"**Secured Parties**" shall mean Agents, Lenders and Lender Counterparties and shall include, without limitation, all former Agents, Lenders and Lender Counterparties to the extent that any Obligations owing to such Persons were incurred while such Persons were Agents, Lenders or Lender Counterparties and such Obligations have not been paid or satisfied in full.

"**Securities**" shall mean any stock, shares, membership interests, limited liability company interests, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Accounts**" shall mean all "securities accounts" as defined in Article 8 of the UCC.

"**Supporting Obligation**" shall mean all "supporting obligations" as defined in Article 9 of the UCC.

"**Tax Code**" shall mean the United States Internal Revenue Code of 1986, as amended from time to time.

"**Trademark Licenses**" shall mean any and all agreements providing for the granting of any right in or to Trademarks (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement referred to in Schedule 4.6(F).

"**Trademark Security Agreement**" shall mean a Trademark Security Agreement, substantially in the form of Exhibit E, executed and delivered by a Grantor in favor of Collateral Agent for the benefit of Secured Parties.

"**Trademarks**" shall mean all United States, state, non-registered common law trademarks and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature, all registrations and applications for any of the foregoing including, but not limited to: (i) the registrations and applications referred to in Schedule 4.6(E), (ii) all extensions or renewals of any of the foregoing, (iii) all of the goodwill of the business connected with the use of and symbolized by the foregoing, (iv) the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill, and (v) all Proceeds of the

6

foregoing, including, without limitation, royalties, income, payments, claims, damages, and proceeds of suit.

"**Trade Secret Licenses**" shall mean any and all agreements providing for the granting of any right in or to Trade Secrets (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement referred to in Schedule 4.6(G).

"**Trade Secrets**" shall mean all trade secrets and all other confidential or proprietary information and know-how whether or not reduced to a writing or other tangible form, including but not limited to:   (i) the right to sue for past, present and future misappropriation or other violation of any trade secret, and (ii) all Proceeds of the foregoing, including, without limitation, royalties, income, payments, claims, damages, and proceeds of suit.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

"**United States**" shall mean the United States of America.

"**US Bank**" shall have the meaning set forth in the preamble.

1.2     **Definitions; Interpretation**.  All capitalized terms used herein (including the preamble and recitals hereto) and not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement or, if not defined therein, in the UCC.  References to "Sections," "Exhibits" and "Schedules" shall be to Sections, Exhibits and Schedules, as the case may be, of this Agreement unless otherwise specifically provided.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not nonlimiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  If any conflict or inconsistency exists between this Agreement and the Credit Agreement, the Credit Agreement shall govern.   All references herein to provisions of the UCC shall include all successor provisions under any subsequent version or amendment to any Article of the UCC.

## SECTION 2.      GRANT OF SECURITY.

2.1     **Grant of Security**.  Each Grantor hereby grants to Collateral Agent, for the ratable benefit of Secured Parties, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under all personal property of such Grantor including, but not limited to the following, in each case whether now owned or existing or hereafter

7

acquired or arising and wherever located (all of which, except as provided in Section 2.2, being hereinafter collectively referred to as the "**Collateral**"):

      (a)    Accounts;

      (b)    Chattel Paper;

      (c)    Documents;

      (d)    General Intangibles;

      (e)    Goods;

      (f)    Instruments;

      (g)    Intellectual Property;

      (h)    Investment Related Property;

      (i)    Letter of Credit Rights;

      (j)    Commercial Tort Claims;

      (k)    cash;

      (l)    Equipment;

      (m)    Inventory;

      (n)    to the extent not otherwise included above, all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and

      (o)    to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.

    2.2    **Certain Limited Exclusions**.  Notwithstanding anything herein to the contrary, in no event shall the Collateral include, and no Grantor shall be deemed to have granted a security interest in, nor shall the security interest granted under Section 2.1 hereof attach to:

      (a)    any lease, Intellectual Property, General Intangible, license, contract, property right, asset or agreement to which any Grantor is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of any Grantor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, Intellectual Property, General Intangibles, license, contract, property right, asset or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity); <u>provided</u> that the Collateral shall include and such security interest shall

8

attach immediately at such time as the condition causing such abandonment, invalidation or unenforceability shall be remedied and to the extent severable, shall attach immediately to any portion of such lease, Intellectual Property, General Intangible, license, contract, property rights or agreement that does not result in any of the consequences specified in clauses (i) or (ii) above;

(b)     in any of the outstanding capital stock of a Controlled Foreign Corporation in excess of 66% of the voting power of all classes of capital stock of such Controlled Foreign Corporation entitled to vote; provided that immediately upon the amendment of the Tax Code to allow the pledge of a greater percentage of the voting power of capital stock in a Controlled Foreign Corporation without adverse tax consequences, the Collateral shall include, and the security interest granted by each Grantor shall attach to, such greater percentage of capital stock of each Controlled Foreign Corporation;

(c)     including any intent-to-use United States trademark application for which an amendment to allege use or statement of use has not been filed under 15 U.S.C. § 1051(c) or 15 U.S.C. § 1051(d), respectively, or, if filed, has not been deemed in conformance with 15 U.S.C. § 1051(a), or examined and accepted, respectively, by the United States Patent and Trademark Office, in each case, only to the extent the grant of security interest in such intent-to-use Trademark is in violation of 15 U.S.C. § 1060 and only unless and until a "Statement of Use" or "Amendment to Allege Use" is filed, has been deemed in conformance with 15 U.S.C. §1051(a) or examined and accepted, respectively, by the United States Patent and Trademark Office at which point such Trademarks shall automatically be included as Collateral;

(d)     any property of any person acquired by a Grantor after the Closing Date pursuant to Section 6.2(i) of the Credit Agreement, if and to the extent that, and for so long as, (i) such grant of security interest would violate applicable law or any contractual obligation binding upon such property and (ii) such law or obligation existed at the time of the acquisition thereof and was not created or made binding upon such property in contemplation of or in connection with the acquisition of such subsidiary; (provided that the foregoing clause (ii) shall not apply in the case of a joint venture, including a joint venture that is a Subsidiary); provided further that each Grantor shall use its commercially reasonable efforts to avoid any such restriction described in this clause (d); and

(e)     any general or limited partnership interests in a general or limited partnership or membership in a limited liability company to the extent not permitted under the applicable organizational instrument pursuant to which such partnership or limited liability company is formed; provided that such Grantor shall, following the request of Collateral Agent (acting at the direction of the Requisite Lenders), use commercially reasonable efforts to obtain a waiver, amendment or other modification of such organizational instrument necessary to allow for the granting of a Lien on such general or limited partnership interests, as the case may be, by such Grantor hereunder.

**SECTION 3.     SECURITY FOR OBLIGATIONS; GRANTORS REMAIN LIABLE.**

3.1     **Security for Obligations**.  This Agreement secures, and the Collateral is collateral security for, the prompt and complete payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or

9

otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a) (and any successor provision thereof)), of all Obligations with respect to every Grantor (the "**Secured Obligations**").

      3.2    **Continuing Liability Under Collateral**.  Notwithstanding anything herein to the contrary, (a) each Grantor shall remain liable for all obligations under the Collateral and nothing contained herein is intended or shall be a delegation of duties to Collateral Agent or any Secured Party, (b) each Grantor shall remain liable under each of the agreements included in the Collateral, including, without limitation, any agreements relating to Pledged Partnership Interests or Pledged LLC Interests, to perform all of the obligations undertaken by it thereunder all in accordance with and pursuant to the terms and provisions thereof and neither Collateral Agent nor any Secured Party shall have any obligation or liability under any of such agreements by reason of or arising out of this Agreement or any other document related thereto nor shall Collateral Agent or any Secured Party have any obligation to make any inquiry as to the nature or sufficiency of any payment received by it or have any obligation to take any action to collect or enforce any rights under any agreement included in the Collateral, including, without limitation, any agreements relating to Pledged Partnership Interests or Pledged LLC Interests, and (c) the exercise by Collateral Agent of any of its rights hereunder shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral.

**SECTION 4.**      **REPRESENTATIONS AND WARRANTIES AND COVENANTS.**

      4.1    **Generally**.

          (a)    <u>Representations and Warranties</u>.  Each Grantor hereby represents and warrants, on the Closing Date and on each Credit Date, that:

          (i)    it owns the Collateral purported to be owned by it or otherwise has the rights it purports to have in each item of Collateral and, as to all Collateral whether now existing or hereafter acquired, will continue to own or have such rights in each item of the Collateral, in each case free and clear of any and all Liens, rights or claims of all other Persons other than Permitted Liens;

          (ii)    on the Closing Date, it has indicated on Schedule 4.1 (A) the full legal name of such Grantor, (B) the type of organization of such Grantor, (C) the jurisdiction of organization of such Grantor, (D) its organizational identification number and (E) the jurisdiction where the chief executive office or its sole place of business is located.

          (iii)    (A) upon the filing of all UCC financing statements naming each Grantor as "debtor" and Collateral Agent as "secured party" and describing the Collateral in the filing office located in state of organization of such Grantor and other filings delivered by each Grantor, (B) upon delivery of all Instruments, Chattel Paper and certificated Pledged Equity Interests and Pledged Debt, (C) upon sufficient identification of Commercial Tort Claims, (D) upon execution of a control agreement establishing

Collateral Agent's "control" (within the meaning of Section 8-106, 9-106 or 9-104 of the UCC, as applicable) with respect to any Investment Account, (E) upon consent of the issuer with respect to Letter of Credit Rights and (F) to the extent not subject to Article 9 of the UCC, upon recordation of the security interests granted hereunder in applicable Patents, Trademarks and Copyrights in the United States Patent and Trademark Office and the United States Copyright Office, the security interests granted to Collateral Agent hereunder constitute valid and perfected First Priority Liens (subject in the case of priority only to Permitted Liens and, with respect to United States government Receivables, the rights of the United States government (including any agency or department thereof) on all of the Collateral;

(iv)    [reserved];

(v)    no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body is required for the exercise by Collateral Agent of any rights or remedies in respect of any Collateral (whether specifically granted or created hereunder or created or provided for by applicable law), except (A) for the filings contemplated by clause (iii) above and (B) as may be required, in connection with the disposition of any Investment Related Property, by laws generally affecting the offering and sale of Securities;

(vi)    except as would not reasonably be expected to result, either individually or in the aggregate in a Material Adverse Effect, all information supplied by any Grantor with respect to any of the Collateral (in each case taken as a whole with respect to any particular Collateral) is accurate and complete;

(vii)    none of the Collateral constitutes, or is the Proceeds of, "farm products" (as defined in the UCC);

(viii)    it does not own any "as extracted collateral" (as defined in the UCC) or any timber to be cut; and

(ix)    such Grantor has been duly organized as an entity of the type as set forth opposite such Grantor's name on Schedule 4.1 solely under the laws of the jurisdiction as set forth opposite such Grantor's name on Schedule 4.1 and remains duly existing as such.  Such Grantor has not filed any certificates of domestication, transfer or continuance in any other jurisdiction.

(b)    <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees that:

(i)    except for the security interest created by this Agreement, it shall not create or suffer to exist any Lien upon or with respect to any of the Collateral, except Permitted Liens, and such Grantor shall defend the Collateral against all Persons at any time claiming any interest therein;

(ii)    except as could not reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect, it shall not produce, use or

11

permit any Collateral to be used unlawfully or in violation of any provision of this Agreement or any applicable statute, regulation or ordinance or any policy of insurance covering the Collateral;

(iii)    it shall not (A) change such Grantor's name or jurisdiction or organization except in compliance with Section 5.2(e) of the Credit Agreement or (B) change its corporate structure (e.g., by merger, consolidation or otherwise) except in compliance with Section 6.4 of the Credit Agreement; provided that (x) concurrently with such change in name or jurisdiction of organization, merger or consolidation, such Grantor shall execute and deliver to Collateral Agent a completed Pledge Supplement, substantially in the form of Exhibit A attached hereto, together with all Supplements to Schedules thereto, identifying such new proposed name, jurisdiction of organization or corporate structure and (y) such Grantor shall have taken all actions necessary or advisable to maintain the continuous validity, perfection and the same priority of Collateral Agent's security interest in the Collateral intended to be granted and agreed to hereby; and

(iv)    it shall not sell, transfer or assign (by operation of law or otherwise) any Collateral except as otherwise permitted under the Credit Agreement.

4.2    **Equipment and Inventory**.

(a)    Representations and Warranties.  Each Grantor represents and warrants, on the Closing Date and on each Credit Date, that except as would not reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect, any Goods now or hereafter produced by any Grantor included in the Collateral have been and will be produced in compliance with the requirements of the Fair Labor Standards Act, as amended.

(b)    Covenants and Agreements.  Each Grantor covenants and agrees that:

(i)    it shall keep correct and accurate records of the Inventory in accordance with its customary practices and procedures, and in any event in conformity with GAAP; and

(ii)    it shall not deliver any Document evidencing any Equipment and Inventory to any Person other than the issuer of such Document to claim the Goods evidenced therefor or Collateral Agent.

4.3    **Receivables**.

(a)    Representations and Warranties.  Each Grantor represents and warrants, on the Closing Date and on each Credit Date, that no Receivable in excess of $500,000 individually or $2,500,000 in the aggregate is evidenced by, or constitutes, an Instrument or Chattel Paper which has not been delivered to, or otherwise subjected to the control of, Collateral Agent to the extent required by, and in accordance with Section 4.3(c).

