## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| THE ART INSTITUTE OF PHILADELPHIA LLC, *et al.*,[1] | Case No. 18-11535 (CTG) |
| *Debtors.* | Jointly Administered |
| GEORGE L. MILLER, Chapter 7 Trustee, | |
| *Plaintiff,* | Adv. Pro. No. 20-50627 (CTG) |
| v. | |
| TODD S. NELSON, *et al.*, | |
| *Defendants.* | **Re: Adv. Docket Nos. 93, 98, 102** |

### PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): American Education Centers, Inc. (6160); Argosy Education Group, Inc. (5674); Argosy University of California LLC (1273); Brown Mackie College - Tucson, Inc. (4601); Education Finance III LLC (2533); Education Management LLC (6022); Education Management II LLC (2661); Education Management Corporation (9571); Education Management Holdings II LLC (2529); Higher Education Services II LLC (3436); Miami International University of Art & Design, Inc. (1065); South Education – Texas LLC (2573); South University of Florida, Inc. (9226); South University of Michigan, LLC (6655); South University of North Carolina LLC (9113); South University of Ohio LLC (9944); South University of Virginia, Inc. (9263); South University, LLC (7090); Stautzenberger College Education Corporation (4675); TAIC-San Diego, Inc. (1894); TAIC-San Francisco, Inc. (9487); The Art Institutes International Minnesota, Inc. (6999); The Art Institute of Atlanta, LLC (1597); The Art Institute of Austin, Inc. (3626); The Art Institute of California-Hollywood, Inc. (3289); The Art Institute of California-Inland Empire, Inc. (6775); The Art Institute of California - Los Angeles, Inc. (4215); The Art Institute of California-Orange County, Inc. (6608); The Art Institute of California-Sacramento, Inc. (6212); The Art Institute of Charleston, Inc. (6048); The Art Institute of Charlotte, LLC (4912); The Art Institute of Colorado, Inc. (3062); The Art Institute of Dallas, Inc. (9012); The Art Institute of Fort Lauderdale, Inc. (0255); The Art Institute of Houston, Inc. (9015); The Art Institute of Indianapolis, LLC (6913); The Art Institute of Las Vegas, Inc. (6362); The Art Institute of Michigan, Inc. (8614); The Art Institute of Philadelphia LLC (7396); The Art Institute of Pittsburgh LLC (7441); The Art Institute of Portland, Inc. (2215); The Art Institute of Raleigh-Durham, Inc. (8031); The Art Institute of St. Louis, Inc. (9555); The Art Institute of San Antonio, Inc. (4394); The Art Institute of Seattle, Inc. (9614); The Art Institute of Tampa, Inc. (6822); The Art Institute of Tennessee-Nashville, Inc. (5359); The Art Institute of Virginia Beach, Inc. (2784); The Art Institute of Washington, Inc. (7043); The Art Institutes International II LLC (9270); The Illinois Institute of Art at Schaumburg, Inc. (3502); The Illinois Institute of Art, Inc. (3500); The Institute of Post-Secondary Education, Inc. (0283); The New England Institute of Art, LLC (7798); The University of Sarasota, Inc. (5558);Western State University of Southern California (3875).

KAUFMAN, COREN & RESS, P.C.
Steven M. Coren, Esq. *(pro hac vice)*
Benjamin M. Mather, Esq. *(pro hac vice)*
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700


Dated:  May 16, 2022

PACHULSKI STANG ZIEHL & JONES LLP
Bradford J. Sandler (DE Bar No. 4142)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Tel: (302) 652-4100

*Attorneys for Plaintiff George L. Miller,*
*Chapter 7 Trustee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

NATURE AND STAGE OF THE PROCEEDING........................................................... 1

INTRODUCTION ........................................................................................................... 2

BACKGROUND ............................................................................................................. 3

    A. The EDMC Companies Perpetrate Illegal Recruiting and Compensation Schemes, Which Continue Even After the 2015 Settlements, Until the Petition Date ................................... 3

    B. The Excessive Payments ...................................................................................... 6

    C. Procedural History................................................................................................ 7

STANDARD OF REVIEW ............................................................................................. 9

ARGUMENT .................................................................................................................. 9

I. The FAC States a Claim to Avoid and Recover Excessive Payments Made Within One Year of the Petition Date as Preferential Transfers ................................................... 9

    A. The FAC Identifies the Debtor Which Made the Excessive Payments ............. 10

    B. The FAC Sufficiently Alleges That the Trustee Conducted "Reasonable Due Diligence" .............................................................................................................. 10

    C. The Excessive Payments Constituted Transfers of Debtor Property ................. 14

    D. The FAC Pleads All Required Elements Under Section 547(b).......................... 18

        1. Antecedent Debt............................................................................................. 19

        2. Insider Status.................................................................................................. 20

        3. Insolvency ...................................................................................................... 22

II. As the Court Already Held, the Trustee's Claims to Recover the Excessive Payments as Constructively Fraudulent Transfers under the Bankruptcy Code and DUFTA are Sufficiently Stated ................................................................................................... 24

    A. Count Seven States a Claim for Avoidance of the Excessive Payments as Constructively Fraudulent Pursuant to 11 U.S.C. § 548(a)(1)(b)............................. 25

    B. Count Nine States Claims For Constructive Fraudulent Transfer Under Section 1304(a)(2) and 1305 of DUFTA ....................................................................... 27

i

III.  Count Ten States a Claim for Recovery of Avoided Transfers Under § 550 of the Bankruptcy Code ..................................................................................................................28

IV. As the Court Has Already Held, The Trustee's Breach of Fiduciary Duty Claim (Count One) and Related Civil Conspiracy Claim (Count Three) Are Sufficiently Stated .........................29

A. The FAC States Claims for Breach of Fiduciary Duty Against the Defendants.................29

B. The FAC States Claims for Civil Conspiracy Against the Defendants..............................40

V.  Defendants McEachen, Jalufka, and Danielson's Alternative Rule 12(e) Motion Should Be Denied ......................................................................................................................................41

CONCLUSION.......................................................................................................................43

## TABLE OF AUTHORITIES

**Cases**

*Anchel v. Shea*, 762 A.2d 346 (Pa. Super. 2000) ................................................... 31, 32

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................... 9

*Banks v. Allstate Fire and Casualty Ins. Co.*, 2020 WL 6273891 (M.D. Pa. Oct. 26, 2020) ....... 42

*Barnes v. Harris*, 2013 WL 1982182 (D. Utah May 13, 2013) ............................................. 36, 37

*Bausch & Lomb Inc. v. SBH Holdings LLC*, 2022 WL 856750 (D. Del. Mar. 23, 2022) ........... 42

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 9

*Buckley v. O'Hanlon*, 2007 WL 956947 (D. Del. Mar. 28, 2007) .............................................. 32

*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993) ......................................... 31

*Connelly v. Lane Constr. Corp.*, 809 F.3d 780 (3d Cir. 2016) ....................................... 9

*CRAFT EM CLO 2006-1, Ltd. v. Deutsche Bank AG*, 139 A.D.3d 638 (N.Y. App. Div. 2016).. 39

*Crystallex Int'l Corp. v. Petroleos De Venezuela, S.A.*, 879 F.3d 79 (3d Cir. 2018) ................. 28

*Dix v. Total Petrochemicals USA, Inc.*, 2011 WL 2474215 (D.N.J. June 20, 2011).................... 17

*Entergy Ark., Inc. v. Central Interstate Low-Level Radioactive Waste Com'n*, 2007 WL 121720 (D. Neb. Jan. 11, 2007), *aff'd*, 358 F.3d 528 (8th Cir. 2004) ...................... 39

*Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261 (3d Cir. 2016) ........................... 17

*In re All Phase Roofing & Constr., LLC*, 2020 WL 374357 (Bankr. W.D. Okla. Jan. 17, 2020), *aff'd*, 2020 WL 5512500 (10th Cir. B.A.P. Sept. 14, 2020)............................................. 29

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ................................... 17

*In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996) ........................................ 32

*In re DA Liquidating Corp.*, 622 B.R. 172 (Bankr. D. Del. 2020) ................................................. 19

*In re DBSI, Inc.*, 445 B.R. 344 (Bankr. D. Del. 2011) ................................................................. 21

*In re Dewey & LeBoeuf LLP*, 2014 WL 4746209 (Bankr. S.D.N.Y. Sept. 23, 2014)................. 25

*In re DigitalBridge Holdings, Inc.*, 2015 WL 5766761 (Bankr. D. Utah)................................... 29

*In re DVI, Inc.*, 2008 WL 4239120 (Bankr. D. Del. Sept. 16, 2008)............................................ 9

*In re Enron Corp.*, 357 B.R. 32 (Bankr. S.D.N.Y. 2006) ............................................................ 19

*In re First Jersey Sec., Inc.*, 180 F.3d 504 (3d Cir. 1999) ............................................................ 19

*In re Fruehauf Trailer Corp.*, 444 F.3d 203 (3d Cir. 2006) ......................................................... 26

*In re F-Squared Inv. Mgmt., LLC*, 600 B.R. 294 (Bankr. D. Del. 2019)....................................... 22

*In re Genesis Health Ventures, Inc.*, 355 B.R. 438 (Bankr. D. Del. Dec. 13, 2006) .................... 34

*In re Hecker*, 496 B.R. 541 (8th Cir. B.A.P. 2013) ...................................................................... 29

*In re Insys Therapeutics, Inc.*, 2021 WL 5016127 (Bankr. D. Del. Oct. 28, 2021)..................... 13

*In re Liquid Holdings Group, Inc.*, 2018 WL 6841351 (Bankr. D. Del. Nov. 14, 2018)............ 19

*In re Longview Aluminum, LLC*, 657 F.3d 507 (7th Cir. 2011).................................................... 21

*In re Massey Energy Co.*, 2011 WL 2176479 (Del. Ch. May 26, 2011) ...................................... 32

*In re New Century TRS Holdings, Inc.*, 502 B.R. 416 (Bankr. D. Del. 2013) ............................ 37

*In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1 (Del. Ch. 2014)................................. 31

*In re Our Alchemy, LLC*, 2019 WL 4447202 (Bankr. D. Del. Sept. 16, 2019) ........................... 21

*In re Pearson*, 2010 WL 3956762 (Bankr. M.D. Pa. Oct. 7, 2010)............................................. 21

*In re Pitt Penn Holding Co.*, 484 B.R. 25 (Bankr. D. Del. 2012)................................................ 32

*In re PostRock Energy Corp.*, 2019 WL 137116 (Bankr. W.D. Okla. Jan. 8, 2019)............. 19, 24

*In re Ritz Camera & Image, LLC*, 2014 WL 432192 (Bankr. D. Del. Feb. 4, 2014) .................. 28

*In re Student Fin. Corp.*, 335 B.R. 539 (D. Del. 2005) ................................................................ 9

*In re Trailhead Eng'g LLC*, 2020 WL 7501938 (Bankr. S.D. Tex. Dec. 21, 2020).................... 12

*In re TSIC, Inc.*, 428 B.R. 103 (Bankr. D. Del. 2010) ................................................................ 27

*In re USDigital, Inc.*, 443 B.R. 22 (Bankr. D. Del. 2011) ..................................................... 41, 43

*In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003).......................... 38

*In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) ............................................................................................................................ 32

*In re Wash. Mut., Inc.*, 2013 WL 3757330 (Bankr. D. Del. July 16, 2013) ................................ 29

*In re: Liberty State Benefits of Del., Inc.*, 541 B.R. 219 (Bankr. D. Del. 2015).......................... 18

*Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872 (Del. Ch. 2009).................................................. 40

*Lubin v. Skow*, 382 F. App'x 866 (11th Cir. 2010)...................................................................... 36

*Marchand v. Barnhill*, 212 A.3d 805 (Del. 2019) ...................................................................... 33

*Mayer v. Belichick*, 605 F.3d 223 (3d Cir. 2010) ................................................................... 17, 18

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs.*, 854 A.2d 121 (Del. Ch. 2004)... 32

*Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).......................................... 26

*Nicolet, Inc. v. Nutt*, 525 A.2d 146 (Del. 1987) .......................................................................... 40

*Rypac Packaging Mach. Inc. v. Coakley*, 2000 WL 567895 (Del. Ch. May 1, 2000)................. 39

*Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) ..................................................................... 9, 13

*Skold v. Galderma Labs., L.P.*, 99 F. Supp. 3d 585 (E.D. Pa. 2015)........................................... 17

*Slobodian v. U.S. ex rel. I.R.S.*, 2014 WL 2041815 (M.D. Pa. May 12, 2014) .......................... 14

*Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362 (Del. 2006) ....................................... 31

*Stone v. Ritter*, 911 A.2d 362 (Del. 2006) .................................................................................. 32

*Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246 (E.D. Pa. 2020)........................................ 37

iv

*Sweda v. Univ. of Penn.*, 923 F.3d 320 (3d Cir. 2019) .................................................... 14

*Sylvester v. Beck*, 178 A.2d 755 (Pa. 1962) ..................................................................... 31

*Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065
    (Del. Ch. Aug. 24, 2020)............................................................................................... 33

*Warehime v. Warehime*, 777 A.2d 469 (Pa. Super. 2001), *rev'd on other grounds*,    860
    A.2d 41 (Pa. 2004) ...................................................................................................... 34

*Wright v. Apartment Inc. & Mgmt. Co.*, 726 S.E.2d 779 (Ga. Ct. App. 2012) ............................ 39

*Xcoal Energy & Res. v. Bluestone Energy Sales Corp.*, 2021 WL 1170374 (D. Del. Mar. 29,
    2021) ......................................................................................................................... 39

## Statutes and Rules

11 U.S.C. § 101 ......................................................................................................... *passim*

11 U.S.C. § 544 .............................................................................................................. 27

11 U.S.C. § 547 ......................................................................................................... *passim*

11 U.S.C. § 548 ......................................................................................................... *passim*

20 U.S.C. § 1094 ............................................................................................................. 4

6 Del. C. § 1309 ................................................................................................... 24, 28, 32

6 Del. C. § 1304 ...................................................................................................... 25, 28

6 Del. C. § 1305 ............................................................................................................. 28

6 Del. C. § 1301 ............................................................................................................. 15

FED. R. CIV. P. 12 ...................................................................................................... 1, 41

Federal Rule of Bankruptcy Procedure 7012 .................................................................. 1

## Other Authorities

51 Cong. Rec. S1979-01, 2005 WL 497395 (Cong. Rec. Mar. 3, 2005)..................................... 27

ABI Report, 23 AM. BANKR. INST. L. REV................................................................................. 12

*American Bankruptcy Institute Commission to Study the Reform of Chapter 11*, 23 AM. BANKR.
    INST. L. REV. 1, 164 (Winter 2015)............................................................................ 12, 13

House of Representatives' Committee on the Judiciary Report .................................................. 12

Small Business Reorganization Act of 2019 ("SBRA"), Section 547.................................. 10, 11

Plaintiff George L. Miller, in his capacity as the Chapter 7 Trustee ("Plaintiff" or the "Trustee") for the jointly administered bankruptcy estates of the above-referenced debtors (collectively, the "Debtors"), submits this Omnibus Memorandum of Law in opposition to the motions to dismiss the First Amended Complaint (collectively, the "Motions")[2] filed by Defendants J. Devitt Kramer, Mark Novad, Mark A. McEachen, Frank Jalufka, John Danielson, Edward West, and Mick Beekhuizen (collectively, the "Defendants").

## NATURE AND STAGE OF THE PROCEEDING

The Debtors filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code on June 29, 2018. On June 17, 2020, the Trustee commenced the instant adversary proceeding by filing the Complaint. *See* D.I. 1, Complaint. Defendants filed motions to dismiss the claims in the Complaint. On January 12, 2022, the Court issued its opinion granting in part and denying in part Defendants' motions to dismiss. *See* D.I. 87, Memorandum Opinion (the "Opinion").

Following issuance of the Court's Opinion, the Trustee filed the First Amended Complaint, which, *inter alia*, cures certain deficiencies identified by the Court with respect to his preferential transfer claims. *See* D.I. 91, First Amended Complaint (the "FAC"). The remaining Defendants have again moved to dismiss pursuant to FED. R. CIV. P. 12(b)(6), applicable here pursuant to FED. R. BANKR. P. 7012(b). Defendants McEachen, Jalufka, and Danielson alternatively seek a more definite statement pursuant to FED. R. CIV. P. 12(e). The Trustee objects and responds to the Motions herein.

---

[2]    *See* D.I. 93, 94, & 95 (motion to dismiss, brief, and request for judicial notice filed by Defendants Kramer and Novad); D.I. 98, 99, 100, & 101 (motion to dismiss, brief, declaration, and request for judicial notice filed by Defendants West and Beekhuizen); D.I. 102 & 103 (motion to dismiss and brief filed by Defendants Danielson, Jalufka, and McEachen).

DOCS_DE:239230.1 57092/001

## INTRODUCTION

Count Eight of the FAC seeks to avoid, as preferential transfers under Section 547 of the Bankruptcy Code, large bonus payments made to certain of the Defendants during the one-year period prior to the filing of the Debtors' bankruptcy petitions. The FAC corrects the deficiency previously identified by the Court with respect to this claim, by alleging which specific Debtor made the payments. The FAC further alleges reasonable due diligence conducted by the Trustee in advance of filing his claim, and pleads each required element under Section 547, including antecedent debt, insolvency, and insider status. Defendants' factual disputes regarding the purportedly "worthless" nature of the property transferred (which is contradicted by the very stipulation on which Defendants rely), the purported value of services they provided, or other matters have no bearing on whether the Trustee has stated his claims (which he has) and are not a basis for dismissal under Rule 12(b)(6).

As to the Trustee's remaining claims, the Court has already ruled that they are sufficiently pled and should reject Defendants' attempts to revive arguments which have already been rejected. Counts Seven and Nine state claims for constructive fraudulent transfer because, among other allegations, the Trustee pleads lack of reasonably equivalent and insolvency. Defendants raise little other than factual disputes in response.

The Trustee's breach of fiduciary duty and related civil conspiracy claims are similarly well-pled. The Court already determined that the Trustee stated claims against McEachen, Jalufka, Kramer, and Danielson in connection with their roles as fiduciaries of EDMC and the Delaware Holding Companies, and against West, Novad, and Beekhuizen in connection with their roles as fiduciaries of the Delaware Holding Companies. These claims are based primarily on Defendants' failure to reform the EDMC Companies' illegal recruitment and compensation schemes, which

2

continued unabated until the Petition Date—within the relevant limitations periods under both Pennsylvania and Delaware law. The Court should reject Defendants' renewed dismissal arguments, as already ruled upon and raising issues which cannot be resolved on a motion to dismiss.

The Motions should be denied.

## BACKGROUND

**A.    The EDMC Companies Perpetrate Illegal Recruiting and Compensation Schemes, Which Continue Even After the 2015 Settlements, Until the Petition Date**

Debtors Education Management Corporation ("EDMC") and subsidiaries (collectively, the "Company" or the "EDMC Companies") were one of the largest for-profit providers of secondary education, but their exponential growth was fueled by illegal recruiting and compensation schemes which were implemented by and/or known to Defendants, and which resulted in fines and penalties exceeding $95 million, numerous consent decrees, the loss of more than $100 million of outstanding tuition receivables (by way of loan forgiveness), and ultimately the demise of the Company. *See* FAC at ¶¶ 2-3; *see also id.* at ¶¶ 16-22 (describing roles(s) and tenure with the Company of each of the remaining Defendants).

The EDMC Companies' corporate structure includes: (a) ultimate parent EDMC, a Pennsylvania corporation; (b) four intermediate holding companies—Education Management Holdings, LLC, Education Management LLC, Education Management Holdings II, LLC, and Education Management II LLC ("Education Management II") (collectively, the "Delaware Holding Companies")—which are Delaware limited liability companies for which EDMC served as sole and managing member; and (c) numerous for-profit learning institutions that were wholly-owned subsidiaries of the Delaware Holding Companies. *See* FAC at ¶ 10.

EDMC was founded in 1962 and expanded over the next four decades—including by expanding the Art Institutes chain and acquiring Argosy Education Group, South University, and American Education Centers—with enrollment of approximately 50,000 at EDMC-owned schools in 2003. *Id.* at ¶¶ 23-27. In 2006, Congress deregulated online education by removing the "50/50 Rule" which had required institutes of higher education to enroll more than half of their students in campus-based programs (as opposed to online programs) to obtain full access to federal funding of student loans. *Id.* at ¶ 29.[3] This led to explosive growth at for-profit educational institutions offering primarily online course offerings, as well as an explosion in private equity investments in such institutions. *Id.* at ¶¶ 30-31. In 2006, EDMC was acquired in a $3.4 billion highly leveraged buyout by a consortium of private equity investors, who, in order to service the substantial debt incurred as part of the LBO, changed the culture of EDMC to pursue aggressive growth strategies that undermined academic quality and opportunity, and were instead driven by unlawful recruiting and enrollment practices. *Id.* at ¶¶ 32-33, 35-37. The Company's new focus on online enrollment, with its easy access to federal student loan funds, fueled explosive growth, with online student enrollment (of 4,000 in 2006) increasing tenfold in the following five years—driven by aggressive recruiting of unqualified students. *Id.* at ¶¶ 34, 38.

To carry out this plan, the Company drastically increased its number of Assistant Directors of Admissions ("ADAs"), the euphemism attributed to the boiler room of recruiters, and by 2010

---

[3]    Under Title IV of the Higher Education Act of 1965, Congress established various student loan and grant programs. FAC at ¶ 75. To become eligible to receive or to have its students receive Title IV funding, a post-secondary educational institution must enter into a program participation agreement ("PPA") with the Department of Education, which requires compliance with certain statutory requirements. *Id.* at ¶¶ 77-78. One such requirement is that schools: "Will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance ...." 20 U.S.C. § 1094(a)(20) (the "Incentive Compensation Ban"). FAC at ¶ 79.

employed 5,669 recruiters, for its 158,300 students (resulting in one recruiter for every 28 students). *Id.* at ¶¶ 47-48. ADAs were encouraged and incentivized by EDMC management to dramatically increase student enrollment without regard for requirements of accrediting agencies, and were illegally rewarded with direct or indirect commission payments for each student enrolled. *Id.* at ¶ 49; *see also id.* at ¶¶ 50-54 (describing ADA training materials).

These practices drew the attention of federal and state governments, which conducted investigations of the recruiting practices employed by EDMC, and were also the subject of qui tam actions filed in the Western District of Pennsylvania. *See id.* at ¶¶ 56-60, 67-68 (summarizing investigations conducted by federal and state governments); *id.* at ¶¶ 61, 65. The Qui tam Actions focused primarily on violations in connection with EDMC's receipt of more than $11.1 billion in Title IV funding between 2003 and 2011, and alleged, *inter alia*, that, under the direction of Defendants (including West, Kramer, Novad, and Beekhuizen), EDMC compensated ADAs and others based upon the number of new students enrolled, in violation of the Incentive Compensation Ban, and operated a "boiler room" style sales culture solely focused on increasing enrollment numbers, without regard for academic qualifications or other "quality factors." *Id.* at ¶¶ 63-64, 66, 69-72, 91-92, 95-101, 103, 110. To further these illegal practices, the Company submitted PPAs and certifications for annual compliance audits that falsely certified the Company's compliance with the Incentive Compensation Ban and other Title IV requirements. *Id.* at ¶¶ 83-90, 106-08.

In November 2015, the Company reached a settlement with the U.S. Department of Justice, 12 state attorneys general, the District of Columbia, and relators resolving the Qui tam Actions and other cases filed under federal and state False Claims Act provisions. *Id.* at ¶ 117 and Ex. D

(Settlement Agreement).[4]    Concurrently, the Company settled investigations which were being

conducted by a consortium of 38 states and the District of Columbia (the "Consumer Protection

Consortium").    *Id.* at ¶¶ 68, 117.    In connection with the 2015 Settlements, the Company paid

$95.5 million (to be distributed among the United States, the various states, and the relators).    *Id.*

at ¶ 118.    The 2015 Settlements also resulted in Consent Judgments entered in state courts for the

states involved in the Consumer Protection Consortium, which required, *inter alia*, reforms to the

EDMC Companies' operations and forgiveness of $102.8 million in loans made to EDMC

students.    *Id.* at ¶ 119.