(b)    Covenants and Agreements:  Each Grantor hereby covenants and agrees that:

#4847-9299-7919

(i)      it shall not amend, modify, terminate or waive any provision of any Receivable in any manner that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  Other than in the ordinary course of business, during the continuance of an Event of Default, such Grantor shall not (A) grant any extension or renewal of the time of payment of any Receivable, (B) compromise or settle any dispute, claim or legal proceeding with respect to any Receivable for less than the total unpaid balance thereof, (C) release, wholly or partially, any Person liable for the payment thereof, or (D) allow any credit or discount thereon; and

(ii)      except as otherwise provided in this subsection, each Grantor shall use its commercially reasonable efforts to collect all amounts due or to become due to such Grantor under any Receivable and to exercise each material right it may have under any Receivable, in each case, at its own expense.  If so required by Collateral Agent (acting at the direction of the Requisite Lenders) at any time after the occurrence and during the continuance of an Event of Default, any payments of Receivables received by any Grantor shall be forthwith (and in any event within two Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to Collateral Agent if required, in a Securities Account or Deposit Account maintained under the control of Collateral Agent, and until so turned over, all amounts and proceeds (including checks and other instruments) received by such Grantor in respect of the Receivables, any Supporting Obligation or Collateral Support shall be received in trust for the benefit of Collateral Agent hereunder and shall be segregated from other funds of such Grantor and such Grantor shall not adjust, settle or compromise the amount or payment of any Receivable, or release wholly or partly any Account Debtor or obligor thereof or allow any credit or discount thereon.

(c)      Delivery and Control of Receivables.  With respect to any Receivables in excess of $500,000 individually or $2,500,000 in the aggregate that is evidenced by, or constitutes, Chattel Paper or Instruments, each Grantor shall cause each originally executed copy thereof to be delivered to Collateral Agent (or its agent or designee) appropriately indorsed to Collateral Agent or indorsed in blank (i) with respect to any such Receivables in existence on the date hereof, on or prior to the date hereof and (ii) with respect to any such Receivables hereafter arising, within 10 days of such Grantor acquiring rights therein.  Any Receivable that is evidenced by, or constitutes, Chattel Paper or Instruments or would constitute "electronic chattel paper" under Article 9 of the UCC which would not otherwise required to be delivered in accordance with this Section 4.3(c) shall be delivered or subjected to such control upon request of Collateral Agent (acting at the direction of the Requisite Lenders) at any time during the continuance of an Event of Default.

4.4      **Investment Related Property**.

### 4.4.1  Investment Related Property Generally

(a)      Covenants and Agreements.  Each Grantor hereby covenants and agrees that:

(i)      subject to the limitation described in Section 2.2(b) with respect to the capital stock of any Controlled Foreign Corporation, in the event it acquires rights in any Investment Related Property constituting Pledged Equity Interests or Pledged Debt, after the date hereof, it shall comply with the requirements of Section 4.4.1(b) with respect to such new Investment Related Property.  Notwithstanding the foregoing, it is understood and agreed that the security interest of Collateral Agent shall attach to all Investment Related Property immediately upon any Grantor's acquisition of rights therein and shall not be affected by the failure of any Grantor to comply with Section 4.4.1(b);

(ii)      except as provided in the next sentence, in the event such Grantor receives any dividends, interest or distributions on any Investment Related Property, or any securities or other property upon the merger, consolidation, liquidation or dissolution of any issuer of any Investment Related Property, then (A) such dividends, interest or distributions and securities or other property shall be included in the definition of Collateral without further action and (B) such Grantor shall within 10 days take all steps, if any, necessary to ensure the validity, perfection, priority and, if applicable, control of Collateral Agent over such Investment Related Property (including, without limitation, delivery thereof to Collateral Agent) and pending any such action such Grantor shall be deemed to hold such dividends, interest, distributions, securities or other property in trust for the benefit of Collateral Agent and shall segregate such dividends, distributions, Securities or other property from all other property of such Grantor.  Notwithstanding the foregoing, so long as no Event of Default shall have occurred and be continuing, Collateral Agent authorizes each Grantor to retain all cash dividends and distributions and all payments of interest and principal;

(iii)      each Grantor consents to the grant by each other Grantor of a Security Interest in all Investment Related Property to Collateral Agent.

(b)      Delivery and Control.

(i)      Each Grantor agrees that with respect to any Investment Related Property in which it currently has rights, it shall comply with the provisions of this Section 4.4.1(b) on or before the Closing Date and with respect to any Investment Related Property hereafter acquired by such Grantor it shall comply with the provisions of this Section 4.4.1(b) promptly upon acquiring rights therein (and in any event within 10 days).  With respect to any Investment Related Property that is represented by a certificate or that is an "instrument" (other than any Investment Related Property credited to a Securities Account) it shall cause such certificate or instrument to be delivered to Collateral Agent, indorsed in blank by an "effective indorsement" (as defined in Section 8-107 of the UCC), regardless of whether such certificate constitutes a "certificated security" for purposes of the UCC.  With respect to any Investment Related Property that is an "uncertificated security" for purposes of the UCC (other than any "uncertificated securities" credited to a Securities Account), it shall, upon the request of Collateral Agent (acting at the direction of the Requisite Lenders), cause the issuer (in the case of Pledged Equity Interests issued by a Subsidiary of a Grantor, mutual funds and other open-ended investments funds) and it shall use its commercially reasonable efforts to cause the issuer (in the case of all other Investment Related Property) of such

#4847-9299-7919

uncertificated security to either (A) register Collateral Agent as the registered owner thereof on the books and records of the issuer or (B) execute an agreement substantially in the form of Exhibit B hereto, pursuant to which such issuer agrees to comply with Collateral Agent's instructions with respect to such uncertificated security without further consent by such Grantor.

      (c)    <u>Voting and Distributions</u>.

      (i)    Unless an Event of Default shall have occurred and be continuing and Collateral Agent shall have given written notice thereof:

      (A)    except as otherwise provided under the covenants and agreements relating to Investment Related Property in this Agreement or elsewhere herein or in the Credit Agreement, each Grantor shall be entitled to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Investment Related Property or any part thereof;

      (B)    Collateral Agent shall promptly execute and deliver (or cause to be executed and delivered) to each Grantor all proxies, and other instruments as such Grantor may from time to time reasonably request in writing for the purpose of enabling such Grantor to exercise the voting and other consensual rights when and to the extent which it is entitled to exercise pursuant to clause (A) above; and

      (C)    upon the occurrence and during the continuance of an Event of Default and written notice thereof by Collateral Agent, and subject to applicable law:

      (1)    all rights of each Grantor to exercise or refrain from exercising the voting and other consensual rights which it would otherwise be entitled to exercise pursuant hereto shall cease and all such rights shall thereupon become vested in Collateral Agent who shall thereupon have the sole right to exercise such voting and other consensual rights; <u>provided</u> that Collateral Agent (acting at the direction of the Requisite Lenders) shall have the right from time to time following the occurrence and during the continuance of an Event of Default to permit the Grantors to exercise such rights; and

      (2)    in order to permit Collateral Agent to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive

15

all dividends and other distributions which it may be entitled to receive hereunder, (A) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to Collateral Agent all proxies, dividend payment orders and other instruments as Collateral Agent (acting at the direction of the Requisite Lenders) may from time to time reasonably request and (B) each Grantor acknowledges that Collateral Agent may utilize the power of attorney set forth in Section 6.1.

After all Events of Default have been cured or waived and Company has delivered to Collateral Agent a certificate to that effect, each Grantor will have the right to exercise the voting and consensual rights that such Grantor would otherwise be entitled to exercise pursuant to the terms of Section 4.4.1(c)(i)(A).

### 4.4.2   Pledged Equity Interests

(a)   <u>Representations and Warranties</u>.   Each Grantor hereby represents and warrants, on the Closing Date and on each Credit Date, that:

(i)   Schedule 4.4 sets forth under the headings "Pledged Stock," "Pledged LLC Interests," "Pledged Partnership Interests" and "Pledged Trust Interests," respectively, all of the Pledged Stock, Pledged LLC Interests, Pledged Partnership Interests and Pledged Trust Interests owned by any Grantor on the Closing Date and such Pledged Equity Interests constitute, on the Closing Date, the percentage of issued and outstanding shares of stock, percentage of membership interests, percentage of partnership interests or percentage of beneficial interest of the respective issuers thereof indicated on such Schedule;

(ii)   (A) it is the record and beneficial owner of the Pledged Equity Interests free of all Liens, rights or claims of other Persons other than Permitted Liens and (B) none of such Pledged Equity Interests is subject to any option to purchase or similar right of any Person, except as permitted by the Credit Agreement;

(iii)   without limiting the generality of Section 4.1(a)(v), except as described in Schedule 4.4, no consent of any Person, including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary, is necessary or desirable in connection with the creation, perfection or first priority status of the security interest of Collateral Agent in any Pledged Equity Interests or the exercise by Collateral Agent of the voting or other rights provided for in this Agreement or the exercise of remedies in respect thereof; and

(iv)   except as described in Schedule 4.4, as of the Closing Date, none of the Pledged LLC Interests nor Pledged Partnership Interests are or represent interests

16

in issuers that (A) are registered as investment companies or (B) are dealt in or traded on securities exchanges or markets.

(b)    <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees that:

(i)    other than as permitted under the Credit Agreement or without the prior written consent of Collateral Agent (acting at the direction of the Requisite Lenders), it shall not vote to enable or take any other action to cause any issuer of any Pledged Partnership Interests or Pledged LLC Interests which are not securities (for purposes of the UCC) on the date hereof to elect or otherwise take any action to cause such Pledged Partnership Interests or Pledged LLC Interests to be treated as securities for purposes of the UCC.  Notwithstanding the foregoing, if any issuer of any Pledged Partnership Interests or Pledged LLC Interests takes any such action in violation of the foregoing in this clause (i), such Grantor shall promptly notify Collateral Agent in writing of any such election or action and, in such event, shall take (or cause to be taken) all steps necessary or advisable to establish Collateral Agent's "control" thereof; and

(ii)    each Grantor consents to the grant by each other Grantor of a security interest in all Investment Related Property to Collateral Agent and, without limiting the foregoing, consents to the transfer of any Pledged Partnership Interest and any Pledged LLC Interest to Collateral Agent or its nominee following the occurrence and during the continuance of an Event of Default and to the substitution of Collateral Agent or its nominee as a partner in any partnership or as a member in any limited liability company with all the rights and powers related thereto.

### 4.4.3    Pledged Debt

(a)    <u>Representations and Warranties</u>.  Each Grantor hereby represents and warrants, on the Closing Date and each Credit Date, that Schedule 4.4 sets forth under the heading "Pledged Debt" all of the Pledged Debt that is intercompany Indebtedness and otherwise in excess of $500,000 individually owned by such Grantor and, to the best of such Grantor's knowledge, all of such Pledged Debt has been duly authorized, authenticated or issued, and delivered and is the legal, valid and binding obligation of the issuers thereof subject to the effect of applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting rights of creditors and general principles of equity and is not in default and constitutes all of the issued and outstanding intercompany Indebtedness in excess of $500,000 individually owned by such Grantor;

(b)    <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees that (i) it shall notify Collateral Agent in writing of any material default under any Pledged Debt and (ii) upon the occurrence and during the continuance of an Event of Default, all Indebtedness issued by a Grantor represented by any Pledged Debt shall be automatically fully subordinated to the indefeasible payment in full in cash of the Secured Obligations.

4.5    **Letter of Credit Rights**.

17

(a)    <u>Representations and Warranties</u>.  Except with respect to Letters of Credit issued or deemed issued under the Credit Agreement, each Grantor hereby represents and warrants, on the Closing Date and on each Credit Date, that:

(i)    all material letters of credit in excess of $5,000,000 individually to which such Grantor has rights as a beneficiary on the Closing Date is listed on Schedule 4.5 hereto; and

(ii)    it has obtained the consent of each issuer of any letter of credit in an amount in excess of $5,000,000 listed on Schedule 4.5 to the assignment of the proceeds of the letter of credit to Collateral Agent.

(b)    <u>Covenants and Agreements</u>.  Except with respect to Letters of Credit issued or deemed issued under the Credit Agreement, each Grantor hereby covenants and agrees that, with respect to any such letter of credit in an amount in excess of $5,000,000 hereafter arising, it shall use commercially reasonable efforts to obtain the consent of the issuer thereof to the assignment of the proceeds of such letter of credit to Collateral Agent and shall deliver to Collateral Agent a completed Pledge Supplement, substantially in the form of Exhibit A attached hereto, together with all Supplements to Schedules thereto.

4.6    **Intellectual Property**.