The 2015 Settlements and the revelation of the Company's illegal practices sent the

Company into a downward spiral from which it never recovered.    *Id.* at ¶ 122.    Yet, Defendants

made no efforts to reform the Company's practices or comply with the Consent Judgments—and

instead merely continued the illegal scheme and continued to put the Company at risk for further

fines, penalties, and other monetary harm.    *Id.* at ¶¶ 90, 131; *see also id.* at ¶ 133 (setting forth red

flags that should have alerted Defendants to the EDMC Companies' continued illegal recruiting

practices and other unlawful conduct, which included expressions of concern from members of

Congress in 2017 and a lawsuit filed by the Massachusetts attorney general in 2018 concerning

the Company's continuing recruiting practices).

### B.    The Excessive Payments

While the Debtors disintegrated, certain Defendants looted them of more than $20 million

via unwarranted bonus and severance payments.    *Id.* at ¶¶ 4, 135, 137-42.    Debtor Education

Management II (one of the Delaware Holding Companies) made millions of dollars in payments

---

[4]    The settlements effectuated by the Settlement Agreement are referred to collectively herein
as the "2015 Settlements."

to certain of the Defendant insiders (collectively, the "Excessive Payments") without receiving reasonably equivalent value (especially in light of said Defendants' participation in the wrongdoing that caused the Debtors' demise). *See id.* at ¶ 136 (alleging all of the Excessive Payments were made by Education Management II); ¶ 137 and Ex. G ($13.7 million in payments to McEachen); ¶ 138 and Ex. H ($2.2 million in payments to Jalufka); ¶ 139 and Ex. I ($2.4 million in payments to Kramer); ¶ 140 and Ex. J ($1.4 million in payments to Novad); ¶ 141 ($965,000 payment to Danielson); ¶ 142 ($262,000 payment to Beekhuizen); ¶ 144.[5] Education Management II, along with the other Debtors, had been insolvent since at least June 30, 2014 (when liabilities exceeded assets by almost $300 million) and continued to be so through the Petition Date. *See id.* at ¶¶ 113, 143. On June 30, 2017, Debtors had $717,217,387 in total assets and $1,184,301,067 in total liabilities, for an excess of liabilities over assets of $467,083,680. *Id.* at ¶ 143. At the time of the Petition Date, the Company had only $394,635 in assets (excluding net operating loss) and liabilities of $628,885,442. *Id.*

### C.    Procedural History

The Trustee commenced this adversary proceeding by filing the Complaint on June 17, 2020. *See* D.I. 1. The Complaint asserted claims for breach of fiduciary duty, fraud, and civil conspiracy against all Defendants, as well as claims for corporate waste, unjust enrichment, avoidance of actual and constructive fraudulent transfers, avoidance of preferential transfers, and recovery of avoided transfers against the Transferee Defendants. The Court granted in part and denied in part Defendants' motions to dismiss the Complaint. *See* Opinion (D.I. 87). The Court denied the motions as to the following claims: (i) breach of fiduciary duty claims against

---

[5]    Defendants McEachen, Jalufka, Kramer, Novad, Danielson, and Beekhuizen are referred to herein as the "Transferee Defendants." McEachen, Jalufka, Kramer, Novad, and Danielson are further referred to as the "Preference Defendants."

McEachen, Jalufka, Kramer, and Danielson in connection with their roles as fiduciaries of EDMC and the Delaware Holding Companies; (ii) breach of fiduciary duty claims against West, Novad, and Beekhuizen in connection with their roles as fiduciaries of the Delaware Holding Companies; (iii) civil conspiracy claims, to the same extent as the surviving breach of fiduciary duty claims; and (iv) constructive fraudulent transfer claims for the Excessive Payments. *See id.* at pp. 15-17, 20-24, 36-37, 40-41  The Court dismissed the remainder of the Trustee's claims, including all claims against Nelson, McKernan, and Cowley.

On February 15, 2022, the Trustee filed the FAC to correct certain deficiencies identified by the Court in its Opinion, particularly with respect to his preferential transfer claim.  Specifically, the FAC contains the following amendments: (i) the addition of the allegation in paragraph 136 that "All of the Excessive Payments to Defendants were made by Debtor Education Management II LLC."; and (ii) the addition of the allegation in paragraph 199 that "The Trustee and his professionals have conducted reasonable due diligence into potential affirmative defenses and have concluded that those defenses are without merit given the nature of and circumstances surrounding the Excessive Payments to Defendants, including, but not limited to, the fact that they were running an essentially illegal business and made the Excessive Payments to themselves as the Debtors were struggling to operate and preparing for bankruptcy." *See* FAC at ¶¶ 136, 199.  Additionally, the Trustee added the statement in paragraph 6 that "As directed by the Court in its January 12, 2022 Opinion, the Trustee hereby states that his breach of fiduciary duty claims are non-core and that the Trustee does <u>not</u> consent to entry of final orders or judgment by the Court." *See id.* at ¶ 6.  The Trustee also amended two prior drafting errors by (i) removing Defendant Beekhuizen as a defendant for purposes of Count Eight (preference claim under 11 U.S.C § 547), and (ii) clarifying that Count Nine (fraudulent transfer claim under Delaware state law) is intended to assert claims

under 6 Del. C. § 1304(a)(2) and/or § 1305.  *See id.* at p. 42, p. 44, and ¶¶ 193-94, 198, 202.  The FAC also contains explanatory footnotes which make clear where claims previously dismissed by the Court remain in the FAC solely for purposes of preserving the Trustee's appellate rights.  *See* FAC at ¶ 12 n. 2; p. 36 n. 3; p. 39 nn. 4-5; p. 40 nn. 6-7; p. 41 n. 8; p. 44 n. 9.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must give a defendant fair notice of what the claim is and the grounds upon which its rests, "[b]ut detailed pleading is not generally required."  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016).  "The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case."  *In re Student Fin. Corp.*, 335 B.R. 539, 546 (D. Del. 2005).  "An affirmative defense with disputed facts is not a proper basis to dismiss a complaint."  *In re DVI, Inc.*, 2008 WL 4239120, at *11 (Bankr. D. Del. Sept. 16, 2008); *see also Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014).

## ARGUMENT

**I.    The FAC States a Claim to Avoid and Recover Excessive Payments Made Within One Year of the Petition Date as Preferential Transfers**

Count Eight of the FAC seeks to avoid the Excessive Payments that were made within one year of the Petition Date (*i.e.*, on or after June 29, 2017) as preferences under Section 547(b) of the Bankruptcy Code.  *See* FAC at ¶¶ 195, 200 (seeking avoidance of "the Excessive Payments to Defendants made within one year of the Petition Date" as preferential transfers).  In total, the Trustee seeks to avoid and recover $20,392,173.27 in preferential payments made by Education Management II to the Preference Defendants, as follows: (i) $13,459,814.27 to McEachen; (ii)

$2,202,295 to Jalufka; (iii) $2,321,402 to Kramer; (iv) $1,443,662 to Novad; and (v) $965,000 to Danielson. *See id.* at ¶¶ 136-41 and Exs. G-J (identifying transfers).

Section 547(b) of the Bankruptcy Code provides that a transfer is avoidable as a preference when the transfer was (i) to or for the benefit of a creditor, (ii) for or on account of an antecedent debt, (iii) made when the Debtor was insolvent, (iv) made within 90 days before the petition or within one year if the creditor was an insider, and (v) enabled the creditor to receive more than he would have in a Chapter 7 liquidation had the payment not been made.  11 U.S.C. § 547(b).  The FAC identifies each of the transfers at issue—including identifying the relevant Debtor-transferor—and pleads all required elements under Section 547(b).[6]  The Preference Defendants' dismissal arguments must be rejected.

### A.    The FAC Identifies the Debtor Which Made the Excessive Payments

The Court previously dismissed Count Eight because the Trustee had not identified the particular Debtor which made the preferential payments.  *See* Opinion at pp. 41-42.  The FAC corrects this deficiency, alleging that "[a]ll of the Excessive Payments to Defendants were made by Debtor Education Management II LLC."  FAC at ¶ 136.  The FAC thus sufficiently identifies each of the preferential payments at issue.  *See* Opinion at p. 42.

### B.    The FAC Sufficiently Alleges That the Trustee Conducted "Reasonable Due Diligence"

In connection with the Small Business Reorganization Act of 2019 ("SBRA"), Section 547(b) was amended to add language emphasizing that a preference claim brought thereunder

---

[6]    In its January 12, 2022 Opinion, the Court also discussed that the Trustee had not alleged that he conducted "reasonable due diligence" related to the preference claim, but found that it was unnecessary to resolve the question of whether he was required to do so.  *See* Opinion at pp. 43-44; *see also* 11 U.S.C. § 547(b).  In any event, as discussed herein, the FAC affirmatively alleges that the Trustee conducted reasonable due diligence.

DOCS_DE:239230.1 57092/001

should be "based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection [547](c)." 11 U.S.C. § 547(b); *see also* Small Business Reorganization Act of 2019, Pub. L. 116-54, Aug. 23, 2019, 133 Stat. 1079, § 3(a) (2019) (enacted) (effective Feb. 19, 2020).  The Court noted in the Opinion that "[b]ankruptcy courts are divided on the question whether this statutory language adds an element to a preference claim that must be sufficiently alleged in the complaint and proven at trial," but found that it was not necessary for the Court to resolve that question in connection with Defendants' motions to dismiss.  Opinion at p. 44 and n. 118 (collecting cases).

While it is the Trustee's position that the "reasonable due diligence" language contained in Section 547(b) does not modify or create additional pleading requirements, the FAC remedies any potential deficiency in this regard by alleging:

> The Trustee and his professionals have conducted reasonable due diligence into potential affirmative defenses and have concluded that those defenses are without merit given the nature of and circumstances surrounding the Excessive Payments to Defendants, including, but not limited to, the fact that they were running an essentially illegal business and made the Excessive Payments to themselves as the Debtors were struggling to operate and preparing for bankruptcy.

FAC at ¶ 199.  This allegation suffices under Section 547(b).  It is not perfunctory, as the Preference Defendants contend.  Rather, the facts and circumstances supporting the Trustee's assertion in paragraph 199 are alleged at length throughout the FAC and demonstrate the inapplicability of the affirmative defenses in Section 547(c)—in particular, that the Excessive Payments were made outside the ordinary course of business and that the Preference Defendants did not provide a contemporaneous exchange or new value for the payments.[7]  *See, e.g.*, FAC at ¶

---

[7]    The primary defense raised by the Preference Defendants in their briefing—that the funds transferred were purportedly encumbered by a lien held by U.S. Bank—is not one under Section

189 (alleging Excessive Payments "were not made in the ordinary course of business, as they consisted largely of unwarranted bonus payments for engaging in unlawful activity"); *In re Trailhead Eng'g LLC*, 2020 WL 7501938, at *7 (Bankr. S.D. Tex. Dec. 21, 2020) (finding that allegations in complaint, which mapped out parties' relationships and demonstrated the trustee's review of the debtors' records, sufficiently showed the trustee's due diligence).

Congress's addition of language concerning "reasonable due diligence" and consideration of potential affirmative defenses to Section 547(b) was intended to "specif[y] an additional criterion that a trustee must *consider* before commencing an action to recover a preferential transfer." *See* H.R. Rep. No. 116-171, at 4 (2019) (House of Representatives' Committee on the Judiciary Report discussing purpose of SBRA's revisions to Section 547) (emphasis added); *see also American Bankruptcy Institute Commission to Study the Reform of Chapter 11: 2012~2014 Final Report and Recommendations* (the "ABI Report"), 23 AM. BANKR. INST. L. REV. 1, 164 (Winter 2015) (explaining that goal of change was to "codify[] a standard" requiring the Trustee "to perform reasonable due diligence and to make good faith efforts to evaluate the merits of the preference claim.").[8]

Even though Section 547(b) provides for consideration of affirmative defenses as part of the Trustee's pre-suit investigation, that language does not have the effect of shifting the burden of proof onto the Trustee to plead extensive facts refuting potential defenses or prove the

---

547(c). The Preference Defendants cite no authority for their assertion that the Trustee is required to plead facts refuting every possible factual dispute or other defense in his complaint.