(a)    <u>Representations and Warranties</u>.  Except as disclosed in Schedule 4.6(H), each Grantor hereby represents and warrants, on the Closing Date and on each Credit Date, that:

(i)    Schedule 4.6 sets forth a true and complete list of (A) all United States, state and foreign registrations of and applications to register Patents, Trademarks, and Copyrights owned by each Grantor and (B) all Patent Licenses, Trademark Licenses, Trade Secret Licenses and Copyright Licenses material to the business of such Grantor;

(ii)    it owns or has the valid right to use all other Intellectual Property used in or necessary to conduct its business, free and clear of all Liens and licenses, except for Permitted Liens, license agreements executed in the normal course of business consistent with past practice and the licenses set forth on Schedule 4.6(B), (D), (F) and (G);

(iii)    except in each case to the extent that a particular Patent, Trademark or Copyright is not material to the business of such Grantor, all registrations of and applications to register Copyrights, Trademarks and Patents and applications thereof owned by any Grantor have not been abandoned and have not been adjudged invalid or unenforceable, in whole or in part, and each Grantor has filed all necessary documents and has paid all renewal, maintenance, and other fees and taxes required to maintain each and every registration of and application to register the Copyrights, Trademarks and Patents listed on Schedule 4.6 in full force and effect;

(iv)    except as set forth in Schedule 4.6(H) and except for matters that are not material to such Grantor, no holding, decision, or judgment has been rendered in any action or proceeding before any court or administrative authority and no action or

18

proceeding before any court or administrative authority is pending or, to the best of such Grantor's knowledge, threatened challenging the validity of, such Grantor's right to register, or such Grantor's rights to own any material Intellectual Property owned by such Grantor;

(v)    all registrations and applications for Copyrights, Patents and Trademarks listed on Schedule 4.6 are standing in the name of each Grantor, and none of the Trademarks, Patents, Copyrights or Trade Secrets has been licensed by any Grantor to any Affiliate or third party, except as disclosed in Schedule 4.6(B), (D), (F), or (G) and except for licenses executed in the ordinary course of business consistent with past practice;

(vi)    except as set forth in Schedule 4.6(H), to the best of each Grantor's knowledge, the conduct of such Grantor's business does not infringe upon or otherwise violate any Trademark, Patent, Copyright or Trade Secret owned by a third party in any material respect and no claim is pending against Grantor that any Intellectual Property owned or used by Grantor violates the asserted rights of any third party; and

(vii)    to the best of each Grantor's knowledge, no third party is infringing upon or otherwise violating any rights in any material Intellectual Property owned or used by such Grantor;

(b)    <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees as follows until the payment in full of the Secured Obligations and termination of the Commitments:

(i)    it shall not, without the prior consent of Collateral Agent, which shall not be unreasonably withheld or delayed, do any act or omit to do any act whereby any of the Intellectual Property which is, in such Grantor's reasonable business judgment, material to the business of Grantor may lapse, or be abandoned, dedicated to the public, or become unenforceable, or which would adversely affect the validity, grant, or enforceability of the security interest granted therein;

(ii)    it shall maintain Trademarks that are material to the business of any Grantor in full force free from any adjudication of abandonment or invalidity for non-use and maintain the level of the quality of products sold and services rendered under any of such Trademark at a level at least substantially consistent with the quality of such products and services as of the date hereof, and each Grantor shall take all steps reasonably necessary to insure that licensees of such Trademarks use such consistent standards of quality;

(iii)    it shall, within 30 days of the creation or acquisition of any Copyrightable work the registration of which is material to the business of Grantor, apply to register the Copyright in the United States Copyright Office when such registration is deemed necessary by the Grantor exercising its reasonable business judgment;

19

(iv)    it shall promptly notify Collateral Agent in writing if it knows that any item of the Intellectual Property that is material to the business of any Grantor may become (A) abandoned or dedicated to the public or placed in the public domain other than by expiration in the normal course (and not in violation of clause (v) below), (B) invalid or unenforceable, or (C) subject to any adverse determination or development (including the institution of proceedings) in any action or proceeding (other than routine office actions) in the United States Patent and Trademark Office, the United States Copyright Office, any state registry, any foreign counterpart of the foregoing, or any court;

(v)    on the Closing Date, each applicable Grantor will sign and deliver to Collateral Agent Intellectual Property Security Agreements with respect to all Recordable Intellectual Property then owned by it;

(vi)    it shall take all commercially reasonable steps in the United States Patent and Trademark Office, the United States Copyright Office, any state registry or any foreign counterpart of the foregoing, to maintain and prosecute any application or registration of each Trademark, Patent, and Copyright owned by any Grantor and material to its business which is now or shall become included in the Intellectual Property including, but not limited to, those items on Schedule 4.6(A), (C) and (E);

(vii)    in the event that a Grantor becomes aware that any material Intellectual Property owned by or exclusively licensed to any Grantor is being infringed, misappropriated, or diluted by a third party, such Grantor shall, in the exercise of its reasonable business judgment, promptly take all commercially reasonable actions as are appropriate in the circumstances to stop such infringement, misappropriation, or dilution and protect its rights in such Intellectual Property including, but not limited to, the initiation of a suit for injunctive relief and to recover damages;

(viii)    it shall on a semi-annual basis report to Collateral Agent (A) the filing of any application to register any Intellectual Property owned by the Grantor with the United States Patent and Trademark Office, the United States Copyright Office, or any state registry or foreign counterpart of the foregoing (whether such application is filed by such Grantor or through any agent, employee, licensee, or designee thereof) and (B) the registration of any Intellectual Property owned by the Grantor by any such office, and upon the request of Collateral Agent (acting at the direction of the Requisite Lenders), it shall execute and deliver to Collateral Agent a completed Pledge Supplement, substantially in the form of Exhibit A attached hereto, together with all Supplements to Schedules thereto;

(ix)    it shall, promptly upon the reasonable request of Collateral Agent (acting at the direction of the Requisite Lenders), execute and deliver to Collateral Agent any document reasonably required to acknowledge, confirm, register, record, or perfect Collateral Agent's interest in any part of the Intellectual Property, whether now owned or hereafter acquired;

(x)    except with the prior consent of Collateral Agent or as permitted under the Credit Agreement, each Grantor shall not sell, assign, transfer, grant an exclusive license otherwise outside of the ordinary course of business, consistent with past practice, grant any option, or create or suffer to exist any Lien upon or with respect to any material Intellectual Property, except for the Lien created or permitted by and under this Agreement and the other Credit Documents;

(xi)    it shall take all commercially reasonable steps reasonably necessary to protect the secrecy of all Trade Secrets, including, without limitation, entering into confidentiality agreements with relevant employees, except to the extent that a Trade Secret is no longer material or necessary to the business of such Grantor or the Trade Secret no longer derives substantial value from not being known to the public, as determined by such Grantor in its reasonable business judgment; and

(xii)    it shall use proper statutory notice in connection with its use of any material registered Copyrights, Trademarks and Patents (and, if applicable, applications thereof) where necessary and proper in its reasonable business judgment.

4.7    **Commercial Tort Claims**.

(a)    <u>Representations and Warranties</u>.  Each Grantor hereby represents and warrants, on the Closing Date, that Schedule 4.7 sets forth all Commercial Tort Claims of each Grantor on the Closing Date in excess of $5,000,000 in the aggregate; and

(b)    <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees that with respect to any Commercial Tort Claim in excess of $5,000,000 in the aggregate hereafter arising it shall deliver to Collateral Agent a completed Pledge Supplement, substantially in the form of Exhibit A attached hereto, together with all Supplements to Schedules thereto, identifying such new Commercial Tort Claims.

**SECTION 5.    ACCESS; RIGHT OF INSPECTION AND FURTHER ASSURANCES; ADDITIONAL GRANTORS.**

5.1    **Further Assurances**.

(a)    Each Grantor agrees that from time to time, at the expense of such Grantor, that it shall promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary, or that Collateral Agent (acting at the direction of the Requisite Lenders) may reasonably request, in order to create and maintain the validity, perfection or priority of and protect any security interest granted hereby or to enable Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, each Grantor shall:

(i)    file (or authorize the filing of) such financing or continuation statements, or amendments thereto, and execute and deliver such other agreements, instruments, endorsements, powers of attorney or notices as Collateral Agent may reasonably request, in order to perfect and preserve the security interests granted or purported to be granted hereby; and

21

(ii)    take all actions as Collateral Agent may reasonably request to ensure the recordation of appropriate evidence of the liens and security interest granted hereunder in the Copyrights, Patents and Trademarks with any intellectual property registry in which said Copyrights, Patents or Trademarks is registered or in which an application for registration is pending including, without limitation, the United States Patent and Trademark Office, the United States Copyright Office, the comparable State agencies, and the foreign counterparts on any of the foregoing.

(b)    Each Grantor hereby authorizes Collateral Agent (without obligation) to file a Record or Records, including, without limitation, financing or continuation statements, and amendments thereto, in any jurisdictions and with any filing offices as the Requisite Lenders determine are necessary or advisable to perfect the security interest granted to Collateral Agent herein.  Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as the Requisite Lenders determine is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to Collateral Agent herein, including, without limitation, describing such property as "all assets" or "all personal property, whether now owned or hereafter acquired."  Each Grantor shall furnish to Collateral Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Collateral Agent may reasonably request.  For the avoidance of doubt, the Collateral Agent shall have no responsibility or obligation to file any financing or continuation statements or record any documents or instruments in any public office at any time or times or to otherwise perfect or maintain the perfection of any security interest in or Lien over any Collateral and such responsibility shall be solely that of the Grantors.

(c)    Each Grantor hereby authorizes Collateral Agent to modify this Agreement after obtaining such Grantor's approval of or signature to such modification by amending Schedule 4.6 to include reference to any right, title or interest in any existing Intellectual Property or any Intellectual Property acquired or developed by any Grantor after the execution hereof or to delete any reference to any right, title or interest in any Intellectual Property in which any Grantor no longer has or claims any right, title or interest.

5.2    **Additional Grantors**.  From time to time subsequent to the date hereof, additional Persons may become parties hereto as additional Grantors (each, an "**Additional Grantor**"), by executing a Counterpart Agreement.  Upon delivery of any such counterpart agreement to Collateral Agent, notice of which is hereby waived by Grantors, each Additional Grantor shall be a Grantor and shall be as fully a party hereto as if Additional Grantor were an original signatory hereto.  Each Grantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Grantor hereunder, nor by any election of Collateral Agent not to cause any Subsidiary of Company to become an Additional Grantor hereunder.  This Agreement shall be fully effective as to any Grantor that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantor hereunder.

**SECTION 6.    COLLATERAL AGENT APPOINTED ATTORNEY-IN-FACT.**

#4847-9299-7919

6.1    **Power of Attorney**.  Each Grantor hereby irrevocably appoints Collateral Agent (such appointment being coupled with an interest) as such Grantor's attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor, Collateral Agent or otherwise, from time to time to take any action and to execute any instrument that may be necessary to accomplish the purposes of this Agreement, including, without limitation, the following:

(a)    upon the occurrence and during the continuance of any Event of Default, to obtain and adjust insurance required to be maintained by such Grantor or paid to Collateral Agent pursuant to the Credit Agreement;

(b)    upon the occurrence and during the continuance of any Event of Default, to ask for, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(c)    upon the occurrence and during the continuance of any Event of Default, to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with Section 6.1(b);

(d)    upon the occurrence and during the continuance of any Event of Default, to file any claims or take any action or institute any proceedings that Collateral Agent (acting at the direction of the Requisite Lenders) may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Collateral Agent with respect to any of the Collateral;

(e)    to prepare and file any UCC financing statements against such Grantor as debtor;

(f)    to prepare, sign, and file for recordation in any registry or similar office, appropriate evidence of the lien and security interest granted herein in the Copyrights, Patents or Trademarks in the name of such Grantor as debtor;

(g)    upon the occurrence and during the continuance of any Event of Default to take or cause to be taken all actions necessary or desirable to perform or comply or cause performance or compliance with the terms of this Agreement, including, without limitation, access to pay or discharge taxes or Liens (other than Permitted Liens) levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by Collateral Agent (acting at the direction of the Requisite Lenders), any such payments made by Collateral Agent to become obligations of such Grantor to Collateral Agent, due and payable immediately without demand; and

(h)    upon the occurrence and during the continuance of any Event of Default, generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Collateral Agent were the absolute owner thereof for all purposes, and to do, at Collateral Agent's option (acting at the direction of the Requisite Lenders) and such Grantor's expense, at any time or from time to time, all acts and things that Collateral Agent deems reasonably necessary or desirable to protect, preserve or

23

realize upon the Collateral and Collateral Agent's security interest therein in accordance with the terms of this Agreement, all as fully and effectively as such Grantor might do.

6.2    **No Duty on the Part of Collateral Agent or Secured Parties**.  The powers conferred on Collateral Agent hereunder are solely to protect the interests of Secured Parties in the Collateral and shall not impose any duty upon Collateral Agent or any Secured Party to exercise any such powers.  Collateral Agent and Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable judgment or order.

## SECTION 7.    REMEDIES.

7.1    **Generally**.

(a)    If any Event of Default shall have occurred and be continuing, Collateral Agent may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it at law or in equity, all the rights and remedies of a Secured Party on default under the UCC (whether or not the UCC applies to the affected Collateral) to collect, enforce or satisfy any Secured Obligations then owing, whether by acceleration or otherwise, and also may pursue any of the following separately, successively or simultaneously:

(i)    require any Grantor to, and each Grantor hereby agrees that it shall at its expense and promptly upon request of Collateral Agent forthwith (acting at the direction of the Requisite Lenders), assemble all or part of the Collateral as directed by Collateral Agent and make it available to Collateral Agent at a place to be designated by Collateral Agent that is reasonably convenient to all parties;

(ii)    enter onto the property where any Collateral is located and take possession thereof with or without judicial process;

(iii)    prior to the disposition of the Collateral, store, process, repair or recondition the Collateral or otherwise prepare the Collateral for disposition in any manner to the extent Collateral Agent (acting at the direction of the Requisite Lenders) deems appropriate; and

(iv)    without notice except as specified below or under the UCC, sell, assign, lease, license (on an exclusive or nonexclusive basis) or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, at any of Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as Collateral Agent (acting at the direction of the Requisite Lenders) may deem commercially reasonable.

(b)    Upon the occurrence and during the continuance of an Event of Default, Collateral Agent or any Secured Party may be the purchaser of any or all of the Collateral at any public or private (to the extent the portion of the Collateral being privately sold is of a kind that

24

is customarily sold on a recognized market or the subject of widely distributed standard price quotations) sale in accordance with the UCC and Collateral Agent, as collateral agent for and representative of Secured Parties, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale made in accordance with the UCC, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by Collateral Agent at such sale in accordance with Section 9.8(b) of the Credit Agreement.  Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by applicable law) all rights of redemption, stay and appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.  Each Grantor agrees that, to the extent notice of sale shall be required by law, at least 10 days' notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification.  Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor agrees that it would not be commercially unreasonable for Collateral Agent to dispose of the Collateral or any portion thereof by using Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets.  Each Grantor hereby waives any claims against Collateral Agent arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if Collateral Agent accepts the first offer received and does not offer such Collateral to more than one offeree; provided this sentence shall not restrict the operation of Section 9-615(1) of the UCC.  If the proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, Grantors shall be liable for the deficiency and the reasonable fees of any attorneys employed by Collateral Agent to collect such deficiency. Each Grantor further agrees that a breach of any of the covenants contained in this Section will cause irreparable injury to Collateral Agent and the other Secured Parties, that Collateral Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no default has occurred giving rise to the Secured Obligations becoming due and payable prior to their stated maturities.  Nothing in this Section shall in any way alter the rights of Collateral Agent or the other Secured Parties hereunder.

(c)     Upon the occurrence and during the continuance of an Event of Default, Collateral Agent may sell the Collateral without giving any warranties as to the Collateral. Collateral Agent may specifically disclaim or modify any warranties of title or the like.  This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(d)     Upon the occurrence and during the continuance of an Event of Default, Collateral Agent shall have no obligation to marshal any of the Collateral.