[8]    The provisions of the SBRA were derived primarily from recommendations developed by the ABI and the National Bankruptcy Conference. *See* H.R. Rep. No. 116-171, at 2-4. The ABI recommended adding language to Section 547(b) concerning "reasonable due diligence" and consideration of potential affirmative defenses by the trustee. *See* ABI Report, 23 AM. BANKR. INST. L. REV. at 161-65. That recommendation was incorporated into the SBRA. *See* Pub. L. 116-54, § 3(a).

DOCS_DE:239230.1 57092/001

inapplicability of defenses. In its report recommending addition of the "reasonable due diligence" language, the ABI explained that it had purposefully rejected proposed revisions that would have added requirements for a trustee to make "affirmative statements" regarding his investigation or rebut affirmative defenses as part of his prima facie case. *See* ABI Report, 23 AM. BANKR. INST. L. REV. at 164. This accords with the well-established principle that a plaintiff is not required to overcome or disprove possible affirmative defenses in his pleading. *See Schmidt*, 770 F.3d at 248. Section 547(g) codifies this principle with respect to preferential transfers, providing that "the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section." 11 U.S.C. § 547(g). Thus, even to the extent that the SBRA amended Section 547 to add the "reasonable due diligence" requirement, it did not shift the burden of proof concerning affirmative defenses. *See In re Insys Therapeutics, Inc.*, 2021 WL 5016127, at *3 (Bankr. D. Del. Oct. 28, 2021) (even to extent plaintiff-trustee was required to conduct due diligence concerning affirmative defenses, there was still "no requirement that [he] plead around" the defenses in his complaint). Furthermore, this case is not a situation where preference claims have been indiscriminately asserted "against every defendant that received a payment" in advance of the bankruptcy—which is the situation the SBRA amendment was meant to address. *See* Opinion at p. 43. Rather, the Trustee's claims specifically involve large bonus payments made to insiders who were involved in the illegal activity alleged in the FAC.

Though the Preference Defendants have couched their argument as criticism of the Trustee's investigative efforts, it is clear that their argument is actually based on nothing more than a dispute concerning the avoidability of the preferential transfers alleged by the Trustee. The Trustee asserts that the Excessive Payments to the Preference Defendants were transfers of

13

property, or of an interest in property, of the Debtors.  *See* FAC at ¶ 193.  The Preference

Defendants disagree.  *See, e.g.*, D.I. 94 at pp. 10-14 (arguing transfers not within reach of Section

547 because funds at issue were encumbered).  For the reasons discussed herein, their argument is

wrong.  *See infra* Section I.C.  In any event, the Preference Defendants assert  a purported defense

which must be resolved at summary judgment or trial.  *See Slobodian v. U.S. ex rel. I.R.S.*, 2014

WL 2041815, at *4 (M.D. Pa. May 12, 2014) (declining to dismiss preference claim based on

challenges concerning the creditor/debtor relationship and whether transferred funds were the

debtor's interest in property, because the trustee was not required to prove his case at the pleading

stage).

The Preference Defendants' attempt to add additional facts and documents into the record

as a supposed basis for dismissal should be rejected.  *See, e.g.*, D.I. 94 at p. 12 (assertions

concerning U.S. Bank being undersecured); *id.* at pp. 18-19 (assertions concerning whether

Defendants deserved the payments for their "employment service").  The Preference Defendants'

belief that additional facts not contained in the FAC mitigate their liability for the preference

claims asserted against them is not appropriate for consideration at this stage and is not a basis for

dismissal.  *See Sweda v. Univ. of Penn.*, 923 F.3d 320, 332 (3d Cir. 2019) (reasonable inferences

must be drawn in plaintiff's favor on a motion to dismiss, and district court erred by instead

drawing inferences in defendant's favor and faulting plaintiff for not pleading facts contradicting

those inferences).

### C.    The Excessive Payments Constituted Transfers of Debtor Property

The FAC pleads that the Excessive Payments constituted transfers of property, or of an

interest in property, of the Debtors to or for the benefit of the Transferee Defendants.  *See* FAC at

¶¶ 186, 193; *see also* 11 U.S.C. § 547(b) (providing for avoidance of a "transfer of an interest of

14

the debtor in property"). The funds were paid by Education Management II. *See id.* at ¶ 136. The Bankruptcy Code defines the term "transfer" to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D); *see also* 6 Del. C. § 1301(12) (defining "transfer" in substantively similar terms, for purposes of DUFTA). As payments of money belonging to Education Management II, the Excessive Payments plainly constituted "transfers" within the meaning of the Bankruptcy Code and DUFTA.

The Preference Defendants argue, based on a Stipulation the Trustee entered into with U.S. Bank in the main bankruptcy case, that the Trustee's avoidance claims should all be dismissed because the Debtors' interest in the transferred funds was encumbered, "worthless," and therefore did not constitute Debtor property. *See* D.I. 103 at pp. 23-24; D.I. 94 at pp. 10-14; *see also* Case No. 18-11500, *Stipulation Resolving Objection of George L. Miller, Chapter 7 Trustee, to Proofs of Claim Filed By U.S. Bank, National Association as Administrative Agent on Behalf of Itself and Each Secured Claimant*, D.I. 64-1 (the "U.S. Bank Stipulation").[9] As an initial matter, while the Court did not discuss this argument in its Opinion, it implicitly rejected it by holding that the Trustee had sufficiently stated a claim for constructive fraudulent transfer (which, like a preference claim, requires the transfer "of an interest of the debtor in property," *see* 11 U.S.C. § 548(a)(1)) with respect to the Excessive Payments. *See* Opinion at pp. 40-41. The Court was correct to reject this argument and should do so again here.

The plain language of the U.S. Bank Stipulation on which the Preference Defendants rely contradicts their argument. Paragraph 3 of the U.S. Bank Stipulation states as follows:

---

[9]    Education Management II is listed as one of the Credit Party Debtors in the U.S. Bank Stipulation. *See* U.S. Bank Stipulation at pp. 2, 4.

> U.S. Bank holds a valid and enforceable first priority security interest in and continuing lien on all of the Credit Party Debtors' right, title, and interest to and under all of the Credit Party Debtors' assets ***other than*** (i) estate causes of action, if any, to the extent such causes of action are "Commercial Tort Claims" (as defined in the New York Uniform Commercial Code § 9-102(a)(13)), and (ii) ***causes of action, if any, under chapter 5 of the Bankruptcy Code*** (together, (i) and (ii), the "***<u>Unliened Assets</u>***").

U.S. Bank Stipulation at ¶ 3 (emphasis added). Causes of action under chapter 5 of the Bankruptcy Code include, *inter alia*, causes of action asserted under Sections 544, 547, 548, and 550.

The Preference Defendants baldly assert that the exceptions identified in paragraph 3 of the U.S. Bank Stipulation are inapplicable (*see* D.I. 94 at p. 14 n. 9), but there can be no dispute that the Trustee's avoidance and recovery claims are being asserted under chapter 5 of the Bankruptcy Code—and as such are included within the expressly-defined category of "Unliened Assets" under the U.S. Bank Stipulation. Kramer and Novad's assertion that even if Education Management II has an interest in the avoidance and recovery causes of action, it still did not have an interest in the underlying funds that were transferred does not make logical or legal sense because those causes of action would not even exist unless Education Management II held an interest in the property for which avoidance and recovery were sought. The U.S. Bank Stipulation clearly contemplated that the estates held and intended to pursue causes of action under chapter 5 of the Bankruptcy Code, such as those asserted by the Trustee here. *See, e.g.*, U.S. Bank Stipulation at ¶¶ 9, 13(iii).

In an attempt to dodge the language of the U.S. Bank Stipulation, the Preference Defendants ask the Court to take judicial notice of the underlying Credit and Guaranty Agreement and Pledge and Security Agreement. *See* D.I. 95, *Request of Defendants John Devitt Kramer and Mark Novad to Take Judicial Notice in Support of Motion to Dismiss the First Amended Complaint*, at Exhibits 1-B and 1-C (collectively, the "Agreements"). These documents do not

16

provide a basis for dismissal because they are extrinsic documents upon which none of the Trustee's claims are based.

For purposes of Rule 12(b)(6), "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). An extrinsic document may only be considered on a motion to dismiss if it is "integral to or explicitly relied upon" in the complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations omitted). "It is not enough that a putatively integral document be critical for an affirmative defense, or bear on an essential element of the claim. The rule [permitting consideration of integral documents] is applied when the claim would not exist but-for the existence of the document." *Dix v. Total Petrochemicals USA, Inc.*, 2011 WL 2474215, at *1 (D.N.J. June 20, 2011); *see also Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261, 273-74 (3d Cir. 2016).

None of the Trustee's claims are based on the Agreements or on the Debtors' relationship with U.S. Bank. Kramer and Novad argue that the documents can be relied upon because the Trustee is aware of them, but the "exception to the ordinary rule limiting what the Court may consider at this procedural stage does not provide that any relevant evidence may be submitted for consideration on 12(b)(6) so long as Plaintiff had notice of it," because "[s]uch a reading of the exception would swallow the rule." *Dix*, 2011 WL 2474215, at *2.; *see also Skold v. Galderma Labs., L.P.*, 99 F. Supp. 3d 585, 597 (E.D. Pa. 2015) (document supporting defense argument could

not be considered at motion to dismiss stage because plaintiff's claim was not based on that document).[10]  The Court should deny Kramer and Novad's request for judicial notice.

The Court should similarly decline the Preference Defendants' invitation to make various factual findings at the pleading stage concerning the terms of the Agreements, whether U.S. Bank was undersecured, and whether the Debtors suffered any loss.  These issues go far beyond the Trustee's pleadings and cannot be resolved on a motion to dismiss.  Moreover, the potential effect of U.S. Bank's security interest on how recovered funds will ultimately be distributed to creditors has no relevance to this adversary proceeding or the question of whether the Trustee has adequately stated claims to avoid and recover the transfers described in the FAC.

The Trustee has reasonably alleged that Education Management II had a property interest in funds that it paid to the Transferee Defendants.  Because the Stipulation between U.S. Bank and the Trustee (which resolved the Trustee's objections to U.S. Bank's proofs of claim based on the Agreements) plainly provides a carve-out for avoidance actions under Chapter 5 of the Bankruptcy Code, the Preference Defendants' arguments concerning the purportedly "worthless" nature of the claims should be rejected.

### D.    The FAC Pleads All Required Elements Under Section 547(b)

The Preference Defendants further challenge the Trustee's preference claim by arguing that the FAC fails to plead the existence of antecedent debt, the Preference Defendants' insider status, or Education Management II's insolvency.  None of these arguments has merit.

---

[10]     Additionally, while the Trustee does not dispute the existence of the Agreements, it is unclear where the copies attached to Kramer and Novad's Request for Judicial Notice came from, such that there is no information from which the Court or the Trustee can determine that these particular documents are "undisputedly authentic" or from a "source[] whose accuracy cannot reasonably be questioned."  *Mayer*, 605 F.3d at 230; *In re: Liberty State Benefits of Del., Inc.*, 541 B.R. 219, 234 (Bankr. D. Del. 2015).

18

### 1.    Antecedent Debt

The FAC sufficiently pleads that the Excessive Payments were made on account of antecedent debts because they were bonus payments arising out of the Preference Defendants' employment contracts.  *See* FAC at ¶¶ 137-41, 196.  Under the Bankruptcy Code, the term "debt" is "coextensive with the definition of a claim," which includes any right to payment "whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," and is "construed broadly." *In re First Jersey Sec., Inc.*, 180 F.3d 504, 510 (3d Cir. 1999) (citing 11 U.S.C. § 101(5)). "[T]he case law reveals an obvious trend interpreting 'antecedent debt' broadly and rejecting the proposition that debt is only incurred as it becomes due." *In re Enron Corp.*, 357 B.R. 32, 44 (Bankr. S.D.N.Y. 2006).  As such, bonuses constitute payments on antecedent debt, and therefore avoidable preferences, when paid pursuant to an employment agreement or bonus/retention plan. *See In re PostRock Energy Corp.*, 2019 WL 137116, at *9 (Bankr. W.D. Okla. Jan. 8, 2019) ("This Court agrees with many courts that find that the 'debt' associated with bonus and retention plans arise when the contract, agreement or plan is formed and put in place rather than when the payment becomes due.").  The Trustee's allegations that the preferential Excessive Payments constituted bonuses made on account of antecedent debts arising out of employment contracts plausibly allege the existence of antecedent debt for purposes of avoiding the transfers as preferences.