#4847-9299-7919

7.2 **Application of Proceeds**. Except as expressly provided elsewhere in this Agreement, all proceeds received by Collateral Agent in respect of any sale, any collection from, or other realization upon all or any part of the Collateral, in each case pursuant to its exercise of remedies under Section 7.1 hereof, shall be applied in full or in part by Collateral Agent against, the Secured Obligations in the following order of priority: *first*, to the payment of all reasonable costs and expenses of such sale, collection or other realization, including reasonable fees and out-of-pocket expenses to Collateral Agent and its agents and counsel, and all other reasonable out-of-pocket expenses, liabilities and advances made or incurred by Collateral Agent in connection therewith, and all amounts for which Collateral Agent is entitled to indemnification hereunder (in its capacity as Collateral Agent and not as a Lender) and all advances made by Collateral Agent hereunder for the account of the applicable Grantor, and to the payment of all reasonable costs and expenses paid or incurred by Collateral Agent in connection with the exercise of any right or remedy hereunder or under the Credit Agreement, all in accordance with the terms hereof or thereof; *second*, to the extent of any excess of such proceeds and without duplication, to the payment of all Priority Obligations for the ratable benefit of the Priority Lenders; *third*, to the extent of any excess of such proceeds and without duplication, to the payment of all Non-Priority Obligations for the ratable benefit of the Non-Priority Lenders and Lender Counterparties; and *fourth*, to the extent of any excess of such proceeds, to the payment to or upon the order of such Grantor or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct. For the avoidance of doubt, any non-cash proceeds received by Collateral Agent will, for purposes of determining the application of proceeds hereunder and the satisfaction of Secured Obligations, be valued at their fair market value as of the time of application (and not, in the case of loans, notes or other securities, their face value, liquidation preference or other nominal value).

7.3 **Sales on Credit.**

If Collateral Agent sells any of the Collateral upon credit, Grantor will be credited only with payments actually made by purchaser and received by Collateral Agent and applied to indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Collateral Agent may resell the Collateral and Grantor shall be credited with proceeds of the sale.

7.4 **Investment Related Property**.

Each Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws, Collateral Agent may be compelled, with respect to any sale of all or any part of the Investment Related Property conducted without prior registration or qualification of such Investment Related Property under the Securities Act or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Investment Related Property for their own account, for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act) and, notwithstanding such circumstances, each Grantor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Collateral Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Investment Related Property for the period of time necessary to permit the issuer

26

thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it. If Collateral Agent determines to exercise its right to sell any or all of the Investment Related Property, upon written request, each Grantor shall and shall cause each issuer of any Pledged Equity Interests to be sold hereunder, from time to time to furnish to Collateral Agent all such information as Collateral Agent may request in order to determine the number and nature of interest, shares or other instruments included in the Investment Related Property which may be sold by Collateral Agent in exempt transactions under the Securities Act and the rules and regulations of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

7.5     **Intellectual Property**.

(a)     Anything contained herein to the contrary notwithstanding, upon the occurrence and during the continuance of an Event of Default:

(i)     the Collateral Agent shall have the right (but not the obligation) to bring suit or otherwise commence any action or proceeding in the name of any Grantor, the Collateral Agent or otherwise, (acting at the direction of the Requisite Lenders) to enforce any Intellectual Property, in which event such Grantor shall, at the request of the Collateral Agent, do any and all lawful acts and execute any and all documents required by the Requisite Lenders in aid of such enforcement and such Grantor shall promptly, upon demand, reimburse and indemnify the Collateral Agent as provided in Section 10 hereof in connection with the exercise of its rights under this Section;

(ii)     upon written demand from the Collateral Agent, each Grantor shall grant, assign, convey or otherwise transfer to the Collateral Agent or such Collateral Agent's designee all of such Grantor's right, title and interest in and to the Intellectual Property and shall execute and deliver to the Collateral Agent such documents as are necessary or appropriate to carry out the intent and purposes of this Agreement;

(iii)     each Grantor agrees that such an assignment and/or recording shall be applied to reduce the Secured Obligations outstanding only to the extent that the Collateral Agent (or any Secured Party) receives cash proceeds in respect of the sale of, or other realization upon, the Intellectual Property; and

(iv)     the Collateral Agent shall have the right to notify, or require each Grantor to notify, any obligors with respect to amounts due or to become due to such Grantor in respect of any licensed Intellectual Property, of the existence of the security interest created herein, to direct such obligors to make payment of all such amounts directly to the Collateral Agent, and, upon such notification and at the expense of such Grantor, to enforce collection of any such amounts and to adjust, settle or compromise the amount or payment thereof; in the same manner and to the same extent as such Grantor might have done;

(A)     all amounts and proceeds (including checks and other instruments) received by Grantor in respect of amounts due

to such Grantor in respect of the Collateral or any portion thereof shall be received in trust for the benefit of the Collateral Agent hereunder, shall be segregated from other funds of such Grantor and shall be forthwith paid over or delivered to the Collateral Agent in the same form as so received (with any necessary endorsement) to be held as cash Collateral and applied as provided by Section 7.6 hereof; and

    (B)    Grantor shall not adjust, settle or compromise the amount or payment of any such amount or release wholly or partly any obligor with respect thereto or allow any credit or discount thereon.

(b)    If (i) an Event of Default shall have occurred and, by reason of cure, waiver, modification, amendment or otherwise, no longer be continuing, (ii) no other Event of Default shall have occurred and be continuing, (iii) an assignment or other transfer to the Collateral Agent of any rights, title and interests in and to the Intellectual Property shall have been previously made and shall have become absolute and effective, and (iv) the Secured Obligations shall not have become immediately due and payable, upon the written request of any Grantor, the Collateral Agent shall promptly execute and deliver to such Grantor, at such Grantor's sole cost and expense, such assignments or other transfer as may be necessary to reassign to such Grantor any such rights, title and interests as may have been assigned to the Collateral Agent as aforesaid, subject to any disposition thereof that may have been made by the Collateral Agent; <u>provided</u>, after giving effect to such reassignment, the Collateral Agent's security interest granted pursuant hereto, as well as all other rights and remedies of the Collateral Agent granted hereunder, shall continue to be in full force and effect; and <u>provided further</u>, the rights, title and interests so reassigned shall be free and clear of any other Liens granted by or on behalf of the Collateral Agent and the Secured Parties.

(c)    Solely for the purpose of enabling the Collateral Agent to exercise rights and remedies under this Section 7 and at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Collateral Agent, to the extent it has the right to do so, a nonexclusive license (exercisable without payment of royalty or other compensation to such Grantor but only exercisable so long as an Event of Default has occurred and is continuing), subject, in the case of Trademarks, to the grant of sufficient rights to quality control and inspection in favor of such Grantor to avoid the risk of invalidation of said Trademarks, to use, operate under, license, or sublicense any Intellectual Property now owned or hereafter acquired by such Grantor, and wherever the same may be located.

7.6    **Cash Proceeds**.  In addition to the rights of Collateral Agent specified in Section 4.3 with respect to payments of Receivables, all proceeds of any Collateral received by any Grantor consisting of cash, checks and other non-cash items (collectively, "**Cash Proceeds**") (a) except as specified in clause (b), shall be applied by such Grantor in a manner not inconsistent with the Credit Agreement, and (b) if an Event of Default shall have occurred and be continuing, shall be held by such Grantor in trust for Collateral Agent, segregated from other

funds of such Grantor, and, unless otherwise agreed in writing by Collateral Agent, shall, forthwith upon receipt by such Grantor, unless otherwise provided pursuant to Section 4.4.1(a)(ii), be turned over to Collateral Agent in the exact form received by such Grantor (duly indorsed by such Grantor to Collateral Agent, if required). Any Cash Proceeds received by Collateral Agent (whether from a Grantor or otherwise) (i) if no Event of Default shall have occurred and be continuing, shall be held by Collateral Agent for the ratable benefit of Secured Parties, as collateral security for the Secured Obligations (whether matured or unmatured) and (ii) if an Event of Default shall have occurred and be continuing, may, in the discretion of the Requisite Lenders, (A) be held by Collateral Agent for the ratable benefit of Secured Parties, as collateral security for the Secured Obligations (whether matured or unmatured) and (B) then or at any time thereafter may be applied by Collateral Agent against the Secured Obligations then due and owing. Prior to an Event of Default, any cash proceeds received by Collateral Agent shall be paid to the Grantors.

**SECTION 8.        COLLATERAL AGENT.**

Collateral Agent has been appointed to act as Collateral Agent hereunder by Lenders and, by their acceptance of the benefits hereof, the other Secured Parties. Collateral Agent shall be obligated, and shall have the right hereunder, to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking any action (including, without limitation, the release or substitution of Collateral), solely in accordance with this Agreement and the Credit Agreement. In furtherance of the foregoing provisions of this Section, each Secured Party, by its acceptance of the benefits hereof, agrees that it shall have no right individually to realize upon any of the Collateral hereunder, it being understood and agreed by such Secured Party that all rights and remedies hereunder may be exercised solely by Collateral Agent (acting at the direction of the Requisite Lenders) for the benefit of Secured Parties in accordance with the terms of this Section. Collateral Agent may resign at any time by giving prior written notice thereof to Lenders and the Grantors, and Collateral Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to the Grantors and Collateral Agent signed by the Requisite Lenders. Upon any such notice of resignation or any such removal, Collateral Agent immediately shall be discharged from its duties and obligations under this Agreement and Requisite Lenders shall have the right, upon notice to Administrative Agent, to appoint a successor Collateral Agent. Upon the acceptance of any appointment as Collateral Agent hereunder by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Collateral Agent under this Agreement, and the retiring or removed Collateral Agent under this Agreement shall promptly at the Grantors' expense (a) transfer to such successor Collateral Agent all sums, Securities and other items of Collateral held hereunder, together with all records and other documents necessary or appropriate in connection with the performance of the duties of successor Collateral Agent under this Agreement, and (b) execute and deliver to such successor Collateral Agent or otherwise authorize the filing of such amendments to financing statements, and take such other actions, as may be necessary in connection with the assignment to such successor Collateral Agent of the security interests created hereunder. After any retiring or removed Collateral Agent's resignation or removal hereunder as the Collateral Agent, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement while it was Collateral Agent hereunder.

#4847-9299-7919

**SECTION 9.        CONTINUING SECURITY INTEREST; TRANSFER OF LOANS.**

This Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect until the payment in full in cash of all Secured Obligations, the cancellation or termination of the Commitments and the cancellation or expiration of all outstanding Letters of Credit (or the cash collateralization thereof in accordance with the terms of the Credit Agreement), be binding upon each Grantor, its successors and assigns and inure, together with the rights and remedies of Collateral Agent hereunder, to the benefit of Collateral Agent and its successors, transferees and assigns for the benefit and on behalf of Secured Parties. Without limiting the generality of the foregoing, but subject to the terms of the Credit Agreement, any Lender may assign or otherwise transfer any Loans held by it to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to Lenders herein or otherwise. Upon the payment in full in cash of all Secured Obligations, the cancellation or termination of the Commitments and the cancellation or expiration of all outstanding Letters of Credit (or the cash collateralization thereof in accordance with the terms of the Credit Agreement), the security interest granted hereby (other than with respect to any cash collateralization in respect of Letters of Credit) shall automatically terminate hereunder and of record and all rights to the Collateral shall revert to Grantors. Upon any such termination Collateral Agent shall, at Grantors' expense, promptly execute and deliver to Grantors or otherwise authorize the filing of such documents as Grantors shall reasonably request, including financing statement amendments to evidence such termination. Upon any disposition of property permitted by the Credit Agreement (including a sale or other disposition of a Subsidiary), the Liens granted herein shall be deemed to be automatically released and such property shall automatically revert to the applicable Grantor with no further action on the part of any Person. Collateral Agent shall, at Grantor's expense, execute and deliver or otherwise authorize the filing of such documents as Grantors shall reasonably request, in form and substance reasonably satisfactory to the Requisite Lenders, including financing statement amendments to evidence such release.

**SECTION 10.        STANDARD OF CARE; COLLATERAL AGENT MAY PERFORM.**

The powers conferred on Collateral Agent hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which Collateral Agent accords its own property. Neither Collateral Agent nor any of its directors, officers, employees or agents shall be liable for failure to, except to the extent such delay or failure arises from the gross negligence or willful misconduct of Collateral Agent, as determined by a court of competent jurisdiction in a final, non-appealable judgment or order, demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or otherwise. If any Grantor fails to perform any agreement contained herein, Collateral Agent may itself perform, or cause

30

performance of, such agreement, and the expenses of Collateral Agent incurred in connection therewith shall be payable by each Grantor under Section 10.2 of the Credit Agreement.

## SECTION 11.   MISCELLANEOUS.

Any notice required or permitted to be given under this Agreement shall be given in accordance with Section 10.1 of the Credit Agreement.  No failure or delay on the part of Collateral Agent in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  All rights and remedies existing under this Agreement and the other Credit Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available. In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.  This Agreement shall be binding upon and inure to the benefit of Collateral Agent (on behalf of Secured Parties) and Grantors and their respective successors and assigns.  No Grantor shall, without the prior written consent of the Collateral Agent (acting at the direction of the Requisite Lenders) given in accordance with the Credit Agreement, assign any right, duty or obligation hereunder.  This Agreement and the other Credit Documents embody the entire agreement and understanding between Grantors and the Collateral Agent and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof.  Accordingly, the Credit Documents may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Delivery of an executed counterpart of this Agreement by telefacsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ITS CONFLICTS OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATION LAWS).**

[Remainder of page intentionally left blank]

#4847-9299-7919

IN WITNESS WHEREOF, each Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first set forth above.