Kramer and Novad argue that the Trustee's antecedent debt allegations are too "generic," but the cases they cite are inapposite.  *See* D.I. 94 at pp. 20-21 (citing *In re Liquid Holdings Group, Inc.*, 2018 WL 6841351, at *3 (Bankr. D. Del. Nov. 14, 2018) (complaint contained "no description" of "the nature of the relationship between the Defendant and the Debtors"); *In re DA Liquidating Corp.*, 622 B.R. 172, 176-77 (Bankr. D. Del. 2020) (complaint's allegations did not

describe the nature of the relationship between the parties and were contradicted by the relevant

agreements)).  Here, the FAC does describe the nature of the relationship between the Defendants

and the Debtor-transferor—specifically, that each of the Preference Defendants served as an

officer or a director of Education Management II.  *See infra* Section I.D.2.  By alleging the

relationship between the parties, the nature of the preferential payments (*i.e.*, bonus payments),

and the contracts out of which the payments arose (*i.e.*, the Preference Defendants' respective

employment agreements), the Trustee has sufficiently alleged the existence of an antecedent debt

on account of which the Excessive Payments were made.

### 2.    Insider Status

To be recoverable as preferences under Section 547(b), a transfer must have been made

"on or within 90 days before the date of the filing of the petition" or "between ninety days and one

year before the date of the filing of the petition, if such creditor at the time of such transfer was an

insider."  11 U.S.C. § 547(b)(4).  Here, each of the Excessive Payments that the Trustee seeks to

recover as a preference was made to an insider between 90 days and one year before the Petition

Date.  Preferential bonus payments were made: (i) to McEachen, Jalufka, Kramer, and Novad on

August 4, 2017; (ii) to all of the Preference Defendants on October 20, 2017; and (iii) to McEachen

on February 2, 2018.  *See* FAC at ¶¶ 137-41 and Exs. G-J.  These payments are properly

recoverable as preferences because the FAC pleads the Preference Defendants' insider status of

the Debtor-transferor, Education Management II, when the payments were made.[11]

---

[11]    Defendant McEachen argues that the February 2, 2018 payment he received was not an "insider" payment because he had already left the Company by that time.  This argument should be rejected because the payment is alleged to have been a bonus payment arising out of his employment relationship with the Company (which continued until December 2017, within the one-year insider preference period), even if the funds were not actually paid until after he left.  *See* FAC at ¶ 137 and Ex. G.  While cases have held that insider status for the recipient of a preference should be determined by the exact date of the transfer (*see, e.g.*, *In re Our Alchemy, LLC*, 2019

The Bankruptcy Code sets forth a non-exhaustive list of the types of individuals or entities which may be considered "insiders" of a debtor, which includes, *inter alia*, directors, officers, and persons in control of the debtor.  *See* 11 U.S.C. § 101(31)(B).[12]  The FAC alleges that the Preference Defendants held the following roles during the relevant time period:

- McEachen: "CEO of EDMC and the Delaware Holding Companies from September 2015 until December 2017" and "Chairman of the EDMC Boards from April 2015 through December 2017";

- Jalufka: "Chief Financial Officer of EDMC and the Delaware Holding Companies from January 2016 through December 2017";

- Kramer: "Senior Vice President, General Counsel, and Secretary [for EDMC and the Delaware Holding Companies] from July 2006 through December 2017";

- Novad: "Office of the Chairman and Senior Vice President of Human Resources [for EDMC and the Delaware Holding Companies]"[13]; and

---

WL 4447202, at *6 (Bankr. D. Del. Sept. 16, 2019)), this Court has recognized in the fraudulent transfer context that where, as here, an insider is granted an employment-related benefit payment but does not actually receive the payment until he has already left the company, such a payment should still be considered an "insider" payment. *See In re TSIC, Inc.*, 428 B.R. 103, 110-11 (Bankr. D. Del. 2010); *In re DBSI, Inc.*, 445 B.R. 344, 348 (Bankr. D. Del. 2011).  The same reasoning should apply here for the preference received by McEachen in February 2018, because otherwise "insiders could orchestrate the timing of [employment-related benefit payments] to occur after resignation when they were no longer insiders." *TSIC*, 428 B.R. at 111.

[12]    The Bankruptcy Code's definition of a "corporation" includes unincorporated limited liability companies.  *See* 11 U.S.C. § 101(9)(A)(iv); *In re Longview Aluminum, LLC*, 657 F.3d 507, 509 n.1 (7th Cir. 2011); *see also In re Pearson*, 2010 WL 3956762, at *3 (Bankr. M.D. Pa. Oct. 7, 2010) (a limited liability company is the equivalent of a corporation for purposes of determining insider status).

[13]    Defendant Novad held these positions at the time the Excessive Payments to him were made.  *See In re Educ. Mgmt. II LLC*, Case No. 18-11494, D.I. 10, Official Form 207: Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy at Part 13, entry 29.9 (stating that Novad was Senior Vice President, Human Resources "Through December 31, 2017").

- Danielson: "member of the EDMC Boards from April 2015 through June 2018."[14]

*See* FAC at ¶¶ 17-21.  The FAC further alleges that each of these Defendants played an instrumental role in implementing, approving and/or continuing the Debtors' business activities described in the FAC.  *See id.*

Debtor Education Management II is one of the Delaware Holding Companies.  *See id.* at ¶ 10 (defining "Delaware Holding Companies" to include, *inter alia*, Education Management II LLC).  Thus, each of the Preference Defendants is alleged to have been an officer (in the case of McEachen, Jalufka, Kramer, and Novad) and/or a director (in the case of McEachen and Danielson) of Education Management II, the transferor of the Excessive Payments they received.

These allegations suffice to allege statutory insider status under the Bankruptcy Code.  *See* 11 U.S.C. § 101(31)(B); *see also In re F-Squared Inv. Mgmt., LLC*, 600 B.R. 294, 311 (Bankr. D. Del. 2019) (allegations that defendants held "Senior Vice President" titles and participated in company's management sufficiently alleged insider status for purposes of Section 547).

### 3.    Insolvency

Finally, the Preference Defendants argue that the FAC fails to plead that Education Management II was insolvent when the preferential Excessive Payments were made.  The Court already ruled on this issue in relation to the Trustee's constructive fraudulent transfer claim, holding that "[t]he allegations in the complaint regarding the debtors' financial distress are sufficient, at the motion to dismiss stage, to allege that the debtors were insolvent when the transfers were made."  Opinion at p. 41 n. 110; *see also* FAC at ¶ 143.

---

[14]    "EDMC Boards" is defined in the FAC as, collectively, "the boards of EDMC and each of the Delaware Holding Companies."  *See* FAC at ¶ 13.

Insolvency is defined generally as an entity's debts being greater than the sum of such

entity's property, at a fair valuation.  *See* 11 U.S.C. § 101(32)(A).  The Trustee's allegations

establish the Debtors' continual state of insolvency, with excess liabilities amounting to hundreds

of millions of dollars, in the years leading up to the Debtors' bankruptcy, including during the one-

year insider preference period (*i.e.* from June 29, 2017 to June 29, 2018):

> On June 30, 2017, Debtors had $717,217,387 in total assets and
> $1,184,301,067 in total liabilities, for an excess of liabilities over
> assets of $467,083,680.  And at the time of the Petition Date, the
> Company had only $394,635 in assets (excluding net operating loss)
> and liabilities of $628,885,442.

FAC at ¶ 143[15]; *see also id.* at ¶¶ 113, 122, 128, 135, 197.  The Court can plausibly infer that the

Debtors continued to be insolvent throughout the course of the year, particularly given that the

Debtors' business was in a death spiral at the time.  *See In re Troll Commc'ns, LLC*, 385 B.R. 110,

123 (Bankr. D. Del. 2008) (insolvency adequately pleaded where plaintiff alleged facts showing

that debtors' liabilities exceeded their assets beginning one year before, and continuing until, the

petition date, during which time the transfers were made).

The Preference Defendants argue that these allegations are not sufficient because they

reference the insolvency of all of the Debtors instead of just Debtor Education Management II.

This argument is baseless.  The FAC alleges that all of the Debtors—including Education

Management II, one of the Delaware Holding Companies—were insolvent during the insider

preference period.  Allegations which "paint[] a plausible picture of insolvency" for the Debtors

"as a whole and separately" are sufficient at the pleading stage.  *PostRock*, 2019 WL 137116, at

---

[15]     The data points cited in paragraph 143 of the FAC are measured as of June 30 because the
Debtors' fiscal year ended on June 30.

*8.[16]  As the Court already determined, the Trustee's allegations sufficiently plead insolvency at the time the Excessive Payments were made.

Because the FAC pleads each of the required elements under § 547(b), the Preference Defendants' motions to dismiss Count Eight must be denied.

## II.   As the Court Already Held, the Trustee's Claims to Recover the Excessive Payments as Constructively Fraudulent Transfers under the Bankruptcy Code and DUFTA are Sufficiently Stated

Counts Seven and Nine of the FAC seek to avoid the Excessive Payments as constructive fraudulent transfers under the Bankruptcy Code and DUFTA, respectively.[17]  *See* FAC at p. 42 (Count Seven, asserting avoidance claims under 11 U.S.C. § 548(a)(1)(B) against the Transferee Defendants); *id.* at pp. 44-45 (Count Nine, asserting avoidance claims under 6 Del. C. §§ 1304(a)(2), 1305 against the Transferee Defendants).[18]  The Court held that the Transferee Defendants' arguments concerning the existence of reasonably equivalent value could not be resolved at the pleading stage, and that the Trustee sufficiently pled insolvency.  *See* Opinion at pp. 40-41.  The Transferee Defendants' renewed dismissal arguments must again be rejected.

---

[16]      The cases cited by Kramer and Novad (D.I. 94 at p. 23) do not say anything different.  *See In re PostRock Energy Corp.*, 2018 WL 4279476, at *5 (Bankr. W.D. Okla. Sept. 6, 2018) (plaintiff had not pled any information concerning insolvency and instead relied only on the 90-day presumption of insolvency under § 547(b), which the court found was insufficient to establish insolvency for the one-year insider preference period); *Miller v. Fallas (In re J & M Sales Inc.)*, Bankr. D. Del. Case No. 18-11801-JTD, Adv. No. 20-50775-JTD, Opinion and Order dated August 20, 2021 (D.I. 306), at pp. 35-39 (finding that allegations of insolvency on a combined basis were sufficient, even though debtors' estates had not been substantively consolidated) (opinion not available on Westlaw).

[17]      The Trustee acknowledges that the Excessive Payments made to McEachen and Kramer on January 15, 2016 and to Beekhuizen on March 18, 2016 (*see* FAC at ¶¶ 137, 139, and 142) were made more than 2 years before the Petition Date and are thus avoidable only under DUFTA, and not § 548 of the Bankruptcy Code.  *Compare* 6 Del. C. § 1309(2) (providing four-year lookback period), *with* 11 U.S.C. § 548(a)(1) (providing two-year lookback period).

[18]      The actual fraud component of Count Nine was dismissed (*see* Opinion at pp. 39-40) and is included in the FAC solely for the purpose of preserving the Trustee's appellate rights.  *See* FAC at p. 44 n. 9.

A. **Count Seven States a Claim for Avoidance of the Excessive Payments as Constructively Fraudulent Pursuant to 11 U.S.C. § 548(a)(1)(b)**

A plaintiff states a claim for constructive fraudulent transfer by alleging facts demonstrating that: (i) the debtor received less than reasonably equivalent value in exchange for the transfer, and (ii) was insolvent at the time of the transfer or rendered insolvent as a result, or was engaged (or about to be engaged) in business or a transaction for which it had unreasonably small capital. *See* 11 U.S.C. § 548(a)(1)(B); 6 Del. C. §§ 1304(a)(2) & 1305(a). Transfers are also constructively fraudulent under the Bankruptcy Code when made for less than reasonably equivalent value and "to or for the benefit of an insider . . . under an employment contract and not in the ordinary course of business." *See* 11 U.S.C. § 548(a)(1)(B)(ii)(IV).