**EDUCATION MANAGEMENT CORPORATION**

By: _____
    Name: Mick J. Beekhuizen
    Title: Executive Vice President and
          Chief Financial Officer

**EDUCATION MANAGEMENT HOLDINGS II LLC**

By: _____
    Name: Mick J. Beekhuizen
    Title: Executive Vice President and
          Chief Financial Officer

**EDUCATION MANAGEMENT II LLC**

By: _____
    Name: Mick J. Beekhuizen
    Title: Executive Vice President and
          Chief Financial Officer

[Signature Page to Pledge and Security Agreement]

**THE CONNECTING LINK II LLC**

**HIGHER EDUCATION SERVICES II LLC**

**EDUCATION FINANCE III LLC**

**BROWN MACKIE EDUCATION II LLC**

**SOUTH UNIVERSITY RESEARCH II LLC**

**THE ART INSTITUTES INTERNATIONAL II LLC**


By: _____
    Name: James A. Terrell
    Title: Treasurer

[Signature Page to Pledge and Security Agreement]

**BMC REAL PROPERTY HOLDINGS LLC**

By: _____
Name: James A. Terrell
Title: Treasurer

**U.S. BANK NATIONAL ASSOCIATION,**
as Collateral Agent

By: _____

Name:

Title:

James A. Hanley
Vice President

**Schedule 4.1**

**General Information**

Full Legal Name, Type of Organization, Jurisdiction of Organization, Chief Executive
Office/Sole Place of Business and Organizational Identification Number of each Grantor

| Full Legal Name | Type of Organization | Jurisdiction of Organization | Chief Executive Office / Sole Place of Business | Organization ID Number |
|---|---|---|---|---|
| Brown Mackie Education II LLC | Limited Liability Company | Delaware | 210 Sixth Ave., 33rd Floor Pittsburgh, PA 15222 | 5627780 |
| Education Finance III LLC | Limited Liability Company | Delaware | 210 Sixth Ave., 33rd Floor Pittsburgh, PA 15222 | 5628039 |
| Education Management Corporation | Corporation | Pennsylvania | 210 Sixth Ave., 33rd Floor Pittsburgh, PA 15222 | 76302 |
| Education Management Holdings II LLC | Limited Liability Company | Delaware | 210 Sixth Ave., 33rd Floor Pittsburgh, PA 15222 | 5615168 |
| Education Management II LLC | Limited Liability Company | Delaware | 210 Sixth Ave., 33rd Floor Pittsburgh, PA 15222 | 5615171 |
| Higher Education Services II LLC | Limited Liability Company | Georgia | 200 Stephenson Ave. Savannah GA 31405 | 14103644 |
| South University Research II LLC | Limited Liability Company | Georgia | 200 Stephenson Ave. Savannah GA 31405 | 14108249 |
| The Art Institutes International II LLC | Limited Liability Company | Pennsylvania | 210 Sixth Ave., 33rd Floor Pittsburgh, PA 15222 | 4304399 |
| The Connecting Link II LLC | Limited Liability Company | Georgia | 5126 Ralston St., Ventura CA 93003 | 14102591 |

| BMC Real Property Holdings LLC | Limited Liability Company | Delaware | 210 Sixth Ave., 33rd Floor Pittsburgh, PA 15222 | 5631685 |
|---|---|---|---|---|

## Schedule 4.4

## Investment Related Property

**Pledged Common Stock Interests**

| Grantor | Stock Issuer | Class of Stock | Certificated (Y/N) | Stock Certificate No. | Par Value | No. of Pledged Stock | % of Outstanding Stock of the Stock Issuer |
|---|---|---|---|---|---|---|---|
| Education Management II LLC | EDMC Marketing and Advertising, Inc. | Common Stock | Y | 5 | N/A | 1,000 | 100% |
| Education Management II LLC | AIIM Restaurant, Inc. | Common Stock | Y | 3 | $.01 | 100 | 100% |
| The Art Institutes International II LLC | The Art Institute of Washington, Inc. | Common Stock | Y | 4 | $1.00 | 100 | 100% |
| The Art Institutes International II LLC | EITA Holdings, Inc. | Common Stock | Y | 2 | none | 100 | 100% |
| The Art Institutes International II LLC | The Art Institute of Colorado, Inc. | Common Stock | Y | 7 | none | 1,100 | 100% |
| The Art Institutes International II LLC | The Art Institute of Austin, Inc. | Common Stock | Y | 2 | $1.00 | 100 | 100% |
| The Art Institutes International II LLC | The Art Institute of Fort Lauderdale, Inc. | Common Stock | Y | 5 | $1.00 | 1,000 | 100% |
| The Art Institutes International II LLC | The Art Institute of Houston, Inc. | Common Stock | Y | 5 | $1.00 | 100 | 100% |

| **Grantor** | **Stock Issuer** | **Class of Stock** | **Certificated (Y/N)** | **Stock Certificate No.** | **Par Value** | **No. of Pledged Stock** | **% of Outstanding Stock of the Stock Issuer** |
|---|---|---|---|---|---|---|---|
| The Art Institutes International II LLC | The Art Institutes International Minnesota, Inc. | Common Stock | Y | 4 | $1.00 | 100 | 100% |
| The Art Institutes International II LLC | The Art Institute of New York City, Inc. | Common Stock | Y | 4 | $0.01 | 100 | 100% |
| The Art Institutes International II LLC | The Art Institute of Portland, Inc. | Common Stock | Y | 4 | $0.01 | 100 | 100% |
| The Art Institutes International II LLC | The Art Institute of Seattle, Inc. | Common Stock | Y | 5 | $1.00 | 100 | 100% |
| The Art Institutes International II LLC | The Art Institute of Jacksonville, Inc. | Common Stock | Y | 3 | none | 100 | 100% |
| The Art Institutes International II LLC | The Art Institute of Tampa, Inc. | Common Stock | Y | 3 | none | 100 | 100% |
| The Art Institutes International II LLC | The Illinois Institute of Art, Inc. | Common Stock | Y | 4 | $1.00 | 100 | 100% |
| The Art Institutes International II LLC | The Art Institute of San Antonio, Inc. | Common Stock | Y | 2 | none | 100 | 100% |
| The Art Institutes International II LLC | Miami International University of Art & Design, Inc. | Common Stock | Y | 5 | $1.00 | 100 | 100% |
| The Art Institutes International II LLC | The Art Institute of Tennessee-Nashville, Inc. | Common Stock | Y | 3 | none | 100 | 100% |

| **Grantor** | **Stock Issuer** | **Class of Stock** | **Certificated (Y/N)** | **Stock Certificate No.** | **Par Value** | **No. of Pledged Stock** | **% of Outstanding Stock of the Stock Issuer** |
|---|---|---|---|---|---|---|---|
| The Art Institutes International II LLC | The Art Institute of Charleston, Inc. | Common Stock | Y | 3 | none | 100 | 100% |

**Pledged LLC Interests**

| Grantor | Limited Liability Company | Certificated (Y/N) | Certificate No. (if any) | No. of Pledged Units | % of Outstanding LLC Interests of the Limited Liability Company |
|---|---|---|---|---|---|
| Education Management Corporation | Education Management Holdings LLC | N | N/A | N/A | 100% |
| Education Management Corporation | Education Management Holdings II LLC | N | N/A | N/A | 100% |
| Education Management Holdings II LLC | Education Management II LLC | N | N/A | N/A | 100% |
| Education Management II LLC | Education Finance III LLC | N | N | N/A | 100% |
| Education Management II LLC | South University, LLC | N | N/A | N/A | 100% |
| Education Management II LLC | The Art Institutes International II LLC | N | N/A | N/A | 100% |
| Education Management II LLC | Argosy University of California LLC | N | N/A | N/A | 100% |
| Education Management II LLC | Southern Ohio College LLC | N | N/A | N/A | 45% |
| Education Management II LLC | The Connecting Link II LLC | N | N/A | N/A | 100% |
| Education Management II LLC | Brown Mackie Education II LLC | N | N/A | N/A | 100% |
| Education Management II LLC | BMC Real Property Holdings LLC | N | N/A | N/A | 100% |
| Education Management II LLC | Higher Education Services II LLC | N | N/A | N/A | 100% |
| Education | South University | N | N/A | N/A | 100% |

| Management II LLC | Research II LLC | | | | |
|---|---|---|---|---|---|
| Brown Mackie Education II LLC | Brown Mackie College-Salina LLC | N | N/A | N/A | 100% |
| Brown Mackie Education II LLC | Southern Ohio College LLC | N | N/A | N/A | 11% |
| The Art Institutes International II LLC | The Art Institute of Atlanta, LLC | N | N/A | N/A | 100% |
| The Art Institutes International II LLC | The Art Institute of York-Pennsylvania LLC | N | N/A | N/A | 100% |
| The Art Institutes International II LLC | The Art Institute of Pittsburgh LLC | N | N/A | N/A | 100% |
| The Art Institutes International II LLC | The Art Institute of Philadelphia LLC | N | N/A | N/A | 100% |
| The Art Institutes International II LLC | The Art Institute of Washington – Dulles LLC | N | N/A | N/A | 100% |
| The Art Institutes International II LLC | The New England Institute of Art, LLC | N | N/A | N/A | 100% |

**Pledged Partnership Interests**

None

**Pledged Trust Interests**

None

**Pledged Debt**

None

**Schedule 4.5**

**Letter of Credit Rights**

None

**Schedule 4.6**

**Intellectual Property**

**(A)    Copyrights**

| Registration No. | Registration Date | Owner of Record | Title |
|---|---|---|---|
| TX-2-855-734 | June 19, 1990 | Education Management II LLC | Your investment in education. |
| TX-2-858-624 | June 18, 1990 | Education Management II LLC | Your complete guide to financial aid. |
| TX-3-018-358 | June 25, 1990 | Education Management II LLC | Student financial planning training manual: v. 1. |
| TX-3-066-291 | April 22, 1991 | Education Management II LLC | Your investment in education: a practical guide to financial planning. |
| TX-3-123-662 | April 22, 1991 | Education Management II LLC | Your complete guide to financial aid. |
| TXu-424-572 | June 25, 1990 | Education Management II LLC | Education Management Corporation student financial planning software. |
| TXu-816-222 | September 8, 1997 | Education Management II LLC | New media information design. |
| TXu-869-508 | August 19, 1998 | Education Management II LLC | New media information design. |
| TX0006408634 | July 11, 2006 | Education Management Corporation | American regional cuisine by Art Institutes. |
| TX0005499878 | March 22, 2002 | Education Management Corporation | American regional cuisine by the Art Institutes with photography by Cynthia Holling-Morris. |
| TXu000424572 | June 25, 1990 | Education Management Corporation | Education Management Corporation student financial planning software. |
| TXu000869508 | August 19, 1998 | Education Management Corporation | New media information design. |
| TXu000816222 | September 8, 1997 | Education Management Corporation | New media information design. |
| TX0003018358 | June 25, 1990 | Education Management Corporation | Student financial planning training manual: v.1. |
| TX0003123662 | April 22, 1991 | Education Management Corporation | Your complete guide to financial aid. |
| TX0002858624 | June 18, 1990 | Education Management Corporation | Your complete guide to financial aid. |
| TX0002855734 | June 19, 1990 | Education Management Corporation | Your investment in education. |
| V3539D871 | June 20, 2006 | Education Management Corporation | Your investment in education & 8 other titles. |

| Registration No. | Registration Date | Owner of Record | Title |
|---|---|---|---|
| TX0003066291 | April 22, 1991 | Education Management Corporation | Your investment in education: a practical guide to financial planning. |

**(B)**   **Copyright Licenses**

None

**(C)**   **Patents**

None

**(D)**   **Patent Licenses**

None

**(E)**   **Trademarks**

**a.   Registered Trademarks**

**i.   Education Management Corporation**

| Mark | Country | Registration | Classes | FHFGD Ref. |
|---|---|---|---|---|
| AI (Stylized) | China | 3429609 08/28/04 | 14 | 05662-0098.00139 |
| AI (Stylized) | China | 3429608 12/28/04 | 16 | 05662-0098.01139 |
| AI (Stylized) | China | 3429626 10/07/04 | 21 | 05662-0098.02139 |
| AI (Stylized) | China | 3429624 06/14/04 | 41 | 05662-0098.03139 |
| AI (Stylized) | China | 3429607 09/14/06 | 18 | 05662-0098.08139 |
| ARGOSY UNIVERSITY & Torch Design | China | 3451818 08/28/04 | 14 | 05662-0114.00139 |
| ARGOSY UNIVERSITY & Torch Design | China | 3451816 01/28/05 | 18 | 05662-0114.01139 |
| ARGOSY UNIVERSITY & Torch Design | China | 3451815 12/14/04 | 21 | 05662-0114.02139 |
| ARGOSY UNIVERSITY & Torch Design | China | 3451814 01/14/05 | 25 | 05662-0114.03139 |
| ARGOSY UNIVERSITY & Torch Design | China | 3451813 06/21/04 | 41 | 05662-0114.04139 |
| ARGOSY UNIVERSITY & Torch Design | China | 3451817 11/14/05 | 16 | 05662-0114.05139 |