The FAC pleads that Education Management II did not receive reasonably equivalent value in exchange for making $21 million dollars' worth of bonus and severance payments (over $13 million of which went to McEachen alone) because the Transferee Defendants were responsible for the unlawful activity that caused the Debtors to suffer hundreds of millions in damages and ultimately collapse. *See, e.g.*, FAC at ¶¶ 144-45, 190. Kramer and Novad argue that they engaged in valuable "employment activities" during the time the Excessive Payments were made,[19] but these are factual disputes which cannot be resolved at the pleading stage. *See In re Dewey & LeBoeuf LLP*, 2014 WL 4746209, at *11 (Bankr. S.D.N.Y. Sept. 23, 2014) (allegations that payments were so exorbitant that they could not be justified by the services performed sufficiently pled lack of reasonably equivalent value and raised questions of fact inappropriate for resolution on motion to dismiss).

---

[19] *See* D.I. 94 at p. 24.

To evaluate whether reasonably equivalent value exists, the Third Circuit looks to the totality of the circumstances, including (1) fair market value of the benefit received for the transfer, (2) whether there is an arm's length relationship between the parties, and (3) the transferee's good faith. *See In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006). Here, all three *Fruehauf Trailer* factors are lacking. Specifically, the FAC pleads that (1) the only "services" provided by the Transferee Defendants consisted of running the Company in an illegal fashion and causing substantial damages to the Company, (2) the Transferee Defendants were insiders, and (3) the Transferee Defendants "abused their positions of trust, lined their pockets and looted the EDMC Companies" in connection with the Excessive Payments. FAC at ¶ 4; *see also id.* at ¶¶ 116, 135. These allegations, coupled with the Trustee's allegations concerning the Debtors' financial condition,[20] sufficiently state a claim under Section 548(a)(1)(b) of the Bankruptcy Code.

Additionally, the FAC pleads a constructive fraudulent transfer claim under Section 548(a)(1)(B)(ii)(IV), which provides for avoidance of a transfer made "to or for the benefit of an insider . . . under an employment contract and not in the ordinary course of business." 11 U.S.C. § 548(a)(1)(B)(ii)(IV); *see also* FAC at ¶ 189. The Excessive Payments were made to the Transferee Defendants on top of the regular compensation they received as officers and directors, in which roles they had preexisting duties to provide services to the Debtors. In *In re TSIC, Inc.,*

---

[20]    *See* Opinion at p. 41 n. 110 (holding the Trustee sufficiently pled insolvency). The FAC also pleads a constructive fraudulent transfer claim based on unreasonably small capital. *See* 11 U.S.C. 548(a)(1)(B)(ii)(II). "[U]nreasonably small capital denotes a financial condition short of equitable insolvency," and "refer[s] to the inability to generate sufficient profits to sustain operations." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992). The FAC alleges that as a result of the Excessive Payments the Debtors were left with unreasonably small capital with which to conduct their business. *See* FAC at ¶ 187. The Debtors were already in the process of selling off assets for pennies on the dollar and winding down operations, giving rise to the plausible inference that they lacked sufficient capital to sustain their operations—a condition only worsened by making more than $20 million in unwarranted bonus payments to the Transferee Defendants. *See id.* at ¶¶ 4, 122-29, 135, 187.

26

428 B.R. 103, 116-17 (Bankr. D. Del. 2010), the court granted summary judgment for the debtor

on its constructive fraudulent transfer claim concerning a severance payment made to its CEO

shortly before the company collapsed.  The court held that the debtor had received less than

reasonably equivalent value in exchange for the severance payment because "[a]t the time [the

CEO] signed the Employment Agreement, [his] base salary served as consideration for his services

as CEO. . . . [He] had a preexisting duty to provide services as CEO to the Debtor." *Id.* at 114.

Furthermore, "[c]ourts hold that when a debtor transfers funds for the sole benefit of an insider,

the transfer is not considered in the ordinary course of business." *Id.* at 116.  The allegations of

the FAC—taken as true as they must be at this stage—describe "transfer[s] made to [] insider[s]

at a time when [Education Management II] suffered from severe financial distress, therefore

making the payment[s] extraordinary and avoidable." *Id.*  Indeed, Section 548(a)(1)(B)(ii)(IV)

was enacted specifically to address the problem of large payouts and bonuses—such as the

Excessive Payments—made to corporate executives as the Company collapses.  *See id.* at 110

(citing 151 Cong. Rec. S1979-01, 2005 WL 497395, at *21-26 (Cong. Rec. Mar. 3, 2005)).

For the foregoing reasons, and those stated in the Court's prior ruling on this claim, the

Transferee Defendants' motions to dismiss Count Seven should be denied.

**B.     Count Nine States Claims For Constructive Fraudulent Transfer Under Section 1304(a)(2) and 1305 of DUFTA**

Section 544 of the Bankruptcy Code authorizes the avoidance of transfers of the debtor's

property that are avoidable by unsecured creditors under applicable state law (here, DUFTA).  *See*

11 U.S.C. § 544.  The requirements to state claims for avoidance of constructive fraudulent

transfers under Sections 1304(a)(2) and 1305(a) of DUFTA are substantially the same as those

under Section 548 of the Bankruptcy Code, though they provide for avoidance of fraudulent

transfers made up to four years before the Petition Date (and therefore encompass all of the

27

Excessive Payments, including those made in 2016).  *See* 6 Del. C. §§ 1304(a)(2), 1305(a), & 1309(2).  When evaluating whether the substantive elements of such claims have been sufficiently pled, "the result under Delaware law should be the same as the outcome under the Bankruptcy Code."  *Crystallex Int'l Corp. v. Petroleos De Venezuela, S.A.*, 879 F.3d 79, 86 (3d Cir. 2018).  Thus, the FAC states claims against the Transferee Defendants under §§ 1304(a)(2) and 1305(a) for the same reasons as discussed above concerning the constructive fraudulent transfer claims under the Bankruptcy Code —particularly, that the FAC pleads lack of reasonably equivalent value, Education Management II's insolvency, and unreasonably small capital.

Additionally, Section 1305(b) of DUFTA provides for avoidance of transfers made within one year of the Petition Date if made "to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent."  6 Del. C. §§ 1305(b) & 1309(3).  With respect to the transfers made to McEachen, Jalufka, Danielson, Kramer, and Novad during 2017 and 2018 (all of which were made within one year of the Petition Date), the FAC states claims under 6 Del. C. § 1305(b) because the transfers were made to insiders on account of antecedent debt, and the Transferee Defendants, by virtue of their roles as officers and directors, knew that the Debtors were insolvent at the time.  *See supra* Section I.D; *see also* FAC at ¶ 205 ("Defendants took the Excessive Payments to Defendants knowing that the Debtors were insolvent and heading into bankruptcy.").

## III.  Count Ten States a Claim for Recovery of Avoided Transfers Under § 550 of the Bankruptcy Code

Because the FAC, for the reasons discussed above and in the Court's Opinion, adequately states avoidance claims under 11 U.S.C. §§ 544, 547, & 548, the Trustee's claim for recovery of the Excessive Payments under 11 U.S.C. § 550 is also adequately pled.  *See In re Ritz Camera & Image, LLC*, 2014 WL 432192, at *3 (Bankr. D. Del. Feb. 4, 2014) ("Where a party's only basis

for dismissing the complaint for recovery of payments under 11 U.S.C. § 550 is the dismissal of the underlying claim, it is proper to rule on the Section 550 claim in the same manner as the underlying claim."); *In re Wash. Mut., Inc.*, 2013 WL 3757330, at *6 (Bankr. D. Del. July 16, 2013) (denying motion to dismiss count for recovery where the court declined to dismiss related avoidance count).

Insofar as the Transferee Defendants also repeat their argument concerning Education Management II's supposedly "worthless" interest in the Excessive Payments, this argument is baseless because the Trustee's Section 550 claim is not subject to the U.S. Bank Stipulation on which the Transferee Defendants rely. *See supra* Section I.C. Furthermore, questions concerning the scope of any ultimate recovery on the Trustee's claims cannot be resolved at the pleading stage.[21] Because the FAC states claims for avoidance of the Excessive Payments, the claim for recovery is stated as well.

## IV. As the Court Has Already Held, The Trustee's Breach of Fiduciary Duty Claim (Count One) and Related Civil Conspiracy Claim (Count Three) Are Sufficiently Stated

### A. The FAC States Claims for Breach of Fiduciary Duty Against the Defendants

As with the original Complaint, the FAC details years of corruption and illegal activity committed and continued by Defendants, which ultimately destroyed the Company. This Court has already held that the original Complaint sufficiently stated claims for breach of fiduciary duty

---

[21]    The cases cited by Kramer and Novad illustrate the point, as they are post-trial or summary judgment decisions decided with the benefit of a full evidentiary record. *See* D.I. 94 at pp. 9, 14 (citing *In re All Phase Roofing & Constr., LLC*, 2020 WL 374357, at *16-17 (Bankr. W.D. Okla. Jan. 17, 2020), *aff'd*, 2020 WL 5512500 (10th Cir. B.A.P. Sept. 14, 2020) (post-trial); *In re DigitalBridge Holdings, Inc.*, 2015 WL 5766761, at *19 (Bankr. D. Utah) (post-trial); *In re Hecker*, 496 B.R. 541, 552 (8th Cir. B.A.P. 2013) (summary judgment)). These decisions do not support the argument that the Trustee's Section 550 claim should be dismissed at the pleading stage.

against the Defendants, and the Court may deny Defendants' renewed arguments on that basis alone.

In its Opinion addressing Defendants' motions to dismiss the Trustee's original Complaint, this Court correctly held that the Trustee's original "complaint adequately states a claim for breach of fiduciary duty against the defendants alleged to have been directors or officers at any period within the three years before the petition date." Opinion at p. 10. As succinctly summarized by the Court:

> The allegations in the complaint are sufficient to state a *prima facie* claim of breach of fiduciary duty against the fiduciaries of both the Delaware and Pennsylvania entities. The elements of a claim for breach of fiduciary duty are the same under both Delaware and Pennsylvania law. To state a claim, a plaintiff must allege facts sufficient to show that the defendant (i) owed a duty, (ii) breached that duty, and (iii) the breach of that duty resulted in injury to the plaintiff. Here, the complaint alleges that each of the defendants was a director and/or officer of one of debtors. And directors and officers of a corporate entity owe fiduciary duties to the corporation under both Pennsylvania and Delaware law.

> Certain defendants argue that the complaint does not allege that they held the type of positions under which they would owe a fiduciary duty to the corporation. Under applicable law, however, the existence of a fiduciary duty does not turn on a director or officer's title, but rather on the individual's authority, control, and/or substantive responsibilities within the corporation. "Delaware law imposes fiduciary duties on those who effectively control a corporation." Fairly read, the complaint alleges that each of the defendants played a sufficiently substantial role in devising or implementing corporate policy relating to its recruiting or compensation policies to owe a fiduciary duty to the corporation. *See* D.I. 1 ¶¶ 12-22 (describing the important roles that each of the defendants was alleged to have served).

> The complaint alleges the defendants implemented, or failed to reform, unlawful compensation and recruiting practices. *Id.* ¶¶ 119, 131, 160. That allegation is sufficient to state a claim for breach of duty. Finally, the complaint alleges that the respective debtors were injured, indeed, that the businesses were forced into liquidation, as a result of those breaches. *Id.* ¶¶ 73, 109, 112. The complaint thus

30

> sufficiently alleges that each defendant breached a fiduciary duty owed to the corporation for which he or she allegedly served as an officer or director.

*Id.* at pp. 15-16 (footnotes 41-44 omitted; footnotes 45-47 interposed in text).

Those allegations from the original Complaint which the Court found sufficient to state a claim for breach of fiduciary duty against Defendants have been repleaded in their entirety in the FAC, *compare* Complaint at ¶¶ 12-22, 73, 109, 112, 119, 131, 160 *with* FAC at ¶¶ 12-22, 73, 109, 112, 119, 131, 161, and this Court should decline Defendants' invitation to reconsider its sound decision.