**ii.   Education Management II LLC**

| Mark | Country | Reg. No. | Reg. Date |
|---|---|---|---|
| AI & Shield/Globe Design (Black & White) | Canada | TMA747,968 | 9/17/2009 |
| AI & Shield/Globe Design (Black & White) | Mexico | 1,055,201 | 8/25/2008 |

| Mark | Country | Reg. No. | Reg. Date |
|------|---------|----------|-----------|
| AI & Shield/Globe Design (Black & White) | United States | 3,483,786 | 8/12/2008 |
| AI & Shield/Globe Design (Color) | Canada | TMA747,969 | 9/17/2009 |
| AI & Shield/Globe Design (Color) | Mexico | 1,055,200 | 8/25/2008 |
| AI & Shield/Globe Design (Color) | United States | 3,483,785 | 8/12/2008 |
| AI | Mexico | 1,427,013 | 1/17/2014 |
| AI | United States | 4,328,435 | 4/30/2013 |
| AI (Stylized) | Canada | TMA611,020 | 5/25/2004 |
| AI (Stylized) | United States | 2,371,036 | 7/25/2000 |
| AI (Stylized) | United States | 4,501,261 | 3/25/2014 |
| AI (Stylized) | Mexico | 1,427,012 | 1/17/2014 |
| AI (Stylized) (in color) | United States | 4,328,458 | 4/30/2013 |
| AI THE ART INSTITUTE OF TORONTO (Stylized) | Canada | TMA667,938 | 7/17/2006 |
| AI THE ART INSTITUTE OF VANCOUVER (Stylized) | Canada | TMA667,943 | 7/17/2006 |
| AI THE ART INSTITUTES (Stylized) (Horizontal) | Mexico | 1,452,853 | 5/6/2014 |
| AI THE ART INSTITUTES (Stylized) (Horizontal) | United States | 4,500,279 | 3/25/2014 |
| AI THE ART INSTITUTES (Stylized) (Horizontal) | United States | 4,582,763 | 8/12/2014 |
| AI THE ART INSTITUTES (Stylized) (Stacked) | United States | 4,500,280 | 3/25/2014 |
| AI THE ART INSTITUTES (Stylized) (Stacked) | United States | 4,582,766 | 8/12/2014 |
| AI THE ART INSTITUTES INTERNATIONAL | United States | 2,262,221 | 7/20/1999 |
| AI THE ART INSTITUTES INTERNATIONAL (Stylized) | United States | 1,652,020 | 7/23/1991 |
| AMERICA'S LEADER IN CREATIVE EDUCATION | United States | 3,480,621 | 8/5/2008 |
| AMERICAN SCHOOL OF PROFESSIONAL PSYCHOLOGY | United States | 4,256,243 | 12/11/2012 |
| ARGOSY UNIVERSITY | United States | 2,719,073 | 5/27/2003 |
| ARGOSY UNIVERSITY | United States | 4,345,386 | 6/4/2013 |
| Argosy University Logo (Shield) | United States | 3,487,096 | 8/19/2008 |
| ARIZONA SCHOOL OF PROFESSIONAL PSYCHOLOGY | United States | 4,208,001 | 9/11/2012 |
| ASSIGNMENTS RESTAURANT | United States | 2,859,720 | 7/6/2004 |
| BEST TEEN CHEF | Canada | TMA718,836 | 7/17/2008 |
| BEST TEEN CHEF | United States | 2,926,054 | 2/8/2005 |
| BEST TEEN CHEF | United States | 3,615,917 | 5/5/2009 |
| BROWN MACKIE COLLEGE | United States | 2,975,531 | 7/26/2005 |
| BROWN MACKIE COLLEGE | United States | 4,501,262 | 3/25/2014 |
| Brown Mackie College Logo (Fleur-de-Lis) | United States | 3,054,075 | 1/31/2006 |
| CI (Stylized) | Canada | TMA716,701 | 6/16/2008 |
| COLLEGE ON THE LOT | United States | 3,862,873 | 10/19/2010 |
| CREATE TOMORROW | Canada | TMA854,930 | 7/11/2013 |
| CREATE TOMORROW | United States | 4,186,271 | 8/7/2012 |
| CREATIVITY FOR LIFE | United States | 4,557,582 | 6/24/2014 |
| FLORIDA SCHOOL OF PROFESSIONAL PSYCHOLOGY | United States | 4,208,002 | 9/11/2012 |
| GEORGIA SCHOOL OF PROFESSIONAL PSYCHOLOGY | United States | 4,211,786 | 9/18/2012 |
| HAWAII SCHOOL OF PROFESSIONAL PSYCHOLOGY | United States | 4,207,987 | 9/11/2012 |
| ILLINOIS SCHOOL OF PROFESSIONAL PSYCHOLOGY | United States | 4,208,000 | 9/11/2012 |
| MIAMI INTERNATIONAL UNIVERSITY OF ART AND DESIGN | United States | 2,902,717 | 11/16/2004 |
| MINNESOTA SCHOOL OF PROFESSIONAL PSYCHOLOGY | United States | 4,211,785 | 9/18/2012 |
| NORTH AMERICA'S LEADER IN CREATIVE EDUCATION | Canada | TMA735,309 | 2/26/2009 |
| ONE COURSE A MONTH | United States | 4,328,465 | 4/30/2013 |
| ONLINE HIGHER EDUCATION MILITARY CONSORTIUM | United States | 3,843,343 | 8/31/2010 |
| PERSONAL ATTENTION, PROFESSIONAL GROWTH. | United States | 3,075,998 | 4/4/2006 |
| Shield Capital Dome Design | United States | 4,612,655 | 9/30/2014 |
| Shield/Bridge/Water/Cityscape Design | United States | 4,612,658 | 9/30/2014 |
| Shield/Chicago Cityscape Design | United States | 4,612,659 | 9/30/2014 |
| Shield/Cliff/Sun/Ocean/Flower Design | United States | 4,612,657 | 9/30/2014 |

| Mark | Country | Reg. No. | Reg. Date |
|---|---|---|---|
| Shield/Diamond Pattern Design | United States | 4,612,652 | 9/30/2014 |
| Shield/Golden Gate Bridge Design | United States | 4,612,653 | 9/30/2014 |
| Shield/Hawaiian Flower Design | United States | 4,612,656 | 9/30/2014 |
| Shield/Leaves/Acorn Design | United States | 4,612,660 | 9/30/2014 |
| Shield/Sun/Ocean Design | United States | 4,612,651 | 9/30/2014 |
| Shield/Tree/Cityscape Design - Illinois (Schaumburg) | United States | 4,612,654 | 9/30/2014 |
| SOCRATES DISTANCE LEARNING TECHNOLOGIES GROUP | United States | 2,655,861 | 12/3/2002 |
| TALK-ON! | Canada | TMA663,319 | 4/29/2006 |
| TEXAS SCHOOL OF PROFESSIONAL PSYCHOLOGY | United States | 4,211,778 | 9/18/2012 |
| THE ART INSTITUTE OF ATLANTA | United States | 1,604,098 | 6/26/1990 |
| THE ART INSTITUTE OF ATLANTA | United States | 3,864,583 | 10/19/2010 |
| THE ART INSTITUTE OF AUSTIN | United States | 3,459,909 | 7/1/2008 |
| THE ART INSTITUTE OF AUSTIN | United States | 4,613,334 | 9/30/2014 |
| THE ART INSTITUTE OF CALIFORNIA | United States | 3,076,348 | 4/4/2006 |
| THE ART INSTITUTE OF CHARLESTON | United States | 4,367,249 | 7/16/2013 |
| THE ART INSTITUTE OF CHARLOTTE | United States | 3,076,338 | 4/4/2006 |
| THE ART INSTITUTE OF COLORADO | United States | 3,095,761 | 5/23/2006 |
| THE ART INSTITUTE OF DALLAS | United States | 1,621,670 | 11/6/1990 |
| THE ART INSTITUTE OF DALLAS | United States | 4,021,830 | 9/6/2011 |
| THE ART INSTITUTE OF FORT LAUDERDALE | United States | 1,601,475 | 6/12/1990 |
| THE ART INSTITUTE OF FORT LAUDERDALE | United States | 3,864,586 | 10/19/2010 |
| THE ART INSTITUTE OF FORT WORTH | United States | 3,805,075 | 6/15/2010 |
| THE ART INSTITUTE OF HOUSTON | United States | 1,602,967 | 6/19/1990 |
| THE ART INSTITUTE OF HOUSTON | United States | 3,900,760 | 1/4/2011 |
| THE ART INSTITUTE OF INDIANAPOLIS | United States | 4,090,469 | 1/24/2012 |
| THE ART INSTITUTE OF JACKSONVILLE | United States | 3,399,418 | 3/18/2008 |
| THE ART INSTITUTE OF LAS VEGAS | United States | 2,555,535 | 4/2/2002 |
| THE ART INSTITUTE OF LAS VEGAS | United States | 4,190,749 | 8/14/2012 |
| THE ART INSTITUTE OF MICHIGAN | United States | 4,547,678 | 6/10/2014 |
| THE ART INSTITUTE OF NEW YORK CITY | United States | 2,664,210 | 12/17/2002 |
| THE ART INSTITUTE OF OHIO | United States | 2,984,379 | 8/9/2005 |
| THE ART INSTITUTE OF OHIO | United States | 3,900,779 | 1/4/2011 |
| THE ART INSTITUTE OF PHILADELPHIA | United States | 1,605,991 | 7/10/1990 |
| THE ART INSTITUTE OF PHOENIX | United States | 2,903,000 | 11/16/2004 |
| THE ART INSTITUTE OF PITTSBURGH | United States | 1,602,968 | 6/19/1990 |
| THE ART INSTITUTE OF PITTSBURGH | United States | 3,864,584 | 10/19/2010 |
| THE ART INSTITUTE OF PORTLAND | United States | 3,079,236 | 4/11/2006 |
| THE ART INSTITUTE OF RALEIGH/DURHAM | United States | 3,552,278 | 12/23/2008 |
| THE ART INSTITUTE OF RALEIGH-DURHAM | United States | 4,613,337 | 9/30/2014 |
| THE ART INSTITUTE OF SALT LAKE CITY | United States | 4,579,076 | 8/5/2014 |
| THE ART INSTITUTE OF SAN ANTONIO | United States | 3,921,295 | 2/15/2011 |
| THE ART INSTITUTE OF SEATTLE | United States | 1,604,099 | 6/26/1990 |
| THE ART INSTITUTE OF ST. LOUIS | United States | 4,238,046 | 11/6/2012 |
| THE ART INSTITUTE OF TAMPA | United States | 4,104,617 | 2/28/2012 |
| THE ART INSTITUTE OF TENNESSEE | United States | 4,134,854 | 5/1/2012 |
| THE ART INSTITUTE OF VIRGINIA BEACH | United States | 3,775,341 | 4/13/2010 |
| THE ART INSTITUTE OF WASHINGTON | United States | 3,065,867 | 3/7/2006 |
| THE ART INSTITUTE OF WISCONSIN | United States | 3,949,522 | 4/19/2011 |
| THE ART INSTITUTE OF YORK-PENNSYLVANIA | United States | 3,474,200 | 7/22/2008 |
| THE ART INSTITUTE OF YORK-PENNSYLVANIA | United States | 4,613,336 | 9/30/2014 |
| THE ILLINOIS INSTITUTE OF ART | United States | 3,192,178 | 1/2/2007 |
| THE INTERNATIONAL CULINARY SCHOOL | United States | 3,464,763 | 7/8/2008 |

| Mark | Country | Reg. No. | Reg. Date |
|------|---------|----------|-----------|
| THE LEADER IN ONLINE CREATIVE ARTS EDUCATION | United States | 3,354,546 | 12/11/2007 |
| THE NEW ENGLAND INSTITUTE OF ART | United States | 3,487,706 | 8/19/2008 |
| WASHINGTON SCHOOL OF PROFESSIONAL PSYCHOLOGY | United States | 4,207,986 | 9/11/2012 |
| WE'RE OUT THERE | Canada | TMA684,004 | 3/19/2007 |
| WESTERN STATE COLLEGE OF LAW | United States | 4,595,748 | 9/2/2014 |
| Western State College of Law Logo (Torch/Scales Design) | United States | 4,514,652 | 4/15/2014 |
| WORLD CUISINES UNCOVERED | Canada | TMA472,970 | 7/3/2009 |
| WORLD CUISINES UNCOVERED | United States | 3,483,697 | 8/12/2008 |
| A Student Experience that Extends Beyond the Classroom | United States | 3529893 | 11/11/2008 |
| The Miami Masters | United States | 3610669 | 04/21/2009 |

## b.   Pending Trademarks

### i.   Education Management II LLC

| Mark | Country | App. No. | App. Date |
|------|---------|----------|-----------|
| AI | Mexico | 1,326,345 | 11/15/2012 |
| AI (Stylized) | China | 13,004,838 | 7/31/2013 |
| AI (Stylized) | China | 13,004,839 | 7/31/2013 |
| AI (Stylized) | China | 13,004,840 | 7/31/2013 |
| AI (Stylized) | China | 13,004,841 | 7/31/2013 |
| AI (Stylized) | Mexico | 1,326,343 | 11/15/2012 |
| AI INSPIRE | United States | 86/253,647 | 4/16/2014 |
| AI SPECTRUM | United States | 86/197,265 | 2/19/2014 |
| AI THE ART INSTITUTES (Stylized) (Horizontal) | India | 2,197,646 | 8/30/2011 |
| AI THE ART INSTITUTES (Stylized) (Horizontal) | Mexico | 1,338,206 | 1/9/2013 |
| AI THE ART INSTITUTES (Stylized) (Horizontal) | United States | 85/939,685 | 5/22/2013 |
| AI THE ART INSTITUTES (Stylized) (Stacked) | China | 13,004,832 | 7/31/2013 |
| AI THE ART INSTITUTES (Stylized) (Stacked) | China | 13,004,833 | 7/31/2013 |
| AI THE ART INSTITUTES (Stylized) (Stacked) | China | 13,004,834 | 7/31/2013 |
| AI THE ART INSTITUTES (Stylized) (Stacked) | China | 13,004,835 | 7/31/2013 |
| AI THE ART INSTITUTES (Stylized) (Stacked) | China | 13,004,836 | 7/31/2013 |
| AI THE ART INSTITUTES (Stylized) (Stacked) | China | 13,004,837 | 7/31/2013 |
| AI THE ART INSTITUTES (Stylized) (Stacked) | United States | 85/939,754 | 5/22/2013 |
| ARGOSY UNIVERSITY | India | 2,191,615 | 8/30/2011 |
| ARGOSY UNIVERSITY | China | 13,004,830 | 7/31/2013 |
| ARGOSY UNIVERSITY | China | 13,004,831 | 7/31/2013 |
| BROWN MACKIE COLLEGE | India | 2,191,614 | 8/30/2011 |
| BROWN MACKIE COLLEGE | China | 13,004,828 | 7/31/2013 |
| BROWN MACKIE COLLEGE | China | 13,004,829 | 7/31/2013 |
| CREATE TOMORROW | United States | 85/939,251 | 5/22/2013 |
| CREATIVITY FOR LIFE | Canada | 1,672,194 | 4/10/2014 |
| CREATIVITY FOR LIFE | China | N/A | 4/23/2014 |
| LION OF COURAGE | United States | 86/268,351 | 5/1/2014 |
| SOUTH UNIVERSITY | India | 2,191,616 | 8/30/2011 |
| SOUTH UNIVERSITY | China | 13,004,826 | 7/31/2013 |
| SOUTH UNIVERSITY | China | 13,004,827 | 7/31/2013 |
| THE ART INSTITUTE OF CONNECTICUT | United States | 86/114,406 | 11/8/2013 |

## (F)    Trademark Licenses

Non-Exclusive Trademark License Agreement, dated June 1, 2013, between Education Management II LLC (as assignee of Education Management LLC), as licensor, and Educational Supplies Direct LLC, as licensee

**(G)**    **Trademark Secret Licenses**

None

**(H)**    **Intellectual Property Exceptions**

None

**Schedule 4.7**

**Commercial Tort Claims**

None

EXHIBIT A
TO PLEDGE AND SECURITY AGREEMENT

## PLEDGE SUPPLEMENT

This **PLEDGE SUPPLEMENT**, dated as of [mm/dd/yy], is delivered by **[NAME OF GRANTOR]**, a **[NAME OF STATE OF INCORPORATION]** [corporation] (the "**Grantor**") pursuant to the Pledge and Security Agreement, dated as of January 5, 2015 (as it may be from time to time amended, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), among Education Management II LLC, the other Grantors named therein, and U.S. Bank National Association, as Collateral Agent.  Capitalized terms used herein not otherwise defined herein shall have the meanings ascribed thereto in the Security Agreement.