Even if this Court decides to entertain Defendants' attempt to get a second bite at the apple, Defendants' renewed arguments are without merit and the Trustee's breach of fiduciary duty claims should be allowed to proceed to discovery because the FAC sufficiently alleges Defendants' breaches of the fiduciary duties of loyalty and care. *See, e.g.*, *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 32-33 (Del. Ch. 2014) (discussing duties of loyalty and care under Delaware law); *Anchel v. Shea*, 762 A.2d 346, 357 (Pa. Super. 2000) (discussing duties of loyalty and care under Pennsylvania law). The duty of loyalty (within which the duty of good faith is subsumed) requires fiduciaries to avoid financial or other cognizable fiduciary conflicts of interest. *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ; *Sylvester v. Beck*, 178 A.2d 755, 757 (Pa. 1962); *see also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ("[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."); *Anchel*, 762 A.2d at 357 ("The duty of loyalty . . . requires that corporate directors devote themselves to corporate affairs with a view to promote the common interests and not only their own, and they cannot directly or indirectly utilize their position to

31

obtain any personal profit or advantage other than that enjoyed by their fellow shareholders."). The fiduciary duty of loyalty is breached, *inter alia*, when fiduciaries consciously disregard their responsibilities (by failing to act in the face of a known duty to act) or fail to act in good faith in the best interests of the corporation. *See, e.g.*, *Stone*, 911 A.2d at 370. Fiduciaries abdicate their responsibilities and duties—and thus violate their duty of loyalty—when they knowingly cause the entity to seek profit by violating the law. *See, e.g.*, *In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 26, 2011); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs.*, 854 A.2d 121, 131 (Del. Ch. 2004).

The duty of care requires fiduciaries to manage the company with the "care which ordinarily careful and prudent men would use in similar circumstances" and not act with gross negligence. *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006); *see also Anchel*, 762 A.2d at 357 ("The duty of care obligates every corporate director to discharge duties to the corporation with the same diligence, care, and skill which ordinary prudent persons exercise in their personal affairs.") (Pennsylvania law). A plaintiff states a claim based on failure to sufficiently oversee the company's affairs if he pleads that the directors or officers "knew or should have known that violations of the law were occurring, that they took no good faith steps to ameliorate the situation, and that the company suffered losses as a result." *Buckley v. O'Hanlon*, 2007 WL 956947, at *3 (D. Del. Mar. 28, 2007) (citing *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996)); *see also In re Pitt Penn Holding Co.*, 484 B.R. 25, 55 (Bankr. D. Del. 2012) (allegations that officer "knew or was reckless in not knowing" that the company's public statements were false stated claim for breach of fiduciary duty). Fiduciaries violate their duty of care when lack of oversight causes a company's failure to comply

with the law.  *See, e.g.*, *Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065,

at *16-17 (Del. Ch. Aug. 24, 2020); *Marchand v. Barnhill*, 212 A.3d 805, 822 (Del. 2019).

The FAC contains extensive allegations of Defendants' behavior that breached these

fiduciary duties.  Indeed, as noted by this Court, the allegation that "the defendants implemented,

or failed to reform, unlawful compensation and recruiting practices . . . is sufficient to state a claim

for breach of duty."  Opinion at p. 16 (citing Complaint at ¶¶ 119, 131, 160). The FAC includes

those allegations which were found to state a breach of fiduciary duty in the first instance:

> The 2015 Settlements also resulted in Consent Judgments (the "Consent Judgments") entered in state courts for the states involved in the Consumer Protection Consortium that required certain reforms to the Defendants operations, and, inter alia, required the EDMC Companies to forgive $102.8 million in loans to certain students who attended the Company's institutions between January 1, 2006 and December 31, 2014. As an example of the Consent Judgments, a copy of the Consent Judgment the EDMC Companies entered into with the State of Florida is attached as Exhibit E and incorporated herein.
>
> * * *
>
> Upon information and belief, Defendants' unlawful behavior continued through the sale of the Debtors' businesses. The unlawful behavior was part of a course of conduct that continued unabated through and beyond the time of the 2015 Settlements. A review of the Board of Directors' meeting minutes shows no concerted effort by Defendants to reform their behavior or to comply with the Consent Judgments.
>
> * * *
>
> Defendants McEachen, Jalufka, Kramer, Novad, Danielson and Beekhuizen also failed in their fiduciary duties to cause EDMC and the Delaware Holding Companies to investigate and assert claims against those Defendants who were responsible to the Debtors for unlawful conduct (as hereinafter described) but had left the Company.

FAC at ¶¶ 119, 131, 161.[22]   The allegations in the FAC accordingly are more than sufficient to state a claim for breach of fiduciary duty against all Defendants.

None of the arguments raised in Defendants' renewed motions to dismiss warrant a different result.   Defendants Kramer and Novad renew their failed accusations of so-called "group pleading," which, they argue, makes the FAC insufficient.   They are once again wrong.   The FAC details each Defendant's role at EDMC, *see id.* at ¶¶ 16-22, and includes specific claims regarding the conduct of individual Defendants throughout.   To the extent that certain paragraphs are alleged in terms of conduct the Defendants as a group engaged in or allowed to happen, the FAC is pleaded in that fashion because all of the Defendants collectively engaged in, or continued, that behavior. In such instances, allegations of conduct by the group sufficiently plead a breach of fiduciary duty claim.   *See Buckley*, 2007 WL 956947, at *5 (stating a claim for breach of fiduciary duty does not require a plaintiff to "associate specific parties to particularized conduct" when "much of the alleged conduct involved collective action and decision making"); *In re Genesis Health Ventures, Inc.*, 355 B.R. 438, 457 (Bankr. D. Del. Dec. 13, 2006) (collective references to certain groups of defendants did not render the pleadings defective, and made sense because the allegations arose out of group action on the part of a committee).   Here, as in *Genesis Health*, the Trustee has "clearly provided a statement of facts upon which [his] allegations are based."   *Id.* at 456.   Nothing more is required at the pleading stage.

---

[22]   The FAC's allegations that the Transferee Defendants looted the Company for their own benefit, via the Excessive Payments (over $13 million of which went to McEachen alone), while the company was in a downward spiral and headed to bankruptcy also set forth self-interested transactions which constitute a breach of fiduciary duty.   *See* FAC at ¶ 162 (alleging Defendants breached fiduciary duties by authorizing and accepting the Excessive Payments); *Valeant Pharma. Int'l v. Jerney*, 912 A.2d 732, 736 (Del. Ch. 2007) (finding director breached duty of loyalty by approving and receiving a portion of "unfair, self-interested bonuses"); *Warehime v. Warehime*, 777 A.2d 469, 482 (Pa. Super. 2001), *rev'd on other grounds*, 860 A.2d 41 (Pa. 2004) ("The duty of loyalty requires that there be no self-dealing.").

Defendants McEachen, Jalufka, and Danielson argue that they cannot be held liable for actions taken before they became fiduciaries, a general proposition with which the Trustee does not disagree. Their motion is without merit, however, because the FAC clearly pleads their liability for perpetuating and failing to remedy the unlawful conduct of their predecessors after they became fiduciaries. *See* FAC at ¶¶ 17-18 (alleging that McEachen and Jalufka "continued the unlawful activities hereinafter described which caused damage to and the ultimate destruction of the Debtors, and . . . failed in [their] fiduciary duties to cause EDMC and the Delaware Holding Companies to investigate and assert claims against those Defendants who were responsible to the Debtors for unlawful conduct . . . but had left the Company prior to [McEachen's and Jalufka's] arrival."), ¶ 21 ("Danielson played an instrumental role in supervising, approving and continuing the unlawful activities hereinafter described which caused damage to and the ultimate destruction of the Debtors, and he failed in his fiduciary duties to cause EDMC and the Delaware Holding Companies to investigate and assert claims against those Defendants who were responsible to the Debtors for unlawful conduct . . . but had left the Company."); *see also* Opinion at p. 2 (noting that the management claims "include implementing ***and leaving in place*** the allegedly unlawful recruiting and compensation programs"), p. 16 ("the allegation that "the defendants implemented, ***or failed to reform***, unlawful compensation and recruiting practices . . . is sufficient to state a claim for breach of duty.") (emphasis added).

The Trustee's allegations concerning the continuation of the EDMC Companies' unlawful practices to the time of the Petition Date are not "conclusory one-liners," as Defendants West and Beekhuizen contend (*see* D.I. 99 at p. 22); rather, they are supported by, *inter alia*, allegations that the attorney general of Massachusetts brought a lawsuit against an EDMC school for unlawful enrollment practices in 2018 and that multiple U.S. Senators and a U.S. Congresswoman called

35

for increased scrutiny of EDMC's continued predatory recruitment model in 2017.  *See* FAC at ¶ 133(m)-(o).  These allegations point to illegal practices which had continued unabated and unreformed well beyond the time of the 2015 Settlements and were ongoing, and continuing to damage the Debtors, during the applicable limitations periods (under both Pennsylvania and Delaware law).

Defendants West and Beekhuizen also misleadingly argue that "the Delaware Holding Companies are not alleged to have engaged in the illegal conduct upon which the entire Complaint is predicated," a specious argument which they support by cherry picking two paragraphs from the FAC and then arguing that only EDMC and the individual educational institution entities (which were wholly-owned by the Delaware Holding Companies) were responsible for the behavior alleged in those two paragraphs.  *See* D.I. 99 at pp. 14-15 (citing ¶¶ 83-84 of FAC).  This argument ignores the remainder of the FAC, which alleges that the EDMC Companies functioned as an enterprise.  The recruitment and compensation schemes that are the subject of the FAC were enterprise-wide policies that had been implemented and kept in place by Defendants, all of whom are alleged to have held director and officer roles not just with EDMC, but also with the Delaware Holding Companies.  *See* FAC at ¶¶ 16-22.  West and Beekhuizen cite two unpublished cases involving banks and their holding companies where allegations against officers of a holding company were found to be inadequate.  *See* D.I. 99 at p. 19 (citing *Lubin v. Skow*, 382 F. App'x 866, 873 (11th Cir. 2010); *Barnes v. Harris*, 2013 WL 1982182, at \*6-7 (D. Utah May 13, 2013)).  In addition to the fact that these cases implicated FDIC and FIRREA issues not relevant here, the plaintiffs therein failed to allege how the holding company allegations related to the breaches of fiduciary duty, whereas here the Court has already determined that the Trustee's allegations sufficiently plead breaches of duty and harm as to both EDMC and the Delaware Holding

36

Companies.  *See, e.g.*, *Barnes*, 2013 WL 1982182, at *7 (finding complaint did not explain how conduct constituted a breach of fiduciary duty or related to the alleged damages).  *Lubin* notes that a failure by holding company officers to "respond to mismanagement [at the bank] by changing the [b]ank management" may have been sufficient to state a claim.  382 F. App'x at 873.  Here, beyond mere mismanagement, the Trustee alleges that the Defendants, who were officers and directors of the Delaware Holding Companies, failed to respond to known illegal practices by leaving them in place, failing to reform them, and failing to bring claims against those responsible.  *See* FAC at ¶¶ 16-22; Opinion at pp. 2, 16.  Additionally, the Excessive Payments were paid by Education Management II, one of the Delaware Holding Companies.  *See* FAC at ¶ 136; *id.* at ¶ 162 (alleging Defendants breached fiduciary duties by authorizing and accepting the Excessive Payments).

West and Beekhuizen ask the Court to take judicial notice of various exhibits that were attached to the Government *qui tam* Complaint, purportedly as proof that the Delaware Holding Companies had no involvement in the schemes alleged by the Trustee.  *See* D.I. Nos. 100 & 101 (Request for Judicial Notice and Declaration of Michael L. Kichline), Exs. 4-12.  As an initial matter, because these documents are public records and were exhibits to the *qui tam* Complaint attached as Exhibit B to the FAC, the Court may take judicial notice of their existence, *but* it would not be appropriate at the pleading stage to, as West and Beekhuizen encourage, use them to make factual findings concerning the role or involvement of specific entities or as an evidentiary basis to dismiss claims against the Defendants.  *See In re New Century TRS Holdings, Inc.*, 502 B.R. 416, 423 (Bankr. D. Del. 2013); *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 257-58 (E.D. Pa. 2020).  "If a court adopted the approach of considering such documents for the truth of the matter asserted therein, it would be authorizing a trial by public documents, and thus imprudently

expanding the scope of 12(b)(6) motions." *In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *1 (E.D. Pa. Apr. 7, 2003). Furthermore, the documents do not prove anything. The Government *qui tam* Complaint to which they were attached (the allegations of which are incorporated into the FAC, *see* ¶ 61) alleged the involvement of the entire EDMC enterprise, including the Delaware Holding Companies. *See* FAC at Ex. B, ¶¶ 6 (defining "EDMC" to mean all defendants in caption, including 2 of the Delaware Holding Companies), 10-11, 29; *see also id.* at Ex. D (Settlement Agreement to which 2 of the Delaware Holding Companies were parties); *id.* at Ex. E (Consent Judgment to which all of the Delaware Holding Companies were parties). The use of the ultimate parent's name in training materials is hardly unusual and does not provide evidence that the multiple other entities which owned the EDMC Companies' assets and through which EDMC operated were uninvolved in the scheme.