Grantor hereby confirms the grant to Collateral Agent set forth in the Security Agreement of, and does hereby grant to Collateral Agent, a security interest in all of Grantor's right, title and interest in and to all Collateral to secure the Secured Obligations, in each case whether now or hereafter existing or in which Grantor now has or hereafter acquires an interest and wherever the same may be located.  Grantor represents and warrants that the attached Supplements to Schedules accurately and completely set forth all additional information required pursuant to the Security Agreement and hereby agrees that such Supplements to Schedules shall constitute part of the Schedules to the Security Agreement.

**IN WITNESS WHEREOF**, Grantor has caused this Pledge Supplement to be duly executed and delivered by its duly authorized officer as of the date first written above.

**[NAME OF GRANTOR]**

By: _____
Name:
Title:

EXHIBIT A-1

#4847-9299-7919

SUPPLEMENT TO SCHEDULE 4.1
TO PLEDGE AND SECURITY AGREEMENT

Additional Information:

Full Legal Name, Type of Organization, Jurisdiction of Organization, Chief Executive Office/Sole Place of Business and Organizational Identification Number of each Grantor:

| Full Legal Name | Type of Organization | Jurisdiction of Organization | Chief Executive Office/Sole Place of Business | Organization I.D.# |
|---|---|---|---|---|
| | | | | |

EXHIBIT A-2

SUPPLEMENT TO SCHEDULE 4.4
TO PLEDGE AND SECURITY AGREEMENT

Additional Information:

Pledged Stock:

Pledged Partnership Interests:

Pledged LLC Interests:

Pledged Trust Interests:

Pledged Debt:

EXHIBIT A-3

SUPPLEMENT TO SCHEDULE 4.5
TO PLEDGE AND SECURITY AGREEMENT

Additional Information:

Name of Grantor                    Description of Letters of Credit

EXHIBIT A-4

SUPPLEMENT TO SCHEDULE 4.6
TO PLEDGE AND SECURITY AGREEMENT

Additional Information:

(A)     Copyrights

(B)     Copyright Licenses

(C)     Patents

(D)     Patent Licenses

(E)     Trademarks

(F)     Trademark Licenses

(G)     Trade Secret Licenses

(H)     Intellectual Property Exceptions

EXHIBIT A-5

SUPPLEMENT TO SCHEDULE 4.7
TO PLEDGE AND SECURITY AGREEMENT

Additional Information:

<u>Name of Grantor</u>                                         <u>Commercial Tort Claims</u>

EXHIBIT A-6

## UNCERTIFICATED SECURITIES CONTROL AGREEMENT

Uncertificated Securities Control Agreement, dated as of [_____], 20[__] (as amended, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**") among [_____] (the "**Pledgor**"), U.S. Bank National Association, in its capacity as collateral agent for the Secured Parties, including its successors and assigns from time to time ( "**Collateral Agent**"), and [_____], a [_____] corporation (the "**Issuer**").  Capitalized terms used but not defined herein shall have the meaning assigned in the Pledge and Security Agreement dated as of January 5, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**") among the Pledgor, the other Grantors party thereto and Collateral Agent.  All references herein to the "**UCC**" shall mean the Uniform Commercial Code as in effect in the State of New York.

**Section l.   Registered Ownership of Shares**.  The Issuer hereby confirms and agrees that as of the date hereof the Pledgor is the registered owner of [_____] shares of the Issuer's [common] stock (the "**Pledged Shares**") and the Issuer shall not change the registered owner of the Pledged Shares without the prior written consent of Collateral Agent.

**Section 2.   Instructions**.  If at any time the Issuer shall receive instructions originated by Collateral Agent relating to the Pledged Shares, the Issuer shall comply with such instructions without further consent by the Pledgor or any other person.

**Section 3.   Additional Representations and Warranties of the Issuer**.  The Issuer hereby represents and warrants to Collateral Agent:

(a)    It has not entered into, and until the termination of this Agreement will not without the consent of Collateral Agent enter into, any agreement with any other person relating the Pledged Shares pursuant to which it has agreed to comply with instructions issued by such other person; and

(b)    It has not entered into, and until the termination of this Agreement will not without the consent of Collateral Agent (acting at the direction of the Requisite Lenders) enter into, any agreement with Pledgor purporting to limit or condition the obligation of Issuer to comply with Instructions as set forth in Section 2 hereof.

(c)    Except for the claims and interests of Collateral Agent and of Pledgor in the Pledged Shares, Issuer does not know of any claim to, or interest in, the Pledged Shares.  If any person asserts any lien, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against the Pledged Shares, the Issuer will promptly notify Collateral Agent and Pledgor, in writing, thereof.

(d)    This Agreement is the valid and legally binding obligation of the Issuer.

**Section 4.   Choice of Law**.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND

SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT THAT THE SAME ARE NOT MANDATORILY APPLICABLE BY STATUTE AND THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

**Section 5.    Amendment; Modification**.    No amendment or modification of this Agreement or waiver of any right hereunder shall be binding on any party hereto unless it is in writing and is signed by all of the parties hereto.

**Section 6.   Voting Rights**.    Until such time as Collateral Agent shall otherwise instruct Issuer in writing, Pledgor shall have the right to vote the Pledged Shares.

**Section 7.   Successors; Assignment**.    The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors or heirs and personal representatives who obtain such rights solely by operation of law.    Collateral Agent may assign its rights hereunder in accordance with the Credit Agreement.

**Section 8.   Indemnification of Issuer**.    Pledgor and Collateral Agent hereby agree that (a) Issuer is released from any and all liabilities to Pledgor and Collateral Agent arising from the terms of this Agreement and the compliance of Issuer with the terms hereof, except to the extent that such liabilities arise from Issuer's negligence or willful misconduct and (b) Pledgor, its successors and assigns shall at all times indemnify and save harmless Issuer from and against any and all claims, actions and suits of others arising out of the terms of this Agreement or the compliance of Issuer with the terms hereof, except to the extent that such arises from Issuer's negligence or willful misconduct, and from and against any and all liabilities, losses, damages, costs, charges, reasonable counsel fees and other expenses of every nature and character arising by reason of the same, until the termination of this Agreement.

**Section 9.   Notices**.    Each notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or certified or registered United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof; upon receipt of telefacsimile or telex, or three Business Days after being sent by certified or registered United States mail, return receipt requested, postage prepaid and properly addressed to the party at the address set forth below.

|  |  |
|---|---|
| Pledgor: | [Name]<br>[Address]<br>Attention:<br>Telecopier: |
| Collateral Agent: | [Name]<br>[Address]<br>Attention:<br>Telecopier: |
| Issuer: | [Name]<br>[Address] |

EXHIBIT B-2

#4847-9299-7919

Attention:
Telecopier:

Any party may change its address for notices in the manner set forth above.

**Section 10.  Termination**.  The obligations of Issuer to Collateral Agent pursuant to this Agreement shall continue in effect until the security interests of Collateral Agent in the Pledged Shares have been terminated pursuant to the terms of the Security Agreement and Collateral Agent has notified Issuer of such termination in writing.  Collateral Agent agrees to provide Notice of Termination in substantially the form of Exhibit A hereto to Issuer promptly upon the request of Pledgor on or after the termination of Collateral Agent's security interest in the Pledged Shares pursuant to the terms of the Security Agreement.  The termination of this Agreement shall not terminate the Pledged Shares or alter the obligations of Issuer to Pledgor pursuant to any other agreement with respect to the Pledged Shares.

**Section 11.    Counterparts**.   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Delivery of an executed counterpart of this Agreement by telefacsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.

*[Remainder of page intentionally left blank]*

#4847-9299-7919

IN WITNESS WHEREOF, the parties hereto have caused this Uncertificated Securities Control Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**[NAME OF PLEDGOR]**

By: _____
   Name:
   Title:

**U.S. BANK NATIONAL ASSOCIATION,**
Collateral Agent

By: _____
   Name:
   Title:

**[NAME OF ISSUER]**

By: _____
   Name:
   Title:

EXHIBIT B-4

EXHIBIT A
TO UNCERTIFICATED SECURITIES ACCOUNT CONTROL AGREEMENT

[Letterhead of Collateral Agent]

[Date]

[Name and Address of Issuer]
Attention:  [_____]

Re:  Termination of Control Agreement

You are hereby notified that the Uncertificated Securities Control Agreement dated as of [_____] (the "**Agreement**"), between you, [Name of Pledgor] ("**Pledgor**") and the undersigned (a copy of which is attached) is terminated and you have no further obligations to the undersigned pursuant to such Agreement.  Notwithstanding any previous instructions to you, you are hereby instructed to accept all future directions with respect to Pledged Shares (as defined in the Agreement) from Pledgor.  This notice terminates any obligations you may have to the undersigned with respect to the Pledged Shares; however, nothing contained in this notice shall alter any obligations which you may otherwise owe to Pledgor pursuant to any other agreement.

You are instructed to deliver a copy of this notice by telefacsimile or electronic mail to Pledgor.

Very truly yours,

**U.S. BANK NATIONAL ASSOCIATION,**
as Collateral Agent

By:  _____
         Name:
         Title:

EXHIBIT B-A-1

EXHIBIT C
TO PLEDGE AND SECURITY AGREEMENT

[_____], 20[__]

## PATENT SECURITY AGREEMENT

### (Patents, Patent Applications and Exclusive Patent Licenses)

WHEREAS, [name of Grantor], a [_____] [and [name of Grantor], a [_____]] (herein referred to individually as a "**Grantor**" [and collectively, the "**Grantors**"]) owns, or in the case of licenses is a party to, the Patent Collateral (as defined below);

WHEREAS, Education Management II LLC (the "**Company**"), Education Management Holdings II LLC, Education Management Corporation, Certain Subsidiaries of Company, as Guarantors, the Lenders party thereto from time to time and U.S. Bank National Association, as Administrative Agent and as Collateral Agent are parties to a Credit Agreement dated as of January 5, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined); and

WHEREAS, pursuant to (i) a Pledge and Security Agreement dated as of January 5, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**") among the Company, the Grantors party thereto and U.S. Bank National Association, as Collateral Agent for Secured Parties referred to therein (in such capacity, together with its successors in such capacity, "**Grantee**"), and (ii) certain other Security Documents (including this Patent Security Agreement), Grantor has secured the Secured Obligations (as defined in the Security Agreement) or its guarantee thereof, as applicable, (the "**Grantor's Secured Guarantee**") by granting to Grantee for the benefit of such Secured Parties a continuing security interest in personal property of Grantor, including all right, title and interest of Grantor in, to and under the Patent Collateral (as defined below);

WHEREAS, Grantor has duly authorized the execution, delivery and performance of this Patent Security Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in order to induce the Lenders to make Loans and other financial accommodations to Company pursuant to the Credit Agreement, Grantor agrees, for the benefit of Secured Parties as follows:

1.      Grant of Security Interest.  For the benefit of Secured Parties to secure payment, performance and observance of the Secured Obligations, Grantor grants to Grantee, a continuing security interest in, and a right of set-off against, and agrees to assign, transfer and convey, upon demand made upon the occurrence and during the continuance of an Event of Default without requiring further action by either party and to be effective upon such demand, all of Grantor's right, title and interest in, to and under the following (all of the following items or types of

EXHIBIT C-1

#4847-9299-7919

property being herein collectively referred to as the "**Patent Collateral**"), whether now owned or existing or hereafter acquired or arising:

> (i)    each Patent owned by Grantor, including, without limitation, each Patent referred to in Schedule 1 hereto; and

> (ii)    each exclusive Patent License to which Grantor is a party, including, without limitation, each exclusive Patent License identified in Schedule 1 hereto.

Grantor irrevocably constitutes and appoints Grantee and any officer or agent thereof, with full power of substitution, as its true and lawful attorney in fact with full power and authority in the name of Grantor or in Grantee's name, from time to time, in Grantee's discretion, so long as any Event of Default shall have occurred and be continuing, to take with respect to the Patent Collateral any and all appropriate action which Grantor might take with respect to the Patent Collateral and to execute any and all documents and instruments which may be necessary or desirable to carry out the terms of this Patent Security Agreement and to accomplish the purposes hereof.

Except to the extent expressly permitted in the Security Agreement or the Credit Agreement, Grantor agrees not to sell, license, exchange, assign or otherwise transfer or dispose of, or grant any rights with respect to, or mortgage or otherwise encumber, any of the Patent Collateral.

2.    Purpose.  This Patent Security Agreement has been executed and delivered by Grantor for the purpose of recording the grant of security interest herein with the United States Patent and Trademark Office.  The security interest granted hereby has been granted to Grantee in connection with the Security Agreement and is expressly subject to the terms and conditions thereof.  The Security Agreement (and all rights and remedies of the Secured Parties thereunder) shall remain in full force and effect in accordance with its terms.