Additionally, the Delaware Holding Companies were harmed by the misconduct alleged in the FAC because they were subject to the fines and penalties imposed on the EDMC Companies (*see, e.g.*, FAC at Ex. D) and because the value of the EDMC Companies' assets, which they owned, was destroyed. *See, e.g., id.* at ¶¶ 124-29 and Ex. A. West and Beekhuizen argue that the Delaware Holding Companies are "pass-through entities,"[23] and cite a handful of cases stating,

---

[23]    West and Beekhuizen ask the Court to take judicial notice of LLC Agreements for 3 of the Delaware Holdings Companies, certain Certificates of Formation, and selected pages from certain Debtors' bankruptcy petitions, apparently in an effort to have the Court find, based on these documents, that the Delaware Holding Companies are pass-through entities that cannot suffer damages. *See* D.I. 101 (Request for Judicial Notice); D.I. 100 at Exs. 1-3 and 13-16; D.I. 99 at p. 24. While the Court may properly refer to the Debtors' bankruptcy petitions and may take judicial notice of public records such as the Certificates of Formation for their existence and for the fact that certain of the Delaware Holding Companies were previously known by a different name (though such fact bears no relevance to the instant Motions), it would be far beyond the appropriate scope of a motion to dismiss for the Court to take judicial notice of LLC Agreements (the source of which is unclear) for the purpose of determining whether the entities involved have suffered damages. In the cases cited in West and Beekhuizen's Request for Judicial Notice, courts considered formation documents for the purpose of taking judicial notice of an exculpation

either in *dicta* or based on the particular facts of that case, that a pass-through entity had not

suffered damages.  *See* D.I. 99 at pp. 24-25 (citing *Xcoal Energy & Res. v. Bluestone Energy Sales*

*Corp.*, 2021 WL 1170374, at \*20 (D. Del. Mar. 29, 2021), *amended in part on reconsideration*,

2021 WL 4319224 (D. Del. Sept. 23, 2021) (post-trial opinion commenting in *dicta* that it was

"unclear" how a pass-through entity had suffered lost profits); *Rypac Packaging Mach. Inc. v.*

*Coakley*, 2000 WL 567895, at \*10 (Del. Ch. May 1, 2000) (post-trial opinion dismissing tortious

interference claim because plaintiff had no expectation of receiving sales profits); *Wright v.*

*Apartment Inc. & Mgmt. Co.*, 726 S.E.2d 779, 784 (Ga. Ct. App. 2012) (finding that trial court

erred in denying motion for judgment notwithstanding the verdict because there was "no evidence"

pass-through entity incurred losses as part of kickback scheme) (applying Georgia law)).  Even to

the extent that the Delaware Holding Companies could be characterized as "pass-through entities"

(which has not been established), these cases are not persuasive and do not establish any kind of

*per se* rule concerning the availability of damages for a pass-through entity.[24]   The LLC

Agreements do not establish any inability of the Delaware Holding Companies to suffer damages

for breach of fiduciary duty, particularly given the Trustee's allegations that Defendants owed and

breached fiduciary duties to each of those entities, and that the Delaware Holding Companies

owned the operating entities ruined by those breaches.  Further, as noted above, all three of the

cases cited by West and Beekhuizen are post-trial opinions—demonstrating that the issue of

---

provision, the duties that were owed, and the fact that the LLC did not have a board of directors,
*see* D.I. 101 at p. 3 (citing *Essar Steel*, *Kahn*, and *Lazard Debt Recovery*, respectively), not for the
purpose of making findings concerning damages.  The Court should deny West and Beekhuizen's
request to take judicial notice of the LLC Agreements.

[24]     Other courts have rejected the argument that a pass-through entity cannot suffer damages
in its own right.  *See, e.g.*, *Entergy Ark., Inc. v. Central Interstate Low-Level Radioactive Waste
Com'n*, 2007 WL 121720, at \* 6 (D. Neb. Jan. 11, 2007), *aff'd*, 358 F.3d 528 (8th Cir. 2004);
*CRAFT EM CLO 2006-1, Ltd. v. Deutsche Bank AG*, 139 A.D.3d 638, 638 (N.Y. App. Div. 2016).

damages is one of fact.  Indeed, to the extent that Defendants dispute that the Trustee will ultimately be able to prove damages, this Court already determined that is a factual question which cannot be resolved on a motion to dismiss.  *See* Opinion at pp. 23-24.

### B.    The FAC States Claims for Civil Conspiracy Against the Defendants

In its Opinion addressing Defendants' motions to dismiss the original Complaint, the Court found that the Trustee stated a civil conspiracy claim "to the same extent as the claim for breach of fiduciary duty."  Opinion at p. 36.  Pleading a claim for civil conspiracy under either Pennsylvania or Delaware law requires that a plaintiff alleged "a valid underlying claim" and that (i) two or more persons combined or agreed (ii) to commit an unlawful act (or an act in furtherance of the conspiracy), resulting in (iii) actual injury.  *Id.* (citing *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del. 1987); *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 892 (Del. Ch. 2009)).  In finding that the Trustee pled each of these elements, the Court explained:

> [A] court must draw all inferences from the facts as alleged in favor of the non-moving party. The Court therefore concludes that the allegations regarding the defendants' common participation in a plan to operate the debtor's business in a manner that violated applicable law is sufficient to survive a motion to dismiss. To that end, it bears note that this Court has previously observed that a claim for civil conspiracy to breach a fiduciary duty is substantively similar to a claim for aiding and abetting breach of fiduciary duty. *In re USA Detergents*, 418 B.R. 533, 547 (Bankr. D. Del. 2009). It therefore seems to follow that **a complaint that is sufficient to allege that various members of a corporate board individually breached their duties to the corporate entity by facilitating and failing to reform unlawful corporate practices need not allege much more to state a claim against those same defendants for conspiring with one another to breach those fiduciary duties**.

Opinion at p. 37 (footnote 100 interposed in text) (emphasis added).

The same allegations supporting the Trustee's civil conspiracy claim in his original Complaint are present in the FAC.  As discussed above, the FAC alleges a valid underlying claim

for breach of fiduciary duty, and further alleges that the Defendants "conspired with each other, and with each operating entity of EDMC" and "undertook substantial overt acts" to commit those unlawful breaches, which resulted in damages to EDMC and the Delaware Holding Companies. FAC at ¶¶ 169-70.  Defendants are alleged to have been well aware of the Company's illegal business practices, but simply rubber-stamped them and eschewed any efforts to reform them, even beyond the time of the 2015 Settlements and continuing until the Petition Date. *See, e.g.*, *id.* at ¶¶ 108, 110, 133.  As the Court already found, since the Trustee sufficiently alleged that the Defendants individually breached their fiduciary duties by facilitating and failing to reform unlawful corporate practices, "not . . . much more" is needed to sufficiently allege that the same Defendants conspired with the other directors and officers to carry out those breaches.  Opinion at p. 37.

## V.    Defendants McEachen, Jalufka, and Danielson's Alternative Rule 12(e) Motion Should Be Denied

McEachen, Jalufka, and Danielson seek, in the alternative to dismissal, a more definite statement pursuant to FED. R. CIV. P. 12(e) (applicable here pursuant to FED. R. BANKR. P. 7012(b)).  Motions for more definite statement are "not favored," and will only be granted in "rare case[s]" when a complaint is "extremely vague and ambiguous" to the point of being "unintelligib[le]." *In re USDigital, Inc.*, 443 B.R. 22, 53 (Bankr. D. Del. 2011); *see also* FED. R. CIV. P. 12(e) (applies only when pleading is "so vague or ambiguous that the party cannot reasonably prepare a response").  Relief under Rule 12(e) is not warranted here.

*First*, Defendants cannot reasonably maintain that the FAC is so unintelligible as to prevent them from framing a responsive pleading.  By this point, the parties have engaged in extensive briefing concerning the original Complaint and related motions to dismiss (wherein they did *not*

seek relief under Rule 12(e)[25] and the Court issued a comprehensive Opinion defining the scope of remaining claims.  The FAC contains targeted amendments in response to the Court' holdings and otherwise denotes where certain claims remain only for purposes of preserving appellate rights.

*Second*, Defendants' demand for further pleading as to Count One[26] concerns breach of fiduciary duty claims which the Court has already determined are sufficiently stated.  *See* Opinion (D.I. 87) at pp. 15-17, 23-24 and n. 65 (holding that Complaint sufficiently states a *prima facie* claim of breach of fiduciary duty under both Delaware and Pennsylvania law against Defendants who were director or officers within the respective state-law limitations period, which includes McEachen, Danielson, and Jalufka for EDMC and the Delaware Holding Companies).[27]  Motions under Rule 12(e) are not a substitute for discovery.  *See Bausch & Lomb Inc. v. SBH Holdings LLC*, 2022 WL 856750, at *2 (D. Del. Mar. 23, 2022).

*Third*, the requested additional "clarifying" information concerning dismissed claims[28] is already contained in the FAC.  *See* FAC at ¶ 12 n. 2; p. 36 n. 3; p. 39 nn. 4-5; p. 40 nn. 6-7; p. 41 n. 8; p. 44 n. 9 (acknowledging that certain identified claims have been dismissed, stating that they are included in the FAC "solely for the purpose of preserving the Trustee's appellate rights," and stating that Defendants need not plead to these claims).  *See also Banks v. Allstate Fire and Casualty Ins. Co.*, 2020 WL 6273891, at *2, *4 (M.D. Pa. Oct. 26, 2020) (holding there was "no longer any live controversy for the court to resolve" where the amended complaint clarified that

---

[25]      *See* D.I. 42, 43 & 67 (McEachen, Jalufka, and Danielson's filings concerning their motion to dismiss the Complaint, which did not seek a more definite statement under Rule 12(e)).
[26]      *See* D.I. 30 at p. 15.
[27]      *See* FAC at ¶¶ 17, 18, 21 (allegations concerning each Defendant's role and tenure with EDMC and the Delaware Holding Companies).
[28]      *See* D.I. 103 at pp. 28, 30.

42

claim was repleaded "for preservation purposes only"). Nor can Defendants reasonably maintain

that the mere existence of incorporation paragraphs in the Claims section in the FAC somehow

prevents them from framing a response or approaches the level of unintelligibility required to grant

a Rule 12(e) motion. *See USDigital*, 443 B.R. at 53.

### CONCLUSION

In light of the foregoing facts and authorities, Defendants' motions to dismiss the First

Amended Complaint should be denied.

Dated: May 16, 2022                Respectfully submitted,


                                   */s/ Colin R. Robinson*
                                   Bradford J. Sandler (DE Bar No. 4142)
                                   Colin R. Robinson (DE Bar No. 5524)
                                   PACHULSKI STANG ZIEHL & JONES LLP
                                   919 North Market Street, 17th Floor
                                   P.O. Box 8705
                                   Wilmington, DE 19899 (Courier 19801)
                                   Telephone: 302-652-4100
                                   Facsimile:  302-652-4400
                                   E-mail:  bsandler@pszjlaw.com
                                            crobinson@pszjlaw.com

                                   Steven M. Coren (*pro hac vice*)
                                   Benjamin M. Mather (*pro hac vice*)
                                   KAUFMAN, COREN & RESS, P.C.
                                   Two Commerce Square, Suite 3900
                                   2001 Market Street
                                   Philadelphia, PA 19103
                                   Telephone: (215) 735-8700
                                   Facsimile: (215) 735-5170
                                   E-mail:  scoren@kcr-law.com
                                            bmather@kcr-law.com

                                   *Counsel for George L. Miller, Chapter 7 Trustee*

43