3.    Acknowledgement.  The foregoing security interest is granted in conjunction with the security interests granted by Grantor to Grantee pursuant to the Security Agreement.  Grantor acknowledges and affirms that the rights and remedies of Grantee with respect to the security interest in the Patent Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which (including the remedies provided for therein) are incorporated by reference herein as if fully set forth herein.  In the event of any conflict between the terms of this Patent Security Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall govern.

4.    Definitions.  Unless otherwise defined herein or the context otherwise requires, terms used in this Patent Security Agreement, including its preamble and recitals, have the meanings provided by reference in the Security Agreement.

5.    Counterparts.  This Patent Security Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Delivery of an executed counterpart of this Patent Security Agreement by telefacsimile or electronic mail shall

EXHIBIT C-2

#4847-9299-7919

be equally as effective as delivery of an original executed counterpart of this Patent Security Agreement.  Any party delivering an executed counterpart of this Patent Security Agreement by telefacsimile or electronic mail also shall deliver an original executed counterpart of this Patent Security Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Patent Security Agreement.

EXHIBIT C-3

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first set forth above.

**[NAME OF GRANTOR]**

By: _____
     Name:
     Title:

Acknowledged:

**U.S. BANK NATIONAL ASSOCIATION,**
as Collateral Agent

By: _____
     Name:
     Title:

EXHIBIT C-4

#4847-9299-7919

**Schedule 1**
**to Patent**
**Security Agreement**

## [NAME OF GRANTOR]

### PATENTS AND DESIGN PATENTS

| Patent No. | Issued | Expiration | Country | Title |
| --- | --- | --- | --- | --- |

### PATENT APPLICATIONS

| Case No. | Serial No. | Country | Date | Filing Title |
| --- | --- | --- | --- | --- |

### EXCLUSIVE PATENT LICENSES

| Name of Agreement | Parties Licensor/Licensee | Date of Agreement | Exclusively Licensed Patent/s |
| --- | --- | --- | --- |

EXHIBIT C-5

EXHIBIT D
TO PLEDGE AND SECURITY AGREEMENT

[_____], 20[__]

## COPYRIGHT SECURITY AGREEMENT

### (Copyright Registrations and Exclusive Copyright Licenses)

WHEREAS, [name of Grantor], a [_____] herein referred to as "**Grantor**") [and [name of Grantor], a [_____]] (herein referred to individually as a "**Grantor**" [and collectively, the "**Grantors**"]) owns, or in the case of licenses is a party to, the Copyright Collateral (as defined below);

WHEREAS, Education Management II LLC (the "**Company**"), Education Management Holdings II LLC, Education Management Corporation, Certain Subsidiaries of Company, as Guarantors, the Lenders party thereto from time to time and U.S. Bank National Association, as Administrative Agent and as Collateral Agent are parties to a Credit Agreement dated as of January 5, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined); and

WHEREAS, pursuant to (i) a Pledge and Security Agreement dated as of January 5, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**") among the Company, the Grantors party thereto and U.S. Bank National Association, as Collateral Agent for Secured Parties referred to therein (in such capacity, together with its successors in such capacity, "**Grantee**"), and (ii) certain other Security Documents (including this Copyright Security Agreement), Grantor has secured the Secured Obligations (as defined in the Security Agreement) or its guarantee thereof, as applicable, (the "**Grantor's Secured Guarantee**") by granting to Grantee for the benefit of such Secured Parties a continuing security interest in personal property of Grantor, including all right, title and interest of Grantor in, to and under the Copyright Collateral (as defined below);

WHEREAS, Grantor has duly authorized the execution, delivery and performance of this Copyright Security Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in order to induce Lenders to make Loans and other financial accommodations to Company pursuant to the Credit Agreement, Grantor agrees, for the benefit of the Secured Parties as follows:

1.      Grant of Security Interest.  For the benefit of Secured Parties to secure payment, performance and observance of the Secured Obligations, Grantor pledges and grants to Grantee, a continuing security interest in, and a right of set-off against, and agrees to assign, transfer and convey, upon demand made upon the occurrence and during the continuance of an Event of Default without requiring further action by either party and to be effective upon such demand, all of Grantor's right, title and interest in, to and under the following (all of the following items or

#4847-9299-7919

types of property being herein collectively referred to as the "**Copyright Collateral**"), whether now owned or existing or hereafter acquired or arising:

> (i)        each Copyright owned by Grantor, including, without limitation, each Copyright registration or application therefor referred to in Schedule 1 hereto; and

> (ii)        each exclusive Copyright License (as defined in the Security Agreement) to which Grantor is a party, including, without limitation, each exclusive Copyright License identified in Schedule 1 hereto.

Grantor irrevocably constitutes and appoints Grantee and any officer or agent thereof, with full power of substitution, as its true and lawful attorney in fact with full power and authority in the name of Grantor or in Grantee's name, from time to time, in Grantee's discretion, so long as any Event of Default shall have occurred and be continuing, to take with respect to the Copyright Collateral any and all appropriate action which Grantor might take with respect to the Copyright Collateral and to execute any and all documents and instruments which may be necessary or desirable to carry out the terms of this Copyright Security Agreement and to accomplish the purposes hereof.

Except to the extent expressly permitted in the Security Agreement or the Credit Agreement, Grantor agrees not to sell, license, exchange, assign or otherwise transfer or dispose of, or grant any rights with respect to, or mortgage or otherwise encumber, any of the Copyright Collateral.

2.        Purpose.  This Copyright Security Agreement has been executed and delivered by Grantor for the purpose of recording the grant of security interest herein with the United States Copyright Office.    The security interest granted hereby has been granted to Grantee in connection with the Security Agreement and is expressly subject to the terms and conditions thereof.  The Security Agreement (and all rights and remedies of the Secured Parties thereunder) shall remain in full force and effect in accordance with its terms.

3.        Acknowledgement.  The foregoing security interest is granted in conjunction with the security interests granted by Grantor to Grantee pursuant to the Security Agreement.  Grantor acknowledges and affirms that the rights and remedies of Grantee with respect to the security interest in the Copyright Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which (including the remedies provided for therein) are incorporated by reference herein as if fully set forth herein.  In the event of any conflict between the terms of this Copyright Security Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall govern.

4.        Definitions.  Unless otherwise defined herein or the context otherwise requires, terms used in this Copyright Security Agreement, including its preamble and recitals, have the meanings provided by reference in the Security Agreement.

5.        Counterparts.  This Copyright Security Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

EXHIBIT D-2

Delivery of an executed counterpart of this Copyright Security Agreement by telefacsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Copyright Security Agreement.  Any party delivering an executed counterpart of this Copyright Security Agreement by telefacsimile or electronic mail also shall deliver an original executed counterpart of this Copyright Security Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Copyright Security Agreement.

EXHIBIT D-3

#4847-9299-7919

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first set forth above.

**[NAME OF GRANTOR]**

By: _____
     Name:
     Title:

Acknowledged:

**U.S. BANK NATIONAL ASSOCIATION**,
as Collateral Agent

By: _____
     Name:
     Title:

EXHIBIT D-4

**Schedule 1**
**to Copyright**
**Security Agreement**

**[NAME OF GRANTOR]**

**COPYRIGHT REGISTRATIONS**

| Registration No. | Registration Date | Title | Expiration Date |
| --- | --- | --- | --- |

**EXCLUSIVE COPYRIGHT LICENSES**

| Name of Agreement | Parties Licensor/Licensee | Date of Agreement | Exclusively Licensed Copyright/s |
| --- | --- | --- | --- |

EXHIBIT D-5

#4847-9299-7919

EXHIBIT E
TO PLEDGE AND SECURITY AGREEMENT

[_____], 20[__]

## TRADEMARK SECURITY AGREEMENT

### (Trademark Registrations, Trademark
### Applications and Exclusive Trademark Licenses)

WHEREAS, [name of Grantor], a [_____] herein referred to as "**Grantor**") [and [name of Grantor], a [_____]] (herein referred to individually as a "**Grantor**" [and collectively, the "**Grantors**"]) owns, or in the case of licenses is a party to, the Trademark Collateral (as defined below);

WHEREAS, Education Management II LLC (the "**Company**"), Education Management Holdings II LLC, Education Management Corporation, Certain Subsidiaries of Company, as Guarantors, the Lenders party thereto from time to time and U.S. Bank National Association, as Administrative Agent and as Collateral Agent are parties to a Credit Agreement dated as of January 5, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined); and

WHEREAS, pursuant to (i) a Pledge and Security Agreement dated as of January 5, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**") among the Company, the Grantors party thereto and U.S. Bank National Association, as Collateral Agent for Secured Parties referred to therein (in such capacity, together with its successors in such capacity, "**Grantee**"), and (ii) certain other Security Documents (including this Trademark Security Agreement), Grantor has secured the Secured Obligations (as defined in the Security Agreement) or its guarantee thereof, as applicable, (the "**Grantor's Secured Guarantee**") by granting to Grantee for the benefit of such Secured Parties a continuing security interest in personal property of Grantor, including all right, title and interest of Grantor in, to and under the Trademark Collateral (as defined below);

WHEREAS, Grantor has duly authorized the execution, delivery and performance of this Trademark Security Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in order to induce the Lenders to make Loans and other financial accommodations to Company pursuant to the Credit Agreement, Grantor agrees, for the benefit of Secured Parties as follows:

1.	Grant of Security Interest.  For the benefit of Secured Parties to secure payment, performance and observance of the Secured Obligations, Grantor pledges and grants to Grantee, a continuing security interest in, and a right of set-off against, and agrees to assign, transfer and convey, upon demand made upon the occurrence and during the continuance of an Event of Default without requiring further action by either party and to be effective upon such demand, all of Grantor's right, title and interest in, to and under the following (all of the following items or

EXHIBIT E-1

types of property being herein collectively referred to as the "**Trademark Collateral**"), whether now owned or existing or hereafter acquired or arising:

      (i)     each Trademark owned by Grantor, including, without limitation, each Trademark registration and application referred to in Schedule 1 hereto, but in all cases excluding any intent-to-use (ITU) United States trademark application for which an amendment to allege use or statement of use has not been filed under 15 U.S.C. § 1051(c) or 15 U.S.C. § 1051(d), respectively, or, if filed, has not been deemed in conformance with 15 U.S.C. § 1051(a), or examined and accepted, respectively, by the United States Patent and Trademark Office, in each case, only to the extent the grant of security interest in such intent-to-use Trademark is in violation of 15 U.S.C. § 1060 and only unless and until a "Statement of Use" or "Amendment to Allege Use" is filed, has been deemed in conformance with 15 U.S.C. §1051(a) or examined and accepted, respectively, by the United States Patent and Trademark Office at which point such Trademarks shall automatically be subject to the security interest granted herein and be deemed to be included as Trademark Collateral; and

      (ii)    each exclusive Trademark License to which Grantor is a party, including, without limitation, each exclusive Trademark License identified in Schedule 1 hereto.

Grantor irrevocably constitutes and appoints Grantee and any officer or agent thereof, with full power of substitution, as its true and lawful attorney in fact with full power and authority in the name of Grantor or in Grantee's name, from time to time, in Grantee's discretion, so long as any Event of Default shall have occurred and be continuing, to take with respect to the Trademark Collateral any and all appropriate action which Grantor might take with respect to the Trademark Collateral and to execute any and all documents and instruments which may be necessary or desirable to carry out the terms of this Trademark Security Agreement and to accomplish the purposes hereof.

Except to the extent expressly permitted in the Security Agreement or the Credit Agreement, Grantor agrees not to sell, license, exchange, assign or otherwise transfer or dispose of, or grant any rights with respect to, or mortgage or otherwise encumber, any of the Trademark Collateral.

    2.    Purpose.  This Trademark Security Agreement has been executed and delivered by Grantor for the purpose of recording the grant of security interest herein with the United States Patent and Trademark Office or the comparable state agency.  The security interest granted hereby has been granted to Grantee in connection with the Security Agreement and is expressly subject to the terms and conditions thereof.  The Security Agreement (and all rights and remedies of the Secured Parties thereunder) shall remain in full force and effect in accordance with its terms.

    3.    Acknowledgement.  The foregoing security interest is granted in conjunction with the security interests granted by Grantor to Grantee pursuant to the Security Agreement.  Grantor acknowledges and affirms that the rights and remedies of Grantee with respect to the security interest in the Trademark Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which (including the remedies provided for therein) are

#4847-9299-7919

incorporated by reference herein as if fully set forth herein.  In the event of any conflict between the terms of this Trademark Security Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall govern.

4.    Definitions.  Unless otherwise defined herein or the context otherwise requires, terms used in this Trademark Security Agreement, including its preamble and recitals, have the meanings provided by reference in the Security Agreement.

5.    Counterparts.  This Trademark Security Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Delivery of an executed counterpart of this Trademark Security Agreement by telefacsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Trademark Security Agreement.  Any party delivering an executed counterpart of this Trademark Security Agreement by telefacsimile or electronic mail also shall deliver an original executed counterpart of this Trademark Security Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Trademark Security Agreement.

EXHIBIT E-3

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first set forth above.

**[NAME OF GRANTOR]**

By: _____
     Name:
     Title:

Acknowledged:

**U.S. BANK NATIONAL ASSOCIATION,**
as Collateral Agent

By: _____
     Name:
     Title:

#4847-9299-7919

**Schedule 1**
**to Trademark**
**Security Agreement**

**[NAME OF GRANTOR]**

### U.S. TRADEMARK REGISTRATIONS

| TRADEMARK | REG. NO. | REG. DATE |
|-----------|----------|-----------|
|           |          |           |

### U.S. TRADEMARK APPLICATIONS

| TRADEMARK APPLICATION | SERIAL. NO. | APPL. DATE |
|-----------------------|-------------|------------|
|                       |             |            |

### EXCLUSIVE TRADEMARK LICENSES

| Name of Agreement | Parties Licensor/Licensee | Date of Agreement | Exclusively Licensed Trademark/s |
|-------------------|---------------------------|-------------------|----------------------------------|
|                   |                           |                   |                                  |

4847-9299-7919, v. 7

EXHIBIT E-5

#4847-9299-7919